## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 Case No. |
| AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware Corporation, et al.,[1] | Case No. 09-11214 (___) |
| Debtors. | Joint Administration Pending |

**EMERGENCY MOTION OF THE DEBTORS, FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES AND (III) SCHEDULING A FINAL HEARING**

Aventine Renewable Energy Holdings, Inc., a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, the "Debtors"), respectfully represent:

### SUMMARY OF RELIEF REQUESTED

1.    By this motion (the "Motion"), the Debtors request entry of interim (the "Interim Order") and final orders, pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) (i) authorizing the Debtors to use the "Cash Collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) of the Prepetition

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The Debtors corporate headquarters are 120 North Parkway, P.O. Box 1800, Pekin, Illinois 61555-1800

Lenders, and (ii) granting and authorizing the adequate protection proposed herein for the benefit of the Prepetition Lenders; (b) authorizing the Debtors to enter into a debtor in possession financing facility (the "DIP Facility") with the DIP Lenders and to obtain first priority secured postpetition financing on a priming basis in the aggregate principal amount of $15 million on an interim basis and $30 million in the aggregate on a final basis; (c) scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of a final order approving the Motion ; and (d) granting related relief. The terms of the DIP Facility are substantially set forth in the term sheet (the "Term Sheet")[2] attached hereto as Exhibit A and the proposed form of Interim Order attached hereto as Exhibit B.

## STATUS OF THE CASE AND JURISDICTION

2. On April 7, 2009 (the "Petition Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

3. In support of this Motion, the Debtors rely on the Declaration of William J. Brennan in Support of the Debtors' Chapter 11 Petitions and First Day Relief (the "Brennan Declaration"), which is filed contemporaneous herewith and incorporated herein by reference. Additional information regarding the Debtors' history, its business operations and the events leading to the commencement of these cases can be found in the Brennan Declaration.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Term Sheet.

DB02:8029812.6                                                                    068125.1001

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## The Debtors' Prepetition Credit Facility and Senior Notes

5. All of the Debtors are parties to that certain credit agreement dated as of March 23, 2007 (as amended, the "Credit Agreement"), among JPMorgan Chase Bank, N.A., as administrative agent (the "Prepetition Agent"), Bank of America, N.A., as syndication agent, UBS Securities and Wells Fargo Foothill, LLC, as co-documentation agents and J.P. Morgan Securities Inc., as sole bookrunner and sole lead arranger, and the lenders party thereto (collectively, the "Prepetition Lenders"). The Credit Agreement provided for (i) a revolving loan commitment of up to $200 million, subject to collateral availability (the "Prepetition Revolver"), and (ii) a $25 million sub-limit for letters of credit (the "Prepetition LC Facility"). The Credit Agreement is purportedly secured by substantially all of the Debtors' assets (the "Prepetition Collateral"), including their: (a) equipment, (b) inventory, (c) chattel paper, (d) accounts, (e) other pledged property and securities, (f) investment related property, (g) cash collateral accounts, (h) intellectual property and (i) commercial tort claims.

6. On March 10, 2009, the Debtors and the Prepetition Lenders entered into that certain amendment of the Credit Agreement (the "Amendment"). After giving effect to the Amendment, the Debtors had $0.7 million of cash and $6.6 million of additional borrowing availability under the Credit Agreement as of March 12, 2009. As a result of the Amendment, all of the Debtors' cash receipts were automatically applied to reduce amounts outstanding under the Credit Agreement on a daily basis. As of the close of business on April 7, 2009, approximately $18.35 million in revolving loans was outstanding under the Prepetition Revolver and approximately $21.9 million of letters of credit were outstanding under the Prepetition LC

3

Facility, for a total principal secured exposure in the approximate amount of $40.25 million (the "Prepetition Secured Debt").

7.  In March 2007, Aventine issued $300 million aggregate principal amount of senior unsecured 10% fixed-rate notes due April 2017 (the "Original Senior Notes") pursuant to an indenture between Aventine, as issuer, the other Debtors, as guarantors, and Wells Fargo Bank, N.A., as trustee. On August 10, 2007, Aventine exchanged all of the Original Senior Notes for an issue of registered unsecured senior notes (the "Senior Notes"), with terms identical to the Original Senior Notes. The Senior Notes are guaranteed by and are general unsecured obligations of all of the Debtors. The Senior Notes have interest payments due semi-annually on April 1 and October 1 of each year. The proposed DIP Lenders are holders of approximately 75% of the outstanding amounts of the Senior Notes.

## RELIEF REQUESTED

8.  By this Motion, the Debtors request that the Court (a) authorize (i) the Debtors' non-consensual usage of the Prepetition Lenders' Cash Collateral, and (ii) the Debtors' provision of adequate protection to the Prepetition Lenders for the usage of their Cash Collateral and the incurrence of the DIP Obligations; (b) approve the Debtors' entry into the DIP Facility and to borrow up to $15 million, on an interim basis, and up to $30 million in the aggregate, on a final basis, thereunder; (c) schedule the Final Hearing on the Motion; and (d) grant such other and related relief necessary. The Debtors submit that obtaining the relief requested herein is in the best interest of the Debtors, their estates and creditors and presents the best opportunity for the Debtors to maximize value from their assets and their estates through these cases for the benefit of all stakeholders.

A.    Usage of the Prepetition Lenders' Cash Collateral
      and Priming the Prepetition Lenders' Liens

9.     In connection with their entry into the DIP Facility, the Debtors are requesting that the Court authorize (i) the non-consensual usage of the Prepetition Lenders' Cash Collateral, and (ii) the priming of the Prepetition Lenders' Liens in favor of the DIP Liens. The Debtors have proposed an Adequate Protection Package that the Debtors believe more than adequately protects the interests of the Prepetition Lenders in the Prepetition Collateral during these cases. Additionally, the Debtors believe that the Prepetition Lenders have a significant equity cushion, even after accounting for the priming of the Prepetition Lenders' Liens proposed herein, which will further protect the Prepetition Lenders.

