## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**, a Delaware Corporation, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 09-11214 (KG)<br><br>(Jointly Administered)<br><br>**Relates to: Dkt. No. 15**<br>**Hearing Date and Time: 4/14/09 at 2:00 p.m.** |

**JPMORGAN CHASE BANK, N.A.'S PRELIMINARY OBJECTION TO EMERGENCY MOTION OF THE DEBTORS, FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES AND (III) SCHEDULING A FINAL HEARING**

**TO THE HONORABLE KEVIN GROSS,**
**UNITED STATES BANKRUPTCY JUDGE:**

**JPMORGAN CHASE BANK, N.A.**, as administrative agent (in such capacity, the "Agent") for Bank of America, N.A., BMO Capital Markets Financing, Inc., JPMorgan Chase Bank, N.A., Siemens Financial Services, Inc., UBS Loan Finance LLC, Wachovia Bank, National Association, and Wells Fargo Foothill, LLC (collectively, the "Senior Secured Lenders"), files this preliminary objection (this "Objection") to the *Emergency Motion of the Debtors, for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing and (B) to Utilize*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway, P.O. Box 1800, Pekin, Illinois 61555-1800.

*Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Secured Parties and (III) Scheduling a Final Hearing* (the "Motion") [Dkt. No.15] filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). In support of its Objection, the Agent respectfully states as follows:

## SUMMARY OF KEY OBJECTIONS

1.    As further set forth below, the following is a summary of the key objections of the Agent to the relief requested in the Motion:

- Debtors' Proposed Facility (as defined below) imposes severe and unreasonable risk on the interests of the Senior Secured Lenders and the Debtors cannot adequately protect the Senior Secured Lenders' interests. Under the Debtors' Proposed Facility, the Debtors are attempting to layer $30 million of senior postpetition debt above the approximate $40 million of secured claims of the Senior Secured Lenders. However, since at least the second half of 2008, the Debtors have been operating with negative gross margins and continue to incur losses as a result of, among other things, ethanol and corn commodity prices. Further, the ethanol industry is under severe distress and there is no reliable evidence that this will change in the near future. Rather, it is likely that the industry's prospects may continue to deteriorate with the Debtors continually experiencing negative gross margins, greatly reducing the value of the Debtors' assets.

- As will be demonstrated at the interim hearing on the Motion, it is expected that, if the Debtors' Proposed Facility is approved, the Debtors will deplete their liquidity and working capital in less than nine months, leaving the Senior Secured Lenders to look only to the Debtors' property and equipment to satisfy their claims, the value of which will likely not be sufficient. The Debtors may not be allowed to severely jeopardize the interests of the Senior Secured Lenders based on the Debtors' speculative and unsubstantiated hopes that the fortunes of the ethanol industry will improve within the next nine months. As a result of these unreasonable risks and the Debtors' inability to adequately protect the Senior Secured Lenders' interests, the Motion must be denied.

- The Senior Secured Lenders have offered postpetition financing to the Debtors on terms and conditions more suited to the Debtors' specific business needs than those of the Debtors' Proposed Facility taking into account the Debtors' cash flows and negative gross margin and the current persistently depressed ethanol industry. Unlike the Debtors' Proposed Facility, the terms and conditions of the postpetition financing offered by the Senior Secured Lenders incorporate a sound and fair sale process for the Debtors that is necessary and reasonable in terms of both time and value maximization for these estates. The Debtors' Proposed Facility is not in the best interests of these estates and is not an exercise of sound and reasonable judgment as the Debtors' Proposed Facility is excessive in amount and overly expensive to the estates, and is likely to result in the Debtors'

depleting their liquidity and working capital while not pursuing a viable exit strategy, to the detriment of all of the Debtors' creditors. Given this and the availability of alternative financing on superior terms, the Motion must be denied.

