# EXHIBIT B

# DEBTOR IN POSSESSION FINANCING AMENDMENT TO CREDIT AGREEMENT

THIS DEBTOR IN POSSESSION FINANCING AMENDMENT TO CREDIT AGREEMENT (this "**DIP Financing Amendment**") is dated as of April __, 2009, and entered into among **AVENTINE RENEWABLE ENERGY, INC.**, a Delaware corporation ("**Aventine**"), **AVENTINE RENEWABLE ENERGY – MT VERNON, LLC**, a Delaware limited liability company ("**Mt Vernon**"), and **AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**, a Delaware limited liability company ("**Aurora West**" and, collectively with Aventine and Mt Vernon, the "**Borrowers**" and each individually a "**Borrower**"), the lenders party to the Credit Agreement referred to below (the "**Lenders**"), and **JPMORGAN CHASE BANK, N.A.**, a national banking association, individually as a Lender and as the Administrative Agent (in such capacity, the "**Administrative Agent**").

## WITNESSETH:

WHEREAS, the Borrowers, the Lenders and the Administrative Agent have entered into a Credit Agreement dated as of March 23, 2007, as amended by the First Amendment to Credit Agreement dated as of March 10, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**");

WHEREAS, pursuant to the terms of the Credit Agreement, the Lenders made loans and granted other financial accommodations to the Borrowers, which loans are secured by a lien upon substantially all of the personal and real property of the Borrower and are guaranteed by Aventine Renewable Energy Holdings, Inc. ("**Holdings**"), Aventine Renewable Energy, LLC ("**Parent**"), Aventine Power, LLC ("**Power**"), Nebraska Energy, L.L.C. ("**NELLC**", and collectively with Holdings, Parent and Power, the "**Guarantors**" and each individually a "**Guarantor**").

WHEREAS, each of the Borrowers and the Guarantors filed voluntary petitions for relief under Chapter 11, Title 11, United States Code, on April 7, 2009, in the United States Bankruptcy Court for the District of Delaware (the "**Cases**");

WHEREAS, the Borrowers and the Guarantors have insufficient unencumbered cash or liquid assets with which to operate their businesses;

WHEREAS, the Borrowers and the Guarantors are unable to obtain credit on an unsecured basis or as an administrative claim pursuant to 11 U.S.C §§ 364(a) and (b), and 503(b)(1);

WHEREAS, an immediate need exists for the Borrowers and the Guarantors to obtain funds to continue operation of their businesses;

WHEREAS, the Borrowers and the Guarantors have requested that the Lenders extend additional credit to the Borrowers, up to an amount not to exceed *$70,000,000* for Budgeted Expenses (as defined below) from the DIP Financing Amendment Effective Date (defined

1

below) until the earlier of (a) notice of the occurrence of a Postpetition Default (as defined below) or (b) October *[__ / 180 days after DIP Financing Amendment Effective Date]*, 2009;

WHEREAS, the Lenders have agreed to grant the request of the Borrowers and the Guarantors to extend such additional credit, but only upon the terms and conditions set forth in this DIP Financing Amendment;

WHEREAS, the Borrowers and the Guarantors have agreed to secure the obligations of the Borrowers to the Administrative Agent in connection with such additional credit with, among other things, a first priority perfected security interest in all of its existing and future personal and real property, to the extent set forth in the Financing Order (as defined below); and

WHEREAS, the parties hereto have agreed to modify the Credit Agreement to permit such additional borrowings upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. **Definitions**. Capitalized terms used but not defined in this DIP Financing Amendment have the meanings specified in the Credit Agreement, including, to the extent applicable, after giving affect to this DIP Financing Amendment.

Section 2. **Amendments to Credit Agreement**. Subject to the terms and conditions hereof, the provisions of the Credit Agreement enumerated below shall be amended as follows:

(a) Effective as of the DIP Financing Amendment Effective Date, the following definitions set forth in Section 1.01 of the Credit Agreement are hereby amended to read as follows:

"**Fixed Asset Component**" means $30,000,000 on the DIP Financing Amendment Effective Date; provided, that the Fixed Asset Component shall increase by *$10,000,000* (to an aggregate amount of *$40,000,000)* on the DIP Increase Date; provided, further, that the Fixed Asset Component shall reduce by an amount determined by the Administrative Agent in its Permitted Discretion with respect to any Fixed Asset Collateral which is subject of a casualty event (including, without limitation, damage, destruction or condemnation) or a Disposition or otherwise no longer satisfies the criteria applicable to Eligible Equipment or Eligible Real Property.

"**Loans**" means each and all of the (a) loans and advances made by the Lenders pursuant to the Credit Agreement, including Loans made pursuant to Section 2.01, Swingline Loans, Overadvances and Protective Advances or (b) Postpetition Loans, as the context requires.

"**Maturity Date**" means the earlier of (a) October *[__ / 180 days after DIP Financing Amendment Effective Date]*, 2009 or (b) the Postpetition Termination Date.

2

(b)     Effective as of the DIP Financing Amendment Effective Date, clause (b) of the definition of "**Eligible Accounts**" set forth in Section 1.01 of the Credit Agreement shall be amended to delete clause (b) thereof and replace it with the following clause (b) which shall read in full as follows:

> (b)     which is subject to any Lien other than (i) Liens in favor of the Administrative Agent, (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent and (iii) rights of vendors arising under PACA but only to the extent no past due amounts are owed to such vendors;

(c)     Effective as of the DIP Financing Amendment Effective Date, clause (b) of the definition of "**Eligible Equipment**" set forth in Section 1.01 of the Credit Agreement shall be amended to delete clause (b) thereof and replace it with the following clause (b) which shall read in full as follows:

> (b)     such Borrower has the right to subject such equipment to Liens in favor of the Administrative Agent; and such equipment is subject to a first priority perfected Lien in favor of the Administrative Agent and is free and clear of all other Liens of any nature whatsoever (except for Permitted Encumbrances which do not have priority over the Lien in favor of the Administrative Agent);

(d)     Effective as of the DIP Financing Amendment Effective Date, clause (b) of the definition of "**Eligible Inventory**" set forth in Section 1.01 of the Credit Agreement shall be amended to delete clause (b) thereof and replace it with the following clause (b) which shall read in full as follows:

