IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**, a Delaware Corporation, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 09-11214 (KG)<br><br>(Jointly Administered)<br><br>Relates to: Dkt. No. 15<br>Hearing Date and Time: 5/5/09 at 10:00 a.m. |

**JPMORGAN CHASE BANK, N.A.'S OBJECTION TO EMERGENCY
MOTION OF THE DEBTORS FOR ENTRY OF FINAL ORDER PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),
AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING
DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING AND
(B) TO UTILIZE CASH COLLATERAL, AND (II) GRANTING
ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES**

TO THE HONORABLE KEVIN GROSS,
UNITED STATES BANKRUPTCY JUDGE:

JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Agent") for Bank of America, N.A., BMO Capital Markets Financing, Inc., JPMorgan Chase Bank, N.A., Siemens Financial Services, Inc., UBS Loan Finance LLC, Wachovia Bank, National Association, and Wells Fargo Foothill, LLC (collectively, the "Senior Secured Lenders"), files this objection (the "Objection") to the *Emergency Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing and (B) to Utilize Cash*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway, P.O. Box 1800, Pekin, Illinois 61555-1800.

1

*Collateral, and (II) Granting Adequate Protection to Pre-Petition Secured Parties* (the "Motion") [Dkt. No. 15] filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). In support of its Objection, the Agent respectfully states as follows:

## PRELIMINARY STATEMENT

1. Pursuant to the Motion, the Debtors propose to layer up to $30 million of senior secured postpetition debt (inclusive of $15 million of senior secured postpetition debt previously approved by this Court on an interim basis) over the claims and liens of the Senior Secured Lenders without their consent. However, rather than adequately protecting the interests of the Senior Secured Lenders as required by the Bankruptcy Code, the proposed DIP facility (the "Proposed DIP Facility") would severely degrade the interests of the Senior Secured Lenders and subject the Senior Secured Lenders' interests to unreasonable and severe risk. The Debtors attempt to primarily rely on an alleged "substantial equity cushion" to meet their adequate protection burden. This alleged "substantial equity cushion" is premised on a comparison by the Debtors of their assets to a singular transaction that is not indicative of the market, as well as assumptions, with no basis other than raw speculation, that ethanol prices will increase more than 20% from current prices in the third and fourth quarters of 2009 despite the oversupply in the ethanol industry. However, as will be demonstrated at the hearing on the Motion, the continued negative gross margin of the Debtors, the highly distressed state and questionable long-term viability of the ethanol industry (with no assurance of any improvement in the near future), and the Debtors' speculative and baseless assumptions make reliance on any purported equity cushion highly speculative and of little value to the Senior Secured Lenders. As the Debtors recognized in March of this year, "[t]he current spread between ethanol and corn prices cannot

support the long-term viability of the U.S. ethanol industry in general or [the Debtors] in particular." See Excerpt of the Debtors' Form 10-K at pg. 19 attached hereto as Exhibit A.

2.  Further, the projected negative cash flow of the Debtors, the anticipated continuing depletion of the Debtors' working capital, and the failure of the Debtors to promptly pursue a Chapter 11 exit strategy puts the Senior Secured Lenders in severe danger of finding the Debtors with fully exhausted working capital and liquidity within the next six months and no viable alternatives for exiting Chapter 11 without additional funding. In such event, if the Proposed DIP Facility is granted, the value of the Senior Secured Lenders' collateral is likely insufficient to satisfy the Senior Secured Lenders' approximate $40 million in credit exposure. As a result, the Debtors simply are not able to adequately protect the Senior Secured Lenders' interests from this certain diminution in value.

3.  For these reasons and the reasons more fully discussed below, this Court must deny the relief requested in the Motion.

## BACKGROUND

### A. The Debtors' Bankruptcy Cases.

4.  On April 7, 2009, the Debtors commenced the above-referenced chapter 11 cases (collectively, the "Cases") when each Debtor filed a voluntary petition for relief under title 11 of the United States Code, *et seq.* (the "Bankruptcy Code"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are operating and managing their businesses and assets as debtors-in-possession.

