IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**, a Delaware Corporation, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 09-11214 (KJ)<br><br>(Jointly Administered)<br><br>Hearing Date: January 13, 2010 at 3:00 p.m. (ET)<br>Obj. Deadline: December 28, 2009 at 4:00 p.m. (ET) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363, 503, 1123 AND 1125 OF THE BANKRUPTCY CODE (I) APPROVING THE DEBTORS' ENTRY INTO THE BACKSTOP COMMITMENT AGREEMENT RELATED TO THE OFFERING OF NEW NOTES AND EQUITY, AND (II) AUTHORIZING THE DEBTORS' PAYMENT OF RELATED FEES, EXPENSES, AND INDEMNIFICATION TO THE BACKSTOP PURCHASERS

Aventine Renewable Energy Holdings, Inc. ("ARE Holdings") and its affiliated debtors and debtors in possession (together with ARE Holdings, collectively, the "Debtors") hereby move the Court (the "Backstop Motion") for entry of an order, substantially in the form annexed hereto as Exhibit 1 (the "Approval Order"), pursuant to sections 105(a), 363(b), and 503 of title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), (i) approving the Debtors' entry into the Backstop Commitment Agreement dated as of December 3, 2009 (the "Backstop Commitment Agreement"), a copy of which is attached to the Approval Order as Exhibit A, by and among the Debtors and certain entities (the "Backstop Purchasers") holding the Debtors' prepetition senior unsecured 10% notes due 2017 (the "Pre-Petition Notes"), each as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

DB02:8677544.8    068125.1001

set forth on Schedule I to the Senior Secured Notes Term Sheet,[2] and (ii) authorizing and approving the Debtors' payment of the Break-Up Fee (as defined below), the reimbursement of the reasonable fees, expenses, disbursements and charges of the Backstop Purchasers to the extent set forth in and incurred in connection with the Backstop Commitment Agreement, and indemnification of the Indemnified Persons (as defined in the Backstop Commitment Agreement) in accordance with the indemnification provisions set forth in the Backstop Commitment Agreement. In support of the Backstop Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Backstop Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Backstop Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105, 363 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014.

## BACKGROUND

### I. General Background

3. On April 7, 2009 (the "Petition Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

---

[2] The "Senior Secured Notes Term Sheet" shall mean the Senior Secured Notes Term Sheet annexed to the Backstop Commitment Agreement. The Backstop Commitment Agreement and the Senior Secured Notes Term Sheet are incorporated herein by reference.

4. Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of William J. Brennan in Support of the Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 4], which is incorporated herein by reference.

5. On April 23, 2009, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee"). No request has been made for the appointment of a trustee or examiner.

6. On May 6, 2009, the Court approved, on a final basis, the Debtors' entry into a postpetition priming, first-lien $30 million credit facility (as amended, the "DIP Facility").

## II. The Plan of Reorganization

7. After extensive negotiations between the Debtors and the Backstop Purchasers, on the date hereof, the Debtors have filed a proposed plan of reorganization (as may be amended, supplemented or modified, the "Plan").[3] The Plan, which has broad-based support, provides for a reorganization of the Debtors' business operations with ARE Holdings maintaining a direct or indirect 100% ownership interest of each of the other operating Debtors upon emergence.

8. The Plan proposes, among other things, to pay all outstanding obligations under the DIP Facility Documents, all administrative claims, and all priority claims in full in cash. With respect to claims arising under their prepetition secured credit facility (the "Pre-Petition Credit Facility"), the Plan proposes to pay such claims in full in cash except with respect to the portion of such claims related to the LC Obligations. Under the Plan, the LC Obligations

---

[3] Unless otherwise defined in this section of the Backstop Motion, capitalized terms shall have the meanings ascribed to them in the Plan. The summary and description of the Plan herein is subject to the terms of the Plan. To the extent there is any inconsistency between the summary and description of the Plan herein and the Plan, the Plan shall control.

will be fully cash collateralized until the respective letters of credit are released, matured or drawn.

