IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**, a Delaware Corporation, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 09-11214 (KG)<br><br>(Jointly Administered)<br><br>Docket Ref. No. 592, 628 and 629 |

## DEBTORS' REPLY IN SUPPORT OF AND IN RESPONSE TO OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363, 503, 1123 AND 1125 OF THE BANKRUPTCY CODE (I) APPROVING THE DEBTORS' ENTRY INTO THE BACKSTOP COMMITMENT AGREEMENT RELATED TO THE OFFERING OF NEW NOTES AND EQUITY, AND (II) AUTHORIZING THE DEBTORS' PAYMENT OF RELATED FEES, EXPENSES, AND INDEMNIFICATION TO THE BACKSTOP PURCHASERS

Aventine Renewable Energy Holdings, Inc. ("ARE Holdings") and its affiliated debtors and debtors in possession (together with ARE Holdings, collectively, the "Debtors") hereby submit this reply (the "Reply") in support of, and in response to the objections to, the *Debtors' Motion for Entry of an Order Pursuant to Sections 105, 363, 503, 1123 and 1125 of the Bankruptcy Code (i) Approving the Debtors' Entry into the Backstop Commitment Agreement Related to the Offering Of New Notes and Equity, and (ii) Authorizing the Debtors' Payment of Related Fees, Expenses, and Indemnification to the Backstop Purchasers* (the "Backstop Motion") [Docket No. 592].[2] In further support of the Backstop Motion and in reply to the Objections, the Debtors respectfully submit the following:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

[2] The Backstop Motion, including all attachments and exhibits thereto, is incorporate herein by reference. Capitalized terms used but not defined in the Reply shall have the meanings ascribed to them in the Backstop Motion or the Plan (as the case may be).

DB02:9099428.7                                                                                                                                         068125.1001

## PRELIMINARY STATEMENT

1. On December 4, 2009, the Debtors filed their Plan and Disclosure Statement. Concurrent with filing the Plan and Disclosure Statement, the Debtors filed the Backstop Motion, which seeks approval of the Debtors' entry into the Backstop Commitment Agreement, under which the Backstop Purchasers have agreed to underwrite exit financing in the amount of $100 million (subject to the terms and conditions of the Backstop Commitment Agreement and Senior Secured Notes Term Sheet). In exchange for the Backstop Purchasers' commitment, the Debtors have agreed to (i) allow the Backstop Purchasers to acquire Offering Units at 97% of the proposed purchase price, and (ii) pay the Backstop Purchasers the Break-Up Fee of $3 million if (a) the Debtors enter into an Alternate Transaction, or (b) if the Backstop Commitment Agreement is terminated, a Subsequent Transaction Event occurs. The proceeds of the Senior Secured Notes will be essential to the Debtors' implementation of the Plan, once confirmed, and the Debtors' long-term business plan.

2. While the Objectors do not contest the Debtors' need for exit financing being committed by the Backstop Purchasers, they contend that the consideration paid to the Backstop Purchasers for their commitment is inappropriate and should not be approved. The Debtors and their advisors, prior to entering into extensive and good-faith negotiations with the Backstop Purchasers regarding the Backstop Commitment Agreement and Senior Secured Notes Term Sheet, engaged in an extensive marketing process in order to maximize the value of the Debtors' assets for the benefit of all stakeholders. As a result, the Debtors believe that the Plan, which is made possible by the Backstop Commitment Agreement, does maximize value for the benefit of the Debtors and their stakeholders.

3. The Objectors misconstrue the Backstop Commitment Agreement and, in the process, contend that the Backstop Purchasers are entitled to receive the Break-Up Fee upon

any Backstop Termination Event. In reality, the Break-Up Fee, like most break-up fees, is only earned if the Debtors determine to pursue another transaction and ultimately consummate an Alternate Transaction. Thus, the Break-Up Fee, like numerous others approved by this Court, is properly limited to compensating the Backstop Purchasers for their lost opportunity cost in the event that the Debtors—and not the Backstop Purchasers—move on to another transaction and walk away from the exit financing contemplated by the Backstop Commitment Agreement. Finally, Kiewit inexplicably contends that the Backstop Commitment Agreement is a *sub rosa* plan. The Debtors have already filed the Plan, and the Backstop Commitment Agreement merely facilitates the Plan by providing the Debtors with a guarantee of exit financing in the event the Plan is confirmed.

