## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------x
                                                            :
In re                                                       :   Chapter 11
                                                            :
Aventine Renewable Energy Holdings, Inc., *et al.*,         :   Case No. 09-11214 (KG)
                                                            :
    Debtors.                                                :   (Jointly Administered)
                                                            :   **Re: Docket Nos. 592, 628, 629**
                                                            :
------------------------------------------------------------x

**REPLY OF THE BACKSTOP PURCHASERS TO OBJECTIONS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' ENTRY INTO THE BACKSTOP COMMITMENT AGREEMENT RELATED TO THE OFFERING OF NEW NOTES AND EQUITY, AND (II) AUTHORIZING THE DEBTORS' PAYMENT OF RELATED FEES, EXPENSES, AND INDEMNIFICATION TO THE BACKSTOP PURCHASERS**

The Backstop Purchasers,[1] by and through their undersigned counsel, reply (the "Reply") to the Objection of Kiewit Energy Company [Dkt. Nos. 628] (the "Kiewit Objection") and the Objection of Andrew Shirley [Dkt. Nos. 629] (the "Shirley Objection," together with the Kiewit Objection, the "Objections") to the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Entry into a Backstop Commitment Agreement Related to the Offering of New Notes and Equity, and (II) Authorizing the Debtors' Payment of Related Fees, Expenses, and Indemnification to the Backstop Purchasers [Dkt. No. 592] (the "Motion").[2] In support of the Reply, the Backstop Purchasers respectfully submit as follows:

---

[1] The Backstop Purchasers are Brigade Capital Management, LLC, Nomura Corporate Research & Asset Management, Inc., Whitebox Advisors LLC, Senator Investment Group LP and Seacor Capital Corporation.

[2] Unless otherwise defined, terms used herein shall have the meanings ascribed to such terms in the Motion.

**PRELIMINARY STATEMENT**

The Objections assert numerous unsubstantiated arguments, the overwhelming majority of which raise, at most, disclosure statement or confirmation issues that have no bearing on the relief requested in the Motion. The few arguments that are relevant – which address the Debtors' business judgment in entering into the Backstop Commitment Agreement and the propriety of the Break-Up Fee and Expense Reimbursement provisions – should be rejected because those arguments ignore the controlling authority in this jurisdiction that break-up fees and expense reimbursement provisions at or even above the levels proposed in the Motion should be approved if they provide a benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). Here, the Break-Up Fee and Expense Reimbursement provisions are clearly well within market standards and provide a significant benefit to the Debtors' estates, as they facilitate $100 million in exit financing that is essential to the Debtors' reorganization and, in particular, to the Debtors' ability to complete their two unfinished facilities in Mt. Vernon, Indiana and Aurora, Nebraska. Completing these two plants will unlock significant value for the Debtors and their estates. Absent the financing, however, the Debtors' path to emerge from chapter 11 becomes uncertain and the Debtors will most likely need to liquidate one or both of these unfinished plants. Thus, if the relief requested is denied, the Debtors will lose $100 million of committed financing, their reorganization efforts will be thrown into a tailspin and, most important, their estates will be deprived of significant value. Accordingly, the Court should overrule the Objections and grant the relief requested in the Motion.

**REPLY**

I.  **The Break-Up Fee, Expense Reimbursement and Indemnification Provisions Are Reasonable and Customary and Should Be Approved.**

1.      The proposed Break-Up Fee is $3 million, or only 3% of the $100 million exit financing commitment being provided by the Backstop Purchasers. See Backstop Commitment Agreement at 2. Contrary to the misstatements made in the Objections and as discussed in more detail below, the Break-Up Fee is payable only if the Backstop Purchasers are ready, willing and able to fund their commitments under the Backstop Commitment Agreement and the Debtors nonetheless prosecute and ultimately consummate an alternative chapter 11 plan or sell substantially all of their assets. See id. The Expense Reimbursement provisions are likewise limited and require the Debtors to pay only the "reasonable" fees and expenses of the Backstop Purchasers incurred in connection with the Backstop Commitment Agreement and the transactions contemplated therein. See id. at 3-4.

