**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES AND REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THE PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware Corporation, *et al.*, | Case No. 09-11214 (KG) |
| Debtors.[1] | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR
## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER
## CHAPTER 11 OF THE BANKRUPTCY CODE DATED, AS OF JANUARY 13, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for the Debtors and Debtors in Possession

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

# TABLE OF CONTENTS

**I. INTRODUCTION** ..............................................................................................2

    A.    Holders of Claims Entitled to Vote........................................................4

    B.    Voting Procedures...................................................................................5

    C.    Confirmation Hearing.............................................................................7

    D.    Creditors Committee's Statement In Support Of Plan With Reservation of Rights.....................................................................................................7

**II. OVERVIEW OF THE PLAN**...........................................................................8

    A.    Summary of Classification and Treatment ............................................8

**III. OVERVIEW OF CHAPTER 11** ....................................................................18

**IV. COMPANY BACKGROUND** ........................................................................19

    A.    General Background .............................................................................19

    B.    The Debtors..........................................................................................19

    C.    The Businesses.....................................................................................20

    D.    Debtors' Prepetition Capital Structure.................................................23

**V. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**.................................................................................................................25

**VI. THE CHAPTER 11 CASES** ...........................................................................26

    A.    Significant "First Day" Motions; Retention of Professionals...................26

    B.    DIP Credit Facility and Use of Prepetition Secured Lenders' Cash Collateral.............................................................................................27

    C.    Official Committee of Unsecured Creditors.........................................28

    D.    Request for Appointment of Equity Committee ..................................28

    E.    Executory Contracts and Leases ..........................................................29

    F.    Claims Process......................................................................................30

    G.    Disposition of Assets Not Essential to Reorganization ............................30

    H.    Post-Petition Insurance Policies...........................................................30

    I.    Stipulation with Motiva Enterprises LLC.............................................31

    J.    Vopak Adversary Proceeding ..............................................................31

    K.    Extension of the Debtors' Exclusive Periods........................................31

    L.    The Debtors Key Employee Incentive Program ..................................32

    M.    The Debtors' Exit Financing and the Backstop Commitment Agreement 32

    N.    The Status of the Debtors' Partially Constructed Mt. Vernon Facility and Aurora West Facility and Related Negotiations .......................................34

    O.    The Debtors' Marketing Efforts..............................................................35

DB02:8549217.27                                                                                           068125.1001

**VII. SUMMARY OF THE PLAN** ...................................................................36

    A.     Introduction..................................................................................36
    B.     Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan.................................................36
    C.     Provisions Regarding Corporate Governance and Management of the Reorganized Debtors...................................................................48
    D.     Provisions Regarding Means of Implementation........................50
    E.     Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims ...................................................................53
    F.     Effect of Confirmation of the Plan.............................................60
    G.     Retention of Jurisdiction.............................................................64
    H.     Miscellaneous Provisions............................................................65
    I.     Executory Contracts and Unexpired Leases ...............................68
    J.     Benefit Plans ..............................................................................69
    K.     Confirmation and Effectiveness of the Plan ...............................70

**VIII. PROJECTIONS AND VALUATION** ................................................72

    A.     Financial Projections...................................................................72
    B.     Valuation....................................................................................72

**IX. CERTAIN RISK FACTORS TO BE CONSIDERED** ..........................80

    A.     Projected Financial Information .................................................80
    B.     Risks Related to the Debtors' Business and Operations.............80
    C.     Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness..............................................................86
    D.     Certain Bankruptcy Law Considerations....................................87
    E.     Certain Risks Relating to the Equity Securities Issued under the Plan......87

**X. CONFIRMATION PROCEDURE**..........................................................88

    A.     Solicitation of Votes ...................................................................88
    B.     The Confirmation Hearing..........................................................89
    C.     Confirmation ..............................................................................90

**XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**..............................................................................................92

    A.     Alternative Plan of Reorganization or Plan of Liquidation ........92
    B.     Liquidation Under Chapter 7 ......................................................93
    C.     Dismissal of the Chapter 11 Cases..............................................93

**XII. SECURITIES LAW MATTERS**..........................................................93

    A.     Exemption From Registration Requirements for Issuances of New ARE Holdings Common Stock and Warrants Pursuant to Plan. ........93

DB02:8549217.27

068125.1001

B. Subsequent Transfers of New ARE Holdings Common Stock and Warrants Issued Pursuant to the Plan...........................................................94

C. Issuance of Senior Secured Notes and Additional New Equity................95

D. Resale of Senior Secured Notes and Noteholder Equity ...........................95

**XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..96**

A. U.S. Federal Income Tax Consequences to the Debtors............................96

B. Federal Income Tax Consequences to the Holders of Claims.................100

C. Professional Tax Assistance. .................................................................107

D. Reservation of Rights............................................................................108

**XIV. CONCLUSION** ....................................................................................109

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. **ALL CREDITORS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE IX BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE

1

ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

## I.

## INTRODUCTION

On April 7, 2009 (the "Petition Date"), Aventine Renewable Energy Holdings, Inc. ("ARE Holdings," together with each of its direct and indirect subsidiaries and affiliates, "Aventine" or the "Company"), Aventine Renewable Energy, LLC ("ARE LLC"), Aventine Renewable Energy, Inc. ("ARE Inc."), Aventine Renewable Energy – Aurora West, LLC ("ARE – Aurora West"), Aventine Renewable Energy – Mt Vernon, LLC ("ARE – Mt. Vernon"), Aventine Power, LLC ("Aventine Power"), and Nebraska Energy, L.L.C. ("NELLC") (collectively, the "Debtors") filed their petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court"). All of the Debtors' bankruptcy cases are being jointly administered for procedural purposes only.

On the date hereof, the Debtors filed their proposed joint plan of reorganization (the "Plan"), which sets forth the manner in which Claims against and Equity Interests in the Debtors will be treated. This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan, the Debtors' business and related matters.

The Plan contemplates: (i) payment in full in Cash either on or after the Effective Date to holders of Allowed (a) Administrative Claims, (b) Fee Claims, (c) Priority Tax Claims, (d) DIP Financing Claims, (e) Other Priority Claims, and (f) Prepetition Secured Credit Facility Claims; (ii) to holders of the Kiewit Mt. Vernon Secured Claim, the Kiewit Aurora West Secured Claim and Other Secured Claims, either reinstatement of such Claims, a Cash payment or payments, or return of the Collateral securing such Allowed Other Secured Claims; (iii) to holders of Prepetition Unsecured Notes Claims and General Unsecured Claims, a *pro rata* distribution of the Unsecured Claims Stock Pool allocable to the Debtor against which such Claims are allowed; (iv) to holders of Convenience Class Claims, a Cash payment equal to 35% of the Allowed Amount of such Claims; (v) to holders of Equity Interests in ARE Holdings, the issuance of the Warrants; and (vi) no recovery to holders of Equity Interests in the Subsidiaries. In no event will such holders be entitled to receive value in excess of the Allowed amount of their Claims.

Upon emergence from Chapter 11, the Reorganized Debtors will issue $105 million in notes that will be secured by senior liens on all of the Reorganized Debtors' assets and used to fund distributions under the Plan as well as the Reorganized Debtors' working capital and liquidity needs post-emergence. The Reorganized Debtors will also enter into a $20 million secured asset-based lending facility after the Effective Date which will be used to fund liquidity and working capital needs post-emergence.

2

This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of votes to accept or reject the Debtors' Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [February 24, 2010 at 3:00 p.m. (prevailing Eastern Time).

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (**Exhibit A**);

- An Order of the Court (excluding the exhibits thereto) dated [_____] (the "Disclosure Statement Order"), among other things, approving the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (**Exhibit B**);

- The Debtors' prepetition corporate organizational chart (**Exhibit C**);

- The Debtors' Financial Projections (**Exhibit D**);

- The Debtors' Liquidation Analysis (**Exhibit E**); and

- Other documents approved by the Court to be included in the solicitation materials with respect to the Plan.

In addition, Aventine's (i) Annual Report on Form 10-K for the fiscal year ended December 31, 2008, which was filed on March 16, 2009, and amended on April 30, 2009, and (ii) Quarterly Report on Form 10-Q for the quarterly period ending September 30, 2009, which was filed on November 9, 2009, are available for inspection online at the Securities and Exchange Commission's website, at the following address: http://sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001285043.

Finally, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On [_____], after notice and a hearing, the Court entered the Disclosure Statement Order, determining that the Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court

3

shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information...." 11 U.S.C. § 1125(a)(1). NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A. Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

Classes 2 (Prepetition Secured Credit Facility Claims), 4(b) (Kiewit Aurora West Secured Claim), 5 (Prepetition Unsecured Notes Claims), 6 (General Unsecured Claims), 7 (Convenience Claims), and 9(a) (Equity Interests in ARE Holdings) under the Plan may be or are Impaired. To the extent Claims and Interests in Classes 2(a) – 2(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) are not the subject of an objection, the holders of such Claims or Interests are entitled to vote to accept or reject the Plan. Classes 9(b) through 9(f) (Equity Interests in the Subsidiaries) will receive no distributions pursuant to the Plan and, thus, pursuant to section 126(g) of the Bankruptcy Code, such holders are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan. Classes 1(a) – 1(f) (Other Priority Claims), 3(a) – 3(f) (Other Secured Claims), 4(a) (Kiewit Mt. Vernon Secured Claim), and 8(a) – 8(f) (Intercompany Claims) under the Plan are unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Classes 1(a) – 1(f), 3(a) – 3(f), 4(a) and 8(a) – 8(f) are conclusively deemed

to have accepted the Plan and therefore may not vote to accept or reject the Plan. ACCORDINGLY, A BALLOT TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 2(a) – 2(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a).

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article X below.

Because Classes 9(b) through 9(f) are deemed to reject the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article X below.

For a summary of the treatment of each Class of Claims and Interests, see Article II below.

### B.    Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims. Please vote and return your Ballot(s).

If you received a Ballot from a broker, bank or other institution, return the completed Ballot(s) to such broker, bank or other institution promptly so that it can be forwarded to the Debtors' voting tabulation agent, The Garden City Group, Inc. (the "Claims Agent" or "GCG"). If you received a Ballot(s) from the Debtors, please vote and return your Ballot(s) directly to the following address, if by mail:

> The Garden City Group, Inc.
> Attn: Aventine Voting Agent
> P.O. Box 9000 #6527
> Merrick, NY 11566-9000

If you decide to return your Ballot by hand or overnight delivery, please deliver your Ballot to the following address:

> The Garden City Group, Inc.
> Attn: Aventine Voting Agent
> 105 Maxess Road
> Melville, NY 11747

DB02:8549217.27                                    068125.1001

DO NOT RETURN YOUR NOTES OR ANY OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, [FEBRUARY 17, 2010].

Any Claim in Classes 2(a) – 2(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) to which an objection or request for estimation is pending, is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing such Claim for the purpose of voting on the Plan. In addition, the Debtors propose that Ballots cast by alleged creditors whose Claims (a) are not listed on the Debtors' Schedules of liabilities or (b) are listed as disputed, contingent and/or unliquidated on the Debtors' Schedules of liabilities, but who have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate Claim amount requirements of that section.

Pursuant to the Disclosure Statement Order, the Court set January 13, 2010 as the record date (the "<u>Voting Record Date</u>") for voting on the Plan. Accordingly, only holders of record as of the Voting Record Date will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call GCG (631) 470-5000 from 8:30 a.m. to 5:30 p.m., prevailing Eastern Time, Monday through Friday.

### C. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Court has scheduled a hearing to consider confirmation of the Plan for [February 24, 2010 at 3:00 p.m.] prevailing Eastern Time before the Honorable Kevin Gross, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the "Confirmation Hearing"). The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [February 17, 2010 at 4:00 p.m.], prevailing Eastern Time, in the manner described below in Article X. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

### D. Creditors Committee's Statement In Support Of Plan With Reservation of Rights

The Creditors Committee has carefully considered the Plan and Disclosure Statement and whether a better plan for unsecured creditors may be negotiated with the Debtors and Backstop Purchasers, or whether an alternative plan may be filed which could lead to a better result for general unsecured creditors. The Creditors Committee has also considered the additional costs which may be involved should this case be converted to a Chapter 7 proceeding. At present, the Creditors Committee believes the Plan provides the highest and best recovery to unsecured creditors.

While the Creditors Committee believes the Plan offers the highest and best recovery to unsecured creditors, the Creditors Committee does not support the issuance of Warrants to Class 9(a) Equity Interests at a proposed strike price of $40.94  To this end, the Creditors Committee believes the proposed issuance of Warrants to Class 9(a) Equity Interests at a strike price of $40.94 allows Class 9(a) Equity Interests to realize a potential recovery before the New ARE Holdings Common Stock to be distributed under the Plan reaches a value in an aggregate amount that would pay General Unsecured Claims in full. While the Creditors Committee generally supports the Plan, the Creditors Committee reserves the right in connection with the Confirmation Hearing to challenge and object to the issuance of Warrants to Class 9(a) Equity Interests at the current strike price. The Creditors Committee further believes that the strike price of any Warrants to Class 9(a) Equity Interests should be set at $46.00.

The Creditors Committee urges each unsecured Creditor to review the enclosed Plan, Disclosure Statement and accompanying documents, and make an independent decision as to whether you should accept the Plan. However, based on the foregoing, the Creditors Committee recommends that unsecured Creditors vote to accept the Plan.

# II.

## OVERVIEW OF THE PLAN

### A.    Summary of Classification and Treatment

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Interests thereunder.

SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.[2]

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|-------|-------------|------------|------------------|------------------------------|----------------------|
| Unclassified | Administrative Claims | Unimpaired | No (deemed to accept) | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim shall receive from the Debtor against which such Allowed Administrative Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (A) Cash of the applicable Debtor against which such Administrative Claim is Allowed equal to the unpaid portion of such Allowed Administrative Claim, or (b) such less favorable treatment to which such Debtor or Reorganized Debtor and the holder of such Allowed Administrative Claim shall have agreed upon in writing; *provided, however,* that Allowed Ordinary Course Administrative Claims shall be paid in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing relating thereto. | 100% |

---

[2]     This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| Unclassified | DIP Financing Claims | Unimpaired | No (deemed to accept) | On the Initial Distribution Date, each holder of a DIP Financing Claim shall receive payment in full in Cash of all obligations of the Debtors under the DIP Facility Documents; *provided, however,* that upon the written instruction of any holder of a DIP Financing Claim, such Cash payment may be applied against the purchase of the Senior Secured Notes. | 100% |
| Unclassified | Fee Claims | Unimpaired | No (deemed to accept) | Except as otherwise provided for in the Plan, all requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, and counsel to the Creditors Committee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date, unless such date is otherwise modified by order of the Court.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors and the requesting party on or before twenty (20) days after the filing and service of such request. | 100% |

DB02:8549217.27

068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|-------|-------------|------------|------------------|------------------------------|----------------------|
| Unclassified | Priority Tax Claims | Unimpaired | No (deemed to accept) | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim shall receive from the Debtor against which such Priority Tax Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of the Debtor against which such Priority Tax Claim is Allowed equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtor or Reorganized Debtor, and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (C) at the option of the Reorganized Debtors, Cash of the applicable Debtor in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. | 100% |
| Classes 1(a) – 1(f) | Other Priority Claims | Unimpaired | No (deemed to accept) | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if an Other Priority Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Other Priority Claim becomes Allowed, each holder of an Allowed Other Priority Claim in Classes 1(a) through 1(f) shall receive from the Debtor against which such Allowed Other Priority Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Other Priority Claim, (A) Cash equal to the amount of such Allowed Other Priority Claim or (B) such less favorable treatment as to which such Debtor or Reorganized Debtor and the holder of such Allowed Other Priority Claim have agreed upon in writing. | 100% |

DB02:8549217.27

068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| Classes 2(a) – 2(f) | Prepetition Secured Credit Facility Claims | Impaired | Yes | Except to the extent that a holder of an Allowed Prepetition Secured Credit Facility Claim shall have agreed in writing to a different treatment, in full and final satisfaction of, and in exchange for, as to the Debtors' estates, such Claim, the holders of Allowed Prepetition Secured Credit Facility Claims in Classes 2(a) through 2(f) shall receive the following: a.     With respect to that portion of the Allowed Prepetition Secured Credit Facility Claim that includes all amounts other than for the LC Obligations, Cash in the Allowed amount of such Claim (including interest and any fees related to same to the extent and amounts permitted by prior Order of the Bankruptcy Court or 11 U.S.C. §506) on the later of the Initial Distribution Date or as soon as practicable after such Prepetition Secured Credit Facility Claim becomes an Allowed Claim (provided that to the extent any portion of such claim is not Allowed on the Initial Distribution Date, the Reorganized Debtors shall escrow funds sufficient to pay such claim once Allowed, in an amount agreed to by the Reorganized Debtors and the holders of such claims or as determined by the Bankruptcy Court; and upon payment or escrowing of all such amounts, any and all Liens held by the holders of Prepetition Secured Credit Facility Claims on the Debtors' or Reorganized Debtors' assets, other than with respect to the LC Collateral Account as described below in subsection b(i)(c) or to the Prepetition Lender Claim Escrow, shall be extinguished, nullified and void as to property of the estates of the Debtors. b.     With respect to the portion of the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, one of the following treatments shall apply: (i)  (a) the LC Obligations shall be entitled to letter of credit service fees on the outstanding balance at the rate of 6.625% per annum, payable on a monthly basis; (b) the Existing LCs shall continue until the earlier of (1) | ~100% |

DB02:8549217.27 068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|-------|-------------|------------|------------------|------------------------------|----------------------|
| | | | | the release of any Existing LC by the beneficiary thereof, (2) an Existing LC is drawn in full by the beneficiary thereof, or (3) the term of an Existing LC matures; (c) the LC Obligations shall be secured as to the Reorganized Debtors only by the LC Collateral Account and the Reorganized Debtors shall, on the Initial Distribution Date, adjust the amount in the LC Collateral Account so that it equals 110% of the face amount of all Existing LCs as of such date; and (d) as soon as reasonably practicable, but in no event more than fifteen (15) business days, after an Existing LC (1) matures without being drawn, (2) is both (A) released in writing to the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, in whole or in part by the beneficiary and (B) in the case of a release in whole, the original of such Existing LC is returned to and received by the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations or, if such Existing LC has been lost, then through the completion and delivery of an affidavit and indemnity agreement setting forth that such Existing LC has been lost and indemnifying the Agent on terms customary for the Agent in such circumstances, or in the case of a partial release, such Existing LC is amended on terms and conditions reasonably acceptable to the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, (3) is drawn in full or for less than the full amount of the Existing LC, then in each case of (d)(1) through (d)(3), the portion of the LC Collateral Account in excess of the sum of, (A) the then aggregate and drawn amounts under all Existing LCs plus (B) 110% of any and all amounts that may yet be drawn under all Existing LCs, shall be released and returned to the Reorganized Debtors. The foregoing treatment shall supersede and replace the terms of the LC Collateral Account Stipulation; or (ii) such other treatment as is agreed | |

DB02:8549217.27

068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | | | | to by the Debtors (subject to the consent of the Majority Backstop Purchasers not to be unreasonably withheld) and the holders of the Allowed Prepetition Secured Credit Facility Claims for LC Obligations and as is approved by the Bankruptcy Court; or (iii) in the event (a) the holders of Allowed Prepetition Secured Facility Claims for LC Obligations do not vote to accept the Plan as a class, (b) the Court will not approve the treatment provided for in (b)(i) above without acceptance of the Plan by the holders of Allowed Prepetition Secured Facility Claims for LC Obligations as a class, and (c) the treatment provided for in (b)(ii) above is not applicable, then such other treatment as is approved by the Bankruptcy Court to provide the holders of Allowed Prepetition Secured Facility Claims for LC Obligations with the indubitable equivalent of their Allowed Prepetition Secured Facility Claims for LC Obligations. | |
| Classes 3(a) – 3(f) | Other Secured Claims | Unimpaired | No | Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the applicable Debtor against which such Allowed Other Secured Claim is held (subject to the consent of the Majority Backstop Purchasers), in full and final satisfaction of such claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Claim is held, Cash in an amount equal to such Allowed Other Secured Claim, | 100% |

DB02:8549217.27 068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | | | | including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) the Initial Distribution Date, or (b) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim, or (iii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Allowed Other Secured Claim is held, the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of (y) the Initial Distribution Date, or (z) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim. | |
| Class 4(a) | Kiewit Mt. Vernon Secured Claim | Unimpaired | No | Except as otherwise provided in the Plan, on the Initial Distribution Date, if the Kiewit Mt. Vernon Secured Claim is Allowed as of the Effective Date, and otherwise, as soon as practicable after the Kiewit Mt. Vernon Secured Claim is Allowed, the holder of such Allowed Kiewit Mt. Vernon Secured Claim shall receive from ARE – Mt. Vernon, in full satisfaction and release of, and in exchange for, such Allowed Kiewit Mt. Vernon Secured Claim, Cash equal to the amount of such Allowed Kiewit Mt. Vernon Secured Claim, and any and all Liens held on account of such claim against ARE – Mt. Vernon's assets shall be extinguished, nullified and void. | 100% |
| Class 4(b) | Kiewit Aurora West Secured Claim | Impaired | Yes | As soon as practical after the occurrence of the Effective Date, the holder of such Allowed Kiewit Aurora West Secured Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed Kiewit Aurora West Secured Claim, which shall be Allowed in the amount of $15,251,808, the following: (i) an initial payment of $10.0 million; and | 100% |

DB02:8549217.27

068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| | | | | (ii) a secured non-recourse note (the "Kiewit Note") in a face amount equal to $5,251,808, together with a deed of trust or other similar documentation required for the perfection of the security interest granted in connection with the Kiewit Note. Subject to the Backstop Purchaser Approval Condition, the form of the Kiewit Note and the deed of trust or similar documentation required for the perfection of the security interest granted in connection with the Kiewit Note shall be contained in the Plan Supplement.<br><br>The Kiewit Note shall (i) be for a term of four (4) years from the Effective Date with an interest rate of 5.0% per annum payable semi-annually; (ii) be non-recourse and secured by a Lien, senior to the Lien granted in connection with the Senior Secured Notes, in the same Collateral that presently secure the Allowed Kiewit Aurora West Secured Claim and with the same validity, priority, force and effect; (iii) amortize $0.5 million semi-annually with a final balloon payment due at the earlier to occur of (a) four (4) years from the Effective Date or (b) 120 days from the date upon which the Aurora West Facility is completed and operating at 90% of nameplate capacity; and (iv) be permitted to be paid in full prior to the maturity date without penalty. | |

DB02:8549217.27

068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| Classes 5(a) – 5(f) | Prepetition Unsecured Notes Claims | Impaired | Yes | Except as otherwise provided for in the Plan, on the Initial Distribution Date, each holder of an Allowed Prepetition Unsecured Note Claim in Classes 5(a) through 5(f) shall receive from each Debtor against which such Allowed Prepetition Unsecured Note Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Prepetition Unsecured Note Claim, its pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which each such Allowed Prepetition Unsecured Note Claim is held. The holders of Allowed Prepetition Unsecured Notes Claims shall also have the right to share in any supplemental distribution of excess shares of New ARE Holdings Common Stock held in the reserves established pursuant to IV(E)(5) of the Plan, as provided for therein. | 5(a) – Less than 1%<br><br>5(b) – 35%<br><br>5(c) – Less than 1%<br><br>5(d) – 4%<br><br>5(e) – Less than 1%<br><br>5(f) – 9% |

DB02:8549217.27                                                                                068125.1001

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|-------|-------------|------------|------------------|------------------------------|----------------------|
| Classes 6(a) – 6(f)[3] | General Unsecured Claims | Impaired | Yes | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a General Unsecured Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such General Unsecured Claim becomes Allowed, each holder of any such General Unsecured Claim in Classes 6(a) through 6(f) shall receive from the applicable Debtor against which such Allowed General Unsecured Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Claim, its pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which each such Allowed General Unsecured Claim is held. The holders of Allowed General Unsecured Claims shall also have the right to share in any supplemental distribution of excess shares of New ARE Holdings Common Stock held in the reserves established pursuant to IV(E)(5) of the Plan, as provided for therein. | 6(a) – Less than 1%<br><br>6(b) – 35%<br><br>6(c) – Less than 1%<br><br>6(d) – 4%<br><br>6(e) – Less than 1%<br><br>6(f) – 9% |
| Classes 7(a) – 7(f)[4] | Convenience Claims | Impaired | Yes | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Convenience Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Convenience Claim becomes Allowed, each holder of any such Convenience Claim in Classes 7(a) through 7(f) shall receive from each Debtor against which such Allowed Convenience Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Convenience Claim, Cash in an amount equal to 35% of the amount of the Allowed Convenience Claim. | 35% |

---

[3]     The approximate recovery percentage identified for Classes 6(a) – 6(f) is based on the Debtors' best estimate of the aggregate amount of the General Unsecured Claims ultimately Allowed upon conclusion of the claims reconciliation and objection process. Accordingly, actual recoveries may be less as they are subject to a number of factors, including, but not limited to, the successful prosecution of certain objections to Claims.

