# Exhibit A –Plan of Reorganization

THIS PLAN HAS NOT BEEN APPROVED BY THE COURT FOR DISSEMINATION. UNTIL APPROVED, IT SHOULD NOT BE RELIED UPON BY ANY PERSON OR ENTITY, NOR MAY IT BE USED IN CONNECTION WITH ANY SOLICITATION OF VOTES.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware Corporation, *et al.*, | Case No. 09-11214 (KG) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE DATED AS OF JANUARY 13, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Counsel for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
January 13, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

# TABLE OF CONTENTS

Page

I. DEFINITIONS AND CONSTRUCTION OF TERMS .................................................. 2
    A.    Definitions. ......................................................................................... 2
    B.    Interpretation, Application of Definitions and Rules of Construction...... 18

II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS............................. 18
    A.    Introduction. ....................................................................................... 18

III. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
    CLAIMS ............................................................................................................. 23
    A.    Administrative Claims. ....................................................................... 23
    B.    Bar Dates for Administrative Claims.................................................... 23
    C.    DIP Financing Claims. ........................................................................ 24
    D.    Fee Claims. ......................................................................................... 24
    E.    Priority Tax Claims............................................................................. 24

IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................... 25
    A.    Class 1 — Other Priority Claims. ....................................................... 25
    B.    Class 2 — Prepetition Secured Credit Facility Claims........................... 25
    C.    Class 3 — Other Secured Claims......................................................... 27
    D.    Class 4(a) — Kiewit Mt. Vernon Secured Claim. .................................. 28
    E.    Class 4(b) — Kiewit Aurora West Secured Claim. ............................... 28
    F.    Class 5 — Prepetition Unsecured Note Claims. .................................... 29
    G.    Class 6 — General Unsecured Claims. ................................................. 29
    H.    Class 7 — Convenience Claims............................................................ 30
    I.    Class 8 — Intercompany Claims. ........................................................ 30
    J.    Class 9 — Equity Interests................................................................... 30
    K.    Limitation to Full Recovery................................................................. 31

V. PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE REORGANIZED
    DEBTORS ........................................................................................................... 31
    A.    Amendments to Certificates of Incorporation......................................... 31
    B.    Equity Securities to Be Issued Pursuant to the Plan. .............................. 32
    C.    Registration Rights Agreement............................................................. 32
    D.    Appointment of Directors and Officers. ................................................ 33
    E.    Reorganized Debtors' Management Incentive Plan. ............................... 33
    F.    Indemnification of Directors, Officers and Employees. .......................... 34
    G.    Corporate Reorganization. ................................................................... 34

VI. PROVISIONS REGARDING MEANS OF IMPLEMENTATION, VOTING,
    DISTRIBUTIONS, AND TREATMENT OF DISPUTED CLAIMS.................. 34
    A.    Exit Financing. ................................................................................... 34
    B.    Allocation of New ARE Holdings Common Stock and Issuance of New
        Subsidiary Equity Interests. ................................................................. 35

C.      Substantive Consolidation and Merger of ARE LLC into ARE Holdings 36
D.      Voting of Claims. ...................................................................... 36
E.      Distributions. ............................................................................ 36
F.      Estimation. ................................................................................ 42
G.      Nonconsensual Confirmation. ................................................... 42
H.      Amendment and Confirmability of a Plan. ............................... 42
I.       Severability of Plan Provisions. ................................................ 42

VII. EFFECT OF CONFIRMATION OF THE PLAN ....................................... 43
A.      Continued Corporate Existence. ............................................... 43
B.      Dissolution of Creditors Committee. ......................................... 43
C.      Vesting of Property. .................................................................. 43
D.      Discharge of the Debtors. ......................................................... 43
E.      Injunction. ................................................................................ 44
F.      Preservation of Causes of Action. ............................................. 44
G.      Votes Solicited in Good Faith. .................................................. 45
H.      Administrative Claims Incurred After the Confirmation Date. ................ 45
I.       Releases by the Debtors. ........................................................... 45
J.      Releases by non-Debtors. ......................................................... 45
K.      Exculpation and Injunction in Respect of Released Parties. ..................... 46
L.      Preservation of Certain Defenses. ............................................. 46
M.     Term of Bankruptcy Injunction or Stays. .................................. 47
N.      Preservation of Insurance. ........................................................ 47
O.      Indemnification Obligations Owed by the Debtors. .................. 47

VIII. RETENTION OF JURISDICTION ......................................................... 47

IX. MISCELLANEOUS PROVISIONS ........................................................... 48
A.      Payment of Statutory Fees. ....................................................... 48
B.      Modification of the Plan. .......................................................... 48
C.      Governing Law. ....................................................................... 49
D.      Filing or Execution of Additional Documents. .......................... 49
E.      Withholding and Reporting Requirements. ............................... 49
F.      Exemption From Transfer Taxes. .............................................. 49
G.      Section 1145 Exemption. .......................................................... 49
H.      Waiver of Federal Rule of Civil Procedure 62(a). .................... 49
I.       Exhibits/Schedules. .................................................................. 50
J.      Notices. .................................................................................... 50
K.      Plan Supplement. ..................................................................... 50
L.      Conflict. ................................................................................... 50

X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................... 51
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. 51
B.      Cure. ........................................................................................ 51
C.      Rejection Damage Claims. ........................................................ 51

XI. BENEFIT PLANS ................................................................................... 52

A.     Treatment of the Aventine Pension Plan ................................................... 52

XII. EFFECTIVENESS OF THE PLAN.......................................................................... 53
    A.     Conditions Precedent to Effectiveness.................................................... 53
    B.     Waiver of Conditions.............................................................................. 53
    C.     Effect of Failure of Conditions. ............................................................. 54
    D.     Vacatur of Confirmation Order............................................................... 54
    E.     Revocation, Withdrawal, or Non-Consummation. ................................... 54

EXHIBITS

A.     -  Backstop Commitment Agreement

B.     -  Secured Notes Offering Procedures

C.     -  Warrant Term Sheet

## SCHEDULE A

| DEBTOR | ALLOCABLE SHARES OF NEW ARE HOLDINGS COMMON STOCK IN UNSECURED CLAIMS STOCK POOL |
|---|---|
| Consolidated Holdings | 19,219 |
| ARE Inc. | 4,995,417 |
| Aurora West | 68,304 |
| Mt. Vernon | 541,781 |
| Aventine Power | 6,880 |
| NELLC | 1,208,399 |

# INTRODUCTION

Aventine Renewable Energy Holdings, Inc., Aventine Renewable Energy, LLC, Aventine Renewable Energy, Inc., Aventine Renewable Energy – Aurora West, LLC, Aventine Renewable Energy – Mt Vernon, LLC, Aventine Power, LLC, and Nebraska Energy, L.L.C., the above-captioned debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of the Bankruptcy Code.[2]

The Debtors' Chapter 11 Cases are being jointly administered pursuant to an order of the Court, and the Plan is being presented as a joint plan of reorganization of the Debtors for administrative purposes only. Claims against, and Interests in, the Debtors (other than Administrative Claims, Priority Tax Claims, Fee Claims, DIP Financing Claims) are classified in Article II hereof and treated in Article III hereof. The Plan is predicated on the substantive consolidation of and merger of ARE LLC into ARE Holdings. The Plan is not predicated upon and does not provide for the substantive consolidation of the Chapter 11 Cases of any of the Debtors other than ARE Holdings and ARE LLC and nothing herein shall be otherwise construed. Except with respect to ARE Holdings and ARE LLC, this Plan is being proposed with respect to each Debtor individually, and the failure to confirm the Plan with respect to one Debtor shall have no bearing on confirmation of the Plan with respect to any other Debtor.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, results of operations, and projections for future operations and risk factors, together with a summary and analysis of this Plan. All Claim and Interest holders entitled to vote on this Plan should consult the Disclosure Statement and read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

---

[2] Capitalized terms used in this Introduction shall have the meanings ascribed to them herein below.

# I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.  Definitions.

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

| | |
|---|---|
| **ABL Collateral** | means the Collateral (including, without limitation, accounts receivables, inventory, capital stock, certain intellectual property, deposit accounts and investment property) securing the ABL Credit Facility which shall be more fully described in the ABL Credit Facility. |
| **ABL Credit Facility** | means that certain senior secured revolving credit facility with availability of up to $20 million to be entered into by the Reorganized Debtors on, or as soon as practicable after, the Effective Date, on terms substantially similar to those included in the Plan Supplement.   The terms and conditions of the ABL Credit Facility are subject to the Backstop Purchaser Approval Condition. |
| **Administrative Claim** | means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code and Section 503(b)(9) Claims. |
| **Administrative Claims Bar Date** | means the first business day that is thirty (30) days after the Confirmation Date. |

DB02:8993437.11                                                                                        068125.1001

| | |
|---|---|
| ***Allowed*** | means, with reference to any Claim, (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim that is not Disputed by the Claims Objection Deadline or (d) any Claim the amount or existence of which, if Disputed, (i) has been determined by a Final Order of a court of competent jurisdiction other than the Court, or (ii) has been allowed by Final Order of the Court; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Court shall not be considered "Allowed Claims" hereunder. |
| ***ARE – Aurora West*** | means Aventine Renewable Energy – Aurora West, LLC |
| ***ARE Holdings*** | means Aventine Renewable Energy Holdings, Inc. |
| ***ARE Inc.*** | means Aventine Renewable Energy, Inc. |
| ***ARE LLC*** | means Aventine Renewable Energy, LLC |
| ***ARE – Mt. Vernon*** | means Aventine Renewable Energy – Mt. Vernon, LLC |
| ***Auction Rate Securities Litigation*** | means any and all claims and causes of action against JP Morgan Chase Bank, N.A. and JP Morgan Securities, Inc. related to the purchase and sale of certain auction rate securities, including, without limitation, those Claims and Causes of Action asserted in the matter styled as *Aventine Renewable Energy, Inc. v. JP Morgan Securities, Inc. and JPMorgan Chase Bank, N.A.* pending in the Circuit Court for Tazewell County, Illinois. |
| ***Aventine Pension Plan*** | means that certain pension plan established and maintained by ARE Inc. for certain individuals employed by ARE Inc. or its subsidiaries known as the Aventine Renewable Energy, Inc. Hourly Pension Plan. |
| ***Aventine Power*** | means Aventine Power, LLC |
| ***Backstop Commitment Agreement*** | means that certain commitment letter agreement dated as of December 3, 2009, by and among the Debtors |

and the Backstop Purchasers, attached hereto as Exhibit A, pursuant to which the Backstop Purchasers have agreed to purchase the Senior Secured Notes, subject to the terms and conditions set forth therein.

***Backstop Purchaser Approval Condition*** refers to the agreement by and among the Backstop Purchasers and the Debtors, as and to the extent set forth in the Backstop Commitment Agreement, that the Backstop Purchasers' obligation to purchase the Senior Secured Notes is conditioned upon the Plan, Disclosure Statement, Solicitation Order, Confirmation Order, New Corporate Governance Documents, the ABL Credit Facility, the Senior Secured Notes and other specified documents including, without limitation, those in the Plan Supplement being in a form acceptable to the Backstop Purchasers in their sole discretion, provided, that the Majority Backstop Purchasers shall endeavor to consult with the Creditors Committee with respect to the documents specified in the Backstop Commitment Agreement, provided, further, that the failure to consult with the Creditors Committee shall not affect the rights of the Majority Backstop Purchasers.

***Backstop Purchasers*** means Brigade Capital Management LLC, Nomura Corporate Research & Asset Management, Inc., Whitebox Advisors, Senator Investment Group LP, and SEACOR Capital Corporation, each as investment manager, for and on behalf of certain funds, which entities have agreed, pursuant to the Backstop Commitment Agreement to backstop the offering of the Senior Secured Notes.

***Ballots*** means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim (other than to holders not entitled to vote on the Plan) upon which is to be indicated, among other things, acceptance or rejection of the Plan.

***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the date hereof.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and local rules of the Court, as the context may require.

***Bar Date*** means the date(s) set by the Court as the last day for

filing proofs of Claim in the Chapter 11 Cases.

| | |
|---|---|
| ***Business Day*** | means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a). |
| ***Cash*** | means legal tender of the United States of America. |
| ***Causes of Action*** | means all claims, choses in action and causes of action (including those assertable derivatively), liabilities, obligations, suits, debts, sums of money, damages, demands, judgments, whether known or unknown, now owned or hereafter acquired by the Debtors, and the Cash and non-Cash proceeds thereof, whether arising under the Bankruptcy Code or other Federal, state or foreign law, equity or otherwise, including, without limitation, (i) the Auction Rate Securities Litigation, (ii) the action styled as *Aventine Renewable Energy, Inc. v. Agri-Energy, LLC*, pending in the Circuit Court for Tazewell County, Illinois, (iii) the action styled as *Aventine Renewable Energy, Inc. v. e-Biofuels, LLC and JP Morgan Chase Bank, N.A.*, pending in the United States District Court for the Southern District of Indiana, and (iv) any causes of action arising under sections 510, 544, 547, 548, 549, 550, 551 or any other section of the Bankruptcy Code. |
| ***Chapter 11 Cases*** | means the chapter 11 cases commenced by the Debtors. |
| ***Claim*** | means any claim, as such term is defined in section 101(5) of the Bankruptcy Code. |
| ***Claims Agent*** | means The Garden City Group, Inc. |
| ***Claims Objection Deadline*** | means the first business day that is one hundred eighty (180) days after the Effective Date, or such other later date the Court may establish upon a motion by the Reorganized Debtors, which motion may be approved without notice to any party or a hearing. |
| ***Class*** | means a group of Claims or Equity Interests as classified under the Plan. |
| ***Collateral*** | means any property or interest in property of the Debtors' estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law. |

5

| | |
|---|---|
| *Commitment Percentage* | means the percentage of each Backstop Purchaser set forth on Schedule I of the Backstop Commitment Agreement. |
| *Confirmation Date* | means the date on which the Confirmation Order is entered by the Court. |
| *Confirmation Hearing* | means the hearing to consider confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time. |
| *Confirmation Order* | means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which is subject to the Backstop Purchaser Approval Condition. |
| *Consolidated Holdings* | means, collectively, ARE Holdings and ARE LLC as substantively consolidated and merged in accordance with the Plan. |
| *Convenience Class Claim* | means any Claim that would otherwise be a General Unsecured Claim that is Allowed in an amount of $50,000 or less. |
| *Court* | means, (a) the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases; (b) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware; and (c) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein. |
| *Creditors Committee* | means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Debtors' Chapter 11 Cases, as constituted from time to time. |
| *Debtors* | means Aventine Renewable Energy Holdings, Inc., Aventine Renewable Energy, LLC, Aventine Renewable Energy, Inc., Aventine Renewable Energy – Aurora West, LLC, Aventine Renewable Energy – Mt Vernon, LLC, Aventine Power, LLC, and Nebraska Energy, L.L.C. |
| *Debtors in Possession* | means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. |
| *Deficiency Claim* | means the Claim of a Holder of a Secured Claim equal to the amount by which such Creditor's |

| | Allowed Claim exceeds the value of the Collateral securing such Claim, as determined pursuant to section 506 of the Bankruptcy Code. |
|---|---|
| ***DIP Agent*** | means Whitebox Advisors, LLC, in its capacity as Administrative Agent under the DIP Credit Facility |
| ***DIP Credit Facility*** | means that certain Debtor in Possession Credit Facility Term Sheet dated as of April 7, 2009 as approved by the Final DIP Order, by and among ARE Inc., ARE - Mt. Vernon and ARE - Aurora West, as Borrowers, and ARE Holdings, ARE LLC, Aventine Power and certain other parties thereto, as Guarantors, the DIP Lenders and the DIP Agent, as may be amended from time to time. |
| ***DIP Facility Documents*** | means collectively, the DIP Credit Facility, the Interim DIP Order and the Final DIP Order. |
| ***DIP Financing Claims*** | means all Claims arising under or relating to the DIP Facility Documents and all agreements and instruments relating thereto. |
| ***DIP Lenders*** | means Brigade Leveraged Capital Structures Fund, Ltd., Nomura Corporate Research & Asset Management, Inc., Whitebox Hedged High Yield Partners, L.P., Whitebox Combined Partners, L.P., and Pandora Select Partners, L.P. and such other lenders, banks, financial institutions or other non-Debtor entities that may become parties to the DIP Credit Facility from time-to-time. |
| ***Disclosure Statement*** | means the written disclosure statement that relates to this Plan, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time. The Disclosure Statement is subject to the Backstop Purchaser Approval Condition. |
| ***Disputed*** | means, with reference to any Claim, (a) any Claim, (i) proof of which was not timely or properly filed and that has been or hereafter is listed on the Schedules as unliquidated, disputed or contingent, or (ii) that is not listed in the Schedules; (b) any Claim as to which the Debtors, the Creditors Committee or any other party in interest has filed an objection or request for estimation on or before such limitation period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Court, except to the extent that such |

DB02:8993437.11

068125.1001

objection or request for estimation is withdrawn or determined by a Final Order in favor of the holder of such Claim; or (c) any Claim as to which a proof of claim is timely and properly filed and as to which the amount asserted in the proof of claim exceeds the liquidated, undisputed, and noncontingent amount set forth in the Schedules with respect to such Claim. A Claim that is a Disputed Claim under subsection (b) of this definition shall cease to be Disputed upon the withdrawal of such objection following the Claims Objection Deadline or request for estimation or a determination thereon by a Final Order in favor of the holder of such Claim.

**Distributions**

means the distribution in accordance with this Plan of (a) Cash, (b) New ARE Holdings Common Stock, or (c) Warrants, as the case may be.

**Effective Date**

means the first Business Day on which all of the conditions specified in Article XII of the Plan have been satisfied or waived in accordance with such Article; *provided, however*, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

**Equity Interest or Interest**

means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors (including, without limitation, any shares of common stock or preferred stock or any other capital stock, or options, warrants, rights or similar instruments derived from, relating to or convertible or exchangeable for shares of capital stock), whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest.

**ERISA**

means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. section 1301 et seq.

**Estates**

means the estates of the Debtors, individually or collectively, as is appropriate in the context created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**Existing LC**

means any letter of credit issued and outstanding under the Prepetition Secured Credit Facility as of the Effective Date.

