# Exhibit A

BRIGADE CAPITAL MANAGEMENT, LLC
NOMURA CORPORATE RESEARCH & ASSET MANAGEMENT, INC.
WHITEBOX ADVISORS LLC
SENATOR INVESTMENT GROUP LP
SEACOR CAPITAL CORPORATION

December 3, 2009

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554

Re:   $105,000,000 Senior Secured Notes

Ladies and Gentlemen:

Reference is made to the Chapter 11 bankruptcy cases, lead case no. 09-11214 (KG) (the "Bankruptcy Cases"), currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in which Aventine Renewable Energy Holdings, Inc. ("ARE Holdings" and, in the case of reorganized ARE Holdings, the "Issuer") and certain of its affiliates are debtors and debtors in possession (collectively with the ARE Holdings, the "Debtors"). Reference is further made to: (i) a Chapter 11 plan of reorganization that will be filed by the Debtors on or before December 4, 2009 (as such plan of reorganization may be modified or amended from time to time, the "Plan") and (ii) a disclosure statement that will accompany the Plan (as it may be modified or amended from time to time, the "Disclosure Statement"). Capitalized terms used in this letter agreement (the "Backstop Commitment Agreement") and not otherwise defined shall have the meanings provided in the Plan or, as applicable, the term sheet relating to the issuance of the Senior Secured Notes (the "Senior Secured Notes Term Sheet") attached hereto as Exhibit A.[1]

The Plan proposes that the Debtors will obtain exit financing required for the emergence of the Debtors from Chapter 11 of the Bankruptcy Code through the offering and sale (the "Offering") of $105,000,000 in aggregate principal amount (the "Offering Amount") of the Issuer's senior secured notes (the "Senior Secured Notes") on the terms described in the Plan and the Senior Secured Notes Term Sheet. Pursuant to the Plan, and subject to, the terms and conditions of this Backstop Commitment Agreement, each holder (each, a "Pre-Petition Noteholder") of a pre-petition claim with respect to ARE Holdings' 10% senior notes due 2017 (the "Pre-Petition Notes") will be entitled to purchase its respective *pro rata* amount of the Senior Secured Notes. To exercise its right to purchase the Senior Secured Notes in the

---

[1] The Senior Secured Notes Term Sheet (including all appendices and schedules attached thereto) is incorporated into and constitutes a part of this Backstop Commitment Agreement as if set forth herein.

Offering, each Pre-Petition Noteholder will be required to accept such offer on or before the Confirmation Hearing in accordance with the offering procedures that will be established in the Plan. For purposes of this Backstop Commitment Agreement (unless otherwise stated), the term "*pro rata*" with respect to any Pre-Petition Noteholder means the percentage yielded by (x) the aggregate principal amount of Pre-Petition Notes held by such Pre-Petition Noteholder divided by (y) the aggregate principal amount of Pre-Petition Notes outstanding as of the Petition Date.

To provide assurance that the Offering will be fully subscribed, subject to the conditions set forth herein, each of the undersigned (collectively, the "Backstop Purchasers") hereby severally, and not jointly, commits to purchase its Commitment Percentage, not to exceed its Commitment Amount (as such terms are defined on Schedule I to the Senior Secured Notes Term Sheet) of the Senior Secured Notes not purchased by Pre-Petition Noteholders in the Offering (the "Backstop Commitment").

In consideration of the foregoing agreements of the Backstop Purchasers:

(a)    in connection with the closing of the Offering, each Backstop Purchaser shall be entitled to purchase units consisting of the Senior Secured Notes and related Noteholder New Equity issued to it in the Offering at a per unit price equal to 97.0% of the Purchase Price; or

(b)    subject to satisfying the terms and conditions set forth herein, in the event any of the Debtors (i) enter into an Alternate Transaction (as defined below) and (ii) do not issue the Senior Secured Notes on the terms set forth in the Senior Secured Notes Term Sheet, the Debtors shall pay to each Backstop Purchaser (unless waived by such purchaser) its pro rata portion of an aggregate fee equal to $3,000,000 (the "Break Up Fee"); provided, however, that any Backstop Purchaser that provides financing or purchases assets as part of an Alternate Transaction shall not be entitled to receive its pro rata portion of the Break Up Fee.

For purposes hereof, an "Alternate Transaction" includes the consummation of (i) any Chapter 11 plan involving the Debtors (other than the Plan), or (ii) any sale or series of sales of the Debtors' assets, which sale(s) reduce the Debtors' ethanol production capacity by more than 50%. For the avoidance of doubt, an Alternate Transaction shall not include the Debtors' entry into the ABL Credit Facility.

