U.S. Bankruptcy Court
**RECEIVED**

FEB 03 2010

Judge_____

# MICHAEL J. WELSH, P.E., S.E.
## CONSULTING STRUCTURAL ENGINEER

### 300 WEST PERSHING STREET    MORTON, IL    61550

---

## DOCUMENT TRANSMITTAL LETTER

| TO: | FROM: |
|---|---|
| Honorable Judge Kevin Gross | Michael Welsh |

| COMPANY: | DATE: |
|---|---|
| Delaware Bankruptcy Court | February 2, 2010 |
| 824 Market Street | |
| Wilmington, DE  19801 | |

| REFERENCE: | OUR PROJECT/FILE NUMBER: |
|---|---|
| SEC Complaint / Objection Letter | N.A. |
| Aventine Renewable Energy | |
| Case No. 09-11214-KG | |

☐ FOR CONSTRUCTION   ☐ FOR REVIEW/COMMENT   ☐ FOR BIDDING   ☐ PRELIMINARY

---

CONTENTS/NOTES/COMMENTS:

Judge Gross,

I received a phone message today from US Trustee Mark Kenney requesting that I send the enclosed letter directly to you.

If you would like me to email the letter (so that you can click on the links and access the Case Docket information I have cited in the letter directly), please send me an email at mwelsh11@comcast.net and I will reply to it.

I tried to email the letter to the SEC on February 1, but the SEC server wouldn't let it go through with the attachments.

Thank you for your service to our legal system.

> Michael J. Welsh, P.E., S.E.
> Illinois S.E. License No. 081- 004656

---

PHONE:   (309) 266-5461     FAX:   (309) 266-5461

# MICHAEL J. WELSH, P.E., S.E.

## CONSULTING STRUCTURAL ENGINEER

### 300 WEST PERSHING STREET   MORTON, IL  61550

February 1, 2010

U.S. Securities and Exchange Commission
Office of Investor Education and Advocacy
100 F Street, N.E.
Washington, DC  20549-0213

Cc: Executive Office for U.S. Trustees
Criminal Enforcement Unit
20 Massachusetts Avenue, NW
Washington, DC  20530

Cc: The Honorable Judge Kevin Gross
c/o Mark S. Kenney, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

Cc: Roberta A. DeAngelis
Acting United States Trustee, Region 3
833 Chestnut Street
Suite 500
Philadelphia, PA  19107

## INTRODUCTION

I am an Aventine Renewable Energy Holdings, Inc. ("Aventine", symbol AVRNQ) stockholder writing in reference to Delaware Bankruptcy Court Case No. 09-11214-KG, which I have been following on the Case Dockets from the beginning of Aventine's Chapter 11 filing. I have also followed Aventine's SEC filings from the time of their initial public offering in spring of 2006. I currently own approximately 431,000 shares of Aventine stock, or roughly 1% of outstanding shares. Aventine is an ethanol production company headquartered at 120 North Parkway, Pekin, Illinois.

I am a 52 year old consulting engineer who has worked within the ethanol industry for over 28 years, and I have provided engineering services directly to Aventine on an ongoing basis over the past 16 years. Because of my stock investment and extensive work experience with Aventine and other ethanol producers, I am extremely familiar with Aventine's fuel production plants, Aventine's business fundamentals, the operating margins Aventine has generated over time, and events related to many companies operating within the ethanol industry in general. I am also a Class 7 Creditor of Aventine's, having invoiced Aventine approximately $11,600 on April 3, 2009 five days prior to their Chapter 11 filing.

## STATEMENT OF OBJECTION

As an Aventine stockholder, I object to the confirmation of the Debtors Plan of Reorganization ("The Plan") based on the conflict-of-interest detailed in the Complaint below. The Plan should not be confirmed because the valuation that it is predicated upon was developed by the Debtors restructuring and financial advisor who is one of the parties to the conflict-of-interest.

## STATEMENT OF COMPLAINT

This Complaint will formally document and express my deep concern and profound dismay over what I perceive as a significant conflict-of-interest and breach of duty by Aventines restructuring investment advisor Houlihan, Lokey, Howard, and Zukin Capital, Inc. ("Houlihan"). According to Case Docket 87, Houlihan was retained *nunc pro tunc* by Aventine to provide restructuring and financial advisory and investment banking services to Aventine during the Chapter 11 cases. Houlihan's duties and responsibilities include efforts to preserve the value of Aventine's estate for creditors and stakeholders. The Minneapolis branch of Houlihan has been actively engaged advising Aventine since November 18, 2008, or approximately 5 months prior to the Chapter 11 filing.

The perceived conflict-of-interest involves Houlihan's association with Whitebox Advisors ("Whitebox"), a Minneapolis based hedge fund firm. According to court documents and SEC filings, Whitebox's involvement with Aventine before and during these Chapter 11 cases can be summarized as follows:

1) Whitebox is a "Pre-Petition Noteholder" and one of four hedge funds who collectively hold approximately 75% of $300M in Aventine's 10% Senior Unsecured Bonds (issue AREY.GC / CUSIP: 053505AA1) due 2017. As a result, Whitebox is member of the "Informal Noteholder Group" (Case Docket 15, page 4 and Case Docket 52, Annex I).

2) Whitebox is the "DIP Administrative and Collateral Agent" for Aventine's DIP Facility (Case Docket 52, Exhibit 1, page 1).

3) Whitebox is one of four hedge funds acting as a DIP Facility Lender to Aventine. The DIP Facility provides $30M in Debtor-In-Possession financing. To date Aventine has drawn $15M from the DIP Facility (Case Docket 52, Exhibit 1and Annex II).

4) As a Pre-Petition Noteholder, Whitebox is one of five hedge funds backstopping $105M in new senior secured notes and entitled to purchase its respective *pro rata* amount of the New Senior Note as part of Aventine's exit financing in their Plan of Reorganization (Case Docket 679, Exhibit A). In addition, under the terms of the Backstop Agreement, Whitebox will also receive a *pro rata* share of 20% of the aggregate shares in Aventine's New Equity (Case Docket 679, page 33).

---

5) As a Pre-Petition Noteholder, Whitebox is a Class 5 Creditor and will receive a *pro rata* share of the "Unsecured Claims Stock Pool", comprised of 80% of the New ARE Holdings Common Stock (Case Docket 679, page 16 and Exhibit A, page 17).

The first conflict arises in that over the same period of time Whitebox and Houlihan were involved in Aventine's case, they were also both involved in the Delaware bankruptcy case of Verasun Energy Corporation ("Verasun"). Verasun is another ethanol production company that filed for Chapter 11 on October 31, 2008 due to poor timing of aggressive acquisitions of other ethanol producers and poor corn contract decisions resulting in hundreds of millions of dollars in losses. Houlihan has been advising Whitebox as an ex-officio member of Verasun's Official Committee of Unsecured Creditors.

The second conflict arises in that over the same period of time Whitebox and Houlihan were involved in Aventine's case, they were also both involved in the Texas bankruptcy case of Energy Partners, Ltd ("Energy Partners"). Energy Partners is an oil and natural gas exploration and production company. Houlihan had been advising Whitebox as a member of Energy Partners' Official Unsecured Noteholders Committee.

