# EXHIBIT C

# Aventine Renewable Energy Holdings, Inc.

*WET MILL vs. DRY MILL - Cost Structure and Valuation Comparison*
*(US$ in Millions)*

## Cost Structure

| Process Type | | Wet | Dry | Variance | |
|---|---|---|---|---|---|
| Net Corn Cost | | 0.88 | 1.14 | (0.26) | see calculation below |
| Fuel Cost | | 0.12 | 0.22 | (0.10) | see calculation below |
| Other Utility Cost | | 0.05 | 0.05 | - | estimate |
| Labor Cost | | 0.15 | 0.05 | 0.10 | estimate |
| Other Conversion Costs | | 0.20 | 0.20 | - | estimate |
| Total Cash Costs | $ / gal | 1.40 | 1.66 | (0.26) | |

## Valuation Comparison

| | | Wet | Dry | Variance | |
|---|---|---|---|---|---|
| EBITDA Margin | | | | 0.26 | see calculation above |
| Margin for Error | | | | (0.06) | contingency |
| Adj. EBITDA Margin | | | | 0.20 | |
| Multiple | | | | 8.0 x | placeholding assumption |
| Incremental Value | | | | 1.60 | |
| Discount Factor | | | | 63% | further contingency |
| Adj. Incremental Value | $ / gal | | | 1.00 | assumed Wet Mill premium |

## Net Corn Cost

| | | Wet | Dry | Variance | |
|---|---|---|---|---|---|
| Corn Cost | $ / bu | 4.22 | 4.22 | | from DS Projections |
| Yield | gal / bu | 2.50 | 2.70 | | from 2008 10-K |
| Unit Corn Cost | $ / gal | 1.69 | 1.56 | | |
| *Co Product Net-back %* | | *47.7%* | *26.8%* | | see calculation below |
| Co Product Net-back | $ / gal | 0.80 | 0.42 | | |
| Net Corn Cost | $ / gal | 0.88 | 1.14 | (0.26) | |

## Historical Co Product Net-back

| | Wet | Dry | Variance | |
|---|---|---|---|---|
| 2006 | 51.1% | 27.7% | 23.4% | from 2008 10-K |
| 2007 | 46.3% | 26.6% | 19.7% | from 2008 10-K |
| 2008 | 45.6% | 26.2% | 19.4% | from 2008 10-K |
| Average | 47.7% | 26.8% | 20.8% | |

## Fuel Cost

| Energy Source | | Coal | Nat. Gas | | |
|---|---|---|---|---|---|
| Unit Cost | $ / mmbtu | 3.00 | 7.17 | | Aventine Wet Mill uses coal |
| Energy Intensity | mmbtu / gal | 4.00% | 3.00% | | estimate / from DS Projections |
| Fuel Cost | $ / gal | 0.12 | 0.22 | (0.10) | estimate |

**ATTACHMENT F**

Please see attached .pdf file "ABI – Equity Committees – Zone of Insolvency"

—

## Equity Committees: A Consequence of the "Zone of Insolvency"
Written by: Neil B. Glassman, Jeffrey M. Schlerf, Christopher A. Ward

A good deal has been written lately regarding directors and officers and their fiduciary duties when a company enters the "zone of insolvency". Chancellor Allen's footnote in *Credit Lyonnais Bank Nederland N.V. v. Pathe Communications*, 1991 WL 277613 (Del. Ch. 1991), heightened awareness that directors owe all creditors a fiduciary duty under that scenario, yet what has not been discussed is equity's need for representation after a company enters the "zone of insolvency." There has been a surprising number of official committee of equity security-holders appointed in recent years.[1] This phenomenon may be attributed, at least in part, to *Credit Lyonnais* and the subsequent decisions.

By definition, the board of directors is a warrior for shareholders. However, since *Credit Lyonnais*, once a board determines that the company may not be able to pay its debts as they come due, the board ceases being a warrior for the shareholders and becomes a watchdog for all creditors. At this moment shareholders lose their favored position in the corporate structure. For all intents and purposes, any lingering concerns of shareholders can be easily forgotten if the board elects to file for protection under chapter 11. The Bankruptcy Code has built-in protections for secured and unsecured creditors, and these creditors are actively represented in a bankruptcy case. However, prior to *Credit Lyonnais*, shareholders were typically left out of the equation. The creation of a quasifiduciary duty to all creditors in the "zone of insolvency" left shareholders in the precarious position of not being zealously represented upon the filing of a bankruptcy petition. As a result, official equity committees can become the warrior the board once was. Since in many bankruptcy cases the interests of shareholders run contrary to those of other creditors, inevitably there will be disagreements regarding valuations of a company's assets and its chances of survival. The appointment of an equity committee certainly changes the dynamics of these struggles.

### Process for Appointment of Equity Committee
A shareholder's first step in requesting the appointment of an official equity committee is sending a letter to the Office of the U.S. Trustee petitioning the Trustee to solicit interest among shareholders to serve on an official equity committee. "Ad hoc" or informal committees often will already have been formed before such a request, so that equity's concerns may have already been brought to the attention of management or debtor's counsel (usually with less-thansatisfactory results). These committees consist of shareholders who are knowledgeable about the company's condition and, typically, disenchanted with the attention given to their interests or management's general intentions regarding equity. These informal committees invariably are represented by counsel.

Time is not necessarily on the share-holder's side when seeking the appointment of an official equity committee. One impediment in the process will be a cool reception or even opposition by the debtor. One way to expedite the process is to seek support from counsel to the Securities & Exchange Commission (SEC). With SEC support of an official equity committee, the U.S. Trustee may be more receptive to the idea. Otherwise, filing a motion with the court may be the only other option in a fastmoving case.

