IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware Corporation, et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-11214 (KG)<br><br>Jointly Administered<br><br>Objection Deadline: Feb 17, 2010 @ 4:00 pm<br>Hearing Date: Feb 24, 2010 @ 3:00 pm<br>Relating to Docket No. 678 and 679 |

## OBJECTION TO CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION[1]

Andrew Shirley ("Shirley"), as a beneficial holder of equity interests (the "Equity Interests") of Aventine Renewable Energy Holdings, Inc. ("ARE Holdings") hereby submits this Objection to Confirmation of the Debtors' Plan of Reorganization [Docket No. 678] (the "Objection")[2], and respectfully represents as follows:

## PRELIMINARY STATEMENT

The Court should deny confirmation because the Plan in its present form does not meet the "fair and equitable" standard of section 1129(b) of the Bankruptcy Code. This failure is attributable to the anachronistically and absurdly low valuation estimate contained in Section VIII of the Disclosure Statement (the "Valuation"), which forms the foundation of the Plan and its proposed distribution scheme. The midpoint Valuation estimate is only $240 million on an enterprise basis, versus a more conventional valuation estimate of $600 million, or 150% higher, based upon a Comparable Public Company Analysis prepared by Shirley. The Plan's reliance on

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the proposed Debtors' Plan of Reorganization dated January 13, 2010 (the "Plan").

[2] Shirley reserves the right to supplement this Objection prior to the scheduled hearing date.

1

a flawed Valuation underpins a distribution scheme that unfairly transfers substantial prepetition equity value that rightfully belongs to Class 9 Equity Interests to an influential creditor class, the Class 5 Prepetition Unsecured Notes Claims (the "Class 5 Notes"), that stands to reap a windfall recovery well in excess of its allowed, or even accrued, claim. This excessive recovery is also evidenced by recent trading levels for the Class 5 Notes at above 100 cents on the dollar according to the NASD TRACE bond pricing service, versus a 50 cent recovery as estimated in the Plan.

The Court should deny confirmation of the Plan in its present form unless and until the Court makes a definitive finding that the Plan meets the "good faith" standard of section 1129(a)(3) of the Bankruptcy Code. Equity interest holder Michael J. Welsh, in Docket No. 738, asserts a "significant conflict-of-interest and breach of duty by Aventines restructuring investment advisor Houlihan, Lokey, Howard, and Zukin Capital, Inc. ("Houlihan")." The Valuation prepared by Houlihan and the Exit Financing arranged by Houlihan are the foundation of the Plan and its proposed distribution scheme. The Court should deny confirmation of the Plan unless and until it has determined that this foundation was established in good faith.

## BACKGROUND

1. On April 7, 2009, each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On December 4, 2009, the Debtors filed their Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 587] (as the same may be amended, the

"Plan"), and their Disclosure Statement for Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as the same may be amended, the "Disclosure Statement").

3. In general terms, the Plan provides for the payment in cash in full of all unclassified and priority claims and secured claims (with some limited exceptions). Holders of Unsecured Claims, including the Class 5 Notes, receive their pro rata share of 80% of the common stock of the Reorganized Debtors (allocated among the various Debtors), while holders of Equity Interests in ARE Holdings receive the Warrants.

4. In addition to their pro rata share of 80% of the reorganized Debtors' common stock, holders of the Class 5 Notes - but no other creditors - are entitled to receive their pro rata share of 20% of the remaining common stock to the extent such parties participate in a rights offering for new Senior Secured Notes and Noteholder New Equity underwritten by the Backstop Purchasers.

5. The Plan and the proposed distribution scheme are based on the Financial Projections and the Valuation analysis contained in Section VIII and Exhibit D of the Disclosure Statement. Based upon the metrics employed by the Debtors' professionals, the Debtors have endorsed a valuation range of $220 million to $260 million for their businesses as going concerns.

6. On December 23, 2009, Shirley requested that the U.S. Trustee appoint an official committee of equity security holders to provide holders of Equity Interests with a collective voice in the Debtors' bankruptcy cases (the "Shirley Trustee Letter").

7. On January 13, 2010 the Debtors filed their First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 678] and their Disclosure Statement for Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

## OBJECTION

A. **The Plan does not meet the "fair and equitable" standard of <u>section 1129(b) of the Bankruptcy Code and should not be confirmed.</u>**

8.  Under section 1129(b) of the Bankruptcy Code, a court may cram-down a class of interests only if it is "fair and equitable" with respect to each dissenting class. *In re Cellular Info. Sys., Inc., C.I.S.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994); *see In re Labrum & Doak, LLP*, 227 B.R. 372, 381 (Bankr. E.D. Pa. 1998). With respect to holders of interests, section 1129(b)(2) of the Bankruptcy Code defines the phrase "fair and equitable" to include the following requirements:

> (C) With respect to a class of interests –
>
> (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
>
> (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

9.  While not expressly detailed in the statutory language, courts have found that an important corollary to the absolute priority rule of section 1129(b)(2) is that senior classes may not receive more than full compensation on account of their claims. *See In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003); *In re Genesis Health Ventures, Inc.* 266 B.R. 591 (Bankr. D. Del. 2001); *Kipperman v. Onex Corp.*, 411 B.R. 805 (N.D. Ga. 2009). If the Plan provides more than a 100% recovery to certain creditors while providing holders of Equity Interests with only de minimis Warrants, it is unconfirmable as a matter of law to the extent holders of Equity Interests vote against the Plan.

