# OBJECTION EXHIBIT A

ANDREW SHIRLEY
555 South Barrington Avenue, Suite 428
Los Angeles, California 90049
O: (424) 832-3993 ▪ M: (917) 406-4905
aeshirley1@yahoo.com

January 20, 2010

**VIA OVERNIGHT DELIVERY & EMAIL**

Board of Directors (the "Board")
Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554

     Re:     Protection of Equity Interests and Allocation of Substantial Equity Value

Dear Members of the Board:

     I write to again ask each of you, individually, and the Board, collectively, to fulfill your fiduciary duties to preserve value for all stakeholders, including stockholders, through the chapter 11 cases of Aventine Renewable Energy Holdings, Inc. ("Aventine") and its affiliated debtors (collectively with Aventine, the "Debtors") (Case No. 09-11214).

     Attached hereto as Exhibit A is a *Comparable Public Company Analysis* which clearly shows that Aventine pre-petition equity has substantial value. The proposed Debtors' Plan of Reorganization dated January 13, 2010 (the "Plan")[1] provides only a "de minimis" recovery to equity and fails to fairly allocate the substantial value that rightfully belongs to stockholders. I ask the Board to submit a revised plan of reorganization that fairly and rightfully allocates Aventine's substantial equity value to stockholders, rather than providing it as a windfall to the Debtors' influential creditor constituency that is dominated by a small group of Backstop Purchasers.

     Exhibit A shows that Aventine pre-petition equity has approximately $200 million to $300 million of value based on the publicly-determined value of Green Plains Renewable Energy, Inc. ("GPRE"). Scenario 1 in Exhibit A shows that Aventine equity is worth approximately $200 million based conservatively on GPRE's EV / Capacity valuation of $1.60 per gallon of ethanol production capacity. Scenario 2 in Exhibit A assumes that Aventine's wet mill production capacity is valued at a $1.00 per gallon premium to dry mill capacity to reflect

---

[1] Unless otherwise defined herein, capitalized terms used in this letter shall have the meanings provided in the Plan.

the superior profitability of a wet mill facility. Scenario 2 shows that Aventine equity is worth approximately $300 million. Attached hereto as Exhibit B is a selection of excerpts, which describe the advantages of the wet mill process, taken from Aventine's public filings with the Securities and Exchange Commission. Attached hereto as Exhibit C is a *Wet Mill vs. Dry Mill Cost Structure and Valuation Comparison* which supports the value premium assumption used for wet mill capacity in Scenario 2. Whether or not the Board feels that certain adjustments might appropriately be made to the analysis in Exhibit A, one thing is perfectly clear - Aventine equity has substantial value which should be fairly and rightfully allocated to stockholders.

The analysis in Exhibit A values Aventine equity based exclusively on GPRE because according to the Disclosure Statement the Debtors' financial advisor, Houlihan Lokey ("Houlihan"), contends that GPRE is the only publicly available ethanol company which is appropriately comparable to the Debtors. The Disclosure Statement also indicates that "the ratio of enterprise value to annual ethanol production capacity is the industry standard" for comparable public company analysis. Notwithstanding Houlihan's contention, Exhibit A also provides information on BioFuel Energy Corp. ("BIOF") and Pacific Ethanol, Inc. ("PEIX") because I believe that the valuations of these ethanol producers are also relevant. The BIOF valuation of approximately $1.60 per gallon further corroborates the valuation of ethanol producers in the public market. The PEIX valuation of approximately $2.00 per gallon also shows the potential for Aventine equity if the Board performs its duty to protect the interests of all stakeholders, including stockholders. While the ethanol production subsidiaries of PEIX are currently operating under chapter 11 bankruptcy protection, the board of PEIX is apparently working to preserve potential equity value for its stockholders. The actions taken to date by the Board of Aventine, conversely, suggest that the Board is content to sacrifice the interests of an inadequately represented equity class, perhaps at the behest of an influential creditor constituency.

Together the Disclosure Statement and the Board's letter to the Office of the United States Trustee dated January 5, 2010 (filed by Debtors' counsel) only detail certain assumptions that underlie the Precedent Transactions Analysis referenced in the Disclosure Statement. As far as I know, there has been no disclosure of valuation assumptions for the Comparable Public Company Analysis or the Discounted Cash Flow Approach also referenced in the Disclosure Statement. I caution you against an excessive reliance on the Precedent Transactions Analysis because (i) the vast majority of the referenced transactions occurred prior to the recent and dramatic recovery of the ethanol industry; and (ii) the vast majority of the transactions occurred as part of a distressed process, for example a bankruptcy auction and/or a motivated sale. The Plan clearly provides that Aventine's ethanol production assets are not to be sold in a distressed process, but rather are to emerge as part of a publicly traded company. Therefore, Comparable Public Company Analysis should be given a much more full weighting and the Precedent Transactions Analysis should be given a very limited, or even zero, weighting when the Board evaluates the Debtors' enterprise value.

The Plan currently values the Debtors' enterprise at a midpoint of $240 million. The pro forma enterprise value is $345 million after adding approximately $105 million for the remaining capital cost, including remobilization, to complete the Mt. Vernon and Aurora West expansion plants as projected in the Disclosure Statement. The pro forma EV / Capacity value implied by the Plan, based on 433 million gallons of ethanol production capacity, is approximately $0.80 per gallon, or a shocking 50% discount to the publicly-determined values of comparable companies, even before factoring in the value premium warranted by Aventine's wet mill capacity. Simply put, the Plan valuation blessed by the Board is anachronistically and absurdly low.

Again, I ask the Board to submit a revised plan of reorganization that fairly and rightfully allocates Aventine's substantial equity value to stockholders.

Please let me know if you have any questions or comments regarding my analysis or this letter. Thank you for your time and consideration.

[DISCLAIMER: The analyses contained herein should not be construed as me giving investment advice to any person. I also caution any person against relying on my analyses or the contents of this letter in making any investment decision.]

Sincerely,

Andrew Shirley

cc:    Bobby L. Latham, Chairman of the Board
Leigh J. Abramson, Board Member
Theodore H. Butz, Board Member
Richard A. Derbes, Board Member
Farokh S. Hakimi, Board Member
Michael C. Hoffman, Board Member
Wayne D. Kuhn, Board Member
Arnold M. Nemirow, Board Member
George T. Henning, Jr., Interim Chief Executive Officer
Office of the United States Trustee

