# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 09-11214 (KG) |
| AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware Corporation, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF AND IN RESPONSE TO OBJECTIONS TO CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION

Dated: Wilmington, Delaware
February 22, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone:     (302) 571-6600
Facsimile:      (302) 571-1253

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iv

I.    INTRODUCTION ........................................................................................................1

II.   OVERVIEW OF THE PLAN......................................................................................3

     A.  Summary of the Plan.........................................................................................3

     B.  Plan Solicitation and Results Thereof...............................................................4

III.  THE PLAN SHOULD BE CONFIRMED BECAUSE IT COMPLIES WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE..........................7

     A.  Section 1129(a) Requirements ...........................................................................7

     1.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1))..........................................................................8

     a.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ............................................................................8

     b.  The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code..............9

     i.  Mandatory Provisions .........................................................................9

     ii.  Permissive Provisions ......................................................................12

     2.  The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)). .......................................................21

     3.  The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law (Section 1129(a)(3))..................................................21

     4.  The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval (Section 1129(a)(4))...........................23

     5.  The Debtors Will Have Disclosed All Necessary Information Regarding Directors, Officers and Insiders (Section 1129(a)(5)). ....................................23

     6.  The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission (Section 1129(a)(6)). .......................25

DB02:9285601.1

068125.1001

7. The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)). ................................................................................................25

8. The Plan Has Been Accepted by A Majority of Classes Entitled to Vote On the Plan; However, Certain Impaired Classes Have Either Rejected The Plan or Have Not Voted on the Plan (Section 1129(a)(8)). ........................................27

9. The Plan Provides for the Payment in Full of All Allowed Priority Claims (Section 1129 (a)(9)). ..............................................................................28

10. At Least One Class of Impaired Claims has Accepted the Plan (Section 1129 (a)(10)). ......................................................................................................31

11. The Plan Meets the Feasibility Requirement of Bankruptcy Code Section 1129(a)(11). ...............................................................................................32

a. The Plan Satisfies the Factors Examined to Determine Feasibility. .............................33

12. All Statutory Fees Have Been or Will be Paid (Section 1129(a)(12)). ...........................35

13. The Plan Adequately and Properly Treats Retiree Benefits (Section 1129 (a)(13)). ......................................................................................................35

B. Section 1129(b) Requirements .................................................................................35

1. The Plan complies with Section 1129(b)(1) because it does not discriminate unfairly against holders of Claims and Equity Interests in rejecting Classes. ...............36

a. Unsecured Claims are appropriately classified and there is no unfair discrimination ...........................................................................................37

b. Equity Interests are appropriately classified and there is no unfair discrimination ...........................................................................................38

2. The Plan complies with Section 1129(b)(1) because it is fair and equitable with respect to holders of Claims And Equity Interests in rejecting Classes. .......................38

a. The Plan is fair and equitable with respect to the Abstaining Classes ...........................38

b. The Plan is fair and equitable with respect to the Equity Interests ...............................39

3. No Claim in Classes 2(a) through 7(a) receives more than the Allowed amount of its Claim ...................................................................................................39

III. ALL OBJECTIONS, TO THE EXTENT NOT RESOLVED, SHOULD BE OVERRULED ...................................................................................................40

A. The Dissenting Shareholders' Objections ...............................................................40

DB02:9285601.1                                                                           068125.1001

1. The Plan's Valuation is accurate and Equity Interest are not entitled to a distribution. ........................................................................................41

2. There Is No Conflict Of Interest and the Plan was Proposed in Good Faith ................42

B. The Alliance Parties' Objection.................................................................................43

C. The Debtors' Proposed Assumption of Executory Contracts and Lease and Objections Thereto ...............................................................................................43

1. Aurora Cooperative..................................................................................................44

2. Other Objections to the Cure Notice........................................................................45

IV. CONCLUSION......................................................................................................46

DB02:9285601.1

068125.1001

# TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Ct.*
   *(In re Chateaugay Corp.)*, 89 F.3d 942 (2d Cir. 1996)................................................................. 9

*Bruce Energy Ctr. Ltd. V. Orfa Corp. of Am. (In re Orfa Corp. of Phila.)*,
   129 B.R. 404 (Bankr. E.D. Pa. 1991) ........................................................................ 19

*Corestates Bank, N.A. v. United Chem. Tech., Inc.*,
   202 B.R. 33 (E.D. Pa. 1996) .................................................................................... 32

*Eastgroup Props. v. Southern Motel Assoc.*,
   935 F.2d 245 (11th Cir. 1991) .................................................................................. 19

*Heartland Federation Savings & Loan Ass'n v. Briscoe Enters. Ltd. II*
   *(In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160 (5th Cir. 1993) ................................. 7

*In re 11,111, Inc.*,
   117 B.R. 471 (Bankr. D. Minn. 1990) ..................................................................... 36

*In re Alta+Cast, LLC*,
   2004 Bankr. LEXIS 219 (Bankr. D. Del. 2004) ....................................................... 7

*In re America Online Latin America*,
   Case No. 05-11778 (KG) (Bankr. D. Del. April 25, 2006) ..................................... 18

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986)................................................................................. 8

*In re Blue Tulip Corporation*,
   Case No. 09-10015 (KG) (Bankr. D. Del. June 4, 2009)......................................... 17

*In re Briscoe Enters., Ltd.*,
   994 F.2d 1160 (5th Cir. 1993) ............................................................................ 32, 33

*In re Buffets Holdings, Inc.*,
   Case No. 08-10141(MFW) (Bankr. D. Del Apr. 17, 2009)..................................... 18

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y 1990)........................................................................ 36

*In re Caldwell*,
   76 B.R. 643 (Bankr. E.D. Tenn. 1987) ..................................................................... 8

DB02:9285601.1
068125.1001

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) (same) ................................................... 22

*In re Century Glove, Inc.*,
    1993 WL 239489 (D. Del. Feb. 10, 1993) ............................................... 8, 22

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ......................................................... 22

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ......................................................... 14

*In re Drexel Burnham Lambert Group Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................... 21

*In re Dura Automotive Systems, Inc.*,
    Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008) ......................... 18

*In re Eddington Thread Mfg., Co., Inc.*,
    181 B.R. 826 (Bankr. E.D. Pa. 1995) ....................................................... 32

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ........................................................... 39

*In re Genesis Health Ventures, Inc.*,
    402 F.3d 416 (3d Cir. 2005) .................................................................... 19

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D. N.J. 2000) .................................................... 32, 33

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007) ...................................................... 9

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987) ..................................................................... 8

*In re Kennedy*,
    158 B.R. 589 (Bankr. D. N.J. 199) ........................................................... 36

*In re Lackawanna Detective Agency, Inc.*,
    82 B.R. 336 (Bank. D. Del. 1988) .............................................................. 7

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...................................................... 19

*In re Mayer Pollack Steel Corp.*,
    174 B.R. 414 (Bankr. E.D. Pa. 1994) ....................................................... 32

DB02:9285601.1                                                068125.1001

/In re Mrs. Fields' Original Cookies, Inc.,
Case No. 08-11953 (PJW) (Bankr. D. Del. October 2, 2008) ........................................... 18

In re Nellson Nutraceutical, Inc.,
Case No. 06-10072 (CSS) (Bankr. D. Del. September 10, 2008) ........................................ 18

In re Neshaminy Office Building Assocs.,
62 B.R. 798 (E.D. Pa. 1986) ............................................................................................. 15

In re Owens Corning,
419 F.3d 195 (3d Cir. 2005) ............................................................................................. 19

In re Prussia Assocs.,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ............................................................................ 32, 33

In re PWS Holding Corp.,
228 F.3d 224 (3d Cir. 2000) ......................................................................... 16, 18, 21, 28

In re Resorts Int'l Inc.,
145 B.R. 412  (Bankr. D.N.J. 1990) .................................................................................. 21

In re RFE Inds., Inc.,
283 F.3d 159 (3d Cir. 2002) ............................................................................................. 15

In re Richard Buick, Inc.,
126 B.R. 840 (Bankr. E.D. Pa. 1991) .................................................................................. 7

In re Stone & Webster, Inc.,
286 B.R. 532 (Bankr. D. Del. 2002) .................................................................................. 19

In re Texaco, Inc.,
85 B.R. 934 (Bankr. S.D.N.Y. 1988) .................................................................................. 23

In re T-H New Orleans Ltd. P'ship,
116 F.3d 790 (5th Cir. 1997) ......................................................................................... 32, 33

In re Union Meeting Partners,
165 B.R. 553 (Bankr. E.D. Pa. 1994) ............................................................................... 38

In re W.T. Grant and Co.,
699 F.2d 599 (2d Cir. 1983),
cert. denied, 464 U.S. 22 (1983) ...................................................................................... 15

In re WorldCom, Inc.,
2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003) .......................................................... 33

In re Zenith Elecs. Corp.,
241 B.R. 92, 111 (Bankr. D. Del. 1999) ............................................................................ 17

*Kane v. Johns-Mansville Corp.*,
843 F.2d 636 (2d Cir. 1988) ............................................................... 8, 32

*Meyers v. Martin (In re Meyers)*,
91 F.3d 389 (3d Cir. 1996) ................................................................. 15

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. Inc.*
*(In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir. 1986) ............................... 8

**Statutes**

11 U.S.C. § 105 ................................................................................. 19

11 U.S.C. § 1122 ............................................................................... 8, 9

11 U.S.C. § 1122(a) ........................................................................... 8, 9

11 U.S.C. § 1122(b) ........................................................................... 29

11 U.S.C. § 1123 ............................................................................ 8, 9, 14

11 U.S.C. § 1123(a)(1) ....................................................................... 9

11 U.S.C. § 1123(a)(2) ....................................................................... 10

11 U.S.C. § 1123(a)(3) ....................................................................... 10

11 U.S.C. § 1123(a)(4) ....................................................................... 10

11 U.S.C. § 1123(a)(5) ..................................................................... 10, 11

11 U.S.C. § 1123(a)(5)(B) ................................................................ 19, 20

11 U.S.C. § 1123(a)(6) ....................................................................... 11

11 U.S.C. § 1123(a)(7) ..................................................................... 11, 12

11 U.S.C. § 1123(a)(l) ....................................................................... 10

11 U.S.C. § 1123(b) ........................................................................... 12

11 U.S.C. § 1123(b)(2) ....................................................................... 12

11 U.S.C. § 1123(b)(3)(A) ................................................................... 14

11 U.S.C. § 1125 ............................................................................... 21

11 U.S.C. § 1125(e) ........................................................................... 22

DB02:9285601.1                                                      068125.1001

11 U.S.C. § 1126 .......................................................................................... 21, 28

11 U.S.C. § 1126(c) .......................................................................................... 27

11 U.S.C. § 1126(d) .......................................................................................... 27

11 U.S.C. § 1126(f) ........................................................................................... 28

11 U.S.C. § 1126(g) .......................................................................................... 28

11 U.S.C. § 1129 (a)(10) ................................................................................... 31

11 U.S.C. § 1129(a) ................................................................................. 7, 28, 35

11 U.S.C. § 1129(a)(1) ........................................................................................ 8

11 U.S.C. § 1129(a)(11) ............................................................................... 32, 34

11 U.S.C. § 1129(a)(12) ..................................................................................... 35

11 U.S.C. § 1129(a)(13) ..................................................................................... 35

11 U.S.C. § 1129(a)(2) ....................................................................................... 21

11 U.S.C. § 1129(a)(3) ................................................................................. 21, 22

11 U.S.C. § 1129(a)(4) ....................................................................................... 23

11 U.S.C. § 1129(a)(5) ................................................................................. 23, 25

11 U.S.C. § 1129(a)(5)(A)(i) .............................................................................. 23

11 U.S.C. § 1129(a)(5)(A)(ii) ............................................................................. 24

11 U.S.C. § 1129(a)(5)(B) .................................................................................. 24

11 U.S.C. § 1129(a)(6) ....................................................................................... 25

11 U.S.C. § 1129(a)(7) ....................................................................................... 25

11 U.S.C. § 1129(a)(8) ............................................................................. 27, 28, 35

11 U.S.C. § 1129(a)(9)(A) .................................................................................. 30

11 U.S.C. § 1129(a)(9)(C) .................................................................................. 31

11 U.S.C. § 1129(a)(9)(D) .................................................................................. 31

11 U.S.C. § 1129(b) ..................................................................................... passim

DB02:9285601.1                                                             068125.1001

11 U.S.C. § 1129(b)(1) .................................................................................... 35, 36

11 U.S.C. § 1145(a) ........................................................................................... 12

11 U.S.C. § 507(a) ............................................................................................ 29

**Rules**

Fed. R. Bankr. P. 3017 ...................................................................................... 24

Fed. R. Bankr. P. 3018 ...................................................................................... 24

Fed. R. Bankr. P. 9019 ...................................................................................... 16

DB02:9285601.1                                                                                           068125.1001

# I.    INTRODUCTION

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed their First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (as may be amended or modified, the "Plan"),[2] on January 13, 2010 [Docket No. 678].[3]  A hearing on confirmation of the Plan is scheduled for February 24, 2010 (the "Confirmation Hearing").  In connection with the Confirmation Hearing, the Debtors submit this Memorandum in support of confirmation of the Plan (the "Memorandum"), to address the basic requirements set forth in the Bankruptcy Code for confirmation.  The Debtors will also present evidence at the Confirmation Hearing to establish the factual predicates necessary for confirmation of the Plan.