10.    Absent obtaining postpetition financing, the Debtors' going-concern value will be seriously diminished to the detriment of all stakeholders other than the Prepetition Lenders. The Debtors received debtor-in-possession financing proposals from both the Prepetition Lenders and the DIP Lenders. After negotiating, reviewing and analyzing both proposals, the Debtors determined to proceed with the DIP Facility instead of the proposal from the Prepetition Lenders for a variety of reasons, including, among other things, the fees requested under the Prepetition Lenders' proposal, the more limited liquidity under the Prepetition Lenders' proposal, the Prepetition Lenders' requirement that the Debtors' prepetition obligations to them be rolled-up and become post-petition obligations, and the Prepetition Lenders' imposition of a sale timeline that the Debtors believed would not afford sufficient time to fully explore and analyze potential means of maximizing the value of their assets for the benefit of all stakeholders. The financing proposed under the DIP Facility provides the Debtors with both the liquidity infusion and the financing timeline necessary for the Debtors to maximize the value of

their estates while enabling the Debtors to avoid a forced liquidation of their assets at distressed values.

B.  The Prepetition Lenders' Adequate Protection

11.  The Debtors are requesting the (i) non-consensual usage of the Cash Collateral of the Prepetition Lenders, and (ii) priming of the liens on the Debtors' assets granted to the Prepetition Lenders in connection with the Credit Agreement (the "Prepetition Lenders' Liens"). In order to provide the Prepetition Lenders with adequate protection, pursuant to sections 363(e) and 364(d)(1), the Debtors propose the following (the "Adequate Protection Package"):

a.  *Adequate Protection Liens.* Pursuant to Bankruptcy Code sections 361, 363(e) and 364(d), as adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the granting of the Postpetition Liens, (iii) the Debtors' use of Cash Collateral and other Prepetition Collateral, and (iv) the imposition of the automatic stay, the Debtors will grant to the Prepetition Agent on behalf of the Prepetition Lenders, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Collateral (the "Replacement Liens"). The Replacement Liens shall be junior in priority only to: (i) Permitted Priority Liens; (ii) the Carve-Out; (iii) the Postpetition Liens; and (iv) the Prepetition Liens on the Prepetition Collateral. The Replacement Liens shall be senior to all other security interests in, liens on, or claims against any of the Collateral.

b.  *Adequate Protection Claim.* As further adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the granting of the Postpetition Liens, (iii) the Debtors' use of Cash Collateral and other Prepetition Collateral, and (iv) the imposition of the automatic stay, the Prepetition Agent on behalf of the Prepetition Lenders will be granted as and to the extent provided by Bankruptcy Code section 507(b) an allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Case (the "Adequate Protection Priority Claim"). Except as set forth in the Interim Order, the Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or

6

their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; <u>provided, however,</u> that the Adequate Protection Priority Claim shall be junior in priority to the Superpriority Claim of the DIP Lenders and the Carve-Out.

 c. *Payment of Postpetition Interest.* As additional adequate protection for the use of the Prepetition Collateral (including Cash Collateral) by the Debtors, and in accordance with Bankruptcy Code sections 361, 363(e), and 364(d), the Prepetition Agent on behalf of the Prepetition Lenders shall receive, as applicable, from the Debtors (i) the payment of interest on the Prepetition Lender Debt at the non-default contractual rate until such time as the Prepetition Lender Debt is paid in full, and (ii) the same documentation and reports provided by the Debtors to the DIP Agent and DIP Lenders pursuant to the terms of the Term Sheet, and the Interim Order or the Final Order.

As more fully set forth below, the Debtors also believe that the Prepetition Lenders are adequately protected by an equity cushion because the Debtors believe that the value of the Prepetition Collateral far exceeds the aggregate amount of the Prepetition Secured Debt and the total amount of postpetition financing the Debtors are requesting under the DIP Facility.

## C. The DIP Facility

 12. The Debtors are requesting the authorization to enter into the DIP Facility, and to prime the Prepetition Lenders' Liens on a non-consensual basis. The pertinent terms of the DIP Facility are:[3]

 a. <u>Borrowers</u>. (i) Aventine Renewable Energy, Inc., (ii) Aventine Renewable Energy – Mt Vernon, LLC, and (iii) Aventine Renewable Energy – Aurora West LLC on a joint and several basis as debtors in possession under chapter 11 of the United States Bankruptcy Code in jointly administered cases in the United States Bankruptcy Court for the District of Delaware.

---

[3] The description of the DIP Facility set forth herein are fully qualified by the Term Sheet and the Interim Order, and parties in interest are advised to review both of these document in their entirety. Unless otherwise defined herein, all capitalized terms used in this description of the DIP Facility shall have the meanings ascribed to them in the DIP Facility Documents.

b. *Guarantors*. (i) Aventine Renewable Energy Holdings, Inc., (ii) Aventine Renewable Energy, LLC, (iii) Aventine Power, LLC, (iv) each of the Borrowers' domestic subsidiaries, and (v) any other entity who, as of the Petition Date, was a party to the Credit Agreement.

c. *DIP Lenders*. Brigade Leveraged Capital Structures Fund, Ltd., Nomura Corporate Research & Asset Management, Inc., Whitebox Hedged High Yield Partners, L.P., and Pandora Select Partners, L.P.

d. *DIP Agent*. Whitebox Advisors.

e. *Maximum Availability*. A debtor-in-possession term loan facility made available to the Borrowers in a maximum aggregate principal amount of up to $30,000,000. All obligations outstanding under the DIP Facility shall become due and payable on the Termination Date. Prior to the entry by the Bankruptcy Court of an order finally and unconditionally approving the DIP Facility on terms and conditions acceptable to the DIP Lenders holding a majority of the commitments under the DIP Facility in their discretion, the maximum aggregate principal amount of the DIP Facility shall be limited to the amount reflected in the Approved Budget prior to entry of the Final Order; provided, that the Initial Availability shall in no event exceed $20,000,000.

f. *Purpose*. Proceeds of the DIP Facility will be used to, among other things, (i) fund the working capital and general corporate needs of the Debtors and the costs of the Chapter 11 Cases in accordance with the Approved Budget to allow the Debtors and their creditors to negotiate a plan of reorganization that will provide for a deleveraging of the Debtors' balance sheet through a conversion of debt to equity in the reorganized Debtors and (ii) provide adequate protection, in accordance with the terms of this Term Sheet, to the Prepetition Agent for the benefit of itself and the Prepetition Lenders (as such terms are defined below).