- Notably and shockingly absent from the Debtors' Proposed Facility is any timeline for a sale or other exit strategy for the Debtors in these Cases. The Debtors are currently experiencing significant losses, have been expending cash at an alarming rate, and are operating, and will likely continue to operate, with negative gross margins for the foreseeable future, all while operating within an industry in high distress and with no assurance of recovery. Cash flow projections for the Debtors also show that, even with access to all of the proposed funding under the Debtors' Proposed Facility, the Debtors will have sufficient liquidity to operate for no more than the next nine months. Despite these facts, the Debtors and DIP Lenders[2] have decided to enter into, and are requesting this Court approve, a DIP financing facility (a) with a one-year maturity, (b) without any timeline for any sale procedure or other exit strategy, and (c) that will burden the estates with $2 million more in interest and fees compared to the Senior Secured Lenders' Proposed Facility, so that the Debtors and DIP Lenders (who hold approximately 75% in principal amount of the outstanding Unsecured Senior Notes (as defined below)) may engage in high risk speculation to the detriment of the interests of the Senior Secured Lenders.

## PRELIMINARY STATEMENT

2.      The interim relief requested in the Motion goes well beyond simply providing the

Debtors access to funds necessary to avoid immediate and irreparable harm pending a final

hearing on the Motion, severely threatens (rather than protects) the interests of the Senior

Secured Lenders, is not in the best interests of the Debtors' estates, and is not an exercise of

sound and reasonable business judgment of the Debtors. Instead, the Debtors' proposed DIP

facility (the "Debtors' Proposed Facility") appears to be nothing more than an attempt by the

Debtors and the DIP Lenders (each of which holds significant unsecured claims against the

Debtors) to speculate on uncertain hopes that the ethanol industry may recover within the next

nine months, while severely jeopardizing the interests of the Senior Secured Lenders.

3.      Particularly alarming, the attempted layering of up to $30 million of senior

postpetition debt over the claims and liens of the Senior Secured Lenders would severely degrade

the interests of the Senior Secured Lenders and subject the Senior Secured Lenders' interests to

unreasonable and severe risk. The Debtors attempt to primarily rely on an alleged "substantial equity cushion" to meet their adequate protection burden, based on assumptions, with no basis other than raw speculation, that the ethanol industry will rebound in the third and fourth quarters of 2009. However, as will be demonstrated at the interim hearing on the Motion, the continued negative gross margin of the Debtors, together with the highly distressed state of the ethanol industry (with no assurance of any improvement in the near future), make reliance on any purported equity cushion highly speculative and of little value to the Senior Secured Lenders. Further, the projected negative cash flow of the Debtors and the anticipated continuing depletion of the Debtors' working capital put the Senior Secured Lenders in severe danger of finding the Debtors with fully exhausted working capital and liquidity within the next nine months. In such event, the Senior Secured Lenders' current first priority liens in substantially all of the Debtors' assets would be reduced to junior liens on the Debtors' remaining property, plants and equipment, the value of which may likely be insufficient to satisfy the Senior Secured Lenders' approximate $40 million in credit exposure. As a result, the Debtors simply are not able to adequately protect the Senior Secured Lenders' interests from this certain diminution in value. For these reasons and the reasons more fully discussed below, this Court must deny the relief requested in the Motion.

## BACKGROUND

### A.     The Debtors' Bankruptcy Cases.

4.      On April 7, 2009, the Debtors commenced the above-referenced chapter 11 cases (collectively, the "Cases") when each Debtor filed a voluntary petition for relief under title 11 of the United States Code, *et seq.* (the "Bankruptcy Code"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are operating and managing their businesses and assets as

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

debtors-in-possession.

5. To date, an official committee of unsecured creditors has not yet been appointed in the Cases.

**B.     The Senior Secured Lenders' Claims and Liens.**

6. Prior to the commencement of the Cases, the Senior Secured Lenders made certain loans and other extensions of credit to certain of the Debtors pursuant to and in accordance with that certain Credit Agreement dated as of March 23, 2007, among the Debtors, the Agent, Bank of America, N.A., as syndication agent, UBS Securities and Wells Fargo Foothill, LLC, as co-documentation agents, J.P. Morgan Securities Inc., as sole bookrunner and sole lead arranger, and the Senior Secured Lenders, as lenders (as amended and supplemented from time to time prior to this date, the "Credit Agreement"). The Credit Agreement provided for (i) a revolving loan commitment of up to $60 million, subject to collateral availability (the "Prepetition Revolver"), and (ii) a $25 million sub-limit for letters of credit, subject to collateral availability (the "Prepetition LC Facility").