> (b)     which is subject to any Lien other than (i) Liens in favor of the Administrative Agent and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(e)     Effective as of the DIP Financing Amendment Effective Date, clause (b) of the definition of "**Eligible Real Property**" set forth in Section 1.01 of the Credit Agreement shall be amended to delete clause (c) thereof and replace it with the following clause (c) which shall read in full as follows:

> (c)     (i) in respect of which (A) the Administrative Agent is satisfied that all actions necessary or desirable in order to create a perfected first priority Lien on such real property have been taken, including, the filing and recording of Mortgages and (B) which is not subject to any Lien other than (1) Liens in favor of the Administrative Agent and (2) a Permitted Encumbrance which does not have priority over the Lien in favor of the Administrative Agent;

(f)     Effective as of the DIP Financing Amendment Effective Date, the definition of "**Reserves**" set forth in Section 1.01 of the Credit Agreement shall be amended to

3

insert "Carve-Out Reserve, G&A Restructuring Expenses Reserves," after "Banking Service Reserves," and before "Rent Reserves".

(g)     Effective as of the DIP Financing Amendment Effective Date, the following definitions are hereby added to Section 1.01 of the Credit Agreement:

"**Bankruptcy Code**" means 11 U.S.C. § 101 *et seq.*

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court with competent jurisdiction over the Cases.

"**Budget**" means the cash budget detailing the Borrowers' anticipated cash receipts and expenditures from the week ending April 17, 2009, until October 16, 2009, as amended or supplemented from time to time, which budget (and any amendments thereto) shall be in form and substance acceptable to the Administrative Agent and Required Lenders and shall be incorporated into the Financing Order and attached hereto as Exhibit C.  Changes to the Budget are subject to the prior written approval of the Required Lenders in their Permitted Discretion.

"**Budgeted Expenses**" means expenses permitted to be paid by the Borrowers for the purposes set forth in the Budget.

"**Carve-Out Reserve**" means a Reserve in the amount of the "Carve-Out" as defined in the Financing Order.

"**Cases**" means the Chapter 11 bankruptcy cases of the Borrowers and the Guarantors pending before the Bankruptcy Court entitled "In re Aventine Renewable Energy Holdings, Inc., a Delaware Corporation, *et al.*", jointly administered as Case No. 09-11214 (KG), including adversary proceedings or other ancillary proceedings.

"**Cash Collateral**" means cash collateral, as such term is defined in Section 363(a) of the Bankruptcy Code and as defined in the Financing Order, arising from or relating to Collateral granted to the Administrative Agent for the benefit of the Lenders.

"**DIP Collateral**" means any and all of the properties and assets of the Borrowers, the Guarantors and the Borrowers' and Guarantors' bankruptcy estates, both real and personal, including, without limitation, all cash, accounts, chattel paper, commercial tort claims, commodity accounts, deposit accounts, documents, equipment, fixtures, general intangibles, goods, instruments, intellectual property, inventory, investment property, money, securities accounts, supporting obligations, other personal property of any kind or character, whether tangible or intangible, real property, tax refunds of any nature, insurance proceeds, insurance premium refunds, security deposits, utility deposits, bonds and proceeds of same, causes of action (whether by contract or tort, common law

4

or statutory, equitable or otherwise, but excluding causes of action and recoveries under Chapter 5 of the Bankruptcy Code), leasehold interests in real estate or personal property, and customer lists, whether acquired before or after the Petition Date, whether now owned and existing or hereafter acquired, created, or arising, and all products and proceeds thereof (including, without limitation, claims of the Borrowers and Guarantors against third parties for loss or damage to such property), together with books and records related thereto, and all accessions thereto, substitutions and replacements therefor, and wherever located, and all assets acquired by any of the Borrowers and Guarantors post-petition, in which the Administrative Agent, for the benefit of the Lenders, is granted a first priority lien or security interest to secure the Postpetition Obligations as set forth in the Financing Order.

"**DIP Financing Amendment**" means that Debtor in Possession Financing Amendment to Credit Agreement dated as of April [___], 2009 among the Borrowers, the Guarantors, the Administrative Agent and the Lenders.

"**DIP Financing Amendment Effective Date**" means the date on which all the conditions precedent set forth in the DIP Financing Amendment are satisfied in full.

"**DIP Increase Date**" means the date on which all the conditions set forth in Section 6.17(i) hereof are satisfied in full.

"**Final Financing Order Date**" means the date on which the Bankruptcy Court authorizes and approves on a final basis the financing contemplated by the DIP Financing Amendment and use of Cash Collateral, in form and substance satisfactory to the Lenders.

"**Financing Order**" means the one or more orders of the Bankruptcy Court authorizing and approving, on either an interim or final basis, the financing contemplated by the DIP Financing Amendment and use of Cash Collateral, each in form and substance satisfactory to the Lenders.

"**G&A Restructuring Expenses Reserves**" means Reserves with respect to G&A Restructuring Expenses set forth on the Budget for the prior periods through and including the month following the Postpetition Termination Date, which have not yet been paid.

"**Maximum Postpetition Loan Amount**" means, at any time, the lesser of (a) the Postpetition Aggregate Commitments or (b) the DIP Commitment (as defined in the Financing Order) approved by the Bankruptcy Court.

"**Petition Date**" means April 7, 2009.

"**Postpetition Availability**" means, at any time, an amount equal to (a) the lesser of (x) the Maximum Postpetition Loan Amount and (y) the Borrowing Base, *minus* (b) the amount of the Prepetition Obligations, *minus* (c) Reserves,

*minus* (d) the amount of the Postpetition Obligations, *minus* (e) the Availability Block.

"**Postpetition Aggregate Commitments**" means $60,000,000, being the aggregate amount of the Postpetition Commitments of all Lenders on the DIP Financing Amendment Effective Date; provided, that, the Postpetition Aggregate Commitments shall increase by *$10,000,000* (to an aggregate amount of *$70,000,000)* on the DIP Increase Date.

"**Postpetition Borrowing Request**" has the meaning given such term in Section 2.23(b).