5.  On April 8, 2009, the Debtors filed the Motion requesting, among other things, approval of the Proposed DIP Facility. On April 13, 2009, the Agent filed its *Preliminary Objection to Emergency Motion of the Debtors, for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and*

3

*Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Secured Parties and (III) Scheduling a Final Hearing* (the "Preliminary Objection") [Dkt. No. 53] in opposition to the relief requested in the Motion on an interim basis.

6. On April 14, 2009, this Court conducted an interim hearing on the Motion. The arguments of the Agent set forth in the Preliminary Objection and the evidence adduced by the Agent at the interim hearing are incorporated herein by reference.

7. On April 14, 2009, over the objection of the Agent and Senior Secured Lenders, this Court entered its *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Secured Parties and (III) Scheduling a Final Hearing* (the "Interim Order") [Dkt. No. 65] granting interim approval of the Motion and authorizing the Debtors to incur up to $15 million of senior secured postpetition financing under the Proposed DIP Facility.

8. On or about April 24, 2009, an official committee of unsecured creditors was appointed in the Cases.

**B.     The Senior Secured Lenders' Claims and Liens.**

9. Prior to the commencement of the Cases, the Senior Secured Lenders made certain loans and other extensions of credit to certain of the Debtors pursuant to and in accordance with that certain Credit Agreement dated as of March 23, 2007, among the Debtors, the Agent, Bank of America, N.A., as syndication agent, UBS Securities and Wells Fargo Foothill, LLC, as co-documentation agents, J.P. Morgan Securities Inc., as sole bookrunner and

sole lead arranger, and the Senior Secured Lenders, as lenders (as amended and supplemented from time to time prior to this date, the "Credit Agreement"). The Credit Agreement provided for (i) a revolving loan commitment of up to $60 million, subject to collateral availability (the "Prepetition Revolver"), and (ii) a $25 million sub-limit for letters of credit, subject to collateral availability (the "Prepetition LC Facility").

10. As of the close of business on April 7, 2009, the Senior Secured Lenders were owed at least $40.25 million as follows: (i) at least $18.35 million pursuant to the Prepetition Revolver, plus any and all other fees, costs, expenses, charges, other debts or obligations of the Debtors to the Senior Secured Lenders under the Credit Agreement, related documents, and applicable law and (ii) at least $21.9 million of letters of credit were outstanding under the Prepetition LC Facility (collectively, the "Senior Secured Debt").

11. The Senior Secured Debt is secured by, among other things, perfected first priority liens and security interests in substantially all of the personal property and real estate of the Debtors, including, without limitation, all accounts, chattel paper, copyrights, patents, trademarks, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, cash, cash equivalents, letters of credit, letter-of-credit rights, supporting obligations, deposit accounts with any bank or other financial institution, commodity accounts with any bank or other financial institution, securities accounts with any bank or other financial institution, commercial tort claims, farm products, and all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing (collectively, the

"Prepetition Collateral").

### C. The Unsecured Notes.

12. In March 2007, Aventine Renewable Energy Holdings, Inc. ("Aventine") issued unsecured 10% fixed-rate notes due April 2017 (the "Original Unsecured Senior Notes") in the aggregate principal amount of $300 million pursuant to an indenture between Aventine, as issuer, the other Debtors, as guarantors, and Wells Fargo Bank, N.A., as trustee. On August 10, 2007, Aventine exchanged all of the Original Unsecured Senior Notes for an issue of registered unsecured notes (the "Unsecured Senior Notes") with terms identical to the Original Unsecured Senior Notes. The Unsecured Senior Notes are guaranteed by and are general unsecured obligations of all of the Debtors. The DIP Lenders are, upon information and belief, holders of approximately 49% of the aggregate outstanding amounts of the Unsecured Senior Notes.