9. The Plan proposes that other secured claims, including without limitation, mechanic lien claims and the claims of Kiewit, will be (i) restructured, (ii) reinstated in accordance with section 1124(a) of the Bankruptcy Code, (iii) paid in full in cash, or (iii) satisfied by the return of the collateral securing such claim to the claimant.

10. The Plan further proposes that the Debtors' unsecured creditors – specifically, the holders of Prepetition Unsecured Notes Claims and General Unsecured Claims – will receive their *pro rata* share of 80% of the New ARE Holdings Common Stock to be issued and outstanding on the Effective Date, subject to dilution by the exercise of any Warrants and subject to dilution by any stock awards issued on or after the Effective Date under the Management Incentive Plan. Unsecured creditors holding Allowed Unsecured Claims in an amount equal to or less than $50,000 (i.e., Convenience Claims) will receive a cash distribution equal to 35% of the Allowed amount of such Convenience Claim. Finally, the Plan proposes that existing equity holders of ARE Holdings will receive certain warrants, and the equity holders of the other Debtors will not receive a distribution under the Plan on account of such equity interests.

11. A critical element of the Plan is the Debtors' ability to obtain exit financing to fund the distributions required to be made under the Plan, as well as to fund the Debtors' working capital and general corporate needs upon emergence from chapter 11. The Debtors have entered into the Backstop Commitment Agreement to ensure that the Debtors' capital and general corporate needs will be fulfilled upon emergence through the issuance of no

less than $105 million in senior secured notes pursuant to the terms of the Senior Secured Notes Terms Sheet.

### III. The Notes and New Equity Offering and the Backstop Commitment Agreement

12. After significant arms-length negotiations with the Backstop Purchasers, the Debtors have determined to commence an offering (the "Offering")[4] in connection with their emergence from chapter 11 of not less than $105,000,000 of senior secured notes issued by Holdings (each a "Senior Secured Note") and 20% of the New Equity (the "Noteholders New Equity") the purchase of which will be guaranteed by the Backstop Purchasers on the terms set forth in the Senior Secured Notes Term Sheet. The Debtors believe that conducting the Offering as set forth in the Senior Secured Notes Term Sheet will meet the Debtors' capital and liquidity needs upon emergence from chapter 11 and that the terms of the Senior Secured Notes Term Sheet are in the best interest of the Debtors, their estates and creditors.

13. The Senior Secured Notes Term Sheet provides for the Senior Secured Notes and Noteholders New Equity to be offered together in units (each an "Offering Unit"), with each Offering Unit consisting of a Senior Secured Note in the face amounts of $1,000 and a *pro rata* share of the Noteholders New Equity based on the aggregate amount of Senior Secured Notes issued pursuant to the Offering. Each unit will be issued and sold for an aggregate cash consideration of $952.38. The Senior Secured Notes will be guaranteed on a joint and several basis by each of Reorganized ARE Holdings' present and future domestic subsidiaries and shall be secured by first priority liens on all of the Debtors' assets upon emergence; provided, however, that any liens securing the senior secured revolving credit facility contemplated by the

---

[4] The principal terms and conditions of the Offering are set forth in the Senior Secured Notes Term Sheet. The Backstop Motion provides only a brief, summary description of the Offering. Capitalized terms used, but not defined in this description of the Offering shall have the meanings ascribed to them in the Senior Secured Notes Term Sheet. All interested parties should consult the Senior Secured Notes Term Sheet for a full description of the Offering.

Plan and entered into by the Debtors on or after the Effective Date shall have priority over the liens securing the Senior Secured Notes. Only the holders of the Pre-Petition Notes (the "Pre-Petition Noteholders")[5] will be given the opportunity to participate in the Offering, and the Pre-Petition Noteholders shall be entitled to purchase Offering Units based on their *pro rata* ownership of the Pre-Petition Notes. If all of the Pre-Petition Noteholders do not purchase their allocation of the Offering, the Backstop Purchasers are required to purchase the remaining Offering Units in the percentages set forth on Schedule I to the Senior Secured Notes Term Sheet.