## THE OBJECTIONS

4. On December 28, 2009, Andrew Shirley, an equity holder of Debtor ARE Holdings ("Shirley"), and Kiewit Energy Company, a party to two prepetition engineering, procurement and construction services contracts with certain Debtors ("Kiewit," and together with Shirley, the "Objectors") filed objections to the Backstop Motion (the "Shirley Objection" and "Kiewit Objection," respectively, and collectively, the "Objections") [Docket Nos. 628 and 629, respectively]. Taken together, the Objections assert that: (i) (A) the Plan, as proposed, cannot be confirmed,[3] and (B) thus, approval of the Backstop Motion is unnecessary and inappropriate (Kiewit Obj., at ¶ 8; Shirley Obj., at ¶ 6); (ii) entering into the financing arrangement contemplated by the Senior Secured Notes Term Sheet is not a sound exercise of

---

[3] Shirley contends that the Plan cannot be confirmed because the Debtors' valuation drastically undervalues the enterprise value of the Debtors' businesses. Kiewit asserts various bases as to why the Plan cannot be confirmed, including that: the Plan does not provide Kiewit the indubitable equivalent of its claim; Kiewit is not provided with adequate protection for any priming of its lien; the Plan provides Kiewit with an inappropriate rate of interest; and the Plan impermissibly discharges guarantees between Kiewit and ARE Holdings. These are confirmation objections that are most appropriately dealt with, if not resolved, at the hearing on confirmation of the Plan.

the Debtors' business judgment (Shirley Obj., at ¶ 9); (iii) the Break-Up Fee and other protections provided for under the Backstop Commitment Agreement are excessive (id.); (iv) the Backstop Purchasers are not required to make any commitment or risk any loss in order to earn the Break-Up Fee (Kiewit Obj., at ¶¶ 8, 9; Shirley Obj., at ¶ 6); and (v) the Disclosure Statement fails to make sufficient disclosures related to (A) the extent and nature of any liens granted as part of the Debtors' exit financing, including whether such liens "prime" existing liens (including Kiewit's purported prepetition liens or any liens granted Kiewit under the Plan), (B) the Debtors' marketing efforts regarding any potential sale of assets or financing, (C) the eventual treatment that the Kiewit Aurora West Secured Claim will receive pursuant to the Plan,[4] (D) the current and future state of development at the Debtors' two partially constructed ethanol facilities, (E) the potential results of contract negotiations with the Debtors major suppliers' and the effect the result of those negotiations has on the Debtors' financial projections, and (F) the allowance of, or any contemplated objections to, Kiewit's claims (Kiewit Obj., at ¶¶ 11-15).

## REPLY

5. Entry into the Backstop Commitment Agreement is an exercise of sound business judgment and the terms of the Backstop Commitment Agreement, which were negotiated in good faith, are fair and reasonable. Approval of the Debtors' entry into the Backstop Commitment Agreement when the Debtors are on the verge of solicitation of the Plan is clearly appropriate. Finally, there is no basis to conclude that the Backstop Commitment Agreement is a *sub rosa* plan. For the reasons set forth below and which will be demonstrated at the hearing on the Backstop Motion, the Objections should be overruled and the Debtors' entry into the Backstop Motion should be approved.

---

[4] In an effort to resolve this issue and subject to definitive documentation, the Debtors have agreed to an extension of Kiewit's deadline to make an election pursuant to section 1111(b) of the Bankruptcy Code.

## A. The Debtors' Entry Into the Backstop Commitment Agreement Is An Exercise Of Sound Business Judgment

6. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

7. Bankruptcy courts are given a great deal of discretion when deciding whether to authorize the use of estate property outside the ordinary course of business. See In re Montgomery Ward Holding Corp., 242 B.R. 147, 152-53 (D. Del. 1999); In re Chateaugay Corp., 973 F.2d 141, 144 (2d Cir. 1992). The proposed use, sale or lease of property of an estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Naron & Wagner, Chartered, 88 B.R. 85, 87-88 (Bankr. D. Md. 1988) (adopting the standard set forth in In re Lionel Corp.).