2.      In the Third Circuit, claims for break-up fees and expense reimbursement are accorded administrative expense priority under section 503(b) of the Bankruptcy Code if such fees and expenses are "actually necessary to preserve the value of the estate . . . . [T]hat inquiry stems directly from § 503(b)(1)(A), which requires that an expense provide some benefit to the debtor's estate." In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 535-6 (3d Cir. 1999); accord In re Reliant Energy Channelview, LP, 403 B.R. 308, 311 (D. Del. 2009) ("correct legal standard governing award of break-up fees has been set forth by the Third Circuit in [O'Brien]"); In re Beth Israel Hosp. Ass'n of Passaic, No. 06-16186, 2007 WL 2049881, at *12 (D.N.J. Jul. 12, 2007) (holding same); In re Homelife Corp., 01-2412, 2002 WL 31115654, at *1 (D. Del. Sept. 20, 2002) (holding same); see also In re Circuit City Stores, Inc., No. 08-35653, 2009 WL

3

1841772, at **10-11 (Bankr. E.D. Va. Apr. 9, 2009) (relying upon O'Brien to pre-approve break-up fee and expense reimbursement provisions).

3. Here, the Break-Up Fee and Expense Reimbursement provisions provide a clear benefit to the Debtors' estates – indeed, they enable a $100 million exit financing commitment that is integral to the Debtors' reorganization. Absent the protections afforded under the Backstop Commitment Agreement, including the Break-Up Fee and Expense Reimbursement provisions, the Backstop Purchasers are unwilling to commit $100 million of new capital to the Debtors' enterprise. Without such financing, however, the Debtors cannot, among other things, fund distributions to be made under the Plan, finance all of their post-bankruptcy working capital needs or effectuate their business plan, which in particular, includes the completion of the partially completed facilities in Mt. Vernon, Indiana and Aurora, Nebraska. Without these two plants – which will likely need to be liquidated absent the financing provided by the Backstop Purchasers – the total enterprise value of the Debtors' enterprise is reduced substantially. See Disclosure Statement, Art. VIII. Thus, the Break-Up Fee and the Expense Reimbursement provisions allow the Debtors to maximize the value of their assets for the benefit of all stakeholders. Accordingly, under the rationale applied by the Third Circuit in O'Brien, the Break-Up Fee and the Expense Reimbursement provisions should be approved.

4. Furthermore, bankruptcy courts in this jurisdiction have approved break-up fees that are consistent with or well above the 3% Break-Up Fee requested here. See, e.g., In re Accuride Corp., Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving $10 million break-up fee, which represented more than 7% of the $140 million offering amount); In re EZ Lube, LLC, Case No. 08-13256 (CSS) (Bankr. D. Del. Sept. 24, 2009) (approving break-up fee equal to 5% of the financing commitment); In re RathGibson, Case No. 09-12452 (CSS) (Bankr.

4

D. Del. Sept. 2, 2009) (approving $1.35 million break-up fee, representing 3% of the transaction value); In re MagnaChip Semiconductor Fin. Co., Case No. 09-12008 (PJW) (Bankr. D. Del. Aug. 31, 2009) (approving $6 million break-up fee, representing 24% of the offering amount); In re Dayton Superior Corp., Case No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (approving break-up fee that was 3% of the $100 million offering amount less any commitment fee that had been paid); In re Key Plastics L.L.C. and Key Plastic Fin. Corp., Case No. 08-13324 (MFW) (Bankr. D. Del. Dec. 17, 2008) (approving $1.5 million break-up fee less any commitment fee paid, which represented 7.5% of the $20 million offering amount); In re Global Power Equip. Group Inc., Case No. 06-11045 (BLS) (Bankr. D. Del. Oct. 31, 2007) (approving $2.5 million break-up fee, representing approximately 2.8% to 4.3% of the offering amount); In re Dura Auto. Sys., Case No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (approving break up fee of 3% of the maximum offering amount of $160 million).