[4]     The approximate recovery percentage identified for Classes 7(a) – 7(f) is based on the Debtors' best estimate of the aggregate amount of the Convenience Claims ultimately Allowed upon conclusion of the claims

| Class | Designation | Impairment | Entitled to Vote | Treatment of Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|
| Classes 8(a) – 8(f) | Intercompany Claims | Unimpaired | No (deemed to accept) | On the Initial Distribution Date, each Intercompany Claim will be paid, readjusted, reinstated or discharged to the extent reasonably determined to be appropriate by the Reorganized Debtors, subject to the consent of the Majority Backstop Purchasers. | 100% |
| Class 9(a) | Equity Interests in Consolidated Holdings | Impaired | Yes | Except as otherwise provided for in the Plan, on the Initial Distribution Date, each holder of an Allowed Class 9(a) Equity Interests shall receive from Reorganized ARE Holdings, in full satisfaction and release of, and in exchange for, its Allowed Class 9(a) Equity Interests, its pro rata share of the Warrants. Notwithstanding the foregoing, if the Court declines to confirm the Plan with the inclusion of the Warrants being distributed to holders of Allowed Class 9(a) Equity Interests, then (i) each holder of an Allowed Class 9(a) Equity Interest shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests, (ii) Class 9(a) shall be deemed to reject the Plan, and (iii) except as otherwise provided herein, the Debtors will request that the Court confirm the Plan notwithstanding the deemed rejection of the Plan by Class 9(a). | De minimis[5] |
| Classes 9(a) – 9(f) | Equity Interests in the Subsidiaries | Impaired | No (deemed to reject) | The holders of Equity Interests in Classes 9(b) through 9(f) shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests. | 0.00% |

reconciliation and objection process. Accordingly, actual recoveries may be less as they are subject to a number of factors, including, but not limited to, the successful prosecution of certain objections to Claims.

[5] The Debtors have not ascribed a specific numeric value to the Warrants. Because the strike price of the Warrants is substantially higher than what the Debtors believe to be the value of the New ARE Common Stock as of the Effective Date of the Plan, the Debtors believe that the Warrants will have minimal value upon the Effective Date and any value the Warrants might have during the five year exercise period is highly speculative.

DB02:8549217.27

068125.1001

# III.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

# IV.

## COMPANY BACKGROUND

### A.    General Background

As of March 31, 2009, the close of the last fiscal quarterly period immediately prior to the Petition Date, and as reflected in the Form 10-Q[6] filed by Aventine for the period ending March 31, 2009, the Debtors' books and records indicated approximately $676,475,000 in assets and outstanding liabilities of approximately $391,115,000 which included

---

[6]    As noted in the Debtors' SEC filings, the reporting of assets and liabilities requires the Debtors to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the applicable reporting period.

approximately $14,422,000 of secured debt[7] and $300,000,000 in principal amount of senior unsecured notes, based on the Debtors' book value.

## B. The Debtors

Aventine is a producer and marketer of ethanol, an alcohol derived in the United States principally from corn. Aventine is the successor to businesses engaged in the production and marketing of ethanol since 1981. On May 30, 2003, Aventine was acquired by Morgan Stanley Capital Partners IV and related investment funds (the "MSCP IV Funds") from a subsidiary of The Williams Companies, Inc. On July 5, 2006, Aventine completed an initial public offering of its common stock and became listed on the New York Stock Exchange. As of December 31, 2008, the MSCP IV Funds beneficially owned approximately 28% of Aventine's outstanding common stock. Metalmark Subadvisor LLC ("Metalmark") manages the MSCP IV Funds on a subadvisory basis, and two employees of Metalmark are on the nine member board of directors of Aventine.

ARE LLC, a 100% owned subsidiary of ARE Holdings, owns all of the outstanding equity in Debtors ARE Inc., ARE – Aurora West, ARE – Mt. Vernon, and Aventine Power and 78.42% of the equity interests of Debtor NELLC. In October, 2008, the remaining 21.58% of the equity interest in NELLC was purchased by ARE Inc. from the Nebraska Energy Cooperative, bringing all of the equity in NELLC under the common control of the Debtors. A chart of the Debtors' prepetition corporate ownership structure is attached hereto as Exhibit C. The Plan contemplates a reorganization of the Debtors' organizational structure and the elimination of certain intermediary entities.

## C. The Businesses

The Debtors own and operate three plants, two located in Pekin, Illinois and one located in Aurora, Nebraska, which produce ethanol and ethanol co-products. The Debtors also have two additional non-operating partially constructed plants located in Aurora, Nebraska and Mt. Vernon, Indiana. As of December 1, 2009, the Debtors employed 300 people, 254 of which are employed by ARE Inc. who are involved with the day-to-day operations of the Pekin facility as well as the Debtors' corporate level employees who handle the Debtors' general and administrative functions. Approximately 63% of ARE Inc.'s employees are members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industry and Service Workers International Union Local 7-662 ("Local 7-662"). ARE Inc. and Local 7-662 are parties to a collective bargaining agreement dated as of July 2, 2006, which was originally set to expire in October, 2009, but, by agreement between ARE Inc. and Local 7-662, was extended by one year through and including October 31, 2010 on the same terms and conditions, subject to an option to reopen negotiations upon mutual consent after the effective date of a confirmed Chapter 11 plan of reorganization. As of December 1, 2009, NELLC employs 40 people and Mt. Vernon employs an additional 6 people.

---

[7] The amount of secured debt reflected in the Form 10-Q does not reflect certain letters of credit issued on behalf of the Debtors, as of March 31, 2009, which were secured under the Prepetition Secured Credit Facility in the approximate amount of $22 million.

DB02:8549217.27 068125.1001

## 1.    The Debtors' Products and Production Process

Ethanol is marketed as a gasoline blend component that serves as a clean air additive, an octane enhancer and a renewable fuel resource. It is blended with gasoline (i) as an oxygenate to help meet fuel emission standards, (ii) to improve gasoline performance by increasing octane levels, and (iii) to extend fuel supplies. Generally, the production of ethanol from corn can be accomplished through one of two distinct processes: wet milling and dry milling.

The principal difference between the two processes is the initial treatment of the corn and the resulting co-products. In the wet mill process, the corn is soaked or "steeped" in water and sulfurous acid for 24 to 48 hours to separate the grain into its many parts. After steeping, the corn slurry is processed to separate the various components of the corn kernel, including the corn germ, which is then sold for processing into corn oil. The starch and any remaining water from the slurry can then be fermented and distilled into ethanol. The remaining parts of the grain in the wet mill are then processed into a number of different forms of protein used to feed livestock.

In the dry mill process, on the other hand, the entire corn kernel is first ground into a flour, which is referred to in the industry as "meal," and is processed without first separating the various component parts of the grain. The meal is processed with enzymes, ammonia, and water, and then placed in a high-temperature cooker to ferment where yeast is added and the conversion of sugar to ethanol begins. The fermentation process generally takes between forty and fifty hours. After fermentation, the resulting liquid is transferred to distillation columns where the ethanol is evaporated from the remaining "stillage" for fuel uses. With the starch elements of the corn kernel consumed, the principal co-product produced by the dry mill process is dried distillers grain with solubles ("DDGS"), a protein used in animal feed.

A small but growing amount of ethanol is also used as E85, a renewable fuels-driven blend composed of up to 85% ethanol. The Debtors also produce and market certain co-products, including corn gluten feed and meal, corn germ, condensed corn distillers solubles, wet distillers grain with solubles ("WDGS"), DDGS, carbon dioxide, and brewers' yeast. For the years ended December 31, 2008, 2007, and 2006, ethanol sales represented approximately 90% of the Debtors' total revenue. The remaining 10% of revenue is split among multiple sources, including the sale of the above co-products and, to a lesser extent, the sale of bio-products, which are processed into a growing variety of products for use in fermentation applications and animal and human food. A schematic of the ethanol production processes follows:

DB02:8549217.27                                                                                        068125.1001

# Corn To Ethanol Conversion Process



## 2. The Debtors' Production Facilities

The Debtors' Pekin, Illinois facility is located on the east bank of the Illinois River, approximately 160 miles southwest of Chicago. The Pekin facility is composed of two distinct plants: a coal-fired plant in operation since 1981 that uses the wet mill process for producing ethanol and a natural-gas fired plant in operation since 2007 that uses the dry mill process for producing ethanol. The Debtors also own and operate a natural gas-fired dry mill plant in Aurora, Nebraska, located approximately 60 miles west of Lincoln, Nebraska, which has

DB02:8549217.27                                                                                      068125.1001

been operating since 1995. These facilities have a combined total ethanol production capacity of approximately 200 million gallons annually.

As part of its expansion plans, in May 2007, ARE – Mt Vernon and ARE – Aurora West each entered into separate Engineering, Procurement and Construction Services Fixed Price Contracts (each an "EPC Contract") with Kiewit Energy Company ("Kiewit") for the construction of two additional ethanol production facilities, one in Mt. Vernon, Indiana (the "Mt. Vernon Facility") and one in Aurora, Nebraska (the "Aurora West Facility"). Each EPC Contract contemplates the construction of two plants, each capable of producing at least 110 million gallons of ethanol annually. With respect to the Mt. Vernon Facility, ARE – Mt. Vernon began construction of the first 110 million gallon plan on property leased from the State of Indiana. With respect to the Aurora West Facility, ARE – Aurora West began construction of its first 110 million gallon plant on property owned by the Debtors. Prior to the Petition Date, ARE – Mt. Vernon delayed completion of the first 110 million gallon plant at the Mt. Vernon Facility, and ARE – Aurora West suspended construction of the first 110 million gallon plant at the Aurora West Facility because of the downturn in the ethanol market and in order to conserve liquidity. On or about February 9, 2009, Kiewit filed certain mechanics liens related to the Mt. Vernon Facility and the Aurora West Facility, in the amounts of $8,291,215 and $16,125,620, respectively. In the months before the Petition Date, ARE – Mt. Vernon and ARE – Aurora West agreed with Kiewit to certain amendments of their respective EPC Contracts to extend the construction and payment schedules. However, on March 6, 2009, Kiewit notified the Debtors of the termination of the EPC Contracts, referencing certain of the Debtors' failure to make a payment under the EPC Contracts. Kiewit has filed Claims asserting approximately $7,930,706 due on account of the Mt. Vernon Facility and $15,251,808 due on account of the Aurora West Facility under the respective EPC Contracts, as of the Petition Date.

### 3. Marketing Alliance and Sales of Sourced Ethanol

In addition to selling ethanol produced at its own facilities, the Debtors sell or have sold ethanol from two other sources. First, prior to the Petition Date, the Debtors operated an ethanol marketing alliance (the "Marketing Alliance") pursuant to which their alliance partners (third-party producers) sold their ethanol production to the Debtors on an exclusive basis. The Marketing Alliance contracts required the Debtors to purchase all ethanol produced by the alliance partners and sell it at contract or prevailing market prices and entitled the Debtors to a commission on the gallons sold. In the months before the Petition Date, the Debtors worked to wind-down the Marketing Alliance, which process was ongoing as of the commencement of the Chapter 11 Cases, but has now been completed. Second, the Debtors, from time to time, purchased ethanol from third parties on the spot market, which they then resold through their distribution network. The margins from these purchase/resale transactions were typically less volatile than the margins on the production gallons.

Prior to the Petition Date, the Debtors utilized an extensive national distribution network that comprised trucks, a leased railcar and barge fleet, and leased terminal space at critical points on the nation's transportation grid where their ethanol was blended with their customers' gasoline. As the Debtors unwound the Marketing Alliance, they endeavored to terminate certain distribution arrangements that imposed significant fixed costs. The Debtors continue to use a distribution network that is a scaled down version from the network used prior

to the Petition Date. The Debtors' distribution network continues to provide them with access to ethanol markets in the western, eastern and Gulf Coast regions of the United States. However, the distribution network subjects the Debtors to significant fixed costs.

### 4. Financial Risks and Results

The Debtors were and continue to be subject to significant market risk with respect to the price of ethanol, their principal product, as well as the price and availability of corn, the Debtors' principal commodity used in their ethanol production process. Ethanol prices are generally influenced by the supply and demand for gasoline, the availability of substitutes and the effect of related laws and regulations. Likewise, the availability and price of corn are subject to wide fluctuations due to unpredictable factors such as weather conditions during the corn growing season, carry-over from the previous crop year and current crop yield, governmental policies with respect to agriculture and international supply and demand. Although corn is the Debtors' most significant raw material production cost, other major costs include natural gas, transportation costs, and the purchase price of ethanol from other producers, which is tied to the ethanol market price.

In 2008, the Debtors sold 936 million gallons of ethanol resulting in net sales of $2.2 billion. The Debtors also realized $128.5 million of revenue from the sale of co-products in 2008. As of December 31, 2008, the Debtors' consolidated financial statements reflected assets totaling approximately $799.5 million and liabilities totaling approximately $490.7 million, based on the Debtors' book value.

### D. Debtors' Prepetition Capital Structure

### 1. Secured Financing

Each of the Debtors is a party to a five-year secured revolving credit facility, dated as of March 23, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Secured Credit Facility"), among JPMorgan Chase Bank, N.A., as administrative agent (the "Prepetition Agent"), Bank of America, N.A., as syndication agent, UBS Securities and Wells Fargo Foothill, LLC, as co-documentation agents and J.P. Morgan Securities Inc., as sole bookrunner and sole lead arranger, and the lenders party thereto (the "Prepetition Secured Lenders"). The Prepetition Secured Credit Facility originally provided for (i) a revolving loan commitment of up to $200 million, subject to collateral availability (the "Revolver"), and (ii) a $25 million sub-limit for letters of credit. The Prepetition Secured Lenders assert that the Debtors' obligations under the Prepetition Secured Credit Facility are secured by substantially all of the Debtors' assets, including their: (a) equipment, (b) inventory, (c) chattel paper, (d) accounts, (e) other pledged property and securities, (f) investment related property, (g) cash collateral accounts, (h) intellectual property, and (i) commercial tort claims.

On March 10, 2009, the Debtors and the Prepetition Agent entered into that certain amendment of the Prepetition Secured Credit Facility (the "Prepetition Secured Credit Facility Amendment"). After giving effect to the Prepetition Secured Credit Facility Amendment, the Debtors had $0.7 million of cash and $6.6 million of additional borrowing

available under the Prepetition Secured Credit Facility as of March 12, 2009. Among other things, the Prepetition Secured Credit Facility Amendment reduced the commitment under the Revolver to $75 million. On April 1, 2009 and May 1, 2009, the commitment was further reduced to $60 million and $50 million, respectively. The Prepetition Secured Credit Facility Amendment also required the Debtors to obtain, by March 31, 2009, formal written agreements with the holders of at least 80% of the Prepetition Unsecured Notes (as defined below) committing to binding terms of an exchange offer for a like principal amount of a new series of "pay-in-kind" notes.

On March 30, 2009, the Debtors notified the Prepetition Agent that they would not be able to obtain the necessary consents from the holders of the Prepetition Unsecured Notes that were required under the Prepetition Secured Credit Facility Amendment and also notified the Prepetition Agent that the Debtors would not make an interest payment on the Prepetition Unsecured Notes due on April 1, 2009. On March 30, 2009, the Debtors and the Prepetition Secured Lenders entered into a letter agreement that waived certain events of default under the Prepetition Secured Credit Facility until April 8, 2009.

As of the Petition Date, approximately $18.35 million in revolving loans was outstanding under the Revolver. In addition, approximately $22.0 million of letters of credit were outstanding. Approximately $9.4 million of letters of credits have been drawn down upon during these cases, and approximately $3.0 million of letters of credit have been released during these cases. Based on the draw of $9.4 million from the letters of credit, the revolving loan balance is $27.8 million.

## 2. Unsecured Financings

In March 2007, Aventine issued $300 million aggregate principal amount of 10% unsecured senior notes due April 2017 (the "Original Senior Notes") pursuant to an indenture between Aventine, as issuer, the other Debtors, as guarantors, and Wells Fargo Bank, N.A., as trustee. On August 10, 2007, Aventine exchanged all of the Original Senior Notes in a registered offering for unsecured senior notes (the "Prepetition Unsecured Notes"), with terms identical to the Original Senior Notes. The Prepetition Unsecured Notes are guaranteed by and are general unsecured obligations of each Debtor. The Prepetition Unsecured Notes have interest payments due semi-annually on April 1 and October 1 of each year.

In addition to the foregoing bank and bond indebtedness, the Debtors also had approximately $40,000,000 in ordinary course trade debt that was unpaid as of the Petition Date.

## 3. Equity Interests in the Debtors.

As of November 9, 2009, ARE Holdings had 42,963,158 shares of common stock issued and outstanding. Prior to the Petition Date, ARE Holdings' shares were publicly traded on the New York Stock Exchange. ARE Holdings either directly or indirectly owns all of the equity interests in the remaining Debtors.

# V.

## EVENTS LEADING TO THE COMMENCEMENT
## OF THE CHAPTER 11 CASES

A variety of factors contributed to the Debtors' commencing these Chapter 11 Cases, including the volatility in commodity prices for corn, natural gas and ethanol. Corn and ethanol prices were highly volatile during 2008 and were impacted by a number of factors beyond the Debtors' control. In addition, the costs of producing ethanol, even apart from corn, rose in the year preceding the Petition Date. Ultimately, the Chapter 11 Cases were precipitated by sizeable fluctuations in the price of corn, natural gas and ethanol, obligations to service the Debtors' debt in the face of continued lack of liquidity in the credit markets, a significant loss on the sale of auction rate securities, and the inability to raise additional investment capital from depressed equity markets.

The Debtors' gross margin depends principally on the spread between ethanol and corn prices (the "Commodity Spread"). As noted above, corn is the predominant feedstock used in ethanol production. However, corn prices do not necessarily correlate with the price of ethanol, since each market is affected by unique supply and demand conditions. Factors affecting the grain markets, such as weather, crop conditions, and international trade, are distinct from those that affect ethanol prices, such as crude oil and gasoline supply and demand factors, the regulatory climate, and the availability of other fuel oxygenates. In early 2006, the Commodity Spread was at historically high levels in excess of $2.50. Since then, the Commodity Spread has narrowed significantly, decreasing from $1.17 in the fourth quarter of 2007 to $0.63 in the fourth quarter of 2008. Immediately before the Petition Date, the ethanol industry was operating at or near breakeven cash margins as a result of a depressed Commodity Spread. The Debtors experienced negative gross margins during the second half of 2008 and through the first quarter of 2009, due in part as a result of fixed price obligations to purchase corn and natural gas at prices above market.

Conversion costs per gallon are an important factor that affect liquidity. Conversion costs represent the cost of converting corn to ethanol and include production salaries, wages and benefits, utilities, maintenance, denaturant, insurance, materials and supplies. As the Commodity Spread narrowed in the period before the Petition Date, conversion costs—the costs of converting corn into ethanol—rose. Conversion costs for the fourth quarter of 2008 increased to $32.3 million from $29.6 million for the fourth quarter of 2007. The total dollars spent on conversion costs increased year over year principally as a result of higher utility costs, higher denaturant costs and higher maintenance costs. The conversion cost per gallon of ethanol increased year over year to $0.67 per gallon in the fourth quarter of 2008 versus $0.66 per gallon in the fourth quarter of 2007.

A number of factors have contributed to the Debtors' declining liquidity. Specifically, the Debtors operating results continued to decline in the fourth quarter of 2008, with the Debtors operating at negative gross margins principally as a result of the declining Commodity Spread, inventory write-downs from declining ethanol prices and above market fixed price corn and natural gas contracts. The Debtors unsuccessfully attempted to raise cash to cover operating cash flow shortfalls through a number of different transactions, including

potential asset sales, a sale of the company, a restructuring of the Debtors' existing debt and obtaining new debt or equity financing. Faced with declining margins and liquidity stress due to frozen credit markets, the Debtors also negotiated termination agreements with most of its sourced-ethanol marketing partners in an effort to rationalize its distribution network to primarily focus on sales of non-sourced ethanol. Despite these efforts, the Debtors had insufficient liquidity to meet anticipated working capital, debt service, and other liquidity needs.

Additionally, during the period from 2006 through 2008, the Debtors invested a substantial portion of the capital raised through their July 2006 public offering in certain auction rate securities (the "Auction Rate Securities"). Those securities, however, proved to lack the liquidity represented to the Debtors and, as a result, were sold at a loss in excess of $31.6 million in the first and second quarters of 2008. Among other things, these losses adversely affected the Debtors' ability to complete and generate revenue through the construction projects at the Mt. Vernon Facility and Aurora West Facility. As a result of the Debtors having to suspend the construction at the Mt. Vernon Facility and Aurora West Facility, in addition to the claims asserted by Kiewit, the Debtors were required to expend approximately $9.9 million in demobilization costs. On November 6, 2008, the Debtors commenced litigation against JPMorgan Chase Bank, N.A. ("JPM") and J.P. Morgan Securities Inc. ("JPMSI") with respect to the Auction Rate Securities asserting claimed damages in the approximate amount of $31.6 million. Per an order of the Circuit Court of Tazewell County, Illinois, which is the court presiding over the Auction Rate Securities litigation, the litigation is stayed. The Debtors cannot predict the timing of when the stay may be lifted or the ultimate outcome of the litigation given the inherent uncertainties associated with any litigation.

As a result of the foregoing, given the severe financial pressures facing them and the short time within which to address them, the Debtors were unsuccessful in their efforts to resolve their liquidity crisis outside the bankruptcy forum and, accordingly, commenced the Chapter 11 Cases to preserve and maximize the value of their assets for the benefit of all stakeholders.

## VI.

## THE CHAPTER 11 CASES

### A.     Significant "First Day" Motions; Retention of Professionals

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Court entered several orders authorizing the Debtors to pay various prepetition claims. These orders were designed to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the filings. The Court entered orders authorizing the Debtors to, among other things:  (i) pay certain prepetition taxes and fees; (ii) pay the claims of certain shippers and warehousemen having possession of the Debtors' goods as of the Petition Date; (iii) pay prepetition claims to certain vendors that the Debtors deem critical to their business operations; and (iv) continue employee wage and benefit programs and pay certain amounts outstanding in connection therewith. In addition, the Court entered other orders granting the Debtors certain relief with respect to various administrative requirements under the Bankruptcy

Code, including authorization to continue their existing cash management system and to provide the Debtors' utility providers with adequate assurance of performance.

In addition, the Debtors filed several applications seeking orders authorizing the retention of certain professionals. Specifically, the Debtors filed applications, which have been approved by the Court, to retain (i) Young Conaway Stargatt & Taylor, LLP, as counsel, (ii) Westervelt, Johnson, Nicoll & Keller, LLC, as special counsel; (iii) Davis Polk & Wardwell LLP, as special financing, corporate and tax counsel, (iv) Jenner & Block LLP, as special litigation counsel, (v) Houlihan Lokey Howard & Zukin Capital, Inc., as financial advisor and investment banker ("Houlihan Lokey"), (vi) Ernst & Young LLP, as tax services provider and independent auditor, and (vii) American Appraisal Associates, Inc., as valuation consultants.

### B. DIP Credit Facility and Use of Prepetition Secured Lenders' Cash Collateral

Immediately prior to the Petition Date, the Debtors negotiated with certain holders of the Prepetition Unsecured Notes to enter into a $30 million non-consensual priming first lien debtor-in-possession financing facility (the "DIP Credit Facility"), to be made on two separate draws. A necessary condition of the DIP Credit Facility was that the obligation thereunder be granted first priority liens senior to the existing liens of the Prepetition Secured Lenders under the Prepetition Secured Credit Facility. On April 8, 2009, the Debtors filed a motion (the "DIP Motion") for (i) approval of the DIP Credit Facility, (ii) authorization for the Debtors to use the cash collateral ("Cash Collateral") of the Prepetition Secured Lenders and the lenders under the DIP Credit Facility (the "DIP Lenders"), and (iii) authorization to provide adequate protection to the Prepetition Secured Lenders.