DB02:8993437.11

068125.1001

| | |
|---|---|
| ***Exit Financing*** | shall mean the ABL Credit Facility and the Senior Secured Notes. The terms and conditions of the Exit Financing are subject to the Backstop Purchaser Approval Condition. |
| ***Fee Claims*** | means an Administrative Claim under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including reasonable expenses of the members of the Creditors Committee incurred as members of the Creditors Committee in discharge of their duties as such). For the avoidance of doubt, professional fees and expenses incurred by the DIP Lenders and Backstop Purchasers are not Fee Claims. |
| ***Final DIP Order*** | means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 354(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing and (B) to Utilize Cash Collateral and (II) Granting Adequate Protection to Pre-Petition Secured Parties* entered by the Court on May 6, 2009, as may be amended or supplemented from time to time. |
| ***Final Order*** | means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such Court, the operation or effect of which has not been stayed, reversed, vacated or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending. |
| ***General Unsecured Claim*** | means a Claim against any of the Debtors that is not an Administrative Claim, Convenience Claim, DIP Facility Claim, Fee Claim, Intercompany Claim, Other Priority Claim, Prepetition Unsecured Notes Claims, Prepetition Secured Credit Facility Claim, Priority Tax Claim, Kiewit Aurora West Secured Claim, Kiewit Mt. Vernon Secured Claim, Other Secured Claim, or Subordinated Claim and shall include, without limitation, (a) Claims of vendors or customers of the Debtors that are not Priority Claims, |

DB02:8993437.11                                                          068125.1001

| | (b) Claims of employees of the Debtors that are not Priority Claims, (c) Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, (d) Claims arising as a result of Prepetition Date litigation against any of the Debtors that are not subordinated under section 510(b) of the Bankruptcy Code, and (e) any Deficiency Claim. |
|---|---|
| ***Governmental Unit*** | has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code. |
| ***Impaired*** | means, when used with reference to a Claim, a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| ***Indemnification Obligation*** | means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to charter, by-laws, contract, or otherwise; *provided however*, that such term shall not include any obligation that constitutes a Subordinated Claim. |
| ***Initial Distribution Date*** | means the Effective Date or as soon thereafter as practicable. |
| ***Insured Claim*** | means any Claim or portion of a Claim (other than a Workers Compensation Claim) that is insured under the Debtors' insurance policies, but only to the extent of such coverage. |
| ***Intercompany Claims*** | means any Claim arising before the Petition Date held by one of the Debtors against any other Debtor, including, without limitation, (a) any account reflecting intercompany book entries by such Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor, and (c) any derivative Claim asserted or assertable by or on behalf of such Debtor against any other Debtor. |
| ***Interim DIP Order*** | means the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 354(c)(1), 364(c)(2), 364 (c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing and (B) to Utilize Cash Collateral and (II) Granting Adequate Protection to Pre-Petition Secured Parties, entered by the Court on April 14, 2009 [Docket No. 65] |
| ***Kiewit Note*** | has the meaning ascribed to such term in Article IV(E) of the Plan. |

| | |
|---|---|
| ***Kiewit Aurora West Secured Claim*** | means the Secured Claim of Kiewit Energy Company arising under those certain Engineering, Procurement and Construction Services Fixed Price Contracts entered into by Kiewit Energy Company and ARE – Aurora West. |
| ***Kiewit Mt. Vernon Secured Claim*** | means the Secured Claim of Kiewit Energy Company arising under those certain Engineering, Procurement and Construction Services Fixed Price Contracts entered into by Kiewit Energy Company and ARE – Mt. Vernon. |
| ***LC Collateral Account*** | means the collateral account established pursuant to the LC Collateral Account Stipulation, in which cash was deposited by the Debtors in connection with the renewal of two letters of credit issued to Southern Indiana Gas and Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc., as such collateral account may be modified as provided for in Article IV (B) of the Plan. |
| ***LC Collateral Account Stipulation*** | means that certain Stipulation By and Among the Debtors, the Prepetition Agent and the DIP Agent Regarding the Collateralization of Certain Letters of Credit and Related Reimbursement Rights in Favor of JPMorgan Chase Bank, N.A., dated September 17, 2009 and approved by Order of the Court dated September 17, 2009 [Docket No. 463] |
| ***LC Obligations*** | means the obligations due or which may become due under the Prepetition Secured Credit Facility with respect to all Existing LCs. |
| ***Lien*** | has the meaning set forth in section 101 of the Bankruptcy Code. |
| ***Litigation Rights*** | means the Causes of Action, claims, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person (except to the extent such claims are expressly released under the Plan), which are to be retained by the Reorganized Debtors, including, without limitation, claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code. |
| ***Majority Backstop Purchasers*** | means the Backstop Purchasers having at least a majority of the aggregate Commitment Percentages. |
| ***Management Incentive Plan*** | has the meaning ascribed to such term in Article V(E) of the Plan. |

| | |
|---|---|
| *NELLC* | means Nebraska Energy, L.L.C. |
| *New ARE Holdings Common Stock* | means the shares of common stock of reorganized ARE Holdings authorized to be issued under Article V(B) of the Plan, the principal terms of which shall be described in the Plan Supplement. |
| *New Board* | means the initial Board of Directors of Reorganized ARE Holdings, which shall be disclosed in the Plan Supplement and which shall be constituted as provided for in Article V(D) of the Plan. Notwithstanding the foregoing, the selection of the members of the New Board shall be subject to the Backstop Purchaser Approval Condition. |
| *New Corporate Governance Documents* | has the meaning ascribed to such term in Article V(A) of the Plan. |
| *New Subsidiary Equity Interests* | means with respect to a particular Reorganized Debtor, the Equity Interests in such Reorganized Debtor to be issued pursuant to Article V of the Plan. |
| *Noteholder New Equity* | means the shares of New ARE Holdings Common Stock included in the Senior Secured Notes Equity Distribution. |
| *Ordinary Course Administrative Claims* | means Administrative Clams (but specifically excluding section 503(b)(9) Claims) against the Debtors that represent liabilities (a) to sellers of goods or services on account of such seller's provision of goods and/or services after the Petition Date and (b) that were incurred in the ordinary course of business by the Debtors. |
| *Other Priority Claim* | means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims), including, without limitation, certain allowed employee compensation and benefit claims of the Debtors' employees incurred within one hundred eighty (180) days prior to the Petition Date. |
| *Other Secured Claim* | means any Secured Claim, other than the DIP Financing Claims, the Kiewit Aurora West Secured Claim, the Kiewit Mt. Vernon Secured Claim and the Prepetition Secured Credit Facility Claims, to the extent reflected in the Schedules or a proof of claim. |
| *PBGC* | means the Pension Benefit Guaranty Corporation. |
| *Person* | means any individual, corporation, partnership, limited liability company, association, indenture |

|  |  |
|---|---|
|  | trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity. |
| ***Petition Date*** | means April 7, 2009. |
| ***Plan*** | means this Plan, as it may be amended or modified from time to time, together with all addenda, exhibits, schedules or other attachments, if any. |
| ***Plan Supplement*** | means the forms of documents specified in Article IX(K) of the Plan. |
| ***Prepetition Agent*** | means JP Morgan Chase Bank, N.A., in its capacity as administrative agent under the Prepetition Secured Credit Facility. |
| ***Prepetition Claims Bar Date Order*** | means the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claims and Approving the Form and Manner of Notice Thereof* entered by the Court on June 30, 2009. |
| ***Prepetition Indenture*** | means that certain indenture, dated March 27, 2007, as amended from time to time, by and among ARE Holdings, as issuer, and ARE, LLC, ARE, Inc., Aventine Power, ARE-Aurora West and ARE – Mt. Vernon, each as guarantors, and Wells Fargo Bank, N.A. (predecessor in interest to Deutsche Bank National Trust Company), as indenture trustee. |
| ***Prepetition Indenture Trustee*** | means Deutsche Bank National Trust Company as successor in interest to Wells Fargo Bank, N.A., in its capacity as indenture trustee under the Prepetition Indenture. |
| ***Prepetition Lender Claim Escrow*** | has the meaning ascribed to such term in Article (IV)(B) of the Plan. |
| ***Prepetition Secured Credit Facility*** | means that certain Credit Agreement dated as of March 23, 2007, as amended from time-to-time, by and among ARE Inc., ARE - Mt. Vernon and ARE - Aurora West, as Borrowers, other loan parties to the Prepetition Credit Agreement, the Prepetition Agent and the lenders party thereto. |
| ***Prepetition Secured Credit Facility Claims*** | means all Claims arising under or relating to the Prepetition Secured Credit Facility and all agreements and instruments relating thereto, to the extent such Claims are secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy |

|                                   | Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff. |
| --- | --- |
| ***Prepetition Unsecured Notes*** | means those certain senior unsecured 10% notes due 2017 issued pursuant to the Prepetition Indenture. |
| ***Prepetition Unsecured Notes Claims*** | means all Claims arising under or relating to the Prepetition Unsecured Notes and the Prepetition Indenture and all agreements and instruments relating thereto. The Prepetition Unsecured Notes Claims are Allowed in the aggregate amount of $315,500,000. |
| ***Priority Tax Claim*** | means any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code. |
| ***pro rata*** | means, with respect to any Claim, at any time, the proportion that the amount of a Claim in a particular Class bears to the aggregate amount of all Claims (including Disputed Claims) in such Class, unless in each case the Plan provides otherwise. |
| ***Professional*** | means (i) any professional employed in the Chapter 11 Cases pursuant to section 327 of the Bankruptcy Code or otherwise and (ii) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b) of the Bankruptcy Code. |
| ***Quarterly Distribution Date*** | means March 31, June 30, September 30 or December 31 of each year (or the next Business Day if such date is not a Business Day); provided, however, that the initial Quarterly Distribution Date for purposes of this Plan shall be the first Quarterly Distribution Date that is no less than fifteen (15) days after the Initial Distribution Date. |
| ***Record Date*** | means, (a) for purposes of making distributions under the Plan on account of Allowed Claims, the Confirmation Date, and (b) for purposes of casting Ballots, the date set forth in the order approving the Disclosure Statement. |
| ***Released Parties*** | means (a) the DIP Agent and the DIP Lenders, solely in their respective capacities as such; (b) the Backstop Purchasers, solely in their respective capacities as such; (c) the Creditors Committee and the members thereof, solely in their respective capacities as such; (d) with respect to each of the entities in clauses (a) through (c) above, such entity's respective successors, |

predecessors, control persons, members, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such entities, in each case solely in their capacities as such and only if serving in such capacity); and (e) the Debtors and the Debtors' respective officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such entities, in each case solely in their capacity as such and only if serving in such capacity on or after the Petition Date).

**Reorganized ARE Holdings**  means Aventine Renewable Energy Holdings, Inc. or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date.

**Reorganized Debtors**  means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

**Reorganized Subsidiaries**  means the Subsidiaries (other than ARE LLC), collectively, on or after the Effective Date.

**Scheduled**  means, with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

**Schedules**  means the schedules of assets and liabilities, statements of financial affairs, and lists of holders of Claims and Equity Interests filed with the Court by each of the Debtors, including any amendments or supplements thereto.

**Section 503(b)(9) Claims**  means any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

**Secured Claim**  means (a) a Claim that is secured by a Lien on property in which any Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the holder of the Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code, or (b) a

DB02:8993437.11

068125.1001

Claim Allowed under this Plan as a Secured Claim.

***Senior Secured Notes***      means the $105 million in aggregate principal amount of senior secured notes issued pursuant to the Senior Secured Notes Offering Procedures by Reorganized ARE Holdings and guaranteed by each of Reorganized ARE Holdings' existing and future domestic subsidiaries and backstopped by the Backstop Purchasers pursuant to the Backstop Commitment Agreement, on the terms and conditions set forth in the Plan Supplement, which terms and conditions are subject to the Backstop Purchaser Approval Condition.

***Senior Secured Notes Equity Distribution***      means the 1,710,000 shares of New ARE Holdings Common Stock equal to 20% in the aggregate of the New ARE Holdings Common Stock to be issued and outstanding on the Effective Date, subject to dilution by the exercise of any Warrants and subject to dilution by any stock awards issued on or after the Effective Date under the Management Incentive Plan. The Senior Secured Notes Equity Distribution shall be distributed ratably to the holders of the Senior Secured Notes in connection with the Senior Secured Notes Offering.

***Senior Secured Notes Offering***      means the offering of (a) $105 million in aggregate principal amount of Senior Secured Notes and (b) shares of Noteholder New Equity, on a pro rata basis to each holder of an Allowed Prepetition Unsecured Notes Claim. The Senior Secured Notes and the Noteholder New Equity will be offered (i) on a pro rata basis to each holder of an Allowed Prepetition Unsecured Notes Claim and (ii) to the extent less than all of the Senior Secured Notes and Noteholder New Equity are issued to such holders, on terms and subject to the conditions set forth in the Backstop Commitment Agreement, to the Backstop Purchasers. The Senior Secured Notes and the Noteholder New Equity shall be offered together in units and shall not be purchased separately. Each unit, consisting of $1,000 in face amount of Senior Secured Notes, together with the pro rata portion of the Noteholder New Equity to be issued therewith, shall be issued and sold for an aggregate cash consideration of $952.38. The rights to subscribe for the purchase of the Senior Secured Notes and Noteholder New Equity shall be non-transferrable and shall be subject to the

16

    

Senior Secured Notes Offering Procedures. For the avoidance of doubt, the Backstop Purchasers shall be entitled to participate in the Senior Secured Notes Offering in their capacity as holders of Prepetition Unsecured Notes Claims. For purposes of the Senior Secured Notes Offering, the term "pro rata" means (x) the aggregate principal amount of Prepetition Unsecured Notes held by a holder of Prepetition Unsecured Notes divided by (y) the aggregate principal amount of Prepetition Unsecured Notes outstanding as of the Petition Date.

**Senior Secured Notes Offering Procedures**

means those certain offering procedures, setting forth the terms and conditions of the Senior Secured Notes Offering, in substantially the form annexed hereto as Exhibit B.

**Solicitation Order**

means the Order (i) approving the Plan solicitation materials and the Disclosure Statement and (ii) scheduling a hearing to confirm the Plan. The Solicitation Order is subject to the Backstop Purchaser Approval Condition.

**Subordinated Claims**

means any claim that is subordinated pursuant to Section 510(b) or 510(c) of the Bankruptcy Code.

**Subsidiaries**

means ARE Inc., ARE LLC, ARE - Aurora West, ARE - Mt. Vernon, Aventine Power, and NELLC.

**Unsecured Claim**

means a Claim against any of the Debtors that is not secured by a Lien or a valid setoff right

**Unsecured Claims Reserve**

has the meaning ascribed to such term in Article VI (E)(5) of the Plan.

**Unsecured Claims Stock Pool**

means the 6,840,000 shares of New ARE Holdings Common Stock equal to 80% of the New ARE Holdings Common Stock to be issued and outstanding on the Effective Date, subject to dilution by the exercise of any Warrants and subject to dilution by any stock awards issued on or after the Effective Date under the Management Incentive Plan, allocable to each Debtor in the amounts set forth on Schedule A hereto, to be distributed pro rata to the holders of (i) Allowed Prepetition Unsecured Notes Claims, and (ii) Allowed General Unsecured Claims pursuant to Articles IV(F) and (G) of the Plan.

**Warrants**

means warrants exercisable for the purchase of an aggregate of 5.0% of the New ARE Holdings Common Stock on a fully diluted basis (but subject to

DB02:8993437.11

068125.1001

dilution in connection with any stock awards issued on or after the Effective Date under the Management Incentive Plan) at an exercise price of $40.94 per share, and subject to the terms and conditions set forth in further detail in the Warrant Term Sheet

**Warrant Term Sheet**  means that term sheet, setting forth the terms and conditions of the Warrants, in substantially the form annexed hereto as Exhibit C.

**Workers Compensation Claim**  means a Claim held by an employee of the Debtors for workers compensation coverage under the workers compensation program applicable in the particular state in which the employee is employed by the Debtors.

## B.  Interpretation, Application of Definitions and Rules of Construction.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in the Plan that are not defined herein shall have the same meaning assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section or subsection in the Plan unless expressly provided otherwise. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. Captions and headings to articles, sections and exhibits are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

## A.  Introduction.

All Claims and Equity Interests, except Administrative Claims, DIP Financing Claims, Fee Claims, and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Financing Claims, Fee Claims and Priority Tax Claims, as described below, have not been classified.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other

DB02:8993437.11  068125.1001

Classes to the extent that any remaining portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

1. **Unclassified Claims (not entitled to vote on the Plan).**

    (a) Administrative Claims.

    (b) DIP Financing Claims.

    (c) Fee Claims.

    (d) Priority Tax Claims.

2. **Unimpaired Classes of Claims (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).**

    (a) Class 1: Other Priority Claims.

Class 1 consists of all Other Priority Claims against the applicable Debtor in the following sub-classes.

| Class 1(a) | Class 1(a) consists of all Other Priority Claims against Consolidated Holdings. |
| Class 1(b) | Class 1(b) consists of all Other Priority Claims against ARE Inc. |
| Class 1(c) | Class 1(c) consists of all Other Priority Claims against ARE - Aurora West. |
| Class 1(d) | Class 1(d) consists of all Other Priority Claims against ARE - Mt. Vernon. |
| Class 1(e) | Class 1(e) consists of all Other Priority Claims against Aventine Power. |
| Class 1(f) | Class 1(f) consists of all Other Priority Claims against NELLC. |

    (b) Class 3: Other Secured Claims.

Class 3 consists of all Other Secured Claims against the applicable Debtor in the following sub-classes.

| Class 3(a) | Class 3(a) consists of all Other Secured Claims against Consolidated Holdings. |
| Class 3(b) | Class 3(b) consists of all Other Secured Claims against ARE Inc. |

DB02:8993437.11          068125.1001

| Class 3(c) | Class 3(c) consists of all Other Secured Claims against ARE - Aurora West. |
| Class 3(d) | Class 3(d) consists of all Other Secured Claims against ARE - Mt. Vernon. |
| Class 3(e) | Class 3(e) consists of all Other Secured Claims against Aventine Power. |
| Class 3(f) | Class 3(f) consists of all Other Secured Claims against NELLC. |

(c)    <u>Class 4(a):  Kiewit Mt. Vernon Secured Claim.</u>

Class 4 (a) consists of the Kiewit Mt. Vernon Secured Claim.

(d)    <u>Class 8:  Intercompany Claims.</u>

Class 8 consists of all Intercompany Claims against the applicable Debtor in the following sub-classes.

| Class 8(a) | Class 8(a) consists of all Intercompany Claims against Consolidated Holdings |
| Class 8(b) | Class 8(b) consists of all Intercompany Claims against ARE Inc. |
| Class 8(c) | Class 8(c) consists of all Intercompany Claims against ARE - Aurora West. |
| Class 8(d) | Class 8(d) consists of all Intercompany Claims against ARE - Mt. Vernon. |
| Class 8(e) | Class 8(e) consists of all Intercompany Claims against Aventine Power |
| Class 8(f) | Class 8(f) consists of all Intercompany Claims against NELLC |

**3.**    **<u>Impaired Classes of Claims</u>**

(a)    Class 2:  Prepetition Secured
<u>Credit Facility Claims.</u>

Class 2 consists of all Prepetition Secured Credit Facility Claims against the applicable Debtor in the following sub-classes.

| Class 2(a) | Class 2(a) consists of all Prepetition Secured Credit Facility Claims against Consolidated Holdings | This Class is impaired and entitled to vote on the Plan. |
| Class 2(b) | Class 2(b) consists of all Prepetition Secured Credit Facility Claims against ARE Inc. | This Class is impaired and entitled to vote on the Plan. |

DB02:8993437.11

068125.1001

| Class 2(c) | Class 2(c) consists of all Prepetition Secured Credit Facility Claims against ARE - Aurora West. | This Class is impaired and entitled to vote on the Plan. |
|---|---|---|
| Class 2(d) | Class 2(d) consists of all Prepetition Secured Credit Facility Claims against ARE - Mt. Vernon. | This Class is impaired and entitled to vote on the Plan. |
| Class 2(e) | Class 2(e) consists of all Prepetition Secured Credit Facility Claims against Aventine Power. | This Class is impaired and entitled to vote on the Plan. |
| Class 2(f) | Class 2(f) consists of all Prepetition Secured Credit Facility Claims against NELLC. | This Class is impaired and entitled to vote on the Plan. |

(b)    Class 4(b):  Kiewit Aurora West Secured Claim.

Class 4 (b) consists of the Kiewit Aurora West Secured Claim. This class is impaired and entitled to vote on the Plan.

(c)    Class 5:  Prepetition Unsecured Notes Claims.

Class 5 consists of all Prepetition Unsecured Notes Claims against the applicable Debtor in the following sub-classes.

| Class 5(a) | Class 5(a) consists of all Prepetition Unsecured Note Claims against Consolidated Holdings. | This Class is impaired and entitled to vote on the Plan. |
|---|---|---|
| Class 5(b) | Class 5(b) consists of all Prepetition Unsecured Note Claims against ARE Inc. | This Class is impaired and entitled to vote on the Plan. |
| Class 5(c) | Class 5(c) consists of all Prepetition Unsecured Note Claims against ARE - Aurora West. | This Class is impaired and entitled to vote on the Plan. |
| Class 5(d) | Class 5(d) consists of all Prepetition Unsecured Note Claims against ARE - Mt. Vernon. | This Class is impaired and entitled to vote on the Plan. |
| Class 5(e) | Class 5(e) consists of all Prepetition Unsecured Note Claims against Aventine Power. | This Class is impaired and entitled to vote on the Plan |
| Class 5(f) | Class 5(f) consists of all Prepetition Unsecured Note Claims against NELLC. | This Class is impaired and entitled to vote on the Plan. |

(d)    Class 6:  General Unsecured Claims.