Notwithstanding the foregoing, the Break Up Fee shall, subject to satisfying the conditions set forth herein, be (a) deemed fully earned on the date of the entry of the Approval Order by the Bankruptcy Court, and (b) payable in full in cash upon the consummation of an Alternate Transaction; provided, the Backstop Purchasers shall not be entitled to receive the Break Up Fee if a Backstop Termination Event has occurred (unless a Subsequent Transaction Event (as defined below) occurs).

A "Subsequent Transaction Event" shall have occurred, if (i) at the time of the occurrence of a Backstop Termination Event, the Debtors are engaged in discussions with respect to an Alternate Transaction, (ii) such Alternate Transaction is consummated within ninety (90) calendar days of the Backstop Termination Event, (iii) the terms of the Alternate Transaction are better than the terms set forth in Senior Secured Notes Term Sheet, and (iv) the

condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith.

For the avoidance of doubt, the Debtors shall not be required to pay any Break Up Fee if the Backstop Purchasers are in breach of this Backstop Commitment Agreement.

The Break Up Fee, once paid, shall be nonrefundable, paid in immediately available funds, without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.

Various terms essential to the Offering must still be developed and agreed upon, and we specifically reserve the right to approve all terms and conditions and to propose additional terms. In particular, the Senior Secured Notes Term Sheet does not purport to include all of the conditions, covenants, closing conditions, representations, warranties, defaults, definitions and other terms that would be contained in the definitive documents for the Senior Secured Notes. In addition to the satisfaction of each of the conditions set forth in the Senior Secured Notes Term Sheet, this Backstop Commitment is subject to the negotiation, execution and delivery of definitive documentation satisfactory in form and substance to the Majority Backstop Purchasers and their counsel in their sole discretion. Furthermore, all matters relating to the confirmation and consummation of the Plan, including, without limitation, the form of the Plan as ultimately confirmed by the Bankruptcy Court and the terms of the Senior Secured Notes and of any guarantees and intercreditor arrangements relating to other indebtedness of Debtors, including, specifically, with respect to the ABL Credit Facility, must be in form and substance satisfactory to the Majority Backstop Purchasers and their counsel in their sole discretion. The agreement of the Backstop Purchasers hereunder is further conditioned upon the Backstop Purchasers not having become aware of any information or other matter affecting the Debtors or the transactions contemplated hereby that is inconsistent in a material and adverse manner with any information or other matter disclosed to the Backstop Purchasers or otherwise known or made available to any of the Backstop Purchasers prior to the date hereof, or of any material omissions from the information which has previously been, or may hereafter be, furnished by the Debtors, or their representatives or advisors, to the Backstop Purchasers for their review.

More specifically and for purposes of clarity, the commitment of the Backstop Purchasers to purchase the Senior Secured Notes set forth in this Backstop Commitment Agreement shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to (i) pay the reimbursable expenses provided for in this Backstop Commitment Agreement, (ii) satisfy their indemnification obligations under this Backstop Commitment Agreement and (iii) solely in the event a Subsequent Transaction Event occurs, pay the Break Up Fee) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any Backstop Termination Event occurs (as set forth in the "Termination of Backstop Commitments" section of the Senior Secured Notes Term Sheet); provided that each such Backstop Termination Event may be waived in writing by the Majority Backstop Purchasers.

Whether or not the transactions contemplated hereby are consummated, the Debtors or the reorganized Debtors, as the case may be, agree to: (i) pay within 10 days of demand the reasonable fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the Backstop

3

Commitment or to the preparation and negotiation of this Backstop Commitment Agreement, the Senior Secured Notes Term Sheet and the proposed documentation and the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and expenses of counsel to the Backstop Purchasers; and (ii) indemnify and hold harmless the Backstop Purchasers and their affiliates and each of their respective directors, officers, partners, members, representatives, employees, agents, attorneys, financial advisors, restructuring advisors and other professional advisors, each of the foregoing solely in their capacities as such with respect to the transactions contemplated by this Backstop Commitment Agreement (each an "Indemnified Person"), and hold each Indemnified Person harmless from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to the Backstop Commitment Agreement, the Backstop Commitment, the Offering, the Senior Secured Notes Term Sheet, the Plan, the use of proceeds of the Senior Secured Notes or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons within 10 days after demand for any reasonable legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Notwithstanding any other provision to the contrary, no Indemnified Person shall be liable to the Debtors or their estates for any special, indirect, consequential or punitive damages in connection with its activities related to the Backstop Commitment Agreement, the Backstop Commitment, the Offering, the Senior Secured Notes Term Sheet, the Plan or the use of proceeds of the Senior Secured Notes. The terms set forth in this indemnification section shall survive termination of the Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the Offering is consummated.