As will be documented below, Whitebox is an ex-officio member of Verasun's Creditors Committee and Houlihan is providing financial advisory and investment banking services to the Verasun Creditors Committee. Whitebox was also a member of Energy Partners' Official Unsecured Noteholders Committee and Houlihan provided investment banking and valuation services to the Energy Partners Noteholders Committee. In other words, Houlihan was advising Whitebox on matters involving Verasun's and Energy Partners' bankruptcy cases while simultaneously negotiating with Whitebox on matters involving Aventine's bankruptcy case.

Houlihan has been retained to advise Aventine in their restructuring and refinancing efforts as an independent and "disinterested" advisor (Aventine Case Docket 87). Houlihan's relationships with Whitebox in both Verasun's and Energy Partners bankruptcy cases over the same time period constitutes a conflict of interest and a breach of Houlihan's duty to Aventine. The "Statement of Facts and Timetable of Events" section below outlines this conflict of interest in greater detail and provides web page links to document each statement presented.

STATEMENT OF FACTS AND TIMETABLE OF EVENTS

1) Houlihan has been engaged in providing financial advisory and investment banking services to the Official Committee of Unsecured Creditors of Verasun, which includes committee member Whitebox, since November 18, 2008. Please refer to the first 5 pages of Verasun Case Docket 598 at the link below:

http://www.verasuncommittee.com/598.pdf

—

2) Houlihan began advising and providing restructuring and financial advisory and investment banking services to Aventine on November 4, 2008 approximately 5 months prior to Aventine's Chapter 11 filing. At the time Whitebox was one of a group of four hedge funds with a controlling interest in Aventine's $300M Senior Unsecured Bond issue. Please refer to Houlihan's April 17, 2009 Engagement Letter, page 3 of "Exhibit C", of Aventine Case Docket 87 at the link below:

http://www.aventineinfo.com/87_11214.pdf

3) Page 3 of Houlihan's April 17, 2009 Engagement Letter to Aventine outlines their responsibilities and duties, stating "My duties as Managing Director with respect to Houlihan Lokey's engagement to represent the Debtors include, among other things, strategic advice, advice on restructuring options, participation in negotiations among the Debtors and their

creditors, suppliers, and other interested parties...". Please refer to Houlihan's Engagement Letter, page 3 of "Exhibit C", of Aventine Case Docket 87 at the link below:

http://www.aventineinfo.com/87_11214.pdf

4) Pages 7 through 10 of Houlihan's April 17, 2009 Engagement Letter contains a "Disinterestedness of Professionals" section. The first paragraph states:

"Houlihan Lokey is performing an ongoing conflict search amoung its databases and is performing reasonable due diligence for possible conflicts with "Parties-In-Interest" in the Debtors' Chapter 11 Cases. Based on what I have been advised regarding the limited results to date, to the best of my knowledge, neither I, Houlihan Lokey, nor any member or employee thereof, insofar as we have been able to ascertain (as reasonably known to us prior to the completion of our detailed conflict search), except as further described below, has a connection with the Debtors, their creditors, other parties-in-interest, their respective attorneys...".

In April of 2009, and for months following, Houlihan had "a connection" with one of Aventine's largest creditors, Whitebox, and was actively engaged advising them as part of Verasun's Creditors Committee. Please refer to Houlihan's Engagement Letter, page 7 of "Exhibit C", of Aventine Case Docket 87 at the link below:

http://www.aventineinfo.com/87_11214.pdf

5) Pages 8 through 10 of the "Disinterestedness of Professionals" section of Houlihan's Engagement Letter to Aventine contains many statements and assurances that Houlihan's "Compliance Group" performs an extensive and ongoing program to avoid conflicts of interest. Page 8 of the Engagement Letter states:

—

4

"the Compliance Group maintains, for purposes of monitoring and avoiding conflicts of interest, a list (the "Restricted List") of companies with which Houlihan Lokey, or one of its affiliates is doing business, either as an advisor or an investor, or with respect to which Houlihan Lokey or one of its affiliates is in possession of material, non-public information..." It also states the Compliance Group has undertaken a comprehensive ongoing review of the Parties-In-Interest to determine possible conflicts...that the conflict review procedures remain ongoing during the time of this Chapter 11 filing...".

Later it states "Should it be learned that a relationship should be disclosed, a supplemental declaration with such disclosures shall be filed." Please refer to Houlihan's Engagement Letter, pages 7 through 10 of "Exhibit C", of Aventine Case Docket 87 at the link below:

http://www.aventineinfo.com/87_11214.pdf

6) Houlihan continued to be engaged in providing financial advisory and investment banking services to the Official Committee of Unsecured Creditors of Verasun through at least June 30, 2009 and possibly beyond this date. Whitebox continued to sit on the Creditors Committee and be advised by Houlihan throughout this period. Please refer to the first 4 pages of Verasun Case Docket 1640 at the link below:

http://www.verasuncommittee.com/1640_12606.pdf

7) In addition to Houlihan's advising of Whitebox, by June 2009, Brigade Leveraged Capital Structures Fund ("Brigade") had joined Versasun's Creditors Committee. Brigade is a "Pre-Petition Noteholder" and one of four hedge funds who collectively hold approximately 75% of $300M in Aventine's 10% Senior Unsecured Bonds. Accordingly, Brigade is a member of the "Informal Noteholder Group". Brigade is also a DIP Facility Lender, a party to the Backstop Agreement receiving a *pro rata* share of 20% of the aggregate shares in Aventines New Equity, and a Class 5 Creditor that will receive a *pro rata* share of the "Unsecured Claims Stock Pool", comprised of 80% of the New ARE Holdings Common Stock.

Please refer to all of the Aventine Case Dockets referenced for Whitebox in the "Statement of Complaint" section to verify Brigade's involvement with Aventine's bankruptcy. Please refer to the first 4 pages of Verasun Case Docket 1640 at the link below to verify Brigade's participation on Verasun's Creditor Committee:

http://www.verasuncommittee.com/1640_12606.pdf

8) Houlihan continues to advise and provide restructuring and financial advisory and investment banking services to Aventine to this day knowing that Whitebox and Brigade are part of a group of hedge funds with a controlling interest in Aventines $300M Senior Unsecured Bond issue, administering and/or financing the $30M DIP Facility, and providing

backstop financing for $105M in New Senior Secured Bonds. Please refer to Houlihan's most recent Fee Application contained in Aventine Case Docket 661 at the link below:

http://www.aventineinfo.com/661_11214.pdf

9) There is a perceived additional conflict of interest between Houlihan and Whitebox that is related to the Texas bankruptcy case of Energy Partners (Case No. 09-32957-H4-11). According to Energy Partners Case Docket 386, the Official Committee of Unsecured Noteholders in this case, which included Whitebox, retained Houlihan to advise the Committee effective as of July 10, 2009. At the time, Houlihan had been advising Aventine for approximately 8 months and, as explained earlier, Whitebox was one of four hedge funds comprising the Informal Noteholders Group.

The footnote at the bottom of page 3 of Energy Partners Case Docket 386 identifies Whitebox as a member of the Energy Partners Noteholders Committee being advised by Houlihan.