### Applicable Legal Standard
Under §1102(a)(2) of the Code, upon request of a party in interest, the court may order the appointment of a committee of equity security-holders if necessary to assure "adequate

representation" of equity securityholders. 11 U.S.C. §1102. Section 1102 does not define what constitutes "adequate representation."

To make that determination, courts have considered the following factors: (1) the number of shareholders, (2) the complexity of the case, (3) the solvency of the debtor, (4) whether the cost to the estate outweighs the adequate representation interest of shareholders and (5) whether the interests of shareholders are already represented. *In re Exide*, 2002 U.S. Dist. LEXIS 27210 (D. Del. 2002). No one factor is dispositive, and the relative weight that should be afforded to the various factors depends on the circumstances of the particular reorganization case. *In re Kalvar Microfilm Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996).

**Not Hopelessly Insolvent**
In considering the solvency issue, the most frequently applied legal standard is whether the debtors are "hopelessly insolvent." *In re Exide* at *4 (determining that appointment of an official committee of equity security-holders was necessary to assure adequate representation where the debtor was not hopelessly insolvent).

It is not a question of whether recovery to the debtors' shareholders is guaranteed. *Id*. Economic indicators must demonstrate that there is value for shareholders and that those shareholders are not necessarily "out of the money." *In re Mansfield Ferrous Castings Inc.*, 96 B.R. 779, 781 (Bankr. N.D. Ohio 1988) (rejecting insolvency as barring appointment of an equity committee and stating that the court will be guided by all the facts and not just the issue of solvency). Where the debtor is even marginally solvent, shareholders have a meaningful interest in the outcome of the case and should have the benefit of an equity committee representing their interests, regardless of the cost. *In re Wang Laboratories Inc.*, 149 B.R. 1, 3. This can be established through various means, including the volume of shares trading postpetition (in the bankruptcy context, this will most likely be in over-the-counter trading or on "pink slips"), the post-petition volatility in share price or through the market capitalization of the debtors. The more difficult arguments to allege are that substantial room for improvement exists with respect to the debtors' business operations, or that regardless of the fact that unsecured creditors are not being paid in full, a restructuring will provide a more viable deleveraged company that may in the future provide value to equity.

**Substantial Likelihood of Recovery**
Opponents of equity committees seek application of a higher standard than "not hopelessly insolvent," as advocated in *In re Williams Communications Group Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002). This standard requires that there is a substantial likelihood that shareholders will receive a meaningful distribution in the chapter 11 case under a strict application of the absolute priority rule. The "substantial likelihood" standard established in *Williams* does not appear to be supported by prior case law. In fact, since the *Williams Communication* ruling in 2002, courts have been reluctant to apply the "substantial likelihood" standard. *In re Northwestern Corp.*, 2004 WL 1077913, *2 (Bankr. D. Del. May 13, 2004).

The party seeking the formation of an official equity committee will no doubt assert that the court should not impose the "substantial likelihood of a meaningful distribution" standard on shareholders as a condition to official recognition. If this were the standard, then it would require the U.S. Trustee (or the court) to rely on a valuation of the debtors in every case prior to exercising their discretion under §1102 to appoint an official equity committee. In most chapter 11 cases, there is some uncertainty surrounding the debtors' performance and financial

information. Thus, equity-holders would have to put forth a valuation case, at their own expense, relying on questionable information that they have limited access to in order to persuade the U.S. Trustee and/or the court that the debtors' enterprise value exceeds the total amount of potential claims against the estates. This would unfairly alter shareholders from having their voice heard in already tenuous negotiations with the core constituencies in the case.

The more prevalent view is that when equity is marginally in the money, shareholders need an equity committee. While there may be substantial debt in a given chapter 11 case, expert financial testimony can show equity is substantially "in the money," even if only $1-2 per share. For example, in the recent *Trump Hotels and Casino* case, there was approximately $2 billion in debt, and approximately 30 million shares of common stock equivalents. The equity committee increased the recovery for shareholders from virtually nothing to a cash distribution of approximately $40 million in addition to warrants (or $2-3 per share). This return turned out to be inconsequential to the bondholders, who received most of the reorganized equity. One may ask what motivation do directors have to fight for such "scraps" in the absence of official representation of equity-holders?

**Shareholders Interests Are Not Adequately Represented**
Shareholders seeking the appointment of an equity committee must also demonstrate that their interests will not be adequately protected by any other party. As a starting point, most constituencies in a chapter 11 case have divergent interests. The post-petition lender is out to assure that its post-petition financing is repaid. The creditors' committee wants assurance that unsecured creditors are, at a minimum, being made whole prior to any distribution to equity. These considerations, in turn, are the focus of the bankrupt debtor—before much attention is given to equity.

The legislative history of §1102 confirms that the purpose of an equity committee is to "counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business at the expense of small and scattered public investors." S.Rep.No. 989, 95th Cong., 2d Sess. 10 (1978). The other creditor constituencies that are represented in the chapter 11 case have their own interests to protect and cannot reasonably be expected to protect the interests of shareholders. Under the proper circumstances, the appointment of an official equity committee may be the only way to ensure the fairness of the process and provide adequate representation to equity.

**Cases Are Clearly Large and Complex**
For the most part, debtors will have difficulty arguing that their cases are not large and complex. In most instances, one need go no further than the affidavit in support of the "first-day pleadings" where debtors routinely argue that their cases are large and complex and therefore must be jointly administered. The size and complexity of a debtor's case can further be highlighted by considering their corporate structure and workforce. Another avenue to support this position would be to review the amount of professionals retained in the case, as well as the applications to retain such professionals, as most will include resounding admissions regarding the intricacies of the debtor's cases and the need for seasoned professionals.