10. <u>Additional Disclosure With Respect to Valuation</u>. Whether one uses Comparable Public Company Analysis, Discounted Cash Flow Analysis using the Debtors' own

4

Financial Projections, or simply looks to the market for the Debtors' publicly-traded Class 5 Notes, there is a very strong argument to be made for the Debtors' solvency. Attached as <u>Exhibit A</u> is a letter to the Board of Directors dated January 20, 2010 that includes a Comparable Public Company Analysis prepared by Shirley to determine the Debtors' enterprise value and prepetition equity value (the "<u>Shirley Valuation Letter</u>"). The Shirley Valuation Letter clearly shows that Aventine's prepetition Equity Interests have substantial value of approximately $200 million or more. The Plan unfairly and inequitably allocates this substantial value as a windfall to the Class 5 Notes above and beyond the full satisfaction of all Class 5 Notes claims, including accruing prepetition and postpetititon interest through the assumed March 31, 2010 emergence date. The Shirley Valuation Letter also reveals certain flaws of the Plan Valuation, which appears anachronistically and absurdly low.

11. The Plan provides the Class 5 Notes a recovery that exceeds the allowed amount of such claims, as shown in the Shirley Valuation Letter. This excessive recovery is also evidenced by recent trading levels for the Class 5 Notes at above 100 cents on the dollar according to the NASD TRACE bond pricing service. Attached as <u>Exhibit B</u> is a TRACE trade history for the Class 5 Notes printed via the Bloomberg Professional information service. The public market is valuing the Class 5 Notes above par notwithstanding the uncertainty of the Plan confirmation and notwithstanding the substantial investment return hurdle required by bankruptcy investors. These investors, no doubt, expect that the value of the Class 5 Notes will be substantially higher than recent trading levels when the uncertainty and taint of the bankruptcy process are expunged and when a much larger universe of public equity investors are able to invest in the Aventine enterprise.

12. The Plan does not allow holders of Class 9 Equity Interests to retain their interests and does not provide Class 9 Equity Interests a recovery that equals the value of such interests. Rather, the Plan provides Class 9 only a "de minimis" Warrant recovery that is apparently too low to even calculate. The Shirley Valuation Letter clearly shows that Aventine's prepetition Equity Interests have substantial value of approximately $200 million or more were it not for the unfair and inequitable treatment provided for in the Plan.

13. The Plan Valuation inappropriately places excessive reliance on Precedent Transactions Analysis with a 40% weighting. Beyond the arguments presented in the Shirley Valuation Letter, recent public disclosures further illustrate the limited relevance of the "distressed sales" that comprise Houlihan's Precedent Transactions Analysis. One of the most recent precedent transactions relied upon in the analysis involved the sale and purchase of an ethanol plant in Jefferson, Wisconsin. Within just two months of the initial December 11, 2009 bankruptcy auction of the Jefferson plant, the second place bidder offered to purchase the plant for 39% more than the winning bid and, even with this substantial premium, the offer was still rejected. Attached as Exhibit C is a press release filed by the second place bidder, ALL Fuels & Energy, which describes the process. Simply put, the valuation realized for an ethanol plant in a distressed sale process is not representative of the value of that plant as part of a publicly traded company. The Plan clearly provides that Aventine's ethanol production assets are not to be sold in a distressed process, but rather are to emerge as part of a publicly traded company. Therefore, Comparable Public Company Analysis should be given a much more full weighting and the Precedent Transactions Analysis should be given a very limited, or even zero, weighting when determining the Debtors' enterprise value. Yet Houlihan inexplicably weights the Precedent Transactions Analysis at fully 40% versus only 20% for Houlihan's own Comparable Public

6

Company Analysis. A Discounted Cash Flow Approach is attributed the remaining 40% weighting.

14. Houlihan and the Board responded to the Shirley Valuation Letter via a letter from Houlihan dated January 28, 2010, which is attached as Exhibit D. The Houlihan letter indicates that the Shirley Valuation Letter, which includes a Comparable Public Company Analysis, "ignores other accepted valuation methodologies [and] assumes away the complexity of completing two uncompleted production facilities..." Firstly, it should come as no surprise to Houlihan or the Board that publicly-determined valuations of comparable ethanol companies incorporate all publicly available information; and therefore represent a compilation of all potential valuation methodologies, including precedent transaction and discounted cash flow, as well as other, methodologies. Secondly, my analysis does not "assume away" anything, but rather assumes that the expansion plants are completed just as assumed in the Debtors' own Financial Projections. Aventine also has a track record of completing its expansion projects as evidenced by the completion of the Pekin, Illinois dry mill expansion in 2007. Applying a reasonable risk-based discount to the value of the expansion plants does not change the fact that Aventine pre-petition equity has substantial value.