# EXHIBIT A

# Aventine Renewable Energy Holdings, Inc.
*COMPARABLE PUBLIC COMPANY ANALYSIS*
*(US$ in Millions)*

| TRADING SYMBOL | | | GPRE | BIOF | PEIX | AVRNQ [1] | Scenario 1 AVRNQ [2] | Scenario 2 AVRNQ [3] |
|---|---|---|---|---|---|---|---|---|
| **Capitalization** [4] | | | | | | | | |
| Share Price | as of | 1/19/10 | 15.29 | 3.35 | 2.25 | 0.27 | 4.55 | 6.88 |
| Shares O/S | | | 25.0 | 34.5 [5] | 57.6 | 43.0 | 43.0 | 43.0 |
| Market Cap / Equity Value | | | 381.7 | 115.6 | 129.7 | 11.6 | 195.7 | 295.7 |
| % EV | | | 50% | 32% | 29% | 2% | 28% | 37% |
| | | | | | | | | |
| Preferred Stock | | | - | - | - | - | | |
| Total Debt | | | 457.3 | 254.4 | 326.7 | 449.7 | 449.7 | 449.7 |
| Cash | | | (69.1) | (8.2) | (11.3) | (43.2) [6] | (43.2) | (43.2) |
| Net Debt + Pref | | | 388.2 | 246.3 | 315.4 | 406.5 | 406.5 | 406.5 |
| % EV | | | 50% | 68% | 71% | 80% | 59% | 51% |
| | | | | | | | | |
| + Minority Interest | | | - | - | - | - | - | - |
| + Expansion Capital Spending | | | - | - | - | 105.0 [7] | 105.0 | 105.0 |
| - Investments | | | - | - | - | (5.4) [8] | (5.4) | (5.4) |
| +/- Other | | | - | - | - | (7.2) [9] | (7.2) | (7.2) |
| Net Other | | | - | - | - | 92.4 | 92.4 | 92.4 |
| % EV | | | 0% | 0% | 0% | 18% | 13% | 12% |
| | | | | | | | | |
| Enterprise Value ("EV") | | | 769.9 | 361.9 | 445.1 | 510.4 | 694.5 | 794.5 |
| | | | | | | | | |
| Production Capacity | | mm gal | 480 | 230 | 221 | 433 | 433 | 433 |
| | | | | | | | | |
| EV / Capacity | | $ / gal | 1.60 | 1.57 | 2.01 | 1.18 | 1.60 | 1.83 |
| | | | | | | | | |
| **EV / Capacity Detail** | | | | | | | | |
| Dry Mill | | $ / gal | 1.60 | 1.57 | 2.01 | | | |
| Wet Mill | | $ / gal | | | | | | 1.60 |
| Average | | $ / gal | 1.60 | 1.57 | 2.01 | 1.18 | 1.60 | 2.60 1.83 |
| | | | | | | | | |
| **Production Capacity Detail** | | | | | | Pro Forma | Pro Forma | Pro Forma |
| Dry Mill | | mm gal | 480 | 230 | 221 | 333 | 333 | 333 |
| Wet Mill | | mm gal | - | - | - | 100 | 100 | 100 |
| Total | | mm gal | 480 | 230 | 221 | 433 | 433 | 433 |
| | | | | | | | | |
| **Total Debt Detail** | | | | | | | | |
| Short Term Debt | | | 57.2 | 33.6 | 60.8 | 42.8 | 42.8 | 42.8 |
| Long Term Debt | | | 400.1 | 220.8 | 15.7 | - | - | - |
| Liabilities Subject to Compromise | | | - | - | 250.3 | 371.9 [10] | 371.9 | 371.9 |
| Post-petition Accrued Interest | | | - | - | - | 30.0 [11] | 30.0 | 30.0 |
| Other | | | - | - | - | 5.0 [12] | 5.0 | 5.0 |
| Total Debt | | | 457.3 | 254.4 | 326.7 | 449.7 | 449.7 | 449.7 |

**Notes**

1. Aventine capitalization is based on the full satisfaction of all claims accruing through scheduled 3/31/10 emergence date and is pro forma for completion of the Mt. Vernon and Aurora West expansion plants, as projected in the Disclosure Statement.
2. Scenario 1: Solves for Aventine equity value assuming EV / Gallon is equivalent to GPRE.
3. Scenario 2: Same as Scenario 1, except assumes $1/gal value premium for wet mill capacity due to superior profitability.
4. All balance sheet data as of 9/30/09 unless otherwise indicated.
5. 25.9mm share count grossed up to reflect 75% ownership of BioFuel Energy, LLC.
6. Cash balance includes $7.448mm restricted cash assumed to be released per the Disclosure Statement.
7. Estimated remaining capital cost, including remobilization, to complete expansion plants as projected in the Disclosure Statement.
8. Includes Aventine's ownership stake in GPRE at 12/31/09 market value.
9. Includes estimated present value of $11.064mm prepaid utility costs for the Mt. Vernon expansion plant.
10. Adds back $5.805mm unamortized debt issuance cost.
11. Estimated post-petition accrued interest through 3/31/10 emergence date.
12. Other make-whole payments, fees, and administrative costs of $25mm offset by $20mm free cash flow through emergence date.

# EXHIBIT B

**Aventine Renewable Energy Holdings, Inc.**
**Excerpts from Public Filings with the Securities and Exchange Commission (the "SEC")**

The following excerpt is from the Competitive Strengths section of the form S-1 Registration Statement for Aventine Renewable Energy Holdings, Inc. filed with the SEC on March 31, 2006.

"Low Cost Producer. We believe we are one of the lowest cost producers of ethanol in the United States. Our Illinois facility generates 58.0% of its own electricity and 93.0% of its fuel requirements are met by using coal, which provides us significant cost savings compared to ethanol facilities that use natural gas to generate power. During the year ended December 31, 2005, the average Illinois basin coal spot price was $2.13 per MMBtu and the average Henry Hub spot gas price was $9.04 per MMBtu. In addition, our Illinois facility, through its wet mill production process, generates higher margin co-products and bio-products, which allowed us to recapture 55.3% of our corn cost in the year ended December 31, 2005, which is a higher percentage than our competitors who employ the dry mill production process. At our Nebraska facility which employs the dry mill process, we recaptured 36.7% of our total corn costs. We believe the current cost to replace a wet mill makes further construction unlikely as evidenced by the fact that no wet mills have been constructed in North America in the last twenty years, and all of the 2.1 billion gallons of announced or in process new plants are dry mill facilities. Furthermore, we source all of the corn used at the Nebraska facility from the Nebraska Energy Cooperative at prices which have historically been lower than our corn prices paid at Pekin. The Nebraska Energy Cooperative has a 21.6% interest in our Nebraska facility."

The following excerpts are from the form 10-K Annual Report for the year ended December 31, 2008 for Aventine Renewable Energy Holdings, Inc. filed with the SEC on March 16, 2009.

"The remaining parts of the grain in the wet mill process are processed into a number of different forms of protein used to feed livestock. The multiple co-products from a wet mill facility generate a higher level of cost recovery from corn than the principal co-product (dried distillers grains with solubles ("DDGS")) from the dry mill process. In addition, a wet mill, if properly equipped, can produce a higher value brewers' yeast in order to lower its net corn cost. For the years ended December 31, 2008, 2007 and 2006, we recovered 45.6%, 46.3% and 51.1%, respectively, of our total corn costs related to our wet mill process through our sale of co-products and bio-products."

"With the starch elements of the corn kernel consumed in the above described process, the principal co-product produced by the dry mill process is DDGS. DDGS is sold as a protein used in animal feed and recovers a portion of the total cost of the corn, although less than the co-products resulting from the wet mill process described above. For the years ended December 31, 2008, 2007 and 2006, we recovered 26.2%, 26.6% and 27.7%, respectively, of our corn costs related to our dry mill process through the sale of DDGS and other co-products."

"The increased production of higher margin co-products in the wet mill process results in a lower ethanol yield. At a denaturant blend level of 1.96%, a typical wet mill yields approximately 2.5 gallons of ethanol per bushel of corn while a typical dry mill yields approximately 2.7 gallons of fully denatured ethanol per bushel of corn."

# EXHIBIT C

# Aventine Renewable Energy Holdings, Inc.
### WET MILL vs. DRY MILL - Cost Structure and Valuation Comparison
*(US$ in Millions)*

| Cost Structure Comparison | | Wet | Dry | Variance | Notes |
|---|---|---|---|---|---|
| Process Type | | Wet | Dry | | |
| Net Corn Cost | | 0.88 | 1.14 | (0.26) | see calculation below |
| Fuel Cost | | 0.12 | 0.22 | (0.10) | see calculation below |
| Other Utility Cost | | 0.05 | 0.05 | - | estimate |
| Labor Cost | | 0.15 | 0.05 | 0.10 | estimate |
| Other Conversion Costs | | 0.20 | 0.20 | - | estimate |
| Total Cash Costs | $ / gal | 1.40 | 1.66 | (0.26) | |

| Valuation Comparison | | Wet | Dry | Variance | Notes |
|---|---|---|---|---|---|
| EBITDA Margin | | | | 0.26 | see calculation above |
| Margin for Error | | | | (0.06) | contingency |
| Adj. EBITDA Margin | | | | 0.20 | |
| Multiple | | | | 8.0 x | placeholding assumption |
| Incremental Value | | | | 1.60 | |
| Discount Factor | | | | 63% | further contingency |
| Adj. Incremental Value | $ / gal | | | 1.00 | assumed Wet Mill premium |