Since the commencement of these cases on April 7, 2009 (the "Petition Date") and through the remainder of 2009, the Debtors focused on stabilizing their core business operations, completing the wind-down of unprofitable business segments, eliminating burdensome contracts and leases and unnecessary operating costs, and determining a strategy that would maximize the value of the Debtors' businesses for the benefit of their stakeholders. These efforts, as well as the marketing efforts employed by the Debtors and their advisors during the chapter 11 Cases, have resulted in the Plan, which contemplates the reorganization of the Debtors through a deleveraging of the Debtors' balance sheet and the completion of construction of the Debtors' two partially completed ethanol production facilities in Indiana and Nebraska

---

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement with respect to Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated January 13, 2010 [Docket No. 679] (as amended or modified, the "Disclosure Statement").

[3]  On February 5, 2010, the Debtors filed that certain Supplement to the Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code [Docket No. 743] (the "Initial Plan Supplement").  On February 19, 2010 and February 22, 2010, the Debtors filed amendments to the Initial Plan Supplement [Docket No. 800] (collectively, the "Plan Supplement Amendments," together with the Initial Plan Supplement and all other amendments and modification thereto, the "Plan Supplement").

post emergence, which shall be funded, in part, by the proceeds from the $105 million Senior Secured Notes.

Following the solicitation of acceptances of the Plan, which ended on February 17, 2010 (the "Plan Solicitation"), every Class of Impaired Claims entitled to vote on the Plan, other than Classes 6(d) and 7(d) (the "Abstaining Classes") and Classes 6(e) and 7(e) (the "Empty Classes"),[4] which are discussed below, voted in overwhelming favor of accepting the Plan. The only impaired class of Equity Interests entitled to vote on the Plan, Class 9(a) which is comprised of Equity Interests in ARE Holdings, voted to reject the Plan. The substantial support for the Plan by the Debtors' creditors reflects the good-faith negotiations which led to the proposal of the Plan, the fair and equitable treatment that the Plan provides to the Debtors' various constituencies, and the viability of the Debtors and their business operations post-emergence. The sole Class voting against the Plan – shareholders of ARE Holdings – is an out-of-the-money class that is not entitled to any distribution, but is nonetheless receiving a *de minimis* distribution of out-of-the-money Warrants pursuant to the Plan. The Debtors believe, and the evidence to be presented at the Confirmation Hearing will demonstrate, that the valuation upon which the Debtors have formulated the Plan is based on accepted valuation principles and methodologies, supported by reasonable assumptions and discounts, and substantiated by a robust marketing process undertaken by the Debtors and their advisors.

In total, the Debtors received formal objections to confirmation of the Plan from the following parties: (i) Glacial Lakes Energy, LLC, *et al.* [Docket No. 774] (the "Alliance Parties"), a group of the Debtors' former marketing alliance members, and (ii) Michael Welsh

---

[4] Classes 6(e) and 7(e), which would have been comprised of General Unsecured Claims and Convenience Class Claims against Aventine Power, respectively, have no members.

[Docket No. 738] ("Mr. Welsh"), Andrew Shirley [Docket No. 776] ("Mr. Shirley"),[5] Fred

Graetzer [Docket No. 787] ("Mr. Graetzer"), and Alan Betensley [Docket No. 788] ("Mr.

Betensley").[6] The Debtors also received certain informal objections that the Debtors believe

have been resolved by clarifying or adding language in the Confirmation Order. Additionally,

the Debtors received objections to the assumption of executory contracts and leases and/or the

applicable cure amount from the following parties: Aurora Cooperative Elevator Company

[Docket No. 747] ("Aurora Co-op"), Southern Indiana Gas and Electric Company d/b/a Vectren

Corporation [Docket No. 748] ("Vectren"), Zurich American Insurance Company, and/or its

affiliates as they may appear, [Docket No. 759] (collectively, "Zurich"). The Debtors anticipate

resolving the objections of the Alliance Parties, Vectren, and Zurich, either through discussions

with the objecting parties or inclusion of certain language in the proposed Confirmation Order.

## II.     OVERVIEW OF THE PLAN

### A.  *Summary of the Plan*

The Plan proposes to pay all administrative and priority claims in full, and

provides for the financial restructuring of the Debtors by converting the unsecured claims in

Classes 5 (Prepetition Unsecured Notes Claims) and 6 (General Unsecured Claims) into 80% of

the equity in Reorganized ARE Holdings and providing unsecured claims in Class 7

(Convenience Class Claims) with a cash payment. The remaining 20% of the equity in

Reorganized ARE Holdings will be distributed ratably to the participants in the Senior Secured

---

[5] While not stated in Mr. Shirley's papers, in addition to being a shareholder, Mr. Shirley is a holder of the
Prepetition Unsecured Notes and submitted a Subscription Form to participate in the Senior Secured Notes Offering.
[6] The Debtors also received an objection that has not been docketed from two current shareholders of ARE
Holdings, Sean and Kimberly McGuigan (the "McGuigans," and together with Mr. Welsh, Mr. Shirley, Mr.
Graetzer and Mr. Betensley, collectively the "Dissenting Shareholders") who appears to adopt the views of Mr.
Welsh and Mr. Shirley.

068125.1001

Notes Offering.[7] Reorganized Holdings will, in turn, own 100% of the Reorganized Subsidiaries. All secured claims will, in effect, be satisfied in full under the Plan either through cash payments, reinstatement of such claims, or the return of the collateral securing such claim. Additionally, existing equity holders of ARE Holdings will receive the Warrants on account of their Equity Interests, and holders of Equity Interests in the Subsidiaries will receive no distribution under the Plan on account of their existing Equity Interests. In connection with the Debtors' financial restructuring under the Plan, ARE LLC will be substantively consolidated with, and merged into, ARE Holdings. Finally, the Plan contemplates the issuance of $105 million of Senior Secured Notes and a new ABL working capital facility with PNC Bank, the proceeds of which will be used to fund distributions under the Plan and the Debtors' working capital needs post-emergence.

### B. *Plan Solicitation and Results Thereof*

On or about January 19, 2010,[8] the Debtors commenced solicitation of acceptances of the Plan by distributing the Disclosure Statement and related materials to holders of Claims and Equity Interests classified in Impaired Classes entitled to vote under the Plan, as required by the Court's order approving the Disclosure Statement and the Debtors' proposed procedures for solicitation of acceptances of the Plan [Docket No. 684] (the "DS and Solicitation Order"). With respect to the Plan Solicitation, the Debtors transmitted: (i) a CD-ROM containing the Disclosure Statement and the Plan, including the exhibits to each, and the DS and Solicitation Order, excluding the exhibits thereto; (ii) the confirmation hearing notice; (iii) a ballot and/or a master ballot, as appropriate, together with a return envelope, and (iv) with

---

[7] The percentages of New ARE Holdings Common Stock distributed under the Plan are subject to dilution by shares of New ARE Holdings Common Stock issued under the Management Incentive Plan and the Warrants.
[8] Pursuant to the Solicitation Order, January 20, 2010 was established as the deadline for the mailing of Solicitation Packages to holders of Claims and Equity Interests entitled to vote on the Plan.

respect to holders of Prepetition Unsecured Notes Claims, the Senior Secured Notes Offering Procedures and a Subscription Form (collectively, the "Solicitation Package"), to all known holders of Claims and Equity Interests in each Impaired class of Claims and Equity Interests (or their Voting Nominees, if applicable) entitled to vote to accept or reject the Plan, as of January 13, 2010 (the "Record Date"). Specifically, the Solicitation Package was distributed to holders of Claims in Classes 2(a)-(f) (Prepetition Secured Credit Facility Claims), 4(b) (Kiewit Aurora West Secured Claim), 5(a)-(f) (Prepetition Unsecured Notes Claims), 6(a)-(d) and (f) (General Unsecured Claims), 7(a)-(d) and (f) (Convenience Class Claims), and 9(a) (Equity Interest in ARE Holdings). *See* Affidavit of Service filed with the Court on February 5, 2010 [Docket No. 742] (the "Solicitation Package Affidavit of Service").

Additionally, as required by the DS and Solicitation Order, the Debtors transmitted to each member of Classes 1(a)-(f) (Other Priority Claims), Classes 3(a)-(f) (Other Secured Claims), Class 4(a) (Kiewit Mt. Vernon Secured Claim), Classes 8(a)-(f) (Intercompany Claims), and Classes 9(b)-(f) (Equity Interests in the Debtors other than ARE Holdings and ARE LLC) the notice of the non-voting status of the class members' Claims or Equity Interests. *See* Solicitation Package Affidavit of Service. Finally, the Debtors published notice of the Confirmation Hearing and the deadlines to vote on and file objection to the Plan in the national edition of The Wall Street Journal on January 19, 2010. *See* Affidavit of Erin Ostenson filed with the Court on February 4, 2010. [Docket No. 2136]. In addition, the Debtors, through GCG, timely mailed Subscription Forms to all record holders of the Prepetition Unsecured Notes as of January 13, 2010.

Pursuant to the DS and Solicitation Order, the deadline for returning ballots accepting or rejecting the Plan was set at 4:00 p.m. (ET) on February 17, 2010. Based on the

voting results provided by GCG to the Debtors after the Voting Deadline, the Debtors received acceptance from each Impaired class of Claims, other than the Empty Classes and Abstaining Classes who did not vote on the Plan, but holders of Equity Interests in ARE Holdings voted to reject the Plan.[9]

| | Percentages Accepting by Class | | | | | | | | | | | Classes | |
| | 2 | | 4(b) | | 5 | | 6 | | 7 | | 9(a) | | | |
| | Claim Amt. | Numerosity | Claim Amt. | Numerosity | Claim Amt. | Numerosity | Claim Amt. | Numerosity | Claim Amt. | Numerosity | No. of Shares | Numerosity | Accepting | Rejecting |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consolidated Holdings | Accept | Accept | n/a | | Accept | Accept | Accept | Accept | Accept | Accept | Reject | n/a | 2,5,6,7 | 9 |
| AREI | Accept | Accept | n/a | | Accept | Accept | Accept | Accept | Accept | Accept | | n/a | 2,5,6,7 | None |
| ARE – Aurora West | Accept | Accept | Accept | Accept | Accept | Accept | Accept | Accept | Accept | Accept | | n/a | 2,4,5,6,7 | None |
| ARE – Mt. Vernon | Accept | Accept | n/a | | Accept | Accept | No Votes | | No Votes | | | n/a | 2, 5 | None |
| Aventine Power | Accept | Accept | n/a | | Accept | Accept | Empty Class | | Empty Class | | | n/a | 2, 5 | None |
| NELLC | Accept | Accept | n/a | | Accept | Accept | Accept | Accept | Accept | Accept | | n/a | 2,5,6,7 | None |

Because no members of Classes 6(d) and 7(d) submitted ballots, Class 9(a) voted to reject the Plan and Classes 9(b)-(f) (Equity Interests in the Debtors other than ARE Holdings and ARE LLC) are deemed to have rejected the Plan, the Debtors seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code as to such classes.

Also, pursuant to the DS and Solicitation Order, the Court approved the Secured Notes Offering Procedures and Subscription Form. Eligible holders of Prepetition Unsecured Notes were required to submit a completed Subscription Form on or before February 17, 2010 if such parties desired to participate in the Senior Secured Notes Offering.

---

[9] The declaration from GCG certifying the results of the balloting (the "Voting Declaration") is being finalized by GCG and will be filed prior to the Confirmation Hearing.