For the avoidance of doubt, no portion of the DIP Facility, the collateral securing the DIP Facility, the proceeds of the DIP Facility or the Carve-Out may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, objection or other litigation against the DIP Agent or any of the DIP Lenders.

g. *Closing Date*. No later than one (1) business day following the entry of an interim order by the Bankruptcy Court approving the DIP Facility on terms and conditions acceptable to the Required DIP Lenders in their sole discretion, which, among other things, (i) authorizes and approves the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and liens, and the payment of all fees referred to in the Term Sheet, and (ii)

8

modifies the automatic stay to permit the Debtors to perform their obligations under the DIP Facility Documents and the DIP Agent and the Required DIP Lenders to exercise their rights and remedies with respect to the DIP Facility.

h.    *Term*.  The period from the Closing Date to the earliest to occur of (i) one year after the commencement of the chapter 11 cases, (ii) the consummation of a sale of substantially all of the assets of the Debtors approved by the Required DIP Lenders, (iii) the effective date of a plan of reorganization in respect of a Debtor in the Chapter 11 Cases, (iv) the date the loans become due and payable, whether at stated maturity, upon an event of default or otherwise, (v) the expiration of the Approved Budget, (vi) the acceptance by a Debtor of any offer or bid for the purchase of all or substantially all of the assets of a Debtor or all of the equity of a reorganized Debtor which is unacceptable to the Required DIP Lenders unless the proceeds of such offer or bid are deemed sufficient, in the discretion of the DIP Lenders, to pay in full in cash all of the obligations due under the DIP Facility, or (vii) the date on which any Debtor files a motion with the Bankruptcy Court for authority to proceed with the sale or liquidation of a Debtor (or any material portion of the assets of a Debtor) unless the proceeds of such sale or liquidation are deemed sufficient, in the discretion of the DIP Lenders, to pay in full in cash all of the obligations due under the DIP Facility.

i.    *Availability*.  During the Term and subject to the conditions described in the Term Sheet, the Borrowers shall be able to (i) draw up to the amount of the Initial Availability on the Closing Date and (ii) draw the remainder of the DIP Facility upon entry of the Final Order.

j.    *Priority*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the Debtors under the DIP Facility at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out.

k.    *Security*.  Pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code, all amounts owing by the Debtors under the DIP Facility will be secured by a first priority priming security interest in, and lien on, all of the assets (tangible, intangible, real, personal or mixed) of the Debtors, whether now owned or hereafter acquired, including, without limitation, accounts, documents, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, including avoidance actions (subject to entry of the Final Order), and other general intangibles, and all products and

9

proceeds thereof, subject only to (i) the Carve-Out and (ii) valid, perfected, enforceable and non-avoidable liens as of the commencement of the Chapter 11 Cases which were senior in priority to liens securing obligations owing as of the Petition Date under that certain credit agreement dated as of March 27, 2007 by and among Aventine Renewable Energy, Inc., Aventine Renewable Energy – Mt Vernon, LLC, and Aventine Renewable Energy – Aurora West LLC, as Borrowers, certain other loan parties thereto, and JPMorgan Chase Bank, N.A., as administrative agent for certain lenders under the Credit Agreement. All collections and other proceeds from the Postpetition Collateral shall be directed to a lock-box or blocked account that would be assigned to the DIP Agent and in form and substance acceptable to the DIP Agent and the Required DIP Lenders in their sole discretion.

*l.*    *Carve Out.* The liens and the superpriority claims securing the DIP Facility shall be subject to a "Carve-Out", which shall mean collectively: (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and all fees required to be paid to the Clerk of the Bankruptcy Court, which are incurred after the first business day after effective delivery of a Carve-Out Trigger Notice; (ii) allowed fees, expenses and costs of attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors or any official committee of unsecured creditors pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 and owed pursuant to such Professionals' respective engagement letters (other than any success fee, transaction fee, or other similar fee set forth in such professionals' respective engagement letter) to the extent permitted under the Approved Budget for such respective Professionals in each case, which are actually incurred prior to the business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether or not allowed prior to or after such date; and (iii) allowed fees and expenses of Professionals incurred after the first business day after effective delivery of a Carve-Out Trigger Notice not to exceed $2,000,000 in the aggregate, in each case subject to the rights of the DIP Agent and/or DIP Lenders to object to the allowance of any such fees and expenses.

The "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Borrowers and their counsel which notice may be delivered at any time following the occurrence and during the continuation of an Event of Default.

For the avoidance of doubt, the proceeds of the DIP Facility may be used, subject to the Approved Budget, (i) for payment of fees and expenses of Professionals allowed and payable under Sections 330 and 331 of the Bankruptcy Code (and the same shall not reduce the Carve-Out except to the extent paid after delivery of a Carve-Out Trigger Notice) and (ii) for payments contemplated to be made pursuant to "first day" orders (or any other order) approved by the Required DIP Lenders.

DB02:8029812.6

068125.1001

m.  *Interest Rate; Default Rate*.  The DIP Facility shall accrue interest at a rate equal to 16.5% per annum, calculated on an actual/360 basis and payable monthly in arrears in cash on the last day of each month.  During the continuance of an Event of Default, the DIP Facility will accrue interest at an additional 5.0% per annum, calculated on an actual/360 basis, payable on demand.

n.  *Origination Fee*.  An origination fee equal to 3.0% of the maximum aggregate principal amount of the DIP Facility shall be fully earned and due and payable for the ratable account of each DIP Lender at the Closing Date.

o.  *DIP Agent Fees*:  $100,000.

p.  *Mandatory Repayments*.  100% of the net proceeds from any and all asset sales (other than sales of inventory in the ordinary course of the Debtors' business), insurance and condemnation proceeds (unless the Debtors promptly inform the DIP Agent that such proceeds are to be used by the Debtors to repair or replace damaged property and are in fact so used within sixty (60) calendar days of the Debtors' receipt of such proceeds), and other extraordinary receipts (other than tax refunds the receipt of which is anticipated in the Approved Budget).

q.  *Conditions Precedent to Initial Funding; Second Draw Down*.  Customary for debtor in possession financing facilities.