7. As of the close of business on April 7, 2009, the Senior Secured Lenders were owed at least $40.25 million as follows: (i) at least $18.35 million pursuant to the Prepetition Revolver, plus any and all other fees, costs, expenses, charges, other debts or obligations of the Debtors to the Senior Secured Lenders under the Credit Agreement, related documents, and applicable law and (ii) at least $21.9 million of letters of credit were outstanding under the Prepetition LC Facility (collectively, the "Senior Secured Debt").

8. The Senior Secured Debt is secured by, among other things, perfected first priority liens and security interests in substantially all of the personal property and real estate of the Debtors, including, without limitation, all accounts, chattel paper, copyrights, patents,

trademarks, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, cash, cash equivalents, letters of credit, letter-of-credit rights, supporting obligations, deposit accounts with any bank or other financial institution, commodity accounts with any bank or other financial institution, securities accounts with any bank or other financial institution, commercial tort claims, farm products, and all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing (collectively, the "Prepetition Collateral").

C.      **The Unsecured Notes**.

9.      In March 2007, Aventine Renewable Energy Holdings, Inc. ("Aventine") issued unsecured 10% fixed-rate notes due April 2017 (the "Original Unsecured Senior Notes") in the aggregate principal amount of $300 million pursuant to an indenture between Aventine, as issuer, the other Debtors, as guarantors, and Wells Fargo Bank, N.A., as trustee. On August 10, 2007, Aventine exchanged all of the Original Unsecured Senior Notes for an issue of registered unsecured notes (the "Unsecured Senior Notes") with terms identical to the Original Unsecured Senior Notes. The Unsecured Senior Notes are guaranteed by and are general unsecured obligations of all of the Debtors. The proposed DIP Lenders are, upon information and belief, holders of approximately 75% of the outstanding amounts of the Unsecured Senior Notes.

D.      **The Senior Secured Lenders' Offer of Postpetition Financing**.

10.      In the weeks leading up to the filing of the Debtors' bankruptcy petitions and thereafter, the Agent and Senior Secured Lenders have, in good faith, negotiated with the

Debtors and their financial advisors in an effort to agree to terms pursuant to which the Senior

Secured Lenders would provide postpetition financing to the Debtors. Specifically, the Agent

and Senior Secured Lenders have offered to provide the Debtors with postpetition financing on

substantially the following terms (the "Senior Secured Lenders' Proposed Facility"), which offer

has not been accepted by the Debtors:[3]

| | |
|---|---|
| Borrowers: | Aventine Renewable Energy, Inc., Aventine Renewable Energy – Mount Vernon, LLC, and Aventine Renewable Energy – Aurora West, LLC. |
| Guarantors: | The remaining Debtors. |
| Credit Facility: | $60 million senior secured revolving DIP facility, which would provide approximately $20 million of new funding after taking the roll-up of Senior Secured Debt into account; provided that the Senior Secured Lenders' Proposed Facility shall increase by $10 million (to an aggregate amount of $70 million) if the Debtors' obtain the Court's approval of the sale procedures and a stalking horse bidder within 90 days of closing. |
| Security: | All assets of the Debtors and their respective estates other than causes of action under Chapter 5 of the Bankruptcy Code. |
| Interest Rate: | LIBOR plus 450 basis points, with a LIBOR floor of 300 basis points (interest rate currently estimated to be 7.5%), or upon election of the Borrowers, ABR plus 325 basis points. |
| Default Rate: | LIBOR plus 850 basis points, with a LIBOR floor of 300 basis points (default interest rate currently estimated to be 11.5%). |
| Unused Fee: | 50 basis points. |
| Borrowing Base: | Subject to a $2.5 availability block at all times, 85% of eligible accounts receivable, plus (a) the lesser of (i) 70% of eligible finished goods inventory or (ii) inventory advance rate percentage of finished goods inventory; (b) the lesser of (i) 70% of eligible raw material inventory or (ii) inventory advance rate percentage of raw material inventory; (c) the lesser of (i) 70% eligible in-transit inventory or (ii) inventory advance rate percentage of in-transit |

---

[3] An indicative summary of the Senior Secured Lenders' Proposed Facility, a form of proposed Debtor in Possession Financing Amendment to Credit Agreement, and a form of proposed interim financing order, each of which were previously provided to the Debtors, are attached hereto as Exhibits A, B, and C, respectively.

inventory; and (d) $30 million fixed asset component, provided, that the Fixed Asset Component shall increase by $10 million if the Debtors' obtain the Bankruptcy Court's approval of the sale procedures and a stalking horse bidder.