"**Postpetition Commitment**" means the commitment of any Lender to make Postpetition Loans as set forth in Section 2.23(a) hereof up to the amount for such Lender set forth on Exhibit A attached to the DIP Financing Amendment.

"**Postpetition Default**" means the occurrence and continuance of any of the following events:

(a)     The Borrowers shall fail to pay any principal of the Postpetition Loans when the same becomes due and payable;

(b)     The Borrowers shall fail to pay any interest on the Postpetition Loans or any fee or other amount due with respect to the Postpetition Obligations after such interest, fee, or other amount becomes due and payable;

(c)     Any representation or warranty made by the Borrowers or the Guarantors in the DIP Financing Amendment or in any statement or certificate given after the DIP Financing Amendment Effective Date by the Borrowers or the Guarantors in writing pursuant to any Loan Document or in connection with any Loan Document shall be false in any material respect on the date as of which made;

(d)     The Borrowers or the Guarantors shall breach or violate any term, covenant or agreement contained in the DIP Financing Amendment, Articles V, VI, or VII of this Agreement (other than as set forth on Exhibit B attached to the DIP Financing Amendment), or any of the Loan Documents;

(e)     An Event of Default shall occur under and as defined in the Financing Order;

(f)     Conversion of any Borrower's or Guarantor's Case to a case under Chapter 7 of the Bankruptcy Code;

(g) The appointment of a trustee in any Borrower's or Guarantor's Case without the consent of the Administrative Agent and the Required Lenders;

(h) The appointment of an examiner in any Borrower's or Guarantor's Case with expanded powers without the consent of the Administrative Agent and the Required Lenders;

(i) The dismissal of any Borrower's or Guarantor's Case;

(j) The entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending any Financing Order without the express prior written consent of the Administrative Agent and the Required Lenders;

(k) Any security interest, lien, claim or encumbrance, excluding the Liens permitted pursuant to Section 6.02 hereof, shall be granted in any of the DIP Collateral which is *pari passu* with or senior to the claims of the Lenders therein, including any surcharge of the DIP Collateral pursuant to Bankruptcy Code § 506(c) or otherwise;

(l) The Borrowers or Guarantors shall attempt to vacate or modify a Financing Order over the objection of the Administrative Agent;

(m) Any challenge by the Borrowers or Guarantors to the extent, validity, priority, or unavoidability of the Administrative Agent's or Lenders' liens or security interests securing the Secured Obligations or Postpetition Loans or an order is entered sustaining any such challenge commenced by any party other than the Borrowers or Guarantors;

(n) The Borrowers shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness, except to the Lenders, unless approved by the Administrative Agent in writing or as authorized by the Bankruptcy Court after notice and hearing;

(o) The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the Lenders) in any DIP Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the DIP Collateral;

(p) Any provision of the documents relating to the Postpetition Loans shall cease to be valid and binding on the Borrowers and Guarantors, or any Borrower or Guarantor shall so assert in any pleading filed in any court;

7

(q)     The Borrowers shall for any reason fail to remit to the Administrative Agent all net proceeds from the sale, disposition, collection, or other realization upon the Collateral or the DIP Collateral for application in accordance with Section 2.23(g);

(r)     The filing or confirmation of a plan of reorganization by any Borrower or Guarantor that does not provide for the indefeasible payment in full of the DIP facility upon confirmation;

(s)     The Borrowers and Guarantors shall fail to obtain, on or before July __ *[90 days after DIP Financing Amendment Effective Date]*, 2009, an order of the Bankruptcy Court approving sale and auction procedures (the "**Sale Procedures**") and bid protections, if any, for a proposed sale of all or substantially all of the Debtors' assets to a ready, willing and able "stalking horse" bidder (the "**Stalking Horse Bidder**"), which shall (i) provide for an all cash bid that has no financing, due diligence or other contingencies, and which shall be in an amount which is adequate to repay all Postpetition Obligations and Prepetition Obligations in full, including, without limitation, Postpetition Loans in an aggregate principal amount of *$70,000,000*, and (ii) otherwise be on terms and conditions reasonably satisfactory to the Administrative Agent and Lenders; or

(t)     The Borrowers and Guarantors shall fail to consummate the sale of all or substantially all of their assets on or before October __ *[180 days after DIP Financing Amendment Effective Date]*, 2009 on terms and conditions satisfactory to the Administrative Agent and Lenders.

"**Postpetition Loan Applicable Rate**" means, for any day, with respect to any Postpetition Loan which is an ABR Loan or Eurodollar Loan, or with respect to the commitment fees payable hereunder with respect to the Postpetition Aggregate Commitment, as the case may be, the rate per annum set forth below under the caption "ABR Spread", "Eurodollar Spread" or "Commitment Fee Rate", as the case may be:

| ABR Spread | Eurodollar Spread | Commitment Fee Rate |
|---|---|---|
| 3.25% | 4.50% | .50% |

"**Postpetition Loans**" means advances by the Lenders to the Borrowers pursuant to the Postpetition Commitments in an aggregate amount not to exceed at any time the Maximum Postpetition Loan Amount.

"**Postpetition Obligations**" means all present and future obligations and other liabilities of the Borrowers arising with respect to the Postpetition Loans, including without limitation the principal amount thereof, and any interest, fees,

8

and charges related thereto or in connection therewith, and any and all renewals, extensions, rearrangements, and refundings of the foregoing.

"**Postpetition Termination Date**" means the earliest of (a) October __ *[180 days after DIP Financing Amendment Effective Date]*, 2009 at 5:00 p.m. Central Time, (b) the date the Borrowers terminate the commitment of the Lenders to make the Postpetition Loans, (c) the date the Administrative Agent terminates the commitment of the Lenders to make the Postpetition Loans upon the occurrence of a Postpetition Default that is not timely cured, (d) the effective date of a confirmed plan of reorganization for the Borrowers, or (e) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Borrowers or Guarantors over the objection of the Administrative Agent.

"**Prepetition Obligations**" means all Secured Obligations other than the Postpetition Obligations.