### D. The Senior Secured Lenders' Offer of Postpetition Financing.

13. In the weeks leading up to the filing of the Debtors' bankruptcy petitions and thereafter, the Agent and Senior Secured Lenders negotiated, in good faith, with the Debtors and their financial advisors in an effort to agree to terms pursuant to which the Senior Secured Lenders would provide postpetition financing to the Debtors. Despite the superior proposals made by the Senior Secured Lenders, the Debtors rejected all such proposals and elected to proceed with the Proposed DIP Facility.

### E. The Debtors' Proposed DIP Facility and Use of Cash Collateral.

14. Pursuant to the Motion, the Debtors have requested, among other things, that this Court authorize the nonconsensual usage of the Senior Secured Lenders' Cash Collateral and approve, on a final basis, the Debtors' Proposed DIP Facility providing up to $30 million in postpetition term loans (inclusive of $15 million of senior secured postpetition loans previously

6

approved by this Court pursuant to the Interim Order). If approved as requested, the Debtors' Proposed DIP Facility provides that the DIP Lenders would be granted first priority liens on, among other things, the Prepetition Collateral, priming the Senior Secured Lenders' liens on same. Moreover, projections show that the Debtors' Proposed DIP Facility will run out within six months, which may likely leave the Debtors' without a viable exit strategy from Chapter 11.

15. As purported "adequate protection" of the Senior Secured Lenders' interests in the Prepetition Collateral, the Debtors have proposed the following limited "adequate protection package" for the benefit of the Senior Secured Lenders: (i) the granting of replacement liens subordinate to liens of the DIP Lenders and the Carve-Out, (ii) the granting of super-priority administrative claims subordinate to those of the DIP Lenders and the Carve-Out, (iii) providing financial reporting to the Senior Secured Lenders to the same extent as the DIP Lenders, and (iv) the payment of interest to the Senior Secured Lenders as it accrues at the non-default rate under the Credit Agreement. See Motion, at pgs. 6-7.

16. Notably absent from the Debtors' Proposed DIP Facility is any timeline for a sale or other exit strategy for the Debtors in these Cases. The Debtors are experiencing continuing significant losses, have been expending cash at an alarming rate, and are operating, and will likely continue to operate, with negative gross margins for the foreseeable future, all while operating within an industry in high distress and with no assurance of recovery. Cash flow projections for the Debtors also show that, even with access to all of the proposed funding under the Debtors' Proposed DIP Facility, the Debtors will not have sufficient liquidity to operate for more than the next six months.

17. Despite this, the Debtors and DIP Lenders have decided to enter into, and are requesting this Court approve on a final basis, a DIP financing facility with a one-year maturity, without any timeline for any sale procedure or other exit strategy, and with substantial fees and a

16.5% interest rate, so that the Debtors and DIP Lenders (who hold approximately 49% in principal amount of the outstanding Unsecured Senior Notes) may engage in high risk speculation to the detriment of the interests of the Senior Secured Lenders.

## OBJECTION

**The Requested Priming DIP Facility and Use of Cash Collateral Are Impermissible Because The Debtors Cannot Adequately Protect the Interests of the Senior Secured Lenders.**

### A. The Alleged "Equity Cushion" Does Not Adequately Protect the Senior Secured Lenders' Interests.

18. The Bankruptcy Code demands not only that secured lenders be compensated for the decline in value of their collateral caused by a priming postpetition financing facility, but also that they receive the same level of protection negotiated for and obtained prior to bankruptcy as if there had been no postpetition priming financing facility. Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland), 16 F.3d 552, 564 (3d Cir. 1994); In re Dunes Casino Hotel, 69 B.R. 784, 793 (Bankr. D.N.J. 1986); see also In re Winsor Hotel, LLC, 295 B.R. 307, 314 (Bankr. C.D.Ill. 2003) ("[W]here the debtor proposes a priming lien, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing"). Moreover, the adequate protection offered by the debtor must not be "illusory." Carpet Ctr. Leasing Co., Inc. v. Nalley Motor Trucks, 991 F.2d 682, 685 (11th Cir. 1993). The determination of whether a secured creditor has received adequate protection is a question of fact, decided on a case by case basis. Swedeland, 16 F.3d at 564. The ability to prime an existing lender is extraordinary and, in such circumstances, a court "must be particularly cautious when assessing whether creditors so displaced are adequately protected." See In re First South Savings Assoc., 820 F.2d 700, 710 (5th Cir. 1987); In re Stoney Creek Technologies, LLC, 364 B.R. 882, 889-890 (Bankr.