14. In consideration for their agreement to guarantee the full amount of the Offering, (a) in connection with the closing of the Offering, each Backstop Purchaser shall be entitled to purchase units consisting of the Senior Secured Notes and related Noteholder New Equity issued to it in the Offering at a per unit price equal to 97.0% of the Purchase Price; or (b) subject to satisfying the terms and conditions set forth in the Backstop Commitment Agreement, in the event any of the Debtors (i) enter into an Alternate Transaction and (ii) do not issue the Senior Secured Notes on the terms set forth in the Senior Secured Notes Term Sheet, the Debtors shall pay to each Backstop Purchaser (unless waived by such purchaser) its pro rata portion of an aggregate fee equal to $3,000,000 (the "Break Up Fee"), provided, however, that any Backstop Purchaser that provides financing or purchases assets as part of an Alternate Transaction shall not be entitled to receive its pro rata portion of the Break Up Fee. The Break Up Fee shall be deemed fully earned upon entry of the Approval Order and accorded administrative expense status under section 503(b) of the Bankruptcy Code and shall be payable in full upon (i) the effective date of any chapter 11 plan (other than the Plan) with respect to the Debtors, or (ii) the

---

[5] The Backstop Purchasers are each Pre-Petition Noteholders.

consummation of a sale or any series of sales of the Debtors' assets, which sale(s) reduce the Debtors' ethanol production capacity by more than 50%.

15. The Debtors shall not be required to pay any Break Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement. The Debtors are also not required to pay the Break Up Fee in the event the Backstop Commitment Agreement is terminated by the Backstop Purchasers based on the occurrence of any Backstop Termination Event, except in the event there is a Subsequent Termination Event. A Subsequent Termination Event, which is defined more fully in the Backstop Commitment Agreement, only arises if certain factors occurred, including the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

16. Pursuant to the Backstop Commitment Agreement, the Debtors have also agreed to reimburse the reasonable fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the Backstop Commitment or to the preparation and negotiation of the Backstop Commitment Agreement, the Senior Secured Notes Term Sheet and the proposed documentation and the transactions contemplated thereby, including, without limitation, the reasonable fees and expenses of counsel to the Backstop Purchasers (the "Expense Reimbursement").

17. Further, pursuant to the Backstop Commitment Agreement, the Debtors have agreed to indemnify and hold harmless each Indemnified Persons from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to the Backstop Commitment Agreement, the Backstop Commitment, the Offering, the Senior Secured Notes Term Sheet, the Plan, the use of proceeds

of the Senior Secured Notes or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons for any reasonable legal or other expenses incurred in connection with any of the foregoing; provided, however, that the indemnity provided for in the Backstop Commitment Agreement shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person (collectively, the "Indemnification").

18. The Senior Secured Notes Term Sheet is the result of extensive negotiations between the Debtors, the Backstop Purchasers, and the Committee as well as their respective counsel and financial advisors. The Debtors believe that the terms and conditions set forth in the Senior Secured Notes Term Sheet are fair and reasonable and reflect an exercise of the Debtors' sound business judgment. The Debtors submit that the Break-Up Fee, Expense Reimbursement and Indemnification are appropriate given the undertaking and the commitment that the Backstop Purchasers have made in guaranteeing, on a collective basis, the purchase of $105 million in Senior Secured Notes. The Offering is integral to the Debtors' ability to successfully emerge from chapter 11 and is one of the key elements to the viability of the Plan. Accordingly, the Debtors believe that it is in the best interests of the their estates and creditors to approve the Debtors' entry into the Backstop Commitment Agreement.

## RELIEF REQUESTED

19. By this Backstop Motion, the Debtors respectfully request that the Court (i) approve the Debtors' entry into the Backstop Commitment Agreement, and (ii) authorize the

Debtors' payment of the Break-Up Fee, Expense Reimbursement and the Indemnification, to the extent provided for in the Backstop Commitment Agreement.