8. Shortly after the commencement of theses cases, the Debtors turned their attention towards stabilizing business operations, reducing operating expenses and identifying transactions that would yield the highest return to the Debtors' stakeholders. The Debtors conducted a dual track process for the solicitation of interest in the Debtors and contacted approximately 100 parties. Certain of those parties expressed interest in financing transactions or a potential sale of the Debtors' assets. After evaluating each of the expressions of interest received as a result of the solicitation process, the Debtors determined that the Plan and the issuance of the Senior Secured Notes, the proceeds of which will be used to finance, among other

5

things, the Plan and the Debtors' post-emergence operations, provided the best opportunity to maximize the value of the Debtors' assets.

9. The proposed restructuring under the Plan has significant capital requirements. A critical element of the proposed restructuring is promptly resuming (and completing) construction at the Debtors' partially completed ethanol plant at Mt. Vernon, Indiana upon emergence from chapter 11. Further, the Debtors will need sufficient liquidity to continue their ethanol production operations at their facilities currently in operation. In addition to these current operational requirements, the Debtors have existing claims that are secured by liens on either (i) substantially all of the Debtors' assets, in the case of the DIP Financing Claims (no less than $15 million) and the Prepetition Credit Facility Claims (approximately $27.8 million plus outstanding letters of credit), or (ii) the interest of certain of the Debtors in partially constructed ethanol plants, in the case of the Kiewit Mt. Vernon Secured Claim (asserted to be approximately $7.9 million) and Kiewit Aurora West Secured Claim (asserted to be approximately $15.2 million).[5] The Debtors also believe that it is in their best interest to satisfy those claims secured by liens on either (i) substantially all of the Debtors' operating assets and (ii) the Mt. Vernon facility, with cash payments at or reasonably following emergence.[6] The failure to satisfy these claims in full through cash payments may impair the Debtors' ability to obtain acceptance and confirmation of the Plan and deliver unencumbered collateral to their exit financiers and may present future disruptions to the Debtors' operations post-emergence. The proposed financial restructuring through the Plan is the best opportunity presently available to

---

[5] The amount of Kiewit's claims as set forth herein are as asserted by Kiewit in the Kiewit Objection. *See* Kiewit Obj., at ¶ 6. The Debtors reserve their rights to contest the exact amount, validity and classification of Kiewit's asserted claims.

[6] The Debtors do not anticipate resuming construction at the Aurora West facility immediately upon emergence.

maximize the value of the Debtors' assets and the proceeds of the proposed exit financing are necessary and appropriate to implement the Plan.

10. The proceeds that will be obtained from the issuance of the Senior Secured Notes are necessary to the implementation of the Plan. Nonetheless, the Objectors argue that approval of the Break-Up Fee at this stage of the case is inappropriate. The Debtors negotiated the Backstop Commitment Agreement for the express purpose of ensuring that the proceeds from the issuance of the Senior Secured Notes would be available at emergence, given the critical nature of those funds to the Debtors' go-forward business strategy and obligations under the Plan upon emergence. Without approval of the relief requested in the Backstop Motion at this stage, the Debtors would be forced to pursue solicitation of the Plan with an overwhelming uncertainty as to whether the Debtors will have the funds needed to implement the Plan and the Debtors' business plan upon emergence. Entry into the Backstop Commitment Agreement provides the Debtors with a high level of assurance that if the Plan is confirmed the financing needed to implement the Plan will be available. Accordingly, ample business justification supports approving the relief requested in the Backstop Motion and granting such approval now.

11. The Objectors also argue that the terms of the Backstop Commitment Agreement are unreasonable. As set forth above and as will be more amply demonstrated at the hearing on the Backstop Motion, the Backstop Commitment Agreement is the culmination of an extensive solicitation and marketing process conducted by the Debtors and their advisors. At the conclusion of that process, the Debtors determined that the financing terms that the Backstop Purchasers agreed to guarantee would allow the Debtors to maximize the value of the their estates and return the highest value to stakeholders. Thereafter, the Debtors and Backstop Purchasers engaged in extensive arm's-length, good faith negotiations over the terms of the

DB02:9099428.7

068125.1001

Senior Secured Notes Term Sheet and the Backstop Commitment Agreement. Following the filing of the Plan and Disclosure Statement, the Debtors and their advisors contacted the same parties they previously contacted earlier in the chapter 11 cases to determine if they would be willing to provide terms better than those offered by the Backstop Purchasers. The Objectors statement that the terms of the Senior Secured Notes are "usurious" is not only conclusory but is also belied by the solicitation and market-testing conducted by the Debtors prior to and after the filing of the Plan, as well as the extensive efforts and the negotiations conducted between the Debtors and the Backstop Purchasers to formulate the Backstop Commitment Agreement.[7]