5. Similarly, bankruptcy courts in this jurisdiction routinely approve expense reimbursement provisions that are virtually identical to the Expense Reimbursement sought here. See, e.g., In re Accuride Corp., Case No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009); In re RathGibson, Case No. 09-12452 (CSS) (Bankr. D. Del. Sept. 2, 2009); In re Dayton Superior Corporation, Case No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009); In re MagnaChip Semiconductor Finance Co., Case No. 09-12008 (PJW) (Bankr. D. Del. Aug. 31, 2009); In re Landsource Cmtys. Dev. LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009).

6. Notwithstanding the fact that the Break-Up Fee and Expense Reimbursement provisions (a) act to preserve the value of the Debtors' estates and should therefore be approved under controlling Third Circuit authority in O'Brien, and (b) are consistent with or lower on a percentage basis than the break-up fee and expense reimbursement provisions that have been

5

approved in other cases decided in this jurisdiction, the Objections make numerous unsubstantiated assertions that these protections are "generous and inappropriate" and place an "unnecessary burden" on the Debtors' estates. See, e.g., Shirley Objection, ¶ 6; Kiewit Objection, ¶ 9. These arguments, however, are meritless and should be rejected because, as set forth above, they are unsupported by both the facts and the law.

7. The Kiewit Objection, in particular, misunderstands the circumstances under which the Break-Up Fee must be paid. For example, Kiewit incorrectly argues that if the Approval Order is not entered by January 14, 2010, or if the Disclosure Statement is not approved or the Plan is not confirmed (or is amended without the consent of the Backstop Purchasers), then the Debtors are required to pay the Break-Up Fee. See Kiewit Objection, ¶ 8-10; see also Shirley Objection, ¶ 6 (same mistake). Kiewit has simply misread the documents. While the Backstop Purchasers may terminate their commitment if any of the foregoing events occur (each, a "Backstop Termination Event"), none of these events trigger the payment of the Break-Up Fee. To the contrary, if any Backstop Termination Event occurs and the Backstop Purchasers then terminate their commitment, the Debtors' obligation to pay the Break-Up Fee *likewise terminates*, except in the remote situation in which a Subsequent Transaction Event occurs. See Backstop Commitment Agreement at 2 ("[T]he Backstop Purchasers shall not be entitled to receive the Break Up Fee if a Backstop Termination Event has occurred (unless a Subsequent Transaction Event occurs)").[3]

---

[3] See also Senior Secured Notes Term Sheet at 8 ("The commitment of the Backstop Purchasers to purchase the Notes . . . shall terminate and *all of the obligations of the Debtors* (other than the obligations of the Debtors to (i) pay the reimbursable expenses under the Backstop Commitment Agreement, (ii) satisfy their indemnification obligations under the Backstop Commitment Agreement and (iii) pay the Break Up Fee if a Subsequent Transaction Event occurs) *shall be of no further force or effect*, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any [Backstop Termination Event] occurs, each of which may be waived in writing by the Majority Backstop Purchasers.") (emphasis added).

6

8. As plainly defined in the Backstop Commitment Agreement, a Subsequent Transaction Event occurs only if:

> (i) at the time of the occurrence of a Backstop Termination Event, the Debtors are engaged in discussions with respect to an Alternate Transaction; (ii) such Alternate Transaction is consummated within ninety (90) calendar days of the Backstop Termination Event, (iii) the terms of the Alternate Transaction are better than the terms set forth in this Senior Secured Notes Term Sheet, and (iv) the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

Backstop Commitment Agreement at 2.