At the hearing initially scheduled on the DIP Motion, the Debtors, the Prepetition Secured Lenders and the DIP Lenders agreed to adjourn the hearing on the DIP Motion, and the Prepetition Secured Lenders consented to the Debtors' usage of their Cash Collateral based on an agreed budget for the period until the adjourned hearing on the DIP Motion, which was scheduled for April 14, 2009 (the "Interim DIP Hearing"). The Prepetition Secured Lenders filed an objection (the "DIP Objection") to the approval of the DIP Credit Facility contesting, among other things, the material terms of the DIP Credit Facility and the non-consensual priming of the Prepetition Secured Lenders' liens. Following a contested evidentiary hearing, the Court approved the DIP Credit Facility on an interim basis and authorized the Debtors to draw and utilize $15 million under the DIP Credit Facility on an interim basis (the "Interim DIP Order") and scheduled a final hearing on the DIP Motion for May 5, 2009 (the "Final DIP Hearing"). Following entry of the Interim DIP Order, the Debtors made their first draw under the DIP Credit Facility.

Prior to the Final DIP Hearing, the Prepetition Secured Lenders renewed their objections to approval of the DIP Credit Facility. The Final DIP Hearing, like the Interim DIP Hearing, was a contested evidentiary hearing. At the conclusion of the Final DIP Hearing, the Court overruled the objections of the Prepetition Secured Lenders and entered the Final DIP Order approving the DIP Motion and DIP Credit Facility, subject to certain agreed upon modifications, on a final basis. As of the date hereof, the Debtors still have the ability to make a second draw of up to $15 million under the DIP Credit Facility.

DB02:8549217.27 068125.1001

During these Chapter 11 Cases, the Debtors received notice from JPM, as issuing bank of certain letters of credit under the Prepetition Secured Credit Facility, that it would not renew two letters of credit (the "Vectren LOCs") issued in the aggregate amount of $6.32 million for the benefit of Southern Indiana Gas and Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren") that were set to expire on October 15, 2009. In order to avoid having to obtain replacement letters of credit to issue to Vectren or, in the alternative, to avoid Vectren drawing down on the Vectren LOCs, the Debtors undertook negotiations with the DIP Lenders and JPM to provide for the renewal of the Vectren LOCs. JPM agreed to extend the Vectren LOCs on the condition that the Debtors agree to create a collateral account funded in the amount of 110% of the outstanding issued amount of the Vectren LOCs from which JPM would have a first priority right to reimburse itself for any amounts that JPM was required to disburse under the Vectren LOCs and that JPM actually does disburse on account of the Vectren LOCs. On September 17, 2009, the Debtors, JPM and the DIP Lenders entered into a stipulation, to which the Creditors Committee consented, that provided for the creation of a cash collateral account funded in the approximate amount of $6.95 million in which JPM was granted a first priority reimbursement right on account of disbursements required to be and actually made by JPM under the Vectren LOCs. On September 17, 2009, the Court entered an order approving the stipulation related to the cash collateralization of the Vectren LOCs and granting JPM certain priority reimbursement rights therein.

### C.      Official Committee of Unsecured Creditors

On April 24, 2009, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors Committee (the "Creditors Committee"). The Creditors Committee is currently comprised of (a) Laerernes Pension Investment f.m.b.a. afdeling 3 "Sanders MB High Yield" – Teachers Pension and Life Invest f.m.b.a. "Sanders MB High Yield," (b) Senator Investment Group, L.P., (c) Union Tank Car Company, (d) Agri-Energy, LLC, and (e) Deutsche Bank National Trust Company.

The Creditors Committee has, with Court approval, employed and retained (i) Greenberg Traurig, LLP as its bankruptcy counsel and (ii) Jefferies & Company as its financial advisor.

### D.      Request for Appointment of Equity Committee

On December 23, 2009, Andrew Shirley, a holder of Class 9(a) Equity Interests, submitted a letter request to the United States Trustee for the appointment of an official committee of equity security holders. The Debtors, the Creditors Committee, and the Backstop Purchasers each submitted a response opposing the formation of an official committee of equity security holders. By letter dated January 11, 2010, the United States Trustee denied Mr. Shirley's request.

Mr. Shirley has asserted and advised that he may assert at the Confirmation Hearing that the value of the Debtors exceeds the Claims against the Debtors and that the Plan impermissibly pays certain holders of Allowed Claims more 100% of such Claims to the detriment of holders of Equity Interests. The Debtors, the Creditors Committee and the Backstop Purchasers believe that the positions taken by Mr. Shirley are inaccurate and, if asserted at the

Confirmation Hearing, will be overruled by the Court. <u>See</u> Article VII(B) of this Disclosure Statement discussing the valuation of the Debtors.

### E.        Executory Contracts and Leases

As set forth above, one of the principal goals of these cases was the elimination of unprofitable and out-of-market executory contracts and personal property leases as part of the Debtors' efforts to stabilize their business and return to profitability. The Debtors have undertaken an extensive analysis of their contract and lease portfolio, which remains ongoing, to determine which agreements are no longer necessary to the operation of the Debtors' business or contain terms that are above market or overly burdensome to the Debtors. As a result, the Debtors have filed several motions to reject executory contracts and leases, many of which related to (i) the Debtors' former Marketing Alliance, which the Debtors began winding down prior to the Petition Date, (ii) the purchase of corn and other commodities, and (iii) various agreements for the provision of goods and services incidental to the operation of the Debtors' core businesses. The Court has entered four separate orders, dated May 5, 2009, May 26, 2009, July 15, 2009, and October 13, 2009, approving these rejection motions.

The Debtors also successfully obtained an extension of the period under section 365(d)(4) of the Bankruptcy Code by which the Debtors must decide to assume or reject leases of non-residential real property (the "<u>Assumption/Rejection Deadline</u>") until November 3, 2009. The Debtors have received a further extension of the Assumption/Rejection Deadline, to the extent that it applies, from (i) Kinder Morgan Liquid Terminals LLC and Motiva Enterprises LLC with respect to certain agreements for the storage and transfer of Ethanol at the terminals located at Argo, Illinois and Doraville, Georgia, respectively, (ii) DTHC Properties Land Trust ("<u>DTHC</u>") with respect to the Debtors' corporate headquarters (the "<u>Headquarters Lease</u>"), and (iii) from National Rental with respect to an agreement for the storage of certain personal property, through the effective date of a chapter 11 plan (except that DTHC only agreed to an extension of the Assumption/Rejection Deadline through January 15, 2010). By Order dated January [____], 2010, the Debtors were authorized to assume the Headquarters Lease, as amended. The Debtors are continuing to investigate their lease and contract portfolio to determine which, if any of these leases, should be rejected prior to the Assumption/Rejection Deadline.

In May of 2009, the Debtors negotiated an amendment of their lease with The Ports of Indiana for the real property underlying the Mt. Vernon, Indiana facility (the "<u>Mt. Vernon Lease</u>"), which included an extension of the Assumption/Rejection Deadline until one year after the Petition Date (the "<u>Mt. Vernon Lease Amendment</u>"). On May 7, 2009, the Debtors filed a motion to approve the Mt. Vernon Lease Amendment, which motion was approved by order dated May 26, 2009. As discussed below, the Debtors are engaged in further discussions related to the Mt. Vernon Lease.

### F.        Claims Process

On June 8, 2009, the Debtors filed their Schedules and Statements some of which were amended on July 8, 2009 and subsequently on September 8, 2009. By order dated June 30, 2009, the Court established (i) September 8, 2009 as the general bar date by which all creditors

(other than governmental units (as defined in the Bankruptcy Code)) must file proofs of prepetition claims against the Debtors, and (ii) October 5, 2009 as the date by which all governmental units (as defined in the Bankruptcy Code) must file proofs of prepetition claims against the Debtors (collectively, the "Bar Dates").

The Debtors' claims, noticing and balloting agent, GCG, commenced service of notice of the Bar Dates to the holders of known claims against the Debtors, as well as other parties set forth in the creditors matrix maintained in these cases. As of December 3, 2009, 472 claims have been filed in these cases. As the Bar Date for non-governmental units passed on September 8, 2009, the Debtors have begun assessing all of the proofs of claim filed as of the Bar Date. As a result of the Debtors' review of the proofs of claims, on December 14, 2009, the Debtors filed their first and second omnibus objections to certain Claims. The Debtors are continuing to review and reconcile the filed proofs of claim and expect to object to Claims in the coming weeks and months.

### G. Disposition of Assets Not Essential to Reorganization

In order to maximize the value of the Debtors' estates and to eliminate carrying costs associated with maintaining assets that are no longer essential to the conduct of the Debtors' business, the Debtors filed a motion on June 26, 2009 to establish and authorize procedures for the sale of miscellaneous assets in amounts not to exceed $200,000, as well as any publicly traded equity securities owned by the Debtors, in the reasonable exercise of their business judgment. On July 16, 2009, the Court entered an order authorizing and approving the Debtors' proposed procedures for the sale of miscellaneous assets and publicly traded equity securities owned by the Debtors.

### H. Post-Petition Insurance Policies

On the Petition Date, the Debtors filed a motion authorizing them to continue financing arrangements for insurance policies (collectively, the "Policies") which provide coverage for, among other things, property and liability risks on the Debtors' real and personal property (including all risks of direct physical loss or damage including boiler and machinery, terrorism, flood and earthquake), cargo, charterer's liability, wharfinger's liability, primary and excess directors and officers liability, employment practices liability, fiduciary liability and criminal acts. On April 9, 2009, the Court entered an order permitting the Debtors to honor the terms of their existing premium finance and security agreements with respect to the Policies (the "PFAs").

In connection with the renewal of the Policies covering the Debtors' workers' compensation, automobile and general liability insurance, the Debtors' insurance provider, Liberty Mutual Insurance Company ("Liberty Mutual"), required that the Debtors provide it with a collateral deposit to secure the Debtors' obligations under their pre- and postpetition workers' compensation Policy and their postpetition automobile and general liability Policies. On June 12, 2009, the Debtors filed a motion to authorize the Debtors to provide Liberty Mutual the requested collateral deposit in connection with the renewal of the workers' compensation, automobile and general liability Policies. The Court entered an order authorizing the Debtors to provide Liberty Mutual with the requested collateral deposit on June 19, 2009.

## I.    Stipulation with Motiva Enterprises LLC

Shortly after the Petition Date, Motiva Enterprises LLC ("Motiva") asserted that it was entitled to set off approximately $680,000 owed to it by ARE Inc. under two separate prepetition contracts between the parties, from the approximately $2.6 million owed to ARE Inc. by Motiva on account of ethanol sales and deliveries. The Debtors and Motiva engaged in extensive negotiations to resolve Motiva's alleged setoff rights and entitlement to withhold funds from the Debtors on account of the receivable owed to Motiva and any alleged damages that may arise if the Debtors' rejected their agreement with Motiva. As a result of those negotiations, the Debtors and Motiva entered into a stipulation for the payment of approximately $1.9 million owed to ARE Inc. by Motiva and for Motiva to retain approximately $50,000 on account of potential rejection damages. The Debtors filed a motion to approve their stipulation with Motiva on August 28, 2009. The Court entered an order approving the stipulation on September 15, 2009.

## J.    Vopak Adversary Proceeding

During these cases, the Debtors have been engaged in and forced to respond to various litigation matters and disputes. On May 13, 2009, Vopak Terminals Savannah, Inc. ("Vopak") commenced an adversary proceeding (the "Adversary Proceeding") (Adv. Pro. No. 09-50971) by filing a complaint (as amended, the "Complaint") against ARE Inc., e-Biofuels, LLC, Masefield Biofuels, Inc. and certain unidentified bona fide purchasers, with respect to a dispute over the ownership of certain biodiesel product in Vopak's possession (the "Disputed Product"). The Complaint was later amended to add Tombstone Energy Solutions, L.P. as a defendant. To date, each of the named defendants, including ARE Inc., have filed answers to the Complaint, and certain of the defendants in the Adversary Proceeding have asserted various cross-claims against each other. A status conference in the Adversary Proceeding was held on July 1, 2009 at which the Court ordered that the Disputed Product be sold and the proceeds therefrom be placed into escrow pending the outcome of the Adversary Proceeding.

## K.    Extension of the Debtors' Exclusive Periods

On August 4, 2009, the Debtors filed a motion with the Court requesting an extension of the exclusive periods within which the Debtors may file a chapter 11 plan and solicit acceptance of such a plan (the "Exclusive Periods") until October 5, 2009 and December 3, 2009, respectively. On August 18, 2009, the Court entered an order approving the Debtors' requested extensions of the Exclusive Periods. On January 7, 2010, the Court, upon consideration of a motion of the Debtors dated December 4, 2009, entered an order further extending the Exclusive Periods through and including March 4, 2010 and May 3, 2010.

## L.    The Debtors Key Employee Incentive Program

The Debtors' board of directors approved the *Aventine Renewable Energy, Inc. and Affiliates Key Employee Incentive Plan* (the "KEIP"). The KEIP was designed to optimize the Debtors' business operations and profitability and maximize the value of its assets by providing incentives to key employees of the Company to achieve certain financial, operational and administrative milestones. Payments under the KEIP will be earned if the identified metrics,

which contribute a specific percentage to the ultimate KEIP-payment, are met. The KEIP requires the Debtors to meet threshold amounts or dates for the following items for participants to earn their applicable percentage of their KEIP-payment: (a) the Debtors' cash position at emergence from chapter 11, which is accorded 30% of the weight, (b) the Debtors' production level measured from October 2009 through the month immediately preceding emergence, which is accorded 40% of the weight, and (c) emergence from chapter 11 occurs by March 31, 2010, which is accorded 30% of the weight. The maximum incentive payments to be paid under the KEIP are based on a percentage of the annual salary of each eligible participant (measured as of November 1, 2009) and range from approximately $21,000 to approximately $117,000. On November 25, 2009, the Debtors filed a motion to approve the KEIP, which was approved by the Court through an Order entered on December 15, 2009.

### M.     The Debtors' Exit Financing and the Backstop Commitment Agreement

On December 3, 2009, the Debtors entered into that certain backstop commitment letter agreement dated as of December 3, 2009 (the "Backstop Commitment Agreement") with the Backstop Purchasers, who collectively hold approximately 70% of the Prepetition Unsecured Notes. Attached to the Backstop Commitment Agreement and incorporated therein is a senior secured notes term sheet (the "Senior Secured Notes Term Sheet"). The Backstop Commitment Agreement and the Senior Secured Notes Term Sheet set forth, among other things, the terms and conditions upon which the Backstop Purchasers have agreed to participate in and support the Plan. On December 4, 2009, the Debtors filed a motion (the "Backstop Commitment Agreement Motion") to approve their entry into the Backstop Commitment Agreement and authorize and approve the Break-Up Fee, Expense Reimbursement and Indemnification (as such terms are defined in the Backstop Commitment Agreement Motion). The hearing to consider approval of the Backstop Commitment Agreement Motion was held on January 13, 2010. [By Order entered on January [___], 2010, the Court approved the relief requested in the Backstop Commitment Agreement Motion.]

Pursuant to the Backstop Commitment Agreement, the Backstop Purchasers have committed, subject to certain conditions, to purchase up to $105 million of Senior Secured Notes. The proceeds of the Senior Secured Notes will be used to finance the Debtors' distributions under the Plan, as well as working capital and liquidity needs after the Effective Date. Pursuant to the Backstop Commitment Agreement, each holder of Prepetition Unsecured Notes will be entitled to purchase, on a *pro rata* basis, the Senior Secured Notes. Subject to satisfaction of the conditions set forth in the Backstop Commitment Agreement, the Backstop Purchasers will purchase any Senior Secured Notes that are not purchased by such holders of Prepetition Unsecured Notes. In accordance with the offer made by the Backstop Purchasers and as provided for in the Backstop Commitment Agreement, only holders of the Prepetition Unsecured Notes that satisfy the criteria and comply with the terms of the Senior Secured Notes Offering Procedures and no other holders of Allowed Claims or Equity Interests are entitled to participate in the Senior Secured Notes to be issued. The Senior Secured Notes will be issued in units containing a note in the face amount of $1,000 and a *pro rata* share of 20% of the aggregate shares of New ARE Holdings Common Stock to be issued together with the Senior Secured Notes. The Senior Secured Notes will bear interest either (i) at a rate of 13% per annum, payable in cash, or (ii) at a rate of 15% per annum, payable as a Partial PIK Payment (as defined in the Senior Secured Notes Term Sheet). The Senior Secured Notes will be secured by a first priority

lien on all of the Debtors' assets, except that the lien on the ABL Collateral securing the Senior Secured Notes will be junior to the liens securing the ABL Credit Facility. The Senior Secured Notes will be guaranteed on a senior secured basis by each of ARE Holdings' existing and future domestic subsidiaries. The Senior Secured Notes contain other customary redemption rights, repurchase obligations, covenants, and events of default as found in similar types of financings.

The indenture governing the Senior Secured Notes will contain customary covenants and events of default and other terms related to change of control transactions, asset sales, casualty events and equity issuance offers. Subject to certain specified conditions and terms, the indenture will also permit the issuance of up to an additional $50,000,000 of Senior Secured Notes to fund the completion of the Aurora West Facility. The documents evidencing and securing the Senior Secured Notes will be governed by New York law except that matters with respect to real property liens will be governed by local real property laws.

In partial consideration for the Backstop Purchasers' commitment to backstop the offer and sale of the Senior Secured Notes on the terms and subject to the conditions set forth in the Backstop Commitment Agreement, the Debtors have agreed to provide the Backstop Purchasers with a fee equal to $3,000,000. The Debtors have also agreed to reimburse the reasonable out-of pocket costs and expenses of the Backstop Purchasers and to provide customary indemnification to the Backstop Purchasers in connection with the issuance of the Senior Secured Notes. In addition, and in partial consideration for their commitment under the Backstop Commitment Agreement, in the event that any of the Debtors (i) enter into an Alternate Transaction (as in the Backstop Commitment Agreement) and (ii) do not issue the Senior Secured Notes on the terms set forth in the Senior Secured Notes Term Sheet, the Debtors shall pay to each Backstop Purchaser (unless waived by such purchaser) its pro rata portion of an aggregate fee equal to $3,000,000 (the "Break Up Fee"), provided, however, that any Backstop Purchaser that provides financing or purchases assets as part of an Alternate Transaction shall not be entitled to receive its pro rata portion of the Break Up Fee. The Break Up Fee shall be deemed fully earned upon entry of the Approval Order and accorded administrative expense status under section 503(b) of the Bankruptcy Code and shall be payable in full upon (i) the effective date of any chapter 11 plan (other than the Plan) with respect to the Debtors, or (ii) the consummation of a sale or any series of sales of the Debtors' assets, which sale(s) reduce the Debtors' ethanol production capacity by more than 50%. The Debtors shall not be required to pay any Break Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement. The Debtors are also not required to pay the Break Up Fee in the event the Backstop Commitment Agreement is terminated by the Backstop Purchasers based on the occurrence of any Backstop Termination Event, except in the event there is a Subsequent Termination Event. A Subsequent Termination Event, which is defined more fully in the Backstop Commitment Agreement, only arises if certain factors occurred, including the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

Holders of the Senior Secured Notes shall be the beneficiaries of a Registration Rights Agreement under which the Debtors shall provide for (a) the exchange of the Senior Secured Notes for debt securities with substantially the same terms as the Senior Secured Notes and (b) the registration of the offer and resale of the New ARE Holdings Common Stock issued in connection with the Senior Secured Notes and held by any Backstop Purchaser. In addition,

DB02:8549217.27                                                          068125.1001

any person who receives as a result of the distributions made under the Plan shares of New ARE Holdings Common Stock equal to 10% or more of the issued and outstanding New ARE Holdings Common Stock shall be entitled to "piggyback" registration rights on any registration statement filed by ARE Holdings, all as more fully set forth in the Registration Rights Agreement. To the extent that the Reorganized Debtors are unable to meet their obligations with respect to the Exchange Registration or the Resale Registration, the interest payable on the Senior Secured Notes shall be increased in the amount of 2% per annum.

In addition, on the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall enter into the ABL Credit Facility. The ABL Credit Facility shall be a senior secured revolving credit agreement, with aggregate commitments of up to $20 million. The obligations under the ABL Credit Facility shall be secured by a first priority lien on the ABL Collateral, which shall consist of accounts receivables, inventory, capital stock, intellectual property, deposit accounts and certain investment property of the Reorganized Debtors.

### N. The Status of the Debtors' Partially Constructed Mt. Vernon Facility and Aurora West Facility and Related Negotiations

During the Chapter 11 Cases, the Debtors have been engaged in negotiations related to the completion of the Mt. Vernon Facility and Aurora West Facility. The construction of both facilities is subject to finalizing various agreements and documentation with a number of third parties, which documentation must be acceptable to the Majority Backstop Purchasers. There is no assurance that such agreements and documentation will be finalized or ultimately agreed to by the Debtors or the other parties. If the Debtors are not able to finalize such agreements or documentation or assume existing agreements on acceptable terms, the projected timelines for the completion of the Mt. Vernon Facility and/or the Aurora West Facility could be impacted. Accordingly, the Debtors reserve all rights with respect to the decision to proceed or not proceed with the completion of construction of the Mt. Vernon Facility and/or the Aurora West Facility.

### 1. Mt. Vernon Facility

Subject to the execution of definitive documentation with Kiewit and the Ports of Indiana, which documentation must be acceptable to the Majority Backstop Purchasers, the Debtors have determined to proceed with the construction of the Mt. Vernon Facility. As of the date hereof, the Debtors have reached an understanding with Kiewit as to the costs and timeline for the completion of the construction of the Mt. Vernon Facility. Likewise, with the Ports of Indiana, the Debtors have reached an understanding as to certain modifications to be made to the lease agreement with the Ports of Indiana that will among other things, modify certain deadlines in the lease agreement for the completion of the facilities at Mt. Vernon. In addition, the Debtors are currently engaged in negotiations with CGB regarding certain amendments and modifications to the existing corn supply agreement for the Mt. Vernon Facility in order to improve the terms of the existing corn supply agreement. There is no assurance, however, that the Debtors will be able to renegotiate such terms prior to the Debtors' emergence from bankruptcy.

DB02:8549217.27                                                                                           068125.1001

### 2. Aurora West Facility

The Debtors currently intend to retain the Aurora West Facility and recommence construction in April 2011. After the Effective Date, the Reorganized Debtors will enter into good faith negotiations with Kiewit in an effort to come to agreement on terms under which Kiewit would complete the construction of the Aurora West Facility; provided, however, the Reorganized Debtors shall have no obligation to either complete the construction of the Aurora West Facility or to retain Kiewit to complete such construction. Moreover, the recommencement of construction of the Aurora West Facility in April 2011 is subject to a number of factors and events, including, but not limited to, obtaining additional financing and/or the continued improvement of margins. In the event additional financing is not available and/or margins do not improve, the recommencement of construction at the Aurora West Facility could be significantly delayed.

Prior to the Petition Date, in connection with the construction and operation of the Aurora West Facility, certain of the Debtors entered into numerous agreements with the Aurora Cooperative Elevator Company (the "Aurora Co-op"). Subject to the approval of the Majority Backstop Purchasers, the Debtors may assume some or all of the agreements with the Aurora Co-op if appropriate modifications to those agreements can be agreed upon and documented. To the extent certain modifications are not made to the agreements between the Debtors and Aurora Co-op, subject to the approval of the Majority Backstop Purchasers, the Debtors may determine to reject some or all of the agreements and implement any required alternative arrangements. In the event that some or all of the agreements with the Aurora Co-op are rejected by the Debtors, the Debtors believe that Aurora Co-op will assert additional claims related to the rejection of such agreements.

### O. The Debtors' Marketing Efforts

The Debtors, through Houlihan Lokey, their financial advisor and investment banker, employed a dual track process for the solicitation of interest in the Debtors. Houlihan Lokey, during the past summer, contacted approximately 100 parties, including financial and strategic investors, to solicit interest in a potential transaction with the Debtors' estates. Various expressions of interest and non-binding letters of intent for a sale of some or all of the Debtors' assets or to provide financing for a reorganization of the Debtors were received. The Debtors engaged in advanced discussions with certain of those parties and worked with their advisors to determine which transaction(s) would provide maximum value to the Debtors, their estates and stakeholders. Given the extensive marketing efforts and the facts and circumstances of the Chapter 11 Cases, the Debtors determined that pursuing a chapter 11 plan or plans of reorganization providing for a balance sheet financial restructuring maximizes the value of the Debtors' assets and the ultimate recovery to the Debtors' stakeholders. As such, the Debtors engaged in substantial negotiations with certain of their existing creditors regarding the terms of a potential plan of reorganization and obtaining exit financing to fund distributions under a plan and the Debtors' post-emergence business operations. The result of those negotiations is the Plan.