Class 6 consists of all General Unsecured Claims against the applicable Debtor in the following sub-classes.

DB02:8993437.11    068125.1001

| Class 6(a) | Class 6(a) consists of all General Unsecured Claims against Consolidated Holdings. | This Class is impaired and entitled to vote on the Plan. |
|---|---|---|
| Class 6(b) | Class 6(b) consists of all General Unsecured Claims against ARE Inc. | This Class is impaired and entitled to vote on the Plan. |
| Class 6(c) | Class 6(c) consists of all General Unsecured Claims against ARE - Aurora West. | This Class is impaired and entitled to vote on the Plan. |
| Class 6(d) | Class 6(d) consists of all General Unsecured Claims against ARE - Mt. Vernon. | This Class is impaired and entitled to vote on the Plan. |
| Class 6(e) | Class 6(e) consists of all General Unsecured Claims against Aventine Power. | This Class is impaired and entitled to vote on the Plan |
| Class 6(f) | Class 6(f) consists of all General Unsecured Claims against NELLC. | This Class is impaired and entitled to vote on the Plan. |

    (e)    <u>Class 7:  Convenience Claims</u>.

Class 7 consists of all Convenience Claims against the applicable Debtor in the following sub-classes.

| Class 7(a) | Class 7(a) consists of all Convenience Claims against Consolidated Holdings. | This Class is impaired and entitled to vote on the Plan. |
|---|---|---|
| Class 7(b) | Class 7(b) consists of all Convenience Claims against ARE Inc. | This Class is impaired and entitled to vote on the Plan. |
| Class 7(c) | Class 7(c) consists of all Convenience Claims against ARE - Aurora West. | This Class is impaired and entitled to vote on the Plan. |
| Class 7(d) | Class 7(d) consists of all Convenience Claims against ARE - Mt. Vernon. | This Class is impaired and entitled to vote on the Plan. |
| Class 7(e) | Class 7(e) consists of all Convenience Claims against Aventine Power. | This Class is impaired and entitled to vote on the Plan. |
| Class 7(f) | Class 7(f) consists of all Convenience Claims against NELLC. | This Class is impaired and entitled to vote on the Plan. |

    (f)    <u>Class 9:  Equity Interests</u>.

Class 9 consists of all Equity Interests in the applicable Debtor in the following sub-classes.

| Class 9(a) | Class 9(a) consists of all Equity Interests in Consolidated Holdings. | This Class is impaired and entitled to vote on the Plan. |
|---|---|---|
| Class 9(b) | Class 9(b) consists of all Equity Interests in ARE Inc. | This Class is impaired and deemed to reject the Plan. |

DB02:8993437.11    068125.1001

| Class 9(c) | Class 9(c) consists of all Equity Interests in ARE - Aurora West. | This Class is impaired and deemed to reject the Plan. |
|---|---|---|
| Class 9(d) | Class 9(d) consists of all Equity Interests in ARE - Mt. Vernon. | This Class is impaired and deemed to reject the Plan. |
| Class 9(e) | Class 9(e) consists of all Equity Interests in Aventine Power. | This Class is impaired and deemed to reject the Plan. |
| Class 9(f) | Class 9(f) consists of all Equity Interests in NELLC. | This Class is impaired and deemed to reject the Plan. |

## III.

## TREATMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

### A. **Administrative Claims.**

Except as otherwise provided for herein, on (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim shall receive from the Debtor against which such Allowed Administrative Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (A) Cash of the applicable Debtor against which such Administrative Claim is Allowed equal to the unpaid portion of such Allowed Administrative Claim, or (B) such less favorable treatment to which such Debtor or Reorganized Debtor and the holder of such Allowed Administrative Claim shall have agreed upon in writing; *provided, however*, that Allowed Ordinary Course Administrative Claims shall be paid in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing relating thereto. For the avoidance of doubt, the payment of Professional Fee Claims shall be governed by Article III (D) herein.

### B. **Bar Dates for Administrative Claims.**

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing applications for allowance of Administrative Claims (except for Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims), which date will be the first business day that is thirty (30) days after the Confirmation Date. Holders of Administrative Claims, except for Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims, not paid prior to the Confirmation Date must submit requests for payment **directly to the Claims Agent** and in accordance with the instructions set forth in the Confirmation Order or notice of entry of the Confirmation Order on or before the applicable Administrative Claims Bar Date or forever be barred from doing so. The notice of confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date, the appropriate address to submit requests to the Claims Agent and constitute good and sufficient notice of the Administrative Claims Bar Date.

DB02:8993437.11                                                                    068125.1001

For the avoidance of doubt, Section 503(b)(9) Claims were and continue to be subject to the Bar Dates set forth in the Prepetition Claims Bar Date Order, and nothing set forth herein shall be deemed an extension of the Bar Dates with respect to Section 503(b)(9) Claims.

## C.   DIP Financing Claims.

On the Initial Distribution Date, each holder of a DIP Financing Claim shall receive payment in full in Cash of all obligations of the Debtors under the DIP Facility Documents; *provided, however*, that upon the written instruction of any holder of a DIP Financing Claim, such Cash payment may be applied against the purchase of the Senior Secured Notes.

## D.   Fee Claims.

Except as otherwise provided herein, all requests for compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, and counsel to the Creditors Committee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date, unless such date is otherwise modified by order of the Court. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, Reorganized Debtors or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors and the requesting party on or before twenty (20) days after the filing and service of such request.

## E.   Priority Tax Claims.

Except as otherwise provided for herein, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim shall receive from the Debtor against which such Allowed Priority Tax Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of the Debtor against which such Priority Tax Claim is Allowed equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtor or Reorganized Debtor, and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (C) at the option of the Reorganized Debtors, Cash of the applicable Debtor in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

DB02:8993437.11                                                   068125.1001

# IV.

## TREATMENT OF CLAIMS AND
## EQUITY INTERESTS

### A.     Class 1 — Other Priority Claims.

#### 1.     Treatment and Distributions.

Except as otherwise provided for herein, on (i) the Initial Distribution Date, if an Other Priority Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Other Priority Claim becomes Allowed, each holder of an Allowed Other Priority Claim in Classes 1(a) through 1(f) shall receive from the Debtor against which such Allowed Other Priority Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Other Priority Claim, (A) Cash equal to the amount of such Allowed Other Priority Claim or (B) such less favorable treatment as to which such Debtor or Reorganized Debtor and the holder of such Allowed Other Priority Claim have agreed upon in writing.

#### 2.     Impairment and Voting.

Class 1 is unimpaired under the Plan.  The holders of Allowed Other Priority Claims in Classes 1(a) through 1(f) are conclusively presumed to have accepted the Plan and the votes of holders of Allowed Other Priority Claims in Classes 1(a) through 1(f) therefore shall not be solicited.

### B.     Class 2 — Prepetition Secured Credit Facility Claims.

#### 1.     Treatment and Distributions.

Except to the extent that a holder of an Allowed Prepetition Secured Credit Facility Claim shall have agreed in writing to a different treatment, in full and final satisfaction of, and in exchange for, as to the Debtors' estates, such Claim, the holders of Allowed Prepetition Secured Credit Facility Claims in Classes 2(a) through 2(f) shall receive the following:

        a.     With respect to that portion of the Allowed Prepetition Secured Credit Facility Claim that includes all amounts other than for the LC Obligations, Cash in the Allowed amount of such Claim (including interest and any fees related to same to the extent and amounts permitted by prior Order of the Bankruptcy Court or 11 U.S.C. §506) on the later of the Initial Distribution Date or as soon as practicable after such Prepetition Secured Credit Facility Claim becomes an Allowed Claim (provided that to the extent any portion of such claim is not Allowed on the Initial Distribution Date, the Reorganized Debtors shall escrow funds sufficient to pay such claim once Allowed, in an amount agreed to by the Reorganized Debtors and the holders of such claims or as determined by the Bankruptcy Court (the "Prepetition Lender Claim Escrow"); and upon payment or escrowing of all such amounts, any and all Liens held by the holders of Prepetition

DB02:8993437.11                                                                                     068125.1001

Secured Credit Facility Claims on the Debtors' or Reorganized Debtors' assets, other than with respect to the LC Collateral Account as described below in subsection b(i)(c) or to the Prepetition Lender Claim Escrow, shall be extinguished, nullified and void as to property of the estates of the Debtors.

b. With respect to the portion of the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, one of the following treatments shall apply:

(i) (a) the LC Obligations shall be entitled to letter of credit service fees on the outstanding balance at the rate of 6.625% per annum, payable on a monthly basis; (b) the Existing LCs shall continue until the earlier of (1) the release of any Existing LC by the beneficiary thereof, (2) an Existing LC is drawn in full by the beneficiary thereof, or (3) the term of an Existing LC matures; (c) the LC Obligations shall be secured as to the Reorganized Debtors only by the LC Collateral Account and the Reorganized Debtors shall, on the Initial Distribution Date, adjust the amount in the LC Collateral Account so that it equals 110% of the face amount of all Existing LCs as of such date; and (d) as soon as reasonably practicable, but in no event more than fifteen (15) business days, after an Existing LC (1) matures without being drawn, (2) is both (A) released in writing to the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, in whole or in part by the beneficiary and (B) in the case of a release in whole, the original of such Existing LC is returned to and received by the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations or, if such Existing LC has been lost, then through the completion and delivery of an affidavit and indemnity agreement setting forth that such Existing LC has been lost and indemnifying the Agent on terms customary for the Agent in such circumstances, or in the case of a partial release, such Existing LC is amended on terms and conditions reasonably acceptable to the Agent for the Allowed Prepetition Secured Credit Facility Claim for LC Obligations, (3) is drawn in full or for less than the full amount of the Existing LC, then in each case of (d)(1) through (d)(3), the portion of the LC Collateral Account in excess of the sum of, (A) the then aggregate and drawn amounts under all Existing LCs plus (B) 110% of any and all amounts that may yet be drawn under all Existing LCs, shall be released and returned to the Reorganized Debtors. The foregoing treatment shall supersede and replace the terms of the LC Collateral Account Stipulation; or

(ii) such other treatment as is agreed to by the Debtors (subject to the consent of the Majority Backstop Purchasers not to be unreasonably withheld) and the holders of the Allowed Prepetition Secured Credit Facility Claims for LC Obligations and as is approved by the Bankruptcy Court; or

DB02:8993437.11                                                                                 068125.1001

(iii) in the event (a) the holders of Allowed Prepetition Secured Facility Claims for LC Obligations do not vote to accept the Plan as a class, (b) the Court will not approve the treatment provided for in (b)(i) above without acceptance of the Plan by the holders of Allowed Prepetition Secured Facility Claims for LC Obligations as a class, and (c) the treatment provided for in (b)(ii) above is not applicable, then such other treatment as is approved by the Bankruptcy Court to provide the holders of Allowed Prepetition Secured Facility Claims for LC Obligations with the indubitable equivalent of their Allowed Prepetition Secured Facility Claims for LC Obligations.

### 2. Impairment and Voting.

Class 2 is impaired under the Plan. The holders of Allowed Prepetition Secured Credit Facility Claims in Classes 2(a) through 2(f) are entitled to vote to accept or reject the Plan.

## C. Class 3 — Other Secured Claims.

### 1. Treatment and Distributions.

Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the applicable Debtor against which such Allowed Other Secured Claim is held (subject to the consent of the Majority Backstop Purchasers), in full and final satisfaction of such claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Claim is held, Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) the Initial Distribution Date, or (b) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim., or (iii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Allowed Other Secured Claim is held, the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of (y) the Initial Distribution Date, or (z) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim.

### 2. Impairment and Voting.

Class 3 is unimpaired under the Plan. The holders of Allowed Other Secured Claims in Classes 3(a) through 3(f) are conclusively presumed to have accepted the Plan and the votes of holders of Allowed Other Secured Claims in Classes 3(a) through 3 (f) therefore shall not be solicited.

DB02:8993437.11  068125.1001

### D. Class 4(a) — Kiewit Mt. Vernon Secured Claim.

#### 1. Treatment and Distributions.

Except as otherwise provided herein, on the Initial Distribution Date, if the Kiewit Mt. Vernon Secured Claim is Allowed as of the Effective Date, and otherwise, as soon as practicable after the Kiewit Mt. Vernon Secured Claim is Allowed, the holder of such Allowed Kiewit Mt. Vernon Secured Claim shall receive from ARE – Mt. Vernon, in full satisfaction and release of, and in exchange for, such Allowed Kiewit Mt. Vernon Secured Claim, Cash equal to the amount of such Allowed Kiewit Mt. Vernon Secured Claim, and any and all Liens held on account of such claim against ARE – Mt. Vernon's assets shall be extinguished, nullified and void.

#### 2. Impairment and Voting.

Class 4(a) is unimpaired under the Plan. The holders of Allowed Kiewit Mt. Vernon Secured Claims are conclusively presumed to have accepted the Plan and the votes of holders of Allowed Kiewit Mt. Vernon Secured Claims in Class 4(a) therefore shall not be solicited.

### E. Class 4(b) — Kiewit Aurora West Secured Claim.

#### 1. Treatment and Distributions.

As soon as practical after the occurrence of the Effective Date, the holder of such Allowed Kiewit Aurora West Secured Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed Kiewit Aurora West Secured Claim, which shall be Allowed in the amount of $15,251,808, the following: (i) an initial payment of $10.0 million; and (ii) a secured non-recourse note (the "Kiewit Note") in a face amount equal to $5,251,808, together with a deed of trust or other similar documentation required for the perfection of the security interest granted in connection with the Kiewit Note. Subject to the Backstop Purchaser Approval Condition, the form of the Kiewit Note and the deed of trust or similar documentation required for the perfection of the security interest granted in connection with the Kiewit Note shall be contained in the Plan Supplement.

The Kiewit Note shall (i) be for a term of four (4) years from the Effective Date with an interest rate of 5.0% per annum payable semi-annually; (ii) be non-recourse and secured by a Lien, senior to the Lien granted in connection with the Senior Secured Notes, in the same Collateral that presently secure the Allowed Kiewit Aurora West Secured Claim and with the same validity, priority, force and effect; (iii) amortize $0.5 million semi-annually with a final balloon payment due at the earlier to occur of (a) four (4) years from the Effective Date or (b) 120 days from the date upon which the Aurora West Facility is completed and operating at 90% of nameplate capacity; and (iv) be permitted to be paid in full prior to the maturity date without penalty.

DB02:8993437.11

068125.1001

## 2. Impairment and Voting.

Class 4(b) is impaired under the Plan. The holders of Allowed Kiewit Aurora West Secured Claims in Class 4(b) are entitled to vote to accept or reject the Plan.

### F. Class 5 — Prepetition Unsecured Note Claims.

#### 1. Treatment and Distributions.

Except as otherwise provided for herein, on the Initial Distribution Date, each holder of an Allowed Prepetition Unsecured Note Claim in Classes 5(a) through 5(f) shall receive from each Debtor against which such Allowed Prepetition Unsecured Note Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Prepetition Unsecured Note Claim, its pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which each such Allowed Prepetition Unsecured Note Claim is held. The holders of Allowed Prepetition Unsecured Note Claims shall also have the right to share in any supplemental distribution of excess shares of New ARE Holdings Common Stock held in the reserves established pursuant to Article VI (E)(5) of the Plan, as provided for therein.

#### 2. Impairment and Voting.

Class 5 is impaired under the Plan. The holders of Allowed Prepetition Unsecured Note Claims in Classes 5(a) through 5(f) are entitled to vote to accept or reject the Plan.

### G. Class 6 — General Unsecured Claims.

#### 1. Treatment and Distributions.

Except as otherwise provided for herein, on (i) the Initial Distribution Date, if a General Unsecured Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such General Unsecured Claim becomes Allowed, each holder of any such General Unsecured Claim in Classes 6(a) through 6(f) shall receive from the applicable Debtor against which such Allowed General Unsecured Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Claim, its pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which each such Allowed General Unsecured Claim is held. The holders of Allowed General Unsecured Claims shall also have the right to share in any supplemental distribution of excess shares of New ARE Holdings Common Stock held in the reserves established pursuant to Article VI (E)(5) of the Plan, as provided for therein.

#### 2. Impairment and Voting.

Class 6 is impaired under the Plan. The holders of Allowed General Unsecured Claims in Classes 6(a) through 6(f) are entitled to vote to accept or reject the Plan.

DB02:8993437.11

068125.1001

### H.    Class 7 — Convenience Claims.

#### 1.    Treatment and Distributions.

Except as otherwise provided for herein, on (i) the Initial Distribution Date, if a Convenience Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Convenience Claim becomes Allowed, each holder of any such Convenience Claim in Classes 7(a) through 7(f) shall receive from each Debtor against which such Allowed Convenience Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Convenience Claim, Cash in an amount equal to 35% of the amount of the Allowed Convenience Claim.

#### 2.    Impairment and Voting.

Class 7 is impaired under the Plan.  The holders of Allowed General Unsecured Claims in Classes 7(a) through 7(f) are entitled to vote to accept or reject the Plan.

### I.    Class 8 — Intercompany Claims.

#### 1.    Treatment and Distributions.

On the Initial Distribution Date, each Intercompany Claim in Classes 8(a) through 8(f) will be paid, readjusted, reinstated or discharged to the extent reasonably determined to be appropriate by the Reorganized Debtors, subject to the consent of the Majority Backstop Purchasers.

#### 2.    Impairment and Voting.

Class 8 is unimpaired under the Plan.  The holders of Intercompany Claims in Classes 8(a) through 8(f) are presumed to accept the Plan and therefore the votes of such holders shall not be solicited.

### J.    Class 9 — Equity Interests.

#### 1.    Treatment and Distributions.

Except as otherwise provided for herein, on the Initial Distribution Date, each holder of an Allowed Class 9(a) Equity Interests shall receive from Reorganized ARE Holdings, in full satisfaction and release of, and in exchange for, its Allowed Class 9(a) Equity Interests, its pro rata share of the Warrants. For the avoidance of doubt, the Allowed Class 9(a) Equity Interests will only include Equity Interests in ARE Holdings as the Equity Interests in ARE LLC will be automatically eliminated as a result of the substantive consolidation and merger of ARE LLC into ARE Holdings pursuant to the Plan.

Notwithstanding the foregoing, if the Court declines to confirm the Plan with the inclusion of the Warrants being distributed to holders of Allowed Class 9(a) Equity Interests, then (i) each holder of an Allowed Class 9(a) Equity Interest shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests, (ii) Class 9(a) shall be

deemed to reject the Plan, and (iii) except as otherwise provided herein, the Debtors will request that the Court confirm the Plan notwithstanding the deemed rejection of the Plan by Class 9(a).

The holders of Equity Interests in Classes 9(b) through 9(f) shall neither receive distributions nor retain any property under the Plan on account of such Equity Interests.

### 2. Impairment and Voting.

Class 9 is impaired under the Plan. The holders of Class 9(a) Equity Interests are entitled to vote to accept or reject the Plan. The holders of Class 9(b) through 9(f) Equity Interests are presumed to reject the Plan and therefore shall not be solicited.

### K. Limitation to Full Recovery.

Notwithstanding anything herein to the contrary, Creditors holding Allowed Claims that are obligations of more than one of the Debtors (including, without limitation, as a result of guarantees) shall not be entitled to receive a total distribution from the Debtors' estates on account of such Allowed Claims with a value, as of the Effective Date, in excess of 100% of the Allowed amount of such Claims. Allowed Unsecured Claims will not be entitled to post-petition interest on account of their respective Allowed Unsecured Claims.