This Backstop Commitment Agreement and the rights and obligations hereunder may not be assigned by the Debtors without the prior written consent of the Majority Backstop Purchasers (and any purported assignment without such consent shall be null and void). This Backstop Commitment Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons. Notwithstanding the foregoing, the Backstop Purchasers may assign all or any portion of their obligations hereunder to one or more financial institutions reasonably acceptable to the Debtors; provided, that no Debtor's consent shall be required for such an assignment to a fund affiliated with any Backstop Purchaser; provided further, in the event that a Backstop Purchaser wishes to assign all or any portion of its obligations hereunder in accordance with the foregoing provisions, each other Backstop Purchaser shall have a right of first refusal to purchase such obligations in such manner as they may agree. Upon any such assignment (other than an assignment to a fund affiliated with any Backstop Purchaser without the Debtors' consent), the obligations of the Backstop Purchasers in respect of the portion of their obligations so assigned shall terminate. In the event that any Backstop Purchaser fails to meet its obligations under this Backstop Commitment Agreement, the non breaching Backstop Purchasers shall have the right, but not the obligation, to assume such obligations in such manner as they may agree.

This Backstop Commitment Agreement sets forth the agreement of the Backstop Purchasers to fund the Backstop Commitment on the terms and subject to the conditions described herein and in the Senior Secured Notes Term Sheet shall be considered withdrawn if the Backstop Purchasers have not received from the Debtors a fully executed counterpart to this Backstop Commitment Agreement on or before 4:00 p.m. New York City time on December 4, 2009.

This Backstop Commitment Agreement will be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

By accepting delivery of this Backstop Commitment Agreement, each Debtor agrees that this Backstop Commitment Agreement is confidential and that neither its existence nor the terms hereof will be disclosed by such Debtor to any person other than such Debtor's officers, directors, employees, accountants, attorneys and other advisors, and then only on a *"need to know"* basis in connection with the transactions contemplated hereby and on a confidential basis. Notwithstanding the foregoing, following the Debtors' acceptance of the provisions hereof and delivery of an executed counterpart of this Backstop Commitment Agreement to the Backstop Purchasers as provided below, the Debtors may (i) make such public disclosures of the terms and conditions hereof as required by law; in the opinion of counsel to the Debtors, to be made, and (ii) file a copy of this Backstop Commitment Agreement with the Bankruptcy Court in connection with the filing of the Plan or the filing of a motion to approve any of the terms of this Backstop Commitment Agreement, and (iii) file a copy of this Backstop Commitment Agreement with the Securities and Exchange Commission or in any public record in which it is required by law to be filed.

This Backstop Commitment Agreement may not be amended or waived except in writing signed by the Debtors and the Majority Backstop Purchasers. This Backstop Commitment Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Agreement by email in portable document format (.pdf format) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Agreement.

This Backstop Commitment Agreement shall become effective and binding upon (i) the mutual exchange of fully executed counterparts and (ii) the entry of the Approval Order.

The Debtors' obligations under this Backstop Commitment Agreement are subject to approval by the Bankruptcy Court and shall not be effective until such approval is obtained; provided, however, that the Debtors agree to file a motion with the Bankruptcy Court, in form and substance acceptable to the Majority Backstop Purchasers, in their sole discretion, on or before December 4, 2009, requesting entry of an order approving the Debtors' entry into this Backstop Commitment Agreement and approving payment of the fees contemplated hereby and in the Senior Secured Notes Term Sheet, the expenses of each of the Backstop Purchasers set forth herein and in the Senior Secured Notes Term Sheet, and the indemnification provisions set forth herein.

5

If the foregoing is in accordance with your understanding of our agreement, please sign this Backstop Commitment Agreement in the space indicated below and return it to us.

Very truly yours,

Signatures continue on following pages

BRIGADE CAPITAL MANAGEMENT, LLC, as
investment manager for and on behalf of certain lenders

By: _____

Name: Garnett Hawke

Title: Partner

Dated: __12/1__, 2009

[Signatures continue on following pages]

NOMURA CORPORATE RESEARCH & ASSET
MANAGEMENT, INC., as investment manager for and
on behalf of certain lenders

By: _____
    Name: Stephen Kotsen
    Title: Managing Director

Dated: _____12/03_____, 2009

[Signatures continue on following pages]

WHITEBOX ADVISORS LLC, as investment manager
for and on behalf of certain lenders

By:

Name: Jonathan Wood
Title: Chief Operating Officer

Dated: December 1, 2009

[Signatures continue on following pages]

SENATOR INVESTMENT GROUP LP, as investment manager for and on behalf of certain lenders.

By: _____
Name: EDWARD LARMANN
Title: CHIEF FINANCIAL OFFICER

Dated: December 2, 2009

[Signatures continue on following pages]

SEACOR Capital Corporation, as investment manager for
and on behalf of certain lenders

By: _____

Name: DICK FAGERSTAL

Title: PRESIDENT

Dated: _____, 2009

[Signatures continue on following pages]

The foregoing is hereby
agreed to and accepted:

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.