Page 5 of Energy Partners Docket 386 outlines Houlihan's services to be provided to the Noteholders Committee stating as follows:

"the Noteholders Committee retained Houlihan Lokey to, among other things, evaluate the enterprise value of the Debtors and represent the Noteholders Committee in negotiations with the Debtors and any third parties regarding the valuation of the Debtors and the Plan. (Houlihan Lockey Application at 7 – 8.)"

Page 12 of Energy Partners Docket 386 indicates "individual members" of the Noteholders Committee agreed to "backstop" Houlihan's fees in the event they would be denied by the Court, stating as follows:

"the Noteholders' Committee so strongly believed that it needed Houlihan Lokey's services under the negotiated terms that after the Court denied the Houlihan Lokey Application pursuant to section 328(a), individual members of the Noteholders' Committee agreed to backstop Houlihan Lokey's fees on a pro-rata if the cCourt denied any portion of them."

Please refer to the attached .pdf file "Energy Partners – Docket 386" to review and verify the above statements regarding Houlihan's involvement with Whitebox during Energy Partners bankruptcy case.

SUMMARY OF OBJECTION AND COMPLAINT

This Objection, submitted to the Bankruptcy Court, and this Complaint, submitted to the SEC, stem from the series of facts outlined above that I have documented with links to court documents so that they can be easily verified and substantiated.

-

Apparently, Houlihan does not believe their simultaneous activities advising Whitebox and Brigade, both major creditors of Aventine, while also advising Aventine, and negotiating with Whitebox and Brigade on Aventines behalf, constitutes a conflict of interest. The above facts lead me to believe there has been is a very serious conflict of interest resulting in a breach of duty by Houlihan in their advisory capacity to Aventine beginning before Aventine's Chapter 11 filing and continuing to present date.

The conflict of interest calls into question all of Houlihan's services rendered to Aventine, including their advising of Aventine prior to the April 8 Chapter 11 filing, the valuation analysis of Aventine's business, the evaluation of restructuring alternatives, and the valuation of Aventines PP&E assets. Houlihan's services form the primary foundation for Aventine's Plan of Reorganization which is currently in the process of being voted upon. Because of the conflict, the current Plan of Reorganization should not be approved and an alternate plan should be developed that is fair and equitable to all stakeholders, including stockholders.

COMMENTS REGARDING HOULIHAN'S EXTREMELY LOW VALUATION OF AVENTINE

Houlihans valuation of Aventine contained in the Disclosure Statement includes a "comparable company" analysis. An attachment to the email I received from paralegal Debbie Laskin on the afternoon of January 12, 2010 (just prior to the January 13 Disclosure Statement Hearing) contained Houlihan's assertion that Green Plains Renewable Energy ("GPRE") is the only publicly traded ethanol producer that is comparable to Aventine for the purposes of valuation. As someone who has worked for various ethanol companies for many years, I disagree with this statement. However, for the purposes of this illustration I will accept it, and I offer the following side-by-side comparison of GPRE and Aventine financial data for your consideration. The data cited are taken from Google Finance after the market closed on January 26, 2010, and are from the most recent quarterly SEC 10-Q filings of each company. The asset, debt, and shareholders equity for Aventine are taken from the Balance Sheet in their December 2009 Monthly Operating Report (Case Docket 699).

Comparison of Financials for GPRE and AVRNQ

### Asset, Debt, Shareholders Equity Comparison

|  | Current Assets | Total Assets | Current Liabilities | Total Liabilities | Share. Equity |
|---|---|---|---|---|---|
| AVRNQ | $99.14M | $711.88M | $61.11M | $449.10M | $262.78M |
| GPRE | $198.67M | $822.34M | $131.53M | $536.85M | $285.49M |

## Margins and Income Comparison

|       | Net Profit Margin | Gross Margin | Operating Margin | Net income | EBITDA   |
|-------|-------------------|--------------|------------------|------------|----------|
| AVRNQ | $11.76M           | $6.63M       | $12.80M          | $13.89M    | $18.62M  |
| GPRE  | $1.53M            | $5.92M       | $2.97M           | $5.55M     | $19.02M  |

## Financial Ratios Comparison

|       | Current Ratio | LT Debt/Assets | Tot. Debt/Assets | LT Debt/Equity | Tot. Debt/Equity |
|-------|---------------|----------------|------------------|----------------|------------------|
| AVRNQ | 1.40          | 52.50%         | 58.63%           | 144.94%        | 161.87%          |
| GPRE  | 1.51          | 48.65%         | 55.61%           | 144.20%        | 164.81%          |

## Operating Metrics Comparison

|       | Return on Avg. Assets | Return on Avg. Equity | Return on Investment |
|-------|-----------------------|-----------------------|----------------------|
| AVRNQ | 7.98%                 | 22.72%                | 8.75%                |
| GPRE  | 2.93%                 | 7.97%                 | 3.55%                |

The above side-by-side financial comparison of GPRE and Aventine shows two very closely structured and leveraged companies that are in the same business, competing against each other within the same industry, and with the same industry outlook and future prospects. This would indicate to a reasonable investor that the Enterprise Values of these two fuel production companies should be very similar.

However, GPRE has an Enterprise Value of $716M, and Houlihan's valuation of Aventine is $220M to $260M, or approximately 1/3 of the value of GPRE, the only public company that Houlihan believes is "comparable" to Aventine. This extremely low valuation is not realistic in the least, and the effect of it causes the company to "appear" insolvent when in reality it is very solvent.

Aventine has been in the ethanol business for 28 years and is self described as the "lowest cost producer" in the entire US ethanol industry. Following is a quote taken from the "Competitive Strengths" section on page 4 of Aventine's SEC Form S-1 dated March 30, 2006:

*"Low Cost Producer* . We believe we are one of the lowest cost producers of ethanol in the United States. Our Illinois facility generates 58.0% of its own electricity and 93.0% of its fuel requirements are met by using coal, which provides us significant cost savings compared to ethanol facilities that use natural gas to generate power. During the year ended December 31, 2005, the average Illinois basin coal spot price was $2.13 per MMBtu and the average Henry Hub spot gas price was $9.04 per MMBtu. In addition, our Illinois facility, through its wet

mill production process, generates higher margin co-products and bio-products, which allowed us to recapture 55.3% of our corn cost in the year ended December 31, 2005, which is a higher percentage than our competitors who employ the dry mill production process. At our Nebraska facility which employs the dry mill process, we recaptured 36.7% of our total corn costs. We believe the current cost to replace a wet mill makes further construction unlikely as evidenced by the fact that no wet mills have been constructed in North America in the last twenty years, and all of the 2.1 billion gallons of announced or in process new plants are dry mill facilities. Furthermore, we source all of the corn used at the Nebraska facility from the Nebraska Energy Cooperative at prices which have historically been lower than our corn prices paid at Pekin. The Nebraska Energy Cooperative has a 21.6% interest in our Nebraska facility."

GPRE's business history and ethanol production plants are in stark contrast to Aventine's 28 year business history and production plants described above. GPRE is a relatively new company that has grown through recent acquisitions of dry mill plants of bankrupt producers. Aventine has been refining and marketing ethanol since 1981, practically the very beginning of the fuel ethanol industry. Aventine's 100M gallon/year Pekin wet mill plant and coal-fired power plant which generates both electricity and process steam, set it apart from typical dry mill plants. Wet mills are rare in todays industry and, as described in Aventine's quote above, the wet mill produces several unique coproducts that command higher prices and greater corn cost recapture than dry mill coproducts. The long business history and low production cost advantages that Aventine enjoys would actually command a valuation premium for Aventine when compared to GPRE.