**No Undue Delay or Burden to the Debtors' Estates**
The fundamental purpose of §1102(a)(2) is to provide a level playing field for public shareholders, but there will obviously be some costs and concomitant delay. However, the additional cost must be weighed against the need for adequate representation of shareholders.

673692-1

*Wang Laboratories*, 149 B.R. 4. The oversight of professional fees already provided by the U.S. Trustee and the court operates as a check against any official committee undertaking unreasonable activities. "The potential added cost is not sufficient in itself to deprive the creditors of the formation of an additional committee if one is otherwise appropriate." *In re Interco Inc.*, 141 B.R. 422, 424 (Bankr. E.D. Mo. 1992). *See, also, In re McLean Indus. Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("costs alone cannot, and should not, deprive public debt and security-holders of representation"). Allowing the board to once again hear from shareholders should not always be considered a negative consequence; rather, the board should realize that it will be fulfilling its duty to *all* creditors, which should be a fair and equitable plan that treats *all* parties fairly.

## Actions the Equity Committee Can Undertake

The most compelling argument in support of the formation of an official equity committee is that it will provide an oversight to the chapter 11 process that is not already in place. Illustrations of what activities an official equity committee can undertake to add this value include:

1. Analyze the debtors' business plan, which will likely form the basis of the debtors' ultimate restructuring strategy (be it a stand-alone reorganization plan, going-concern sale or otherwise);

2. Work with the other constituencies and their professionals to provide a determination, valuation and accounting—for the benefit of all creditors and equityholders—of the debtors' assets and liabilities, the extent to which the debtors' equity-holders are "in the money," the debtors' ability to confirm a feasible plan and the treatment of equity-holders through any such plan;

3. Analyze and/or seek approval to commence potential causes of action against insiders and/or the current or former directors or any other possible breaches of fiduciary duty;

4. Analyze whether the debtors' estates have any other claims or causes of action including, but not limited to, causes of action under chapter 5 of the Code;

5. Analyze whether any of the debtors should proceed under a distinct and separate reorganization plan, or if consolidation (substantive or otherwise) of two or more of the debtors is appropriate;

6. Analyze whether insider shareholders should be afforded separate voting classes and treatment through any reorganization plan;

7. Analyze whether there has been any mismanagement, self-dealing or other improprieties in the debtors' operations; and

8. Perform such other and further analyses as is deemed necessary and proper after notice and opportunity of interested parties to be heard.

## Conclusion

The appointment of an official equity committee will mean shareholders receive a greater voice in a chapter 11 case where equity may be "in the money." More than anything, delay can negatively affect a request for the appointment of an official equity committee as the passage of time will render the equity's voice silent and allow the debtor to gain momentum. If a request for the solicitation of an equity committee goes unanswered by the U.S. Trustee, an informal committee must be prepared to attack in order to salvage equity's voice in the chapter 11 process. Shareholders and professionals must move quickly and convincingly in order to succeed.

*Reprinted with permission from the* ABI Journal, *Vol. XXIV, No. 10, December/January 2006.*
673692-1

*The American Bankruptcy Institute is a multi-disciplinary, non-partisan organization devoted to bankruptcy issues. ABI has more than 11,000 members representing all facets of the insolvency field. For more information, visit ABI World at www.abiworld.org.*

1: Equity committees have been appointed in at least 30 cases in 12 separate jurisdictions across the nation since 2000. Some examples include: USG Corp. (01-2094 D. Del.); Loral Space & Communications Ltd. (03-41710 S.D.N.Y); THCR/LP Corp. (Trump Hotels & Casinos) (04-46898 D. N.J.); Interstate Bakeries Corp. (0445814 W.D. Mo.); Internet Corp. (04-67597 E.D. Mich.); Bush Industries (04-12295 W.D.N.Y); Footstar (04-22350 S.D.N.Y.); Gadzooks (04-31806 N.D. Texas); Seitel (03-12227 D. Del.); Mirant Corp. (03-46590 N.D. Texas); Impath (03-16113 S.D.N.Y.); Solutia (03-17949 S.D.N.Y.); Peregrine Systems Inc. (02-12740 D. Del.); Cone Mills (03-12944 D. Del.); Exide Technologies (02-11125 D. Del.); MSCP Holdings Inc. (02-10253 D. Del.); Kmart Corp. (0202474 N.D. Ill.); Adelphia Communications Corp. (02-41729 S.D.N.Y.); Pathmark Stores Inc. (02-2963 D. Del.); Federal Mogul Corp. (01-10578, D. Del.); W.R. Grace (01-01139 D. Del.); Quintus Corp. (01-501 D. Del.); Imperial Distributing (01-00140 D. Del.); Amresco Inc. (01-35327 N.D. Texas); Finova Corp. (01-00697 D. Del.); Comdisco (01-24795 N.D. Ill.); Heilig-Meyers (00- 34533 E.D. Va.); Coram Healthcare Corp. (00-03299 D. Del.); Stone & Webster Inc. (00-2142, D. Del.); and LTV Steel Co. (00-43866 N.D. Ohio). Equity Committees were also appointed in at least the following cases across the nation prior to 2000: American Banknote (S.D.N.Y.); Harnischfeger Industries (D. Del.); Continental Airlines Holdings Inc. (D. Del.); El Paso Electric Co. (N.D. Texas); America West Airlines (D. Ariz.); Roses Stores Inc. (D. N.C.); Sizzler International (C.D. Calif.); Caldor Corp. (S.D.N.Y.); Leslie Fay Cos. (S.D.N.Y.); JohnsManville (S.D.N.Y.); Wang Laboratories (D. Mass.); Beker Industries (S.D.N.Y.); Evans Products (S.D. Fla.); and Columbia Gas (D. Del.). In addition, the appointment of an equity committee was sought, but not obtained, in several other cases. See, e.g., GB Holdings Inc. (0543736 D.N.J.); Ultimate Electronics (05-10104 D. Del.); Touch America (03-11195 D. Del.); Resorts International Inc. (94-259 D. N.J.); Edisto Resources Corp. (92-1345 D. Del.).