15. The Plan currently values the Debtors' enterprise at a midpoint of $240 million. The pro forma enterprise value is $345 million after adding approximately $105 million for the remaining capital cost, including remobilization, to complete the Mt. Vernon and Aurora West expansion plants as projected in the Disclosure Statement. The pro forma EV / Capacity value implied by the Plan, based on 433 million gallons of ethanol production capacity, is approximately $0.80 per gallon, or a shocking 50% discount to the publicly-determined values of comparable companies, even before factoring in the value premium warranted by Aventine's wet

7

mill capacity. Simply put, the Plan Valuation prepared by Houlihan and blessed by the Board is anachronistically and absurdly low.

16. The $600 million enterprise valuation mentioned in the Preliminary Statement above is based on the $695 million to $795 million pro forma enterprise valuation range shown in a sub-exhibit (exhibit A) to the Shirley Valuation Letter. The $600 million valuation is derived by deducting the remaining $105 million capital costs for the expansion plants from the low end of the pro forma range (i.e. $705 million minus $105 million equals $600 million).

17. The Shirley Trustee Letter attached hereto as Exhibit E is hereby incorporated into this Additional Disclosure With Respect to Valuation section for its additional analysis of valuation and the ethanol industry in general. The Shirley letter to the Board of Directors dated December 3, 2009 and attached as a sub-exhibit (exhibit B) to the Shirley Trustee Letter is hereby incorporated into this Additional Disclosure With Respect to Valuation section for its additional analysis of valuation and the ethanol industry in general.

18. The Court should deny confirmation because the Plan in its present form does not meet the "fair and equitable" standard of section 1129(b) of the Bankruptcy Code.

**B. The Plan may not meet the "good faith" standard of section 1129(a)(3) of the Bankruptcy Code and should not be confirmed until the Court makes a definitive finding.**

19. This Court should deny confirmation of the Plan in its present form unless and until the Court makes a definitive finding that the Plan meets the "good faith" standard of section 1129(a)(3) of the Bankruptcy Code. Equity interest holder Michael J. Welsh, in Docket No. 738, asserts a "significant conflict-of-interest and breach of duty by Aventines restructuring investment advisor Houlihan, Lokey, Howard, and Zukin Capital, Inc. ("Houlihan")." The

Valuation prepared by Houlihan and the Exit Financing arranged by Houlihan are the foundation of the Plan and its proposed distribution scheme. The Court should deny confirmation of the Plan unless and until it has determined that this foundation was established in good faith.

20. The reliance of the Board on Houlihan's valuation analysis and financing arrangement further makes it critical that the Court determine that this foundation was established in good faith. Due to its own conflicts, the Board likely did not adequately explore any alternative plan that might have been based on a more realistic valuation and/or a superior exit financing. The Disclosure Statement and the Plan clearly reveal that the Backstop Purchasers, who together own approximately 70% of the Class 5 Notes, are calling the shots for the Debtor. Every key deadline is established by the Backstop Commitment Agreement and every key decision must be approved by the Backstop Purchasers. The Backstop Purchasers will appoint four out of five members of the New Board, and that same board will make senior management selections for at least the new CEO, who will likely be the fifth member of the New Board, and the new CFO. The members of the existing Board, who may seek appointment to the New Board, and the members of the existing management team, who will be retained and remunerated by the Backstop Purchasers' New Board, are no doubt acting under extreme pressure, real or perceived, from these powerful Backstop Purchasers. Thus, no one currently employed by the Debtor is likely to adequately explore any alternative plan that might jeopardize the windfall gain that the proposed Plan is expected to lavish on these same Backstop Purchasers. While some may applaud the Backstop Purchasers for their hard-nosed business tactics, these same tactics make it impossible for any existing constituency to adequately protect the interests of equity. Simply put, equity interests can not be adequately protected by Board members or

managers who are expected to be directly or indirectly selected and remunerated by the Backstop Purchasers.

C. **A reasonable delay to confirmation will not
jeopardize the successful reorganization of the Debtors.**

21. A reasonable delay to confirmation will not jeopardize the successful reorganization of the Debtors, who have ample liquidity, who hold more than $52 million of cash as of December 31, 2009, who accumulated $17 million of cash in the December quarter alone, and who should continue to accumulate substantial additional cash through the rest of these cases based on current profitability. In fact, this delay is necessary to achieve a fair and equitable plan that meets the requirements of section 1129 of the Bankruptcy Code. As suggested in the Shirley letter to the Board dated December 3, 2009, the Board should immediately seek to extend, renegotiate or replace the existing DIP credit facility to provide better flexibility and terms to the Debtors.

## CONCLUSION

WHEREFORE, Shirley respectfully requests that the Court deny confirmation of the Plan and grant such other and further relief as is just and appropriate.

Dated: February 17, 2010
Wilmington, Delaware

Respectfully submitted,
Andrew Shirley (*pro se*)

Andrew Shirley
555 South Barrington Avenue, Suite 428
Los Angeles, CA 90049
Telephone: (424) 832-3993
Facsimile: (424) 832-3994
aeshirley1@yahoo.com