| Net Corn Cost | | Wet | Dry | Variance | Notes |
|---|---|---|---|---|---|
| Corn Cost | $ / bu | 4.22 | 4.22 | | from DS Projections |
| Yield | gal / bu | 2.50 | 2.70 | | from 2008 10-K |
| Unit Corn Cost | $ / gal | 1.69 | 1.56 | | |
| *Co Product Net-back %* | | *47.7%* | *26.8%* | | see calculation below |
| Co Product Net-back | $ / gal | 0.80 | 0.42 | | |
| Net Corn Cost | $ / gal | 0.88 | 1.14 | (0.26) | |

| Historical Co Product Net-back | | Wet | Dry | Variance | Notes |
|---|---|---|---|---|---|
| 2006 | | 51.1% | 27.7% | 23.4% | from 2008 10-K |
| 2007 | | 46.3% | 26.6% | 19.7% | from 2008 10-K |
| 2008 | | 45.6% | 26.2% | 19.4% | from 2008 10-K |
| Average | | 47.7% | 26.8% | 20.8% | |

| Fuel Cost | | Wet | Dry | Variance | Notes |
|---|---|---|---|---|---|
| Energy Source | | Coal | Nat. Gas | | Aventine Wet Mill uses coal |
| Unit Cost | $ / mmbtu | 3.00 | 7.17 | | estimate / from DS Projections |
| Energy Intensity | mmbtu / gal | 4.00% | 3.00% | | estimate |
| Fuel Cost | $ / gal | 0.12 | 0.22 | (0.10) | |

OBJECTION EXHIBIT B

| 1) Export | AVRN 10 04/01/17 | | Trace Trade History |
|---|---|---|---|
| Issue:    AVRN 10 04/01/17 | Issue Date:      08/10/07 | | Cusip:            053505AA |
| Issuer:   AVENTINE RENEWAB | Amt Outstanding: 300,000(M) | | Next Cpn Date:  04/01/10 |
| Industry: Energy-Alternate | Rating:          WR/NR/N.A. | | Callable |

View: Price/Yield          Range: 10/19/09  -  02/16/10          Trade Size: >=250M

| | | Price | | | | Yield | | | |
|---|---|---|---|---|---|---|---|---|---|
| Agg.Volume(M) | Agg.Trades | First | High | Low | Last | First | Low | High | Last |
| 76,491 | 87 | 62.000 | 101.500 | 61.500 | 100.000 | | | | 9.569 |

3) Table   4) Graph

| | | | Price | | | | Yield | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Vol(M) | Trades(#) | First | High | Low | Last | First | Low | High | Last |
| 5) 02/10 | 2,000 | 2 | 100.500 | 100.500 | 100.000 | 100.000 | | | | 9.569 |
| 6) 02/08 | 3,000 | 3 | 100.500 | 101.000 | 100.500 | 101.000 | | | | 9.413 |
| 7) 02/03 | 1,000 | 1 | 101.000 | 101.000 | 101.000 | 101.000 | | | | 9.394 |
| 8) 02/02 | 5,000 | 5 | 101.000 | 101.500 | 101.000 | 101.500 | | | | 9.253 |
| 9) 01/26 | 1,000 | 3 | 98.000 | 98.500 | 98.000 | 98.500 | | | | 9.958 |
| 10) 01/25 | 3,500 | 4 | 98.000 | 98.500 | 98.000 | 98.500 | | | | 9.951 |
| 11) 01/21 | 8,282 | 11 | 96.000 | 96.500 | 95.750 | 96.000 | | | | 10.455 |
| 12) 01/19 | 2,000 | 2 | 91.750 | 92.000 | 91.750 | 92.000 | | | | 11.272 |
| 13) 01/15 | 5,000 | 2 | 92.000 | 92.375 | 91.000 | 91.000 | | | | 11.483 |
| 14) 01/14 | 500 | | 90.000 | 90.250 | 90.000 | 90.250 | | | | 11.641 |
| 15) 01/12 | 4,000 | 7 | 87.500 | 88.000 | 87.500 | 87.500 | | | | 12.228 |

# OBJECTION EXHIBIT C

ALL Fuels Agrees to Valero's Offer of $100 Million to Sell the Renew Energy
Ethanol Plant in Jefferson, Wisconsin. Valero Then Says ''No Deal''

Business Wire

DES MOINES, Iowa -- February 03, 2010

ALL Fuels & Energy announced that its subsidiary, ALL Fuels - Jefferson, LLC,
has agreed to Valero's offer price of $100 million for the purchase of Renew
Energy from Valero Renewable Energy. The $100 million cash price ALL Fuels -
Jefferson LLC agreed to pay Valero is $28 million more than the $72 million
winning bid made by Valero for Renew, which was confirmed by the bankruptcy
court on December 11, 2009 on the motion of secured creditor Bankers Bank,
based on the recommendation of William Blair & Company, LLC, the financial
advisor for the sale.

The $100 million offer by ALL Fuels - Jefferson resulted from negotiations
over the last few weeks, after ALL Fuels was unsuccessful in overturning
bankruptcy court approval of the sale of Renew to Valero, claiming that Wm.
Blair and Banker's Bank had rejected ALL Fuel's better offer at the time of
the auction for no good reason. ALL Fuels had offered $77 million in the
auction. "The terms of the auction were not followed in good faith" said Dean
Sukowatey, President of ALL Fuels, "Our bid exceeded the successful Valero bid
by $5 million, but Bankers Bank, Valero and Wm. Blair unilaterally discounted
our offer, in order to terminate the auction and accept Valero's bid. We
negotiated in good faith, and were ready to go much higher, but the auction
was prematurely terminated. To purchase Renew Energy, we had no choice but to
deal directly with Valero, and bid up the price even before the closing has
taken place."

On Tuesday, January 19, 2010, ALL Fuels offered Valero $82 million cash for
Renew. Valero countered the ALL Fuels $82 million bid at $100 million. On
Friday, January 29, ALL Fuels accepted Valero's $100 million counteroffer.
Valero's closing with Bankers Bank is now set for Thursday, February 4, 2010.

On Friday, January 29, after ALL Fuels agreed to Valero's $100 million price
for Renew, Valero's V.P. of Alternative Energy and Project Development, George
Stutzmann, notified ALL Fuels at 5:53PM, "We do not have a deal. While we
casually discussed the $100 mm number as something that might be of interest
awhile back, it no longer is and we are now committed to close."

"Valero is in a great position now as we are offering them $28 million more
than Valero is to pay for Renew as a result of the bankruptcy auction," said
Dean Sukowatey, President and CEO, ALL Fuels and Energy. "For reasons we do
not understand, Wm. Blair and Bankers Bank deprived Renew's creditors of $28
million in additional proceeds in order to steer the sale to Valero. ALL Fuels
is actively pursuing its options."

FURTHER BACKGROUND:

Valero Renewable Energy Company was awarded the best bid to purchase the Renew
plant at $72 million in the Renew Bankruptcy Auction managed by Wm Blair,
Chicago, and Bankers Bank, Madison. The ALL Fuels-Jefferson, LLC auction bid
was $77 million. ALL Fuels-Jefferson, LLC attempted to enter a substantially
higher bid but was not allowed to do so. Instead, Blair and Bankers' advised
the auction participants that time had run out, the auction was closed and
Blair announced that Valero had the best bid. ALL Fuels Jefferson, LLC filed a
motion to reconsider and open for re-auction in the Renew Energy LLC Chapter
11 bankruptcy proceeding (U.S. Bankruptcy Court, Western District of

Copyright (c) 2010

BUS      ALL Fuels Agrees to Valero's Offer of $100 Million to Sell the
         Feb 3 2010  13:40:01

Wisconsin, Case No. 09-10491. The appeal motion was denied Jan 12, 2010. Renew
Energy is the debtor-in-possession in a Chapter 11 bankruptcy.