DB02:9285601.1 068125.1001

# III. THE PLAN SHOULD BE CONFIRMED BECAUSE IT COMPLIES WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

## A. *Section 1129(a) Requirements*

To confirm the Plan, the Court must find that the Plan and the Debtors satisfy the requirements of section 1129(a) of the Bankruptcy Code. *See, e.g., In re Alta+Cast, LLC*, 2004 Bankr. LEXIS 219, *6 (Bankr. D. Del. 2004); *In re Lackawanna Detective Agency, Inc.*, 82 B.R. 336, 337 (Bank. D. Del. 1988) ("Section 1129 of title 11 recites the standards which must be met before a plan can be confirmed."); *In re Richard Buick, Inc.*, 126 B.R. 840, 846 (Bankr. E.D. Pa. 1991). This Memorandum demonstrates, and the evidence that will be presented at the Confirmation Hearing will demonstrate, by a preponderance of the evidence that both the Plan satisfies and the Debtors, as proponents of the Plan, have satisfied the requirements of section 1129(a) of the Bankruptcy Code. *See Heartland Fed'n Sav. & Loan Ass'n v. Briscoe Enters. Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 by a preponderance of the evidence).

As addressed in detail below, the Plan and the Debtors, as applicable, satisfy all of the applicable requirements of section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8). Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding the fact that not all impaired Classes of Claims and Equity Interests have accepted the Plan. The Plan is fair and equitable with respect to such non-accepting impaired Classes and does not unfairly discriminate against such Classes. Accordingly, the Plan can and should be confirmed pursuant to section 1129 of the Bankruptcy Code.

DB02:9285601.1  068125.1001

1. **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(1). The phrase "applicable provisions" has been interpreted to include Bankruptcy Code sections 1122 and 1123, which govern the classification of claims and interests and the contents of a plan of reorganization. *See, e.g., Kane v. Johns-Mansville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988).

    a. *The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.*

Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if it is substantially similar to other claims or interests in that class. *See In re Caldwell*, 76 B.R. 643, 644 (Bankr. E.D. Tenn. 1987). Claims or interests in a class need not be identical, but should be similar in legal character or effect with respect to the debtor. *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1150-51 (D.C. Cir. 1986) (affirming plan confirmation where claims guaranteed by third party were grouped with non-guaranteed claims).

Section 1122(a) does not require placement of all claims that are substantially similar in the same class just because they may share some attributes. *See, e.g., In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("[t]he express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes."). The debtor must simply advance a legitimate reason supported by credible proof for the separate classification. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. Inc. (In re U.S. Truck Co.)*, 800 F.2d 581, 585 (6th Cir. 1986) (affirming plan confirmation over objection by collective bargaining unit, finding that section 1122(a) "does not require that similar claims be grouped together, but merely that any

8

group created must be homogenous"); *Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Ct. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (affirming plan confirmation where debtor offered business justification for dividing workers' compensation claims into two classes); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 298 n. 86 (Bankr. N.D. Tex. 2007) (finding that if creditors had different legal rights under principles of equitable subordination, then separate classification would be appropriate). Thus, section 1122 provides debtors with a large amount of flexibility to create classification schemes that will facilitate reorganization.

The Plan designates a total of nine (9) classes of Claims and Equity Interests with respect to the Debtors, not including sub-classes.[10] This classification scheme complies with section 1122(a) because each class contains only claims or interests that are substantially similar to each other. Furthermore, the classification scheme created by the Plan is based on the similar nature of claims or interests contained in each class and not on an impermissible classification factor. Finally, similar claims have not been placed into different classes in order to affect the outcome of the vote on the Plan.

Because each class consists of only substantially similar claims or interests, the Court should approve the classification scheme as set forth in the Plan as consistent with section 1122(a) of the Bankruptcy Code.

    b.   *The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code.*

    i.   **Mandatory Provisions**

The Plan meets the seven mandatory requirements of sections 1123(a)(l)-(7) of the Bankruptcy Code,[11] which require that a plan (1) designate classes of claims and interests; (2)

---

[10] Only Debtors ARE – Aurora West and ARE – Mt. Vernon have Secured Claims asserted against them asserted by Kiewit. Debtor Aventine Power has no claims in Classes 6 and 7 asserted against it.
[11] 11 U.S.C. § 1123(a)(8) is applicable only in cases in which the debtor is an individual.

specify unimpaired classes of claims and interests; (3) specify treatment of impaired classes of claims and interests; (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest; (5) provide adequate means for implementation of the plan; (6) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (7) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.

Specifically, Articles II and IV of the Plan satisfy the first three requirements of section 1123(a) by: designating classes of claims and interests, as required by section 1123(a)(l), *See* Plan, at Article II; specifying the classes of claims and interests that are unimpaired under the Plan, as required by section 1123(a)(2), *see Id.*; and specifying the treatment of each class of claims and interests that is impaired, as required by section 1123(a)(3), *see Id.*, at Article IV. The Plan also satisfies section 1123(a)(4) (the fourth requirement) because, with respect to each Debtor, the treatment of each claim or interest within a class is the same as the treatment of each other claim or interest within that class (unless otherwise consented to), *see Id.*

Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and gives several examples of what may constitute "adequate means."[12]

---

[12] Section 1123(a)(5) requires a plan to provide for "adequate means" for the plan's implementation, "such as—
    (A) retention by the debtor of all or any part of the property of the estate;
    (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan;
    (C) merger or consolidation of the debtor with one or more persons;
    (D) sale of all or any part of property of the estate … among those having an interest in such property of the estate;
    (E) satisfaction or modification of any lien;
    (F) cancellation or modification of any indenture or similar instrument;
    (G) curing or waiving of any default;
    (H) extension of a maturity date or change in an interest rate or other term of outstanding securities;

Articles V and VI of the Plan set forth the means for implementation of the Plan, including, among other things, the vesting of all property of the Debtors in the Reorganized Debtors, the substantive consolidation and merger of ARE LLC into ARE Holdings, entry into the Exit Financing, the issuance and distribution of the New ARE Holdings Common Stock, the Warrants, and New Subsidiary Equity Interests, and the means by which distributions will be made to holders of allowed Claims and Equity Interests. Therefore, the Plan adequately provides for the implementation of the Debtors' reorganization.

Under section 1123(a)(6), a corporate debtor's plan must provide that a debtor's corporate charter will prohibit the issuance of nonvoting equity securities. The Reorganized Debtors' new corporate charters and limited liability company agreements (as applicable), the forms of which are included in the Plan Supplement, prohibit the issuance of such securities, and, thus, comply with the requirements of section 1123(a)(6).

Section 1123(a)(7) states that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. §1123(a)(7). Article V(D) of the Plan sets forth the means by which the Reorganized Debtors' officers and directors shall be selected. The Plan Supplement identifies those individuals proposed to serve, after the Effective Date, as a director or officer of the Reorganized Debtors. No party has objected to the manner of selection of officers and directors and their successors, and no party contends that the proposed manner of

---

(I)  amendment of the debtor's charter; or
(J)  issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;"
11 U.S.C. § 1123(a)(5).

selection is inconsistent with public policy or the interests of creditors and equity security holders.[13] The Plan therefore complies with section 1123(a)(7).

### ii. Permissive Provisions

Section 1123(b) of the Bankruptcy Code describes certain permissive plan provisions.[14] The Plan contains certain of these provisions. For example, as permitted by section 1123(b)(2), Article X of the Plan provides for assumption of certain of the Debtors' executory contracts and unexpired leases. Specifically, Article X(A) provides that, to the extent not (i) assumed in the Chapter 11 Cases prior to the Confirmation Date, (ii) rejected in the Chapter 11 Cases prior to the Confirmation Date, or (iii) specifically rejected pursuant to the Plan, each executory contract and unexpired lease that exists between a Debtor and any Person is specifically assumed by the Debtor that is a party to such executory contract or unexpired lease as of and subject to the Effective Date. Further, in accordance with section 1145(a) of the Bankruptcy Code, the issuance and distribution pursuant to the Plan of the New ARE Holdings Common Stock to holders of Claims in Classes 5(a)-(f) and 6(a)-(d) and (f) and the Warrants shall be exempt from registration under applicable securities laws.

---

[13] See also Section III(A)(5) below.

[14] Section 1123(b) provides that "Subject to subsection (a) of this section, a plan may—
   (1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
   (2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;
   (3) provide for—
      (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
      (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
   (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;
   (5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and
   (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.
11 U.S.C. § 1123(b)

068125.1001

Section 1123(b)(6) also provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). In addition to the aforementioned permissive provisions of the Plan, Article VII(I) of the Plan provides for certain releases by the Debtors and Article VII(J) of the Plan provides for certain consensual non-debtor releases.[15] Additionally, Article VI(C) provides for the substantive consolidation and merger of ARE LLC into ARE Holdings. As set forth in part III(B) below, the Debtors believe that these permissive provisions are consistent with section 1123(b).

The release provisions provided in Articles VII(I) and (J) of the Plan are part of the overall agreement with the Backstop Purchasers and are an integral part of the Plan. The Plan itself is a global compromise among the Debtors, the Backstop Purchasers and the Creditors Committee with respect to the treatment of creditors and interest holders and distributions under the Plan, and the releases embodied in Articles VII(I) and (J) of the Plan were a heavily negotiated component of that compromise. The Released Parties have been actively and integrally involved in these cases, and the releases offer appropriate consideration to those parties who have substantially contributed, and who will substantially contribute, to the Debtors' Estates.

Pursuant to the Plan, the Debtors have determined, in the exercise of their business judgment, to compromise and release the claims against the Released Parties as set forth in Article VII(I) of the Plan. The Released Parties have made, and will continue to make, important contributions to the Chapter 11 Cases, including, among other things, (i) negotiating and supporting the Plan, (ii) providing the means to ensure that the Debtors have adequate liquidity (a) during the Chapter 11 Cases, with respect to the DIP Lenders who provided the

---

[15] Section 1123(b)(3)(A) also provides that a debtor may settle or adjust any claim or interest of the debtor's estate. 11 U.S.C. § 1123(b)(3)(A).

13

Debtors with much-needed financing at the outset of the Chapter 11 Cases, and (b) upon emergence, with respect to the Backstop Purchaser who agreed to backstop the Senior Secured Notes Offering, and (iii) in the case of officers and directors, their efforts on behalf of the Debtors prior to and throughout the chapter 11 cases to right-size the Debtors' businesses. The Debtors also believe that these contributions have resulted in significant benefits to the Debtors' estates. Therefore, there is ample basis for this Court to approve the Plan's releases.

The Plan's release provisions will eliminate the costs and risks of future litigation and allow the principals of the Reorganized Debtors to focus on operations after emergence, as opposed to being distracted by litigation (either as a party to such litigation themselves or the stakeholders who will bear the burdens of the Debtors' investigation, prosecution or participation in such litigation).[16] The release provisions (as well as the exculpation and injunction provisions described below) were the product of arm's-length negotiations, have been critical to obtaining the support of the various constituencies for the Plan, and, as part of the Plan, have received overwhelming support from voting creditors. Accordingly, the Debtors submit that the Plan's release provisions and related injunctions are necessary and appropriate under the circumstances of the Chapter 11 Cases and should be approved pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019.

Section 1123(b)(3)(A) provides that a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C. § 1123 (b)(3)(A). Where a compromise is part of a plan, the court has a duty to determine if the proposed compromise is "fair and equitable." *In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004). "The standards for approval of a settlement under section 1123 are

---

[16] The Debtors are not aware of any valid claims or causes of action exist against the Released Parties for which releases are being granted.

generally the same as those under Rule 9019" of the Bankruptcy Rules. *Id.* Under Bankruptcy Rule 9019, approval of a proposed settlement is within the "sound discretion" of the bankruptcy court. *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in *Meyers v. Martin (In re Meyers)*, 91 F.3d 389 (3d Cir. 1996). The bankruptcy court should not substitute its judgment for that of the debtor. *Neshaminy*, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). The Third Circuit Court of Appeals has enumerated the following four-factor test to be used in deciding whether to approve a compromise or settlement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re RFE Inds., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002) (citation omitted). Additionally, the court should defer to a debtor's judgment if there is a legitimate business justification for its action. *See Meyers*, 91 F.3d at 395.