r.  *Representation and Warranties*.  Each of the Debtors shall be deemed to make each of the representations and warranties set forth in Article III of the Credit Agreement and in the Security Agreement (as defined in the Credit Agreement), *mutatis mutandis*, and are incorporated into the Term Sheet by reference as fully as if such representations and warranties were set forth in the Term Sheet in their entirety, except for (a) any such representation and warranty expressly stated to be "as of the Effective Date" (as "Effective Date" is defined in the Credit Agreement), and (b) the representations and warranties set forth in Section 3.04, the second sentence of Section 3.11, and Sections 3.13, 3.16 and 3.20 of the Credit Agreement.  Each such representation and warranty so deemed to be made by each of the Debtors shall also be deemed, as the context may require, to be made subject to an exception for the filing of the Chapter 11 Cases.

s.  *Affirmative and Negative Covenants*.  The Term Sheet contains certain affirmative and negative covenants customary for debtor in possession financing facilities.  Additionally, the Term Sheet contains the following covenant:  The Debtors shall be required to not file, support or endorse any plan of reorganization or propose any sale of assets outside the ordinary course of business that has not been approved by the DIP Lenders (unless such plan or sale is determined by the DIP Lenders, in their

11

discretion, to result in the payment in full in cash of all obligations due under the DIP Facility).

t.    *Approved Budget*. The Borrowers and the Required DIP Lenders shall agree upon a budget[4] which shall be a 13-week budget which reflects on a line-item basis the Borrowers' anticipated cumulative cash receipts and disbursements on a weekly basis and all necessary and required cumulative expenses (subject to a permitted variance for such cumulative cash receipts, disbursements and expenses, each not to exceed 15% on a weekly basis and on a cumulative basis from the commencement of such Approved Budget to the date of determination) which the Borrowers expect to incur during each week of the Approved Budget and which shall be in a form and substance acceptable to the Required DIP Lenders. Not later than one month prior to the expiration of the Original Budget Period, the Borrowers shall provide to the DIP Agent and the Required DIP Lenders an updated budget for an additional 13-week period in substantially the same format as the previous budget, which upon acceptance by the Required DIP Lenders, shall become the Approved Budget; provided, however, that a new budget may be effectuated at any time with the consent of the Required DIP Lenders. In the event the Borrowers and the Required DIP Lenders fail to agree upon a new budget by the end of the then-current Approved Budget, the DIP Facility will terminate upon the expiration of the last Approved Budget. The Borrowers shall provide the DIP Agent and the DIP Lenders with a weekly variance report reflecting the actual cash receipts and disbursements for each weekly period during the term of the DIP Facility within three (3) business days after the end of such weekly period, and showing the percentage variance of actual receipts and disbursements from those reflected in the Approved Budget for such period.

u.    *Event of Default*. The following shall be events of default under the DIP Facility:

    a.    The Borrowers shall fail to pay any principal of any of the loans extended under the DIP Facility when the same becomes due and payable; or

    b.    The Borrowers shall fail to pay any interest on the Postpetition Loans or any fee or other amount due with respect to the Postpetition Obligations after such interest, fee, or other amount becomes due and payable; or

    c.    Any representation or warranty made by the Borrowers or the Guarantors in the Term Sheet, the Interim DIP Order or the Final

---

[4] The Approved Budget is attached to the Interim Order.

Order, or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Term Sheet or any such other DIP Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

d.  Any Debtor shall breach or violate any term, covenant or agreement contained in the Term Sheet, the Interim Order or the Final Order; or

e.  An Event of Default shall occur under and as defined in the Term Sheet, the Interim Order or the Final Order; or

f.  Conversion of any Borrower's or Guarantor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

g.  The appointment of a trustee in any Borrower's or Guarantor's Chapter 11 Case without the consent of the Required DIP Lenders; or

h.  The appointment of an examiner in any Borrower's or Guarantor's Chapter 11 Case with expanded powers without the consent of the Administrative Agent and the Required Lenders; or

i.  The dismissal of any Borrower's or Guarantor's Chapter 11 Case; or

j.  The entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending the Interim Order or the Final Order without the express prior written consent of the Required DIP Lenders; or

k.  The Interim Order shall not have been replaced by a Final Order acceptable to the Required DIP Lenders in their discretion within thirty (30) days of the Petition Date; or

l.  A change in executive management (which shall be deemed to consist of the Chief Executive Officer, the Chief Financial Officer and the Chief Operations Officer of the Debtors) shall occur, unless (i) a person acceptable to the Required DIP Lenders is appointed to fill the vacancy caused by such change or (ii) a process for replacing such person is agreed upon by the Required DIP Lenders, in each case within ten (10) business days following such change; or

m. A plan of reorganization is filed that is not acceptable (unless such plan is determined by the DIP Lenders, in their discretion, to result

in the payment in full in cash of all obligations due under the DIP Facility); or

n. The Borrowers or Guarantors shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the Required DIP Lenders; or

o. The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the DIP Lenders) in any Postpetition Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Postpetition Collateral; or

p. Any provision of the documents relating to the Postpetition Loans shall cease to be valid and binding on the Borrowers and Guarantors, or any Borrower or Guarantor shall so assert in any pleading filed in any court; or

q. Any Debtor shall bring or consent to any motion or application in the Chapter 11 Cases: (i) to obtain working capital financing from any person other than the DIP Lenders under section 364(d) of the Bankruptcy Code (other than with respect to a financing used, in whole or part, to repay in full in cash all obligations due under the DIP Facility); or (ii) to obtain financing from any person other than the DIP Lenders under section 364(c) of the Bankruptcy Code (other than with respect to a financing used, in whole or part, to repay in full in cash all obligations due under the DIP Facility); or (iii) to grant any lien that is pari passu or senior to any lien granted to the DIP Agent under the Interim Order or Final Order, except as permitted therein; or (iv) to recover from any portions of the Postpetition Collateral any costs or expenses of preserving or disposing of such Postpetition Collateral under section 506(c) of the Bankruptcy Code; or (v) to grant a superpriority claim, other than that granted in the Interim Order or Final Order (and other than with respect to the Carve-Out), which is pari passu with or senior to any of the claims of the DIP Agent and the DIP Lenders against the Borrower or any other Guarantor hereunder, the Interim Order or the DIP Order (or there shall arise or be granted any superpriority claim pari passu or senior to any such claims); or

r. Any other party shall seek and obtain allowance of any order in the Chapter 11 Cases to recover from any portions of the Postpetition Collateral any costs or expenses of preserving or disposing of such Postpetition Collateral under section 506(c) of the Bankruptcy Code; or