Term: 180 days after closing on the Senior Secured Lenders' Proposed Facility, subject to events of default and other conditions.

Origination Fee: $600,000 (100 basis points on $60 million).

DIP Agent Fee: $75,000.

Sale Timeline: Debtors must receive an acceptable bid for the sale of all or substantially all of their assets from a ready, willing, and able buyer within 90 days of closing and consummate a sale of all or substantially all of their assets within 180 days of closing.

Budgeted Usage: Approved budget with allowable 15% variances on cash receipts, disbursements, and all expenses (weekly and cumulative testing).

Roll-Up: Prepetition Revolver to be rolled-up as part of the Senior Secured Lenders' Proposed Facility; upon approval of facility on final basis, Prepetition LC Facility to be deemed part of the Senior Secured Lenders' Proposed Facility.

11.    Attached hereto as Exhibit D is a side-by-side comparison summary of the Senior Secured Lenders' Proposed Facility and the Debtors' Proposed Facility.

**E.    The Debtors' Proposed DIP Facility and Use of Cash Collateral.**

12.    Pursuant to the Motion, the Debtors have requested, among other things, that this Court authorize the nonconsensual usage of the Senior Secured Lenders' Cash Collateral and approve the Debtors' entry into the Debtors' Proposed Facility providing up to $15 million, on an interim basis, and up to $30 million, on a final basis, in postpetition term loans. If approved as requested, the Debtors' Proposed Facility provides that the DIP Lenders would be granted first priority liens on, among other things, the Prepetition Collateral, priming the Senior Secured Lenders' liens on same. Moreover, the Debtors' Proposed Facility will run out within nine months, leaving the Debtors' without an exit.

13.     The Motion discloses the following pertinent terms to the Debtors' Proposed

Facility:[4]

| | |
|---|---|
| Borrowers: | Aventine Renewable Energy, Inc., Aventine Renewable Energy – Mount Vernon, LLC, and Aventine Renewable Energy – Aurora West, LLC. |
| Guarantors: | The remaining Debtors. |
| Credit Facility: | A $30 million term loan, with initial availability not to exceed $15 million. |
| Security: | All assets of the Debtors and their respective estates, including causes of action under Chapter 5 of the Bankruptcy Code upon entry of an order approving the Motion on a final basis. |
| Interest Rate: | 16.5%. |
| Default Rate: | 21.5%. |
| Term: | One year after the commencement of the Cases, subject to events of default and other conditions. |
| Origination Fee: | $900,000 (300 basis points on $30 million). |
| DIP Agent Fee: | $100,000. |
| Sale Timeline: | None. |
| Budgeted Usage: | Approved budget with allowable 15% variances on cash receipts, disbursements, and all expenses (weekly and cumulative testing). |

14.     As purported "adequate protection" of the Senior Secured Lenders' interests in

the Prepetition Collateral, the Debtors have proposed the following limited "adequate protection

package" for the benefit of the Senior Secured Lenders:  (i) the granting of replacement liens

subordinate to liens of the DIP Lenders and the Carve-Out, (ii) the granting of super-priority

administrative claims subordinate to those of the DIP Lenders and the Carve-Out, (iii) providing

financial reporting to the Senior Secured Lenders to the same extent as the DIP Lenders, and (iv) the

---

[4] To date, a proposed credit agreement to be entered into in connection with the DIP Facility has not been filed with

payment of interest to the Senior Secured Lenders as it accrues at the non-default rate under the Credit Agreement. See Motion, at pgs. 6-7.

15.     Notably and shockingly absent from the Debtors' Proposed Facility is any timeline for a sale or other exit strategy for the Debtors in these Cases. The Debtors are currently experiencing significant losses, have been expending cash at an alarming rate, and are operating, and will likely continue to operate, with negative gross margins for the foreseeable future, all while operating within an industry in high distress and with no assurance of recovery. Cash flow projections for the Debtors also show that, even with access to all of the proposed funding under the Debtors' Proposed Facility, the Debtors will have sufficient liquidity to operate for no more than the next nine months. Despite these facts, the Debtors and DIP Lenders have decided to enter into, and are requesting this Court approve, a DIP financing facility (a) with a one-year maturity, (b) without any timeline for any sale procedure or other exit strategy, and (c) that will burden the estates with $2 million more in interest and fees compared to the Senior Secured Lenders' Proposed Facility, so that the Debtors and DIP Lenders (who hold approximately 75% in principal amount of the outstanding Unsecured Senior Notes) may engage in high risk speculation to the detriment of the interests of the Senior Secured Lenders.