"**Superpriority Claim**" means a claim against the Borrowers in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

(h)     Effective as of the DIP Financing Amendment Effective Date, Section 1.01 of the Credit Agreement shall be amended to delete the definitions of "**Exchange Offer**", "**Senior Exchange Note Documents**" and "**Senior Exchange Notes**".

(i)     Effective as of the DIP Financing Amendment Effective Date, clause (a) of Section 2.04 of the Credit Agreement shall be amended as follows:

(i)     By deleting the reference to "$7,500,000" contained therein and inserting in lieu thereof a reference to "$3,000,000";

(ii)     By deleting the reference to "Overadvances" contained therein and inserting in lieu thereof a reference to "Safeguard Advances (as defined in the DIP Financing Amendment)"; and

(iii)     By replacing the reference to "Supermajority Lenders" contained therein with a reference to "Required Lenders".

(j)     Effective as of the DIP Financing Amendment Effective Date, Section 2.05 of the Credit Agreement shall be amended as follows:

(i)     Clause (a) of Section 2.05 is amended by deleting the reference to "during the Availability Period" contained therein and inserting in lieu thereof a reference to "prior to the DIP Amendment Effective Date".

(ii)     The first sentence of clause (c) of Section 2.05 is amended by inserting the reference to "prior to the DIP Amendment Effective Date" before the reference to "in its sole discretion".

(iii)    A new clause (g) shall be added to be read in full as follows:

(g)    Notwithstanding any contrary provision hereof, the Administrative Agent shall not make any Swingline Loans or Overadvances to the Borrowers on or after the DIP Amendment Effective Date.

(k)    Effective as of the DIP Financing Amendment Effective Date, Section 2.06(a) of the Credit Agreement shall be amended by inserting the reference to "prior to the DIP Amendment Effective Date" before the reference to "the Borrower Representative may request" in the first sentence of clause (a) of Section 2.06(a).

(l)    Effective as of the DIP Financing Amendment Effective Date, Section 2.06(j) of the Credit Agreement shall be amended as follows:

(i)    The first sentence of Section 2.06(j) shall be amended by deleting the first sentence contained therein and inserting in lieu thereof the following two sentences, "Within one (1) Business Day after the Final Financing Order Date, the Borrowers shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders (the "**LC Collateral Account**"), an amount in cash equal to 101% of the LC Exposure as of the Final Financing Order Date. Upon funding the LC Collateral Account as required in the preceding sentence, the LC Exposure will be reduced on a dollar per dollar basis (but in no event below zero) by the amount deposited in the LC Collateral Account.", and immediately prior to the sentence commencing with "Such deposit shall";

(ii)    The sixth sentence of Section 2.06(j) shall be amended by inserting a "." after the reference to "the LC Exposure at such time" and deleting the remainder of the sentence; and

(iii)    The seventh sentence of Section 2.06(j) shall be deleted in its entirety.

(m)    Effective as of the DIP Financing Amendment Effective Date, Section 2.12 of the Credit Agreement is amended as follows:

(i)    First, the existing clause (d) of Section 2.12 shall be amended and reset as clause (e) of Section 2.12.

(ii)    Second, a new clause (d) shall be added to read in full as follows:

(d)    The Borrowers agree to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the Postpetition Loan Applicable Rate on the average daily amount of the Postpetition Commitment of such Lender during the period from and including the DIP Financing Amendment Effective Date to but excluding the date on which the Lenders' Postpetition Commitments terminate.

10

Accrued commitment fees shall be payable in arrears on the first day of each fiscal quarter and on the date on which the Postpetition Commitments terminate, commencing on the first such date to occur after the DIP Financing Amendment Effective Date. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

(n)     Effective as of the DIP Financing Amendment Effective Date, clause (d) of Section 2.13 of the Credit Agreement shall be amended by adding after each reference to "2%" contained therein the parenthetical phrase "(or 4% in the case of Postpetition Loans)".

(o)     Effective as of the DIP Financing Amendment Effective Date, Article II of the Credit Agreement shall be amended to add thereto the following Section 2.23:

SECTION 2.23.     Postpetition Loans.

(a)     Commitment for Postpetition Loans. From and after the Petition Date, the Lenders shall have no obligation to make any new Loans or issue any Letters of Credit to the Borrowers. Notwithstanding the foregoing, subject to the terms and conditions contained in this Section 2.23, the Lenders agree to make Postpetition Loans to the Borrowers from time to time, but not more frequently than once per day, from the DIP Financing Amendment Effective Date until the Postpetition Termination Date, in accordance with their Postpetition Commitments and in an aggregate amount not to exceed at any time outstanding (i) the lesser of (x) the Maximum Postpetition Loan Amount and (y) the Borrowing Base, *minus* (ii) the amount of the Prepetition Obligations, *minus* (iii) Reserves, *minus* (iv) the Availability Block; provided that, with respect to the payment of Budgeted Expenses incurred but not paid prior to the Postpetition Termination Date, the Lenders shall continue to make Postpetition Loans subsequent to the Postpetition Termination Date solely in accordance with the terms of the Financing Order. Each Postpetition Loan may be prepaid at any time without premium or penalty and may be borrowed, repaid, and reborrowed subject to the terms and conditions of this Agreement.

(b)     Borrowing Mechanics. To request a Postpetition Loan, the Borrower Representative shall notify the Administrative Agent of such request either in writing (delivered by hand or facsimile) in a form approved by the Administrative Agent and signed by the Borrower Representative or by telephone ("**Postpetition Borrowing Request**") (i) in the case of a Eurodollar Borrowing, not later than 10:00 a.m., Chicago time, three Business Days before the date of the proposed Borrowing or (ii) in the case of an ABR Borrowing, not later than noon, Chicago time, on the date of the proposed Borrowing; provided that any such notice of an ABR Borrowing to finance the reimbursement of a LC Disbursement as contemplated by Section 2.06(e) may be given not later than 9:00 a.m., Chicago time, on the date of the proposed Borrowing. Each such

11

telephonic Postpetition Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Postpetition Borrowing Request in a form approved by the Administrative Agent and signed by the Borrower Representative. Each such telephonic and written Postpetition Borrowing Request shall specify the following information in compliance with Section 2.23(a):

      (a) the name of the applicable Borrower;

      (b) the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing;

      (c) the date of such Borrowing, which shall be a Business Day;

      (d) whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

      (e) in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "**Interest Period**."