8

E.D.Penn. 2007).

19. The burden of showing that the Senior Secured Lenders' interests in the Prepetition Collateral are adequately protected rests on the Debtors. The Bankruptcy Code squarely places the burden of proving that the interest of a lien holder is adequately protected on the debtor. See 11 U.S.C. § 364(d)(2); Swedeland, 16 F.3d at 564; see also In re The Colad Group, Inc., 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005) (noting that "[c]ontrary to the mandate of 11 U.S.C. § 364(d)(2)," the debtor failed to meet its burden of proof on the issue of adequate protection).

20. As purported adequate protection of the Senior Secured Lenders' interests, the Debtors assert that the Senior Secured Lenders' liens are adequately protected by a "significant equity cushion." See Motion, at pgs. 19-20. The Debtors also purport to satisfy their burden by granting the Senior Secured Lenders replacement liens subordinate to liens of the DIP Lenders and the Carve-Out, granting the Senior Secured Lenders super-priority administrative claims subordinate to those of the DIP Lenders and the Carve-Out, providing certain financial reporting, and paying interest as it accrues at the non-default rate under the Credit Agreement. See Motion, at pgs. 6-7. However, despite the Debtors' assertions, it is clear that the Debtors are not providing the Senior Secured Lenders with the same level of protection negotiated for and obtained prior to bankruptcy as if there had been no priming financing facility.

21. As the Agent will further demonstrate at the hearing on the Motion, based on valuations and continuing negative cash flow, the purported "equity cushion" is illusory and insufficient to provide the Senior Secured Lenders adequate protection. See In re Aqua Assoc., 123 B.R. 192, 196 (Bankr. E.D.Penn. 1991) ("[W]hile the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis.").

Given the current distressed state of the Debtors' industry, the questionable viability of the Debtors' ongoing business operations, and the Debtors' admitted continuing negative gross margins and operation in an industry with questionable viability, the claimed protection of the alleged "substantial equity cushion" will be speculative at best and subject to substantial question, particularly in light of the current economic climate. See, e.g., Excerpt of the Debtors' Form 10-K at pg. 19 in which the Debtors admit that "[t]he current spread between ethanol and corn prices cannot support the long-term viability of the U.S. ethanol industry in general or [the Debtors] in particular."

22. In determining the protection provided by the alleged equity cushion, the Debtors will ask this Court to value the Debtors' assets using a "fair market value in continued use" valuation. However, such a valuation methodology is not appropriate in this case as it is based on groundless assumptions that the price of ethanol will increase in the second half of 2009 and is the improper methodology to be applied given the questionable viability of the ethanol industry. See In re Conquest Offshore Int'l, 73 B.R. 171, 176-177 (Bankr. S.D.Miss. 1986) (holding that, in defining the appropriate method of valuation to be utilized for adequate protection purposes, the courts must operate on a case by case basis); In re Columbia Gas Sys., Inc., 1992 WL 79323 (Bankr. D.Del. 1992). First, the Debtors' continuing losses, negative gross margin, and questionable viability, together with the severe distress and speculative future prospects of the ethanol industry, dictate that a liquidation value be used in determining the value of the alleged "substantial equity cushion." See Conquest, 73 B.R. 171 (using liquidation value in adequate protection analysis); In re Keystone Camera Products Corp., 126 B.R. 177 (Bankr. D.N.J. 1991) (same); see also In re Phoenix Steel Corp., 39 B.R. 218, 226-27 (valuing collateral at mean of liquidation and going concern value "given the speculative projections entangling