**BASIS FOR RELIEF REQUESTED**

I.  **Entry into the Backstop Commitment Agreement is in the Best Interests of the Estates and Represents a Valid Business Judgment Pursuant to Section 363 of the Bankruptcy Code**

   A.  *The Business Judgment Standard*

   20.  Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C, § 363(b)(1). A court can authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. Meyers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996); The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991). Under section 363 of the Bankruptcy Code, a debtor in possession may use, sell or lease property of the estate outside the ordinary course of business if (i) it has an articulated business justification, (ii) it provides adequate notice to all creditors, and (iii) a hearing is held on the proposed use. See Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991).

   21.  The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). The business judgment

rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. Id.; see In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).

22. Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Pursuant to section 105(a) of the Bankruptcy Code, orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors. See United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.), 197 F.3d 631, 640 (2d Cir. 1999); Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

  B. *Entering into the Backstop Commitment Agreement is an Exercise of Sound Business Judgment and is in the Estates' Best Interests*

23. The Debtors submit that entry into the Backstop Commitment Agreement for purposes of commencing the Offering is a sound exercise of their business judgment. The Debtors commenced these bankruptcy cases to address near term liquidity issues, as well as to explore a deleveraging of their balance sheet to ensure long-term financial viability. The Debtors' successful emergence from chapter 11 will require sufficient capital to allow the Debtors to implement their go-forward business strategy, as well as to make the distributions

required under the Plan. The Debtors, in consultation with their advisors and other interested parties, have concluded that the amounts raised by the Offering will be sufficient to meet the Debtors' obligations under the Plan and to provide the Debtors with the working capital needed to fund the Debtors' business operations after emergence.

24. The Debtors believe that the terms and conditions of the Offering, as well as the amounts payable to the Backstop Purchasers under the Backstop Commitment Agreement, are fair and reasonable and appropriate. During these cases, the Debtors conducted a dual track process for the solicitation of interest in the Debtors. As a result, the Debtors and their advisors have been in contact with a number of parties expressing an interest in both financing and sale transactions related to the Debtors' assets. After evaluating each of the expressions of interest received as a result of the solicitation process, the Debtors determined that the Plan and the Offering, the proceeds of which will finance the Plan and the Debtors' post-emergence operations, provide the best opportunity to maximize the value of the Debtors' assets. Further, the reorganization proposed by the Plan leaves the Debtors' existing business operations substantially intact thus minimizing the effect of these chapter 11 cases on the Debtors' various stakeholders, including their employees and vendors.

25. Having determined that pursuing approval of the Plan is in the best interests of all stakeholders, the Debtors have negotiated the terms of the Backstop Commitment Agreement and Senior Secured Notes Term Sheet to ensure that the Debtors exit chapter 11 with the necessary liquidity to ensure the success of the Plan. The funding contemplated by the Offering is a critical component to effectuating the Plan, and the Debtors believe that the terms of the Backstop Commitment Agreement and Senior Secured Notes Term Sheet are fair and reasonable. Further, by the Backstop Commitment Agreement, the Debtors are able to minimize

the risk that the Offering will not be fully funded by obtaining the Backstop Purchasers' commitment to purchase any remaining Senior Secured Notes that are not purchased by the Pre-Petition Noteholders.

26. In light of the foregoing, the Debtors submit that the relief requested herein is necessary to secure the Backstop Purchasers' guarantee of the Offering amount so that the Debtors have the financing necessary for the implementation of the Plan and an effective and successful emergence from chapter 11. Simply put, entering into the Backstop Commitment Agreement, which guarantees that the Offering will be funded, is essential to the Plan's implementation and will maximize creditor recoveries and provide the Debtors with additional capital that will ensure a healthy balance sheet upon exit and allow the Debtors' to continue their current operations and undertake future improvements and developments in their operations and facilities.