12. Moreover, the discount offered to the Backstop Purchasers (i.e., 97% of the Purchase Price for the Senior Secured Notes) is appropriate to compensate the Backstop Purchasers for their agreement to backstop the entire amount of the offering. Indeed, similar discounts and premiums have been offered to parties agreeing to backstop exit financing to chapter 11 debtors in this and other jurisdictions. See, e.g., In re Landsource Communities Development LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009) (approving premium of 5% to parties backstopping $140 million rights offering); In re Foamex International Inc., Case No. 05- 12685 (Bankr. D. Del. Nov. 27, 2006) (approving a backstop fee equal to 5% of the total amount of $150 million rights offering); In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (approving a backstop fee of 4.57% fee of total amount of $2.2 billion rights offering); In re Silicon Graphics, Inc., Case No. 06-10977 (Bankr. S.D.N.Y. Jun 27, 2006) (approving a backstop fee of 2% of the total amount of $50 million rights offering); In re

---

[7] By the Backstop Motion, the Debtors are requesting approval of the Debtors' entry into the Backstop Commitment Agreement, not approval of the Senior Secured Notes Term Sheet. To the extent that the Objectors raise objections to the terms of the Senior Secured Notes (i.e., the issuance of the Noteholders New Equity and the original issue discount), the Debtors believe that the terms of the Senior Secured Notes Term Sheet are fair and reasonable and that fact will be demonstrated at the hearing on confirmation of the Plan when the issue is properly before the Court.

USG Corp., Case No. 01-2094 (Bankr. D. Del. February 23, 2006) (approving a backstop fee 5.5% of the total amount of $1.8 billion rights offering).

**B. The Break-Up Fee Is Appropriate And The Objectors Mischaracterize The Condition Upon Which The Backstop Purchasers Might Earn The Break-Up Fee**

13. Simply put, the Objectors have mischaracterized the Break-Up Fee. The Backstop Purchasers earn the Break-Up Fee only if an Alternate Transaction occurs: (a) either by the Debtors' affirmative election to pursue an Alternate Transaction, in the event that the Backstop Purchasers have not terminated the Backstop Commitment Agreement, or (b) as part of a Subsequent Transaction Event, in the event that the Backstop Purchasers have terminated the Backstop Commitment Agreement after a Backstop Termination Event. The Break-Up Fee provided for under the Backstop Commitment Agreement is similar to break-up fees provided for in other contexts, including, section 363 sale transactions and exit financing transactions. In this case, much like in other contexts, the Break-Up Fee is intended to compensate the Backstop Purchasers for, among other things, their lost opportunity costs of committing their resources to the Senior Secured Notes transaction and possibly foregoing other transactions in the event the Debtors ultimately complete an Alternate Transaction.[8] Indeed, the Break-Up Fee, which is three percent (3%), is consistent with other break-up or termination fees approved for such transactions in this jurisdiction. See, e.g., In re Dayton Superior Corporation, Case No. 09-11351 (BLS) (Bankr. D. Del. Aug 24, 2009) (approving 3% alternate transaction fee to parties backstopping $100 million rights offering); In re Landsource Communities Development LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009) (approving payment of 5% premium to parties backstopping $140 million rights offering if alternate transaction occurs); In re Global

---

[8] For similar reasons, by the Backstop Commitment Agreement, the Debtors have agreed to reimburse the Backstop Purchasers for their actual and reasonable expenses and to indemnify the Backstop Purchasers for any liability (except to the extent such liability is the result of bad faith, willful misconduct or gross negligence) incurred in connection with the transactions contemplated by the Backstop Commitment Agreement and the Plan.

Motorsport Group, Inc., No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (break-up fee of approximately 4% of sale price); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (approving 3% alternative transaction fee to parties backstopping $140-160 million rights offering); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (break-up fee of 2% of sale price and expense reimbursement of 1% of sales price); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) (authoring debtors to offer up to 3% break-up for sale transaction); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 12, 2007) (approximately 2% break-up fee for sale transaction).