9. While the Break-Up Fee must be paid if a Subsequent Transaction Event occurs, in that situation, the Debtors would have closed an Alternate Transaction that has better terms, and the Debtors would have benefitted from using the Senior Secured Notes Term Sheet as a floor for obtaining the more favorable terms of an Alternate Transaction. Accordingly, Kiewit's concerns that the Debtors will be required to pay the Break-Up Fee upon the occurrence of a Backstop Termination Event are unfounded, as the Break-Up Fee is only payable under remote circumstances when the Debtors close on a better Alternate Transaction.

10. For the foregoing reasons, as well as the reasons set forth in the Debtors' Motion, the Break-Up Fee, Expense Reimbursement and Indemnification provisions should be approved.

## II. The Remaining Arguments Made in the Objections Are Disclosure Statement or Confirmation Issues That Have No Bearing Upon the Relief Requested in the Motion.

11. Virtually all of the remaining arguments in the Objections are disclosure statement or confirmation issues that are irrelevant to whether the Debtors should be authorized to enter into the Backstop Purchase Agreement or whether the Break-Up Fee, Expense Reimbursement and/or Indemnification provisions should be approved. Accordingly, below is only a summary of responses to these arguments. The Backstop Purchasers reserve all of their rights to supplement or amend the arguments contained herein in any future pleadings.

7

| Objections' Assertion | Backstop Purchasers' Response |
|---|---|
| The Disclosure Statement contains inadequate or no disclosure regarding why exit financing is needed. See Kiewit Objection, Preliminary Statement, sec. (b)(i). | The financing is essential in order to, among other things, fund the distributions to be made under the Plan, finance all of the Debtors' post-bankruptcy working capital needs and effectuate the Debtors' business plan, which in particular, includes the completion of the partially completed facilities in Mt. Vernon, Indiana and Aurora, Nebraska. See Disclosure Statement, Art. VIII.B. |
| The Disclosure Statement cannot be approved because it contains multiple choice treatment of the Kiewit Aurora West Secured Claim, which prevents Kiewit from being able to make an informed decision regarding its right to elect 11 U.S.C. § 1111(b) treatment for this claim. See Kiewit Objection, ¶ 14(a). | Resolved. We understand that the Debtors have agreed to extend Kiewit's § 1111(b) election deadline. |
| The multiple choice treatment could cause the Debtors' financial projections to be speculative because such projections assume that the Aurora West plant will be completed by Q1 2012, which will not happen if the plant is abandoned. See Kiewit Objection, ¶ 14(a). | The Debtors' business plan assumes that the Aurora West plant will be completed. If the Debtors decide to abandon the Aurora West plant, then Kiewit can argue at the confirmation hearing that the Plan has been materially modified. |
| The Disclosure Statement contains inadequate disclosures of the alternatives presented to the Debtors which they rejected in favor of the Plan. See Kiewit Objection, ¶ 13 | The Disclosure Statement contains adequate disclosure on this point. See Disclosure Statement, Article VI.N. |
| There is no disclosure of other expressions of interest or why the Backstop Purchasers' proposal was preferable in the Debtors' business judgment. See Kiewit Objection, ¶ 13. | Same response. |
| The Disclosure Statement contains conflicting disclosures about the status of Kiewit's lien and whether the Backstop Purchasers are to be granted a priming lien under 11 U.S.C. § 364(d) over the Kiewit Aurora West Secured Claim. See Kiewit Objection, ¶ 12. | The liens granted in connection with the Senior Secured Notes are junior to Kiewit's secured non-recourse lien on the Collateral securing the Kiewit Aurora West Secured Claim. |
| The Disclosure Statement does not disclose if the Backstop Purchasers are being granted a priming lien under 11 U.S.C. 364(d) over the Kiewit Aurora West Secured Claim, and if so, how Kiewit will be adequately protected. See Kiewit Objection, ¶ 14(e). | The Plan does not provide priming liens to the Backstop Purchasers on the Collateral securing the Kiewit Aurora West Secured Claim that are senior to the Kiewit liens. |
| The Disclosure Statement contains inadequate or no disclosure regarding the completion of Aurora West and Mt. Vernon plants or the effects of abandoning such plants, rendering the Debtors' financial | The Disclosure Statement contains adequate disclosure concerning the completion of both plants. See Disclosure Statement, Article VI.M and Ex. D. If the Debtors decide to abandon these plants, then |