DB02:8549217.27 068125.1001

# VII.

## SUMMARY OF THE PLAN

### A.    Introduction

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries for their creditors. The Debtors believe, and will demonstrate to the Court, that their creditors will receive at least as much, and likely more, in value under the Plan than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Plan is supported by the Backstop Purchasers. Certain provisions of the Plan are subject to the Backstop Purchaser Approval Condition which refers to the agreement by and among the Backstop Purchasers and the Debtors, as and to the extent set forth in the Backstop Commitment Agreement, that the Backstop Purchasers' obligation to purchase the Senior Secured Notes is conditioned upon the Plan, Disclosure Statement, Solicitation Order, Confirmation Order, New Corporate Governance Documents, the ABL Credit Facility, the Senior Secured Notes and other specified documents, including, without limitation, those in the Plan Supplement, being in a form acceptable to the Backstop Purchasers in their sole discretion, provided, that the Majority Backstop Purchasers shall endeavor to consult with the Creditors Committee with respect to the documents specified in the Backstop Commitment Agreement, provided, further, that the failure to consult with the Creditors Committee shall not affect the rights of the Majority Backstop Purchasers.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

### B.    Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the Debtors agree, or in the event of a dispute, that the Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtors. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's

schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments described:

| Class | Designation | Impairment |
|-------|-------------|------------|
| Unclassified | Administrative Claims | Paid in Full |
| Unclassified | DIP Financing Claims | Paid in Full |
| Unclassified | Fee Claims | Paid in Full |
| Unclassified | Priority Tax Claims | Paid in Full |

| Classes 1(a) – 1(f) | Other Priority Claims | Unimpaired |
|---|---|---|
| Classes 2(a) – 2(f) | Prepetition Secured Credit Facility Claims | Impaired |
| Classes 3(a) – 3(f) | Other Secured Claims | Unimpaired |
| Class 4(a) | Kiewit Mt. Vernon Secured Claim | Unimpaired |
| Class 4(b) | Kiewit Aurora West Secured Claim | Impaired |
| Classes 5(a) – 5(f) | Prepetition Unsecured Notes Claims | Impaired |
| Classes 6(a) – 6(f) | General Unsecured Claims | Impaired |
| Classes 7(a) – 7(f) | Convenience Claims | Impaired |
| Classes 8(a) – 8(f) | Intercompany Claims | Unimpaired |
| Class 9(a) | Equity Interests in Consolidated Holdings | Impaired |
| Class 9(b) – (f) | Equity Interests in the Subsidiaries | Impaired |

For purposes of computing distributions under the Plan, Allowed Claims do not include postpetition interest unless otherwise specified in the Plan.

### 1. Unclassified — Administrative Claims

Administrative Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code and Section 503(b)(9) Claims.

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim shall receive from the Debtor against which such Allowed Administrative Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (A) Cash of the applicable Debtor against which such Administrative Claim is Allowed equal to the unpaid portion of such Allowed Administrative Claim, or (b) such less favorable treatment to which such Debtor or Reorganized Debtor and the holder of such Allowed Administrative Claim

shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing relating thereto.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications for allowance of Administrative Claims (except for Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims), which date will be the first business day that is thirty (30) days after the Confirmation Date. Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims, not paid prior to the Confirmation Date must submit requests for payment **directly to the Claims Agent** and in accordance with the instructions set forth in the Confirmation Order or notice of entry of the Confirmation Order on or before the applicable Administrative Claims Bar Date or forever be barred from doing so. The notice of confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date, the appropriate address to submit requests to the Claims Agent and constitute good and sufficient notice of the Administrative Claims Bar Date. **For the avoidance of doubt, Section 503(b)(9) Claims were and continue to be subject to the Bar Dates set forth in the Prepetition Claims Bar Date Order, and nothing set forth in the Plan shall be deemed an extension of the Bar Dates with respect to Section 503(b)(9) Claims.**

### 2. Unclassified — DIP Financing Claims

DIP Financing Claims are all Claims arising under or relating to the DIP Facility Documents and all agreements and instruments relating thereto.

On the Initial Distribution Date, each holder of a DIP Financing Claim shall receive payment in full in Cash of all obligations of the Debtors under the DIP Facility Documents; provided, however, that upon the written instruction of any holder of a DIP Financing Claim, such Cash payment may be applied against the purchase of the Senior Secured Notes.

### 3. Unclassified — Fee Claims

Fee Claims are Administrative Claims under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including reasonable expenses of the members of the Creditors Committee incurred as members of the Creditors Committee in discharge of their duties as such). For the avoidance of doubt, professional fees and expenses incurred by the DIP Lenders and Backstop Purchasers are not Fee Claims.).

Except as otherwise provided for in the Plan, all requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, and counsel to the Creditors Committee and such other entities who are designated by the

Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date, unless such date is otherwise modified by order of the Court. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors and the requesting party on or before twenty (20) days after the filing and service of such request.

### 4. Unclassified — Priority Tax Claims

Priority Tax Claims include any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed Priority Tax Claims will be approximately $1.0 million.

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim shall receive from the Debtor against which such Allowed Priority Tax Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of the Debtor against which such Priority Tax Claim is Allowed equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtor or Reorganized Debtor, and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (C) at the option of the Reorganized Debtors, Cash of the applicable Debtor in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### 5. Classification and Treatment of Claims

(a)     Class 1 – Other Priority Claims.

Other Priority Claims include any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims), including, without limitation, certain allowed employee compensation and benefit claims of the Debtors' employees incurred within one hundred eighty (180) days prior to the Petition Date. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed Other Priority Claims will be approximately $1.2 million.

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if an Other Priority Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Other Priority Claim becomes Allowed, each holder of an Allowed Other Priority Claim in Classes 1(a) through 1(f) shall receive from the Debtor against

which such Allowed Other Priority Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Other Priority Claim, (A) Cash equal to the amount of such Allowed Other Priority Claim or (B) such less favorable treatment as to which such Debtor or Reorganized Debtor and the holder of such Allowed Other Priority Claim have agreed upon in writing.

Class 1 is unimpaired under the Plan. The holders of Allowed Other Priority Claims in Classes 1(a) through 1(f) are conclusively presumed to have accepted the Plan and the votes of holders of Allowed Other Priority Claims in Classes 1(a) through 1(f) therefore shall not be solicited.

(b)    Class 2 — Prepetition Secured Credit Facility Claims.

Prepetition Secured Credit Facility Claims are Claims arising under or relating to the Prepetition Secured Credit Facility and all agreements and instruments relating thereto, to the extent such Claims are secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff. The Debtors estimate that the amount of related to unpaid principal due under the Prepetition Secured Credit Facility is approximately $27.8 million and the amount related to LC Obligations is approximately $3.2 million.

Except to the extent that a holder of an Allowed Prepetition Secured Credit Facility Claim shall have agreed in writing to a different treatment, in full and final satisfaction of, and in exchange for, as to the Debtors' estates, such Claim, the holders of Allowed Prepetition Secured Credit Facility Claims in Classes 2(a) through 2(f) shall receive the following:

a.    With respect to that portion of the Allowed Prepetition Secured Credit Facility Claim that includes all amounts other than for the LC Obligations, Cash in the Allowed amount of such Claim (including interest and any fees related to same to the extent and amounts permitted by prior Order of the Bankruptcy Court or 11 U.S.C. §506) on the later of the Initial Distribution Date or as soon as practicable after such Prepetition Secured Credit Facility Claim becomes an Allowed Claim (provided that to the extent any portion of such claim is not Allowed on the Initial Distribution Date, the Reorganized Debtors shall escrow funds sufficient to pay such claim once Allowed, in an amount agreed to by the Reorganized Debtors and the holders of such claims or as determined by the Bankruptcy Court (the "Prepetition Lender Claim Escrow"); and upon payment or escrowing of all such amounts, any and all Liens held by the holders of Prepetition Secured Credit Facility Claims on the Debtors' or Reorganized Debtors' assets, other than with respect to the LC Collateral Account as described below in subsection b(i)(c) or to the Prepetition Lender Claim Escrow, shall be extinguished, nullified and void as to property of the estates of the Debtors.

b.    With respect to the portion of the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, one of the following treatments shall apply:

(i) (a) the LC Obligations shall be entitled to letter of credit service fees on the outstanding balance at the rate of 6.625% per annum, payable on a monthly basis; (b) the Existing LCs shall continue until the earlier of (1) the release of any Existing LC by the beneficiary thereof, (2) an Existing LC is drawn in full by the beneficiary thereof, or (3) the term of an Existing LC matures; (c) the LC Obligations shall be secured as to the Reorganized Debtors only by the LC Collateral Account and the Reorganized Debtors shall, on the Initial Distribution Date, adjust the amount in the LC Collateral Account so that it equals 110% of the face amount of all Existing LCs as of such date; and (d) as soon as reasonably practicable, but in no event more than fifteen (15) business days, after an Existing LC (1) matures without being drawn, (2) is both (A) released in writing to the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, in whole or in part by the beneficiary and (B) in the case of a release in whole, the original of such Existing LC is returned to and received by the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations or, if such Existing LC has been lost, then through the completion and delivery of an affidavit and indemnity agreement setting forth that such Existing LC has been lost and indemnifying the Agent on terms customary for the Agent in such circumstances, or in the case of a partial release, such Existing LC is amended on terms and conditions reasonably acceptable to the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, (3) is drawn in full or for less than the full amount of the Existing LC, then in each case of (d)(1) through (d)(3), the portion of the LC Collateral Account in excess of the sum of, (A) the then aggregate and drawn amounts under all Existing LCs plus (B) 110% of any and all amounts that may yet be drawn under all Existing LCs, shall be released and returned to the Reorganized Debtors. The foregoing treatment shall supersede and replace the terms of the LC Collateral Account Stipulation; or

(ii) such other treatment as is agreed to by the Debtors (subject to the consent of the Majority Backstop Purchasers not to be unreasonably withheld) and the holders of the Allowed Prepetition Secured Credit Facility Claims for LC Obligations and as is approved by the Bankruptcy Court; or

(iii) in the event (a) the holders of Allowed Prepetition Secured Facility Claims for LC Obligations do not vote to accept the Plan as a class, (b) the Court will not approve the treatment provided for in (b)(i) above without acceptance of the Plan by the holders of Allowed Prepetition Secured Facility Claims for LC Obligations as a class, and (c) the treatment provided for in (b)(ii) above is not applicable, then such other treatment as is approved by the Bankruptcy Court to provide the holders of Allowed Prepetition Secured Facility Claims for LC Obligations with the

indubitable equivalent of their Allowed Prepetition Secured Facility Claims for LC Obligations.

Class 2 is impaired under the Plan. The holders of Allowed Prepetition Secured Credit Facility Claims in Classes 2(a) through 2(f) are entitled to vote to accept or reject the Plan..

(c)      Class 3 — Other Secured Claims.

Other Secured Claims include any Secured Claim, other than the DIP Financing Claims, the Kiewit Secured Claims and the Prepetition Secured Credit Facility Claims, to the extent reflected in the Schedules or a proof of claim. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed Other Secured Claims will be approximately $4.8 million.

Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the applicable Debtor against which such Allowed Other Secured Claim is held (subject to the consent of the Majority Backstop Purchasers), in full and final satisfaction of such claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Claim is held, Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) the Initial Distribution Date, or (b) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim, or (iii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Allowed Other Secured Claim is held, the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of (y) the Initial Distribution Date, or (z) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim.

Class 3 is unimpaired under the Plan. The holders of Allowed Other Secured Claims in Classes 3(a) through 3(f) are conclusively presumed to have accepted the Plan and the votes of holders of Allowed Other Secured Claims in Classes 3(a) through 3 (f) therefore shall not be solicited.

(d)      Class 4(a) — Kiewit Mt. Vernon Secured Claim.

Class 4(a) is the Secured Claim of Kiewit Energy Company arising under those certain Engineering, Procurement and Construction Services Fixed Price Contracts entered into by Kiewit Energy Company and ARE – Mt. Vernon.

Except as otherwise provided in the Plan, on the Initial Distribution Date, if the Kiewit Mt. Vernon Secured Claim is Allowed as of the Effective Date, and otherwise, as soon as practicable after the Kiewit Mt. Vernon Secured Claim is Allowed, the holder of such Allowed Kiewit Mt. Vernon Secured Claim shall receive from ARE – Mt. Vernon, in full satisfaction and release of, and in exchange for, such Allowed Kiewit Mt. Vernon Secured Claim, Cash equal to the amount of such Allowed Kiewit Mt. Vernon Secured Claim, and any and all Liens held on account of such claim against ARE – Mt. Vernon's assets shall be extinguished, nullified and void.

Class 4(a) is unimpaired under the Plan. The holders of Allowed Kiewit Mt. Vernon Secured Claims are conclusively presumed to have accepted the Plan and the votes of holders of Allowed Kiewit Mt. Vernon Secured Claims in Class 4(a) therefore shall not be solicited.

(e)     Class 4(b) — Kiewit Aurora West Secured Claim.

Class 4(b) is the Secured Claim of Kiewit Energy Company arising under those certain Engineering, Procurement and Construction Services Fixed Price Contracts entered into by Kiewit Energy Company and ARE – Aurora West.

As soon as practical after the occurrence of the Effective Date, the holder of such Allowed Kiewit Aurora West Secured Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed Kiewit Aurora West Secured Claim, which shall be Allowed in the amount of $15,251,808, the following: (i) an initial payment of $10.0 million; and (ii) a secured non-recourse note (the "Kiewit Note") in a face amount equal to $5,251,808, together with a deed of trust or other similar documentation required for the perfection of the security interest granted in connection with the Kiewit Note. Subject to the Backstop Purchaser Approval Condition, the form of the Kiewit Note and the deed of trust or similar documentation required for the perfection of the security interest granted in connection with the Kiewit Note shall be contained in the Plan Supplement.

The Kiewit Note shall (i) be for a term of four (4) years from the Effective Date with an interest rate of 5.0% per annum payable semi-annually; (ii) be non-recourse and secured by a Lien, senior to the Lien granted in connection with the Senior Secured Notes, in the same Collateral that presently secure the Allowed Kiewit Aurora West Secured Claim and with the same validity, priority, force and effect; (iii) amortize $0.5 million semi-annually with a final balloon payment due at the earlier to occur of (a) four (4) years from the Effective Date or (b) 120 days from the date upon which the Aurora West Facility is completed and operating at 90% of nameplate capacity; and (iv) be permitted to be paid in full prior to the maturity date without penalty.

Class 4(b) is impaired under the Plan. The holders of Allowed Kiewit Aurora West Secured Claims in Class 4(b) are entitled to vote to accept or reject the Plan.

(f)     Class 5 — Prepetition Unsecured Notes Claims.

DB02:8549217.27                                                    068125.1001

Prepetition Unsecured Notes Claims are all Claims arising under or relating to the Prepetition Unsecured Notes and the Prepetition Indenture and all agreements and instruments relating thereto. The Prepetition Unsecured Notes Claims are Allowed in the aggregate amount of $315,500,000.

Except as otherwise provided for in the Plan, on the Initial Distribution Date, each holder of an Allowed Prepetition Unsecured Note Claim in Classes 5(a) through 5(f) shall receive from each Debtor against which such Allowed Prepetition Unsecured Note Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Prepetition Unsecured Note Claim, its pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which each such Allowed Prepetition Unsecured Note Claim is held. The holders of Allowed Prepetition Unsecured Notes Claims shall also have the right to share in any supplemental distribution of excess shares of New ARE Holdings Common Stock held in the reserves established pursuant to Article VI(E)(5) of the Plan, as provided for therein.

Class 5 is impaired under the Plan. The holders of Allowed Prepetition Unsecured Notes Claims in Classes 5(a) through 5(f) are entitled to vote to accept or reject the Plan.

(g) Class 6 — General Unsecured Claims.

General Unsecured Claims include any Claim against any of the Debtors that is not an Administrative Claim, Convenience Claim, DIP Facility Claim, Fee Claim, Intercompany Claim, Other Priority Claim, Prepetition Unsecured Notes Claims, Prepetition Secured Credit Facility Claim, Priority Tax Claim, Other Secured Claim, or Subordinated Claim and shall include, without limitation, (a) Claims of vendors or customers of the Debtors that are not Priority Claims, (b) Claims of employees of the Debtors that are not Priority Claims, (c) Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, (d) Claims arising as a result of Prepetition Date litigation against any of the Debtors that are not subordinated under section 510(b) of the Bankruptcy Code, and (e) any Deficiency Claim. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed General Unsecured Claims will be approximately $40.0 million.[8]

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a General Unsecured Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such General Unsecured Claim becomes Allowed, each holder of any such General Unsecured Claim in Classes 6(a) through 6(f) shall receive from the applicable Debtor against which such Allowed General Unsecured Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Claim, its pro

---

[8]  The amount of the Allowed General Unsecured Claims is the Debtors' best estimate of the aggregate amount of the General Unsecured Claims ultimately Allowed upon conclusion of the claims reconciliation and objection process. Accordingly, the amount of Allowed General Unsecured Claims may be more or less than the estimate contained herein as it is subject to a number of factors, including, but not limited to, the successful prosecution of certain objections to Claims.

rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which each such Allowed General Unsecured Claim is held. The holders of Allowed General Unsecured Claims shall also have the right to share in any supplemental distribution of excess shares of New ARE Holdings Common Stock held in the reserves established pursuant to Article VI(E)(5) of the Plan, as provided for therein.

Class 6 is impaired under the Plan. The holders of Allowed General Unsecured Claims in Classes 6(a) through 6(f) is entitled to vote to accept or reject the Plan.

(h)    Class 7 –Convenience Claims

Convenience Claims include any Claim that would otherwise be a General Unsecured Claim that is Allowed in an amount of $50,000 or less. The Debtors estimate that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed Convenience Claims will be approximately $2.2 million.[9]

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Convenience Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Convenience Claim becomes Allowed, each holder of any such Convenience Claim in Classes 7(a) through 7(f) shall receive from each Debtor against which such Allowed Convenience Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Convenience Claim, Cash in an amount equal to 35% of the amount of the Allowed Convenience Claim.

Class 7 is impaired under the Plan. The holders of Allowed General Unsecured Claims in Classes 7(a) through 7(f) are entitled to vote to accept or reject the Plan.

(i)    Class 8 — Intercompany Claims

Intercompany Claims include any Claim arising before the Petition Date held by one of the Debtors against any other Debtor, including, without limitation, (a) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor, and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor. The Debtors believe that after accounting for Claims already paid and Claims the potential amount of Allowed Intercompany Claims will be approximately $15.9 million.

On the Initial Distribution, each Intercompany Claim in Classes 8(a) through 8(f) will be paid, readjusted, reinstated or discharged to the extent reasonably determined to be

---

[9]    The amount of the Allowed Convenience Claims is the Debtors' best estimate of the aggregate amount of the Convenience Claims ultimately Allowed upon conclusion of the claims reconciliation and objection process. Accordingly, the amount of Allowed Convenience Claims may be more or less than the estimate contained herein as it is subject to a number of factors, including, but not limited to, the successful prosecution of certain objections to Claims.

appropriate by the Reorganized Debtors, subject to the consent of the Majority Backstop Purchasers.

Class 8 is unimpaired under the Plan. The holders of Intercompany Claims in Classes 8(a) through 8(f) are presumed to accept the Plan and therefore the votes of such holders shall not be solicited.

(j)      Class 9 – Equity Interests

An Equity Interest is any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors (including, without limitation, any shares of common stock or preferred stock or any other capital stock, or options, warrants, rights or similar instruments derived from, relating to or convertible or exchangeable for shares of capital stock), whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.

Except as otherwise provided for in the Plan, on the Initial Distribution Date, each holder of an Allowed Class 9(a) Equity Interests shall receive from Reorganized ARE Holdings, in full satisfaction and release of, and in exchange for, its Allowed Class 9(a) Equity Interests, its pro rata share of the Warrants. For avoidance of doubt, the Allowed Class 9(a) Equity Interests will only include Equity Interests in ARE Holdings as the Equity Interests in ARE LLC will be automatically eliminated as a result of the substantive consolidation and merger of ARE LLC into ARE Holdings pursuant to the Plan. **Notwithstanding the foregoing, if the Court declines to confirm the Plan with the inclusion of the Warrants being distributed to holders of Allowed Class 9(a) Equity Interests, even if the holders of Class 9(a) Equity Interests vote to accept the Plan, then (i) each holder of an Allowed Class 9(a) Equity Interest shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests, (ii) Class 9(a) shall be deemed to reject the Plan, and (iii) except as otherwise provided herein, the Debtors will request that the Court confirm the Plan notwithstanding the deemed rejection of the Plan by Class 9(a).**

The holders of Equity Interests in Classes 9(b) through 9(f) shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests.

Class 9 is impaired under the Plan. The holders of Class 9(a) Equity Interests are entitled to vote to accept or reject the Plan. The holders of Class 9(b) through 9(f) Equity Interests are presumed to reject the Plan and therefore shall not be solicited.

**6.      Limitation to Full Recovery**

Notwithstanding anything herein to the contrary, Creditors holding Allowed Claims that are obligations of more than one of the Debtors (including, without limitation, as a result of guarantees) shall not be entitled to receive a total distribution from the Debtors' estates on account of such Allowed Claims with a value, as of the Effective Date, in excess of 100% of the Allowed amount of such Claims. Allowed Unsecured Claims will not be entitled to post-petition interest on account of their respective Allowed Unsecured Claims.

## C. Provisions Regarding Corporate Governance and Management of the Reorganized Debtors

### 1. Amendments to Certificates of Incorporation

(a) <u>Aventine Renewable Energy Holdings, Inc.</u>  On the Effective Date, the certificate of incorporation of ARE Holdings shall be amended to (i) authorize the issuance of the New ARE Holdings Common Stock (including the shares issuable upon the exercise of the Warrants), (ii) provide for the cancellation of all outstanding Equity Interests in ARE Holdings other than the New ARE Holdings Common Stock, and (iii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting securities is prohibited.

(b) <u>The Subsidiaries.</u>  On the Effective Date, the certificate of incorporation each Debtor other than ARE Holdings and ARE LLC (which is being merged into ARE Holdings under the Plan), shall be amended to (i) provide for the cancellation of all outstanding Equity Interests in the respective Debtor, (ii) authorize the issuance of the New Subsidiary Equity Interests in the applicable Reorganized Debtor in accordance with Article V of the Plan, (iii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting securities is prohibited, and (iv) authorize the distribution of New ARE Holdings Common Stock in accordance with Article V(B) of the Plan.

(c) <u>Backstop Purchaser Approval.</u>  All certificates or articles of incorporation, certificates of formation or limited partnership, bylaws, voting trusts, stockholder or voting agreements, limited liability company or limited partnership agreements and all other similar documents and agreements executed by the Reorganized Debtors on the Effective Date (including, without limitation, Reorganized ARE Holdings) (collectively, the "<u>New Corporate Governance Documents</u>") shall be subject to the Backstop Purchaser Approval Condition.

### 2. Equity Securities to be Issued Pursuant to the Plan

On the Effective Date, Reorganized ARE Holdings will issue the New ARE Holdings Common Stock and the Warrants.  Each of the Reorganized Subsidiaries shall issue the New Subsidiary Equity Interests, the principal terms of which will be described in the Plan Supplement.

### 3. Registration Rights Agreement.

On or after the Effective Date, the Reorganized Debtors shall enter into a registration rights agreement (the "<u>Registration Rights Agreement</u>") in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion.  The Registration Rights Agreement shall provide, among other things, for (i) the registered exchange of the Senior Secured Notes for a new issue of substantially identical debt securities (the "<u>Exchange Registration</u>") and (ii) registration of the offer and resale of the Noteholder New Equity issued in the Senior Secured Notes Offering (and any other shares of New ARE Holdings Common Stock held by any Backstop Purchaser) (the "<u>Resale Registration</u>").  Notwithstanding the foregoing or anything contained in the Plan, holders of General Unsecured Claims, if any, who, as a result of the Distributions set forth in Article IV(G) of the Plan, receive shares of New ARE Holdings

Common Stock equal to 10% or more of the New ARE Holdings Common Stock outstanding as of the Effective Date, shall be entitled to "piggyback" registration rights on any registration statement filed by Reorganized ARE Holdings with respect to Noteholder New Equity; provided, however, that holders entitled to such piggyback rights shall be subject to customary cut backs.