## V.

## PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE REORGANIZED DEBTORS

### A. Amendments to Certificates of Incorporation.

**1. Aventine Renewable Energy Holdings, Inc.** On the Effective Date, the certificate of incorporation of ARE Holdings shall be amended to (i) authorize the issuance of the New ARE Holdings Common Stock (including the shares issuable upon the exercise of the Warrants), (ii) provide for the cancellation of all outstanding Equity Interests in ARE Holdings other than the New ARE Holdings Common Stock, and (iii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting securities is prohibited.

**2. The Subsidiaries.** On the Effective Date, the certificate of incorporation of each Debtor other than ARE Holdings and ARE LLC (which is being merged into ARE Holdings under the Plan), shall be amended to (i) provide for the cancellation of all outstanding Equity Interests in the respective Debtor, (ii) authorize the issuance of the New Subsidiary Equity Interests in the applicable Reorganized Debtor in accordance with Article V (B) of the Plan, (iii) prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting securities is prohibited, and (iv) authorize the distribution of New ARE Holdings Common Stock in accordance with Article V (B) of the Plan.

**3. Backstop Purchaser Approval.** All certificates or articles of incorporation, certificates of formation or limited partnership, bylaws, voting trusts, stockholder or voting agreements, limited liability company or limited partnership agreements and all other

similar documents and agreements executed by the Reorganized Debtors on the Effective Date (including, without limitation, Reorganized ARE Holdings) (collectively, the "New Corporate Governance Documents") shall be acceptable in form and substance to the Majority Backstop Purchasers.

B.    **Equity Securities to Be Issued Pursuant to the Plan.**

On the Effective Date, Reorganized ARE Holdings will issue the New ARE Holdings Common Stock and the Warrants. Each of the Reorganized Subsidiaries shall issue the New Subsidiary Equity Interests, the principal terms of which will be described in the Plan Supplement.

C.    **Registration Rights Agreement.**

On or after the Effective Date, the Reorganized Debtors shall enter into a registration rights agreement (the "Registration Rights Agreement") in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion. The Registration Rights Agreement shall provide, among other things, for (i) the registered exchange of the Senior Secured Notes for a new issue of substantially identical debt securities (the "Exchange Registration") and (ii) registration of the offer and resale of the Noteholder New Equity issued in the Senior Secured Notes Offering (and any other shares of New ARE Holdings Common Stock held by any Backstop Purchaser) (the "Resale Registration"). Notwithstanding the foregoing or anything contained herein, holders of General Unsecured Claims, if any, who, as a result of the Distributions set forth in Article IV (G) of the Plan, receive shares of New ARE Holdings Common Stock equal to 10% or more of the New ARE Holdings Common Stock outstanding as of the Effective Date, shall be entitled to "piggyback" registration rights on any registration statement filed by Reorganized ARE Holdings with respect to Noteholder New Equity; provided, however, that holders entitled to such piggyback rights shall be subject to customary cut backs.

1.    **Exchange Registration.**

With respect to the Exchange Registration, the Registration Rights Agreement will obligate the Reorganized Debtors to:

(a)    file a registration statement with the Securities and Exchange Commission enabling the holders of the Senior Secured Notes to exchange the privately issued Senior Secured Notes for publicly registered notes with substantially identical terms within 180 days after the Effective Date;

(b)    cause such registration statement to become effective within 365 days after the Effective Date and to complete the exchange offer within 50 days after the effective date of such registration statement; and

(c)    file a shelf registration statement for the resale of the Senior Secured Notes if the Reorganized Debtors cannot effect an exchange offer within the time periods listed above and in certain other circumstances.

## 2. **Resale Registration.**

With respect to the Resale Registration, the Registration Rights Agreement will obligate the Reorganized Debtors to:

(a) file a registration statement with the Securities and Exchange Commission seeking to register the offer and resale of the Noteholder New Equity (together with any other shares of New ARE Holdings Common Stock held by any Backstop Purchaser) (collectively, "Registrable Securities") pursuant to Rule 415 under the Securities Act of 1933 (the "Securities Act") within 180 days after the Effective Date;

(b) cause such registration statement to become effective within 365 days after the Effective Date; and

(c) cause such registration statement to remain effective, and supplemented and amended as required by the Securities Act throughout the period ending on the date which is the earliest to occur of (A) the date on which all shares of Registrable Securities registered under such registration statement may be sold in a three-month period under Rule 144 under the Securities Act, (B) the date all such shares of Registrable Securities registered under such registration statement have been sold and (C) two years after the date on which such registration statement became effective with respect to the offer and sale of Registrable Securities, plus the aggregate number of days in all applicable "suspension periods", if any, as set forth in the Registration Rights Agreement.

The failure of the Reorganized Debtors to meet any of the obligations described in this Article V (C) of the Plan with respect to the Exchange Registration or the Resale Registration shall result in additional interest becoming payable with respect to the Senior Secured Notes (including the notes issued in the Exchange Registration) in the amount of 2.0%.

## D. **Appointment of Directors and Officers.**

The New Board shall be composed of five members, who shall be identified in the Plan Supplement. The Majority Backstop Purchasers shall appoint four members of the New Board. The fifth member shall be the chief executive officer of the Reorganized Debtors. The initial board of directors of each Reorganized Subsidiary shall consist of one to five members appointed by the Majority Backstop Purchasers, whose names and biographical information shall be set forth in the Plan Supplement. The directors of the Reorganized Debtors shall serve in accordance with the New Corporate Governance Documents, as the same may be amended from time to time.

The identities of the officers of the Reorganized Debtors shall be set forth in the Plan Supplement.

## E. **Reorganized Debtors' Management Incentive Plan.**

Reorganized ARE Holdings shall adopt such management incentive plan (the "Management Incentive Plan"), if any, as may be determined by the New Board; provided, that

the maximum number of shares of capital stock (or securities convertible or exchangeable for such shares) of reorganized ARE Holdings issuable under such plan shall not exceed the number equal to 10% of the common capital stock of Reorganized ARE Holdings outstanding on the Effective Date; provided, further, that the maximum number of shares of capital stock of reorganized ARE Holdings issuable under such plan during the first year after the Effective Date shall not exceed the number equal to 3.5% of the common capital stock of Reorganized ARE Holdings outstanding on the Effective Date; and provided, further, that the foregoing limitation regarding awards in the first year after the Effective Date shall not apply to any stock options that may be issued under the Management Incentive Plan. No plan may be adopted with respect to the issuance of capital stock (or securities convertible or exchangeable for such capital stock) of any Reorganized Subsidiary.

### F.     Indemnification of Directors, Officers and Employees.

On the Effective Date, the New Corporate Governance Documents of Reorganized ARE Holdings and each Reorganized Subsidiary shall contain provisions which (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized.

### G.     Corporate Reorganization.

Except as otherwise set forth herein, or as modified by appropriate corporate action after the Effective Date, the corporate structure and equity ownership of the Debtors and their subsidiaries shall be unchanged.

## VI.

## PROVISIONS REGARDING MEANS OF IMPLEMENTATION, VOTING, DISTRIBUTIONS, AND TREATMENT OF DISPUTED CLAIMS

### A.     Exit Financing.

#### 1.     Senior Secured Notes.

##### (a)     Use of Offering Proceeds.

On the Effective Date, the Senior Secured Notes shall have been issued by Reorganized ARE Holdings and guaranteed by each of Reorganized ARE Holdings' then existing domestic subsidiaries. The proceeds of the issuance of the Senior Secured Notes shall be used to (i) make payments required to be made on or after the Effective Date under the Plan, including, without limitation, repayment of all amounts owing under the DIP Facility Documents and payments required to be made under Class 2 on account of the Prepetition Secured Credit

Facility Claims, and (ii) fund the working capital and general corporate needs of the Reorganized Debtors.

(b) **Senior Secured Notes Offering Procedures.**

Holders of Allowed Prepetition Unsecured Notes Claims shall be entitled, pursuant to the Senior Secured Notes Offering Procedures, to subscribe and acquire their pro rata share of (i) $105 million in aggregate principal amount of the Senior Secured Notes and (ii) the shares of Noteholder New Equity.

(c) **Senior Secured Notes Offering Backstop.**

The Backstop Purchasers have agreed to backstop the Senior Secured Notes Offering in accordance with the terms of the Backstop Commitment Agreement.

(d) **Allocation of Amount Paid.**

For federal income tax purposes only, the Senior Secured Notes will be issued as part of an investment unit and the amount paid for the Senior Secured Note and the New ARE Holdings Common Stock will be allocated between the two securities by the New Board, and each person participating in the Senior Secured Notes Offering will agree, for federal income tax purposes only, to report the purchase of the Senior Secured Notes in accordance with the determination of the New Board.

2. **ABL Credit Facility.**

On or as soon as practicable after the Effective Date, the Reorganized Debtors shall close on the ABL Credit Facility. The amounts borrowed under the ABL Credit Facility shall be used to fund the Reorganized Debtors' working capital needs after the Effective Date.

B. **Allocation of New ARE Holdings Common Stock and Issuance of New Subsidiary Equity Interests.**

On the Effective Date, the New ARE Holdings Common Stock shall be distributed as follows: (i) the holders of the Senior Secured Notes shall receive their pro rata share of the Senior Secured Notes Equity Distribution subject to and in accordance with the Senior Secured Notes Offering Procedures, and (ii) the Unsecured Claims Stock Pool shall be distributed to each Reorganized Debtor or retained by Reorganized ARE Holdings, as the case may be, in the amounts set forth on Schedule A hereto, to be distributed to the holders of Allowed Unsecured Claims against such Reorganized Debtor, as set forth in Articles IV (F) and (G)

In exchange for the shares of New ARE Holdings Common Stock being allocated to each of the Reorganized Subsidiaries in the Unsecured Claims Stock Pool: 100% of the New Subsidiary Equity Interest of each of the Reorganized Subsidiaries shall be issued to Reorganized ARE Holdings. The terms of the New Subsidiary Equity Interests shall be set forth in the Plan Supplement.

DB02:8993437.11                                          068125.1001

## C.   Substantive Consolidation and Merger of ARE LLC into ARE Holdings

Pursuant to the Plan, the Chapter 11 cases of ARE Holdings and ARE LLC will be substantively consolidated for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation and distribution. As a result of such substantive consolidation, (i) all assets and liabilities of ARE LLC shall be treated as though they were merged into and with the assets and liabilities of ARE Holdings, (ii) no distributions shall be made under the Plan on account of intercompany claims, if any, between ARE Holdings and ARE LLC, (iii) all guarantees of ARE Holdings and ARE LLC of each other's obligations and any joint or several liability of ARE Holdings and ARE LLC shall be deemed to be one obligation of Consolidated Holdings and (iv) each and every Claim filed or to be filed in the Chapter 11 cases of ARE Holdings or ARE LLC shall be deemed filed against Consolidated Holdings and shall be deemed one Claim against and obligation of Consolidated Holdings.

Immediately prior to or on the Effective Date, ARE LLC shall be merged into and become a part of Reorganized ARE Holdings and will cease to exist as a separate entity.

The Plan does not provide for and nothing here shall be deemed to provide for the substantive consolidation and/or merger of any of the Debtors other than ARE Holdings and ARE LLC.

## D.   Voting of Claims.

Each holder of an Allowed Claim in an Impaired Class of Claims shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

## E.   Distributions.

### 1.   Allowed Claims.

(a)   *Delivery of Distributions.*  Distributions under the Plan shall be made by the Reorganized Debtors or their designee to the holders of Allowed Claims in all Classes at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

(b)   *Distribution of Cash.*  Any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(c)   *Unclaimed Distributions of Cash.*  Any distribution of Cash under the Plan that is unclaimed after ninety (90) days after it has been delivered (or attempted to be delivered) shall become the property of the Reorganized Debtor against which such Claim was

36

Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim shall be extinguished and forever barred.

(d) *Unclaimed Distributions of New ARE Holdings Common Stock and Warrants.* Any distribution of New ARE Holdings Common Stock under the Plan on account of an Allowed Unsecured Claim or Warrants on account of Class 9(a) Equity Interests that is unclaimed after ninety (90) days after it has been delivered (or attempted to be delivered) shall be deemed forfeited and such shares of New ARE Holdings Common Stock or Warrants shall be cancelled notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim or Equity Interest to such distribution or any subsequent distribution on account of such Allowed Claim or Equity Interest shall be extinguished and forever barred.

(e) *Saturdays, Sundays, or Legal Holidays.* If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

(f) *Fractional New ARE Holdings Common Stock and Warrants and De Minimis Distributions.* Notwithstanding any other provision in the Plan to the contrary, no fractional interests of New ARE Holdings Common Stock or Warrants exercisable for fractional New ARE Holdings Common Stock shall be issued or distributed pursuant to the Plan. Whenever any payment of a fraction of a share of New ARE Holdings Common Stock or Warrants would otherwise be required under the Plan, the actual distribution made shall reflect a rounding of such faction to the nearest whole share (up or down), with half shares or less being rounded down and fractions in excess of a half of a share being rounded up. If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole shares, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole shares to such holders by random lot or such other impartial method as the Reorganized Debtors deems fair, in the Reorganized Debtors' sole discretion. Upon the allocation of all of the whole New ARE Holdings Common Stock and Warrants authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

The Debtors or the Reorganized Debtors, as the case may be, shall not be required to, but may in their sole and absolute discretion, make distributions to any holder of a Claim of Cash in amount less than $25. In addition, the Debtors and the Reorganized Debtors shall not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(g) *Distributions for Claims and Equity Interests Allowed as of the Initial Distribution Date.* On the Initial Distribution Date, the Reorganized Debtors shall distribute Cash, New ARE Holdings Common Stock, Warrants or Collateral or interests therein, as the case may be, to the holders of Allowed Claims and Equity Interests as contemplated herein.

(h)     *Distributions as of the Record Date.*  As of the close of business on the Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests.  The Debtors and the Reorganized Debtors shall have no obligation to, but may in their sole and absolute discretion, recognize any transfer of any Claims or Equity Interests occurring after the Record Date.  The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Record Date.

(i)     *Interest on Claims.*  Except as specifically provided for in the Plan with respect to DIP Financing Claims, Prepetition Secured Credit Facility Claims, Priority Tax Claims or Other Secured Claims, no Claims (including Administrative Claims), Allowed or otherwise, shall be entitled, under any circumstances to receive any post-petition interest on a Claim.

(j)     *Establishment of Reserve Amounts for Disputed Unsecured Claims.*  In order to effect Distributions to holders of Allowed Unsecured Claims in a timely manner, within sixty (60) days after the Effective Date, the Reorganized Debtors shall file a motion for order establishing a reserve with respect to unliquidated and/or Disputed Unsecured Claims for Distribution purposes; *provided, however,* that the Reorganized Debtors shall not be required to establish any reserve for any unliquidated or Disputed Claims that the Reorganized Debtors believe, in their reasonable discretion, would receive a distribution of Cash under the Plan once such Claim is Allowed.

(k)     *Allowed Amount of Prepetition Unsecured Note Claims to Share in Distribution from the Debtors' Estates.*  The Prepetition Unsecured Note Claims are obligations, either directly or as a result of guarantees, of each of the Debtors.  For purposes of making distributions on account of the Class 5 Allowed Prepetition Unsecured Note Claims from each of the respective Debtors' estates, the amount of the Allowed Prepetition Unsecured Note Claims to share in the pro rata distribution of New ARE Holdings Common Stock from the respective Unsecured Claims Stock Pool, shall, except as otherwise ordered by the Court, be determined as follows:  the full amount of the Allowed Prepetition Unsecured Notes Claims shall be entitled to receive a distribution from  each of the Debtors' estates (for the avoidance of doubt, the full amount of the Prepetition Unsecured Notes Claims shall be entitled to receive a single distribution from the  consolidated estates of Consolidated Holdings).

## 2.     Setoff.

The Debtors and Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claims and the payments or other Distribution to be made pursuant to the Plan in respect of such Claims, or claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim (except to the extent that such claims have been waived by the Debtors in the Plan or otherwise); *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or Reorganized Debtors may have against such

holder. In no event shall any holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right or cause of action of the Reorganized Debtors, unless such holder has filed a motion with the Bankruptcy Court requesting authority to perform such setoff on or before the Effective Date.

### 3. Objections To And Resolution Of Claims.

The Reorganized Debtors shall have the exclusive right to make and to file objections to, or otherwise contest the allowance of, Administrative Claims (other than Fee Claims) and Claims, from and after the Effective Date. Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of, Administrative Claims and Claims shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. Objections to Fee Claims shall be filed and served within twenty (20) days (or such longer period as may be allowed by order of the Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

Objections to, or other proceedings contesting the allowance of, Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion. The Reorganized Debtors may settle any such objections or proceedings without Court approval or may seek Court approval without notice to any Person.

Unless an order of the Court specifically provides for a later date, any proof of claim filed after the applicable bar date relating to any Claim shall be automatically disallowed as a late filed claim, without any action by the Reorganized Debtors, unless and until the party filing such Claim obtains the written consent of the Reorganized Debtors to file such Claim late or obtains an order of the Court upon written motion on notice to the Reorganized Debtors that permits the filing of the Claim. In the event any proof of claim is permitted to be filed after the Claims Objection Deadline, the Reorganized Debtors shall have one hundred eighty (180) days from the date of such order or agreement to object to such Claim, which deadline may be extended by the Court on motion of the Reorganized Debtors without a hearing or notice to any party.

### 4. Special Provisions Regarding Insured Claims.

(a) Distributions under the Plan to each holder of an Insured Claim shall be in accordance with the treatment provided under the Plan for Unsecured Claims; *provided, however,* that the maximum amount of any distribution under the Plan on account of an Allowed Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy; *provided further, however,* that, to the extent a holder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors or Reorganized Debtors, such holder shall have an Allowed Unsecured Claim in the amount by which such Allowed Insured Claim exceeds the coverage available from the relevant Debtors' or Reorganized Debtors' or Reorganized Debtors' insurance policies. Nothing in this section shall constitute a waiver of any Litigation Rights the Debtors or Reorganized Debtors may hold against any

Person, including the Debtors' or Reorganized Debtors' insurance carriers. Nothing in this section is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such holder may receive under the Plan; *provided, however,* that the Debtors and the Reorganized Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(b)     The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' or Reorganized Debtors' insurers under their policies, and the Debtors' and Reorganized Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors and the Reorganized Debtors, the existence, primacy, and/or scope of available coverage under any alleged applicable policy. The Plan shall not operate as a waiver of any other Claims of the Debtors' or Reorganized Debtors' insurers have asserted or may assert in any proof of claim filed in the Chapter 11 cases or the Debtors' or Reorganized Debtors' rights and defenses to such proofs of claim.

### 5.     Reserve for Disputed General Unsecured Claims.

(a)     **Establishment of Unsecured Claims Reserves.** On or after the Effective Date, but no later then ten (10) days after entry of an order approving the Motion required pursuant to Article V (E)(1)(j), each of the Reorganized Debtors shall place into reserve, from its allocated portion of the Unsecured Claims Stock Pool, New ARE Holdings Common Stock with an aggregate liquidation value equal to 100% of the distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims, or such other amount as estimated by the Court, against the applicable Debtor (the "Unsecured Claims Reserves"); *provided, however*, that the Reorganized Debtors shall not be required to place any New ARE Holdings Common Stock or Cash in the Unsecured Claims Reserves for any Disputed Unsecured Claims that would be a Convenience Claim if Allowed in the Disputed amount.