By: _____
Name:
Title:

Dated: December 3, 2009

AVENTINE RENEWABLE ENERGY, INC.

By: _____
Name:
Title:

Dated: December 3, 2009

AVENTINE RENEWABLE ENERGY – MT
VERNON, LLC

By: _____
Name:
Title:

Dated: December 3, 2009

AVENTINE RENEWABLE ENERGY –
AURORA WEST LLC

By: _____
Name:
Title:

Dated: December 3, 2009


AVENTINE RENEWABLE ENERGY LLC

By: _____
Name:
Title:

Dated: December 3, 2009


AVENTINE POWER, LLC

By: _____
Name:
Title:

Dated: December 3, 2009


NEBRASKA ENERGY, LLC

By: _____
Name:
Title:

Dated: December 3, 2009

# EXHIBIT A

## Senior Secured Notes Term Sheet

## AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

### $105,000,000 Senior Secured Notes

### Summary of Principal Terms

*The following Summary of Principal Terms (this "Senior Secured Notes Term Sheet") provides on outline of a proposed Notes offering by the Issuer identified below in connection with and upon the emergence of Aventine Renewable Energy Holdings, Inc. and its affiliates (collectively, the "Debtors") from chapter 11 proceedings pursuant to a Chapter 11 plan of reorganization (the "Plan"). This Senior Secured Notes Term Sheet is an expression of interest only and is not meant to be binding on the parties and is meant only as a negotiation aid to be used by the Debtors, any Backstop Purchaser (defined below) or other person or entity to provide any financing or to enter into any agreement or contract or any other financing arrangement. Accordingly, the parties do not intend to be bound unless and until they enter into definitive documentation regarding the subject matter of this Senior Secured Notes Term Sheet. The actual terms and conditions upon which any purchaser might purchase the Notes are subject to internal approvals, execution and delivery of definitive legal documentation, including an indenture (the "Indenture") governing the Notes, by all required parties and such other terms and conditions as are determined by the parties; provided that such other terms and conditions are consistent with the terms of this Senior Secured Notes Term Sheet. Until disclosed by Debtors, with the prior written consent of the Majority Backstop Purchasers, this Senior Secured Notes Term Sheet and the information contained herein is strictly confidential and may not be shared with any person or entity. Unless otherwise defined herein, each capitalized term used in this Senior Secured Notes Term Sheet shall have the same meaning ascribed to such term in the Backstop Commitment Agreement (as defined below) to which this Senior Secured Notes Term Sheet is attached.*

| | |
|---|---|
| Issuer: | Reorganized Aventine Renewable Energy Holdings, Inc. (the "*Issuer*"). |
| Securities Offered: | Not less than $105,000,000 in aggregate principal amount (the "*Offering Amount*") of senior secured notes (the "*Notes*") and shares of New Equity equal to 20% in the aggregate of the New Equity issued and outstanding on the Effective Date (the "*Noteholder New Equity*"), subject to dilution by (i) any stock awards issued on or after the Effective Date under the Management Incentive Plan and (ii) the exercise of any warrants issued pursuant to the Plan. The Notes and the Noteholder New Equity will be offered together in units and may not be purchased separately. Each unit, consisting of $1,000 in face amount of Notes, together with the pro rata portion of the Noteholder New Equity to be issued therewith, will be issued and sold for an aggregate cash consideration equal to $952.38 (the "*Purchase Price*"). |
| Offering: | The Notes and the Noteholder New Equity will be offered (the "*Offering*") (i) on a pro rata basis to each holder (collectively, the "*Pre-Petition Noteholders*") of a pre-petition claim with respect to the 10% senior notes due 2017 issued by Aventine Renewable Energy Holdings, Inc. and (ii) to the extent less than all of the Notes and Noteholder New Equity are issued to the Pre-Petition Noteholders, to the entities which agree to backstop the Offering pursuant to the Backstop Commitment Agreement (defined below), the initial list of which is set forth on Schedule I hereto (the parties listed on Schedule I, the "*Backstop Purchasers*" and each a "*Backstop Purchaser*"). The rights to subscribe for the purchase of the Notes and Noteholder New Equity |

shall be non-transferrable. For the avoidance of doubt, the Backstop Purchasers shall be entitled to participate in the Offering in their capacity as Pre-Petition Noteholders.

On the terms and subject to the conditions set forth in that certain commitment letter agreement, dated as of December 3, 2009 (the "*Backstop Commitment Agreement*"), each Backstop Purchaser will severally commit to purchase its respective Commitment Percentage (as defined below) of (i) Notes up to an aggregate principal amount equal to $105,000,000 and (ii) shares of Noteholder New Equity. For purposes hereof, (i) a Backstop Purchaser's "*Commitment Percentage*" is the percentage for such purchaser set forth on Schedule I hereto and (ii) "*Majority Backstop Purchasers*" shall mean the Backstop Purchasers having at least a majority of the aggregate Commitment Percentages.