Furthermore, the sum of the fair values of Aventine's "operating plants" and the two "unfinished plants" (that are 85 to 90 percent complete) can easily be shown to exceed the current $589M balance sheet value of PP&E assets. This is due to the fact that Aventines 100M gallon/year Pekin wet mill, with its own coal-fired power plant, has been substantially depreciated over the years. These are fuel production, and electricity and steam generating assets. The value of these older assets is largely a function of the lower costs of production that result in higher margins for the company. The replacement cost of these "aged" assets in Pekin is well over $400M alone. Add to that the value of the three year old 57M gallon/year Pekin dry mill, the 10 year old Pekin brewers yeast plant, the 50M gallon/year Aurora dry mill, and the two unfinished plants that Aventine has invested $493M in over the last 3 years, and the total replacement cost value is easily in the range of $800M to $1.1B.

REQUESTS TO THE SEC U.S. AND THE U.S. TRUSTEE

I respectfully request the SEC investigate the perceived conflict of interest outlined in the first 7 pages of this Objection and Complaint.

-

9

I respectfully request the Court refrain from approving the current Plan of Reorganization that was developed based on Houlihan Lokeys extremely low valuation performed in their capacity as restructuring advisors to Aventine in light of their conflict of interest and breach of duty to Aventine.

I respectfully request that counsel to the SEC support the formation of an Official Equity Committee to represent stockholders interests in Aventines bankruptcy case. Accordingly, I respectfully request the U.S. Trustee solicit interest among equity stockholders to serve on an official equity committee. Many of the stockholders are already communicating with each other informally and are knowledgeable about Aventine and the ethanol industry in general.

EQUITY REQUESTS TO DATE

Some of the requests equity interest holders have already made in an effort to gain "adequate representation" in this bankruptcy case per Section1102(a)(2) of the Bankruptcy Code include the following:

1) Stockholder Andrew Shirley's letter to Aventine's Board of Directors dated December 3, 2009. Please refer to Attachment A.

2) Stockholder Michael J. Welsh's letter to Judge Kevin Gross dated December 23, 2009. Please refer to Aventine Case Docket 658 and Attachment B.

3) Stockholders William and Sheila Toomey's letter to Judge Kevin Gross dated December 23, 2009. Please refer to Aventine Case Docket 657.

4) Stockholder Herschel C. Patton's letter to Judge Kevin Gross dated December 23, 2009. Please refer to Aventine Case Docket 656.

5) Stockholder Andrew Shirley's letter to the U.S. Trustee dated December 23, 2009. Please refer to Aventine Case Docket 679, page 29.

6) Stockholder Andrew Shirley's motion Objecting to the Disclosure Statement entered January 5, 2010. Please refer to Aventine Case Docket 644.

7) Stockholder Dr. Alan Betensley's email to Judge Kevin Gross dated January 12, 2010. Please refer to Attachment C.

8) Stockholder Michael J. Welsh's email to Judge Kevin Gross dated January 13, 2010. Please refer to Attachment D.

9) Stockholder Andrew Shirley's letter to Aventine's Board of Directors dated January 20, 2010. Please refer to Attachment E.

—

GENERAL CRITERIA FOR APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE

American Bankruptcy Institute Journal, Vol. XXIV, No. 10, December/January 2006, entitled "Equity Committees: A Consequence of the "Zone of Insolvency"" outlines the following general criteria that courts have considered to make a determination to appoint an official equity committee:

1) Debtors are not "hopelessly insolvent"

2) There is a substantial likelihood of recovery

3) Shareholders interests are not adequately represented

4) Case is clearly large and complex

5) No undue delay or burden to the Debtors estates

Please refer to Attachment F for a copy of the ABI Journal article referenced above, which includes many references to applicable Bankruptcy Code sections and precedent cases.

A careful review and study of Aventine's present balance sheet combined with an accurate valuation of Aventine conforming to FASB Statement of Financial Accounting Standards 157, "Fair Value Measurements" will show beyond any doubt that Aventine is not "hopelessly insolvent" and is in fact solvent. The remaining criteria for appointment of an official equity committee also appear to be satisfied.

On December 10, 2009, Mr. Andrew Shirley solicited interest from Aventine stockholders in support of an informal group, the Aventine Stockholders Alliance, to advance efforts to preserve stockholder value. In a December 16, 2009 update to stockholders, Mr. Shirley reported that he had received a response from more than 50 Aventine stockholders, indicating a combined ownership of more than 15% of the total shares outstanding.

To date, stockholders have been excluded from representation by both Aventine's Board of Directors and the Court. Aventine's Board has not performed its fiduciary duty to protect the interests of all creditors and stakeholders, including stockholders. At stake is over $262,000,000 in stockholders equity in this solvent and profitable fuel production company.

If the Court will permit, a Plan of Reorganization can be developed that allows Aventine to restructure in such a way that all creditor constituencies can be paid in full. The key to this restructuring is reinstating the $300M in senior unsecured bonds under their original terms. The present Plan of Reorganization is based on an extremely low valuation developed by

---

Houlihan that unfairly leaves most creditors with substantially reduced payouts and transfers the equity in this company to the holders of the 10% Senior Unsecured Bonds (largely the group of four hedge funds that include Whitebox and Brigade). Please refer to Mr. Shirley's December 3 letter to Aventine's Board of Directors, Attachment A, for arguments in support of an alternate restructuring plan. Please refer to my letter in Case Docket 658, Attachment B, and my email of January 13, 2010 to Judge Gross, for a brief description of some of the extreme underestimates of value contained in Houlihan's valuation of Aventine.

CLOSING REMARKS

Thank you for considering the above Objection, Complaint, and valuation information.

Thank you also for considering my requests to investigate the perceived conflict of interest and consider the formation of an official equity committee to provide adequate representation for stockholders in Aventine's bankruptcy case.

If you have any questions regarding any aspect of the above information, please contact me.

Michael J. Welsh, P.E., S.E.
300 W. Pershing Street
Morton, IL  61550
309-266-5461

mwelsh11@comcast.net

**ATTACHMENT A**

—

December 3, 2009

Board of Directors
Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554


To Members of the Board:

## INTRODUCTION

I am an Aventine Renewable Energy Holdings, Inc. ("Aventine" or "the Company") equity holder and I currently own approximately 900,000 shares of common stock, or 2.1% of the outstanding shares. I have 18 years of professional investment experience, including more than 10 years of bankruptcy investing experience.

## PURPOSE

I am writing to request that the Board use its best efforts to evaluate the feasibility of Chapter 11 reorganization alternatives that preserve shareholder value and ownership. My analysis shows that Aventine pre-petition equity has substantial value, potentially more than $10 per share, and that a fair and equitable plan of reorganization can be structured to benefit all stakeholders, including shareholders. As court documents indicate, Aventine filed for bankruptcy on April 7, 2009 due to the confluence of weak ethanol margins and a global credit crisis. However, as I am sure you are aware, both ethanol margins and the credit markets have recovered dramatically since the filing date. As a result of this recovery, the primary conditions that precipitated Aventine's bankruptcy filing no longer exist and pro forma earnings sufficiently support the Company's capital structure and operating plan. Accordingly, the Board has an obligation to use its best efforts to evaluate reorganization alternatives that preserve value for all stakeholders, including shareholders. The contents of the remainder of this letter will justify my request and the Board's obligation.