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | Chapter 11 |
| ENERGY PARTNERS, LTD. *et al.*,[1] | § | |
| | § | Case No. 09-32957-H4-11 |
| Debtors. | § | |
| | § | Jointly Administered |
| | § | |
| | § | Re: Docket Nos. 304, 309 & 366 |
| | § | |

JOINT MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
NOTEHOLDERS OF ENERGY PARTNERS, LTD., *ET AL.* AND HOULIHAN
LOKEY HOWARD & ZUKIN CAPITAL, INC. TO AMEND THE COURT'S
MEMORANDUM OPINION ON: (1) EMERGENCY APPLICATION OF THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR ENTRY
OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF
TUDOR PICKERING HOLT & CO. SECURITIES, INC. AS VALUATION
CONSULTANT FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS *NUNC PRO TUNC* TO JUNE 30, 2009; AND (2) EXPEDITED
APPLICATION FOR AN ORDER TO RETAIN AND EMPLOY HOULIHAN LOKEY
HOWARD & ZUKIN CAPITAL, INC. AS FINANCIAL ADVISORS TO THE OFFICIAL
COMMITTEE OF UNSECURED NOTEHOLDERS OF ENERGY PARTNERS, LTD.,
*ET AL., NUNC PRO TUNC* TO THE EFFECTIVE DATE [DOCKET NO. 366]

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF
YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE
MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY
CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE
MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20
DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST
STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A
TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER
NOTICE TO YOU.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

TO THE HONORABLE JEFF BOHM
U.S. BANKRUPTCY JUDGE:

---

[1]     The Debtors are the following six entities: Energy Partners, Ltd.; EPL Pipeline, L.L.C.; Nighthawk,
L.L.C.; EPL of Louisiana, L.L.C.; Delaware EPL of Texas, LLC; and EPL Pioneer Houston, Inc.

The Official Committee of Unsecured Noteholders (the "Noteholders' Committee") of

the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") and

Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey" and collectively with the

Noteholders Committee, the "Movants") hereby file this Motion, pursuant to Rule 59(e) of the

Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to bankruptcy

proceedings by Rule 9023(e) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for reconsideration and modification of the memorandum opinion (the "Opinion"),

[Docket No. 366] denying (1) the application of the Official Committee of Equity Security

Holders (the "Equity Committee") to retain and employ Tudor Pickering Holt & Co. Securities,

Inc. ("Tudor Pickering") as valuation consultant for the Equity Committee (the "Tudor

Pickering Application"), [Docket No. 304]; and (2) the application of the Noteholders'

Committee to retain and employ Houlihan Lokey as financial advisors to the Noteholders'

Committee (the "Houlihan Lokey Application"), [Docket No. 309], (collectively, the

"Applications"). In support of this Motion, the Movants, by and through their undersigned

counsel, respectfully state as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under

28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

2.    The Noteholders' Committee is a limited co-movant with Houlihan Lokey

because it seeks and supports the narrow relief requested by Houlihan Lokey. While the

Movants recognize that the circumstances of these cases have obviated the Noteholders'

Committee's request that it be authorized to retain its chosen financial advisor, they nonetheless bring this Motion so that the Court can correct several critical factual errors and misstatements of the applicable law. Indeed, these errors led the Court to enter its Opinion that unfairly and incorrectly impugned Houlihan Lokey's integrity, credibility and motives. The Movants therefore respectfully request that the Court, based on fundamental principles of fairness and equity, amend the Opinion to correctly set forth the factual record and applicable law, and restore the integrity of Houlihan Lokey.

## FACTUAL BACKGROUND

3.      On May 1, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continued to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner was appointed in these cases. The Debtors' plan of reorganization (the "Plan") was confirmed on August 3, 2009.

4.      On May 12, 2009, the Debtors filed their Expedited Application for Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment and Retention of Parkman Whaling LLC as Financial Advisors for the Debtors, *Nunc Pro Tunc* to the Petition (the "Parkman Whaling Application"). [Docket No. 122.] The Court approved the retention of Parkman Whaling under section 328(a) of the Bankruptcy Code on May 27, 2009. [Docket No. 176.]

5.      On June 3, 2009, the Office of the United States Trustee for the Southern District of Texas appointed the Noteholders' Committee[2] to represent the interests of unsecured

---

[2]      The Noteholders Committee is comprised of the following members: Wexford Capital, LP (as investment advisor to Wexford Funds); The K2 Principal Fund, LP; Carlson Capital LP; Third Point LLC; Farallon Capital Management LLC; and Whitebox Advisors.

noteholders in these chapter 11 cases.

6.      On July 13, 2009, the Equity Committee filed the Tudor Pickering Application in which it sought to retain Tudor Pickering to serve as its valuation consultant in connection with its potential objection to the Plan, specifically as it related to the Debtors' proposed treatment of equity interests. [Docket No. 304.]