"The ALL Fuels auction bid of $77 million was the best bid at the time, and
best result for the participating banks and bondholders. Subsequent forced
negotiation with Valero has yielded what we thought was an accepted offer for
$100 million to purchase Renew from them, even before they close on their own
purchase. The creditors of Renew were shorted $28 million. Bankers Bank and
its advisor William Blair contracted for the sale of Renew to Valero at far
below the market, for a price of $72 million where the real value is more than
$100 million. ALL Fuels has engaged Attorney Stephen Kravit and the Kravit,
Hovel & Krawczyk S.C. law firm of Milwaukee, Wisconsin to advise ALL Fuels on
its options to acquire Renew" said Sukowatey.

Contact:

ALL Fuels & Energy
Dean Sukowatey, 515-331-6509
dean@allfuelsandenergy.com

-0- Feb/03/2010 21:40 GMT

Copyright (c) 2010

OBJECTION EXHIBIT D



# HOULIHAN LOKEY

January 28, 2010

Andrew Shirley
aeshirley1@yahoo.com
424.832.3993

Mr. Shirley:

I am writing in response to your second letter to the Board of Directors of Aventine Renewable Energy Holdings, Inc. ("Aventine" or the "Debtor") dated January 20, 2010. In your letter you argue the Debtor incorrectly values the estate and inappropriately advances a Plan of Reorganization favoring the interests of an "influential" backstop noteholder constituency over the interests of the Aventine shareholders. As you are aware from our prior communications we disagree with your analysis.

The central element of your argument is an application of the GPRE public valuation multiple as of January 19, 2010, to the Aventine production gallonage, pro-forma for the completion of Mount Vernon and Aurora West facilities. By this simple mathematical exercise you derive a pro-forma enterprise value of approximately $700 million. Unfortunately, your analysis ignores other accepted valuation methodologies, assumes away the complexity of completing two uncompleted production facilities, fails to provide a source of funding for the plant construction and working capital needs and posits a post-emergence debt capitalization of approximately $550 million.

In reality, for Aventine to complete construction of both facilities, achieve its business plan and provide greater recoveries to shareholders than what is currently contemplated under the Debtors' Plan of Reorganization ("POR"), it would need to roll-over its $400 million of unsecured debt obligations and obtain at least $150 million of incremental equity financing at emergence by a party willing to invest at an enterprise value in excess of $550 million while providing greater consideration to existing shareholders than the current POR. Given the vagaries of plant construction and the historic volatility of ethanol industry margins it is our assessment that this enterprise value is not supportable by other valuation methodologies and such equity financing is not available to the Debtors. Our assessment has been corroborated by the capital markets. Rather than ask you to merely accept our professional judgment we have twice canvassed the markets for financing alternatives including equity investments along the

lines described above and have yet to receive a single alternative financing proposal superior to the financing proposed in the POR. It is also relevant to note that the Company is operating under the public disclosure requirements of the bankruptcy code and the financial advisors to the Official Committee of Unsecured Creditors have made a similar feasibility and valuation assessment. In addition, you yourself have conducted a very visible public effort to obtain alternative financing and to date have failed to provide an alternative proposal with committed capital along the lines suggested in your letters to the Debtors' Board of Directors.

As we have discussed with you at length, we do not suppose that the POR filed by the Debtors is the only plan of reorganization possible. Still, we believe the feasible set of alternatives don't deviate materially from what is contemplated under the existing POR. While you have not thus far provided the Debtors with a fully financed restructuring proposal and none of the theoretical structures you have shared with us so far qualify in the remotest sense as feasible, we will evaluate any feasible proposal on its merits and will always respond to any legitimate information requests. Lastly, to the extent you are in contact with parties willing to provide alternative financing we would ask you again to have them contact us so that we can better understand their interest and support their diligence to the extent appropriate.

Regards

Stephen J. Spencer
sspencer@hl.com

*with copy to:*
Aventine Board of Directors
Young, Conaway, Stargatt & Taylor LLP

OBJECTION EXHIBIT E

ANDREW SHIRLEY
555 South Barrington Avenue, Suite 428
Los Angeles, California 90049
O: (424) 832-3993 ▪ M: (917) 406-4905
aeshirley1@yahoo.com

December 23, 2009

<u>VIA OVERNIGHT DELIVERY</u>

Mark S. Kenney, Esq.
United States Trustee
Office of the United States Trustee
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801

Re:     *Aventine Renewable Energy Holdings, Inc.*
<u>Jointly Administered Chapter 11 Case No. 09-11214</u>

Dear Mr. Kenney:

I am a sophisticated individual investor, with over 10 years of experience investing in securities of companies in distress, and currently hold approximately 2.2% of the outstanding shares of common stock of Aventine Renewable Energy Holdings, Inc. ("Aventine" or the "Company", together with its debtor affiliates, the "Debtors"). I am extremely troubled that Aventine – which has not engaged in any meaningful dialogue with its widely dispersed shareholders - recently filed a plan of reorganization (the "Plan") and disclosure statement (the "Disclosure Statement"), both dated December 4, 2009, that purport to provide equity holders with an admittedly minimal recovery even though Aventine is clearly solvent. Accordingly, I write this letter to request that the Office of the United States Trustee appoint an official committee of equity security holders (the "Official Equity Committee") in the Debtors' chapter 11 cases (the "Chapter 11 Cases"), pursuant to Bankruptcy Code Section 1102(a)(2).

In determining whether to appoint an Official Equity Committee, the factors generally considered are (1) whether the debtor is hopelessly insolvent; (2) whether the interests of equity holders are adequately represented without the appointment of an official equity committee; (3) whether the stock is widely held and publicly traded; (4) the size and complexity of the case; and (5) the timing of the request. *See e.g., Exide Tech. v. State of Wisconsin Inv. Board,* 2002 U.S. Dist. LEXIS 27210 (D. Del. Dec. 23, 2002). For the reasons set forth below, I believe that the facts and circumstances in the Chapter 11 Cases overwhelmingly support the appointment of an Official Equity Committee, and that active participation of shareholders in the Chapter 11 Cases through an Official Equity Committee is both necessary and appropriate to protect the interests of common shareholders.

1.    The Debtors are Solvent and Equity is the Fulcrum Security

Solvency is a key factor in determining whether or not the appointment of an official equity is appropriate. *In re Wang Lab., Inc.,* 149 B.R. 1, 3 (Bankr. D.Mass. 1992). Where the debtor is solvent or near solvent, an equity committee is warranted to ensure that shareholders – whose recovery will rise or fall based upon the strategies undertaken in the bankruptcy case – is adequately represented.

Based on its most recent quarterly SEC filings, on a simple balance sheet basis, Aventine is solvent with $253 million of stockholders' equity, including $697 million in assets over $445 million in liabilities, as of September 30, 2009. The Debtors' most recent monthly operating report further reflects $257 million of stockholders' equity as of November 30, 2009.

More compelling, however, is the Debtors' recent operating performance, which, consistent with the general ethanol industry, has dramatically improved over the past few months. *See* "Christmas in October for Ethanol" *The Wall Street Journal,* October 12, 2009 (attached as "Exhibit A") (noting "wide profit margins" for ethanol producers). The key driving metric in the ethanol industry is ethanol margin per gallon, and the Debtors' recent monthly operating reports show plant-level EBITDA (earnings before interest, taxes, depreciation, and amortization) margins of approximately 50 cents per gallon for October and November – a huge increase from negative margins in the months leading up to the April 7, 2009 filing date and a 100% increase from margins achieved in the quarter ended September 30, 2009. Ethanol industry margins have continued to remain firm in the ensuing weeks.

While many industries experienced severe margin volatility through the recently passed global financial crisis, ethanol production, as a nascent industry, was particularly vulnerable. According to the Renewable Fuels Association, the national trade association for the U.S. ethanol industry, ethanol production capacity more than doubled from the end of 2006 to the end of 2008. This sharp increase in production capacity was required to meet the rapidly increasing ethanol blending (or consumption) levels mandated by the Renewable Fuel Standard section of the Energy Independence and Security Act of 2007 (the "EISA"). Such a rapidly growing industry was vulnerable to periods of weak margins, as production supply must ramp up in advance of the federally mandated blending targets. This vulnerability was magnified and exacerbated when the industry's natural growing pains coincided with a global financial crisis that has universally been described as the worst in generations. The good news, however, is that the vast majority of ethanol production supply needed to meet EISA targets has now been completed. In line with these targets, ethanol blending is expected to increase a healthy 10-15% for the full year 2009, with this increased demand having recently restored both supply-demand balance and more normalized profit margins for the industry. Moreover, EISA targets require ethanol blending to increase an additional 14% in 2010 and 43% through 2015, both from 2009 levels. This mandated blending growth, balanced against a now more stabilized supply base, will provide a sustained tailwind to ethanol producers and profit margins for at least the next six years.