The releases provided for in Article VII(I) of the Plan satisfy the requirements under section 1123(b) and Bankruptcy Rule 9019. A critical element of the Plan is the agreement of the Backstop Purchasers to backstop the Senior Secured Notes Offering to ensure that the Debtors' have adequate liquidity post-emergence to fund the distributions under the Plan and implement the Debtors' post-emergence business plan. The negotiation of the Debtors' releases in the Plan were important elements to obtaining the Backstop Purchasers' and the Creditors Committee's support of the Plan. With respect to the first three factors, the Debtors are not aware of any viable claims against the Released Parties, so it is not possible to place any

probability of success on such litigation. However, given the good faith efforts of each of the Released Parties during the Chapter 11 Cases, it is anticipated that any litigation arising out of the Chapter 11 Cases would be "unlikely to succeed," and, given the sophisticated relationships among them, such litigation would no doubt be "expensive, time consuming, complicated, protracted and vigorously defended[.]" *See In re PWS Holding Corp.*, 228 F.3d at 231. Given the critical nature that the Released Parties played in these cases and their good faith efforts, the Released Parties, and the Reorganized Debtors should not be shouldered with the specter of litigation post-emergence. Further, the Reorganized Debtors would likely bear a substantial portion of the costs of any such litigation due to the indemnity obligations to such parties.

The Debtors submit that the fourth factor– the paramount interest of creditors – weighs heavily in favor of approval of the Plan's releases. Among other things, the substantial contributions made by the Released Parties in connection with the Chapter 11 Cases have resulted in the preservation of the Debtors' enterprise value during the Chapter 11 Cases and the proposal of the Plan, which provides for the reorganization of the Debtors' businesses with an enterprise value in excess of any presently available viable alternatives. In order for the Debtors to have been in a position to formulate and propose the Plan, the Debtors' required the initial capital infusion provided by the DIP Lenders that the Debtors needed to operate in the initial stages of the Chapter 11 Cases, and to consummate and implement the Plan, the Debtors will require the $100 million provided under the Senior Secured Notes that the Backstop Purchasers agreed to backstop in connection with the Senior Secured Notes Offering. The Plan, which the releases are an integral part of, is a compromise supported by the Released Parties and the distributions available to creditors and equity interest holders are themselves, a result of that compromise. Moreover, each of the Debtors, their directors, officers, employees and advisors,

with the assistance of the Creditors Committee, have focused their efforts on stabilizing and

streamlining the Debtors' businesses through increased performance and reduced costs. Further,

the Debtors, the Creditors Committee and their affiliated parties were instrumental in negotiating

with the DIP Lenders and the Backstop Purchasers over the terms of the financing extended to

the Debtors during the Chapter 11 Cases, the Exit Financing and the Plan itself. Indeed, the

cumulative benefits provided to the Debtors and their estates by the Released Parties during the

Chapter 11 Cases will continue to redound to the Debtors' unsecured creditors as substantial

owners of the Debtors post-emergence. Accordingly, the Debtors submit that approval of the

releases provided for in Article VII(I) of the Plan is appropriate under section 1123(b)(3)(A) of

the Bankruptcy Code and Bankruptcy Rule 9019.

While the Plan provides that, as of the Effective Date, the Debtors shall release

certain claims, rights and causes of action arising prior to the Effective Date that the Debtors

may have against the Released Parties, similar to releases commonly granted in other chapter 11

cases, the Plan does not include non-consensual, third-party releases of claims against the

Released Parties. Instead, Article VII(J) of the Plan provides for the grant of third-party releases

only by parties who actually vote to accept the Plan and who do not opt out of the third-party

release by marking their ballot with such election to opt out. *See In re Zenith Elecs. Corp.,* 241

B.R. 92, 111 (Bankr. D. Del. 1999) (holding that third-party releases that allow a party to

withhold consent to granting the release are permissible); *In re Arrowmill Development Corp.,*

211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that releases consented to under a plan are

binding contractual arrangements). Consensual third party releases are commonly approved in

this District. *See, e.g. In re Blue Tulip Corporation,* Case No. 09-10015 (KG) (Bankr. D. Del.

June 4, 2009); *In re Buffets Holdings, Inc.,* Case No. 08-10141(MFW) (Bankr. D. Del Apr. 17,

2009); *In re Mrs. Fields' Original Cookies, Inc.*, Case No. 08-11953 (PJW) (Bankr. D. Del. October 2, 2008); *In re Nellson Nutraceutical, Inc.*, Case No. 06-10072 (CSS) (Bankr. D. Del. September 10, 2008); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008). Accordingly, the Debtors submit that the consensual releases granted by third-parties under Article VII(J) of the Plan should be approved.

Additionally, Article VII(K)(1) of the Plan is an exculpation provision benefiting the Released Parties, which expressly excludes any acts that constitute willful misconduct or gross negligence and is consistent with the exculpation clause approved in *In re PWS Holding Corp.*, 228 F.3d 224. Accordingly, the exculpation provision of the Plan is appropriate and should be approved. Finally, Article VII(K)(2) of the Plan is an injunction provision relating to, and necessary to implementing the release and exculpation provisions of the Plan and should be approved.[17]

The Plan also proposes to merge and substantively consolidate ARE LLC, whose primary assets are direct or indirect ownership interests in each of the other Subsidiaries, into ARE Holdings, whose primary assets are 100% of the ownership interest in ARE LLC and interests in certain insurance policies. In essence, the Plan proposes to merge and consolidate these two holding companies into one holding company, which will be owned by the Debtors' existing creditors and the participants in the Senior Secured Notes Offering. The Debtors believe that such substantive consolidation is fair, appropriate and necessary and should be approved.

---

[17] Further, Articles VII(F)(4), (5), (9), (10) and (11) of the Disclosure Statement, along with Articles VII(D), (E), (I), (J) and (K) of the Plan, comply with the requirements of Bankruptcy Rule 3016(c) that "the plan and disclosure statement shall describe in specific and conspicuous language (bold, italics, or underlined text) all acts to be enjoined and entities that would be subject to the injunction." The Disclosure Statement states in bold letters all acts to be enjoined and identifies all entities that would be subject to the injunction. The applicable release, exculpation, and injunction provisions are clearly identified in the Plan and Disclosure Statement, are displayed in bold font, and specifically identify all acts to be enjoined and identifies all entities that would be subject to the injunction.

Although the power to substantively consolidate bankruptcy estates is not explicitly authorized by any provision of the Bankruptcy Code, it is well established that bankruptcy courts may use their equitable powers under section 105 of the Bankruptcy Code to consolidate cases involving related debtors. *See e.g., Eastgroup Props. v. Southern Motel Assoc.*, 935 F.2d 245, 248 (11th Cir. 1991); *In re Stone & Webster, Inc.*, 286 B.R. 532, 539 (Bankr. D. Del. 2002); *In re Leslie Fay Cos.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); *Bruce Energy Ctr. Ltd. V. Orfa Corp. of Am. (In re Orfa Corp. of Phila.)*, 129 B.R. 404, 413-14 (Bankr. E.D. Pa. 1991) ("the court's power to substantively consolidate cases is derived from its general equitable powers under 11 U.S.C. § 105").

The Third Circuit in *In re Owens Corning* held that the criteria utilized to permit substantive consolidation, absent consent of the parties, include pre-petition disregard of corporate separateness or post-petition scrambling of assets and liabilities. *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) ("Substantive consolidation … emanates from equity [and] 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities'") (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005)).

As an initial matter, no party has interposed an objection to the merger and substantive consolidation of ARE LLC into ARE Holdings. Indeed, section 1123(a)(5)(B) of the Bankruptcy Code expressly contemplates plan provisions that provide for a merger or consolidation of the debtor with one or more persons as a means for the implementation of Chapter 11 plan. *See* 11 U.S.C. § 1123(a)(5)(B). The Debtors believe that the merger and consolidation of ARE LLC into ARE Holdings is appropriate, because ARE LLC's continued corporate existence is no longer necessary in the context of the Debtors' proposed restructuring.

DB02:9285601.1

068125.1001

Accordingly, the Debtors have determined, in their business judgment to merge ARE LLC into ARE Holdings.

The Debtors do not believe that parties will be prejudiced by the proposed merger and substantive consolidation of ARE LLC into ARE Holdings. ARE LLC and ARE Holdings have essentially the same assets – direct or indirect ownership interests in the Debtor-entities with actual business operations: ARE Inc., ARE – Mt. Vernon, ARE – Aurora West, Aventine Power and NELLC. Further, the only parties with significant, valid claims against ARE LLC also assert those same claims against ARE Holdings (as well as some or all of the other Debtors), including the holders of Prepetition Secured Credit Facility Claims and Prepetition Unsecured Notes Claims. Accordingly, holders of Claims against ARE LLC and ARE Holdings will not be significantly affected by the substantive consolidation proposed under the Plan. Additional facts support a substantial identity between ARE Holdings and ARE LLC, including, among other things, (a) the entities shared the same corporate office, located in Pekin, Illinois; (b) the entities had substantially the same corporate officers; (c) the entities issued financial statements on a consolidated basis, with the other Debtors; (d) the entities file joint (consolidated) federal income tax returns, with the other Debtors; and (e) the entities were part of a consolidated cash and treasury management system, with the other Debtors.

Section 1123(a)(5)(B) of the Bankruptcy Code expressly contemplates plan provisions that provide for a merger or consolidation of the debtor with one or more persons as a means for the implementation of Chapter 11 plan. The Debtors submit that the merger and substantive consolidation of ARE LLC into ARE Holdings is appropriate, will allow the Debtors to emerge from the Chapter 11 Cases as a more streamlined operation and, accordingly, should be approved.

20

## 2. The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent comply with the applicable provisions of title 11. A principal purpose of section 1129(a)(2) is to ensure that qualified proponents have complied with the requirements of the Bankruptcy Code and Bankruptcy Rules regarding disclosure and the solicitation of acceptances of a plan of reorganization. *See* H.R. Rep. No. 95-595, 1st Sess. at 412 (1977). In determining whether a plan proponent has complied with this section, courts focus on whether the disclosure and solicitation requirements of sections 1125 and 1126 have been adhered to. *See In re PWS Holding Corp.*, 228 F.3d. 224, 248 (3d Cir. 2000); *In re Resorts Int'l Inc.*, 145 B.R. 412, 468 (Bankr. D.N.J. 1990) (applying section 1129(a)(2) only to disclosure requirements of Bankruptcy Code).

The Debtors have complied with the provisions of sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 regarding the Disclosure Statement and Plan Solicitation. Accordingly, the requirements of section 1129(a)(2) have been satisfied. *See In re Drexel Burnham Lambert Group Inc.,* 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (Section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to plan).

## 3. The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law (Section 1129(a)(3)).

Section 1129(a)(3) of the Bankruptcy Code requires a plan to have been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. §1129(a)(3). "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr.

D. Del. 2001) (citations omitted). In determining whether a plan has been proposed in good faith, courts have recognized that they should avoid applying any hard and inflexible rules, but should instead evaluate each case on its own merits. *See In re Century Glove*, Civ. No. 90-400-SLR, 1993 WL 239489 at *4 (D. Del. Feb. 10, 1993) (good faith should be evaluated in light of the totality of circumstances surrounding confirmation); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (same).

The Debtors proposed the Plan in good faith and not by any means forbidden by law. The Plan itself, the process leading to its formulation, including, but not limited to the robust marketing process employed by the Debtors and their advisors, and the overwhelming support for the Plan received from impaired Classes of Claims provides independent evidence of the Debtors' good faith. The Debtors and their directors, officers, employees, agents, affiliates and professionals (acting in such capacity) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, thereby satisfying the "good faith" requirement of section 1129(a)(3). Further, the evidence to be presented at the Confirmation Hearing will demonstrate that the treatment of the holders of Claims and Equity Interests under the Plan was proposed in good faith, is fair and equitable, and is supported by a valuation of the Debtors' that is consistent with accepted valuation methodologies and substantiated by an extensive dual-track marketing process designed to solicit interest from parties regarding potential sale or financing transactions. The Plan was negotiated heavily with the Creditors Committee who was advised by its financial advisors, Jefferies & Company ("Jefferies") and its counsel, Greenberg Traurig, LLP. It is the Debtors' understanding that the Creditors Committee concurs with the Debtors' valuation of the Reorganized Debtors. Finally, the Debtors believe that the allegations raised by

DB02:9285601.1
068125.1001

certain of the Dissenting Shareholders regarding any alleged conflict of interests of the Debtors' financial advisors, which are addressed below, are wholly without merit.

### 4. The Plan Provides That Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval (Section 1129(a)(4)).

Section 1129(a)(4) of the Bankruptcy Code provides that the Court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, [or] by the debtor, . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." In other words, the debtor must disclose to the Court all professional fees and expenses, and such fees and expenses must be subject to Court approval. *In re Texaco, Inc.*, 85 B.R. 934, 939 (Bankr. S.D.N.Y. 1988). Fees incurred and requested to be paid by the Debtors' and Committee's professionals thus far in the Chapter 11 Cases have been fully disclosed. These fees have been subject to objections by interested parties as well as to Court review and approval. The award of final fees payable to the Debtors' and the Creditors Committee's professionals is also subject to the fee application process and Court approval. Thus, the Plan complies with Section 1129(a)(4).