DB02:8029812.6

068125.1001

s.  An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases (or any Debtor shall propose a plan of reorganization or liquidation in any of the Chapter 11 Cases) that does not contain a provision for payment of all of the obligations due under the DIP Facility by an indefeasible payment in full in cash of such obligations on or before the effective date of such plan; or

t.  An order shall be entered by the Bankruptcy Court, or any Debtor shall make a motion for an order of the Bankruptcy Court, dismissing any of the Chapter 11 Cases that does not contain a provision for payment of all of the obligations due under the DIP Facility by an indefeasible payment in full in cash of such obligations; or

u.  There shall occur an Excess Budget Variance unless waived by the Required DIP Lenders; or

v.  (i) Any Debtor shall enter into, or the Bankruptcy Court shall approve, any debtor-in-possession credit facility in the Chapter 11 Cases (except as expressly permitted in the Term Sheet) without the consent of the Required DIP Lenders, that in any way is inconsistent with any of the provisions of this Term Sheet, the Interim DIP Order or the Final Order or otherwise adversely affects the rights, remedies, claims, liens or bankruptcy priorities of the DIP Lenders as established by Term Sheet, the Interim DIP Order or the Final Order, or (ii) any Debtor shall seek approval of, or the Bankruptcy Court shall approve, any order permitting the use of cash collateral of any Debtor in the Chapter 11 Cases (except as expressly permitted in the Term Sheet), without the consent of the Required DIP Lenders, that in any way is inconsistent with any of the provisions of this Term Sheet, the Interim DIP Order or the Final DIP Order or otherwise adversely affects the rights, remedies, claims, liens or bankruptcy priorities of the DIP Lenders as established by this Term Sheet, the Interim DIP Order or the Final DIP Order; or

w.  The Borrower shall fail to provide an Approved Budget that is acceptable to the Required DIP Lenders in accordance with the terms set forth in the Term Sheet, the Interim Order or the Final Order; or

x.  The Borrowers shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness, unless approved by the Required Lenders or as authorized by the Bankruptcy Court after notice and a hearing; or

y. The Borrowers shall for any reason fail to remit to the DIP Agent and the DIP Lenders all net proceeds from the sale, disposition, collection or other realization upon the Debtors' assets for application in accordance with the terms set forth in the Term Sheet.

v. *Indemnification.* The Debtors shall indemnify and hold harmless the DIP Agent, each DIP Lender and each of their affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Facility Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated by the Term Sheet are consummated. The Debtors further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any of their security holders or creditors for or in connection with the transactions contemplated by the Term Sheet, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

w. *DIP Lenders Expenses.* The Debtors shall jointly and severally pay all out of pocket costs and expenses of the DIP Agent and DIP Lenders (including all fees, expenses and disbursements of outside counsel and consultants) incurred in any of their respective capacities in connection with the Chapter 11 Cases, including, but not limited to, the preparation, execution and delivery of the DIP Facility Documents and the funding of the DIP Facility, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Facility Documents (whether or not executed) and in connection with the enforcement or

16

protection of any of their rights and remedies under the DIP Facility
Documents.

x. *Amendments and Waivers.* Amendments and waivers shall be in writing
and shall require the consent of the Required DIP Lenders, except that (a)
amendments and waivers that affect the rights, obligations or duties of the
DIP Agent shall also require the consent of the DIP Agent, and (b) without
the consent of each DIP Lender, no such amendment or waiver shall (i)
increase the lending commitment of any DIP Lender, (ii) reduce the
amount of any payment of principal, interest or fees required hereunder
(other than any mandatory prepayment), (iii) postpone the date of any
scheduled payment hereunder, (iv) release all or substantially all of the
Postpetition Collateral or release any Debtor from any of its obligations in
respect of the DIP Facility or (v) amend this provision or the definition of
"Required DIP Lenders"..

13. In accordance with Local Rule 4001-2(a)(i), the Debtors highlight for the

Court the following provisions included in the DIP Facility:

a. Local Rule 4001-2(a)(i)(B) requires disclosure of, among other things, the
waiver of claims against a secured creditor without first providing parties-
in-interest 75 days, and the creditors committee 60 days from its
formation, to investigate the claims being waived. The Interim Order
waives claims related to (i) any so-called "lender liability" or equitable
subordination claims or defenses, solely with respect to or relating to the
negotiation and entry into the DIP Facility Documents, and (ii) any and all
defenses (including, without limitation, offsets and counterclaims of any
nature or kind) as to the validity, perfection, priority, enforceability and
nonavoidability of the Postpetition Liens and Superpriority Claims, which
may be held or asserted against the DIP Agent, the DIP Lenders and
affiliated parties. (Interim Order, at ¶ 12.) The Debtors believe that this
provision of the Local Rules is intended to address prepetition claims
against existing lenders for events occuring prior to the commencement of
a debtor's bankruptcy case and is not applicable to waivers granted with
respect to entering into a new money debtor-in-possession facility.
Accordingly, the Debtors submit that Local Rule 4001-2(a)(i)(B) is not
applicable to the waiver but the Debtors are nonetheless highlighting it for
purposes of full disclosure.

b. Local Rule 4001-2(a)(i)(C) requires disclosure of any provision which
seeks to waive, without notice, whatever rights the estate may have under
section 506(c) of the Bankruptcy Code. While the Debtors do not believe
any disclosure is necessary under this provision of the Local Rules, the
DIP Facility does include an event of default if (i) the Debtors bring or
consent to, or (ii) any party in interest seeks and obtains an order to
surcharge the Collateral pursuant to section 506(c). Additionally, the