## OBJECTION

### I.     The DIP Facility Should Not Be Approved.

#### A.     The Requested Priming DIP Facility Is Impermissible Because The Debtors Cannot Adequately Protect the Interests of the Senior Secured Lenders.

16.     The Bankruptcy Code demands not only that secured lenders be compensated for the decline in value of their collateral caused by a priming postpetition financing facility, but also that they receive the same level of protection negotiated for and obtained prior to bankruptcy as

---

the Court or made available to the Agent.

if there had been no postpetition priming financing facility. Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland), 16 F.3d 552, 564 (3d Cir. 1994); In re Dunes Casino Hotel, 69 B.R. 784, 793 (Bankr. D.N.J. 1986); see also In re Winsor Hotel, LLC, 295 B.R. 307, 314 (Bankr. C.D.Ill. 2003) ("[W]here the debtor proposes a priming lien, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing"). Moreover, the adequate protection offered by the debtor must not be "illusory." Carpet Ctr. Leasing Co., Inc. v. Nalley Motor Trucks, 991 F.2d 682, 685 (11th Cir. 1993). The determination of whether a secured creditor has received adequate protection is a question of fact, decided on a case by case basis. Swedeland, 16 F.3d at 564. The ability to prime an existing lender is extraordinary and, in such circumstances, a court "must be particularly cautious when assessing whether creditors so displaced are adequately protected." See In re First South Savings Assoc., 820 F.2d 700, 710 (5th Cir. 1987); In re Stoney Creek Technologies, LLC, 364 B.R. 882, 889-890 (Bankr. E.D.Penn. 2007).

17. The burden of showing that the Senior Secured Lenders' interests in the Prepetition Collateral are adequately protected rests on the Debtors. The Bankruptcy Code squarely places the burden of proving that the interest of a lien holder is adequately protected on the debtor. See 11 U.S.C. § 364(d)(2); Swedeland, 16 F.3d at 564; see also In re The Colad Group, Inc., 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005) (noting that "[c]ontrary to the mandate of 11 U.S.C. § 364(d)(2)," the debtor failed to meet its burden of proof on the issue of adequate protection).

18. As purported adequate protection of the Senior Secured Lenders' interests, the Debtors assert that the Senior Secured Lenders' liens are adequately protected by a "significant

equity cushion." See Motion, at pgs. 19-20. The Debtors also purport to satisfy their burden by granting the Senior Secured Lenders replacement liens subordinate to liens of the DIP Lenders and the Carve-Out, granting the Senior Secured Lenders super-priority administrative claims subordinate to those of the DIP Lenders and the Carve-Out, providing certain financial reporting, and paying interest as it accrues at the non-default rate under the Credit Agreement. See Motion, at pgs. 6-7. However, despite the Debtors' assertions, it is clear that the Debtors are not providing the Senior Secured Lenders with the same level of protection negotiated for and obtained prior to bankruptcy as if there had been no priming financing facility.

19.    As the Agent will demonstrate at the hearing on the Motion based on valuations and continuing negative cash flow, the purported "equity cushion" is illusory and insufficient to provide the Senior Secured Lenders adequate protection. See Aqua Assoc., 123 B.R. at 196 ("[W]hile the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis."). Given the current distressed state of the Debtors' industry, the questionable viability of the Debtors' ongoing business operations, and the Debtors' admitted continuing negative gross margins, the claimed protection of the alleged "substantial equity cushion" will be speculative at best and subject to substantial question, particularly in light of the current economic climate.