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the applicable Borrower(s) shall be deemed to have selected an Interest Period of one month's duration. Administrative Agent may condition the disbursement of Postpetition Loans on receipt of such documentation as it reasonably shall require to evidence that the proceeds of such Postpetition Loans shall be used in accordance with the Budget both as to amount of such Postpetition Loans and as to the timing of such Postpetition Loans. Promptly following receipt of a Postpetition Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Postpetition Loan to be made as part of the requested Borrowing.

(c)    Conditions Precedent to Each Postpetition Loan. The obligation of the Lenders to make any Postpetition Loan (including the initial Postpetition Loan) shall be subject to the following conditions precedent: (i) the Borrower Representative shall provide the Administrative Agent with a Postpetition Borrowing Request pursuant to Section 2.23(b) hereto; (ii) the Borrower Representative shall deliver to the Administrative Agent a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the week immediately preceding the DIP Financing Amendment Effective Date; (iii) no event has occurred and is continuing which constitutes a Postpetition Default or which would constitute a Postpetition Default but for the requirement that notice be given or time elapsed or both, in each case that is not waived or cured at the time of such

12

Postpetition Loan irrespective of any time period for such cure; (iv) the Borrower Representative shall deliver to the Administrative Agent a certificate of the Financial Officer of each Borrower and each other Guarantor certifying that (A) all representations and warranties made by such Borrower or Guarantor in the DIP Financing Amendment or in any statement or certificate after the DIP Financing Amendment Effective Date by such Borrower or Guarantor in writing pursuant to any Loan Document or in connection with any Loan Document shall be true and correct in all material respects and (B) such Borrower shall apply the proceeds of the Postpetition Loan only to Budgeted Expenses; (v) with respect to the initial Postpetition Loan, the Administrative Agent shall have received such other approvals or documents as the Lenders may reasonably request; (vi) except for the Financing Order, no Bankruptcy Court order has been entered authorizing the Borrowers to obtain financing or credit pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lenders secured by a security interest or having the priority of an administrative claim unless otherwise consented to by the Administrative Agent in writing; (vii) the Financing Order shall not have been vacated, reversed, modified, or amended and, in the event that such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending appeal; and (viii) the Administrative Agent shall have received payment for all reasonable professional fees incurred by the Administrative Agent and the Lenders with respect to the Postpetition Loans then due and payable unless such shall be paid from the subject advance. In no event shall the Lenders be requested to advance any funds or extend any credit other than for Budgeted Expenses actually incurred and payable either at the time of such advance or within one week thereafter.

(d)     Repayment. The Borrowers shall repay the entire unpaid principal amount of the Postpetition Loans, together with all accrued and unpaid interest thereon, on the earlier of the Postpetition Termination Date or the date on which the Bankruptcy Court approves the extension of any other credit facilities to a Borrower or Guarantor or, in the case any Postpetition Loan is made subsequent to the Postpetition Termination Date, upon demand therefor.

(e)     Interest. The Borrowers shall pay interest on the unpaid principal amount of each Postpetition Loan from the date made until the principal amount thereof shall have been paid in full at a rate per annum equal at all times to the Postpetition Loan Applicable Rate in effect from time to time, payable, monthly in arrears on the first Business Day of each month, and on the Postpetition Termination Date; provided however that all principal outstanding after the occurrence of a Postpetition Default shall bear interest, from the date of such Postpetition Default until the date on which such amount is due until such amount is paid in full or such Postpetition

13

Default is waived or cured, payable on demand, at the Postpetition Loan Applicable Rate in effect from time to time plus 4% per annum.

(f) <u>Grant of Security Interest</u>. As security for the prompt payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Postpetition Obligations and to induce the Lenders to make the Postpetition Loans in accordance with the terms hereof, the Borrowers and the Guarantors shall, pursuant to the Financing Order, and do hereby, assign, convey, mortgage, pledge, hypothecate and grant to the Administrative Agent, for the benefit of the Lenders, a first priority perfected security interest in the DIP Collateral, in each case subject to "Prior Liens" and the "Carve-Out" (as such terms are defined in the Financing Order) and to those certain fees and expenses payable to the United States Trustee and the Clerk of the Bankruptcy Court as more fully set forth in the Financing Order. Furthermore, in the event any unapplied remaining retainer funds paid to any of the Borrowers' Bankruptcy Court approved professionals are returned to any Borrower or remain at the conclusion of such approved professional's engagement, such unapplied remaining retainer funds shall be considered Cash Collateral. No cost or surcharge shall be imposed against the DIP Collateral or the Collateral under Section 506(c) of the Code.

(g) <u>Application of Sale Proceeds and Collections</u>. Notwithstanding anything to the contrary contained in this Agreement, from and after the DIP Financing Amendment Effective Date and so long as no Postpetition Default has occurred and is continuing, all net proceeds received from the sale, disposition, collection or other realization upon the Collateral or the DIP Collateral shall be applied (i) first, to payment of the Prepetition Obligations plus any accrued interest, fees, costs, or expenses thereon or chargeable thereto until such Prepetition Obligations have been paid and satisfied in full on terms and conditions satisfactory to the Administrative Agent and the Lenders, and (ii) second, once the Prepetition Obligations plus any accrued interest thereon is satisfied in full accordance with the Financing Order, to the Postpetition Obligations, each in the order of application determined by the Administrative Agent in accordance with the terms and conditions of the Pre-Petition Claim Documents and DIP Facility Documents (both as defined in the Financing Order), respectively, until such time as all such obligations of the Borrowers are indefeasibly paid and satisfied in full.

(h) <u>Postpetition Default</u>. Upon the occurrence and during the continuance of any Postpetition Default, the Administrative Agent (at the request of the Lenders) may, by written notice to the Borrowers, declare all or any portion of the Postpetition Obligations to be, and the same shall forthwith become, due and payable for all purposes, rights, and remedies, together with accrued interest thereon, and the obligation of the Lenders to make any further Postpetition Loans shall thereupon terminate, except as

14

provided in the Financing Order with respect to Budgeted Expenses incurred but not paid prior to such Postpetition Default. After the occurrence and during the continuance of any Postpetition Default, all net proceeds received from the sale, disposition, collection or other realization upon the Collateral or the DIP Collateral shall be applied in accordance with Section 2.23(g) hereof.