[the] case."). However, such value does not and cannot provide the Senior Secured Lenders with any meaningful protection from the diminution in value that would be caused by priming liens, especially in light of the fact that projections show the Debtors would fully expend their working capital and fully draw the Debtors' Proposed DIP Facility within the next six months - the effect of which decimates the Senior Secured Lenders' collateral base. Further, the valuations provided by the Debtors are highly speculative and suspect as they rely upon both (a) a singular transaction that is not indicative of the current market and (b) speculative assumptions that the price of ethanol will increase in excess of 20% in the second half of 2009 despite the fact that the ethanol industry is currently in oversupply and ethanol imports have increased approximately 50% over the last year. The Debtors should not be allowed to speculate at the risk of the Senior Secured Lenders based on their unsubstantiated hopes that the price of ethanol will substantially increase in the next six months.

**B.     The Proposed Adequate Protection Package Is Insufficient.**

23.    In addition to the fatal flaw in the Debtors' proposed adequate protection package resulting from the absence of an adequate equity cushion, the Debtors' adequate protection package is insufficient for numerous other reasons.

24.    First, the structure of the Debtors' Proposed DIP Facility in and of itself also puts the interests of the Senior Secured Lenders in the Prepetition Collateral at substantial risk. As previously discussed, the Debtors are currently operating at negative gross margins, and have been experiencing such losses since at least the second half of 2008. See Declaration, at ¶21. Even with the entire amount of the Debtors' Proposed DIP Facility available, the Debtors will likely deplete their liquidity within at least the next six months. Yet, the Debtors' Proposed DIP Facility provides for a maturity of up to one year, with no time line for a proposed sale or other bankruptcy exit

11

strategy for the Debtors despite the Debtors' continued losses. The Debtors' continued operation at a loss, together with current economic conditions and the state of the Debtors' industry, pose a substantial risk that the Debtors will find themselves incurring up to $30 million in postpetition financing well prior to the maturity of the Debtors' Proposed DIP Facility, while substantially degrading the interests of the Senior Secured Lenders in the Prepetition Collateral and not promptly pursuing a viable exit strategy in these Cases.

25. Second, given the severe risks being shouldered by the Senior Secured Lenders under the Proposed DIP Facility, this Court should require monthly status conferences be held to further the expeditious and economic resolution of these Cases. See 11 U.S.C. § 105(d) (stating that "the court, on its own motion or on the request of a party in interest, shall hold such status conferences as are necessary to further the expeditious and economic resolution of the case . . . and issue any order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically."). At such status conferences, the Debtors should be required to report on their efforts to facilitate a reorganization of the Debtors or to market and sell any of the Debtors' properties, the status of the Debtors' business and operations, and the valuation of the Debtors' assets for adequate protection purposes. The Court should establish benchmark dates for the Debtors to meet in these cases. To maximize the value of the estates for all parties in interest, the Senior Secured Lenders suggest that this Court require the Debtors to select a stalking horse bidder for the sale of all or substantially all of their assets from a ready, willing, and able buyer within 90 days of the initial closing date of the Proposed DIP Facility and consummate a sale of all or substantially all of their assets within 180 days of the initial closing date of the Proposed DIP Facility.

26. Other deficiencies in the proposed adequate protection package include, without

limitation, the following:

- Cross-Default Protections; Automatic Stay Relief. The Debtors' Proposed DIP Facility does not provide the Agent and Senior Secured Lenders with cross-default protection and automatic stay relief so that the Senior Secured Lenders may protect their interests in the event a default occurs under the Debtors' Proposed DIP Facility. Further, the Debtors' Proposed DIP Facility allows the DIP Lenders to allow the continued use of the Senior Secured Lenders' Cash Collateral upon a default if the DIP Lenders waive such default. Any use of the Senior Secured Lenders' Cash Collateral after the occurrence of a default should only be allowed if such default is waived by the Agent and Senior Secured Lenders.

- No Additional Senior or *Pari Passu* Liens or Debt. Any order granting the Debtors' Proposed DIP Facility on a final basis should restrict the Debtors from granting or incurring any other liens or debt that would be senior to or *pari passu* with the liens or claims of the Agent and Senior Secured Lenders.