C. *The Break-Up Fee, the Expense Reimbursement, and Indemnification Should Be Approved*

27. The Debtors submit that the Break-Up Fee, Expense Reimbursement and Indemnification are necessary inducements for the Backstop Purchasers to enter into the Backstop Commitment Agreement, particularly in light of the financial risks that they are undertaking. As set forth in the Backstop Commitment Agreement, the Break-Up Fee is only payable in the event that an Alternate Transaction occurs and requires (i) either that no Backstop Termination Event has occurred, and thus the Backstop Purchasers remained obligated to backstop the Offering, or (ii) if a Backstop Termination Event occurred, it was followed by a Subsequent Transaction Event, and by definition the Debtors' actions were the primary reason for such Backstop Termination Event. The Break-Up Fee is reasonably and narrowly tailored to ensure that the commitment of the Backstop Purchaser is protected in the event that the Debtors

pursue an Alternative Transaction. Importantly, the Break-Up Fee is only payable in the event that the Backstop Purchasers' willingness to backstop the Offering is frustrated by decisions of the Debtors to pursue other financing or restructuring alternatives. Such a structure provides reasonable safeguards and is properly designed to compensate the Backstop Purchasers for their commitment to guarantee the Offering. Finally, the Break-Up Fee was a necessary condition for the Backstop Purchasers to enter into the Backstop Commitment Agreement – absent the Break-Up Fee the Debtors would have been unlikely to obtain the financing commitments required by the Plan.

28. The Debtors further submit that both the Expense Reimbursement and the Indemnification are customary in financing transactions such as this, both in and out of chapter 11, are reasonable and appropriate and should, therefore, be approved. The Expense Reimbursement, specifically, will compensate the Backstop Purchasers for their actual costs incurred in connection with pursuing the Offering and participating in the negotiation of the Senior Secured Notes Term Sheet and the Plan. The Expense Reimbursement and the Indemnification are also the result of arm's-length negotiations between the Debtors, the Backstop Purchasers and the Committee, and the Debtors believe that the terms thereof are fair and reasonable in light of the undertakings that the Backstop Purchasers have had to date, and will continue to have, in developing and pursuing confirmation of the Plan, as well as the consummation of the Offering.

29. This Court has previously approved agreements for the provision of exit financing that provide break-up fees and expense reimbursements on terms and conditions similar to the Backstop Commitment Agreement. See In re Accuride Corporation, Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving (i) a backstop fee of $5.6 million

(payable in new equity or as a superpriority administrative expense claim) plus 4% of new equity issued under a plan related to a $140 million notes offering, (ii) a break-up fee of $10 million and (ii) an expense reimbursement); In re Dayton Superior Corp., Case No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (alternate transaction fee of 3% of the rights offering amount); In re Landsource Communities Development LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. Jun. 2, 2009) (approving premium equal to 5% of a $140 million offering which was payable in cash in the event that an "Alternative Transaction" occurred and approving expense reimbursement); In re Key Plastics, Inc., Case No. 08-13324 (MFW) (Bankr. D. Del. December 17, 2008) (approving an alternate transaction fee of 7.5% of the rights offering amount); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. August 17, 2007) (approving a backstop commitment fee of 4% of the rights offering amount and an alternative transaction fee of 3% of the rights offering amount).

## II. The Break-Up Fee, Expense Reimbursement and Indemnification Are Proper and Should be Afforded Administrative Expense Status

30. Finally, in accordance with section 503(b)(1)(a) of the Bankruptcy Code, the Break-Up Fee (if payable under the Backstop Commitment Agreement), Expense Reimbursement and Indemnification (if an indemnification event occurs) should be afforded administrative expense priority. The costs and expenses charged and incurred by the Backstop Purchasers for the benefit of the Debtors in connection with the Offering are entitled to the highest level of priority for its "actual, necessary costs and expenses of preserving the estate . . ." 11 U.S.C. § 503(b)(1). Under the prevailing test, for a claim to be entitled to administrative expense priority under section 503(b)(1), "the debt must arise from a transaction with the debtor-in-possession ... [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business.'" Calpine Corp. v.