14. The Debtors are not required to pay any Break-Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement. The Debtors are also not required to pay the Break Up Fee in the event the Backstop Commitment Agreement is terminated by the Backstop Purchasers based on the occurrence of any Backstop Termination Event, except in the event there is a Subsequent Transaction Event. A Subsequent Transaction Event, which is defined more fully in the Backstop Commitment Agreement, only arises if certain factors have occurred, including that the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

15. Under the Objectors' characterization of the Break-Up Fee, the Backstop Purchasers are entitled to the Break-Up Fee if any Backstop Termination Event occurs.[9] This is simply untrue. Instead, if the Backstop Commitment Agreement is terminated, the Break-Up Fee is payable to the Backstop Purchasers only when a Subsequent Transaction Event occurs. The

---

[9] The "Backstop Termination Events" are defined in the Backstop Commitment Agreement and include, among other things, the failure to achieve certain milestones, including obtaining approval of the Backstop Commitment Agreement and Disclosure Statement and confirmation of the Plan by certain dates.

parameters for when a Subsequent Transaction Event occurs were heavily negotiated between the Debtors and the Backstop Purchasers. Those parameters were designed to promote value optimizing behavior on behalf of the Debtors and the Backstop Purchasers and to avoid the very situations that the Objectors posit: that one side is able to terminate its obligations under the Backstop Commitment Agreement in a self-interested manner and without acting in good faith towards the non-breaching side in order to escape its obligations. Notably, a Subsequent Transaction Event can only occur if the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

### C. The Backstop Commitment Agreement Is Not A *Sub Rosa* Plan

16. Kiewit contends that the Backstop Commitment Agreement is a *sub rosa* plan and cannot be approved. However, Kiewit improperly construes what transactions constitute *sub rosa* plans. Most recently, the Second Circuit explained that *sub rosa* plans are transactions that are prohibited out of "a fear that one class of creditors may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum." Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC), 576 F.3d 108, 116 (2d Cir. 2009). Courts have declined to hold that agreements and transactions, like the Backstop Commitment Agreement, which may shape or affect the terms of a particular plan of reorganization are *sub rosa* plans where the transaction does not prohibit the exercise of parties' rights (i.e., the ability to vote to accept or reject the plan) with respect to that plan or any other plan. In re Allegheny Int'l, Inc., 117 B.R. 171, 175-76 (E.D. Pa. 1990) (affirming on appeal approval of debtors' entry into a financing commitment letter and holding that the commitment letter was not a *sub rosa* plan because while the "commitment letter

contains certain terms which might dictate the terms of a future plan of reorganization, [the] commitment letter does not dictate the terms of <u>any</u> plan of reorganization" (emphasis in original)); see also In re Marvel Entertainment Group, Inc., 222 B.R. 243 (Bankr. D. Del. 1998) (approving trustee's settlement agreement and declining to find that settlement was a *sub rosa* plan where, among other things, trustee agreed to support a plan of reorganization under the settlement that he "had already intended to support" after extensive due diligence by trustee and where the trustee was limited in his ability to solicit other offers but would still bring any offers received to the attention of the court).

17. No elements of a *sub rosa* plan exist in the Backstop Commitment Agreement. As an initial matter, Kiewit appears to ignore the fact that the Debtors have proposed the Plan and the Backstop Commitment Agreement as a means to implement the Plan. Nonetheless, the Backstop Commitment Agreement does not: alter the fundamental rights of the Debtors' creditors, bind or dictate the terms of *any* plan (other than the Plan it intends to finance) or the treatment of a class of or particular creditor under any plan, or otherwise attempt to proscribe the requirements of section 1129 of the Bankruptcy Code. If the Court approves the relief requested in the Backstop Motion, the Debtors will still be free to pursue an Alternate Transaction should they decide to do so, and parties may still exercise their rights under the Bankruptcy Code in connection with confirmation of the Plan. The relief requested in the Backstop Motion is meant to compensate the Backstop Purchasers for: (a) their commitment to guarantee the offering of the Senior Secured Notes, and (b) the risk that the Debtors may, nonetheless, decide to pursue and consummate an Alternate Transaction. It does not structure the terms of a plan of reorganization—the Debtors have already done that—or impermissibly

limit any parties' rights with respect to the confirmation of the Debtors' proposed Plan or any other plan.

WHEREFORE, for all of the reasons set forth in the Backstop Motion and herein, the Debtors respectfully request that the Court overrule the Objections, approve the Backstop Motion, and enter the Approval Order.

Dated: Wilmington, Delaware
January 8, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Ryan M. Bartley

James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 571-6600
Facsimile:   (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*