8

| Objections' Assertion | Backstop Purchasers' Response |
|---|---|
| projections speculative. See Kiewit Objection, ¶ 14(b). | Kiewit can argue at the confirmation hearing that the Plan has been materially modified. |
| The Disclosure Statement contains inadequate or no disclosure regarding the impact that rejecting some or all of the Aurora Co-op contracts would have on the Debtors' financial projections or the completion of the Aurora West plant. See Kiewit Objection, ¶ 14(c). | The Debtors' business plan is premised on the assumption of the Aurora Co-op contracts (or the assumption and amendment of such contracts). If the Debtors decide to reject such contracts, then Kiewit can argue at the confirmation hearing that the Plan has been materially modified. |
| The Disclosure Statement contains inadequate or no disclosure regarding balance sheet values used for the liquidation values of the Aurora West and Mt. Vernon plants, or the rationale for discounting the balance sheet values. See Kiewit Objection, ¶ 14(d). | There is adequate disclosure in the Liquidation Analysis section of the Disclosure Statement, which describes the balance sheet values used for the liquidation values of the Debtors' assets. See Disclosure Statement, Ex. E, Note D. |
| The Plan is not feasible because it does not provide Kiewit's secured claim against ARE - Aurora-West with either the indubitable equivalent or fair and equitable treatment required for confirmation under section 1129(b) of the Bankruptcy Code. See Kiewit Objection, ¶ 14(e). | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. At confirmation, the Debtors and Backstop Purchasers intend to argue that the treatment of the Kiewit's secured claim against ARE - Aurora-West complies with the requirements of section 1129(b) of the Bankruptcy Code. |
| If the Plan provides priming liens in favor of the Backstop Purchasers, the Plan fails to provide adequate protection and violates §§ 364(d) and 1129(a)(2). See Kiewit Objection, ¶ 14(e). | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. As set forth above, the Kiewit liens are senior to the liens granted in connection with the Senior Secured Notes. Accordingly, the Plan does not provide priming liens to the Backstop Purchasers on the Collateral securing the Kiewit Aurora West Secured Claim that are senior to the Kiewit liens. |
| The Plan also eliminates Kiewit's deficiency claim against ARE - Aurora-West if the Debtors (a) default on their payment under proposed five-year nonrecourse note option or (b) if the plant is returned. Based on the Debtors' liquidation values of $2.4-5.0 million for ARE - Aurora West, Kiewit has an unsecured deficiency claim of $10.8-13.4 million. Since the Plan provides recovery to other creditors, it violates the absolute priority rule by excluding Kiewit from the unsecured pool and requiring Kiewit to accept a collateralized non-recourse note, or return of collateral with fraction of the value of its claim in full satisfaction of those claims. See Kiewit Objection, ¶ 14(e). | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. At confirmation, the Debtors and Backstop Purchasers intend to argue that the treatment of the Kiewit Aurora West Secured Claim against ARE - Aurora-West complies with the requirements of section 1129(b) of the Bankruptcy Code. |