(a)  Exchange Registration.  With respect to the Exchange Registration, the Registration Rights Agreement will obligate the Reorganized Debtors to: (i) file a registration statement with the Securities and Exchange Commission enabling the holders of the Senior Secured Notes to exchange the privately issued Senior Secured Notes for publicly registered notes with substantially identical terms within 180 days after the Effective Date; (ii) cause such registration statement to become effective within 365 days after the Effective Date and to complete the exchange offer within 50 days after the effective date of such registration statement; and (iii) file a shelf registration statement for the resale of the Senior Secured Notes if the Reorganized Debtors cannot effect an exchange offer within the time periods listed above and in certain other circumstances.

(b)  Resale Registration.  With respect to the Resale Registration, the Registration Rights Agreement will obligate the Reorganized Debtors to: (i) file a registration statement with the Securities and Exchange Commission seeking to register the offer and resale of the Noteholder New Equity (together with any other shares of New ARE Holdings Common Stock held by any Backstop Purchaser) (collectively, "Registrable Securities") pursuant to Rule 415 under the Securities Act of 1933 (the "Securities Act") within 180 days after the Effective Date; (ii) cause such registration statement to become effective within 365 days after the Effective Date; and (iii) cause such registration statement to remain effective, and supplemented and amended as required by the Securities Act throughout the period ending on the date which is the earliest to occur of (A) the date on which all shares of Registrable Securities registered under such registration statement may be sold in a three-month period under Rule 144 under the Securities Act, (B) the date all such shares of Registrable Securities registered under such registration statement have been sold and (C) two years after the date on which such registration statement became effective with respect to the offer and sale of Registrable Securities, plus the aggregate number of days in all applicable "suspension periods", if any, as set forth in the Registration Rights Agreement.

The failure of the Reorganized Debtors to meet any of the obligations described in Article V(C) of the Plan with respect to the Exchange Registration or the Resale Registration shall result in additional interest becoming payable with respect to the Senior Secured Notes (including the notes issued in the Exchange Registration) in the amount of 2.0%.

**4.  Management**

(a)  Appointment of Directors and Officers.  The New Board shall be composed of five members, who shall be identified in the Plan Supplement.  The Majority Backstop Purchasers shall appoint four members of the New Board.  The fifth member shall be the chief executive officer of the Reorganized Debtors.  The initial board of directors of each Reorganized Subsidiary shall consist of one to five members appointed by the Majority Backstop Purchasers, whose names and biographical information shall be set forth in the Plan Supplement.

The directors of the Reorganized Debtors shall serve in accordance with the New Corporate Governance Documents, as the same may be amended from time to time.

The identities of the officers of the Reorganized Debtors shall be set forth in the Plan Supplement.

(b)     Reorganized Debtors' Management Incentive Plan. Reorganized ARE Holdings shall adopt such management incentive plan (the "Management Incentive Plan"), if any, as may be determined by the New Board; provided, that the maximum number of shares of capital stock (or securities convertible or exchangeable for such shares) of reorganized ARE Holdings issuable under such plan shall not exceed the number equal to 10% of the common capital stock of Reorganized ARE Holdings outstanding on the Effective Date; provided, further, that the maximum number of shares of capital stock of reorganized ARE Holdings issuable under such plan during the first year after the Effective Date shall not exceed the number equal to 3.5% of the common capital stock of Reorganized ARE Holdings outstanding on the Effective Date; and provided, further, that the foregoing limitation regarding awards in the first year after the Effective Date shall not apply to any stock options that may be issued under the Management Incentive Plan. No plan may be adopted with respect to the issuance of capital stock (or securities convertible or exchangeable for such capital stock) of any Reorganized Subsidiary.

(c)     Indemnification of Directors, Officers and Employees. On the Effective Date, the New Corporate Governance Documents of Reorganized ARE Holdings and each Reorganized Subsidiary shall contain provisions which (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized.

5.     **Corporate Reorganization.**

Except as otherwise set forth herein or in the Plan, or as modified by appropriate corporate action after the Effective Date, the corporate structure and equity ownership of the Debtors and their subsidiaries shall be unchanged.

D.     **Provisions Regarding Means of Implementation**

1.     **Exit Financing**

(a)     Senior Secured Notes. On the Effective Date, the Senior Secured Notes shall have been issued by Reorganized ARE Holdings and guaranteed by each of Reorganized ARE Holdings' then existing domestic subsidiaries. The proceeds of the issuance of the Senior Secured Notes shall be used to (i) make payments required to be made on or after the Effective Date under the Plan, including, without limitation, repayment of all amounts owing under the DIP Facility Documents and payments required to be made under Class 2 on account

51

of the Prepetition Secured Credit Facility Claims, and (ii) fund the working capital and general corporate needs of the Reorganized Debtors.

(b)     <u>Senior Secured Notes Offering Procedures</u>.  Holders of Allowed Prepetition Unsecured Notes Claims shall be entitled, pursuant to the Senior Secured Notes Offering Procedures, to subscribe and acquire their pro rata share of (i) $105 million in aggregate principal amount of the Senior Secured Notes and (ii) the shares of Noteholder New Equity.

(c)     <u>Senior Secured Notes Offering Backstop</u>.  The Backstop Purchasers have agreed to backstop the Senior Secured Notes Offering in accordance with the terms of the Backstop Commitment Agreement.

(d)     <u>Allocation of Amount Paid.</u>  For federal income tax purposes only, the Senior Secured Notes will be issued as part of an investment unit and the amount paid for the Senior Secured Note and the New ARE Holdings Common Stock will be allocated between the two securities by the New Board, and each person participating in the Senior Secured Notes Offering will agree, for federal income tax purposes only, to report the purchase of the Senior Secured Notes in accordance with the determination of the New Board.

(e)     <u>ABL Credit Facility</u>.  On or as soon as practicable after the Effective Date, the Reorganized Debtors shall close on the ABL Credit Facility.  The amounts borrowed under the ABL Credit Facility shall be used to fund the Reorganized Debtors' working capital needs after the Effective Date.

**2.     Allocation of New ARE Holdings Common Stock and Issuance of New Subsidiary Equity Interests**

On the Effective Date, the New ARE Holdings Common Stock shall be distributed as follows: (i) the holders of the Senior Secured Notes shall receive their pro rata share of the Senior Secured Notes Equity Distribution subject to and in accordance with the Senior Secured Notes Offering Procedures, and (ii) the Unsecured Claims Stock Pool shall be distributed to each Reorganized Debtor or retained by Reorganized ARE Holdings, as the case may be, in the amounts set forth on <u>Schedule A</u> to the Plan, to be distributed to the holders of Allowed Unsecured Claims against such Reorganized Debtor, as set forth in Articles IV(F) and (G).

In exchange for the shares of New ARE Holdings Common Stock being allocated to each of the Reorganized Subsidiaries in the Unsecured Claims Stock Pool: 100% of the New Subsidiary Equity Interest for each of the other Reorganized Subsidiaries shall be issued to ARE Holdings.  The terms of the New Subsidiary Equity Interests shall be set forth in the Plan Supplement.

**3.     Substantive Consolidation and Merger of ARE LLC into ARE Holdings**

Pursuant to the Plan, the Chapter 11 Cases of ARE Holdings and ARE LLC will be substantively consolidated for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation and distribution.  As a result of such substantive

    

consolidation, (i) all assets and liabilities of ARE LLC shall be treated as though they were merged into and with the assets and liabilities of ARE Holdings, (ii) no distributions shall be made under the Plan on account of intercompany claims, if any, between ARE Holdings and ARE LLC, (iii) all guarantees of ARE Holdings and ARE LLC of each other's obligations and any joint or several liability of ARE Holdings and ARE LLC shall be deemed to be one obligation of Consolidated Holdings and (iv) each and every Claim filed or to be filed in the Chapter 11 cases of ARE Holdings or ARE LLC shall be deemed filed against Consolidated Holdings and shall be deemed one Claim against and obligation of Consolidated Holdings. Immediately prior to or on the Effective Date, ARE LLC shall be merged into and become a part of Reorganized ARE Holdings and will cease to exist as a separate entity. The Debtors do not believe that the proposed substantive consolidation and the merger of ARE LLC into ARE Holdings will have any affect on the recovery that the holders of Allowed Class 9(a) Equity Interests are entitled to receive in the Chapter 11 Cases. The Plan does not provide for and nothing here shall be deemed to provide for the substantive consolidation and/or merger of any of the Debtors other than ARE Holdings and ARE LLC.

Unless the Court has approved the substantive consolidation of ARE Holdings and ARE LLC by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates as set forth in the Plan. If no objection to substantive consolidation under the Plan is timely filed and served, then the holders of Claims will be deemed to have consented to substantive consolidation for purposes of the Plan only and the Court may approve substantive consolidation of ARE Holdings and ARE LLC in the Confirmation Order. If such objection(s) to the substantive consolidation provided for in the Plan is timely filed and served, a hearing with respect to the substantive consolidation of ARE Holdings and ARE LLC and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis 18043 (Aug. 23, 2005). In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering consolidation. Instead, the Third Circuit Court of Appeals articulated a number of "principles" to guide the court in its analysis. Owens Corning, 419 F.3d at 211. These principles include: (i) absent compelling circumstances courts must respect entity separateness; (ii) recognition that substantive consolidation nearly always addresses harms caused by debtors disregarding separateness; (iii) mere benefit of administration is "hardly a harm calling substantive consolidation into play;" (iv) substantive consolidation should be used rarely and as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may not be used as a "sword." Id.

Using these principles, the Third Circuit Court of Appeals set forth the standard by which courts in this jurisdiction must weigh requests for substantive consolidation where creditor consent is lacking. Specifically, in ordering substantive consolidation (absent consent of the parties) courts must either find, with respect to the entities in question, that (a) prepetition, they disregarded their separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (b) postpetition, "their assets and

liabilities are so scrambled that separating them is prohibitive and hurts <u>all</u> creditors." <u>Id.</u> (emphasis added).

The Debtors believe that substantive consolidation of ARE Holdings and ARE LLC is warranted here because, among other reasons, both entities are holding companies that do not have business operations. Moreover, ARE LLC is wholly owned by ARE Holdings. ARE LLC is also a disregarded entity for tax purposes and its only obligations, and thus the Claims asserted against it, are guarantee obligations under the Prepetition Secured Credit Facility and the Prepetition Unsecured Notes. Such obligations will be satisfied by the distributions in the Plan from other Debtors. Additionally, substantive consolidation of ARE Holdings and ARE LLC is supported by the Backstop Purchasers, which hold the majority of the Prepetition Unsecured Notes Claims. The Debtors further believe that substantive consolidation of ARE Holdings and ARE LLC under the terms of the Plan will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the process of making Distributions. Accordingly, based on the foregoing, the Debtors believe that substantive consolidation of the estates of ARE Holdings and ARE LLC is justified.

### E. Voting, Distributions and Treatment of Disputed, Contingent and Unliquidated Claims

#### 1. Voting of Claims

Each holder of an Allowed Claim in an Impaired Class of Claims shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

#### 2. Distributions

(a) <u>Allowed Claims.</u>

(i) *Delivery of Distributions*. Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Claims in all Classes at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

(ii) *Distribution of Cash*. Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(iii) *Unclaimed Distributions of Cash*. Any distribution of Cash under the Plan that is unclaimed after ninety (90) days after it has been delivered (or attempted to

be delivered) shall become the property of the Reorganized Debtor against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

(iv) *Unclaimed Distributions of New ARE Holdings Common Stock and Warrants*. Any distribution of New ARE Holdings Common Stock under the Plan on account of an Allowed Unsecured Claim or Warrants on account of Class 9(a) Equity Interests that is unclaimed after ninety (90) days after it has been delivered (or attempted to be delivered) shall be deemed forfeited and such shares of New ARE Holdings Common Stock or Warrants shall be cancelled notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim or Equity Interest to such distribution or any subsequent distribution on account of such Allowed Claim or Equity Interest shall be extinguished and forever barred.

(v) *Saturdays, Sundays, or Legal Holidays*. If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(vi) *Fractional New ARE Holdings Common Stock and Warrants and De Minimis Distributions.* Notwithstanding any other provision in the Plan to the contrary, no fractional interests of New ARE Holdings Common Stock or Warrants exercisable for fractional New ARE Holdings Common Stock shall be issued or distributed pursuant to the Plan. Whenever any payment of a fraction of a share of New ARE Holdings Common Stock or Warrants would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such faction to the nearest whole share (up or down), with half shares or less being rounded down and fractions in excess of a half of a share being rounded up. If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole shares, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole shares to such holders by random lot or such other impartial method as the Reorganized Debtors deems fair, in the Reorganized Debtors' sole discretion. Upon the allocation of all of the whole New ARE Holdings Common Stock or Warrants authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

The Debtors or the Reorganized Debtors, as the case may be, shall not be required to, but may in their sole and absolute discretion, make distributions to any holder of a Claim of Cash in amount less than $25. In addition, the Debtors and the Reorganized Debtors shall not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(vii) *Distributions for Claims and Equity Interests Allowed as of the Initial Distribution Date*. On the Initial Distribution Date, the Reorganized Debtors shall distribute Cash, New ARE Holdings Common Stock, Warrants or Collateral or interests therein,

as the case may be, to the holders of Allowed Claims and Equity Interests as contemplated in the Plan.

(viii) *Distributions as of the Record Date.* As of the close of business on the Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests. The Debtors and the Reorganized Debtors shall have no obligation to, but may in their sole and absolute discretion, recognize any transfer of any Claims or Equity Interests occurring after the Record Date. The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Record Date.

(ix) *Interest on Claims.* Except as specifically provided for in the Plan with respect to DIP Financing Claims, Prepetition Secured Credit Facility Claims, Priority Tax Claims or Other Secured Claims, no Claims (including Administrative Claims), Allowed or otherwise, shall be entitled, under any circumstances to receive any post-petition interest on a Claim.

(x) *Establishment of Reserve Amounts for Disputed General Unsecured Claims.* In order to effect Distributions to holders of Allowed Unsecured Claims in a timely manner, within sixty (60) days after the Effective Date, the Reorganized Debtors shall file a motion for order establishing a reserve with respect to unliquidated and/or Disputed Unsecured Claims for Distribution purposes; *provided*, *however*, that the Reorganized Debtors shall not be required to establish any reserve for any unliquidated or Disputed Claims that the Reorganized Debtors believe, in their reasonable discretion, would receive a distribution of Cash under the Plan once such Claim is Allowed.

(xi) *Allowed Amount of Prepetition Unsecured Note Claims to Share in Distribution from the Debtors' Estates.* The Prepetition Unsecured Note Claims are obligations, either directly or as a result of guarantees, of each of the Debtors. For purposes of making distributions on account of the Class 5 Allowed Prepetition Unsecured Note Claims from each of the respective Debtors' estates, the amount of the Allowed Prepetition Unsecured Note Claims to share in the pro rata distribution of New ARE Holdings Common Stock from the respective Unsecured Claims Stock Pool, shall, except as otherwise ordered by the Court, be determined as follows: the full amount of the Allowed Prepetition Unsecured Notes Claims shall be entitled to receive a distribution from each of the Debtors' estates (for the avoidance of doubt, the full amount of the Prepetition Unsecured Notes Claims shall be entitled to receive a single distribution from the consolidated estates of Consolidated Holdings).

(b) Setoff.

The Debtors and Reorganized Debtors may, pursuant to section 553 fo the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claims and the payments or other Distribution to be made pursuant to the Plan in respect of such Claims, or claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim (except to the extent that such claims have been waived by

the Debtors in the Plan or otherwise); *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or Reorganized Debtors may have against such holder. In no event shall any holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right or cause of action of the Reorganized Debtors, unless such holder has filed a motion with the Bankruptcy Court requesting authority to perform such setoff on or before the Effective Date.

(c)     Objections to and Resolution of Claims.

The Reorganized Debtors shall have the exclusive right to make and to file objections to, or otherwise contest the allowance of, Administrative Claims (other than Fee Claims) and Claims, from and after the Effective Date. Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of, Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. Objections to Fee Claims shall be filed and served within twenty (20) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

Objections to, or other proceedings contesting the allowance of, Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion. The Reorganized Debtors may settle any such objections or proceedings without Court approval or may seek Court approval without notice to any Person.

Unless an order of the Court specifically provides for a later date, any proof of claim filed after the applicable bar date relating to any Claim shall be automatically disallowed as a late filed claim, without any action by the Reorganized Debtors, unless and until the party filing such Claim obtains the written consent of the Reorganized Debtors to file such Claim late or obtains an order of the Court upon written motion on notice to the Reorganized Debtors that permits the filing of the Claim. In the event any proof of claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have one hundred eighty (180) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Court on motion of the Reorganized Debtors without a hearing or notice to any party.

(d)     Special Provisions Regarding Insured Claims.

(i)     Distributions under the Plan to each holder of an Insured Claim shall be in accordance with the treatment provided under the Plan for Unsecured Claims; *provided, however,* that the maximum amount of any distribution under the Plan on account of an Allowed Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy; *provided further, however,* that, to the extent a holder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors or Reorganized Debtors, such holder shall have an Allowed Unsecured Claim in the amount by which such Allowed

Insured Claim exceeds the coverage available from the relevant Debtors' or Reorganized Debtors' or Reorganized Debtors' insurance policies. Nothing in this section shall constitute a waiver of any Litigation Rights the Debtors or Reorganized Debtors may hold against any Person, including the Debtors' or Reorganized Debtors' insurance carriers. Nothing in this section is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under the Plan; *provided, however,* that the Debtors and the Reorganized Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(ii)     The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' or Reorganized Debtors' insurers under their policies, and the Debtors' and Reorganized Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors and the Reorganized Debtors, the existence, primacy, and/or scope of available coverage under any alleged applicable policy. The Plan shall not operate as a waiver of any other Claims of the Debtors' or Reorganized Debtors' insurers have asserted or may assert in any proof of claim filed in the Chapter 11 cases or the Debtors' or Reorganized Debtors' rights and defenses to such proofs of claim.

(e)     <u>Reserve for Disputed General Unsecured Claims.</u>

(1)     <u>Establishment of Unsecured Claims Reserve.</u>  On or after the Effective Date, but no later then ten (10) days after entry of an order approving the Motion required pursuant to Article V(E)(1)(j), each of the Reorganized Debtors shall place into reserve, from its allocated portion of the Unsecured Claims Stock Pool, New ARE Holdings Common Stock with an aggregate liquidation value equal to 100% of the distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims, or such other amount as estimated by the Court, against the applicable Debtor (the "<u>Unsecured Claims Reserves</u>"); *provided, however,* that the Reorganized Debtors shall not be required to place any New ARE Holdings Common Stock or Cash in the Unsecured Claims Reserves for any Disputed Unsecured Claims that would be a Convenience Claim if Allowed in the Disputed amount.

(2)     <u>New ARE Holdings Common Stock Held in General Unsecured Claims Reserve.</u>  New ARE Holdings Common Stock held in the Unsecured Claims Reserves shall be held by the Reorganized Debtors in trust for the benefit of holders of Allowed Prepetition Unsecured Notes Claims and General Unsecured Claims. New ARE Holdings Common Stock held in the Unsecured Claims Reserves shall not constitute property of the Reorganized Debtors or any of them, subject to the provisions of Article VI(E)(5) of the Plan. The Reorganized Debtors shall pay, or cause to be paid, out of any dividends paid on account of New ARE Holdings Common Stock held in the Unsecured Claims Reserves, any tax imposed on the Unsecured Claims Reserves by any Governmental Unit with respect to income generated by New ARE Holdings Common Stock held in the Unsecured Claims Reserves and any costs associated with maintaining the Unsecured Claims Reserves. Any New ARE Holdings Common Stock held in the Unsecured Claims Reserves after all General Unsecured Claims have been

Allowed or disallowed shall be transferred by the Reorganized Debtors (as applicable), in a supplemental distribution, pro rata, to the holders of Allowed Prepetition Unsecured Notes Claims and Allowed General Unsecured Claims, *provided, however,* that to the extent such pro rata allocation results in a distribution of less than one share of New ARE Holdings Common Stock to over fifty per cent (50%) of holders of Allowed Unsecured Claims otherwise entitled to such distribution, the Reorganized Debtors shall have no obligation to make such distribution and all then-undistributed New ARE Holdings Common Stock shall be canceled and the entitlement of any Person thereto shall be extinguished and forever barred.

(f) *Allowance of Disputed Unsecured Claims*. Each holder of a Disputed General Unsecured Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive a pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which such Allowed Claim is held from the Unsecured Claims Reserves on the next Quarterly Distribution Date.

(g) *Allocation of Consideration*. The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid, interest and costs, if any, and attorneys' fees, where applicable.

(h) *Cancellation and Surrender of Existing Securities and Agreements*. Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, the promissory notes, share certificates (including treasury stock), the Prepetition Unsecured Notes, the Prepetition Indenture, other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests shall be deemed automatically extinguished, canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under the notes, share certificates, Prepetition Unsecured Notes, the Prepetition Note Indenture and other agreements and instruments governing such Claims and Interests shall be automatically discharged and released. The holders of or parties to such canceled notes, share certificates, Prepetition Notes, the Prepetition Indenture and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, Prepetition Unsecured Notes, the Prepetition Indenture, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that the Prepetition Unsecured Notes and the Prepetition Indenture shall continue in effect solely for the purposes of (i) allowing the Prepetition Indenture Trustee or its agents to make Distributions to holders of Prepetition Unsecured Notes and (ii) allowing holders of the Prepetition Unsecured Notes to receive Distributions hereunder. The Prepetition Indenture shall terminate completely upon the completion of all Distributions to the holders of the Prepetition Unsecured Notes and the payment in full of the reasonable fees and expenses of the Prepetition Indenture Trustee. After the performance by the Unsecured Note Indenture Trustee or its agents of all duties that are required under the Plan, the Confirmation Order and/or under the terms of the Prepetition Indenture, the Prepetition Indenture Trustee and its agents and advisors shall be relieved of, and released from, all obligations associated with the Prepetition Unsecured Notes

arising under the Prepetition Indenture or under other applicable agreements or law, and the Prepetition Indenture Trustee shall be deemed fully released and discharged.

### 3. Estimation

The Reorganized Debtors may at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (c) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, or the Reorganized Debtors as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### 4. Nonconsensual Confirmation

If less than all Impaired Classes accept the Plan, but at least one (1) Class of Claims impaired under the Plan has accepted the Plan (and which class's acceptance is determined without inclusion of claims of insiders), the Debtors may seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

### 5. Amendment and Confirmability of a Plan

The Debtors reserve the right to alter, amend or modify the Plan as it applies to any particular Debtor (subject to the Backstop Purchasers Approval Condition). A determination by the Court that the Plan, as it applies to a particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (i) the confirmability of the Plan as it applies to any other Debtor, or (ii) the Debtors' ability to modify the Plan (subject to the Backstop Purchasers Approval Condition), as it relates to any particular Debtor, to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

### 6. Severability of Plan Provisions

Except as otherwise provided in the Plan, in the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Bankruptcy Court shall, at the request of the Debtors (subject to the Backstop Purchasers Approval Condition), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and

DB02:8549217.27

068125.1001

shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

## F.     Effect of Confirmation of the Plan

### 1.     Continued Corporate Existence

Except as otherwise provided in the Plan, the Debtors shall continue to exist as the Reorganized Debtors after the Effective Date, under the laws of the respective states governing their formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith, including, without limitation, the New Corporate Governance Documents.  In addition, the Reorganized Debtors may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including without limitation, the documents and instruments included in the Plan Supplement.

### 2.     Dissolution of Creditors Committee

The Creditors Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors Committee's attorneys, financial advisors, and other agents shall terminate except with respect to their respective Fee Claims.

### 3.     Vesting of Property

The property of the Debtors' estates, including all of the Debtors' claims and causes of action against third parties, including, without limitation, causes of action described in Article VII(F) of the Plan shall be revested in the Reorganized Debtors on the Effective Date.

### 4.     Discharge of the Debtors

**The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date.  Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims against, and Liens on the Debtors, their respective assets and properties, arising at any time before the entry of the Confirmation Order, regardless of whether a proof of Claim with respect thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder.  Except as otherwise**

expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order

### 5. Injunction

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all entities who have held, hold, or may hold Claims against the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, with respect to any such Claim, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim and (d) asserting any right of setoff, or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim. Such injunction shall extend to successors of the Debtor (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property. Such injunction shall not apply in respect of Ordinary Course Administrative Claims.