(b)     **New ARE Holdings Common Stock Held in Unsecured Claims Reserves.** New ARE Holdings Common Stock held in the Unsecured Claims Reserves shall be held by the Reorganized Debtors in trust for the benefit of holders of Allowed Prepetition Unsecured Note Claims and General Unsecured Claims. New ARE Holdings Common Stock held in the Unsecured Claims Reserves shall not constitute property of the Reorganized Debtors or any of them, subject to the provisions of this Article. The Reorganized Debtors shall pay, or cause to be paid, out of any dividends paid on account of New ARE Holdings Common Stock held in the Unsecured Claims Reserves, any tax imposed on the Unsecured Claims Reserves by any Governmental Unit with respect to income generated by New ARE Holdings Common Stock held in the Unsecured Claims Reserves and any costs associated with maintaining the Unsecured Claims Reserves. Any New ARE Holdings Common Stock held in the Unsecured Claims Reserves after all General Unsecured Claims have been Allowed or disallowed shall be transferred by the Reorganized Debtors (as applicable), in a supplemental distribution, pro rata, to the holders of Allowed Prepetition Unsecured Note Claims and Allowed General Unsecured Claims, *provided, however*, that to the extent such pro rata allocation results in a distribution of

less than one share of New ARE Holdings Common Stock to over fifty per cent (50%) of holders of Allowed Unsecured Claims otherwise entitled to such distribution, the Reorganized Debtors shall have no obligation to make such distribution and all then-undistributed New ARE Holdings Common Stock shall be canceled and the entitlement of any Person thereto shall be extinguished and forever barred.

### 6.  Allowance of Disputed Unsecured Claims.

Each holder of a Disputed General Unsecured Claim that becomes an Allowed Claim subsequent to the Initial Distribution Date shall receive a pro rata share of the Unsecured Claims Stock Pool allocable to the Debtor against which such Allowed Claim is held from the Unsecured Claims Reserves on the next Quarterly Distribution Date.

### 7.  Allocation of Consideration.

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid, interest and costs, if any, and attorneys' fees, where applicable.

### 8.  Cancellation and Surrender of Existing Securities and Agreements.

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, the promissory notes, share certificates (including treasury stock), the Prepetition Unsecured Notes, the Prepetition Indenture, other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests shall be deemed automatically extinguished, canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under the notes, share certificates, Prepetition Unsecured Notes, the Prepetition Note Indenture and other agreements and instruments governing such Claims and Interests shall be automatically discharged and released. The holders of or parties to such canceled notes, share certificates, Prepetition Notes, the Prepetition Indenture and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, Prepetition Unsecured Notes, the Prepetition Indenture, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that the Prepetition Unsecured Notes and the Prepetition Indenture shall continue in effect solely for the purposes of (i) allowing the Prepetition Indenture Trustee or its agents to make Distributions to holders of Prepetition Unsecured Notes and (ii) allowing holders of the Prepetition Unsecured Notes to receive Distributions hereunder. The Prepetition Indenture shall terminate completely upon the completion of all Distributions to the holders of the Prepetition Unsecured Notes and the payment in full of the reasonable fees and expenses of the Prepetition Indenture Trustee. After the performance by the Unsecured Note Indenture Trustee or its agents of all duties that are required under the Plan, the Confirmation Order and/or under the terms of the Prepetition Indenture, the Prepetition Indenture Trustee and its agents and advisors shall be relieved of, and released from, all obligations associated with the Prepetition Unsecured Notes

arising under the Prepetition Indenture or under other applicable agreements or law, and the Prepetition Indenture Trustee shall be deemed fully released and discharged.

### F.     Estimation.

The Reorganized Debtors may at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (c) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, or the Reorganized Debtors as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### G.     Nonconsensual Confirmation.

If less than all Impaired Classes accept the Plan, but at least one (1) Class of Claims impaired under the Plan has accepted the Plan (and which class's acceptance is determined without inclusion of claims of insiders), the Debtors may seek to have the Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

### H.     Amendment and Confirmability of a Plan.

The Debtors reserve the right to alter, amend or modify the Plan as it applies to any particular Debtor (subject to the Backstop Purchasers Approval Condition). A determination by the Court that the Plan, as it applies to a particular Debtor, is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect: (i) the confirmability of the Plan as it applies to any other Debtor, or (ii) the Debtors' ability to modify the Plan (subject to the Backstop Purchasers Approval Condition), as it relates to any particular Debtor, to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

### I.     Severability of Plan Provisions.

Except as otherwise provided herein, in the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Bankruptcy Court shall, at the request of the Debtors (subject to the Backstop Purchasers Approval Condition), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall

provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

## VII.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.     Continued Corporate Existence.

Except as otherwise provided in the Plan, the Debtors shall continue to exist as the Reorganized Debtors after the Effective Date, under the laws of the respective states governing their formation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith, including, without limitation, the New Corporate Governance Documents. In addition, the Reorganized Debtors may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of the Plan as well as the documents and instruments executed and delivered in connection therewith, including without limitation, the documents and instruments included in the Plan Supplement.

### B.     Dissolution of Creditors Committee.

The Creditors Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Creditors Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors Committee's attorneys, financial advisors, and other agents shall terminate except with respect to their respective Fee Claims.

### C.     Vesting of Property.

The property of the Debtors' estates, including all of the Debtors' claims and causes of action against third parties, including, without limitation, causes of action described in Article VII (F) below shall be revested in the Reorganized Debtors on the Effective Date.

### D.     Discharge of the Debtors.

**The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, the Reorganized Debtors or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims against, and Liens on the Debtors, their respective assets and properties, arising at any time before the entry of the Confirmation Order, regardless of whether a proof of Claim with respect**

43

thereto was filed, whether the Claim is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder. Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such discharged Claim shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

### E. Injunction.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all entities who have held, hold, or may hold Claims against the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, with respect to any such Claim, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim and (d) asserting any right of setoff, or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors on account of any such Claim. Such injunction shall extend to successors of the Debtor (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property. Such injunction shall not apply in respect of Ordinary Course Administrative Claims.

### F. Preservation of Causes of Action.

Except as expressly set forth in the Plan, the Reorganized Debtors shall retain all rights and all Causes of Action and Litigation Rights accruing to them and their estates under sections 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including, without limitation, the Auction Rate Securities Litigation. Except as expressly provided in this Plan or the Confirmation Order, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights, Causes of Action or Litigation Rights. Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, Litigation Rights, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by this Plan. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, Litigation Rights, rights of setoff and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### G.    Votes Solicited in Good Faith.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan and therefore have not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

### H.    Administrative Claims Incurred After the Confirmation Date.

Administrative Claims incurred by the Debtors after the Confirmation Date including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Court approval, subject to any agreements with any claim holders.

### I.    Releases by the Debtors.

**On the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their estates, shall be deemed to release unconditionally the Released Parties from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken solely in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct, (ii) the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, and (iii) the foregoing release shall not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors.**

### J.    Releases by non-Debtors.

**On the Effective Date, all Persons who (a) directly or indirectly, have held, hold, or may hold Claims, (b) vote to accept the Plan as set forth on the relevant Ballot, and (c) do not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan, to have forever released and covenanted with the Released Parties not to (y) sue or otherwise seek recovery from any of the Released Parties on account of any Claim, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act,**

occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their business and affairs or (z) assert against any of the Released Parties any claim, obligation, right, cause of action or liability that any holder of a Claim or Interest may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, provided, however, (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct, (ii) the foregoing release shall not apply to Ordinary Course Administrative Claims and Fee Claims, and (iii) obligations arising under the Plan. Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to claims arising against such Released Parties in their capacity as parties in interest in the Chapter 11 cases.

### K. Exculpation and Injunction in Respect of Released Parties.

#### 1. Exculpation.

The Released Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the negotiation of the Plan, the negotiation of the documents included in the Plan Supplement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan, the management or operations of the Debtors or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

#### 2. Injunction.

Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest shall be permitted to commence or continue any action, employment of process, or any act to collect, offset, or recover any Claim against any of the Released Parties that accrued on or prior to the Effective Date and that has been released or waived pursuant to Article VII (I) or VII (J).

### L. Preservation of Certain Defenses

The releases by non-debtors and injunction provided in the Plan shall not be deemed a waiver or relinquishment of any equitable or legal defense that an entity held against the Debtors immediately prior to the Petition Date, with respect to any Cause of Action commenced by the Debtors prior to the Effective Date or the Reorganized Debtors after the

Effective Date, as the case may be, against such entity; *provided*, that the releases and injunction provided in the Plan shall be deemed a waiver or relinquishment of any right of setoff or recoupment or any other monetary claim to the extent such right or claim was not properly preserved through the timely filing of a proof of claim.

### M.    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### N.    Preservation of Insurance.

The Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and directors) or any other person or entity.

### O.    Indemnification Obligations Owed by the Debtors.

Indemnification Obligations owed to directors, officers, and employees of the Debtors (or the estates of any of the foregoing) who served or were employed by the Debtors as of or after the Petition Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

All Indemnification Obligations owed to directors, officers, and employees of the Debtors who served or were employed by the Debtors prior to, but not after, the Petition Date shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan.

## VIII.

## RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine timely objections to Claims; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any

modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the Plan requires a Final Order of the Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (14) to hear and determine any Causes of Action preserved under the Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3), (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge, (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article VII of the Plan, (17) to enter a final decree closing the Chapter 11 Cases, and (18) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered after the Effective Date.

## IX.

## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees.

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

### B.    Modification of the Plan.

#### 1.    Pre-Confirmation Modifications.

The Debtors may alter, amend, or modify the Plan before the Confirmation Date as provided in Section 1127 of the Bankruptcy Code, subject to the Backstop Purchasers Approval Condition.

#### 2.    Post-Confirmation Immaterial Modifications.

After the Confirmation Date, the Reorganized Debtors may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

#### 3.    Post-Confirmation Material Modifications.

After the Confirmation Date, the Reorganized Debtors may alter or amend the Plan (subject to the Backstop Purchasers Approval Condition) in a manner which, as determined

by the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing as provided in Section 1127 of the Bankruptcy Code.

### C. Governing Law.

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules) or the Delaware General Corporation Law, the laws of the State of Delaware (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified. The documents evidencing and securing the Senior Secured Notes will be governed by New York law except that matters with respect to real property liens will be governed by local real property law.

### D. Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors or the Reorganized Debtors, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### E. Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### F. Exemption From Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange under the Plan of New ARE Holdings Common Stock, the Warrants, and the security interests in favor of the lenders under the Exit Financing, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan shall not be subject to any stamp, real estate transfer, recording or other similar tax.

### G. Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New ARE Holdings Common Stock (other than the Noteholder New Equity) and the Warrants is exempt from the registration requirements of the Securities Act of 1933, as amended, and any State or local law requiring registration for offer or sale of a security.

### H. Waiver of Federal Rule of Civil Procedure 62(a).

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

## I.    Exhibits/Schedules.

All Exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if set forth herein.

## J.    Notices.

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, attention: George T. Henning and Christopher A. Nichols, with a copy to Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, DE 19801, attention:  Joel A. Waite and Matthew B. Lunn, Tel:  (302) 571-6600, Fax:  (302) 571-1253.

To the Creditors Committee:  In care of Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19801, attention: Scott D. Cousins and Donald J. Detweiler, Tel:  (302) 661-7000, Fax:  (302) 661-7360.

To the Backstop Purchasers:  In care of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, attention:  Michael S. Stamer and Shaya Rochester, Tel: (212) 872-1000, Fax: (212) 872-1002.

## K.    Plan Supplement.

The Plan Supplement (which shall include, without limitation, the New Corporate Governance Documents and the documents relating to the Senior Secured Notes), to the extent not previously filed, shall be filed with the Clerk of the Court no later than ten (10) calendar days prior to the voting deadline on the Plan.  The documents included in the Plan Supplement shall be subject to the Backstop Purchasers Approval Condition.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at "https://ecf.deb.uscourts.gov."  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article IX (J). of the Plan.

## L.    Conflict.

The terms of this Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in the Disclosure Statement.

# X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.  Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided for below and subject to the approval of the Majority Backstop Purchasers, to the extent not previously assumed in the Chapter 11 Cases, each executory contract and unexpired lease that exists between any Debtor and any Person is specifically assumed by the Debtor that is a party to such executory contract or unexpired lease as of and subject to the Effective Date pursuant to the Plan.

The following executory contracts and unexpired leases are rejected:

> (a)  executory contacts or unexpired leases that were rejected before the Confirmation Date;

> (b)  employment agreements that were terminated or rejected prior to the Confirmation Date; and

> (c)  contracts and unexpired leases identified in the Plan Supplement (the "Rejected Contracts and Leases"), which contracts and unexpired leases are deemed rejected by the applicable Debtor as of the corresponding rejection dates set forth in the Plan Supplement.  For the avoidance of doubt, the schedule of Rejected Contracts and Leases identified in the Plan Supplement must be acceptable to the Majority Backstop Purchasers.

Notwithstanding the foregoing, and subject to the approval of the Majority Backstop Purchasers, the Debtors shall specifically identify in the Plan Supplement unexpired leases of nonresidential real property that the Debtors intend to assume, as of and subject to the Effective Date (the "Assumed Real Property Leases"), and the Confirmation Order shall operate as an order authorizing the Debtors' assumption of the Assumed Real Property Leases, as may be amended by agreement of the parties thereto, as of and subject to the Effective Date.

### B.  Cure.

The applicable Reorganized Debtor, except as otherwise agreed to by the parties, will cure any and all undisputed defaults under any executory contract or unexpired lease that is assumed by such Reorganized Debtor pursuant to the Plan in accordance with section 365 of the Bankruptcy Code.  All disputed defaults that are required to be cured shall be cured either within 30 days of the entry of a Final Order determining the amount, if any, of the applicable Debtor or the applicable Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

### C.  Rejection Damage Claims.

All Claims for damages arising from the rejection of executory contracts or unexpired leases must be filed with the Court in accordance with the terms of the order

51

authorizing such rejection, but in no event later than thirty (30) days after the Effective Date. Any Claims not filed within such time will be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 6 General Unsecured Claims.

## XI.

## BENEFIT PLANS

As of and subject to the Effective Date, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code) and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, contracts, or programs.

### A.    Treatment of the Aventine Pension Plan

The Aventine Pension Plan will not be terminated, and Reorganized ARE Inc. will assume and continue to maintain the Aventine Pension Plan. Reorganized ARE Inc. and all members of its controlled group will be obligated to contribute to the Aventine Pension Plan the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Internal Revenue Code, 26 U.S.C. §§ 412 and 430. The Aventine Pension Plan may be terminated after the Effective Date only if the statutory requirements of either ERISA section 4041, 29 U.S.C. § 1341, or ERISA section 4042, 29 U.S.C. § 1342, are met. If the Aventine Pension Plan terminates, Reorganized ARE Inc., and all members of its controlled group will be jointly and severally liable for the unpaid minimum funding contributions, statutory premiums, and unfunded benefit liabilities of the Aventine Pension Plan. See ERISA sections 4062(a), 4007; 29 U.S.C. §§ 1362(a), 1307.

Nothing in the Plan will be construed as discharging, releasing, or relieving ARE Inc., or its successor, including Reorganized ARE Inc. or any party, in any capacity, from any liability for the minimum funding requirements or statutory premiums under ERISA or the Internal Revenue Code with respect to the Aventine Pension Plan or PBGC. PBGC and the Aventine Pension Plan will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Plan or the Confirmation Order. The Plan will not release or discharge any person or entity from liability with respect to the Aventine Pension Plan arising as a result of such person's or entity's breach of fiduciary duty under ERISA.

DB02:8993437.11                                                                                                068125.1001

On the Effective Date, and upon assumption of the Aventine Pension Plan, PBGC's Claims filed against the Debtors on behalf of the Aventine Pension Plan shall be deemed withdrawn, without prejudice to the rights of PBGC, or the true party in interest with respect to the Aventine Pension Plan, to take such action as may be appropriate with respect to future actions or inactions, as the case may be, of Reorganized ARE Inc., or any of its controlled group members, as contributing sponsor with respect to the Aventine Pension Plan, during the period subsequent to the Effective Date under the provisions of the Aventine Pension Plan and ERISA.

## XII.

## EFFECTIVENESS OF THE PLAN

### A.  Conditions Precedent to Effectiveness.

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to Article XII (B):

(1) the Confirmation Order shall have become a Final Order;

(2) all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

(3) the New Corporate Governance Documents shall have been duly executed as provided in Article V (A);

(4) the New ARE Holdings Common Stock and New Subsidiary Equity Interests to be issued pursuant to Article V (B) shall be consistent with the Plan;

(5) the Reorganized Debtors shall have entered into and issued the Senior Secured Notes, and all conditions precedent to the effectiveness of the Senior Secured Notes shall have been met;

(6) the Reorganized Debtors shall have entered into the ABL Credit Facility; and

(7) all conditions set forth in the Backstop Commitment Agreement, including, without limitation, the Backstop Purchasers Approval Condition, shall have been satisfied or waived as permitted under the Backstop Commitment Agreement.

### B.  Waiver of Conditions.

The Debtors (with the consent of the Majority Backstop Purchasers as and to the extent set forth in the Backstop Commitment Agreement) may waive any or all of the conditions set forth in Article XII (A) above at any time and without leave of or order of the Court and without any formal action. By order of the Court, the Majority Backstop Purchasers may waive any or all of the conditions set forth in Article XII(A)(2) and Article XII(A)(6) at any time after consultation with the Debtors.

DB02:8993437.11 068125.1001

C.    **Effect of Failure of Conditions.**

In the event that the Effective Date does not occur on or before ninety (90) days after the Confirmation Date, upon notification submitted by the Debtors to the Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors unless extended by Court order.

D.    **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

E.    **Revocation, Withdrawal, or Non-Consummation.**

1.    **Right to Revoke or Withdraw.**

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. From the Confirmation Date through the Effective Date, the Debtors, may revoke or withdraw the Plan with the consent of the Majority Backstop Purchasers or by order of the Bankruptcy Court.

2.    **Effect of Withdrawal, Revocation, or Non-Consummation.**

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

DB02:8993437.11                                                                                                                    068125.1001

Dated: January 13, 2010

AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
     Interim Chief Financial Officer


AVENTINE RENEWABLE ENERGY, LLC

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
     Interim Chief Financial Officer


AVENTINE RENEWABLE ENERGY, INC.

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
     Interim Chief Financial Officer


AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC

By: _____
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
     Interim Chief Financial Officer

DB02:8993437.11

068125.1001

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _[signature]_
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
Interim Chief Financial Officer


**AVENTINE POWER, LLC**

By: _[signature]_
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
Interim Chief Financial Officer


**NEBRASKA ENERGY, L.L.C.**

By: _[signature]_
Name: George T. Henning, Jr.
Title: Interim Chief Executive Officer and
Interim Chief Financial Officer

DB02:8993437.11

068125.1001

**EXHIBIT A**

BRIGADE CAPITAL MANAGEMENT, LLC
NOMURA CORPORATE RESEARCH & ASSET MANAGEMENT, INC.
WHITEBOX ADVISORS LLC
SENATOR INVESTMENT GROUP LP
SEACOR CAPITAL CORPORATION

December 3, 2009

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554

Re: $105,000,000 Senior Secured Notes

Ladies and Gentlemen:

Reference is made to the Chapter 11 bankruptcy cases, lead case no. 09-11214 (KG) (the "Bankruptcy Cases"), currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in which Aventine Renewable Energy Holdings, Inc. ("ARE Holdings" and, in the case of reorganized ARE Holdings, the "Issuer") and certain of its affiliates are debtors and debtors in possession (collectively with the ARE Holdings, the "Debtors"). Reference is further made to: (i) a Chapter 11 plan of reorganization that will be filed by the Debtors on or before December 4, 2009 (as such plan of reorganization may be modified or amended from time to time, the "Plan") and (ii) a disclosure statement that will accompany the Plan (as it may be modified or amended from time to time, the "Disclosure Statement"). Capitalized terms used in this letter agreement (the "Backstop Commitment Agreement") and not otherwise defined shall have the meanings provided in the Plan or, as applicable, the term sheet relating to the issuance of the Senior Secured Notes (the "Senior Secured Notes Term Sheet") attached hereto as Exhibit A.[1]

The Plan proposes that the Debtors will obtain exit financing required for the emergence of the Debtors from Chapter 11 of the Bankruptcy Code through the offering and sale (the "Offering") of $105,000,000 in aggregate principal amount (the "Offering Amount") of the Issuer's senior secured notes (the "Senior Secured Notes") on the terms described in the Plan and the Senior Secured Notes Term Sheet. Pursuant to the Plan, and subject to the terms and conditions of this Backstop Commitment Agreement, each holder (each, a "Pre-Petition Noteholder") of a pre-petition claim with respect to ARE Holdings' 10% senior notes due 2017 (the "Pre-Petition Notes") will be entitled to purchase its respective *pro rata* amount of the Senior Secured Notes. To exercise its right to purchase the Senior Secured Notes in the

---

[1] The Senior Secured Notes Term Sheet (including all appendices and schedules attached thereto) is incorporated into and constitutes a part of this Backstop Commitment Agreement as if set forth herein.