Without limiting the foregoing, a DIP Lender may, at its written election, apply any payment owed by the Debtors to such DIP Lender under the DIP Facility Documents against the purchase of the Notes and Noteholder New Equity, as provided in the Plan.

**Registered Exchange Offer; Registration Rights:**

On or after the Effective Date, the reorganized Debtors shall enter into a registration rights agreement (the "*Registration Rights Agreement*") in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion. The Registration Rights Agreement shall provide, among other things, for (i) the registered exchange of the Notes for a new issue of substantially identical debt securities (the "*Exchange Registration*") and (ii) registration of the offer and resale of the Noteholder New Equity issued in the Offering (and any other shares of New Equity held by any Backstop Purchaser) (the "*Resale Registration*"). Notwithstanding the foregoing or anything contained herein, holders of GUC Claims who, as a result of the Unsecured Distribution, receive shares of New Equity equal to 10% or more the New Equity outstanding as of the Effective Date, shall be entitled to "piggyback" registration rights on any registration statement filed by reorganized Holdings with respect to Noteholder New Equity; provided, however, that holders entitled to such piggyback rights shall be subject to customary cut backs.

With respect to the Exchange Registration, the Registration Rights Agreement will obligate the reorganized Debtors to:

- file a registration statement with the Securities and Exchange Commission enabling the holders of the Notes to exchange the privately issued Notes for publicly registered notes with substantially identical terms within 180 days after the Effective Date;

- cause such registration statement to become effective within 365 days after the Effective Date and to complete the exchange offer within 50 days after the effective date of such registration statement; and

- file a shelf registration statement for the resale of the Notes if the

2

reorganized Debtors cannot effect an exchange offer within the time periods listed above and in certain other circumstances.

With respect to the Resale Registration, the Registration Rights Agreement will obligate the reorganized Debtors to:

- file a registration statement with the Securities and Exchange Commission seeking to register the offer and resale of the Noteholder New Equity (together with any other shares of New Equity held by any Backstop Purchaser) (collectively, "*Registrable Securities*") pursuant to Rule 415 under the Securities Act of 1933 (the "*Securities Act*") within 180 days after the Effective Date;

- cause such registration statement to become effective within 365 days after the Effective Date; and

- cause such registration statement to remain effective, and supplemented and amended as required by the Securities Act throughout the period ending on the date which is the earliest to occur of (A) the date on which all shares of Registrable Securities registered under such registration statement may be sold in a three-month period under Rule 144 under the Securities Act, (B) the date all such shares of Registrable Securities registered under such registration statement have been sold and (C) two years after the date on which such registration statement became effective with respect to the offer and sale of Registrable Securities, plus the aggregate number of days in all applicable "suspension periods", if any, as set forth in the Registration Rights Agreement.

The failure of the reorganized Debtors to meet any of the obligations describe above with respect to the Exchange Registration or the Resale Registration shall result in additional interest becoming payable with respect to the Notes (including the notes issued in the Exchange Registration) in the amount of 2.0%.

| Listing Requirement: | The reorganized Debtors shall use their commercially reasonable best efforts to cause the New Equity to become listed for trading on a national securities exchange as soon as practicable following the Effective Date. |
| --- | --- |
| Maturity Date: | The fifth anniversary of the issuance of the Notes. |
| Guarantees: | The Notes will be fully guaranteed on a senior secured basis, jointly and severally, by each of the Issuer's existing and future domestic subsidiaries (each a "*Guarantor*" and, collectively, the "*Guarantors*"). |
| Collateral: | The Notes and each note guarantee (the "*Guarantees*") will be secured by a security interest in, and perfected lien on, all of the assets (tangible, intangible, real, personal or mixed) of the Issuer and each Guarantor, whether now owned or hereafter acquired, including, without limitation, all products and proceeds thereof (the "*Collateral*"). |
| Ranking: | The Notes and each Guarantee will rank senior in right of payment to all existing and future subordinated indebtedness of the Issuer and the |

3

Guarantors.

The Notes and Guarantees will be secured by a first priority lien (subject to specified permitted liens) on all of the Collateral; *provided* that with respect to ABL Collateral (defined below), the Notes and the Guarantees will be secured by a second priority lien (subject to specified permitted liens) in favor of, and to the extent such collateral is pledged to secure the obligations under, a senior secured revolving credit agreement, with aggregate commitments of up to $20 million,[1] to be entered into by the Issuer and/or one or more of its subsidiaries for working capital purposes and otherwise with terms and conditions acceptable in form and substance to the Majority Backstop Purchasers in their sole discretion (such revolving credit agreement, the *"ABL Credit Facility"*). For purposes hereof, *"ABL Collateral"* includes accounts receivable, inventory, capital stock, certain intellectual property, deposit accounts and investment property.