## ETHANOL MARGIN RECOVERY

Supply-and-demand in the ethanol industry has returned to balance after a period of great dislocation in late 2008 and early 2009. The resulting recovery in ethanol plant EBITDA

---

margins has been impressive, from breakeven or below to a multi-year high of more than 50 cents per gallon currently. On October 12, 2009, *The Wall Street Journal* published an article titled "Christmas in October for Ethanol" which highlighted "wide profit margins" for ethanol producers. Beyond the headlines, Aventine's October 2009 Monthly Operating Report, filed with the bankruptcy court, shows that the Company achieved plant-level EBITDA margins of approximately 50 cents per gallon for the month. Ethanol margins have continued to expand in the ensuing weeks and may currently exceed 70 cents per gallon for Aventine. Key factors in this recovery include: (1) continued growth in ethanol demand mandated by Renewable Fuel Standard ("RFS") legislation; (2) absorption of blenders' excess renewable identification numbers ("RINS"); (3) lower corn, natural gas, and other input costs; (4) a near doubling of gasoline prices that now encourage discretionary ethanol blending; (5) a spike in Brazilian ethanol prices that makes U.S. imports uneconomical and potentially opens export markets to U.S. producers; and (6) the idling of higher-cost ethanol plants. While a few new ethanol plants are scheduled to come on line over the upcoming months and other idled plants may restart if attractive margins persist, this incremental capacity will be absorbed by a 1.5 billion gallon, or 14%, increase in RFS blending mandates in 2010 (from 10.5 billion to 12.0 billion gallons). By 2015, RFS mandates call for a 4.5 billion gallon, or 43%, increase in ethanol blending over 2009 levels, providing a huge multi-year tailwind to ethanol supply-and-demand fundamentals and margins.

## CREDIT MARKET RECOVERY

Global and U.S. credit markets have improved dramatically since the Aventine bankruptcy filing in early April. The CSFB High Yield Index is up 40% over this time with yield spreads tightening from 1,500 to 730 basis points. The CSFB Leveraged Loan Index has similarly improved, up 30% from 65 at the end of March to 85 at the end of October. Aventine's own 10% Notes due April 2017 are up almost 500% from 12 cents on the dollar in April to approximately 70 cents recently.

Strong margins and enviable multi-year fundamentals suggest that Aventine should have sufficient access to credit market capital. A sample of leveraged and cyclical commodity producers includes, but is not limited to, Bunge, Dow Chemical, Neenah Paper, Rockwood Holdings, Smithfield Foods, Tyson Foods, Sunoco, and Valero. The leverage ratios for these companies range from 3x to 9x, calculated as net debt divided by EBITDA, and the unsecured credit ratings range from BBB to CCC +. Many of these companies successfully issued unsecured bonds over the last nine months and yields to maturity on selected bonds range from 5% to 10%, with spreads of 225 to 725 basis points. This summary

—

data illustrates that the credit markets "understand" the nature of cyclical industries and currently offer affordable access to capital, even in recessionary times. Furthermore, the ethanol industry has a decided advantage over most cyclical industries as blending mandates increase 14% in 2010 and 43% over the next six years.

## EARNINGS ANALYSIS

Aventine currently operates 207 million gallons of ethanol capacity and should generate more than $100 million of plant-level EBITDA based on recent industry margins of more than 50 cents per gallon. At this level of earnings, the Company can cover all fixed costs including interest expense on existing debt, interest expense on exit financing debt, taxes, and maintenance capital requirements. Aventine also has two nearly completed ethanol plants for which construction is currently suspended. If successfully completed, these plants would add approximately 226 million gallons of ethanol capacity and generate more than $100 million of additional EBITDA at recent margins. These plants are now 85-90% constructed and require an additional $70-100 million capital investment to complete. Pro forma for completion of the plants, Aventine would operate 433 million gallons of ethanol capacity and generate more than $200 million of EBITDA at recent margins.

## CAPITAL STRUCTURE ANALYSIS

With the dramatic recovery in credit markets and industry margins, Aventine now has financing options available that it did not have in the March-April 2009 timeframe. Aventine should be able to raise a secured credit facility that would allow the Company to emerge from bankruptcy while preserving shareholder value and ownership. This facility would be used to pay-off the existing DIP facility, the existing credit facility, all accrued interest, and all other liabilities subject to compromise as required. Aventine needs approximately $100-150 million to fund these exit payments. The Company's 10% Notes could be reinstated and would emerge from the reorganization unimpaired.

As mentioned above, Aventine needs approximately $100-150 million to exit from bankruptcy and an additional $70-100 million to complete the two ethanol plants under suspended construction. The $170-250 million total requirement could be funded with a new secured credit facility that would be structurally senior to the unsecured 10% Notes. The indenture governing the 10% Notes seems to allow for secured indebtedness of at least $300 million. Even at the high-end requirement of $250 million, a new secured facility would be leveraged less than 1.5x debt to EBITDA at recent margins and less than $0.60 per gallon of capacity, relative to replacement cost exceeding $2.00 per gallon.

---

Upon completion of the new plants, Aventine would have total pro forma net debt of $500 million, comprised of a $250 million secured exit facility, $300 million of existing 10% Notes, and approximately $50 million of cash and equivalents. Pro forma net debt could be as much as $100 million lower, or a total of $400 million, depending on variables including the potential reinstatement of certain liabilities subject to compromise, remaining capital costs, free cash flow generation, utilization of tax losses, recapture of restricted cash, savings from prepaid utilities, and potential proceeds from auction rate securities litigation. Even at the high estimate of $500 million, net debt would be a modest 2.5x EBITDA at recent margins and $1.15 per gallon of capacity. These credit metrics are roughly in-line with public industry comparables, particularly after adjusting for the superior profitability of Aventine's 100 million gallon wet mill facility. In this scenario, Aventine could generate close to $100 million of annual free cash flow after all interest, tax, and maintenance capital requirements, suggesting that a new secured facility could be fully amortized after only a few years. Even if ethanol margins decline 50% from recent levels, Aventine would have a manageable capital structure and generate substantial free cash flow.

## ASSUMPTIONS

The analysis above includes the following pro forma assumptions: 433 million gallons ethanol capacity and production, 50 cents per gallon plant-level EBITDA margin, $15 million corporate expense, $40 million depreciation expense, 10% average coupon on $500 million net debt, 35% tax rate, and $12 million maintenance capital expenditures. A full cash tax rate is assumed despite substantial tax loss carryforwards that are likely available to Aventine. Based on information available through Bloomberg, spot margins are now materially higher than the 50 cents per gallon assumption, which therefore implicitly includes a contingency against potential margin contraction. As of the date of this letter, I calculate average spot plant-level EBITDA margins of 75 cents per gallon for Aventine based on the following commodity price and processing assumptions: $2.19 per gallon ethanol benchmark, zero ethanol basis differential, $3.61 per bushel corn, zero corn basis differential, 2.70 gallons per bushel corn yield, 35% co-product recapture, $0.10 per gallon freight expense, $0.17 per gallon utility expense, and $0.30 per gallon other cash conversion costs.