7.      As the attorney for the Noteholders' Committee explained, despite the enormity of the amounts at stake, "the [Unsecured] Noteholders' Committee has really been conscious of costs since the beginning of its formation . . . given the amount at stake here. The Noteholders' collectively are owed $450,000,000.00 and could have easily justified the retention of a financial advisor dating back to March of this year, but the [Unsecured] Noteholders' Committee, conscious of cost, declined at that point to hire a financial advisor." (Opinion at 10.) The Noteholders' Committee not only disagreed with the Debtors' valuation, but also disagreed with the Equity Committee's valuation of the new common stock. Thus, the Noteholders' Committee needed its own independent advisor to help navigate through the complex issues associated with a valuation fight. Based upon Houlihan Lokey's expertise and international reputation,[3] the Noteholders' Committee decided to retain Houlihan Lokey as its financial advisors effective as of July 10, 2009, and the Noteholders' Committee and Houlihan Lokey entered into an

---

[3]      As noted in the Houlihan Lokey Application, established in 1970, Houlihan Lokey is an international investment banking/financial advisory firm, with fourteen offices in the United States, Europe and Asia and more than 800 employees. Houlihan Lokey provides finance and financial advisory services, as well as execution capabilities, in a variety of areas, including financial restructuring. The firm has one of the largest worldwide financial restructuring practices of any investment bank and Houlihan Lokey annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations. Moreover, Houlihan Lokey has extensive valuation experience and has provided valuation advisory services in numerous large and complex chapter 11 cases, including those of American Commercial Lines, Inc.; AMF Bowling Worldwide, Inc.; and Adelphia Communications Corporation (Frontier Vision, L.P.); among many others. Not only that, but Houlihan Lokey has specific expertise in the energy industry, devoting untold hours meeting with management teams and studying the industry in order to be prepared to serve clients, such as the Noteholders Committee, who require knowledge of the energy industry-specific metrics and valuation methodologies on an expedited basis.

agreement on July 14, 2009, pursuant to which Houlihan Lokey agreed to serve as financial advisors to the Noteholders' Committee. On July 14, 2009, the Noteholders' Committee filed the Houlihan Lokey Application, seeking Court approval to retain Houlihan Lokey on an expedited basis, pursuant to section 328 of the Bankruptcy Code.[4] [Docket No. 309.] In support of the Houlihan Lokey Application, the Noteholders' Committee submitted the Affidavit of Adam Dunayer, a Managing Director of Houlihan Lokey.

8.      As set forth in the Houlihan Lokey Application, the Noteholders' Committee retained Houlihan Lokey to, among other things, evaluate the enterprise value of the Debtors and represent the Noteholders' Committee in negotiations with the Debtors and any third parties regarding the valuation of the Debtors and the Plan. (Houlihan Lokey Application at 7-8.) Based upon the procedural posture of these cases at the time, it was expected that Houlihan Lokey would be called upon to (i) thoroughly understand the complex issues in these cases, (ii) prepare a valuation report that would serve as the basis of the recoveries to the Noteholders and (iii) be prepared to assist in anticipated litigation surrounding these issues with both the Debtors and the Equity Committee. Were these tasks not difficult enough, Houlihan Lokey was being asked to complete these tasks in a highly compressed timeframe:

- July 8: Houlihan Lokey received a call regarding the possible opportunity to represent the Noteholders' Committee

- July 10: Houlihan Lokey was notified by the Noteholders' Committee that it had selected Houlihan Lokey as its financial advisor

---

[4]    In addition to the Court's approval of the Debtors' retention of Parkman Whaling pursuant to section 328(a), the Court also approved the retention of Alan Bell, as Chief Restructuring Officer of the Debtors [Docket No. 171]and Garry Hanna as consultant to the Noteholders Committee [Docket No. 313], pursuant to section 328(a). Each of these retentions was approved based upon proffered testimony.

- July 14: Houlihan Lokey and the Noteholders' Committee executed the engagement letter

- July 23: Houlihan Lokey's valuation report was due

- July 25: Depositions for all parties were scheduled

- July 29: The confirmation hearing begins

9.     As reported at the Retention Hearing, this accelerated schedule required Houlihan Lokey to dedicate substantial time and resources, including reallocating professionals from other engagements, to provide the Noteholders' Committee with the level of services it required.

10.     Recognizing that its financial resources were in fact at stake, the Noteholders' Committee negotiated aggressively with Houlihan Lokey on the compensation structure for this engagement, eventually agreeing upon: (a) a nonrefundable initial fee of $500,000; (b) a nonrefundable fee of $100,000 for each of the periods from (i) August 1, 2009 through August 15, 2009, and (ii) August 16, 2009 through August 31, 2009; and (c) actual and necessary out-of-pocket business expenses. (Houlihan Lokey Application at 8.)

11.     On July 15, 2009, the Court held a hearing (the "Retention Hearing") on the Applications. In regard to the Houlihan Lokey Application, as had been done previously in these cases for certain of the Debtors' professionals, the Noteholders' Committee presented by proffer the testimony of Mr. Dunayer regarding the nature and extent of its engagement and the terms of its compensation. The Court continued the Retention Hearing to the following day at which time it denied Houlihan Lokey's and Tudor Pickering's request to have their fees approved under section 328 of the Bankruptcy Code.[5]

12.     On July 31, 2009, the Court issued a Memorandum Opinion memorializing its

---

[5]     The Court noted that it reserved the right to make additional findings and conclusions as it deems appropriate or as any party may request. Transcript of July 16, 2009 hearing at 26: 19-21.

oral rulings. In both its tone and substance, the Opinion departs considerably from the Court's oral ruling, denying the Applications in their entirety.[6] In doing so, the Court relied upon the Fifth Circuit's standards for approving professionals *after* they have provided services under section 330 of the Bankruptcy Code, though both Houlihan Lokey and Tudor Pickering (like Parkman Whaling before them) had sought approval of their compensation as reasonable *prior* to their services being rendered pursuant to the standards set forth in section 328 of the Bankruptcy Code. Not surprisingly, the Court was then left with applying a far more stringent test for retention of Houlihan Lokey and Tudor Pickering than contemplated by section 328 and its judicial progeny.