Recognizing the recent industry recovery, the price of the Debtors' publicly-traded $300 million principal amount of unsecured 10% Notes due 2017 (the "Notes"), according to the NASD TRACE bond pricing service, has recently reached as high as 95 cents on the dollar, up from 12 cents on the dollar in April 2009. The Debtors' 43 million shares of common stock, which traded at a price of $0.08 per share immediately prior to and subsequent to the bankruptcy filing, have increased in price by almost five times that amount to $0.38 per share, yielding a substantial market capitalization of over $16 million. Indeed, even using the Debtors' own financial projections set forth in the Disclosure Statement (the "Financial Projections"), there is a compelling case that the Debtors are solvent. This fact is tacitly acknowledged by the fact that the Plan provides equity with a recovery, albeit at an unreasonably low level because equity holders had no seat at the negotiating table.[1]

For example, Aventine currently operates 207 million gallons of ethanol capacity and should generate more than $100 million of plant-level EBITDA based on recent company margins of 50 cents per gallon. At this level of earnings, Aventine can support its current capital structure and operating plan. Aventine also owns two nearly completed ethanol plants for which construction is currently suspended. If successfully completed, these plants would add approximately 226 million gallons of ethanol capacity and generate more than $100 million of additional EBITDA at recent margins. These plants are now approximately 85% constructed and require an additional $100 million capital investment to complete according to the Financial Projections, which assume that the plants are completed over the next two years. Pro forma for completion of the plants, Aventine would operate 433 million gallons of ethanol capacity and generate approximately $200 million of EBITDA at recent margins. The Financial Projections assume that the Debtors will have approximately $350 million of net debt and exit payment obligations immediately prior to emergence on March 31, 2009. While the Debtors' Plan calls for unsecured claims to be canceled in exchange for new equity, below I will further illustrate the Debtors' solvency by assuming an additional $50 million of net obligations to account for potential post-petition interest and other payments required to make all creditors whole. Adding the $100 million of plant completion costs to a grossed-up $400 million of net debt and obligations results in pro forma net debt and obligations of $500 million. Taking these factors into account, any unbiased valuation shows without serious doubt that the Debtors are solvent, even if ethanol margins are cut in half from recent levels. For example:

*EV / EBITDA Methodology.* Based on pro forma EBITDA of $200 million (see above), a typical industrial enterprise value multiple of 8.0x, pro forma net debt of $500 million (see above), and 43 million shares outstanding, Aventine has potential equity value of $1.1 billion, or

---

[1] As court documents indicate, Aventine filed for bankruptcy on April 7, 2009 due to the confluence of weak ethanol margins and a global credit crisis. However, both ethanol margins and the credit markets have recovered dramatically since the filing date. As a result of this recovery, the primary conditions that precipitated Aventine's bankruptcy filing no longer exist.

$25 per share. Even if ethanol margins are cut in half from recent levels, as assumed in the Financial Projections, an 8.0x multiple on approximately $100 million of EBITDA suggests potential equity value of $300 million, or $7 per share.

*Free Cash Flow Methodology.* Aventine can generate pro forma free cash flow to equity of approximately $100 million based on recent margins and approximately $35 million assuming EBITDA margins are cut in half. Applying a reasonable 10x free cash flow multiple suggests a similar potential equity value range of $350 million to $1.0 billion, or $8 to $23 per share.

*Replacement Cost Methodology.* Given recent margin strength, a robust demand-growth outlook, and the potential need for some additional ethanol capacity to meet EISA blending mandates in 2015, there is a compelling argument that ethanol plants should be worth at least replacement cost. Based on industry-standard replacement cost of $2.00 per gallon of dry mill capacity (pro forma 333 million gallons) and $3.00 per gallon of wet mill capacity (100 million gallons), Aventine's pro forma enterprise value would be $966 million. Deducting pro forma net debt of $500 million leaves potential equity value of $466 million, or $11 per share.

*Discounted Cash Flow Methodology.* The Debtors' own Financial Projections support a discounted cash flow valuation that derives equity value in excess of $200 million, based on reasonable exit multiple and weighted average cost of capital assumptions that are not otherwise provided with the projections. Again of note, the Financial Projections assume ethanol profit margins that are substantially below recent actual margins.

All indications are that the Debtors are solvent and that Aventine's shareholders have a significant economic stake in the outcome of the Chapter 11 Cases. An Official Equity Committee should therefore be appointed.[2]

>    2.    Aventine's Other Constituencies Cannot
>    Adequately Protect the Interests of Shareholders.

Neither creditors nor the Official Committee of Unsecured Creditors (the "Creditors' Committee") can adequately represent the interests of shareholders, because "when it comes to valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds." *Pilgrim's Pride Corp.*, 407 B.R. at 218, n. 17. This is because creditors are not "disposed to value Debtors so liberally that equity may be sure to receive its

---

[2] Even if solvency is unclear, an official equity committee should be appointed and given a reasonable opportunity to explore whether there is equity value. *See, e.g., In re AM Int'l, Inc.* 203 B.R. 898, 902 (Bankr. D. Del. 1996) (bankruptcy court appointed an official equity committee over creditors' objection where there was question whether the debtor was in fact insolvent). Where the debtor will emerge from bankruptcy as a going concern, the value of the debtor will ultimately be determined by its ability to generate cash flow. *Pilgrim's Pride Corp.*, 407 B.R. at 217.

due." *Id.* at 218 (citing *In re Mirant Corp.,* 334 B.R. 800, 814-15 (Bankr. N.D. Tex. 2005)) (noting that many courts have recognized different parties' "incentive to overvalue or undervalue" a debtor). This creditor incentive to undervalue enterprise value could not be more apparent here: the Plan values distributions to unsecured creditors at a mere 50 cents, yet the Notes (which are entitled to that distribution) trade at almost twice that level and assume a par recovery!

Nor can management adequately represent shareholder interests. Like the Debtors' creditors, management is often biased to undervalue the enterprise, because "[t]he dynamics of chapter 11 are such that Debtors - and their management - are likely to be constrained to accept and advocate to the court a conservative value of their business in order to obtain creditor assent to a reorganization plan." *Pilgrim's Pride Corp.,* 407 B.R. at 218-19. In this particular case, it appears that the management and board of directors (who, under the Plan, will obtain releases and exculpations and be replaced by management selected by creditors) have ignored the empirical industry and market data evidencing solvency at the behest of a powerful and sophisticated creditor constituency that has been funded by the estate. Finally, unlike an official equity committee whose duty is to represent shareholders, (and which could act as rational counterweight to the biased valuation arguments set forth by the creditors), directors of the Company have broad-based fiduciary responsibilities to every interested party in the bankruptcy case, which dilutes their ability to advocate for shareholders in the face of strong creditor opposition. *See CFTC v. Weintraub,* 471 U.S. 343, 355 (1985).

The problem is only exacerbated by the fact that both the Debtors and the Creditors' Committee are represented by well-respected, highly competent legal and financial advisors who are zealously representing the interests of the creditors for the reasons discussed in *Pilgrim's Pride Corp,* above. Without official committee status, it is not likely that any equity holder will have the means and incentive to challenge the woefully low valuation and recovery set forth in the Debtors' Plan and Disclosure Statement.