### 5. The Debtors Will Have Disclosed All Necessary Information Regarding Directors, Officers and Insiders (Section 1129(a)(5)).

Section 1129(a)(5) of the Bankruptcy Code contains three requirements. First, pursuant to section 1129(a)(5)(A)(i), the proponent of a plan must disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director [or] officer. . . [of] a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A)(i). The method for selecting each of the persons who will serve as directors and officers of Reorganized ARE Holdings and the Reorganized Subsidiaries is discussed in Article V(D) of the Plan. The identities of the parties to serve as directors and officers of the Reorganized Debtors after the

Effective Date were set forth in the Plan Supplement, and the Debtors' current officers and directors will remain in office until the Effective Date.

Second, section 1129(a)(5)(A)(ii) requires that the appointment or continuance in office of each director or officer must be "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(ii). Pursuant to the Plan, the initial board of directors of Reorganized ARE Holdings shall be a five-member board comprised of four directors designated by the Majority Backstop Purchasers and the Chief Executive Officer of the Reorganized Debtors. The initial boards of directors of the Reorganized Subsidiaries, shall be composed of one to five members of the New Board appointed by the Majority Backstop Purchasers. Because the Backstop Purchasers will hold a controlling portion of the equity in the Reorganized Debtors, comprised of the equity distributed on account of their Prepetition Unsecured Notes Claims and on account of their participation in and backstopping the Senior Secured Notes Offering, the Debtors believe that it is appropriate under the circumstances for these parties to select the directors for the Reorganized Debtors. The Debtors do not believe that the manner of selection of the officer and directors of the Reorganized Debtors is inconsistent with the interest of the creditors and equity holders or with public policy, and, as noted above, no party has raised such objection.

Third, section 1129(a)(5)(B) requires that the plan proponent disclose "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." 11 U.S.C. § 1129(a)(5)(B). "Insider," in the case of a corporation, is defined under section 101(31)(B) of the Bankruptcy Code. Certain of the Debtors' current officers will remain employed by the Reorganized Debtors after the Effective Date. Other than Mr. Daniel Trunfio and Mr. Christopher Nichols, the insiders of the Debtors as

identified in the Plan Supplement that will be employed or retained by the Reorganized Debtors after the Effective Date will continue to receive the same compensation and benefits that such individuals received during the chapter 11 cases and may be entitled to participate in the Management Incentive Plan as set forth in the Plan. Mr. Trunfio and Mr. Nichols are finalizing the terms of consulting agreements that will govern their respective relationship with the Reorganized Debtors. The Debtors will disclose the terms of their compensation under the respective consulting agreements prior to or at the Confirmation Hearing. Accordingly, the Plan satisfies the requirement of section 1129(a)(5) of the Bankruptcy Code.

6. **The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission (Section 1129(a)(6)).**

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its business approve any rate change provided for in the plan. The Plan does not provide for or contemplate any rate change that would require the approval of any regulatory agency. Accordingly, section 1129(a)(6) is inapplicable in the instant case.

7. **The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).**

The "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in an impaired class either accept the plan or receive or retain property that is not worth less, as of the effective date of the plan, than the amount that such holder of the claim or interest would receive or retain if the debtor were liquidated under chapter 7. 11 U.S.C. § 1129(a)(7). With respect to Claims in Classes 1(a)-(f) (Other Priority Claims), 3(a)-(f) (Other Secured Claims), 4(a) (Kiewit Mt. Vernon Secured Claim) and 8(a)-(f) (Intercompany Claims), section 1129(a)(7) is not implicated because the creditors in these Classes are unimpaired. Claims and Interests in Classes 2(a)-(f) (Prepetition

Secured Credit Facility Claims), 4(b) (Kiewit Aurora West Secured Claim), 5(a)-(f) (Prepetition

Unsecured Notes Claims), 6(a)-(f) (General Unsecured Claims), 7(a)-(f) (Convenience Claims)

and 9(a)-(f) (Equity Interests) are impaired under the Plan, and the "best interests test" must be

applied.

Under the Plan, the Debtors believe that holders of Prepetition Secured Credit

Facility Claims, Other Secured Claims and the Kiewit Aurora West Secured Claim will receive a

recovery of 100% of the Allowed amount of their claims; holders of Prepetition Unsecured Notes

Claims and General Unsecured Claims will receive from the applicable Debtor(s) between 35%

(the high range of recoveries, with respect to Claims against ARE Inc.) and less than 1% (the low

range of recoveries, with respect to Claims against Consolidated Holdings, ARE – Aurora West

and Aventine Power), depending on which Debtor the Claim is asserted against; holders of

Convenience Class Claims will receive 35% of the Allowed amount of such Claim; and holders

of Equity Interests in ARE Holdings will receive the Warrants. *See* Disclosure Statement, at

Article II.  Holders of Equity Interest in the Subsidiaries will receive no distributions on account

of such interests.  *See Id.*

The Disclosure Statement contains a detailed liquidation analysis (the

"Liquidation Analysis"), which is set forth in Exhibit E to the Disclosure Statement.  The

Liquidation Analysis assumes that Prepetition Secured Credit Facility Claims will be satisfied in

full and that approximately all administrative and priority claims will be satisfied in full.  As set

forth in the Liquidation Analysis, in a liquidation of the Debtors' assets, however, the holders of

mechanics liens and other similar secured claims against the Debtors, including those classified

under the Plan as Other Secured Claims, the Kiewit Aurora West Secured Claim and the Kiewit

Mt. Vernon Secured Claim (which is currently unimpaired under the Plan), would likely receive

less than full payment, depending on which Debtor the claim was asserted against and the ultimate value obtained from liquidating the collateral securing such claims. *See* Disclosure Statement, <u>Exhibit E</u>. Holders of unsecured claims (including those classified as Prepetition Unsecured Notes Claims, General Unsecured Claims, and Convenience Class Claims under the Plan) would receive a recovery estimated to be 16-22% for claims against ARE Inc., 4-6% for claims against NELLC, and no recovery for Claims against the remaining Debtors. *See* Disclosure Statement, <u>Exhibit E</u>. Finally, the Liquidation Analysis shows that holders of existing Equity Interests in the Debtors, including shareholders of ARE Holdings, would receive nothing if the Debtors were liquidated under chapter 7. *See* Disclosure Statement, <u>Exhibit E</u>. Accordingly, the Debtors submit that holders of Claims and Equity Interests in the Impaired Classes will not receive less under the Plan than what such holders would be entitled to receive in a Chapter 7 liquidation of the Debtors.

8. **The Plan Has Been Accepted by A Majority of Classes Entitled to Vote On the Plan; However, Certain Impaired Classes Have Either Rejected The Plan or Have Not Voted on the Plan (Section 1129(a)(8)).**

Subject to the exceptions identified in section 1129(b) of the Bankruptcy Code, section 1129(a)(8) requires that each class of claims and interests either has accepted the Plan or is not impaired under the Plan. A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan. 11 U.S.C. § 1126(c). A class of interests accepts a plan if the holders of at least two-thirds in amount of the interests in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan. 11 U.S.C. § 1126(d).

It is undisputed that Class 1 (Other Priority Claims), Class 3 (Other Secured Claims), Class 4(a) (Kiewit Mt. Vernon Secured Claim) and Class 8 (Intercompany Claims) are

unimpaired under the Plan and therefore are deemed to have accepted the Plan. 11 U.S.C. § 1126(f). Further, the Empty Classes have no members. Based on the voting results provided by GCG to the Debtors after the Voting Deadline, Classes 2(a)-(f) (Prepetition Secured Credit Facility Claims), Class 4(b) (Kiewit Aurora West Secured Claims), Classes 5(a)-(f) (Prepetition Unsecured Note Claims), Classes 6(a)-(c) and (f) (General Unsecured Claims), and Classes 7(a)-(c) and (f) (Convenience Claims) have voted to accept the Plan within the meaning of section 1126 of the Bankruptcy Code.

GCG has advised the Debtors that no votes to accept or reject the Plan were submitted by the holders of Claims in Classes 6(d) and 7(d).[18] GCG has also advised the Debtors that holders of Equity Interests in Class 9(a) have voted to reject the Plan. The holders of Equity Interests in Classes 9(b)-(f), who receive no distributions under the Plan, were deemed to have rejected the Plan. 11 U.S.C. § 1126(g); *In re PWS Holding Corp.*, 228 F.3d at 231-232. Since the Plan does not satisfy the acceptance requirements of section 1129(a)(8), it must be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code , which requires that a plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. As demonstrated in Section III.B below, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to each of the non-accepting Classes..

### 9. The Plan Provides for the Payment in Full of All Allowed Priority Claims (Section 1129 (a)(9)).

Under section1129(a)(9) of the Bankruptcy Code, unless otherwise agreed, a plan must provide that:

---

[18] It is not surprising that the Abstaining Classes did not vote on the Plan. Class 6(d) has four members, three of which have asserted claims on account of contracts the Debtors will likely assume. Class 7(d), likewise, has a relatively small number of creditors with claims are primarily of *de minimis* amount.

A. the holder of a claim entitled to priority under Section 507(a)(2) or (3) will receive cash for the allowed amount of the claims on the effective date of the plan;

B. the holder of a claim entitled to priority under Section 507(a)(1), (4), (5), (6) or (7) will receive either deferred cash payments for the allowed amount, or cash for the allowed amount of the claim on the effective date of the plan; and

C. the holder of a tax claim entitled to priority under Section 507(a)(8) will receive regular installment payments in cash (i) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and, (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

D. the holder of a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, will receive cash payments on account of that claim in the same manner and over the same period as described above in subparagraph (C).

Article III(A) of the Plan provides that each Holder of an Allowed Administrative Claim of the kind specified in section 507(a)(2) of the Bankruptcy Code [19] shall receive on (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim shall receive from the Debtor against which such Allowed Administrative Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (A) Cash of the applicable Debtor against which such Administrative Claim is Allowed equal to the unpaid portion of such Allowed Administrative Claim, or (B) such less favorable treatment to which such Debtor or Reorganized Debtor and the holder of such

---

[19] The Debtors cases were commenced voluntarily; therefore, no claims exist under section 507(a)(3) of the Bankruptcy Code.

DB02:9285601.1 068125.1001

Allowed Administrative Claim shall have agreed upon in writing; *provided, however*, that Allowed Ordinary Course Administrative Claims shall be paid in the ordinary course of business of the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing or relating thereto. The Plan therefore satisfies the requirements of section1129(a)(9)(A).

With respect to Other Priority Claims, Article IV(A) of the Plan provides that, on (i) the Initial Distribution Date, if an Other Priority Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Other Priority Claim becomes Allowed, each holder of an Allowed Other Priority Claim in Classes 1(a) through 1(f) shall receive from the Debtor against which such Allowed Other Priority Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Other Priority Claim, (A) Cash equal to the amount of such Allowed Other Priority Claim or (B) such less favorable treatment as to which such Debtor or Reorganized Debtor and the holder of such Allowed Other Priority Claim have agreed upon in writing. The Plan therefore satisfies the requirements of section 1129(a)(9)(B).

Article III(E) of the Plan provides that, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim shall receive from the Debtor against which such Allowed Priority Tax Claim is held, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of the Debtor against which such Priority Tax Claim is Allowed equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtor or Reorganized Debtor, and the holder of such Allowed Priority Tax Claim shall

have agreed upon in writing; or (C) at the option of the Reorganized Debtors, Cash of the applicable Debtor in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. This provision satisfies the requirements of section 1129(a)(9)(C).

To the extent that any Other Secured Claim is also entitled to treatment as a Priority Tax Claims, the Debtors believes that the treatment afforded to Other Secured Claims[20] is consistent with the treatment proscribed by section 1129(a)(9)(C) of the Bankruptcy Code. Thus the Debtors believe that the Plan satisfies section 1129(a)(9)(D).

### 10. At Least One Class of Impaired Claims has Accepted the Plan (Section 1129 (a)(10)).

Section 1129(a)(10) of the Bankruptcy Code requires at least one class of impaired claims to accept the Plan, not counting the votes of any insiders. All impaired Classes of Claims entitled to vote on the Plan – other than the Abstaining Classes and the Empty Classes – voted to accept the Plan, and at least one impaired Class of Claims for each of the Debtors has

---

[20] Under the Plan, Other Secured Claims shall receive, except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a different treatment, at the option of the applicable Debtor against which such Allowed Other Secured Claim is held (subject to the consent of the Majority Backstop Purchasers), in full and final satisfaction of such claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Claim is held, Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of (a) the Initial Distribution Date, or (b) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim., or (iii) each holder of an Allowed Other Secured Claim shall receive from the applicable Debtor against which such Allowed Other Secured Claim is held, the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of (y) the Initial Distribution Date, or (z) the first Quarterly Distribution date following the date on which such Claim becomes an Allowed Claim.