17

Interim Order provides that, effective upon entry of the Interim Order, no party may seek to charge the Carve-Out of the Collateral, including charges under section 506(c). (Interim Order, at ¶ 11(e).) The Debtors believe that the Local Rule seeks to address waivers of 506(c) rights as to prepetition secured claims and does not apply to the contest of postpetition borrowings from a new money lender.

 c. Local Rule 4001-2(A)(I)(D) requires the disclosure of provisions that immediately grant to prepetition secured creditors liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code (collectively "Avoidance Actions"). While the DIP Facility does not grant any liens on Avoidance Actions to the Prepetition Lenders, the Debtors highlight for the Court that the DIP Lenders will have a lien on Avoidance Actions upon entry of the Final Order. (Interim Order, at ¶ 5(a).) Additionally, the Superpriority Claim granted to the DIP Lenders can be satisfied from the proceeds of Avoidance Actions, subject to entry of the Final Order. (Interim Order, at ¶ 4.)

 d. Local Rule 4001-2(a)(i)(G) requires disclosure of any provision which seeks to prime any secured lien without the consent of that lienor. The DIP Facility provides for the priming of the Prepetition Lenders' Liens and the Debtors do not believe that the Prepetition Lenders consent to such priming. (Interim Order, at ¶ 5.) Nonetheless, the priming of the Prepetition Lenders' Liens was a necessary condition to entering into the DIP Facility, and the Debtors believe that the DIP Facility presents the Debtors' best available financing proposal. Moreover, as demonstrated below, the Prepetition Lenders are more than adequately protected for the priming of their liens. Accordingly, the Debtors believe that the proposed priming provisions are appropriate.

## APPLICABLE AUTHORITY

### A. Use of Cash Collateral

14. Section 363 of the Bankruptcy Code governs a debtor's use of property of its estate.[5] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the

---

[5] Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

> ordinary course of business, without notice or a hearing,
> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

15.     Section 363(c)(2) of the Bankruptcy Code, however, provides an

exception with respect to "cash collateral" to the general grant of authority to use property of the

estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a

trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection

(c)(1) unless:

> (A)     each entity that has an interest in such collateral
>         consents; or
>
> (B)     the court, after notice and a hearing, authorizes such
>         use, sale, or lease in accordance with the provisions
>         of this section.

11 U.S.C. § 363(c)(2).

16.     The Debtors submit that, under the circumstances here, their request to use

Cash Collateral should be approved.  Absent access to the usage of Cash Collateral, the Debtors

access to liquidity would be severely limited, and the Debtors' efforts to preserve and maximize

the value of their estates during these cases would be significantly impaired.  While the DIP

Lenders have expressly consented to the use of any Cash Collateral they advance (satisfying the

requirements of section 363(c)(2)(A) of the Bankruptcy Code), the Prepetition Lenders have not

consented to the use of their Cash Collateral on the terms proposed herein.  However, the

Debtors are nonetheless compelled to request approval for the usage of the Prepetition Lenders'

Cash Collateral in order to have access to sufficient funds to operate their business.  As

demonstrated herein, the Prepetition Lenders' interest in the Cash Collateral is adequately

19

protected by a significant equity cushion and the proposed Adequate Protection Package, and the Court should authorize the usage of the Prepetition Lenders' Cash Collateral.

### *The Need to Use Cash Collateral*

17.     The Debtors have proposed to use the Cash Collateral of the Prepetition Lenders, as well as the borrowings under the DIP Facility, pursuant to the Approved Budget (subject to permitted variances), in order to fund these cases.  As of the Petition Date, the Debtors had no unencumbered cash with which to operate their business, and all of the Debtors' receipts (which constitute the Prepetition Lenders' Cash Collateral), other than those received shortly prior to the filing of theses cases, were applied to reduce the Prepetition Secured Debt in accordance with the Amendment.  To ensure a smooth entry into chapter 11, the Debtors need the use of Cash Collateral to maintain their assets, provide financial information, pay necessary employees, payroll taxes, inventory suppliers and other vendors, overhead, and other expenses necessary to maximize the value of the Debtors' estates.  However, in order to permit the Debtors sufficient time to explore options to deleverage their balance sheet and to maximize the value of the Debtors' assets, as well as to account for periodic shortfalls in receipts and unexpected costs, the Debtors anticipate the need to supplement their use of Cash Collateral with the funding being provided by the DIP Facility.  As the Debtors cannot operate their business and pursue their chapter 11 strategy using the funds provided under the DIP Facility alone, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion and the Financing Orders.  Accordingly, in order to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

18.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). To use cash collateral without the lienholder's consent and to use other property in which a creditor claims an interest, the debtor is required to provide the lienholder with adequate protection of its interest in the cash collateral and other property in which an interest is claimed. Further, Bankruptcy Code section 363(e) provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will cause a decrease in the value of such entity's interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property. 11 U.S.C. § 361.

19.     Additionally, courts have found a secured creditor adequately protected where either a sufficient equity cushion in the collateral exists to protect the secured creditor, or the level of the secured creditor's collateral is not decreasing over time. *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.H. 1993) (secured creditor was adequately protected and debtor was authorized to use cash collateral where level of collateral was not declining); *In re May*, 169 B.R.

462 (Bankr. S.D. Ga. 1994) (equity cushion in property may provide creditor with adequate

protection of its interest, sufficient to permit the debtor to use cash collateral); *In re Southwest

Associates*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992) (same). Even in those instances where its

equity cushion is fluctuating, a secured creditor is adequately protected so long as an adequate

cushion remains over and above its secured claim. *Dynaco Corp.*, 162 B.R. at 394 (Bankr. D.

N.H. 1993).

20.     Nevertheless, adequate protection must be determined on a case-by-case

basis, in light of the particular facts and circumstances presented, the focus being that which is

required to protect a secured creditor from diminution in the value of its interest in the particular

collateral during the use period. *In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass.

1990); *Delbridge v. Production Credit Assoc. and Federal Land Bank*, 104 B.R. 824, 827 (E.D.

Mich. 1989); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.*,

58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

21.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors

are prepared to adequately protect the Prepetition Lenders to the extent: (i) they are secured; and

(ii) there is any diminution in the value of the prepetition collateral resulting from the Debtors'

use of the Cash Collateral. The Debtors submit that the significant equity cushion that the

Prepetition Lenders currently enjoy, as well as the Adequate Protection Package,[6] satisfy the

requirements that the Debtors provide the Prepetition Lenders with adequate protection for the

use of their Cash Collateral.