20.    In determining the protection provided by the alleged equity cushion, it is anticipated that the Debtors will ask this Court to value the Debtors' assets using a "fair market value in continued use" valuation. However, such a valuation methodology is not appropriate in this case. See In re Conquest Offshore Int'l, 73 B.R. 171, 176-177 (Bankr. S.D.Miss. 1986) (holding that, in defining the appropriate method of valuation to be utilized for adequate protection purposes, the courts must operate on a case by case basis); In re Columbia Gas Sys.,

Inc., 1992 WL 79323 (Bankr. D.Del. 1992). Rather, the Debtors' continuing losses, negative gross margin, and questionable viability, together with the severe distress and speculative future prospects of the ethanol industry, dictate that a liquidation value be used in determining the value of the alleged "substantial equity cushion." See Conquest, 73 B.R. 171 (using liquidation value in adequate protection analysis); In re Keystone Camera Products Corp., 126 B.R. 177 (Bankr. D.N.J. 1991) (same); see also In re Phoenix Steel Corp., 39 B.R. 218, 226-27 (valuing collateral at mean of liquidation and going concern value "given the speculative projections entangling [the] case."). As will be shown at the interim hearing on the Motion, such value does not and cannot provide the Senior Secured Lenders with any meaningful protection from the diminution in value that would be caused by priming liens, especially in light of the fact that projections show the Debtors would fully expend their working capital and fully draw the Debtors' Proposed Facility within the next nine months - the effect of which decimates the Senior Secured Lenders' collateral base.

21.     In addition to the fatal flaw in the Debtors' proposed adequate protection package resulting from the absence of an adequate equity cushion, the Debtors' adequate protection package is insufficient for numerous other reasons.

22.     First, despite the Debtors' concession that the Senior Secured Lenders are oversecured, any adequate protection package offered the Senior Secured Lenders must include the ongoing payment of postpetition fees and expenses, including attorneys' fees, incurred by the Agent and Senior Secured Lenders in accordance with the Credit Agreement.

23.     The structure of the Debtors' Proposed Facility in and of itself also puts the interests of the Senior Secured Lenders in the Prepetition Collateral at substantial risk. As previously discussed, the Debtors are currently operating at negative gross margins, and have been

13

experiencing such losses since at least the second half of 2008. See Declaration, at ¶21. Even with the entire amount of the Debtors' Proposed Facility available, the Debtors will likely deplete their liquidity within at least the next nine months. Yet, the Debtors' Proposed Facility provides for a maturity of up to one year, with no time line for a proposed sale or other bankruptcy exit strategy for the Debtors despite the Debtors' continued losses. The Debtors' continued operation at a loss, together with current economic conditions and the state of the Debtors' industry, pose a substantial risk that the Debtors will find themselves incurring up to $30 million in postpetition financing well prior to the maturity of the Debtors' Proposed Facility, while substantially degrading the interests of the Senior Secured Lenders in the Prepetition Collateral and not pursuing a viable exit strategy in these Cases.

24.     Other deficiencies in the proposed adequate protection package include the following:

- The Debtors' Proposed Facility does not provide the Agent and Senior Secured Lenders with cross-default protection and automatic stay relief so that the Senior Secured Lenders may protect their interests in the event a default occurs under the Debtors' Proposed Facility.

- The proposed interest to be paid the Senior Secured Lenders should be paid at the default rate provided under the Credit Agreement rather than the non-default rate as proposed.

- The proposed replacement liens are inadequate given the speculative value of the Debtors' assets and the Debtors' ongoing losses.

- The Debtors may not subject the Senior Secured Lenders' interests to the "Carve-Out" in the amount of $2 million to pay professional fees of these estates under Section 506(c) of the Bankruptcy Code or otherwise. See Kivitz v. CIT Group/Sales Finance, Inc., 272 B.R. 332 (D. Md. 2000).

- The Debtors' Proposed Facility allows the DIP Lenders the ability to extend an already excessive maturity of the Debtors' Proposed Facility by waiving any events of default in their sole discretion and with no court oversight, allowing the Debtors and DIP Lenders to continue speculating that the depressed ethanol industry will recover, while providing no protections to

the Agent and Senior Secured Lenders in such event.

- The Debtors should be required to provide the Agent and Senior Secured Lenders with continued reporting consistent with the requirements of the Credit Agreement.