(p)     Effective as of the DIP Financing Amendment Effective Date, Section 5.19 of the Credit Agreement shall be deleted in its entirety. A reference to "[Intentionally Deleted]" shall be inserted in lieu thereof.

(q)     Effective as of the DIP Financing Amendment Effective Date, clause (k) of Section 6.02 of the Credit Agreement shall be deleted in its entirety. A reference to "[Intentionally Deleted]" shall be inserted in lieu thereof.

(r)     Effective as of the DIP Financing Amendment Effective Date, Section 6.05 of the Credit Agreement shall be amended and restated in full to read as follows:

SECTION 6.05.     Asset Sales. No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will any Loan Party permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to another Loan Party in compliance with Section 6.04, except (i) sales, transfers and disposition of (A) inventory in the ordinary course of business and (B) used, obsolete, worn out or surplus equipment or property in the ordinary course of business and (ii) sales, transfers and dispositions approved by the Administrative Agent or subject to a Bankruptcy Court order.

(s)     Effective as of the DIP Financing Amendment Effective Date, Article VI of the Credit Agreement shall be amended to add thereto the following new sections at the end of such Article:

SECTION 6.14.     Chapter 11 Claims. Other than Prior Liens and the Carve-Out (as each such term is defined in the Financing Order), the Borrowers and the Guarantors shall not incur, create, assume, suffer to exist, or permit any claim in any of the Cases (including without limitation any claim under Section 506(c) of the Bankruptcy Code and any deficiency claim remaining after the satisfaction of a Lien that secures a claim) to be on a parity with or senior to the claims of the Administrative Agent for the benefit of the Lenders against the Borrowers or Guarantors hereunder, or apply to the Bankruptcy Court for authority to do so unless such relief, if granted, would cause the Postpetition Obligations to be satisfied in full. The Borrowers and Guarantors shall not pay fees and expenses to any Bankruptcy Court-approved professional until such Bankruptcy Court-approved professional is authorized to be paid pursuant to any fee procedure approved by the Bankruptcy Court.

15

SECTION 6.15.    Budget; Minimum Postpetition Availability.    The Borrowers and Guarantors shall operate strictly in accordance with the Budget attached hereto as Exhibit C and shall pay only those actual, ordinary and necessary operating expenses of the Borrowers' and Guarantors' businesses in compliance with the Budget subject to allowable overage variances of either (i) up to 15% in aggregate cash receipts, disbursements and all expenses during a particular week of the forecast period, or (ii) up to 15% in aggregate cash receipts, disbursements and all expenses on a cumulative basis from inception to the particular week of the forecast period.

SECTION 6.16.    Reports. The Borrowers shall furnish the following:

(a)    Not later than the close of business on Wednesday of each week, the Borrower Representative will provide the Administrative Agent with a certificate from the Borrowers and Guarantors, which shall include the Borrowers' and Guarantors' bank account balances and a variance report for each Borrower and Guarantor showing (A) actual receipts and expenses for the preceding week as compared to those contemplated by the Budget, and (B) aggregate actual receipts and expenses for period from the Petition Date through the end of the preceding week as compared to the Budget for the same period.

(b)    Such other reports that the Administrative Agent or any Lender may reasonably request in writing from time to time.

(c)    The Borrower Representative will provide or cause to be provided to the Administrative Agent and the Lenders, telephonic and/or written weekly reports by the Borrowers and Houlihan, as may be requested by the Administrative Agent.

SECTION 6.17.    Sale Procedure Timeline. The Borrowers must (i) obtain, on or before July __ *[90 days after the DIP Financing Effective Date]*, 2009, an order of the Bankruptcy Court approving the Sale Procedures and bid protections, if any, for the Stalking Horse Bidder which shall both (a) provide for an all cash bid that has no financing, due diligence or other contingencies, and which shall be in an amount which is adequate to repay all Postpetition Obligations and Prepetition Obligations in full, including, without limitation, Postpetition Loans in an aggregate principal amount of *$70,000,000*, and (b) otherwise be on terms and conditions reasonably satisfactory to the Administrative Agent and Lenders; and (ii) consummate the sale of all or substantially all of the assets of the Borrowers and Guarantors on or before October __ *[180 days after the DIP Financing Effective Date]*, 2009 on terms and conditions satisfactory to the Administrative Agent and Lenders.

Section 3.    **Conditions Precedent**.  This DIP Financing Amendment shall not be effective until all corporate actions of the Borrowers and Guarantors taken in connection

16

herewith and the transactions contemplated hereby shall be satisfactory in form and substance to Administrative Agent and the Lenders, and each of the following conditions precedent shall have been satisfied:

(a)     Borrowers shall have paid all fees and expenses due and owing in connection with this DIP Financing Amendment, including, without limitation, a Lender fee of $600,000 payable to the Administrative Agent for the benefit of each Lender that delivers an executed counterpart of this DIP Financing Amendment on or prior to the DIP Financing Amendment Effective Date (which fee shall be divided amongst the Lenders based on each such Lender's Postpetition Aggregate Commitment on the DIP Financing Amendment Effective Date) and an agency fee payable to the Administrative Agent in the amount equal to $75,000.

(b)     The Administrative Agent and each Lender shall have received each of the following, in form and substance satisfactory to the Administrative Agent, the Lenders and the Administrative Agent's counsel, in their sole and absolute discretion:

(i)     a certificate of the Financial Officer of each Borrower certifying that (A) all representations and warranties in this DIP Financing Amendment are true and correct in all material respects and (B) there exists no Postpetition Default after giving effect to this DIP Financing Amendment and the borrowings contemplated hereby; and

(ii)     such other documents, instruments, and certificates, as the Lenders shall deem necessary or appropriate in connection with this DIP Financing Amendment and the transactions contemplated hereby.