- Payment of Agent's and Senior Secured Lenders' Postpetition Fees and Expenses. In light of the Debtors' concession that the Senior Secured Debt is oversecured, any adequate protection package provided the Senior Secured Lenders must include the ongoing payment of postpetition fees and expenses, including attorneys' fees, incurred by the Agent and Senior Secured Lenders in accordance with the Credit Agreement. See 11 U.S.C. § 506(b)

- Default Rate Interest. The proposed interest to be paid the Senior Secured Lenders should be paid at the default rate provided under the Credit Agreement rather than the non-default rate as proposed.

- Replacement Liens Inadequate. The proposed replacement liens are inadequate given the speculative value of the Debtors' assets and the Debtors' ongoing losses.

- Carve-Out of Senior Secured Lenders' Interests Improper for Professional Fees. The Debtors may not subject the Senior Secured Lenders' interests to the "Carve-Out" in the amount of $2 million to pay professional fees of these estates under Section 506(c) of the Bankruptcy Code or otherwise. See Kivitz v. CIT Group/Sales Finance, Inc., 272 B.R. 332 (D. Md. 2000).

- Term of Proposed DIP Facility Excessive. The Debtors' Proposed DIP Facility allows the DIP Lenders the ability to extend an already excessive maturity of the Debtors' Proposed DIP Facility by waiving any events of default in their sole discretion and with no court oversight, allowing the Debtors and DIP Lenders to continue speculating that the depressed ethanol industry will recover, while providing no protections to the Agent and Senior

13

Secured Lenders in such event.

- <u>Reporting</u>. The Debtors should be required to provide the Agent and Senior Secured Lenders with continued reporting and access to Collateral consistent with the requirements of the Credit Agreement, including, but not limited to, the following: (i) weekly borrowing base certificates; (ii) continued monthly reporting and financials; (iii) weekly crush margin calculations; and (iv) the continued ability to conduct sight visits with access to appropriate personnel to inspect and evaluate Collateral.

- <u>Adequate Protection Payments</u>. The Debtors should be required to make adequate protection principal payments to the Agent and Senior Secured Lenders in the event the borrowing base is reduced below certain to-be-determined levels.

- <u>Limitation on Waivers of Events of Default</u>. The DIP Lenders should be restricted from waiving events of default under the Proposed DIP Facility without the consent of the Agent and Senior Secured Lenders or order of the court.

## RESERVATION OF RIGHTS

27. The Agent expressly reserves the right to amend or supplement this Objection, to file additional objections, and to introduce evidence supporting this Objection and any other objections at any hearing on the Motion. In addition, any order granting adequate protection to the Agent and Senior Secured Lenders should state that such order is without prejudice to the request of the Agent or Senior Secured Lenders for any modification of, or further or different, adequate protection.

## PRAYER

**WHEREFORE**, Agent respectfully requests that this Court enter an order (1) denying the Motion and (2) granting the Agent such other relief as is just and appropriate under the circumstances.

Dated: April 28, 2009

        Respectfully submitted,

        */s/ Ian Connor Bifferato*

Ian Connor Bifferato (DE #3273)
Thomas F. Driscoll, III (DE #4703)
**BIFFERATO LLC**
800 King Street, First Floor
Wilmington, DE 19801
Tel: 302-225-7600
Fax: (302) 792-7470
E-mail: cbifferato@bifferato.com
       tdriscoll@bifferato.com

-and-

William L. Wallander[2], TX #20780750; NY #4587804
Matthew W. Moran[2], TX #24002642
Clayton T. Hufft[2], TX #24056658; LA 26391
**VINSON & ELKINS L.L.P.**
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
Tel: 214-220-7700
Fax: 214-220-7716
E-mail: bwallander@velaw.com; mmoran@velaw.com; chufft@velaw.com

**ATTORNEYS FOR JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT**

---

[2] Admitted *pro hac vice*.