O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (quoting In re Mammoth Mart. Inc., 536 F.2d 950, 954 (1st Cir. 1976)); In re Jatran, Inc., 732 F.2d 584, 587 (7th Cir. 1984); see also In re Continental Airlines, Inc., 146 B.R. 520, 526 (Bankr. D. Del. 1992) (stating that a claim qualifies as an administrative expense under § 503(b) where it confers a benefit that "run(s) to the debtors in possession and it is typically fundamental to the conduction of its business").

31. The Break-Up Fee (if payable under the Backstop Commitment Agreement), Expense Reimbursement and Indemnification (if an indemnifiable event occurs) are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing the value thereof and enhancing creditor recoveries by providing for a guarantee of financing that will permit the Debtors to emerge from these chapter 11 cases pursuant to the Plan. The Backstop Purchasers have provided a benefit to the Debtors' estates during the post-petition period because they have been substantially involved in the negotiation of the Plan and exit financing and they have guaranteed the necessary infusion of capital into the Debtors' estates upon which the Plan is premised. In the event the Pre-Petition Noteholders do not exercise their rights to purchase the Senior Secured Notes, absent the Backstop Purchasers' commitments, the Debtors would be without the capital needed to effectuate their go-forward business strategy and would not be able to de-lever their balance sheet in a manner that provides for a successful reorganization of their businesses. Indeed, given the nature of the Break-Up Fee and the conditions upon which it is payable, it is likely that the Break-Up Fee will only be paid in the event that the Debtors are able to consummate a sale or financing transaction that results in a benefit to the estates that exceeds the amounts payable to the Backstop Purchasers under the Backstop Commitment Agreement.

32. For all of the foregoing reasons, the Break-Up Fee (if payable under the Backstop Commitment Agreement), Expense Reimbursement and Indemnification associated with the proposed Offering and Backstop Commitment Agreement are actual and necessary costs of preserving these estates, and should therefore be granted under section 503(b)(1)(a).

### WAIVER OF THE STAY PROVIDED BY BANKRUPTCY RULE 6004

33. The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Backstop Motion. Pursuant to Federal Rule of Bankruptcy Procedure 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Based upon the facts and circumstances set forth herein, the Debtors submits that ample cause exists to justify a waiver of any stay imposed by Federal Rules of Bankruptcy Procedure 6004(h), 7062, or 9014 to the extent they apply. The Debtors need to emerge from chapter 11 expeditiously, and the Plan is premised in significant part upon obtaining the exit financing provided by the Offering. By approving this Backstop Motion, this Court will be approving a Backstop Motion integral to confirmation of the Plan.

34. The Debtors submit that the waiver of the stay under Bankruptcy Rule 6004 is appropriate here to allow for the consummation of the transactions described in the Backstop Commitment Agreement, so that the Debtors, the Committee and the Backstop Purchasers can work to consummate the transactions contemplated by the Plan and the Offering immediately. The certainty of funding of the Offering, and consequently the viability of the Plan, depends on approval of the Backstop Commitment Agreement and the related relief sought in the Backstop Motion. Accordingly, the Debtors submit that a waiver of the stay under Bankruptcy Rule 6004 is appropriate and necessary.

## NOTICE

35. Notice of this Backstop Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) counsel to the Backstop Purchasers; (d) counsel to the agent under the Debtors' debtor-in-possession financing facility; (e) counsel to the agent under the Pre-Petition Credit Facility; (f) all parties who have requested notice in these cases pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

36. No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto (i) approving the Debtors' entry into the Backstop Commitment Agreement, (ii) authorizing and approving the Debtors' payment of the Break-Up Fee, Expense Reimbursement and the Indemnification, to the extent provided for in the Backstop Commitment Agreement, and (iii) granting such other and further relief, as the Court deems appropriate.

Dated: Wilmington, Delaware
December 4, 2009

YOUNG CONAWAY STARGATT & TAYLOR LLP

James L. Patton (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors in Possession