| Objections' Assertion | Backstop Purchasers' Response |
|---|---|
| The Plan discriminates against Kiewit by giving the Backstop Purchasers a 13% fully secured and recourse note and Kiewit a 5% nonrecourse note secured by a depreciating unfinished plant. See Kiewit Objection, ¶ 14(f)(i). | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. As set forth above, the Kiewit liens are senior to the liens granted in connection with the Senior Secured Notes. Accordingly, the Senior Secured Notes are entitled to a higher interest rate. |
| The Plan discriminates against Kiewit by exonerating ARE Holdings from its pre-petition guaranty of the obligations of ARE - Mt. Vernon and ARE - Aurora West to Kiewit. See Kiewit Objection, ¶ 14(f). | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. The Kiewit guaranty claim against ARE Holdings, to the extent allowed, is being treated like all other allowed claims at ARE Holdings. See Plan, II.A. |
| The Disclosure Statement does not disclose whether the Debtors will allow or object to Kiewit's claims. See Kiewit Objection, ¶ 14(g). | The Bankruptcy Code does not require a debtor to disclose whether it will object to the claims of a particular creditor. See generally In re Phoenix Petroleum, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001). |
| The Motion represents a "sub rosa" plan, which would bind the Debtors to a financing package that is tied to a plan prior to approval of a disclosure statement. See Kiewit Objection, Preliminary Statement, sec. (a). | The Kiewit Objection omits any discussion as to how the Motion and the Backstop Commitment Agreement constitute a "sub rosa" plan. In any event, the Debtors have filed a chapter 11 plan, and the Backstop Commitment Agreement merely facilitates that plan with the guarantee of exit financing in the event the proposed plan is confirmed. Additionally, the Motion and the Backstop Commitment Agreement do not represent a "sub rosa" plan because they do not limit the rights of any parties in connection with confirmation of the proposed plan. |
| The Debtors' proposed entry into Backstop Commitment Agreement is premature because the Plan is unconfirmable. Equity holders will object to the Plan because it is based on an enterprise value that undervalues the Debtors' business. See Shirley Objection, ¶ 5. | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. Based on the Debtors' analysis, the Debtors' total enterprise value ranges from between $220 and $260 million (with a midpoint of $240 million), but the equity hurdle is at least $549 million, rendering the Debtors insolvent by more than $300 million. |
| Unsecured creditors will get a recovery greater than 100%, diluting the equity holders' recovery. See Shirley Objection, ¶ 5. | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. Shirley provides no evidence in support of this allegation.<br><br>3. There is a virtual certainty that unsecured creditors will not receive a full recovery. Specifically, the estimated range of enterprise value of the Reorganized |

10

| Objections' Assertion | Backstop Purchasers' Response |
|---|---|
| | Debtors is $220 million to $260 million (with a midpoint of $240 million). See Disclosure Statement, Art. VIII.B. However, Prepetition Unsecured Note Claims alone total more than *$315 million*. See Plan, Article I.A., p. 13. Accordingly, under the proposed Plan, General Unsecured Claims (including claims on account of the Notes) will receive only a 1-9% recovery at every Debtor entity other than ARE Inc. See Disclosure Statement, Article II.A. General Unsecured Claims at ARE Inc. receive a recovery of only 35%. See id. |
| Equity holders will receive less under the Plan than they would receive in a liquidation. See Shirley Objection, ¶ 5. | 1. As a threshold matter, this is a confirmation issue and is not in any way relevant to the relief requested in the Motion.<br><br>2. Shirley provides no evidence in support of this allegation. |

## CONCLUSION

WHEREFORE, the Backstop Purchasers respectfully request that the Court overrule the Objections and enter an order substantially in the form attached to the Motion as <u>Exhibit I</u> (i) approving the Debtors' entry into the Backstop Commitment Agreement, (ii) authorizing and approving the Debtors' payment of the Break-Up Fee, Expense Reimbursement and the Indemnification, to the extent provided for in the Backstop Commitment Agreement, and (iii) granting such other and further relief, as the Court deems appropriate.

Dated: January 8, 2010

*/s/ David W. Carickhoff*
Bonnie Glantz Fatell (No. 3809)
David W. Carickhoff (No. 3715)
Stanley Tarr
BLANK ROME, LLP
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

– and –

Michael S. Stamer (admitted *pro hac vice*)
Shaya Rochester (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Counsel to the Backstop Purchasers