### 6. Preservation of Causes of Action

Except as expressly set forth in the Plan, the Reorganized Debtors shall retain all rights and all Causes of Action and Litigation Rights accruing to them and their estates under sections 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including, without limitation, the Auction Rate Securities Litigation. Except as expressly provided in this Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights, Causes of Action or Litigation Rights. Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, Litigation Rights, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by this Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, Litigation Rights, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

DB02:8549217.27

068125.1001

### 7. Votes Solicited in Good Faith

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan and therefore have not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

### 8. Administrative Claims Incurred After the Effective Date

Administrative Claims incurred by the Debtors after the Confirmation Date including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Court approval, subject to any agreements with any claim holders.

### 9. Releases by the Debtors

**The Plan provides that on the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their estates, shall be deemed to release unconditionally the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken solely in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct, (ii) the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, and (iii) the foregoing release shall not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors.**

### 10. Releases by non-Debtors.

**The Plan provides that on the Effective Date, all Persons who (a) directly or indirectly, have held, hold, or may hold Claims, (b) vote to accept the Plan as set forth on the relevant Ballot, and (c) do not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with the Released Parties not to (y) sue or otherwise seek recovery from any of the Released Parties on account of any Claim, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or**

otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their business and affairs or (z) assert against any of the Released Parties any claim, obligation, right, cause of action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, provided, however, (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct, (ii) the foregoing release shall not apply to Ordinary Course Administrative Claims and Fee Claims, and (iii) obligations arising under the Plan. Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to claims arising against such Released Parties in their capacity as parties in interest in the Chapter 11 cases

11. **Exculpation and Injunction in Respect of Released Parties**

(a) **Exculpation**. The Released Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the negotiation of the Plan, the negotiation of the documents included in the Plan Supplement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan, the management or operations of the Debtors or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

(b) **Injunction**. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest shall be permitted to commence or continue any action, employment of process, or any act to collect, offset, or recover any Claim against any of the Released Parties that accrued on or prior to the Effective Date and that has been released or waived pursuant to Article VII(I) or VII(J) of the Plan.

12. **Preservation of Certain Defenses**

The releases by non-debtors and injunction provided in the Plan shall not be deemed a waiver or relinquishment of any equitable or legal defense that an entity held against the Debtors immediately prior to the Petition Date, with respect to any Cause of Action commenced by the Debtors prior to the Effective Date or the Reorganized Debtors after the Effective Date, as the case may be, against such entity; *provided*, that the releases and injunction provided in the Plan shall be deemed a waiver or relinquishment of any right of setoff or

recoupment or any other monetary claim to the extent such right or claim was not properly preserved through the timely filing of a proof of claim.

### 13. Term of Bankruptcy Injunction or Stays

The Plan provides that all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date..

### 14. Preservation of Insurance

The Plan provides that the Debtors' discharge and release from all Claims as provided in the Plan, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, their officers and directors) or any other person or entity.

### 15. Indemnification Obligations Owed by the Debtors

Indemnification Obligations owed to directors, officers, and employees of the Debtors (or the estates of any of the foregoing) who served or were employed by the Debtors as of or after the Petition Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan. All Indemnification Obligations owed to directors, officers, and employees of the Debtors who served or were employed by the Debtors prior to, but not after, the Petition Date shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan.

### G. Retention of Jurisdiction

The Plan provides that the Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine timely objections to Claims; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the

DB02:8549217.27                                                                              068125.1001

Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the Plan requires a Final Order of the Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (14) to hear and determine any Causes of Action preserved under the Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3), (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge, (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article VII of the Plan, (17) to enter a final decree closing the Chapter 11 Cases, and (18) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered after the Effective Date.

### H.  Miscellaneous Provisions

#### 1.  Payment of Statutory Fees

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

#### 2.  Modification of the Plan

(a)  _Pre-Confirmation Modifications_.  The Debtors may alter, amend, or modify the Plan before the Confirmation Date as provided in Section 1127 of the Bankruptcy Code, subject to the Backstop Purchasers Approval Condition.

(b)  _Post-Confirmation Immaterial Modifications_.  After the Confirmation Date, the Reorganized Debtors may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

(c)  _Post-Confirmation Material Modifications_.  After the Confirmation Date, the Reorganized Debtors may alter or amend the Plan (subject to the Backstop Purchasers Approval Condition) in a manner which, as determined by the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing as provided in Section 1127 of the Bankruptcy Code.

#### 3.  Governing Law

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules) or the Delaware General Corporation Law, the laws of the State of Delaware (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and

DB02:8549217.27                                        068125.1001

instruments executed in connection with the Plan, unless otherwise specified. The documents evidencing and securing the Senior Secured Notes will be governed by New York law except that matters with respect to real property liens will be governed by local real property law.

### 4.    Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors or the Reorganized Debtors, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 5.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### 6.    Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange under the Plan of New ARE Holdings Common Stock, the Warrants and the security interests in favor of the lenders under the Exit Financing, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan shall not be subject to any stamp, real estate transfer, recording or other similar tax.

### 7.    Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New ARE Holdings Common Stock (other than the Noteholder New Equity) and the Warrants is exempt from the registration requirements of the Securities Act of 1933, as amended, and any State or local law requiring registration for offer or sale of a security.

For a more detailed description of these matters, see Article XII below.

### 8.    Waiver of Federal Rule of Civil Procedure 62(a)

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### 9.    Exhibits/Schedules

All Exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if set forth therein.

## 10.     Notices

All notices, requests, and demands under the Plan to be effective shall be in writing and unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, attention: George T. Henning, Jr. and Christopher A. Nichols, with a copy to Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19801, attention:  Joel A. Waite and Matthew B. Lunn, Tel:  (302) 571-6600, Fax:  (302) 571-1253.

To the Creditors Committee:  In care of Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801, attention: Scott D. Cousins and Donald J. Detweiler, Tel:  (302) 661-7000, Fax:  (302) 661-7360.

To the Backstop Purchasers:  In care of (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, attention:  Michael S. Stamer and Shaya Rochester, Tel: (212) 872-1000, Fax: (212) 872-1002, and (b) Blank Rome, LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, attention:  Bonnie Glantz Fatell and Stanley Tarr, Tel:  (302) 425-6400, Fax (302) 425-6464.

## 11.     Plan Supplement

The Plan Supplement (which shall include, without limitation, the New Corporate Governance Documents and the documents relating to the Senior Secured Notes), to the extent not previously filed, shall be filed with the Clerk of the Court no later than ten (10) calendar days prior to the voting deadline on the Plan.  The documents included in the Plan Supplement shall be subject to the Backstop Purchasers Approval Condition.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at "https://ecf.deb.uscourts.gov."  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article IX(J) of the Plan.

## 12.     Conflict

The terms of this Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement.

## I.     Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection.  In the case of the Debtors' rejection of leases of real property and employment agreements, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided for below and subject to the approval of the Majority Backstop Purchasers, to the extent not previously assumed in the Chapter 11 Cases, each executory contract and unexpired lease that exists between any Debtor and any Person is specifically assumed by the Debtor that is a party to such executory contract or unexpired lease as of and subject to the Effective Date pursuant to the Plan.

The following executory contracts and unexpired leases are rejected:
(a) executory contacts or unexpired leases that were rejected before the Confirmation Date;
(b) employment agreements that were terminated or rejected prior to the Confirmation Date; and
(c) contracts and unexpired leases identified in the Plan Supplement (the "Rejected Contracts and Leases"), which contracts and unexpired leases are deemed rejected by the applicable Debtor as of the corresponding rejection dates set forth in the Plan Supplement.

Notwithstanding the foregoing, the Debtors shall specifically indentify in the Plan Supplement unexpired leases of nonresidential real property that the Debtors intend to assume, as of and subject to the Effective Date (the "Assumed Real Property Leases"), and the Confirmation Order shall operate as an order authorizing the Debtors' assumption of the Assumed Real Property Leases, as may be amended by agreement of the parties thereto, as of and subject to the Effective Date.

The Debtors reserve the right to amend the lists of (x) Rejected Contracts and Leases and (y) Assumed Real Property Leases at any time prior to the Confirmation Date.

### 2. Cure

The applicable Reorganized Debtor, except as otherwise agreed to by the parties, will cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed by such Reorganized Debtor pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within 30 days of the entry of a Final Order determining the amount, if any, of the applicable Debtor or the applicable Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

### 3. Rejection Damage Claims

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date. Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 6 General Unsecured Claims.

## J.     Benefit Plans

As of and subject to the Effective Date, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts, or programs.

### 1.     Treatment of the Aventine Pensions Plan

ARE Inc. established and maintains a pension plan for certain individuals employed by ARE Inc. as the Aventine Renewable Energy, Inc. Hourly Pension Plan. The Aventine Pension Plan is covered by Title IV of ERISA.

PBGC, a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

Under the Plan, the Aventine Pension Plan will not be terminated, and Reorganized ARE Inc. will assume and continue to maintain the Aventine Pension Plan. Reorganized ARE Inc. and all members of its controlled group will be obligated to contribute to the Aventine Pension Plan the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Internal Revenue Code, 26 U.S.C. §§ 412 and 430. The Aventine Pension Plan may be terminated after the Effective Date only if the statutory requirements of either ERISA section 4041, 29 U.S.C. § 1341, or ERISA section 4042, 29 U.S.C. § 1342, are met. If the Aventine Pension Plan terminates, Reorganized ARE Inc., and all members of its controlled group will be jointly and severally liable for the unpaid minimum funding contributions, statutory premiums, and unfunded benefit liabilities of the Aventine Pension Plan. See ERISA sections 4062(a), 4007; 29 U.S.C. §§ 1362(a), 1307.

Nothing in the Plan will be construed as discharging, releasing, or relieving ARE Inc., or its successor, including Reorganized ARE Inc. or any party, in any capacity, from any liability for the minimum funding requirements or statutory premiums under ERISA or the Internal Revenue Code with respect to the Aventine Pension Plan or PBGC. PBGC and the Aventine Pension Plan will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Plan or the Confirmation Order. The Plan will not release or discharge any person or entity from liability with respect to the Aventine Pension Plan arising as a result of such person's or entity's breach of fiduciary duty under ERISA.

DB02:8549217.27                                                                068125.1001

On the Effective Date, and upon assumption of the Aventine Pension Plan, PBGC's Claims filed against the Debtors on behalf of the Aventine Pension Plan shall be deemed withdrawn, without prejudice to the rights of PBGC, or the true party in interest with respect to the Aventine Pension Plan, to take such action as may be appropriate with respect to future actions or inactions, as the case may be, of Reorganized ARE Inc., or any of its controlled group members, as contributing sponsor with respect to the Aventine Pension Plan, during the period subsequent to the Effective Date under the provisions of the Aventine Pension Plan and ERISA.

### K.    Confirmation and Effectiveness of the Plan

#### 1.    Conditions Precedent to Effectiveness

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XII(B) of the Plan:

(1)  the Confirmation Order shall have become a Final Order;

(2)  all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

(3)  the New Corporate Governance Documents shall have been duly executed as provided in Article V(A);

(4)  the New ARE Holdings Common Stock and New Subsidiary Equity Interests to be issued pursuant to Article V(B) shall be consistent with the Plan; and

(5)  the Reorganized Debtors shall have entered into and issued the Senior Secured Notes, and all conditions precedent to the effectiveness of the Senior Secured Notes shall have been met.

(6)  the Reorganized Debtors shall have entered into the ABL Credit Facility;

(7)  all conditions set forth in the Backstop Commitment Agreement, including, without limitation, the Backstop Purchasers Approval Condition, shall have been satisfied or waived as permitted under the Backstop Commitment Agreement.

#### 2.    Waiver of Conditions

The Debtors (with the consent of the Majority Backstop Purchasers as and to the extent set forth in the Backstop Commitment Agreement) may waive any or all of the conditions set forth in Article XII(A) of the Plan at any time and without leave of or order of the Court and without any formal action.  By order of the Court, the Majority Backstop Purchasers may waive any or all of the conditions set forth in Article XII(A)(2) and Article XII(A)(6) of the Plan at any time after consultation with the Debtors.

### 3. Effect of Failure of Conditions

In the event that the Effective Date does not occur on or before ninety (90) days after the Confirmation Date, upon notification submitted by the Debtors to the Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

### 4. Vacatur of Confirmation Order

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

### 5. Revocation, Withdrawal, or Non-Consummation

(a)     <u>Right to Revoke or Withdraw</u>.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  From the Confirmation Date through the Effective Date, the Debtors may revoke or withdraw the Plan with the consent of the Majority Backstop Purchasers or by order of the Bankruptcy Court.

(b)     <u>Effect of Withdrawal, Revocation, or Non-Consummation</u>.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein or in the Plan, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## VIII.

## PROJECTIONS AND VALUATION

The Debtors, with the assistance of their advisors, developed a set of financial projections (as summarized below and in <u>Exhibit D</u>, the "<u>Financial Projections</u>") to generally

assess the value of the Reorganized Debtors and, specifically, to determine the value of the New ARE Holdings Common Stock to be distributed to Classes 5 and 6 under the Plan. The Financial Projections and valuations set forth below and in Exhibit D are based on a number of significant assumptions, including, among other things, the successful reorganization of the Debtors.

THE PROJECTIONS AND VALUATIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY.

## A. Financial Projections

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management have, through the development of the Financial Projections, analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business subsequent to their emergence from chapter 11. The Financial Projections were also prepared to assist holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein and in Exhibit D, and certain relevant information set forth in ARE Holdings' Annual Report on Form 10 K for the fiscal year ended December 31, 2008, and ARE Holdings' Quarterly Reports on Form 10 Q for the first three quarters of fiscal year 2009, all of which are available, along with other financial filings, at the SEC's EDGAR website at: http://sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001285043. The Financial Projections were prepared in good faith based upon assumptions believed to be reasonable. The Financial Projections, which were prepared during November of 2009, were based, in part, on economic, competitive, and general business conditions prevailing at the time. Any future changes in these conditions may materially impact the Debtors' ability to achieve the Financial Projections.

## B. Valuation

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY MAY BE MATERIALLY DIFFERENT FROM THE ENTERPRISE VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Houlihan Lokey has advised the Debtors with respect to the enterprise value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated range of enterprise value of the Reorganized Debtors was assumed to be $220.0 million to $260.0 million (with a midpoint value of $240.0 million) as of an assumed Effective Date of

March 31, 2010. Houlihan Lokey's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ESTIMATED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MARCH 31, 2010, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF AVENTINE AVAILABLE TO HOULIHAN LOKEY AS OF NOVEMBER 19, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.**

Based upon the estimated range of the enterprise value of the Reorganized Debtors of between $220.0 million and $260.0 million and assumed total net debt of $28.9 million (including $105.0 million in Senior Secured Notes, no balance outstanding under the ABL Credit Facility as of the Effective Date, $5.3 million note proposed to be provided to Kiewit on account of the Kiewit Aurora West Claim and $81.4 million cash on hand assuming an Effective Date of March 31, 2010), Houlihan Lokey has estimated the range of equity value for the Reorganized Debtors between approximately $191.1 million and $231.1 million, with a mid-point equity value of $211.1 million. Assuming the issuance on the Effective Date of 8.550 million shares of New ARE Holdings Common Stock pursuant to the Plan, the imputed estimate of the range of equity values on a per share basis for Reorganized Aventine is between $22.35 and $27.03 per share, with a midpoint value of $24.69 per share. The per share Equity Value range of $22.35 to $27.03 does not give effect to the potentially dilutive impact of any options or warrants to be issued or granted pursuant to the Management Incentive Plan (*see* section Article V(E) of the Plan, entitled, "Reorganized Debtors' Management Incentive Plan"), or the Warrants proposed to be issued under the Plan.

The foregoing estimate of the enterprise value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the Financial Projections, access to the Senior Secured Notes and ABL Credit Facility, market conditions as of November 19, 2009 continuing through the assumed Effective Date of March 31, 2010, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Financial Projections prepared by the management of the Debtors and included in Exhibit D to this Disclosure Statement, Houlihan Lokey assumed that such Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of Aventine as to the future operating and financial performance of Reorganized Aventine. Houlihan Lokey's estimate of a range of enterprise values assumes that Aventine's Projections will be achieved by the Reorganized Debtors in all material respects, including revenue growth, completion of both the Mt. Vernon and Aurora West facilities and improvements in operating margins, earnings and cash flow. Certain of the results forecasted by the management of Aventine are better than the recent historical results of operations of the Debtors. As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in

DB02:8549217.27

068125.1001

the Financial Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Financial Projections, such performance may have a material impact on the Financial Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE ENTERPRISE VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE FINANCIAL PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY AVENTINE'S MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE ETHANOL INDUSTRY;

- REVIEWED THE TERMS OF THE COMPETITIVE BIDS RECEIVED FROM VARIOUS THIRD PARTIES IN CONNECTION WITH HOULIHAN LOKEY'S MARKETING EFFORTS;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S FINANCIAL PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF AVENTINE WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF REORGANIZED AVENTINE THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY

PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

## 1.    Valuation Methodology

Houlihan Lokey performed a variety of analyses and considered a variety of factors in preparing the valuation of Aventine. Several generally accepted valuation techniques for estimating the Debtors' enterprise value were used. Houlihan Lokey primarily relied on three methodologies: comparable public company analysis, discounted cash flow analysis, and precedent transactions analysis. Houlihan Lokey made judgments as to the significance of each analysis in determining the Debtors' indicated enterprise value range and determined the discounted cash flow analysis and precedent transactions analysis to be the most pertinent valuation methodologies for the purpose of valuing the Debtors and, therefore, weighted each at 40% of total enterprise value and weighted comparable companies at 20% of total enterprise value. Houlihan Lokey's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Debtors' enterprise value.

In preparing its valuation estimate, Houlihan Lokey performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

As described in Article VI(N) of this Disclosure Statement, in an effort to maximize value to all constituencies, in conjunction with its retention, Houlihan Lokey approached a over 100 parties with strategic or financial interest in the ethanol industry to determine if any party would be interested in acquiring one or more of the Debtors. Despite actively soliciting interest in purchasing the Debtors as a going concern as well as marketing each ethanol facility individually throughout the period leading up to the Petition Date and continuing until the filing of the Plan, Houlihan Lokey was unable to discover a party that was interested in acquiring the Debtors at a value that exceeded the valuation derived by Houlihan Lokey herein. In fact, in the case of parties that submitted initial indications of interest all parties proposed values below the low end of Houlihan Lokey's valuation range.

(a)    *Comparable Public Company Analysis*. A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, cash flows and operating capacity. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, cash flow statement and operating capacity. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on

these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, ethanol production and marketing), business risks, location of ethanol facilities, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, Houlihan Lokey deemed there to be only one publicly available ethanol company (Green Plains Renewable Energy, Inc.) which is generally comparable to the Debtors in some or all of the factors described above (the "Comparable Company"). Houlihan Lokey excluded several ethanol producers that were deemed not comparable or not usable for the purposes of the valuation because (i) their equity is privately held; (ii) ethanol production makes up less than 10% of sales and/or (iii) the companies are distressed. After analyzing the current trading value for the Comparable Company as a multiple of actual fiscal year projected fiscal year earnings before interest, taxes, depreciation, and amortization ("EBITDA"), Houlihan Lokey deemed this metric not meaningful for a variety of factors including (i) the Comparable Company does not have projected financial information (i.e., no management or analyst estimates) thus, forward looking multiples are not available; and (ii) the ethanol industry is a commodity industry in which companies are typically valued by a ratio of enterprise value to annual production capacity. The ratio of enterprise value to annual ethanol production capacity is the industry standard primarily because ethanol producers often experience significant variance in EBITDA from one year to the next due to volatility in either input costs (chiefly corn and natural gas) or output pricing (ethanol and co-product). To adjust for this industry-wide volatility Houlihan Lokey relied primarily upon a multiple of enterprise value to operating capacity in lieu of EBITDA. Based on extensive research and its experience in marketing the Debtors' assets, Houlihan Lokey believes this methodology is consistent with common valuation practices in the ethanol industry. As such, the derived enterprise value to capacity multiples were applied to the Debtors' current operating capacity and uncompleted facilities (net of estimated completion costs and risk adjusted for start-up and other risks) to determine a range of enterprise values.

(b)     *Precedent Transactions Analysis.* Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics (particularly total annual production capacity in the case of the ethanol industry) reveals industry acquisition multiples for companies in similar lines of businesses to the Debtors. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. As nearly all of the recent precedent transactions were for ethanol facilities that were idled or did not publicly disclose financial information, Houlihan Lokey specifically focused on prices paid as a multiple of annual operating capacity, as is customary in the ethanol industry (discussed above in (a)). These multiples are then applied to the Debtors' annual production capacity to determine the total

enterprise value or value to a potential buyer. In order to account for the Debtors' uncompleted facilities (Mt. Vernon and Aurora West), Houlihan Lokey risk adjusted the multiple of enterprise value to annual operating capacity (to reflect the risks inherent in completion of the facilities) before applying the risk adjusted multiple to the Debtors' uncompleted annual operating capacity. Houlihan Lokey then reduced the resulting implied enterprise valuation for the estimated costs of completing the facilities and providing sufficient working capital to start-up the facilities upon completion.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. However, most of the transactions with publicly available financial data in the ethanol industry occurred during a time of extreme duress in both the ethanol industry and the capital markets more broadly and, as such, may not be indicative of attainable values in a normalized industry and capital markets environment. Other aspects of value that manifest themselves in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. For the purposes of this valuation, Houlihan Lokey analyzed all sale transactions of ethanol facilities occuring from January 1, 2009 through November 15, 2009 for which purchase prices were publically disclosed and were not subject to extraordinary factors making them not relevant to this valuation (i.e., cold idled facilities sold for scrap value). The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

(c)  **_Discounted Cash Flow Approach._** The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected

future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the weighted average cost of debt and equity capital ("WACC") for publicly traded companies that are similar to the Debtors. As discussed in the comparable public company analysis, there is only one publicly traded comparable company and therefore does not provide a sufficient sample size to be relied upon solely when determining an appropriate WACC for the Debtors. Therefore, in addition to analyzing the WACC of the Comparable Company, Houlihan Lokey also relied both on the terms of the Debtors' exit financing as well as its insight and experience in the debt and equity capital markets to estimate the Debtors' WACC. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Financial Projections). Houlihan Lokey's discounted cash flow valuation is based on the Debtors' Financial Projections. Houlihan Lokey discounted the projected cash flows from the Financial Projections using the Debtors' estimated WACC and calculated the terminal value of the Debtors using a per gallon multiple of operating capacity as is consistent with industry practice.

This approach relies on the company's ability to project future cash flows with some degree of accuracy and also assumes the Company will be successful in raising additional financing in 2011 on terms substantially similar to the Senior Secured Notes (excluding the equity component and original issue discount). Because the Debtors' Financial Projections reflect significant assumptions made by the Debtors' management concerning anticipated results including the successful completion of Mt. Vernon and Aurora West, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. If the assumptions for underlying commodity prices prove to be incorrect or there are any issues with the completion and start-up of Mt. Vernon or Aurora West, the Debtors' actual results could differ materially than what is presented in the Financial Projections. Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' Financial Projections.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY HOULIHAN LOKEY REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH HOULIHAN LOKEY'S VALUATION ANALYSIS.

DB02:8549217.27 068125.1001

# IX.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Projected Financial Information

The Financial Projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the assumptions contained therein. These projections reflect numerous assumptions, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, the Reorganized Debtors' anticipated future performance, the future performance of the ethanol sector and overall fuel industry, certain assumptions with respect to the Reorganized Debtors' competitors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Reorganized Debtors' actual financial results. Although the Reorganized Debtors believe that the Financial Projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

### B.    Risks Related to the Debtors' Business and Operations

#### 1.    Availability and Prices of Commodity Inputs

The Debtors' profitability is primarily driven by the spread between corn and ethanol prices. Decreases in the spread between ethanol and corn prices will have a negative impact on the Reorganized Debtors' profitability. The price of corn is influenced by general economic, market and regulatory factors, which include weather conditions, farmer planting decisions, government policies and subsidies with respect to agriculture and international trade and global demand and supply. The significance and relative impact of these factors on the price of corn is difficult to predict. Factors such as severe weather or crop disease could have an adverse impact on the Reorganized Debtors' financial performance because they may be unable to pass on higher corn costs to customers. Increasing ethanol capacity could also boost demand for corn and result in increased prices for corn. Any event that tends to negatively impact the supply of corn will tend to increase prices and potentially harm the Reorganized Debtors' financial performance.

Both of the Debtors' dry-mill facilities are fired by natural gas. The Debtors rely upon third parties to supply them with natural gas which is consumed in the production of

ethanol, and the prices for and availability of natural gas are subject to volatile market conditions. These market conditions often are affected by factors beyond the Debtors' control such as weather conditions, overall economic conditions and foreign and domestic governmental regulation and relations. Significant disruptions in the supply of natural gas could temporarily impair the Reorganized Debtors' ability to produce ethanol at their dry-mill facilities. Further, increases in natural gas prices or changes in the Reorganized Debtors' natural gas costs relative to natural gas costs paid by competitors may adversely affect the Reorganized Debtors' financial performance.