687155.0001 WEST 6383353 v27

Offering, each Pre-Petition Noteholder will be required to accept such offer on or before the Confirmation Hearing in accordance with the offering procedures that will be established in the Plan. For purposes of this Backstop Commitment Agreement (unless otherwise stated), the term "*pro rata*" with respect to any Pre-Petition Noteholder means the percentage yielded by (x) the aggregate principal amount of Pre-Petition Notes held by such Pre-Petition Noteholder divided by (y) the aggregate principal amount of Pre-Petition Notes outstanding as of the Petition Date.

To provide assurance that the Offering will be fully subscribed, subject to the conditions set forth herein, each of the undersigned (collectively, the "Backstop Purchasers") hereby severally, and not jointly, commits to purchase its Commitment Percentage, not to exceed its Commitment Amount (as such terms are defined on Schedule I to the Senior Secured Notes Term Sheet) of the Senior Secured Notes not purchased by Pre-Petition Noteholders in the Offering (the "Backstop Commitment").

In consideration of the foregoing agreements of the Backstop Purchasers:

(a)    in connection with the closing of the Offering, each Backstop Purchaser shall be entitled to purchase units consisting of the Senior Secured Notes and related Noteholder New Equity issued to it in the Offering at a per unit price equal to 97.0% of the Purchase Price; or

(b)    subject to satisfying the terms and conditions set forth herein, in the event any of the Debtors (i) enter into an Alternate Transaction (as defined below) and (ii) do not issue the Senior Secured Notes on the terms set forth in the Senior Secured Notes Term Sheet, the Debtors shall pay to each Backstop Purchaser (unless waived by such purchaser) its pro rata portion of an aggregate fee equal to $3,000,000 (the "Break Up Fee"); provided, however, that any Backstop Purchaser that provides financing or purchases assets as part of an Alternate Transaction shall not be entitled to receive its pro rata portion of the Break Up Fee.

For purposes hereof, an "Alternate Transaction" includes the consummation of (i) any Chapter 11 plan involving the Debtors (other than the Plan), or (ii) any sale or series of sales of the Debtors' assets, which sale(s) reduce the Debtors' ethanol production capacity by more than 50%. For the avoidance of doubt, an Alternate Transaction shall not include the Debtors' entry into the ABL Credit Facility.

Notwithstanding the foregoing, the Break Up Fee shall, subject to satisfying the conditions set forth herein, be (a) deemed fully earned on the date of the entry of the Approval Order by the Bankruptcy Court, and (b) payable in full in cash upon the consummation of an Alternate Transaction; provided, the Backstop Purchasers shall not be entitled to receive the Break Up Fee if a Backstop Termination Event has occurred (unless a Subsequent Transaction Event (as defined below) occurs).

A "Subsequent Transaction Event" shall have occurred, if (i) at the time of the occurrence of a Backstop Termination Event, the Debtors are engaged in discussions with respect to an Alternate Transaction, (ii) such Alternate Transaction is consummated within ninety (90) calendar days of the Backstop Termination Event, (iii) the terms of the Alternate Transaction are better than the terms set forth in Senior Secured Notes Term Sheet, and (iv) the

condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

For the avoidance of doubt, the Debtors shall not be required to pay any Break Up Fee if the Backstop Purchasers are in breach of this Backstop Commitment Agreement.

The Break Up Fee, once paid, shall be nonrefundable, paid in immediately available funds, without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.

Various terms essential to the Offering must still be developed and agreed upon, and we specifically reserve the right to approve all terms and conditions and to propose additional terms. In particular, the Senior Secured Notes Term Sheet does not purport to include all of the conditions, covenants, closing conditions, representations, warranties, defaults, definitions and other terms that would be contained in the definitive documents for the Senior Secured Notes. In addition to the satisfaction of each of the conditions set forth in the Senior Secured Notes Term Sheet, this Backstop Commitment is subject to the negotiation, execution and delivery of definitive documentation satisfactory in form and substance to the Majority Backstop Purchasers and their counsel in their sole discretion. Furthermore, all matters relating to the confirmation and consummation of the Plan, including, without limitation, the form of the Plan as ultimately confirmed by the Bankruptcy Court and the terms of the Senior Secured Notes and of any guarantees and intercreditor arrangements relating to other indebtedness of Debtors, including, specifically, with respect to the ABL Credit Facility, must be in form and substance satisfactory to the Majority Backstop Purchasers and their counsel in their sole discretion. The agreement of the Backstop Purchasers hereunder is further conditioned upon the Backstop Purchasers not having become aware of any information or other matter affecting the Debtors or the transactions contemplated hereby that is inconsistent in a material and adverse manner with any information or other matter disclosed to the Backstop Purchasers or otherwise known or made available to any of the Backstop Purchasers prior to the date hereof, or of any material omissions from the information which has previously been, or may hereafter be, furnished by the Debtors, or their representatives or advisors, to the Backstop Purchasers for their review.

More specifically and for purposes of clarity, the commitment of the Backstop Purchasers to purchase the Senior Secured Notes set forth in this Backstop Commitment Agreement shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to (i) pay the reimbursable expenses provided for in this Backstop Commitment Agreement, (ii) satisfy their indemnification obligations under this Backstop Commitment Agreement and (iii) solely in the event a Subsequent Transaction Event occurs, pay the Break Up Fee) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any Backstop Termination Event occurs (as set forth in the "Termination of Backstop Commitments" section of the Senior Secured Notes Term Sheet); provided that each such Backstop Termination Event may be waived in writing by the Majority Backstop Purchasers:

Whether or not the transactions contemplated hereby are consummated, the Debtors or the reorganized Debtors, as the case may be, agree to: (i) pay within 10 days of demand the reasonable fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the Backstop

Commitment or to the preparation and negotiation of this Backstop Commitment Agreement, the Senior Secured Notes Term Sheet and the proposed documentation and the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and expenses of counsel to the Backstop Purchasers; and (ii) indemnify and hold harmless the Backstop Purchasers and their affiliates and each of their respective directors, officers, partners, members, representatives, employees, agents, attorneys, financial advisors, restructuring advisors and other professional advisors, each of the foregoing solely in their capacities as such with respect to the transactions contemplated by this Backstop Commitment Agreement (each an "Indemnified Person"), and hold each Indemnified Person harmless from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to the Backstop Commitment Agreement, the Backstop Commitment, the Offering, the Senior Secured Notes Term Sheet, the Plan, the use of proceeds of the Senior Secured Notes or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons within 10 days after demand for any reasonable legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Notwithstanding any other provision to the contrary, no Indemnified Person shall be liable to the Debtors or their estates for any special, indirect, consequential or punitive damages in connection with its activities related to the Backstop Commitment Agreement, the Backstop Commitment, the Offering, the Senior Secured Notes Term Sheet, the Plan or the use of proceeds of the Senior Secured Notes. The terms set forth in this indemnification section shall survive termination of the Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the Offering is consummated.

This Backstop Commitment Agreement and the rights and obligations hereunder may not be assigned by the Debtors without the prior written consent of the Majority Backstop Purchasers (and any purported assignment without such consent shall be null and void). This Backstop Commitment Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons. Notwithstanding the foregoing, the Backstop Purchasers may assign all or any portion of their obligations hereunder to one or more financial institutions reasonably acceptable to the Debtors; provided, that no Debtor's consent shall be required for such an assignment to a fund affiliated with any Backstop Purchaser; provided further, in the event that a Backstop Purchaser wishes to assign all or any portion of its obligations hereunder in accordance with the foregoing provisions, each other Backstop Purchaser shall have a right of first refusal to purchase such obligations in such manner as they may agree. Upon any such assignment (other than an assignment to a fund affiliated with any Backstop Purchaser without the Debtors' consent), the obligations of the Backstop Purchasers in respect of the portion of their obligations so assigned shall terminate. In the event that any Backstop Purchaser fails to meet its obligations under this Backstop Commitment Agreement, the non breaching Backstop Purchasers shall have the right, but not the obligation, to assume such obligations in such manner as they may agree.

This Backstop Commitment Agreement sets forth the agreement of the Backstop Purchasers to fund the Backstop Commitment on the terms and subject to the conditions described herein and in the Senior Secured Notes Term Sheet shall be considered withdrawn if the Backstop Purchasers have not received from the Debtors a fully executed counterpart to this Backstop Commitment Agreement on or before 4:00 p.m. New York City time on December 4, 2009.

This Backstop Commitment Agreement will be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

By accepting delivery of this Backstop Commitment Agreement, each Debtor agrees that this Backstop Commitment Agreement is confidential and that neither its existence nor the terms hereof will be disclosed by such Debtor to any person other than such Debtor's officers, directors, employees, accountants, attorneys and other advisors, and then only on a "*need to know*" basis in connection with the transactions contemplated hereby and on a confidential basis. Notwithstanding the foregoing, following the Debtors' acceptance of the provisions hereof and delivery of an executed counterpart of this Backstop Commitment Agreement to the Backstop Purchasers as provided below, the Debtors may (i) make such public disclosures of the terms and conditions hereof as required by law, in the opinion of counsel to the Debtors, to be made, and (ii) file a copy of this Backstop Commitment Agreement with the Bankruptcy Court in connection with the filing of the Plan or the filing of a motion to approve any of the terms of this Backstop Commitment Agreement, and (iii) file a copy of this Backstop Commitment Agreement with the Securities and Exchange Commission or in any public record in which it is required by law to be filed.

This Backstop Commitment Agreement may not be amended or waived except in writing signed by the Debtors and the Majority Backstop Purchasers. This Backstop Commitment Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Agreement by email in portable document format (.pdf format) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Agreement.

This Backstop Commitment Agreement shall become effective and binding upon (i) the mutual exchange of fully executed counterparts and (ii) the entry of the Approval Order.

The Debtors' obligations under this Backstop Commitment Agreement are subject to approval by the Bankruptcy Court and shall not be effective until such approval is obtained; provided, however, that the Debtors agree to file a motion with the Bankruptcy Court, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, on or before December 4, 2009, requesting entry of an order approving the Debtors' entry into this Backstop Commitment Agreement and approving payment of the fees contemplated hereby and in the Senior Secured Notes Term Sheet, the expenses of each of the Backstop Purchasers set forth herein and in the Senior Secured Notes Term Sheet, and the indemnification provisions set forth herein.

If the foregoing is in accordance with your understanding of our agreement, please sign this Backstop Commitment Agreement in the space indicated below and return it to us.

Very truly yours,

Signatures continue on following pages

6

BRIGADE CAPITAL MANAGEMENT, LLC, as
investment manager for and on behalf of certain lenders

By: _____

Name: Carney Hawks

Title: Partner

Dated: ____12 / 1____, 2009

[Signatures continue on following pages]

NOMURA CORPORATE RESEARCH & ASSET
MANAGEMENT, INC., as investment manager for and
on behalf of certain lenders

By: _Stph S Kt_____
Name: Stephen Kotsen
Title: Managing Director

Dated: ___12/03_____, 2009

[Signatures continue on following pages]

WHITEBOX ADVISORS LLC, as investment manager for and on behalf of certain lenders

By: _____
   Name: Jonathan Wood
   Title: Chief Operating Officer

Dated: December 1, 2009

[Signatures continue on following pages]

SENATOR INVESTMENT GROUP LP, as investment
manager for and on behalf of certain lenders

By: _____
Name: EDWARD LARMANN
Title: CHIEF FINANCIAL OFFICER

Dated: December 2, 2009

[Signatures continue on following pages]

SEACOR Capital Corporation, as investment manager for
and on behalf of certain lenders

By: _____

Name: DICK FAGERSTAL

Title: PRESIDENT

Dated: _____, 2009

[Signatures continue on following pages]

The foregoing is hereby
agreed to and accepted:

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.

By: _____

Name:

Title:

Dated: _Deccember 3_, 2009


AVENTINE RENEWABLE ENERGY, INC.

By: _____

Name:

Title:

Dated: _Diccmbu 3_, 2009


AVENTINE RENEWABLE ENERGY – MT
VERNON, LLC

By: _____

Name:

Title:

Dated: _Dicember 3_, 2009

**AVENTINE RENEWABLE ENERGY –
AURORA WEST LLC**

By: _____

Name:

Title:

Dated: _December 3_, 2009


**AVENTINE RENEWABLE ENERGY LLC**

By: _____

Name:

Title:

Dated: _December 3_, 2009


**AVENTINE POWER, LLC**

By: _____

Name:

Title:

Dated: _December 3_, 2009


**NEBRASKA ENERGY, LLC**

By: _____

Name:

Title:

Dated: _December 3_, 2009

## EXHIBIT A

**Senior Secured Notes Term Sheet**

## AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

### $105,000,000 Senior Secured Notes

### <u>Summary of Principal Terms</u>

*The following Summary of Principal Terms (this **"Senior Secured Notes Term Sheet"**) provides an outline of a proposed Notes offering by the Issuer identified below in connection with and upon the emergence of Aventine Renewable Energy Holdings, Inc. and its affiliates (collectively, the **"Debtors"**) from chapter 11 proceedings pursuant to a Chapter 11 plan of reorganization (the **"Plan"**). This Senior Secured Notes Term Sheet is an expression of interest only and is not meant to be binding on the parties and is meant only as a negotiation aid to be used by the Debtors, any Backstop Purchaser (defined below) or other person or entity to provide any financing or to enter into any agreement or contract or any other financing arrangement. Accordingly, the parties do not intend to be bound unless and until they enter into definitive documentation regarding the subject matter of this Senior Secured Notes Term Sheet. The actual terms and conditions upon which any purchaser might purchase the Notes are subject to internal approvals, execution and delivery of definitive legal documentation, including an indenture (the **"Indenture"**) governing the Notes, by all required parties and such other terms and conditions as are determined by the parties; <u>provided</u> that such other terms and conditions are consistent with the terms of this Senior Secured Notes Term Sheet. Until disclosed by Debtors, with the prior written consent of the Majority Backstop Purchasers, this Senior Secured Notes Term Sheet and the information contained herein is strictly confidential and may not be shared with any person or entity. Unless otherwise defined herein, each capitalized term used in this Senior Secured Notes Term Sheet shall have the same meaning ascribed to such term in the Backstop Commitment Agreement (as defined below) to which this Senior Secured Notes Term Sheet is attached.*

| | |
|---|---|
| **Issuer:** | Reorganized Aventine Renewable Energy Holdings, Inc. (the **"Issuer"**). |
| **Securities Offered:** | Not less than $105,000,000 in aggregate principal amount (the **"Offering Amount"**) of senior secured notes (the **"Notes"**) and shares of New Equity equal to 20% in the aggregate of the New Equity issued and outstanding on the Effective Date (the **"Noteholder New Equity"**), subject to dilution by (i) any stock awards issued on or after the Effective Date under the Management Incentive Plan and (ii) the exercise of any warrants issued pursuant to the Plan. The Notes and the Noteholder New Equity will be offered together in units and may not be purchased separately. Each unit, consisting of $1,000 in face amount of Notes, together with the pro rata portion of the Noteholder New Equity to be issued and sold for an aggregate cash consideration equal to $952.38 (the **"Purchase Price"**). |
| **Offering:** | The Notes and the Noteholder New Equity will be offered (the **"Offering"**) (i) on a pro rata basis to each holder (collectively, the **"Pre-Petition Noteholders"**) of a pre-petition claim with respect to the 10% senior notes due 2017 issued by Aventine Renewable Energy Holdings, Inc. and (ii) to the extent less than all of the Notes and Noteholder New Equity are issued to the Pre-Petition Noteholders, to the entities which agree to backstop the Offering pursuant to the Backstop Commitment Agreement (defined below), the initial list of which is set forth on Schedule I hereto (the parties listed on Schedule I, the **"Backstop Purchasers"** and each a **"Backstop Purchaser"**). The rights to subscribe for the purchase of the Notes and Noteholder New Equity |

shall be non-transferrable. For the avoidance of doubt, the Backstop Purchasers shall be entitled to participate in the Offering in their capacity as Pre-Petition Noteholders.

On the terms and subject to the conditions set forth in that certain commitment letter agreement, dated as of December 3, 2009 (the "*Backstop Commitment Agreement*"), each Backstop Purchaser will severally commit to purchase its respective Commitment Percentage (as defined below) of (i) Notes up to an aggregate principal amount equal to $105,000,000 and (ii) shares of Noteholder New Equity. For purposes hereof, (i) a Backstop Purchaser's "*Commitment Percentage*" is the percentage for such purchaser set forth on Schedule I hereto and (ii) "*Majority Backstop Purchasers*" shall mean the Backstop Purchasers having at least a majority of the aggregate Commitment Percentages.

Without limiting the foregoing, a DIP Lender may, at its written election, apply any payment owed by the Debtors to such DIP Lender under the DIP Facility Documents against the purchase of the Notes and Noteholder New Equity, as provided in the Plan.

| | |
|---|---|
| **Registered Exchange Offer; Registration Rights:** | On or after the Effective Date, the reorganized Debtors shall enter into a registration rights agreement (the "*Registration Rights Agreement*") in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion. The Registration Rights Agreement shall provide, among other things, for (i) the registered exchange of the Notes for a new issue of substantially identical debt securities (the "*Exchange Registration*") and (ii) registration of the offer and resale of the Noteholder New Equity issued in the Offering (and any other shares of New Equity held by any Backstop Purchaser) (the "*Resale Registration*"). Notwithstanding the foregoing or anything contained herein, holders of GUC Claims who, as a result of the Unsecured Distribution, receive shares of New Equity equal to 10% or more the New Equity outstanding as of the Effective Date, shall be entitled to "piggyback" registration rights on any registration statement filed by reorganized Holdings with respect to Noteholder New Equity; provided, however, that holders entitled to such piggyback rights shall be subject to customary cut backs. |

With respect to the Exchange Registration, the Registration Rights Agreement will obligate the reorganized Debtors to:

- file a registration statement with the Securities and Exchange Commission enabling the holders of the Notes to exchange the privately issued Notes for publicly registered notes with substantially identical terms within 180 days after the Effective Date;

- cause such registration statement to become effective within 365 days after the Effective Date and to complete the exchange offer within 50 days after the effective date of such registration statement; and

- file a shelf registration statement for the resale of the Notes if the

reorganized Debtors cannot effect an exchange offer within the time periods listed above and in certain other circumstances.