**Interest Rates; Partial PIK Payments:**

For any interest period under the Notes, the Issuer may elect to pay interest on the entire principal amount (i) in cash at a rate equal to 13.0% per annum or (ii) in the form of a Partial PIK Payment (as defined below) at a rate equal to 15.0% per annum. For purposes hereof, a *"Partial PIK Payment"* shall mean the payment by the Issuer of accrued interest on the Notes for any interest period thereunder (a) in cash at a rate equal to 8.0% per annum plus (b) the issuance and delivery of additional Notes to the holders thereof in an aggregate principal amount equal to the interest accruing on the Notes for such interest period at a rate equal to 7.0% per annum. Interest on the Notes, including any interest accruing on the Notes issued as part of a Partial PIK Payment, will accrue and be payable quarterly in arrears, commencing on the fiscal quarter ending immediately after the Closing Date.

**Default Interest Rate:**

Upon the occurrence and during the continuance of an Event of Default (to be defined in the Notes Documents, as defined below), principal on the Notes (and any overdue interest, including any interest accruing on the Notes issued as part of a Partial PIK Payment) will accrue interest at an additional 2.0% per annum, payable in full in cash from time to time on demand.

**Trustee and Collateral Agent:**

[TBD] (the *"Collateral Agent"*).

**Use of Proceeds:**

Proceeds of the Notes may only be used to (i) make payments required to be made on and after the Closing Date under the Plan, including, without limitation, repayment of all amounts owing under the DIP Facility Documents, and (ii) fund the working capital and general corporate needs of the Issuer.

---

[1] Amount of ABL Credit Facility to be determined by Debtors, subject to approval of the Majority Backstop Purchasers.

| | |
|---|---|
| **Backstop Purchaser Discount:** | In consideration of the agreements of the Backstop Purchasers set forth in the Backstop Commitment Agreement, each Backstop Purchaser shall be entitled to purchase units consisting of the Senior Secured Notes and related Noteholder New Equity issued to it in the Offering at a per unit price equal to 97.0% of the Purchase Price. |
| **Break Up Fee:** | Subject to satisfying the terms and conditions of the Backstop Commitment Agreement, in the event that any of the Debtors (i) enter into an Alternate Transaction (as defined in the Backstop Commitment Agreement) and (ii) do not issue the Notes on the terms set forth in this Senior Secured Notes Term Sheet, then the Debtors shall pay to each Backstop Purchaser (unless waived by such purchaser) its pro rata portion of an aggregate fee equal to $3,000,000 (the *"Break Up Fee"*), provided, however, that any Backstop Purchaser that provides financing or purchases assets as part of an Alternate Transaction shall not be entitled to receive its pro rata portion of the Break Up Fee. For the avoidance of doubt, the Debtors shall not be required to pay any Break Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement. |
| **Optional Redemption:** | The Notes will be redeemable, in whole or in part, at the option of the Issuer, at any time and from time to time, at the redemption prices equal to the percentage of the aggregate face amount of the Notes subject to redemption as set forth below, plus the accrued and unpaid interest thereon, if any, to the date of such redemption. |

| Year | Price |
|---|---|
| If redeemed: | |
| prior to the first anniversary of the Closing Date.............. | 105% |
| on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date... | 104% |
| on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date..................................................................... | 103% |
| on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date .... | 102% |
| on or at any time after the fourth anniversary of the Closing Date................................................................. | 101% |

| | |
|---|---|
| | Notwithstanding the foregoing, if the reorganized Debtors determine not to complete construction of the unfinished facilities located at either Aurora, Nebraska or Mt. Vernon, Indiana, then during the 90-day period following the Effective Date, the reorganized Debtors may redeem, on a pro rata basis, up to $25 million in aggregate principal amount of the Notes at a redemption price equal to 101% of the aggregate face amount of the Notes subject to redemption, plus the accrued and unpaid interest thereon, if any, to the date of such redemption. |
| **Change of Control Offer:** | Upon the occurrence of a Change of Control (to be defined in the Indenture), the Issuer will be obligated to offer to repurchase the |

5

outstanding Notes at a purchase price equal to 101% of the aggregate face amount of the outstanding Notes, plus the accrued but unpaid interest thereon, if any, to the date of repurchase.