## VALUATION ANALYSIS

My analysis shows that Aventine pre-petition equity has substantial value based on various valuation methodologies. *EV/EBITDA Methodology.* Based on pro forma EBITDA of $200 million, a typical industrial enterprise value multiple of 8.0x, pro forma net debt of $500 million, and 43 million shares outstanding, Aventine has potential equity value of $1.1 billion, or $25 per share. Even if ethanol margins are cut in half, an 8.0x multiple on $100 million EBITDA suggests potential equity value of $300 million, or $7 per share. *Free Cash Flow Methodology.* As detailed above, Aventine can generate pro forma free cash flow of $100 million, or $2.30 per share, based on recent margins and approximately $0.80 per share assuming margins are cut in half. Applying a reasonable 10x free cash flow multiple suggests a similar potential equity value range of $8 to $23 per share. *Replacement Cost Methodology.* Based on $2.00 per gallon of dry mill capacity (pro forma 333 million gallons) and $3.00 per gallon of wet mill capacity (100 million gallons), Aventine's pro forma enterprise value is $966 million. Deducting pro forma net debt leaves potential equity value of $466 million, or $11 per share. Given recent margin strength, a robust demand-growth outlook, and the potential need for additional capacity to meet 2015 RFS mandates, there is a compelling argument that ethanol plants should be worth at least replacement cost. Of note, none of these valuation methodologies attribute any value to potential exit payment or capital cost savings, free cash flow generation, utilization of tax losses, recapture of restricted cash, savings from prepaid utilities, or potential proceeds from auction rate securities litigation. These items could total approximately $100 million, or more than $2 per share. Any way you look at it, Aventine equity appears to have substantial value that can and should be preserved for shareholders.

## CONCLUSION

Aventine filed for Chapter 11 bankruptcy protection on April 7, 2009 due to the confluence of weak ethanol margins and a global credit crisis that is universally described as the worst in generations. Ethanol margins are now strong and the credit markets have recovered. Earnings and capital structure analyses suggest that Aventine should be able to secure a sufficient credit facility to exit bankruptcy and make whole all of the Company's pre-petition and post-petition obligations. Traditional valuation analysis shows that Aventine's pre-petition equity has substantial value, potentially more than $10 per share. Accordingly, the Board has an obligation to use its best efforts to evaluate reorganization alternatives that preserve value for all stakeholders, including shareholders. Aventine and the Board would not be alone in such efforts, as even today there are at least three

pending bankruptcy proceedings, including Pilgrim's Pride Corporation, W.R. Grace & Co., and Vermillion, Inc., in which the respective debtor has proposed a reorganization plan that preserves substantial shareholder value. General Growth Properties, Inc. also appears to have a board and management team that are working constructively to preserve shareholder value because of the dramatic recovery in the credit and capital markets since that company's bankruptcy filing, also in April 2009.

The Board should immediately seek to renegotiate or replace the existing DIP credit facility to provide better flexibility and terms to the Company. While the existing DIP facility likely provided the best terms available on the filing date, the $30 million commitment is arguably too low, the April 7, 2010 maturity is arguably too short, and the 16.5% interest rate is arguably too high. Simply put, with the dramatic recovery in both industry margins and the credit markets, substantially better terms are likely now available. The Company could perhaps even obtain a new DIP facility that permits, during the bankruptcy process, the continued construction of one or both of the ethanol plants under suspended construction.

FURTHER OFFERS AND REQUESTS TO THE BOARD

I offer my immediate availability, via phone and email, to the Board and management in order to provide any necessary clarification or to answer any questions regarding my analyses. I also invite any feedback the Board or management might have regarding my analyses. I encourage the Board and management and their various advisors to commence a dialogue with me and other interested shareholders to discuss the matters addressed in this letter. In furtherance of such dialogue, I ask the Board to seek the appointment of an official committee of shareholders as part of the bankruptcy proceedings. I ask the members of the Board, as fiduciaries to all stakeholders including shareholders, to use their best efforts to evaluate the feasibility of Chapter 11 reorganization alternatives that preserve shareholder value and ownership. Finally, I ask that the Company defer from filing any plan of reorganization in advance of completing the requested evaluation. I expect that the Company will file a motion to extend exclusivity, as is not uncommon in such complex cases, beyond the December 5, 2009 expiration to provide sufficient time to complete the requested evaluation.

DISCLAIMER

The analyses contained herein should not be construed as me giving investment advice to any person. I also caution any person against relying on my analyses or the contents of this letter in making any investment decision.

Thank you for your time and consideration.

Andrew Shirley
aeshirley1@yahoo.com
424-832-3993

with copy to:
Bobby L. Latham, Chairman of the Board
Leigh J. Abramson, Board Member
Theodore H. Butz, Board Member
Richard A. Derbes, Board Member
Farokh S. Hakimi, Board Member
Michael C. Hoffman, Board Member
Wayne D. Kuhn, Board Member
Arnold M. Nemirow, Board Member
George T. Henning, Jr., Interim Chief Executive Officer

—

**ATTACHMENT B**

To the Honorable Judge Kevin Gross

c/o Mark S. Kenney, Esq.
Office of the United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

Honorable Judge Gross,

I am an Aventine Renewable Energy stockholder writing in reference to Case No. 09-11214-KG, which I have been following on the Case Dockets. I currently own approximately 431,000 shares of Aventine stock, or roughly 1% of outstanding shares. I am a consulting engineer who has worked within the ethanol industry for over 28 years, and I have provided engineering services directly to Aventine on an ongoing basis over the past 16 years.

I am writing to express my wholehearted disagreement with the Debtors Disclosure Statement and Proposed Plan of Reorganization (the Plan). The primary reasons for my disagreement with these proposals are outlined below.

1) Disclosure Statement Exhibit D – "Summary of Key Business Plan Assumptions" contains projections of future "plant EBITDA margins" that range from 44% to 56% of the actual plant EBITDA margins that Aventine has posted in their Monthly Operating Reports during the 7 month period they have been operating as a Debtor-In-Possession. The Debtors extremely low future margin projections do not reflect the realities of current corn-based ethanol margins, or the current markets that Aventine operates within. FASB Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", paragraphs 5 and 7 require valuations to be based on "the measurement date", not past dates, or some other unspecified date. The Debtors future "plant EBITDA margin" projections should begin with values consistent with recent actual operating margins realized during their post-petition operating period. These future margin projections directly impact the valuations contained in Exhibit D rendering the entire valuation contained in Exhibit D and the proposed Plan inaccurate and unrealistic. In addition, the market factors that resulted in breakeven and negative operating margins prior to their Chapter 11 filing are no longer in play. These include unprecedented commodity bubbles in both fuel and corn prices during 2008 (followed by rapidly collapsing commodity prices), excess ethanol production capacity in 2007 and 2008 due to "overbuilding" of the industry, and excess RINS carried into 2008 and 2009 from oversupply in previous years. These market factors have largely corrected themselves and the supply and demand balance for ethanol is in synch now, resulting in higher prices for the fuel and reasonable if not very good operating margins.