13.     Having created an incorrect legal framework under which to analyze these issues, the Court then chose to overlook certain critical facts and unfortunately misinterpret others. For example, the Court overlooked not only the proffered testimony of Mr. Dunayer regarding the substantial effort required from Houlihan Lokey and what would lie ahead in this increasingly contentious valuation fight, but also the reasonableness of the compensation being sought. And to this end, while the Court placed great reliance upon the compensation that it had previously approved for Parkman Whaling, in castigating Houlihan Lokey, the Court overlooked that in addition to the $75,000 monthly fee it had approved, Parkman Whaling stands to earn substantial additional fees from this engagement that far exceed those the Noteholders' Committee sought to pay its financial advisor. The totality of these errors led the Court to engage in an unsubstantiated attack against Houlihan Lokey and its reputation, calling this industry leader,

---

[6]     In response to the Movants' request for clarification regarding the Court's oral ruling, the Court informed the Movants that it solely denied Houlihan Lokey's and Tudor Pickering's request to have their fees approved under section 328 of the Bankruptcy Code, and did not deny the Applications in their entirety. Obviously, between making that clarification and issuing the Opinion, for reasons that are not explained in the Opinion, the Court changed its position.

among other invectives, "*greedy,*" "*hogs,*" and "*arrogant,*" and comparing Houlihan Lokey to both Tiger Woods merely collecting an appearance fee and the infamous fictional character, Gordon Gekko, best known for the words, "greed is good."

## ARGUMENT

14. The Movants respectfully request that the Court amend the Opinion. As detailed below, the Opinion contains several serious misstatements of fact and law that have now impugned Houlihan Lokey's reputation in this industry. The Opinion also includes several disparaging descriptions of Houlihan Lokey's motives and character that are not supported by any evidence in the record. For those reasons, amending the Opinion to correct those misstatements pursuant to Federal Rule 59(e) is justified by the equities of the case.

### A. Legal Standard

15. This Motion should be adjudicated under the standards of Federal Rule 59, made applicable to this proceeding by Bankruptcy Rule 9023. Upon a motion filed no later than 10 days after the entry of the judgment,[7] "[u]nder Rule 59(e), a court has discretion to amend its previous judgment or order if the movant establishes some manifest error of law or fact justifying such an amendment." *In re SI Restructuring, Inc.*, Case No. 04-54504-LMC, 2008 Bankr. LEXIS 1330, *3-4 (Bankr. W.D. Tex. April 24, 2008) (citing *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)); *Lowe v. Jay (In re Jay-Reyna Homes & Constr., Inc.*), 387 B.R. 716, 719-720 (Bankr. W.D. Tex. 2008) ("a court has complete discretion to amend its own orders to prevent a manifest error of law"). In deciding whether to amend a judgment or order, "the touchstone for relief . . . under Rule 59 is consideration of the equities of the case." *In re Gonzales*, Case No. 07-53386-C, 2008 Bankr. LEXIS 1421, *5 (Bankr. W.D. Tex. May 7, 2008).

---

[7] The Opinion was entered on July 31, 2009.

The Movants further submit that the relief sought herein is warranted under the equitable common law principles of section 105(a) of the Bankruptcy Code. *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 265 n.5 (3d Cir. 1991) ("[i]t is well settled that a bankruptcy court has the power to vacate or modify its orders, as long as it is equitable to do so") (internal citations omitted); *see also In re Olsen*, 861 F.2d 188, 189 (8th Cir. 1988) ("[b]ankruptcy courts have general authority to change the terms of their own orders when equity so requires").

**B.    The Opinion Contains Critical Misstatements of Fact That Should Be Corrected**

16.    The seminal determinations contained in the Opinion rely heavily upon an inaccurate comparison between the fees agreed to by the Noteholders' Committee and Houlihan Lokey and fees previously approved by the Court for Parkman Whaling.[8]  Specifically, the Opinion concludes that "Parkman Whaling has received $75,000.00 per month, which is substantially lower than the fees demanded by Houlihan Lokey and Tudor Pickering" and that "[i]t is entirely legitimate to ask why Houlihan Lokey and Tudor Pickering are unwilling to work under the same or similar terms as Parkman Whaling." (Opinion at 21.)  The Opinion further finds that Houlihan Lokey did not demonstrate why it should be treated "so much more favorably than Parkman Whaling" and that Houlihan Lokey demands "far more exorbitant terms" than Parkman Whaling. (*Id.*)  This entire premise is not supported by the record in these cases.

17.    As the Court is well aware, Parkman Whaling was retained pursuant to section 328(a) of the Bankruptcy Code (based upon the proffered testimony of one witness).  And, while Parkman Whaling was entitled to receive a monthly fee of $75,000, its compensation package

---

[8]    The Court entered the Order approving the Debtors' retention of Parkman Whaling pursuant to sections 327(a) and 328(a) on May 27, 2009. [Docket No. 176.]

that was approved pursuant to section 328(a) included, in addition to the monthly fees, Financing Transaction Fees, Restructuring Transaction Fees and M&A Transaction Fees (as those terms are defined in Parkman Whaling's engagement letter).[9]  Parkman Whaling has already earned a Restructuring Transaction Fee of $2,000,000 upon confirmation of the Plan, and it has an opportunity to receive a potentially sizeable Financing Transaction Fee based on the Debtors' exit financing.  The substantial additional Transaction Fees, which are in addition to the $75,000 monthly fee, simply cannot be ignored when comparing their compensation to that agreed to by the Noteholders' Committee and its financial advisor.  Thus, the Court's conclusion that Houlihan Lokey's proposed compensation far exceeded that of Parkman Whaling is incorrect and cannot serve as a basis for its broad-reaching findings.