Indeed, given the Company's strong performance, the healthy state of the ethanol industry, and the financial market's recognition of the Debtors' solvency, I recently wrote Aventine's board of directors requesting that they consider the interests of equity holders when negotiating and proposing a plan of reorganization. (A copy of that letter is attached as "Exhibit B"). Unfortunately, the Board of Directors, after negotiating a plan of reorganization with the Debtors' *creditors,* filed a plan of reorganization that provided equity holders with what the Disclosure Statement refers to as a "de-minimis" recovery. It is critical that equity holders have an official seat at the table to ensure that their interests are not inappropriately diluted through this reorganization.

As part of my effort to preserve shareholder value, I have initiated correspondence with several investment firms that could potentially provide financing for a potential alternative plan of reorganization that would maximize value for all stakeholders. While several of these firms have expressed a level of interest in providing such financing, a question has repeatedly been

posed asking whether the Debtors and their advisors will genuinely consider the merits and feasibility of any alternative plan. This common concern, from sophisticated investment firms that are specifically experienced with the bankruptcy process, likely derives from these firms' familiarity with the difficulty of prying open a chapter 11 proceeding from the influential clutch of senior creditors, regardless of how compelling the evidence is that junior classes have value as the true fulcrum security.

Further bringing into question whether shareholders have adequate representation, the Debtors have obstructed attempts at inter-shareholder communication. After the filing of the Plan, I informally sought a list or lists of both legal and beneficial owners of the publicly traded shares. After this initial request was rejected, I submitted a formal request under Delaware Corporations Law Section 220. This second request was rejected for what I believe are absurd technical grounds, which I nonetheless was able to overcome in an amended request. I then received a list of the legal shareholders, which included about a dozen individuals and the Depository Trust & Clearing Corporation, despite having clearly requested a complete list of beneficial holders and having clearly stated the reasons for my request. Thus two weeks after my initial request, I still have not received from the Debtors any meaningful contact information for the current beneficial shareholders, and can only communicate with those shareholders who chose to contact me after I publicized my letter to the board of directors. An Official Equity Committee will have the power to cut through such delaying tactics and directly give voice to the interests of shareholders.

3.     Aventine's Common Stock is
       Widely Held and Publicly Traded.

The common stock of Aventine is widely held and actively traded. As of November 9, 2009, there were 43.0 million shares of common stock issued and outstanding. Prior to the Chapter 11 Cases, Aventine's stock traded on the New York Stock Exchange and the stock is currently and actively trading on the "Pink Sheets" over-the-counter market, with an average of three hundred thousand (300,000) shares trading daily in the last thirty (30) trading days. In the days following the filing of the Plan, I have been attempting to mobilize shareholders and, to date, despite the Debtors' lack of meaningful cooperation, have been in contact with holders of approximately 15% of the Company's common stock. I believe that most, if not all, of these shareholders would support the formation of an Official Equity Committee. What has become clear to me during this long, time consuming, and expensive process, however, is that without official committee status, most of Aventine's public shareholders simply do not have the wherewithal, expertise, or resources to advocate for a recovery in this bankruptcy case.

Moreover, even if certain large equity holders did have the ability and incentive to put forward an alternative plan or object to the Debtors' Plan, those equity holders would not have fiduciary duties to individual investors like me or the thousands of other holders whose interests need to be represented as well. As the court noted in *In re Beker Indus. Corp, 55* B.R. 945, 949 (Bankr. S.D.N.Y. 1985):

> The position that some members of the [investor] class may have
> resources sufficient to protect their interests is of little significance, in our
> judgment, at least where the security is widely held. They do not have the
> fiduciary duty to represent their fellow security holders.

4.    The Bankruptcy Cases Are Large and Complex.

The Debtors concede that the Chapter 11 Cases are large and complex, *see* 12/4/09
*Motion to Extend Exclusive Period* [Docket No. 591] ("Exclusivity Motion"). Indisputably,
these cases involve complex legal, business and financial issues. *Id.* As noted by the Debtors
themselves, reorganizations of this "size and magnitude" often require lengthy and complex
negotiations before they can be resolved. *Id.* To navigate themselves through this admittedly
difficult process, Aventine and its creditor constituencies have hired numerous sets of lawyers,
bankers, and advisors.

Although the size and complexity of this case necessitated that Aventine engage in
detailed negotiations with *creditors, see* Exclusivity Motion at 11 (noting Aventine's "regular
and frequent dialogue with the Committee, prepetition and postpetition secured creditors, and
with other creditors"); *Id* at 8 (Aventine negotiated Plan with "certain creditor constituencies");
there have been *no* negotiations with *shareholders*, who - unlike creditors - are not represented
by sophisticated counsel or advisors. Given that shareholders and their advisors are not "at the
table" in plan negotiations, it unfortunately should come as no surprise that the Plan provides
shareholders with no real value. To meaningfully participate in these complex negotiations, and
ensure shareholders get a fair recovery, shareholders need to be afforded official committee
status.

5.    The Timing of the Request for an Official Equity Committee is Appropriate.

This request is not premature, as the financial markets and all objective indica indicate
the estate is solvent, and the case is nearing conclusion. Nor is this request too late, as only
recently did the Debtors file the Plan that provides equity a "token" recovery. This proposed
recovery was a surprise to equity holders given the recent and dramatic recovery of profit
margins for Aventine and the ethanol industry, the recent and dramatic recovery of the Debtors'
publicly-traded securities, and the recent and dramatic recovery of other publicly-traded ethanol
industry equity securities. The stock prices of publicly-traded ethanol industry comparable
companies, BioFuel Energy Corporation and Green Plains Renewable Energy, Inc., have
increased 135% and 83%, respectively, over just the one month leading up to the filing of the
Plan. Indeed, the most important role to be played in any restructuring is negotiating the terms
of the Plan and determining the proper value of the Debtors' enterprise, and those negotiations
(and, if necessary, attendant litigation) will take place over the next few months.

Nor will the appointment of an equity committee derail the Chapter 11 Cases.
Confirmation is currently set for mid-February 2010. During this time, an official equity

committee can quickly appoint professionals and negotiate amendments to the Plan that make it more amenable and equitable to the entire constituency. If such a consensual process is unsuccessful, the equity committee may object to confirmation, and such an objection can be heard (and considered) on the merits. If the Debtors' valuation is correct, the appointment of an official equity committee will not slow this case down. But it will at least put the purported valuation to a meaningful test, and the Debtors and creditors will be forced to explain the significant discrepancy between the values set forth in the Disclosure Statement and the values being ascribed by sophisticated market investors, as implied by recent prices of the Debtors' debt and equity securities, as well as the values supported by the Debtors' recent operating performance, the Debtors' Financial Projections, the Debtors' asset base, and the values of other publicly-traded ethanol producers.

With respect to fees, given the short time frame in which an equity committee will be appointed (confirmation is currently two months away), the costs and expenses of an equity committee for a few mere months will be small compared to the fees and expenses already incurred by the estate on professionals and various "in the money" constituencies. Indeed, the entire equity committee's professional fees and expenses will be substantially less than the $3 million "Backstop Fee" for which the Debtors' are currently seeking court approval. In any event, Aventine's shareholders - who are effectively paying for every constituency's costs in the Chapter 11 Cases - have a significant interest in ensuring that the costs of administering the Chapter 11 Cases are appropriate.

For the reasons set forth above, I believe that the active participation of common shareholders through an official committee is necessary and appropriate to protect the interests of shareholders. I would appreciate an opportunity to discuss this matter further with your office as soon as possible and to respond to any questions you may have concerning this request.

Very truly yours,

Andrew Shirley

cc:     Roberta A. DeAngelis, Esq.

# EXHIBIT A



Associated Press

Corn prices have been helped by ethanol demand, a weak dollar and cold-weather worries. Here, Illinois corn farmer Dietr Ostermeier last month.

# 'Christmas' in October for Ethanol

## Rise in Cost of Energy Drives Up Margins; Support for Depressed Corn Prices

BY IAN BERRY 10/12/09

CHICAGO—Renewed life in the ethanol industry is drawing the attention of Chicago Board of Trade traders and analysts, giving the corn market a boost.