DB02:9285601.1                    068125.1001

accepted the Plan, not counting the votes of any insiders. The Plan therefore meets the requirements of section 1129(a)(10).

### 11. The Plan Meets the Feasibility Requirement of Bankruptcy Code Section 1129(a)(11).

Section 1129(a)(11) of the Bankruptcy Code requires as a condition to confirming a plan of reorganization that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). In interpreting the requirements of section 1129(a)(11), courts have found the language of the statute to be "sufficiently broad so as to have provided a great deal of latitude to Courts interpreting its provisions." *In re Eddington Thread Mfg., Co., Inc.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995). The courts have also universally interpreted the statute to mean that a debtor need only demonstrate a reasonable assurance of commercial viability, and the court need not require a guarantee of success in order to find that a plan satisfies the feasibility requirement. *See e.g., In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1165-66 (5th Cir. 1993); *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D. N.J. 2000); *Corestates Bank, N.A. v. United Chem. Tech., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).

While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence – proof that a given fact is "more likely than not." *In re Briscoe Enters., Ltd.*, 994 F.2d at 1164; *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 802; *Corestates Bank, N.A.*, 202 B.R. at 45. Further, a number of courts have held that this constitutes "a relatively low threshold of proof." *In re Eddington Thread Mfg. Co.*, 181 B.R. at 833; *In re Mayer Pollack Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that

the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking. . ."); *see also In re Briscoe Enters. Ltd.*, 944 F.2d at 1116 (upholding the bankruptcy court's ruling that a reorganization that had only "'a marginal prospect of success'" was feasible because only "a reasonable assurance of commercial viability" was required). The courts have also made clear that "speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds." *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at *170 (Bankr. S.D.N.Y. 2003).

a.  *The Plan Satisfies the Factors Examined to Determine Feasibility.*

The courts have fashioned a series of factors to be considered in the determination of whether a debtor's plan is feasible. These factors, while varying from case to case, traditionally include: the adequacy of the debtor's capital structure, the earning power of its business, economic conditions, the ability of the debtor's management, the probability of the continuation of the same management, and other related matters affecting successful performance under the provisions of the plan. *See, e.g., In re Prussia Assocs.*, 322 B.R. at 584; *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 226-27; *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible). Importantly, none of the objecting parties has challenged the feasibility of the Plan. As the record of the Chapter 11 Cases to date has shown and the evidence to be presented at the Confirmation Hearing will show, the Plan satisfies each of the factors courts consider in determining whether a plan of reorganization is feasible.

Upon emergence from bankruptcy, the Debtors will have deleveraged their balance sheet significantly by converting their Prepetition Unsecured Notes, the claims relating to which are Allowed under the Plan in the amount of $315.5 million,, and existing trade debt into equity in the Reorganized Debtors or, with respect to Convenience Class Claims, cash

payments made under the Plan. The Reorganized Debtors will have a balance sheet at emergence with $105 million in secured debt in connection with the issuance of the Senior Secured Notes, approximately $5.3 million of non-recourse secured debt at ARE-Aurora West on account of the Kiewit Note, and up to an additional $20 million of secured borrowing available under the ABL Credit Facility (there will be no borrowing under the ABL Credit Facility at emergence, although a significant portion of the availability will be reserved for letters of credit). The Debtors' available liquidity at emergence will satisfy the Reorganized Debtors' working capital needs, and the Debtors believe that the Reorganized Debtors will have sufficient capital availability to complete construction of the partially completed ethanol facilities in Mt. Vernon, Indiana and Aurora, Nebraska.

Further, the Debtors have successfully stabilized their businesses and reduced operating costs throughout the Chapter 11 Cases, which has improved the Debtors' overall financial health and performance. As set forth in Exhibit D to the Disclosure Statement, the financial projections for the Reorganized Debtors' annual performance through the end of calendar year, 2014, show that the Reorganized Debtors anticipate operating at EBITDAR positive levels year-to-year post-emergence. The Debtors' financial projections, which are based on reasonable assumptions, historical data and trends in the ethanol industry, and appropriate risk factors, and future business plans support the conclusion that the Reorganized Debtors' will be able to meet their financial obligations while maintaining sufficient liquidity and capital resources.

In sum, no party has objected to the feasibility of the Plan, and the Debtors will establish at the Confirmation Hearing that the Plan meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

DB02:9285601.1

068125.1001

**12. All Statutory Fees Have Been or Will be Paid (Section 1129(a)(12)).**

Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan only if "[a]ll fees payable under § 1930 of Title 28, as determined by the court at the hearing on confirmation of the Plan have been paid or the plan provides for the payment of all such fees on the effective date of the plan." Article IX(A) of the Plan provides for the payment by the Reorganized Debtors of any quarterly fees due to the Office of the United States Trustee. The Plan therefore meets the requirements of section 1129(a)(12).

**13. The Plan Adequately and Properly Treats Retiree Benefits (Section 1129 (a)(13)).**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continued payment of certain retiree benefits "for the duration of the period that the debtor has obligated itself to provide such benefits." Article XI of the Plan provides that the Reorganized Debtors will assume certain employee related agreements, policies, programs, and plans, including agreements and programs, if any, subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date. Therefore, the Plan meets the requirements of section 1129(a)(13).

**B. _Section 1129(b) Requirements_**

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests. Section 1129(b)(1) provides, in pertinent part:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirements contained in section 1129(a)(8) of the Bankruptcy Code] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims and interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). This provision is referred to as "cram-down."

The holders of Equity Interests either voted to reject the Plan, in the case of Class 9(a), or were deemed to reject the Plan, in the case of Classes 9(b)-(f); thus, the Debtors must pursue confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code in order to "cram down" the Plan on such Classes. Additionally, since the Abstaining Classes did not accept the Plan (although they also did not reject the Plan), they must also be crammed down. The Plan can be confirmed notwithstanding the failure of these Classes to vote to accept the Plan so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to those Classes.

1. **The Plan complies with Section 1129(b)(1) because it does not discriminate unfairly against holders of Claims and Equity Interests in rejecting Classes.**

The section 1129(b)(1) requirement that a plan not discriminate unfairly against impaired, dissenting classes focuses on the treatment of the dissenting class relative to other classes consisting of similar legal rights. *See* H.R. REP. NO. 95-595, at 416-417 (1977) ("The plan may be confirmed. . . if the class is not unfairly discriminated against with respect to equal classes if junior classes will receive nothing under the plan. . . ."); *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 62 (Bankr. S.D.N.Y 1990) (same). Moreover, section 1129(b)(1) does not prohibit discrimination among classes; it prohibits only discrimination that is "unfair" with respect to the class or classes that do not accept the plan. *In re 11,111, Inc.*, 117 B.R. 471,478 (Bankr. D. Minn. 1990). As such, a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if classes comprising similarly situated claims or interests receive treatment under the plan that is not equivalent, and there is no reasonable basis for the disparate treatment. *See, e.g., In re Kennedy*, 158 B.R. 589, 599 (Bankr. D. N.J. 199); *In re Resorts Int'l*, 145 B.R. 412, 481 (Bankr. D. N.J. 1990).

### a. *Unsecured Claims are appropriately classified and there is no unfair discrimination*

The Plan established three classes of unsecured claims for each Debtor: Class 5, which is comprised of claims arising under or related to the Prepetition Unsecured Notes and the Prepetition Indenture, Class 6, which is comprised of all other non-priority unsecured claims over $50,000, and Class 7 which is comprised of all other non-priority unsecured claims equal to or below $50,000. A reasonable basis exists for the separate classifications of unsecured claims. With respect to Class 5, the Prepetition Unsecured Notes Claims are materially distinct from the Debtors' other unsecured claims. Among other things, each of these claims is based on loaned funds and not trade debt, the Prepetition Unsecured Notes Claims are governed by and subject to the Prepetition Indenture and the obligations under the Prepetition Indenture are guaranteed by each of the Debtors. The Debtors' other unsecured claims do not share these characteristics and, accordingly, a reasonable basis exists for separately classifying the Prepetition Unsecured Notes Claims from other unsecured claims. Notwithstanding the separate classification between Classes 5 and 6 for each Debtor, there is no discrimination because holders of claims in Class 5 and Class 6 are entitled to receive a pro-rata distribution from the same Unsecured Claims Stock Pool allocable to each Debtor. Additionally, the bifurcation of unsecured claims that are not Prepetition Unsecured Notes Claims into Class 6 and Class 7, which is a convenience class, is authorized by section 1122(b) of the Bankruptcy Code.[21] Accordingly, there is no "unfair discrimination" with respect to the Abstaining Classes which did not vote to accept the Plan.

---

[21] Section 1122(b) provided that "a plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b).

### b. Equity Interests are appropriately classified and there is no unfair discrimination

Classes 9(a)-(f) consist of Equity Interests in the Debtors. The legal rights of the holders of the Equity Interests in Classes 9(a)-(f) are unique with respect to each Debtor that issued such Equity Interests. Given the unique legal rights and characteristics of the Equity Interests asserted against each of the Debtors, section 1129(b) can only require that the Equity Interest with respect to a particular Debtor receive the same treatment as other Equity Interest with respect to that Debtor. Each of the Equity Interests in a particular Debtor receive the same treatment; thus, this requirement simply does not come into play with respect to the dissenting Classes 9(a)-(f). Accordingly, the Equity Interests are appropriately classified, and the Plan does not discriminate unfairly with respect Classes 9(a)-(f).

### 2. The Plan complies with Section 1129(b)(1) because it is fair and equitable with respect to holders of Claims And Equity Interests in rejecting Classes.

Under section 1129(b)(2)(C)(ii), a plan is fair and equitable with respect to a dissenting class of interests if no class junior to such class receives or retains any property under the plan. 11 U.S.C. § 1129(b)(2)(C)(ii); *see also In Armstrong World Industries, Inc.,* 432 F.3d 507, 513 (3d Cir. 2000) ("The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired[.]"); *In re Union Meeting Partners,* 165 B.R. 553, 569 (Bankr. E.D. Pa. 1994) (a plan is not fair and equitable if it violates the "absolute priority rule").

### a. The Plan is fair and equitable with respect to the Abstaining Classes

None of the holders of Claims in the Abstaining Classes submitted ballots to accept or reject the Plan. However, the only class junior to the Abstaining Classes at ARE – Mt. Vernon are Equity Interests, which are not receiving any distribution under the Plan on account

of their existing Equity Interests. Accordingly, the Plan is fair and equitable as to the Abstaining Classes.

### b. *The Plan is fair and equitable with respect to the Equity Interests*

With respect to each Debtor, the most junior class is Class 9, which consists of Equity Interests in the applicable Debtor. Based on the Debtors' valuation, no Class of Equity Interests in the Debtors is entitled to a distribution. Nonetheless, the Plan provides for a distribution of the out-of-the-money Warrants to Class 9(a). Since no senior Class of Consolidated Holdings has voted to reject the Plan, Class 9(a) will receive the Warrants notwithstanding the fact that it is not entitled to any distribution under the Plan. Because there are no classes junior to the existing Equity Interests in the Debtors that will receive any distributions under the Plan, the Plan satisfies the "fair and equitable" standard under section 1129(b) of the Bankruptcy Code with respect to such Classes.

### 3. No Claim in Classes 2(a) through 7(a) receives more than the Allowed amount of its Claim

The Dissenting Shareholders argue that even though the requirements of section 1129(b) have been met, the Plan is not fair and equitable with respect to Class 9(a). The Dissenting Shareholders contend, relying on *In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003) that the plan is not "fair and equitable" because Classes senior to Class 9(a) receive a distribution of more than 100% of their claims.