22.     Among the assets constituting the Prepetition Collateral, is the Debtors'

working capital (the "Working Capital") in the amount of approximately $47.6 million, based on

---

[6] As set forth in paragraphs 29-31 below, the Debtors believe that the size of the equity cushion alone provides sufficient adequate protection to prime the Prepetition Lenders' Liens under section 364(d) of the Bankruptcy Code.

the Debtor's most recent calculations, consisting of accounts receivables (the "A/R") in the amount of $20.8 million and inventory (the "Inventory") valued at $26.8 million. Based on the Debtors' most recent daily borrowing base reviewed by the Prepetition Lenders, the value of the A/R was $15.1 million and the Inventory was $18.4 million, after taking into account various deductions to Working Capital ("Net Working Capital"), as well as applying an advance rate of 85% and 70% on the Net Working Capital amounts of the A/R and Inventory, respectively after the deductions. In addition to the Working Capital, the Prepetition Secured Debt is secured by the Debtors' property, plant and equipment ("PP&E"), which the Debtors believe has a value substantially in excess of the amount of the Prepetition Secured Debt. Based on amounts paid in recent ethanol plant sales in the chapter 11 context, the Debtors believe that the going concern value of their operations would be at least $0.50 per gallon of production capacity, which price may not fully take into account, among other things, the geographic benefits the Debtors enjoy from the strategic location of their plants in the heart of the Mid-West (Illinois and Nebraska) and is well below the high end of consideration received (on a price per gallon basis) recently for operating ethanol facilities in the chapter 11 context. At the Debtors' current operating capacity (207 million gallons per year), the PP&E has a value of at least $104 million based on the Debtors' calculation. Even assuming the low-end valuation for recent ethanol plant sales in the chapter 11 context, or a price of $0.45 per gallon of production capacity,[7] the Debtors' PP&E would have a value of at least $93 million which does not assign any value to the Debtors' two nearly completed ethanol production facilities which would add an additional 220 million gallons of production capacity.

---

[7] The significant difference in value may be attributed to whether a plant was fully operational at the time of sale or maintained in a "hot-idle" state, where the equipment is left operational but no product is manufactured.

DB02:8029812.6

068125.1001

23. Given the value of the Working Capital and the PP&E, the Debtors assert that the Prepetition Lenders are substantially oversecured. Even assuming the net value of Working Capital as calculated under the Prepetition Credit Agreement ($34 million) and that the value of the PP&E falls at the low-end of the recent valuation spectrum for ethanol plants ($93 million), which the Debtors believe represents a significant undervaluation of their assets in light of the fact that the Debtors continue to produce and supply their products, enjoy a net corn cost advantage on account of the wet mill technology employed at a portion of the Debtors' Illinois facility and have geographic advantages in their plant locations, the Prepetition Lenders have a substantial equity cushion because the total value of the Prepetition Collateral ($128 million) exceeds the amount of the Prepetition Secured Debt and the proposed DIP Facility by $57.2 million, an amount more than 140% of the Prepetition Secured Debt. Accordingly, the Debtors submit that the Prepetition Lenders are more than adequately protected.

24. To the extent that further protection against diminution in the value of the Collateral resulting from the Debtors' use of Cash Collateral is required, the Debtors have proposed the Adequate Protection Package, consisting of: (a) replacement liens, junior in right only to the (i) Permitted Priority Liens; (ii) the Carve-Out; (iii) the Postpetition Liens; and (iv) the Prepetition Liens on the Prepetition Collateral; (b) a superpriority administrative expense claim pursuant to section 507(b) for any diminution in the value of the Prepetition Collateral, junior in priority to the Superpriority Claim and the Carve-Out; and (iii) the payment of interest on the Prepetition Secured Debt at the non-default contractual rate until such time as the Prepetition Secured Debt is paid in full and the provision of the same documentation and reports provided to the DIP Agent and DIP Lenders under the Term Sheet, the Interim Order and Final Order. The Debtors believe that the foregoing Adequate Protection Package provides the

24

Prepetition Lenders with sufficient adequate protection of their interest in the Prepetition Collateral and also compensates the Prepetition Lenders for the Debtors' continued usage of the Prepetition Collateral during these cases.

25.     Accordingly, the Debtors respectfully submit that the use of Cash Collateral on the terms set forth herein and in the attached proposed Term Sheet and Interim Order provide the Prepetition Lenders with adequate protection and is in the best interest of the Debtors, their estates, their creditors and all parties in interest and therefore should be authorized by this Court.

B.      The DIP Facility Should Be Approved

26.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  Indeed, section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

27.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

<blockquote>
(a)    the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.
</blockquote>

*In re Ames Dep't Stores*, 115 B.R. at 37-39.

28.      Prepetition, the Debtors endeavored to identify potential sources of postpetition financing. Based on discussions with potential lenders, the Debtors have determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Lenders is not available. Without postpetition financing, the Debtors would be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all stakeholders. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve and maximize the value of their assets for the benefit of all creditors. Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

C.      Approval of Priming Liens and Adequate Protection under Section 364(d)

29.      If a debtor is unable to obtain adequate credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

26

(a) the trustee is unable to obtain such credit otherwise; and

(b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

30. The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). The Debtors have concluded that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the DIP Lenders under the DIP Facility is currently unobtainable. Indeed, the Debtors and their advisors spent substantial effort attempting to negotiate a debtor in possession financing facility with the Prepetition Lenders, but ultimately the terms required by the Prepetition Lenders were determined by the Debtors to be too onerous given the availability of the DIP Facility proposed herein.