**B.** **The Motion Must Be Denied as the Debtors' Proposed Facility Is Not in the Best Interests of the Estates, Is Not an Exercise of Sound and Reasonable Business Judgment of the Debtors, and Alternative Postpetition Financing Is Available to the Debtors on Superior Terms.**

25.     To prevail on a financing motion seeking the imposition of priming liens, a debtor has the initial burden of showing: first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interests of the estates and their creditors; and as a corollary to the first three points, that no better offers, bids, or timely proposals are before the court. In re Western Pacific Airlines, Inc., 223 B.R. 567, 572 (Bankr. Colo. 1997); In re Phase-I Molecular Toxicology, 285 B.R. 494, 496 (Bankr. D.N.M. 2002); see also In re Aqua Assoc., 123 B.R. 192, 196 (Bankr. E.D.Penn. 1991) (stating that a court must make a qualitative assessment of a proposed credit transaction in light of readily available alternatives.); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D.Penn. 1987).

26.     Given the current state of the Debtors' businesses and the ethanol industry, it cannot be said that the Debtors' Proposed Facility is in the best interests of the Debtors' estates or an exercise of the Debtors' sound and reasonable business judgment. Since the second half of 2008, the Debtors have been incurring significant losses and continue to operate with a negative margin. See, e.g., Declaration of the Debtors' Chief Financial Officer, William J. Brennan, in Support of Chapter 11 Petitions and First Day Relief (the "Declaration") [Docket No. 4]. It is projected that the Debtors will continue to incur losses and operate with a negative gross margin for the foreseeable future, with forecasts showing that, even with full access to the Debtors'

Proposed Facility, the Debtors would have insufficient cash and cash availability for operations in less than nine months.[5] Given the extreme distress being experienced by the ethanol industry, it is also anticipated that many other ethanol producers will be the subject of distressed asset sales, flooding the market in the near future and significantly depressing the market value of the Debtors' assets and businesses.

27.     Yet, despite these continued losses, degradation in value, and significant risks to the value of these estates, management of the Debtors have selected a postpetition financing facility that is significantly more expensive to the Debtors' estates than available financing alternatives and which provides for no proposed exit strategy to preserve and protect the value of the Debtors' estates for the benefit of their creditors. Rather, it appears that the Debtors' management and the DIP Lenders intend to speculate on the commodity prices of both corn and ethanol with hopes that the ethanol industry will recover before the Debtors' liquidity evaporates (anticipated to occur **in less than nine months**), all while burdening the estates with $30 million in superpriority financing, failing to pursue a reasonable exit strategy, and placing significant risk on the Senior Secured Lenders and other parties in interest as a result of the anticipated continued decline in the Debtors' value. Such high risk speculation clearly cannot be said to be in the best interests of the Debtors' estates or an exercise of sound and reasonable business judgment.

28.     The Motion must also be denied because there is a superior alternative to the Debtors' Proposed Facility available to the Debtors. See Reading Tube Indus., 72 B.R. at 332. The Senior Secured Lenders' Proposed Facility would likely save the Debtors' estates fees and expenses in excess of $2 million as compared to the Debtors' Proposed Facility in the same time

---

[5] The Debtors' projections assume, without basis, a recovery in ethanol pricing that would result in an overall cash flow improvement of $16 million by year-end 2009.

16

period and would protect creditors and parties in interest against the continuing losses of the Debtors and resulting degradation of the Debtors' estates by providing a fair and rational sale process. Specifically, the Senior Secured Lenders' Proposed Facility would provide the Debtors access to approximately $20 million in new money with (a) an interest rate 800 basis points lower than that of the Debtors' Proposed Facility, (b) an Origination Fee $300,000 less than that of the Debtors' Proposed Facility, and (c) a DIP Agent Fee of $25,000 less than that of the Debtors' Proposed Facility. The $20 million in new money that would be available under the Senior Secured Lenders' Proposed Facility is sufficient to provide the Debtors with reasonable liquidity without burdening the estates with the unnecessary and unwarranted burden of the excessive postpetition financing proposed pursuant to the Motion.

29.     Unlike the Debtors' Proposed Facility, the Senior Secured Lenders' Proposed Facility is designed to tie to a sale process that is grounded in current market conditions (rather than baseless hopes of an ethanol market recovery) and is reasonable in terms of time and value maximization for the estates, thereby avoiding the unacceptable speculative risks inherent to the Debtors' Proposed Facility.