(c)     The Administrative Agent shall have received a counterpart of this DIP Financing Amendment for each Lender duly executed and delivered by a duly authorized officer of each Borrower.

(d)     The Bankruptcy Court shall have entered an interim or final Financing Order, which shall be in form and substance satisfactory to the Administrative Agent and Lenders.

(e)     The Lenders shall have received the Budget which shall be in a form and substance acceptable to the Administrative Agent and Lenders.

(f)     All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrowers shall have been obtained on satisfactory terms and shall be in full force and effect.

Section 4.     **Representations and Warranties; Ratifications**.     Each Borrower represents and warrants to the Administrative Agent and the Lenders that (a) upon approval by the Bankruptcy Court, this DIP Financing Amendment shall constitute its legal, valid, and binding obligations, enforceable in accordance with the terms hereof (subject as to enforcement of remedies to any applicable bankruptcy, reorganization, moratorium, or other laws or principles of equity affecting the enforcement of creditors' rights generally), (b) the Credit Agreement, as amended hereby, and the other Loan Documents remain in full force and effect,

and (c) there exists no Postpetition Event of Default under the Credit Agreement after giving effect to this DIP Financing Amendment and, other than as disclosed on Exhibit B as of the Petition Date, there exists no Event of Default under the Credit Agreement after giving effect to this DIP Financing Amendment. Except as expressly modified by this DIP Financing Amendment or the Financing Order, the terms and provisions of the Credit Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. Except as provided herein, this DIP Financing Amendment shall not constitute an amendment or waiver of any terms and provisions of the Credit Agreement and other Loan Documents nor a waiver of the rights of the Administrative Agent and the Lenders to insist upon compliance with each term, covenant, condition, or provision of the Credit Agreement and other Loan Documents. Notwithstanding the foregoing, all references in the Credit Agreement to "Event of Default" shall be construed to mean a "Postpetition Event of Default" and the existence of an Event of Default under the Credit Agreement shall have no consequence unless it is a Postpetition Event of Default.

Section 5.    **Further Assurances**.  Each Borrower and each Guarantor shall execute and deliver such further agreements, documents, instruments, and certificates in form and substance reasonably satisfactory to the Administrative Agent, as the Administrative Agent or any Lender may deem reasonably necessary or appropriate in connection with this DIP Financing Amendment.

Section 6.    **Counterparts**.  This DIP Financing Amendment and the other Loan Documents may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument; in making proof of any such agreement, it shall not be necessary to produce or account for any counterpart other than one signed by the party against which enforcement is sought.  Telecopies of signatures shall be binding and effective as originals.

Section 7.    **Expenses**.  Each Borrower agrees, on a joint and several basis, to pay all costs and expenses of the Administrative Agent and Lenders including, without limitation, those contemplated under Section 2.12 of the Credit Agreement and any other Loan Document, and expressly including fees, charges and expenses of Vinson & Elkins L.L.P., FTI or any other consultant for or advisor to the Administrative Agent or Lenders in connection with the preparation, negotiation, execution, delivery and administration of this DIP Financing Agreement and all other instruments or documents provided for herein or delivered or to be delivered hereunder or in connection herewith (all such costs and expenses, the "**Administrative Agent's and Lenders' Expenses**").  In addition, each Borrower, on a joint and several basis, agrees to save and hold harmless the Administrative Agent and the Lenders from all liability for the Administrative Agent's and Lenders' Expenses.  All of the Administrative Agent's and Lenders' Expenses constitute Postpetition Obligations under the Loan Documents.  Each Borrower acknowledges that it will receive a summary invoice reflecting only the total amount due and that such summary invoice will not contain any narrative description of the services provided by Vinson & Elkins L.L.P., FTI or any other consultant or advisor.  Each Borrower agrees that delivery of such summary invoices shall not, in any way constitute a waiver of any right or privilege of the Administrative Agent and Lenders associated with such invoices.  The Administrative Agent is authorized by the Borrowers and the Lenders, from time to time in the Administrative Agent's sole discretion, to make further Postpetition Loans to the Borrowers, on

18

behalf of all Lenders, which the Administrative Agent deems necessary or desirable to pay any amount chargeable to or required to be paid by the Borrowers pursuant to the terms of the Credit Agreement and other Loan Documents, including payments of the Administrative Agent's and Lenders' Expenses (any of such Loans are herein collectively referred to as "**Safeguard Advances**"); provided that the Administrative Agent and Lenders shall have no obligation to make any Safeguard Advances, the aggregate amount of outstanding Safeguard Advances plus, without duplication, the aggregate Postpetition Loans shall not exceed the Postpetition Aggregate Commitments and the aggregate amount of outstanding Safeguard Advances *plus* the aggregate amount of Protective Advances (as defined in the Agreement after giving effect to the DIP Financing Amendment) at any time shall not exceed $3,000,000. Safeguard Advances may be made even if the conditions precedent set forth in Section 2.23(c) of the Credit Agreement have not been satisfied. The Administrative Agent is additionally authorized by each Borrower to charge the Borrowers' deposit accounts with JPMorgan for any and all of the Administrative Agent's and Lenders' Expenses from time to time as determined by the Administrative Agent. All obligations provided in this <u>Section 7</u> shall survive any termination of this DIP Financing Amendment and the other Loan Documents. Each Borrower and each Guarantor agrees and intends that each transfer to or for the benefit of the Administrative Agent and the Lenders made or to be made under this <u>Section 7</u> are (a) made according to ordinary business terms between the Borrowers, the Guarantors, the Administrative Agent and the Lenders taking into account the Borrowers' and Guarantors' businesses and financial affairs and (b) intended by the Borrowers, the Guarantors, the Administrative Agent and Lenders to be a contemporaneous exchange for new value given to the Borrowers by the Administrative Agent and the Lenders as set forth herein.

Section 8.     **Indemnification**.  Each Borrower, on a joint and several basis, hereby agrees to indemnify the Administrative Agent and the Lenders from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent or any Lender in any way relating to or arising out of or any action taken or omitted by the Administrative Agent or any Lender under this DIP Financing Amendment or in any way relating to the Postpetition Loans; provided that the Borrowers shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the Administrative Agent's or any Lender's gross negligence or willful misconduct.