### 2. Operations of the Debtors' Facilities

The Debtors currently operate three manufacturing plants, two in Pekin, Illinois, and one in Aurora, Nebraska. Any disruption or shut down of operations at one or more of the Reorganized Debtors' plants for any prolonged period of time will have a negative impact on financial performance. Included in the risks that the Debtors face are: (i) breakdown, failure or substandard performance of equipment or processes; (ii) a major accident; (iii) severe weather or natural disasters; (iv) the need to comply with directives of, and maintain all necessary permits from, governmental agencies; (v) raw material supply disruptions; (vi) labor force shortages, work stoppages, or other labor difficulties; (vii) transportation disruptions; and (viii) disruptions to the network infrastructure and enterprise applications, and internal technology systems for the Reorganized Debtors' operational, marketing support and sales, and product development activities. The occurrence of any one or more of these events would likely lead to delays in production and/or failure to fulfill customer orders and, thus, a negative effect on the Reorganized Debtors' financial results.

### 3. Completion of Plants Currently under Construction.

Both the Aurora West Facility and the Mt. Vernon Facility require significant additional construction and development to complete the first 110 million gallon capacity plants at each site. Prior to the Petition Date, Kiewit terminated each of the EPC Contracts. Such construction and development will be pursuant to new, amended and/or modified agreements with a number of third parties. The Debtors have been engaged in negotiations with certain third parties, including Kiewit and the Ports of Indiana, concerning the terms of the agreements for the construction of the Mt. Vernon Facility and Aurora West Facility. Although the Debtors and Kiewit and the Debtors and the Ports of Indiana have reached understandings as to the terms and conditions of the construction and completion of the Mt. Vernon Facility, no assurances can be made that definitive documentation will be agreed to among the parties, which documentation must be acceptable to the Majority Backstop Purchasers. The Debtors also currently intend to retain and recommence the construction of the Aurora West Facility in April 2011. However, the commencement of the construction of the Aurora West Facility is subject to a number of factors and events, including, but not limited to, obtaining additional financing and/or the continued improvement of margins.

### 4. Employment and Labor Matters.

Approximately 50% of the Debtors' employees are member of Local 7-662. The Debtors' Collective Bargaining Agreement with Local 7-662 which was originally set to expire

in October, 2009 but was subsequently extended by one year through and including October 31, 2010 on the same terms and conditions, subject to an option to reopen negotiations upon mutual consent after the effective date of a confirmed Chapter 11 plan of reorganization. There can be no certainty about the outcome of future negotiations related to the collective bargaining agreement.

The Debtors operate with a limited number of corporate personnel, and their commitment to a less centralized organization also places greater emphasis on the strength of local management. The Reorganized Debtors' success will depend on, among other factors, their ability to attract and retain other qualified personnel, particularly executive management. The loss of the services of any key employees or the failure to attract or retain other qualified personnel could have a material adverse effect on the Reorganized Debtors' business or business prospects

### 5.    Impact of Demand for Gasoline on Ethanol Sales

Ethanol is marketed as an oxygenate to reduce vehicle emissions from gasoline, as an octane enhancer to improve the octane rating of gasoline with which it is blended and as a fuel extender. As a result, ethanol demand has historically been influenced by the supply of and demand for gasoline. Among other things, the demand for gasoline is affected by the price of gasoline, seasonality and consumer lifestyle decisions related to the current domestic economy – all factors outside of the Debtors' control. If gasoline demand decreases, the Reorganized Debtors' ability to sell their product and their results of operations and financial condition may be materially adversely affected.

### 6.    Future Supply and Demand of Ethanol

The supply of ethanol and development of new production facilities has increased significantly in the last ten years in response to increases in demand for ethanol over that corresponding time period. There is a risk that the recent increase in development and construction of ethanol production facilities and the attendant increase in the supply of ethanol may exceed demand levels. Additionally, there is the risk that the general demand for ethanol will decrease. Either or both of these events will likely create a surplus supply of ethanol in the market leading to a depressed price and/or excess capacity and inventories of the Reorganized Debtors' product.

### 7.    Effect of Hedging, Derivative and Fixed Pricing Strategies

In an attempt to minimize the effects of the volatility of the price of corn, natural gas, electricity and ethanol, in the past, the Debtors' routinely took economic hedging positions in such commodities. Although the Debtors attempted to link their economic hedging activities to sales plans and pricing activities, occasionally such hedging activities can themselves result in losses. There can be no certainty that additional losses will not occur in the future if the Debtors take economic hedging positions. Additionally, economic hedging arrangements also expose the Debtors to the risk of financial loss in situations where the other party to the hedging contract defaults on its contract or there is a change in the expected differential between the underlying price in the hedging agreement and the actual price of the commodities. Alternatively, the

DB02:8549217.27                                                                    068125.1001

Reorganized Debtors may choose not to engage in hedging transactions in the future. As a result, the Reorganized Debtors' results of operations may be adversely affected during periods in which commodity prices move against the Reorganized Debtors' hedged positions.

In addition, the Reorganized Debtors may, from time to time, enter into fixed pricing contracts with their customers either based on either an agreed per gallon price or a price equal to the wholesale price of gasoline plus or minus a fixed amount. To the extent that the Reorganized Debtor are parties to a fixed price contract, there can be no guarantees that such agreements will ultimately prove to be profitable.

## 8. Regulatory Environment; Taxes and Tariffs

Various state and federal legislation intended to increase the usage of renewable fuels, and ethanol specifically, have a direct impact on the ethanol and renewable fuels industry and the Debtors' business operations. Among these regulations are (1) the renewable fuels standard, which requires an increasing amount of renewable fuels to be used in the U.S. each year, (2) the Volumetric Ethanol Excise Tax Credit, which provides a tax credit of $0.45 per gallon on 10% ethanol blends that is set to expire in 2010, (3) the small ethanol producer tax credit, for which the Debtors' do not qualify because of the size of their ethanol plants, but which certain of their competitors do enjoy, and (4) the federal "farm bill," which establishes federal subsidies for agricultural commodities, including corn, which is the Debtors' primary feedstock. The continuation or cessation of these programs, as well as their scope and extent, will have a significant effect on the number of participants in the ethanol industry, on both the supply and demand side, and will have a direct effect on the Reorganized Debtors' financial performance.

Additionally, the federal government currently imposes a tariff on foreign produced ethanol, but certain countries in the Americas are exempted from the application of the tariff, and increased imports from those countries can have a negative impact on the Reorganized Debtors' financial results. Further, any changes in the tariff amount could increase (or decrease) foreign competition in the domestic ethanol market and, accordingly, the Reorganized Debtors' market share and financial performance.

## 9. Health, Safety and Environmental Laws

The Debtors are subject to extensive federal, state and local environmental laws, regulations and permit conditions (and interpretations thereof), including those relating to the discharge of materials into the air, water and ground, the generation, storage, handling, use, transportation and disposal of hazardous materials, and the health and safety of their employees. These laws, regulations, and permits will require the Reorganized Debtors to incur significant capital and other costs, including costs to obtain and maintain expensive pollution control equipment. They may also require the Reorganized Debtors to make operational changes to limit actual or potential impacts to the environment. A violation of these laws, regulations or permit conditions can result in substantial fines, natural resource damages, criminal sanctions, permit revocations and/or facility shutdowns. In addition, environmental laws and regulations (and interpretations thereof) change over time, and any such changes, more vigorous enforcement policies or the discovery of currently unknown conditions may require substantial additional environmental expenditures.

DB02:8549217.27 068125.1001

The Debtors are also subject to potential liability for the investigation and cleanup of environmental contamination at each of the properties that the Debtors own or operate and at off-site locations where they arranged for the disposal of hazardous wastes. For instance, soil and groundwater contamination has been identified in the past at the Debtors' Illinois campus. If any of these sites are subject to investigation and/or remediation requirements, the Debtors may be responsible under the Comprehensive Environmental Response, Compensation and Liability Act or other environmental laws for all or part of the costs of such investigation and/or remediation, and for damages to natural resources. The Debtors may also be subject to related claims by private parties alleging property damage or personal injury due to exposure to hazardous or other materials at or from such properties. The ultimate costs of any liabilities that may be identified or the discovery of additional contaminants could adversely impact their results of operation or financial condition.

In addition, the hazards and risks associated with producing and transporting the Debtors' products (such as fires, natural disasters, explosions, abnormal pressures and spills) may result in spills or releases of hazardous substances, and may result in claims from governmental authorities or third parties relating to actual or alleged personal injury, property damage, or damages to natural resources. The Debtors maintain insurance coverage against some, but not all, potential losses caused by their operations. The Debtors' coverage includes, but is not limited to, physical damage to assets, employer's liability, comprehensive general liability, automobile liability and workers' compensation. However, the Debtors do not carry environmental insurance. The occurrence of events which result in significant personal injury or damage to the Debtors property, natural resources or third parties that is not covered by insurance could have a material adverse impact on the Reorganized Debtors' results of operations and financial condition.

The Debtors' air emissions are subject to the federal Clean Air Act, as amended, and similar state laws which generally require them to obtain and maintain air emission permits for ongoing operations as well as for any expansion of existing facilities or any new facilities. Obtaining and maintaining those permits requires the Debtors to incur costs, and any future more stringent standards may result in increased costs and may limit or interfere with the Reorganized Debtors' operating flexibility. In addition, the permits ultimately issued may impose conditions which are more costly to implement than anticipated. These costs could have a material adverse effect on the Debtors' financial condition, and could adversely affect the Debtors in their efforts to compete with foreign producers not subject to such stringent requirements.

Federal and state environmental authorities have been investigating alleged excess VOC emissions and other air emissions from many U.S. ethanol plants, including the Pekin, Illinois facility. The investigation relating to the Illinois wet mill facility is still pending, and the Debtors could be required to install additional air pollution control equipment or take other measures to control air pollutant emissions at that facility. If authorities require the Debtors to install controls, they would anticipate that costs would be higher than the approximately $3.4 million incurred in connection with a similar matter at the Aurora, Nebraska facility due to the larger size of the Illinois wet mill facility. In addition, if the authorities determine the Debtors' emissions were in violation of applicable law, they would likely be required to pay fines that could be material, and it is unclear whether these would be afforded priority status.

85

The Debtors have made, and expect to continue making, significant capital expenditures on an ongoing basis to comply with increasingly stringent environmental laws, regulations and permits, including compliance with the EPA National Emissions Standard for Hazardous Air Pollutants, or NESHAP, for industrial, commercial and institutional boilers and process heaters. This NESHAP was issued but subsequently vacated. The vacated version of the rule required the Debtors to implement maximum achievable control technology at the Pekin, Illinois wet mill facility to reduce hazardous air pollutant emissions from their boilers. The Debtors expect the EPA will revise the rule to impose more stringent requirements than were contained in the vacated version. In the absence of a final EPA NESHAP for industrial, commercial and institutional boilers and process heaters, the Debtors are working with state authorities to determine what technology will be required at the Pekin, Illinois wet mill facility and when such technology must be installed. The Debtors currently cannot estimate the amount that will be needed to comply with any future federal or state technology requirement regarding air emissions from their boilers.

The Debtors currently generate revenue from the sale of carbon dioxide, which is a co-product of the ethanol production process at each of their Illinois and Nebraska facilities. New laws or regulations relating to the production, disposal or emissions of carbon dioxide may require the Debtors to incur significant additional costs and may also adversely affect their ability to continue generating revenue from carbon dioxide sales.

### 10. Competitive Environment

The Debtors face extensive competition in their industry. Certain of the Debtors' competitors are subsidiaries of larger enterprises with significant intra-enterprise financing capabilities. Other competitors are cooperatives comprised of individual farmers who have successfully competed against larger producers. Individual farmers directly involved in the ethanol production process earn their livelihood through the sale of corn, and may not be as focused on obtaining optimal value for their produced ethanol. The Debtors face the threat of consolidation in the industry, including consolidation and elimination occuring as a result of a number of bankruptcy filings by ethanol producers in the last year. Additionally, the Debtors have faced competition from foreign ethanol producers who are exempted from tariffs and duties on ethanol imports pursuant to the Caribbean Basin Initiative or North American Free Trade Agreement. Future relaxation in the barriers to entry affecting foreign producers will lead to increased competition and may reduce the Reorganized Debtors' market share.

In addition to existing ethanol producers, certain competitors are seeking to develop an alternative to ethanol, biobutonal, which purports to have significant performance and environmental benefits over ethanol. If biobutonal is successfully developed and manufactured and sold in the United States, the Reorganized Debtors could face significant competition and may see a decline in sales.

### 11. Consumer and Industry Opposition to Ethanol

Some consumers have expressed a belief that the use of ethanol will have a negative impact on retail gasoline prices or is the reason for increases in food prices. Many also believe that ethanol adds to air pollution and harms car and truck engines. Still other consumers

believe that the process of producing ethanol actually uses more fossil energy, such as oil and natural gas, than the amount of energy produced by ethanol. These consumer beliefs could be wide-spread in the future. If consumers choose not to buy ethanol blended fuels, it would affect the demand for the ethanol produced by the Reorganized Debtors which could lower demand for their product and negatively affect profitability.

Although many trade groups, academics and governmental agencies have supported ethanol as a fuel additive that promotes a cleaner environment, others have criticized ethanol production as consuming considerably more energy and emitting more greenhouse gases than other biofuels. In particular, two 2008 studies conclude that the current production of corn-based ethanol results in more greenhouse gas emissions than conventional fuels if both direct and indirect greenhouse gas emissions, including those resulting from land use changes resulting from planting crops for ethanol feedstocks, are taken into account. Other studies have suggested that corn-based ethanol is less efficient than ethanol produced from switch grass or wheat grain. If these views gain acceptance, support for existing measures promoting use and domestic production of corn-based ethanol could decline, leading to reduction or repeal of these measures. Reductions in these subsidies and promotions would have an adverse effect on the Reorganized Debtors' financial performance.

### 12. Complaints or Litigation

The Debtors are from time to time subject to employee claims alleging injuries and claims from customers, vendors and other parties with whom the Debtors' have a business relationship. Prior to the Petition Date, the Debtors were parties to a number of actions – both as plaintiff and defendants – arising out of the Debtors' Marketing Alliance. Additionally, certain Debtors are plaintiffs in the Auction Rate Securities Litigation which seeks a substantial sum from JPM and JPMSI as a result of the Debtors' purchase of auction rate securities. Regardless of whether any claims against the Reorganized Debtors are valid or whether the Reorganized Debtors ultimately prevail in pending or future litigation, claims may be expensive to defend and may divert time and money away from the Reorganized Debtors' operations and hurt the Reorganized Debtors' financial performance which may not necessarily be offset by a recovery of damages by the Reorganized Debtors. A significant judgment for any claim(s) could materially adversely affect the Reorganized Debtors' financial condition or results of operations.

### C. Ability to Refinance Certain Indebtedness and Restrictions Imposed by Indebtedness

As discussed above, following the Effective Date, the Reorganized Debtors' working capital and liquidity needs are anticipated to be funded by the issuance of $105 million in Senior Secured Notes and entry into the $20 million ABL Credit Facility. The Exit Financing will likely restrict, among other things, the Reorganized Debtors' ability to enter into various transactions. In addition, the Exit Financing may contain certain other and more restrictive covenants. A breach of any of these terms could result in a default under the Exit Facilities. It is also anticipated that substantially all of the assets of the Reorganized Debtors will be pledged as security under the Exit Financing (the relative priority of which will be set forth in the applicable loan documents for the Exit Financing).

DB02:8549217.27

068125.1001

The Debtors cannot be certain that they will be able to generate sufficient cash flow from operations to enable them to repay their indebtedness under the Exit Financing and they may not be able to extend the maturity of or refinance this indebtedness on commercially reasonable terms or at all.

## D. Certain Bankruptcy Law Considerations

### 1. Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Court, there can be no certainty that the Court will reach the same conclusion. Moreover, there can be no certainty that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified.

### 2. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date should occur during the first calendar quarter of 2010, there can be no certainty as to such timing or that such conditions to the Effective Date contained in the Plan will ever occur.

## E. Certain Risks Relating to the Equity Securities Issued under the Plan

### 1. Significant Holders

If holders of significant numbers of shares of New ARE Holdings Common Stock after the Effective Date were to act as a group, such holders could be in a position to control the outcome of actions requiring stockholder approval, including the election of directors. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New ARE Holdings Common Stock.

Further, one or more of the holders of a significant number of shares of New ARE Holdings Common Stock may determine to sell all or a large portion of their shares of New ARE Holdings Common Stock in a short period of time, which may affect the market price of the New ARE Holdings Common Stock.

### 2. Lack of Established Market for New ARE Holdings Common Stock

The New ARE Holdings Common Stock issued under the Plan will be a new issue of stock for which no trading market currently exists and will not be listed on a national securities exchange. While the Debtors have committed to use their commercially reasonable best efforts to have the New ARE Holdings Common Stock listed on a national securities exchange, there can be no certainty that an active trading market for the New ARE Holdings Common Stock will develop. Accordingly, no certainty can be given that a holder of New ARE Holdings Common Stock will be readily able to sell such securities in the future or as to the price at which any such sale may occur. If such market were to develop, the liquidity of the market for such securities and the prices at which such securities would trade will depend upon many

factors, including the number of holders, investor expectations for the Reorganized Debtors, and other factors beyond the Reorganized Debtor's control. In addition, the New ARE Holdings Common Stock will be issued to pre-petition creditors of the Debtors, some of whom may prefer to liquidate their investment rather than to hold it on a long-term basis, which may create an initial imbalance in the market if and when one were to develop.

While the Plan was developed based on an assumed reorganization value of $24.69 per share for the New ARE Holdings Common Stock (based on the midpoint of the estimated enterprise value and without giving effect to the potentially dilutive impact of any options or warrants to be issued or granted pursuant to the Management Incentive Plan (*see* section Article V(E) of the Plan, entitled, "Reorganized Debtors' Management Incentive Plan"), or the Warrants proposed to be issued under the Plan), such valuations are not an estimate of the prices at which the New ARE Holdings Common Stock may trade on and after the Effective Date. Such securities could trade at prices higher or lower than the values ascribed to such securities in this Disclosure Statement, depending on many factors, including prevailing interest rates, markets for similar securities, the general economic and industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

## X.

## CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.     Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims and Interests in Classes 2(a) – 2(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) of the Plan are or may be Impaired, but only the holders of Allowed Claims in Classes 2(a) – 2(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) are entitled to vote to accept or reject the Plan. Holders of Interests in Classes 9(b) through 9(f) are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan. The Claims in Classes 1(a) – 1(f), 3(a) – 3(f), 4(a) and 8(a) – 8(f) are unimpaired. The holders of Allowed Claims in Classes 1(a) – 1(f), 3(a) – 3(f), 4(a) and 8(a) – 8(f) are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Class therefore is not required under section 1126(f) of the Bankruptcy Code.

As to Classes of Claims entitled to vote on the Plan, section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan. As to Classes of Interests entitled to vote on the Plan, the Bankruptcy Code defines acceptance of a plan by a class of equity interest holders as acceptance by holders of at least two thirds in amount of the allowed interests by holders that have timely voted to accept or reject a plan.

DB02:8549217.27                                                                                      068125.1001

A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Claim in Class 2(a) – 2(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) to which an objection or request for estimation is pending, or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed, is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing such Claim for the purpose of voting on the Plan. In addition, the Debtors propose that Ballots cast by alleged creditors whose claims (a) are not listed on the Debtors' Schedules of liabilities or (b) are listed as disputed, contingent and/or unliquidated on the Debtors' Schedules of liabilities, but who have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate claim amount requirements of that section.

## B. The Confirmation Hearing

The Bankruptcy Code requires the Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for [February 24, 2010 at 3:00 p.m.], prevailing Eastern Time, before the Honorable Kevin Gross at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or other Interest(s) held by the objector. Any such objection must be filed with the Court and served so that it is received by the Court and the following parties and the other parties requesting notice in these cases on or before [February 17, 2010 at 4:00 pm.]:

To the Debtors: Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, attention: George T. Henning, Jr. and Christopher A. Nichols, with a copy to Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19801, attention: Joel A. Waite and Matthew B. Lunn, Tel: (302) 571-6600, Fax: (302) 571-1253.

To the Creditors Committee: In care of Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801, attention: Scott D. Cousins and Donald J. Detweiler, Tel: (302) 661-7000, Fax: (302) 661-7360.Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Court.

To the Backstop Purchasers: In care of (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, attention: Michael Stamer and Shaya Rochester, Tel: (212) 872-1000, Fax: (212) 872-1002, and (b) Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, attention: Bonnie Glantz Fatell and Stanley Tarr, Tel: (302) 425-6400, Fax: (302) 425-6464.

## C.    Confirmation

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the Plan.

### 1.    Acceptance

Classes 2(a) – 2(f), 3(a) – 3(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) of the Plan are Impaired under the Plan. Classes 1, 3, 4(a) and 8 of the Plan are unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan. Classes 9(b) through 9(f) are deemed to reject the Plan because they will receive no distribution under the Plan. Thus, only Classes 2(a) – 2(f), 3(a) – 3(f), 4(b), 5(a) – 5(f), 6(a) – 6(f), 7(a) – 7(f) and 9(a) are entitled to vote to accept or reject the Plan. Because Classes 9(b) through 9(f) are Impaired and are deemed to reject the Plan, the Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to such Classes. In addition, to the extent any Impaired Class(es) entitled to vote on the Plan reject(s) the Plan, the Debtors may also seek the nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such rejecting Class(es). Finally, the Debtors, subject to the Backstop Purchasers Approval Condition, reserve their rights to amend the Plan in accordance with Article IX(B) of the Plan with respect to any such rejecting Class(es).

### 2.    Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, also referred to as a "cram down," it must be demonstrated to the Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of creditors or equity holders if:

(a)    <u>Secured Creditors</u>. Either (i) each Impaired creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its Allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its Allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

(b)    <u>Unsecured Creditors</u>. Either (i) each Impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and Interests that are junior to the Claims or Interests of the nonaccepting class will not receive any property under the Plan.

(c)    <u>Equity Interests</u>. Either (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation

preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its interest or (ii) the holder of an Interest that is junior to the nonaccepting class will not receive or retain any property under the Plan.

### 3. Feasibility

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. Based upon the Financial Projections attached as Exhibit D hereto and the assumptions set forth therein, the Debtors believe that they will be able to make all distributions required pursuant to the Plan and to fund their operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 4. Best Interests Test

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Equity Interests resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash, if any, held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared

with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and Interest holders in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under chapter 7 and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7.

The Debtors' liquidation analysis is attached hereto as Exhibit E (the "Liquidation Analysis"). The information set forth in Exhibit E provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Court would liquidate the assets of the Debtors' estates. The Liquidation Analysis was prepared by the Debtors with the assistance of Houlihan Lokey.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of 6 months, allowing for, among other things, the (i) discontinuation of the Debtors' operations, (ii) sale of assets and (iii) collection of receivables.

## XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) an alternative plan of reorganization or a plan of liquidation, (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (iii) dismissal of the Chapter 11 Cases.

### A.  Alternative Plan of Reorganization or Plan of Liquidation

If the Plan is not confirmed, the Court could confirm a different plan. The Plan is, in essence, a reorganization of the Debtors' business and a different plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. The Debtors believe that the Plan, as described herein, enables creditors and interests holders to realize the highest and best value under the circumstances. The Debtors believe that any liquidation of the Debtors' assets or alternative form of chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty

provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs.

## B.    Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached as Exhibit E to this Disclosure Statement. For the reasons articulated in Article E above, the Debtors believe that a liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan.

## C.    Dismissal of the Chapter 11 Cases

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Chapter 11 Cases would likely result in acceleration of the obligations of the Debtors under the Prepetition Secured Credit Facility and the Prepetition Indenture in accordance with their respective terms. Moreover, the DIP Lenders and the Prepetition Secured Lenders would most likely be permitted to foreclose upon the assets that are subject to their Liens, which is substantially all of the Debtors' assets and Cash. Dismissal would also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

## XII.

## SECURITIES LAW MATTERS

## A.    Exemption From Registration Requirements for Issuances of New ARE Holdings Common Stock and Warrants Pursuant to Plan.