With respect to the Resale Registration, the Registration Rights Agreement will obligate the reorganized Debtors to:

- file a registration statement with the Securities and Exchange Commission seeking to register the offer and resale of the Noteholder New Equity (together with any other shares of New Equity held by any Backstop Purchaser) (collectively, "*Registrable Securities*") pursuant to Rule 415 under the Securities Act of 1933 (the "*Securities Act*") within 180 days after the Effective Date;

- cause such registration statement to become effective within 365 days after the Effective Date; and

- cause such registration statement to remain effective, and supplemented and amended as required by the Securities Act throughout the period ending on the date which is the earliest to occur of (A) the date on which all shares of Registrable Securities registered under such registration statement may be sold in a three-month period under Rule 144 under the Securities Act, (B) the date all such shares of Registrable Securities registered under such registration statement have been sold and (C) two years after the date on which such registration statement became effective with respect to the offer and sale of Registrable Securities, plus the aggregate number of days in all applicable "suspension periods", if any, as set forth in the Registration Rights Agreement.

The failure of the reorganized Debtors to meet any of the obligations describe above with respect to the Exchange Registration or the Resale Registration shall result in additional interest becoming payable with respect to the Notes (including the notes issued in the Exchange Registration) in the amount of 2.0%.

**Listing Requirement:** The reorganized Debtors shall use their commercially reasonable best efforts to cause the New Equity to become listed for trading on a national securities exchange as soon as practicable following the Effective Date.

**Maturity Date:** The fifth anniversary of the issuance of the Notes.

**Guarantees:** The Notes will be fully guaranteed on a senior secured basis, jointly and severally, by each of the Issuer's existing and future domestic subsidiaries (each a "*Guarantor*" and, collectively, the "*Guarantors*").

**Collateral:** The Notes and each note guarantee (the "*Guarantees*") will be secured by a security interest in, and perfected lien on, all of the assets (tangible, intangible, real, personal or mixed) of the Issuer and each Guarantor, whether now owned or hereafter acquired, including, without limitation, all products and proceeds thereof (the "*Collateral*").

**Ranking:** The Notes and each Guarantee will rank senior in right of payment to all existing and future subordinated indebtedness of the Issuer and the

Guarantors.

The Notes and Guarantees will be secured by a first priority lien (subject to specified permitted liens) on all of the Collateral; *provided* that with respect to ABL Collateral (defined below), the Notes and the Guarantees will be secured by a second priority lien (subject to specified permitted liens) in favor of, and to the extent such collateral is pledged to secure the obligations under, a senior secured revolving credit agreement, with aggregate commitments of up to $20 million,[1] to be entered into by the Issuer and/or one or more of its subsidiaries for working capital purposes and otherwise with terms and conditions acceptable in form and substance to the Majority Backstop Purchasers in their sole discretion (such revolving credit agreement, the *"ABL Credit Facility"*).  For purposes hereof, *"ABL Collateral"* includes accounts receivable, inventory, capital stock, certain intellectual property, deposit accounts and investment property.

**Interest Rates; Partial PIK Payments:**

For any interest period under the Notes, the Issuer may elect to pay interest on the entire principal amount (i) in cash at a rate equal to 13.0% per annum or (ii) in the form of a Partial PIK Payment (as defined below) at a rate equal to 15.0% per annum.  For purposes hereof, a *"Partial PIK Payment"* shall mean the payment by the Issuer of accrued interest on the Notes for any interest period thereunder (a) in cash at a rate equal to 8.0% per annum plus (b) the issuance and delivery of additional Notes to the holders thereof in an aggregate principal amount equal to the interest accruing on the Notes for such interest period at a rate equal to 7.0% per annum.  Interest on the Notes, including any interest accruing on the Notes issued as part of a Partial PIK Payment, will accrue and be payable quarterly in arrears, commencing on the fiscal quarter ending immediately after the Closing Date.

**Default Interest Rate:**

Upon the occurrence and during the continuance of an Event of Default (to be defined in the Notes Documents, as defined below), principal on the Notes (and any overdue interest, including any interest accruing on the Notes issued as part of a Partial PIK Payment) will accrue interest at an additional 2.0% per annum, payable in full in cash from time to time on demand.

**Trustee and Collateral Agent:**

[TBD] (the *"Collateral Agent"*).

**Use of Proceeds:**

Proceeds of the Notes may only be used to (i) make payments required to be made on and after the Closing Date under the Plan, including, without limitation, repayment of all amounts owing under the DIP Facility Documents, and (ii) fund the working capital and general corporate needs of the Issuer.

---

[1] Amount of ABL Credit Facility to be determined by Debtors, subject to approval of the Majority Backstop Purchasers.

| **Backstop Purchaser Discount:** | In consideration of the agreements of the Backstop Purchasers set forth in the Backstop Commitment Agreement, each Backstop Purchaser shall be entitled to purchase units consisting of the Senior Secured Notes and related Noteholder New Equity issued to it in the Offering at a per unit price equal to 97.0% of the Purchase Price. |
| --- | --- |
| **Break Up Fee:** | Subject to satisfying the terms and conditions of the Backstop Commitment Agreement, in the event that any of the Debtors (i) enter into an Alternate Transaction (as defined in the Backstop Commitment Agreement) and (ii) do not issue the Notes on the terms set forth in this Senior Secured Notes Term Sheet, then the Debtors shall pay to each Backstop Purchaser (unless waived by such purchaser) its pro rata portion of an aggregate fee equal to $3,000,000 (the *"Break Up Fee"*), provided, however, that any Backstop Purchaser that provides financing or purchases assets as part of an Alternate Transaction shall not be entitled to receive its pro rata portion of the Break Up Fee. For the avoidance of doubt, the Debtors shall not be required to pay any Break Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement. |
| **Optional Redemption:** | The Notes will be redeemable, in whole or in part, at the option of the Issuer, at any time and from time to time, at the redemption prices equal to the percentage of the aggregate face amount of the Notes subject to redemption as set forth below, plus the accrued and unpaid interest thereon, if any, to the date of such redemption. |

| Year | Price |
| --- | --- |
| If redeemed: | |
| prior to the first anniversary of the Closing Date.............. | 105% |
| on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date... | 104% |
| on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date................................................................ | 103% |
| on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date .... | 102% |
| on or at any time after the fourth anniversary of the Closing Date.............................................................. | 101% |

Notwithstanding the foregoing, if the reorganized Debtors determine not to complete construction of the unfinished facilities located at either Aurora, Nebraska or Mt. Vernon, Indiana, then during the 90-day period following the Effective Date, the reorganized Debtors may redeem, on a pro rata basis, up to $25 million in aggregate principal amount of the Notes at a redemption price equal to 101% of the aggregate face amount of the Notes subject to redemption, plus the accrued and unpaid interest thereon, if any, to the date of such redemption.

| **Change of Control Offer:** | Upon the occurrence of a Change of Control (to be defined in the Indenture), the Issuer will be obligated to offer to repurchase the |
| --- | --- |

outstanding Notes at a purchase price equal to 101% of the aggregate face amount of the outstanding Notes, plus the accrued but unpaid interest thereon, if any, to the date of repurchase.

**Asset Sale, Casualty Event and Equity Issuance Offers:** The Issuer will be obligated to offer to repurchase the maximum principal amount outstanding on the Notes that may be repurchased, at a purchase price equal to 100% of the principal amount thereof, plus the accrued but unpaid interest to the date of repurchase, with 100% of the net cash proceeds received from (i) asset sales, (ii) insurance proceeds from casualty events and (iii) equity issuances; *except* (a) in each case, to the extent required to be applied to the repayment of loans under the ABL Credit Facility and (b) in the case of proceeds from asset sales and casualty events, if the Issuer elects to, and within 270 days does, use such proceeds to acquire other, or make improvements to, assets that constitute Collateral (other than ABL Collateral) and that are used or useful in the Issuer's or any Guarantor's business.

**Covenants:** The Indenture will contain provisions restricting the Issuer's and its restricted subsidiaries' ability to:

- pay dividends or make distributions, redeem or repurchase stock, prepay subordinated debt or make other restricted payments;

- incur indebtedness or issue disqualified capital stock, warrants, options or rights to purchase capital stock (except as contemplated by the Management Incentive Plan);

- make certain investments;

- create or permit to exist liens on assets;

- restrict dividend payments, distributions or other payments from subsidiaries;

- consolidate or merge;

- sell, lease, exchange or otherwise transfer or dispose of assets, including equity interests of restricted subsidiaries;

- enter into transactions with affiliates;

- designate subsidiaries as unrestricted subsidiaries; and

- use the proceeds of the Notes and permitted proceeds of asset sales.

**Ratings:** The Issuer will obtain ratings for the Notes by either Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or Moody's Investors Service, Inc.

**Events of Default:** The Indenture will contain events of default customary or appropriate for the Notes.

**Governing Law:** State of New York.

6

**Conditions Precedent To the Closing:**

The obligation of the Backstop Purchasers to purchase the Notes as set forth in the Backstop Commitment Agreement will be conditioned upon satisfaction of each of the following; <u>provided,</u> that each of the following conditions may be waived by the Majority Backstop Purchasers in their sole discretion:

- The Notes, the Indenture and all documents, instruments and other agreements executed and delivered in connection with any of the foregoing (collectively, the *"Notes Documents"*) shall be in form and substance satisfactory to the Majority Backstop Purchasers in their sole discretion;

- The Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the *"Plan Documents"*) shall be in form and substance satisfactory to the Majority Backstop Purchasers in their sole discretion;

- All motions and other documents to be filed with the Bankruptcy Court in connection with the offer and sale of the Notes, the approval of the Notes Documents and payment of the fees contemplated hereunder shall be in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion;

- All reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel) required to be paid to each of the Backstop Purchasers, the Trustee and the Collateral Agent on or before the Closing Date have been paid in full in cash;

- The Bankruptcy Court shall have (i) entered an order, in form and substance satisfactory to the Majority Backstop Purchasers in their sole discretion (the *"Approval Order"*), approving the Debtors' entry into the Backstop Commitment Agreement and approving, payment of the fees contemplated thereby, the expenses of each of the Backstop Purchasers set forth therein and herein, and the indemnification provisions set forth therein, and (ii) entered the Confirmation Order, which shall among other things, authorize and approve this Senior Secured Notes Term Sheet and the transactions contemplated herein, including, without limitation, the granting of the security interests and liens and the payment of all consideration and fees referred to herein, which orders shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Backstop Purchasers (which consent may be withheld in their sole discretion);

- Except for the chapter 11 proceedings and any usual and customary consequences of any such filing, there shall have occurred no material adverse effect on any of (i) the operations, performance, prospects, business, assets, properties, or condition (financial or otherwise) of the Debtors, taken as a whole, based on information provided by the Debtors to the Backstop Purchasers since December 4, 2009, (ii) the ability of any of the reorganized Debtors

to perform their respective obligations under the Notes Documents or (iii) the ability of the noteholders to enforce their rights under the Notes Documents (each of the foregoing, a *"**Material Adverse Change**"*);

- Any and all governmental and third party consents and approvals necessary in connection with the offer and sale of the Notes, the execution of the Notes Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect; and

- The Plan shall have become, or simultaneously with the issuance of the Notes will become, effective.

**Termination of Backstop Commitments:** The commitment of the Backstop Purchasers to purchase the Notes set forth in the Backstop Commitment Agreement (the *"**Backstop Commitment**"*) shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to (i) pay the reimbursable expenses under the Backstop Commitment Agreement, (ii) satisfy their indemnification obligations under the Backstop Commitment Agreement and (iii) pay the Break Up Fee if a Subsequent Transaction Event occurs) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the following occurs (each, a *"**Backstop Termination Event**"*), each of which may be waived in writing by the Majority Backstop Purchasers, provided, however, the Debtors shall not be required to pay the Break Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement:

- the Plan and Disclosure Statement, each in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, are not filed by the Debtors with the Bankruptcy Court on or before December 4, 2009;

- a motion, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, requesting entry of the Approval Order is not filed by the Debtors with the Bankruptcy Court on or before December 4, 2009;

- the Solicitation Order, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, is not entered by the Bankruptcy Court on or before January 14, 2010;

- the Approval Order, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, is not entered by the Bankruptcy Court on or before January 14, 2010;

- the Debtors fail to commence a solicitation of votes for acceptance of the Plan on or before January 19, 2010;

- the Plan Supplement (which shall include, without limitation, the Corporate Governance Documents and Notes Documents, each in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion) is not finalized and filed on or before the date that is ten (10) calendar days before the voting deadline on the

Plan;

- the Confirmation Order, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, is not entered by the Bankruptcy Court on or before February 26, 2010;

- the Effective Date does not occur on or before March 15, 2010; provided, that that the Majority Backstop Purchasers have not acted (or failed to act) in a manner materially inconsistent with this Senior Secured Notes Term Sheet.

- the withdrawal, amendment, modification or filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any motion, notice, supplement, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with this Senior Secured Notes Term Sheet;

- the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

- the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (iv) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Debtors;

- an action (or failure to act) by the Debtors that is materially inconsistent with this Senior Secured Notes Term Sheet, unless such action (or inaction) is cured within five (5) business days of receiving written notice thereof from the Majority Backstop Purchasers;

- any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring set forth in this Senior Secured Notes Term Sheet in a manner that cannot be reasonably and promptly remedied by the Debtors or the Backstop Purchasers;

- one or more of the conditions precedent to the consummation of the transactions set forth in this Senior Secured Notes Term Sheet or to the obligations of the Backstop Purchasers set forth in the Backstop Commitment Agreement is not satisfied or, in the judgment of the Majority Backstop Purchasers, becomes impossible to satisfy on or before the Closing Date; or

- at any time from and after the occurrence of a Material Adverse Change.

The foregoing notwithstanding, the Majority Backstop Purchasers shall endeavor to consult with the Creditors' Committee prior to any such approval, waiver or consent; provided, that the failure to consult with the Creditors' Committee shall not affect the rights of the Majority Backstop Purchasers, or the validity of any such approval, waiver or consent.

Notwithstanding anything contained herein or the Backstop Commitment Agreement, if (i) at the time of the occurrence of a Backstop Termination Event, the Debtors are engaged in discussions with respect to an Alternate Transaction; (ii) such Alternate Transaction is consummated within ninety (90) calendar days of the Backstop Termination Event, (iii) the terms of the Alternate Transaction are better than the terms set forth in this Senior Secured Notes Term Sheet, and (iv) the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith (clauses (i) – (iv) together, a "*Subsequent Transaction Event*"), the Debtors or the reorganized Debtors, as the case may be, shall be required to pay the Break Up Fee as if no Backstop Termination Event had occurred.

**Closing Date:**        The effective date of the Plan as ordered by the Bankruptcy Court, it being anticipated that such date will occur on or before March 15, 2010 (the "*Closing Date*").

**Expenses:**        The Debtors shall pay all out of pocket costs and expenses of each of the Backstop Purchasers and the Collateral Agent (including all reasonable fees and expenses of counsel and consultants) in connection with the negotiation, preparation, execution and delivery of the Notes Documents (including, without limitation, the Guarantees), any amendment or waiver of any provision of the Notes Documents and in connection with the enforcement or protection of any of their rights and remedies under the Notes Documents, and the issuance of the Notes and the New Equity issued to the Backstop Purchasers and the Pre-Petition Noteholders that are purchasers of the Notes.

## Schedule I

## Backstop Purchasers

| Backstop Purchasers | Commitment Percentage | Commitment Amount [2] |
|---|---|---|
| Brigade Capital Management, LLC, as investment manager, for and on behalf of certain funds | 36.0% | $37,800,000 |
| Nomura Corporate Research & Asset Management, Inc., as investment manager, for and on behalf of certain funds | 9.0% | $9,450,000 |
| Whitebox Advisors LLC, as investment manager, for and on behalf of certain funds | 27.0% | $28,350,000 |
| Senator Investment Group LP, as investment manager, for and on behalf of certain funds | 18.0% | $18,900,000 |
| SEACOR Capital Corporation | 10.0% | $10,500,000 |
| **TOTAL** | **100%** | **$105,000,000** |

---

[2] These amounts represent the aggregate face amount of the Senior Secured Notes. The actual aggregate cash purchase price of units shall not exceed $100 million.

**EXHIBIT B**

To: Holders of Pre-Petition Claims Relating to the 10% Senior Notes Referenced Below

From: Aventine Renewable Energy Holdings, Inc.

Re: Commitments with respect to the proposed Aventine Senior Secured Notes

Date: January [●], 2010

---

You are receiving this notice (this "Notice") and these procedures (including the attached exhibits, and together with the Notice, the "Procedures") in your capacity as a holder of a pre-petition claim (a "Pre-Petition Noteholder") with respect to the 10% Senior Notes due 2017 ("Pre-Petition Notes") of Aventine Renewable Energy Holdings, Inc. (the "ARE Holdings, Inc.").

*Senior Secured Notes*

In connection with and upon the emergence of ARE Holdings, Inc. and certain of its affiliates (collectively, the "Debtors") from Chapter 11 proceedings pursuant to a confirmed plan of reorganization (the "Plan"), reorganized ARE Holdings, Inc. (the "Issuer") expects to offer and sell (the "Offering") no less than $105,000,000 in aggregate principal amount (the "Offering Amount") of its senior secured notes (the "Senior Secured Notes") and shares of the Issuer's common stock issued pursuant to the Plan ("New Equity") in an amount equal to 20% of the New Equity outstanding on the effective date of the Plan ("Noteholder New Equity"), subject to dilution by (i) any stock awards issued on or after the effective date of the Plan (the "Effective Date") and (ii) the exercise of any warrants issued pursuant to the Plan. The proposed Offering will be made (1) on a pro rata basis to each Pre-Petition Noteholder which certifies its status as either a Qualified Institutional Buyer or Accredited Investor pursuant to Section 4 of the Subscription Form attached hereto as Exhibit A (each an "Eligible Offeree") and (2) to the extent less than all of the Senior Secured Notes and the Noteholder New Equity are issued to the Pre-Petition Noteholders, to certain Pre-Petition Noteholders who have agreed to backstop the Offering (the "Backstop Purchasers") pursuant to that certain commitment letter agreement dated on or about December 3, 2009 among the Backstop Purchasers and ARE Holdings, Inc. (the "Backstop Commitment Agreement"), and will be substantially on the terms described in the Plan. The Senior Secured Notes and the Noteholder New Equity will be offered together in units (each, a "Unit") and may not be purchased separately. Each Unit, consisting of $1,000 in face amount of Senior Secured Notes and a pro rata portion of the Noteholder New Equity, will be issued and sold for an aggregate cash consideration of $952.38. For a more detailed description of the terms of the proposed Offering, please see the Plan.

*Invitation*

This Notice constitutes an invitation to holders of record (or purchasers party to binding trade confirms not yet settled (the "Unsettled Trades")) of Pre-Petition Notes as of 5:00 p.m., New York time, constituting an Eligible Offeree on the deadline to vote on the Plan, which the Debtors anticipate will be February 17, 2010 (the "Subscription Deadline") (such holders and

purchasers party to Unsettled Trades, collectively, the "Eligible Subscribers") to subscribe for and purchase in the Offering (such holdings and Unsettled Trades, collectively, the "Eligible Holdings") their pro rata portion of the Units, subject to the conditions set forth in this Notice and these Procedures.

**If you have entered into an Unsettled Trade with respect to Pre-Petition Notes, we urge you to distribute this Notice and the Procedures to the counterparty to such Unsettled Trade. Until we receive notice of an Unsettled Trade with respect to Pre-Petition Notes, we have no way of knowing the counterparties to such Unsettled Trade, and thus we cannot distribute this Notice and the Procedures to such counterparty.**

In order to subscribe for and purchase Units in the proposed Offering, the Eligible Subscriber and/or its Affiliates[1] must be the holder of record of Pre-Petition Notes or a purchaser party to Unsettled Trades, as applicable, as of the Subscription Deadline. Eligible Subscribers will need to certify their holdings of Pre-Petition Notes and the amount of Unsettled Trades as of the Subscription Deadline. The rights of each Eligible Subscriber to participate in the Offering are not transferable. Any such transfer or attempted transfer shall be null and void, and no purported transferee shall be treated as the holder of any rights to participate in the Offering. Once an Eligible Subscriber has properly delivered its Subscription Form, such exercise cannot be revoked, rescinded or modified.