**Asset Sale, Casualty Event and Equity Issuance Offers:** The Issuer will be obligated to offer to repurchase the maximum principal amount outstanding on the Notes that may be repurchased, at a purchase price equal to 100% of the principal amount thereof, plus the accrued but unpaid interest to the date of repurchase, with 100% of the net cash proceeds received from (i) asset sales, (ii) insurance proceeds from casualty events and (iii) equity issuances; *except* (a) in each case, to the extent required to be applied to the repayment of loans under the ABL Credit Facility and (b) in the case of proceeds from asset sales and casualty events, if the Issuer elects to, and within 270 days does, use such proceeds to acquire other, or make improvements to, assets that constitute Collateral (other than ABL Collateral) and that are used or useful in the Issuer's or any Guarantor's business.

**Covenants:** The Indenture will contain provisions restricting the Issuer's and its restricted subsidiaries' ability to:

- pay dividends or make distributions, redeem or repurchase stock, prepay subordinated debt or make other restricted payments;

- incur indebtedness or issue disqualified capital stock, warrants, options or rights to purchase capital stock (except as contemplated by the Management Incentive Plan);

- make certain investments;

- create or permit to exist liens on assets;

- restrict dividend payments, distributions or other payments from subsidiaries;

- consolidate or merge;

- sell, lease, exchange or otherwise transfer or dispose of assets, including equity interests of restricted subsidiaries;

- enter into transactions with affiliates;

- designate subsidiaries as unrestricted subsidiaries; and

- use the proceeds of the Notes and permitted proceeds of asset sales.

**Ratings:** The Issuer will obtain ratings for the Notes by either Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or Moody's Investors Service, Inc.

**Events of Default:** The Indenture will contain events of default customary or appropriate for the Notes.

**Governing Law:** State of New York.

6

**Conditions Precedent
To the Closing:**

The obligation of the Backstop Purchasers to purchase the Notes as set forth in the Backstop Commitment Agreement will be conditioned upon satisfaction of each of the following; provided, that each of the following conditions may be waived by the Majority Backstop Purchasers in their sole discretion:

- The Notes, the Indenture and all documents, instruments and other agreements executed and delivered in connection with any of the foregoing (collectively, the *"Notes Documents"*) shall be in form and substance satisfactory to the Majority Backstop Purchasers in their sole discretion;

- The Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the *"Plan Documents"*) shall be in form and substance satisfactory to the Majority Backstop Purchasers in their sole discretion;

- All motions and other documents to be filed with the Bankruptcy Court in connection with the offer and sale of the Notes, the approval of the Notes Documents and payment of the fees contemplated hereunder shall be in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion;

- All reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel) required to be paid to each of the Backstop Purchasers, the Trustee and the Collateral Agent on or before the Closing Date have been paid in full in cash;

- The Bankruptcy Court shall have (i) entered an order, in form and substance satisfactory to the Majority Backstop Purchasers in their sole discretion (the *"Approval Order"*), approving the Debtors' entry into the Backstop Commitment Agreement and approving, payment of the fees contemplated thereby, the expenses of each of the Backstop Purchasers set forth therein and herein, and the indemnification provisions set forth therein, and (ii) entered the Confirmation Order, which shall among other things, authorize and approve this Senior Secured Notes Term Sheet and the transactions contemplated herein, including, without limitation, the granting of the security interests and liens and the payment of all consideration and fees referred to herein, which orders shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Backstop Purchasers (which consent may be withheld in their sole discretion);

- Except for the chapter 11 proceedings and any usual and customary consequences of any such filing, there shall have occurred no material adverse effect on any of (i) the operations, performance, prospects, business, assets, properties, or condition (financial or otherwise) of the Debtors, taken as a whole, based on information provided by the Debtors to the Backstop Purchasers since December 4, 2009, (ii) the ability of any of the reorganized Debtors

7

to perform their respective obligations under the Notes Documents or (iii) the ability of the noteholders to enforce their rights under the Notes Documents (each of the foregoing, a *"Material Adverse Change"*);

- Any and all governmental and third party consents and approvals necessary in connection with the offer and sale of the Notes, the execution of the Notes Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect; and

- The Plan shall have become, or simultaneously with the issuance of the Notes will become, effective.

**Termination of Backstop Commitments:**

The commitment of the Backstop Purchasers to purchase the Notes set forth in the Backstop Commitment Agreement (the *"Backstop Commitment"*) shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to (i) pay the reimbursable expenses under the Backstop Commitment Agreement, (ii) satisfy their indemnification obligations under the Backstop Commitment Agreement and (iii) pay the Break Up Fee if a Subsequent Transaction Event occurs) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the following occurs (each, a *"Backstop Termination Event"*), each of which may be waived in writing by the Majority Backstop Purchasers, provided, however, the Debtors shall not be required to pay the Break Up Fee if the Backstop Purchasers are in breach of the Backstop Commitment Agreement:

- the Plan and Disclosure Statement, each in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, are not filed by the Debtors with the Bankruptcy Court on or before December 4, 2009;

- a motion, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, requesting entry of the Approval Order is not filed by the Debtors with the Bankruptcy Court on or before December 4, 2009;

- the Solicitation Order, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, is not entered by the Bankruptcy Court on or before January 14, 2010;

- the Approval Order, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, is not entered by the Bankruptcy Court on or before January 14, 2010;

- the Debtors fail to commence a solicitation of votes for acceptance of the Plan on or before January 19, 2010;

- the Plan Supplement (which shall include, without limitation, the Corporate Governance Documents and Notes Documents, each in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion) is not finalized and filed on or before the date that is ten (10) calendar days before the voting deadline on the

8

Plan;

- the Confirmation Order, in form and substance acceptable to the Majority Backstop Purchasers in their sole discretion, is not entered by the Bankruptcy Court on or before February 26, 2010;

- the Effective Date does not occur on or before March 15, 2010; provided, that that the Majority Backstop Purchasers have not acted (or failed to act) in a manner materially inconsistent with this Senior Secured Notes Term Sheet.

- the withdrawal, amendment, modification or filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any motion, notice, supplement, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with this Senior Secured Notes Term Sheet;

- the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

- the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (iv) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Debtors;

- an action (or failure to act) by the Debtors that is materially inconsistent with this Senior Secured Notes Term Sheet, unless such action (or inaction) is cured within five (5) business days of receiving written notice thereof from the Majority Backstop Purchasers;

- any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring set forth in this Senior Secured Notes Term Sheet in a manner that cannot be reasonably and promptly remedied by the Debtors or the Backstop Purchasers;

- one or more of the conditions precedent to the consummation of the transactions set forth in this Senior Secured Notes Term Sheet or to the obligations of the Backstop Purchasers set forth in the Backstop Commitment Agreement is not satisfied or, in the judgment of the Majority Backstop Purchasers, becomes impossible to satisfy on or before the Closing Date; or

- at any time from and after the occurrence of a Material Adverse Change.

9

The foregoing notwithstanding, the Majority Backstop Purchasers shall endeavor to consult with the Creditors' Committee prior to any such approval, waiver or consent; provided, that the failure to consult with the Creditors' Committee shall not affect the rights of the Majority Backstop Purchasers, or the validity of any such approval, waiver or consent.

Notwithstanding anything contained herein or the Backstop Commitment Agreement, if (i) at the time of the occurrence of a Backstop Termination Event, the Debtors are engaged in discussions with respect to an Alternate Transaction; (ii) such Alternate Transaction is consummated within ninety (90) calendar days of the Backstop Termination Event, (iii) the terms of the Alternate Transaction are better than the terms set forth in this Senior Secured Notes Term Sheet, and (iv) the condition or event that triggered the Backstop Termination Event occurred primarily as a result of the Debtors acting unreasonably or in bad faith (clauses (i) – (iv) together, a *"Subsequent Transaction Event"*), the Debtors or the reorganized Debtors, as the case may be, shall be required to pay the Break Up Fee as if no Backstop Termination Event had occurred.

Closing Date:     The effective date of the Plan as ordered by the Bankruptcy Court, it being anticipated that such date will occur on or before March 15, 2010 (the *"Closing Date"*).

Expenses:     The Debtors shall pay all out of pocket costs and expenses of each of the Backstop Purchasers and the Collateral Agent (including all reasonable fees and expenses of counsel and consultants) in connection with the negotiation, preparation, execution and delivery of the Notes Documents (including, without limitation, the Guarantees), any amendment or waiver of any provision of the Notes Documents and in connection with the enforcement or protection of any of their rights and remedies under the Notes Documents, and the issuance of the Notes and the New Equity issued to the Backstop Purchasers and the Pre-Petition Noteholders that are purchasers of the Notes.

## Schedule I

### Backstop Purchasers

| Backstop Purchasers | Commitment Percentage | Commitment Amount[2] |
|---|---|---|
| Brigade Capital Management, LLC, as investment manager, for and on behalf of certain funds | 36.0% | $37,800,000 |
| Nomura Corporate Research & Asset Management, Inc., as investment manager, for and on behalf of certain funds | 9.0% | $9,450,000 |
| Whitebox Advisors LLC, as investment manager, for and on behalf of certain funds | 27.0% | $28,350,000 |
| Senator Investment Group LP, as investment manager, for and on behalf of certain funds | 18.0% | $18,900,000 |
| SEACOR Capital Corporation | 10.0% | $10,500,000 |
| TOTAL | 100% | $105,000,000 |

---

[2] These amounts represent the aggregate face amount of the Senior Secured Notes. The actual aggregate cash purchase price of units shall not exceed $100 million.