—

2) It is obvious from the operating results contained in the Monthly Operating Reports that Aventine doesn't need to have their initial Proposed Plan approved and exit CH 11 immediately, or even within the next several months, as they have been doing very well operating their business over these past 7 months and margins are currently very favorable. November plant EBITDA margins were $0.66/gallon and greater than margins realized in the preceding 3 month period. This is in contrast to a company that is in Chapter 11 and losing money each month. I respectfully ask that you consider this fact when reviewing recent motions the Debtors have made to expedite their exit from Chapter 11 and transfer the equity in this company to the creditors. I honestly believe these recent motions are rooted in a concerted effort to get the initial "Proposed Plan" through without any input from other interested parties.

3) The Proposed Plan and Disclosure Statement were developed without adequate consideration of the current owners of the company (the stockholders). It is obvious the Debtors and their creditors have structured the "Proposed Plan" for the benefit of the creditors and to the detriment of the equity holders. Aventine's current balance sheet indicates total assets of approximately $700M, total liabilities of approximately $443M, and stockholders equity of approximately $257M. This strong balance sheet affords Aventine financing options that are not normally available to companies in Chapter 11 with insolvent balance sheets.

4) Disclosure Statement Exhibit E – "Liquidation Analysis" values Aventines two unfinished plants that are between 85% and 90% complete at less than 2% of the capital expenditures to date used to construct the plants. These are brand new state-of-the-art dry mill plants designed by Delta-T Corporation and set up for future expansion to double their initial 113M gallon/year capacities. Aventine has invested over $490M in these facilities over the last 2-1/2 years and the Debtors Liquidation Analysis assigns recovery values of between $4M and $8M to these assets. The unconscionable low valuation of these two brand new nearly completed assets alone speaks to the intent of those who developed the Liquidation Analysis and renders the entire Liquidation Analysis faulty. Even in the event that these assets would be sold to used equipment dealers for dismantling and removal, the processing equipment residing at these plants (fans, heat exchangers, distillation columns, rotary dryers, tanks, pumps, loading equipment, etc) would bring many times the liquidation value contained in Exhibit E.

5) There are numerous options that Aventine could pursue to satisfy all of their creditor claims in full in order to exit Chapter 11 with significant value preserved for the existing stockholders. One key to these other options is to reinstate the existing $300M in unsecured bonds, paying the $15.5M interest due and all other costs of reinstatement. All of the other creditor claims can be paid off with either cash generated during bankruptcy (currently at $56.5M), additional secured financing (that is now readily available), issuing additional shares of stock in a secondary offering, or a combination of these sources of funds. Aventine's total of all known creditor claims that must be satisfied in order to emerge from bankruptcy is approximately $135M. Raising this amount of funds is easily achievable in light of Aventines strong balance sheet and the current and near future operating margins for their business.

—

6) A significant number of the stockholders in Aventine have recently joined the "Aventine Stockholders Alliance" behind the leadership of Mr. Andrew Shirley, a holder of over 2.1% of the outstanding shares. Mr. Shirley is an experienced investment professional and a principal in Ivory Capital with offices in Los Angeles and New York. In a recent update from Mr. Shirley, he reports that more than 50 Aventine stockholders representing more than 15% of the outstanding shares have joined the Alliance. I respectfully ask the Court to consider the interests of the existing owners of the company (stockholders) to allow sufficient time for the Aventine Investors Alliance to submit a Plan of Reorganization that is fair and equitable to all parties, satisfies all creditor constituencies in full, and preserves at least a portion of the existing stockholders equity.

Thank you for your time and consideration of the above information and my requests submitted as an Aventine stockholder. Please feel free to contact me if you have any questions.

Michael J. Welsh, P.E., S.E.
309-266-5461
mwelsh11@comcast.net

## ATTACHMENT C

January 12, 2010

I am a holder of 410,000 shares of AVRNQ. I understand that tomorrow is the hearing regarding the disclosure statement.

I read in the dockets that the debtors requested the ability to file a response to Andrew Shirley's objection despite being past the deadline, because they were too busy responding to other objections. I, too, have been very busy. I am a practicing pulmonologist in Detroit, Michigan, but I would like to file an objection to confirmation of the disclosure statement, specifically in response to the blacklined statement filed today.

In the revised statement, they claim that a comparable publicly traded company is Green Plains Renewable Energy. They also claim that ethanol companies are standardly valued as a ratio of enterprise value to production capacity. Green Plains has an enterprise value of $775 million and a production capacity of 480 million gallons per year.

After completion of their unfinished plants, Aventine will have production capacity of 420 million gallons per year. Using enterprise value/capacity ratio, this value Aventine at $678 million. It will require at most approximately $100 million to complete the unfinished plants. So by their own claims of comparing with Green Plains and using enterprise value/production ratios, the enterprise value of Aventine would be $578 million.

Now they also agree that the disclosure statement would be patently unconfirmable if a group of creditors receives greater than 100% of their claim. It seems clear that receiving $578 million worth of equity far exceeds the $300 million in unsecured notes.

Therefore, by their own admission, the disclosure statement is not confirmable.

I hope that you will agree that this is important information that needs to be available for all stakeholders to make a informed decision.

Thank you,
Alan Betensley, MD
Henry Ford Hospital
Detroit, Michigan

**ATTACHMENT D**

—

January 13, 2010

Honorable Judge Gross,

First, please forgive my lack of protocol. I am an engineer who has worked within the ethanol industry for over 28 years now, essentially from the time ethanol became an accepted motor fuel. I am also an Aventine stockholder with about 1 percent of the shares. I have also provided engineering services directly to Aventine for over 16 years now.

I have been reviewing the "blackline" of the amended Disclosure Statement sent by Debbie Laskin last evening.

The valuation information contained on pages 78 through 81 is not accurate in the least and I honestly believe it indicates a concerted effort to undervalue both Aventines business enterprise and their PPE assets.

I know I should not go into great detail here. Very briefly:

1) The "comparable public company analysis" is inaccurate because it purposely considers only a single company (GPRE) without any future cash flow projections. BIOF is not a "distressed" company and is in the same business. I know you are presiding over PEIX case, and I honestly don't know if they are "distressed" or not.

2) The "discounted cash flow analysis" is purposely based on future margin projections that are roughly half of the actual margins Aventine has realized over the past 7 months operating as a DIP. These margins can be easily calculated from data contained in their Monthly Operating Reports and using the Debtors own definition of "plant EBITDA margin". If Houlihan only considered "precedent transactions" from the last 9 months, why not consider margins from the same time period instead of fictitious estimates that are far removed from todays actual margins?

3) The "precedent transactions analysis" was purposely limited to the time period of Jan 1 to Nov 15 to exclude transactions that occurred during periods where operating margins were at (or even less than) todays levels. I am speaking of transactions that took place in 2008. Also, as recently as Dec 16, 2009 Valero purchased two 110MGY plants from ASA Holdings in a non-distress, orderly, arms length transaction for $200M.

4) The "judgment" that Houlihan Lokey made to combine the three cash flows to arrive at enterprise value also shows their intent to yield a low valuation. They weighted the two methodologies with the lowest values at 40% and the one with the highest value at 20%. The intention is very clear.