18.    In fact, based upon a comparison of the compensation approved by Parkman Whaling and that sought by the Noteholders' Committee for the financial advisor of its choosing, the Court easily could have concluded that the compensation sought by Houlihan Lokey was "reasonable," and as discussed, *infra,* that Houlihan Lokey should have been retained pursuant to section 328(a) of the Bankruptcy Code.  If any doubt was created, however, it was answered by the proffered testimony of Mr. Dunayer concerning the substantial effort required from Houlihan Lokey and what would lie ahead in this increasingly contentious and highly expedited valuation fight.[10]

---

[9]    The Movants in no way suggest that Parkman Whaling's compensation was not reasonable under the applicable legal standards given the complexity of the tasks performed and the size of these cases.

[10]    The Movants also respectfully request that the Court clarify its finding that "after the Court orally denied the applications on July 16, 2009, counsel for the Equity Holders' Committee and the Unsecured Noteholders' Committee subsequently informed this Court at a hearing held on July 24, 2009, that Tudor Pickering and Houlihan Lokey had both decided to provide services to the committees and thereafter seek compensation pursuant to § 330." (Opinion at 40, n. 21.) Although Houlihan Lokey did agree to be retained by the Noteholders Committee under section 330 subsequent to the Court's oral ruling, it is important to note that Houlihan Lokey agreed to do so solely because the Noteholders Committee agreed it would backstop any fees that were not approved by the Court under section 330.  Of course, all of this

(continued...)

C.     **The Opinion's Disparagement of Houlihan Lokey Is Unsupported by the Record**

19.     It is also unfortunate that, after denying the Houlihan Lokey Application based upon the improper legal predicate, for reasons that remain unclear, the Court chose to mischaracterize Houlihan Lokey's motives and impugn its integrity without any basis in the record for doing so.

20.     For instance, while not mentioned during the Court's oral ruling, the Opinion concludes that Houlihan Lokey expected to do no work and get paid merely for showing up. Indeed, the Court compares the fees sought by Houlihan Lokey and Tudor Pickering to an appearance fee for Tiger Woods and states that the financial advisors "expect to be paid an appearance for simply showing up -- not only do they not guarantee success; they do not even guarantee they will work a minimum number of hours in order to try to achieve success. This court will therefore not approve the payment of their requested 'appearance fees.'" (Opinion at 38.) There is no suggestion in the record that Houlihan Lokey intended (or would ever expect) to be paid its fees merely for "showing up." Quite to the contrary, the record is clear that Houlihan Lokey's engagement with the Noteholders' Committee required the firm to "take people off existing projects and devote themselves full-time to this project." (Opinion at 11.)[11] In fact, to support the Noteholders' Committee's objectives, Houlihan Lokey necessarily began its work on its complex valuation prior to the Retention Hearing, and it devoted a significant number of

(...continued)

became moot when the parties reached a consensual agreement that resolved the valuation contest and led to confirmation of the Plan.

[11]     While the Court placed particular emphasis on the difficulty of disturbing fees under section 328(a) of the Bankruptcy Code, it cannot be overlooked that section 328(a)'s "improvident" standard would certainly allow a court to modify a professional's payment if the professional chose to perform none of the services that it was contractually engaged to provide. The Court's position assumes incorrectly that Houlihan Lokey would risk its reputation in the marketplace, and among the Noteholders, by simply "showing up" to collect this fee.

hours towards completing the valuation report, work that will now go uncompensated.

21.     The same holds true with the Court's reference to Houlihan Lokey as "hogs" and the analogy of its motives to those of Gordon Gekko and his infamouse motto, "greed is good." (Opinion at 38.)  Again, there is no evidence in the record regarding Houlihan Lokey motives, other than acting to advance the interests of the Noteholders.  The Noteholders' Committee, justifiably concerned about the approximately $450 million it had at stake, sought the professional services of Houlihan Lokey, one of the leading restructuring and valuation firms in the world, to prepare for what it assumed would be hard-fought and expedited litigation with parties which already had retained (or sought to retain) their own financial advisors.  As there is no suggestion that the negotiation of the terms of Houlihan Lokey's engagement were anything but arms'-length, it is unwarranted to attack Houlihan Lokey as "greedy" for agreeing to perform the professional services for which it was retained.  In fact, the Noteholders' Committee so strongly believed that it needed Houlihan Lokey's services under the negotiated terms that after the Court denied the Houlihan Lokey Application pursuant to section 328(a), individual members of the Noteholders' Committee agreed to backstop Houlihan Lokey's fees on a pro-rata if the Court denied any portion of them.

22.     As to Houlihan Lokey's alleged avarice, as noted above, the comparative compensation of the restructuring professionals in these cases reveals that Houlihan Lokey's compensation was considerably less than that of the Debtors' advisor.

**The Opinion Relies on the Incorrect Legal Standard**

23.     Finally, because the Opinion was based upon the application of the incorrect legal standards, the Movants request that the Court modify the Opinion and apply the applicable legal precepts.  Most critically, the Opinion rests largely on the Fifth Circuit's pronouncement of the standard by which professionals' fees should be evaluated under *section 330*.  *Andrews & Kurth,*

*LLP v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998) (debtor's counsel must show that its "services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate"). The *Pro-Snax* standard has been referred to as a "hindsight approach" because it requires the bankruptcy court to conduct an after-the-fact assessment of whether the services actually resulted in a material benefit to the estate. *See Kaye v. Hughes & Luce, LLP*, No. 03:06-CV-01863-B, 2007 WL 2059724, *6 (N.D. Tex. July 13, 2007).