Ethanol producers, which spent much of the past couple of years operating in the red, lately have been enjoying wide profit margins, and as a result have been seeking more corn and ramping up production.

**COMMODITIES REPORT**

Just last week, with energy prices advancing, ethanol processing margins jumped to a dollar a bushel, almost doubling what they were the previous week, said Rich Feltes, vice president of research for MF Global.

"They have every incentive to get their hands on every bushel of corn, and run these plants 24/seven, and push out as much ethanol as they can, pay down their debt," Mr. Feltes said. "This is Christmas time for ethanol plants."

Producers are "clamoring" for cash corn, said Bill Gentry, a broker/analyst with Risk Management Commodities in Lafayette, Ind. He said that has probably removed a lot of grain from the commercial pipeline. He said he has noticed more truck activity related to ethanol for the past six to eight weeks.

The improved ethanol outlook is due to expectations of a large corn crop that has lowered corn prices relative to crude oil and ethanol, Rabobank said in an October report. Friday, the U.S. Department of Agriculture estimated the U.S. corn crop at 13.018 billion bushels and corn used for ethanol at 4.2 billion bushels.

From early June to early October, CBOT corn prices fell 28.5% while crude oil was roughly flat and ethanol futures increased 2%, the bank said.

Since July 6, CBOT December ethanol has jumped 20.5% while December corn is only 5.2% higher.

The improved ethanol demand is helping boost corn prices, though it is probably only the third-most-important factor in the rally, behind weakness in the U.S. dollar and concerns

### Corn Futures

Daily settlement price on the continuous front-month contract
Friday: $3.6225 a bushel, down 1.75 cents



Source: Thomson Reuters

about how cold, wet weather will affect the crop, said Arlan Suderman, an analyst for Farm Futures.

December corn's close of $3.6225 a bushel Friday was up more than 30 cents from Monday's intraday low and up more than 50 cents from a Sept. 21 low.

"I would say that what is happening in the ethanol industry now is definitely a contributing factor," Mr. Suderman said. "We're certainly bringing some

production that had been mothballed back online."

Rabobank said that, as the market shifts its attention from the crop to the demand side, ethanol demand will "help limit downside price potential and establish a floor for prices above long-term averages."

Mr. Feltes said the profit margin for blenders was most recently "quite good" at 31 cents a gallon, which will encourage more blending in the weeks ahead.

The increased ethanol demand comes at a time when corn is tough to come by, analysts said. Harvesting throughout the corn belt has been delayed because of the crop's late maturation and heavy rains in the early autumn that left the crop too wet to gather.

But, some analysts say, ethanol's effect on the market will be minimal. John Kleist, a broker/analyst for Allendale, said ethanol has been used as an ongoing "bull crutch." To the extent that ethanol helps boost corn prices, all that will do is reduce export and feed demand, he said.

# EXHIBIT B

December 3, 2009

Board of Directors
Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554

To Members of the Board:

## INTRODUCTION

I am an Aventine Renewable Energy Holdings, Inc. ("Aventine" or "the Company") equity holder and I currently own approximately 900,000 shares of common stock, or 2.1% of the outstanding shares. I have 18 years of professional investment experience, including more than 10 years of bankruptcy investing experience.

## PURPOSE

I am writing to request that the Board use its best efforts to evaluate the feasibility of Chapter 11 reorganization alternatives that preserve shareholder value and ownership. My analysis shows that Aventine pre-petition equity has substantial value, potentially more than $10 per share, and that a fair and equitable plan of reorganization can be structured to benefit all stakeholders, including shareholders. As court documents indicate, Aventine filed for bankruptcy on April 7, 2009 due to the confluence of weak ethanol margins and a global credit crisis. However, as I am sure you are aware, both ethanol margins and the credit markets have recovered dramatically since the filing date. As a result of this recovery, the primary conditions that precipitated Aventine's bankruptcy filing no longer exist and pro forma earnings sufficiently support the Company's capital structure and operating plan. Accordingly, the Board has an obligation to use its best efforts to evaluate reorganization alternatives that preserve value for all stakeholders, including shareholders. The contents of the remainder of this letter will justify my request and the Board's obligation.

## ETHANOL MARGIN RECOVERY

Supply-and-demand in the ethanol industry has returned to balance after a period of great dislocation in late 2008 and early 2009. The resulting recovery in ethanol plant EBITDA margins has been impressive, from breakeven or below to a multi-year high of more than 50 cents per gallon currently. On October 12, 2009, *The Wall Street Journal* published an article titled "Christmas in October for Ethanol" which highlighted "wide profit margins" for ethanol producers. Beyond the headlines, Aventine's October 2009 Monthly Operating Report, filed with the bankruptcy court, shows that the Company achieved plant-level EBITDA margins of approximately 50 cents per gallon for the month. Ethanol margins have continued to expand in the ensuing weeks and may currently exceed 70 cents per gallon for Aventine. Key factors in this recovery include: (1) continued growth in ethanol demand mandated by Renewable Fuel Standard ("RFS") legislation; (2) absorption of blenders' excess renewable identification numbers ("RINS"); (3) lower corn, natural gas, and other input costs; (4) a near doubling of gasoline prices that now encourage discretionary ethanol blending; (5) a spike in Brazilian ethanol prices that makes U.S. imports uneconomical and potentially opens export markets to U.S. producers; and (6) the

idling of higher-cost ethanol plants. While a few new ethanol plants are scheduled to come on line over the upcoming months and other idled plants may restart if attractive margins persist, this incremental capacity will be absorbed by a 1.5 billion gallon, or 14%, increase in RFS blending mandates in 2010 (from 10.5 billion to 12.0 billion gallons). By 2015, RFS mandates call for a 4.5 billion gallon, or 43%, increase in ethanol blending over 2009 levels, providing a huge multi-year tailwind to ethanol supply-and-demand fundamentals and margins.

## CREDIT MARKET RECOVERY

Global and U.S. credit markets have improved dramatically since the Aventine bankruptcy filing in early April. The CSFB High Yield Index is up 40% over this time with yield spreads tightening from 1,500 to 730 basis points. The CSFB Leveraged Loan Index has similarly improved, up 30% from 65 at the end of March to 85 at the end of October. Aventine's own 10% Notes due April 2017 are up almost 500% from 12 cents on the dollar in April to approximately 70 cents recently.

Strong margins and enviable multi-year fundamentals suggest that Aventine should have sufficient access to credit market capital. A sample of leveraged and cyclical commodity producers includes, but is not limited to, Bunge, Dow Chemical, Neenah Paper, Rockwood Holdings, Smithfield Foods, Tyson Foods, Sunoco, and Valero. The leverage ratios for these companies range from 3x to 9x, calculated as net debt divided by EBITDA, and the unsecured credit ratings range from BBB to CCC+. Many of these companies successfully issued unsecured bonds over the last nine months and yields to maturity on selected bonds range from 5% to 10%, with spreads of 225 to 725 basis points. This summary data illustrates that the credit markets "understand" the nature of cyclical industries and currently offer affordable access to capital, even in recessionary times. Furthermore, the ethanol industry has a decided advantage over most cyclical industries as blending mandates increase 14% in 2010 and 43% over the next six years.

## EARNINGS ANALYSIS

Aventine currently operates 207 million gallons of ethanol capacity and should generate more than $100 million of plant-level EBITDA based on recent industry margins of more than 50 cents per gallon. At this level of earnings, the Company can cover all fixed costs including interest expense on existing debt, interest expense on exit financing debt, taxes, and maintenance capital requirements. Aventine also has two nearly completed ethanol plants for which construction is currently suspended. If successfully completed, these plants would add approximately 226 million gallons of ethanol capacity and generate more than $100 million of additional EBITDA at recent margins. These plants are now 85-90% constructed and require an additional $70-100 million capital investment to complete. Pro forma for completion of the plants, Aventine would operate 433 million gallons of ethanol capacity and generate more than $200 million of EBITDA at recent margins.