Simply put, based on the Debtors' well reasoned, reasonable and supported projections, the Debtors believe that the valuations and calculations suggested by the Dissenting Shareholders are fundamentally flawed and that, based upon the valuation prepared by the Debtors' financial advisors, the holders of Equity Interest in ARE Holdings are well out-of-the-money. The Debtors' valuation was prepared by the Debtors' financial advisors in accordance

with accepted valuation methodologies and relies on reasonable and fair assumptions regarding the Debtors, their future business operations and the industry within which the Debtors operate. Moreover, the Debtors' valuation has been substantiated and confirmed by the results of the Debtors' marketing efforts. Upon information and belief, Jefferies, the Creditors Committee's financial advisor, agrees that the enterprise value of the Debtors is within the range of enterprise values determined by the Debtors. Both the Debtors and the Creditors Committee's valuations are substantially less than the level needed to justify any distribution to Class 9(a) – who nonetheless are being provided the Warrants under the Plan. In fact, the enterprise value of the Debtors would need to be more than twice the value determined by the Debtors' financial advisor before holders of Class 9(a) Equity Interests would be entitled to any recovery in these cases. The Debtors will demonstrate based upon the evidence to be presented at the Confirmation Hearing that the valuation figures and calculations suggested by the Dissenting Shareholders in their objections are fundamentally flawed and that the value of the Debtors is substantially less than the amount required for Equity Interests in Class 9(a)to be entitled to any recovery in the Chapter 11 Cases.

As demonstrated above, the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the nonaccepting Classes, and, therefore, in accordance with sections 1129(a) and (b) of the Bankruptcy Code, this Court should confirm the Plan.

## III.    ALL OBJECTIONS, TO THE EXTENT NOT RESOLVED, SHOULD BE OVERRULED

### A.    *The Dissenting Shareholders' Objections*

The Dissenting Shareholders have essentially advanced two arguments. First, they argue that the Plan should not be confirmed because the Plan is not fair and equitable

because Creditors impermissibly receive more than 100% of their Claims under the Plan while holders of Class 9(a) Equity Interests receive nothing but the Warrants. Second, they argue that the Plan was not proposed in good faith based upon their allegations that the Debtors' financial advisor, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), has a conflict of interest. Both of these arguments are legally and factually unsupported and without merit and therefore should be overruled.

1. ***The Plan's Valuation is accurate and Equity Interest are not entitled to a distribution.***

The Dissenting Shareholders' first and fundamental argument is that the Debtors' enterprise value supports a distribution to Equity Interests in Class 9(a). As the evidence presented at the Confirmation Hearing will demonstrate and as discussed above, the Debtors' enterprise value is insufficient to entitle Equity Interests to any distributions, and, in actuality, Equity Interests are significantly out-of-the-money. The valuation analysis asserted by the Dissenting Shareholders do not conform to the accepted valuation methods and therefore are flawed and fail to take into account realistic and appropriate assumptions regarding the Debtors' future operations and factors affecting the ethanol industry. On the other hand, the valuation prepared by the Debtors' financial advisors is based on accepted valuation methodologies and formulated from reasonable and appropriate assumptions about the Debtors and the ethanol industry. Moreover, the Debtors' have subjected the Plan, both prior to and after its filing, to a marketing process that has not produced any proposal that provides greater value than proposed in the Plan, let alone a valuation that would entitle Class 9(a) Equity Interests to any recovery. The Debtors submit that the evidence to be presented at the Confirmation Hearing will demonstrate that the Dissenting Shareholders' objections with respect to the Debtors' valuation should be overruled.

## 2. There Is No Conflict Of Interest and the Plan was Proposed in Good Faith

Mr. Welsh has asserted, and Mr. Shirley appears to have adopted, that Houlihan Lokey has a "perceived conflict-of-interest" that prevents the Debtors from satisfying section 1129(a)(3) of the Bankruptcy Code. Specifically, Mr. Welsh asserts that Houlihan Lokey has relationships with Whitebox Advisors ("Whitebox") and Brigade Capital Management ("Brigade"), who are holders of Prepetition Unsecured Notes, DIP Lenders and Backstop Purchasers in the Chapter 11 Cases, that create a potential conflict of interest. However, Mr. Welsh has not substantiated his allegations with any actual instances where Houlihan Lokey – or any other party in the Chapter 11 Cases – has an actual conflict-of-interest or acted with anything but good faith.

On February 15, 2010, Houlihan Lokey filed the declaration of William Hardie, III, in further support of the retention of Houlihan Lokey (the "Hardie Supplemental Declaration"), a copy of which is attached hereto as Exhibit A, reaffirming that Houlihan Lokey does not represent any interest adversary to the Debtors. As set forth in the Hardie Supplemental Declaration, Houlihan Lokey's relationships with entities that may be parties in interest in these cases, including Whitebox and Brigade do not constitute a conflict of interest. The further argument advanced by Mr. Betensley that a conflict exists with respect to Houlihan Lokey and Whitebox on the basis that an executive at Houlihan Lokey, who has had no involvement with the Chapter 11 Cases, has made a charitable contribution to the same organization as an executive at Whitebox is so patently without merit and legal basis that it should be summarily denied.

The Debtors and their advisors involved in the Plan negotiations, including Houlihan Lokey, have acted in good faith in the negotiation of the Plan and the valuation of the Debtors' businesses. As discussed further above, and as the evidence to be presented at the

42

Confirmation Hearing will demonstrate, the Plan has been proposed in good faith. None of the Dissenting Shareholders has advanced any legitimate basis – legal or factual – for finding otherwise, and the Dissenting Shareholders objections should be overruled.

**B.   _The Alliance Parties' Objection_**

The Debtors intend to resolve the objection of the Alliance Parties through the inclusion of a provision in the Confirmation Order that will clarify that the injunction in Article VII(K)(2) will not effect the exercise of a valid right of set off. In addition, the Debtors and the Alliance Parties are attempting to resolve the underlying claims issues between them. If a settlement is reached, the Debtors anticipate incorporating that settlement into the Confirmation Order.

**C.   _The Debtors' Proposed Assumption of Executory Contracts and Lease and Objections Thereto_**

As of and subject to the occurrence of the Effective Date, pursuant to Article X of the Plan, each executory contract and unexpired lease that exists between a Debtor and any Person, to the extent not (i) assumed in the Chapter 11 Cases prior to the Confirmation Date, (ii) rejected in the Chapter 11 Cases prior to the Confirmation Date, or (iii) specifically rejected pursuant to the Plan, shall be specifically assumed by the Debtor that is a party to such executory contract or unexpired lease. Pursuant to the DS and Solicitation Order, on January 26, 2010, the Debtors served a notice [Docket No. 703] (the "Cure Notice") on the counterparties to all executory contracts and leases potentially subject to assumption pursuant to Article X of the Plan, identifying the specific executory contracts or unexpired leases to be assumed, the Debtors' proposed cure amount through and including December 31, 2009 (each a "Cure Amount") for such contracts and leases, and the deadline by which parties were required to object to (i) the

assumption of such contracts and leases, and/or (ii) the applicable Cure Amount. As set forth above, Aurora Co-op, Vectren and Zurich filed objections to the Cure Notice.

1. *__Aurora Cooperative__*[22]

The Aurora Co-op is a party to certain agreements with ARE Holdings, ARE – Aurora Waste and NELLC that relate to development projects at the ARE – Aurora Waste and NELLC facilities and the supply of grain thereto. Aurora Co-op has asserted an objection (the "Aurora Co-op Objection") to the Cure Notice and the Debtors' assumption of the various agreements between the Debtors and Aurora Co-op identified in the Cure Notice and the Aurora Co-op Objection. Specifically, Aurora Co-op has alleged that (i) NELLC repudiated the Grain Supply Agreement pre-petition and the Grain Supply Agreement cannot be assumed, (ii) the Cure Notice and Disclosure Statement are too vague and uncertain for Aurora Co-op to make an informed decision, (iii) to the extent agreements between the Debtors and Aurora Co-op are no longer executory, such agreements may not be assumed, (iv) certain of the agreements between the Debtors and Aurora Co-op cannot be assumed without the assumption of other agreements, and (v) the Cure Amount for assumption of the Master Development Agreement (as defined therein) must include amounts arising after December 31, 2009.

The Debtor and Aurora Co-op have discussed the assumption of the Debtors' various executory contracts with Aurora Co-op, and the Debtors believe the Aurora Co-op Objection will be resolved by the following: (i) the Debtors will assume each of their executory contracts with Aurora Co-op (the "Aurora Co-op Contracts"), pursuant to the Plan, effective as of the Effective Date; (ii) the Debtors will pay all Cure Amounts owing on account of the Aurora Co-op Contracts identified in the Cure Notice and all additional amounts that come due under the Aurora Co-op Contracts after December 31, 2009; (iii) the Reorganized Debtors will honor all

---

[22] Capitalized terms used in this section shall have the meanings ascribed to them in the Aurora Co-op Objection.

post-emergence obligations that come due under the Aurora Co-op Contract; and (iv) subject to the foregoing, Aurora Co-op will waive its arguments that the Debtors repudiated the Grain Supply Agreement.

While the Debtors believe that the Aurora Co-op Objection will be fully resolved prior to the Confirmation Hearing, the Debtors reserve their rights to respond to any of the matters raised in the Aurora Co-op Objection. Specifically, the Debtors believe that the Grain Supply Agreement was not repudiated, that the Grain Supply Agreement remains executory, and that the Debtor is able to assume the Grain Supply Agreement,[23] and the other executory contracts with Aurora Co-op, and the Debtors reserve the rights to address these arguments at the Confirmation Hearing.

## 2. *Other Objections to the Cure Notice*

The Debtors have reached an agreement, in principal, with Zurich with respect to its objection to the Cure Notice. The resolution of Zurich's objection will be incorporated in the Confirmation Order. The Debtors are continuing to work with Vectren to resolve its cure claim and believe that a consensual resolution can be reached prior to the Confirmation Hearing.

---

[23] Among other things, the Debtors do not believe that the Grain Supply Agreement was repudiated because (i) the Debtors satisfied Aurora Co-op's demand for adequate assurance when it was made, and (ii) Aurora Co-op took no action to cancel or terminate the Grain Supply Agreement prior to the Petition Date. Accordingly, the Grain Supply Agreement remains executory and subject to assumption by NELLC.

## IV.   CONCLUSION

For all of the foregoing reasons, and based upon the evidence and arguments that will be presented at the Confirmation Hearing, the Debtors respectfully request that the Court overrule the Objections and confirm the Plan.

Dated: Wilmington, Delaware
February 22, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel for the Debtors and Debtors in Possession*

# EXHIBIT A

In re:                                    :        Chapter 11
                                          :
AVENTINE RENEWABLE                        :
ENERGY HOLDINGS, INC., *et al.*           :
                                          :        Bankruptcy No. 09-11214 (KG)
                                          :        Jointly Administered
                    Debtors.              :


## SUPPLEMENTAL DECLARATION AND DISCLOSURE OF WILLIAM HARDIE III ON BEHALF OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.

I, William Hardie III, hereby declare under penalty of perjury that the following is true

and correct to the best of my knowledge, information and belief:

1. I am a Managing Director of Houlihan Lokey Howard & Zukin Capital, Inc.

("Houlihan Lokey") and am duly authorized to make this Supplemental Declaration on behalf of

Houlihan Lokey. Except as otherwise noted, the facts set forth in this Supplemental Declaration

are personally known to me and, if called as a witness, I could and would testify thereto.

2. On April 7, 2009 (the "Petition Date"), the above-captioned debtors and debtors-

in-possession (collectively, the "Debtors") each filed a voluntary petition under chapter 11 of

title 11 of the United States Code, 11 USC §§ 101-1532 (as amended, the "Bankruptcy Code").

On April 17, 2009, the Debtors filed their Application for (i) Authority to Employ Houlihan

Lokey as Financial Advisor and Investment Bankers for the Debtors *Nunc Pro Tunc* to the

Petition Date and (ii) Waiver of Certain Information Requirements of Local Rule 2016-2 (the

"Application") [Dkt No. 87]. In support of the Application, the Debtors submitted a declaration

1

(the "Declaration") that I executed on behalf of Houlihan Lokey. The Court entered an order approving the Application on June 19, 2009 [Dkt. No. 222].

3. Pursuant to Bankruptcy Rules 2014 and 2016 and following discussions with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), Houlihan Lokey conducted supplemental conflict checks with respect to interested or potentially interested parties. The supplemental conflict checks included conflict checks of those parties that were identified on Exhibit A to the Declaration and included in the prior conflict checks, as well as conflict checks of parties that were not included in the conflict checks that Houlihan Lokey completed as referenced in the Declaration.

4. Attached hereto as Exhibit A is a supplemental list of parties-in-interest for which Houlihan Lokey conducted conflict checks (in addition to those parties identified on Exhibit A to the Declaration). Exhibit B attached hereto identifies parties-in-interest for which Houlihan Lokey has provided in the recent past or is currently providing services in matters unrelated to the Debtors' cases. Exhibit A and Exhibit B hereto supplement the Declaration I submitted in connection with the Application. In each instance, Houlihan Lokey does not believe any of the relationships represent a conflict of interest in these cases.