31. Following the receipt of the proposal from the DIP Lenders, and in light of the undesirable terms offered by the Prepetition Lenders, the Debtors proceeded to expeditiously negotiate with the DIP Lenders. The Debtors ultimately concluded that the DIP Facility represented the best available financing for the Debtors under the circumstance. The Debtors believe that financing on the same or comparable terms (both monetary and non-monetary) is otherwise unavailable. As set forth above, the Prepetition Lenders enjoy a significant equity cushion with respect to the Prepetition Secured Debt. In fact, the Debtors believe that the value of the Prepetition Collateral substantially exceeds the amount of the Prepetition Secured Debt

27

and the proposed DIP Facility. The Debtors believe that the substantial equity cushion enjoyed by the Prepetition Lenders by itself provides adequate protection to the Prepetition Lenders. Nonetheless, the Debtors have proposed the Adequate Protection Package to protect the Prepetition Lenders interest in the Prepetition Collateral, to the extent that there is any diminution in the Prepetition Lenders' interest therein. Because the Debtors have demonstrated that (i) the same or superior financing is otherwise unavailable, and (ii) the Prepetition Lenders will be adequately protected, Section 364(d) has been met and the Court should authorize the priming of the Prepetition Lenders' Liens by the DIP Liens in connection with the DIP Facility.

D.    No Adequate Alternative to the DIP Facility is Currently Available

32.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

33.    Substantially all of the Debtors' assets are subject to the Prepetition Lenders' Liens. Because of the amount of the Prepetition Lenders' secured claims, obtaining the financing needed by the Debtors as unsecured debt or debt which would be secured by liens junior to the liens of the Prepetition Lenders was not a realistic option, especially given the current state of the capital markets.

34.    In the weeks prior to the commencement of these cases, the Debtors' financial advisors pursued efforts to find replacement financing that would also provide additional debtor-in-possession funding and in that regard contacted a number of potential lenders with the capability of providing a debtor-in-possession facility. As a result of those efforts, the Debtors and their advisors received two proposals from lender groups considering providing postpetition financing to the Debtors—the Prepetition Lenders and the DIP Lenders.

While the Debtors engaged in substantial negotiations with the Prepetition Lenders up until just prior to commencing these cases, the Prepetition Lenders' proposed terms were ultimately determined to be too burdensome and restrictive for the Debtors given the terms of the DIP Facility negotiated by the Debtors and the DIP Lenders just prior to commencing these cases. The terms of the DIP Facility, taken as a whole, provided the Debtors with greater liquidity and significant non-monetary accommodations which, in the Debtors' belief, will preserve and maximize the value of their estates. As a result and under the circumstances, the Debtors determined that the instant DIP Facility was the best proposal received by the Debtors. Based on the foregoing, the Debtors determined that the proposed debtor-in-possession financing with the DIP Lenders is the best financing option available to the Debtors under the circumstances.

35.     Accordingly, the Debtors have satisfied the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

E.     The DIP Facility Terms are Fair, Reasonable, and Appropriate

36.     The proposed terms of the DIP Facility and the other DIP Facility Documents are fair, reasonable, and adequate under the circumstances. First and foremost, as discussed more fully above, the Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms currently available given the circumstances. Although the Debtors contacted various alternate lending institutions, no other lender was willing to provide an adequate stand alone financing facility junior to the Prepetition Lenders' Liens, and the Prepetition Lenders would not consent to the priming of their liens. Moreover, no lender was willing to provide financing sufficient to repay the Prepetition Secured Debt in full and provide additional liquidity sufficient for the Debtors to operate their business to preserve and maximize the value of their assets. While the Debtors did receive a financing proposal from the Prepetition

Lenders and engaged in substantial negotiation with respect thereto, the terms thereof were undesirable when compared to the DIP Facility.

37.    Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lenders, evaluated their ability to, and the risks associated with, priming the Prepetition Lenders' Liens, engaged in negotiations with the DIP Lenders regarding the Term Sheet, worked with their various advisors to obtain the best possible pricing from the DIP Lenders, and, just prior to commencing these cases, determined that the DIP Lenders' proposal was best suited to the Debtors' needs given the circumstances. Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 while preserving and maximizing the value of the Debtors' estates.

38.    The proposed DIP Facility provides that the security interests and administrative expense claims granted to the DIP Lenders and the Prepetition Lenders are subject to the Carve-Out. In *In re Ames Dep't Stores*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

39.    Likewise, the various fees and charges required by the DIP Lenders under the DIP Facility are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

DB02:8029812.6                                           068125.1001

40. Accordingly, given the circumstances, the terms of the DIP Facility are fair, reasonable and adequate, and the DIP Lenders under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

F.    Interim Approval Should Be Granted

41. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

42. The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Financing Order until the Final Hearing to borrow under the DIP Facility in an amount not less than $15 million. This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

43. The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Financing Order, which fixes the time and date for the filing of objections, by first-class mail upon (i) the United States Trustee for the District of Delaware; (ii) counsel to the DIP Agent; (iii) counsel to the Prepetition Agent; (iv) any known lienholders of the Debtors; (v) the United States Internal Revenue Service; (vi) the parties included on the Debtors' list of thirty (30) creditors holding the largest unsecured claims;

31

(vii) the Indenture Trustee to the Senior Notes; (viii) counsel to the Committee, once appointed; and (ix) any party who filed a request for notices in these chapter 11 cases prior to the date set forth in the Interim Order for service of notice of the Final Hearing or would otherwise be entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[8]

### NOTICE

44.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition Agent; (iv) counsel to the DIP Agent; (v) the Indenture Trustee for the Senior Notes; and (v) such other parties entitled to notice pursuant to Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

---

[8] Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion.  If an official unsecured creditors' committee has not been appointed, service shall be made on the 20 largest unsecured creditors in the case in lieu of the committee."

DB02:8029812.6                                                                          068125.1001

WHEREFORE, the Debtors respectfully request immediate entry of the Interim Order, in the form annexed hereto, granting the Debtors the relief requested herein; following additional notice and a hearing, the entry of a Final Order granting the relief requested herein; and granting such other and further relief as is just.

Dated: April 8 , 2009
      Wilmington, Delaware

           YOUNG CONAWAY STARGATT & TAYLOR, LLP

           James L. Patton, Jr.  (No. 2202)
           Joel A. Waite (No. 2925 )
           Matthew B. Lunn (No. 4119)
           The Brandywine Building
           1000 West Street, 17th Floor
           Wilmington, Delaware 19801
           Telephone: (302) 571-6600
           Facsimile: (302) 571-1253

           Proposed Attorneys for the Debtors
           and  Debtors in Possession