**II.     In the Event this Court Determines that the Debtors' Proposed Facility Should Be Approved on an Interim Basis, Any Interim Financing and Cash Collateral Usage Must Be Limited to Only that Amount Necessary to Avoid Immediate and Irreparable Harm.**

30.     With respect to the interim hearing on the Motion, the Debtors have requested approval for the Debtors to use cash collateral of the Senior Secured Lenders and obtain up to $15 million in priming postpetition loans under the Debtors' Proposed Facility. See Motion, at pg. 4. The Debtors state that interim approval of $15 million of the Debtors' Proposed Facility "will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates

17

and all parties in interest, pending a final hearing." See Motion, at pg. 31.

31.     Although the court may authorize a debtor to obtain credit and use cash collateral within the fifteen-day period immediately following filing of a postpetition financing motion, the court may authorize the obtaining credit and cash collateral usage "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." See Fed. R. Bankr. P. 4001(b)(2) and (c)(2) (emphasis added); Delaware Local Rule 4001-2(b); see also In re The Colad Group, Inc., 324 B.R. 208, 218-19 (Bankr. W.D.N.Y. 2005) (noting that court refused at interim hearing on motion to obtain financing to enter order initially proposed by chapter 11 debtor in part because the "order failed to reflect any effort to limit the conditions of credit only to those which would be absolutely necessary to avoid immediate and irreparable harm").

32.     Here, the Debtors have failed to establish what amount of the Debtors' Proposed Facility and cash collateral usage is necessary to avoid immediate and irreparable harm pending a final hearing. The Debtors' failure to satisfy their burden of demonstrating what amount is necessary to avoid immediate and irreparable harm pending a final hearing warrants denial of the interim relief sought in the Motion. Indeed, the Debtors' own projected cash budget shows that the Debtors will need access to less than $8 million of postpetition financing through May 1, 2009. See Budget attached to proposed Interim Order as Exhibit A. At a minimum, any cash collateral usage and postpetition loans approved on an interim basis must be limited to an amount necessary in order for the Debtors to pay only those postpetition operating expenses that are absolutely necessary to avoid immediate and irreparable harm to the Debtors' estates. Moreover, there is no basis for draws under the Debtors' Proposed Facility in set amounts, but only as is required - up to no more than $8 million after Cash Collateral is exhausted.

III.     **The DIP Motion Does Not Comply with Fed. R. Bankr. P. 4001(c)(1)(A).**

33.     Finally, the Motion does not fully comply with the requirements of Rule 4001 of the Federal Rules of Bankruptcy Procedure.  Specifically, Rule 4001(c)(1)(A) provides that a "motion for authority to obtain credit shall be made in accordance with Rule 9104 and shall be accompanied by a copy of the credit agreement and a proposed form of order."  Fed. R. Bankr. P. 4001(c)(1)(A) (emphasis added).  The Motion is not accompanied by a copy of any credit agreement, just a term sheet.  As of the time of filing this Objection, the Debtors still have not filed a copy of the credit agreement with this Court.

## RESERVATION OF RIGHTS

34.     The Agent expressly reserves the right to amend or supplement this Objection, to file additional objections, and to introduce evidence supporting this Objection and any other objections at any hearing on the Motion.  In addition, any order granting adequate protection to the Agent and Senior Secured Lenders should state that such order is without prejudice to the request of the Agent or Senior Secured Lenders for any modification of, or further or different, adequate protection.

## PRAYER

**WHEREFORE**, Agent respectfully requests that this Court enter an order (1) denying

the Motion and (2) granting the Agent such other relief as is just and appropriate under the

circumstances.

Dated: April 13, 2009.

Respectfully submitted,

Ian Connor Bifferato (#3273)
Kevin G. Collins (#5149)
**BIFFERATO LLC**
800 King Street, First Floor
Wilmington, DE 19801
Tel:   302-225-7600
Fax:   (302) 792-7470
E-mail: cbifferato@bifferato.com

-and-

William L. Wallander[6], TX #20780750; NY #4587804
Clayton T. Hufft[6], TX #24056658; LA 26391
**VINSON & ELKINS L.L.P.**
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas  75201-2975
Tel:   214-220-7700
Fax:   214-220-7716
E-mail: bwallander@velaw.com; chufft@velaw.com

**ATTORNEYS FOR JPMORGAN CHASE BANK,
N.A., AS ADMINISTRATIVE AGENT**

---

[6] Admission *pro hac vice* pending.