Section 9.     **WAIVER OF JURY TRIAL**.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH BORROWER AND GUARANTOR HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE (WHETHER A CLAIM IN TORT, CONTRACT, EQUITY, OR OTHERWISE) ARISING UNDER OR RELATING TO THIS DIP FINANCING AMENDMENT, THE OTHER LOAN DOCUMENTS, OR ANY RELATED MATTERS, AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 10.     **GOVERNING LAW**.

(a)     **THIS DIP FINANCING AMENDMENT AND ALL LOAN DOCUMENTS SHALL BE DEEMED CONTRACTS MADE UNDER THE LAWS OF**

19

THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT (1) FEDERAL LAWS GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF ALL OR ANY PART OF THIS AGREEMENT AND ALL DOMESTIC LOAN DOCUMENTS OR (2) STATE LAW GOVERNS UCC COLLATERAL INTERESTS FOR PROPERTIES OUTSIDE THE STATE OF NEW YORK. THE PARTIES AGREE THAT DURING THE PENDENCY OF THE CASES THE BANKRUPTCY COURT WILL HAVE EXCLUSIVE JURISDICTION OVER PROCEEDINGS IN CONNECTION HEREWITH.

(b) EACH BORROWER AND GUARANTOR HEREBY WAIVES PERSONAL SERVICE OF ANY LEGAL PROCESS UPON IT. IN ADDITION, EACH BORROWER HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON IT BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO IT AT ITS ADDRESS DESIGNATED FOR NOTICE UNDER THE CREDIT AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON RECEIPT BY IT. NOTHING IN THIS SECTION 10 SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 11. **RATIFICATION**. THE BORROWER HEREBY RATIFIES AND CONFIRMS EACH OF THE RELEASES CONTAINED IN SECTION 5.13 OF THE FIRST AMENDMENT.

Section 12. **Binding Agreement**. This DIP Financing Amendment shall be binding on the parties hereto and their respective successors and assigns; provided, however, that the Borrowers may not assign or delegate any of their rights or obligations hereunder without the prior written consent of the Administrative Agent.

Section 13. **Headings**. The section headings hereof are inserted for convenience of reference only and shall in no way alter, amend, define or be used in the construction or interpretation of the text of such section.

Section 14. **Loan Document**. This DIP Financing Amendment is and shall constitute a Loan Document in all respects and for all purposes.

Section 15. **ENTIRE AGREEMENT**. THIS DIP FINANCING AMENDMENT AND THE OTHER LOAN DOCUMENTS COLLECTIVELY REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

[Remainder of page left intentionally blank. Signature pages follow.]

1543025v.13 CHA715/81009

IN WITNESS WHEREOF, this DIP Financing Amendment is executed as of the date first set forth above.

BORROWERS:

**AVENTINE RENEWABLE ENERGY, INC.**, a Delaware corporation

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – MT VERNON, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

OTHER LOAN PARTIES:

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY, LLC**

By: _____
Name: _____
Title: _____

**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____

ADMINISTRATIVE AGENT
AND THE LENDERS:

**JPMORGAN CHASE BANK, N.A.,**
individually as a Lender and as
Administrative Agent

By: _____
Name: _____
Title: _____

**BANK OF AMERICA, N.A.**, individually
as a Lender

By       _____
Name:  _____
Title:   _____

**UBS LOAN FINANCE LLC**, individually
as a Lender

By  _____
Name: _____
Title: _____

**WELLS FARGO FOOTHILL, LLC,**
individually as a Lender

By _____
Name: _____
Title: _____

**BMO CAPITAL MARKETS FINANCING, INC.,** individually as a Lender

By: _____
Name: _____
Title: _____

**SIEMENS FINANCIAL SERVICES, INC.**, individually as a Lender

By _____
Name: _____
Title: _____


By _____
Name: _____
Title: _____

**WACHOVIA BANK, NATIONAL ASSOCIATION**, individually as a Lender

By
Name:
Title:

## EXHIBIT A

## POSTPETITION COMMITMENTS
## AS OF THE DIP FINANCING AMENDMENT EFFECTIVE DATE

| Lender | Postpetition Commitment | Postpetition Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | $ 11,400,000 | 19% |
| Bank of America, N.A. | $ 9,600,000 | 16% |
| UBS Loan Finance LLC | $ 9,600,000 | 16% |
| Wells Fargo Foothill, LLC | $ 9,600,000 | 16% |
| BMO Capital Markets Financing, Inc. | $ 6,600,000 | 11% |
| Siemens Financial Services, Inc. | $ 6,600,000 | 11% |
| Wachovia Bank, National Association | $ 6,600,000 | 11% |
| TOTAL | $ 60,000,000 | 100% |

## POSTPETITION COMMITMENTS
## AS OF THE DIP INCREASE DATE

| Lender | Postpetition Commitment | Postpetition Percentage |
|---|---|---|
| JPMorgan Chase Bank, N.A. | *$ 13,300,000* | 19% |
| Bank of America, N.A. | *$ 11,200,000* | 16% |
| UBS Loan Finance LLC | *$ 11,200,000* | 16% |
| Wells Fargo Foothill, LLC | *$ 11,200,000* | 16% |
| BMO Capital Markets Financing, Inc. | *$ 7,700,000* | 11% |
| Siemens Financial Services, Inc. | *$ 7,700,000* | 11% |
| Wachovia Bank, National Association | *$ 7,700,000* | 11% |
| TOTAL | *$ 70,000,000* | 100% |

A-1

## EXHIBIT B
## DEFAULTS EXISTING ON PETITION DATE


1.      Borrowers and Guarantors voluntarily filed a bankruptcy petition, which resulted in an immediate Event of Default under Article VII(i);

2.      The Borrowers and Guarantors failed to make the payment of interest due under the Senior Notes on April 1, 2009, which resulted in an immediate Event of Default under Article VII(f) and Article VII(g).

3.      Violation of Article VII(e) solely as a result of the Borrowers' breach of Section 5.04 due to their failure to pay interest owing under the Senior Notes.

1543025v.13 CHA715/81009

# EXHIBIT C
## BUDGET

1543025v.13 CHA715/81009