Upon consummation of the Plan, the Debtors will rely on Section 1145 of the Bankruptcy Code to exempt the issuance of shares of New ARE Holdings Common Stock from the Unsecured Claims Stock Pool and the Warrants from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Debtors believe that New ARE Holdings

is a successor to ARE Holdings under the Plan for purposes of Section 1145 of the Bankruptcy Code and that the offer and sale of the shares of New ARE Holdings Common Stock from the Unsecured Claims Stock Pool and the offer and sale of the Warrants pursuant to the Plan satisfy the requirements of Section 1145 and are therefore exempt from the registration requirements of the Securities Act and state securities laws.

> ### B. Subsequent Transfers of New ARE Holdings Common Stock and Warrants Issued Pursuant to the Plan.

In general, recipients of the New ARE Holdings Common Stock from the Unsecured Claims Stock Pool and recipients of the Warrants will be able to resell the securities so received without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act of 1933 (the "Securities Act"), unless the holder of any such security is an "underwriter" within the meaning of Section 1145(b) of the Bankruptcy Code. In addition, the New ARE Holdings Common Stock and Warrants received pursuant to the Plan generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of such securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer. To the extent that recipients of the New ARE Holdings Common Stock or Warrants under the Plan are deemed to be "underwriters," the resale of such securities by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such New ARE Holdings Common Stock or Warrants without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW ARE HOLDINGS COMMON STOCK, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW ARE HOLDINGS COMMON STOCK ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

**C.**   **Issuance of Senior Secured Notes and Additional New Equity**

In connection with the emergence of the Reorganized Debtors, New ARE Holdings expects to offer and sell up to $105,000,000 in aggregate principal amount of Senior Secured Notes.  The Senior Secured Notes will be sold together with additional shares of Common Stock of New ARE Holdings, Inc. (the "Noteholder Equity").  The Senior Secured Notes and the Noteholder Equity will be offered together in units.

The offer and sale of the Senior Secured Notes and the Noteholder Equity shall be exempt from registration under the Securities Act by virtue of section 4(2) thereof.  Unlike the issuance of shares of New ARE Holdings, Inc. Common Stock and Warrants pursuant to the Plan, the offer and sale of the Senior Secured Notes and the related shares of Common Stock will not be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code.

**D.**   **Resale of Senior Secured Notes and Noteholder Equity**

The Senior Secured Notes and Noteholder Equity will be, upon issuance, "restricted securities" within the meaning of Rule 144 of the Securities Act.  On or after the Effective Date, the Reorganized Debtors shall enter into a registration rights agreement (the "Registration Rights Agreement") relating to the Senior Secured Notes and Noteholder Equity. The Registration Rights Agreement shall provide, among other things, for (i) the registered exchange of the Senior Secured Notes for a new issue of substantially identical debt securities (the "Exchange Registration") and (ii) registration of the offer and resale of the Noteholder Equity (and any other shares of New ARE Holdings Common Stock held by any Backstop Purchaser) (the "Resale Registration").  With respect to the Exchange Registration, the Registration Rights Agreement will obligate the Reorganized Debtors to:  (i) file a registration statement with the Securities and Exchange Commission enabling the holders of the Senior Secured Notes to exchange the privately issued Senior Secured Notes for publicly registered notes with substantially identical terms within 180 days after the Effective Date; (ii) cause such registration statement to become effective within 365 days after the Effective Date and to complete the exchange offer within 50 days after the effective date of such registration statement; and (iii) file a shelf registration statement for the resale of the Senior Secured Notes if the Reorganized Debtors cannot effect an exchange offer within the time periods listed above and in certain other circumstances.  With respect to the Resale Registration, the Registration Rights Agreement will obligate the Reorganized Debtors to:  (i) file a registration statement with the Securities and Exchange Commission seeking to register the offer and resale of the Noteholder New Equity (together with any other shares of New ARE Holdings Common Stock held by any Backstop Purchaser) (collectively, "Registrable Securities") pursuant to Rule 415 under the Securities Act within 180 days after the Effective Date; (ii) cause such registration statement to become effective within 365 days after the Effective Date; and (iii) cause such registration statement to remain effective, and supplemented and amended as required by the Securities Act, throughout the period ending on the date which is the earliest to occur of (A) the date on which all shares of Registrable Securities registered under such registration statement may be sold in a three-month period under Rule 144 under the Securities Act, (B) the date all such shares of Registrable Securities registered under such registration statement have been sold and (C) two years after the date on which such registration statement became effective with

96

respect to the offer and sale of Registrable Securities, plus the aggregate number of days in all applicable "suspension periods", if any, as set forth in the Registration Rights Agreement.

# XIII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion is not a complete analysis or listing of all potential tax issues or considerations.

The discussion of U.S. federal tax considerations set forth in this Disclosure Statement is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), U.S. Treasury regulations promulgated thereunder (the "Regulations"), court decisions, and rulings and procedures issued by the Internal Revenue Service (the "IRS"). U.S. federal income tax laws and Regulations, and the interpretations thereof, are subject to change, that could adversely affect the Debtors or the Holder(s) of a Claim or Interest. Should there be any change, including any change having retroactive effect, in the IRC, the Regulations, any administrative guidance issued thereunder, or in the prevailing judicial interpretation of the foregoing, the discussion contained herein would necessarily have to be reevaluated in light of such change.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan, and no request for such a ruling is anticipated. No opinion of tax counsel or advisor has been requested or obtained with respect to the Plan, and no request for such an opinion is anticipated. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**IRS Circular 230 Disclosure- Any discussion of U.S. federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are related. Such discussion is not intended or written to be tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal or state tax penalties that may be imposed on such person. Each Holder of a Claim or Interest should seek advice based on its particular facts and circumstances from an independent tax advisor.**

### A.    U.S. Federal Income Tax Consequences to the Debtors

### 1.    Cancellation of Indebtedness Income.

A debtor generally must recognize income from the cancellation of debt ("COD Income") in the event that its debt is discharged for consideration to a creditor for an amount that is less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor, transferred to the creditor. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the fair

market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange. COD Income is not required to be recognized, and is excluded from gross income, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan confirmed by the court (the "Bankruptcy Exception"). If the Bankruptcy Exception applies, the debtor is required to reduce its tax attributes by the amount of COD Income, generally in the following order: (i) any net operating loss for the taxable year and carryovers to such year ("NOLs"), (ii) general business and minimum tax credit carryforwards, (iii) capital losses for the taxable year and carryovers to such year, (iv) the tax basis of the debtor's assets, and (v) foreign tax credit carryforwards (such items, collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Floor Rule"). A debtor may elect to first apply any portion of the reduction to the tax basis of the debtor's depreciable assets, with any remaining balance applied to the debtor's other Tax Attributes in the order stated above. The Floor Rule does not apply to any reduction in tax basis by reason of this election. The Debtors anticipate incurring COD Income as a result of the confirmation of the Plan. The Debtors anticipate that they will not elect to apply the required Tax Attribute reduction first to the debtors' depreciable assets and the Debtors Tax Attributes will be subject to the general rule of Tax Attribute reduction described above.

In lieu of the rules for COD Income exclusion and Tax Attribute reduction described above, debtors that realize COD Income in 2009 or 2010 generally may elect to take into taxable income the COD Income with respect to discharged debt in equal installments in 2014 through 2018 (i.e., the debtor would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized and must be made on the debtor's tax return for the year that includes the transaction that creates the COD Income. If such an election is made, the COD Income recognition is deferred during the periods preceding the beginning of the installment dates 2014-2018. Certain Original Issue Discount ("OID"), interest deductions that may be associated with the restructuring of the underlying debtor's obligations may also be deferred to the installment recognition periods, although the debt holder of such an OID instrument would still be required to accrue the interest income in each applicable deferral period. The Debtors anticipate that they will not make the above described deferral election for COD Income.

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated U.S. federal income tax return (the "Consolidated Attribute Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor member of a consolidated group are reduced first. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the tax basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOLs attributable to other members, but not including the tax basis of property of other members) must be reduced. In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before the Tax Attributes of non-debtor members of the consolidated

group are reduced as a result of any COD Income. In addition, to the extent that the debtor member is required to reduce its tax basis in the stock of another group member that is a subsidiary of the debtor member, that lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member. Any required Tax Attribute reduction takes place after the consolidated group has determined its taxable income, and any U.S. federal income tax liability, for the taxable year in which the COD Income is realized.

The Debtors expect to realize substantial COD Income as a result of the implementation of the Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the equity interests in New ARE Holdings, which cannot be known with certainty until after the Effective Date. Assuming that the equity interests in New ARE Holdings are valued consistently with the valuation assumptions utilized in this Disclosure Statement, the Debtors estimate that they will realize COD Income of approximately $135 million to $175 million for U.S. federal income tax purposes. Pursuant to the Bankruptcy Exception, this COD Income will not be recognized as taxable income, but the Debtor that realizes the COD Income will have to reduce its Tax Attributes after calculating the tax for the taxable year of discharge, consistent with the general rules discussed above.

## 2. Net Operating Losses and Other Tax Attributes.

As of December 31, 2008, the U.S. consolidated group of which ARE Holdings is the common parent (the "ARE Holdings Group") had approximately $41.4 million of NOLs. The debtor applied for and received carryback refunds for the NOLS existing at December 31, 2008. In addition, the ARE Holdings Group expects that it will generate approximately $12.0 million in additional NOLs in 2009. The actual amount could differ based on positions taken on issues currently being researched.

As a general rule, an NOL incurred by a debtor during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years (five preceding taxable years in the case of qualifying NOLs generated in 2008 and 2009) and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years. Capital losses of corporations can only be used to offset capital gains and generally can be carried back three years or forward five years for such purposes. Certain of the ARE Holdings Group NOLs will be carried back and refunds applied for under the current carryback provisions. The NOLs have not been examined or approved by the IRS and remain subject to adjustment or disallowance.

The Debtors expect that the COD Income realized by the ARE Holdings Group will exceed its NOLs and general business credits and minimum tax credits (which credits are reduced 33⅓ cents for each dollar of COD Income) and thus that these Tax Attributes will be eliminated. The Debtors anticipate that the remaining reduction to Tax Attributes will require that the Debtors' tax basis in assets be reduced.

DB02:8549217.27 068125.1001

### 3. Limitations on Future Use of NOL's and Certain Tax Attributes

Generally, the IRC provides that in certain circumstances in which a corporation experiences a greater than 50 ownership change, NOL carryovers of the corporation to post change periods are subject to limitations on use of such NOLs against post-change income. The annual limitation is based on a published rate (the "Tax Exempt Rate") multiplied by the equity value of the corporation the day before the change. Adjustment to this value is made for pre-change contributions and excess non-business assets. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. An additional limitation is applicable to certain items of built-in-loss inherent in assets held by the corporation, or accrued but unrecognized liabilities as defined under tax rules, owed by a corporation. ("BILs") If any stock held by a 50% owner is treated by such owner as becoming worthless during any taxable year of the owner, and the stock continues to be held by such owner at the close of that owner's taxable year, the owner will be treated as having acquired the stock held on the first day of the next taxable year. Effectively this creates a potential 50% ownership change on the first day of the subsequent year with a value for the deemed acquired stock of zero.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's pre-ownership change NOLs are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another greater than 50% ownership change within two years after the Plan confirmation, then the Debtors' pre-ownership change NOLs would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because a debtor does not qualify for it or a debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes a greater than 50% ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

The Debtors' anticipate making an election to avoid the 382(l)(5) Exception.

### 4. Alternative Minimum Tax Implications

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the

DB02:8549217.27                                           068125.1001

corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryovers. Additionally, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to each asset's proportionate share (determined on the basis of respective fair market values of all assets) of the fair market value of the assets of the corporation, immediately before the ownership change.

### 5.  State Income Tax Treatment of Debtors

While many states begin the calculations of state taxable income with the amount of federal taxable income, numerous adjustments and modifications exist, such that the COD Income exclusion and Tax Attribute reduction provisions may differ from the federal rules. This disclosure generally does not address state, local, or foreign tax consequences, or the consequences of any federal tax other than the federal income tax.

### B.  Federal Income Tax Consequences to the Holders of Claims

The U.S. federal income tax consequences of the transactions provided in the Plan to Holders of Claims or Interests that are United States Persons will depend upon a number of factors. For purposes of this discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States; (2) that is a domestic partnership; (3) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof; (4) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (5) that is a trust (a) over which a court within the United States is able to exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control, or (b) that has validly elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" means a beneficial owner of a Claim or Interest that is a United States Person.

The U.S. federal income tax consequences to Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or any prior year; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for U.S. federal income tax purposes. Certain holders of Claims or Interests (including for example, foreign persons, banks, governmental authorities or agencies, financial institutions,

insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies) may be subject to special rules not addressed in this summary. This summary does not apply to Holders of Claims or Interests that are not United States persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS ADVISED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES, (INCLUDING UNDER ANY APPLICABLE STATE, LOCAL, AND FOREIGN LAW), OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### 1. General

A Holder who receives cash or other consideration (including, without limitation, New ARE Holdings Common Stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent consistent with the Plan, to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by Holders of Claims or Interests who hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the Holder for more than one year and will be short-term if the Claim or Interest was held for one year or less. Any capital losses realized

generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

If not otherwise so required, a Holder who receives New ARE Holdings Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New ARE Holdings Common Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts that would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but that was not included in income because of the application of the cash method of accounting.

## 2. Market Discount

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if the debt obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after the Holder's acquisition of the debt obligation. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

## 3. Holders of Class 1 Claims

Holders of Class 1 Claims are unimpaired by the Plan and should recognize neither gain nor loss as a result of implementation of the Plan.

## 4. Holders of Class 2 Claims.

A Holder of a Class 2 Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of Cash it receives. The Holder of such Claim will recognize the full amount of its gain or loss realized on the exchange. To the extent cash is received as interest relating to the Allowed Prepetition Secured Credit Facility claim for LC Obligations, such amounts will constitute ordinary income irrespective of gain or loss recognized on the exchange.

## 5. Holders of Class 3 Claims

Holders of Class 3 Claims are unimpaired by the Plan and should recognize neither gain nor loss as a result of implementation of the Plan.

DB02:8549217.27 068125.1001

### 6. Holders of Class 4(a) Claim

Holders of Class 4(a) Claims are unimpaired by the Plan and should recognize neither gain nor loss as a result of implementation of the Plan.

### 7. Holders of Class 4(b) Claims

A Holder of a Class 4(b) Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) (depending on whether the Holder receives a secured non-recourse note (a "Note"), Cash, or the Collateral), either (A) the "issue price" of the Note it receives, or (B) the amount of Cash it receives or (C) the fair market value of the Collateral. The "issue price" of the Note is generally expected to equal the principal amount thereof if neither the Note nor the Class 4(b) Claim is treated as "publicly traded." If the Note is treated as publicly traded, then the issue price of the Note will be the fair market value of the Note on the Effective Date. If the Note is not treated as publicly traded but the Class 4(b) Claim is treated as publicly traded, then the issue price of the Note will be determined by reference to the fair market value of the Class 4(b) Claim. For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60-day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions, or (iii) in certain circumstances, price quotations are readily available from dealers, brokers or traders.

If a Holder of the Class 4(b) Claim receives the Note in exchange for the Holder's Claim and both the Claim and Note are considered a "security" for U.S. federal income tax purposes (see "Definition of 'Security'" below), then the exchange should be treated as a recapitalization for U.S. federal income tax purposes. In such a case, the Holder would not recognize any gain or loss on the exchange, its tax basis in the Note would be the same as its basis in the Class 4(b) Claim surrendered, and its holding period in Note would include the holding period in the Class 4(b) Claim surrendered.

If either the Class 4(b) Claim, or Note, does not constitute a "security" for U.S. federal income tax purposes or if the Holder of the Class 4(b) Claim receives cash or Collateral in exchange for its Claim, then the exchange will be a taxable transaction, and the Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange. In such a case, the Holder's initial tax basis in the Note the Holder receives in exchange for its Claim will equal the issue price of the Note and the Holder's holding period would commence on the day after the Effective Date. If the Holder receives the Collateral, the Holder's initial tax basis in the Collateral will be the fair market value of the Collateral as of the Effective Date, and the Holder's holding period would commence on the day after the Effective Date.

DB02:8549217.27  068125.1001

If a Holder receives a Note, the Holder generally will be required to include interest on the Note in income in accordance with such Holder's regular method of tax accounting. If, however, the stated principal amount of the Note exceeds its issue price (determined as described above) by more than a specified de minimis amount (generally, 25 basis points times the weighted average maturity), such excess will be treated as OID for U.S. federal income tax purposes. In such a case, the Holder of the Note will be required to include in income the amount of such OID over the term of the Note based on the constant yield method and will be required to include amounts in income before they are received. The Holder's tax basis in the Note will be increased by the amount of OID included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to the Note.

### 8. Holder of Class 5 Claims

The holder of a Class 5 Claim should be deemed to own a "security" for federal income tax purposes since an Allowed Prepetition Unsecured Note Claim derives from a note with a term of more than ten years. See "Definition of Security" below. Therefore, the exchange of a Class 5 Claim for New ARE Holdings Common Stock should be treated as a tax-free reorganization for U.S. federal income tax purposes. A holder of a Class 5 Claim should not recognize any gain or loss for U.S. federal tax purposes with respect to the exchange, the holder's initial tax basis is the New ARE Holdings Common Stock it receives in exchange for its Claim should equal its adjusted tax basis in such Claim, and the holder's holding period in the New ARE Holdings Common Stock it receives in the exchange will include its holding period in the Claim surrendered.

In addition, the holder of a Class 5 Claim who participates in the Senior Secured Notes offering will have the tax consequences discussed below in "Senior Secured Notes."

### 9. Holder of Class 6 Claims

A Holder of a Class 6 Claim will realize gain or loss for U.S. federal income tax purposes on the exchange of the Holder's Claim for New ARE Holdings Common Stock equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New ARE Holdings Common Stock the Holder receives in the exchange.

The tax consequences to a Holder of a Class 6 Claim depends on whether the Holder's Claim is a "security" for U.S. federal income tax purposes and whether its Claim is a security of ARE Holdings, ARE Inc., or NELLC. See "Definition of 'Security'" below. If the Claim does not constitute a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New ARE Holdings Common Stock will be a taxable transaction, and the Holder of such Claim will be required to recognize gain or loss equal to the full amount of the gain or loss realized on the exchange. In such a case, a Holder's initial tax basis in the New ARE Holdings Common Stock the Holder receives in the exchange will equal the fair market value of such New ARE Holdings Common Stock on the Effective Date, and its holding period in its New ARE Holdings Common Stock would commence on the day after the Effective Date.

DB02:8549217.27                                                               068125.1001

If a Holder's Class 6 Claim constitutes a "security" in ARE Holdings for U.S. federal income tax purposes, then the exchange of the Claim for New ARE Holdings Common Stock should be treated as a tax-free transaction for U.S. federal income tax purposes. In such a case, the Holder should not recognize any gain or loss realized for U.S. federal income tax purposes with respect to the exchange, the Holder's initial tax basis in the New ARE Holdings Common Stock it receives in exchange for its Claim should equal its adjusted tax basis in such Claim, and the Holder's holding period in the New ARE Holdings Common Stock it receives in the exchange will include its holding period in the Claim surrendered.

Holders of Class 6 Claims against ARE Inc., or NELLC, may recognize gain or loss on the exchange of such Claims for New ARE Holdings Common Stock. Although certain claims against ARE Inc. or NELLC may constitute securities, the exchange of ARE Inc. or NELLC Class 6 Claims for New ARE Holdings Common Stock likely may not qualify as a tax-free reorganization because these Class 6 Claims were issued by subsidiaries of ARE Holdings that are not disregarded entities for U.S. income tax purposes, and will be exchanged for equity in New ARE Holdings. Accordingly, Holders of these Class 6 Claims may recognize gain or loss equal to the difference between: (i) the fair market value of the New ARE Holdings Common Stock (as of the effective date) received in exchange for the Class 6 Claims; and (ii) the Holder's adjusted basis in these Claims.

To the extent that a portion of the New ARE Holdings Common Stock received in exchange for the Class 6 Claims is allocable to accrued but untaxed interest income, the Holder may recognize ordinary income. If gains or losses are recognized, a Holder's tax basis in the New ARE Holdings Common Stock received should equal the fair market value of the New ARE Holdings Common Stock as of the Effective Date, and a Holder's holding period for the New ARE Holdings Common Stock should begin on the day following the Effective Date.

### 10. Holder of Class 7 Claims

A Holder of a Class 7 Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of Cash it receives. The Holder of such Claim will recognize the full amount of its gain or loss realized on the exchange. To the extent cash is received as interest relating to the Claims, such amounts will constitute ordinary income irrespective of gain or loss recognized on the exchange.

### 11. Holders of Class 8 Claims

Holders of Class 8 Claims are unimpaired by the Plan and should recognize neither gain nor loss as a result of implementation of the Plan.

### 12. Holders of Class 9(a) Equity Interests

Pursuant to the Plan, all Class 9(a) Equity Interests will be cancelled, annulled, and extinguished as of the Effective Date, and Holders of these Interests will receive Warrants in exchange for such Interests. As a result, each Holder of Class 9(a) Equity Interests will realize gain or loss for U.S. federal income tax purposes on the exchange of the Holder's Class 9(a)

Equity Interests equal to the difference between (i) the adjusted tax basis in the Class 9(a) Equity Interests surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the Warrant it receives in the exchange. Because the Holder of a Class 9(a) Equity Interest receives only the Warrant, the exchange may not be treated as a tax-free transaction for U.S. federal income tax purposes. In such a case, the Holder would recognize any gain or loss realized for U.S. federal income tax purposes with respect to the exchange, the Holder's initial tax basis in the Warrant the Holder receives in exchange for its Class 9(a) Equity Interest should equal the fair value of the Warrant on the Effective Date, and the Holder's holding period in the Warrant it receives in the exchange would begin the day after the day of the Effective Date.

### 13. Holders of Class 9(b)-(f) Equity Interests

Pursuant to the Plan, all Class 9(b)-(f) Equity Interests will be cancelled, annulled, and extinguished as of the Effective Date, and Holders of these Interests will receive no distributions nor retain any property, in exchange for such Interests. A Holder of a Class 9(b)-(f) Equity Interest should consult its tax advisor with respect to the application of the worthless stock or securities provisions under the IRC.

### 14. Definition of "Security".

The term "security" is not defined in the IRC or in the Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 15. Senior Secured Notes Offering

The Senior Secured Notes will be issued as part of an investment unit and the amount paid for the Senior Secured Note and the New ARE Holdings Common Stock will be allocated between the two securities by the New Board and each person participating in the Senior Secured Notes Offering will agree to report the purchase of the Senior Secured Notes in accordance with the determination of the New Board. The Senior Secured Notes will be issued with original issue discount ("OID") for U.S. federal income tax purposes. The amount of OID is equal to the excess of a Senior Secured Note's "stated redemption price at maturity" over its issue price. The issue price will be the amount allocated to the Senior Secured Notes by the New Board. The "stated redemption price at maturity" of a Senior Secured Note is the sum of all payments required to be made on the Senior Secured Note other than interest which is required to

be paid in cash at least annually. A holder of a Senior Secured Note will be required to accrue OID each year and include such accruals in gross income in advance of the receipt of cash attributable to that income.

### 16.    Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. Non U.S. Holders or Claimants are advised to discuss the impact of the Plan on their tax positions with a tax advisor.

### 17.    Information Reporting and Backup Withholding.

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC.

### C.    Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST AND IS NOT A SUBSTITUTE FOR TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.** **Reservation of Rights.**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this discussion and the other tax related sections of the Plan in accordance with the terms of the Plan and the Bankruptcy Code.

DB02:8549217.27                                                           068125.1001

# XIV.

## CONCLUSION

The Debtors and, subject to the satisfaction of certain terms and conditions, the Backstop Purchasers believe that confirmation of the Plan is in the best interests of all Creditors and Equity Interest holders and urge all creditors who receive ballots to vote in favor of the Plan.

Dated: January 13, 2010

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
Interim Chief Financial Officer

**AVENTINE RENEWABLE ENERGY, LLC**

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
Interim Chief Financial Officer

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
Interim Chief Financial Officer

110

**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name:  George T. Henning, Jr.
Title:  Interim Chief Executive Officer and
       Interim Chief Financial Officer

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name:  George T. Henning, Jr.
Title:  Interim Chief Executive Officer and
       Interim Chief Financial Officer

**AVENTINE POWER, LLC**

By: _____
Name:  George T. Henning, Jr.
Title:  Interim Chief Executive Officer and
       Interim Chief Financial Officer

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name:  George T. Henning, Jr.
Title:  Interim Chief Executive Officer and
       Interim Chief Financial Officer

DB02:8549217.27

068125.1001