In order for an Eligible Subscriber to subscribe for and purchase Units in the proposed Offering, it must deliver (1) an executed Subscription Form, in the form attached hereto as Exhibit A (a "Subscription Form"), (2) original executed copies of the tax document required by the Subscription Form, and (3) to the extent required to resolve any discrepancy with respect to Eligible Holdings relating to Unsettled Trades, documents reasonably satisfactory to the Debtors to confirm the entry into, and the principal amount of Pre-Petition Notes subject to, Unsettled Trades, in each case, before 5:00 p.m. Eastern time on the Subscription Deadline. Subscription Forms must be submitted in the prescribed form without alteration. The Debtors have the right to reject any Subscription Form, in their reasonable discretion, which does not conform or is not properly completed and executed or does not include all additional documentation and deliveries required thereby. Executed Subscription Forms must be delivered to the Debtors via email or fax no later than the Subscription Deadline of 5:00 p.m., New York time, on February 17, 2010 as follows:

| | |
|---|---|
| Address: | [●] |
| Fax: | [●] |
| Email: | [●] |
| Attention: | [●] |

If the Debtors for any reason do not receive from a given Eligible Subscriber a duly completed Subscription Form on or prior to the Subscription Deadline in accordance with these Procedures, such Eligible Subscriber shall be deemed to have relinquished and waived its right to participate in the Offering.

---

[1] For purposes of this Notice and the Procedures, the term Affiliates shall additionally include commonly advised or managed funds.

NONE OF THE DEBTORS OR THE BACKSTOP PURCHASERS NOR ANY AGENT ACTING ON OUR OR THEIR BEHALF MAKES ANY RECOMMENDATION AS TO WHETHER OR NOT ELIGIBLE SUBSCRIBERS SHOULD ACCEPT THIS INVITATION TO SUBSCRIBE FOR UNITS IN THE PROPOSED OFFERING. EACH ELIGIBLE SUBSCRIBER MUST MAKE ITS OWN DECISION AS TO WHETHER IT WILL SUBSCRIBE FOR UNITS. ELIGIBLE SUBSCRIBERS SHOULD CONSULT THEIR OWN ADVISORS AS TO WHETHER THEY SHOULD SUBSCRIBE FOR UNITS.

*Subscription in the Proposed Offering*

The Subscription Form attached hereto as <u>Exhibit A</u> requires that each Eligible Subscriber commit to subscribe for its "<u>Subscription Amount</u>". The Subscription Amount with respect to any Eligible Offeree shall be the product of (1) the Offering Amount and (2) the percentage determined by dividing (a) the aggregate principal amount of Pre-Petition Notes held by such Eligible Offeree by (b) the aggregate principal amount of all Pre-Petition Notes outstanding as of the Petition Date.

*Allocation of Units*

Following the Subscription Deadline, each Eligible Subscriber will be allocated its Subscription Amount. If the proposed Offering is not fully subscribed by close of business on the Subscription Deadline, each Backstop Purchaser will purchase its respective Commitment Percentage (as defined in the term sheet relating to the Senior Secured Notes) of the Units not purchased by Eligible Offerees.

*Allocation and Settlement Procedure*

Allocations of the Units will be made ratably among the Eligible Offerees substantially in accordance with this Notice and the Procedures. The Debtors will provide notice of such allocations (a "<u>Preliminary Allocation Notice</u>") to each Eligible Subscriber that elects to participate in the proposed Offering. Allocations will be based on executed Subscription Forms meeting the terms set forth in this Notice and the Procedures. Preliminary Allocation Notices will be sent to participants as soon as reasonably practicable after the Subscription Deadline (the "<u>Allocation Date</u>"). The Allocation Date is expected to be on the third Business Day following the Subscription Deadline. The Preliminary Allocation Notices shall set forth, among other things, wire transfer instructions and the full amount of the Eligible Subscriber's allocation in the proposed Offering. Preliminary allocation amounts are subject to change. Each Eligible Subscriber shall submit its full amount of the Eligible Subscriber's allocation in the proposed Offering (the "<u>Allocated Funding Amount</u>") in immediately available funds no later than the close of business on the Business Day immediately prior to the Effective Date (the "<u>Funding Date</u>"). If the Debtors for any reason do not receive from a given Eligible Subscriber its Allocated Funding Amount in immediately available funds on or prior to the Funding Date, such Eligible Subscriber shall be deemed to have relinquished and waived its right to participate in the Offering. As promptly as reasonably practicable following the Funding Date, each Eligible Subscriber will receive notice of such Eligible Subscriber's final Allocated Funding Amount.

*Exemption from Registration under the Securities Act*

The Offering is being made to Eligible Subscribers only. It is the intention of the Debtors that the Senior Secured Notes and the Noteholder New Equity issued pursuant to the Offering to the Eligible Subscribers shall be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of one or more available exemptions therefrom provided under the Securities Act, including, without limitation, by virtue of section 4(2) thereof. Unlike the New Equity issued to holders of general unsecured claims against the Debtors, the Noteholder New Equity and the Senior Secured Notes issued to the Eligible Subscribers pursuant to the Offering will not be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code.

*Tax and Other Requirements*

Subscribers will be required to provide to the Debtors and the Backstop Purchasers documentation reasonably requested by the Debtors and the Backstop Purchasers to establish satisfaction of ownership requirements with respect to the Pre-Petition Notes. Failure to satisfy such requirements or timely provide such documentation may result in a failure to receive an allocation in the proposed Offering or the rescission of any outstanding allocation.

Prospective subscribers should discuss the tax implications of a subscription with their own tax advisors.

*Validity of Exercise of Subscription Rights*

All questions concerning the timeliness, viability, form and eligibility of any exercise of subscription rights of an Eligible Subscriber shall be determined by the Debtors, whose good faith determinations shall be final and binding. The Debtors, in their discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Eligible Subscriber's subscription rights hereunder. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion. The Debtors shall use commercially reasonable efforts to give notice to any Eligible Subscribers regarding any defect or irregularity in connection with any purported exercise of subscription rights hereunder by such subscriber and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that the Debtors and the Backstop Purchasers shall not incur any liability for failure to give such notification.

*Indemnification of Backstop Purchasers*

Pursuant to the Backstop Commitment Agreement, the Debtors or the Issuer, as the case may be, have agreed to indemnify and hold harmless the Backstop Purchasers and their affiliates and each of their respective directors, officers, partners, members, representatives, employees, agents, attorneys, financial advisors, restructuring advisors and other professional advisors, each of the foregoing solely in their capacities as such with respect to the transactions contemplated by the Backstop Commitment Agreement (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising

out of or in any way related to the Backstop Commitment Agreement, the Backstop Commitment, the Offering, the Plan, the use of proceeds of the Senior Secured Notes or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons within 10 days after demand for any reasonable legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Notwithstanding any other provision to the contrary, no Indemnified Person shall be liable to the Debtors or their estates for any special, indirect, consequential or punitive damages in connection with its activities related to the Backstop Commitment Letter, the Backstop Commitment, the Offering, the Plan or the use of proceeds of the Senior Secured Notes. The terms set forth in this indemnification section shall survive termination of the Backstop Commitment Letter and shall remain in full force and effect regardless of whether the Offering is consummated.

The terms set forth in this indemnification section shall survive termination of the Backstop Commitment Letter and shall remain in full force and effect regardless of whether the Offering is consummated.

*Potential Change in Procedures*

The Debtors, subject to the consent of the Backstop Purchasers, reserve the right, but will not be obligated, at any time and from time to time, to extend the offer described herein beyond the dates noted herein and to amend the offer and the procedures described herein. The Debtors, subject to the consent of the Backstop Purchasers, will provide you notice of any extension, waiver, material amendment or termination of the Notice and the Procedures.

*Questions*

If you have any questions regarding the proposed Offering, please contact any of the following people at [•]:

[•]
Phone: [•]
Email: [•]

[•]
Phone: [•]
Email: [•]

Thank you for your consideration.

# SUBSCRIPTION FORM

## REORGANIZED AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

To:    **[●]**
       Email: **[●]**
       Fax: **[●]**
       Attn: **[●]**

From:  Electing Eligible Subscriber identified below

Date:  **[●]**, 2009

### Section 1 –Election Amount

Eligible Holdings, excluding Unsettled Traded
(with respect to itself and all Affiliates):[2]      $_____

Eligible Holdings with respect to Unsettled
Trades       $_____

Name of counterparty with respect to Unsettled
Trades set forth above:

Total Eligible Holdings (with respect to itself
and all Affiliates) (Pre-Petition Notes Eligible
Holdings plus Unsettled Trades)      $_____

Subscription Amount

(Offering Amount x (Total Eligible Holdings    $_____
divided by $[●]))

If all or a portion of the holdings listed above is held by Affiliates of the prospective purchaser,
please provide the amount held by each Affiliate:

| Affiliate Name | Principal Amount |
|---|---|
|  |  |
|  |  |
|  |  |

---

[2] Once this Subscription Form is submitted, such amount may not be transferred or, with respect to
Unsettled Trades, terminated until after the Subscription Deadline.

If all or a portion of the holdings listed above are on account of Unsettled Trades, please provide the name of the record holder of the applicable Pre-Petition Notes:

| Name of Record Holder | Principal Amount |
|---|---|
| | |
| | |
| | |

By executing this Subscription Form, the undersigned directs the trustee under the Pre-Petition Notes to provide to the Debtor and the Backstop Purchasers any purchaser information requested by the Debtor and the Backstop Purchasers.

## Section 2 – Administrative Details

Issuer Information
Reorganized Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, IL 61554

Issuer Wire Instructions
[●]
[●]
Account Name: [●]
Number: [●]

> It is very important that all of the requested information be completed accurately and that this Subscription Form be returned promptly. If your institution is sub-allocating its allocation, please fill out a Subscription Form for each legal entity.

Legal Name of purchaser to appear in documentation (include all Affiliates proposed to hold all or a portion of the Units):

Legal Name of Record Holder          Principal Amount

Signature Block Information: _____

Type of Entity: _____

(Bank, Asset Manager, Broker/Dealer, CLO/CDO; Finance Company, Hedge Fund, Insurance, Mutual Fund, Pension Fund, Other Regulated Investment Fund, Special Purpose Vehicle, Other-please specify)

Purchaser Parent (if applicable): _____

Purchaser Domestic Address

_____

DB02:9065239.1 068125.1001

| | Contacts/Notification Methods | |
|---|---|---|

|  | Primary Contact | Secondary Contact |
|---|---|---|
| Name: | _____ | _____ |
| Company: | _____ | _____ |
| Title: | _____ | _____ |
| Address: | _____ | _____ |
|  | _____ | _____ |
| Telephone: | _____ | _____ |
| Facsimile: | _____ | _____ |
| E-Mail Address: | _____ | _____ |

## Section 3 – Tax Documents

### NON-U.S. PURCHASERS:

*I.*  *Corporations*:

If your institution is incorporated outside of the United States for U.S. federal income tax purposes, <u>and</u> is the beneficial owner of the interest and other income it receives, you must complete one of the following two tax forms, as applicable to your institution: *a.) Form W-8BEN (Certificate of Foreign Status of Beneficial Owner)* or *b.) Form W-8ECI (Income Effectively Connected to a U.S. Trade or Business)*, in each case claiming complete exemption from U.S. federal withholding tax.

If your institution is claiming complete exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code of 1986, as amended, with respect to payments of "portfolio interest", you must complete the following two tax forms: *a.) Exhibit G (Non-Bank Certificate)* and *b.) Form W-8BEN (Certificate of Foreign Status of Beneficial Owner)*.

A U.S. taxpayer identification number is required for any institution submitting Form W¬8ECI. It is also required on Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S. Please refer to the instructions when completing the form applicable to your

institution. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **An original tax form must be submitted.**

*II.* *Flow-Through Entities*:

If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a Partnership, Trust, Qualified or Non-Qualified Intermediary, or other non-U.S. flow-through entity, an original *Form W-8IMY (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain US. Branches for United States Tax Withholding)* must be completed by the intermediary together with a withholding statement claiming complete exemption from U.S. federal withholding tax. Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underlying beneficial owners.

Please refer to the instructions when completing this form. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **Original tax form(s) must be submitted.**

<u>U.S. PURCHASERS</u>:

If your institution is incorporated or organized <u>within</u> the United States, you must complete and return *Form W-9 (Request for Taxpayer Identification Number and Certification)*. *Please be advised that we request that you submit an original Form W-9.*

**[The applicable tax form for your institution must be completed and returned on or before [●]].** Failure to provide the proper tax form when requested may subject your institution to U.S. tax withholding.

## Section 4 – Qualified Status

By executing this Subscription Form, I certify that I am either (check one box):

☐ a "Qualified Institutional Buyer" (as such term is defined in Annex 1 hereto) that is acting for either my own account or accounts of certain Qualified Institutional Buyers; or

☐ an "Accredited Investor" (as such term is defined in Annex 2 hereto) or acting for accounts of certain Accredited Investors.

## Section 5 – Certifications

By executing this Subscription Form, I certify that (i) I am the holder, or the authorized signatory of the holder, of Pre-Petition Notes in the amounts set forth herein, (ii) I am, or such holder is, entitled to participate in the proposed Offering to the extent of my, or such holder's Subscription Amount indicated under Section 1 above, and (iii) I am, or such holders is, an Eligible Subscriber.

EXECUTED this _____ day of _____, 20__:

PURCHASER NAME:

_____

By: _____
Name: _____
Title: _____

DB02:9065239.1

068125.1001

"Qualified Institutional Buyer" means:

(1)    Any of the following entities, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity:

(a)    Any insurance company as defined in Section 2(a)(13) of the Securities Act of 1933, as amended (the "Securities Act");

(b)    Any investment company registered under the Investment Company Act of 1940 (the "Investment Company Act") or any business development company as defined in Section 2(a)(48) of the Investment Company Act;

(c)    Any small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

(d)    Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees;

(e)    Any employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974;

(f)    Any trust fund whose trustee is a bank or trust company and whose participants are exclusively plans of the types identified in subparagraph (1)(d) or (e) above, except trust funds that include as participants individual retirement accounts or H.R. 10 plans;

(g)    Any business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940 (the "Investment Advisors Act");

(h)    Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation (other than a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution referenced in Section 3(a)(5)(A) of the Securities Act or a foreign bank or savings and loan association or equivalent institution), partnership, or Massachusetts or similar business trust; or

(i)    Any investment adviser registered under the Investment Advisers Act;

(2)    Any dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $10 million of securities of issuers that are not affiliated with the dealer, provided that securities constituting the whole or a part of an unsold allotment to or subscription by a dealer as a participant in a public offering shall not be deemed to be owned by such dealer;

A-1

(3)     Any dealer registered pursuant to Section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a qualified institutional buyer;

(4)     Any investment company registered under the Investment Company Act, acting for its own account or for the accounts of other qualified institutional buyers, that is part of a family of investment companies which own in the aggregate at least $100 million in securities of issuers, other than issuers that are affiliated with the investment company or are part of such family of investment companies. "Family of investment companies" means any two or more investment companies registered under the Investment Company Act, except for a unit investment trust whose assets consist solely of shares of one or more registered investment companies, that have the same investment adviser (or, in the case of unit investment trusts, the same depositor), provided that:

(a)     Each series of a series company (as defined in Rule 18f-2 under the Investment Company Act) shall be deemed to be a separate investment company; and

(b)     Investment companies shall be deemed to have the same adviser (or depositor) if their advisers (or depositors) are majority-owned subsidiaries of the same parent, or if one investment company's adviser (or depositor) is a majority-owned subsidiary of the other investment company's adviser (or depositor);

(5)     Any entity, all of the equity owners of which are qualified institutional buyers, acting for its own account or the accounts of other qualified institutional buyers; and

(6)     Any bank as defined in Section 3(a)(2) of the Securities Act, any savings and loan association or other institution as referenced in Section 3(a)(5)(A) of the Securities Act, or any foreign bank or savings and loan association or equivalent institution, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with it and that has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of sale under the rule in the case of a U.S. bank or savings and loan association, and not more than 18 months preceding such date of sale for a foreign bank or savings and loan association or equivalent institution.

For purposes of the foregoing definition:

In determining the aggregate amount of securities owned and invested on a discretionary basis by an entity, the following instruments and interests shall be excluded: bank deposit notes and certificates of deposit; loan participations; repurchase agreements; securities owned but subject to a repurchase agreement; and currency, interest rate and commodity swaps.

(1)     The aggregate value of securities owned and invested on a discretionary basis by an entity shall be the cost of such securities, except where the entity reports its securities holdings in its financial statements on the basis of their market value, and no current information with respect to the cost of those securities has been published. In the latter event, the securities may be valued at market for purposes of this definition.

A-2

(2)    In determining the aggregate amount of securities owned by an entity and invested on a discretionary basis, securities owned by subsidiaries of the entity that are consolidated with the entity in its financial statements prepared in accordance with generally accepted accounting principles may be included if the investments of such subsidiaries are managed under the direction of the entity, except that, unless the entity is a reporting company under Section 13 or 15(d) of the Exchange Act, securities owned by such subsidiaries may not be included if the entity itself is a majority-owned subsidiary that would be included in the consolidated financial statements of another enterprise.

(3)    "Riskless principal transaction" means a transaction in which a dealer buys a security from any person and makes a simultaneous offsetting sale of such security to a qualified institutional buyer, including another dealer acting as riskless principal for a qualified institutional buyer.

DB02:9065239.1

068125.1001

"Accredited Investor" means:

(1)     Any bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Exchange Act; any insurance company as defined in Section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act or a business development company as defined in section 2(a)(48) of the Investment Company Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)     Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act;

(3)     Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of the Securities Act;

(5)     Any entity in which all of the equity owners are Accredited Investors;

(6)     Any director or executive officer of the issuer;

(7)     Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000; or

(8)     Any natural person with an income in excess of $200,000 during each of the previous two years who reasonably expects to have income in excess of $200,000 during the current year, or joint income with such person's spouse in excess of $300,000 during each of the previous two years and reasonably expects to have joint income in excess of $300,000 during the current year.



**EXHIBIT C**

Aventine Renewable Energy, Inc. ("Aventine")

**Warrant Term Sheet**

The following summary of the terms of the Warrants, is subject in all respects, to the more detailed terms that will be included in the New Corporate Governance Documents.

**Warrant Pool:**

450,000 Warrants (presenting the right to purchase an aggregate of 5.0%, on a fully diluted basis (but subject to dilution in connection with any stock options awarded to management on or after the Effective Date), of the New ARE Holdings Common Stock being issued on the Effective Date pursuant to the Plan), with each Warrant exercisable for one (1) share of New ARE Holdings Common Stock at an exercise price of $40.94 per share

**Duration:**

The Warrants shall expire on the earlier of (a) five years after the Effective Date (the "Exercise Period") and (b) the consummation of a change of control of Reorganized ARE Holdings.

**Exercise Mechanism:**

If, at any time during the Exercise Period, Reorganized ARE Holdings consummates a transaction, or series of related transactions, resulting in a merger or consolidation or other sale of all or substantially all of the New Common Stock for cash, then Warrants may be exercised on a cashless basis, in which case, holders shall be entitled to the net cash amount owing as a result of such transaction, if any, in excess of the exercise price. Except for the foregoing, the Warrants shall be exercisable on a cash basis only.

**No Registration Rights:**

No holder of Warrants shall have the right to cause reorganized Aventine to register the offer and resale of Warrants with the U.S. Securities and Exchange Commission, nor shall holders of Warrants be entitled to any "piggyback" registration rights with respect to Warrants.

**Anti-Dilution:**

The Warrants shall provide customary anti-dilution protection for stock splits and combinations (mechanical anti-dilution only). The Warrants shall not be entitled to economic anti-dilution protection.