—

5) The liquidation analysis also appears to have been structured to purposely understate the values of plant assets, including the new unfinished plants and the existing plants. There is no value mentioned for Aventines coal-fired power plant that supplies a large portion of both electricity and process steam needs in Pekin at far less expense than natural gas fired plants require. There is also no mention of their brewers yeast plant. There is no mention that half of their production is wet mill production with much higher coproduct returns. All of these factors are important to accurately valuing the company.

I only ask that time be granted for stockholders to hire a reputable firm (Lazard, Deloitte, Alston & Bird, etc) to perform an accurate valuation for the courts consideration.

I apologize again for my lack of protocol and my boldness in even emailing you at all. I simply feel compelled to at least try to make these points known. Please forgive my lack of understanding of proper legal procedure.

Thank you for your time and your service to our legal system.

Michael J. Welsh, P.E., S.E.
300 West Pershing Street
Morton, IL 61550
(309) 266-5461
CELL 309-219-1544

**ATTACHMENT E**

Please see .pdf file "Shirley Aventine Letter #2 to Board"

—

ANDREW SHIRLEY
555 South Barrington Avenue, Suite 428
Los Angeles, California 90049
O: (424) 832-3993 • M: (917) 406-4905
aeshirley1@yahoo.com

January 20, 2010

## VIA OVERNIGHT DELIVERY & EMAIL

Board of Directors (the "Board")
Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554

      Re:    Protection of Equity Interests and Allocation of Substantial Equity Value

Dear Members of the Board:

    I write to again ask each of you, individually, and the Board, collectively, to fulfill your fiduciary duties to preserve value for all stakeholders, including stockholders, through the chapter 11 cases of Aventine Renewable Energy Holdings, Inc. ("Aventine") and its affiliated debtors (collectively with Aventine, the "Debtors") (Case No. 09-11214).

    Attached hereto as Exhibit A is a *Comparable Public Company Analysis* which clearly shows that Aventine pre-petition equity has substantial value. The proposed Debtors' Plan of Reorganization dated January 13, 2010 (the "Plan")[1] provides only a "de minimis" recovery to equity and fails to fairly allocate the substantial value that rightfully belongs to stockholders. I ask the Board to submit a revised plan of reorganization that fairly and rightfully allocates Aventine's substantial equity value to stockholders, rather than providing it as a windfall to the Debtors' influential creditor constituency that is dominated by a small group of Backstop Purchasers.

    Exhibit A shows that Aventine pre-petition equity has approximately $200 million to $300 million of value based on the publicly-determined value of Green Plains Renewable Energy, Inc. ("GPRE"). Scenario 1 in Exhibit A shows that Aventine equity is worth approximately $200 million based conservatively on GPRE's EV / Capacity valuation of $1.60 per gallon of ethanol production capacity. Scenario 2 in Exhibit A assumes that Aventine's wet mill production capacity is valued at a $1.00 per gallon premium to dry mill capacity to reflect

---

[1] Unless otherwise defined herein, capitalized terms used in this letter shall have the meanings provided in the Plan.

the superior profitability of a wet mill facility. Scenario 2 shows that Aventine equity is worth approximately $300 million. Attached hereto as Exhibit B is a selection of excerpts, which describe the advantages of the wet mill process, taken from Aventine's public filings with the Securities and Exchange Commission. Attached hereto as Exhibit C is a *Wet Mill vs. Dry Mill Cost Structure and Valuation Comparison* which supports the value premium assumption used for wet mill capacity in Scenario 2. Whether or not the Board feels that certain adjustments might appropriately be made to the analysis in Exhibit A, one thing is perfectly clear - Aventine equity has substantial value which should be fairly and rightfully allocated to stockholders.

The analysis in Exhibit A values Aventine equity based exclusively on GPRE because according to the Disclosure Statement the Debtors' financial advisor, Houlihan Lokey ("Houlihan"), contends that GPRE is the only publicly available ethanol company which is appropriately comparable to the Debtors. The Disclosure Statement also indicates that "the ratio of enterprise value to annual ethanol production capacity is the industry standard" for comparable public company analysis. Notwithstanding Houlihan's contention, Exhibit A also provides information on BioFuel Energy Corp. ("BIOF") and Pacific Ethanol, Inc. ("PEIX") because I believe that the valuations of these ethanol producers are also relevant. The BIOF valuation of approximately $1.60 per gallon further corroborates the valuation of ethanol producers in the public market. The PEIX valuation of approximately $2.00 per gallon also shows the potential for Aventine equity if the Board performs its duty to protect the interests of all stakeholders, including stockholders. While the ethanol production subsidiaries of PEIX are currently operating under chapter 11 bankruptcy protection, the board of PEIX is apparently working to preserve potential equity value for its stockholders. The actions taken to date by the Board of Aventine, conversely, suggest that the Board is content to sacrifice the interests of an inadequately represented equity class, perhaps at the behest of an influential creditor constituency.

Together the Disclosure Statement and the Board's letter to the Office of the United States Trustee dated January 5, 2010 (filed by Debtors' counsel) only detail certain assumptions that underlie the Precedent Transactions Analysis referenced in the Disclosure Statement. As far as I know, there has been no disclosure of valuation assumptions for the Comparable Public Company Analysis or the Discounted Cash Flow Approach also referenced in the Disclosure Statement. I caution you against an excessive reliance on the Precedent Transactions Analysis because (i) the vast majority of the referenced transactions occurred prior to the recent and dramatic recovery of the ethanol industry; and (ii) the vast majority of the transactions occurred as part of a distressed process, for example a bankruptcy auction and/or a motivated sale. The Plan clearly provides that Aventine's ethanol production assets are not to be sold in a distressed process, but rather are to emerge as part of a publicly traded company. Therefore, Comparable Public Company Analysis should be given a much more full weighting and the Precedent Transactions Analysis should be given a very limited, or even zero, weighting when the Board evaluates the Debtors' enterprise value.

The Plan currently values the Debtors' enterprise at a midpoint of $240 million. The pro forma enterprise value is $345 million after adding approximately $105 million for the remaining capital cost, including remobilization, to complete the Mt. Vernon and Aurora West expansion plants as projected in the Disclosure Statement. The pro forma EV / Capacity value implied by the Plan, based on 433 million gallons of ethanol production capacity, is approximately $0.80 per gallon, or a shocking 50% discount to the publicly-determined values of comparable companies, even before factoring in the value premium warranted by Aventine's wet mill capacity. Simply put, the Plan valuation blessed by the Board is anachronistically and absurdly low.

Again, I ask the Board to submit a revised plan of reorganization that fairly and rightfully allocates Aventine's substantial equity value to stockholders.

Please let me know if you have any questions or comments regarding my analysis or this letter. Thank you for your time and consideration.

[DISCLAIMER: The analyses contained herein should not be construed as me giving investment advice to any person. I also caution any person against relying on my analyses or the contents of this letter in making any investment decision.]

Sincerely,

Andrew Shirley

cc:     Bobby L. Latham, Chairman of the Board
        Leigh J. Abramson, Board Member
        Theodore H. Butz, Board Member
        Richard A. Derbes, Board Member
        Farokh S. Hakimi, Board Member
        Michael C. Hoffman, Board Member
        Wayne D. Kuhn, Board Member
        Arnold M. Nemirow, Board Member
        George T. Henning, Jr., Interim Chief Executive Officer
        Office of the United States Trustee