24.     The Court concludes that even for professionals who sought to be retained pursuant to section 328(a), because it "must apply this hindsight test from *Pro-Snax* to professionals whose fee applications will be reviewed pursuant to § 330," it must apply the same test for professionals seeking to be retained pursuant to section 328(a) because "otherwise, every professional would always seek compensation pursuant to § 328 in order to escape *Pro-Snax*'s hindsight test." (Opinion at 25.) This conclusion, however, not only ignores the inherent limitations of section 328(a),[12] but it does not follow from its predicate.[13]

25.     For one, it ignores the significant differences between sections 328(a) and 330. As the *Kaye* court observed in determining that the *Pro-Snax* standard should be applied to the retention of a committee's counsel, "§ 330 itself ties the compensability of a professional's services to the benefit of the estate." *Kaye*, 2007 WL 2059724, at *11 (citing section

---

[12]     Contrary to the Court's concern that every professional would seek compensation pursuant to section 328(a), in fact the vast majority of professionals retained in bankruptcy cases cannot seek retention under 328(a). Because under section 328(a) a bankruptcy court typically approves the terms and conditions of a professional's employment as reasonable before the professional has rendered its services, it essentially is not possible (or at least is rarely attempted) for a professional, including attorneys, who are compensated on an hourly basis to seek section 328(a) approval.

[13]     The Opinion cites no other case in which the *Pro-Snax* hindsight test has been applied to determine whether a professional should be retained pursuant to section 328(a). Thus, it should not be surprising that the "material benefit" standard used to evaluate a professional's compensation under section 330 is not contained in the list of factors adopted by the Court from *In re High Voltage Eng'g Corp.*, 311 B.R. 320, 333 (Bankr. D. Mass. 2004) in determining whether retention should be approved pursuant to section 328.

330(a)(4)(A), which states that "the court shall not allow compensation for . . . services that were not reasonably likely to benefit the debtor's estate"). Section 328(a), by contrast, states that the trustee or a committee "may employ . . . a professional person . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent basis."

26.     As some of the cases actually cited in the Opinion make clear, the appropriate question when determining whether to approve the terms of a professional's retention under section 328(a) "is whether the terms and conditions of [the professional's] employment are 'reasonable' in the context of th[e] case." *See In re Metricom, Inc.*, 275 B.R. 364, 369 (Bankr. N.D. Cal. 2002); *see also In re High Voltage Eng'g Corp.*, 311 B.R. at 333 ("a bankruptcy court has the obligation to determine the reasonableness of terms and conditions before authorizing the employment of professionals under § 328(a)"); *In re Thermadyne Holdings Corp.*, 283 B.R. 749, 755 n. 9 (8th Cir. B.A.P. 2002) (if "terms and conditions are not reasonable, the bankruptcy judge may exercise his discretion, and deny the employment under" section 1103(a)). Indeed, it is the law of the Fifth Circuit. *In re Nat'l Gypsum Co.*, 123 F.3d 861 (5th Cir. 1997).

27.     In the end, there is no legal basis for the Court to have applied a heightened hindsight test to determine whether to approve a professional's retention under section 328(a). While the Court may not appreciate professional retention under section 328, at least as to Houlihan Lokey, it cannot be ignored that the standards set forth in section 328 were adopted by Congress for certain circumstances. Specifically, section 328(a) and the other provisions of the Bankruptcy Code represent a rejection of the previously-existing standards of "conservation of the estate and economy of administration," as Congress determined that those standards discouraged practitioners from entering the bankruptcy field and that estates were ill-served by

less able bankruptcy specialists. *See In re Benassi*, 72 B.R. 44, 47 (D. Minn. 1987); *see also Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho Energy, Inc.)*, 395 F.3d 198, 204 (5th Cir. Tex. 2004) ("[w]hen . . . fee discretion [under section 330] began to dissuade professionals from offering their services to debtors, Congress passed section 328(a) of the bankruptcy code, which allowed professionals to have greater certainty as to their eventual payment"). As the Fifth Circuit Court of Appeals put it in affirming the approval of a retention under section 328(a), "[i]f the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment." *In re Nat'l Gypsum Co.*, 123 F.3d at 862-63.

28.     The rationale for seeking retention in these cases under section 328 was even more critical. While it was certainly likely that, when Houlihan Lokey was retained, a contested valuation fight was in the offing, one of Houlihan Lokey's tasks was to attempt to reach a consensual solution that would minimize the Court's (and other hourly professionals') time. It was important for Houlihan Lokey to ensure that it would be compensated in the amount that it had negotiated with the Noteholders' Committee whichever path these cases progressed in the limited time allowed. It was similarly important for the Noteholders' Committee that there be certainty on the total costs to be paid to its financial advisor. This is precisely what the retention under section 328(a) sought to achieve.

29.     In the end, however, the Movants understand that, based upon what has transpired in these cases, the Noteholders' Committee no longer requires a financial advisor. Nevertheless, the denial of its right to retain a financial advisor of its choosing and, as critically, the tenor of the Court's unwarranted attack on Houlihan Lokey should not stand.

30.     Given the nature of the relief sought herein, the Movants do not believe that an

oral hearing on this matter is necessary.  Should the Court deem it necessary to hear oral arguments with respect to the Motion, Movants will appear before the Court at a date and time that is agreeable to the Court.

[remainder of page intentionally left blank]

WHEREFORE, the Movants respectfully request that this Court enter an order, substantially in the form attached hereto as Exhibit A, (i) amending the Opinion to present factual findings and conclusions of law consistent with the record before the Court as discussed herein, and (ii) grant any other relief this Court deems just and proper.

Dated: August 10, 2009                     Respectfully submitted,

/s/ Tom A. Howley
JONES DAY
Tom A. Howley
Texas Bar Number 24010115
717 Texas Avenue, Suite 3300
Houston, TX 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600

*Counsel for Official Committee of Unsecured Noteholders of Energy Partners, Ltd., et al.*

/s/ Richard A. Chesley
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Richard A. Chesley (IL Bar No. 6240877)
Gregory S. Otsuka (IL Bar No. 6270388)
191 N. Wacker Drive
30th Floor
Chicago, IL 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

*Counsel for Houlihan Lokey Howard & Zukin Capital, Inc.*