## CAPITAL STRUCTURE ANALYSIS

With the dramatic recovery in credit markets and industry margins, Aventine now has financing options available that it did not have in the March-April 2009 timeframe. Aventine should be able to raise a secured credit facility that would allow the Company to emerge from bankruptcy while preserving shareholder value and ownership. This facility

would be used to pay-off the existing DIP facility, the existing credit facility, all accrued interest, and all other liabilities subject to compromise as required. Aventine needs approximately $100-150 million to fund these exit payments. The Company's 10% Notes could be reinstated and would emerge from the reorganization unimpaired.

As mentioned above, Aventine needs approximately $100-150 million to exit from bankruptcy and an additional $70-100 million to complete the two ethanol plants under suspended construction. The $170-250 million total requirement could be funded with a new secured credit facility that would be structurally senior to the unsecured 10% Notes. The indenture governing the 10% Notes seems to allow for secured indebtedness of at least $300 million. Even at the high-end requirement of $250 million, a new secured facility would be leveraged less than 1.5x debt to EBITDA at recent margins and less than $0.60 per gallon of capacity, relative to replacement cost exceeding $2.00 per gallon.

Upon completion of the new plants, Aventine would have total pro forma net debt of $500 million, comprised of a $250 million secured exit facility, $300 million of existing 10% Notes, and approximately $50 million of cash and equivalents. Pro forma net debt could be as much as $100 million lower, or a total of $400 million, depending on variables including the potential reinstatement of certain liabilities subject to compromise, remaining capital costs, free cash flow generation, utilization of tax losses, recapture of restricted cash, savings from prepaid utilities, and potential proceeds from auction rate securities litigation. Even at the high estimate of $500 million, net debt would be a modest 2.5x EBITDA at recent margins and $1.15 per gallon of capacity. These credit metrics are roughly in-line with public industry comparables, particularly after adjusting for the superior profitability of Aventine's 100 million gallon wet mill facility. In this scenario, Aventine could generate close to $100 million of annual free cash flow after all interest, tax, and maintenance capital requirements, suggesting that a new secured facility could be fully amortized after only a few years. Even if ethanol margins decline 50% from recent levels, Aventine would have a manageable capital structure and generate substantial free cash flow.

ASSUMPTIONS
The analysis above includes the following pro forma assumptions: 433 million gallons ethanol capacity and production, 50 cents per gallon plant-level EBITDA margin, $15 million corporate expense, $40 million depreciation expense, 10% average coupon on $500 million net debt, 35% tax rate, and $12 million maintenance capital expenditures. A full cash tax rate is assumed despite substantial tax loss carryforwards that are likely available to Aventine. Based on information available through Bloomberg, spot margins are now materially higher than the 50 cents per gallon assumption, which therefore implicitly includes a contingency against potential margin contraction. As of the date of this letter, I calculate average spot plant-level EBITDA margins of 75 cents per gallon for Aventine based on the following commodity price and processing assumptions: $2.19 per gallon ethanol benchmark, zero ethanol basis differential, $3.61 per bushel corn, zero corn basis differential, 2.70 gallons per bushel corn yield, 35% co-product recapture, $0.10 per gallon freight expense, $0.17 per gallon utility expense, and $0.30 per gallon other cash conversion costs.

VALUATION ANALYSIS

My analysis shows that Aventine pre-petition equity has substantial value based on various valuation methodologies. *EV/EBITDA Methodology.* Based on pro forma EBITDA of $200 million, a typical industrial enterprise value multiple of 8.0x, pro forma net debt of $500 million, and 43 million shares outstanding, Aventine has potential equity value of $1.1 billion, or $25 per share. Even if ethanol margins are cut in half, an 8.0x multiple on $100 million EBITDA suggests potential equity value of $300 million, or $7 per share. *Free Cash Flow Methodology.* As detailed above, Aventine can generate pro forma free cash flow of $100 million, or $2.30 per share, based on recent margins and approximately $0.80 per share assuming margins are cut in half. Applying a reasonable 10x free cash flow multiple suggests a similar potential equity value range of $8 to $23 per share. *Replacement Cost Methodology.* Based on $2.00 per gallon of dry mill capacity (pro forma 333 million gallons) and $3.00 per gallon of wet mill capacity (100 million gallons), Aventine's pro forma enterprise value is $966 million. Deducting pro forma net debt leaves potential equity value of $466 million, or $11 per share. Given recent margin strength, a robust demand-growth outlook, and the potential need for additional capacity to meet 2015 RFS mandates, there is a compelling argument that ethanol plants should be worth at least replacement cost. Of note, none of these valuation methodologies attribute any value to potential exit payment or capital cost savings, free cash flow generation, utilization of tax losses, recapture of restricted cash, savings from prepaid utilities, or potential proceeds from auction rate securities litigation. These items could total approximately $100 million, or more than $2 per share. Any way you look at it, Aventine equity appears to have substantial value that can and should be preserved for shareholders.

CONCLUSION

Aventine filed for Chapter 11 bankruptcy protection on April 7, 2009 due to the confluence of weak ethanol margins and a global credit crisis that is universally described as the worst in generations. Ethanol margins are now strong and the credit markets have recovered. Earnings and capital structure analyses suggest that Aventine should be able to secure a sufficient credit facility to exit bankruptcy and make whole all of the Company's pre-petition and post-petition obligations. Traditional valuation analysis shows that Aventine's pre-petition equity has substantial value, potentially more than $10 per share. Accordingly, the Board has an obligation to use its best efforts to evaluate reorganization alternatives that preserve value for all stakeholders, including shareholders. Aventine and the Board would not be alone in such efforts, as even today there are at least three pending bankruptcy proceedings, including Pilgrim's Pride Corporation, W.R. Grace & Co., and Vermillion, Inc., in which the respective debtor has proposed a reorganization plan that preserves substantial shareholder value. General Growth Properties, Inc. also appears to have a board and management team that are working constructively to preserve shareholder value because of the dramatic recovery in the credit and capital markets since that company's bankruptcy filing, also in April 2009.

The Board should immediately seek to renegotiate or replace the existing DIP credit facility to provide better flexibility and terms to the Company. While the existing DIP facility likely provided the best terms available on the filing date, the $30 million commitment is arguably too low, the April 7, 2010 maturity is arguably too short, and the 16.5% interest rate is arguably too high. Simply put, with the dramatic recovery in both

industry margins and the credit markets, substantially better terms are likely now available. The Company could perhaps even obtain a new DIP facility that permits, during the bankruptcy process, the continued construction of one or both of the ethanol plants under suspended construction.

## FURTHER OFFERS AND REQUESTS TO THE BOARD

I offer my immediate availability, via phone and email, to the Board and management in order to provide any necessary clarification or to answer any questions regarding my analyses. I also invite any feedback the Board or management might have regarding my analyses. I encourage the Board and management and their various advisors to commence a dialogue with me and other interested shareholders to discuss the matters addressed in this letter. In furtherance of such dialogue, I ask the Board to seek the appointment of an official committee of shareholders as part of the bankruptcy proceedings. I ask the members of the Board, as fiduciaries to all stakeholders including shareholders, to use their best efforts to evaluate the feasibility of Chapter 11 reorganization alternatives that preserve shareholder value and ownership. Finally, I ask that the Company defer from filing any plan of reorganization in advance of completing the requested evaluation. I expect that the Company will file a motion to extend exclusivity, as is not uncommon in such complex cases, beyond the December 5, 2009 expiration to provide sufficient time to complete the requested evaluation.

## DISCLAIMER

The analyses contained herein should not be construed as me giving investment advice to any person. I also caution any person against relying on my analyses or the contents of this letter in making any investment decision.

Thank you for your time and consideration.

Andrew Shirley
aeshirley1@yahoo.com
424-832-3993

*with copy to:*
Bobby L. Latham, Chairman of the Board
Leigh J. Abramson, Board Member
Theodore H. Butz, Board Member
Richard A. Derbes, Board Member
Farokh S. Hakimi, Board Member
Michael C. Hoffman, Board Member
Wayne D. Kuhn, Board Member
Arnold M. Nemirow, Board Member
George T. Henning, Jr., Interim Chief Executive Officer