5. At the U.S. Trustee's request, Houlihan Lokey also provides the following information regarding Houlihan Lokey's relationship with Whitebox Advisors ("Whitebox") in other matters unrelated to these cases:

- In April 2008, the Velocity Express Corporation ("Velocity") retained Houlihan Lokey as financial advisor on a prepetition basis (but not in Velocity's bankruptcy case). The engagement has concluded. Whitebox was a creditor in Velocity's bankruptcy cases.

- In December 2008, the Official Committee of Unsecured Creditors (the "VeraSun Creditors Committee") in the bankruptcy cases titled *In re VeraSun Energy Corp.* (Case No. 08-12606 (BLS)) (Bankr. D. Del.) retained Houlihan Lokey as financial advisor and investment banker. The engagement has concluded. Whitebox served as an *ex oficio* member of the VeraSun Creditors Committee. Since the beginning of Houlihan Lokey's engagement in the *Aventine* cases, out of an abundance of caution, Houlihan Lokey has maintained an ethical wall between the professionals who provided services in the *VeraSun* engagement and those professionals who are providing services in the *Aventine* engagement. (The respective teams are located in different Houlihan Lokey offices.)

- In January 2009, Houlihan Lokey was retained as the financial advisor to the Ad Hoc Senior Secured Group (the "Spansion Ad Hoc Group") in the bankruptcy cases titled *In re Spansion, Inc.* (Case No. 09-10690 (KJC)) (Bankr. D. Del.). The engagement is ongoing. Whitebox is a member of the Spansion Ad Hoc Group.

- In July 2009, the Official Committee of Unsecured Noteholders (the "Energy Partners Noteholders Committee") sought to retain Houlihan Lokey as its financial advisor in the bankruptcy cases titled *In re Energy Partners, Ltd.* (Case No. 09-32957-H4-11) (Bankr. S.D. Tex.). The *Energy Partners* bankruptcy court denied the Energy Partners Noteholders Committee's application, so Houlihan Lokey was not retained in those cases and did not receive any compensation. Whitebox was a member of the Energy Partners Noteholders Committee.

- In January 2009 and again in December 2009, Whitebox retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. to provide portfolio valuation services. Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases. Houlihan Lokey Howard & Zukin Financial Advisors' Hedge Fund and Derivatives Valuation Services Group provides valuation opinions on the securities and derivative holdings of various business development companies, private equity firms and hedge funds, such as Whitebox. This work is unrelated to the financial advisory services that Houlihan Lokey provides in these chapter 11 cases. Moreover, Houlihan Lokey, through the establishment of an "Information Wall" has separated its employees in the Hedge Fund and Derivatives Valuation Services Group from the rest of its employees, including those who have provided services in these cases. This "Information Wall" includes physical and technological barriers, compliance mechanisms and policies and procedures designed to prevent confidential, non-public information and work product from being shared improperly.

- Houlihan Lokey's capital markets group from time to time has approached Whitebox, among many other parties, as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey.

6. Houlihan Lokey also provides the following information regarding Houlihan Lokey's relationship with Brigade Capital Management ("Brigade") in other matters unrelated to these cases:

- As described above, the VeraSun Creditors Committee retained Houlihan Lokey as financial advisor and investment banker. The engagement has concluded. Brigade served as an *ex oficio* member of the VeraSun Creditors Committee.

- In October 2008, Brigade retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. to provide portfolio valuation services. As described above, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., and an "Information Wall" has separated its employees in the Hedge Fund and Derivatives Valuation Services Group from the rest of its employees, including those who have provided services in these cases.

- In December 2008, Houlihan Lokey was retained as the financial advisor to an ad hoc group of secured noteholders (the "Trump Ad Hoc Group") in the bankruptcy cases titled *In re TCI 2 Holdings, LLC* (Case No. 09-13654 (JHW)) (Bankr. D. N.J.). The engagement is ongoing. Brigade is a member of the Trump Ad Hoc Group.

- Houlihan Lokey's capital markets group from time to time has approached Brigade, among many other parties, as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey.

7. After reviewing the results of the supplemental conflict check completed by Houlihan Lokey, to the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, neither I nor Houlihan Lokey holds or represents an interest adverse to the Debtors or their respective estates, and Houlihan Lokey is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code, in that: (a) Houlihan has no connection with the Debtors, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in these chapter 11 cases or their respective attorneys or accountants, except as set forth in my Declaration and as set forth herein; (b) Houlihan Lokey is not a creditor, equity security holder or insider of the Debtors; (c) Houlihan Lokey is not and was not,

within two years of the Petition Date, a director, officer or employee of the Debtors; and (d) Houlihan Lokey neither holds nor represents an interest adverse to the Debtors, their respective estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in Debtors, or for any other reason. Accordingly, I believe that Houlihan Lokey is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code.

Dated: February 15, 2010 _____
William Hardie III

## EXHIBIT A

## ADDITIONAL INTERESTED PARTIES SEARCHED [1]

**Equity and Option Holders:**

Mr. Andrew Shirley/Ivory Capital
Mr. Herschel Patton
Mr. James Szumera
Mr. Michael Welsh
Mr. William Toomey
Mrs. Sheila Toomey

**Outside Professionals:**

Akin Gump Strauss Hauer & Feld LLP
Cross & Simon LLC
Ernst & Young
Gibson, Dunn & Crutcher LLP
Greenberg Traurig, LLP
Jefferies & Company, Inc.
Jenner & Block LLP
Mr. Thomas Manuel
The Garden City Group, Inc.
Westervelt, Johnson, Nikoll & Keller, LLC

**Unsecured Creditors:**

Brigade Capital Management
Nomura Asset Management
Nomura Corporate Research & Asset Management, Inc.
SEACOR Capital Corporation
SEACOR Energy Inc.
SEACOR Holdings Inc.
Senator Investment Group LP
WhiteBox Advisors

---

[1] Parties on Exhibit A were not included in the initial list of interested parties received by Houlihan Lokey and were not previously reviewed for potential conflicts. This supplemental disclosure covers all parties identified to Houlihan Lokey as parties in interest as of February 12, 2010. Should additional parties in interest be indicated to Houlihan Lokey after February 12, 2010 Houlihan Lokey will provide an additional supplemental conflicts disclosure on a timely basis.

**Backstop Parties:**

Brigade Capital Management
Nomura Asset Management
Nomura Corporate Research & Asset Management, Inc.
SEACOR Capital Corporation
SEACOR Energy Inc.
SEACOR Holdings Inc.
Senator Investment Group LP
WhiteBox Advisors

**DIP Lenders:**

Brigade Capital Management
Nomura Asset Management
WhiteBox Advisors

**Potential Revolving Credit Facility Provider:**

PNC Bank
PNC Bank National Association

# EXHIBIT B

## ADDITIONAL INTERESTED PARTY RELATIONSHIPS (FORMER CLIENTS)

| HLHZ Relationship | Debtors' Relationship | Work Performed [2][3] | Status |
|---|---|---|---|
| Bank of America, NA | Secured Creditor | Financial Advisory Services – Various (including Fair Market Value Opinion, ESOP Valuation Fairness Opinion and Portfolio Valuation Related Consulting Services); Financial Restructuring Services – Creditor Advisory Services; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Bank of America Business Capital | Affiliate of Secured Creditor Bank of America NA | Financial Advisory Services – Various (including Collateral Valuation and Fair Market Value Opinion); Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Bank of America Corporation | Affiliate of Secured Creditor Bank of America NA | Financial Advisory Services – Fair Market Value Opinion; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Bank of America Merrill Lynch | Affiliate of Secured Creditor Bank of America NA | Financial Restructuring Services – Advisor to Ad Hoc Group of Creditors; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| BP Plc | Top 30 Unsecured Creditor | General Financial Advisory Services & M&A Exclusive Sale Advisory | Former |
| Greenberg Traurig, LLP | Outside Professional (Advisor to Unsecured Creditors Committee) | Financial Advisory Services – Estate & Gift Tax and Transfer Pricing (Houlihan Lokey was engaged to provide services to Greenberg Traurig, LLP's clients, not to Greenberg Traurig, LLP) | Former |
| Jefferies & Company, Inc. | Outside Professional (Advisor to Unsecured Creditors Committee) | General Financial Advisory Services | Former |
| Jenner & Block LLP | Outside Professional (Special Legal Counsel to Debtors) | Financial Advisory Services – Various (including Estate & Gift Tax and Portfolio Valuation Related Consulting Services) (Houlihan Lokey was engaged to provide services to Jenner & Block LLP's clients, not to Jenner & Block LLP) | Former |

---

[2] As further detailed in the body of the declaration, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (Financial Advisory Services) is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases and there is an "Information Wall" separating the two entities including both physical and technological barriers.

[3] General Financial Advisory Services are performed by Houlihan Lokey's corporate finance practice. These assignments relate to various engagements including sell-side, buy-side and other strategic advisory services.

| HLHZ Relationship | Debtors' Relationship | Work Performed [2][3] | Status |
|---|---|---|---|
| JPMorgan Chase Bank | Secured Creditor | Financial Advisory Services – Various (including Fair Market Value Opinion, Tax and Fairness Opinion); Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| JPMorgan H&Q | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Restructuring Services – Distressed M&A Sellside; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| JPMorgan Investment Management | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Advisory Services – Valuation; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| JPMorgan Partners | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Advisory Services – Litigation; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| J.P. Morgan Plc | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Restructuring Services – Advisor to secured creditor group in which J.P. Morgan Plc was a member; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Nomura Holding America, Inc. | Affiliate of Unsecured Creditor / Backstop Party / DIP Lender Nomura Corporate Research and Asset Management, Inc. | Financial Advisory Services – Fair Market Value Opinion; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Nomura International, PLC | Affiliate of Unsecured Creditor / Backstop Party / DIP Lender Nomura Corporate Research and Asset Management, Inc. | Financial Advisory Services – Portfolio Valuation Related Consulting Services; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| UBS Americas Inc. | Affiliate of Secured Creditor UBS Loan Finance, LLC | Financial Advisory Services – Fair Value Opinion; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |

---

[2] As further detailed in the body of the declaration, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (Financial Advisory Services) is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases and there is an "Information Wall" separating the two entities including both physical and technological barriers.

[3] General Financial Advisory Services are performed by Houlihan Lokey's corporate finance practice. These assignments relate to various engagements including sell-side, buy-side and other strategic advisory services.

# ADDITIONAL INTERESTED PARTY RELATIONSHIPS (CURRENT CLIENTS)

| HLHZ Relationship | Debtors' Relationship | Work Performed [2][3] | Status |
|---|---|---|---|
| Akin Gump Strauss Hauer & Feld LLP | Outside Professional (Advisor to DIP Lenders / Exit Financing Lenders) | Financial Advisory Services – Various (including Fairness Opinion, Estate & Gift Tax and Portfolio Valuation Related Consulting Services); Financial Restructuring Services – numerous creditor advisor engagements in which Akin Gump was counsel to various creditor groups and numerous debtor advisor engagements in which Akin Gump was counsel to the debtor and / or other parties in interest in cases in which Houlihan Lokey represented the same or different parties in connection with those matters (Houlihan Lokey is engaged to provide services to Akin Gump Strauss Hauer & Feld LLP's clients, not to Akin Gump Strauss Hauer & Feld LLP) | Various |
| Brigade Capital Management | Unsecured Creditor / Backstop Party / DIP Lender | See declaration | Various |
| Gibson, Dunn & Crutcher, LLP | Outside Professional (Legal Counsel to Shareholder) | General Financial Advisory Services and Financial Advisory Services – Various (including Litigation, Fair Market Value Opinion and Estate & Gift Tax) (Houlihan Lokey is engaged to provide services to Gibson, Dunn & Crutcher, LLP's clients, not to Gibson, Dunn & Crutcher, LLP) | Various |
| JPMorgan Chase & Company | Affiliate of Secured Creditor JP Morgan Chase Bank | General Financial Advisory Services - M&A Exclusive Sale; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Various |
| WhiteBox Advisors | Unsecured Creditor / Backstop Party / DIP Lender | See declaration | Various |

---

[2] As further detailed in the body of the declaration, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (Financial Advisory Services) is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases and there is an "Information Wall" separating the two entities including both physical and technological barriers.

[3] General Financial Advisory Services are performed by Houlihan Lokey's corporate finance practice. These assignments relate to various engagements including sell-side, buy-side and other strategic advisory services.