## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,** a Delaware Corporation, *et al.*, | Case No. 09-11214 (KG) |
| | (Jointly Administered) |
| Debtors.[1] | **Docket Ref No. 678, 743, 800 & 802** |

## NOTICE OF FILING OF THIRD AMENDMENT TO THE PLAN SUPPLEMENT WITH RESPECT TO THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

PLEASE TAKE NOTICE that on January 13, 2010, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed their First Amended Joint Plan of Reorganization under chapter 11 of title 11 of the United States Code [Docket No. 678] (the "Plan") and the Disclosure Statement describing the Plan [Docket No. 679] (the "Disclosure Statement").[2]

PLEASE TAKE FURTHER NOTICE that, on February 5, 2010, the Debtors filed the Plan Supplement [Docket No. 743] (the "Initial Plan Supplement Filing").

PLEASE TAKE FURTHER NOTICE that, on February 19, 2010, the Debtors filed their first amendment to the Plan Supplement [Docket No. 800] (the "First Plan Supplement Amendment").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872). The corporate headquarters address for all of the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

[2] All terms not other wise defined herein shall be given the meanings ascribed to them in the Plan.

PLEASE TAKE FURTHER NOTICE that, on February 22, 2010, the Debtors filed their first amendment to the Plan Supplement [Docket No. 802] (the "Second Plan Supplement Amendment," together with the Initial Plan Supplement Filing and the First Plan Supplement Amendment, the "Plan Supplement Filings").

PLEASE TAKE FURTHER NOTICE that, attached hereto are certain documents which shall amend, supersede and replace the corresponding documents filed as part of the Plan Supplement Filings.

| | |
|---|---|
| Exhibit A: | Form of Indenture and Exhibit Thereto |
| Exhibit B: | Form of Security Agreement accompanying the Indenture |
| Exhibit C: | Form of Intercreditor Agreement |
| Exhibit D: | [INTENTIONALLY OMITTED] |
| Exhibit E: | [INTENTIONALLY OMITTED] |
| Exhibit F: | [INTENTIONALLY OMITTED] |
| Exhibit G: | [INTENTIONALLY OMITTED] |
| Exhibit H: | [INTENTIONALLY OMITTED] |
| Exhibit I: | [INTENTIONALLY OMITTED] |
| Exhibit J: | [INTENTIONALLY OMITTED] |
| Exhibit K: | [INTENTIONALLY OMITTED] |

PLEASE TAKE FURTHER NOTICE that (a) attached hereto as Exhibit A-1 is a blackline of the Form of Indenture and Exhibits Thereto against the version filed with the Second Plan Supplement Amendment,[3] (b) attached hereto as Exhibit B-1 is a blackline of the Form of

---

[3] The forms of the Exhibits to the Form of Indenture were not included in the Second Plan Supplement Amendment. Accordingly, the portion of the blackline containing the forms of Exhibits will reflect any changes made to such Exhibits since the Initial Plan Supplement Filing.

Security Agreement accompanying the Indenture against the version filed with the Second Plan Supplement Amendment, and (c) attached hereto as <u>Exhibit C-1</u> is a blackline of the Form of Intercreditor Agreement against the version filed with the Initial Plan Supplement Filing.

PLEASE TAKE FURTHER NOTICE that the Debtors hereby reserve all rights to amend, revise or supplement any documents relating to the Plan and/or to be executed, delivered, assumed and/or performed in connection with the consummation of the Plan on the Effective Date, including the Plan Supplement.

Dated: Wilmington, Delaware
February 24, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____/s/ Ryan M. Bartley_____
James L. Patton, Jr. (No. 2202)
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Form of Indenture and Exhibits Thereto**

**INDENTURE,**

**DATED AS OF [• ], 2010,**

**AMONG**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,**

**AS ISSUER,**

**THE GUARANTORS NAMED HEREIN,**

**AS GUARANTORS,**

**AND**

**WILMINGTON TRUST FSB,**

**AS TRUSTEE AND COLLATERAL AGENT**

**13% SENIOR SECURED NOTES DUE 2015**

# TABLE OF CONTENTS

**Page**

ARTICLE ONE DEFINITIONS AND INCORPORATION BY REFERENCE ........................... 1
    SECTION 1.01    Definitions. ................................................................................. 1
    SECTION 1.02    Incorporation by Reference of Trust Indenture Act. ................... 37
    SECTION 1.03    Rules of Construction. ............................................................... 37

ARTICLE TWO THE NOTES ......................................................................................... 38
    SECTION 2.01    Form and Dating. ...................................................................... 38
    SECTION 2.02    Execution and Authentication; Aggregate Principal
                        Amount. ..................................................................................... 39
    SECTION 2.03    Registrar and Paying Agent. ...................................................... 41
    SECTION 2.04    Obligations of Paying Agent. ..................................................... 42
    SECTION 2.05    Holder Lists. .............................................................................. 42
    SECTION 2.06    Transfer and Exchange. ............................................................. 42
    SECTION 2.07    Replacement Notes. ................................................................... 43
    SECTION 2.08    Outstanding Notes. .................................................................... 43
    SECTION 2.09    Treasury Notes; When Notes Are Disregarded. .......................... 44
    SECTION 2.10    Temporary Notes. ...................................................................... 44
    SECTION 2.11    Cancellation. ............................................................................. 45
    SECTION 2.12    CUSIP Numbers. ....................................................................... 45
    SECTION 2.13    Deposit of Moneys. ................................................................... 45
    SECTION 2.14    Book-Entry Provisions for Global Notes..................................... 45
    SECTION 2.15    Special Transfer Provisions. ....................................................... 47
    SECTION 2.16    Transfers of Global Notes and Physical Notes. ........................... 50
    SECTION 2.17    Defaulted Interest. ..................................................................... 50
    SECTION 2.18    Computation of Interest. ............................................................ 50

ARTICLE THREE REDEMPTION ................................................................................. 51
    SECTION 3.01    Optional Redemption.................................................................. 51
    SECTION 3.02    No Mandatory Redemption. ....................................................... 51
    SECTION 3.03    Selection of Notes to Be Redeemed. ........................................... 52
    SECTION 3.04    Notice of Redemption................................................................. 52
    SECTION 3.05    Effect of Notice of Redemption. ................................................. 53
    SECTION 3.06    Deposit of Redemption Price. ..................................................... 54
    SECTION 3.07    Notes Redeemed in Part. ............................................................ 54
    SECTION 3.08    Company May Acquire Notes...................................................... 54

ARTICLE FOUR COVENANTS ..................................................................................... 54
    SECTION 4.01    Payment of Notes; Accrual of Interest......................................... 54
    SECTION 4.02    Maintenance of Registrar and Paying Agent. .............................. 56
    SECTION 4.03    Corporate Existence. .................................................................. 56
    SECTION 4.04    Payment of Taxes and Other Claims. .......................................... 56
    SECTION 4.05    Maintenance of Properties and Insurance.................................... 57
    SECTION 4.06    Compliance Certificate; Notice of Default. ................................. 57
    SECTION 4.07    Compliance with Laws. .............................................................. 58

| | | |
|---|---|---|
| SECTION 4.08 | Reports to Holders. | 58 |
| SECTION 4.09 | Waiver of Stay, Extension or Usury Laws. | 59 |
| SECTION 4.10 | Limitation on Restricted Payments. | 59 |
| SECTION 4.11 | Limitations on Transactions with Affiliates. | 63 |
| SECTION 4.12 | Incurrence of Indebtedness and Issuance of Disqualified Stock, Preferred Stock and Incentive Interests. | 65 |
| SECTION 4.13 | Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries. | 70 |
| SECTION 4.14 | Additional Note Guarantees. | 71 |
| SECTION 4.15 | Repurchase Upon Change of Control. | 72 |
| SECTION 4.16 | Limitation on Asset Sales. | 74 |
| SECTION 4.17 | Event of Loss. | 77 |
| SECTION 4.18 | [Reserved] | 78 |
| SECTION 4.19 | Repurchase Offers. | 78 |
| SECTION 4.20 | Limitation on Liens. | 81 |
| SECTION 4.21 | Business Activities. | 81 |
| SECTION 4.22 | Payments for Consent. | 81 |
| SECTION 4.23 | Impairment of Security Interest. | 81 |
| SECTION 4.24 | Designation of Restricted and Unrestricted Subsidiaries. | 82 |
| SECTION 4.25 | Additional Interest. | 82 |
| SECTION 4.26 | Limitation on Sale and Leaseback Transactions. | 83 |
| SECTION 4.27 | Subordination of Intercompany Debt; No Amendments to Certain Agreements. | 83 |
| SECTION 4.28 | After-Acquired Property. | 84 |
| SECTION 4.29 | Further Assurances. | 84 |
| SECTION 4.30 | Calculation of Original Issue Discount. | 85 |
| ARTICLE FIVE SUCCESSOR CORPORATION | | 85 |
| SECTION 5.01 | Merger, Consolidation and Sale of Assets. | 85 |
| SECTION 5.02 | Successor Person Substituted. | 87 |
| ARTICLE SIX DEFAULT AND REMEDIES | | 88 |
| SECTION 6.01 | Events of Default. | 88 |
| SECTION 6.02 | Acceleration. | 90 |
| SECTION 6.03 | Other Remedies. | 91 |
| SECTION 6.04 | Waiver of Past Defaults. | 92 |
| SECTION 6.05 | Control by Majority. | 92 |
| SECTION 6.06 | Limitation on Holders' Rights to Pursue Remedies. | 93 |
| SECTION 6.07 | Rights of Holders to Receive Payment. | 93 |
| SECTION 6.08 | Collection Suit by Trustee or Collateral Agent. | 93 |
| SECTION 6.09 | Trustee May File Proofs of Claim. | 94 |
| SECTION 6.10 | Priorities. | 94 |
| SECTION 6.11 | Undertaking for Costs. | 95 |
| SECTION 6.12 | Restoration of Rights and Remedies. | 95 |
| SECTION 6.13 | Rights and Remedies Cumulative. | 95 |
| SECTION 6.14 | Delay or Omission not Waiver. | 95 |
| ARTICLE SEVEN TRUSTEE | | 96 |

SECTION 7.01       Duties of Trustee. ............................................................. 96
SECTION 7.02       Rights of Trustee. .............................................................. 97
SECTION 7.03       Individual Rights of Trustee. .............................................. 99
SECTION 7.04       Trustee's Disclaimer. ......................................................... 99
SECTION 7.05       Notice of Default. ............................................................. 100
SECTION 7.06       Reports by Trustee to Holders. .......................................... 100
SECTION 7.07       Compensation and Indemnity. ........................................... 100
SECTION 7.08       Replacement of Trustee. ................................................... 102
SECTION 7.09       Successor Trustee by Merger, Etc. ..................................... 103
SECTION 7.10       Eligibility; Disqualification. .............................................. 103
SECTION 7.11       Preferential Collection of Claims Against Company. ............... 104
SECTION 7.12       Trustee as Collateral Agent and Paying Agent. ..................... 104
SECTION 7.13       Co-Trustees, Co-Collateral Agent and Separate Trustees,
                        Collateral Agent. ............................................................ 104

ARTICLE EIGHT SATISFACTION AND DISCHARGE OF INDENTURE .......................... 105
SECTION 8.01       Legal Defeasance and Covenant Defeasance. ........................ 105
SECTION 8.02       Satisfaction and Discharge. ............................................... 108
SECTION 8.03       Survival of Certain Obligations. ........................................ 109
SECTION 8.04       Acknowledgment of Discharge by Trustee. ........................... 109
SECTION 8.05       Application of Trust Moneys. ............................................. 110
SECTION 8.06       Repayment to the Company of Unclaimed Money. .................. 110
SECTION 8.07       Reinstatement. ................................................................. 110
SECTION 8.08       Indemnity for Government Obligations. ................................ 111

ARTICLE NINE AMENDMENTS, SUPPLEMENTS AND WAIVERS ................................. 111
SECTION 9.01       Without Consent of Holders. .............................................. 111
SECTION 9.02       With Consent of Holders. .................................................. 112
SECTION 9.03       Compliance with TIA. ...................................................... 114
SECTION 9.04       Revocation and Effect of Consents. ..................................... 114
SECTION 9.05       Notation on or Exchange of Notes. ..................................... 114
SECTION 9.06       Trustee or Collateral Agent to Sign Amendments, Etc. ........... 115
SECTION 9.07       Acts of Holders ............................................................... 115

ARTICLE TEN GUARANTEE ............................................................................ 116
SECTION 10.01     Guarantee. ...................................................................... 116
SECTION 10.02     Release of a Guarantor. ..................................................... 117
SECTION 10.03     Limitation of Guarantor's Liability. ..................................... 118
SECTION 10.04     Guarantors May Consolidate, etc., on Certain Terms. ............ 118
SECTION 10.05     Contribution. ................................................................... 119
SECTION 10.06     Waiver of Subrogation. ..................................................... 119
SECTION 10.07     Waiver of Stay, Extension or Usury Laws. ............................ 119
SECTION 10.08     Note Guarantee Evidenced by Indenture; No Notation of
                        Note Guarantee. .............................................................. 120

ARTICLE ELEVEN MISCELLANEOUS .................................................................. 120
SECTION 11.01     Trust Indenture Act Controls. ............................................ 120
SECTION 11.02     Notices. .......................................................................... 120
SECTION 11.03     Communications by Holders with Other Holders. ................... 122

| | | |
|---|---|---|
| SECTION 11.04 | Certificate and Opinion as to Conditions Precedent. | 122 |
| SECTION 11.05 | Statements Required in Certificate or Opinion. | 123 |
| SECTION 11.06 | Rules by Trustee, Paying Agent, Registrar. | 124 |
| SECTION 11.07 | Legal Holidays. | 124 |
| SECTION 11.08 | Governing Law. | 124 |
| SECTION 11.09 | No Adverse Interpretation of Other Agreements. | 124 |
| SECTION 11.10 | No Recourse Against Others. | 124 |
| SECTION 11.11 | Successors. | 125 |
| SECTION 11.12 | Duplicate Originals. | 125 |
| SECTION 11.13 | Severability. | 125 |
| SECTION 11.14 | Waiver of Jury Trial. | 125 |
| SECTION 11.15 | Table of Contents, Headings, etc. | 125 |

ARTICLE TWELVE SECURITY ................................................................ 125

| | | |
|---|---|---|
| SECTION 12.01 | Grant of Security Interest. | 125 |
| SECTION 12.02 | Intercreditor Agreement. | 131 |
| SECTION 12.03 | Recording and Opinions. | 131 |
| SECTION 12.04 | Release of Note Collateral. | 131 |
| SECTION 12.05 | Specified Releases of Note Collateral. | 133 |
| SECTION 12.06 | Release of all Note Collateral. | 133 |
| SECTION 12.07 | Matters as to Releases. | 134 |
| SECTION 12.08 | Purchaser Protected. | 135 |
| SECTION 12.09 | Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Documents. | 135 |
| SECTION 12.10 | Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Documents. | 135 |
| SECTION 12.11 | Collateral Monies. | 136 |
| SECTION 12.12 | Limitation on Certain Securities Collateral. | 137 |

| | | | |
|---|---|---|---|
| Exhibit A | - | Form of Initial Note | A-1 |
| Exhibit B | - | Form of Exchange Note | B-1 |
| Exhibit C | - | Form of Legend for Global Notes | C-1 |
| Exhibit D | - | Form of Private Placement Legend | D-1 |
| Exhibit E | - | Form of Certificate to Be Delivered in Connection with Transfers to Non-QIB Accredited Investors | E-1 |
| Exhibit F | - | Form of Certificate to Be Delivered in Connection with Transfers Pursuant to Regulation S | F-1 |
| Exhibit G | - | Form of Supplemental Indenture | G-1 |
| Exhibit H | - | Form of Mortgage | H-1 |

NOTE:     This Table of contents shall not, for any purpose, be deemed to be part of this Indenture.

# CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.03; 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 11.03 |
| (c) | 11.03 |
| 313(a) | 7.06 |
| (b)(1) | 7.06 |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 7.06 |
| 314(a) | 4.06; 4.08 |
| (b) | 12.03 |
| (c)(1) | 11.04 |
| (c)(2) | 11.04 |
| (c)(3) | N.A. |
| (d) | 12.04 |
| (e) | 11.05 |
| (f) | N.A. |
| 315(a) | 7.01(b) |
| (b) | 7.05 |
| (c) | 7.01(a) |
| (d) | 7.01(c) |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 11.01 |
| (b) | N.A. |
| (c) | 11.01 |

N.A. means Not Applicable

NOTE:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of this Indenture.

INDENTURE, dated as of **[•]**, 2010, among Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company"), the Guarantors (as herein defined) and Wilmington Trust FSB, as trustee (in such capacity, the "Trustee") and collateral agent (in such capacity, the "Collateral Agent").

# W I T N E S S E T H:

WHEREAS, the Company has duly authorized the creation of an issue of 13% Senior Secured Notes due 2015 (referred to herein as the "Notes") and the Guarantors have duly authorized the creation of the Note Guarantees (as herein defined) and, to provide therefor, the Company and the Guarantors have duly authorized the execution and delivery of this Indenture; and

WHEREAS, all things necessary to make the Notes and Note Guarantees, when the Notes are duly issued and executed by the Company and authenticated and delivered hereunder, the valid obligations of each of the Company and the Guarantors, respectively, and to make this Indenture a valid and binding agreement of each of the Company and the Guarantors, have been done.

NOW, THEREFORE, each party hereto agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as herein defined):

## ARTICLE ONE

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01        Definitions.

"ABL Facility" means the senior secured revolving credit agreement dated as of **[•]**, 2010, among the Company, the lenders party thereto, and PNC Bank, National Association, as administrative agent, as amended, restated, modified, increased, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of one or more series of notes, bonds or other debt securities and related indentures or similar agreements) in whole or in part from time to time, including any agreement increasing the amount of Indebtedness incurred thereunder or available to be borrowed thereunder to the extent permitted under clause (1) of the second paragraph of Section 4.12.

"ABL Facility Lien Security Documents" means one or more security agreements, pledge agreements, collateral assignments, or other grants or transfers for security executed and delivered by the Company or any Guarantor creating a Lien upon assets constituting Secondary Collateral owned or to be acquired by the Company or such Guarantor in favor of any holder or holders of Credit Facility Obligations under the ABL Facility, or any administrative agent, agent or representative acting for any such holders, as security for any Credit Facility Obligations under the ABL Facility.

"ABL Facility Trigger Date" means the date on which the Company delivers written notice to the Trustee that clause (1)(a) of the second paragraph of Section 4.12 will no longer be available for incurrence of any additional Indebtedness under the ABL Facility.

"Acceleration Notice" has the meaning set forth in Section 6.02(a).

"Accredited Investor" means an individual or institution that is an "accredited investor" as that term is defined in Rule 501(a) under the Securities Act.

"Additional Assets" means: (i) any property or assets (other than Indebtedness, Capital Stock, Excluded General Intangibles and Excluded Trademark Applications and other than any assets classified as current assets under GAAP) used or useful in a Permitted Business; or (ii) the Capital Stock of a Person that becomes a Wholly-Owned Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Company or a Guarantor; provided, however, that, in the case of this clause (ii), such Wholly-Owned Restricted Subsidiary is primarily engaged in a Permitted Business and becomes a Guarantor at or prior to consummation of such acquisition.

"Additional Interest" has, with respect to any Notes that are entitled to the benefits of a Registration Rights Agreement, the meaning set forth in such Registration Rights Agreement.

"Additional Notes" means any Notes that are originally issued after the Issue Date from time to time pursuant to clause (c) of the fourth paragraph of Section 2.02 and otherwise in accordance with the terms of this Indenture and any PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in partial payment of the interest accrued on any Additional Notes that is due and payable on such Interest Payment Date.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control", as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling", "controlled by" and "under common control with" have correlative meanings.

"Affiliate Transaction" has the meaning set forth in Section 4.11.

"After-Acquired Property" means, with respect to the Company or any Guarantor:

(1) any property acquired by the Company or such Guarantor upon a transfer (including upon an Investment) from the Company or any other Guarantor of property that was Note Collateral of the Company or such other Guarantor immediately prior to the transfer;

(2) any Additional Assets acquired by the Company or such Guarantor that (pursuant to Section 4.16, Section 4.17, 12.01(j) or 12.11(a)(v) or pursuant to clause (2) or (3) of the definition of "Asset Sale" or clause (3) of the definition of "Permitted Investments") are to become Note Collateral prior to or simultaneously with the acquisition thereof (or, if such Additional Assets are acquired pursuant to clause (a) of the

first paragraph of <u>Section 4.17</u>, on or prior to the later of the date of completion of rebuilding, repair or improvement or acquisition of replacement referred to therein);

   (3) from and after the Indiana Port Leasehold Required Mortgage Date, the Indiana Port Leased Premises and any Indiana Port Lease Collateral owned by the Indiana Port Lessee on the Indiana Port Lease Required Mortgage Date;

   (4) any property or assets (other than property or assets not already constituting Note Collateral) on which the Company or any Guarantor grants a Lien for the benefit of holders of Credit Facility Obligations; or

   (5) any Specified Assets or material other property that is acquired or otherwise owned by the Company or such Guarantor on or after the date of this Indenture of a type that secures the Note Obligations.

"<u>After-Acquired Covered Property</u>" means any After-Acquired Property other than real property acquired or owned by the Company or any Restricted Subsidiary that, at the time the Company or such Restricted Subsidiary acquires or first owns such After-Acquired Property, such After-Acquired Property automatically becomes subject to valid and perfected Note Liens already created pursuant to then existing Collateral Documents.

"<u>After-Acquired Property Required Date</u>" means, with respect to any After-Acquired Property acquired or owned by the Company or any Guarantor:

   (i) if such After-Acquired Property constitutes After-Acquired Specified Property (other than the Indiana Port Leased Premises or any Indiana Port Leased Collateral), the date the Company or such Guarantor acquires or first owns such After-Acquired Specified Property (or, if such After-Acquired Specified Property is acquired pursuant to clause (a) of the first paragraph of <u>Section 4.17</u>, the later of the date of completion of rebuilding, repair or improvement or acquisition of replacement referred to therein);

   (ii) if such After-Acquired Property constitutes the Indiana Port Leased Premises or any Indiana Port Lease Collateral, owned by the Indiana Port Lessee on the Indiana Port Lease Required Mortgage Date, the Indiana Port Lease Required Mortgage Date;

   (iii) if such After-Acquired Property constitutes property or assets specified in clause (4) of the definition of "After-Acquired Property", the date on which the Lien referred to in such clause is granted for benefit of holders of Credit Facility Obligations; or

   (iv) otherwise, the date 30 days after the Company or such Guarantor acquires or first owns such After-Acquired Property.

"<u>After-Acquired Specified Property</u>" means any After-Acquired Property constituting property or Additional Assets specified in clause (1), (2) or (3) of the definition of "After-Acquired Property".

"Agent" means any Paying Agent, Registrar or co-Registrar.

"Agent Members" has the meaning set forth in Section 2.14(a) and means, with respect to the Depository, Euroclear or Clearstream, a Person who has an account with the Depository, Euroclear or Clearstream, respectively (and, with respect to the Depository, shall include Euroclear and Clearstream).

"AI Global Notes" has the meaning set forth in Section 2.01.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depository, Euroclear or Clearstream that apply to such transfer or exchange.

"Asset Sale" means:

    (a) the sale, lease, conveyance or other disposition of (including by way of any merger or consolidation and including any loss, destruction, damage, condemnation, confiscation, requisition, seizure, forfeiture or taking of title to or use of) any assets of the Company or any Restricted Subsidiary; provided that the sale, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by the provisions of Section 4.15 or Section 5.01 or Section 10.04 and not by the provisions of Section 4.16; and

    (b) the issuance of Equity Interests in any of the Company's Restricted Subsidiaries (other than directors' qualifying shares) or the sale or other disposition of Equity Interests in any of its Restricted Subsidiaries.

Notwithstanding the preceding, none of the following will be deemed to be an Asset Sale:

    (1) any single transaction or series of related transactions that involves assets (other than assets constituting Specified Collateral) having a Fair Market Value of less than $5,000,000;

    (2) a transfer of assets (A) between or among (i) solely the Company and/or its Restricted Subsidiaries that are Guarantors so long as, to the extent such transfer includes any Note Collateral, such transfer does not occur unless such assets become Note Collateral of the transferee prior to or simultaneously with such transfer and until and unless the provisions of Section 4.28 (to the extent applicable to such transfer) have otherwise been complied with in respect of such Note Collateral or (ii) Restricted Subsidiaries that are not Guarantors or (B) by any Restricted Subsidiary that is not a Guarantor to the Company or a Guarantor;

    (3) an issuance of Equity Interests by (A) a Restricted Subsidiary of the Company that is a Guarantor solely to the Company or another Restricted Subsidiary that is a Guarantor so long as such issuance does not occur unless such Equity Interests become Note Collateral simultaneously with the issuance thereof and until and unless the provisions of Section 4.28 (to the extent applicable to such issuance) have otherwise been complied with in respect of such Equity

Interests or (B) a Restricted Subsidiary that is not a Guarantor solely to the Company or to another Restricted Subsidiary of the Company;

(4)    the sale, disposition or lease of inventory, products, services or accounts receivable (other than Specified Collateral) in the ordinary course of business;

(5)    any sale, abandonment or other disposition in the ordinary course of business of intellectual property or other assets (other than Specified Collateral) determined by the Company in its reasonable judgment to be damaged, worn-out, surplus, obsolete, permanently retired or no longer useful or economically practicable to maintain in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole;

(6)    the sale or other disposition of cash or Cash Equivalents;

(7)    a Restricted Payment of assets other than Specified Collateral that is not prohibited by Section 4.10 or a Permitted Investment of assets other than Specified Collateral;

(8)    the grant in the ordinary course of business of any non-exclusive license or sublicense of patents, trademarks, registrations therefor and other intellectual property;

(9)    the lease or sublease of other property or assets (other than Specified Collateral) in the ordinary course of business not involving any purchase option which does not materially interfere with the business of the Company and its Restricted Subsidiaries, taken as a whole (subject, in the case of any Note Collateral, to the Lien securing the Notes Obligations);

(10)    to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of property (other than Specified Collateral) for like property for use in any Permitted Business;

(11)    any Lien (or foreclosure thereon) securing Indebtedness to the extent such Lien is permitted by Section 4.20;

(12)    an Event of Loss; and

(13)    any release of intangible claims or rights in connection with the loss or settlement of a bona fide lawsuit, dispute or other controversy.

"Attributable Debt" in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction, including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such Sale and Leaseback Transaction, determined in accordance with GAAP; provided,

however, that if such Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"Aurora Facility" means that certain unfinished ethanol production facility of the Company located in Aurora, Nebraska.

"Aurora West" means Aventine Renewable Energy – Aurora West, LLC, a Delaware limited liability company.

"Aurora West Kiewit Documents" means the Aurora West Kiewit Note and the Aurora West Kiewit Mortgage.

"Aurora West Kiewit Mortgage" means the deed of trust granted on the Issue Date by Aurora West to Kiewit to secure the Aurora West Kiewit Note by Liens on the Aurora West Real Property, as the same may be amended, modified, renewed, restated or replaced, in whole or in part, from time to time in accordance with its terms and the terms hereof (including Section 4.27).

"Aurora West Kiewit Note" means the note payable by Aurora West to Kiewit in the original principal amount of $5,251,808, as the same may be amended, restated or modified in accordance with its terms and the terms hereof (including Section 4.27).

"Aurora West Real Property" means the real property in Aurora, Nebraska owned by Aurora West on the Issue Date and improvements and accessions to such property or proceeds or distributions thereof.

"Authenticating Agent" has the meaning set forth in Section 2.02.

"Authentication Order" has the meaning set forth in Section 2.02.

"Backstop Purchasers" means Brigade Capital Management LLC, Nomura Corporate Research & Asset Management, Inc., Whitebox Advisors, Senator Investment Group LP, and SEACOR Capital Corporation, each as investment manager, for and on behalf of certain funds.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 et seq.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time or only upon the occurrence of a subsequent condition.

"Board of Directors" means:

(1) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2) with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(3) with respect to a limited liability company, the board of directors or other governing body, and in the absence of same, the manager or board of managers or the managing member or members or any controlling committee of managing members thereof; and

(4) with respect to any other Person, the board or committee of such Person or other individual or entity serving a similar function.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the applicable Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee. Unless otherwise specified herein, each reference to a Board Resolution will refer to a Board Resolution of the Company.

"Business Day" means a day that is not a Legal Holiday.

"Calculation Date" means any date on which an event occurs that requires the calculation of the Fixed Charge Coverage Ratio.

"Capital Lease Obligation" means, with respect to any Person, any obligation of such Person under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP; and the amount of Indebtedness represented by such lease at the time any determination is to be made shall be the amount of the liability in respect of such lease that would at that time be required to be capitalized on a balance sheet in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) similar to corporate stock;

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents" means:

(1)     cash in the form of United States of America dollars received in the ordinary course of business;

(2)     securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof) having maturities of not more than one year from the date of acquisition;

(3)     dollar denominated time deposits, overnight deposits, demand deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than one year from the date of acquisition;

(4)     dollar denominated time deposits, overnight deposits, demand deposits and certificates of deposit of any bank not meeting the qualifications specified in clause (3) above with maturities of not more than one year from the date of acquisition; provided, that the aggregate amount of such deposits with such banks and outstanding at any time shall not exceed $100,000;

(5)     repurchase obligations for underlying securities of the types described in clause (2) above entered into with any bank meeting the qualifications specified in clause (3) above;

(6)     commercial paper issued by any Person incorporated in the United States of America, any state thereof or the District of Columbia rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than one year after the date of acquisition;

(7)     marketable direct obligations issued by the District of Columbia or any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(8)     Investments in money market funds substantially all of whose assets are comprised of Cash Equivalents of the types described in clauses (2) through (7) above; and

(9)     in the case of Investments by Foreign Subsidiaries, other short-term investments in accordance with normal investment practices for cash management of a type analogous to the foregoing.

"Change of Control" means the occurrence of any of the following:

(1)     any Person or Persons acting together that would constitute a group (for purposes of Section 13(d) of the Exchange Act, or any successor provision thereto) (a "group"), together with any Affiliates or related Persons thereof, other than any such Person, Persons, Affiliates or related Person who are Permitted Holders, is or becomes the "Beneficial Owner," directly or indirectly, of at least 35% of the voting power of the Company's outstanding Voting Stock, and the Permitted Holders own less than such Person or group (in performing the "own less than" comparison, the holdings of the Permitted Holders who are members of the new group shall not be counted in the shares held in the aggregate by Permitted Holders);

(2)     any sale, lease or other transfer (other than by way of merger or consolidation), in one transaction or a series of related transactions, is made by the Company or any of its Restricted Subsidiaries of all or substantially all of the consolidated assets of the Company and the Restricted Subsidiaries, taken as a whole, to any Person;

(3)     the Company consolidates with or merges with or into another Person or any Person consolidates with, or merges with or into, the Company, in any such event pursuant to a transaction in which immediately after the consummation thereof Persons owning a majority of the Company's Voting Stock voting immediately prior to such consummation shall cease to own a majority of the Company's Voting Stock or, if the Company is not the surviving entity, a majority of the Voting Stock of such surviving entity;

(4)     Continuing Directors cease to constitute at least a majority of the Board of Directors of the Company; or

(5)     the Company's stockholders approve any plan or proposal for the Company's liquidation or dissolution;

provided, however, that in no event shall the sale of the Company's common stock to an underwriter or group of underwriters in privity of contract with the Company (or any other Person in privity of contract with such underwriters) be deemed to be a Change of Control unless such common stock is held in an investment account, in which case the investment account would be treated without giving effect to the foregoing part of this proviso.

"Change of Control Offer" has the meaning set forth in Section 4.15(a).

"Change of Control Payment Date" has the meaning set forth in Section 4.15(b)(2).

"Clearstream" means Clearstream Banking, société anonyme, and any successor thereto.

"Collateral Account" means an account of the Company established at [•] and pledged as Primary Collateral to the Collateral Agent for the benefit of the Trustee and the Holders and into which, among other things, (i) the Net Proceeds corresponding to the Primary Collateral sold in a Primary Collateral Asset Sale, (ii) the Net Loss Proceeds from an Event of Loss or (iii) the net proceeds from an issuance of Additional Notes are deposited in accordance with the provisions of Sections 4.16, 4.17 or 12.01(j), respectively.

"Collateral Agent" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"Collateral Documents" means, collectively, the Security Agreement, the Intercreditor Agreement and each Mortgage, in each case, as the same may be in force from time to time.

"Collateral Monies" means all cash and Cash Equivalents received by the Collateral Agent:

(1)     as Net Proceeds corresponding to the Primary Collateral sold in a Primary Collateral Asset Sale in accordance with the provisions of Section 4.16;

(2)     as Net Loss Proceeds from an Event of Loss in accordance with the provisions of Section 4.17;

(3)     pursuant to the Collateral Documents;

(4)     as proceeds of any sale or other disposition of all or any part of the Primary Collateral by or on behalf of the Collateral Agent or any collection, recovery, receipt, appropriation or other realization of or from all or any part of the Primary Collateral pursuant to this Indenture or any of the Collateral Documents or otherwise;

(5)     as net proceeds from the issuance of any Additional Notes in accordance with the provisions of Section 12.01(j); or

(6)     other than pursuant to clauses (1), (2), (3), (4) or (5) above, for application as provided in the relevant provisions of this Indenture or any Collateral Document.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to Section 5.02 and thereafter means such successor.

"Confirmation Order" means that certain order confirming the Plan pursuant to Section 1129 of the Bankruptcy Code entered by the United States Bankruptcy Court for the District of Delaware on February [__], 2010.

"Consolidated Cash Flow" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period plus the sum of, without duplication:

(1)     an amount equal to any extraordinary loss plus any net loss realized by such Person or any of its Restricted Subsidiaries in connection with an Asset Sale, if, and only to the extent that, such losses were deducted in computing such Consolidated Net Income; plus

(2)     an amount equal to the provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, if, and only to the extent that, such provision for taxes was deducted in computing such Consolidated Net Income; plus

(3)     an amount equal to the Fixed Charges of such Person and its Restricted Subsidiaries for such period, if, and only to the extent that, such Fixed Charges were deducted in computing such Consolidated Net Income; plus

(4)     an amount equal to depreciation and amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) of such Person and its Restricted Subsidiaries for such period, if, and only to the extent that, such depreciation and amortization expenses were deducted in computing such Consolidated Net Income; plus

(5)     non-cash items, if, and only to the extent that, such non-cash items were deducted in computing such Consolidated Net Income, other than any non-cash charges that represent accruals of, or reserves for, cash disbursements to be made in any future accounting period;

in each case, on a consolidated basis and determined in accordance with GAAP.

Notwithstanding the preceding, the provision for taxes based on the income or profits of, and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of the Company that is not a Guarantor will be added to Consolidated Net Income to compute Consolidated Cash Flow of the Company only to the extent that a corresponding amount would be permitted at the date of determination to be dividended to the Company or to a Guarantor by such Restricted Subsidiary without prior governmental approval that has not been obtained, and without direct or indirect restriction pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Restricted Subsidiary or its stockholders.

"Consolidated Net Income" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that:

(1)     the Net Income (but not loss) of any Person that is not a Restricted Subsidiary of the specified Person or that is accounted for by the equity method of accounting will be included only to the extent of the aggregate amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the specified Person;

(2)     the Net Income of any Restricted Subsidiary of the Specified Person will be excluded only to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders or otherwise;

(3)     the cumulative effect of a change in accounting principles will be excluded;

(4)     any gain or loss, together with any related provision for taxes on such gain or loss, realized in connection with (a) any sale of assets outside the ordinary course of business of such Person or any of its Restricted Securities, (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or (c) the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries shall be excluded;

(5)     any extraordinary gain or loss, together with any related provision for taxes on such extraordinary gain or loss, shall be excluded;

(6)     any charges related to restructuring, debt retirement, extinguishment of Hedging Obligations or facility closings shall be excluded;

(7)     all non-cash expenses related to stock-based compensation plans or other non-cash compensation, including stock option non-cash expenses, shall be excluded;

(8)     any non-cash impact as a result of the Company's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Plan shall be excluded; and

(9)     the calculation of Consolidated Net Income will not give effect to, without duplication, any deduction for (a) any increased amortization, depreciation or cost of sales resulting from the write-up of assets pursuant to Accounting Principles Board Opinion Nos. 16 and 17 or their respective successors under the Financial Accounting Standards Board's FASB Statement No. 168, "The FASB Accounting Standards Codification," and (b) any nonrecurring charges relating to any premium or penalty paid, write-off of deferred financing costs or other financial recapitalization charges in connection with redeeming or retiring any Indebtedness prior to its Stated Maturity.

"Consolidated Net Worth" means, with respect to any specified Person as of any date, the sum of:

(1)     the consolidated equity of the common stockholders of such Person and its consolidated Subsidiaries as of such date; plus

(2)     the respective amounts reported on such Person's balance sheet as of such date with respect to any series of preferred stock (other than Disqualified Stock) that by its terms is not entitled to the payment of dividends unless such dividends may be declared and paid only out of net earnings in respect of the year of such declaration and payment, but only to the extent of any cash received by such Person upon issuance of such preferred stock.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)     was a member of such Board of Directors on the Issue Date (following consummation of the transactions contemplated by the Plan); or

(2)　　was elected to such Board of Directors with the approval of, or whose nomination for election was approved or ratified by, a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

"Corporate Trust Office" means the office of the Trustee specified in Section 11.02.

"Covenant Defeasance" has the meaning set forth in Section 8.01(c).

"Credit Facilities" means one or more debt facilities (including the ABL Facility) or commercial paper facilities, in each case with banks or other institutional lenders, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), bankers' acceptances or letters of credit, including any related notes, guarantees, collateral documents, instruments and agreements executed and delivered in connection therewith, and, in each case, as amended, restated, modified, increased, renewed, refunded, replaced (whether upon termination or otherwise) or refinanced (including by means of sales of one or more series of notes, bonds or other debt securities and related indentures or similar agreements) in whole or in part from time to time; provided that the aggregate principal amount of Indebtedness outstanding at any time under all such Credit Facilities is permitted to be incurred at such time under clause (1) of the second paragraph of Section 4.12.

"Credit Facility Agent" means, at any time, the Person serving at such time as the "Agent", "Administrative Agent" or "Collateral Agent" under the applicable Credit Facility or any other representative of the lenders thereunder or any trustee or agent or representative of holders of Credit Facility Obligations then most recently designated by the terms of the Credit Facility, in a written notice delivered to the administrative agent, as the Credit Facility Agent for the purposes of the Intercreditor Agreement.

"Credit Facility Amount" means (i) at any time prior to the ABL Facility Trigger Date, $37,000,000; or (ii) at any time on or after the ABL Facility Trigger Date, $60,000,000 less the aggregate principal amount of Indebtedness incurred pursuant to clause (1)(a) of the second paragraph of Section 4.12 that is outstanding at such time.

"Credit Facility Lien" means, to the extent securing Credit Facility Obligations, a Lien on assets constituting Secondary Collateral granted to the Credit Facility Agent or any holder, or other administrative agent, agent, trustee or representative of holders, of Credit Facility Obligations as security for Credit Facility Obligations and subject to the Intercreditor Agreement.

"Credit Facility Lien Documents" means the documentation relating to the Credit Facility Liens granted under any Credit Facility, including the ABL Facility, the ABL Facility Lien Security Documents, any related loans, guarantees, collateral documents, instruments and agreements executed in connection therewith and all other agreements governing, securing or relating to any Credit Facility Obligations.

"Credit Facility Obligations" means Indebtedness arising under any Credit Facility and all other Obligations of the Company or any Guarantor under the Credit Facility Lien Documents.

"Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Code.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Depository" means the DTC.

"Disqualified Stock" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Capital Stock) or upon the happening of any event, (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise or (b) is or may become redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the Maturity Date.  Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a Change of Control or an Asset Sale prior to the date that is 91 days after the Maturity Date will not constitute Disqualified Stock if the change of control or asset sale provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in Sections 4.15 and 4.16, respectively, and provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 4.10.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"Domestic Subsidiary" means any Restricted Subsidiary of the Company that either (1) was formed under the laws of the United States of America or any state of the United States of America or the District of Columbia or (2) does not conduct substantially all its operations outside the United States of America.

"DTC" means The Depository Trust Company, its nominees and successors.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear system, and any successor thereto.

"Event of Default" has the meaning set forth in Section 6.01.

"Event of Loss" means, with respect to any property or asset (tangible or intangible, real or personal) that constitutes Primary Collateral (including any of the Facilities), any of the following:

> (1)     any loss or destruction of, or damage to, such property or asset;

(2)     any institution of any proceedings for the condemnation or seizure of, or for the exercise of any right of eminent domain with respect to, such property or asset;

(3)     any actual condemnation, seizure or taking by exercise of the power of eminent domain or otherwise of such property or asset, or confiscation of such property or asset or the requisition of the use of such property or asset; or

(4)     any settlement in lieu of clauses (2) or (3) above.

"Excess Asset Sale Proceeds" has the meaning set forth in Section 4.16.

"Excess Loss Proceeds" has the meaning set forth in Section 4.17.

"Excess Proceeds" has the meaning set forth in Section 4.19.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto, and the rules and regulations of the SEC promulgated thereunder.

"Exchange Notes" means (i) the Notes, if any, issued under Section 2.02 pursuant to an Exchange Offer and (ii) any PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in partial payment of the interest accrued on any Exchange Notes that is due and payable on such Interest Payment Date.

"Exchange Offer" means an exchange offer that may be made by the Company, pursuant to a Registration Rights Agreement, to exchange for any and all of the Initial Notes a like aggregate principal amount of Exchange Notes registered under the Securities Act and having substantially identical terms to the Initial Notes.

"Excluded Foreign Subsidiary Capital Stock" has the meaning set forth in the Security Agreement.

"Excluded General Intangibles" has the meaning set forth in the Security Agreement.

"Excluded Personal Property" has the meaning set forth in the Security Agreement.

"Excluded Trademark Applications" has the meaning set forth in the Security Agreement.

"Facilities" means the Company's ethanol production facilities and, in each case, all improvements thereto.

"Fair Market Value" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and unaffiliated willing buyer under no compulsion to buy in a transaction not involving distress or necessity of either party.  "Fair Market Value" shall be determined, except as otherwise provided in this Indenture, in good faith (a) by any Officer, if Fair Market Value is equal to or less than $5.0 million or (b) by the Board of Directors of the Company, whose determination shall be

conclusive if evidenced by a resolution of the Board of Directors, if Fair Market Value exceeds $5.0 million.

"<u>Fixed Charge Coverage Ratio</u>" means, with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period.  In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, Guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the applicable Calculation Date, then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect to such incurrence, assumption, Guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of such preferred stock, and the use of the proceeds therefrom, as if the same had occurred on the first day of the applicable period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio for any period:

(1)     acquisitions and dispositions of business entities or property and assets constituting a division or line of business of any Person that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations or as a result of a Permitted Investment and including any related financing transactions and including increases in ownership of Restricted Subsidiaries, during such period or subsequent to such period and on or prior to the Calculation Date will be given pro forma effect as if they had occurred on the first day of such period;

(2)     the Consolidated Cash Flow of the specified Person and its Restricted Subsidiaries attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(3)     the Fixed Charges of the specified Person and its Restricted Subsidiaries attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date;

(4)     any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such period;

(5)     any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such period;

(6)     if any Indebtedness of the specified Person and its Restricted Subsidiaries bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such

Indebtedness if such Hedging Obligation has a remaining term until the earlier of the maturity of such Indebtedness or more than 12 months after the Calculation Date; and

(7)     for purposes of making the computations referred to above, interest on any Indebtedness of the specified Person and its Restricted Subsidiaries under a revolving credit facility (to the extent not excluded from the calculation of the Fixed Charge Coverage Ratio due to the operation of the first parenthetical phrase of this definition) computed on a pro forma basis shall be computed based on the weighted average daily balance of such Indebtedness during such period.

For purposes of this definition and the first paragraph of <u>Section 4.12</u>, whenever pro forma effect is to be given to any calculation, the pro forma calculations shall be determined in good faith by the chief financial officer of the Company.  Any such pro forma calculations may include operating expense reductions (net of associated expenses) for such period resulting from the acquisition which is being given pro forma effect that (a) would be permitted to be reflected on pro forma financial statements pursuant to Rule 11-02 of Regulation S-X under the Securities Act or (b) have been realized or for which substantially all the steps necessary for realization have been taken or, at the time of determination, are reasonably expected to be taken with 90 days immediately following any such acquisition, including the execution, termination, renegotiation or modification of any contracts, the termination of any personnel or the closing of any facility, as applicable, provided that, in any case, such adjustments shall be (A) calculated on an annualized basis and (B) set forth in an Officers' Certificate signed by the Company's chief financial officer and another Officer which states in reasonable detail (i) the amount of such adjustment or adjustments, (ii) that such adjustment or adjustments are based on the reasonable good faith beliefs of the Officers executing such Officers' Certificate at the time of such execution and (iii) that such adjustment or adjustments and the plan or plans related thereto have been reviewed and approved by the Company's Board of Directors.

"<u>Fixed Charges</u>" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; plus

(2)     the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period to the extent the net income of such Restricted Subsidiary is included in the calculation of Net Income; plus

(3)     any interest accruing on Indebtedness of another Person that is Guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such

Person or one of its Restricted Subsidiaries, whether or not such Guarantee or Lien is called upon; plus

      (4)    the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of such Person or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or a Restricted Subsidiary of the Company and (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal,

in each case, on a consolidated basis and in accordance with GAAP.

"<u>Foreign Subsidiary</u>" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"<u>GAAP</u>" means generally accepted accounting principles set forth in the Financial Accounting Standards Board's FASB Statement No. 168, "The FASB Accounting Standards Codification," the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as have been approved by a significant segment of the accounting profession which are in effect from time to time.

"<u>Global Notes</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Guarantee</u>" means, as to any Person, a guarantee other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business, direct or indirect, in any manner, including by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness of another Person (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services or to maintain such other Person's financial condition or otherwise).

"<u>Guarantors</u>" means:

      (1)    all of the Company's existing Restricted Subsidiaries that have executed and delivered this Indenture as a guarantor; and

      (2)    any other Subsidiary of the Company that executes and delivers a supplemental indenture hereto providing for a Note Guarantee in accordance with the provisions of this Indenture;

and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

"<u>Hedging Obligations</u>" means, with respect to any specified Person, the obligations of such Person under:

(1)     interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate protection agreements, interest rate cap agreements, interest rate collar agreements, interest rate hedge agreements and other agreements (including any ISDA agreements) or arrangements designed to manage interest rates or interest rate risk;

(2)     commodity swap agreements, commodity option agreements, forward contracts and other agreements (including any ISDA agreements) or arrangements designed to protect such Person against fluctuations in commodity prices or the prices of other raw materials used in its business; and

(3)     foreign exchange contracts, currency swap agreements, futures contracts, currency options, synthetic caps and other agreements (including any ISDA agreements) or arrangements designed to protect such Person against fluctuations in currency exchange rates.

"Holder" means the Person in whose name a Note is registered on the Registrar's books.

"Incentive Interests" has the meaning set forth in Section 4.12.

"incur" has the meaning set forth in Section 4.12.

"Indebtedness" means, with respect to any specified Person, at any date of determination (without duplication):

(1)     any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

(a)     in respect of borrowed money;

(b)     evidenced by bonds, loans, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(c)     in respect of bankers' acceptances;

(d)     representing Capital Lease Obligations; or

(e)     representing any Hedging Obligations; and

(2)     all Obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all Obligations under any title retention agreement (but excluding (A) trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 90 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and (B) any deferred purchase price represented by earn outs customary for like transactions),

if and to the extent any of the preceding items (other than letters of credit, Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.  In addition, the term "Indebtedness" includes (a) such portion of the Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) as shall equal the lesser of (x) the Fair Market Value of such asset as of the date of determination and (y) the amount of such Indebtedness and (b) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.  Notwithstanding the foregoing, Indebtedness of the Company or any Restricted Subsidiary shall not include the pledge by the Company or such Restricted Subsidiary of, or a Guarantee thereof limited in recourse to, the Capital Stock of an Unrestricted Subsidiary to secure Non-Recourse Debt of such Unrestricted Subsidiary.

"Indemnified Party" has the meaning set forth in Section 7.07.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"Indenture Documents" means, collectively, this Indenture, the Notes and the Collateral Documents.

"Indiana Port Lease Agreement" means the Lease Agreement, dated as of October 31, 2006, between the Indiana Port Lessor and the Indiana Port Lessee, as amended as of the Issue Date and as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time after the date hereof in accordance with its terms and the terms hereof (including Section 4.27).

"Indiana Port Lease Collateral" means any inventory, equipment or fixtures of the Indiana Port Lessee that are (a) now or hereafter located on the Indiana Port Leased Premises or (b) at any time used in connection with the business of the Indiana Port Lessee carried out on the Indiana Port Leased Premises.

"Indiana Port Leased Premises" means the real property leasehold interest leased by the Indiana Port Lessee from the Indiana Port Lessor pursuant to the Indiana Port Lease Agreement on which the Mt. Vernon Facility is located.

"Indiana Port Lease Required Mortgage Date" means the date 45 days after the Issue Date.

"Indiana Port Lessee" means Aventine Renewable Energy – Mt. Vernon, LLC, a Delaware limited liability company.

"Indiana Port Lessor" means the Indiana Port Commission, a body corporate and politic existing under the laws of the State of Indiana, and its successors and assigns.

"Initial Notes" means (i) any Notes that are originally issued on the Issue Date in the aggregate principal amount of up to $105,000,000 and (ii) any PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in partial payment of the interest accrued on any Initial Notes that is due and payable on such Interest Payment Date.

"Initial Purchasers" means the Backstop Purchasers and [any subscribers].

"Intercompany Debt" means any Indebtedness owing by any of the Company or any of the Restricted Subsidiaries of the Company to the Company or any of the Restricted Subsidiaries of the Company.

"Intercreditor Agreement" means an intercreditor agreement to be entered into between the Collateral Agent, on behalf of the Trustee and the Holders, and each applicable Credit Facility Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Interest Payment Date" means the stated maturity of an installment of interest on the Notes.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), and purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities of such other Person together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company or such Restricted Subsidiary will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's or the Restricted Subsidiary's Investments in such Restricted Subsidiary that were not sold or disposed of, if any, in an amount determined as provided in the last paragraph of Section 4.10.  The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the last paragraph of Section 4.10.  Except as otherwise provided in this Indenture, the amount or Fair Market Value of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"ISDA" means the International Swaps and Derivatives Association or any successor thereto.

"Issue Date" means **[• ]**, 2010.

"Issue Date Opinions" means the Opinions of Counsel addressed and delivered to the Trustee and the Collateral Agent substantially in the form of the Opinions of Counsel delivered on the Issue Date to the Credit Facility Agent and the Initial Purchasers relating to (i) any of the Note Collateral or the Collateral Documents, (ii) the due authorization, execution and delivery of the Initial Notes, this Indenture, the Note Guarantees and the Collateral Documents, and the validity and enforceability of such documents, (iii) exemption of the offer and sale of the Initial

Notes and Note Guarantees to the Initial Purchasers from registration under the Securities Act, and (iv) the absence of the need to qualify this Indenture under the TIA in respect of such sale and offer.

"<u>Kiewit</u>" means Kiewit Energy Company.

"<u>Legal Defeasance</u>" has the meaning set forth in <u>Section 8.01(b)</u>.

"<u>Legal Holiday</u>" has the meaning set forth in <u>Section 11.07</u>.

"<u>Lien</u>" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"<u>Management Incentive Plan</u>" means the "Management Incentive Plan" as defined in the Plan, as the same may be amended, modified, renewed, restated or replaced, in whole or in part, from time to time in accordance with its terms and the terms hereof (including <u>Section 4.27</u>).

"<u>Maturity</u>" means, with respect to any Note, the date on which the principal of such Note becomes due and payable as therein or herein provided, whether at the Maturity Date or by declaration of acceleration, call for redemption or otherwise.

"<u>Maturity Date</u>" means **[• ]**, 2015.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and its successors.

"<u>Mortgages</u>" means the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents, if any, granting Liens on the Facilities or any other real property owned by the Company or any Guarantor to secure the Note Obligations.

"<u>Mt. Vernon Facility</u>" means that certain unfinished ethanol production facility of the Company located in Mt. Vernon, Indiana.

"<u>Net Income</u>" means, with respect to any specified Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however:

> (1)    any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with: (a) any Asset Sale; or (b) the disposition of any Equity Interests or other securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries;

> (2)    any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss); and

(3)     any unrealized non-cash gains or losses in respect of Hedging Obligations, to the extent such gains or losses are taken into account in computing the net income (loss) of such Person.

"Net Loss Proceeds" means the aggregate cash proceeds received by the Company or any Guarantor in respect of any Event of Loss, including insurance proceeds, condemnation awards or damages awarded by any judgment, net of (1) the direct costs in recovery of such Net Loss Proceeds (including reasonable legal, accounting, appraisal and insurance adjuster fees and any relocation expenses incurred as a result thereof), (2) amounts required to be applied to the repayment of Indebtedness, other than Credit Facility Obligations, secured by a Lien on the asset or assets that were the subject of such Event of Loss, (3) any taxes paid or payable as a result thereof and (4) amounts taken by the Company or its Restricted Subsidiaries, as the case may be, as a reserve against any liabilities associated with such Event of Loss and retained by the Company or its Restricted Subsidiaries, as the case may be, after such Event of Loss, including liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Event of Loss, all as determined in accordance with GAAP.

"Net Proceeds" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (1) the direct costs relating to such Asset Sale, including legal, accounting and investment banking, broker or finder fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, (2) any taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, (3) amounts required to be applied to the repayment of Indebtedness, other than Credit Facility Obligations, secured by a Lien on the asset or assets that were the subject of such Asset Sale, (4) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP or amount placed in an escrow account for purposes of such an adjustment and (5) escrowed amounts and amounts taken by the Company or its Restricted Subsidiaries as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in accordance with GAAP; provided that (a) excess amounts set aside for payment of taxes pursuant to clause (2) above remaining after such taxes have been paid in full or the statute of limitations therefor has expired and (b) amounts escrowed or initially held in reserve pursuant to clause (5) no longer so held, will, in the case of each of subclauses (a) and (b), at that time become Net Proceeds.

"Non-Recourse Debt" means Indebtedness:

(1)     as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable (as a guarantor or otherwise) or (c) constitutes the lender;

(2)     no default with respect to which would permit, upon notice, lapse of time or both, any holder of any other Indebtedness of the Company or any of its Restricted

Subsidiaries to declare a default on such other Indebtedness or cause the payment of such other Indebtedness to be accelerated or payable prior to its Stated Maturity; and

(3) as to which (a) the explicit terms provide that there is no recourse against any assets of the Company or any of its Restricted Subsidiaries (other than Equity Interests of Unrestricted Subsidiaries) or (b) the lenders have been notified in writing that they will have no recourse to the stock or any assets of the Company or any of its Restricted Subsidiaries (other than Equity Interests of Unrestricted Subsidiaries).

"Non-U.S. Person" means a Person who is not a "U.S. person," as such term is defined in Regulation S.

"Note Collateral" means, collectively, all the property and assets (including Primary Collateral and Secondary Collateral) of the Company or any of the Guarantors that are from time to time subject to the Lien of the Collateral Documents, including the Liens, if any, required to be granted pursuant to this Indenture.

"Note Collateral Covered Property" means any property or assets other than real property acquired or owned by the Company or any Restricted Subsidiary that, at the time the Company or such Restricted Subsidiary acquires or first owns such property or assets, such property or assets automatically become subject to valid and perfected Note Liens already created pursuant to then existing Collateral Documents.

"Note Collateral Non-Specified Covered Property" means any Note Collateral Covered Property that is not After-Acquired Specified Property.

"Note Collateral Required Date" means, as to any additional property or assets required to be added to the Note Collateral, (i) if such property or assets are After-Acquired Property, the After-Acquired Property Required Date or (ii) otherwise, the date 30 days after the first date on which any provision of this Indenture or any Collateral Document requires such additional property or assets so to be added to the Note Collateral.

"Note Guarantee" has the meaning set forth in Section 10.01.

"Note Lien" means, to the extent securing Note Obligations, a Lien granted pursuant to a Collateral Document as security for Note Obligations.

"Note Obligations" means the Notes, the Note Guarantees and all other Obligations of any Obligor under this Indenture, the Note Guarantees and the Collateral Documents.

"Notes" means the 13% Senior Secured Notes due 2015 that are issued pursuant to this Indenture, as amended or supplemented from time to time in accordance with the terms hereof, including the Initial Notes, the Exchange Notes, any Additional Notes and any PIK Notes, all treated as a single class.

"Obligations" means all obligations for principal, premium, interest (including, with respect to the Notes, any interest accruing after the commencement of any bankruptcy, insolvency, or similar proceeding, whether or not a claim for post-filing or post-petition interest

is allowed in such proceeding), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"Obligors" means, as the context may require, the Company or the Guarantors.

"Offer Trigger Date" has the meaning set forth in Section 4.19.

"Offering" means the offering of the Initial Notes that are originally issued on the Issue Date in accordance with and pursuant to the Plan.

"Officer" means the Chief Executive Officer, the President, the Chief Financial Officer, the Chief Accounting and Compliance Officer, the Corporate Controller, any Senior Vice President or any Vice President of the Company.

"Officers' Certificate" means a certificate signed by two Officers of the Company, at least one of whom shall be the principal financial officer of the Company, and that meets the requirements of Section 11.05 and is delivered to the Trustee.

"Opinion of Counsel" means a written opinion of counsel who may be an employee of or counsel for the Trustee or the Company and shall be reasonably acceptable to the Trustee and that meets the requirements of Section 11.05.

"Paying Agent" has the meaning set forth in Section 2.03.

"Payment Default" has the meaning set forth in Section 6.01(f)(1).

"Permitted Business" means (1) the business of the Company and its Subsidiaries engaged in on the Issue Date and (2) any business or activity ancillary, reasonably related or complementary thereto.

"Permitted Collateral Liens" means (1) with respect to any Specified Collateral, Liens described in clauses (1), (4), (5), (8), (9), (10), (11), (12), (13) (solely to the extent (i) securing Permitted Refinancing Indebtedness incurred in exchange for, or to refund, refinance, replace, defease or discharge, Indebtedness that was secured by Liens permitted pursuant to clause (4) or (5) of the definition of "Permitted Liens" and (ii) on the same property and assets on which such other Liens were so permitted), (14), (16), (17), (20), (21) and (27) of the definition of "Permitted Liens" or (2) with respect to any Note Collateral (other than Specified Collateral), any Permitted Liens.

"Permitted Debt" has the meaning set forth in Section 4.12.

"Permitted Holders" means each of the Backstop Purchasers, its Affiliates and its and its Affiliates' managed funds and accounts and (1) entities controlled by any such Persons, (2) trusts for the benefit of any such individual Persons or the spouses, issue, parents or other relatives of such individual Persons and (3) in the event of the death of any such individual Person, heirs or testamentary legatees of such Person. For purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or

cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Permitted Investments" means:

(1)    any Investment by (a) the Company or a Restricted Subsidiary of the Company in the Company or a Guarantor so long as, to the extent such Investment includes any assets constituting Note Collateral of the Person making the Investment, such Investment does not occur until and unless the provisions of Section 4.28 (to the extent applicable to such Investment) have otherwise been complied with in respect of such assets, (b) the Company or a Guarantor (of assets other than Specified Collateral) in a Restricted Subsidiary of the Company that is not a Guarantor to the extent that the aggregate amount of all such Investments does not exceed $250,000 at any time outstanding or (c) a Restricted Subsidiary of the Company that is not a Guarantor in any other Restricted Subsidiary;

(2)    any Investment in Cash Equivalents;

(3)    any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

(a)    such Person becomes a Restricted Subsidiary of the Company and a Guarantor; or

(b)    such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company that is a Guarantor;

so long as, in the case of clause (a) or (b), to the extent as a result of such Investment the Person making the Investment acquires or owns any After-Acquired Property, such Investment does not occur unless such After-Acquired Property has become Note Collateral prior to or simultaneously with the acquisition thereof and until and unless the provisions of Section 4.28 (to the extent applicable to such Investment) have otherwise been complied with respect to such After-Acquired Property;

(4)    any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.16;

(5)    any acquisition of assets or Capital Stock (including pursuant to any merger or consolidation of the Company in accordance with Section 5.01) solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(6)    any Investments received in compromise or resolution of (a) obligations of any Person or customer that were incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of

reorganization or similar arrangement upon the bankruptcy or insolvency of such Person; or (b) litigation, arbitration or other disputes with Persons who are not Affiliates;

(7)     Investments represented by deposits or other Liens in respect of Hedging Obligations permitted in accordance with clause (25) of the definition of "Permitted Liens";

(8)     other Investments (of assets other than Specified Collateral) in any Person other than an Affiliate of the Company having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this <u>clause (8)</u> that are at the time outstanding, not to exceed $1,000,000;

(9)     to the extent permitted by applicable law, loans or advances to employees in the ordinary course of business for bona fide business purposes and not to exceed $250,000 in the aggregate at any time outstanding;

(10)     Investments constituting repurchases or acquisitions of the Notes;

(11)     Investments in existence on the Issue Date;

(12)     Investments represented by Guarantees that are otherwise permitted under this Indenture;

(13)     endorsements for collection or deposit in the ordinary course of business by any Person of bank drafts and similar negotiable instruments of any other Person received as payment for ordinary course of business trade receivables;

(14)     (a) lease, utility, worker's compensation, insurance, construction, performance and other similar deposits of cash or Cash Equivalents or other investment property provided to secure (or provided to secure letters of credit securing) obligations to third parties ("ordinary course deposits") to the extent such deposits are permitted pursuant to clause (6) of the definition of "Permitted Liens" and (b) prepaid expenses recorded as assets of such Person in accordance with GAAP ("GAAP prepaid expenses"), in each case if (but only if) such deposits or prepaid expenses arise in the ordinary course of business [no cap] [and, in addition, the amount of such Investments made pursuant to this clause (14), when added to the aggregate outstanding amount of Investments constituting ordinary course deposits or GAAP prepaid expenses in existence on the Issue Date and made pursuant to clause (11) above, does not exceed $__.0 million in the aggregate at any time outstanding];

(15)     receivables (including pursuant to extensions of trade credit) arising in the ordinary course of business; provided, however, that such receivables would be recorded as assets of such Person in accordance with GAAP; and

(16)     deposit of cash or Cash Equivalents or other investment property constituting Secondary Collateral to secure Credit Facility Obligations under the ABL Facility in an amount not to exceed $5,000,000;

provided, however, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of such Investment to one or more of the above clauses (1) through (16) so that all or a portion of such Investment would be a Permitted Investment.

In connection with any assets or property contributed or transferred to any Person as an Investment, such property and assets shall be equal to the Fair Market Value at the time of Investment. The amount of Investments outstanding at any time pursuant to clause (8) shall be reduced by an amount equal to the net reduction in Investments by the Company and its Restricted Subsidiaries, subsequent to the date of the Indenture, resulting from repayments of loans or advances or other transfers of assets, in each case, to the Company or any such Restricted Subsidiary from any such Investment, or from the net cash proceeds from the sale of any such Investment, or from a redesignation of an Unrestricted Subsidiary to a Restricted Subsidiary, not to exceed, in the case of any Investment, the amount of the Investment previously made by the Company or any of its Restricted Subsidiaries in such Person or Unrestricted Subsidiary.

"Permitted Liens" means:

(1)    Liens created for the benefit of (or to secure) the Notes or the Note Guarantees;

(2)    Credit Facility Liens on Secondary Collateral;

(3)    Liens in favor of the Company or the Guarantors (not securing Credit Facility Obligations);

(4)    Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Company or any Restricted Subsidiary of the Company; provided that such Liens were in existence prior to, and not incurred in contemplation of, such merger or consolidation and do not extend to any assets other than those assets of the Person merged into or consolidated with the Company or such Restricted Subsidiary that were so subject to such Liens;

(5)    Liens on property (including Capital Stock) existing at the time of acquisition of the property, including by way of merger, consolidation or otherwise, by the Company or any Restricted Subsidiary of the Company; provided that such Liens were in existence prior to, and not incurred in contemplation of, such acquisition and do not extend to any other assets owned by the Company or any Restricted Subsidiary;

(6)    Liens on cash or Cash Equivalents or other investment property provided to secure (or to secure letters of credit securing) the performance of statutory obligations (including obligations under worker's compensation, unemployment insurance or similar legislation), surety or appeal bonds, leases, utility agreements, insurance agreements, construction agreements, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(7)    Liens existing on the Issue Date (other than pursuant to the Aurora West Kiewit Mortgage or the Indiana Port Lease Agreement or clause (2) or (3) of this definition);

(8) Liens granted on the Issue Date on the Aurora West Real Property to secure the Aurora West Kiewit Note pursuant to the Aurora West Kiewit Mortgage;

(9) (i) at any time prior to the Indiana Port Leasehold Required Mortgage Date, the Lien in favor of the Indiana Port Lessor pursuant to the Indiana Port Lease Agreement on any Indiana Port Lease Collateral securing the obligations of the Indiana Port Lessee under the Indiana Port Lease Agreement or (ii) on or after the Indiana Port Leasehold Required Mortgage Date, the Lien in favor of the Indiana Port Lessor pursuant to the Indiana Port Lease Agreement on any Indiana Port Lease Collateral securing the obligations of the Indiana Port Lessee under the Indiana Port Lease Agreement if (but only if) (x) the Indiana Port Leased Premises on which such Indiana Port Lease Collateral is located is subject to a Mortgage securing the Note Obligations, (y) such Indiana Port Lease Collateral constitutes Note Collateral and (z) such Lien is subordinated to the Lien of the Collateral Documents (including such Mortgage) in accordance with the terms of the Indiana Port Lease Agreement;

(10) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(11) Liens imposed by law (such as carriers', warehousemen's and mechanics' Liens), Liens imposed by law in favor of sellers of farm products and Liens of landlords imposed by law securing obligations to pay lease amounts, in each case, that are not due and payable or in default or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded, in each case, incurred in the ordinary course of business;

(12) survey exceptions, encumbrances, restrictions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that, in each case, were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(13) Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under this Indenture; provided, however, that:

(a) the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged (plus improvements and accessions to such property or proceeds or distributions thereof); and

(b) the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (i) the outstanding principal amount (or accreted value, if applicable) or, if greater, the committed amount of the Indebtedness

being exchanged, refunded, refinanced, replaced, defeased or discharged and (ii) an amount necessary to pay all accrued interest on such Indebtedness and any fees and expenses, including premiums and tender and defeasance costs, related to such exchange, refunding, refinancing, replacement, defeasance or discharge;

(14)     Liens arising pursuant to an order of attachment, condemnation, eminent domain, distraint or similar legal process arising in connection with legal proceedings and any Liens that are required to protect or enforce rights in any administrative, arbitration or other court proceedings in the ordinary course of business, in each case, not giving rise to an Event of Default;

(15)     pledges of Equity Interests of an Unrestricted Subsidiary securing Non-Recourse Debt of such Unrestricted Subsidiary;

(16)     any Lien on property (real or personal), plant or equipment, all or any part of the purchase price or cost of design, development, construction, installation or improvement of which was financed by Indebtedness permitted to be incurred pursuant to clause (4) of the second paragraph of Section 4.12 solely to the extent securing such Indebtedness;

(17)     leases or  subleases granted to others that do not materially interfere with the ordinary course of business of the Company and its Restricted Subsidiaries, taken as a whole, so long as the aggregate Fair Market Value of all Specified Collateral subject to such Liens pursuant to this clause (17) does not exceed $500,000;

(18)     bankers' Liens, rights of setoff and similar Liens with respect to cash and Cash Equivalents on deposit in one or more bank accounts in the ordinary course of business;

(19)     Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the products and proceeds thereof, so long as the aggregate amount of obligations secured by Liens incurred pursuant to this clause (19) does not exceed $1.0 million at any one time outstanding;

(20)     Liens on goods imported by the Company or any Restricted Subsidiary in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of such goods;

(21)     Liens consisting of conditional sale, title retention, consignment or similar arrangements for the sale of goods acquired by the Company or any of its Restricted Subsidiaries in the ordinary course of business in accordance with the past practices of the Company and its Restricted Subsidiaries prior to the Issue Date so long as the aggregate Fair Market Value of all Specified Collateral subject to such Liens pursuant to this clause (21) does not exceed $500,000;

(22)     Liens securing insurance premium financing arrangements, provided that such Lien is limited to the applicable insurance contracts;

(23)     Liens arising from filing Uniform Commercial Code financing statements regarding operating leases;

(24)     any interest or title of a lessor, licensor or sublicensor in property leased, licensed or sublicensed to the Company or any Restricted Subsidiary pursuant to any lease, license or sublicense not constituting Indebtedness;

(25)     Liens encumbering customary initial deposits and margin deposits and other Liens on cash or Cash Equivalents or other investment property that are within the general parameters customary in the industry and incurred in the ordinary course of business, in each case, securing Indebtedness under Hedging Obligations designed solely to protect the Company or any of its Restricted Subsidiaries from fluctuations in interest rates, currencies or the price of commodities;

(26)     Liens incurred in the ordinary course of business of the Company or any Subsidiary of the Company with respect to obligations that do not exceed $1,000,000 at any one time outstanding; and

(27)     Liens incurred in the ordinary course of business of the Company or any Subsidiary of the Company with respect to obligations that do not secure Indebtedness and that do not exceed $1,000,000 at any one time outstanding.

"Permitted Refinancing Indebtedness" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to refund, refinance, replace, defease or discharge, other Indebtedness of the Company or any of its Restricted Subsidiaries (other than Intercompany Debt); provided that:

(1)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness exchanged, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on such Indebtedness and the amount of all fees and expenses, including premiums and tender and defeasance costs, incurred in connection therewith);

(2)     such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged (or, if shorter, has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Notes);

(3)     if the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Notes or any Note Guarantee, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Notes or such Note Guarantee, as the case may be, on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged; and

(4)    such Indebtedness has the Company or any Restricted Subsidiary of the Company as an obligor (whether as borrower, guarantor or otherwise) only if the Company or such Restricted Subsidiary is an obligor (in any capacity) on the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"<u>Physical Notes</u>" has the meaning set forth in <u>Section 2.14(b)</u>.

"<u>PIK Interest</u>" means the portion of an installment of interest due on an Interest Payment Date payable by issuance of PIK Notes as and to the extent provided for in <u>Section 4.01(d)</u>.

"<u>PIK Interest Amount</u>" means, with respect to any Interest Payment Date for any Note that is prior to the Maturity thereof and with respect to which the Company has duly made a PIK Interest Election, the portion of the aggregate installment of interest due and payable on such Interest Payment Date that is payable on such Interest Payment Date by issuance of PIK Notes in accordance with the fourth paragraph of <u>Section 2.02</u>, such portion being 7/15 of such aggregate installment of interest.

"<u>PIK Interest Election</u>" means, with respect to any Interest Payment Date, an election by the Company duly given pursuant to <u>Section 4.01(c)</u> not to pay the entire amount of interest due on the Notes on such Interest Payment Date in cash.

"<u>PIK Notes</u>" means Notes issued (including by any increase in the principal amount of any outstanding Global Note previously authenticated hereunder) on any Interest Payment Date pursuant to the fourth paragraph of <u>Section 2.02</u> in payment of the portion of the aggregate installment of interest due and payable on any Notes on such Interest Payment Date constituting the PIK Interest Amount with respect to such Interest Payment Date for such Notes.

"<u>Plan</u>" means that certain Joint Plan of Reorganization filed by the Company and its affiliates on December 4, 2009 in the United States Bankruptcy Court for the District of Delaware, as amended or supplemented from time to time prior to entry of the Confirmation Order, including any exhibits, supplements, annexes, appendices and schedules thereto, as confirmed by such Bankruptcy Court pursuant to the Confirmation Order.

"<u>Primary Collateral</u>" means the "Indenture Exclusive Collateral" as defined in the Intercreditor Agreement.

"<u>Primary Collateral Asset Sale</u>" means an Asset Sale consisting of the disposition of assets constituting Primary Collateral (including the disposition of Capital Stock of a Subsidiary which results in the disposition of assets constituting Primary Collateral); <u>provided</u> that if an Asset Sale results in the disposition of assets constituting Primary Collateral and Secondary Collateral, the term "<u>Primary Collateral Asset Sale</u>" shall be limited to the portion of the Note Collateral so disposed of that constitutes Primary Collateral.

"<u>Primary Collateral Liens</u>" means Note Liens on Primary Collateral.

"principal" of any Indebtedness (including the Notes) means the principal amount (or accreted value, as the case may be) of such Indebtedness.

"Private Placement Legend" means the legend initially set forth on the Notes in the form set forth in Exhibit D.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Record Date" means any of the record dates specified in the Notes, whether or not a Legal Holiday.

"Redemption Date" means, when used with respect to any Note to be redeemed, the date fixed for redemption of such Note pursuant to this Indenture and the Notes.

"Redemption Price" means, when used with respect to any Note to be redeemed, the price fixed for redemption of such Note pursuant to this Indenture and the Notes.

"Register" has the meaning set forth in Section 2.03.

"Registrar" has the meaning set forth in Section 2.03.

"Registration Rights Agreement" means (a) the Registration Rights Agreement, dated as of the Issue Date, among the Company, the Guarantors and the Initial Purchasers, as the same may be amended or supplemented from time to time in accordance with the terms thereof and (b) any registration rights agreement among the Company, the Guarantors and the other parties thereto in connection with the issuance of Additional Notes.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Global Note" has the meaning set forth in Section 2.01.

"Repurchase Offer" has the meaning set forth in Section 4.19.

"Repurchase Offer Payment Date" has the meaning set forth in Section 4.19.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payments" has the meaning set forth in Section 4.10.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Security" has the meaning assigned to such term in Rule 144(a)(3) under the Securities Act and shall include any Note bearing the Private Placement Legend; provided that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Note constitutes a Restricted Security. Any Note issued (i) subject to Section 2.15(c), upon the transfer, exchange or replacement of any Restricted Security and (ii) any Note issued as a PIK Note in payment of interest due and payable on any Restricted Security, shall, in each case, constitute a "Restricted Security"; provided, however, that any Note

issued upon the transfer, exchange or replacement of any Restricted Security that no longer bears (or, pursuant to Section 2.15(c), is no longer required to bear) a Private Placement Legend shall cease to (and shall not) be a Restricted Security.

"Restricted Subsidiary" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary.

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Global Notes" has the meaning set forth in Section 2.01.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, and its successors.

"Sale and Leaseback Transaction" means a transaction whereby a Person sells or otherwise transfers assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or otherwise transferred.

"SEC" means the Securities and Exchange Commission.

"Secondary Collateral" means "Second Lien Collateral" as defined in the Intercreditor Agreement.

"Secured Parties" means, collectively, the Collateral Agent, the Trustee and the Holders.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the Security Agreement, dated as of the Issue Date, made by the Company and the Guarantors in favor of the Collateral Agent, as amended and supplemented from time to time in accordance with its terms and the terms hereof.

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X under the Securities Act, as such Regulation is in effect on the Issue Date.

"Specified Assets" means any real property (including any real property leasehold interest) or equipment.

"Specified Collateral" means any Note Collateral comprising Specified Assets.

"Stated Maturity" means (a) with respect to any series of Indebtedness, the date specified in the documentation governing such Indebtedness as of the date such documentation was entered into as the fixed date on which the final installment of principal of such Indebtedness is due and payable and (b) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified in the documentation governing such Indebtedness as of the

date such documentation was entered into as the fixed date on which such installment is due and payable and, in each case, will not include any contingent obligations to repay, redeem or repurchase any such installment of interest or principal prior to the date originally scheduled for the payment thereof.

"Subordination Agreement" means that certain Intercompany Subordination Agreement, dated the Issue Date, among the Company, the Guarantors and the Collateral Agent, as amended or supplemented from time to time, in accordance with its terms and the terms hereof (including Section 4.27).

"Subsidiary" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)     any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as amended, as in effect on the Issue Date.

"Trust Officer" means any officer of the Trustee assigned by the Trustee to administer this Indenture or, in the case of a successor trustee, an officer assigned to the department, division or group performing the corporation trust work of such successor and assigned to administer this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"Unrestricted Subsidiary" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1)     has no Indebtedness other than Non-Recourse Debt;

(2)     except as permitted by Section 4.11, is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3)        is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve specified levels of operating results;

(4)        has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries;

(5)        does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any asset or property of, the Company or any Restricted Subsidiary of the Company and does not own any Note Collateral and has no Subsidiaries other than Unrestricted Subsidiaries; and

(6)        would constitute an Investment which the Company could make in compliance with Section 4.10.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.10.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.12, the Company will be in default of such Section 4.12.  The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided that such designation will be deemed to be an incurrence by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary and such designation will only be permitted if (i) such Indebtedness is permitted under Section 4.12, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period and (ii) no Default or Event of Default would be in existence following such designation.

"U.S. Government Obligations" means non-callable direct obligations of, and non-callable obligations guaranteed by, the United States of America for the payment of which the full faith and credit of the United States of America is pledged.

"U.S. Legal Tender" means such coin or currency of the United States of America which, as at the time of payment, shall be immediately available legal tender for the payment of public and private debts.

"U.S. Person" means a "U.S. person," as such term is defined in Regulation S.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)     the sum of the product obtained by multiplying (1) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect of the Indebtedness, by (2) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2)     the then outstanding principal amount of such Indebtedness.

"<u>Wholly-Owned Restricted Subsidiary</u>" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required by applicable law) will at the time be owned by such Person or by one or more Wholly-Owned Restricted Subsidiaries of such Person or by such Person and one or more Wholly-Owned Restricted Subsidiaries of such Person.

SECTION 1.02     <u>Incorporation by Reference of Trust Indenture Act</u>.

Whenever this Indenture refers to a provision of the TIA, such provision is incorporated by reference in, and made a part of, this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"<u>indenture securities</u>" means the Notes.

"<u>indenture security holder</u>" means a Holder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" or "institutional trustee" means the Trustee.

"<u>obligor</u>" on the indenture securities means the Company or any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule and not otherwise defined herein have the meanings assigned to them therein.

SECTION 1.03     <u>Rules of Construction</u>.

Unless the context otherwise requires:

(a)     a term has the meaning assigned to it;

(b)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)     "or" is not exclusive;

(d)     words in the singular include the plural, and words in the plural include the singular;

(e)  "herein", "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(f)  when the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation";

(g)  all references to "interest" in this Indenture in respect of any Note shall include any Additional Interest due on such Note pursuant to the terms of the applicable Registration Rights Agreement;

(h)  all references to Sections or Articles refer to Sections or Articles of this Indenture unless otherwise indicated;

(i)  solely for the purposes of Section 4.12, all obligations with respect to redemption, repayment or other repurchase of any Disqualified Stock of any Person and the amount of the liquidation preference of any preferred stock of such Person shall be deemed "Indebtedness" of such Person and the amount thereof outstanding at any time shall be (a) in the case of Disqualified Stock, as specified in the last sentence of the definition thereof or (b) in the case of preferred stock, (1) the maximum liquidation value of such preferred stock or (2) the maximum mandatory redemption or mandatory repurchase price with respect to such preferred stock, whichever is greater;

(j)  provisions apply to successive events and transactions; and

(k)  references to sections of or rules under the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time.

# ARTICLE TWO

# THE NOTES

SECTION 2.01          Form and Dating.

The Initial Notes and the Additional Notes and the Trustee's certificate of authentication thereon shall be substantially in the form of Exhibit A hereto.  The Exchange Notes and the Trustee's certificate of authentication thereon shall be substantially in the form of Exhibit B hereto.  The Notes may have notations, legends or endorsements required by law, stock exchange rule or Depository rule or usage.  The Company shall approve the form of the Notes and any notation, legend or endorsement on them.  Each Note shall be dated the date of its authentication.

The terms and provisions contained in the forms of the Notes annexed hereto as Exhibit A and Exhibit B shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

Notes offered and sold in reliance on Rule 144A shall be issued initially in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A hereto (the "Rule 144A Global Notes"), deposited with the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in Exhibit C.

Notes offered and sold to Accredited Investors in reliance on Rule 501(a) under the Securities Act shall be issued initially in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A (the "AI Global Notes"), deposited with the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in Exhibit C.

Notes offered and sold in offshore transactions in reliance on Regulation S shall be issued in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A (a "Regulation S Global Note") deposited with the Trustee, as custodian for the Depository, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Company and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in Exhibit C.

The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Global Note that are held by participants through Euroclear or Clearsteam. Rule 144A Global Notes, AI Global Notes, Regulation S Global Notes and Exchange Notes issued in global form are referred to collectively as the "Global Notes."

The aggregate principal amount of any Global Note may from time to time be increased or decreased by adjustments made on the records of the Registrar and simultaneous notation by the Trustee, as custodian of the Depository, of such increase or decrease on the schedule to such Global Note, all as hereinafter provided.

The definitive Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Notes may be listed, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

SECTION 2.02        Execution and Authentication; Aggregate Principal Amount.

An Officer (who shall have been duly authorized by all requisite corporate actions) shall sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office or position at the time the Trustee authenticates the Note, the Note shall nevertheless be valid.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence, and the only evidence, that the Note has been authenticated under this Indenture.

The Trustee shall authenticate (a) Initial Notes for original issue in the aggregate principal amount not to exceed $105,000,000, (b) Exchange Notes from time to time for issue only pursuant to a Registration Rights Agreement in exchange for a like principal amount of Initial Notes or Additional Notes, and (c) subject to compliance with Section 4.12, one or more series of Additional Notes for original issue after the Issue Date in an aggregate principal amount not to exceed $50,000,000, in each case upon a written order of the Company in the form of an Officers' Certificate (an "Authentication Order"), which Authentication Order shall, in the case of any issuance of Additional Notes, certify that such issuance is in compliance with Section 4.12. In addition, each such Authentication Order shall specify the amount of Notes to be authenticated and the date on which the Notes are to be authenticated, whether the Notes are to be Initial Notes, Exchange Notes or Additional Notes. Upon the Trustee's receipt of an Authentication Order for authentication of PIK Notes to be delivered to Holders of the Notes on an Interest Payment Date prior to Maturity of such Notes in satisfaction of the portion of the aggregate installment of interest due and payable on such Notes on such Interest Payment Date constituting the PIK Interest Amount with respect to such Interest Payment Date for such Notes, the Trustee shall authenticate for original issue additional Notes constituting PIK Notes (or increase the principal amount of any Global Notes previously authenticated hereunder) in an aggregate principal amount equal to such PIK Interest Amount with respect to such Interest Payment Date for such Notes, all as specified in such Authentication Order. Each such Authentication Order shall specify the respective amount of the additional Notes constituting PIK Notes to be authenticated or principal amount of Global Notes previously authenticated to be increased and the Interest Payment Date on which the additional Notes constituting PIK Notes are to be authenticated or the principal amount of Global Notes is to be increased. On any Interest Payment Date on which the Company pays PIK Interest on any Notes by increasing the principal amount of any Global Note previously authenticated hereunder, the Trustee shall increase the principal amount of such Global Note by an amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up to the nearest $1.00, to the credit of the Holders of such Notes as of the relevant Record Date for such Interest Payment Date, pro rata in accordance with their interests, and an adjustment shall be made on the books and records of the Registrar with respect to such Global Note by the Registrar to reflect such increase. On any Interest Payment Date on which the Company pays PIK Interest on any Notes by issuing additional Notes constituting PIK Notes, the Trustee shall deliver to the Holders of such Notes as of the relevant Record Date for such Interest Payment Date additional Notes constituting PIK Notes having an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, with the principal amount thereof rounded up to the nearest $1.00.

The Company shall deliver to the Trustee an Authentication Order requesting the Trustee to authenticate, and, upon receipt of such Authentication Order, the Trustee shall authenticate, Notes upon exchange for other Notes in accordance with Sections 2.14(e), 3.07, 4.15, 4.19 or 9.05.

At the same time as the Registrar registers on its records an increase or decrease in the principal amount of any Global Note, the Trustee, as custodian for the Depository, shall notate such increase or decrease on the schedule of increases or decreases to such Global Note.

All Notes issued under this Indenture shall vote and consent together on all matters as one class and no series of Notes shall have the right to vote or consent as a separate class on any matter.

The Trustee may appoint an authenticating agent (the "Authenticating Agent") reasonably acceptable to the Company to authenticate Notes. Unless otherwise provided in the appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authenticating Agent. An Authenticating Agent has the same rights as an Agent to deal with the Company and Affiliates of the Company.

The Notes shall be issuable in fully registered form only, without coupons, in denominations of $2,000 in principal amount and any integral multiple of $1,000 in excess of $2,000, subject to the payment of interest on any Notes on any Interest Payment Date by issuance of PIK Notes, in which case the aggregate principal amount of Global Notes previously authenticated hereunder may be increased by, or additional Notes constituting PIK Notes may be issued in, an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up the nearest $1.00.

Each PIK Note is an additional obligation of the Company and shall be governed by, and entitled to the benefits of, this Indenture and shall be subject to the terms of this Indenture, shall rank *pari passu* with and be subject to the same terms (including the rate of interest from time to time payable thereon) as all other Notes (except, as the case may be, with respect to the issue date).

SECTION 2.03        Registrar and Paying Agent.

The Company shall maintain an office or agency which shall initially be the office of the Trustee, c/o Wilmington Trust Company, Corporate Capital Markets - OAS, 301 West 11th Street, c/o 1100 North Market Street, Wilmington, DE 19801, where (a) Notes may be presented or surrendered for registration of transfer or for exchange (the "Registrar") and (b) Notes may be presented or surrendered for payment (the "Paying Agent"). The Registrar shall keep a register (the "Register") of the Notes and of their transfer and exchange. The Company, upon prior written notice to the Trustee, may have one or more co-Registrars and one or more additional Paying Agents reasonably acceptable to the Trustee. The Company may change the Paying Agent or Registrar without prior notice to the Holders. The term "Paying Agent" includes any additional Paying Agent and the term "Registrar" includes any additional Registrar. The Company or any Affiliate of the Company may act as Paying Agent or Registrar.

The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions of this Indenture that relate to such Agent. The Company shall notify the Trustee in writing, in advance, of the name and address of any such Agent. If the Company

fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such, as shall be entitled to appropriate compensation therefor, pursuant to <u>Section 7.07</u>.

The Company initially appoints the Trustee as Registrar, Paying Agent and agent for service of demands and notices in connection with the Notes.  The Paying Agent or Registrar may resign upon thirty (30) days' written notice to the Company.

The Company appoints The Depository Trust Company as Depository.

SECTION 2.04          <u>Obligations of Paying Agent.</u>

The Company shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold in trust for the benefit of the Holders or the Trustee all assets held by the Paying Agent for the payment of principal of, or interest on, the Notes (whether such assets have been distributed to it by the Company or any other obligor on the Notes), and the Paying Agent shall promptly notify the Trustee in writing of any Default by the Company (or any other obligor on the Notes) in making any such payment.  The Company at any time may require a Paying Agent to distribute all assets held by it to the Trustee and account for any assets disbursed and the Trustee may at any time during the continuance of any payment Default, upon written request to a Paying Agent, require such Paying Agent to distribute all assets held by it to the Trustee and to account for any assets distributed.  Upon receipt by the Trustee of all assets that shall have been delivered by the Company to the Paying Agent, the Paying Agent shall have no further liability for such assets.  If the Company or one of its Subsidiaries acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all assets held by it as Paying Agent.

SECTION 2.05          <u>Holder Lists.</u>

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders and shall otherwise comply with TIA Section 312(b).  If the Trustee is not the Registrar, the Company shall furnish or cause the Registrar to furnish to the Trustee before each Record Date and at such other times as the Trustee may request in writing a list as of such date and in such form as the Trustee may reasonably request of the names and addresses of the Holders, which list may be conclusively relied upon by the Trustee.

SECTION 2.06          <u>Transfer and Exchange.</u>

Subject to the provisions of <u>Sections 2.14</u> and <u>2.15</u>, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested; <u>provided, however,</u> that the Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Company and the Registrar or co-Registrar, duly executed by the Holder thereof or such Holder's attorney duly authorized in writing, and such other documents as the Registrar or Co-Registrar may reasonably require.  To permit registrations of transfers and exchanges, the

Company shall execute, issue and deliver and the Trustee shall authenticate Notes at the Registrar's or co-Registrar's request.  No service charge shall be made for any registration of transfer or exchange, but the Company or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchanges pursuant to Sections 2.10, 2.14, 3.07, 4.15, 4.19 or 9.05 not involving any transfer, in which event the Company shall be responsible for the payment of such taxes).  All Notes issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture and the Note Guarantees, as the Notes surrendered upon such registration of transfer or exchange.

The Registrar or co-Registrar shall not be required to register the transfer or exchange of any Note (a) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (b) selected for redemption in whole or in part pursuant to Article Three, except the unredeemed portion of any Note being redeemed in part.

Any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through the Depository, in accordance with this Indenture and the Applicable Procedures.

SECTION 2.07          Replacement Notes.

If a mutilated Note is surrendered to the Trustee or if the Holder of a Note claims in writing that the Note has been lost, destroyed or wrongfully taken, then, in the absence of written notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall execute, issue and deliver and the Trustee shall authenticate a replacement Note of like tenor and principal amount and bearing a number not contemporaneously outstanding if the Trustee's requirements are met.  Except with respect to mutilated Notes, if required by the Trustee or the Company, such Holder must provide an affidavit of lost certificate and an indemnity bond or other indemnity, sufficient in the judgment of both the Company and the Trustee, to protect the Company, the Trustee or any Agent from any loss which any of them may suffer if a Note is replaced.  The Company may charge such Holder for the Company's reasonable out-of-pocket expenses in replacing a Note, including reasonable fees and expenses of its counsel and of the Trustee and its counsel.  In case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Company in its discretion may pay such Note instead of issuing a new Note in replacement thereof.  Every replacement Note shall constitute an additional obligation of the Company, entitled to the benefits of this Indenture, subject to Section 2.08.

SECTION 2.08          Outstanding Notes.

Notes outstanding at any time are all the Notes that have been authenticated by the Trustee except those cancelled by it, those delivered to it for cancellation and those described in this Section 2.08 as not outstanding.  Subject to the provisions of Section 2.09, a Note does not cease to be outstanding because the Company or any of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.07 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.07.

If on a Redemption Date or the Maturity Date the Paying Agent holds U.S. Legal Tender or U.S. Government Obligations sufficient to pay all of the principal and interest due on the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

SECTION 2.09        Treasury Notes; When Notes Are Disregarded.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver, consent or notice, Notes owned by the Company or any of its Affiliates shall be considered as though they are not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Trust Officer of the Trustee actually knows are so owned shall be so considered. Notes so owned which have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes (including any outstanding PIK Notes issued (including by any increase in the principal amount of any Global Note previously authenticated) hereunder) outstanding at such date of determination (as determined in accordance with this Section 2.09 and Section 2.08). With respect to any matter requiring consent, waiver, approval or other action of the Holders of a specified percentage of the principal amount of all the Notes then outstanding, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes held by Holders that have so consented by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with this Section 2.09 and Section 2.08. Any such calculation made pursuant to this Section 2.09 shall be made by the Company and delivered to the Trustee pursuant to an Officers' Certificate.

SECTION 2.10        Temporary Notes.

Until definitive Notes are ready for delivery, the Company may prepare and execute and deliver and the Trustee shall authenticate temporary Notes upon receipt of a written order of the Company in the form of an Officers' Certificate. The Officers' Certificate shall specify the amount of temporary Notes to be authenticated and the date on which the temporary Notes are to be authenticated. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes. Without unreasonable delay, the Company shall execute and deliver and the Trustee shall authenticate upon receipt of a written order of the Company pursuant to Section 2.02 definitive Notes in

exchange for temporary Notes. Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as definitive Notes.

SECTION 2.11    Cancellation.

The Company at any time may deliver Notes previously authenticated hereunder which the Company has acquired in any lawful manner to the Trustee for cancellation. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment. The Trustee, or at the direction of the Trustee, the Registrar or the Paying Agent, and no one else, shall cancel all Notes surrendered for transfer, exchange, payment or cancellation. Subject to Section 2.07, the Company may not issue new Notes to replace Notes that it has paid or delivered to the Trustee for cancellation. If the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11. The Trustee shall dispose of all cancelled Notes in accordance with the Trustee's customary procedures.

SECTION 2.12    CUSIP Numbers.

A "CUSIP" number shall be printed on the Notes, and the Trustee shall use the CUSIP number in notices of redemption, purchase or exchange as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee of any change in the CUSIP number.

SECTION 2.13    Deposit of Moneys.

Prior to 12:00 p.m. (noon) New York, New York time on each Interest Payment Date and the Maturity Date, the Company shall deposit with the Paying Agent U.S. Legal Tender sufficient to make payments, if any, of any principal, premium and interest (other than any interest payable as PIK Interest on such Interest Payment Date in accordance with Section 4.01(d)) due on such Interest Payment Date or the Maturity Date, as the case may be.

SECTION 2.14    Book-Entry Provisions for Global Notes.

(a)    The Global Notes initially shall (1) be registered in the name of the Depository or the nominee of such Depository, (2) be delivered to the Trustee as custodian for such Depository and (3) bear legends as set forth in Exhibit C. Members of, or participants in, the Depository ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Trustee as its custodian, or under any Global Note, and the Depository may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of the Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members,

the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)     Transfers of the Global Notes shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees.  Interests of beneficial owners in the Global Notes may be transferred or exchanged in accordance with the Applicable Procedures of the Depository and the provisions of <u>Section 2.15</u>, <u>provided</u>, <u>however</u>, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser).  In addition, Notes in the form of certificated Notes in registered form in substantially the form set forth in <u>Exhibit A</u> hereto (the "<u>Physical Notes</u>") shall be transferred to all beneficial owners in exchange for their beneficial interests in the Global Notes if (1) either (x) the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Notes or (y) at any time such Depository ceases to be a "clearing agency" registered under the Exchange Act and in either case a successor Depository is not appointed by the Company within ninety (90) days of such notice or (2) a Default or Event of Default has occurred and is continuing and the Trustee has received a request from the Depository; <u>provided</u> that a beneficial interest in the Regulation S Global Note may not be exchanged for a Physical Note or transferred to a Person who takes delivery thereof in the form of a Physical Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of a certification, pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act (except in the case of a Distributor as defined in Rule 902(d) under the Securities Act), of beneficial ownership of the Notes by a non-U.S. Person or a U.S. Person who purchased the Notes in a transaction that did not require registration under the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(c)     Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of a beneficial interest in another Global Note shall, upon transfer, cease to be a beneficial interest in such first Global Note and become a beneficial interest in such other Global Note and shall thereafter be subject to all transfer restrictions, if any, and other procedures applicable to a beneficial interest in such other Global Notes for as long as it remains such an interest.

(d)     In connection with any transfer or exchange of a portion of the beneficial interest in the Global Note to beneficial owners pursuant to <u>clause (b)</u>, the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Company shall execute and deliver, and the Trustee shall authenticate, one or more Physical Notes of like tenor and aggregate principal amount.

(e)     In connection with the transfer of an entire Global Note to beneficial owners pursuant to <u>clause (b)</u>, the Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute and deliver, and, upon receipt of an Authentication Order in accordance with <u>Section 2.02</u>, the Trustee shall authenticate,

to each beneficial owner identified by the Depository in exchange for its beneficial interest in the Global Note, an equal aggregate principal amount of Physical Notes of authorized denominations.

(f)     Any Physical Note constituting a Restricted Security delivered in exchange for an interest in the Global Note pursuant to clause (b), except as otherwise provided by clauses (a)(1)(i) and (c) of Section 2.15, shall bear the legend regarding transfer restrictions applicable to the Physical Notes set forth in Exhibit A.

(g)     The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

SECTION 2.15     Special Transfer Provisions.

(a)     Transfers to Non-QIB Accredited Investors and Non-U.S. Persons.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to any Accredited Investor which is not a QIB or to any Non-U.S. Person:

(1)     the Registrar shall register the transfer of any Physical Note constituting a Restricted Security which after transfer is to be evidenced by a Physical Note, whether or not such Note bears the Private Placement Legend, upon surrender of such Physical Note to the Registrar, if (i) the requested transfer is after the date one year after the Issue Date or (ii) (A) in the case of a transfer to an Accredited Investor which is not a QIB (excluding Non-U.S. Persons), the proposed transferee has delivered to the Registrar a certificate substantially in the form of Exhibit E hereto or (B) in the case of a transfer to a Non-U.S. Person, the proposed transferor has delivered to the Registrar a certificate substantially in the form of Exhibit F hereto, whereupon the Registrar shall reflect on its books and records the date and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount and the Trustee shall cancel the Physical Notes so transferred; or

(2)     if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee is an Agent Member who will hold a beneficial interest in a Global Note, the Registrar shall register such transfer upon receipt of (i) the certificate, if any, required by clause (1) above and (ii) instructions given in accordance with the Applicable Procedures and the Registrar's procedures, whereupon the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred and a corresponding increase in the Global Note to which such beneficial interest is transferred; or

(3)    if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee's interest will be evidenced by a Physical Note, the Registrar shall register such transfer upon receipt of (i) the certificate, if any, required by clause (1) above and (ii) instructions given in accordance with the Applicable Procedures and the Registrar's procedures, whereupon the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount; or

(4)    if the proposed transferee is an Agent Member and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in a Global Note, the Registrar shall register such transfer upon surrender of such Physical Note to the Registrar, upon receipt of (i) the certificate, if any, required by clause (1) above and (ii) instructions given in accordance with the Applicable Procedures and the Registrar's procedures, whereupon the Registrar shall reflect on its books and records the date and an increase in the principal amount of such Global Note in an amount equal to the principal amount of the Physical Notes to be transferred and the Trustee shall cancel the Physical Notes so transferred.

(b)    Transfers to QIBs.  The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to a QIB (excluding transfers to Non-U.S. Persons):

(1)    The Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A.

(2)    Subject to compliance with clause (1) above, if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in the Global Note, upon surrender of such Physical Note to the Registrar, upon receipt by the Registrar of instructions given in accordance with the Applicable Procedures and the Registrar's procedures, the Registrar shall reflect on its books and records the

date and an increase in the principal amount of the Global Note in an amount equal to the principal amount of the Physical Notes to be transferred, and the Trustee shall cancel the Physical Notes so transferred.

(3)     Subject to compliance with underline(clause (1)) above, if the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by Physical Notes, upon the surrender of such Physical Notes to the Registrar, the Registrar shall reflect on its books and records the date and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount and the Trustee shall cancel the Physical Notes to be transferred.

(4)     Subject to compliance with underline(clause (1)) above, if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee is an Agent Member who will hold a beneficial interest in a Global Note, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred and a corresponding increase in the Global Note to which such beneficial interest is transferred.

(5)     Subject to compliance with underline(clause (1)) above, if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee's interest will be evidenced by a Physical Note, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount.

(c)     Private Placement Legend.  Upon the transfer, exchange or replacement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend.  Upon the transfer, exchange or replacement of Notes bearing the Private Placement Legend, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (1) the circumstance contemplated by clause (a)(1)(i) of this Section 2.15 exists or (2) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Company and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (3) the Notes bearing the Private Placement Legend are being exchanged for Exchange Notes issued under Section 2.02 pursuant to a Registration Rights Agreement.  Upon the issuance of PIK Notes in payment of PIK Interest payable with respect to any Notes bearing the Private Placement Legend, such PIK Notes shall bear the Private Placement Legend.  By its acceptance of any Note bearing the Private Placement Legend, each Holder of such a Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in the Private Placement Legend and agrees that it shall transfer such Note only as provided in this Indenture.

(d)    General.  The Registrar shall not register a transfer of any Note unless such transfer complies with the restrictions on transfer of such Note set forth in this Indenture.  In connection with any transfer of Notes, each Holder agrees by its acceptance of the Notes to furnish the Registrar or the Company such certifications, legal opinions or other information as either of them may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or a transaction not subject to, the registration requirements of the Securities Act; provided that the Registrar shall not be required to determine (but may rely on a determination made by the Company with respect to) the sufficiency of any such certifications, legal opinions or other information.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any security (including any transfers between or among Agent Members or beneficial owners of interests in any Global Note) other than to require delivery of such certificates, Opinions of Counsel and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

The Registrar shall retain copies of all letters, notices and other written communications received by it pursuant to Section 2.14 or this Section 2.15.  The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

Neither the Trustee nor any Agent shall have any responsibility for any actions taken or not taken by DTC.

SECTION 2.16          Transfers of Global Notes and Physical Notes.

A transfer of a Global Note or a Physical Note (including the right to receive principal and interest payable thereon) may be made only by the Registrar's entering the transfer in the Register.  Prior to such entry, the Company shall treat the person in whose name such Note is registered as the owner of the Note for all purposes.

SECTION 2.17          Defaulted Interest.

If the Company defaults in a payment of interest on the Notes, the Company shall pay defaulted interest (plus interest on such defaulted interest to the extent lawful) in any lawful manner at the rate provided in the Notes.  The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date.  The Company shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.18          Computation of Interest.

Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

# ARTICLE THREE

## REDEMPTION

SECTION 3.01    Optional Redemption.

(a)    The Company may, at its option, redeem the Notes, in whole or in part, at specified times and under specified conditions, as set forth in this Section 3.01. If the Company elects to redeem Notes pursuant to this Section 3.01, it shall, prior to mailing the notice of redemption referred to in Section 3.04 and at least 30 days but not more than 60 days prior to the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee) furnish to the Trustee and Paying Agent an Officers' Certificate setting forth the Redemption Date and the principal amount of the Notes to be redeemed, the clause of this Indenture pursuant to which the redemption shall occur and the Redemption Price.

(b)    The Company may, at its option, on any one or more occasions, redeem all or a part of the Notes upon not less than 30 days' nor more than 60 days' prior notice to the Trustee, at the Redemption Prices (expressed as percentages of the principal amount) set forth below plus accrued and unpaid interest to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date referred to in the Notes), if redeemed during the twelve-month period commencing on [•] of the years set forth below:

| Year | Percentage |
|------|-----------:|
| 2010 | 105% |
| 2011 | 104% |
| 2012 | 103% |
| 2013 | 102% |
| 2014 | 101% |

(c)    Notwithstanding clause (b) above, if the Company delivers a Board Resolution to the Trustee setting forth the irrevocable determination of the Company not to complete construction of either the Aurora Facility or Mt. Vernon Facility, then during the 90-day period following the Issue Date, the Company may, at its option, redeem up to $25,000,000 in aggregate principal amount of the Notes at a Redemption Price equal to 101% of the principal amount of the Notes redeemed plus accrued and unpaid interest on the Notes redeemed to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date referred to in the Notes).

SECTION 3.02    No Mandatory Redemption.

The Company shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.

SECTION 3.03          Selection of Notes to Be Redeemed.

If fewer than all of the Notes are to be redeemed pursuant to the provisions of this Indenture, the Trustee shall select the Notes to be redeemed (a) in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed or (b) if such Notes are not then listed on a national securities exchange, on a pro rata basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate; provided, that if any redemption is made pursuant to Section 3.01(c), the Trustee will select the Notes only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to DTC procedures), unless such method is otherwise prohibited. The Trustee shall make the selection from the Notes outstanding and not previously called for redemption and shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof, to be redeemed.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected will be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

SECTION 3.04          Notice of Redemption.

At least 30 days but not more than 60 days before a Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at such Holder's registered address, with a copy to the Trustee and any Paying Agent. At the Company's written request delivered at least fifteen days prior to the date such notice is to be given (unless a shorter period shall be acceptable to the Trustee), the Trustee shall give the notice of redemption in the Company's name and at the Company's expense, provided the Company provides the Trustee with all information required for such notice of redemption. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Note.

Each notice of redemption shall identify the Notes to be redeemed and shall state:

(a)          the Redemption Date;

(b)          the Redemption Price and the amount of accrued interest, if any, to be paid;

(c)          the name and address of the Paying Agent;

(d)          the CUSIP number;

(e)     the subsection of <u>Section 3.01</u> pursuant to which such redemption is being made;

(f)     the place where such Notes called for redemption must be surrendered to the Paying Agent to collect the Redemption Price plus accrued interest, if any;

(g)     Notes and portions of Notes selected will be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000;

(h)     that, unless the Company fails to deposit with the Paying Agent funds in satisfaction of the applicable Redemption Price plus accrued interest, if any, interest on Notes called for redemption ceases to accrue on and after the Redemption Date in accordance with <u>Section 3.06</u>, and the only remaining right of the Holders of such Notes is to receive payment of the Redemption Price plus accrued interest, if any, upon surrender to the Paying Agent of the Notes redeemed;

(i)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date, and upon surrender of such Note, a new Note or Notes in the aggregate principal amount equal to the unredeemed portion thereof shall be issued; and

(j)     if fewer than all the Notes are to be redeemed, the identification of the particular Notes (or portion thereof) to be redeemed, as well as the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption.

If any of the Notes to be redeemed is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to accord with the procedures of the Depository applicable to redemption.

SECTION 3.05     <u>Effect of Notice of Redemption.</u>

Once notice of redemption is mailed in accordance with <u>Section 3.04</u>, Notes or portions thereof called for redemption shall become irrevocably due and payable on the Redemption Date and at the Redemption Price plus accrued interest thereon.  Upon surrender to the Trustee or Paying Agent, such Notes or portions thereof called for redemption shall be paid at the Redemption Price plus accrued interest thereon to the Redemption Date, but installments of interest thereon, the maturity of which is on or prior to the Redemption Date, shall be payable to Holders of record at the close of business on the relevant Record Dates referred to in the Notes. No notice of any redemption may be subject to any conditions precedent or otherwise conditional.

SECTION 3.06          Deposit of Redemption Price.

Not later than 12:00 p.m. (noon) local time in the place of payment on the Redemption Date, the Company shall deposit with the Paying Agent U.S. Legal Tender sufficient to pay the Redemption Price plus accrued and unpaid interest, if any, of all Notes or portions thereof to be redeemed on that date.  The Paying Agent shall promptly return to the Company any U.S. Legal Tender so deposited which is not required for that purpose, except with respect to monies owed as obligations to the Trustee pursuant to Section 7.07.

If the Company complies with the preceding paragraph, then, unless the Company defaults in the payment of such Redemption Price plus accrued and unpaid interest, if any, interest on the Notes to be redeemed shall cease to accrue on and after the applicable Redemption Date, whether or not such Notes are presented for payment, and the only remaining right of the Holders of such Notes shall be to receive payment of the Redemption Price upon surrender to the Paying Agent of the Notes redeemed.  If any Note called for redemption shall not be so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the Redemption Date until such principal is paid, and to the extent lawful, on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

SECTION 3.07          Notes Redeemed in Part.

Upon surrender of a Note that is to be redeemed in part, the Company shall execute and deliver and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate for the Holder at the expense of the Company a new Note or Notes equal in principal amount to the unredeemed portion of the Note surrendered.

SECTION 3.08          Company May Acquire Notes.

The Company or its Affiliates (or any Person acting on behalf of the Company or its Affiliates) may at any time and from time to time acquire the Notes by means other than redemption, including by tender offer, open market purchases, negotiated transactions or otherwise, so long as such acquisition is not prohibited by applicable securities laws or regulations or the terms of this Indenture.  In accordance with, and subject to, Section 2.11, the Company may deliver such acquired Notes to the Trustee for cancellation.

## ARTICLE FOUR

## COVENANTS

SECTION 4.01          Payment of Notes; Accrual of Interest.

(a)          The Company shall pay the principal of, or premium, if any, or interest, if any, on the Notes on the dates and in the manner provided in the Notes and in this Indenture.

(b)          An installment of principal of, or premium, if any, or interest, if any, on the Notes payable in cash shall be considered paid on the date it is due if the Trustee or

Paying Agent (other than the Company or an Affiliate of the Company) holds at 12:00 p.m. (noon) New York, New York time on that date U.S. Legal Tender designated for and sufficient to pay the installment in full. The portion of an installment of interest, if any, on the Notes payable as PIK Interest on any Interest Payment Date shall be considered paid on such date if on such date (1) to the extent such PIK Interest is paid by issuance of additional Notes constituting PIK Notes, PIK Notes having an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes have been executed and delivered, together with an Authentication Order in accordance with <u>Section 2.02</u>, to the Trustee for authentication and delivery to the Holders of such Notes in accordance with the terms of this Indenture and (2) to the extent such PIK Interest is paid by increasing the principal amount of Global Notes previously authenticated hereunder, the Company has directed the Trustee in writing to increase the principal amount of such Global Notes previously authenticated by the PIK Interest Amount with respect to such Interest Payment Date for such Notes. The portion of any installment of interest on Notes payable as PIK Interest that is not paid on the date it is due shall thenceforth be payable solely in cash.

(c)     Not less than five (5) Business Days prior to each Interest Payment Date, so long as such Interest Payment Date is prior to Maturity, the Company shall be entitled to deliver a notice to the Trustee specifying (i) that the Company has elected, so long as such Interest Payment Date is prior to Maturity, not to pay the entire amount of interest due on such Interest Payment Date in cash, (ii) the respective aggregate amounts of interest to be paid in cash and as PIK Interest as determined in accordance with <u>Section 4.01(d)</u> and (iii) the respective aggregate amounts of PIK Interest to be paid through increases in the aggregate principal amount of Global Notes previously authenticated hereunder or through the issuance of additional Notes constituting PIK Notes. If the Company does not deliver such notice with respect to any Interest Payment Date within the time period specified in the preceding sentence, the Company shall be deemed to have elected to pay the entire amount of interest due on such Interest Payment Date in cash. On the relevant Interest Payment Date for any Note as to which such notice has been timely given, so long as such Interest Payment Date is prior to Maturity, the Trustee shall record increases in the Global Notes or authenticate and deliver additional Notes constituting PIK Notes, as appropriate, in an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes. The Company shall deliver an Authentication Order to the Trustee in accordance with <u>Section 2.02</u> upon issuance of PIK Notes in payment of PIK Interest.

(d)     Interest shall accrue on the principal amount of any outstanding Notes at a rate of 13% per annum and be payable solely in cash; <u>provided</u>, <u>however</u>, that, if with respect to any Interest Payment Date that occurs prior to Maturity of any Notes, the Company has duly elected pursuant to <u>Section 4.01(c)</u> not to pay the entire installment of interest due on such Interest Payment Date in cash:

(1)     the interest on such Notes that is due on such Interest Payment Date shall be deemed to have accrued since the next preceding Interest Payment Date (or, if such Interest Payment Date is the first Interest Payment Date in respect of such Notes, the issue date therefor) at a rate of 15% per annum,

whether or not the Company duly pays on such Interest Payment Date such installment of interest due on such Interest Payment Date; and

(2)      if (but only if) the Company pays on such Interest Payment Date the entire installment of interest on such Notes due on such Interest Payment Date, the portion of such installment equal to the PIK Interest Amount with respect to such Interest Payment Date (*i.e.*, the portion equal to 7/15 of the aggregate amount thereof) shall be payable by issuance of PIK Notes in accordance with the fourth paragraph of Section 2.02 and the remainder of such installment shall be payable in cash.

(e)      The Company shall pay interest on overdue principal at 15% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America from principal or interest payments hereunder.

SECTION 4.02      Maintenance of Registrar and Paying Agent.

The Company shall maintain a Registrar and Paying Agent required under Section 2.03. The Company shall give prior written notice to the Trustee and the Holders of the location, and any change in the location, of the Registrar and Paying Agent.  If at any time the Company shall fail to maintain a Registrar or Paying Agent or shall fail to furnish the Trustee with the address thereof, such presentations and surrenders may be made or served at the Corporate Trust Office and the Company hereby appoints the Trustee as its agent to receive all such presentations and surrenders.

SECTION 4.03      Corporate Existence.

Except as otherwise permitted by Articles Four, Five and Ten, the Company shall do or cause to be done, at its own cost and expense, all things necessary to preserve and keep in full force and effect its corporate existence and the limited liability company, partnership or corporate existence of each of its Restricted Subsidiaries in accordance with the respective organizational documents of the Company and each such Restricted Subsidiary, as the case may be, and the material rights (charter and statutory) and franchises of the Company and each such Restricted Subsidiary; provided, however, that the Company shall not be required to preserve, with respect to itself, any material right or franchise and, with respect to any of its Restricted Subsidiaries, any such existence, material right or franchise, if the Board of Directors of the Company shall determine in good faith that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole.

SECTION 4.04      Payment of Taxes and Other Claims.

The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material taxes, assessments and governmental charges (including withholding taxes and any penalties, interest and additions to taxes) levied or imposed upon it or

any of its Restricted Subsidiaries or its properties or any of its Restricted Subsidiaries' properties and (b) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon its properties or any of its Restricted Subsidiaries' properties; <u>provided</u>, <u>however</u>, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being or shall be contested in good faith by appropriate proceedings properly instituted and diligently conducted for which adequate reserves, to the extent required under GAAP, have been taken.

SECTION 4.05        <u>Maintenance of Properties and Insurance.</u>

(a)        The Company shall, and shall cause each of its Restricted Subsidiaries to, maintain its properties (including by the repair or replacement thereof) in good working order and condition (including by the repair or replacement thereof) in all material respects (subject to ordinary wear and tear); <u>provided</u>, <u>however</u>, that, subject to <u>Section 4.23</u>, nothing in this <u>Section 4.05</u> shall prevent the Company or any of its Restricted Subsidiaries from discontinuing the operation and maintenance of any of its properties, or disposing of them, if such discontinuance or disposal is, in the good faith judgment of the Board of Directors of the Company, desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole.

(b)        The Company shall maintain insurance (including appropriate self-insurance) against loss or damage of the kinds that, in the good faith judgment of the Company, are adequate and appropriate for the conduct of the business of the Company and its Restricted Subsidiaries in a prudent manner, with reputable insurers or with the government of the United States of America or an agency or instrumentality thereof.

(c)        The Company shall, and shall cause each of its Restricted Subsidiaries to, cause the Collateral Agent to be named as an additional insured and loss payee (as applicable) with respect to all insurance maintained by the Company or any Restricted Subsidiary thereof on the Note Collateral.  The Company shall, and shall cause each of its Restricted Subsidiaries to, furnish to the Collateral Agent all relevant information relating to its property and liability insurance carriers, including any such information as may be reasonably requested by Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class.

SECTION 4.06        <u>Compliance Certificate; Notice of Default</u>.

(a)        The Company and each Guarantor shall deliver to the Trustee, within 90 days after the end of each calendar year, an Officers' Certificate stating that a review of the activities of the Company and its Restricted Subsidiaries during the preceding calendar year has been made under the supervision of the signing Officers (one of whom shall be the principal executive officer, principal financial officer or principal accounting officer) with a view to determining whether they have kept, observed, performed and fulfilled their obligations under this Indenture and further stating, as to each such Officer signing such certificate, that to the best of such Officer's actual knowledge the Company and its Restricted Subsidiaries during such preceding calendar year have kept, observed,

performed and fulfilled each and every condition and covenant under this Indenture and no Default or Event of Default occurred during such year and at the date of such certificate there is no Default or Event of Default that has occurred and is continuing or, if such signers do know of such Default or Event of Default, the certificate shall describe the Default or Event of Default and its status with particularity.

(b)     The Company shall, so long as any Notes are outstanding, upon any Officer of the Company becoming aware of any Default or Event of Default, deliver to the Trustee and Collateral Agent an Officers' Certificate specifying such Default or Event of Default within 10 Business Days of such Officer becoming aware of such occurrence.

SECTION 4.07     Compliance with Laws.

The Company shall, and shall cause each of its Restricted Subsidiaries to, comply with all applicable statutes, rules, regulations, orders and restrictions of the United States of America, all states and municipalities thereof, and of any governmental department, commission, board, regulatory authority, bureau, agency and instrumentality of the foregoing, in respect of the conduct of its businesses and the ownership of its properties, except for such noncompliances as are not in the aggregate reasonably likely to have a material adverse effect on the financial condition or results of operations of the Company and its Restricted Subsidiaries, taken as a whole, or the ability of the Company to perform its material obligations hereunder.

SECTION 4.08     Reports to Holders.

Whether or not required by the rules and regulations of the SEC, so long as any Notes are outstanding, the Company will furnish the Holders of the Notes, with a copy to the Trustee:

(a)     all quarterly and annual financial information that would be required to be contained in a filing with the SEC on Forms 10-Q and 10-K if the Company were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated Subsidiaries (showing in reasonable detail, either on the face of the financial statements or in the footnotes thereto and in "Management's Discussion and Analysis of Financial Condition and Results of Operations", the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company, if any), and, with respect to the annual information only, a report thereon by the Company's certified independent accountants; and

(b)     all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports,

in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations.

In addition, following the consummation of the Exchange Offer contemplated by the Registration Rights Agreement relating to the Initial Notes issued in connection with the

Offering, whether or not required by the rules and regulations of the SEC, the Company will file a copy of all such information and reports with the SEC for public availability within the time periods specified in the SEC's rules and regulations (unless the SEC will not accept such a filing) and make such information available to securities analysts and prospective investors upon request. In addition, the Company has agreed that, if the Company is not subject to Section 13 or 15(d) of the Exchange Act, it will furnish to the Holders and prospective purchasers of the Notes designated by a Holder, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates of the Company).

The Company shall be deemed to have furnished any such information, report or other document to the Holders if the Company shall have made such information, report or other document available on the Electronic Data Gathering, Analysis and Retrieval System of the SEC (or any successor system) available at www.sec.gov or any successor SEC website for such filings or, if the Company is no longer required to file with the SEC, on the Company's website, in each case except with respect to the information required to be furnished under the last sentence of the second paragraph of this <u>Section 4.08</u>.

SECTION 4.09        <u>Waiver of Stay, Extension or Usury Laws</u>.

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Company and each of the Guarantors from paying all or any portion of the principal of, premium, if any, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture; and (to the extent that it may lawfully do so) the Company and each of the Guarantors hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 4.10        <u>Limitation on Restricted Payments.</u>

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly:

(a)        declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such

(other than dividends, payments or distributions payable in Equity Interests (other than Disqualified Stock) of the Company and other dividends, payments or distributions payable to the Company or another Restricted Subsidiary of the Company);

(b)     purchase, redeem or otherwise acquire or retire for value (including in connection with any merger or consolidation involving the Company) any Equity Interests of the Company or any direct or indirect parent of the Company other than those Equity Interests owned by the Company or any Restricted Subsidiary of the Company;

(c)     make any payment on or with respect to, or purchase, redeem, repurchase, defease or otherwise acquire or retire for value, any Indebtedness of the Company or any Guarantor that is contractually subordinated in right of payment to the Notes or any Note Guarantee (excluding any Intercompany Debt between or among the Company and any of the Guarantors), except a payment of interest or principal at the Stated Maturity thereof; or

(d)     make any Restricted Investment;

(all such payments and other actions set forth in these clauses (a) through (d) above being collectively referred to as "Restricted Payments"), unless, at the time of and after giving effect to such Restricted Payment:

(1)     no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(2)     the Company would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.12; and

(3)     such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the Issue Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (5) and (6) of the next succeeding paragraph of this Section 4.10), is less than the sum, without duplication, of:

(i)     50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) from the beginning of the first fiscal quarter commencing after the Issue Date to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit); plus

(ii)     100% of the aggregate net proceeds, including cash and the Fair Market Value of the property other than cash, received by the Company since the Issue Date as a contribution to its common equity

capital or from the issue or sale of Equity Interests of the Company (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Company that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Company); provided, however, that the Company may not include the net cash proceeds to the extent that any such common equity capital or Equity Interests are repurchased, redeemed or otherwise acquired or retired pursuant to clauses (2) and (5) of the next succeeding paragraph of this Section 4.10; plus

      (iii)     to the extent that any Restricted Investment that was made after the Issue Date is sold for cash or otherwise liquidated or repaid for cash, the lesser of (A) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any) and (B) the initial amount of the Restricted Investment; plus

      (iv)     to the extent that any Unrestricted Subsidiary of the Company designated as such after the Issue Date is redesignated as a Restricted Subsidiary after the Issue Date, the lesser of (A) the Fair Market Value of the Company's Investment in such Subsidiary as of the date of such redesignation or (B) such Fair Market Value as of the date on which such Subsidiary was originally designated as an Unrestricted Subsidiary after the Issue Date; plus

      (v)     50% of any dividends or distributions received by the Company or a Wholly-Owned Restricted Subsidiary of the Company that is a Guarantor after the Issue Date from an Unrestricted Subsidiary of the Company, to the extent that such dividends or distributions were not otherwise included in Consolidated Net Income of the Company for such period.

In the case of clause (3)(ii) above, any net cash proceeds from issuances and sales of Capital Stock of the Company financed directly or indirectly using funds borrowed from the Company or any Subsidiary of the Company shall be excluded until and to the extent such borrowing is repaid.

      Notwithstanding the foregoing, the provisions set forth in the immediately preceding paragraph do not prohibit:

      (1)     the payment, by the Company or any Restricted Subsidiary, of any dividend or distribution or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Indenture;

(2) so long as no Default has occurred and is continuing or would result therefrom, the making of any Restricted Payment in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests of the Company (other than Disqualified Stock) or from the substantially concurrent contribution of common equity capital to the Company; provided that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (3)(ii) of the preceding paragraph;

(3) so long as no Default has occurred and is continuing or would result therefrom, the making of any payment on or with respect to, or the defeasance, redemption, repurchase, retirement or other acquisition or retirement for value of, Indebtedness of the Company or any Restricted Subsidiary that is contractually subordinated in right of payment to the Notes or to any Note Guarantee with, in exchange for, by conversion into or out of the net cash proceeds from a substantially concurrent incurrence of, or in exchange for, Permitted Refinancing Indebtedness;

(4) the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a pro rata basis;

(5) so long as no Default has occurred and is continuing or would result therefrom, the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company or any Restricted Subsidiary of the Company held by any current or former officer, director, employee or consultant of the Company or any of its Restricted Subsidiaries at no more than Fair Market Value; provided that (x) the excess of (i) the aggregate price paid after the Issue Date for all such repurchased, redeemed, acquired or retired Equity Interests over (ii) the aggregate net cash proceeds received by the Company after the Issue Date from such Persons from the issuance of or equity contributions with respect to Equity Interests of the Company pursuant to any equity subscription agreement, stock option agreement, shareholders' or members' agreement or similar agreement, plan or arrangement may not exceed $5,000,000 and (y) the excess of (i) the aggregate price paid after the Issue Date in any calendar year for such Equity Interests over (ii) the aggregate such net cash proceeds so received by the Company in such calendar year may not exceed $1,000,000 in the aggregate; provided further that the amount of any such net cash proceeds that are utilized for such Restricted Payment will be excluded from clause (3)(ii) of the preceding paragraph;

(6) the repurchase of Equity Interests deemed to occur upon the cashless exercise of stock options to the extent such Equity Interests represent a portion of the exercise price of those stock options; provided, that no proceeds in respect of the issuance of such Equity Interests shall be deemed to have been received for the purposes of clause (3)(ii) of the preceding paragraph;

(7)     so long as no Default has occurred and is continuing or would result therefrom, the declaration and payment of regularly scheduled or accrued dividends to holders of any class or series of Disqualified Stock of the Company or any Restricted Subsidiary of the Company issued on or after the Issue Date in accordance with the Fixed Charge Coverage Ratio test set forth in the first sentence of Section 4.12;

(8)     so long as no Default has occurred and is continuing or would result therefrom, the making of any other Restricted Payment which, together with all other Restricted Payments made pursuant to this clause (8) since the Issue Date, does not exceed $5,000,000;

(9)     the repurchase or redemption of preferred stock purchase rights issued in connection with any stockholders rights plan of the Company at an amount not to exceed $0.01 per right or $100,000 in the aggregate; and

(10)     the making of any distributions required to be made by the Company on or after the Effective Date (as defined in the Plan) pursuant to the Plan and the Confirmation Order.

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.  The Fair Market Value of any assets or securities that are required to be valued by this Section 4.10 will be determined by the Board of Directors of the Company, whose resolution with respect thereto will be delivered to the Trustee.  In the case of a determination of Fair Market Value in excess of $10,000,000, such Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of recognized national standing.  In determining whether any Restricted Payment is permitted by this Section 4.10, the Company may allocate all or any portion of such Restricted Payment among the categories described in clauses (1) through (10) of the immediately preceding paragraph or among such categories and the types of Restricted Payments described in the first paragraph of this Section 4.10; provided that at the time of such allocation, all such Restricted Payments, or allocated portions thereof, would be permitted under the various provisions of this Section 4.10.

SECTION 4.11     Limitations on Transactions with Affiliates.

The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company or any Restricted Subsidiary (each, an "Affiliate Transaction"), unless:

(a)     the Affiliate Transaction is on terms no less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a

comparable transaction by the Company or such Restricted Subsidiary on an arm's length basis with an unrelated Person; and

        (b)      the Company obtains and delivers to the Trustee:

            (1)       with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5,000,000, a resolution of its Board of Directors set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this <u>Section 4.11</u> and that such Affiliate Transaction has been approved by a majority of the disinterested members of its Board of Directors; and

            (2)       with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10,000,000, an opinion as to the fairness to the Company or such Restricted Subsidiary of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm selected by the Company or such Restricted Subsidiary, as applicable, of recognized national standing with experience in appraising the terms and conditions of the type of transaction or series of related transactions for which such opinion is required.

      The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

        (1)      any employment agreement, collective bargaining agreement, employee benefit plan (including the Management Incentive Plan and any vacation plan, health and life insurance plan, deferred compensation plan, retirement or savings plan or stock option, stock ownership or similar plan), officer and director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business, and the payment or issuance of securities pursuant to any such agreement, plan or arrangement;

        (2)      the payment of compensation (including awards or grants in cash, securities or other payments) for the personal services of, and expense reimbursement and indemnity provided on behalf of, officers, directors (including the payment of, or an agreement providing for the payment of, reasonable directors' fees), consultants and employees of the Company or any of its Restricted Subsidiaries, in each case in the ordinary course of business;

        (3)      to the extent permitted by applicable law, loans or advances to employees in the ordinary course of business for bona fide business purposes and not to exceed $250,000 in the aggregate at any time outstanding;

        (4)      transactions between or among the Company and/or its Restricted Subsidiaries;

        (5)      transactions pursuant to agreements or arrangements in effect on the Issue Date, or any amendment, modification or supplement thereto or replacement thereof, so

long as such agreement or arrangement, as so amended, modified, supplemented or replaced, taken as a whole, is not materially less favorable, taken as a whole, to the Holders of the Notes than the original agreement or arrangement in existence on the Issue Date;

(6) any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company; and

(7) Restricted Payments that do not violate Section 4.10.

SECTION 4.12        <u>Incurrence of Indebtedness and Issuance of Disqualified Stock, Preferred Stock and Incentive Interests.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "<u>incur</u>") any Indebtedness, and the Company will not issue any shares of Disqualified Stock or preferred stock or warrants, options or other rights to purchase Capital Stock ("<u>Incentive Interests</u>") and will not permit any of its Restricted Subsidiaries to issue any shares of Disqualified Stock or preferred stock or any Incentive Interests; <u>provided</u>, <u>however</u>, that (x) the Company or any Guarantor may incur Indebtedness or the Company may issue Disqualified Stock or preferred stock, if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or preferred stock is issued would have been at least 2.0 to 1 determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if such additional Indebtedness had been incurred or Disqualified Stock or preferred stock had been issued, as the case may be, at the beginning of such four-quarter period and (y) the Company may issue Incentive Interests not constituting Indebtedness, Disqualified Stock or preferred stock that are granted subject to the Management Incentive Plan.

The first paragraph of this <u>Section 4.12</u> will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "<u>Permitted Debt</u>"):

(1) Indebtedness incurred (a) prior to the ABL Facility Trigger Date under the ABL Facility in an aggregate principal amount not exceeding $23,000,000 at any time outstanding and (b) under the Credit Facilities (including the ABL Facility) in an aggregate principal amount not exceeding the Credit Facility Amount at any time outstanding and, in each case, any related Guarantees;

(2) Indebtedness represented by the Notes issued on the Issue Date and Indebtedness represented by Exchange Notes issued pursuant to a Registration Rights Agreement and, in each case, the related Note Guarantees;

(3) Indebtedness represented by Additional Notes and the related Note Guarantees issued upon original issue at any time after the Issue Date in aggregate principal amount not to exceed $50,000,000;

(4)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness (including Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations) incurred for the purpose of financing all or any part of the purchase price or cost of design, development, construction, installation or improvement of property (real or personal), plant or equipment used in a Permitted Business of the Company or such Restricted Subsidiary (including through the direct acquisition of such assets or the acquisition of Equity Interests of the Person owning such assets), in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to refund, refinance or replace any Indebtedness incurred pursuant to this clause (4), not to exceed $5,000,000 at any time outstanding;

(5)     the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to extend, renew, refund, refinance, replace, defease or discharge, Indebtedness (other than Intercompany Debt) that was permitted by this Indenture to be incurred under the first paragraph of this Section 4.12, this clause (5) or clauses (2), (3) or (10) of this paragraph;

(6)     the incurrence by the Company or any of its Restricted Subsidiaries of Intercompany Debt; provided, however, that:

(a)     if the Company or any Guarantor is the obligor on such Intercompany Debt and the payee is not the Company or a Guarantor, such Intercompany Debt must be (i) permitted as a Permitted Investment described in clause (1)(b) of the definition thereof and (ii) expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Company, or the Note Guarantee, in the case of a Guarantor; and

(b)     (i) any subsequent issuance or transfer of Equity Interests that results in any such Intercompany Debt being held by a Person other than the Company or a Restricted Subsidiary of the Company and (ii) any sale or other transfer of any such Intercompany Debt to a Person that is not any of the Company, a Guarantor or, in the case where the payor on such Intercompany Debt is not the Company or a Guarantor, any Restricted Subsidiary of the Company will be deemed, in each case, to constitute an incurrence of such Intercompany Debt by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7)     the issuance by any of the Company's Restricted Subsidiaries to the Company or to any other Restricted Subsidiaries of shares of Disqualified Stock or preferred stock; provided, however, that if the issuer of such shares of Disqualified Stock or preferred stock is a Restricted Subsidiary of the Company that is not a Guarantor and the purchaser of such shares is the Company or a Guarantor, such Investment must be permitted as a Permitted Investment described in clause (1)(b) of the definition thereof and:

(a)      any subsequent issuance or transfer of Equity Interests that results in any such Disqualified Stock or preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company; and

(b)      any sale or other transfer of any such Disqualified Stock or preferred stock to a Person that is not any of the Company, a Guarantor or, in the case where the issuer of such Disqualified Stock or preferred stock is not a Guarantor, any Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an issuance of such Disqualified Stock or preferred stock by such Restricted Subsidiary that was not permitted by this clause (7);

(8)      the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations in the ordinary course of business;

(9)      the Guarantee by the Company or any of the Guarantors of Indebtedness of the Company or any of its Restricted Subsidiaries that was permitted to be incurred by another provision of this Section 4.12; provided that if the Indebtedness being guaranteed is subordinated in right of payment to the Notes or a Note Guarantee, then such Guarantee shall be subordinated in right of payment to the same extent as the Indebtedness Guaranteed;

(10)      Indebtedness represented by PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in payment of the portion of the aggregate installment of interest due and payable on any Notes on such Interest Payment Date constituting the PIK Interest Amount with respect to such Interest Payment Date for such Notes;

(11)      the incurrence by the Company or any Guarantor of Indebtedness to the extent that the net proceeds thereof are promptly (A) used to purchase Notes tendered in connection with a Change of Control Offer pursuant to Section 4.15 or (B) deposited to defease or to satisfy and discharge the Notes pursuant to Article Eight;

(12)      the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of standby and other letters of credit, bankers' acceptances, surety, performance, appeal or similar bonds, completion guarantees or similar instruments issued in the ordinary course and not supporting obligations for borrowed money, including in respect of workers' compensation claims and self-insurance obligations;

(13)      the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds; provided, however, that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(14)      Indebtedness represented by the Aurora West Kiewit Note issued on the Issue Date;

(15)    the incurrence of Indebtedness arising from agreements of the Company or a Guarantor providing indemnification, adjustment of purchase price, earn outs or similar obligations, in each case, incurred in connection with the disposition or acquisition of any business, assets or a Guarantor in accordance with the terms of this Indenture, other than Indebtedness or guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Guarantor for the purpose of financing such acquisition, in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this underline clause (15), not to exceed $5,000,000; provided, however, in the case of any disposition, the maximum principal amount of such Indebtedness does not exceed the gross cash proceeds actually received by the Company or a Guarantor in connection with such disposition;

(16)    Guarantees in the ordinary course of business of the obligations not constituting Indebtedness of suppliers, customers, distributors, franchisers and licensees;

(17)    endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(18)    to the extent constituting Indebtedness, indemnification obligations and other similar obligations (including advancement of expenses) of the Company or any of its Subsidiaries in favor of directors, officers, employees, consultants or agents of the Company or any of its Subsidiaries extended in the ordinary course of business in an aggregate principal amount not to exceed $1,000,000 at any time outstanding;

(19)    Indebtedness owing to insurance companies (or another Person engaged at the direction of the Company or any of its Subsidiaries and any such insurance company) to finance insurance premiums incurred in the ordinary course of business in an aggregate principal amount not to exceed $1,000,000 at any time outstanding; and

(20)    additional Indebtedness of the Company or any of its Restricted Subsidiaries (in addition to the Indebtedness under clauses (1) through (19) above) in an aggregate principal amount outstanding at any time, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (20), not to exceed $5,000,000.

The Company will not incur, and will not permit any Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the applicable Note Guarantee on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company solely by virtue of being unsecured or by virtue of being secured on a first or junior Lien basis.

For purposes of determining compliance with this Section 4.12, in the event that an item of proposed Indebtedness, Disqualified Stock or preferred stock meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (20) above, or is entitled

to be incurred pursuant to the first paragraph of this Section 4.12, the Company will be permitted to classify such item of Indebtedness, Disqualified Stock or preferred stock or any portion thereof on the date of its incurrence or issuance, and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or preferred stock in one of the above clauses or as having been incurred or issued pursuant to the first paragraph of this Section 4.12, although the Company may divide and classify an item of Indebtedness, Disqualified Stock or preferred stock in one or more of the categories of Permitted Debt described in such clauses or as having been incurred or issued pursuant to the first paragraph of this Section 4.12 and may later reclassify all or a portion of such item of Indebtedness, Disqualified Stock or preferred stock, in any manner that complies with this Section 4.12. The accrual of interest or dividends, the accretion of accreted value or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms and the payment of dividends on Disqualified Stock or preferred stock in the form of additional shares of the same class of Disqualified Stock or preferred stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock or preferred stock for purposes of this Section 4.12; provided, in each such case (other than preferred stock that is not Disqualified Stock), that the amount of any such accrual, accretion or amortization or payment (without duplication) is included in Fixed Charges of the Company as accrued, accreted or amortized or paid. Notwithstanding any other provision of this Section 4.12, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 4.12 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

The amount of any Indebtedness outstanding as of any date will be:

      (1)    the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

      (2)    the principal amount of the Indebtedness, in the case of any other Indebtedness; and

      (3)    in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

            (i)    the Fair Market Value of such asset at the date of determination; and

            (ii)    the amount of such Indebtedness of the other Person.

Notwithstanding the foregoing, for purposes of determining any particular principal amount of Indebtedness under this Section 4.12, the principal amount of Indebtedness deemed to arise from a Guarantee of, or obligations with respect to letters of credit supporting, or as a result of a Lien on property securing, the principal amount of any Indebtedness otherwise included in the determination of such particular principal amount shall not be included.

SECTION 4.13    Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(a)    pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(b)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(c)    transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

provided, however, that the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(1)    the ABL Facility as in effect on the Issue Date and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of such agreement; provided that the encumbrances or restrictions in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacement or refinancings are not, in the good faith judgment of the Company's Board of Directors, materially less favorable, taken as a whole, to the Holders than those contained in that agreement on the Issue Date;

(2)    this Indenture, the Notes, the Note Guarantees and the Collateral Documents;

(3)    applicable law, rule, regulation, order, approval, license, permit or similar restriction;

(4)    (i) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; provided that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred; and (ii) any amendment, modification, renewal, replacement or refinancing thereof; provided, however, that the encumbrances or restrictions in any such amendment, modification, renewal, replacement or refinancing are not, in the good faith judgment of the Company's Board of Directors, materially less favorable, taken as

a whole, to the Holders than such encumbrances or restrictions prior to such amendment, modification, renewal, replacement or refinancing;

(5)     customary non-assignment or sub-letting provisions in contracts, leases and licenses entered into in the ordinary course of business;

(6)     any agreement for the sale or other disposition of all or substantially all of the Capital Stock or assets of a Restricted Subsidiary that restricts distributions, loans or transfers by that Restricted Subsidiary pending the sale or other disposition;

(7)     Permitted Refinancing Indebtedness; provided that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not, in the good faith judgment of the Company's Board of Directors, materially less favorable, taken as a whole, to the Holders than those contained in the agreements governing the Indebtedness being refinanced, extended, renewed, refunded, refinanced, replaced, defeased or discharged;

(8)     Liens permitted to be incurred under the provisions of Section 4.20 that limit the right of the debtor to dispose of the assets subject to such Liens;

(9)     Provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, limited liability company organizational documents, sale-leaseback agreements, stock sale agreements, stockholder agreements and other similar agreements entered into with the approval of the Company's Board of Directors, which limitation is applicable only to the assets that are the subject of such agreements;

(10)     restrictions on cash or other deposits or net worth imposed by suppliers, landlords or customers or required by insurance, surety or bonding companies, in each case under contracts entered into in the ordinary course of business; and

(11)     other Indebtedness or Disqualified Stock, preferred stock or Incentive Stock of Restricted Subsidiaries permitted to be incurred subsequent to the Issue Date pursuant to the provisions of Section 4.12; provided that the encumbrances or restrictions imposed thereby are ordinary and customary with respect to the type of Indebtedness incurred.

SECTION 4.14     Additional Note Guarantees.

If (a) the Company or any of its Restricted Subsidiaries acquires or creates or redesignates another Domestic Subsidiary that is not an Unrestricted Subsidiary after the Issue Date or (b) any Subsidiary of the Company that is not a Guarantor guarantees or otherwise becomes an obligor on any Indebtedness of the Company or any Guarantor, then the Company shall cause that newly acquired or created Domestic Subsidiary that is not an Unrestricted Subsidiary or Subsidiary that is such an obligor, as applicable, to, within 10 Business Days after the date on which it was acquired or created or redesignated or becomes such an obligor, as

applicable: (1) become a Guarantor and execute and deliver to the Trustee (i) a supplemental indenture pursuant to which such Domestic Subsidiary that is a Restricted Subsidiary shall guarantee the Note Obligations on the terms set forth in <u>Article Ten</u> of this Indenture and (ii) a supplement to the Intercreditor Agreement and the Security Agreement and such other Collateral Documents as may be applicable, in the case of clause (i) or (ii) in form reasonably satisfactory to the Trustee; (2) cause such instruments and Uniform Commercial Code financing statements to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to perfect the Note Lien created under the Security Agreement and such other Collateral Documents, if any, on the Specified Assets and other After-Acquired Property owned by such Subsidiary; and (3) deliver to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee addressed to the Trustee and covering, among other things, the authorization, execution and delivery by such Subsidiary of such supplemental indenture and supplements to such Collateral Documents and the validity and enforceability against such Subsidiary of this Indenture (including the Note Guarantee of such Subsidiary) and of such Collateral Documents and the perfection of the Note Liens purported to be created thereby.

SECTION 4.15        <u>Repurchase Upon Change of Control.</u>

(a)        Upon the occurrence of a Change of Control, each Holder will have the right to require the Company to repurchase all or a portion (<u>provided</u> that (i) unless all of such Holder's Notes are to be repurchased, the purchased portion of such Holder's Notes shall equal $2,000 or an integral multiple of $1,000 in excess of $2,000 and (ii) in any event, the unpurchased portion of such Holder's Notes must be at least $2,000) of such Holder's Notes pursuant to the offer described below (the "<u>Change of Control Offer</u>"), at a repurchase price in cash equal to 101% of the aggregate principal amount thereof on the date of repurchase, plus accrued and unpaid interest, if any, to (but not including) the date of repurchase (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

(b)        Within 30 days following the date upon which the Change of Control occurred, the Company shall send by registered first class mail, postage prepaid, a notice to each record Holder as shown on the register of Holders, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Offer. The notice to the Holders shall contain all instructions and materials reasonably necessary to enable such Holders to tender Notes pursuant to the Change of Control Offer. Such notice shall state:

(1)        that the Change of Control Offer is being made pursuant to this <u>Section 4.15</u> and that all Notes validly tendered and not validly withdrawn shall be accepted for payment (subject to <u>clause (ii)</u> of the penultimate paragraph of this <u>Section 4.15</u>);

(2)        the repurchase price (including the amount of accrued interest) and the repurchase date (which shall be no earlier than thirty (30) days nor later than sixty (60) days from the date such notice is mailed, other than as may be required by law) (the "<u>Change of Control Payment Date</u>");

(3)        that any Note not validly tendered shall continue to accrue interest;

(4)       that, unless the Company defaults in making payment therefor, any Note accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest on and after the Change of Control Payment Date;

(5)       that any Holder electing to have a Note repurchased pursuant to a Change of Control Offer shall be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day prior to the Change of Control Payment Date;

(6)       that any Holder shall be entitled to withdraw its election if the Paying Agent receives, not later than three (3) Business Days prior to the Change of Control Payment Date, a telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Notes the Holder delivered for repurchase and a statement that such Holder is withdrawing its election to have such Notes repurchased;

(7)       that Holders whose Notes are being purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered;

(8)       that, unless all of a Holder's Notes are to be purchased, the purchased portion of a Holder's Notes must be equal in principal amount to $2,000 or an integral multiple of $1,000 in excess of $2,000, except that (i) if all of the Notes of a Holder are to be purchased, the entire outstanding principal amount of Notes held by such Holder, even if not a multiple of $1,000, shall be purchased, subject, in the case of Global Notes, to the procedures of DTC and (ii) in any event, the unpurchased portion of Notes purchased in part shall be at least $2,000; and

(9)       the circumstances and relevant facts regarding such Change of Control.

If any of the Notes subject to the Change of Control Offer is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to comply with the procedures of the Depository applicable to repurchases.

On or before the Change of Control Payment Date, the Company shall, to the extent lawful (i) accept for payment Notes or portions thereof properly tendered and not validly withdrawn pursuant to the Change of Control Offer, (ii) deposit with the Paying Agent U.S. Legal Tender sufficient to pay the repurchase price plus accrued interest, if any, of all Notes or portions thereof so properly tendered and not validly withdrawn and (iii) deliver or cause to be delivered to the Trustee the Notes so properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being repurchased by the Company.  The Paying Agent shall promptly mail or pay by wire transfer to the Holders of the Notes so properly tendered and so accepted the repurchase price for such Notes and the

Company shall promptly execute and deliver, upon receipt of an Authentication Order in accordance with Section 2.02, and the Trustee shall promptly authenticate and deliver to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered; provided that such unpurchased portion, if any, must be equal to at least $2,000. Any Note so accepted for repurchase will cease to accrue interest on and after the Change of Control Payment Date. Any Notes not so accepted shall be promptly mailed by the Company to the Holders thereof. For purposes of this Section 4.15, the Trustee shall act as the Paying Agent.

The Company will publicly announce the results of the Change of Control Offer on or as soon as reasonably practicable after the Change of Control Payment Date. Any amounts remaining after the repurchase of Notes pursuant to a Change of Control Offer shall be returned by the Trustee to the Company.

The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent the provisions of any securities laws or regulations conflict with the provisions under this Section 4.15, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.15 by virtue thereof.

Notwithstanding the above, the Company shall not be required to make a Change of Control Offer upon a Change of Control if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements of this Section 4.15 and repurchases all Notes properly tendered and not withdrawn under such Change of Control Offer or (ii) a notice with respect to the redemption of all Notes has been given pursuant to Section 3.04 at any time before the Change of Control Payment Date and the Company redeems the Notes in accordance with such notice.

Notes (or portions thereof) repurchased pursuant to a Change of Control Offer shall be cancelled and may not be reissued.

SECTION 4.16      Limitation on Asset Sales.

The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(a)      the Company or the Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of;

(b)      at least 75% (or, in the case of an Asset Sale of Specified Collateral, 100%) of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash or Cash Equivalents; provided, however, that, for purposes of this Section 4.16, each of the following will be deemed to be cash:

(1)      solely in the case of any Asset Sale of assets other than Specified Collateral, any liabilities of the Company or any Restricted Subsidiary that would

otherwise be required to be included on the Company's consolidated balance sheet (other than contingent liabilities and liabilities that are by their terms subordinated in right of payment to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets pursuant to a customary novation or assignment and assumption agreement that releases the Company or such Restricted Subsidiary from further liability;

(2) solely in the case of any Asset Sale of assets other than Specified Collateral, any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion; and

(3) any Additional Assets (provided, that (x) if such Asset Sale constitutes a Primary Collateral Asset Sale, (A) to the extent the assets disposed of constitute Primary Collateral, this clause (3) shall be limited to only Additional Assets that simultaneously with the acquisition thereof will become Primary Collateral or (B) to the extent the assets disposed of constitute Specified Collateral, this clause (3) shall be limited to only Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof will become Specified Collateral and (y) to the extent such Asset Sale includes any Note Collateral, such Asset Sale does not occur unless such Additional Assets become Note Collateral prior to or simultaneously with the acquisition thereof and until and unless the provisions of Section 4.28 have been complied with respect to the Additional Assets being received as consideration for the Asset Sale of such Note Collateral);

provided further, however, that the 75% requirement referred to in this clause (b) will not apply to any Asset Sale that is not a Primary Collateral Asset Sale if the cash or Cash Equivalents portion of the consideration received therefrom, determined in accordance with subclauses (1), (2) and (3) above, is equal to or greater than what the after-tax proceeds would have been had that Asset Sale complied with the aforementioned 75% limitation;

(c) if such Asset Sale involves the disposition of Secondary Collateral, the proceeds are applied in accordance with the Intercreditor Agreement to the extent required therein;

(d) in the event of a Primary Collateral Asset Sale, the Net Proceeds corresponding to the Primary Collateral sold shall be paid directly to the Collateral Agent for deposit into the Collateral Account which shall become part of the Primary Collateral and be subject to the Primary Collateral Lien in favor of the Holders and the Trustee; and

(e) if such Asset Sale includes any issuance, sale or other disposition of any Equity Interests of any Restricted Subsidiary of the Company, (1) such Asset Sale is of all Equity Interests of such Restricted Subsidiary and (2) any Investment by the Company or

any Restricted Subsidiary of the Company in such Person existing immediately after giving effect to such Asset Sale would have been permitted to be made pursuant to Section 4.10 if made at such time;

provided, however, that, in the case of any Asset Sale (other than a Primary Collateral Asset Sale), clauses (a) and (b) above need not be satisfied (I) to the extent the Note Collateral to be released consists solely of Secondary Collateral with respect to which the required lenders under the ABL Facility have given their consent and authorized the release of same or to the extent the Secondary Collateral to be released is disposed of by such Credit Facility Agent on behalf of the lenders in connection with the exercise of rights or remedies under the ABL Facility, in each case so long as (x) the Collateral Agent is required to release its lien thereon pursuant to the terms of the Intercreditor Agreement and (y) the proceeds therefrom are applied in accordance with the Intercreditor Agreement or (II) to the extent such Asset Sale results from the loss, destruction, damage, condemnation, confiscation, requisition, seizure, forfeiture or taking of title to or use of Secondary Collateral.

Within 270 days after the date the Company or a Restricted Subsidiary of the Company actually receives any Net Proceeds from an Asset Sale, the Company may, or may cause such Restricted Subsidiary to, apply those Net Proceeds, at its option:

> (1) to acquire Additional Assets (provided that (x) if such Asset Sale constitutes a Primary Collateral Asset Sale, (A) to the extent the assets disposed of constitute Primary Collateral, such Additional Assets shall be limited to only Additional Assets that simultaneously with the acquisition thereof become Primary Collateral or (B) to the extent the assets disposed of constitute Specified Collateral, such Additional Assets shall be limited to only Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof become Specified Collateral and (y) to the extent the assets that were the subject of such Asset Sale includes any Note Collateral, such Additional Assets are not acquired unless such Additional Assets become Note Collateral prior to or simultaneously with the acquisition thereof and until and unless the provisions of Section 4.28 have otherwise been complied with respect to such Additional Assets);

> (2) solely in the case of Net Proceeds from any Asset Sale other than a Primary Collateral Asset Sale, to make a capital expenditure; or

> (3) solely in the case of Net Proceeds from any Asset Sale other than a Primary Collateral Asset Sale, to any combination of the actions set forth in the foregoing clauses (1) and (2).

Unless and until any Net Proceeds from a Primary Collateral Asset Sale are finally applied as specified in the preceding paragraph or in accordance with Section 4.19, the Company shall cause such Net Proceeds to be held by the Collateral Agent as Collateral Monies in the Collateral Account. Unless and until any Net Proceeds from an Asset Sale (other than a Primary Collateral Asset Sale) are finally applied as specified in the preceding paragraph or in accordance

with Section 4.19, the Company shall temporarily use such Net Proceeds to reduce revolving Indebtedness or invest such Net Proceeds in Cash Equivalents.

Any Net Proceeds from Asset Sales that are not applied as provided in the second preceding paragraph within 270 days after the date the Company or such Restricted Subsidiary actually receives such Net Proceeds will constitute "Excess Asset Sale Proceeds".

SECTION 4.17    Event of Loss.

In the event of an Event of Loss, the Company may, or may cause the affected Guarantor to, apply the Net Loss Proceeds from such Event of Loss to:

(a)    the rebuilding, repair, replacement or construction of improvements to the assets subject to such Event of Loss so long as the rebuilt, repaired or improved property or replacement property constitutes Additional Assets (provided that (x) such Additional Assets shall be limited to only Additional Assets that no later than the completion of such rebuilding, repair or improvement or the acquisition of such replacement have become Primary Collateral; (y) to the extent the assets subject to such Event of Loss constitute Specified Collateral, such Additional Assets shall be limited to only Additional Assets constituting Specified Assets that have become Specified Collateral; and (z) the provisions of Section 4.28 have been complied with respect to such Additional Assets no later than the completion of such rebuilding, repair or improvement or the acquisition of such replacement);

(b)    acquire Additional Assets (provided that (x) such Additional Assets shall be limited to only Additional Assets that simultaneously with the acquisition thereof become Primary Collateral; (y) to the extent the assets subject to such Event of Loss constitute Specified Collateral, such Additional Assets shall be limited to only Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof become Specified Collateral; and (z) such Additional Assets are not acquired until and unless the provisions of Section 4.28 have been complied with respect to such Additional Assets); or

(c)    a combination of the actions set forth in the foregoing clauses (a) and (b).

With respect to any property or asset subject to an Event of Loss pursuant to clause (4) of the definition of "Event of Loss" that has a Fair Market Value (or replacement cost, if greater) in excess of $1,000,000, the Company (or the affected Guarantor, as the case may be), shall be required to receive consideration (i) at least equal to the Fair Market Value (as evidenced by a Board Resolution) of the assets subject to the Event of Loss and (ii) at least 75% of which is in the form of cash or Cash Equivalents.

Unless and until any Net Loss Proceeds from an Event of Loss are finally applied as specified in the first sentence of this Section 4.17 or in accordance with Section 4.19, the Company shall cause such Net Loss Proceeds to be held by the Collateral Agent as Collateral Monies in the Collateral Account.

Any Net Loss Proceeds that are not applied as provided in the first sentence of this Section 4.17 within the later of (i) the date 30 days after the date the Company or Restricted Subsidiary actually receives such Net Loss Proceeds and (ii) the date 270 days after the date of such Event of Loss will constitute "Excess Loss Proceeds".

SECTION 4.18          [Reserved]

SECTION 4.19          Repurchase Offers.

(a)          When the aggregate amount of the sum of all Excess Asset Sale Proceeds and Excess Loss Proceeds (collectively, "Excess Proceeds") exceeds $5,000,000 (the date of such occurrence is referred to herein as the "Offer Trigger Date"), within 30 days thereof, the Company will make an offer (the "Repurchase Offer") to all Holders to repurchase the maximum principal amount of Notes that may be repurchased out of all such Excess Proceeds.  The offer price in any Repurchase Offer will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of repurchase (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), and will be payable in cash.  If any Excess Proceeds remain after consummation of a Repurchase Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture; provided that any remaining Excess Proceeds shall remain subject to the Note Lien.  If the aggregate principal amount of Notes tendered into such Repurchase Offer exceeds the amount of Excess Proceeds, the Trustee will select the Notes to be repurchased on a pro rata basis. Upon completion of each Repurchase Offer, the amount of Excess Proceeds will be reset at zero.

All Excess Proceeds shall, pending their application in accordance with this Section 4.19 or the release thereof in accordance with the provisions described under Article Twelve, (i) to the extent constituting Collateral Monies, be held as Collateral Monies in the Collateral Account or (ii) to the extent not constituting Collateral Monies, be invested in Cash Equivalents or applied to temporarily reduce revolving Indebtedness.

(b)          Within 30 days following the date upon which the Offer Trigger Date occurred, the Company shall send by registered first class mail, postage prepaid, a notice to each record Holder as shown on the register of Holders, with a copy to the Trustee, which notice shall govern the terms of the Repurchase Offer.  The notice to the Holders shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Repurchase Offer.  Such notice shall state:

(1)          that the Repurchase Offer is being made pursuant to this Section 4.19 and the amount of Excess Proceeds and that all Notes validly tendered and not withdrawn shall be accepted for payment up to the maximum principal amount of Notes that may be repurchased out of such Excess Proceeds;

(2)          the repurchase price (including the amount of accrued interest) and the repurchase date (which shall be no earlier than thirty (30) days nor later than

sixty (60) days from the date such notice is mailed, other than as may be required by law) (the "Repurchase Offer Payment Date");

(3)        that any Note not tendered shall continue to accrue interest;

(4)        that, unless the Company defaults in making payment therefor, any Note accepted for payment pursuant to the Repurchase Offer shall cease to accrue interest on and after the Repurchase Offer Payment Date;

(5)        that Holders electing to have a Note purchased pursuant to a Repurchase Offer may elect to have Notes purchased in an amount equal to $2,000 or integral multiples of $1,000 in excess of $2,000 except that (i) if a Holder elects to have all the Notes held by such Holder purchased, such Holder may elect to have the entire outstanding principal amount of such Holder, even if not an integral multiple of $1,000, purchased and (ii) in any event, the portion of Notes of a Holder as to which an election for purchase is not made shall be at least $2,000;

(6)        that Holders electing to have a Note repurchased pursuant to a Repurchase Offer shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day prior to the Repurchase Offer Payment Date;

(7)        that any Holder shall be entitled to withdraw its election if the Paying Agent receives, not later than three (3) Business Days prior to the Repurchase Offer Payment Date, a telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Notes the Holder delivered for repurchase and a statement that such Holder is withdrawing its election to have such Notes repurchased;

(8)        that; if the aggregate principal amount of Notes surrendered by Holders exceeds the aggregate amount of Excess Proceeds, the Trustee shall select the Notes to be purchased on a pro rata basis on the basis of the aggregate principal amount of validly tendered Notes with such adjustments as may be deemed appropriate by the Trustee so that only Notes in denominations of $2,000, or integral multiples of $1,000 in excess of $2,000, shall be purchased, except that (i) if all of the Notes of a Holder are to be purchased, the entire outstanding amount of Notes held by such Holder, even if not an integral multiple of $1,000, may be purchased, subject, in the case of Global Notes, to the procedures of DTC and (ii) in any event the unpurchased portion of Notes of any Holder purchased in part shall be at least $2,000;

(9)        that any Holder whose Notes are repurchased only in part shall be issued new Notes in a principal amount equal to the unpurchased portion of the Notes surrendered; provided that the unpurchased portion of Notes of any Holder

whose Notes are purchased in part shall be in a principal amount of at least $2,000; and

        (10)    the circumstances and relevant facts regarding such Excess Proceeds.

If any of the Notes subject to the Repurchase Offer is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to comply with the procedures of the Depository applicable to repurchases.

On or before the Repurchase Offer Payment Date, the Company shall, to the extent lawful (i) accept for payment Notes or portions thereof properly tendered and not withdrawn pursuant to the Repurchase Offer, up to the maximum principal amount of Notes that may be repurchased out of such Excess Proceeds; (ii) deposit with the Paying Agent U.S. Legal Tender sufficient to pay the repurchase price plus accrued interest, if any, of all Notes or portions thereof so properly tendered; and (iii) deliver or cause to be delivered to the Trustee the Notes so properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being repurchased by the Company. If the aggregate principal amount of Notes surrendered by Holders exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased on a pro rata basis on the basis of the aggregate principal amount of tendered Notes (with such adjustments as may be deemed appropriate by the Trustee so that only Notes in denominations of $2,000, or integral multiples of $1,000 in excess of $2,000, shall be purchased, except that (i) if all of the Notes of a Holder are to be purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, may be purchased, subject, in the case of Global Notes, to the procedures of DTC and (ii) in any event the unpurchased portion of Notes of any Holder purchased in part shall be at least $2,000. The Paying Agent shall promptly mail or pay by wire transfer to the Holders of Notes so properly tendered and so accepted the repurchase price for such Notes and the Company shall promptly execute and deliver and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall promptly authenticate and deliver to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; provided that the unpurchased portion of Notes of any Holder whose Notes are purchased in part shall be in a principal amount of at least $2,000. Any Note so accepted for repurchase will cease to accrue interest on and after the Repurchase Offer Payment Date. Any Notes not so accepted shall be promptly mailed by the Company to the Holders thereof. For purposes of this Section 4.19, the Trustee shall act as the Paying Agent.

The Company will publicly announce the results of the Repurchase Offer on or as soon as reasonably practicable after the Repurchase Offer Payment Date. Any amounts remaining after the repurchase of Notes pursuant to a Repurchase Offer (including as a result of the limitations specified herein on the denominations of purchased and unpurchased Notes of any Holder) shall be returned by the Trustee to the Company.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to a Repurchase Offer. To the extent that the provisions of any applicable securities laws or regulations conflict with this

<u>Section 4.19</u>, the Company will comply with such securities laws and regulations and shall not be deemed to have breached its obligations under this <u>Section 4.19</u> by virtue thereof.

Notes (or portions thereof) repurchased pursuant to a Repurchase Offer shall be cancelled and may not be reissued.

SECTION 4.20      <u>Limitation on Liens.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset, now owned or hereafter acquired, that constitutes (a) Note Collateral, other than Permitted Collateral Liens, or (b) any asset (other than Note Collateral), other than Permitted Liens.

SECTION 4.21      <u>Business Activities.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses.

SECTION 4.22      <u>Payments for Consent.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of any Indenture Document, the Registration Rights Agreement with respect to which such Holder is a beneficiary or the Intercreditor Agreement unless such consideration is offered to be paid and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

SECTION 4.23      <u>Impairment of Security Interest.</u>

Neither the Company nor any of its Restricted Subsidiaries will take or omit to take any action which would adversely affect or impair in any material respect the Note Liens in favor of the Trustee with respect to the Note Collateral, except in the case where such Note Collateral constitutes Secondary Collateral, to the extent required or permitted under the Intercreditor Agreement. Neither the Company nor any Guarantor shall grant to any Person (other than the Trustee), or permit any Person (other than the Trustee) to retain, any interest whatsoever in the Note Collateral other than Permitted Collateral Liens. Neither the Company nor any Guarantor will enter into any agreement that requires the proceeds received from any sale of Note Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than as permitted by this Indenture, the Notes and the Collateral Documents. The Company shall, and shall cause each Guarantor to, at their sole cost and expense, execute and deliver all such agreements and instruments as the Trustee shall reasonably request to more fully or accurately describe the property intended to be Note Collateral or the obligations intended to be secured by the Collateral Documents. The Company shall, and shall cause each Guarantor to, at their sole cost and expense, file any such notice filings or other agreements or instruments as may be necessary or as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as

a single class, reasonably desirable under applicable law to perfect the Note Liens created by the Collateral Documents.

SECTION 4.24          Designation of Restricted and Unrestricted Subsidiaries.

The relevant Board of Directors of the Company or any of its Restricted Subsidiaries may designate any of its Restricted Subsidiaries (including any newly acquired or newly formed Subsidiary or Person becoming a Subsidiary through merger or consolidation or Investment therein) to be an Unrestricted Subsidiary if that designation would not cause a Default.  If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as of the time of the designation and, unless such Investment is a Permitted Investment, will reduce the amount available for Restricted Payments under Section 4.10 or under one or more clauses of the definition of Permitted Investments, as determined by the Company.  That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.  The relevant Board of Directors may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.10.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.12, the Company will be in default of such covenant.  The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; provided that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if

(a)          such Indebtedness is permitted under Section 4.12, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period; and

(b)          no Default or Event of Default would be in existence following such designation.

SECTION 4.25          Additional Interest.

If Additional Interest becomes payable by the Company pursuant to the Registration Rights Agreement, the Company shall deliver to the Trustee an Officers' Certificate stating (a) the amount of Additional Interest due and payable, (b) the section of the Registration Rights Agreement pursuant to which Additional Interest is due and payable and (c) the date on which

Additional Interest is payable. Unless and until a Trust Officer of the Trustee receives such an Officers' Certificate, the Trustee may assume without inquiry that no Additional Interest is payable; provided, that the failure of the Company to deliver to the Trustee such Officers' Certificate shall not relieve the Company of its obligation to pay any such Additional Interest when due and payable.

SECTION 4.26        Limitation on Sale and Leaseback Transactions.

The Company will not, and will not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; provided that the Company or any Guarantor may enter into a Sale and Leaseback Transaction if:

(a)        the Company or that Guarantor, as applicable, could have (1) incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction under the Fixed Charge Coverage Ratio test in the first paragraph of Section 4.12 and (2) incurred a Lien to secure such Indebtedness pursuant to Section 4.20;

(b)        the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value, as determined in good faith by the Board of Directors of the Company and set forth in an Officers' Certificate of the Company delivered to the Trustee, of the property that is the subject of that Sale and Leaseback Transaction; and

(c)        the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.16.

SECTION 4.27        Subordination of Intercompany Debt; No Amendments to Certain Agreements.

Each of the Guarantors and the Company will not, directly or indirectly, incur or suffer to exist any Intercompany Debt, unless such Intercompany Debt constitutes Subordinated Indebtedness of the Company or such Guarantor, as applicable, owing such Intercompany Debt that is subject to the terms and provisions of the Subordination Agreement.

Each of the Guarantors and the Company will not, directly or indirectly, without the prior written consent of Holders of a majority in aggregate principal amount of Notes then outstanding voting as a single class, amend, waive or otherwise modify, or surrender any rights, or increase the obligations, of the Company or such Guarantor, respectively, under, the Subordination Agreement, the Management Incentive Plan, the Aurora West Kiewit Documents or the Indiana Port Lease Agreement (or any agreements entered into in accordance therewith), in each case, unless the terms of the Subordination Agreement, the Management Incentive Plan, the Aurora West Kiewit Documents or the Indiana Port Lease Agreement (or any such agreements entered into in accordance therewith), as applicable, as so amended, waived or modified, or the rights and obligations of the Company and the Guarantors established thereunder after giving effect to such surrender or increase, as applicable, are not materially less favorable to the Holders of the Notes as those contained in the Subordination Agreement, the Management Incentive Plan, the Aurora West Kiewit Documents or the Indiana Port Lease Agreement (or any such agreements

entered into in accordance therewith), as applicable, immediately before such amendment, waiver, modification or as those rights and obligations established thereunder immediately before such surrender or increase, as applicable.

SECTION 4.28    After-Acquired Property.

If at any time the Company or any Guarantor acquires or otherwise owns any After-Acquired Property (but subject to the limitations, if applicable, specified in Section 12.12 and other than any Excluded General Intangibles, Excluded Foreign Subsidiary Capital Stock, Excluded Trademark Applications and (prior to the Indiana Port Leasehold Required Mortgage Date) the Indiana Port Leased Premises and any Indiana Port Lease Collateral), no later than the After-Acquired Property Required Date with respect to such After-Acquired Property (and subject to any provision hereof requiring any earlier action), the Company or such Guarantor shall

(a)    cause a valid and enforceable and (except solely as to any Excluded Personal Property) perfected first priority Lien in or on such After-Acquired Property (subject only to Permitted Collateral Liens) to have vested in the Collateral Agent, as security for the Note Obligations; and

(b)    except as to any Excluded Personal Property, have executed and delivered to the Collateral Agent the documents and certificates required by Section 12.01(g) or any other provision of this Indenture;

and thereupon all provisions of this Indenture relating to the Note Collateral shall be deemed to relate to such After-Acquired Property to the same extent and with the same force and effect.

SECTION 4.29    Further Assurances.

(a)    Each of the Guarantors and the Company shall, and the Company shall cause each of its Restricted Subsidiaries to:

(1)    promptly furnish to the Collateral Agent (for the benefit of the Trustee and the Holders) from time to time, at the sole cost and expense of such Guarantor or the Company, respectively, statements and schedules further identifying and describing the Note Collateral and such other reports in connection with the Note Collateral as Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class may reasonably request by written notice delivered to the Company, all in such detail as such Holders may reasonably request; and

(2)    subject to the Intercreditor Agreement (solely with respect to Secondary Collateral), at any time and from time to time, at the sole cost and expense of such Guarantor or the Company, respectively, promptly and duly execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, security agreements, mortgages, assignments, estoppel certificates, financing statements and continuations thereof, termination statements, notices of assignment, transfers,

certificates, assurances and other instruments, and take such further actions, as the Collateral Agent may reasonably request from time to time in order to (i) carry out more effectively the purposes of any Collateral Document, (ii) subject to the Liens created by any of the Collateral Documents any of the properties, rights or interests intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, perfection, enforceability and priority of any of the Collateral Documents and the Liens intended to be created thereby, or (iv) better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Collateral Agent the rights granted or now or hereafter intended to be granted to the Collateral Agent under the Collateral Documents.

(b)     Upon request of the Collateral Agent at any time after an Event of Default has occurred and is continuing, the Company and each of the Guarantors shall, and the Company shall cause each of its Restricted Subsidiaries to, (1) permit the Collateral Agent or any advisor, auditor, consultant, attorney or representative acting for the Collateral Agent, upon reasonable notice to the Company or such Guarantor or Restricted Subsidiary, as applicable, and during normal business hours, to visit and inspect the Company or any of the property of the Company or such Guarantor or such Restricted Subsidiary, as applicable, to review, make extracts from and copy the books and records of the Company or such Guarantor or Restricted Subsidiary, as applicable, relating to any such property, and to discuss any matter pertaining to any such property with the officers and employees of the Company or such Guarantor or Restricted Subsidiary, as applicable, and (2) deliver to the Collateral Agent such reports, including valuations, relating to any such property or any Lien thereon as the Collateral Agent may reasonably request.  The Company will promptly reimburse the Trustee and Collateral Agent for all costs and expenses incurred by the Trustee or Collateral Agent in connection therewith, including all reasonable fees and charges of any advisors, auditors, consultants, attorneys or representatives acting for the Trustee or for the Collateral Agent.

SECTION 4.30          Calculation of Original Issue Discount.

The Company shall file with the Trustee promptly at the end of each calendar year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on the Notes as of the end of such year and (ii) such other specific information relating to such original issue discount as may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

## ARTICLE FIVE

## SUCCESSOR CORPORATION

SECTION 5.01          Merger, Consolidation and Sale of Assets.

The Company shall not, directly or indirectly, (a) consolidate or merge with or into another Person (whether or not the Company is the surviving entity); or (b) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties and assets of the

Company and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to another Person, unless:

        (1)      either:

            (i)      the Company is the surviving entity; or

            (ii)      the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a Person organized or existing under the laws of the United States of America, any state of the United States of America or the District of Columbia;

        (2)      the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Company under the Notes, this Indenture and any Collateral Documents to which the Company is a party pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee and in connection therewith shall execute and deliver such other agreements, cause such instruments and Uniform Commercial Code financing statements to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to continue the validity and enforceability, and perfect or continue the perfection, of the Note Lien created under the Collateral Documents on the Note Collateral owned by or transferred to such Person;

        (3)      immediately before and after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

        (4)      the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made will, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period:

            (i)      have Consolidated Net Worth immediately after the transaction equal to or greater than the Consolidated Net Worth of the Company immediately preceding the transaction; and

            (ii)      be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of <u>Section 4.12</u>; and

        (5)      the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consummation of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition and, if such an assumption is required in connection with such

transaction, such assumption, complies with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to such transaction have been satisfied.

The conditions set forth in <u>clause (4)</u> of the first paragraph of this <u>Section 5.01</u> will not apply to:

> (1)     a merger of the Company with an Affiliate solely for the purpose of reincorporating the Company in another jurisdiction; or

> (2)     any merger, consolidation, sale, assignment, transfer, conveyance or other disposition of properties and assets, solely between or among the Company and one or more Restricted Subsidiaries that are Guarantors.

The Company shall not, directly or indirectly, lease all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to any other Person.

For purposes of the foregoing, the disposition (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties and assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

SECTION 5.02      <u>Successor Person Substituted.</u>

Upon any consolidation or merger or any disposition of all or substantially all of the properties and assets of the Company in accordance with <u>Section 5.01</u> in which the Company is not surviving or the continuing Person, the successor Person formed by such consolidation or into which the Company is merged or to which such disposition is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes with the same effect as if such surviving entity had been named as such (so that from and after the date of such consolidation, merger or disposition, the provisions of this Indenture referring to the "Company" shall refer instead to such Person and not to the Company) and will succeed to, and be substituted for, and may exercise every right and power of, the Company under the Notes, this Indenture and the Collateral Documents. Upon such substitution, except in the case of a sale, assignment, transfer, conveyance or other disposition of less than all the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, the predecessor Company shall be released from its obligations under the Notes, this Indenture and the Collateral Documents. The Trustee shall enter into a supplemental indenture to evidence the succession and substitution of such Person and such discharge and release of the Company.

# ARTICLE SIX

## DEFAULT AND REMEDIES

SECTION 6.01        Events of Default.

Each of the following is an "Event of Default"  (whatever the reason for such Event of Default and whether it shall be involuntary or be effected by operation of law):

(a)        the failure to pay interest on any Notes when the same becomes due and payable and the default continues for a period of 30 consecutive days;

(b)        the failure to pay the principal of or premium, if any, on any Notes, when such principal or premium, if any, becomes due and payable, at maturity, upon redemption or otherwise;

(c)        default in the payment of principal of and interest on Notes required to be repurchased pursuant to a Change of Control Offer or a Repurchase Offer as described under Section 4.15 or 4.19, respectively, when due and payable;

(d)        failure to perform or comply with any of the provisions of Section 5.01 or 10.04);

(e)        failure by the Company or any of its Restricted Subsidiaries to perform any covenant or agreement in the Indenture Documents (other than any default described in clause (a), (b), (c) or (d) above), and such failure continues for a period of 60 consecutive days after written notice to the Company by the Trustee or Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class;

(f)        default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Significant Subsidiaries or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary (or the payment of which is guaranteed by the Company or any of its Significant Subsidiaries), whether such Indebtedness or guarantee now exists or is created after the Issue Date (but excluding Indebtedness owing to the Company or a Guarantor), if that default:

(1)        is caused by a failure to pay any portion of the principal (or effect any cash collateralization of letters of credit when required) of such Indebtedness when due and payable after the expiration of the grace period provided in such Indebtedness (a "Payment Default"); or

(2)        results in the acceleration of such Indebtedness prior to its Stated Maturity (which acceleration is not rescinded, annulled or otherwise cured within 20 days of receipt by the Company, such Significant Subsidiary or any Subsidiary in such group of Restricted Subsidiaries of notice of any such acceleration),

(3) and, in each case, the principal (or face) amount of any such Indebtedness so due and payable or that has been accelerated, together with the principal (or face) amount that is so due and payable or that has been accelerated of any other such Indebtedness under which there has been a Payment Default or the Stated Maturity of which has been so accelerated, aggregates $10,000,000 or more;

(g) the rendering of a final judgment or judgments (not subject to appeal) against the Company or any of its Restricted Subsidiaries, to the extent not covered or paid by insurance, in an amount in excess of $2,500,000, which judgments are not paid, waived, satisfied, discharged or stayed for a period of 60 consecutive days after the date on which the right to appeal has expired;

(h) the denial or disaffirmation by the Company or any of its Restricted Subsidiaries, or any Person acting on behalf of any of them, in writing, of any material obligation of the Company or any of its Restricted Subsidiaries set forth in or arising under this Indenture, the Notes or any Collateral Documents (other than by reason of a release from such obligation or the Note Lien related thereto in accordance with the terms of this Indenture and the Collateral Documents);

(i) the Company or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) (1) commences a voluntary case or proceeding under any Bankruptcy Code with respect to itself (or themselves), (2) consents to the entry of a judgment, decree or order for relief against it (or them) in an involuntary case or proceeding under any Bankruptcy Code, (3) consents to the appointment of a Custodian of it (or them) or for substantially all of its (or their) property, (4) consents to or acquiesces in the institution of a bankruptcy or an insolvency proceeding against it (or them), (5) makes a general assignment for the benefit of its (or their) creditors or (6) takes any corporate action to authorize or effect any of the foregoing;

(j) a court of competent jurisdiction enters a judgment, decree or order for relief in respect of the Company or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) in an involuntary case or proceeding under any Bankruptcy Code, which shall (1) approve as properly filed a petition seeking reorganization, arrangement, adjustment or composition in respect of the Company or such Significant Subsidiary (or such group of Restricted Subsidiaries), (2) appoint a Custodian of the Company or such Significant Subsidiary (or such group of Restricted Subsidiaries) or for substantially all of its (or their) property or (3) order the winding-up or liquidation of its (or their) affairs; and such judgment, decree or order shall remain unstayed and in effect for a period of 60 consecutive days;

(k) any Note Guarantee from a Significant Subsidiary, or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, ceases to be in full force and effect or is declared null and void and unenforceable or is found to be invalid or a Guarantor denies in writing its liability under the Note Guarantee

(other than by reason of a release of such Guarantor from the Note Guarantee in accordance with the terms of the Indenture Documents); and

(l)     except as a result of the release of any Lien in accordance with the terms of this Indenture and the Collateral Documents, any Lien purported to be created by any Collateral Document with respect to any Specified Collateral or with respect to any other Note Collateral (other than Specified Collateral) that, individually or in the aggregate, has a Fair Market Value in excess of $2,000,000 (1) ceases to be in full force and effect, (2) ceases to give the Collateral Agent, for the benefit of the holders of the Note Obligations, the Liens, rights, powers and privileges purported to be created and granted thereby (including a perfected first priority security interest in and Lien on (subject only to Permitted Collateral Liens) all of the Note Collateral thereunder) in favor of the Collateral Agent, or (3) is asserted by the Company or any Guarantor not to be, a valid, perfected, first priority security interest in or Lien on (subject only to Permitted Collateral Liens) the Note Collateral covered thereby.

SECTION 6.02     Acceleration.

(a)     If an Event of Default (other than an Event of Default specified in Section 6.01(i) or 6.01(j) above with respect to the Company, any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) shall occur and be continuing and has not been waived, the Trustee may, or at the written direction of Holders of at least 25% in aggregate principal amount of outstanding Notes voting as a single class shall, declare all unpaid principal of and premium, if any, and accrued interest on all the Notes to be due and payable by notice in writing to the Company and the Trustee (if given by the Holders) specifying the Event of Default and that it is a "notice of acceleration" (the "Acceleration Notice"), and the same shall become immediately due and payable.

(b)     If an Event of Default specified in Section 6.01(i) or 6.01(j) above with respect to the Company, any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary shall occur and be continuing, then all unpaid principal of and premium, if any, and accrued interest on all of the outstanding Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(c)     In the event of a declaration of acceleration of the Notes because an Event of Default described in Section 6.01(f) has occurred and is continuing, such declaration of acceleration of the Notes shall be automatically rescinded and annulled and such Event of Default under Section 6.01(f) shall be deemed not to have occurred or be continuing if both (a) either (x) the default giving rise to such Event of Default pursuant to Section 6.01(f) shall be remedied or cured pursuant to the terms of, or waived by the holders of, such Indebtedness or any consequent acceleration of such Indebtedness shall be rescinded, annulled or otherwise cured or (y) such Indebtedness shall have been discharged in full, in the case of clause (x) or (y), within 30 days after such declaration of acceleration of the Notes with respect thereto and (b) (1) the rescission and annulment of

such acceleration of the Notes would not conflict with any judgment or decree and (2) all existing Events of Default, except nonpayment of principal, premium or interest on the Notes that became due solely because of such acceleration of the Notes, have been cured or waived.

(d) At any time after a declaration of or automatic acceleration with respect to the Notes as described in Sections 6.02(a) and 6.02(b), the Holders of a majority in principal amount of the Notes voting as a single class may rescind and cancel such declaration and its consequences: (1) if the rescission would not conflict with any judgment or decree; (2) if all existing Events of Default, other than nonpayment of principal, premium, if any, or interest on the Notes that has become due solely because of the acceleration of the Notes, have been cured or waived; (3) to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal and premium, if any, which has become due otherwise than by such declaration of acceleration, has been paid; (4) if the Company has paid each of the Trustee and the Collateral Agent its reasonable compensation and reimbursed each of the Trustee and the Collateral Agent for its reasonable expenses, disbursements and its advances; and (5) in the event of the cure or waiver of an Event of Default of the type described in Section 6.01(i) or 6.01(j), the Trustee shall have received an Officers' Certificate that such Event of Default has been cured or waived together with evidence confirming the requisite majority vote of the Holders. No such rescission shall affect any subsequent Default or impair any right consequent thereto.

(e) If an Event of Default occurs by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company with the intention of avoiding payment of the premium that the Company would have been required to pay if the Company then had elected to redeem the Notes pursuant to the optional redemption provisions of Section 3.01, an equivalent premium will also become and be immediately due and payable to the extent permitted by applicable law upon the acceleration of the Notes.

SECTION 6.03    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of, premium, if any, or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture, any Collateral Document or any Note Guarantee or to direct the Collateral Agent to exercise remedies with respect to the Primary Collateral and, subject to the terms of the Intercreditor Agreement, the Secondary Collateral.

The Trustee or the Collateral Agent may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee, the Collateral Agent or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative to the extent permitted by law.

If an Event of Default occurs, the Trustee, on behalf of the Holders of the Notes, in addition to any rights or remedies available to the Trustee under this Indenture, will be entitled to take (or instruct the Collateral Agent to take) such actions as the Trustee deems advisable to protect and enforce the rights of the Trustee, the Collateral Agent and the Holders in the Note Collateral, including, without limitation, the institution of foreclosure proceedings in accordance with the Collateral Documents and applicable law. However, the rights and remedies available to the Trustee and the Collateral Agent under the Note Collateral Documents and the actions permitted to be taken by the Trustee and the Collateral Agent thereunder will be subject to the provisions of the Intercreditor Agreement.

The Trustee will apply (or instruct the Collateral Agent to apply) the proceeds received by the Collateral Agent or the Trustee from any foreclosure of the Note Collateral in accordance with the provisions of Section 6.10;  provided, that the application of any such proceeds of Note Collateral that constitutes Secondary Collateral shall be subject to the terms of the Intercreditor Agreement.

SECTION 6.04        Waiver of Past Defaults.

Subject to Sections 2.09, 6.07 and 9.02, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may, on behalf of the Holders of all the Notes, rescind an acceleration or waive (including, without limitation, in connection with a purchase of, or tender offer or exchange offer for, Notes) any existing Default or Event of Default, and its consequences, except (other than as provided in Section 6.02(c) or Section 6.02(d)) a default in the payment of the principal of or premium, if any, or interest on any Notes or in respect of a covenant or provision which under this Indenture cannot be modified or amended without the consent of the Holder of each Note then outstanding.  When a Default or Event of Default is waived, it is cured and ceases to exist and is deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred for every purpose of this Indenture, the Notes and the Collateral Documents, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

SECTION 6.05        Control by Majority.

Subject to Section 2.09, the Intercreditor Agreement and applicable law, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or the Collateral Agent, as the case may be, or exercising any trust or power conferred on the Trustee or the Collateral Agent, as the case may be, including any remedies provided for in Section 6.03.  Subject to Section 7.01, however, the Trustee or the Collateral Agent, as the case may be, may refuse to follow any direction (which direction, if sent to the Trustee or the Collateral Agent, as the case may be, shall be in writing) that the Trustee or the Collateral Agent, as the case may be, reasonably believes conflicts with any applicable law, this Indenture, the Notes, the Note Guarantees, the Collateral Documents or the Intercreditor Agreement, that the Trustee or the Collateral Agent, as the case may be, determines may be unduly prejudicial to the rights of another Holder, or that may subject the Trustee or the Collateral Agent, as the case may be, to personal liability; provided that the Trustee or the

Collateral Agent, as the case may be, may take any other action deemed proper by the Trustee or the Collateral Agent, as the case may be, which is not inconsistent with such direction (which direction, if sent to the Trustee or the Collateral Agent, as the case may be, shall be in writing).

SECTION 6.06    Limitation on Holders' Rights to Pursue Remedies.

A Holder may not pursue any remedy with respect to this Indenture or the Notes unless:

(a)    such Holder gives to the Trustee written notice of a continuing Event of Default;

(b)    subject to Section 2.09, Holders of at least 25% in aggregate principal amount of the outstanding Notes voting as a single class make a written request to the Trustee to institute proceedings in respect of that Event of Default;

(c)    such Holder or Holders offer to the Trustee security or indemnity reasonably satisfactory to the Trustee against any loss, liability or expense to be incurred in compliance with such request;

(d)    the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of security or indemnity; and

(e)    during such 60 day period the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class do not give the Trustee a written direction which, in the opinion of the Trustee, is inconsistent with the request.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over such other Holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders.

SECTION 6.07    Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of, premium, if any, and interest on a Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; provided that a Holder shall not have the right to institute any such suit for the enforcement of payment if, and to the extent, the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Note Lien upon any Note Collateral.

SECTION 6.08    Collection Suit by Trustee or Collateral Agent.

If an Event of Default in payment of principal of, premium, if any, or interest specified in Section 6.01(a) or Section 6.01(b) shall occur and be continuing, subject to the Intercreditor Agreement, the Trustee and the Collateral Agent may recover judgment (1) in its own name and (2) (x) in the case of the Trustee, as trustee of an express trust or (y) in the case of the Collateral Agent, as collateral agent on behalf of each of the Holders, in each case against the Company or

any other obligor on the Notes for the whole amount of principal, premium, if any, and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest at the rate set forth in <u>Section 4.01</u> and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel and any other amounts due the Trustee under <u>Section 7.07</u> and the Collateral Agent under the Collateral Documents.

SECTION 6.09 <u>Trustee May File Proofs of Claim.</u>

The Trustee and the Collateral Agent are authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee or the Collateral Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent, their respective agents and counsel) and the Holders allowed in any judicial proceedings relating to the Company or any other obligor upon the Notes, any of their respective creditors or any of their respective property and, subject to the Intercreditor Agreement, shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any Custodian in any such judicial proceedings is hereby authorized by each Holder to make such payments to the Trustee or Collateral Agent and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee or Collateral Agent any amount due to it for the reasonable compensation, expenses, taxes, disbursements and advances of the Trustee, the Collateral Agent, their respective agents and counsel, and any other amounts due any such Person under the Collateral Documents and <u>Section 7.07</u>. The Company's payment obligations under this <u>Section 6.09</u> shall be secured in accordance with the provisions of <u>Section 7.07</u>. Nothing herein contained shall be deemed to authorize the Trustee or Collateral Agent to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee or the Collateral Agent, as the case may be, to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10 <u>Priorities.</u>

If the Trustee collects any money or property pursuant to this <u>Article Six</u>, it shall, subject to the terms of the Intercreditor Agreement, pay out the money or property in the following order:

<u>First</u>: to the Trustee, the Collateral Agent, the Paying Agent and the Registrar for amounts due under <u>Section 7.07</u> (including payment of all compensation and expenses, all liabilities incurred and all advances made by the Trustee or the Collateral Agent, as the case may be, and the costs and expenses of collection);

<u>Second</u>: if the Holders are forced to proceed against the Company directly without the Trustee or the Collateral Agent, to the Holders for their collection costs;

<u>Third</u>: to the Holders for amounts due and unpaid on the Notes for principal, premium, if any, and accrued interest ratably, without preference or priority of any kind, according to the

amounts due and payable on the Notes for principal, premium, if any, and accrued interest respectively; and

Fourth:  to the Company or any other obligor on the Notes, as their interests may appear, or as a court of competent jurisdiction may direct;

provided, that the application of any such proceeds of Note Collateral that constitutes Secondary Collateral shall be subject to the terms of the Intercreditor Agreement.

The Trustee, upon prior written notice to the Company, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

SECTION 6.11          Undertaking for Costs.

All parties to this Indenture agree, and each Holder by its acceptance of its Note shall be deemed to have agreed, that in any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee or the Collateral Agent, as the case may be, for any action taken or omitted to be taken by it as Trustee or the Collateral Agent, as the case may be, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee or the Collateral Agent, as the case may be, a suit by a Holder pursuant to Section 6.07, or a suit by a Holder or Holders of more than 10% in principal amount of the outstanding Notes voting as a single class.

SECTION 6.12          Restoration of Rights and Remedies.

If the Trustee, the Collateral Agent or any Holder has instituted any proceedings to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee, the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Trustee, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee, the Collateral Agent and the Holders shall continue as though no such proceeding has been instituted.

SECTION 6.13          Rights and Remedies Cumulative.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 6.14          Delay or Omission not Waiver.

No delay or omission of the Trustee or the Collateral Agent or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or in acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

## ARTICLE SEVEN

## TRUSTEE

SECTION 7.01        Duties of Trustee.

The duties and responsibilities of the Trustee shall be as provided by the TIA and as set forth herein or in any Collateral Document.

(a)        If an Event of Default has occurred and is continuing, the Trustee shall exercise such rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise thereof as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)        Except during the continuance of an Event of Default:

(1)        the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the TIA, and the Trustee need perform only those duties as are specifically set forth in this Indenture and no covenants or obligations shall be implied in or read into this Indenture against the Trustee; and

(2)        in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, in case of any such certificates or opinions which by the provisions hereof are furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture but need not confirm or investigate the accuracy of mathematical calculation or other facts stated herein.

(c)        Notwithstanding anything to the contrary herein contained, the Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)        this paragraph does not limit the effect of clause (b) of this Section 7.01;

(2)        the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

Sections 7.01(c)(1), (2) and (3) shall be in lieu of Sections 315(d)(1), 315(d)(2) and 315(d)(3) of the TIA and such Sections 315(d)(1), 315(d)(2) and 315(d)(3) are herein expressly excluded from this Indenture, as permitted by the TIA.

(d)     No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any liability or expense. The Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture, the Intercreditor Agreement or the Collateral Documents at the request of any Holders unless such Holders have offered to the Trustee security and indemnity satisfactory to the Trustee against such risk, liability or expense.

(e)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to clauses (a), (b), (c) and (d) of this Section 7.01.

(f)     The Trustee shall not be liable for interest on any money or assets received by it except as the Trustee may agree in writing with the Company. Money and assets held in trust by the Trustee need not be segregated from other funds or assets held by the Trustee except to the extent required by law.

(g)     Anything in this Indenture to the contrary notwithstanding, in no event shall the Trustee, the Paying Agent or the Registrar be liable under or in connection with this Indenture for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Trustee, the Paying Agent or the Registrar has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

SECTION 7.02     Rights of Trustee.

Subject to Section 7.01:

(a)     In the absence of bad faith on its part, the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, notice, report, request, direction, consent, order, bond, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person; provided, however, in case of any such resolution, certificate, statement, instrument, opinion, notice, report, request, direction, consent, order, bond, note or other paper or document which by the provisions of hereof are furnished to the Trustee, the Trustee shall examine such document to determine whether such document conforms to the requirements of this Indenture. The Trustee need not investigate any fact or matter stated in the document.

(b)     Before the Trustee acts or refrains from acting, it may consult with counsel and may require an Officers' Certificate or an Opinion of Counsel, or both, which shall

conform to Sections 11.04 and 11.05.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The written advice of the Trustee's counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by the Trustee hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care and in good faith.

(d)     The Trustee shall not be liable for any action taken, suffered or omitted to be taken in good faith which it reasonably believes to be authorized or within its rights or powers under this Indenture.

(e)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, notice, report, request, direction, consent, order, bond, note or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon reasonable notice to the Company, to examine the books, records and premises of the Company, personally or by agent or attorney, and to consult with the officers and representatives of the Company, including the Company's accountants and attorneys, at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.  Except as expressly stated herein to the contrary, in no event shall the Trustee have any responsibility to ascertain whether there has been compliance with any of the covenants or provisions of Article Four or Five.

(f)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(g)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if signed by an Officer of the Company and any resolution of the Board of Directors shall be sufficient if evidenced by a copy of such resolution certified by an Officer of the Company to have been duly adopted and in full force and effect as of the date thereof.

(h)     The Trustee shall not be deemed to have notice or be charged with knowledge of any Default or Event of Default unless the Trust Officer or the Trustee shall have received from the Company, any Guarantor or any other obligor upon the Notes or from any Holder written notice thereof at its address set forth in Section 11.02, and such notice references the Notes and this Indenture.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)     The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any persons authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(k)     The permissive right of the Trustee to take any action under this Indenture or any Collateral Document shall not be construed as a duty to so act.

SECTION 7.03     Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company, any Subsidiary of the Company or their respective Affiliates with the same rights it would have if it were not Trustee.  Any Agent may do the same with like rights.  However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04     Trustee's Disclaimer.

The Trustee makes no representation as to the validity, adequacy or sufficiency of this Indenture, the Notes, the Intercreditor Agreement or the Collateral Documents, it shall not be accountable for the Company's use of the proceeds from the Notes and it shall not be responsible for any statement of the Company in this Indenture, the Notes, the Intercreditor Agreement, the Collateral Documents or any other documents connected with the issuance of the Notes other than the Trustee's certificate of authentication, and the Trustee assumes no responsibility for their correctness.

Beyond the exercise of reasonable care in the custody thereof and the fulfillment of its obligations under this Indenture and the Collateral Documents, the Trustee shall have no duty as to any Note Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto.  The Trustee shall be deemed to have exercised reasonable care in the custody of the Note Collateral in its possession if the Note Collateral is accorded treatment substantially equal to that which it accords its own property.

The Trustee and the Collateral Agent each makes no representations as to and shall not be responsible for the existence, genuineness, value, sufficiency or condition of any of the Note Collateral or as to the security afforded or intended to be afforded thereby, hereby or by any Collateral Document, or for the validity, perfection, priority or enforceability of the Liens or security interests in any of the Note Collateral created or intended to be created by any of the Collateral Documents, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Note Collateral, any Collateral Documents or any agreement or assignment contained in any thereof, for the validity of the title of the Company or any Guarantor to the Note Collateral, for insuring the Note Collateral or for the payment of taxes, charges, assessments or Liens upon the Note Collateral or otherwise as to the maintenance of the Note Collateral.  The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of

this Indenture or any other Collateral Document by the Company or any other Person that is a party thereto or bound thereby.

SECTION 7.05    Notice of Default.

If a Default or an Event of Default occurs and is continuing and if a Trust Officer has actual knowledge thereof or has received written notice thereof from the Company or any Holder, the Trustee shall mail to each Holder, with a copy to the Company, notice of the Default or Event of Default within 90 days after the occurrence thereof unless such Default or Event of Default shall have been cured or waived before the giving of such notice.  Except in the case of a Default or an Event of Default in payment of principal of, premium, if any, or interest on any Note, including an accelerated payment and the failure to make payment on the Change of Control Payment Date pursuant to a Change of Control Offer, and except in the case of a failure to comply with Article Five, the Trustee may withhold the notice if and so long as its Board of Directors, the executive committee of its Board of Directors or a committee of its directors and/or Trust Officers in good faith determines that withholding the notice is in the interest of the Holders.

SECTION 7.06    Reports by Trustee to Holders.

Within 60 days after each May 15, beginning with May 15, 2011, the Trustee shall, to the extent that any of the events described in TIA Section 313(a) occurred within the previous twelve (12) months, but not otherwise, mail to each Holder a brief report dated as of such date that complies with TIA Section 313(a).  The Trustee also shall comply with TIA Sections 313(b) and (c).

A copy of each report at the time of its mailing to Holders shall be mailed to the Company and filed by the Trustee with the SEC and each stock exchange or market, if any, on which the Notes are listed or quoted.

The Company shall promptly notify the Trustee if the Notes become listed, quoted on or delisted from any stock exchange or market and the Trustee shall comply with TIA Section 313(d).

SECTION 7.07    Compensation and Indemnity.

The Company and the Guarantors, jointly and severally, shall pay to the Trustee, the Collateral Agent, the Paying Agent and the Registrar (each an "Indemnified Party") from time to time compensation for their respective services as Trustee, Collateral Agent, Paying Agent or Registrar, as the case may be, as the Trustee, Collateral Agent, Paying Agent, Registrar and the Company shall have agreed in writing.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse each Indemnified Party upon request for all reasonable out-of-pocket expenses, disbursements and advances incurred or made by it in connection with the performance of its duties under, as the case may be, this Indenture, the Collateral Documents or the Intercreditor Agreement, except any such expenses, disbursements and advances as may be attributable to such Indemnified Party's gross negligence, bad faith or willful misconduct.  Such expenses, disbursements and advances

shall include the reasonable fees, expenses, disbursements and advances of each of such Indemnified Party's agents and counsel.

The Company and the Guarantors, jointly and severally, hereby agree to indemnify each Indemnified Party and its agents, employees, stockholders and directors and officers for, and hold each of them harmless against, any loss, damage, cost, claim, liability or expense (including taxes, other than taxes based on the income of such Person) incurred by any of them except for such actions, to the extent caused by any negligence, bad faith or willful misconduct on the part of such Indemnified Party, arising out of or in connection with this Indenture, the Intercreditor Agreement or the Collateral Documents or the administration of this trust, including the reasonable costs and expenses of enforcing this Indenture against the Company or any Guarantor (including this Section 7.07) and defending themselves against any claim or liability in connection with the exercise or performance of any of their rights, powers or duties hereunder or thereunder (including the reasonable fees and expenses of counsel). The relevant Indemnified Party shall notify the Company (with a copy to the Trustee) promptly of any claim asserted against such Indemnified Party for which such Indemnified Party may seek indemnity hereunder or under the Collateral Documents or Intercreditor Agreement. Failure by the an Indemnified Party to so notify the Company shall not relieve the Company or any Guarantor of its obligations hereunder except to the extent failure to so notify the Company materially affects its ability to defend against the claim. At the Indemnified Party's sole discretion, the Company shall defend the claim and the Indemnified Party shall cooperate and may participate in the defense; provided that any settlement of a claim shall be approved in writing by the Indemnified Party, which approval shall not be unreasonably withheld. Alternatively, the Indemnified Party may at its option have separate counsel of its own choosing and the Company shall pay the reasonable fees and expenses of such counsel; provided that the Company shall not be required to pay such fees and expenses if it assumes the Indemnified Party's defense and there is no conflict of interest between the Company and the Indemnified Party in connection with such defense as reasonably determined by the Indemnified Party. The Company need not pay for any settlement made without its written consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, the Company and the Guarantors need not reimburse any expense or indemnify against any loss or liability to the extent incurred by an Indemnified Party through its gross negligence, bad faith or willful misconduct.

To secure the Company's and each Guarantor's payment obligations in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee or the Collateral Agent, in its capacity as such, for any amount owing it or any predecessor Trustee, except money or property held in trust to pay principal of or interest on any particular Notes.

When an Indemnified Party incurs expenses or renders services after an Event of Default specified in Section 6.01(i) or 6.01(j) occurs, such expenses (including the reasonable fees and expenses of its counsel) and the compensation for such services are intended to constitute expenses of administration under the Bankruptcy Code.

The obligations of the Company under this Section 7.07 shall survive the satisfaction and discharge of this Indenture, termination of the Collateral Documents or the Intercreditor Agreement or the resignation or removal of the Trustee.

The Trustee shall comply with the provisions of TIA Section 313(b)(2) to the extent applicable.

SECTION 7.08    Replacement of Trustee.

The Trustee may resign upon 45 days' prior written notice to the Company. The Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may remove the Trustee by so notifying the Company and the Trustee in writing and may appoint a successor Trustee. The Company, by a resolution of the Board of Directors, may remove the Trustee if:

       (a)    the Trustee fails to comply with Section 7.10 or TIA Section 310;

       (b)    the Trustee is adjudged bankrupt or insolvent;

       (c)    a Custodian or other public officer takes charge of the Trustee or its property; or

       (d)    the Trustee becomes incapable of acting with respect to the Notes.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee. Within one (1) year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts, duties and obligations of the retiring Trustee. Upon request of the Company or the successor Trustee, such retiring Trustee shall at the expense of the Company and upon payment of the charges of the Trustee then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject to the Lien, if any, provided for in Section 7.07. Upon request of any such successor Trustee or the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of at least 10% in aggregate principal amount of the outstanding Notes voting as a single class may petition any court of competent jurisdiction at the expense of the Company for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.10, any Holder who satisfies the requirements of TIA Section 310(b)(iii) may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

The Company shall give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders in writing. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

Notwithstanding any resignation or replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09        Successor Trustee by Merger, Etc.

If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business to, another Person, the resulting, surviving or transferee Person without any further act shall, if such resulting, surviving or transferee Person is otherwise eligible hereunder, be the successor Trustee; provided, however, that such Person shall be otherwise qualified and eligible under this Article Seven.

In case any Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

SECTION 7.10        Eligibility; Disqualification.

(a)        This Indenture shall always have a Trustee who satisfies the requirements of TIA Sections 310(a)(1), (2), (3) and (5). The Trustee (or, in the case of a Trustee that is an Affiliate of a bank holding company system, the related bank holding company) shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition. In addition, if the Trustee is a corporation included in a bank holding company system, the Trustee, independently of such bank holding company, shall meet the capital requirements of TIA Section 310(a)(2). The Trustee shall comply with TIA Section 310(b); provided, however, that there shall be excluded from the operation of TIA Section 310(b)(1) any indenture or indentures under which other securities, or certificates of interest or participation in other securities, of the Company are outstanding if the requirements for such exclusion set forth in TIA Section 310(b)(1) are met. The provisions of TIA Section 310 shall apply to the Company, as obligor of the Notes.

(b)        If the Trustee has or acquires a conflicting interest within the meaning of the TIA, the Trustee shall (1) eliminate such conflict within 90 days, (2) apply to the SEC for permission to continue as Trustee hereunder (if this Indenture has been qualified under the TIA) or (3) resign, to the extent and in the manner provided by, and subject to the provisions of, the TIA and this Indenture.

SECTION 7.11    Preferential Collection of Claims Against Company.

The Trustee shall comply with TIA Section 311(a), excluding any creditor relationship listed in TIA Section 311(b). A Trustee who has resigned or been removed shall be subject to TIA Section 311(a) to the extent indicated therein.

SECTION 7.12    Trustee as Collateral Agent and Paying Agent.

References to the Trustee in Sections 7.01(e), 7.02, 7.03, 7.04, 7.07 and 7.08 and the first paragraph of Section 7.09 shall include the Trustee in its role as Collateral Agent and Paying Agent.

SECTION 7.13    Co-Trustees, Co-Collateral Agent and Separate Trustees, Collateral Agent.

(a)    At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any of the Note Collateral may at the time be located, the Company and the Trustee shall have the power to appoint, and, upon the written request of the Trustee or of the Holders of at least 25% in principal amount of the Notes outstanding voting as a single class, the Company shall for such purpose join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint, one or more Persons approved by the Trustee either to act as co-trustee, jointly with the Trustee, of all or any part of the Note Collateral, to act as co-collateral agent, jointly with the Collateral Agent, or to act as separate trustees or Collateral Agent of any such property, in either case with such powers as may be provided in the instrument of appointment, and to vest in such Person or Persons in the capacity aforesaid, any property, title, right or power deemed necessary or desirable, subject to the other provisions of this Section 7.13. If the Company does not join in such appointment within 15 days after the receipt by it of a request so to do, or in case an Event of Default has occurred and is continuing, the Trustee alone shall have the power to make such appointment.

(b)    Should any written instrument from the Company be required by any co-trustee, co-Collateral Agent or separate trustee or separate Collateral Agent so appointed for more fully confirming to such co-trustee or separate trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Company.

(c)    Every co-trustee, co-collateral agent or separate trustee or separate collateral agent shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms, namely:

(1)    The Notes shall be authenticated and delivered, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely, by the Trustee.

(2)     The rights, powers, duties and obligations hereby conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee or separate trustee, or by the Collateral Agent and such co-Collateral Agent or separate Collateral Agent, jointly as shall be provided in the instrument appointing such co-trustee or separate trustee or co-Collateral Agent or separate Collateral Agent, except to the extent that under any law of any jurisdiction in which any particular act is to be performed the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustee or separate trustee, Collateral Agent or co-Collateral Agent or separate Collateral Agent.

(3)     The Trustee at any time, by an instrument in writing executed and delivered by it, with the concurrence of the Company evidenced by a resolution of the Company's Board of Directors, may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section 7.13, and, in case an Event of Default has occurred and is continuing, the Trustee shall have power to accept the resignation of, or remove, any such co-trustee, co-collateral agent, separate trustee or separate collateral agent without the concurrence of the Company.  Upon the written request of the Trustee, the Company shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal.  A successor to any co-trustee, co-collateral agent, separate trustee or separate collateral agent so resigned or removed may be appointed in the manner provided in this Section 7.13.

(4)     No co-trustee, co-collateral agent, separate trustee or separate collateral agent hereunder shall be personally liable by reason of any act or omission of the Trustee or the Collateral Agent, or any other such trustee or collateral agent hereunder.

(5)     Any act of Holders delivered to the Trustee shall be deemed to have been delivered to each such co-trustee or separate trustee and any act of Holders delivered to the Collateral Agent shall be deemed to have been delivered to each such co-collateral agent or separate collateral agent.

## ARTICLE EIGHT

## SATISFACTION AND DISCHARGE OF INDENTURE

SECTION 8.01     Legal Defeasance and Covenant Defeasance.

(a)     The Company may, at its option and at any time, elect to have either clause (b) or (c) below be applied to the outstanding Notes upon compliance with the applicable conditions set forth in clause (d).

(b)     Upon the Company's exercise under clause (a) of the option applicable to this clause (b), subject to the satisfaction of the conditions set forth in clause (d) below, the Company and the Guarantors shall be deemed to have been released and discharged from their obligations with respect to the outstanding Notes, the Note Guarantees and the Collateral Documents on the date the applicable conditions set forth below are satisfied ("Legal Defeasance").  For this purpose, such Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of the Sections and matters under this Indenture referred to in subclauses (1) and (2) below, and the Company and the Guarantors shall be deemed to have satisfied all their other obligations under such Notes and this Indenture, the Note Guarantees and the Collateral Documents, except for the following which shall survive until otherwise terminated or discharged hereunder:  (1) the rights of Holders of outstanding Notes to receive solely from the trust fund described in clause (d) below and as more fully set forth in such paragraph payments in respect of the principal of, premium, if any, and interest on such Notes when such payments are due; (2) obligations listed in Section 8.03, subject to compliance with this Section 8.01; (3) the rights, powers, trusts, duties and immunities of the Trustee and the Company's obligations in connection therewith; and (4) this Article Eight.  The Company may exercise its option under this clause (b) notwithstanding the prior exercise of its option under clause (c) below with respect to the Notes.

(c)     Upon the Company's exercise under clause (a) of the option applicable to this clause (c), subject to the satisfaction of the conditions set forth in clause (d) below, the Company and its Restricted Subsidiaries shall be released and discharged from their obligations under any covenant contained in Sections 4.04, 4.05, 4.07, 4.08, 4.10 through 4.24 and 4.26 through 4.29 and clause (4) of the first paragraph of Section 5.01 on and after the date the conditions set forth below are satisfied ("Covenant Defeasance"), and the Notes shall thereafter be deemed to be not "outstanding" for the purpose of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes).  For this purpose, such Covenant Defeasance means that, with respect to the outstanding Notes and the Note Guarantees, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby.  In addition, upon the Company's exercise under clause (a) above of the option applicable to this clause (c), subject to the satisfaction of the conditions set forth in clause (d) below, Sections 6.01(d) (solely as such Section 6.01(d) pertains to clause (4) of the first paragraph of Section 5.01 or Section 10.04), 6.01(e) (solely as such Section 6.01(e) pertains to Sections 4.04, 4.05, 4.07, 4.08, 4.10 through 4.24 and 4.26 through 4.29 and clause (4) of the first paragraph of Section 5.01), 6.01(f), 6.01(g), 6.01(h), 6.01(k) and 6.01(l) shall not constitute Events of Default.

(d)     The following shall be the conditions to application of either <u>clause (b)</u> or <u>(c)</u> above to the outstanding Notes:

(1)     the Company shall have irrevocably deposited with the Trustee, in trust, for the benefit of the Holders, U.S. Legal Tender or non-callable U.S. Government Obligations or a combination thereof, in such amounts and at such times as are sufficient, in the opinion of a nationally-recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated date for payment or redemption, as the case may be;

(2)     in the case of Legal Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States of America in form reasonably satisfactory to the Trustee confirming that:

(i)     the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(ii)     since the date of this Indenture, there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     in the case of Covenant Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States of America reasonably acceptable to the Trustee confirming that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     no Default or Event of Default shall have occurred and be continuing on the date of such deposit pursuant to <u>subclause (1)</u> above (except such Default or Event of Default resulting from the failure to comply with <u>Section 4.12</u> or <u>Section 4.20</u> as a result of the borrowing of funds required to effect such deposit);

(5)     such Legal Defeasance or Covenant Defeasance shall not result in a breach of, or constitute a default under any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(6)     the Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent

of preferring the Holders over any other creditors of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(7)     the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that, assuming no intervening bankruptcy of the Company between the date of deposit and the 91st day following the date of deposit and assuming that no Holder is an insider of the Company, after the 91st day following the date of deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally; and

(8)     the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Notwithstanding the foregoing, the Opinion of Counsel required by Section 8.01(d)(2) above with respect to a Legal Defeasance need not be delivered if all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable or (B) shall become due and payable on the Maturity Date within one (1) year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company.

In the event all or any portion of the Notes are to be redeemed through such irrevocable trust, the Company shall make arrangements reasonably satisfactory to the Trustee, at the time of such deposit, for the giving of the notice of such redemption or redemptions by the Trustee in the name and at the expense of the Company.

(e)     Upon a Legal Defeasance or Covenant Defeasance, each Guarantor will be released and relieved of any obligations under its Note Guarantee, and any security for the Notes (other than the trust fund described in Section 8.05) will be released as provided under Section 12.06.

SECTION 8.02     Satisfaction and Discharge.

In addition to the Company's rights under Section 8.01, this Indenture (subject to Section 8.03) and the Collateral Documents will be discharged and will cease to be of further effect as to all outstanding Notes, when:

(a)     either:

(1)     all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid as provided in Section 2.07 and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation; or

(2)     all Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable by reason of the mailing of a notice of redemption or (ii) (A) shall become due and payable at their Stated Maturity within one (1) year or (B) are to be called for redemption within one (1) year under arrangements reasonably satisfactory to the Trustee, and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee funds in trust solely for the benefit of the Holders U.S. Legal Tender, non-callable U.S. Government Obligations, or a combination of U.S. Legal Tender and non-callable U.S. Government Obligations in an amount sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, and premium, if any, and interest on the Notes to the date of stated maturity or such redemption, as the case may be;

(b)     all other sums payable under this Indenture and the Collateral Documents by the Company or any Guarantor have been paid;

(c)     the Company has delivered irrevocable instruments to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at Stated Maturity or on the Redemption Date, as the case may be; and

(d)     the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

Upon such a satisfaction and discharge of the Indenture, each Guarantor will be released and relieved of any obligations under its Note Guarantee, and any security for the Notes (other than the trust fund described in Section 8.05) will be released as provided under Section 12.06.

SECTION 8.03     Survival of Certain Obligations.

Notwithstanding the occurrence of Legal Defeasance under Section 8.01 or the satisfaction and discharge of this Indenture and the Collateral Documents under Section 8.02, the respective obligations of the Company and the Trustee under Sections 2.02, 2.03, 2.04, 2.05, 2.06, 2.07, 2.10, 2.11, 2.12, 2.13, 2.14, 2.15, 2.16 and 6.07, Article Seven and Sections 8.05, 8.06 and 8.07 shall survive until the Notes are no longer outstanding, and thereafter the obligations of the Company and the Trustee under Sections 7.07, 8.05, 8.06 and 8.07 shall survive.

SECTION 8.04     Acknowledgment of Discharge by Trustee.

Subject to Section 8.07, after the conditions of clauses (a), (b), (c) and (d) of Section 8.02 have been satisfied, each of the Trustee and the Collateral Agent upon written request shall acknowledge in writing the discharge of the Company's obligations under this Indenture except for those surviving obligations specified in Section 8.03.

SECTION 8.05          Application of Trust Moneys.

The Trustee shall hold any U.S. Legal Tender or U.S. Government Obligations deposited with it in the irrevocable trust established pursuant to Section 8.01 or 8.02.  The Trustee shall apply the deposited U.S. Legal Tender or the U.S. Government Obligations, together with earnings thereon, through the Paying Agent, in accordance with this Indenture and the terms of the irrevocable trust agreement established pursuant to Section 8.01 or 8.02, to the payment of principal of, premium, if any, and interest on the Notes.  Anything in this Article Eight to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the Company's request any U.S. Legal Tender or U.S. Government Obligations held by it as provided in Section 8.01(d) or 8.02(a)(2) which, in the opinion of a nationally-recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance or satisfaction and discharge, respectively, of this Indenture.

SECTION 8.06          Repayment to the Company of Unclaimed Money.

Subject to any applicable abandoned property laws, the Trustee and the Paying Agent shall pay to the Company, upon receipt by the Trustee or the Paying Agent, as the case may be, of a written request from the Company, any money held by it for the payment of principal, premium, if any, or interest that remains unclaimed for two (2) years after payment to the Holders is required, without interest thereon; provided, however, that the Trustee and the Paying Agent before being required to make any payment may, but need not, at the expense of the Company cause to be published once in a newspaper of general circulation in The City of New York or mail to each Holder entitled to such money notice that such money remains unclaimed and that after a date specified therein, which shall be at least 30 days from the date of such publication or mailing, any unclaimed balance of such money then remaining shall be repaid to the Company, without interest thereon.  After payment to the Company, Holders entitled to money must look solely to the Company for payment as general creditors unless an applicable abandoned property law designated another Person, and all liability of the Trustee or Paying Agent with respect to such money shall thereupon cease.

SECTION 8.07          Reinstatement.

If the Trustee or Paying Agent is unable to apply any U.S. Legal Tender or U.S. Government Obligations in accordance with Section 8.01 or 8.02 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and each Guarantor's obligations under this Indenture, the Collateral Documents, the Note Guarantees and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.01 or 8.02 until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Legal Tender or U.S. Government Obligations in accordance with Section 8.01 or 8.02; provided, however, that if the Company has made any payment of premium, if any, or interest on or principal of any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Legal Tender or U.S. Government Obligations held by the Trustee or Paying Agent.

SECTION 8.08        Indemnity for Government Obligations.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the U.S. Government Obligations deposited pursuant to Section 8.01 or Section 8.02 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders.

## ARTICLE NINE

## AMENDMENTS, SUPPLEMENTS AND WAIVERS

SECTION 9.01        Without Consent of Holders.

From time to time, the Company, the Guarantors, the Trustee and, if such amendment, waiver or supplement relates to any Collateral Document, the Collateral Agent, without the consent of the Holders, may amend, waive or supplement provisions of this Indenture, the Collateral Documents and the Notes:

(1)        to cure any ambiguity, defect, or inconsistency contained herein or therein;

(2)        to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)        to provide for the assumption of the obligations of the Company or any Guarantor to Holders in accordance with Section 5.01 or Section 10.04, as the case may be (and, if applicable, the discharge and release of the predecessor Company in accordance with Section 5.02);

(4)        to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect in any material respect the legal rights of any such Holder under the Indenture Documents or the Intercreditor Agreement;

(5)        to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the TIA;

(6)        to add any additional assets to the Note Collateral;

(7)        to allow any Subsidiary to become a Guarantor or any other Person to guarantee the Notes;

(8)        to comply with the rules of any applicable securities depositary;

(9)        to provide for a successor Trustee or co-trustees in accordance with the terms of this Indenture or to otherwise comply with any requirement of this Indenture;

(10)  to provide for the issuance of Additional Notes in accordance with this Indenture;

(11)  to release a Guarantor from its Note Guarantee and the Collateral Documents as permitted and in accordance with this Indenture;

(12)  to reflect the grant of Liens on the Note Collateral for the benefit of an additional secured party, to the extent that such Indebtedness and the Lien securing such Indebtedness is permitted by the terms of this Indenture; or

(13)  to release Note Collateral from the Lien of this Indenture and the Collateral Documents when permitted or required by this Indenture or the Collateral Documents (including in the case where such Note Collateral constitutes Secondary Collateral, the Intercreditor Agreement).

After an amendment, waiver or supplement under this Section 9.01 becomes effective, the Company shall mail to the Holders affected thereby a notice briefly describing the amendment or supplement. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of such amendment, waiver or supplement.

SECTION 9.02  With Consent of Holders.

Subject to Sections 2.09 and 6.07, the Company, the Guarantors and the Trustee and, if such amendment or supplement relates to a Collateral Document, the Collateral Agent, as applicable, together, with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) may amend or supplement this Indenture, the Notes, the Collateral Document or the Note Guarantees without notice to any other Holder.  Subject to Sections 2.09 and 6.07, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) may waive any existing Default or Event of Default or compliance by the Company with any provision of this Indenture, the Collateral Documents or the Notes without notice to any other Holder.  However, no amendment, supplement or waiver, including a waiver pursuant to Section 6.04, shall without the consent (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) of:

(a)  each Holder affected thereby (with respect to any Notes held by a non-consenting Holder):

(1)  reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver of any provision of this Indenture, the Notes, the Collateral Documents or the Note Guarantees;

(2)  reduce the principal of or change the fixed maturity of any Note or alter the provisions set forth in Article Three;

(3)        reduce the rate of or change the time for payment of interest (including default interest) on any Note;

(4)        waive a Default or Event of Default in the payment of principal of, or interest or premium, if any, on the Notes (except a rescission and cancellation of acceleration of the Notes and the consequences thereof by Holders holding at least a majority in aggregate principal amount of Notes then outstanding voting as a single class and a waiver of the payment default that resulted from such acceleration as provided in Section 6.02);

(5)        make any Notes payable in currency other than that stated in this Indenture;

(6)        make any change in the provisions of this Indenture relating to waivers of past Defaults (other than to add sections of this Indenture subject thereto) or the rights of Holders to receive payments of principal of, or interest or premium, if any, on the Notes when due and payable;

(7)        amend, change or modify in any material respect the obligation of the Company to make and consummate a Change of Control Offer after the occurrence of a Change of Control or make and consummate a Repurchase Offer or modify any of the provisions or definitions with respect thereto;

(8)        release any Guarantor from any of its obligations under its Note Guarantee or this Indenture or any Collateral Document, except in accordance with the terms of this Indenture;

(9)        contractually subordinate the Notes or any Note Guarantee in right of payment to any other Indebtedness; or

(10)        make any change to Section 9.01 or this Section 9.02; and

(b)        the Holders holding at least 75% in aggregate principal amount of the outstanding Notes voting as a single class, adversely change the priority of the Holders' Liens in the Note Collateral or release all or substantially all of the Note Collateral from the Liens created by the Collateral Documents except as specifically provided for in this Indenture and the Collateral Documents.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall mail to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment, supplement or waiver.

SECTION 9.03          Compliance with TIA.

Every amendment, waiver or supplement of this Indenture, the Notes or any Collateral Document shall comply with the TIA as then in effect.

SECTION 9.04          Revocation and Effect of Consents.

Until an amendment, waiver or supplement becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. Subject to the following paragraph, any such Holder or subsequent Holder may revoke the consent as to such Holder's Note or portion of such Note by written notice to the Trustee and the Company received before the date on which the Trustee and, if such amendment, waiver or supplement relates to any Collateral Document, the Collateral Agent receives an Officers' Certificate certifying that the Holders of the requisite principal amount of Notes have consented (and not theretofore revoked such consent) to the amendment, waiver or supplement.

The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver, which record date shall be, at the Company's election, either (a) at least 30 days prior to the first solicitation of such consent or (b) the date of the most recent list furnished to the Trustee under Section 2.05. If a record date is fixed, then notwithstanding the last sentence of the immediately preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 90 days after such record date.

A consent to any amendment, supplement or waiver under this Indenture, the Notes or any Collateral Document by any Holder given in connection with a purchase, tender or exchange of such Holder's Notes shall not be rendered invalid by such purchase, tender or exchange.

After an amendment, supplement or waiver becomes effective, it shall bind every Holder unless it makes a change described in clause (a) of Section 9.02, in which case, the amendment, supplement or waiver shall bind only each Holder of a Note who has consented to it and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note; provided that any such waiver shall not impair or affect the right of any Holder to receive payment of principal of, premium, if any, and interest on a Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates without the consent of such Holder.

SECTION 9.05          Notation on or Exchange of Notes.

If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder of the Note to deliver the Note to the Trustee. The Trustee at the written direction of the Company may place an appropriate notation on the Note regarding the changed terms and return it to the Holder and the Trustee may place an appropriate notation on any Note thereafter authenticated. Alternatively, if the Company or the Trustee so determines, the

Company in exchange for the Note shall execute, issue and deliver and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate a new Note that reflects the changed terms.  Failure to make an appropriate notation, or issue a new Note, shall not affect the validity and effect of such amendment, supplement or waiver.  Any such notation or exchange shall be made at the sole cost and expense of the Company.

SECTION 9.06    Trustee or Collateral Agent to Sign Amendments, Etc.

The Trustee or the Collateral Agent, as applicable, shall execute and deliver any amendment, supplement or waiver authorized pursuant to this Article Nine; provided that the Trustee or the Collateral Agent, as the case may be, may, but shall not be obligated to, execute and deliver any such amendment, supplement or waiver which adversely affects the rights, duties or immunities of the Trustee or the Collateral Agent, as the case may be, under this Indenture or any Collateral Document.  The Trustee or the Collateral Agent, as the case may be, shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel and an Officers' Certificate each stating that the execution and delivery of any amendment, supplement or waiver authorized pursuant to this Article Nine is authorized or permitted by this Indenture.  Such Opinion of Counsel shall also state that the amendment, supplement or waiver is a valid and enforceable obligation of the Company (subject to customary exceptions).  Such Opinion of Counsel shall not be an expense of the Trustee or the Collateral Agent, as the case may be, and shall be paid for by the Company.

SECTION 9.07    Acts of Holders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided in or pursuant to this Indenture to be given, made or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section 9.07.

Without limiting the generality of this Section 9.07, unless otherwise provided in or pursuant to this Indenture:  (i) a Holder, including a Depository or its nominee that is a Holder of a Global Note, may give, make or take, by an agent or agents duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in or pursuant to this Indenture to be given, made or taken by Holders, and a Depository or its nominee that is a Holder of a Global Note may duly appoint in writing as its agent or agent members of, or participants in, such Depository holding interests in such Global Note in the records of such Depository; and (ii) with respect to any Global Note the Depository for which is DTC, any consent or other action given, made or taken by an Agent Member of DTC by electronic means in accordance with the

Automated Tender Offer Procedures system or other customary procedures of, and pursuant to authorization by, DTC shall be deemed to constitute the "Act" of the Holder of such Global Note, and such "Act" shall be deemed to have been delivered to the Company and the Trustee upon the delivery by DTC of an "agent's message" or other notice of such consent or other action having been so given, made or taken in accordance with the customary procedures of DTC.

(b)        The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by a Person acting in a capacity other than such Person's individual capacity, such certificate or affidavit shall also constitute sufficient proof of the authority of the Person executing the same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

(c)        The ownership of Notes shall be proved by the Register.

(d)        Without limiting the foregoing, a Holder entitled hereunder to give, make or take any action hereunder with regard to any particular Note may do so, or duly appoint in writing any Person or Persons as its agent or agents to do so, with regard to all or any part of the principal amount of such Note.

## ARTICLE TEN

## GUARANTEE

SECTION 10.01        Guarantee.

Each Guarantor hereby, jointly and severally, unconditionally and irrevocably guarantees (such guarantee to be referred to herein as the "Note Guarantee") to each of the Holders and to the Trustee and the Collateral Agent and their respective successors and assigns that:  (a) the principal of, premium, if any, and interest on the Notes shall be promptly paid in full when due, subject to any applicable grace period, whether upon redemption pursuant to the terms of the Notes, by acceleration or otherwise, and interest on the overdue principal (including interest accruing at the then applicable rate provided in the Indenture Documents after the occurrence of any Event of Default set forth in Section 6.01(i) or 6.01(j), whether or not a claim for post-filing or post-petition interest is allowed under applicable law following the institution of a proceeding under bankruptcy, insolvency or similar laws), if any, and interest on any interest, if any, to the extent lawful, of the Notes and all other obligations of the Company to the Holders, the Trustee and the Collateral Agent hereunder, thereunder or under any Collateral Document or the Intercreditor Agreement shall be promptly paid in full or performed, all in accordance with the terms hereof, thereof and of the Collateral Documents and Intercreditor Agreement; and (b) in case of any extension of time of payment or renewal of any of the Notes or of any such other obligations, the same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, subject to any applicable grace period, whether at stated

maturity, by acceleration or otherwise; subject, however, in the case of <u>clauses (a)</u> and <u>(b)</u> above, to the limitations set forth in <u>Section 10.03</u>.  The Note Guarantee of each Guarantor shall rank senior in right of payment to all existing and future subordinated Indebtedness of such Guarantor that expressly provides such Indebtedness shall be so subordinate and equal in right of payment with all other existing and future senior obligations of such Guarantor, including borrowings or guarantees of borrowings under the ABL Facility.  Each Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes, this Indenture, any Collateral Document or the Intercreditor Agreement, the absence of any action to enforce the same, any waiver or consent by any of the Holders with respect to any provisions hereof or thereof, any release of any other Guarantor, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenants that this Note Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes, this Indenture and in this Note Guarantee.  If the Trustee, the Collateral Agent or any Holder is required by any court or otherwise to return to the Company, any Guarantor, or any Custodian or other similar official acting in relation to the Company or any Guarantor, any amount paid by the Company or any Guarantor to the Trustee, the Collateral Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.  Each Guarantor further agrees that, as between each Guarantor, on the one hand, and the Holders, the Collateral Agent and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in <u>Article Six</u> for the purposes of this Note Guarantee notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any acceleration of such obligations as provided in <u>Article Six</u>, such obligations (whether or not due and payable) shall forthwith become due and payable by each Guarantor for the purpose of this Note Guarantee.

SECTION 10.02    <u>Release of a Guarantor.</u>

Notwithstanding the foregoing, a Guarantor will be automatically and unconditionally released from its Note Guarantee and the Collateral Documents without any action required on the part of the Trustee or any Holder:

(a)    in connection with any sale or other disposition of all or substantially all of the assets of that Guarantor (including by way of merger, consolidation or otherwise) to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, if the sale or other disposition complies with the applicable provisions of this Indenture;

(b)    in connection with any sale or other disposition of all of the Capital Stock of a Guarantor by the Company or a Restricted Subsidiary of the Company to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, if the sale or other disposition complies with the applicable provisions of this Indenture;

(c)     if the Company designates any Restricted Subsidiary that is a Guarantor to be an Unrestricted Subsidiary in accordance with the applicable provisions of this Indenture;

(d)     if the Company exercises its Legal Defeasance option or its Covenant Defeasance option as described in Section 8.01; or

(e)     upon satisfaction and discharge of this Indenture or payment in full of the principal and premium, if any, and accrued and unpaid interest on the Notes and all other Note Obligations that are then due and payable.

The Trustee or the Collateral Agent, as applicable, shall promptly deliver an instrument evidencing such release in form reasonably satisfactory to the Trustee or the Collateral Agent, as applicable, upon receipt of a request by the Company accompanied by an Officers' Certificate certifying as to the compliance with this Section 10.02.  Any Guarantor not so released remains liable for the full amount of its Note Guarantee as provided in this Article Ten.

SECTION 10.03     Limitation of Guarantor's Liability.

Each Guarantor and, by its acceptance hereof, each of the Holders hereby confirms that it is the intention of all such parties that the guarantee by such Guarantor pursuant to its Note Guarantee not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law.  To effectuate the foregoing intention, the Holders and each Guarantor hereby irrevocably agree that the obligations of such Guarantor under the Note Guarantee shall be limited to the maximum amount as shall, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Note Guarantee or pursuant to Section 10.05, result in the obligations of such Guarantor under the Note Guarantee not constituting such fraudulent transfer or conveyance.

SECTION 10.04     Guarantors May Consolidate, etc., on Certain Terms.

Each Guarantor will not, and the Company will not cause or permit any Guarantor to, sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), any Person other than the Company or any other Guarantor unless:

(a)     immediately after giving effect to that transaction, no Default or Event of Default exists; and

(b)     either:

(1)     the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor or the Company):

(i)     is a Person organized and existing under the laws of the United States of America or any state thereof or the District of Columbia; and

(ii)     assumes all the obligations of such Guarantor under this Indenture and any Collateral Documents to which such Guarantor is a party pursuant to a supplemental indenture substantially in the form of Exhibit G hereto and in connection therewith shall execute and deliver such other agreements, cause such instruments and Uniform Commercial Code financing statements to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to continue the validity and enforceability, and perfect or continue the perfection, of the Note Lien created under the Collateral Documents on the Note Collateral owned by or transferred to such Person; or

(2)     in the case of any such sale or disposition (including by way of any such consolidation or merger), such sale or disposition complies with Section 4.16; and

(c)     the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consummation of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition and, if such assumption is required in connection with such transaction, such assumption, complies with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to such transaction have been satisfied.

SECTION 10.05     Contribution.

In order to provide for just and equitable contribution among the Guarantors, the Guarantors agree, inter se, that each Guarantor that makes a payment or distribution under a Note Guarantee shall be entitled to a pro rata contribution from each other Guarantor hereunder based on the net assets of each other Guarantor.  The preceding sentence shall in no way affect the rights of the Holders of the Notes to the benefits of this Indenture, the Notes or the Note Guarantees.

SECTION 10.06     Waiver of Subrogation.

Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.

SECTION 10.07     Waiver of Stay, Extension or Usury Laws.

Each Guarantor covenants to the extent permitted by law that it shall not at any time insist upon or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive such Guarantor from performing its Note Guarantee as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note

Guarantee; and each Guarantor hereby expressly waives to the extent permitted by law all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 10.08    Note Guarantee Evidenced by Indenture; No Notation of Note Guarantee.

The Note Guarantee of any Guarantor shall be evidenced solely by its execution and delivery of this Indenture (or, in the case of any Guarantor that is not party to this Indenture on the Issue Date, a supplemental indenture thereto) and not by an endorsement on, or attachment to, any Note of any Note Guarantee or notation thereof. To effect any Note Guarantee of any Guarantor not a party to this Indenture on the Issue Date, such future Guarantor shall execute and deliver a supplemental indenture substantially in the form of Exhibit G hereto, which supplemental indenture shall be executed and delivered on behalf of such Guarantor by an Officer of such Guarantor.

Each Guarantor hereby agrees that its Note Guarantee set forth in Section 10.01 shall be and remain in full force and effect notwithstanding any failure to endorse on any Note a notation of such Note Guarantee.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantees set forth in this Indenture on behalf of each of the Guarantors.

## ARTICLE ELEVEN

## MISCELLANEOUS

SECTION 11.01    Trust Indenture Act Controls.

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA Section 318(c), such TIA-imposed duties shall control. If any provision of this Indenture limits, qualifies or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control. If any provision of this Indenture modifies or excludes any provision of the TIA that may be so modified or excluded, the provision of the TIA shall be deemed to apply to this Indenture as so modified or shall be excluded, as the case may be. Any provision of the TIA which is required to be included in a qualified Indenture, but not expressly included herein, shall be deemed to be included by this reference.

SECTION 11.02    Notices.

Any notices or other communications required or permitted hereunder or under any Collateral Document shall be in writing, and shall be sufficiently given if made by hand delivery, by telex, by telecopier, by email or other electronic format (including in portable document format (.pdf)), by overnight courier or registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

if sent other than by registered or certified mail to the Company or any Guarantor:

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, IL  61554
Attention:  Corporate Controller
            General Counsel
Facsimile Number:  (309) 478-1535

if sent by registered or certified mail to the Company or any Guarantor:

Aventine Renewable Energy Holdings, Inc.
P. O. Box [___]
Pekin, IL  61554
Attention:  Corporate Controller
            General Counsel
Facsimile Number:  (309) 478-1535

if to the Trustee:

Wilmington Trust FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  Aventine Administrator
Facsimile Number:  612-217-5651

if to the Collateral Agent:

Wilmington Trust FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  Aventine Administrator
Facsimile Number:  612-217-5651

Each of the Company, any Guarantor, the Collateral Agent or the Trustee by written notice to each other may designate additional or different addresses for notices to such Person. Any notice or communication to the Company, any Guarantor, the Collateral Agent or the Trustee shall be deemed to have been given or made (whether or not the addressee receives it) as of the date so delivered if personally delivered; when receipt is acknowledged, if faxed, emailed or sent in other electronic form; one (1) Business Day after mailing if sent by overnight courier guaranteeing next day delivery; and five (5) calendar days after mailing if sent by registered or certified first class mail, postage prepaid and return receipt requested, in each case to the address shown above or designated as specified above (except that a notice of change of address shall not be deemed to have been given until actually received by the addressee).

Any notice or communication mailed to a Holder shall be mailed to such Holder by registered or certified first class mail, postage prepaid and return receipt requested, or by overnight air courier guaranteeing next day delivery at such Holder's address as it appears on the registration books of the Registrar and shall be sufficiently given to such Holder if so mailed within the time prescribed (whether or not the addressee receives it). Any notice or communication shall also be so mailed to any Person described in TIA Section 313(c), to the extent required by the TIA.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If the Company mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Where this Indenture provides for notice of any event to a Holder of a Global Note, such notice shall be sufficiently given if given to the Depository for such Note (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

SECTION 11.03    Communications by Holders with Other Holders.

Holders may communicate pursuant to TIA Section 312(b) with other Holders with respect to their rights under this Indenture, any Collateral Document, any Note Guarantee or the Notes. The Company, the Trustee, the Collateral Agent, the Registrar and any other Person shall have the protection of TIA Section 312(c).

SECTION 11.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Company or any Guarantor to the Trustee or the Collateral Agent, as the case may be, to take any action under this Indenture, any Collateral Document or any other Indenture Document, the Company shall furnish to the Trustee or the Collateral Agent, as the case may be, upon request:

(a)    an Officers' Certificate (which shall include the statements set forth in Section 11.05), in form and substance reasonably satisfactory to the Trustee or the Collateral Agent, as the case may be, stating that, in the opinion of the signers, all conditions precedent to be performed by the Company or the applicable Guarantor (as the case may be), if any, provided for in this Indenture, any Collateral Document, the Notes or the Note Guarantees relating to the proposed action have been complied with; and

(b)    an Opinion of Counsel (which shall include the statements set forth in Section 11.05) stating that, in the opinion of such counsel, all such conditions precedent

to be performed by the Company or the applicable Guarantor (as the case may be), if any, provided for in this Indenture, any Collateral Document and the Notes relating to the proposed action have been complied with.

SECTION 11.05    Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or any Collateral Document, other than the Officers' Certificate required by Section 4.06, shall include:

(a)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such Person, he has made such examination or investigation as is reasonably necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of any Person may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate or opinion of, or representation by, counsel or any Opinion of Counsel may be based, insofar as it relates to factual matters, upon certificates of public officials or upon a certificate or opinion of, or representations by, an officer or officers of the Company or any Guarantor (including an Officers' Certificate) stating that the information with respect to such factual matters is in the possession of the Company or such Guarantor unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 11.06        Rules by Trustee, Paying Agent, Registrar.

The Trustee may make reasonable rules in accordance with the Trustee's customary practices for action by or at a meeting of Holders.  The Paying Agent or Registrar may make reasonable rules for its functions.

SECTION 11.07        Legal Holidays.

A "Legal Holiday" used with respect to a particular place of payment is a Saturday, a Sunday or a day on which banking institutions in New York, New York, Chicago, Illinois or at such place of payment are not required to be open.  If a payment date is a Legal Holiday at such place, payment may be made at such place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.

SECTION 11.08        Governing Law.

THIS INDENTURE, THE NOTES, THE COLLATERAL DOCUMENTS (OTHER THAN THE MORTGAGES) AND THE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401).  EACH OF THE PARTIES HERETO AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE GUARANTEES, THE COLLATERAL DOCUMENTS (OTHER THAN THE MORTGAGES) OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

SECTION 11.09        No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret another indenture, loan or debt agreement of the Company or any of its Subsidiaries.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

SECTION 11.10        No Recourse Against Others.

No Affiliate, director, manager, officer, employee, incorporator, member or holder of any Equity Interests in the Company, a Guarantor or the Trustee or any direct or indirect parent of the Company, a Guarantor or the Trustee, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, this Indenture, the Note Guarantees or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees.  The parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

SECTION 11.11        Successors.

All agreements of the Company and the Guarantors in this Indenture, the Notes and the Note Guarantees shall bind their respective successors. All agreements of the Trustee and the Collateral Agent in this Indenture shall bind their respective successors.

SECTION 11.12        Duplicate Originals.

All parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together shall represent the same agreement.

SECTION 11.13        Severability.

In case any one or more of the provisions in this Indenture, the Notes or the other Indenture Documents shall be held invalid, illegal or unenforceable, in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions shall not in any way be affected or impaired thereby, it being intended that all of the provisions hereof shall be enforceable to the full extent permitted by law.

SECTION 11.14        Waiver of Jury Trial.

EACH OF THE COMPANY, THE GUARANTORS, THE TRUSTEE, THE COLLATERAL AGENT, AND BY ITS ACCEPTANCE THEREOF, EACH HOLDER OF A NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE, THE COLLATERAL DOCUMENTS, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

SECTION 11.15        Table of Contents, Headings, etc.

The Table of Contents, Cross-Reference Table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

## ARTICLE TWELVE

## SECURITY

SECTION 12.01        Grant of Security Interest.

(a)     The due and punctual payment of the Note Obligations when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, purchase, repurchase, redemption or otherwise, and the performance of all other Note Obligations of the Company and the Guarantors to the Holders, the Collateral Agent or the Trustee under this Indenture, the Collateral Documents, the Note Guarantees and the Notes are secured as provided in the Collateral Documents which the Company and the Guarantors have entered into simultaneously with the execution of this Indenture

and will be secured by Collateral Documents hereafter delivered as required or permitted by this Indenture.  Subject to the Intercreditor Agreement, the Collateral Documents shall provide for the grant by the Company and Guarantors party thereto to the Collateral Agent of security interests in the Note Collateral.

(b)     Each Holder, by its acceptance of any Notes and Note Guarantees, hereby (i) authorizes the Trustee and the Collateral Agent, as applicable, on behalf of and for the benefit of such Holder, to be the agent for and representative of such Holder with respect to the Note Guarantees, the Note Collateral and the Collateral Documents and (ii) irrevocably appoints the Collateral Agent to act as such Holder's agent and Collateral Agent under the Intercreditor Agreement.

(c)     The Trustee and each Holder, by its acceptance of any Notes and Note Guarantees:  (i) consents and agrees to, and agrees to be bound by, the terms of each Collateral Document, as the same may be in effect or may be amended from time to time in accordance with their respective terms; (ii) authorizes and directs the Collateral Agent to enter into this Indenture and the Collateral Documents and authorizes and empowers the Collateral Agent to bind the Holders of the Notes and other holders of Note Obligations as set forth in the Collateral Documents and the Intercreditor Agreement to perform its obligations and exercise its rights thereunder in accordance therewith; and (iii) irrevocably authorizes the Collateral Agent to perform the duties and exercise the rights, powers and discretions that are specifically given to it hereunder or under the Collateral Documents or the Intercreditor Agreement, together with any other incidental rights, power and discretions.  The Company shall, and shall cause each of its Domestic Subsidiaries to, do or cause to be done, at its sole cost and expense, all such actions and things as may be required by the provisions of the Collateral Documents, or which the Collateral Agent from time to time may reasonably request, to assure and confirm to the Collateral Agent the security interests in the Note Collateral contemplated by the Collateral Documents so as to render the same available for the security and benefit of this Indenture and of the Note Obligations secured hereby, according to the intent and purpose herein and therein expressed and subject to the Intercreditor Agreement.  The Company shall, and shall cause each of its Domestic Subsidiaries to, take any and all commercially reasonable actions required or as may be reasonably requested by the Collateral Agent to (x) cause the Collateral Documents to create and maintain, as security for the Note Obligations, valid and enforceable, perfected security interests in and on all the Note Collateral, in favor of the Collateral Agent, for the benefit of itself and the Trustee and the Holders, superior to and prior to the rights of all third Persons and subject to no other Liens, in each case, except for Permitted Collateral Liens and (y) comply with the applicable provisions of the TIA.  If required for the purpose of meeting the legal requirements of any jurisdiction in which any of the Note Collateral may at the time be located, the Company, the Trustee and the Collateral Agent shall have the power to appoint, and shall take all reasonable action to appoint, one or more Persons approved by the Trustee and reasonably acceptable to the Company to act as co-Collateral Agent with respect to any such Note Collateral, with such rights and powers limited to those deemed necessary for the Company, the Trustee or the Collateral Agent to comply with any such legal requirements with respect to such Note Collateral, and which rights and powers shall not be inconsistent with the provisions of this Indenture or any Indenture Document.

At any time and from time to time, the Company shall, and shall cause each of its Restricted Subsidiaries to, promptly execute, acknowledge and deliver such Collateral Documents, instruments, certificates, notices and other documents and take such other actions as shall be required by law or any Collateral Document, or which the Collateral Agent may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred as contemplated by this Indenture for the benefit of the holders of the Note Obligations. The Company shall from time to time promptly pay all reasonable financing and continuation statement recording or filing fees, charges and taxes relating to this Indenture, the Collateral Documents and any other instruments of further assurance required pursuant hereto or thereto.

(d)     Subject to and in accordance with the provisions of the Collateral Documents and this Indenture, so long as the Collateral Agent or (solely with respect to any Secondary Collateral) any Credit Facility Agent has not exercised their respective rights with respect to the Note Collateral upon the occurrence and during the continuance of an Event of Default, the Company and each Guarantor will have the right to remain in possession and retain exclusive control of the Note Collateral (other than any cash, securities, obligations and Cash Equivalents constituting part of the Note Collateral that may be deposited with the Collateral Agent or (solely with respect to any Secondary Collateral) any Credit Facility Agent in accordance with the provisions of the Collateral Documents and other than as set forth in the Collateral Documents), to operate the Note Collateral, to alter or repair the Note Collateral and to collect, invest and dispose of any income therefrom, subject, in the case of the Secondary Collateral, to the provisions of the Intercreditor Agreement and the Credit Facility Lien Security Documents. Upon the occurrence and continuance of an Event of Default, the Collateral Agent or (solely with respect to any Secondary Collateral) any Credit Facility Agent will be entitled to foreclose upon and sell the Note Collateral or any part thereof as provided in the Collateral Documents or (solely with respect to any Secondary Collateral) the ABL Facility Lien Security Documents.

(e)     Anything contained in this Indenture or the Collateral Documents to the contrary notwithstanding, each Holder hereby agrees that no Holder shall have any right individually to realize upon any of the Note Collateral, it being understood and agreed that all powers, rights and remedies of the Trustee hereunder may be exercised solely by the Trustee in accordance with the terms hereof and all powers, rights and remedies in respect of the Note Collateral under the Collateral Documents may be exercised solely by the Collateral Agent.

(f)     Subject to the provisions of the Collateral Documents, the Trustee may, in its sole discretion and without the consent of the Holders, on behalf of the Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to (i) enforce any of its rights or any of the rights of the Holders under the Collateral Documents and (ii) collect and receive any and all amounts payable in respect of the Note Collateral in respect of the obligations of the Company and the Guarantors hereunder and thereunder. Subject to the provisions of the Collateral Documents, the Trustee shall have the power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Note Collateral

by any acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interest and the interests of the Holders in the Note Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

(g)     Where any provision of this Indenture or any Collateral Document requires that additional property or assets be added to the Note Collateral, the Company shall, no later than the Note Collateral Required Date with respect to such property or assets (and subject to any provision hereof requiring any earlier action): (x) cause a valid and enforceable and (except solely as to Excluded Personal Property) perfected first priority Lien on or in such property or assets (subject only to Permitted Collateral Liens) to vest in the Collateral Agent, as security for the Note Obligations, and (y) deliver to the Trustee and the Collateral Agent the following:

(i)     unless such property or assets constitute Note Collateral Non-Specified Covered Property, a request from the Company that such Note Collateral be added;

(ii)     unless such property or assets constitute Note Collateral Non-Specified Covered Property, an Officers' Certificate to the effect that the Note Collateral being added is in the form, consists of the assets and is in the amount required by this Indenture;

(iii)     unless such property or assets constitute Note Collateral Covered Property or real property, Collateral Documents adding such property or assets as Note Collateral, which Collateral Documents shall be dated no later than such Note Collateral Required Date and, based on the type and location of the property subject thereto, substantially in the form and with substantially the terms of the applicable Collateral Documents entered into on the Issue Date (such Collateral Documents (or financing statements in respect thereof) having been duly received for recording in the appropriate filing, recording or registry office);

(iv)     to the extent such property or assets constitute real property, a Mortgage with respect to such property or assets, dated no later than such Note Collateral Required Date and substantially in the form attached as Exhibit H hereto (with such changes thereto as are customarily acceptable to holders of mortgages on real property in the jurisdiction where such real property is located (such Mortgage having been duly received for recording in the appropriate filing or recording office);

(v)     to the extent such property or assets constitute real property, title and extended coverage insurance covering such property or

assets, in an amount equal to no less than the Fair Market Value of such property or assets;

(vi)     unless such property or assets constitute Note Collateral Covered Property, such financing statements or other filings or recording instruments, if any, as the Company shall deem necessary to perfect the Collateral Agent's Lien in such Note Collateral;

(vii)     unless such property or assets constitute Note Collateral Non-Specified Covered Property, appropriate Opinions of Counsel (of scope and substance, and subject to customary exceptions, substantially the same as the Issue Date Opinions) with respect to, among other things, the creation, validity, perfection and (solely as to certificated securities and instruments) priority of the Collateral Agent's Lien on such property or assets and as to the due authorization, execution, delivery, validity and enforceability of such Mortgage (to the extent such property or assets constitute real property) or Collateral Documents (to the extent such property or assets do not constitute real property) pursuant to which the Collateral Agent's Lien has been or is being granted; and

(viii)     unless such property or assets constitute Note Collateral Non-Specified Covered Property, an Officers' Certificate and Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture to, and any other requirements provided for in this Indenture in respect of, the addition of such property or assets to the Note Collateral have been complied with (it being understood that in any event such Opinion of Counsel pursuant to this clause (viii) and any Opinion of Counsel pursuant to clause (vii) above or the following paragraph may expressly state that no opinion is expressed therein to priority of any Lien on any Note Collateral (except solely as to certificated securities and instruments)).

The Company shall, at the same time as the Company is required to furnish to the Trustee and the Collateral Agent the Opinion of Counsel required pursuant to Section 12.03(b), deliver to the Trustee and the Collateral Agent an Officers' Certificate and Opinion of Counsel to the effect that, as to any property or assets required by any provision of this Indenture or any Collateral Document to be added to the Note Collateral on or after the Issue Date and prior to the date thereof and as to which an Officers' Certificate and Opinion of Counsel have not previously been delivered pursuant to clause (viii) of the preceding paragraph or pursuant to this paragraph of this Section 12.01(g), all conditions precedent provided for in this Indenture to the addition of such property or assets to, and any other requirements provided for in the Indenture in respect of, the addition of such property or assets to the Note Collateral have been complied with.

(h)     Each of the Collateral Agent and the Trustee is authorized and empowered to receive for the benefit of the Holders of the Notes any funds collected or distributed to the Collateral Agent or the Trustee under the Collateral Documents and, subject to the

terms of the Collateral Documents, the Trustee is authorized and empowered to make further distributions of such funds to the Holders of the Notes according to the provisions of this Indenture.

(i)     Each Holder of the Notes, by its acceptance thereof, authorizes and directs the Trustee and the Collateral Agent to enter into one or more amendments to the Intercreditor Agreement or enter into any amendments or supplements to the Collateral Documents in accordance with the provisions of this Indenture, the Intercreditor Agreement and the Collateral Documents.

(j)     In the event that the Company shall issue Additional Notes pursuant to clause (c) of the fourth paragraph of Section 2.02, the net proceeds from any such issuance shall constitute "Collateral Monies" and shall be immediately deposited into the Collateral Account pending their use by the Company or any Guarantor to acquire Additional Assets that become Primary Collateral simultaneously with the acquisition thereof by the Company or such Guarantor, as applicable, or as otherwise specified in Section 12.11.

(k)     The Company shall, and shall cause each Domestic Subsidiary to, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or required by the Collateral Documents to maintain (at the sole cost and expense of the Company and its Domestic Subsidiaries) the security interest created by the Collateral Documents in the Note Collateral (other than with respect to any Note Collateral the security interest in which is not required to be perfected under the Collateral Documents) as a perfected [first] priority security interest subject only to Permitted Collateral Liens.

(l)     The Trustee and the Company hereby acknowledge and agree that the Trustee or the Collateral Agent, as the case may be, holds the Note Collateral in trust for the benefit of the Trustee and the Holders, in each case pursuant to the terms of the Collateral Documents and the Intercreditor Agreement.

(m)     If the Company or any Restricted Subsidiary fails to do so, the Collateral Agent shall, pursuant to the terms of the Collateral Documents, be irrevocably authorized and empowered, with full power of substitution, to execute, acknowledge and deliver such security agreements, instruments, certificates, notices and other documents and, subject to the terms of this Indenture and the Collateral Documents, take such other actions in the name, place and stead of the Company or such Restricted Subsidiary, but the Collateral Agent shall have no obligation to do so and no liability for any action taken or omitted by it in good faith in connection therewith.

(n)     If the Company or any Guarantor grants a Lien on any of its property or assets (including any Capital Stock) for the benefit of any holders of Credit Facility Obligations, the Company or such Guarantor, respectively, shall also simultaneously grant a Lien in such property or assets (including Capital Stock) in favor of the Collateral

Agent for the benefit of the Trustee and the Holders so that such property or assets become Note Collateral.

SECTION 12.02    Intercreditor Agreement.

This Indenture and the Collateral Documents are subject to the terms, limitations and conditions set forth in the Intercreditor Agreement. The Trustee and by its acceptance of its Note(s), each Holder, (a) consents to the subordination of Liens on the Second Lien Collateral as defined, and provided for, in the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Collateral Agent to enter into the Intercreditor Agreement as agent for and representative of such Secured Party. The foregoing provisions are intended as an inducement to the lenders under the Credit Facility to extend credit to the Company and such lenders are intended third party beneficiaries of such provisions. If any conflict or inconsistency exists between this Indenture and the Intercreditor Agreement, the Intercreditor Agreement shall govern. If any conflict or inconsistency exists between this Indenture and any Collateral Document (other than the Intercreditor Agreement), this Indenture shall govern.

SECTION 12.03    Recording and Opinions.

(a)    The Company shall furnish to the Trustee, at such time as required by TIA Section 314(b) an Opinion of Counsel either (1) stating that, in the opinion of such counsel, this Indenture and the Collateral Documents and any financing statements and other instruments have been properly recorded, registered and filed to the extent necessary to perfect the security interests created by the Collateral Documents (to the extent such security interests may be perfected by a recording, registering or filing) and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given or (2) stating that, in the opinion of such counsel, no such action is necessary to perfect any security interest created under any of the Collateral Documents.

(b)    The Company shall furnish to the Trustee and the Collateral Agent (if other than the Trustee), on or within one month of June 30 of each year, commencing June 30, 2011, an Opinion of Counsel either (1) stating that, in the opinion of such counsel, all action necessary to perfect or continue the perfection of the security interests created by the Collateral Documents (to the extent such security interests may be perfected by a recording, registering or filing) has been taken and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given or (2) stating that, in the opinion of such counsel, no such action is necessary to perfect or continue the perfection of any security interest created under any of the Collateral Documents.

SECTION 12.04    Release of Note Collateral.

(a)    Subject to the Intercreditor Agreement, the Collateral Agent shall not at any time release Note Collateral from the security interests created by the Collateral Documents unless such release is in accordance with Section 12.04(b), 12.04(d), 12.05, 12.06, or 12.11.

(b)     So long as no Default or Event of Default under this Indenture shall have occurred and be continuing or would result therefrom and so long as such transaction would not violate this Indenture, the Company and the Guarantors may, in the ordinary course of business and to the extent permitted by applicable law, without any release or consent by the Trustee, the Collateral Agent or any Holder, sell or otherwise dispose of inventory or collect accounts receivable or sell or otherwise dispose of equipment that has become worn out, defective or obsolete or not used or useful in the business of the Company and its Subsidiaries and which is, to the extent required by this Indenture or the Collateral Documents, replaced by property of substantially equivalent or greater value which becomes subject to the Note Lien of the Collateral Documents.  The Company will deliver to the Trustee, within 30 calendar days following the end of each year, an Officers' Certificate to the effect that all releases during the preceding 12-month period in which no release or consent of the Trustee was obtained were in the ordinary course of business and were not prohibited by this Indenture or any Collateral Document.

(c)     The release of any Note Collateral from the terms of the Collateral Documents shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Note Collateral is released pursuant to <u>Section 12.04(b)</u>, <u>12.04(d)</u>, <u>12.05</u>, <u>12.06</u>, or <u>12.11</u> or otherwise pursuant to this Indenture and the Collateral Documents or pursuant to the Intercreditor Agreement. To the extent applicable, the Company shall cause TIA Section 314(d) relating to the release of property from the security interests created by this Indenture and the Collateral Documents to be complied with.  Any certificate or opinion required by TIA Section 314(d) may be made by an Officer of the Company, except in cases where TIA Section 314(d) requires that such certificate or opinion be made by an independent Person, which Person shall be an independent engineer, appraiser or other expert selected or approved by the Trustee in the exercise of reasonable care.  A Person is "independent" if such Person (1) is in fact independent, (2) does not have any direct financial interest or any material indirect financial interest in the Company or in any Affiliate of the Company and (3) is not an officer, employee, promoter, underwriter, trustee, partner or director or person performing similar functions to any of the foregoing for the Company.  The Trustee and the Collateral Agent shall be entitled to receive and rely upon a certificate provided by any such Person confirming that such Person is independent within the foregoing definition.

(d)     Notwithstanding any other provision of any Indenture Document, the consent and release of the Collateral Agent, the Trustee or any Holder will not be required for the sale or other disposition of Secondary Collateral in accordance with the terms of the ABL Facility or any other Credit Facility subject to compliance with the Intercreditor Agreement.

(e)     At any time when an Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Note Collateral pursuant to the provisions of this Indenture or the Collateral Documents will be effective as against the Holders, except (solely with respect to Secondary Collateral) as otherwise provided in the Intercreditor Agreement.

SECTION 12.05    Specified Releases of Note Collateral.

Subject to <u>Section 12.04</u>, any asset included in the Note Collateral may be released from the Note Liens at any time or from time to time in accordance with the provisions of the Collateral Documents, including the Intercreditor Agreement, upon the request of the Company pursuant to an Officers' Certificate certifying that all conditions precedent hereunder and under the Collateral Documents have been met and without the consent of the Collateral Agent, the Trustee or any Holder, under any one or more of the following circumstances:

(a)    upon delivery by the Company to the Collateral Agent of an Officers' Certificate certifying that the asset has been sold or otherwise disposed of by the Company or a Restricted Subsidiary to a Person other than the Company or a Guarantor in a transaction permitted by this Indenture, at the time of such sale or disposition; or

(b)    upon delivery by the Company to the Collateral Agent of an Officers' Certificate certifying that the asset is owned or has been acquired by a Guarantor that has been released from its Note Guarantee (including by virtue of (x) a Guarantor becoming an Unrestricted Subsidiary or (y) a sale by the Company or a Subsidiary thereof of all of the Capital Stock of a Guarantor); or

(c)    upon delivery by the Company to the Collateral Agent of an Officers' Certificate certifying that (x) such asset is comprised of Secondary Collateral, (y) Credit Facility Obligations remain outstanding under one or more Credit Facilities and (z) to the extent such consent is required, the Credit Facility Agent under any such Credit Facility has authorized the release of the same.

SECTION 12.06    Release of all Note Collateral.

The Liens on, and pledges of, all Note Collateral will be terminated and released, and upon the request of the Company pursuant to an Officers' Certificate certifying that all conditions precedent hereunder have been met, the Company and the Guarantors will be entitled to releases of all assets included in the Note Collateral from the Note Liens under all Collateral Documents, without the consent of the Collateral Agent, the Trustee or any Holder, upon any of:

(a)    payment in full of the principal of, premium, if any, and accrued and unpaid interest on the Notes and all other Obligations hereunder, the Note Guarantees and the Collateral Documents that are due and payable at or prior to the time such principal, premium, if any, and accrued and unpaid interest are paid;

(b)    a satisfaction and discharge of this Indenture in accordance with <u>Section 8.02</u>;

(c)    the occurrence of a Legal Defeasance or Covenant Defeasance in accordance with <u>Section 8.01</u>; or

(d)    the written consent of Holders of at least 75% in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).

SECTION 12.07        Matters as to Releases.

(a)        In the event (x) that the Company or any Guarantor has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any property or assets comprising Note Collateral that may be sold, exchanged or otherwise disposed of by the Company or such Guarantor pursuant to and in accordance with Section 12.04(b), 12.04(d), 12.05, 12.06, or 12.11 and the provisions of any applicable Collateral Document and (y) the Company or such Guarantor requests the Trustee or the Collateral Agent to execute and deliver a written instrument of disclaimer, release or quit-claim as to any interest in such property or assets under this Indenture and the Collateral Documents or, to the extent applicable to such property or assets, take all action that is necessary or reasonably requested by the Company (in each case at the expense of the Company) to release and reconvey to the Company or such Guarantor, without recourse, such property or asset or deliver such property or asset in its possession to the Company or such Guarantor, upon satisfaction of the conditions set forth herein or in the Collateral Documents for such execution and delivery or other action, the Collateral Agent or the Trustee, as applicable, shall execute, acknowledge and deliver to the Company or such Guarantor (in proper form) such an instrument or take such other action so requested. As a condition precedent to such execution and delivery or such other action, the Trustee and the Collateral Agent shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel and an Officers' Certificate, each stating (i) that such execution is authorized or permitted by this Indenture and the Collateral Documents, (ii) that all conditions precedent thereto herein and in any Collateral Documents have been satisfied and (iii) under which of the circumstances set forth in Sections 12.04(b), 12.04(d), 12.05, 12.06, or 12.11 the Note Collateral is being released.  All purchasers and grantees of any property or rights purporting to be released herefrom shall be entitled to rely upon any such instrument executed by the Collateral Agent or the Trustee, as applicable, hereunder as sufficient for the purpose of this Indenture and as constituting a good and valid release of the property therein described from the Lien of this Indenture or of the Collateral Documents.

(b)        All instruments effectuating or confirming any release of any Note Liens shall have the effect solely of releasing such Note Liens as to the assets or property comprising Note Collateral described therein on customary terms and without any recourse, representation, warranty or liability whatsoever.

(c)        The Trustee and the Collateral Agent are not required to serve, file, register or record any instrument releasing Note Collateral.

(d)        The Company shall bear and pay all costs and expenses associated with any release of Note Liens pursuant to Sections 12.04, 12.05 or 12.06, including all reasonable fees and disbursements of any attorneys or representatives acting for the Trustee or the Collateral Agent.

SECTION 12.08        Purchaser Protected.

No purchaser or grantee of any property or rights purporting to be released herefrom shall be bound to ascertain the authority of the Trustee or the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority; nor shall any purchaser or grantee of any property or rights permitted by this Indenture to be sold or otherwise disposed of by the Company be under any obligation to ascertain or inquire into the authority of the Company to make such sale or other disposition.

SECTION 12.09        Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Documents.

Wilmington Trust Company is hereby appointed to act in its capacity as the Collateral Agent.  Subject to the provisions of the applicable Collateral Documents and the Intercreditor Agreement, (a) the Collateral Agent shall execute and deliver the Collateral Documents and the Intercreditor Agreement and act in accordance with the terms thereof, (b) the Collateral Agent may, in its sole discretion and without the consent of the Trustee or the Holders, take all actions it deems necessary or appropriate in order to (1) enforce any of the terms of the Collateral Documents and (2) collect and receive any and all amounts payable in respect of the Obligations of the Company and the Guarantors hereunder and under the Notes, the Note Guarantees, the Collateral Documents and the Intercreditor Agreement and (c) the Collateral Agent shall have power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Note Collateral by any act that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Trustee and the Holders in the Note Collateral (including the power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the Note Liens or be prejudicial to the interests of the Holders, the Trustee or the Collateral Agent). Notwithstanding the foregoing, the Collateral Agent may, at the expense of the Company, request the direction of the Holders with respect to any such actions and upon receipt of the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), shall take such actions; provided that all actions so taken shall, at all times, be in conformity with the requirements of the Intercreditor Agreement.

SECTION 12.10        Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Documents.

The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Collateral Documents and the Intercreditor Agreement to the extent permitted under the Intercreditor Agreement, for turnover to the Trustee to make further distributions of such funds to itself, the Collateral Agent and the Holders in accordance with the provisions of Section 6.10 and the other provisions of this Indenture.

SECTION 12.11    Collateral Monies.

(a)    All Collateral Monies, including the Net Proceeds received in connection with a Primary Collateral Asset Sale, the Net Loss Proceeds required to be deposited with the Collateral Agent in connection with an Event of Loss and the net proceeds of issuance of any Additional Notes, shall be held by the Collateral Agent as part of the Primary Collateral securing the Notes.  So long as no Default or Event of Default under this Indenture shall have occurred and be continuing, Collateral Monies may:

(i)    with respect to the Net Proceeds of Primary Collateral Asset Sales, be released as contemplated by Section 4.16, subject to the conditions set forth in this Indenture;

(ii)    with respect to Net Loss Proceeds, be released to repair or replace the relevant Primary Collateral as contemplated by Section 4.17, subject to the conditions set forth in this Indenture;

(iii)    at the Company's direction be applied by the Collateral Agent from time to time to the payment of the principal of, premium, if any, and interest on any Notes at maturity or upon redemption or retirement, or to the purchase of Notes upon tender or in the open market or otherwise, in each case, in compliance with this Indenture;

(iv)    continue to be held by the Collateral Agent as part of the Primary Collateral securing the Notes;

(v)    with respect to the net proceeds of the issuance of Additional Notes, be released to acquire Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof become Specified Collateral and such Additional Assets are not acquired until and unless the provisions of Section 4.28 have been complied with respect to such Additional Assets, subject to the conditions set forth in this Indenture; or

(vi)    solely with respect to Collateral Monies received by the Collateral Agent pursuant to clause (6) of the definition of "Collateral Monies", be applied as provided in the relevant provisions of this Indenture or any Collateral Document applicable thereto.

(b)    Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall be entitled to apply any Collateral Monies to the payment of the principal of, premium if any, and interest on any Notes or otherwise to cure any Event of Default under this Indenture.  Collateral Monies deposited with the Collateral Agent shall be invested in cash or Cash Equivalents pursuant to the Company's direction and, so long as no Default or Event of Default shall have occurred and be continuing, the Company shall be entitled to any interest or dividends accrued, earned or paid on such Cash Equivalents.

SECTION 12.12    Limitation on Certain Securities Collateral.

(a)    The Capital Stock and other securities of any Guarantor shall constitute Note Collateral only to the extent that such Capital Stock and other securities can secure the Notes or the Note Guarantees without Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act (or any other law, rule or regulation) requiring separate financial statements of such Person to be filed with the SEC (or any other governmental agency). In the event that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Guarantor due to the fact that such Person's Capital Stock and other securities secure the Notes or the Note Guarantees, then such portion (and only such portion) of the Capital Stock and other securities of such Guarantor as shall constitute the minimum amount necessary to avoid having such Person be subject to such requirement shall automatically be deemed not to be part of the Note Collateral. In such event, this Indenture or any Collateral Document may be amended or modified, without the consent of any holder of Notes or other Note Obligations, to the extent necessary to release the first-priority security interests on such portion of the shares of Capital Stock and other securities that are so deemed to no longer constitute part of the Note Collateral.

(b)    In the event that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulations adopted, which would permit) such Guarantor's Capital Stock and other securities to secure the Notes or the Note Guarantees in excess of the portion then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Guarantor, then such additional portion of the Capital Stock and other securities of such Person as shall constitute the maximum additional amount possible without having such Person be subject to such requirement shall automatically be deemed to be a part of the Note Collateral. In such event, this Indenture or any Collateral Document may be amended or modified, without the consent of any holder of Notes or other Note Obligations, to the extent necessary to subject such additional Capital Stock and other securities to the Liens under the Collateral Documents.

(c)    Solely for purposes of Section 4.16 and the definition of "Asset Sale", any Capital Stock and other securities that would be Note Collateral but for the provisions described in Section 12.12(a), shall nonetheless be treated as (and deemed to be) "Note Collateral."

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, all as of the date first written above.

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name:
Title:

**WILMINGTON TRUST FSB**, as Trustee and Collateral Agent

By: _____
Name:
Title:

**GUARANTORS:**

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
    Name:
    Title:

**AVENTINE POWER, LLC**

By: _____
    Name:
    Title:

**AVENTINE RENEWABLE ENERGY-AURORA WEST, LLC**

By: _____
    Name:
    Title:

**AVENTINE RENEWABLE ENERGY-MT. VERNON, LLC**

By: _____
    Name:
    Title:

**NEBRASKA ENERGY, L.L.C.**

By: _____
    Name:
    Title:

[FORM OF INITIAL NOTE]

THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ON THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND COMPARABLE YIELD FOR THE NOTES, PLEASE CONTACT AVENTINE RENEWABLE ENERGY HOLDINGS, INC., 120 NORTH PARKWAY DRIVE, PEKIN, ILLINOIS 61554, ATTENTION: CORPORATE CONTROLLER.

[Insert the following two paragraphs if this Note is a Global Note:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[Insert the following paragraph (i.e., the "Private Placement Legend") if this Note is a Restricted Security:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE

SECURITIES ACT), (B) IT IS A NON-U.S. PURCHASER AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE WHICH IS ONE YEAR (OR SUCH OTHER PERIOD THAT MAY BE HEREAFTER PROVIDED UNDER RULE 144 UNDER THE SECURITIES ACT PERMITTING RESALES OF RESTRICTED SECURITIES BY NON-AFFILIATES WITHOUT RESTRICTION) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE), ONLY (A) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S, OR TRANSFER AGENT'S, AS APPLICABLE, RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.]

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

**13% SENIOR SECURED NOTES DUE 2015**

CUSIP No.[    ]

No. [  ]                                                                           $[    ]

       Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company," which term includes any successor entity), for value received promises to pay to _____ or registered assigns the principal sum of _____ Dollars [or such greater or lesser amount as may be indicated on Schedule A hereto][1] on [• ], 2015, and to pay interest thereon as hereinafter set forth.

       Interest Rate:  As specified in paragraph 1 of the reverse side hereof.

       Interest Payment Dates:  **[• ]**, **[• ]**, **[• ]** and **[• ]** of each year, beginning on **[• ]**, 2010.

       Record Dates:  **[• ]**, **[• ]**, **[• ]** and **[• ]**.

       Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

                [Signature Follows Immediately on Next Page]

---

[1] Include only in the Global Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.


By: _____
Name:
Title:

Dated: _____

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the 13% Senior Secured Notes due 2015 referred to in the within-mentioned Indenture.

Wilmington Trust FSB, as Trustee

Dated: _____     By: _____
                                       Authorized Signatory

## 13% SENIOR SECURED NOTE DUE 2015

Capitalized terms used herein but not defined shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    <u>Interest</u>.  Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "<u>Company</u>," which term includes any successor entity), promises to pay interest on the principal amount of this Note at the rate per annum of 13% solely in cash; <u>provided</u>, <u>however</u>, that, if with respect to any Interest Payment Date that occurs prior to Maturity of any Notes, the Company has duly elected pursuant to Section 4.01(c) of the Indenture not to pay the entire installment of interest due on such Interest Payment Date in cash:

> (i)    the interest on such Notes that is due on such Interest Payment Date shall be deemed to have accrued since the next preceding Interest Payment Date (or, if such Interest Payment Date is the first Interest Payment Date in respect of such Notes, the date of original issue thereof) at a rate of 15% per annum, whether or not the Company duly pays on such Interest Payment Date such installment of interest due on such Interest Payment Date; and

> (ii)    if (but only if) the Company pays on such Interest Payment Date the entire installment of interest on such Notes due on such Interest Payment Date, the portion of such installment equal to the PIK Interest Amount with respect to such Interest Payment Date (*i.e.*, the portion equal to 7/15 of the aggregate amount thereof) shall be payable by issuance of PIK Notes in accordance with the fourth paragraph of Section 2.02 of the Indenture and the remainder of such installment shall be payable in cash.

Interest on this Note will accrue from the most recent date on which interest has been paid on this Note or, if no interest has been paid, from and including the Issue Date (or, if this Note was originally issued after the Issue Date as a PIK Note or as an Additional Note, from the date of original issue of this Note).  The Company will pay interest quarterly in arrears on each Interest Payment Date, commencing **[• ]**, 2010.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Company will pay interest on overdue principal at 15% per annum and will pay interest on overdue installments of interest at the same rate to the extent lawful.  Additional Interest may accrue on this Note in certain circumstances pursuant to the Registration Rights Agreement and all references to "interest" in this Note shall include any Additional Interest due on this Note pursuant to the terms of the Registration Rights Agreement.

2.    <u>Method of Payment</u>.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are the registered Holders at the close of business on the Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Record Date, and on or before such Interest Payment Date.  Holders must surrender the Notes to a Paying Agent to collect principal payments.  The Company shall pay principal and (except to the extent payable as PIK Interest) interest in U.S. Legal Tender.  If a Holder has given wire transfer instructions to the Company, the Paying Agent will remit on behalf of the Company all principal, interest and premium, if any,

payable in cash on that Holder's Notes in accordance with those instructions. All other payments on the Notes payable in cash will be made by check mailed to the Holders at their addresses set forth in the Register of Holders. The Company shall pay all interest payable as PIK Interest in the manner specified in the Indenture.

3.  Paying Agent and Registrar.  Initially, Wilmington Trust FSB (the "Trustee") will act as Paying Agent and Registrar. The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

4.  Indenture.  The Notes and the Note Guarantees were issued under an Indenture, dated as of [• ], 2010 (the "Indenture"), among the Company, the Guarantors named therein, the Trustee and the Collateral Agent. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "TIA"), as in effect on the date of the Indenture until such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA. Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of the Notes are referred to the Indenture and the TIA for a statement of such terms. Any conflict between the Notes and the Indenture will be governed by the Indenture. The Notes are senior secured obligations of the Company. Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

5.  Redemption.

(a)  Optional Redemption.  (i) The Company may, at its option, on any one or more occasions redeem all or a part of the Notes upon not less than 30 days' nor more than 60 days' prior notice to the Trustee, at the Redemption Prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date), if redeemed during the twelve-month period commencing on [• ] of the years set forth below:

| Year | Percentage |
| --- | --- |
| 2010 | 105% |
| 2011 | 104% |
| 2012 | 103% |
| 2013 | 102% |
| 2014 | 101% |

(ii)  Notwithstanding clause (a) above, if the Company delivers a Board Resolution to the Trustee setting forth the irrevocable determination of the Company not to complete construction of either the Aurora Facility or Mt. Vernon Facility, then during the 90-day period following the Issue Date, the Company may, at its option, redeem up to $25,000,000 in aggregate principal amount of the Notes originally issued under the Indenture (including the Exchange Notes) at a Redemption Price equal to 101% of the principal amount of the Notes redeemed plus accrued and unpaid interest on the Notes

redeemed to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date).

(b)    Mandatory Redemption.    The Company shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.  The Company may at any time and from time to time purchase Notes in the open market or otherwise.

6.    Notice of Redemption.    At least 30 days but not more than 60 days before the Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at such Holder's registered address with a copy to the Trustee and any Paying Agent.  If fewer than all of the Notes are to be redeemed pursuant to the provisions of the Indenture, the Trustee shall select the Notes to be redeemed (a) in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or (b) if the Notes are not then listed on a national securities exchange, on a pro rata basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate; provided, that if any such redemption is made pursuant to Section 5(a)(ii), the Trustee will select the Notes only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to DTC procedures), unless such method is otherwise prohibited.  Notes and portions of Notes selected shall be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date sufficient to pay such Redemption Price plus accrued and unpaid interest, if any, interest on the Notes to be redeemed shall cease to accrue on the Redemption Date, whether or not such Notes are presented for payment, and the only remaining right of the Holders of such Notes will be to receive payment of the Redemption Price upon surrender to the Paying Agent of the Notes redeemed.

7.    Offers to Purchase.    Sections 4.15 and 4.19 of the Indenture provide that upon the occurrence of a Change of Control or after certain Asset Sales, an Event of Loss and an Equity Offering, respectively, and subject to further limitations contained therein, the Company will make an offer to purchase certain amounts of the Notes in accordance with the procedures set forth in the Indenture.

8.    Registration Rights.    Pursuant to the Registration Rights Agreement, dated as of [•], 2010, among the Company, the Guarantors and the Initial Purchasers, the Company will, subject to the terms and conditions set forth therein, be obligated to consummate an Exchange Offer.  Upon the consummation of such Exchange Offer, the Holders of the Initial Notes shall have the right, subject to compliance with securities laws, to exchange such Notes for 13% Senior Secured Notes due 2015, which have been registered under the Securities Act (the "Exchange Notes"), in like principal amount and having terms identical in all material respects to the Initial Notes.  The Holders of the Initial Notes shall be entitled to receive certain Additional

Interest payments in the event such Exchange Offer is not consummated and upon certain other conditions, all pursuant to and in accordance with the terms of the Registration Rights Agreement, dated as of **[• ]**, 2010, among the Company, the Guarantor and the Initial Purchasers.

9.    <u>Denominations; Transfer; Exchange</u>.    The Notes shall be issuable in fully registered form only, without coupons, in denominations of $2,000 and any integral multiple of $1,000 in excess of $2,000, subject to the payment of interest on any Notes on any Interest Payment Date by issuance of PIK Notes, in which case the aggregate principal amount of Global Notes previously authenticated under the Indenture may be increased by, or additional Notes constituting PIK Notes may be issued in, an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up the nearest $1.00.    A Holder shall register the transfer of or exchange of Notes in accordance with the Indenture.    The Registrar or co-Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture.    The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note or portion thereof (a) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (b) selected for redemption in whole or in part pursuant to Article Three of the Indenture, except the unredeemed portion of any Note being redeemed in part.

10.    <u>Persons Deemed Owners</u>.    The registered Holder of a Note shall be treated as the owner of it for all purposes.

11.    <u>Unclaimed Money</u>.    If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Company.    After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

12.    <u>Discharge Prior to Redemption or Maturity</u>.    If the Company at any time deposits with the Trustee U.S. Legal Tender or U.S. Government Obligations, or a combination thereof, sufficient to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated date for payment or redemption, as the case may be, and complies with the other provisions of the Indenture relating thereto, the Company and its Restricted Subsidiaries will be released and discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding the Company's obligation to pay the principal of and interest and Additional Interest, if any, on the Notes).

13.    <u>Original Issue Discount</u>.    The Notes are issued with "original issue discount" for U.S. federal income tax purposes.    For information on the issue price, amount of original issue discount, issue date and comparable yield for the Notes, please contact Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, Attention:  Corporate Controller.

14.    <u>Amendment; Supplement; Waiver</u>.    Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and the Collateral Documents may be amended or supplemented with the written consent of the Holders of at least a majority in

aggregate principal amount of the Notes then outstanding voting as a single class, and any existing Default or Event of Default or noncompliance with any provision of such agreements may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class. Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or the Collateral Documents to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes in addition to or in place of certificated Notes, provide for the assumption of the obligations of the Company or any Guarantor in accordance with Section 5.01 or Section 10.04 of the Indenture, make any other change that would provide any additional rights or benefits to the Holders or that does not adversely affect in any material respect the legal rights of any Holder of a Note, to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA, to provide for any addition or release of Note Collateral permitted under the Indenture, the Intercreditor Agreement or the Collateral Documents and to release a Guarantor from its Note Guarantee and the Collateral Documents as permitted by the Indenture.

15.    Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to, among other things, incur additional Indebtedness or Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, create dividend or other payment restrictions affecting Restricted Subsidiaries, merge or consolidate with any other Person or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of their assets.  Such limitations are subject to a number of important qualifications and exceptions.

16.    Successors.  When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Note Guarantees and the Indenture, the predecessor will be released from those obligations.

17.    Defaults and Remedies.  If an Event of Default occurs and is continuing (a) with respect to certain events of bankruptcy, the Notes will automatically become due and payable in the manner, at the time and with the effect provided in the Indenture.  If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then outstanding voting as a single class may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture. Holders of Notes may not enforce the Indenture except as provided in the Indenture. The Trustee is not obligated to enforce the Indenture or the Notes unless it has received reasonable indemnity satisfactory to it.  The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) if it determines that withholding notice is in their interest.

18.    Trustee Dealings with Company.  Subject to the terms of the TIA and the Indenture, the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

19.    No Recourse Against Others.  No Affiliate, director, manager, officer, employee, incorporator, member or holder of any Equity Interests in the Company, a Guarantor or the Trustee or any direct or indirect parent of the Company, a Guarantor or the Trustee, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, the Indenture, the Note Guarantees or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees.  The parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

20.    Guarantees.  Payment of principal and interest (including interest on overdue principal and overdue interest, if lawful) on the Notes is unconditionally guaranteed, jointly and severally, by each of the Guarantors as provided in the Indenture.

21.    Authentication.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

22.    Governing Law. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401). EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.

23.    Abbreviations and Defined Terms.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

24.    Security.  Subject to the Intercreditor Agreement, the Company's and Guarantors' obligations under the Notes are secured by Liens on the Note Collateral pursuant to the terms of the Collateral Documents.  Subject to the terms of the Intercreditor Agreement, the actions of the Trustee and the Holders of the Notes in the enforcement of any remedies with respect to the Note Collateral and the application of the proceeds therefrom are limited pursuant to the terms of the Collateral Documents.

25.    CUSIP Numbers.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed thereon.

26.    Acceptance.  Each Holder, by its acceptance of its Note, agrees to be bound by the terms of the Intercreditor Agreement and the Registration Rights Agreement, and each of the

Holders hereby authorizes the Trustee and the Collateral Agent to bind the Holders to the extent provided in the Indenture.

27.     <u>WAIVER OF JURY TRIAL</u>.  EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS NOTE, THE INDENTURE, THE NOTE GUARANTEES, THE COLLATERAL DOCUMENTS, THE INTERCREDITOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture.  Requests may be made to:  Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554.

# ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____

(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____
agent to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Dated: _____     Signed: _____

(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

In connection with any transfer of this Note occurring prior to the date which is the earlier of (i) the date of the declaration by the SEC of the effectiveness of a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), covering resales of this Note (which effectiveness shall not have been suspended or terminated at the date of the transfer) and (ii) [• ], 2011, the undersigned confirms that it has not utilized any general solicitation or general advertising in connection with the transfer and that this Note is being transferred:

[Check One]

(1)    _____    to the Company or a subsidiary thereof; or

(2)    _____    pursuant to and in compliance with Rule 144A under the Securities Act; or

(3)    _____    to an "accredited investor" (as defined in Rule 501(a) under the Securities Act) that has furnished to the Trustee a signed letter containing certain representations and agreements (the form of which letter can be obtained from the Trustee); or

(4)    _____    outside the Unites States to a person other than a "U.S. person" in compliance with Rule 904 of Regulation S under the Securities Act; or

(5)    _____    pursuant to the exemption from registration provided by Rule 144 under the Securities Act; or

(6)    _____    pursuant to an effective registration statement under the Securities Act; or

(7) _____ pursuant to another exemption from the registration requirements of the Securities Act (and based on an opinion of counsel acceptable to the Company).

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered Holder thereof; provided that if box (3), (4) or (5) is checked, the Company or the Trustee may require, prior to registering any such transfer of the Notes, in its sole discretion, such legal opinions, certifications, including an investment letter in the case of box (3) or (4), and other information as the Trustee or the Company has reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.15 of the Indenture shall have been satisfied.

Dated: _____ Signed: _____
(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

### TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____ _____
NOTICE: To be executed by an executive officer

**[OPTION OF HOLDER TO ELECT PURCHASE]**

If you want to elect to have this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, check the appropriate box:

Section 4.15  [      ]

Section 4.19  [      ]

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____       _____

NOTICE:   The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee:   _____

SCHEDULE A

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee, as Custodian of the Depository |
|---|---|---|---|---|

[FORM OF EXCHANGE NOTE]

THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ON THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND COMPARABLE YIELD FOR THE NOTES, PLEASE CONTACT AVENTINE RENEWABLE ENERGY HOLDINGS, INC., 120 NORTH PARKWAY DRIVE, PEKIN, ILLINOIS 61554, ATTENTION: CORPORATE CONTROLLER.

[Insert the following two paragraphs if this Note is a Global Note:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

**13% SENIOR SECURED NOTES DUE 2015**

CUSIP No.[    ]

No. [  ]                                                                        $[    ]

Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company," which term includes any successor entity), for value received promises to pay to _____ or registered assigns the principal sum of _____ Dollars [or such greater or lesser amount as may be indicated on Schedule A hereto][2] on **[• ]**, 2015, and to pay interest thereon as hereinafter set forth.

Interest Rate:  As specified in paragraph 1 of the reverse side hereof.

Interest Payment Dates: **[• ]**, **[• ]**, **[• ]** and **[• ]** of each year, beginning on **[• ]**, 2010.

Record Dates:  **[• ]**, **[• ]**, **[• ]** and **[• ]**.

Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

[Signature Follows Immediately on Next Page]

---

[2] Include only on Global Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.

By: _____
Name:
Title:

Dated: _____

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the 13% Senior Secured Notes due 2015 referred to in the within-mentioned Indenture.

[ • ], as Trustee

Dated: _____   By: _____
Authorized Signatory

**(REVERSE OF NOTE)**

**13% SENIOR SECURED NOTE DUE 2015**

Capitalized terms used herein but not defined shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    <u>Interest</u>.  Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "<u>Company</u>," which term includes any successor entity), promises to pay interest on the principal amount of this Note at the rate per annum of 13% solely in cash; <u>provided</u>, <u>however</u>, that, if with respect to any Interest Payment Date that occurs prior to Maturity of any Notes, the Company has duly elected pursuant to Section 4.01(c) of the Indenture not to pay the entire installment of interest due on such Interest Payment Date in cash:

     (i)    the interest on such Notes that is due on such Interest Payment Date shall be deemed to have accrued since the next preceding Interest Payment Date (or, if such Interest Payment Date is the first Interest Payment Date in respect of such Notes, the date of original issue thereof) at a rate of 15% per annum, whether or not the Company duly pays on such Interest Payment Date such installment of interest due on such Interest Payment Date; and

     (ii)    if (but only if) the Company pays on such Interest Payment Date the entire installment of interest on such Notes due on such Interest Payment Date, the portion of such installment equal to the PIK Interest Amount with respect to such Interest Payment Date (*i.e.*, the portion equal to 7/15 of the aggregate amount thereof) shall be payable by issuance of PIK Notes in accordance with the fourth paragraph of Section 2.02 of the Indenture and the remainder of such installment shall be payable in cash.

Interest on this Note will accrue from the most recent date on which interest has been paid on this Note or, if no interest has been paid, from and including the Issue Date (or, if this Note was originally issued after the Issue Date as a PIK Note or as an Additional Note, from the date of original issue of this Note).  The Company will pay interest quarterly in arrears on each Interest Payment Date, commencing [• ], 2010.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Company will pay interest on overdue principal at 15% per annum and will pay interest on overdue installments of interest at the same rate to the extent lawful.

2.    <u>Method of Payment</u>.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are the registered Holders at the close of business on the Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Record Date, and on or before such Interest Payment Date.  Holders must surrender the Notes to a Paying Agent to collect principal payments.  The Company shall pay principal and (except to the extent payable as PIK Interest) interest in U.S. Legal Tender.  If a Holder has given wire transfer instructions to the Company, the Paying Agent will remit on behalf of the Company all principal, interest and premium, if any, payable in cash on that Holder's Notes in accordance with those instructions.  All other payments on the Notes payable in cash will be made by check mailed to the Holders at their addresses set

forth in the Register of Holders.  The Company shall pay all interest payable as PIK Interest in the manner specified in the Indenture.

3.      <u>Paying Agent and Registrar</u>.  Initially, Wilmington Trust FSB (the "<u>Trustee</u>") will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

4.      <u>Indenture</u>.  The Notes and the Note Guarantees were issued under an Indenture, dated as of [• ], 2010 (the "<u>Indenture</u>"), among the Company, the Guarantors named therein, the Trustee and the Collateral Agent.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "<u>TIA</u>"), as in effect on the date of the Indenture until such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of the Notes are referred to the Indenture and the TIA for a statement of such terms.  Any conflict between the Notes and the Indenture will be governed by the Indenture.  The Notes are senior secured obligations of the Company.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

5.      <u>Redemption</u>.

(a)      <u>Optional Redemption</u>.  (i)  The Company may, at its option, on any one or more occasions redeem all or a part of the Notes upon not less than 30 days' nor more than 60 days' prior notice to the Trustee, at the Redemption Prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date), if redeemed during the twelve-month period commencing on [• ] of the years set forth below:

| Year | Percentage |
| --- | --- |
| 2010 | 105% |
| 2011 | 104% |
| 2012 | 103% |
| 2013 | 102% |
| 2014 | 101% |

(ii)      Notwithstanding clause (a) above, if the Company delivers a Board Resolution to the Trustee setting forth the irrevocable determination of the Company not to complete construction of either the Aurora Facility or Mt. Vernon Facility, then during the 90-day period following the Issue Date, the Company may, at its option, redeem up to $25,000,000 in aggregate principal amount of the Notes originally issued under the Indenture (including the Exchange Notes) at a Redemption Price equal to 101% of the principal amount of the Notes redeemed plus accrued and unpaid interest on the Notes redeemed to (but not including) the Redemption Date (subject to any installment of

interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date).

(b) <u>Mandatory Redemption</u>. The Company shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. The Company may at any time and from time to time purchase Notes in the open market or otherwise.

6. <u>Notice of Redemption</u>. At least 30 days but not more than 60 days before the Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at such Holder's registered address with a copy to the Trustee and any Paying Agent. If fewer than all of the Notes are to be redeemed pursuant to the provisions of the Indenture, the Trustee shall select the Notes to be redeemed (a) in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or (b) if the Notes are not then listed on a national securities exchange, on a <u>pro rata</u> basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate; <u>provided</u>, that if any such redemption is made pursuant to Section 5(a)(ii), the Trustee will select the Notes only on a <u>pro rata</u> basis or on as nearly a <u>pro rata</u> basis as is practicable (subject to DTC procedures), unless such method is otherwise prohibited. Notes and portions of Notes selected shall be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date sufficient to pay such Redemption Price plus accrued and unpaid interest, if any, interest on the Notes to be redeemed shall cease to accrue on the Redemption Date, whether or not such Notes are presented for payment, and the only remaining right of the Holders of such Notes will be to receive payment of the Redemption Price upon surrender to the Paying Agent of the Notes redeemed.

7. <u>Offers to Purchase</u>. Sections 4.15 and 4.19 of the Indenture provide that upon the occurrence of a Change of Control or after certain Asset Sales, an Event of Loss and an Equity Offering, respectively, and subject to further limitations contained therein, the Company will make an offer to purchase certain amounts of the Notes in accordance with the procedures set forth in the Indenture.

8. <u>Denominations; Transfer; Exchange</u>. The Notes shall be issuable in fully registered form only, without coupons, in denominations of $2,000 and any integral multiple of $1,000 in excess of $2,000, subject to the payment of interest on any Notes on any Interest Payment Date by issuance of PIK Notes, in which case the aggregate principal amount of Global Notes previously authenticated under the Indenture may be increased by, or additional Notes constituting PIK Notes may be issued in, an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up the nearest $1.00. A Holder shall register the transfer of or exchange of Notes in accordance with the Indenture. The Registrar or co-Registrar may require a Holder, among other things, to furnish

appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note or portion thereof (a) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (b) selected for redemption in whole or in part pursuant to <u>Article Three</u> of the Indenture, except the unredeemed portion of any Note being redeemed in part.

9. <u>Persons Deemed Owners</u>. The registered Holder of a Note shall be treated as the owner of it for all purposes.

10. <u>Unclaimed Money</u>. If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Company. After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

11. <u>Discharge Prior to Redemption or Maturity</u>. If the Company at any time deposits with the Trustee U.S. Legal Tender or U.S. Government Obligations, or a combination thereof, sufficient to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated date for payment or redemption, as the case may be, and complies with the other provisions of the Indenture relating thereto, the Company and its Restricted Subsidiaries will be released and discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding the Company's obligation to pay the principal of and interest on the Notes).

12. <u>Original Issue Discount</u>. The Notes are issued with "original issue discount" for U.S. federal income tax purposes. For information on the issue price, amount of original issue discount, issue date and comparable yield for the Notes, please contact Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, Attention: Corporate Controller.

13. <u>Amendment; Supplement; Waiver</u>. Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and the Collateral Documents may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class, and any existing Default or Event of Default or noncompliance with any provision of such agreements may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class. Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or the Collateral Documents to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes in addition to or in place of certificated Notes, provide for the assumption of the obligations of the Company or any Guarantor in accordance with Section 5.01 or Section 10.04 of the Indenture, make any other change that would provide any additional rights or benefits to the Holders or that does not adversely affect in any material respect the legal rights of any Holder of a Note, to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA, to provide for any addition or release of Note Collateral permitted under the Indenture, the Intercreditor

Agreement or the Collateral Documents and to release a Guarantor from its Note Guarantee and the Collateral Documents as permitted by the Indenture.

14. <u>Restrictive Covenants</u>. The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to, among other things, incur additional Indebtedness or Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, create dividend or other payment restrictions affecting Restricted Subsidiaries, merge or consolidate with any other Person or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of their assets. Such limitations are subject to a number of important qualifications and exceptions.

15. <u>Successors</u>. When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Note Guarantees and the Indenture, the predecessor will be released from those obligations.

16. <u>Defaults and Remedies</u>. If an Event of Default occurs and is continuing with respect to certain events of bankruptcy, the Notes will automatically become due and payable in the manner, at the time and with the effect provided in the Indenture. If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then outstanding voting as a single class may declare all the Notes to be, due and payable in the manner, at the time and with the effect provided in the Indenture. Holders of Notes may not enforce the Indenture except as provided in the Indenture. The Trustee is not obligated to enforce the Indenture or the Notes unless it has received reasonable indemnity satisfactory to it. The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class to direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) if it determines that withholding notice is in their interest.

17. <u>Trustee Dealings with Company</u>. Subject to the terms of the TIA and the Indenture, the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

18. <u>No Recourse Against Others</u>. No Affiliate, director, manager, officer, employee, incorporator, member or holder of any Equity Interests in the Company, a Guarantor or the Trustee or any direct or indirect parent corporation of the Company, a Guarantor or the Trustee, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, the Indenture, the Note Guarantees or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees. The parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

19.     <u>Guarantees</u>.     Payment of principal and interest (including interest on overdue principal and overdue interest, if lawful) on the Notes is unconditionally guaranteed, jointly and severally, by each of the Guarantors as provided in the Indenture.

20.     <u>Authentication</u>.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

21.     <u>Governing Law</u>.     THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401). EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.

22.     <u>Abbreviations and Defined Terms</u>.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

23.     <u>Security</u>.  Subject to the Intercreditor Agreement, the Company's and Guarantors' obligations under the Notes are secured by Liens on the Note Collateral pursuant to the terms of the Collateral Documents.  Subject to the Intercreditor Agreement, the actions of the Trustee and the Holders of the Notes in the enforcement of any remedies with respect to the Note Collateral and the application of the proceeds therefrom are limited pursuant to the terms of the Collateral Documents.

24.     <u>CUSIP Numbers</u>.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed thereon.

25.     <u>Acceptance</u>.  Each Holder, by its acceptance of its Note, agrees to be bound by the terms of the Intercreditor Agreement, and each of the Holders hereby authorizes the Trustee and the Collateral Agent to bind the Holders to the extent provided in the Indenture.

26.     <u>WAIVER OF JURY TRIAL</u>.  EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS NOTE, THE INDENTURE, THE NOTE GUARANTEES, THE COLLATERAL DOCUMENTS, THE INTERCREDITOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture.  Requests may be made to:  Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554.

## ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____
(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____
agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Dated: _____    Signed: _____
(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee:  _____

**[OPTION OF HOLDER TO ELECT PURCHASE]**

If you want to elect to have this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, check the appropriate box:

Section 4.15  [        ]

Section 4.19  [        ]

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____        _____

NOTICE:   The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee:  _____

SCHEDULE A

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee, as Custodian of the Depository |
|------|------|------|------|------|

EXHIBIT C

[FORM OF LEGEND FOR GLOBAL NOTES]

Any Global Note authenticated and delivered hereunder shall bear a legend (in addition to any other legends required in the case of a Restricted Security) in substantially the following form:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[FORM OF PRIVATE PLACEMENT LEGEND]

Each Note certificate representing a Restricted Security shall bear a legend in substantially the following form:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (B) IT IS A NON-U.S. PURCHASER AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE WHICH IS ONE YEAR (OR SUCH OTHER PERIOD THAT MAY BE HEREAFTER PROVIDED UNDER RULE 144 UNDER THE SECURITIES ACT PERMITTING RESALES OF RESTRICTED SECURITIES BY NON-AFFILIATES WITHOUT RESTRICTION) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE), ONLY (A) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S

AND THE TRUSTEE'S, OR TRANSFER AGENT'S, AS APPLICABLE, RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.

[FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH
TRANSFERS TO NON-QIB ACCREDITED INVESTORS]

_____, ____

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554
Attn:  [   ]

Wilmington Trust FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Aventine Administrator

      Re:     13% Senior Secured Notes due 2015 (the "Notes") of Aventine Renewable Energy Holdings, Inc. (the "Company")

Ladies and Gentlemen:

In connection with our proposed purchase of $_____ aggregate principal amount of the Notes, we confirm that:

We have been provided such information as we deem necessary in order to make our investment decision.

We understand that any subsequent transfer of the Notes is subject to certain restrictions and conditions set forth in the Indenture dated as of **[•]**, 2010, relating to the Notes (the "Indenture") and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "Securities Act").

We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell or otherwise transfer any Notes prior to the date which is within one year after the original issuance of the Notes or the last date on which the Note is owned by the Company or any affiliate of the Company, we will do so only (i) to the Company or any of its subsidiaries, (ii) inside the United States in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (iii) inside the United States to an "accredited investor" (as defined below); provided that, prior to such transfer, the transferee furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you a signed letter containing certain representations and agreements relating to the

restrictions on transfer of the Notes, substantially in the form of this letter, (iv) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (v) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if available) or (vi) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any person purchasing any of the Notes from us a notice advising such purchaser that resales of the Notes are restricted as stated herein.

Either (i) we are not, and will not transfer the Notes to, an entity holding "plan assets," within the meaning of 29 C.F.R. 2510.3-101, of any "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Security Act of 1974, as amended ("ERISA"), or any "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or (2) our purchase and holding of the Notes will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code (or any substantially similar applicable law).

We understand that, on any proposed resale of any Notes, we will be required to furnish to you and the Company such certification, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

We are an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or their investment, as the case may be.

We are acquiring the Notes purchased by us for our own account or for one or more accounts (each of which is an "accredited investor") as to each of which we exercise sole investment discretion.

We are not acquiring Notes with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction; provided that the disposition of our property and the property of any accounts for which we are acting as fiduciary shall remain at all times within our and their control.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby, and we agree to notify you promptly if any of our representations or warranties herein cease to be accurate and complete.

This letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

Very truly yours,
[Name of Transferee]

By: _____

Authorized Signature

[FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH
TRANSFERS PURSUANT TO REGULATION S]

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554
Attn:  [   ]

Wilmington Trust FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Aventine Administrator

> Re:     13% Senior Secured Notes due 2015 (the "Notes") of Aventine Renewable Energy
>           Holdings, Inc. (the "Company")

Ladies and Gentlemen:

In connection with our proposed sale of $_____ aggregate principal amount of the Notes, we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, we represent that:

1.      the offer of the Notes was not made to a person in the United States;

2.      either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

3.      no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

4.      the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.      we have advised the transferee of the transfer restrictions applicable to the Notes.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferee]

By: _____

Authorized Signature

[FORM OF SUPPLEMENTAL INDENTURE]

AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

and

the Guarantors named herein

_____

13% SENIOR SECURED NOTES DUE 2015

_____

_____

[Insert Ordinal Number] SUPPLEMENTAL INDENTURE

DATED AS OF _____, 20__

_____

[WILMINGTON TRUST FSB],

As Trustee and Collateral Agent

_____

This SUPPLEMENTAL INDENTURE, dated as of _____ __, 20__ is among Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company"), each of the parties identified under the caption "Guarantors" on the signature page hereto (the "Guarantors") and [Wilmington Trust FSB], as trustee (in such capacity, the "Trustee") and collateral agent (in such capacity, the "Collateral Agent").

## RECITALS

WHEREAS, the Company, the initial Guarantors and the Trustee entered into an Indenture, dated as of [_____], 2010 (as previously amended or supplemented, the "Indenture"), pursuant to which the Company has issued $___,000,000 in aggregate principal amount of 13% Senior Secured Notes due 2015 (the "Notes");

WHEREAS, Section 9.01(3) of the Indenture provides that the Company, the Guarantors and the Trustee may amend or supplement the Indenture in order to provide for the assumption of the obligations of any Guarantor to Holders in accordance with Section 10.04, without the consent of the Holders of the Notes;

WHEREAS, Section 9.01(7) of the Indenture provides that the Company, the Guarantors and the Trustee may amend or supplement the Indenture to allow any Subsidiary or any other Person to guarantee the Notes, without the consent of the Holders of the Notes; and

WHEREAS, all acts and things prescribed by the Indenture, by law and by the Certificate of Incorporation and the Bylaws (or comparable constituent documents) of the Company, of the Guarantors and of the Trustee necessary to make this Supplemental Indenture a valid instrument legally binding on the Company, the Guarantors and the Trustee, in accordance with its terms, have been duly done and performed;

NOW, THEREFORE, to comply with the provisions of the Indenture and in consideration of the above premises, the Company, the Guarantors and the Trustee covenant and agree for the equal and proportionate benefit of the respective Holders of the Notes as follows:

## ARTICLE 1

Section 1.01   This Supplemental Indenture is supplemental to the Indenture and does and shall be deemed to form a part of, and shall be construed in connection with and as part of, the Indenture for any and all purposes.

Section 1.02   This Supplemental Indenture shall become effective immediately upon its execution and delivery by each of the Company, the Guarantors and the Trustee.

## ARTICLE 2

Section 2.01   From this date, in accordance with Section 4.14 or Section 10.04 and by executing this Supplemental Indenture, each of the Guarantors whose signature appears below is and shall be subject to the provisions of the Indenture applicable to a "Guarantor" to the extent provided for in Article Ten or Section 4.06, 4.09, 4.12, 4.23, 4.27, 4.28 or 4.29 thereunder or elsewhere in the Indenture or any Collateral Document.

Section 2.02   Except as specifically modified herein, the Indenture and the Notes are in all respects ratified and confirmed (mutatis mutandis) and shall remain in full force and effect in accordance with their terms with all capitalized terms used herein without definition having the same respective meanings ascribed to them as in the Indenture.

Section 2.03   Except as otherwise expressly provided herein, no duties, responsibilities or liabilities are assumed, or shall be construed to be assumed, by the Trustee by reason of this Supplemental Indenture.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  The Trustee shall not be responsible for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the correctness of the recitals of fact contained herein, all of which recitals are made solely by the undersigned Guarantors.

Section 2.04   THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401).  EACH OF THE PARTIES HERETO AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SUPPLEMENTAL INDENTURE OR THE TRANSACTIONS CONTEMPLATED BY THIS SUPPLEMENTAL INDENTURE.

Section 2.05   All parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together shall represent the same agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first written above.

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.

By _____
Name: _____
Title: _____

**[NAMES OF GUARANTORS]**

By _____
Name: _____
Title: _____

[WILMINGTON TRUST FSB],
as Trustee and Collateral Agent

By _____
Name: _____
Title: _____

## Exhibit A-1

**Blackline of Form of Indenture and Exhibits Thereto**

**INDENTURE,**

**DATED AS OF [• ], 2010,**

**AMONG**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,**

**AS ISSUER,**

**THE GUARANTORS NAMED HEREIN,**

**AS GUARANTORS,**

**AND**

**WILMINGTON TRUST ~~COMPANY~~FSB,**

**AS TRUSTEE AND COLLATERAL AGENT**


**13% SENIOR SECURED NOTES DUE 2015**

# TABLE OF CONTENTS

**Page**

ARTICLE ONE DEFINITIONS AND INCORPORATION BY REFERENCE ...........................1
    SECTION 1.01    Definitions. .................................................................1
    SECTION 1.02    Incorporation by Reference of Trust Indenture Act. .......37
    SECTION 1.03    Rules of Construction. ..............................................37

ARTICLE TWO THE NOTES ...............................................................................38
    SECTION 2.01    Form and Dating. .....................................................38
    SECTION 2.02    Execution and Authentication; Aggregate Principal
                          Amount. ...............................................................39
    SECTION 2.03    Registrar and Paying Agent. ......................................41
    SECTION 2.04    Obligations of Paying Agent. ....................................42
    SECTION 2.05    Holder Lists. ...........................................................42
    SECTION 2.06    Transfer and Exchange. ............................................42
    SECTION 2.07    Replacement Notes. ..................................................43
    SECTION 2.08    Outstanding Notes. ...................................................43
    SECTION 2.09    Treasury Notes; When Notes Are Disregarded. .............44
    SECTION 2.10    Temporary Notes. ....................................................44
    SECTION 2.11    Cancellation. ...................................................~~44~~45
    SECTION 2.12    CUSIP Numbers. .....................................................45
    SECTION 2.13    Deposit of Moneys. ..................................................45
    SECTION 2.14    Book-Entry Provisions for Global Notes. ....................45
    SECTION 2.15    Special Transfer Provisions. ......................................47
    SECTION 2.16    Transfers of Global Notes and Physical Notes. .............50
    SECTION 2.17    Defaulted Interest. ...................................................50
    SECTION 2.18    Computation of Interest. ............................................50

ARTICLE THREE REDEMPTION .........................................................~~50~~51
    SECTION 3.01    Optional Redemption. ......................................~~50~~51
    SECTION 3.02    No Mandatory Redemption. .......................................51
    SECTION 3.03    Selection of Notes to Be Redeemed. ....................~~51~~52
    SECTION 3.04    Notice of Redemption. ..............................................52
    SECTION 3.05    Effect of Notice of Redemption. .................................53
    SECTION 3.06    Deposit of Redemption Price. ............................~~53~~54
    SECTION 3.07    Notes Redeemed in Part. ...........................................54
    SECTION 3.08    Company May Acquire Notes. ....................................54

ARTICLE FOUR COVENANTS ...........................................................................54
    SECTION 4.01    Payment of Notes; Accrual of Interest. ........................54
    SECTION 4.02    Maintenance of Registrar and Paying Agent. ..........~~55~~56
    SECTION 4.03    Corporate Existence. .................................................56
    SECTION 4.04    Payment of Taxes and Other Claims. ...........................56
    SECTION 4.05    Maintenance of Properties and Insurance. ..............~~56~~57
    SECTION 4.06    Compliance Certificate; Notice of Default. ...................57
    SECTION 4.07    Compliance with Laws. ....................................~~57~~58

SECTION 4.08        Reports to Holders.................................................................58
SECTION 4.09        Waiver of Stay, Extension or Usury Laws.............................59
SECTION 4.10        Limitation on Restricted Payments.......................................59
SECTION 4.11        Limitations on Transactions with Affiliates..........................63
SECTION 4.12        Incurrence of Indebtedness and Issuance of Disqualified
                              Stock, Preferred Stock and Incentive Interests.............~~64~~65
SECTION 4.13        Limitation on Dividend and Other Payment Restrictions
                              Affecting Restricted Subsidiaries................................~~69~~70
SECTION 4.14        Additional Note Guarantees...................................................71
SECTION 4.15        Repurchase Upon Change of Control................................~~71~~72
SECTION 4.16        Limitation on Asset Sales.......................................................74
SECTION 4.17        Event of Loss.....................................................................~~76~~77
SECTION 4.18        [Reserved]..........................................................................~~77~~78
SECTION 4.19        Repurchase Offers.............................................................~~77~~78
SECTION 4.20        Limitation on Liens...........................................................~~80~~81
SECTION 4.21        Business Activities.............................................................~~80~~81
SECTION 4.22        Payments for Consent........................................................~~80~~81
SECTION 4.23        Impairment of Security Interest........................................~~80~~81
SECTION 4.24        Designation of Restricted and Unrestricted Subsidiaries.~~80~~82
SECTION 4.25        Additional Interest...........................................................~~81~~82
SECTION 4.26        Limitation on Sale and Leaseback Transactions.............~~82~~83
SECTION 4.27        Subordination of Intercompany Debt; No Amendments to
                              Certain Agreements...................................................~~82~~83
SECTION 4.28        After-Acquired Property..................................................~~83~~84
SECTION 4.29        Further Assurances...........................................................~~83~~84
SECTION 4.30        Calculation of Original Issue Discount...........................~~84~~85

ARTICLE FIVE SUCCESSOR CORPORATION..................................~~84~~85
SECTION 5.01        Merger, Consolidation and Sale of Assets......................~~84~~85
SECTION 5.02        Successor Person Substituted...........................................~~86~~87

ARTICLE SIX DEFAULT AND REMEDIES............................................~~86~~88
SECTION 6.01        Events of Default.............................................................~~86~~88
SECTION 6.02        Acceleration.....................................................................~~89~~90
SECTION 6.03        Other Remedies..............................................................~~90~~91
SECTION 6.04        Waiver of Past Defaults..................................................~~91~~92
SECTION 6.05        Control by Majority.........................................................~~91~~92
SECTION 6.06        Limitation on ~~Suits.           91~~Holders' Rights to Pursue Remedies.   93
SECTION 6.07        Rights of Holders to Receive Payment............................~~92~~93
SECTION 6.08        Collection Suit by Trustee or Collateral Agent..............~~92~~93
SECTION 6.09        Trustee May File Proofs of Claim...................................~~93~~94
SECTION 6.10        Priorities.........................................................................~~93~~94
SECTION 6.11        Undertaking for Costs.....................................................~~94~~95
SECTION 6.12        Restoration of Rights and Remedies...............................~~94~~95
SECTION 6.13        Rights and Remedies Cumulative....................................~~94~~95
SECTION 6.14        Delay or Omission not Waiver.......................................~~94~~95

ARTICLE SEVEN TRUSTEE....................................................................~~95~~96

SECTION 7.01    Duties of Trustee.................................................95 96
SECTION 7.02    Rights of Trustee.................................................96 97
SECTION 7.03    Individual Rights of Trustee......................................98 99
SECTION 7.04    Trustee's Disclaimer..............................................98 99
SECTION 7.05    Notice of Default................................................98 100
SECTION 7.06    Reports by Trustee to Holders....................................99 100
SECTION 7.07    Compensation and Indemnity.......................................99 100
SECTION 7.08    Replacement of Trustee..........................................100 102
SECTION 7.09    Successor Trustee by Merger, Etc.................................102 103
SECTION 7.10    Eligibility; Disqualification...................................102 103
SECTION 7.11    Preferential Collection of Claims Against Company................102 104
SECTION 7.12    Trustee as Collateral Agent and Paying Agent....................102 104
SECTION 7.13    Co-Trustees, Co-Collateral Agent and Separate Trustees,
                Collateral Agent................................................103 104

ARTICLE EIGHT SATISFACTION AND DISCHARGE OF INDENTURE............................104 105
SECTION 8.01    Legal Defeasance and Covenant Defeasance........................104 105
SECTION 8.02    Satisfaction and Discharge......................................107 108
SECTION 8.03    Survival of Certain Obligations.................................108 109
SECTION 8.04    Acknowledgment of Discharge by Trustee..........................108 109
SECTION 8.05    Application of Trust Moneys.....................................108 110
SECTION 8.06    Repayment to the Company of Unclaimed Money.....................109 110
SECTION 8.07    Reinstatement...................................................109 110
SECTION 8.08    Indemnity for Government Obligations............................109 111

ARTICLE NINE AMENDMENTS, SUPPLEMENTS AND WAIVERS.................................110 111
SECTION 9.01    Without Consent of Holders......................................110 111
SECTION 9.02    With Consent of Holders.........................................111 112
SECTION 9.03    Compliance with TIA.............................................112 114
SECTION 9.04    Revocation and Effect of Consents...............................113 114
SECTION 9.05    Notation on or Exchange of Notes................................113 114
SECTION 9.06    Trustee or Collateral Agent to Sign Amendments, Etc.............114 115
SECTION 9.07    Acts of Holders.................................................114 115

ARTICLE TEN GUARANTEE...........................................................115 116
SECTION 10.01    Guarantee......................................................115 116
SECTION 10.02    Release of a Guarantor.........................................116 117
SECTION 10.03    Limitation of Guarantor's Liability............................117 118
SECTION 10.04    Guarantors May Consolidate, etc., on Certain Terms.............117 118
SECTION 10.05    Contribution...................................................118 119
SECTION 10.06    Waiver of Subrogation..........................................118 119
SECTION 10.07    Waiver of Stay, Extension or Usury Laws........................118 119
SECTION 10.08    Note Guarantee Evidenced by Indenture; No Notation of
                 Note Guarantee.................................................119 120

ARTICLE ELEVEN MISCELLANEOUS....................................................119 120
SECTION 11.01    Trust Indenture Act Controls...................................119 120
SECTION 11.02    Notices........................................................119 120
SECTION 11.03    Communications by Holders with Other Holders...................121 122

| SECTION 11.04 | Certificate and Opinion as to Conditions Precedent. | ~~121~~122 |
| SECTION 11.05 | Statements Required in Certificate or Opinion. | ~~122~~123 |
| SECTION 11.06 | Rules by Trustee, Paying Agent, Registrar. | ~~123~~124 |
| SECTION 11.07 | Legal Holidays. | ~~123~~124 |
| SECTION 11.08 | Governing Law. | ~~123~~124 |
| SECTION 11.09 | No Adverse Interpretation of Other Agreements. | ~~123~~124 |
| SECTION 11.10 | No Recourse Against Others. | ~~123~~124 |
| SECTION 11.11 | Successors. | ~~124~~125 |
| SECTION 11.12 | Duplicate Originals. | ~~124~~125 |
| SECTION 11.13 | Severability. | ~~124~~125 |
| SECTION 11.14 | Waiver of Jury Trial. | ~~124~~125 |
| SECTION 11.15 | Table of Contents, Headings, etc. | ~~124~~125 |
| **ARTICLE TWELVE SECURITY** | | ~~124~~125 |
| SECTION 12.01 | Grant of Security Interest. | ~~124~~125 |
| SECTION 12.02 | Intercreditor Agreement. | ~~130~~131 |
| SECTION 12.03 | Recording and Opinions. | ~~130~~131 |
| SECTION 12.04 | Release of Note Collateral. | ~~130~~131 |
| SECTION 12.05 | Specified Releases of Note Collateral. | ~~131~~133 |
| SECTION 12.06 | Release of all Note Collateral. | ~~132~~133 |
| SECTION 12.07 | Matters as to Releases. | ~~133~~134 |
| SECTION 12.08 | Purchaser Protected. | ~~134~~135 |
| SECTION 12.09 | Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Documents. | ~~134~~135 |
| SECTION 12.10 | Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Documents. | ~~134~~135 |
| SECTION 12.11 | Collateral Monies. | ~~135~~136 |
| SECTION 12.12 | Limitation on Certain Securities Collateral. | ~~136~~137 |

| Exhibit A | - | Form of Initial Note | A-1 |
| Exhibit B | - | Form of Exchange Note | B-1 |
| Exhibit C | - | Form of Legend for Global Notes | C-1 |
| Exhibit D | - | Form of Private Placement Legend | D-1 |
| Exhibit E | - | Form of Certificate to Be Delivered in Connection with Transfers to Non-QIB Accredited Investors | E-1 |
| Exhibit F | - | Form of Certificate to Be Delivered in Connection with Transfers Pursuant to Regulation S | F-1 |
| Exhibit G | - | Form of Supplemental Indenture | G-1 |
| Exhibit H | - | Form of Mortgage | H-1 |

NOTE:        This Table of contents shall not, for any purpose, be deemed to be part of this Indenture.

# CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.03; 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 11.03 |
| (c) | 11.03 |
| 313(a) | 7.06 |
| (b)(1) | 7.06 |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 7.06 |
| 314(a) | 4.06; 4.08 |
| (b) | 12.03 |
| (c)(1) | 11.04 |
| (c)(2) | 11.04 |
| (c)(3) | N.A. |
| (d) | 12.04 |
| (e) | 11.05 |
| (f) | N.A. |
| 315(a) | 7.01(b) |
| (b) | 7.05 |
| (c) | 7.01(a) |
| (d) | 7.01(c) |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 11.01 |
| (b) | N.A. |
| (c) | 11.01 |

N.A. means Not Applicable

NOTE:  This Cross-Reference Table shall not, for any purpose, be deemed to be a part of this Indenture.

INDENTURE, dated as of **[• ]**, 2010, among Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company"), the Guarantors (as herein defined) and Wilmington Trust ~~Company~~FSB, as trustee (in such capacity, the "Trustee") and collateral agent (in such capacity, the "Collateral Agent").

# W I T N E S S E T H:

WHEREAS, the Company has duly authorized the creation of an issue of 13% Senior Secured Notes due 2015 (referred to herein as the "Notes") and the Guarantors have duly authorized the creation of the Note Guarantees (as herein defined) and, to provide therefor, the Company and the Guarantors have duly authorized the execution and delivery of this Indenture; and

WHEREAS, all things necessary to make the Notes and Note Guarantees, when the Notes are duly issued and executed by the Company and authenticated and delivered hereunder, the valid obligations of each of the Company and the Guarantors, respectively, and to make this Indenture a valid and binding agreement of each of the Company and the Guarantors, have been done.

NOW, THEREFORE, each party hereto agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders (as herein defined):

## ARTICLE ONE

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01          Definitions.

"ABL Facility" means the senior secured revolving credit agreement dated as of **[• ]**, 2010, among the Company, the lenders party thereto, and PNC Bank, National Association, as administrative agent, as amended, restated, modified, increased, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of one or more series of notes, bonds or other debt securities and related indentures or similar agreements) in whole or in part from time to time, including any agreement increasing the amount of Indebtedness incurred thereunder or available to be borrowed thereunder to the extent permitted under clause (1) of the second paragraph of Section 4.12.

"ABL Facility Lien Security Documents" means one or more security agreements, pledge agreements, collateral assignments, or other grants or transfers for security executed and delivered by the Company or any Guarantor creating a Lien upon assets constituting Secondary Collateral owned or to be acquired by the Company or such Guarantor in favor of any holder or holders of Credit Facility Obligations under the ABL Facility, or any administrative agent, agent or representative acting for any such holders, as security for any Credit Facility Obligations under the ABL Facility.

"ABL Facility Trigger Date" means the date on which the Company delivers written notice to the Trustee that clause (1)(a) of the second paragraph of Section 4.12 will no longer be available for incurrence of any additional Indebtedness under the ABL Facility.

"Acceleration Notice" has the meaning set forth in Section 6.02(a).

"Accredited Investor" means an individual or institution that is an "accredited investor" as that term is defined in Rule 501(a) under the Securities Act.

"Additional Assets" means:  (i) any property or assets (other than Indebtedness, Capital Stock, Excluded General Intangibles and Excluded Trademark Applications and other than any assets classified as current assets under GAAP) used or useful in a Permitted Business; or (ii) the Capital Stock of a Person that becomes a Wholly-Owned Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Company or a Guarantor; provided, however, that, in the case of this clause (ii), such Wholly-Owned Restricted Subsidiary is primarily engaged in a Permitted Business and becomes a Guarantor at or prior to consummation of such acquisition.

"Additional Interest" has, with respect to any Notes that are entitled to the benefits of a Registration Rights Agreement, the meaning set forth in such Registration Rights Agreement.

"Additional Notes" means any Notes that are originally issued after the Issue Date from time to time pursuant to clause (c) of the fourth paragraph of Section 2.02 and otherwise in accordance with the terms of this Indenture and any PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in partial payment of the interest accrued on any Additional Notes that is due and payable on such Interest Payment Date.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control", as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling", "controlled by" and "under common control with" have correlative meanings.

"Affiliate Transaction" has the meaning set forth in Section 4.11.

"After-Acquired Property" means, with respect to the Company or any Guarantor:

(1)    any property acquired by the Company or such Guarantor upon a transfer (including upon an Investment) from the Company or any other Guarantor of property that was Note Collateral of the Company or such other Guarantor immediately prior to the transfer;

(2)    any Additional Assets acquired by the Company or such Guarantor that (pursuant to Section 4.16, Section 4.17, 12.01(j) or 12.11(a)(v) or pursuant to clause (2) or (3) of the definition of "Asset Sale" or clause (3) of the definition of "Permitted Investments") are to become Note Collateral prior to or simultaneously with the acquisition thereof (or, if such Additional Assets are acquired pursuant to clause (a) of the

first paragraph of <u>Section 4.17</u>, on or prior to the later of the date of completion of rebuilding, repair or improvement or acquisition of replacement referred to therein);

(3)     from and after the Indiana Port Leasehold Required Mortgage Date, the Indiana Port Leased Premises and any Indiana Port Lease Collateral owned by the Indiana Port Lessee on the Indiana Port Lease Required Mortgage Date;

(4)     any property or assets (other than property or assets not already constituting Note Collateral) on which the Company or any Guarantor grants a Lien for the benefit of holders of Credit Facility Obligations; or

(5)     any Specified Assets or material other property that is acquired or otherwise owned by the Company or such Guarantor on or after the date of this Indenture of a type that secures the Note Obligations.

"<u>After-Acquired Covered Property</u>" means any After-Acquired Property other than real property acquired or owned by the Company or any Restricted Subsidiary that, at the time the Company or such Restricted Subsidiary acquires or first owns such After-Acquired Property, such After-Acquired Property automatically becomes subject to valid and perfected Note Liens already created pursuant to then existing Collateral Documents.

"<u>After-Acquired Property Required Date</u>" means, with respect to any After-Acquired Property acquired or owned by the Company or any Guarantor:

(i)     if such After-Acquired Property constitutes After-Acquired Specified Property (other than the Indiana Port Leased Premises or any Indiana Port Leased Collateral), the date the Company or such Guarantor acquires or first owns such After-Acquired Specified Property (or, if such After-Acquired Specified Property is acquired pursuant to clause (a) of the first paragraph of <u>Section 4.17</u>, the later of the date of completion of rebuilding, repair or improvement or acquisition of replacement referred to therein);

(ii)     if such After-Acquired Property constitutes the Indiana Port Leased Premises or any Indiana Port Lease Collateral, owned by the Indiana Port Lessee on the Indiana Port Lease Required Mortgage Date, the Indiana Port Lease Required Mortgage Date;

(iii)     if such After-Acquired Property constitutes property or assets specified in clause (4) of the definition of "After-Acquired Property", the date on which the Lien referred to in such clause is granted for benefit of holders of Credit Facility Obligations; or

(iv)     otherwise, the date 30 days after the Company or such Guarantor acquires or first owns such After-Acquired Property.

"After-Acquired Specified Property" means any After-Acquired Property constituting property or Additional Assets specified in clause (1), (2) or (3) of the definition of "After-Acquired Property".

"Agent" means any Paying Agent, Registrar or co-Registrar.

"Agent Members" has the meaning set forth in Section 2.14(a) and means, with respect to the Depository, Euroclear or Clearstream, a Person who has an account with the Depository, Euroclear or Clearstream, respectively (and, with respect to the Depository, shall include Euroclear and Clearstream).

"AI Global Notes" has the meaning set forth in Section 2.01.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depository, Euroclear or Clearstream that apply to such transfer or exchange.

"Asset Sale" means:

(a)     the sale, lease, conveyance or other disposition of (including by way of any merger or consolidation and including any loss, destruction, damage, condemnation, confiscation, requisition, seizure, forfeiture or taking of title to or use of) any assets of the Company or any Restricted Subsidiary; provided that the sale, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by the provisions of Section 4.15 or Section 5.01 or Section 10.04 and not by the provisions of Section 4.16; and

(b)     the issuance of Equity Interests in any of the Company's Restricted Subsidiaries (other than directors' qualifying shares) or the sale or other disposition of Equity Interests in any of its Restricted Subsidiaries.

Notwithstanding the preceding, none of the following will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets (other than assets constituting Specified Collateral) having a Fair Market Value of less than $5,000,000;

(2)     a transfer of assets (A) between or among (i) solely the Company and/or its Restricted Subsidiaries that are Guarantors so long as, to the extent such transfer includes any Note Collateral, such transfer does not occur unless such assets become Note Collateral of the transferee prior to or simultaneously with such transfer and until and unless the provisions of Section 4.28 (to the extent applicable to such transfer) have otherwise been complied with in respect of such Note Collateral or (ii) Restricted Subsidiaries that are not Guarantors or (B) by any Restricted Subsidiary that is not a Guarantor to the Company or a Guarantor;

(3)     an issuance of Equity Interests by (A) a Restricted Subsidiary of the Company that is a Guarantor solely to the Company or another Restricted

Subsidiary that is a Guarantor so long as such issuance does not occur unless such Equity Interests become Note Collateral simultaneously with the issuance thereof and until and unless the provisions of Section 4.28 (to the extent applicable to such issuance) have otherwise been complied with in respect of such Equity Interests or (B) a Restricted Subsidiary that is not a Guarantor solely to the Company or to another Restricted Subsidiary of the Company;

(4)      the sale, disposition or lease of inventory, products, services or accounts receivable (other than Specified Collateral) in the ordinary course of business;

(5)      any sale, abandonment or other disposition in the ordinary course of business of intellectual property or other assets (other than Specified Collateral) determined by the Company in its reasonable judgment to be damaged, worn-out, surplus, obsolete, permanently retired or no longer useful or economically practicable to maintain in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole;

(6)      the sale or other disposition of cash or Cash Equivalents;

(7)      a Restricted Payment of assets other than Specified Collateral that is not prohibited by Section 4.10 or a Permitted Investment of assets other than Specified Collateral;

(8)      the grant in the ordinary course of business of any non-exclusive license or sublicense of patents, trademarks, registrations therefor and other intellectual property;

(9)      the lease or sublease of other property or assets (other than Specified Collateral) in the ordinary course of business not involving any purchase option which does not materially interfere with the business of the Company and its Restricted Subsidiaries, taken as a whole (subject, in the case of any Note Collateral, to the Lien securing the Notes Obligations);

(10)      to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of property (other than Specified Collateral) for like property for use in any Permitted Business;

(11)      any Lien (or foreclosure thereon) securing Indebtedness to the extent such Lien is permitted by Section 4.20;

(12)      an Event of Loss; and

(13)      any release of intangible claims or rights in connection with the loss or settlement of a bona fide lawsuit, dispute or other controversy.

"Attributable Debt" in respect of a Sale and Leaseback Transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the

remaining term of the lease included in such Sale and Leaseback Transaction, including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such Sale and Leaseback Transaction, determined in accordance with GAAP; provided, however, that if such Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"Aurora Facility" means that certain unfinished ethanol production facility of the Company located in Aurora, Nebraska.

"Aurora West" means Aventine Renewable Energy – Aurora West, LLC, a Delaware limited liability company.

"Aurora West Kiewit Documents" means the Aurora West Kiewit Note and the Aurora West Kiewit Mortgage.

"Aurora West Kiewit Mortgage" means the deed of trust granted on the Issue Date by Aurora West to Kiewit to secure the Aurora West Kiewit Note by Liens on the Aurora West Real Property, as the same may be amended, modified, renewed, restated or replaced, in whole or in part, from time to time in accordance with its terms and the terms hereof (including Section 4.27).

"Aurora West Kiewit Note" means the note payable by Aurora West to Kiewit in the original principal amount of $5,251,808, as the same may be amended, restated or modified in accordance with its terms and the terms hereof (including Section 4.27).

"Aurora West Real Property" means the real property in Aurora, Nebraska owned by Aurora West on the Issue Date and improvements and accessions to such property or proceeds or distributions thereof.

"Authenticating Agent" has the meaning set forth in Section 2.02.

"Authentication Order" has the meaning set forth in Section 2.02.

"Backstop Purchasers" means Brigade Capital Management LLC, Nomura Corporate Research & Asset Management, Inc., Whitebox Advisors, Senator Investment Group LP, and SEACOR Capital Corporation, each as investment manager, for and on behalf of certain funds.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, and codified as 11 U.S.C. §§101 et seq.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire

by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time or only upon the occurrence of a subsequent condition.

"Board of Directors" means:

(1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(3)     with respect to a limited liability company, the board of directors or other governing body, and in the absence of same, the manager or board of managers or the managing member or members or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person or other individual or entity serving a similar function.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the applicable Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.  Unless otherwise specified herein, each reference to a Board Resolution will refer to a Board Resolution of the Company.

"Business Day" means a day that is not a Legal Holiday.

"Calculation Date" means any date on which an event occurs that requires the calculation of the Fixed Charge Coverage Ratio.

"Capital Lease Obligation" means, with respect to any Person, any obligation of such Person under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP; and the amount of Indebtedness represented by such lease at the time any determination is to be made shall be the amount of the liability in respect of such lease that would at that time be required to be capitalized on a balance sheet in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) similar to corporate stock;

(3)　　in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)　　any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents" means:

(1)　　cash in the form of United States of America dollars received in the ordinary course of business;

(2)　　securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof) having maturities of not more than one year from the date of acquisition;

(3)　　dollar denominated time deposits, overnight deposits, demand deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than one year from the date of acquisition;

(4)　　dollar denominated time deposits, overnight deposits, demand deposits and certificates of deposit of any bank not meeting the qualifications specified in clause (3) above with maturities of not more than one year from the date of acquisition; provided, that the aggregate amount of such deposits with such banks and outstanding at any time shall not exceed $100,000;

(5)　　repurchase obligations for underlying securities of the types described in clause (2) above entered into with any bank meeting the qualifications specified in clause (3) above;

(6)　　commercial paper issued by any Person incorporated in the United States of America, any state thereof or the District of Columbia rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than one year after the date of acquisition;

(7)　　marketable direct obligations issued by the District of Columbia or any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(8)　　Investments in money market funds substantially all of whose assets are comprised of Cash Equivalents of the types described in clauses (2) through (7) above; and

(9)     in the case of Investments by Foreign Subsidiaries, other short-term investments in accordance with normal investment practices for cash management of a type analogous to the foregoing.

"Change of Control" means the occurrence of any of the following:

(1)     any Person or Persons acting together that would constitute a group (for purposes of Section 13(d) of the Exchange Act, or any successor provision thereto) (a "group"), together with any Affiliates or related Persons thereof, other than any such Person, Persons, Affiliates or related Person who are Permitted Holders, is or becomes the "Beneficial Owner," directly or indirectly, of at least 35% of the voting power of the Company's outstanding Voting Stock, and the Permitted Holders own less than such Person or group (in performing the "own less than" comparison, the holdings of the Permitted Holders who are members of the new group shall not be counted in the shares held in the aggregate by Permitted Holders);

(2)     any sale, lease or other transfer (other than by way of merger or consolidation), in one transaction or a series of related transactions, is made by the Company or any of its Restricted Subsidiaries of all or substantially all of the consolidated assets of the Company and the Restricted Subsidiaries, taken as a whole, to any Person;

(3)     the Company consolidates with or merges with or into another Person or any Person consolidates with, or merges with or into, the Company, in any such event pursuant to a transaction in which immediately after the consummation thereof Persons owning a majority of the Company's Voting Stock voting immediately prior to such consummation shall cease to own a majority of the Company's Voting Stock or, if the Company is not the surviving entity, a majority of the Voting Stock of such surviving entity;

(4)     Continuing Directors cease to constitute at least a majority of the Board of Directors of the Company; or

(5)     the Company's stockholders approve any plan or proposal for the Company's liquidation or dissolution;

provided, however, that in no event shall the sale of the Company's common stock to an underwriter or group of underwriters in privity of contract with the Company (or any other Person in privity of contract with such underwriters) be deemed to be a Change of Control unless such common stock is held in an investment account, in which case the investment account would be treated without giving effect to the foregoing part of this proviso.

"Change of Control Offer" has the meaning set forth in Section 4.15(a).

"Change of Control Payment Date" has the meaning set forth in Section 4.15(b)(2).

"Clearstream" means Clearstream Banking, société anonyme, and any successor thereto.

"Collateral Account" means an account of the Company established at **[• ]** and pledged as Primary Collateral to the Collateral Agent for the benefit of the Trustee and the Holders and into which, among other things, (i) the Net Proceeds corresponding to the Primary Collateral sold in a Primary Collateral Asset Sale, (ii) the Net Loss Proceeds from an Event of Loss or (iii) the net proceeds from an issuance of Additional Notes are deposited in accordance with the provisions of Sections 4.16, 4.17 or 12.01(j), respectively.

"Collateral Agent" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"Collateral Documents" means, collectively, the Security Agreement, the Intercreditor Agreement and each Mortgage, in each case, as the same may be in force from time to time.

"Collateral Monies" means all cash and Cash Equivalents received by the Collateral Agent:

(1)      as Net Proceeds corresponding to the Primary Collateral sold in a Primary Collateral Asset Sale in accordance with the provisions of Section 4.16;

(2)      as Net Loss Proceeds from an Event of Loss in accordance with the provisions of Section 4.17;

(3)      pursuant to the Collateral Documents;

(4)      as proceeds of any sale or other disposition of all or any part of the Primary Collateral by or on behalf of the Collateral Agent or any collection, recovery, receipt, appropriation or other realization of or from all or any part of the Primary Collateral pursuant to this Indenture or any of the Collateral Documents or otherwise;

(5)      as net proceeds from the issuance of any Additional Notes in accordance with the provisions of Section 12.01(j); or

(6)      other than pursuant to clauses (1), (2), (3), (4) or (5) above, for application as provided in the relevant provisions of this Indenture or any Collateral Document.

 "Company" means the party named as such in this Indenture until a successor replaces it pursuant to Section 5.02 and thereafter means such successor.

"Confirmation Order" means that certain order confirming the Plan pursuant to Section 1129 of the Bankruptcy Code entered by the United States Bankruptcy Court for the District of Delaware on February [__], 2010.

"Consolidated Cash Flow" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period plus the sum of, without duplication:

(1)      an amount equal to any extraordinary loss plus any net loss realized by such Person or any of its Restricted Subsidiaries in connection with an Asset Sale, if, and

only to the extent that, such losses were deducted in computing such Consolidated Net Income; plus

(2)     an amount equal to the provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, if, and only to the extent that, such provision for taxes was deducted in computing such Consolidated Net Income; plus

(3)     an amount equal to the Fixed Charges of such Person and its Restricted Subsidiaries for such period, if, and only to the extent that, such Fixed Charges were deducted in computing such Consolidated Net Income; plus

(4)     an amount equal to depreciation and amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) of such Person and its Restricted Subsidiaries for such period, if, and only to the extent that, such depreciation and amortization expenses were deducted in computing such Consolidated Net Income; plus

(5)     non-cash items, if, and only to the extent that, such non-cash items were deducted in computing such Consolidated Net Income, other than any non-cash charges that represent accruals of, or reserves for, cash disbursements to be made in any future accounting period;

in each case, on a consolidated basis and determined in accordance with GAAP.

Notwithstanding the preceding, the provision for taxes based on the income or profits of, and the depreciation and amortization and other non-cash expenses of, a Restricted Subsidiary of the Company that is not a Guarantor will be added to Consolidated Net Income to compute Consolidated Cash Flow of the Company only to the extent that a corresponding amount would be permitted at the date of determination to be dividended to the Company or to a Guarantor by such Restricted Subsidiary without prior governmental approval that has not been obtained, and without direct or indirect restriction pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Restricted Subsidiary or its stockholders.

"Consolidated Net Income" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that:

(1)     the Net Income (but not loss) of any Person that is not a Restricted Subsidiary of the specified Person or that is accounted for by the equity method of accounting will be included only to the extent of the aggregate amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the specified Person;

(2)     the Net Income of any Restricted Subsidiary of the Specified Person will be excluded only to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been

obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders or otherwise;

(3)     the cumulative effect of a change in accounting principles will be excluded;

(4)     any gain or loss, together with any related provision for taxes on such gain or loss, realized in connection with (a) any sale of assets outside the ordinary course of business of such Person or any of its Restricted Securities, (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or (c) the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries shall be excluded;

(5)     any extraordinary gain or loss, together with any related provision for taxes on such extraordinary gain or loss, shall be excluded;

(6)     any charges related to restructuring, debt retirement, extinguishment of Hedging Obligations or facility closings shall be excluded;

(7)     all non-cash expenses related to stock-based compensation plans or other non-cash compensation, including stock option non-cash expenses, shall be excluded;

(8)     any non-cash impact as a result of the Company's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Plan shall be excluded; and

(9)     the calculation of Consolidated Net Income will not give effect to, without duplication, any deduction for (a) any increased amortization, depreciation or cost of sales resulting from the write-up of assets pursuant to Accounting Principles Board Opinion Nos. 16 and 17 or their respective successors under the Financial Accounting Standards Board's FASB Statement No. 168, "The FASB Accounting Standards Codification," and (b) any nonrecurring charges relating to any premium or penalty paid, write-off of deferred financing costs or other financial recapitalization charges in connection with redeeming or retiring any Indebtedness prior to its Stated Maturity.

"Consolidated Net Worth" means, with respect to any specified Person as of any date, the sum of:

(1)     the consolidated equity of the common stockholders of such Person and its consolidated Subsidiaries as of such date; plus

(2)     the respective amounts reported on such Person's balance sheet as of such date with respect to any series of preferred stock (other than Disqualified Stock) that by its terms is not entitled to the payment of dividends unless such dividends may be declared and paid only out of net earnings in respect of the year of such declaration and payment, but only to the extent of any cash received by such Person upon issuance of such preferred stock.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)     was a member of such Board of Directors on the Issue Date (following consummation of the transactions contemplated by the Plan); or

(2)     was elected to such Board of Directors with the approval of, or whose nomination for election was approved or ratified by, a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

"Corporate Trust Office" means the office of the Trustee specified in Section 11.02.

"Covenant Defeasance" has the meaning set forth in Section 8.01(c).

"Credit Facilities" means one or more debt facilities (including the ABL Facility) or commercial paper facilities, in each case with banks or other institutional lenders, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), bankers' acceptances or letters of credit, including any related notes, guarantees, collateral documents, instruments and agreements executed and delivered in connection therewith, and, in each case, as amended, restated, modified, increased, renewed, refunded, replaced (whether upon termination or otherwise) or refinanced (including by means of sales of one or more series of notes, bonds or other debt securities and related indentures or similar agreements) in whole or in part from time to time; provided that the aggregate principal amount of Indebtedness outstanding at any time under all such Credit Facilities is permitted to be incurred at such time under clause (1) of the second paragraph of Section 4.12.

"Credit Facility Agent" means, at any time, the Person serving at such time as the "Agent", "Administrative Agent" or "Collateral Agent" under the applicable Credit Facility or any other representative of the lenders thereunder or any trustee or agent or representative of holders of Credit Facility Obligations then most recently designated by the terms of the Credit Facility, in a written notice delivered to the administrative agent, as the Credit Facility Agent for the purposes of the Intercreditor Agreement.

"Credit Facility Amount" means (i) at any time prior to the ABL Facility Trigger Date, $37,000,000; or (ii) at any time on or after the ABL Facility Trigger Date, $60,000,000 less the aggregate principal amount of Indebtedness incurred pursuant to clause (1)(a) of the second paragraph of Section 4.12 that is outstanding at such time.

"Credit Facility Lien" means, to the extent securing Credit Facility Obligations, a Lien on assets constituting Secondary Collateral granted to the Credit Facility Agent or any holder, or other administrative agent, agent, trustee or representative of holders, of Credit Facility Obligations as security for Credit Facility Obligations and subject to the Intercreditor Agreement.

"Credit Facility Lien Documents" means the documentation relating to the Credit Facility Liens granted under any Credit Facility, including the ABL Facility, the ABL Facility Lien Security Documents, any related loans, guarantees, collateral documents, instruments and

agreements executed in connection therewith and all other agreements governing, securing or relating to any Credit Facility Obligations.

"Credit Facility Obligations" means Indebtedness arising under any Credit Facility and all other Obligations of the Company or any Guarantor under the Credit Facility Lien Documents.

"Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Code.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Depository" means the DTC.

"Disqualified Stock" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Capital Stock) or upon the happening of any event, (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise or (b) is or may become redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the Maturity Date.  Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a Change of Control or an Asset Sale prior to the date that is 91 days after the Maturity Date will not constitute Disqualified Stock if the change of control or asset sale provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in Sections 4.15 and 4.16, respectively, and provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 4.10.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"Domestic Subsidiary" means any Restricted Subsidiary of the Company that either (1) was formed under the laws of the United States of America or any state of the United States of America or the District of Columbia or (2) does not conduct substantially all its operations outside the United States of America.

"DTC" means The Depository Trust Company, its nominees and successors.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear system, and any successor thereto.

"Event of Default" has the meaning set forth in Section 6.01.

"Event of Loss" means, with respect to any property or asset (tangible or intangible, real or personal) that constitutes Primary Collateral (including any of the Facilities), any of the following:

> (1)    any loss or destruction of, or damage to, such property or asset;

> (2)    any institution of any proceedings for the condemnation or seizure of, or for the exercise of any right of eminent domain with respect to, such property or asset;

> (3)    any actual condemnation, seizure or taking by exercise of the power of eminent domain or otherwise of such property or asset, or confiscation of such property or asset or the requisition of the use of such property or asset; or

> (4)    any settlement in lieu of clauses (2) or (3) above.

"Excess Asset Sale Proceeds" has the meaning set forth in Section 4.16.

"Excess Loss Proceeds" has the meaning set forth in Section 4.17.

"Excess Proceeds" has the meaning set forth in Section 4.19.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto, and the rules and regulations of the SEC promulgated thereunder.

"Exchange Notes" means (i) the Notes, if any, issued under Section 2.02 pursuant to an Exchange Offer and (ii) any PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in partial payment of the interest accrued on any Exchange Notes that is due and payable on such Interest Payment Date.

"Exchange Offer" means an exchange offer that may be made by the Company, pursuant to a Registration Rights Agreement, to exchange for any and all of the Initial Notes a like aggregate principal amount of Exchange Notes registered under the Securities Act and having substantially identical terms to the Initial Notes.

"Excluded Foreign Subsidiary Capital Stock" has the meaning set forth in the Security Agreement.

"Excluded General Intangibles" has the meaning set forth in the Security Agreement.

"Excluded Personal Property" has the meaning set forth in the Security Agreement.

"Excluded Trademark Applications" has the meaning set forth in the Security Agreement.

"Facilities" means the Company's ethanol production facilities and, in each case, all improvements thereto.

"Fair Market Value" means the price that would be paid in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and unaffiliated willing buyer under no compulsion to buy in a transaction not involving distress or necessity of either party. "Fair Market Value" shall be determined, except as otherwise provided in this Indenture, in good faith (a) by any Officer, if Fair Market Value is equal to or less than $5.0 million or (b) by the Board of Directors of the Company, whose determination shall be conclusive if evidenced by a resolution of the Board of Directors, if Fair Market Value exceeds $5.0 million.

"Fixed Charge Coverage Ratio" means, with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, Guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the applicable Calculation Date, then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect to such incurrence, assumption, Guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of such preferred stock, and the use of the proceeds therefrom, as if the same had occurred on the first day of the applicable period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio for any period:

(1) acquisitions and dispositions of business entities or property and assets constituting a division or line of business of any Person that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations or as a result of a Permitted Investment and including any related financing transactions and including increases in ownership of Restricted Subsidiaries, during such period or subsequent to such period and on or prior to the Calculation Date will be given pro forma effect as if they had occurred on the first day of such period;

(2) the Consolidated Cash Flow of the specified Person and its Restricted Subsidiaries attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(3) the Fixed Charges of the specified Person and its Restricted Subsidiaries attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date;

(4) any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such period;

(5)     any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such period;

(6)     if any Indebtedness of the specified Person and its Restricted Subsidiaries bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term until the earlier of the maturity of such Indebtedness or more than 12 months after the Calculation Date; and

(7)     for purposes of making the computations referred to above, interest on any Indebtedness of the specified Person and its Restricted Subsidiaries under a revolving credit facility (to the extent not excluded from the calculation of the Fixed Charge Coverage Ratio due to the operation of the first parenthetical phrase of this definition) computed on a pro forma basis shall be computed based on the weighted average daily balance of such Indebtedness during such period.

For purposes of this definition and the first paragraph of Section 4.12, whenever pro forma effect is to be given to any calculation, the pro forma calculations shall be determined in good faith by the chief financial officer of the Company.  Any such pro forma calculations may include operating expense reductions (net of associated expenses) for such period resulting from the acquisition which is being given pro forma effect that (a) would be permitted to be reflected on pro forma financial statements pursuant to Rule 11-02 of Regulation S-X under the Securities Act or (b) have been realized or for which substantially all the steps necessary for realization have been taken or, at the time of determination, are reasonably expected to be taken with 90 days immediately following any such acquisition, including the execution, termination, renegotiation or modification of any contracts, the termination of any personnel or the closing of any facility, as applicable, provided that, in any case, such adjustments shall be (A) calculated on an annualized basis and (B) set forth in an Officers' Certificate signed by the Company's chief financial officer and another Officer which states in reasonable detail (i) the amount of such adjustment or adjustments, (ii) that such adjustment or adjustments are based on the reasonable good faith beliefs of the Officers executing such Officers' Certificate at the time of such execution and (iii) that such adjustment or adjustments and the plan or plans related thereto have been reviewed and approved by the Company's Board of Directors.

"Fixed Charges" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; plus

(2)     the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period to the extent the net income of such Restricted Subsidiary is included in the calculation of Net Income; plus

(3)     any interest accruing on Indebtedness of another Person that is Guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such Guarantee or Lien is called upon; plus

(4)     the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of such Person or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or a Restricted Subsidiary of the Company and (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal,

in each case, on a consolidated basis and in accordance with GAAP.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles set forth in the Financial Accounting Standards Board's FASB Statement No. 168, "The FASB Accounting Standards Codification," the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as have been approved by a significant segment of the accounting profession which are in effect from time to time.

"Global Notes" has the meaning set forth in Section 2.01.

"Guarantee" means, as to any Person, a guarantee other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business, direct or indirect, in any manner, including by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness of another Person (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services or to maintain such other Person's financial condition or otherwise).

"Guarantors" means:

(1)     all of the Company's existing Restricted Subsidiaries that have executed and delivered this Indenture as a guarantor; and

(2)     any other Subsidiary of the Company that executes and delivers a supplemental indenture hereto providing for a Note Guarantee in accordance with the provisions of this Indenture;

and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person under:

(1) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate protection agreements, interest rate cap agreements, interest rate collar agreements, interest rate hedge agreements and other agreements (including any ISDA agreements) or arrangements designed to manage interest rates or interest rate risk;

(2) commodity swap agreements, commodity option agreements, forward contracts and other agreements (including any ISDA agreements) or arrangements designed to protect such Person against fluctuations in commodity prices or the prices of other raw materials used in its business; and

(3) foreign exchange contracts, currency swap agreements, futures contracts, currency options, synthetic caps and other agreements (including any ISDA agreements) or arrangements designed to protect such Person against fluctuations in currency exchange rates.

"Holder" means the Person in whose name a Note is registered on the Registrar's books.

"Incentive Interests" has the meaning set forth in Section 4.12.

"incur" has the meaning set forth in Section 4.12.

"Indebtedness" means, with respect to any specified Person, at any date of determination (without duplication):

(1) any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

(a) in respect of borrowed money;

(b) evidenced by bonds, loans, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(c) in respect of bankers' acceptances;

(d) representing Capital Lease Obligations; or

(e) representing any Hedging Obligations; and

(2) all Obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all Obligations under any title retention agreement (but excluding (A) trade accounts payable and other accrued

liabilities arising in the ordinary course of business that are not overdue by 90 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and (B) any deferred purchase price represented by earn outs customary for like transactions),

if and to the extent any of the preceding items (other than letters of credit, Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes (a) such portion of the Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) as shall equal the lesser of (x) the Fair Market Value of such asset as of the date of determination and (y) the amount of such Indebtedness and (b) to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person. Notwithstanding the foregoing, Indebtedness of the Company or any Restricted Subsidiary shall not include the pledge by the Company or such Restricted Subsidiary of, or a Guarantee thereof limited in recourse to, the Capital Stock of an Unrestricted Subsidiary to secure Non-Recourse Debt of such Unrestricted Subsidiary.

"Indemnified Party" has the meaning set forth in Section 7.07.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"Indenture Documents" means, collectively, this Indenture, the Notes and the Collateral Documents.

"Indiana Port Lease Agreement" means the Lease Agreement, dated as of October 31, 2006, between the Indiana Port Lessor and the Indiana Port Lessee, as amended as of the Issue Date and as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time after the date hereof in accordance with its terms and the terms hereof (including Section 4.27).

"Indiana Port Lease Collateral" means any inventory, equipment or fixtures of the Indiana Port Lessee that are (a) now or hereafter located on the Indiana Port Leased Premises or (b) at any time used in connection with the business of the Indiana Port Lessee carried out on the Indiana Port Leased Premises.

"Indiana Port Leased Premises" means the real property leasehold interest leased by the Indiana Port Lessee from the Indiana Port Lessor pursuant to the Indiana Port Lease Agreement on which the Mt. Vernon Facility is located.

"Indiana Port Lease Required Mortgage Date" means the date 45 days after the Issue Date.

"Indiana Port Lessee" means Aventine Renewable Energy – Mt. Vernon, LLC, a Delaware limited liability company.

"Indiana Port Lessor" means the Indiana Port Commission, a body corporate and politic existing under the laws of the State of Indiana, and its successors and assigns.

"Initial Notes" means (i) any Notes that are originally issued on the Issue Date in the aggregate principal amount of up to $105,000,000 and (ii) any PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in partial payment of the interest accrued on any Initial Notes that is due and payable on such Interest Payment Date.

"Initial Purchasers" means the Backstop Purchasers and [any subscribers].

"Intercompany Debt" means any Indebtedness owing by any of the Company or any of the Restricted Subsidiaries of the Company to the Company or any of the Restricted Subsidiaries of the Company.

"Intercreditor Agreement" means an intercreditor agreement to be entered into between the Collateral Agent, on behalf of the Trustee and the Holders, and each applicable Credit Facility Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Interest Payment Date" means the stated maturity of an installment of interest on the Notes.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), and purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities of such other Person together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company or such Restricted Subsidiary will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's or the Restricted Subsidiary's Investments in such Restricted Subsidiary that were not sold or disposed of, if any, in an amount determined as provided in the last paragraph of Section 4.10. The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the last paragraph of Section 4.10. Except as otherwise provided in this Indenture, the amount or Fair Market Value of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"ISDA" means the International Swaps and Derivatives Association or any successor thereto.

"Issue Date" means [•], 2010.

"Issue Date Opinions" means the Opinions of Counsel addressed and delivered to the Trustee and the Collateral Agent substantially in the form of the Opinions of Counsel delivered on the Issue Date to the Credit Facility Agent and the Initial Purchasers relating to (i) any of the Note Collateral or the Collateral Documents, (ii) the due authorization, execution and delivery of the Initial Notes, this Indenture, the Note Guarantees and the Collateral Documents, and the validity and enforceability of such documents, (iii) exemption of the offer and sale of the Initial Notes and Note Guarantees to the Initial Purchasers from registration under the Securities Act, and (iv) the absence of the need to qualify this Indenture under the TIA in respect of such sale and offer.

"Kiewit" means Kiewit Energy Company.

"Legal Defeasance" has the meaning set forth in Section 8.01(b).

"Legal Holiday" has the meaning set forth in Section 11.07.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"Management Incentive Plan" means the "Management Incentive Plan" as defined in the Plan, as the same may be amended, modified, renewed, restated or replaced, in whole or in part, from time to time in accordance with its terms and the terms hereof (including Section 4.27).

"Maturity" means, with respect to any Note, the date on which the principal of such Note becomes due and payable as therein or herein provided, whether at the Maturity Date or by declaration of acceleration, call for redemption or otherwise.

"Maturity Date" means [•], 2015.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Mortgages" means the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents, if any, granting Liens on the Facilities or any other real property owned by the Company or any Guarantor to secure the Note Obligations.

"Mt. Vernon Facility" means that certain unfinished ethanol production facility of the Company located in Mt. Vernon, Indiana.

"Net Income" means, with respect to any specified Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however:

(1) any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with: (a) any Asset Sale; or (b) the disposition of any Equity Interests or other securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries;

(2) any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss); and

(3) any unrealized non-cash gains or losses in respect of Hedging Obligations, to the extent such gains or losses are taken into account in computing the net income (loss) of such Person.

"Net Loss Proceeds" means the aggregate cash proceeds received by the Company or any Guarantor in respect of any Event of Loss, including insurance proceeds, condemnation awards or damages awarded by any judgment, net of (1) the direct costs in recovery of such Net Loss Proceeds (including reasonable legal, accounting, appraisal and insurance adjuster fees and any relocation expenses incurred as a result thereof), (2) amounts required to be applied to the repayment of Indebtedness, other than Credit Facility Obligations, secured by a Lien on the asset or assets that were the subject of such Event of Loss, (3) any taxes paid or payable as a result thereof and (4) amounts taken by the Company or its Restricted Subsidiaries, as the case may be, as a reserve against any liabilities associated with such Event of Loss and retained by the Company or its Restricted Subsidiaries, as the case may be, after such Event of Loss, including liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Event of Loss, all as determined in accordance with GAAP.

"Net Proceeds" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (1) the direct costs relating to such Asset Sale, including legal, accounting and investment banking, broker or finder fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, (2) any taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, (3) amounts required to be applied to the repayment of Indebtedness, other than Credit Facility Obligations, secured by a Lien on the asset or assets that were the subject of such Asset Sale, (4) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP or amount placed in an escrow account for purposes of such an adjustment and (5) escrowed amounts and amounts taken by the Company or its Restricted Subsidiaries as a reserve against liabilities associated with such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in accordance with GAAP; provided that (a) excess amounts set aside for payment of taxes pursuant to clause (2) above remaining after such taxes have been paid in full or the statute of limitations therefor has expired and (b) amounts escrowed or initially held in reserve pursuant to clause (5) no longer so held, will, in the case of each of subclauses (a) and (b), at that time become Net Proceeds.

"<u>Non-Recourse Debt</u>" means Indebtedness:

(1)      as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable (as a guarantor or otherwise) or (c) constitutes the lender;

(2)      no default with respect to which would permit, upon notice, lapse of time or both, any holder of any other Indebtedness of the Company or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment of such other Indebtedness to be accelerated or payable prior to its Stated Maturity; and

(3)      as to which (a) the explicit terms provide that there is no recourse against any assets of the Company or any of its Restricted Subsidiaries (other than Equity Interests of Unrestricted Subsidiaries) or (b) the lenders have been notified in writing that they will have no recourse to the stock or any assets of the Company or any of its Restricted Subsidiaries (other than Equity Interests of Unrestricted Subsidiaries).

"<u>Non-U.S. Person</u>" means a Person who is not a "U.S. person," as such term is defined in Regulation S.

"<u>Note Collateral</u>" means, collectively, all the property and assets (including Primary Collateral and Secondary Collateral) of the Company or any of the Guarantors that are from time to time subject to the Lien of the Collateral Documents, including the Liens, if any, required to be granted pursuant to this Indenture.

"<u>Note Collateral Covered Property</u>" means any property or assets other than real property acquired or owned by the Company or any Restricted Subsidiary that, at the time the Company or such Restricted Subsidiary acquires or first owns such property or assets, such property or assets automatically become subject to valid and perfected Note Liens already created pursuant to then existing Collateral Documents.

"<u>Note Collateral Non-Specified Covered Property</u>" means any Note Collateral Covered Property that is not After-Acquired Specified Property.

"<u>Note Collateral Required Date</u>" means, as to any additional property or assets required to be added to the Note Collateral, (i) if such property or assets are After-Acquired Property, the After-Acquired Property Required Date or (ii) otherwise, the date 30 days after the first date on which any provision of this Indenture or any Collateral Document requires such additional property or assets so to be added to the Note Collateral.

"<u>Note Guarantee</u>" has the meaning set forth in <u>Section 10.01</u>.

"<u>Note Lien</u>" means, to the extent securing Note Obligations, a Lien granted pursuant to a Collateral Document as security for Note Obligations.

"Note Obligations" means the Notes, the Note Guarantees and all other Obligations of any Obligor under this Indenture, the Note Guarantees and the Collateral Documents.

"Notes" means the 13% Senior Secured Notes due 2015 that are issued pursuant to this Indenture, as amended or supplemented from time to time in accordance with the terms hereof, including the Initial Notes, the Exchange Notes, any Additional Notes and any PIK Notes, all treated as a single class.

"Obligations" means all obligations for principal, premium, interest (including, with respect to the Notes, any interest accruing after the commencement of any bankruptcy, insolvency, or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"Obligors" means, as the context may require, the Company or the Guarantors.

"Offer Trigger Date" has the meaning set forth in Section 4.19.

"Offering" means the offering of the Initial Notes that are originally issued on the Issue Date in accordance with and pursuant to the Plan.

"Officer" means the Chief Executive Officer, the President, the Chief Financial Officer, the Chief Accounting and Compliance Officer, the Corporate Controller, any Senior Vice President or any Vice President of the Company.

"Officers' Certificate" means a certificate signed by two Officers of the Company, at least one of whom shall be the principal financial officer of the Company, and that meets the requirements of Section 11.05 and is delivered to the Trustee.

"Opinion of Counsel" means a written opinion of counsel who may be an employee of or counsel for the Trustee or the Company and shall be reasonably acceptable to the Trustee and that meets the requirements of Section 11.05.

"Paying Agent" has the meaning set forth in Section 2.03.

"Payment Default" has the meaning set forth in Section 6.01(f)(1).

"Permitted Business" means (1) the business of the Company and its Subsidiaries engaged in on the Issue Date and (2) any business or activity ancillary, reasonably related or complementary thereto.

"Permitted Collateral Liens" means (1) with respect to any Specified Collateral, Liens described in clauses (1), (4), (5), (8), (9), (10), (11), (12), (13) (solely to the extent (i) securing Permitted Refinancing Indebtedness incurred in exchange for, or to refund, refinance, replace, defease or discharge, Indebtedness that was secured by Liens permitted pursuant to clause (4) or (5) of the definition of "Permitted Liens" and (ii) on the same property and assets on which such other Liens were so permitted), (14), (16), (17), (20), (21) and (27) of the definition of "Permitted

Liens" or (2) with respect to any Note Collateral (other than Specified Collateral), any Permitted Liens.

"Permitted Debt" has the meaning set forth in Section 4.12.

"Permitted Holders" means each of the Backstop Purchasers, its Affiliates and its and its Affiliates' managed funds and accounts and (1) entities controlled by any such Persons, (2) trusts for the benefit of any such individual Persons or the spouses, issue, parents or other relatives of such individual Persons and (3) in the event of the death of any such individual Person, heirs or testamentary legatees of such Person. For purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Permitted Investments" means:

(1) any Investment by (a) the Company or a Restricted Subsidiary of the Company in the Company or a Guarantor so long as, to the extent such Investment includes any assets constituting Note Collateral of the Person making the Investment, such Investment does not occur until and unless the provisions of Section 4.28 (to the extent applicable to such Investment) have otherwise been complied with in respect of such assets, (b) the Company or a Guarantor (of assets other than Specified Collateral) in a Restricted Subsidiary of the Company that is not a Guarantor to the extent that the aggregate amount of all such Investments does not exceed $250,000 at any time outstanding or (c) a Restricted Subsidiary of the Company that is not a Guarantor in any other Restricted Subsidiary;

(2) any Investment in Cash Equivalents;

(3) any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary of the Company and a Guarantor; or

(b) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company that is a Guarantor;

so long as, in the case of clause (a) or (b), to the extent as a result of such Investment the Person making the Investment acquires or owns any After-Acquired Property, such Investment does not occur unless such After-Acquired Property has become Note Collateral prior to or simultaneously with the acquisition thereof and until and unless the provisions of Section 4.28 (to the extent applicable to such Investment) have otherwise been complied with respect to such After-Acquired Property;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.16;

(5)     any acquisition of assets or Capital Stock (including pursuant to any merger or consolidation of the Company in accordance with Section 5.01) solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(6)     any Investments received in compromise or resolution of (a) obligations of any Person or customer that were incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such Person; or (b) litigation, arbitration or other disputes with Persons who are not Affiliates;

(7)     Investments represented by deposits or other Liens in respect of Hedging Obligations permitted in accordance with clause (25) of the definition of "Permitted Liens";

(8)     other Investments (of assets other than Specified Collateral) in any Person other than an Affiliate of the Company having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (8) that are at the time outstanding, not to exceed $1,000,000;

(9)     to the extent permitted by applicable law, loans or advances to employees in the ordinary course of business for bona fide business purposes and not to exceed $250,000 in the aggregate at any time outstanding;

(10)    Investments constituting repurchases or acquisitions of the Notes;

(11)    Investments in existence on the Issue Date;

(12)    Investments represented by Guarantees that are otherwise permitted under this Indenture;

(13)    endorsements for collection or deposit in the ordinary course of business by any Person of bank drafts and similar negotiable instruments of any other Person received as payment for ordinary course of business trade receivables;

(14)    (a) lease, utility, worker's compensation, insurance, construction, performance and other similar deposits of cash or Cash Equivalents or other investment property provided to secure (or provided to secure letters of credit securing) obligations to third parties ("ordinary course deposits") to the extent such deposits are permitted pursuant to clause (6) of the definition of "Permitted Liens" and (b) prepaid expenses recorded as assets of such Person in accordance with GAAP ("GAAP prepaid expenses"), in each case if (but only if) such deposits or prepaid expenses arise in the ordinary course of business [no cap] [and, in addition, the amount of such Investments made pursuant to this clause (14), when added to the aggregate outstanding amount of Investments

constituting ordinary course deposits or GAAP prepaid expenses in existence on the Issue Date and made pursuant to clause (11) above, does not exceed $__.0 million in the aggregate at any time outstanding];

(15)     receivables (including pursuant to extensions of trade credit) arising in the ordinary course of business; provided, however, that such receivables would be recorded as assets of such Person in accordance with GAAP; and

(16)     deposit of cash or Cash Equivalents or other investment property constituting Secondary Collateral to secure Credit Facility Obligations under the ABL Facility in an amount not to exceed $5,000,000;

provided, however, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of such Investment to one or more of the above clauses (1) through (16) so that all or a portion of such Investment would be a Permitted Investment.

In connection with any assets or property contributed or transferred to any Person as an Investment, such property and assets shall be equal to the Fair Market Value at the time of Investment. The amount of Investments outstanding at any time pursuant to clause (8) shall be reduced by an amount equal to the net reduction in Investments by the Company and its Restricted Subsidiaries, subsequent to the date of the Indenture, resulting from repayments of loans or advances or other transfers of assets, in each case, to the Company or any such Restricted Subsidiary from any such Investment, or from the net cash proceeds from the sale of any such Investment, or from a redesignation of an Unrestricted Subsidiary to a Restricted Subsidiary, not to exceed, in the case of any Investment, the amount of the Investment previously made by the Company or any of its Restricted Subsidiaries in such Person or Unrestricted Subsidiary.

"Permitted Liens" means:

(1)     Liens created for the benefit of (or to secure) the Notes or the Note Guarantees;

(2)     Credit Facility Liens on Secondary Collateral;

(3)     Liens in favor of the Company or the Guarantors (not securing Credit Facility Obligations);

(4)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Company or any Restricted Subsidiary of the Company; provided that such Liens were in existence prior to, and not incurred in contemplation of, such merger or consolidation and do not extend to any assets other than those assets of the Person merged into or consolidated with the Company or such Restricted Subsidiary that were so subject to such Liens;

(5)     Liens on property (including Capital Stock) existing at the time of acquisition of the property, including by way of merger, consolidation or otherwise, by the Company or any Restricted Subsidiary of the Company; provided that such Liens

were in existence prior to, and not incurred in contemplation of, such acquisition and do not extend to any other assets owned by the Company or any Restricted Subsidiary;

(6)     Liens on cash or Cash Equivalents or other investment property provided to secure (or to secure letters of credit securing) the performance of statutory obligations (including obligations under worker's compensation, unemployment insurance or similar legislation), surety or appeal bonds, leases, utility agreements, insurance agreements, construction agreements, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(7)     Liens existing on the Issue Date (other than pursuant to the Aurora West Kiewit Mortgage or the Indiana Port Lease Agreement or clause (2) or (3) of this definition);

(8)     Liens granted on the Issue Date on the Aurora West Real Property to secure the Aurora West Kiewit Note pursuant to the Aurora West Kiewit Mortgage;

(9)     (i) at any time prior to the Indiana Port Leasehold Required Mortgage Date, the Lien in favor of the Indiana Port Lessor pursuant to the Indiana Port Lease Agreement on any Indiana Port Lease Collateral securing the obligations of the Indiana Port Lessee under the Indiana Port Lease Agreement or (ii) on or after the Indiana Port Leasehold Required Mortgage Date, the Lien in favor of the Indiana Port Lessor pursuant to the Indiana Port Lease Agreement on any Indiana Port Lease Collateral securing the obligations of the Indiana Port Lessee under the Indiana Port Lease Agreement if (but only if) (x) the Indiana Port Leased Premises on which such Indiana Port Lease Collateral is located is subject to a Mortgage securing the Note Obligations, (y) such Indiana Port Lease Collateral constitutes Note Collateral and (z) such Lien is subordinated to the Lien of the Collateral Documents (including such Mortgage) in accordance with the terms of the Indiana Port Lease Agreement;

(10)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(11)     Liens imposed by law (such as carriers', warehousemen's and mechanics' Liens), Liens imposed by law in favor of sellers of farm products and Liens of landlords imposed by law securing obligations to pay lease amounts, in each case, that are not due and payable or in default or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded, in each case, incurred in the ordinary course of business;

(12)     survey exceptions, encumbrances, restrictions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that, in each case, were not incurred in connection with Indebtedness and

that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(13)    Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under this Indenture; provided, however, that:

(a)    the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged (plus improvements and accessions to such property or proceeds or distributions thereof); and

(b)    the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (i) the outstanding principal amount (or accreted value, if applicable) or, if greater, the committed amount of the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged and (ii) an amount necessary to pay all accrued interest on such Indebtedness and any fees and expenses, including premiums and tender and defeasance costs, related to such exchange, refunding, refinancing, replacement, defeasance or discharge;

(14)    Liens arising pursuant to an order of attachment, condemnation, eminent domain, distraint or similar legal process arising in connection with legal proceedings and any Liens that are required to protect or enforce rights in any administrative, arbitration or other court proceedings in the ordinary course of business, in each case, not giving rise to an Event of Default;

(15)    pledges of Equity Interests of an Unrestricted Subsidiary securing Non-Recourse Debt of such Unrestricted Subsidiary;

(16)    any Lien on property (real or personal), plant or equipment, all or any part of the purchase price or cost of design, development, construction, installation or improvement of which was financed by Indebtedness permitted to be incurred pursuant to clause (4) of the second paragraph of Section 4.12 solely to the extent securing such Indebtedness;

(17)    leases or  subleases granted to others that do not materially interfere with the ordinary course of business of the Company and its Restricted Subsidiaries, taken as a whole, so long as the aggregate Fair Market Value of all Specified Collateral subject to such Liens pursuant to this clause (17) does not exceed $500,000;

(18)    bankers' Liens, rights of setoff and similar Liens with respect to cash and Cash Equivalents on deposit in one or more bank accounts in the ordinary course of business;

(19)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the products and proceeds thereof, so long as the aggregate amount of obligations secured by

Liens incurred pursuant to this <u>clause (19)</u> does not exceed $1.0 million at any one time outstanding;

(20)     Liens on goods imported by the Company or any Restricted Subsidiary in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of such goods;

(21)     Liens consisting of conditional sale, title retention, consignment or similar arrangements for the sale of goods acquired by the Company or any of its Restricted Subsidiaries in the ordinary course of business in accordance with the past practices of the Company and its Restricted Subsidiaries prior to the Issue Date so long as the aggregate Fair Market Value of all Specified Collateral subject to such Liens pursuant to this <u>clause (21)</u> does not exceed $500,000;

(22)     Liens securing insurance premium financing arrangements, <u>provided</u> that such Lien is limited to the applicable insurance contracts;

(23)     Liens arising from filing Uniform Commercial Code financing statements regarding operating leases;

(24)     any interest or title of a lessor, licensor or sublicensor in property leased, licensed or sublicensed to the Company or any Restricted Subsidiary pursuant to any lease, license or sublicense not constituting Indebtedness;

(25)     Liens encumbering customary initial deposits and margin deposits and other Liens on cash or Cash Equivalents or other investment property that are within the general parameters customary in the industry and incurred in the ordinary course of business, in each case, securing Indebtedness under Hedging Obligations designed solely to protect the Company or any of its Restricted Subsidiaries from fluctuations in interest rates, currencies or the price of commodities;

(26)     Liens incurred in the ordinary course of business of the Company or any Subsidiary of the Company with respect to obligations that do not exceed $1,000,000 at any one time outstanding; and

(27)     Liens incurred in the ordinary course of business of the Company or any Subsidiary of the Company with respect to obligations that do not secure Indebtedness and that do not exceed $1,000,000 at any one time outstanding.

"<u>Permitted Refinancing Indebtedness</u>" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to refund, refinance, replace, defease or discharge, other Indebtedness of the Company or any of its Restricted Subsidiaries (other than Intercompany Debt); <u>provided</u> that:

(1)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness exchanged, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on such Indebtedness and the amount of all fees and

expenses, including premiums and tender and defeasance costs, incurred in connection therewith);

      (2)     such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged (or, if shorter, has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Notes);

      (3)     if the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Notes or any Note Guarantee, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Notes or such Note Guarantee, as the case may be, on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged; and

      (4)     such Indebtedness has the Company or any Restricted Subsidiary of the Company as an obligor (whether as borrower, guarantor or otherwise) only if the Company or such Restricted Subsidiary is an obligor (in any capacity) on the Indebtedness being exchanged, refunded, refinanced, replaced, defeased or discharged.

    "<u>Person</u>" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

    "<u>Physical Notes</u>" has the meaning set forth in <u>Section 2.14(b)</u>.

    "<u>PIK Interest</u>" means the portion of an installment of interest due on an Interest Payment Date payable by issuance of PIK Notes as and to the extent provided for in <u>Section 4.01(d)</u>.

    "<u>PIK Interest Amount</u>" means, with respect to any Interest Payment Date for any Note that is prior to the Maturity thereof and with respect to which the Company has duly made a PIK Interest Election, the portion of the aggregate installment of interest due and payable on such Interest Payment Date that is payable on such Interest Payment Date by issuance of PIK Notes in accordance with the fourth paragraph of <u>Section 2.02</u>, such portion being 7/15 of such aggregate installment of interest.

    "<u>PIK Interest Election</u>" means, with respect to any Interest Payment Date, an election by the Company duly given pursuant to <u>Section 4.01(c)</u> not to pay the entire amount of interest due on the Notes on such Interest Payment Date in cash.

    "<u>PIK Notes</u>" means Notes issued (including by any increase in the principal amount of any outstanding Global Note previously authenticated hereunder) on any Interest Payment Date pursuant to the fourth paragraph of <u>Section 2.02</u> in payment of the portion of the aggregate

installment of interest due and payable on any Notes on such Interest Payment Date constituting the PIK Interest Amount with respect to such Interest Payment Date for such Notes.

"Plan" means that certain Joint Plan of Reorganization filed by the Company and its affiliates on December 4, 2009 in the United States Bankruptcy Court for the District of Delaware, as amended or supplemented from time to time prior to entry of the Confirmation Order, including any exhibits, supplements, annexes, appendices and schedules thereto, as confirmed by such Bankruptcy Court pursuant to the Confirmation Order.

"Primary Collateral" means the "Indenture Exclusive Collateral" as defined in the Intercreditor Agreement.

"Primary Collateral Asset Sale" means an Asset Sale consisting of the disposition of assets constituting Primary Collateral (including the disposition of Capital Stock of a Subsidiary which results in the disposition of assets constituting Primary Collateral); provided that if an Asset Sale results in the disposition of assets constituting Primary Collateral and Secondary Collateral, the term "Primary Collateral Asset Sale" shall be limited to the portion of the Note Collateral so disposed of that constitutes Primary Collateral.

"Primary Collateral Liens" means Note Liens on Primary Collateral.

"principal" of any Indebtedness (including the Notes) means the principal amount (or accreted value, as the case may be) of such Indebtedness.

"Private Placement Legend" means the legend initially set forth on the Notes in the form set forth in Exhibit D.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Record Date" means any of the record dates specified in the Notes, whether or not a Legal Holiday.

"Redemption Date" means, when used with respect to any Note to be redeemed, the date fixed for redemption of such Note pursuant to this Indenture and the Notes.

"Redemption Price" means, when used with respect to any Note to be redeemed, the price fixed for redemption of such Note pursuant to this Indenture and the Notes.

"Register" has the meaning set forth in Section 2.03.

"Registrar" has the meaning set forth in Section 2.03.

"Registration Rights Agreement" means (a) the Registration Rights Agreement, dated as of the Issue Date, among the Company, the Guarantors and the Initial Purchasers, as the same may be amended or supplemented from time to time in accordance with the terms thereof and (b) any registration rights agreement among the Company, the Guarantors and the other parties thereto in connection with the issuance of Additional Notes.

"Regulation S" means Regulation S under the Securities Act.

"Regulation S Global Note" has the meaning set forth in Section 2.01.

"Repurchase Offer" has the meaning set forth in Section 4.19.

"Repurchase Offer Payment Date" has the meaning set forth in Section 4.19.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payments" has the meaning set forth in Section 4.10.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Security" has the meaning assigned to such term in Rule 144(a)(3) under the Securities Act and shall include any Note bearing the Private Placement Legend; provided that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Note constitutes a Restricted Security. Any Note issued (i) subject to Section 2.15(c), upon the transfer, exchange or replacement of any Restricted Security and (ii) any Note issued as a PIK Note in payment of interest due and payable on any Restricted Security, shall, in each case, constitute a "Restricted Security"; provided, however, that any Note issued upon the transfer, exchange or replacement of any Restricted Security that no longer bears (or, pursuant to Section 2.15(c), is no longer required to bear) a Private Placement Legend shall cease to (and shall not) be a Restricted Security.

"Restricted Subsidiary" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary.

"Rule 144A" means Rule 144A under the Securities Act.

"Rule 144A Global Notes" has the meaning set forth in Section 2.01.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, and its successors.

"Sale and Leaseback Transaction" means a transaction whereby a Person sells or otherwise transfers assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or otherwise transferred.

"SEC" means the Securities and Exchange Commission.

"Secondary Collateral" means "Second Lien Collateral" as defined in the Intercreditor Agreement.

"Secured Parties" means, collectively, the Collateral Agent, the Trustee and the Holders.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute or statutes thereto, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the Security Agreement, dated as of the Issue Date, made by the Company and the Guarantors in favor of the Collateral Agent, as amended or supplemented from time to time in accordance with its terms and the terms hereof.

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X under the Securities Act, as such Regulation is in effect on the Issue Date.

"Specified Assets" means any real property (including any real property leasehold interest) or equipment.

"Specified Collateral" means any Note Collateral comprising Specified Assets.

"Stated Maturity" means (a) with respect to any series of Indebtedness, the date specified in the documentation governing such Indebtedness as of the date such documentation was entered into as the fixed date on which the final installment of principal of such Indebtedness is due and payable and (b) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified in the documentation governing such Indebtedness as of the date such documentation was entered into as the fixed date on which such installment is due and payable and, in each case, will not include any contingent obligations to repay, redeem or repurchase any such installment of interest or principal prior to the date originally scheduled for the payment thereof.

"Subordination Agreement" means that certain Intercompany Subordination Agreement, dated the Issue Date, among the Company, the Guarantors and the Collateral Agent, as amended or supplemented from time to time, in accordance with its terms and the terms hereof (including Section 4.27).

"Subsidiary" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)     any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

"TIA" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as amended, as in effect on the Issue Date.

"Trust Officer" means any officer of the Trustee assigned by the Trustee to administer this Indenture or, in the case of a successor trustee, an officer assigned to the department, division or group performing the corporation trust work of such successor and assigned to administer this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"Unrestricted Subsidiary" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1)     has no Indebtedness other than Non-Recourse Debt;

(2)     except as permitted by Section 4.11, is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3)     is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve specified levels of operating results;

(4)     has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries;

(5)     does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any asset or property of, the Company or any Restricted Subsidiary of the Company and does not own any Note Collateral and has no Subsidiaries other than Unrestricted Subsidiaries; and

(6)     would constitute an Investment which the Company could make in compliance with Section 4.10.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.10. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date

under Section 4.12, the Company will be in default of such Section 4.12. The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided that such designation will be deemed to be an incurrence by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary and such designation will only be permitted if (i) such Indebtedness is permitted under Section 4.12, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period and (ii) no Default or Event of Default would be in existence following such designation.

"U.S. Government Obligations" means non-callable direct obligations of, and non-callable obligations guaranteed by, the United States of America for the payment of which the full faith and credit of the United States of America is pledged.

"U.S. Legal Tender" means such coin or currency of the United States of America which, as at the time of payment, shall be immediately available legal tender for the payment of public and private debts.

"U.S. Person" means a "U.S. person," as such term is defined in Regulation S.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1) the sum of the product obtained by multiplying (1) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect of the Indebtedness, by (2) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Restricted Subsidiary" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required by applicable law) will at the time be owned by such Person or by one or more Wholly-Owned Restricted Subsidiaries of such Person or by such Person and one or more Wholly-Owned Restricted Subsidiaries of such Person.

SECTION 1.02    Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the TIA, such provision is incorporated by reference in, and made a part of, this Indenture. The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes.

"indenture security holder" means a Holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the indenture securities means the Company or any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule and not otherwise defined herein have the meanings assigned to them therein.

SECTION 1.03      Rules of Construction.

Unless the context otherwise requires:

(a)      a term has the meaning assigned to it;

(b)      an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)      "or" is not exclusive;

(d)      words in the singular include the plural, and words in the plural include the singular;

(e)      "herein", "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(f)      when the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation";

(g)      all references to "interest" in this Indenture in respect of any Note shall include any Additional Interest due on such Note pursuant to the terms of the applicable Registration Rights Agreement;

(h)      all references to Sections or Articles refer to Sections or Articles of this Indenture unless otherwise indicated;

(i)      solely for the purposes of Section 4.12, all obligations with respect to redemption, repayment or other repurchase of any Disqualified Stock of any Person and the amount of the liquidation preference of any preferred stock of such Person shall be deemed "Indebtedness" of such Person and the amount thereof outstanding at any time shall be (a) in the case of Disqualified Stock, as specified in the last sentence of the definition thereof or (b) in the case of preferred stock, (1) the maximum liquidation value of such preferred stock or (2) the maximum mandatory redemption or mandatory repurchase price with respect to such preferred stock, whichever is greater;

(j)     provisions apply to successive events and transactions; and

(k)     references to sections of or rules under the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time.

## ARTICLE TWO

## THE NOTES

SECTION 2.01     Form and Dating.

The Initial Notes and the Additional Notes and the Trustee's certificate of authentication thereon shall be substantially in the form of Exhibit A hereto. The Exchange Notes and the Trustee's certificate of authentication thereon shall be substantially in the form of Exhibit B hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or Depository rule or usage. The Company shall approve the form of the Notes and any notation, legend or endorsement on them. Each Note shall be dated the date of its authentication.

The terms and provisions contained in the forms of the Notes annexed hereto as Exhibit A and Exhibit B shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Company, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

Notes offered and sold in reliance on Rule 144A shall be issued initially in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A hereto (the "Rule 144A Global Notes"), deposited with the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in Exhibit C.

Notes offered and sold to Accredited Investors in reliance on Rule 501(a) under the Securities Act shall be issued initially in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A (the "AI Global Notes"), deposited with the Trustee, as custodian for the Depository, duly executed by the Company and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in Exhibit C.

Notes offered and sold in offshore transactions in reliance on Regulation S shall be issued in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A (a "Regulation S Global Note") deposited with the Trustee, as custodian for the Depository, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Company and authenticated by the Trustee as hereinafter provided and shall bear the legend set forth in Exhibit C.

The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Global Note that are held by participants through Euroclear or Clearsteam. Rule 144A Global Notes, AI Global Notes, Regulation S Global Notes and Exchange Notes issued in global form are referred to collectively as the "Global Notes."

The aggregate principal amount of any Global Note may from time to time be increased or decreased by adjustments made on the records of the Registrar and simultaneous notation by the Trustee, as custodian forof the Depository, of such increase or decrease on the schedule to such Global Note, all as hereinafter provided.

The definitive Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any securities exchange on which the Notes may be listed, all as determined by the Officers executing such Notes, as evidenced by their execution of such Notes.

SECTION 2.02        Execution and Authentication; Aggregate Principal Amount.

An Officer (who shall have been duly authorized by all requisite corporate actions) shall sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note was an Officer at the time of such execution but no longer holds that office or position at the time the Trustee authenticates the Note, the Note shall nevertheless be valid.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence, and the only evidence, that the Note has been authenticated under this Indenture.

The Trustee shall authenticate (a) Initial Notes for original issue in the aggregate principal amount not to exceed $105,000,000, (b) Exchange Notes from time to time for issue only pursuant to a Registration Rights Agreement in exchange for a like principal amount of Initial Notes or Additional Notes, and (c) subject to compliance with Section 4.12, one or more series of Additional Notes for original issue after the Issue Date in an aggregate principal amount not to exceed $50,000,000, in each case upon a written order of the Company in the form of an Officers' Certificate (an "Authentication Order"), which Authentication Order shall, in the case of any issuance of Additional Notes, certify that such issuance is in compliance with Section 4.12. In addition, each such Authentication Order shall specify the amount of Notes to be authenticated and the date on which the Notes are to be authenticated, whether the Notes are to be Initial Notes, Exchange Notes or Additional Notes. Upon the Trustee's receipt of an Authentication Order for authentication of PIK Notes to be delivered to Holders of the Notes on an Interest Payment Date prior to Maturity of such Notes in satisfaction of the portion of the aggregate installment of interest due and payable on such Notes on such Interest Payment Date constituting the PIK Interest Amount with respect to such Interest Payment Date for such Notes, the Trustee shall authenticate for original issue additional Notes constituting PIK Notes (or increase the principal amount of any Global Notes previously authenticated hereunder) in an

aggregate principal amount equal to such PIK Interest Amount with respect to such Interest Payment Date for such Notes, all as specified in such Authentication Order. Each such Authentication Order shall specify the respective amount of the additional Notes constituting PIK Notes to be authenticated or principal amount of Global Notes previously authenticated to be increased and the Interest Payment Date on which the additional Notes constituting PIK Notes are to be authenticated or the principal amount of Global Notes is to be increased. On any Interest Payment Date on which the Company pays PIK Interest on any Notes by increasing the principal amount of any Global Note previously authenticated hereunder, the Trustee shall increase the principal amount of such Global Note by an amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up to the nearest $1.00, to the credit of the Holders of such Notes as of the relevant Record Date for such Interest Payment Date, pro rata in accordance with their interests, and an adjustment shall be made on the books and records of the ~~Trustee~~Registrar with respect to such Global Note by the ~~Trustee or the Custodian~~Registrar to reflect such increase. On any Interest Payment Date on which the Company pays PIK Interest on any Notes by issuing additional Notes constituting PIK Notes, the Trustee shall deliver to the Holders of such Notes as of the relevant Record Date for such Interest Payment Date additional Notes constituting PIK Notes having an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, with the principal amount thereof rounded up to the nearest $1.00.

The Company shall deliver to the Trustee an Authentication Order requesting the Trustee to authenticate, and, upon receipt of such Authentication Order, the Trustee shall authenticate, Notes upon exchange for other Notes in accordance with Sections 2.14(e), 3.07, 4.15, 4.19 or 9.05.

At the same time as the Registrar registers on its records an increase or decrease in the principal amount of any Global Note, the Trustee, as custodian for the Depository, shall notate such increase or decrease on the schedule of increases or decreases to such Global Note.

All Notes issued under this Indenture shall vote and consent together on all matters as one class and no series of Notes shall have the right to vote or consent as a separate class on any matter.

The Trustee may appoint an authenticating agent (the "Authenticating Agent") reasonably acceptable to the Company to authenticate Notes. Unless otherwise provided in the appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such Authenticating Agent. An Authenticating Agent has the same rights as an Agent to deal with the Company and Affiliates of the Company.

The Notes shall be issuable in fully registered form only, without coupons, in denominations of $2,000 in principal amount and any integral multiple of $1,000 in excess of $2,000, subject to the payment of interest on any Notes on any Interest Payment Date by issuance of PIK Notes, in which case the aggregate principal amount of Global Notes previously authenticated hereunder may be increased by, or additional Notes constituting PIK Notes may be

issued in, an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up the nearest $1.00.

Each PIK Note is an additional obligation of the Company and shall be governed by, and entitled to the benefits of, this Indenture and shall be subject to the terms of this Indenture, shall rank *pari passu* with and be subject to the same terms (including the rate of interest from time to time payable thereon) as all other Notes (except, as the case may be, with respect to the issue date).

SECTION 2.03     Registrar and Paying Agent.

The Company shall maintain an office or agency which shall initially be the office of the Trustee in [•], c/o Wilmington Trust Company, Corporate Capital Markets - OAS, 301 West 11th Street, c/o 1100 North Market Street, Wilmington, DE 19801, where (a) Notes may be presented or surrendered for registration of transfer or for exchange (the "Registrar") and (b) Notes may be presented or surrendered for payment (the "Paying Agent").  The Registrar shall keep a register (the "Register") of the Notes and of their transfer and exchange.  The Company, upon prior written notice to the Trustee, may have one or more co-Registrars and one or more additional Paying Agents reasonably acceptable to the Trustee.  The Company may change the Paying Agent or Registrar without prior notice to the Holders.  The term "Paying Agent" includes any additional Paying Agent and the term "Registrar" includes any additional Registrar. The Company or any Affiliate of the Company may act as Paying Agent or Registrar.

The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee in writing, in advance, of the name and address of any such Agent.  If the Company fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such, as shall be entitled to appropriate compensation therefor, pursuant to Section 7.07.

The Company initially appoints the Trustee as Registrar, Paying Agent and agent for service of demands and notices in connection with the Notes.  The Paying Agent or Registrar may resign upon thirty (30) days' written notice to the Company.

The Company appoints The Depository Trust Company as DepositaryDepository.

SECTION 2.04     Obligations of Paying Agent.

The Company shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold in trust for the benefit of the Holders or the Trustee all assets held by the Paying Agent for the payment of principal of, or interest on, the Notes (whether such assets have been distributed to it by the Company or any other obligor on the Notes), and the Paying Agent shall promptly notify the Trustee in writing of any Default by the Company (or any other obligor on the Notes) in making any such payment.  The Company at any time may require a Paying Agent to distribute all assets held by it to the Trustee and account for any assets disbursed and the Trustee may at any time during the continuance of any payment Default, upon

written request to a Paying Agent, require such Paying Agent to distribute all assets held by it to the Trustee and to account for any assets distributed.  Upon receipt by the Trustee of all assets that shall have been delivered by the Company to the Paying Agent, the Paying Agent shall have no further liability for such assets.  If the Company or one of its Subsidiaries acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all assets held by it as Paying Agent.

SECTION 2.05        Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Holders and shall otherwise comply with TIA Section 312(b).  If the Trustee is not the Registrar, the Company shall furnish or cause the Registrar to furnish to the Trustee before each Record Date and at such other times as the Trustee may request in writing a list as of such date and in such form as the Trustee may reasonably request of the names and addresses of the Holders, which list may be conclusively relied upon by the Trustee.

SECTION 2.06        Transfer and Exchange.

Subject to the provisions of Sections 2.14 and 2.15, when Notes are presented to the Registrar or a co-Registrar with a request to register the transfer of such Notes or to exchange such Notes for an equal principal amount of Notes of other authorized denominations, the Registrar or co-Registrar shall register the transfer or make the exchange as requested; provided, however, that the Notes presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Company and the Registrar or co-Registrar, duly executed by the Holder thereof or such Holder's attorney duly authorized in writing, and such other documents as the Registrar or Co-Registrar may reasonably require.  To permit registrations of transfers and exchanges, the Company shall execute, issue and deliver and the Trustee shall authenticate Notes at the Registrar's or co-Registrar's request.  No service charge shall be made for any registration of transfer or exchange, but the Company or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchanges pursuant to ~~Section~~Sections 2.10, 2.14, 3.07, 4.15, 4.19 or 9.05 not involving any transfer, in which event the Company shall be responsible for the payment of such taxes).  All Notes issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture and the Note Guarantees, as the Notes surrendered upon such registration of transfer or exchange.

The Registrar or co-Registrar shall not be required to register the transfer or exchange of any Note (a) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (b) selected for redemption in whole or in part pursuant to Article Three, except the unredeemed portion of any Note being redeemed in part.

Any Holder of a Global Note shall, by acceptance of such Global Note, agree that transfers of beneficial interests in such Global Note may be effected only through the Depository, in accordance with this Indenture and the Applicable Procedures.

SECTION 2.07      Replacement Notes.

If a mutilated Note is surrendered to the Trustee or if the Holder of a Note claims in writing that the Note has been lost, destroyed or wrongfully taken, then, in the absence of written notice to the Company or the Trustee that such Note has been acquired by a protected purchaser, the Company shall execute, issue and deliver and the Trustee shall authenticate a replacement Note of like tenor and principal amount and bearing a number not contemporaneously outstanding if the Trustee's requirements are met.  Except with respect to mutilated Notes, if required by the Trustee or the Company, such Holder must provide an affidavit of lost certificate and an indemnity bond or other indemnity, sufficient in the judgment of both the Company and the Trustee, to protect the Company, the Trustee or any Agent from any loss which any of them may suffer if a Note is replaced.  The Company may charge such Holder for the Company's reasonable out-of-pocket expenses in replacing a Note, including reasonable fees and expenses of its counsel and of the Trustee and its counsel.  In case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Company in its discretion may pay such Note instead of issuing a new Note in replacement thereof.  Every replacement Note shall constitute an additional obligation of the Company, entitled to the benefits of this Indenture, subject to Section 2.08.

SECTION 2.08      Outstanding Notes.

Notes outstanding at any time are all the Notes that have been authenticated by the Trustee except those cancelled by it, those delivered to it for cancellation and those described in this Section 2.08 as not outstanding.  Subject to the provisions of Section 2.09, a Note does not cease to be outstanding because the Company or any of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.07 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.  A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.07.

If on a Redemption Date or the Maturity Date the Paying Agent holds U.S. Legal Tender or U.S. Government Obligations sufficient to pay all of the principal and interest due on the Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

SECTION 2.09      Treasury Notes; When Notes Are Disregarded.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver, consent or notice, Notes owned by the Company or any of its Affiliates shall be considered as though they are not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which a Trust Officer of the Trustee actually knows are so owned shall be so

considered. Notes so owned which have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Company or any other obligor upon the Notes or any Affiliate of the Company or of such other obligor.

The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes (including any outstanding PIK Notes issued (including by any increase in the principal amount of any Global Note previously authenticated) hereunder) outstanding at such date of determination (as determined in accordance with this Section 2.09 and Section 2.08). With respect to any matter requiring consent, waiver, approval or other action of the Holders of a specified percentage of the principal amount of all the Notes then outstanding, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes held by Holders that have so consented by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with this Section 2.09 and Section 2.08. Any such calculation made pursuant to this Section 2.09 shall be made by the Company and delivered to the Trustee pursuant to an Officers' Certificate.

SECTION 2.10        Temporary Notes.

Until definitive Notes are ready for delivery, the Company may prepare and execute and deliver and the Trustee shall authenticate temporary Notes upon receipt of a written order of the Company in the form of an Officers' Certificate. The Officers' Certificate shall specify the amount of temporary Notes to be authenticated and the date on which the temporary Notes are to be authenticated. Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Company considers appropriate for temporary Notes. Without unreasonable delay, the Company shall execute and deliver and the Trustee shall authenticate upon receipt of a written order of the Company pursuant to Section 2.02 definitive Notes in exchange for temporary Notes. Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as definitive Notes.

SECTION 2.11        Cancellation.

The Company at any time may deliver Notes previously authenticated hereunder which the Company has acquired in any lawful manner to the Trustee for cancellation. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment. The Trustee, or at the direction of the Trustee, the Registrar or the Paying Agent, and no one else, shall cancel all Notes surrendered for transfer, exchange, payment or cancellation. Subject to Section 2.07, the Company may not issue new Notes to replace Notes that it has paid or delivered to the Trustee for cancellation. If the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11. The Trustee shall dispose of all cancelled Notes in accordance with the Trustee's customary procedures.

SECTION 2.12      CUSIP Numbers.

A "CUSIP" number shall be printed on the Notes, and the Trustee shall use the CUSIP number in notices of redemption, purchase or exchange as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes and that reliance may be placed only on the other identification numbers printed on the Notes.  The Company shall promptly notify the Trustee of any change in the CUSIP number.

SECTION 2.13      Deposit of Moneys.

Prior to 12:00 p.m. (noon) New York, New York time on each Interest Payment Date and the Maturity Date, the Company shall deposit with the Paying Agent U.S. Legal Tender sufficient to make payments, if any, of any principal, premium and interest (other than any interest payable as PIK Interest on such Interest Payment Date in accordance with Section 4.01(d)) due on such Interest Payment Date or the Maturity Date, as the case may be.

SECTION 2.14      Book-Entry Provisions for Global Notes.

(a)      The Global Notes initially shall (1) be registered in the name of the Depository or the nominee of such Depository, (2) be delivered to the Trustee as custodian for such Depository and (3) bear legends as set forth in Exhibit C.  Members of, or participants in, the Depository ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depository, or the Trustee as its custodian, or under any Global Note, and the Depository may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of the Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)      Transfers of the Global Notes shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees.  Interests of beneficial owners in the Global Notes may be transferred or exchanged in accordance with the Applicable Procedures of the Depository and the provisions of Section 2.15, provided, however, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser).  In addition, Notes in the form of certificated Notes in registered form in substantially the form set forth in Exhibit A hereto (the "Physical Notes") shall be transferred to all beneficial owners in exchange for their beneficial interests in the Global Notes if (1) either (x) the Depository notifies the Company that it is unwilling or unable to continue as Depository for the Global Notes or (y) at any time such Depository ceases to be a "clearing agency" registered under the Exchange Act and in either case a successor Depository is not appointed by the Company within ninety (90) days of such notice or (2) a Default or

Event of Default has occurred and is continuing and the Trustee has received a request from the Depository; provided that a beneficial interest in the Regulation S Global Note may not be exchanged for a Physical Note or transferred to a Person who takes delivery thereof in the form of a Physical Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of ~~any certificates required~~a certification, pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act (except in the case of a Distributor as defined in Rule 902(d) under the Securities Act), of beneficial ownership of the Notes by a non-U.S. Person or a U.S. Person who purchased the Notes in a transaction that did not require registration under the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(c)     Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of a beneficial interest in another Global Note shall, upon transfer, cease to be a beneficial interest in such first Global Note and become a beneficial interest in such other Global Note and shall thereafter be subject to all transfer restrictions, if any, and other procedures applicable to a beneficial interest in such other Global Notes for as long as it remains such an interest.

(d)     In connection with any transfer or exchange of a portion of the beneficial interest in the Global Note to beneficial owners pursuant to clause (b), the Registrar shall (if one or more Physical Notes are to be issued) reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Company shall execute and deliver, and the Trustee shall authenticate, one or more Physical Notes of like tenor and aggregate principal amount.

(e)     In connection with the transfer of an entire Global Note to beneficial owners pursuant to clause (b), the Global Note shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute and deliver, and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate, to each beneficial owner identified by the Depository in exchange for its beneficial interest in the Global Note, an equal aggregate principal amount of Physical Notes of authorized denominations.

(f)     Any Physical Note constituting a Restricted Security delivered in exchange for an interest in the Global Note pursuant to clause (b), except as otherwise provided by clauses (a)(1)(i) and (c) of Section 2.15, shall bear the legend regarding transfer restrictions applicable to the Physical Notes set forth in Exhibit A.

(g)     The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

SECTION 2.15        <u>Special Transfer Provisions.</u>

(a)        <u>Transfers to Non-QIB Accredited Investors and Non-U.S. Persons</u>. The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to any Accredited Investor which is not a QIB or to any Non-U.S. Person:

(1)        the Registrar shall register the transfer of any Physical Note constituting a Restricted Security which after transfer is to be evidenced by a Physical Note, whether or not such Note bears the Private Placement Legend, upon surrender of such Physical Note to the Registrar, if (i) the requested transfer is after the date one year after the Issue Date or (ii) (A) in the case of a transfer to an Accredited Investor which is not a QIB (excluding Non-U.S. Persons), the proposed transferee has delivered to the Registrar a certificate substantially in the form of <u>Exhibit E</u> hereto or (B) in the case of a transfer to a Non-U.S. Person, the proposed transferor has delivered to the Registrar a certificate substantially in the form of <u>Exhibit F</u> hereto, whereupon the Registrar shall reflect on its books and records the date and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount and the Trustee shall cancel the Physical Notes so transferred; or

(2)        if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee is an Agent Member who will hold a beneficial interest in a Global Note, the Registrar shall register such transfer upon receipt of (i) the certificate, if any, required by <u>clause (1)</u> above and (ii) instructions given in accordance with the Applicable Procedures and the Registrar's procedures, whereupon the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred and a corresponding increase in the Global Note to which such beneficial interest is transferred; or

(3)        if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee's interest will be evidenced by a Physical Note, the Registrar shall register such transfer upon receipt of (i) the certificate, if any, required by <u>clause (1)</u> above and (ii) instructions given in accordance with the Applicable Procedures and the Registrar's procedures, whereupon the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount; or

(4)        if the proposed transferee is an Agent Member and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in a Global Note, the Registrar shall register such transfer upon surrender of such Physical Note to the Registrar, upon receipt of (i) the certificate,

if any, required by underline clause (1) above and (ii) instructions given in accordance with the Applicable Procedures and the Registrar's procedures, whereupon the Registrar shall reflect on its books and records the date and an increase in the principal amount of such Global Note in an amount equal to the principal amount of the Physical Notes to be transferred and the Trustee shall cancel the Physical Notes so transferred.

(b) _Transfers to QIBs_. The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to a QIB (excluding transfers to Non-U.S. Persons):

(1) The Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A.

(2) Subject to compliance with clause (1) above, if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by an interest in the Global Note, upon surrender of such Physical Note to the Registrar, upon receipt by the Registrar of instructions given in accordance with the Applicable Procedures and the Registrar's procedures, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Global Note in an amount equal to the principal amount of the Physical Notes to be transferred, and the Trustee shall cancel the Physical Notes so transferred.

(3) Subject to compliance with clause (1) above, if the Notes to be transferred consist of Physical Notes which after transfer are to be evidenced by Physical Notes, upon the surrender of such Physical Notes to the Registrar, the Registrar shall reflect on its books and records the date and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount and the Trustee shall cancel the Physical Notes to be transferred.

(4) Subject to compliance with clause (1) above, if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee is an Agent Member who will hold a beneficial interest in

a Global Note, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred and a corresponding increase in the Global Note to which such beneficial interest is transferred.

(5)     Subject to compliance with clause (1) above, if the proposed transferor is an Agent Member holding a beneficial interest in a Global Note and the proposed transferee's interest will be evidenced by a Physical Note, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of the Global Note in an amount equal to the principal amount of the beneficial interest in the Global Note to be transferred, and the Company shall execute and deliver and the Trustee shall authenticate one or more Physical Notes of like tenor and principal amount.

(c)     Private Placement Legend.  Upon the transfer, exchange or replacement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend.  Upon the transfer, exchange or replacement of Notes bearing the Private Placement Legend, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (1) the circumstance contemplated by clause (a)(1)(i) of this Section 2.15 exists or (2) there is delivered to the Registrar an Opinion of Counsel reasonably satisfactory to the Company and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (3) the Notes bearing the Private Placement Legend are being exchanged for Exchange Notes issued under Section 2.02 pursuant to a Registration Rights Agreement.  Upon the issuance of PIK Notes in payment of PIK Interest payable with respect to any Notes bearing the Private Placement Legend, such PIK Notes shall bear the Private Placement Legend.  By its acceptance of any Note bearing the Private Placement Legend, each Holder of such a Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in the Private Placement Legend and agrees that it shall transfer such Note only as provided in this Indenture.

(d)     General.  The Registrar shall not register a transfer of any Note unless such transfer complies with the restrictions on transfer of such Note set forth in this Indenture. In connection with any transfer of Notes, each Holder agrees by its acceptance of the Notes to furnish the Registrar or the Company such certifications, legal opinions or other information as either of them may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or a transaction not subject to, the registration requirements of the Securities Act; provided that the Registrar shall not be required to determine (but may rely on a determination made by the Company with respect to) the sufficiency of any such certifications, legal opinions or other information.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any security (including any transfers between or among Agent Members or beneficial owners of interests in any Global Note) other than to

require delivery of such certificates, Opinions of Counsel and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

The Registrar shall retain copies of all letters, notices and other written communications received by it pursuant to Section 2.14 or this Section 2.15. The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

Neither the Trustee nor any Agent shall have any responsibility for any actions taken or not taken by DTC.

SECTION 2.16     Transfers of Global Notes and Physical Notes.

A transfer of a Global Note or a Physical Note (including the right to receive principal and interest payable thereon) may be made only by the Registrar's entering the transfer in the Register. Prior to such entry, the Company shall treat the person in whose name such Note is registered as the owner of the Note for all purposes.

SECTION 2.17     Defaulted Interest.

If the Company defaults in a payment of interest on the Notes, the Company shall pay defaulted interest (plus interest on such defaulted interest to the extent lawful) in any lawful manner at the rate provided in the Notes. The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date. The Company shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.18     Computation of Interest.

Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

ARTICLE THREE

REDEMPTION

SECTION 3.01     Optional Redemption.

(a)     The Company may, at its option, redeem the Notes, in whole or in part, at specified times and under specified conditions, as set forth in this Section 3.01. If the Company elects to redeem Notes pursuant to this Section 3.01, it shall, prior to mailing the notice of redemption referred to in Section 3.04 and at least 30 days but not more than 60 days prior to the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee) furnish to the Trustee and Paying Agent an Officers' Certificate setting forth the

Redemption Date and the principal amount of the Notes to be redeemed, the clause of this Indenture pursuant to which the redemption shall occur and the Redemption Price.

(b)     The Company may, at its option, on any one or more occasions, redeem all or a part of the Notes upon not less than 30 days' nor more than 60 days' prior notice to the Trustee, at the Redemption Prices (expressed as percentages of the principal amount) set forth below plus accrued and unpaid interest to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date referred to in the Notes), if redeemed during the twelve-month period commencing on [•] of the years set forth below:

| Year | Percentage |
|------|-----------|
| 2010 | 105% |
| 2011 | 104% |
| 2012 | 103% |
| 2013 | 102% |
| 2014 | 101% |

(c)     Notwithstanding clause (b) above, if the Company delivers a Board Resolution to the Trustee setting forth the irrevocable determination of the Company not to complete construction of either the Aurora Facility or Mt. Vernon Facility, then during the 90-day period following the Issue Date, the Company may, at its option, redeem up to $25,000,000 in aggregate principal amount of the Notes at a Redemption Price equal to 101% of the principal amount of the Notes redeemed plus accrued and unpaid interest on the Notes redeemed to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date referred to in the Notes).

SECTION 3.02     No Mandatory Redemption.

The Company shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. ~~The Company or any Subsidiary thereof may at any time and from time to time purchase Notes in the open market or otherwise.~~

SECTION 3.03     Selection of Notes to Be Redeemed.

If fewer than all of the Notes are to be redeemed pursuant to the provisions of this Indenture, the Trustee shall select the Notes to be redeemed (a) in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed or (b) if such Notes are not then listed on a national securities exchange, on a pro rata basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate; provided, that if any redemption is made pursuant to Section 3.01(c), the Trustee will select the Notes only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to DTC procedures), unless such method is otherwise prohibited. The Trustee shall make the selection from the Notes

outstanding and not previously called for redemption and shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof, to be redeemed.

~~No Notes of $2,000 or less shall be redeemed in part. Notes of a principal amount in denominations of $2,000 or less may be redeemed only in whole. The Trustee may select for redemption portions (equal to $2,000 or any integral multiple thereof) of the principal amount of Notes that have denominations larger than~~ The Trustee will promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected will be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

SECTION 3.04     Notice of Redemption.

At least 30 days but not more than 60 days before a Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at such Holder's registered address, with a copy to the Trustee and any Paying Agent. At the Company's written request delivered at least fifteen days prior to the date such notice is to be given (unless a shorter period shall be acceptable to the Trustee), the Trustee shall give the notice of redemption in the Company's name and at the Company's expense, provided the Company provides the Trustee with all information required for such notice of redemption. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Note.

Each notice of redemption shall identify the Notes to be redeemed and shall state:

(a)     the Redemption Date;

(b)     the Redemption Price and the amount of accrued interest, if any, to be paid;

(c)     the name and address of the Paying Agent;

(d)     the CUSIP number;

(e)     the subsection of Section 3.01 pursuant to which such redemption is being made;

(f)     the place where such Notes called for redemption must be surrendered to the Paying Agent to collect the Redemption Price plus accrued interest, if any;

(g)     Notes and portions of Notes selected will be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000;

(h)     (g) that, unless the Company fails to deposit with the Paying Agent funds in satisfaction of the applicable Redemption Price plus accrued interest, if any, interest on Notes called for redemption ceases to accrue on and after the Redemption Date in accordance with Section 3.06, and the only remaining right of the Holders of such Notes is to receive payment of the Redemption Price plus accrued interest, if any, upon surrender to the Paying Agent of the Notes redeemed;

(i)     (h) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date, and upon surrender of such Note, a new Note or Notes in the aggregate principal amount equal to the unredeemed portion thereof shall be issued; and

(j)     (i) if fewer than all the Notes are to be redeemed, the identification of the particular Notes (or portion thereof) to be redeemed, as well as the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption.

If any of the Notes to be redeemed is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to accord with the procedures of the Depository applicable to redemption.

SECTION 3.05     Effect of Notice of Redemption.

Once notice of redemption is mailed in accordance with Section 3.04, Notes or portions thereof called for redemption shall become irrevocably due and payable on the Redemption Date and at the Redemption Price plus accrued interest thereon. Upon surrender to the Trustee or Paying Agent, such Notes or portions thereof called for redemption shall be paid at the Redemption Price plus accrued interest thereon to the Redemption Date, but installments of interest thereon, the maturity of which is on or prior to the Redemption Date, shall be payable to Holders of record at the close of business on the relevant Record Dates referred to in the Notes. No notice of any redemption may be subject to any conditions precedent or otherwise conditional.

SECTION 3.06     Deposit of Redemption Price.

Not later than 12:00 p.m. (noon) local time in the place of payment on the Redemption Date, the Company shall deposit with the Paying Agent U.S. Legal Tender sufficient to pay the Redemption Price plus accrued and unpaid interest, if any, of all Notes or portions thereof to be redeemed on that date. The Paying Agent shall promptly return to the Company any U.S. Legal

Tender so deposited which is not required for that purpose, except with respect to monies owed as obligations to the Trustee pursuant to Section 7.07.

If the Company complies with the preceding paragraph, then, unless the Company defaults in the payment of such Redemption Price plus accrued and unpaid interest, if any, interest on the Notes to be redeemed shall cease to accrue on and after the applicable Redemption Date, whether or not such Notes are presented for payment, and the only remaining right of the Holders of such Notes shall be to receive payment of the Redemption Price upon surrender to the Paying Agent of the Notes redeemed.  If any Note called for redemption shall not be so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the Redemption Date until such principal is paid, and to the extent lawful, on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

SECTION 3.07          Notes Redeemed in Part.

Upon surrender of a Note that is to be redeemed in part, the Company shall execute and deliver and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate for the Holder at the expense of the Company a new Note or Notes equal in principal amount to the unredeemed portion of the Note surrendered.

SECTION 3.08          Company May Acquire Notes.

The Company or its Affiliates (or any Person acting on behalf of the Company or its Affiliates) may at any time and from time to time acquire the Notes by means other than redemption, including by tender offer, open market purchases, negotiated transactions or otherwise, so long as such acquisition is not prohibited by applicable securities laws or regulations or the terms of this Indenture.  In accordance with, and subject to, Section 2.11, the Company may deliver such acquired Notes to the Trustee for cancellation.

## ARTICLE FOUR

## COVENANTS

SECTION 4.01          Payment of Notes; Accrual of Interest.

(a)          The Company shall pay the principal of, or premium, if any, or interest, if any, on the Notes on the dates and in the manner provided in the Notes and in this Indenture.

(b)          An installment of principal of, or premium, if any, or interest, if any, on the Notes payable in cash shall be considered paid on the date it is due if the Trustee or Paying Agent (other than the Company or an Affiliate of the Company) holds at 12:00 p.m. (noon) New York, New York time on that date U.S. Legal Tender designated for and sufficient to pay the installment in full.  The portion of an installment of interest, if any, on the Notes payable as PIK Interest on any Interest Payment Date shall be considered paid on such date if on such date (1) to the extent such PIK Interest is paid by issuance of additional Notes constituting PIK Notes, PIK Notes having an aggregate principal amount

equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes have been ~~authenticated~~executed and delivered, together with an Authentication Order in accordance with Section 2.02, to the Trustee for authentication and delivery to the Holders of such Notes in accordance with the terms of this Indenture and (2) to the extent such PIK Interest is paid by increasing the principal amount of Global Notes previously authenticated hereunder, the Company has directed the Trustee in writing to increase the principal amount of such Global Notes previously authenticated by the PIK Interest Amount with respect to such Interest Payment Date for such Notes.  The portion of any installment of interest on Notes payable as PIK Interest that is not paid on the date it is due shall thenceforth be payable solely in cash.

(c)     Not less than five (5) Business Days prior to each Interest Payment Date, so long as such Interest Payment Date is prior to Maturity, the Company shall be entitled to deliver a notice to the Trustee specifying (i) that the Company has elected, so long as such Interest Payment Date is prior to Maturity, not to pay the entire amount of interest due on such Interest Payment Date in cash, (ii) the respective aggregate amounts of interest to be paid in cash and as PIK Interest as determined in accordance with Section 4.01(d) and (iii) the respective aggregate amounts of PIK Interest to be paid through increases in the aggregate principal amount of Global Notes previously authenticated hereunder or through the issuance of additional Notes constituting PIK Notes.  If the Company does not deliver such notice with respect to any Interest Payment Date within the time period specified in the preceding sentence, the Company shall be deemed to have elected to pay the entire amount of interest due on such Interest Payment Date in cash. On the relevant Interest Payment Date for any Note as to which such notice has been timely given, so long as such Interest Payment Date is prior to Maturity, the Trustee shall record increases in the Global Notes or authenticate and deliver additional Notes constituting PIK Notes, as appropriate, in an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes.  The Company shall deliver an Authentication Order to the Trustee in accordance with Section 2.02 upon issuance of PIK Notes in payment of PIK Interest.

(d)     Interest shall accrue on the principal amount of any outstanding Notes at a rate of 13% per annum and be payable solely in cash; provided, however, that, if with respect to any Interest Payment Date that occurs prior to Maturity of any Notes, the Company has duly elected pursuant to Section 4.01(c) not to pay the entire installment of interest due on such Interest Payment Date in cash:

(1)     the interest on such Notes that is due on such Interest Payment Date shall be deemed to have accrued since the next preceding Interest Payment Date (or, if such Interest Payment Date is the first Interest Payment Date in respect of such Notes, the issue date therefor) at a rate of 15% per annum, whether or not the Company duly pays on such Interest Payment Date such installment of interest due on such Interest Payment Date; and

(2)     if (but only if) the Company pays on such Interest Payment Date the entire installment of interest on such Notes due on such Interest Payment Date, the portion of such installment equal to the PIK Interest Amount with respect to

such Interest Payment Date (*i.e.*, the portion equal to 7/15 of the aggregate amount thereof) shall be payable by issuance of PIK Notes in accordance with the fourth paragraph of <u>Section 2.02</u> and the remainder of such installment shall be payable in cash.

(e)     The Company shall pay interest on overdue principal at 15% per annum, and it shall pay interest on overdue installments of interest at the same rate to the extent lawful.

Notwithstanding anything to the contrary contained in this Indenture, the Company may, to the extent it is required to do so by law, deduct or withhold income or other similar taxes imposed by the United States of America from principal or interest payments hereunder.

SECTION 4.02          <u>Maintenance of Registrar and Paying Agent.</u>

The Company shall maintain a Registrar and Paying Agent required under <u>Section 2.03</u>. The Company shall give prior written notice to the Trustee and the Holders of the location, and any change in the location, of the Registrar and Paying Agent.  If at any time the Company shall fail to maintain a Registrar or Paying Agent or shall fail to furnish the Trustee with the address thereof, such presentations and surrenders may be made or served at the Corporate Trust Office and the Company hereby appoints the Trustee as its agent to receive all such presentations and surrenders.

SECTION 4.03          <u>Corporate Existence.</u>

Except as otherwise permitted by <u>Articles Four</u>, <u>Five</u> and <u>Ten</u>, the Company shall do or cause to be done, at its own cost and expense, all things necessary to preserve and keep in full force and effect its corporate existence and the limited liability company, partnership or corporate existence of each of its Restricted Subsidiaries in accordance with the respective organizational documents of the Company and each such Restricted Subsidiary, as the case may be, and the material rights (charter and statutory) and franchises of the Company and each such Restricted Subsidiary; <u>provided</u>, <u>however</u>, that the Company shall not be required to preserve, with respect to itself, any material right or franchise and, with respect to any of its Restricted Subsidiaries, any such existence, material right or franchise, if the Board of Directors of the Company shall determine in good faith that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole.

SECTION 4.04          <u>Payment of Taxes and Other Claims.</u>

The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material taxes, assessments and governmental charges (including withholding taxes and any penalties, interest and additions to taxes) levied or imposed upon it or any of its Restricted Subsidiaries or its properties or any of its Restricted Subsidiaries' properties and (b) all material lawful claims for labor, materials and supplies that, if unpaid, might by law become a Lien upon its properties or any of its Restricted Subsidiaries' properties; <u>provided</u>, <u>however</u>, that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being or shall be contested in good faith by appropriate proceedings properly instituted and

diligently conducted for which adequate reserves, to the extent required under GAAP, have been taken.

SECTION 4.05     Maintenance of Properties and Insurance.

(a)     The Company shall, and shall cause each of its Restricted Subsidiaries to, maintain its properties (including by the repair or replacement thereof) in good working order and condition (including by the repair or replacement thereof) in all material respects (subject to ordinary wear and tear); provided, however, that, subject to Section 4.23, nothing in this Section 4.05 shall prevent the Company or any of its Restricted Subsidiaries from discontinuing the operation and maintenance of any of its properties, or disposing of them, if such discontinuance or disposal is, in the good faith judgment of the Board of Directors of the Company, desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole.

(b)     The Company shall maintain insurance (including appropriate self-insurance) against loss or damage of the kinds that, in the good faith judgment of the Company, are adequate and appropriate for the conduct of the business of the Company and its Restricted Subsidiaries in a prudent manner, with reputable insurers or with the government of the United States of America or an agency or instrumentality thereof.

(c)     The Company shall, and shall cause each of its Restricted Subsidiaries to, cause the Collateral Agent to be named as an additional insured and loss payee (as applicable) with respect to all insurance maintained by the Company or any Restricted Subsidiary thereof on the Note Collateral.  The Company shall, and shall cause each of its Restricted Subsidiaries to, furnish to the Collateral Agent ~~such~~all relevant information relating to its property and liability insurance carriers, including any such information as may be reasonably requested by ~~the Collateral Agent from time to time~~Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class.

SECTION 4.06     Compliance Certificate; Notice of Default.

(a)     The Company and each Guarantor shall deliver to the Trustee, within 90 days after the end of ~~the Company's fiscal~~each calendar year, an Officers' Certificate stating that a review of the activities of the Company and its Restricted Subsidiaries during the preceding ~~fiscal~~calendar year has been made under the supervision of the signing Officers (one of whom shall be the principal executive officer, principal financial officer or principal accounting officer) with a view to determining whether they have kept, observed, performed and fulfilled their obligations under this Indenture and further stating, as to each such Officer signing such certificate, that to the best of such Officer's actual knowledge the Company and its Restricted Subsidiaries during such preceding ~~fiscal~~calendar year have kept, observed, performed and fulfilled each and every condition and covenant under this Indenture and no Default or Event of Default occurred during such year and at the date of such certificate there is no Default or Event of Default that has occurred and is continuing or, if such signers do know of such Default or Event of Default, the certificate shall describe the Default or Event of Default and its status with

particularity. ~~The Officers' Certificate shall also notify the Trustee should the Company elect to change the manner in which it fixes its fiscal year end.~~

(b)    The Company shall, so long as any Notes are outstanding, upon any Officer of the Company becoming aware of any Default or Event of Default, deliver to the Trustee and Collateral Agent an Officers' Certificate specifying such Default or Event of Default within 10 Business Days of such Officer becoming aware of such occurrence.

SECTION 4.07    Compliance with Laws.

The Company shall, and shall cause each of its Restricted Subsidiaries to, comply with all applicable statutes, rules, regulations, orders and restrictions of the United States of America, all states and municipalities thereof, and of any governmental department, commission, board, regulatory authority, bureau, agency and instrumentality of the foregoing, in respect of the conduct of its businesses and the ownership of its properties, except for such noncompliances as are not in the aggregate reasonably likely to have a material adverse effect on the financial condition or results of operations of the Company and its Restricted Subsidiaries, taken as a whole, or the ability of the Company to perform its material obligations hereunder.

SECTION 4.08    Reports to Holders.

Whether or not required by the rules and regulations of the SEC, so long as any Notes are outstanding, the Company will furnish the Holders of the Notes, with a copy to the Trustee:

(a)    all quarterly and annual financial information that would be required to be contained in a filing with the SEC on Forms 10-Q and 10-K if the Company were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated Subsidiaries (showing in reasonable detail, either on the face of the financial statements or in the footnotes thereto and in "Management's Discussion and Analysis of Financial Condition and Results of Operations", the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company, if any), and, with respect to the annual information only, a report thereon by the Company's certified independent accountants; and

(b)    all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports,

in each case, within the time periods required for filing such forms and reports as specified in the SEC's rules and regulations.

In addition, following the consummation of the Exchange Offer contemplated by the Registration Rights Agreement relating to the Initial Notes issued in connection with the Offering, whether or not required by the rules and regulations of the SEC, the Company will file a copy of all such information and reports with the SEC for public availability within the time periods specified in the SEC's rules and regulations (unless the SEC will not accept such a filing)

and make such information available to securities analysts and prospective investors upon request.  In addition, the Company has agreed that, if the Company is not subject to Section 13 or 15(d) of the Exchange Act, it will furnish to the Holders and prospective purchasers of the Notes designated by a Holder, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates of the Company).

The Company shall be deemed to have furnished any such information, report or other document to the Holders if the Company shall have made such information, report or other document available on the Electronic Data Gathering, Analysis and Retrieval System of the SEC (or any successor system) available at www.sec.gov or any successor SEC website for such filings or, if the Company is no longer required to file with the SEC, on the Company's website, in each case except with respect to the information required to be furnished under the last sentence of the second paragraph of this <u>Section 4.08</u>.

SECTION 4.09        <u>Waiver of Stay, Extension or Usury Laws</u>.

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive the Company and each of the Guarantors from paying all or any portion of the principal of, premium, if any, or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Indenture; and (to the extent that it may lawfully do so) the Company and each of the Guarantors hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 4.10        <u>Limitation on Restricted Payments</u>.

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly:

(a)        declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends, payments or distributions payable in Equity Interests (other than Disqualified Stock) of the Company and other dividends, payments or distributions payable to the Company or another Restricted Subsidiary of the Company);

(b)     purchase, redeem or otherwise acquire or retire for value (including in connection with any merger or consolidation involving the Company) any Equity Interests of the Company or any direct or indirect parent of the Company other than those Equity Interests owned by the Company or any Restricted Subsidiary of the Company;

(c)     make any payment on or with respect to, or purchase, redeem, repurchase, defease or otherwise acquire or retire for value, any Indebtedness of the Company or any Guarantor that is contractually subordinated in right of payment to the Notes or any Note Guarantee (excluding any Intercompany Debt between or among the Company and any of the Guarantors), except a payment of interest or principal at the Stated Maturity thereof; or

(d)     make any Restricted Investment;

(all such payments and other actions set forth in these clauses (a) through (d) above being collectively referred to as "Restricted Payments"), unless, at the time of and after giving effect to such Restricted Payment:

(1)     no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(2)     the Company would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.12; and

(3)     such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the Issue Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (5) and (6) of the next succeeding paragraph of this Section 4.10), is less than the sum, without duplication, of:

(i)     50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) from the beginning of the first fiscal quarter commencing after the Issue Date to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit); plus

(ii)     100% of the aggregate net proceeds, including cash and the Fair Market Value of the property other than cash, received by the Company since the Issue Date as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Company (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Company that have been converted into or exchanged for

such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Company); provided, however, that the Company may not include the net cash proceeds to the extent that any such common equity capital or Equity Interests are repurchased, redeemed or otherwise acquired or retired pursuant to clauses (2) and (5) of the next succeeding paragraph of this Section 4.10; plus

      (iii)    to the extent that any Restricted Investment that was made after the Issue Date is sold for cash or otherwise liquidated or repaid for cash, the lesser of (A) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any) and (B) the initial amount of the Restricted Investment; plus

      (iv)    to the extent that any Unrestricted Subsidiary of the Company designated as such after the Issue Date is redesignated as a Restricted Subsidiary after the Issue Date, the lesser of (A) the Fair Market Value of the Company's Investment in such Subsidiary as of the date of such redesignation or (B) such Fair Market Value as of the date on which such Subsidiary was originally designated as an Unrestricted Subsidiary after the Issue Date; plus

      (v)    50% of any dividends or distributions received by the Company or a Wholly-Owned Restricted Subsidiary of the Company that is a Guarantor after the Issue Date from an Unrestricted Subsidiary of the Company, to the extent that such dividends or distributions were not otherwise included in Consolidated Net Income of the Company for such period.

In the case of clause (3)(ii) above, any net cash proceeds from issuances and sales of Capital Stock of the Company financed directly or indirectly using funds borrowed from the Company or any Subsidiary of the Company shall be excluded until and to the extent such borrowing is repaid.

      Notwithstanding the foregoing, the provisions set forth in the immediately preceding paragraph do not prohibit:

      (1)    the payment, by the Company or any Restricted Subsidiary, of any dividend or distribution or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Indenture;

      (2)    so long as no Default has occurred and is continuing or would result therefrom, the making of any Restricted Payment in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests of the Company (other than

Disqualified Stock) or from the substantially concurrent contribution of common equity capital to the Company; provided that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (3)(ii) of the preceding paragraph;

(3)      so long as no Default has occurred and is continuing or would result therefrom, the making of any payment on or with respect to, or the defeasance, redemption, repurchase, retirement or other acquisition or retirement for value of, Indebtedness of the Company or any Restricted Subsidiary that is contractually subordinated in right of payment to the Notes or to any Note Guarantee with, in exchange for, by conversion into or out of the net cash proceeds from a substantially concurrent incurrence of, or in exchange for, Permitted Refinancing Indebtedness;

(4)      the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a pro rata basis;

(5)      so long as no Default has occurred and is continuing or would result therefrom, the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company or any Restricted Subsidiary of the Company held by any current or former officer, director, employee or consultant of the Company or any of its Restricted Subsidiaries at no more than Fair Market Value; provided that (x) the excess of (i) the aggregate price paid after the Issue Date for all such repurchased, redeemed, acquired or retired Equity Interests over (ii) the aggregate net cash proceeds received by the Company after the Issue Date from such Persons from the issuance of or equity contributions with respect to Equity Interests of the Company pursuant to any equity subscription agreement, stock option agreement, shareholders' or members' agreement or similar agreement, plan or arrangement may not exceed $5,000,000 and (y) the excess of (i) the aggregate price paid after the Issue Date in any calendar year for such Equity Interests over (ii) the aggregate such net cash proceeds so received by the Company in such calendar year may not exceed $1,000,000 in the aggregate; provided further that the amount of any such net cash proceeds that are utilized for such Restricted Payment will be excluded from clause (3)(ii) of the preceding paragraph;

(6)      the repurchase of Equity Interests deemed to occur upon the cashless exercise of stock options to the extent such Equity Interests represent a portion of the exercise price of those stock options; provided, that no proceeds in respect of the issuance of such Equity Interests shall be deemed to have been received for the purposes of clause (3)(ii) of the preceding paragraph;

(7)      so long as no Default has occurred and is continuing or would result therefrom, the declaration and payment of regularly scheduled or accrued dividends to holders of any class or series of Disqualified Stock of the Company or any Restricted Subsidiary of the Company issued on or after the Issue Date in

accordance with the Fixed Charge Coverage Ratio test set forth in the first sentence of <u>Section 4.12</u>;

(8) so long as no Default has occurred and is continuing or would result therefrom, the making of any other Restricted Payment which, together with all other Restricted Payments made pursuant to this <u>clause (8)</u> since the Issue Date, does not exceed $5,000,000;

(9) the repurchase or redemption of preferred stock purchase rights issued in connection with any stockholders rights plan of the Company at an amount not to exceed $0.01 per right or $100,000 in the aggregate; and

(10) the making of any distributions required to be made by the Company on or after the Effective Date (as defined in the Plan) pursuant to the Plan and the Confirmation Order.

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The Fair Market Value of any assets or securities that are required to be valued by this <u>Section 4.10</u> will be determined by the Board of Directors of the Company, whose resolution with respect thereto will be delivered to the Trustee. In the case of a determination of Fair Market Value in excess of $10,000,000, such Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of <u>recognized</u> national standing. In determining whether any Restricted Payment is permitted by this <u>Section 4.10</u>, the Company may allocate all or any portion of such Restricted Payment among the categories described in <u>clauses (1)</u> through <u>(10)</u> of the immediately preceding paragraph or among such categories and the types of Restricted Payments described in the first paragraph of this <u>Section 4.10</u>; <u>provided</u> that at the time of such allocation, all such Restricted Payments, or allocated portions thereof, would be permitted under the various provisions of this <u>Section 4.10</u>.

SECTION 4.11        <u>Limitations on Transactions with Affiliates.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company or any Restricted Subsidiary (each, an "<u>Affiliate Transaction</u>"), unless:

(a) the Affiliate Transaction is on terms no less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary on an arm's length basis with an unrelated Person; and

(b) the Company obtains and delivers to the Trustee:

(1)        with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5,000,000, a resolution of its Board of Directors set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this <u>Section 4.11</u> and that such Affiliate Transaction has been approved by a majority of the disinterested members of its Board of Directors; and

(2)        with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10,000,000, an opinion as to the fairness to the Company or such Restricted Subsidiary of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm ~~of~~selected by the Company or such Restricted Subsidiary, as applicable, of recognized national standing with experience in appraising the terms and conditions of the type of transaction or series of related transactions for which such opinion is required.

The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

(1)        any employment agreement, collective bargaining agreement, employee benefit plan (including the Management Incentive Plan and any vacation plan, health and life insurance plan, deferred compensation plan, retirement or savings plan or stock option, stock ownership or similar plan), officer and director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business, and the payment or issuance of securities pursuant to any such agreement, plan or arrangement;

(2)        the payment of compensation (including awards or grants in cash, securities or other payments) for the personal services of, and expense reimbursement and indemnity provided on behalf of, officers, directors (including the payment of, or an agreement providing for the payment of, reasonable directors' fees), consultants and employees of the Company or any of its Restricted Subsidiaries, in each case in the ordinary course of business;

(3)        to the extent permitted by applicable law, loans or advances to employees in the ordinary course of business for bona fide business purposes and not to exceed $250,000 in the aggregate at any time outstanding;

(4)        transactions between or among the Company and/or its Restricted Subsidiaries;

(5)        transactions pursuant to agreements or arrangements in effect on the Issue Date, or any amendment, modification or supplement thereto or replacement thereof, so long as such agreement or arrangement, as so amended, modified, supplemented or replaced, taken as a whole, is not materially less favorable, taken as a whole, to the Holders of the Notes than the original agreement or arrangement in existence on the Issue Date;

(6)     any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company; and

(7)     Restricted Payments that do not violate Section 4.10.

SECTION 4.12          Incurrence of Indebtedness and Issuance of Disqualified Stock, Preferred Stock and Incentive Interests.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness, and the Company will not issue any shares of Disqualified Stock or preferred stock or warrants, options or other rights to purchase Capital Stock ("Incentive Interests") and will not permit any of its Restricted Subsidiaries to issue any shares of Disqualified Stock or preferred stock or any Incentive Interests; provided, however, that (x) the Company or any Guarantor may incur Indebtedness or the Company may issue Disqualified Stock or preferred stock, if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or preferred stock is issued would have been at least 2.0 to 1 determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if such additional Indebtedness had been incurred or Disqualified Stock or preferred stock had been issued, as the case may be, at the beginning of such four-quarter period and (y) the Company may issue Incentive Interests not constituting Indebtedness, Disqualified Stock or preferred stock that are granted subject to the Management Incentive Plan.

The first paragraph of this Section 4.12 will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(1)     Indebtedness incurred (a) prior to the ABL Facility Trigger Date under the ABL Facility in an aggregate principal amount not exceeding $23,000,000 at any time outstanding and (b) under the Credit Facilities (including the ABL Facility) in an aggregate principal amount not exceeding the Credit Facility Amount at any time outstanding and, in each case, any related Guarantees;

(2)     Indebtedness represented by the Notes issued on the Issue Date and Indebtedness represented by Exchange Notes issued pursuant to a Registration Rights Agreement and, in each case, the related Note Guarantees;

(3)     Indebtedness represented by Additional Notes and the related Note Guarantees issued upon original issue at any time after the Issue Date in aggregate principal amount not to exceed $50,000,000;

(4)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness (including Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations) incurred for the purpose of financing all or any part of the purchase price or cost of design, development, construction, installation or improvement of property (real or personal), plant or equipment used in a Permitted Business of the Company or such Restricted Subsidiary (including through the direct

acquisition of such assets or the acquisition of Equity Interests of the Person owning such assets), in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to refund, refinance or replace any Indebtedness incurred pursuant to this clause (4), not to exceed $5,000,000 at any time outstanding;

(5)     the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to extend, renew, refund, refinance, replace, defease or discharge, Indebtedness (other than Intercompany Debt) that was permitted by this Indenture to be incurred under the first paragraph of this Section 4.12, this clause (5) or clauses (2), (3) or (10) of this paragraph;

(6)     the incurrence by the Company or any of its Restricted Subsidiaries of Intercompany Debt; provided, however, that:

(a)     if the Company or any Guarantor is the obligor on such Intercompany Debt and the payee is not the Company or a Guarantor, such Intercompany Debt must be (i) permitted as a Permitted Investment described in clause (1)(b) of the definition thereof and (ii) expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Company, or the Note Guarantee, in the case of a Guarantor; and

(b)     (i) any subsequent issuance or transfer of Equity Interests that results in any such Intercompany Debt being held by a Person other than the Company or a Restricted Subsidiary of the Company and (ii) any sale or other transfer of any such Intercompany Debt to a Person that is not any of the Company, a Guarantor or, in the case where the payor on such Intercompany Debt is not the Company or a Guarantor, any Restricted Subsidiary of the Company will be deemed, in each case, to constitute an incurrence of such Intercompany Debt by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7)     the issuance by any of the Company's Restricted Subsidiaries to the Company or to any other Restricted Subsidiaries of shares of Disqualified Stock or preferred stock; provided, however, that if the issuer of such shares of Disqualified Stock or preferred stock is a Restricted Subsidiary of the Company that is not a Guarantor and the purchaser of such shares is the Company or a Guarantor, such Investment must be permitted as a Permitted Investment described in clause (1)(b) of the definition thereof and:

(a)     any subsequent issuance or transfer of Equity Interests that results in any such Disqualified Stock or preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company; and

(b)     any sale or other transfer of any such Disqualified Stock or preferred stock to a Person that is not any of the Company, a Guarantor or, in the

case where the issuer of such Disqualified Stock or preferred stock is not a Guarantor, any Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an issuance of such Disqualified Stock or preferred stock by such Restricted Subsidiary that was not permitted by this clause (7);

(8)     the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations in the ordinary course of business;

(9)     the Guarantee by the Company or any of the Guarantors of Indebtedness of the Company or any of its Restricted Subsidiaries that was permitted to be incurred by another provision of this Section 4.12; provided that if the Indebtedness being guaranteed is subordinated in right of payment to the Notes or a Note Guarantee, then such Guarantee shall be subordinated in right of payment to the same extent as the Indebtedness Guaranteed;

(10)     Indebtedness represented by PIK Notes issued on any Interest Payment Date pursuant to the fourth paragraph of Section 2.02 in payment of the portion of the aggregate installment of interest due and payable on any Notes on such Interest Payment Date constituting the PIK Interest Amount with respect to such Interest Payment Date for such Notes;

(11)     the incurrence by the Company or any Guarantor of Indebtedness to the extent that the net proceeds thereof are promptly (A) used to purchase Notes tendered in connection with a Change of Control Offer pursuant to Section 4.15 or (B) deposited to defease or to satisfy and discharge the Notes pursuant to Article Eight;

(12)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of standby and other letters of credit, bankers' acceptances, surety, performance, appeal or similar bonds, completion guarantees or similar instruments issued in the ordinary course and not supporting obligations for borrowed money, including in respect of workers' compensation claims and self-insurance obligations;

(13)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds; provided, however, that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(14)     Indebtedness represented by the Aurora West Kiewit Note issued on the Issue Date;

(15)     the incurrence of Indebtedness arising from agreements of the Company or a Guarantor providing indemnification, adjustment of purchase price, earn outs or similar obligations, in each case, incurred in connection with the disposition or acquisition of any business, assets or a Guarantor in accordance with the terms of this Indenture, other than Indebtedness or guarantees of Indebtedness incurred by any Person acquiring all or any

portion of such business, assets or Guarantor for the purpose of financing such acquisition, in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (15), not to exceed $5,000,000; provided, however, in the case of any disposition, the maximum principal amount of such Indebtedness does not exceed the gross cash proceeds actually received by the Company or a Guarantor in connection with such disposition;

(16)     Guarantees in the ordinary course of business of the obligations not constituting Indebtedness of suppliers, customers, distributors, franchisers and licensees;

(17)     endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(18)     to the extent constituting Indebtedness, indemnification obligations and other similar obligations (including advancement of expenses) of the Company or any of its Subsidiaries in favor of directors, officers, employees, consultants or agents of the Company or any of its Subsidiaries extended in the ordinary course of business in an aggregate principal amount not to exceed $1,000,000 at any time outstanding;

(19)     Indebtedness owing to insurance companies (or another Person engaged at the direction of the Company or any of its Subsidiaries and any such insurance company) to finance insurance premiums incurred in the ordinary course of business in an aggregate principal amount not to exceed $1,000,000 at any time outstanding; and

(20)     additional Indebtedness of the Company or any of its Restricted Subsidiaries (in addition to the Indebtedness under clauses (1) through (19) above) in an aggregate principal amount outstanding at any time, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (20), not to exceed $5,000,000.

The Company will not incur, and will not permit any Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the applicable Note Guarantee on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company solely by virtue of being unsecured or by virtue of being secured on a first or junior Lien basis.

For purposes of determining compliance with this Section 4.12, in the event that an item of proposed Indebtedness, Disqualified Stock or preferred stock meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (20) above, or is entitled to be incurred pursuant to the first paragraph of this Section 4.12, the Company will be permitted to classify such item of Indebtedness, Disqualified Stock or preferred stock or any portion thereof on the date of its incurrence or issuance, and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or preferred stock in one of the above clauses or as having been incurred or issued pursuant to the first paragraph of this Section 4.12, although the

Company may divide and classify an item of Indebtedness, Disqualified Stock or preferred stock in one or more of the categories of Permitted Debt described in such clauses or as having been incurred or issued pursuant to the first paragraph of this Section 4.12 and may later reclassify all or a portion of such item of Indebtedness, Disqualified Stock or preferred stock, in any manner that complies with this Section 4.12. The accrual of interest or dividends, the accretion of accreted value or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms and the payment of dividends on Disqualified Stock or preferred stock in the form of additional shares of the same class of Disqualified Stock or preferred stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock or preferred stock for purposes of this Section 4.12; provided, in each such case (other than preferred stock that is not Disqualified Stock), that the amount of any such accrual, accretion or amortization or payment (without duplication) is included in Fixed Charges of the Company as accrued, accreted or amortized or paid. Notwithstanding any other provision of this Section 4.12, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this Section 4.12 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

The amount of any Indebtedness outstanding as of any date will be:

(1) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(2) the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(3) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(i) the Fair Market Value of such asset at the date of determination; and

(ii) the amount of such Indebtedness of the other Person.

Notwithstanding the foregoing, for purposes of determining any particular principal amount of Indebtedness under this Section 4.12, the principal amount of Indebtedness deemed to arise from a Guarantee of, or obligations with respect to letters of credit supporting, or as a result of a Lien on property securing, the principal amount of any Indebtedness otherwise included in the determination of such particular principal amount shall not be included.

SECTION 4.13    Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(a) pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or

participation in, or measured by, its profits, or pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(b)        make loans or advances to the Company or any of its Restricted Subsidiaries; or

(c)        transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

provided, however, that the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(1)        the ABL Facility as in effect on the Issue Date and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of such agreement; provided that the encumbrances or restrictions in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacement or refinancings are not, in the good faith judgment of the Company's Board of Directors, materially less favorable, taken as a whole, to the Holders than those contained in that agreement on the Issue Date;

(2)        this Indenture, the Notes, the Note Guarantees and the Collateral Documents;

(3)        applicable law, rule, regulation, order, approval, license, permit or similar restriction;

(4)        (i) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; provided that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred; and (ii) any amendment, modification, renewal, replacement or refinancing thereof; provided, however, that the encumbrances or restrictions in any such amendment, modification, renewal, replacement or refinancing are not, in the good faith judgment of the Company's Board of Directors, materially less favorable, taken as a whole, to the Holders than such encumbrances or restrictions prior to such amendment, modification, renewal, replacement or refinancing;

(5)        customary non-assignment or sub-letting provisions in contracts, leases and licenses entered into in the ordinary course of business;

(6)        any agreement for the sale or other disposition of all or substantially all of the Capital Stock or assets of a Restricted Subsidiary that

restricts distributions, loans or transfers by that Restricted Subsidiary pending the sale or other disposition;

(7) Permitted Refinancing Indebtedness; <u>provided</u> that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not, in the good faith judgment of the Company's Board of Directors, materially less favorable, taken as a whole, to the Holders than those contained in the agreements governing the Indebtedness being refinanced, extended, renewed, refunded, refinanced, replaced, defeased or discharged;

(8) Liens permitted to be incurred under the provisions of <u>Section 4.20</u> that limit the right of the debtor to dispose of the assets subject to such Liens;

(9) Provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, limited liability company organizational documents, sale-leaseback agreements, stock sale agreements, stockholder agreements and other similar agreements entered into with the approval of the Company's Board of Directors, which limitation is applicable only to the assets that are the subject of such agreements;

(10) restrictions on cash or other deposits or net worth imposed by suppliers, landlords or customers or required by insurance, surety or bonding companies, in each case under contracts entered into in the ordinary course of business; and

(11) other Indebtedness or Disqualified Stock, preferred stock or Incentive Stock of Restricted Subsidiaries permitted to be incurred subsequent to the Issue Date pursuant to the provisions of <u>Section 4.12</u>; <u>provided</u> that the encumbrances or restrictions imposed thereby are ordinary and customary with respect to the type of Indebtedness incurred.

SECTION 4.14       <u>Additional Note Guarantees.</u>

If (a) the Company or any of its Restricted Subsidiaries acquires or creates or redesignates another Domestic Subsidiary that is not an Unrestricted Subsidiary after the Issue Date or (b) any Subsidiary of the Company that is not a Guarantor guarantees or otherwise becomes an obligor on any Indebtedness of the Company or any Guarantor, then the Company shall cause that newly acquired or created Domestic Subsidiary that is not an Unrestricted Subsidiary or Subsidiary that is such an obligor, as applicable, to, within 10 Business Days after the date on which it was acquired or created or redesignated or becomes such an obligor, as applicable: (1) become a Guarantor and execute and deliver to the Trustee (i) a supplemental indenture pursuant to which such Domestic Subsidiary that is a Restricted Subsidiary shall guarantee the Note Obligations on the terms set forth in <u>Article Ten</u> of this Indenture and (ii) a supplement to the Intercreditor Agreement and the Security Agreement and such other Collateral Documents as may be applicable, in the case of clause (i) or (ii) in form reasonably satisfactory to the Trustee; (2) cause such instruments and Uniform Commercial Code financing statements to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to perfect the

Note Lien created under the Security Agreement and such other Collateral Documents, if any, on the Specified Assets and other After-Acquired Property owned by such Subsidiary; and (3) deliver to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee addressed to the Trustee and covering, among other things, the authorization, execution and delivery by such Subsidiary of such supplemental indenture and supplements to such Collateral Documents and the validity and enforceability against such Subsidiary of this Indenture (including the Note Guarantee of such Subsidiary) and of such Collateral Documents and the perfection of the Note Liens purported to be created thereby.

SECTION 4.15     Repurchase Upon Change of Control.

(a)     Upon the occurrence of a Change of Control, each Holder will have the right to require the Company to repurchase all or a portion (provided that (i) unless all of such Holder's Notes are to be repurchased, the purchased portion of such Holder's Notes shall equal ~~to~~ $2,000 or ~~in~~an integral ~~multiples~~multiple of $1,000 in excess of $2,000 and (ii) in any event, the unpurchased portion of such Holder's Notes must be at least $2,000) of such Holder's Notes pursuant to the offer described below (the "Change of Control Offer"), at a repurchase price in cash equal to 101% of the aggregate principal amount thereof on the date of repurchase, plus accrued and unpaid interest, if any, to (but not including) the date of repurchase (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date).

(b)     Within 30 days following the date upon which the Change of Control occurred, the Company shall send by registered first class mail, postage prepaid, a notice to each record Holder as shown on the register of Holders, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Offer.  The notice to the Holders shall contain all instructions and materials reasonably necessary to enable such Holders to tender Notes pursuant to the Change of Control Offer.  Such notice shall state:

(1)     that the Change of Control Offer is being made pursuant to this Section 4.15 and that all Notes validly tendered and not validly withdrawn shall be accepted for payment (subject to clause (ii) of the penultimate paragraph of this Section 4.15);

(2)     the repurchase price (including the amount of accrued interest) and the repurchase date (which shall be no earlier than thirty (30) days nor later than sixty (60) days from the date such notice is mailed, other than as may be required by law) (the "Change of Control Payment Date");

(3)     that any Note not validly tendered shall continue to accrue interest;

(4)     that, unless the Company defaults in making payment therefor, any Note accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest on and after the Change of Control Payment Date;

(5)     that any Holder electing to have a Note repurchased pursuant to a Change of Control Offer shall be required to surrender such Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note

completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day prior to the Change of Control Payment Date;

(6) that any Holder shall be entitled to withdraw its election if the Paying Agent receives, not later than three (3) Business Days prior to the Change of Control Payment Date, a telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Notes the Holder delivered for repurchase and a statement that such Holder is withdrawing its election to have such Notes repurchased;

(7) that ~~any Holder~~Holders whose Notes are ~~repurchased~~being purchased only in part shall be issued new Notes equal in ~~a~~principal amount ~~equal~~ to the unpurchased portion of the Notes surrendered; ~~provided that each Note repurchased and each new Note issued shall be in an original~~

(8) that, unless all of a Holder's Notes are to be purchased, the purchased portion of a Holder's Notes must be equal in principal amount ~~of~~to $2,000 or ~~integral multiples of $1,000 in excess of~~an integral multiple of $1,000 in excess of $2,000, except that (i) if all of the Notes of a Holder are to be purchased, the entire outstanding principal amount of Notes held by such Holder, even if not a multiple of $1,000, shall be purchased, subject, in the case of Global Notes, to the procedures of DTC and (ii) in any event, the unpurchased portion of Notes purchased in part shall be at least $2,000; and

(9) ~~(8)~~ the circumstances and relevant facts regarding such Change of Control.

If any of the Notes subject to the Change of Control Offer is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to comply with the procedures of the Depository applicable to repurchases.

On or before the Change of Control Payment Date, the Company shall, to the extent lawful (i) accept for payment Notes or portions thereof properly tendered and not validly withdrawn pursuant to the Change of Control Offer, (ii) deposit with the Paying Agent U.S. Legal Tender sufficient to pay the repurchase price plus accrued interest, if any, of all Notes or portions thereof so properly tendered and not validly withdrawn and (iii) deliver or cause to be delivered to the Trustee the Notes so properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being repurchased by the Company. The Paying Agent shall promptly mail or pay by wire transfer to the Holders of the Notes so properly tendered and so accepted the repurchase price for such Notes and the Company shall promptly execute and deliver, upon receipt of an Authentication Order in accordance with Section 2.02, and the Trustee shall promptly authenticate and deliver to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered~~, if any~~; provided that ~~each such new Note shall be in a principal amount of $2,000 or an integral multiple of $1,000 in excess of~~such unpurchased portion, if any, must be equal to at least $2,000. Any Note so accepted for repurchase will cease to accrue interest on and after the Change of Control

Payment Date.  Any Notes not so accepted shall be promptly mailed by the Company to the Holders thereof.  For purposes of this Section 4.15, the Trustee shall act as the Paying Agent.

The Company will publicly announce the results of the Change of Control Offer on or as soon as reasonably practicable after the Change of Control Payment Date.  Any amounts remaining after the repurchase of Notes pursuant to a Change of Control Offer shall be returned by the Trustee to the Company.

The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer.  To the extent the provisions of any securities laws or regulations conflict with the provisions under this Section 4.15, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.15 by virtue thereof.

Notwithstanding the above, the Company shall not be required to make a Change of Control Offer upon a Change of Control if (i) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements of this Section 4.15 and repurchases all Notes properly tendered and not withdrawn under such Change of Control Offer or (ii) a notice with respect to the redemption of all Notes has been given pursuant to Section 3.04 at any time before the Change of Control Payment Date and the Company redeems the Notes in accordance with such notice.

Notes (or portions thereof) repurchased pursuant to a Change of Control Offer shall be cancelled and may not be reissued.

SECTION 4.16          Limitation on Asset Sales.

The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(a)          the Company or the Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of;

(b)          at least 75% (or, in the case of an Asset Sale of Specified Collateral, 100%) of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash or Cash Equivalents; provided, however, that, for purposes of this Section 4.16, each of the following will be deemed to be cash:

(1)          solely in the case of any Asset Sale of assets other than Specified Collateral, any liabilities of the Company or any Restricted Subsidiary that would otherwise be required to be included on the Company's consolidated balance sheet (other than contingent liabilities and liabilities that are by their terms subordinated in right of payment to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets pursuant to a customary novation or assignment and

assumption agreement that releases the Company or such Restricted Subsidiary from further liability;

(2) solely in the case of any Asset Sale of assets other than Specified Collateral, any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion; and

(3) any Additional Assets (provided, that (x) if such Asset Sale constitutes a Primary Collateral Asset Sale, (A) to the extent the assets disposed of constitute Primary Collateral, this clause (3) shall be limited to only Additional Assets that simultaneously with the acquisition thereof will become Primary Collateral or (B) to the extent the assets disposed of constitute Specified Collateral, this clause (3) shall be limited to only Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof will become Specified Collateral and (y) to the extent such Asset Sale includes any Note Collateral, such Asset Sale does not occur unless such Additional Assets become Note Collateral prior to or simultaneously with the acquisition thereof and until and unless the provisions of Section 4.28 have been complied with respect to the Additional Assets being received as consideration for the Asset Sale of such Note Collateral);

provided further, however, that the 75% requirement referred to in this clause (b) will not apply to any Asset Sale that is not a Primary Collateral Asset Sale if the cash or Cash Equivalents portion of the consideration received therefrom, determined in accordance with subclauses (1), (2) and (3) above, is equal to or greater than what the after-tax proceeds would have been had that Asset Sale complied with the aforementioned 75% limitation;

(c) if such Asset Sale involves the disposition of Secondary Collateral, the proceeds are applied in accordance with the Intercreditor Agreement to the extent required therein;

(d) in the event of a Primary Collateral Asset Sale, the Net Proceeds corresponding to the Primary Collateral sold shall be paid directly to the Collateral Agent for deposit into the Collateral Account which shall become part of the Primary Collateral and be subject to the Primary Collateral Lien in favor of the Holders and the Trustee; and

(e) if such Asset Sale includes any issuance, sale or other disposition of any Equity Interests of any Restricted Subsidiary of the Company, (1) such Asset Sale is of all Equity Interests of such Restricted Subsidiary and (2) any Investment by the Company or any Restricted Subsidiary of the Company in such Person existing immediately after giving effect to such Asset Sale would have been permitted to be made pursuant to Section 4.10 if made at such time;

provided, however, that, in the case of any Asset Sale (other than a Primary Collateral Asset Sale), clauses (a) and (b) above need not be satisfied (I) to the extent the Note Collateral to be released consists solely of Secondary Collateral with respect to which the required lenders under the ABL Facility have given their consent and authorized the release of same or to the extent the Secondary Collateral to be released is disposed of by such Credit Facility Agent on behalf of the lenders in connection with the exercise of rights or remedies under the ABL Facility, in each case so long as (x) the Collateral Agent is required to release its lien thereon pursuant to the terms of the Intercreditor Agreement and (y) the proceeds therefrom are applied in accordance with the Intercreditor Agreement or (II) to the extent such Asset Sale results from the loss, destruction, damage, condemnation, confiscation, requisition, seizure, forfeiture or taking of title to or use of Secondary Collateral.

Within 270 days after the date the Company or a Restricted Subsidiary of the Company actually receives any Net Proceeds from an Asset Sale, the Company may, or may cause such Restricted Subsidiary to, apply those Net Proceeds, at its option:

> (1) to acquire Additional Assets (provided that (x) if such Asset Sale constitutes a Primary Collateral Asset Sale, (A) to the extent the assets disposed of constitute Primary Collateral, such Additional Assets shall be limited to only Additional Assets that simultaneously with the acquisition thereof become Primary Collateral or (B) to the extent the assets disposed of constitute Specified Collateral, such Additional Assets shall be limited to only Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof become Specified Collateral and (y) to the extent the assets that were the subject of such Asset Sale includes any Note Collateral, such Additional Assets are not acquired unless such Additional Assets become Note Collateral prior to or simultaneously with the acquisition thereof and until and unless the provisions of Section 4.28 have otherwise been complied with respect to such Additional Assets);

> (2) solely in the case of Net Proceeds from any Asset Sale other than a Primary Collateral Asset Sale, to make a capital expenditure; or

> (3) solely in the case of Net Proceeds from any Asset Sale other than a Primary Collateral Asset Sale, to any combination of the actions set forth in the foregoing clauses (1) and (2).

Unless and until any Net Proceeds from a Primary Collateral Asset Sale are finally applied as specified in the preceding paragraph or in accordance with Section 4.19, the Company shall cause such Net Proceeds to be held by the Collateral Agent as Collateral Monies in the Collateral Account. Unless and until any Net Proceeds from an Asset Sale (other than a Primary Collateral Asset Sale) are finally applied as specified in the preceding paragraph or in accordance with Section 4.19, the Company shall temporarily use such Net Proceeds to reduce revolving Indebtedness or invest such Net Proceeds in Cash Equivalents.

Any Net Proceeds from Asset Sales that are not applied as provided in the second preceding paragraph within 270 days after the date the Company or such Restricted Subsidiary actually receives such Net Proceeds will constitute "Excess Asset Sale Proceeds".

SECTION 4.17    Event of Loss.

In the event of an Event of Loss, the Company may, or may cause the affected Guarantor to, apply the Net Loss Proceeds from such Event of Loss to:

(a)    the rebuilding, repair, replacement or construction of improvements to the assets subject to such Event of Loss so long as the rebuilt, repaired or improved property or replacement property constitutes Additional Assets (provided that (x) such Additional Assets shall be limited to only Additional Assets that no later than the completion of such rebuilding, repair or improvement or the acquisition of such replacement have become Primary Collateral; (y) to the extent the assets subject to such Event of Loss constitute Specified Collateral, such Additional Assets shall be limited to only Additional Assets constituting Specified Assets that have become Specified Collateral; and (z) the provisions of Section 4.28 have been complied with respect to such Additional Assets no later than the completion of such rebuilding, repair or improvement or the acquisition of such replacement);

(b)    acquire Additional Assets (provided that (x) such Additional Assets shall be limited to only Additional Assets that simultaneously with the acquisition thereof become Primary Collateral; (y) to the extent the assets subject to such Event of Loss constitute Specified Collateral, such Additional Assets shall be limited to only Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof become Specified Collateral; and (z) such Additional Assets are not acquired until and unless the provisions of Section 4.28 have been complied with respect to such Additional Assets); or

(c)    a combination of the actions set forth in the foregoing clauses (a) and (b).

With respect to any property or asset subject to an Event of Loss pursuant to clause (4) of the definition of "Event of Loss" that has a Fair Market Value (or replacement cost, if greater) in excess of $1,000,000, the Company (or the affected Guarantor, as the case may be), shall be required to receive consideration (i) at least equal to the Fair Market Value (as evidenced by a Board Resolution) of the assets subject to the Event of Loss and (ii) at least 75% of which is in the form of cash or Cash Equivalents.

Unless and until any Net Loss Proceeds from an Event of Loss are finally applied as specified in the first sentence of this Section 4.17 or in accordance with Section 4.19, the Company shall cause such Net Loss Proceeds to be held by the Collateral Agent as Collateral Monies in the Collateral Account.

Any Net Loss Proceeds that are not applied as provided in the first sentence of this Section 4.17 within the later of (i) the date 30 days after the date the Company or Restricted

Subsidiary actually receives such Net Loss Proceeds and (ii) the date 270 days after the date of such Event of Loss will constitute "<u>Excess Loss Proceeds</u>".

SECTION 4.18       [Reserved]

SECTION 4.19       <u>Repurchase Offers.</u>

(a)       When the aggregate amount of the sum of all Excess Asset Sale Proceeds and Excess Loss Proceeds (collectively, "<u>Excess Proceeds</u>") exceeds $5,000,000 (the date of such occurrence is referred to herein as the "<u>Offer Trigger Date</u>"), within 30 days thereof, the Company will make an offer (the "<u>Repurchase Offer</u>") to all Holders to repurchase the maximum principal amount of Notes that may be repurchased out of all such Excess Proceeds.  The offer price in any Repurchase Offer will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of repurchase (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), and will be payable in cash.  If any Excess Proceeds remain after consummation of a Repurchase Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture; <u>provided</u> that any remaining Excess Proceeds shall remain subject to the Note Lien.  If the aggregate principal amount of Notes tendered into such Repurchase Offer exceeds the amount of Excess Proceeds, the Trustee will select the Notes to be repurchased on a pro rata basis.  Upon completion of each Repurchase Offer, the amount of Excess Proceeds will be reset at zero.

All Excess Proceeds shall, pending their application in accordance with this <u>Section 4.19</u> or the release thereof in accordance with the provisions described under <u>Article Twelve</u>, (i) to the extent constituting Collateral Monies, be held as Collateral Monies in the Collateral Account or (ii) to the extent not constituting Collateral Monies, be invested in Cash Equivalents or applied to temporarily reduce revolving Indebtedness.

(b)       Within 30 days following the date upon which the Offer Trigger Date occurred, the Company shall send by registered first class mail, postage prepaid, a notice to each record Holder as shown on the register of Holders, with a copy to the Trustee, which notice shall govern the terms of the Repurchase Offer.  The notice to the Holders shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Repurchase Offer.  Such notice shall state:

(1)       that the Repurchase Offer is being made pursuant to this <u>Section 4.19</u> and the amount of Excess Proceeds and that all Notes validly tendered and not withdrawn shall be accepted for payment up to the maximum principal amount of Notes that may be repurchased out of such Excess Proceeds;

(2)       the repurchase price (including the amount of accrued interest) and the repurchase date (which shall be no earlier than thirty (30) days nor later than sixty (60) days from the date such notice is mailed, other than as may be required by law) (the "<u>Repurchase Offer Payment Date</u>");

(3)    that any Note not tendered shall continue to accrue interest;

(4)    that, unless the Company defaults in making payment therefor, any Note accepted for payment pursuant to the Repurchase Offer shall cease to accrue interest on and after the Repurchase Offer Payment Date;

(5)    that Holders electing to have a Note purchased pursuant to a Repurchase Offer may elect to have Notes purchased in an amount equal to $2,000 or integral multiples of $1,000 in excess of $2,000 except that (i) if a Holder elects to have all the Notes held by such Holder purchased, such Holder may elect to have the entire outstanding principal amount of such Holder, even if not an integral multiple of $1,000, purchased and (ii) in any event, the portion of Notes of a Holder as to which an election for purchase is not made shall be at least $2,000;

(6)    that Holders electing to have a Note repurchased pursuant to a Repurchase Offer shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day prior to the Repurchase Offer Payment Date;

(67)    that any Holder shall be entitled to withdraw its election if the Paying Agent receives, not later than three (3) Business Days prior to the Repurchase Offer Payment Date, a telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Notes the Holder delivered for repurchase and a statement that such Holder is withdrawing its election to have such Notes repurchased;

(78)    that; if the aggregate principal amount of Notes surrendered by Holders exceeds the aggregate amount of Excess Proceeds, the Trustee shall select the Notes to be purchased on a pro rata basis on the basis of the aggregate principal amount of validly tendered Notes (with such adjustments as may be deemed appropriate by the Trustee so that only Notes in denominations of $2,000, or integral multiples of $1,000 in excess of $2,000, shall be purchased), except that (i) if all of the Notes of a Holder are to be purchased, the entire outstanding amount of Notes held by such Holder, even if not an integral multiple of $1,000, may be purchased, subject, in the case of Global Notes, to the procedures of DTC and (ii) in any event the unpurchased portion of Notes of any Holder purchased in part shall be at least $2,000;

(89)    that any Holder whose Notes are repurchased only in part shall be issued new Notes in a principal amount equal to the unpurchased portion of the Notes surrendered; provided that each Note repurchased and each new Note issued shall be in an original principal amount of $2,000 or integral multiples of $1,000 in excess of the unpurchased portion of Notes of any Holder whose Notes are purchased in part shall be in a principal amount of at least $2,000; and

(9<u>10</u>)   the circumstances and relevant facts regarding such Excess Proceeds.

If any of the Notes subject to the Repurchase Offer is in the form of a Global Note, then the Company shall modify such notice to the extent necessary to comply with the procedures of the Depository applicable to repurchases.

On or before the Repurchase Offer Payment Date, the Company shall, to the extent lawful (i) accept for payment Notes or portions thereof properly tendered and not withdrawn pursuant to the Repurchase Offer, up to the maximum principal amount of Notes that may be repurchased out of such Excess Proceeds; (ii) deposit with the Paying Agent U.S. Legal Tender sufficient to pay the repurchase price plus accrued interest, if any, of all Notes or portions thereof so properly tendered; and (iii) deliver or cause to be delivered to the Trustee the Notes so properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being repurchased by the Company.  If the aggregate principal amount of Notes surrendered by Holders exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased on a pro rata basis on the basis of the aggregate principal amount of tendered Notes (with such adjustments as may be deemed appropriate by the Trustee so that only Notes in denominations of $2,000, or integral multiples of $1,000 in excess of $2,000, shall be purchased)<u>, except that (i) if all of the Notes of a Holder are to be purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, may be purchased, subject, in the case of Global Notes, to the procedures of DTC and (ii) in any event the unpurchased portion of Notes of any Holder purchased in part shall be at least $2,000.</u>  The Paying Agent shall promptly mail or pay by wire transfer to the Holders of Notes so properly tendered and so accepted the repurchase price for such Notes and the Company shall promptly execute and deliver and<u>, upon receipt of an Authentication Order in accordance with Section 2.02,</u> the Trustee shall promptly authenticate and deliver to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; <u>provided</u> that ~~each such new Note~~<u>the unpurchased portion of Notes of any Holder whose Notes are purchased in part</u> shall be in a principal amount of ~~$2,000 or an integral multiple of $1,000 in excess of~~<u>at least</u> $2,000.  Any Note so accepted for repurchase will cease to accrue interest on and after the Repurchase Offer Payment Date.  Any Notes not so accepted shall be promptly mailed by the Company to the Holders thereof.  For purposes of this <u>Section 4.19</u>, the Trustee shall act as the Paying Agent.

The Company will publicly announce the results of the Repurchase Offer on or as soon as reasonably practicable after the Repurchase Offer Payment Date.  Any amounts remaining after the repurchase of Notes pursuant to a Repurchase Offer <u>(including as a result of the limitations specified herein on the denominations of purchased and unpurchased Notes of any Holder)</u> shall be returned by the Trustee to the Company.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations applicable in connection with the repurchase of the Notes pursuant to a Repurchase Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with this

<u>Section 4.19</u>, the Company will comply with such securities laws and regulations and shall not be deemed to have breached its obligations under this <u>Section 4.19</u> by virtue thereof.

Notes (or portions thereof) repurchased pursuant to a Repurchase Offer shall be cancelled and may not be reissued.

SECTION 4.20    <u>Limitation on Liens.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset, now owned or hereafter acquired, that constitutes (a) Note Collateral, other than Permitted Collateral Liens, or (b) any asset (other than Note Collateral), other than Permitted Liens.

SECTION 4.21    <u>Business Activities.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses.

SECTION 4.22    <u>Payments for Consent.</u>

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of any Indenture Document, the Registration Rights Agreement with respect to which such Holder is a beneficiary or the Intercreditor Agreement unless such consideration is offered to be paid and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

SECTION 4.23    <u>Impairment of Security Interest.</u>

Neither the Company nor any of its Restricted Subsidiaries will take or omit to take any action which would adversely affect or impair in any material respect the Note Liens in favor of the Trustee with respect to the Note Collateral, except in the case where such Note Collateral constitutes Secondary Collateral, to the extent required or permitted under the Intercreditor Agreement.  Neither the Company nor any Guarantor shall grant to any Person (other than the Trustee), or permit any Person (other than the Trustee) to retain, any interest whatsoever in the Note Collateral other than Permitted Collateral Liens.  Neither the Company nor any Guarantor will enter into any agreement that requires the proceeds received from any sale of Note Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than as permitted by this Indenture, the Notes and the Collateral Documents.  The Company shall, and shall cause each Guarantor to, at their sole cost and expense, execute and deliver all such agreements and instruments as the Trustee shall reasonably request to more fully or accurately describe the property intended to be Note Collateral or the obligations intended to be secured by the Collateral Documents.  The Company shall, and shall cause each Guarantor to, at their sole cost and expense, file any such notice filings or other agreements or instruments as may be <s>reasonably</s> necessary or <u>as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a</u>

single class, reasonably desirable under applicable law to perfect the Note Liens created by the Collateral Documents ~~at such times and at such places as the Trustee may reasonably request~~.

SECTION 4.24     Designation of Restricted and Unrestricted Subsidiaries.

The relevant Board of Directors of the Company or any of its Restricted Subsidiaries may designate any of its Restricted Subsidiaries (including any newly acquired or newly formed Subsidiary or Person becoming a Subsidiary through merger or consolidation or Investment therein) to be an Unrestricted Subsidiary if that designation would not cause a Default.  If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as of the time of the designation and, unless such Investment is a Permitted Investment, will reduce the amount available for Restricted Payments under Section 4.10 or under one or more clauses of the definition of Permitted Investments, as determined by the Company.  That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.  The relevant Board of Directors may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.10.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.12, the Company will be in default of such covenant. The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; provided that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if

(a)     such Indebtedness is permitted under Section 4.12, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period; and

(b)     no Default or Event of Default would be in existence following such designation.

SECTION 4.25     Additional Interest.

If Additional Interest becomes payable by the Company pursuant to the Registration Rights Agreement, the Company shall deliver to the Trustee an Officers' Certificate stating (a) the amount of Additional Interest due and payable, (b) the section of the Registration Rights Agreement pursuant to which Additional Interest is due and payable and (c) the date on which

Additional Interest is payable. Unless and until a Trust Officer of the Trustee receives such an Officers' Certificate, the Trustee may assume without inquiry that no Additional Interest is payable; provided, that the failure of the Company to deliver to the Trustee such Officers' Certificate shall not relieve the Company of its obligation to pay any such Additional Interest when due and payable.

SECTION 4.26 Limitation on Sale and Leaseback Transactions.

The Company will not, and will not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; provided that the Company or any Guarantor may enter into a Sale and Leaseback Transaction if:

(a) the Company or that Guarantor, as applicable, could have (1) incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction under the Fixed Charge Coverage Ratio test in the first paragraph of Section 4.12 and (2) incurred a Lien to secure such Indebtedness pursuant to Section 4.20;

(b) the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value, as determined in good faith by the Board of Directors of the Company and set forth in an Officers' Certificate of the Company delivered to the Trustee, of the property that is the subject of that Sale and Leaseback Transaction; and

(c) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.16.

SECTION 4.27 Subordination of Intercompany Debt; No Amendments to Certain Agreements.

Each of the Guarantors and the Company will not, directly or indirectly, incur or suffer to exist any Intercompany Debt, unless such Intercompany Debt constitutes Subordinated Indebtedness of the Company or such Guarantor, as applicable, owing such Intercompany Debt that is subject to the terms and provisions of the Subordination Agreement.

Each of the Guarantors and the Company will not, directly or indirectly, without the prior written consent of ~~the Collateral Agent~~Holders of a majority in aggregate principal amount of Notes then outstanding voting as a single class, amend, waive or otherwise modify, or surrender any rights, or increase the obligations, of the Company or such Guarantor, respectively, under, the Subordination Agreement, the Management Incentive Plan, the Aurora West Kiewit Documents or the Indiana Port Lease Agreement (or any agreements entered into in accordance therewith), in each case, unless the terms of the Subordination Agreement, the Management Incentive Plan, the Aurora West Kiewit Documents or the Indiana Port Lease Agreement (or any such agreements entered into in accordance therewith), as applicable, as so amended, waived or modified, or the rights and obligations of the Company and the Guarantors established thereunder after giving effect to such surrender or increase, as applicable, are not materially less favorable to the Holders of the Notes as those contained in the Subordination Agreement, the Management Incentive Plan, the Aurora West Kiewit Documents or the Indiana Port Lease

Agreement (or any such agreements entered into in accordance therewith), as applicable, immediately before such amendment, waiver, modification or as those rights and obligations established thereunder immediately before such surrender or increase, as applicable.

SECTION 4.28    After-Acquired Property.

If at any time the Company or any Guarantor acquires or otherwise owns any After-Acquired Property (but subject to the limitations, if applicable, specified in Section 12.12 and other than any Excluded General Intangibles, Excluded Foreign Subsidiary Capital Stock, Excluded Trademark Applications and (prior to the Indiana Port Leasehold Required Mortgage Date) the Indiana Port Leased Premises and any Indiana Port Lease Collateral), no later than the After-Acquired Property Required Date with respect to such After-Acquired Property (and subject to any provision hereof requiring any earlier action), the Company or such Guarantor shall

(a)    cause a valid and enforceable and (except solely as to any Excluded Personal Property) perfected first priority Lien in or on such After-Acquired Property (subject only to Permitted Collateral Liens) to have vested in the Collateral Agent, as security for the Note Obligations; and

(b)    except as to any Excluded Personal Property, have executed and delivered to the Collateral Agent the documents and certificates required by Section 12.01(g) or any other provision of this Indenture;

and thereupon all provisions of this Indenture relating to the Note Collateral shall be deemed to relate to such After-Acquired Property to the same extent and with the same force and effect.

SECTION 4.29    Further Assurances.

(a)    ~~Upon request by the Collateral Agent, each~~Each of the Guarantors and the Company shall, and the Company shall cause each of its Restricted Subsidiaries to:

(1)    promptly furnish to the Collateral Agent (for the benefit of the Trustee and the Holders) from time to time, at the sole cost and expense of such Guarantor or the Company, respectively, statements and schedules further identifying and describing the Note Collateral and such other reports in connection with the Note Collateral as ~~the Collateral Agent~~Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class may reasonably request by written notice delivered to the Company, all in such detail as ~~the Collateral Agent~~such Holders may reasonably request; and

(2)    subject to the Intercreditor Agreement (solely with respect to Secondary Collateral), at any time and from time to time, at the sole cost and expense of such Guarantor or the Company, respectively, promptly and duly execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, security agreements, mortgages, assignments, estoppel certificates, financing statements and continuations thereof, termination statements, notices of assignment, transfers,

certificates, assurances and other instruments, and take such further actions, as the Collateral Agent may reasonably request from time to time in order to (i) carry out more effectively the purposes of any Collateral Document, (ii) subject to the Liens created by any of the Collateral Documents any of the properties, rights or interests intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, perfection, enforceability and priority of any of the Collateral Documents and the Liens intended to be created thereby, or (iv) better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Collateral Agent the rights granted or now or hereafter intended to be granted to the Collateral Agent under the Collateral Documents.

(b)     Upon request of the Collateral Agent at any time after an Event of Default has occurred and is continuing, the Company and each of the Guarantors shall, and the Company shall cause each of its Restricted Subsidiaries to, (1) permit the Collateral Agent or any advisor, auditor, consultant, attorney or representative acting for the Collateral Agent, upon reasonable notice to the Company or such Guarantor or Restricted Subsidiary, as applicable, and during normal business hours, to visit and inspect the Company or any of the property of the Company or such Guarantor or such Restricted Subsidiary, as applicable, to review, make extracts from and copy the books and records of the Company or such Guarantor or Restricted Subsidiary, as applicable, relating to any such property, and to discuss any matter pertaining to any such property with the officers and employees of the Company or such Guarantor or Restricted Subsidiary, as applicable, and (2) deliver to the Collateral Agent such reports, including valuations, relating to any such property or any Lien thereon as the Collateral Agent may reasonably request.  The Company will promptly reimburse the Trustee and Collateral Agent for all costs and expenses incurred by the Trustee or Collateral Agent in connection therewith, including all reasonable fees and charges of any advisors, auditors, consultants, attorneys or representatives acting for the Trustee or for the Collateral Agent.

SECTION 4.30          Calculation of Original Issue Discount.

The Company shall file with the Trustee promptly at the end of each calendar year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on the Notes as of the end of such year and (ii) such other specific information relating to such original issue discount as may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

## ARTICLE FIVE

## SUCCESSOR CORPORATION

SECTION 5.01          Merger, Consolidation and Sale of Assets.

The Company shall not, directly or indirectly, (a) consolidate or merge with or into another Person (whether or not the Company is the surviving entity); or (b) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties and assets of the Company

and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to another Person, unless:

(1)     either:

(i)     the Company is the surviving entity; or

(ii)     the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a Person organized or existing under the laws of the United States of America, any state of the United States of America or the District of Columbia;

(2)     the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Company under the Notes, this Indenture and any Collateral Documents to which the Company is a party pursuant to a supplemental indenture ~~and other agreements~~in form reasonably satisfactory to the Trustee and in connection therewith shall execute and deliver such other agreements, cause such instruments and Uniform Commercial Code financing statements to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to continue the validity and enforceability, and perfect or continue the perfection, of the Note Lien created under the Collateral Documents on the Note Collateral owned by or transferred to such Person;

(3)     immediately before and after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(4)     the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made will, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period:

(i)     have Consolidated Net Worth immediately after the transaction equal to or greater than the Consolidated Net Worth of the Company immediately preceding the transaction; and

(ii)     be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.12; and

(5)     the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consummation of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition and, if such an assumption is required in connection with such transaction, such

assumption, complies with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to such transaction have been satisfied.

The conditions set forth in <u>clause (4)</u> of the first paragraph of this <u>Section 5.01</u> will not apply to:

> (1)        a merger of the Company with an Affiliate solely for the purpose of reincorporating the Company in another jurisdiction; or

> (2)        any merger, consolidation, sale, assignment, transfer, conveyance or other disposition of properties and assets, solely between or among the Company and one or more Restricted Subsidiaries that are Guarantors.

The Company shall not, directly or indirectly, lease all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, in one or more related transactions, to any other Person.

For purposes of the foregoing, the disposition (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties and assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

SECTION 5.02        <u>Successor Person Substituted.</u>

Upon any consolidation or merger or any disposition of all or substantially all of the properties and assets of the Company in accordance with <u>Section 5.01</u> in which the Company is not surviving or the continuing Person, the successor Person formed by such consolidation or into which the Company is merged or to which such disposition is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture and the Notes with the same effect as if such surviving entity had been named as such (so that from and after the date of such consolidation, merger or disposition, the provisions of this Indenture referring to the "Company" shall refer instead to such Person and not to the Company) and will succeed to, and be substituted for, and may exercise every right and power of, the Company under the Notes, this Indenture and the Collateral Documents.  Upon such substitution, except in the case of a sale, assignment, transfer, conveyance or other disposition of less than all the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, the predecessor Company shall be released from its obligations under the Notes, this Indenture and the Collateral Documents.  The Trustee shall enter into a supplemental indenture to evidence the succession and substitution of such Person and such discharge and release of the Company.

# ARTICLE SIX

## DEFAULT AND REMEDIES

SECTION 6.01          Events of Default.

Each of the following is an "Event of Default"  (whatever the reason for such Event of Default and whether it shall be involuntary or be effected by operation of law):

(a)          the failure to pay interest on any Notes when the same becomes due and payable and the default continues for a period of 30 consecutive days;

(b)          the failure to pay the principal of or premium, if any, on any Notes, when such principal or premium, if any, becomes due and payable, at maturity, upon redemption or otherwise;

(c)          default in the payment of principal of and interest on Notes required to be repurchased pursuant to a Change of Control Offer or a Repurchase Offer as described under Section 4.15 or 4.19, respectively, when due and payable;

(d)          failure to perform or comply with any of the provisions of Section 5.01 or 10.04);

(e)          failure by the Company or any of its Restricted Subsidiaries to perform any covenant or agreement in the Indenture Documents (other than any default described in clause (a), (b), (c) or (d) above), and such failure continues for a period of 60 consecutive days after written notice to the Company by the Trustee or Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class;

(f)          default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Significant Subsidiaries or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary (or the payment of which is guaranteed by the Company or any of its Significant Subsidiaries), whether such Indebtedness or guarantee now exists or is created after the Issue Date (but excluding Indebtedness owing to the Company or a Guarantor), if that default:

(1)          is caused by a failure to pay any portion of the principal (or effect any cash collateralization of letters of credit when required) of such Indebtedness when due and payable after the expiration of the grace period provided in such Indebtedness (a "Payment Default"); or

(2)          results in the acceleration of such Indebtedness prior to its Stated Maturity (which acceleration is not rescinded, annulled or otherwise cured within 20 days of receipt by the Company, such Significant Subsidiary or any Subsidiary in such group of Restricted Subsidiaries of notice of any such acceleration),

(3)        and, in each case, the principal (or face) amount of any such Indebtedness so due and payable or that has been accelerated, together with the principal (or face) amount that is        so due and payable or that has been accelerated of any other such Indebtedness under        which there has been a Payment Default or the Stated Maturity of which has been so accelerated, aggregates $10,000,000 or more;

(g)        the rendering of a final judgment or judgments (not subject to appeal) against the Company or any of its Restricted Subsidiaries, to the extent not covered or paid by insurance, in an amount in excess of $2,500,000, which judgments are not paid, waived, satisfied, discharged or stayed for a period of 60 consecutive days after the date on which the right to appeal has expired;

(h)        the denial or disaffirmation by the Company or any of its Restricted Subsidiaries, or any Person acting on behalf of any of them, in writing, of any material obligation of the Company or any of its Restricted Subsidiaries set forth in or arising under this Indenture, the Notes or any Collateral Documents (other than by reason of a release from such obligation or the Note Lien related thereto in accordance with the terms of this Indenture and the Collateral Documents);

(i)        the Company or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) (1) commences a voluntary case or proceeding under any Bankruptcy Code with respect to itself (or themselves), (2) consents to the entry of a judgment, decree or order for relief against it (or them) in an involuntary case or proceeding under any Bankruptcy Code, (3) consents to the appointment of a Custodian of it (or them) or for substantially all of its (or their) property, (4) consents to or acquiesces in the institution of a bankruptcy or an insolvency proceeding against it (or them), (5) makes a general assignment for the benefit of its (or their) creditors or (6) takes any corporate action to authorize or effect any of the foregoing;

(j)        a court of competent jurisdiction enters a judgment, decree or order for relief in respect of the Company or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) in an involuntary case or proceeding under any Bankruptcy Code, which shall (1) approve as properly filed a petition seeking reorganization, arrangement, adjustment or composition in respect of the Company or such Significant Subsidiary (or such group of Restricted Subsidiaries), (2) appoint a Custodian of the Company or such Significant Subsidiary (or such group of Restricted Subsidiaries) or for substantially all of its (or their) property or (3) order the winding-up or liquidation of its (or their) affairs; and such judgment, decree or order shall remain unstayed and in effect for a period of 60 consecutive days;

(k)        any Note Guarantee from a Significant Subsidiary, or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, ceases to be in full force and effect or is declared null and void and unenforceable or is found to be invalid or a Guarantor denies in writing its liability under the Note Guarantee

(other than by reason of a release of such Guarantor from the Note Guarantee in accordance with the terms of the Indenture Documents); and

(l) except as a result of the release of any Lien in accordance with the terms of this Indenture and the Collateral Documents, any Lien purported to be created by any Collateral Document with respect to any Specified Collateral or with respect to any other Note Collateral (other than Specified Collateral) that, individually or in the aggregate, has a Fair Market Value in excess of $2,000,000 (1) ceases to be in full force and effect, (2) ceases to give the Collateral Agent, for the benefit of the holders of the Note Obligations, the Liens, rights, powers and privileges purported to be created and granted thereby (including a perfected first priority security interest in and Lien on (subject only to Permitted Collateral Liens) all of the Note Collateral thereunder) in favor of the Collateral Agent, or (3) is asserted by the Company or any Guarantor not to be, a valid, perfected, first priority security interest in or Lien on (subject only to Permitted Collateral Liens) the Note Collateral covered thereby.

SECTION 6.02    Acceleration.

(a) If an Event of Default (other than an Event of Default specified in Section 6.01(i) or 6.01(j) above with respect to the Company, any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) shall occur and be continuing and has not been waived, the Trustee may, or at the written direction of Holders of at least 25% in aggregate principal amount of outstanding Notes voting as a single class mayshall, declare all unpaid principal of and premium, if any, and accrued interest on all the Notes to be due and payable by notice in writing to the Company and the Trustee (if given by the Holders) specifying the Event of Default and that it is a "notice of acceleration" (the "Acceleration Notice"), and the same shall become immediately due and payable.

(b) If an Event of Default specified in Section 6.01(i) or 6.01(j) above with respect to the Company, any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary shall occur and be continuing, then all unpaid principal of and premium, if any, and accrued interest on all of the outstanding Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

(c) In the event of a declaration of acceleration of the Notes because an Event of Default described in Section 6.01(f) has occurred and is continuing, such declaration of acceleration of the Notes shall be automatically rescinded and annulled and such Event of Default under Section 6.01(f) shall be deemed not to have occurred or be continuing if both (a) either (x) the default giving rise to such Event of Default pursuant to Section 6.01(f) shall be remedied or cured pursuant to the terms of, or waived by the holders of, such Indebtedness or any consequent acceleration of such Indebtedness shall be rescinded, annulled or otherwise cured or (y) such Indebtedness shall have been discharged in full, in the case of clause (x) or (y), within 30 days after such declaration of acceleration of the Notes with respect thereto and (b) (1) the rescission and annulment of

such acceleration of the Notes would not conflict with any judgment or decree and (2) all existing Events of Default, except nonpayment of principal, premium or interest on the Notes that became due solely because of such acceleration of the Notes, have been cured or waived.

(d)     At any time after a declaration of or automatic acceleration with respect to the Notes as described in Sections 6.02(a) and 6.02(b), the Holders of a majority in principal amount of the Notes voting as a single class may rescind and cancel such declaration and its consequences:  (1) if the rescission would not conflict with any judgment or decree;  (2) if all existing Events of Default, other than nonpayment of principal, premium, if any, or interest on the Notes that has become due solely because of the acceleration of the Notes, have been cured or waived; (3) to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal and premium, if any, which has become due otherwise than by such declaration of acceleration, has been paid; (4) if the Company has paid each of the Trustee and the Collateral Agent its reasonable compensation and reimbursed each of the Trustee and the Collateral Agent for its reasonable expenses, disbursements and its advances; and (5) in the event of the cure or waiver of an Event of Default of the type described in  Section 6.01(i) or 6.01(j), the Trustee shall have received an Officers' Certificate and an Opinion of Counsel that such Event of Default has been cured or waived together with evidence confirming the requisite majority vote of the Holders.  No such rescission shall affect any subsequent Default or impair any right consequent thereto.

(e)     If an Event of Default occurs by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company with the intention of avoiding payment of the premium that the Company would have been required to pay if the Company then had elected to redeem the Notes pursuant to the optional redemption provisions of Section 3.01, an equivalent premium will also become and be immediately due and payable to the extent permitted by applicable law upon the acceleration of the Notes.

SECTION 6.03     Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of, premium, if any, or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture, any Collateral Document or any Note Guarantee or to direct the Collateral Agent to exercise remedies with respect to the Primary Collateral and, subject to the terms of the Intercreditor Agreement, the Secondary Collateral.

The Trustee or the Collateral Agent may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee, the Collateral Agent or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

If an Event of Default occurs, the Trustee, on behalf of the Holders of the Notes, in addition to any rights or remedies available to the Trustee under this Indenture, will be entitled to take (or instruct the Collateral Agent to take) such actions as the Trustee deems advisable to protect and enforce the rights of the Trustee, the Collateral Agent and the Holders in the Note Collateral, including, without limitation, the institution of foreclosure proceedings in accordance with the Collateral Documents and applicable law. However, the rights and remedies available to the Trustee and the Collateral Agent under the Note Collateral Documents and the actions permitted to be taken by the Trustee and the Collateral Agent thereunder will be subject to the provisions of the Intercreditor Agreement.

The Trustee will apply (or instruct the Collateral Agent to apply) the proceeds received by the Collateral Agent or the Trustee from any foreclosure of the Note Collateral~~:~~

> ~~(1)       first, to pay the expenses of such foreclosure and fees and other amounts then payable to the Trustee or the Collateral Agent under this Indenture and the Collateral Documents; and~~

> ~~(2)       thereafter, to pay the principal of, premium, if any, and accrued interest on the Notes;~~ in accordance with the provisions of Section 6.10; _provided_, that the application of any such proceeds of Note Collateral that constitutes Secondary Collateral shall be subject to the terms of the Intercreditor Agreement.

SECTION 6.04        Waiver of Past Defaults.

Subject to Sections 2.09, 6.07 and 9.02, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may, on behalf of the Holders of all the Notes, rescind an acceleration or waive (including, without limitation, in connection with a purchase of, or tender offer or exchange offer for, Notes) any existing Default or Event of Default, and its consequences, except (other than as provided in Section 6.02(c) or Section 6.02(d)) a default in the payment of the principal of or premium, if any, or interest on any Notes or in respect of a covenant or provision which under this Indenture cannot be modified or amended without the consent of the Holder of each Note then outstanding.  When a Default or Event of Default is waived, it is cured and ceases to exist and is deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred for every purpose of this Indenture, the Notes and the Collateral Documents, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

SECTION 6.05        Control by Majority.

Subject to Section 2.09, the Intercreditor Agreement and applicable law, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or the Collateral Agent, as the case may be, or exercising any trust or power conferred on the Trustee or the Collateral Agent, as the case may be, including any remedies provided for in Section 6.03.  Subject to Section 7.01, however, the Trustee or the

Collateral Agent, as the case may be, may refuse to follow any direction (which direction, if sent to the Trustee or the Collateral Agent, as the case may be, shall be in writing) that the Trustee or the Collateral Agent, as the case may be, reasonably believes conflicts with any applicable law, this Indenture, the Notes, the Note Guarantees, the Collateral Documents or the Intercreditor Agreement, that the Trustee or the Collateral Agent, as the case may be, determines may be unduly prejudicial to the rights of another Holder, or that may subject the Trustee or the Collateral Agent, as the case may be, to personal liability; provided that the Trustee or the Collateral Agent, as the case may be, may take any other action deemed proper by the Trustee or the Collateral Agent, as the case may be, which is not inconsistent with such direction (which direction, if sent to the Trustee or the Collateral Agent, as the case may be, shall be in writing).

SECTION 6.06    Limitation on ~~Suits~~Holders' Rights to Pursue Remedies.

A Holder may not pursue any remedy with respect to this Indenture or the Notes unless:

(a)    such Holder gives to the Trustee written notice of a continuing Event of Default;

(b)    subject to Section 2.09, Holders of at least 25% in aggregate principal amount of the outstanding Notes voting as a single class make a written request to the Trustee to institute proceedings in respect of that Event of Default;

(c)    such Holder or Holders offer to the Trustee security or indemnity reasonably satisfactory to the Trustee against any loss, liability or expense to be incurred in compliance with such request;

(d)    the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of security or indemnity; and

(e)    during such 60 day period the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class do not give the Trustee a written direction which, in the opinion of the Trustee, is inconsistent with the request.

~~The foregoing limitations shall not apply to a suit instituted by a Holder of a Note for the enforcement of the payment of principal of, premium, if any, or interest on such Note on or after the respective due dates set forth in such Note (including upon acceleration thereof) or the institution of any proceeding with respect to this Indenture or any remedy hereunder, including acceleration, by the Holders of a majority in principal amount of outstanding Notes in accordance with the terms hereof; provided that upon institution of any proceeding or exercise of any remedy, such Holders provide the Trustee with prompt notice thereof.~~

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over such other Holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all such Holders.

SECTION 6.07          Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of, premium, if any, and interest on a Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; provided that a Holder shall not have the right to institute any such suit for the enforcement of payment if, and to the extent, the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Note Lien upon any Note Collateral.

SECTION 6.08          Collection Suit by Trustee or Collateral Agent.

If an Event of Default in payment of principal of, premium, if any, or interest specified in Section 6.01(a) or Section 6.01(b) shall occur and be continuing, subject to the Intercreditor Agreement, the Trustee and the Collateral Agent may recover judgment (1) in its own name and (2) (x) in the case of the Trustee, as trustee of an express trust or (y) in the case of the Collateral Agent, as collateral agent on behalf of each of the Holders, in each case against the Company or any other obligor on the Notes for the whole amount of principal, premium, if any, and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest at the rate set forth in Section 4.01 and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel and any other amounts due the Trustee under Section 7.07 and the Collateral Agent under the Collateral Documents.

SECTION 6.09          Trustee May File Proofs of Claim.

The Trustee and the Collateral Agent are authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee or the Collateral Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent, their respective agents and counsel) and the Holders allowed in any judicial proceedings relating to the Company or any other obligor upon the Notes, any of their respective creditors or any of their respective property and, subject to the Intercreditor Agreement, shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any Custodian in any such judicial proceedings is hereby authorized by each Holder to make such payments to the Trustee or Collateral Agent and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee or Collateral Agent any amount due to it for the reasonable compensation, expenses, taxes, disbursements and advances of the Trustee, the Collateral Agent, their respective agents and counsel, and any other amounts due any such Person under the Collateral Documents and Section 7.07.  The Company's payment obligations under this Section 6.09 shall be secured in accordance with the provisions of Section 7.07.  Nothing herein contained shall be deemed to authorize the Trustee or Collateral Agent to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the

Notes or the rights of any Holder thereof, or to authorize the Trustee or the Collateral Agent, as the case may be, to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10        Priorities.

If the Trustee collects any money or property pursuant to this Article Six, it shall, subject to the terms of the Intercreditor Agreement, pay out the money or property in the following order:

First:  to the Trustee, the Collateral Agent, the Paying Agent and the Registrar for amounts due under Section 7.07 (including payment of all compensation expenseand expenses, all liabilities incurred and all advances made by the Trustee or the Collateral Agent, as the case may be, and the costs and expenses of collection);

Second:  if the Holders are forced to proceed against the Company directly without the Trustee or the Collateral Agent, to the Holders for their collection costs;

Third:  to the Holders for amounts due and unpaid on the Notes for principal, premium, if any, and accrued interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and accrued interest respectively; and

Fourth:  to the Company or any other obligor on the Notes, as their interests may appear, or as a court of competent jurisdiction may direct;

provided, that the application of any such proceeds of Note Collateral that constitutes Secondary Collateral shall be subject to the terms of the Intercreditor Agreement.

The Trustee, upon prior written notice to the Company, may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

SECTION 6.11        Undertaking for Costs.

All parties to this Indenture agree, and each Holder by its acceptance of its Note shall be deemed to have agreed, that in any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee or the Collateral Agent, as the case may be, for any action taken or omitted to be taken by it as Trustee or the Collateral Agent, as the case may be, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee or the Collateral Agent, as the case may be, a suit by a Holder pursuant to Section 6.07, or a suit by a Holder or Holders of more than 10% in principal amount of the outstanding Notes voting as a single class.

SECTION 6.12        Restoration of Rights and Remedies.

If the Trustee, the Collateral Agent or any Holder has instituted any proceedings to enforce any right or remedy under this Indenture and such proceeding has been discontinued or

abandoned for any reason, or has been determined adversely to the Trustee, the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Trustee, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee, the Collateral Agent and the Holders shall continue as though no such proceeding has been instituted.

SECTION 6.13    Rights and Remedies Cumulative.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 6.14    Delay or Omission not Waiver.

No delay or omission of the Trustee or the Collateral Agent or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or in acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

**ARTICLE SEVEN**

**TRUSTEE**

SECTION 7.01    Duties of Trustee.

The duties and responsibilities of the Trustee shall be as provided by the TIA and as set forth herein or in any Collateral Document.  All provisions of this Article Seven applicable to the Trustee shall also apply to the Collateral Agent.

(a)    If an Event of Default has occurred and is continuing, the Trustee shall exercise such rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise thereof as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)    Except during the continuance of an Event of Default:

(1)    the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the TIA, and the Trustee need only perform those duties as are specifically set forth in this Indenture and no covenants or obligations shall be implied in or read into this Indenture against the Trustee; and

(2)        in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, in case of any such certificates or opinions which by the provisions hereof are furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture but need not confirm or investigate the accuracy of mathematical calculation or other facts stated herein.

(c)        Notwithstanding anything to the contrary herein contained, the Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)        this paragraph does not limit the effect of clause (b) of this Section 7.01;

(2)        the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)        the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

Sections 7.01(c)(1), (2) and (3) shall be in lieu of Sections 315(d)(1), 315(d)(2) and 315(d)(3) of the TIA and such Sections 315(d)(1), 315(d)(2) and 315(d)(3) are herein expressly excluded from this Indenture, as permitted by the TIA.

(d)        No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any liability or expense.  The Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture, the Intercreditor Agreement or the Collateral Documents at the request of any Holders unless such Holders have offered to the Trustee security and indemnity satisfactory to the Trustee against such risk, liability or expense.

(e)        Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to clauses (a), (b), (c) and (d) of this Section 7.01.

(f)        The Trustee shall not be liable for interest on any money or assets received by it except as the Trustee may agree in writing with the Company.  Money and assets held in trust by the Trustee need not be segregated from other funds or assets held by the Trustee except to the extent required by law.

(g)        Anything in this Indenture to the contrary notwithstanding, in no event shall the Trustee, the Paying Agent or the Registrar be liable under or in connection with this Indenture for indirect, special, incidental, punitive or consequential losses or damages

of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Trustee, the Paying Agent or the Registrar has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

SECTION 7.02     Rights of Trustee.

Subject to Section 7.01:

(a)     ~~The~~In the absence of bad faith on its part, the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, notice, report, request, direction, consent, order, bond, note or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person; provided, however, in case of any such resolution, certificate, statement, instrument, opinion, notice, report, request, direction, consent, order, bond, note or other paper or document which by the provisions of hereof are furnished to the Trustee, the Trustee shall examine such document to determine whether such document conforms to the requirements of this Indenture.  The Trustee need not investigate any fact or matter stated in the document.

(b)     Before the Trustee acts or refrains from acting, it may consult with counsel and may require an Officers' Certificate or an Opinion of Counsel, or both, which shall conform to Sections 11.04 and 11.05.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The written advice of the Trustee's counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by the Trustee hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care and in good faith.

(d)     The Trustee shall not be liable for any action taken, suffered or omitted to be taken in good faith which it reasonably believes to be authorized or within its rights or powers under this Indenture.

(e)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, notice, report, request, direction, consent, order, bond, note or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, upon reasonable notice to the Company, to examine the books, records and premises of the Company, personally or by agent or attorney, and to consult with the officers and representatives of the Company, including the Company's accountants and attorneys, at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.  Except as expressly stated herein to the contrary, in no event shall the Trustee have any

responsibility to ascertain whether there has been compliance with any of the covenants or provisions of Article Four or Five.

(f)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(g)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company shall be sufficient if signed by an Officer of the Company and any resolution of the Board of Directors shall be sufficient if evidenced by a copy of such resolution certified by an Officer of the Company to have been duly adopted and in full force and effect as of the date thereof.

(h)     The Trustee shall not be deemed to have notice or be charged with knowledge of any Default or Event of Default unless the Trust Officer or the Trustee shall have received from the Company, any Guarantor or any other obligor upon the Notes or from any Holder written notice thereof at its address set forth in Section 11.02, and such notice references the Notes and this Indenture.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)     The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any persons authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(k)     The permissive right of the Trustee to take any action under this Indenture or any Collateral Document shall not be construed as a duty to so act.

SECTION 7.03      Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company, any Subsidiary of the Company or their respective Affiliates with the same rights it would have if it were not Trustee.  Any Agent may do the same with like rights.  However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04      Trustee's Disclaimer.

The Trustee makes no representation as to the validity, adequacy or sufficiency of this Indenture, the Notes, the Intercreditor Agreement or the Collateral Documents, it shall not be accountable for the Company's use of the proceeds from the Notes and it shall not be responsible for any statement of the Company in this Indenture, the Notes, the Intercreditor Agreement, the Collateral Documents or any other documents connected with the issuance of the Notes other

than the Trustee's certificate of authentication, and the Trustee assumes no responsibility for their correctness.

Beyond the exercise of reasonable care in the custody thereof and the fulfillment of its obligations under this Indenture and the Collateral Documents, the Trustee shall have no duty as to any Note Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Trustee shall be deemed to have exercised reasonable care in the custody of the Note Collateral in its possession if the Note Collateral is accorded treatment substantially equal to that which it accords its own property.

The Trustee and the Collateral Agent each makes no representations as to and shall not be responsible for the existence, genuineness, value, sufficiency or condition of any of the Note Collateral or as to the security afforded or intended to be afforded thereby, hereby or by any Collateral Document, or for the validity, perfection, priority or enforceability of the Liens or security interests in any of the Note Collateral created or intended to be created by any of the Collateral Documents, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Note Collateral, any Collateral Documents or any agreement or assignment contained in any thereof, for the validity of the title of the Company or any Guarantor to the Note Collateral, for insuring the Note Collateral or for the payment of taxes, charges, assessments or Liens upon the Note Collateral or otherwise as to the maintenance of the Note Collateral. The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture or any other Collateral Document by the Company or any other Person that is a party thereto or bound thereby.

SECTION 7.05    Notice of Default.

If a Default or an Event of Default occurs and is continuing and if a Trust Officer has actual knowledge thereof or has received written notice thereof from the Company or any Holder, the Trustee shall mail to each Holder, with a copy to the Company, notice of the Default or Event of Default within 90 days after the occurrence thereof unless such Default or Event of Default shall have been cured or waived before the giving of such notice. Except in the case of a Default or an Event of Default in payment of principal of, premium, if any, or interest on any Note, including an accelerated payment and the failure to make payment on the Change of Control Payment Date pursuant to a Change of Control Offer, and except in the case of a failure to comply with Article Five, the Trustee may withhold the notice if and so long as its Board of Directors, the executive committee of its Board of Directors or a committee of its directors and/or Trust Officers in good faith determines that withholding the notice is in the interest of the Holders.

SECTION 7.06    Reports by Trustee to Holders.

Within 60 days after each May 15, beginning with May 15, 2011, the Trustee shall, to the extent that any of the events described in TIA Section 313(a) occurred within the previous twelve (12) months, but not otherwise, mail to each Holder a brief report dated as of such date that

complies with TIA Section 313(a).  The Trustee also shall comply with TIA Sections 313(b) and (c).

A copy of each report at the time of its mailing to Holders shall be mailed to the Company and filed by the Trustee with the SEC and each stock exchange or market, if any, on which the Notes are listed or quoted.

The Company shall promptly notify the Trustee if the Notes become listed, quoted on or delisted from any stock exchange or market and the Trustee shall comply with TIA Section 313(d).

SECTION 7.07        Compensation and Indemnity.

The Company and the Guarantors, jointly and severally, shall pay to the Trustee, the Collateral Agent, the Paying Agent and the Registrar (each an "Indemnified Party") from time to time compensation for their respective services as Trustee, Collateral Agent, Paying Agent or Registrar, as the case may be, as the Trustee, Collateral Agent, Paying Agent, Registrar and the Company shall have agreed in writing.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Company shall reimburse each Indemnified Party upon request for all reasonable out-of-pocket expenses, disbursements and advances incurred or made by it in connection with the performance of its duties under, as the case may be, this Indenture, the Collateral Documents or the Intercreditor Agreement, except any such expenses, disbursements and advances as may be attributable to such Indemnified Party's gross negligence, bad faith or willful misconduct.  Such expenses, disbursements and advances shall include the reasonable fees, expenses, disbursements and advances of each of such Indemnified Party's agents and counsel.

The Company and the Guarantors, jointly and severally, hereby agree to indemnify each Indemnified Party and its agents, employees, stockholders and directors and officers for, and hold each of them harmless against, any loss, damage, cost, claim, liability or expense (including taxes, other than taxes based on the income of such Person) incurred by any of them except for such actions, to the extent caused by any negligence, bad faith or willful misconduct on the part of such Indemnified Party, arising out of or in connection with this Indenture, the Intercreditor Agreement or the Collateral Documents or the administration of this trust, including the reasonable costs and expenses of enforcing this Indenture against the Company or any Guarantor (including this Section 7.07) and defending themselves against any claim or liability in connection with the exercise or performance of any of their rights, powers or duties hereunder or thereunder (including the reasonable fees and expenses of counsel).  The Trustee relevant Indemnified Party shall notify the Company (with a copy to the Trustee) promptly of any claim asserted against an such Indemnified Party for which such Indemnified Party has advised the Trustee that it may seek indemnity hereunder or under the Collateral Documents or Intercreditor Agreement.  Failure by the Trustee an Indemnified Party to so notify the Company shall not relieve the Company or any Guarantor of its obligations hereunder except to the extent failure to so notify the Company is actually prejudiced thereby materially affects its ability to defend against the claim.  At the Indemnified Party's sole discretion, the Company shall defend the claim and the Indemnified Party shall cooperate and may participate in the defense; provided any settlement of a claim shall be approved in writing by the Indemnified Party, which approval

shall not be unreasonably withheld.  Alternatively, the Indemnified Party may at its option have separate counsel of its own choosing and the Company shall pay the reasonable fees and expenses of such counsel; <u>provided</u> that the Company shall not be required to pay such fees and expenses if it assumes the Indemnified Party's defense and there is no conflict of interest between the Company and the Indemnified Party in connection with such defense as reasonably determined by the Indemnified Party.  The Company need not pay for any settlement made without its written consent, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, the Company and the Guarantors need not reimburse any expense or indemnify against any loss or liability to the extent incurred by an Indemnified Party through its gross negligence, bad faith or willful misconduct.

To secure the Company's and each Guarantor's payment obligations in this <u>Section 7.07</u>, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee or the Collateral Agent, in its capacity as such, for any amount owing it or any predecessor Trustee, except money or property held in trust to pay principal of or interest on any particular Notes.

When an Indemnified Party incurs expenses or renders services after an Event of Default specified in <u>Section 6.01(i)</u> or <u>6.01(j)</u> occurs, such expenses (including the reasonable fees and expenses of its counsel) and the compensation for such services are intended to constitute expenses of administration under ~~any~~the Bankruptcy Code.

The obligations of the Company under this <u>Section 7.07</u> shall survive the satisfaction and discharge of this Indenture, termination of the Collateral Documents or the Intercreditor Agreement or the resignation or removal of the Trustee.

The Trustee shall comply with the provisions of TIA Section 313(b)(2) to the extent applicable.

SECTION 7.08      <u>Replacement of Trustee.</u>

The Trustee may resign upon 45 days' prior written notice to the Company.  The Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may remove the Trustee by so notifying the Company and the Trustee in writing and may appoint a successor Trustee.  The Company, by a resolution of the Board of Directors, may remove the Trustee if:

> (a)      the Trustee fails to comply with <u>Section 7.10</u> or TIA Section 310;

> (b)      the Trustee is adjudged bankrupt or insolvent;

> (c)      a Custodian or other public officer takes charge of the Trustee or its property; or

> (d)      the Trustee becomes incapable of acting with respect to the Notes.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee.  Within one (1) year after the

successor Trustee takes office, the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts, duties and obligations of the retiring Trustee. Upon request of the Company or the successor Trustee, such retiring Trustee shall at the expense of the Company and upon payment of the charges of the Trustee then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject to the Lien, if any, provided for in Section 7.07. Upon request of any such successor Trustee or the Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of at least 10% in aggregate principal amount of the outstanding Notes voting as a single class may petition any court of competent jurisdiction at the expense of the Company for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.10, any Holder who satisfies the requirements of TIA Section 310(b)(iii) may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

The Company shall give notice of any resignation and any removal of the Trustee and each appointment of a successor Trustee to all Holders in writing. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

Notwithstanding any resignation or replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09        Successor Trustee by Merger, Etc.

If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business to, another Person, the resulting, surviving or transferee Person without any further act shall, if such resulting, surviving or transferee Person is otherwise eligible hereunder, be the successor Trustee; provided, however, that such Person shall be otherwise qualified and eligible under this Article Seven.

In case any Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

SECTION 7.10          Eligibility; Disqualification.

(a)     This Indenture shall always have a Trustee who satisfies the requirements of TIA Sections 310(a)(1), (2), (3) and (5).  The Trustee (or, in the case of a Trustee that is an Affiliate of a bank holding company system, the related bank holding company) shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition.  In addition, if the Trustee is a corporation included in a bank holding company system, the Trustee, independently of such bank holding company, shall meet the capital requirements of TIA Section 310(a)(2).  The Trustee shall comply with TIA Section 310(b); provided, however, that there shall be excluded from the operation of TIA Section 310(b)(1) any indenture or indentures under which other securities, or certificates of interest or participation in other securities, of the Company are outstanding if the requirements for such exclusion set forth in TIA Section 310(b)(1) are met.  The provisions of TIA Section 310 shall apply to the Company, as obligor of the Notes.

(b)     If the Trustee has or acquires a conflicting interest within the meaning of the TIA, the Trustee shall (1) eliminate such conflict within 90 days, (2) apply to the SEC for permission to continue as Trustee hereunder (if this Indenture has been qualified under the TIA) or (3) resign, to the extent and in the manner provided by, and subject to the provisions of, the TIA and this Indenture.

SECTION 7.11          Preferential Collection of Claims Against Company.

The Trustee shall comply with TIA Section 311(a), excluding any creditor relationship listed in TIA Section 311(b).  A Trustee who has resigned or been removed shall be subject to TIA Section 311(a) to the extent indicated therein.

SECTION 7.12          Trustee as Collateral Agent and Paying Agent.

References to the Trustee in Sections 7.01(e), 7.02, 7.03, 7.04, 7.07 and 7.08 and the first paragraph of Section 7.09 shall include the Trustee in its role as Collateral Agent and Paying Agent.

SECTION 7.13          Co-Trustees, Co-Collateral Agent and Separate Trustees, Collateral Agent.

(a)     At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any of the Note Collateral may at the time be located, the Company and the Trustee shall have the power to appoint, and, upon the written request of the Trustee or of the Holders of at least 25% in principal amount of the Notes outstanding voting as a single class, the Company shall for such purpose join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint, one or more Persons approved by the Trustee either to act as co-trustee, jointly with the Trustee, of all or any part of the Note Collateral, to act as co-collateral agent, jointly with the Collateral Agent, or to act as separate trustees or Collateral Agent of any such property, in either case with such powers as may be provided in the instrument of appointment, and to vest in such Person or Persons in the

- 105 -

capacity aforesaid, any property, title, right or power deemed necessary or desirable, subject to the other provisions of this Section 7.13. If the Company does not join in such appointment within 15 days after the receipt by it of a request so to do, or in case an Event of Default has occurred and is continuing, the Trustee alone shall have the power to make such appointment.

(b)      Should any written instrument from the Company be required by any co-trustee, co-Collateral Agent or separate trustee or separate Collateral Agent so appointed for more fully confirming to such co-trustee or separate trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Company.

(c)      Every co-trustee, co-collateral agent or separate trustee or separate collateral agent shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms, namely:

(1)      The Notes shall be authenticated and delivered, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely, by the Trustee.

(2)      The rights, powers, duties and obligations hereby conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such co-trustee or separate trustee, or by the Collateral Agent and such co-Collateral Agent or separate Collateral Agent, jointly as shall be provided in the instrument appointing such co-trustee or separate trustee or co-Collateral Agent or separate Collateral Agent, except to the extent that under any law of any jurisdiction in which any particular act is to be performed the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustee or separate trustee, Collateral Agent or co-Collateral Agent or separate Collateral Agent.

(3)      The Trustee at any time, by an instrument in writing executed and delivered by it, with the concurrence of the Company evidenced by a resolution of the Company's Board of Directors, may accept the resignation of or remove any co-trustee or separate trustee appointed under this Section 7.13, and, in case an Event of Default has occurred and is continuing, the Trustee shall have power to accept the resignation of, or remove, any such co-trustee, co-collateral agent, separate trustee or separate collateral agent without the concurrence of the Company. Upon the written request of the Trustee, the Company shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal. A successor to any co-trustee, co-collateral agent, separate trustee or separate collateral agent so resigned or removed may be appointed in the manner provided in this Section 7.13.

(4)    No co-trustee, co-collateral agent, separate trustee or separate collateral agent hereunder shall be personally liable by reason of any act or omission of the Trustee or the Collateral Agent, or any other such trustee or collateral agent hereunder.

(5)    Any act of Holders delivered to the Trustee shall be deemed to have been delivered to each such co-trustee or separate trustee and any act of Holders delivered to the Collateral Agent shall be deemed to have been delivered to each such co-collateral agent or separate collateral agent.

## ARTICLE EIGHT

## SATISFACTION AND DISCHARGE OF INDENTURE

SECTION 8.01    Legal Defeasance and Covenant Defeasance.

(a)    The Company may, at its option and at any time, elect to have either clause (b) or (c) below be applied to the outstanding Notes upon compliance with the applicable conditions set forth in clause (d).

(b)    Upon the Company's exercise under clause (a) of the option applicable to this clause (b), subject to the satisfaction of the conditions set forth in clause (d) below, the Company and the Guarantors shall be deemed to have been released and discharged from their obligations with respect to the outstanding Notes, the Note Guarantees and the Collateral Documents on the date the applicable conditions set forth below are satisfied ("Legal Defeasance").  For this purpose, such Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of the Sections and matters under this Indenture referred to in subclauses (1) and (2) below, and the Company and the Guarantors shall be deemed to have satisfied all their other obligations under such Notes and this Indenture, the Note Guarantees and the Collateral Documents, except for the following which shall survive until otherwise terminated or discharged hereunder:  (1) the rights of Holders of outstanding Notes to receive solely from the trust fund described in clause (d) below and as more fully set forth in such paragraph payments in respect of the principal of, premium, if any, and interest on such Notes when such payments are due; (2) obligations listed in Section 8.03, subject to compliance with this Section 8.01; (3) the rights, powers, trusts, duties and immunities of the Trustee and the Company's obligations in connection therewith; and (4) this Article Eight.  The Company may exercise its option under this clause (b) notwithstanding the prior exercise of its option under clause (c) below with respect to the Notes.

(c)    Upon the Company's exercise under clause (a) of the option applicable to this clause (c), subject to the satisfaction of the conditions set forth in clause (d) below, the Company and its Restricted Subsidiaries shall be released and discharged from their obligations under any covenant contained in Sections 4.04, 4.05, 4.07, 4.08, 4.10 through 4.24 and 4.26 through 4.29 and clause (4) of the first paragraph of Section 5.01 on and after the date the conditions set forth below are satisfied ("Covenant Defeasance"), and

the Notes shall thereafter be deemed to be not "outstanding" for the purpose of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes).  For this purpose, such Covenant Defeasance means that, with respect to the outstanding Notes and the Note Guarantees, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby.  In addition, upon the Company's exercise under clause (a) above of the option applicable to this clause (c), subject to the satisfaction of the conditions set forth in clause (d) below, Sections 6.01(d) (solely as such Section 6.01(d) pertains to clause (4) of the first paragraph of Section 5.01 or Section 10.04), 6.01(e) (solely as such Section 6.01(e) pertains to Sections 4.04, 4.05, 4.07, 4.08, 4.10 through 4.24 and 4.26 through 4.29 and clause (4) of the first paragraph of Section 5.01), 6.01(f), 6.01(g), 6.01(h), 6.01(k) and 6.01(l) shall not constitute Events of Default.

(d)      The following shall be the conditions to application of either clause (b) or (c) above to the outstanding Notes:

(1)      the Company shall have irrevocably deposited with the Trustee, in trust, for the benefit of the Holders, U.S. Legal Tender or non-callable U.S. Government Obligations or a combination thereof, in such amounts and at such times as are sufficient, in the opinion of a nationally-recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated date for payment or redemption, as the case may be;

(2)      in the case of Legal Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States of America in form reasonably ~~acceptable~~satisfactory to the Trustee confirming that:

(i)      the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(ii)      since the date of this Indenture, there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     in the case of Covenant Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel in the United States of America reasonably acceptable to the Trustee confirming that the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     no Default or Event of Default shall have occurred and be continuing on the date of such deposit pursuant to subclause (1) above (except such Default or Event of Default resulting from the failure to comply with Section 4.12 or Section 4.20 as a result of the borrowing of funds required to effect such deposit);

(5)     such Legal Defeasance or Covenant Defeasance shall not result in a breach of, or constitute a default under any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(6)     the Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over any other creditors of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(7)     the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that, assuming no intervening bankruptcy of the Company between the date of deposit and the 91st day following the date of deposit and assuming that no Holder is an insider of the Company, after the 91st day following the date of deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally; and

(8)     the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Notwithstanding the foregoing, the Opinion of Counsel required by Section 8.01(d)(2) above with respect to a Legal Defeasance need not be delivered if all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable or (B) shall become due and payable on the Maturity Date within one (1) year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company.

In the event all or any portion of the Notes are to be redeemed through such irrevocable trust, the Company shall make arrangements reasonably satisfactory to the Trustee, at the time of

such deposit, for the giving of the notice of such redemption or redemptions by the Trustee in the name and at the expense of the Company.

(e)     Upon a Legal Defeasance or Covenant Defeasance, each Guarantor will be released and relieved of any obligations under its Note Guarantee, and any security for the Notes (other than the trust fund described in Section 8.05) will be released as provided under Section 12.06.

SECTION 8.02     Satisfaction and Discharge.

In addition to the Company's rights under Section 8.01, this Indenture (subject to Section 8.03) and the Collateral Documents will be discharged and will cease to be of further effect as to all outstanding Notes, when:

(a)     either:

(1)     all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid as provided in Section 2.07 and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation; or

(2)     all Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable by reason of the mailing of a notice of redemption or (ii) (A) shall become due and payable at their Stated Maturity within one (1) year or (B) are to be called for redemption within one (1) year under arrangements reasonably satisfactory to the Trustee, and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee funds in trust solely for the benefit of the Holders U.S. Legal Tender, non-callable U.S. Government Obligations, or a combination of U.S. Legal Tender and non-callable U.S. Government Obligations in an amount sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, and premium, if any, and interest on the Notes to the date of stated maturity or such redemption, as the case may be;

(b)     all other sums payable under this Indenture and the Collateral Documents by the Company or any Guarantor have been paid;

(c)     the Company has delivered irrevocable instruments to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at Stated Maturity or on the Redemption Date, as the case may be; and

(d)     the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

Upon such a satisfaction and discharge of the Indenture, each Guarantor will be released and relieved of any obligations under its Note Guarantee, and any security for the Notes (other than the trust fund described in Section 8.05) will be released as provided under Section 12.06.

SECTION 8.03          Survival of Certain Obligations.

Notwithstanding the occurrence of Legal Defeasance under Section 8.01 or the satisfaction and discharge of this Indenture and the Collateral Documents under Section 8.02, the respective obligations of the Company and the Trustee under Sections 2.02, 2.03, 2.04, 2.05, 2.06, 2.07, 2.10, 2.11, 2.12, 2.13, 2.14, 2.15, 2.16 and 6.07, Article Seven and Sections 8.05, 8.06 and 8.07 shall survive until the Notes are no longer outstanding, and thereafter the obligations of the Company and the Trustee under Sections 7.07, 8.05, 8.06 and 8.07 shall survive.

SECTION 8.04          Acknowledgment of Discharge by Trustee.

Subject to Section 8.07, after the conditions of clauses (a), (b), (c) and (d) of Section 8.02 have been satisfied, each of the Trustee and the Collateral Agent upon written request shall acknowledge in writing the discharge of the Company's obligations under this Indenture except for those surviving obligations specified in Section 8.03.

SECTION 8.05          Application of Trust Moneys.

The Trustee shall hold any U.S. Legal Tender or U.S. Government Obligations deposited with it in the irrevocable trust established pursuant to Section 8.01 or 8.02.  The Trustee shall apply the deposited U.S. Legal Tender or the U.S. Government Obligations, together with earnings thereon, through the Paying Agent, in accordance with this Indenture and the terms of the irrevocable trust agreement established pursuant to Section 8.01 or 8.02, to the payment of principal of, premium, if any, and interest on the Notes.  Anything in this Article Eight to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the Company's request any U.S. Legal Tender or U.S. Government Obligations held by it as provided in Section 8.01(d) or 8.02(a)(2) which, in the opinion of a nationally-recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance or satisfaction and discharge, respectively, of this Indenture.

SECTION 8.06          Repayment to the Company of Unclaimed Money.

~~The~~Subject to any applicable abandoned property laws, the Trustee and the Paying Agent shall pay to the Company, upon receipt by the Trustee or the Paying Agent, as the case may be, of a written request from the Company, any money held by it for the payment of principal, premium, if any, or interest that remains unclaimed for two (2) years after payment to the Holders is required, without interest thereon; provided, however, that the Trustee and the Paying Agent before being required to make any payment may, but need not, at the expense of the Company cause to be published once in a newspaper of general circulation in The City of New York or mail to each Holder entitled to such money notice that such money remains unclaimed and that after a date specified therein, which shall be at least 30 days from the date of such publication or mailing, any unclaimed balance of such money then remaining shall be repaid to the Company,

- 111 -

without interest thereon.  After payment to the Company, Holders entitled to money must look solely to the Company for payment as general creditors unless an applicable abandoned property law designated another Person, and all liability of the Trustee or Paying Agent with respect to such money shall thereupon cease.

SECTION 8.07          Reinstatement.

If the Trustee or Paying Agent is unable to apply any U.S. Legal Tender or U.S. Government Obligations in accordance with Section 8.01 or 8.02 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and each Guarantor's obligations under this Indenture, the Collateral Documents, the Note Guarantees and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.01 or 8.02 until such time as the Trustee or Paying Agent is permitted to apply all such U.S. Legal Tender or U.S. Government Obligations in accordance with Section 8.01 or 8.02; provided, however, that if the Company has made any payment of premium, if any, or interest on or principal of any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the U.S. Legal Tender or U.S. Government Obligations held by the Trustee or Paying Agent.

SECTION 8.08          Indemnity for Government Obligations.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the U.S. Government Obligations deposited pursuant to Section 8.01 or Section 8.02 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders.

<h1 style="text-align:center">ARTICLE NINE</h1>

<h2 style="text-align:center">AMENDMENTS, SUPPLEMENTS AND WAIVERS</h2>

SECTION 9.01          Without Consent of Holders.

From time to time, the Company, the Guarantors, the Trustee and, if such amendment, waiver or supplement relates to any Collateral Document, the Collateral Agent, without the consent of the Holders, may amend, waive or supplement provisions of this Indenture, the Collateral Documents and the Notes:

(1)          to cure any ambiguity, defect, or inconsistency contained herein or therein;

(2)          to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)          to provide for the assumption of the obligations of the Company or any Guarantor to Holders in accordance with Section 5.01 or Section 10.04, as the

case may be (and, if applicable, the discharge and release of the predecessor Company in accordance with Section 5.02);

(4)	to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect in any material respect the legal rights of any such Holder under the Indenture Documents or the Intercreditor Agreement;

(5)	to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the TIA;

(6)	to add any additional assets to the Note Collateral;

(7)	to allow any Subsidiary to become a Guarantor or any other Person to guarantee the Notes;

(8)	to comply with the rules of any applicable securities depositary;

(9)	to provide for a successor Trustee or co-trustees in accordance with the terms of this Indenture or to otherwise comply with any requirement of this Indenture;

(10)	to provide for the issuance of Additional Notes in accordance with this Indenture;

(11)	to release a Guarantor from its Note Guarantee and the Collateral Documents as permitted and in accordance with this Indenture;

(12)	to reflect the grant of Liens on the Note Collateral for the benefit of an additional secured party, to the extent that such Indebtedness and the Lien securing such Indebtedness is permitted by the terms of this Indenture; or

(13)	to release Note Collateral from the Lien of this Indenture and the Collateral Documents when permitted or required by this Indenture or the Collateral Documents (including in the case where such Note Collateral constitutes Secondary Collateral, the Intercreditor Agreement).

After an amendment, waiver or supplement under this Section 9.01 becomes effective, the Company shall mail to the Holders affected thereby a notice briefly describing the amendment or supplement. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of such amendment, waiver or supplement.

SECTION 9.02	With Consent of Holders.

Subject to Sections 2.09 and 6.07, the Company, the Guarantors and the Trustee and, if such amendment or supplement relates to a Collateral Document, the Collateral Agent, as applicable, together, with the written consent of the Holder or Holders of at least a majority in

aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) may amend or supplement this Indenture, the Notes, the Collateral Document or the Note Guarantees without notice to any other Holder. Subject to Sections 2.09 and 6.07, the Holder or Holders of a majority in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) may waive any existing Default or Event of Default or compliance by the Company with any provision of this Indenture, the Collateral Documents or the Notes without notice to any other Holder. However, no amendment, supplement or waiver, including a waiver pursuant to Section 6.04, shall without the consent (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) of:

(a)     each Holder affected thereby (with respect to any Notes held by a non-consenting Holder):

(1)     reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver of any provision of this Indenture, the Notes, the Collateral Documents or the Note Guarantees;

(2)     reduce the principal of or change the fixed maturity of any Note or alter the provisions set forth in Article Three;

(3)     reduce the rate of or change the time for payment of interest (including default interest) on any Note;

(4)     waive a Default or Event of Default in the payment of principal of, or interest or premium, if any, on the Notes (except a rescission and cancellation of acceleration of the Notes and the consequences thereof by Holders holding at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class and a waiver of the payment default that resulted from such acceleration as provided in Section 6.02);

(5)     make any Notes payable in currency other than that stated in this Indenture;

(6)     make any change in the provisions of this Indenture relating to waivers of past Defaults (other than to add sections of this Indenture subject thereto) or the rights of Holders to receive payments of principal of, or interest or premium, if any, on the Notes when due and payable;

(7)     amend, change or modify in any material respect the obligation of the Company to make and consummate a Change of Control Offer after the occurrence of a Change of Control or make and consummate a Repurchase Offer or modify any of the provisions or definitions with respect thereto;

(8) release any Guarantor from any of its obligations under its Note Guarantee or this Indenture or any Collateral Document, except in accordance with the terms of this Indenture;

(9) contractually subordinate the Notes or any Note Guarantee in right of payment to any other Indebtedness; or

(10) make any change to Section 9.01 or this Section 9.02; and

(b) the Holders holding at least 75% in aggregate principal amount of the outstanding Notes voting as a single class, adversely change the priority of the Holders' Liens in the Note Collateral or release all or substantially all of the Note Collateral from the Liens created by the Collateral Documents except as specifically provided for in this Indenture and the Collateral Documents.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company shall mail to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment, supplement or waiver.

SECTION 9.03     Compliance with TIA.

Every amendment, waiver or supplement of this Indenture, the Notes or any Collateral Document shall comply with the TIA as then in effect.

SECTION 9.04     Revocation and Effect of Consents.

Until an amendment, waiver or supplement becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. Subject to the following paragraph, any such Holder or subsequent Holder may revoke the consent as to such Holder's Note or portion of such Note by written notice to the Trustee and the Company received before the date on which the Trustee and, if such amendment, waiver or supplement relates to any Collateral Document, the Collateral Agent receives an Officers' Certificate certifying that the Holders of the requisite principal amount of Notes have consented (and not theretofore revoked such consent) to the amendment, waiver or supplement.

The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver, which record date shall be, at the Company's election, either (a) at least 30 days prior to the first solicitation of such consent or (b) the date of the most recent list furnished to the Trustee under Section 2.05. If a record date is fixed, then notwithstanding the last sentence of the immediately

preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 90 days after such record date.

A consent to any amendment, supplement or waiver under this Indenture, the Notes or any Collateral Document by any Holder given in connection with a purchase, tender or exchange of such Holder's Notes shall not be rendered invalid by such purchase, tender or exchange.

After an amendment, supplement or waiver becomes effective, it shall bind every Holder unless it makes a change described in clause (a) of Section 9.02, in which case, the amendment, supplement or waiver shall bind only each Holder of a Note who has consented to it and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note; provided that any such waiver shall not impair or affect the right of any Holder to receive payment of principal of, premium, if any, and interest on a Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates without the consent of such Holder.

SECTION 9.05        Notation on or Exchange of Notes.

If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder of the Note to deliver the Note to the Trustee. The Trustee at the written direction of the Company may place an appropriate notation on the Note regarding the changed terms and return it to the Holder and the Trustee may place an appropriate notation on any Note thereafter authenticated. Alternatively, if the Company or the Trustee so determines, the Company in exchange for the Note shall execute, issue and deliver and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make an appropriate notation, or issue a new Note, shall not affect the validity and effect of such amendment, supplement or waiver. Any such notation or exchange shall be made at the sole cost and expense of the Company.

SECTION 9.06        Trustee or Collateral Agent to Sign Amendments, Etc.

The Trustee or the Collateral Agent, as applicable, shall execute and deliver any amendment, supplement or waiver authorized pursuant to this Article Nine; provided that the Trustee or the Collateral Agent, as the case may be, may, but shall not be obligated to, execute and deliver any such amendment, supplement or waiver which adversely affects the rights, duties or immunities of the Trustee or the Collateral Agent, as the case may be, under this Indenture or any Collateral Document. The Trustee or the Collateral Agent, as the case may be, shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel and an Officers' Certificate each stating that the execution and deliverdelivery of any amendment, supplement or waiver authorized pursuant to this Article Nine is authorized or permitted by this Indenture. Such Opinion of Counsel shall also state that the amendment, supplement or waiver is a valid and enforceable obligation of the Company (subject to customary exceptions). Such Opinion of Counsel shall not be an expense of the Trustee or the Collateral Agent, as the case may be, and shall be paid for by the Company.

SECTION 9.07          Acts of Holders.

(a)          Any request, demand, authorization, direction, notice, consent, waiver or other action provided in or pursuant to this Indenture to be given, made or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section 9.07.

Without limiting the generality of this Section 9.07, unless otherwise provided in or pursuant to this Indenture:  (i) a Holder, including a Depository or its nominee that is a Holder of a Global Note, may give, make or take, by an agent or agents duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in or pursuant to this Indenture to be given, made or taken by Holders, and a Depository or its nominee that is a Holder of a Global Note may duly appoint in writing as its agent or agent members of, or participants in, such Depository holding interests in such Global Note in the records of such Depository; and (ii) with respect to any Global Note the Depository for which is DTC, any consent or other action given, made or taken by an Agent Member of DTC by electronic means in accordance with the Automated Tender Offer Procedures system or other customary procedures of, and pursuant to authorization by, DTC shall be deemed to constitute the "Act" of the Holder of such Global Note, and such "Act" shall be deemed to have been delivered to the Company and the Trustee upon the delivery by DTC of an "agent's message" or other notice of such consent or other action having been so given, made or taken in accordance with the customary procedures of DTC.

(b)          The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by a Person acting in a capacity other than such Person's individual capacity, such certificate or affidavit shall also constitute sufficient proof of the authority of the Person executing the same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

(c)          The ownership of Notes shall be proved by the Register.

(d)          Without limiting the foregoing, a Holder entitled hereunder to give, make or take any action hereunder with regard to any particular Note may do so, or duly appoint

in writing any Person or Persons as its agent or agents to do so, with regard to all or any part of the principal amount of such Note.

## ARTICLE TEN

## GUARANTEE

SECTION 10.01     Guarantee.

Each Guarantor hereby, jointly and severally, unconditionally and irrevocably guarantees (such guarantee to be referred to herein as the "Note Guarantee") to each of the Holders and to the Trustee and the Collateral Agent and their respective successors and assigns that:  (a) the principal of, premium, if any, and interest on the Notes shall be promptly paid in full when due, subject to any applicable grace period, whether upon redemption pursuant to the terms of the Notes, by acceleration or otherwise, and interest on the overdue principal (including interest accruing at the then applicable rate provided in the Indenture Documents after the occurrence of any Event of Default set forth in Section 6.01(i) or 6.01(j), whether or not a claim for post-filing or post-petition interest is allowed under applicable law following the institution of a proceeding under bankruptcy, insolvency or similar laws), if any, and interest on any interest, if any, to the extent lawful, of the Notes and all other obligations of the Company to the Holders, the Trustee and the Collateral Agent hereunder, thereunder or under any Collateral Document or the Intercreditor Agreement shall be promptly paid in full or performed, all in accordance with the terms hereof, thereof and of the Collateral Documents and Intercreditor Agreement; and (b) in case of any extension of time of payment or renewal of any of the Notes or of any such other obligations, the same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, subject to any applicable grace period, whether at stated maturity, by acceleration or otherwise; subject, however, in the case of clauses (a) and (b) above, to the limitations set forth in Section 10.03.  The Note Guarantee of each Guarantor shall rank senior in right of payment to all existing and future subordinated Indebtedness of such Guarantor that expressly provides such Indebtedness shall be so subordinate and equal in right of payment with all other existing and future senior obligations of such Guarantor, including borrowings or guarantees of borrowings under the ABL Facility.  Each Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes, this Indenture, any Collateral Document or the Intercreditor Agreement, the absence of any action to enforce the same, any waiver or consent by any of the Holders with respect to any provisions hereof or thereof, any release of any other Guarantor, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenants that this Note Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes, this Indenture and in this Note Guarantee.  If the Trustee, the Collateral Agent or any Holder is required by any court or otherwise to return to the Company, any Guarantor, or any Custodian or other similar official acting in relation to the Company or any Guarantor, any amount paid by the Company or any Guarantor to the Trustee, the Collateral Agent or such Holder, this Note Guarantee, to the extent theretofore discharged,

shall be reinstated in full force and effect. Each Guarantor further agrees that, as between each Guarantor, on the one hand, and the Holders, the Collateral Agent and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article Six for the purposes of this Note Guarantee notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any acceleration of such obligations as provided in Article Six, such obligations (whether or not due and payable) shall forthwith become due and payable by each Guarantor for the purpose of this Note Guarantee.

SECTION 10.02    Release of a Guarantor.

Notwithstanding the foregoing, a Guarantor will be automatically and unconditionally released from its Note Guarantee and the Collateral Documents without any action required on the part of the Trustee or any Holder:

(a)    in connection with any sale or other disposition of all or substantially all of the assets of that Guarantor (including by way of merger, consolidation or otherwise) to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, if the sale or other disposition complies with the applicable provisions of this Indenture;

(b)    in connection with any sale or other disposition of all of the Capital Stock of a Guarantor by the Company or a Restricted Subsidiary of the Company to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, if the sale or other disposition complies with the applicable provisions of this Indenture;

(c)    if the Company designates any Restricted Subsidiary that is a Guarantor to be an Unrestricted Subsidiary in accordance with the applicable provisions of this Indenture;

(d)    if the Company exercises its Legal Defeasance option or its Covenant Defeasance option as described in Section 8.01; or

(e)    upon satisfaction and discharge of this Indenture or payment in full of the principal and premium, if any, and accrued and unpaid interest on the Notes and all other Note Obligations that are then due and payable.

The Trustee or the Collateral Agent, as applicable, shall promptly deliver an ~~appropriate~~ instrument evidencing such release in form reasonably satisfactory to the Trustee or the Collateral Agent, as applicable, upon receipt of a request by the Company accompanied by an Officers' Certificate certifying as to the compliance with this Section 10.02. Any Guarantor not so released remains liable for the full amount of its Note Guarantee as provided in this Article Ten.

SECTION 10.03       Limitation of Guarantor's Liability.

Each Guarantor and, by its acceptance hereof, each of the Holders hereby confirms that it is the intention of all such parties that the guarantee by such Guarantor pursuant to its Note Guarantee not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law.  To effectuate the foregoing intention, the Holders and each Guarantor hereby irrevocably agree that the obligations of such Guarantor under the Note Guarantee shall be limited to the maximum amount as shall, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Note Guarantee or pursuant to <u>Section 10.05</u>, result in the obligations of such Guarantor under the Note Guarantee not constituting such fraudulent transfer or conveyance.

SECTION 10.04       Guarantors May Consolidate, etc., on Certain Terms.

Each Guarantor will not, and the Company will not cause or permit any Guarantor to, sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person), any Person other than the Company or any other Guarantor unless:

(a)       immediately after giving effect to that transaction, no Default or Event of Default exists; and

(b)       either:

(1)       the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor or the Company):

(i)       is a Person organized and existing under the laws of the United States of America or any state thereof or the District of Columbia; and

(ii)       assumes all the obligations of such Guarantor under this Indenture and any Collateral Documents to which such Guarantor is a party pursuant to a supplemental indenture substantially in the form of <u>Exhibit G</u> hereto and other agreements reasonably satisfactory to the Trustee and in connection therewith shall execute and deliver such other agreements, cause such instruments and Uniform Commercial Code financing statements to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to continue the validity and enforceability, and perfect or continue the perfection, of the Note Lien created under the Collateral Documents on the Note Collateral owned by or transferred to such Person; or

(2)       in the case of any such sale or disposition (including by way of any such consolidation or merger), such sale or disposition complies with Section 4.16; and

(c)       the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consummation of such consolidation, merger, sale, assignment, transfer, conveyance or other disposition and, if such an assumption is required in connection with such transaction, such assumption, complies with the applicable provisions of this Indenture and that all conditions precedent in this Indenture relating to such transaction have been satisfied.

SECTION 10.05       Contribution.

In order to provide for just and equitable contribution among the Guarantors, the Guarantors agree, inter se, that each Guarantor that makes a payment or distribution under a Note Guarantee shall be entitled to a pro rata contribution from each other Guarantor hereunder based on the net assets of each other Guarantor.  The preceding sentence shall in no way affect the rights of the Holders of the Notes to the benefits of this Indenture, the Notes or the Note Guarantees.

SECTION 10.06       Waiver of Subrogation.

Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.

SECTION 10.07       Waiver of Stay, Extension or Usury Laws.

Each Guarantor covenants to the extent permitted by law that it shall not at any time insist upon or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law that would prohibit or forgive such Guarantor from performing its Note Guarantee as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Note Guarantee; and each Guarantor hereby expressly waives to the extent permitted by law all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 10.08       Note Guarantee Evidenced by Indenture; No Notation of Note Guarantee.

The Note Guarantee of any Guarantor shall be evidenced solely by its execution and delivery of this Indenture (or, in the case of any Guarantor that is not party to this Indenture on the Issue Date, a supplemental indenture thereto) and not by an endorsement on, or attachment to, any Note of any Note Guarantee or notation thereof.  To effect any Note Guarantee of any Guarantor not a party to this Indenture on the Issue Date, such future Guarantor shall execute and deliver a supplemental indenture substantially in the form of Exhibit G hereto, which

supplemental indenture shall be executed and delivered on behalf of such Guarantor by an Officer of such Guarantor.

Each Guarantor hereby agrees that its Note Guarantee set forth in <u>Section 10.01</u> shall be and remain in full force and effect notwithstanding any failure to endorse on any Note a notation of such Note Guarantee.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantees set forth in this Indenture on behalf of each of the Guarantors.

## ARTICLE ELEVEN

## MISCELLANEOUS

SECTION 11.01 <u>Trust Indenture Act Controls.</u>

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA Section 318(c), such TIA-imposed duties shall control.  If any provision of this Indenture limits, qualifies or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.  If any provision of this Indenture modifies or excludes any provision of the TIA that may be so modified or excluded, the provision of the TIA shall be deemed to apply to this Indenture as so modified or shall be excluded, as the case may be.  Any provision of the TIA which is required to be included in a qualified Indenture, but not expressly included herein, shall be deemed to be included by this reference.

SECTION 11.02 <u>Notices.</u>

Any notices or other communications required or permitted hereunder or under any Collateral Document shall be in writing, and shall be sufficiently given if made by hand delivery, by telex, by telecopier, by email or other electronic format (including in portable document format (.pdf)), by overnight courier or registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

if sent other than by registered or certified mail to the Company or any Guarantor:

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, IL  61554
Attention:  Corporate Controller
General Counsel
Facsimile Number:  (309) 478-1535

if sent by registered or certified mail to the Company or any Guarantor:

Aventine Renewable Energy Holdings, Inc.
P. O. Box [___]

Pekin, IL  61554
Attention:  Corporate Controller
           General Counsel
Facsimile Number:  (309) 478-1535

if to the Trustee:

Wilmington Trust ~~Company~~FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  [•]Aventine Administrator
Facsimile Number:  [•]612-217-5651

if to the Collateral Agent:

Wilmington Trust ~~Company~~FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  [•]Aventine Administrator
Facsimile Number:  [•]612-217-5651

Each of the Company, any Guarantor, the Collateral Agent or the Trustee by written notice to each other may designate additional or different addresses for notices to such Person. Any notice or communication to the Company, any Guarantor, the Collateral Agent or the Trustee shall be deemed to have been given or made (whether or not the addressee receives it) as of the date so delivered if personally delivered; when receipt is acknowledged, if faxed, emailed or sent in other electronic form; one (1) Business Day after mailing if sent by overnight courier guaranteeing next day delivery; and five (5) calendar days after mailing if sent by registered or certified first class mail, postage prepaid and return receipt requested, in each case to the address shown above or designated as specified above (except that a notice of change of address shall not be deemed to have been given until actually received by the addressee).

Any notice or communication mailed to a Holder shall be mailed to such Holder by registered or certified first class mail, postage prepaid and return receipt requested, or by overnight air courier guaranteeing next day delivery at such Holder's address as it appears on the registration books of the Registrar and shall be sufficiently given to such Holder if so mailed within the time prescribed (whether or not the addressee receives it).  Any notice or communication shall also be so mailed to any Person described in TIA Section 313(c), to the extent required by the TIA.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If the Company mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

Where this Indenture provides for notice of any event to a Holder of a Global Note, such notice shall be sufficiently given if given to the Depository for such Note (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

SECTION 11.03    Communications by Holders with Other Holders.

Holders may communicate pursuant to TIA Section 312(b) with other Holders with respect to their rights under this Indenture, any Collateral Document, any Note Guarantee or the Notes.  The Company, the Trustee, the Collateral Agent, the Registrar and any other Person shall have the protection of TIA Section 312(c).

SECTION 11.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Company or any Guarantor to the Trustee or the Collateral Agent, as the case may be, to take any action under this Indenture, any Collateral Document or any other Indenture Document, the Company shall furnish to the Trustee or the Collateral Agent, as the case may be, upon request:

(a)    an Officers' Certificate (which shall include the statements set forth in Section 11.05), in form and substance reasonably satisfactory to the Trustee or the Collateral Agent, as the case may be, stating that, in the opinion of the signers, all conditions precedent to be performed by the Company or the applicable Guarantor (as the case may be), if any, provided for in this Indenture, any Collateral Document, the Notes or the Note Guarantees relating to the proposed action have been complied with; and

(b)    an Opinion of Counsel (which shall include the statements set forth in Section 11.05) stating that, in the opinion of such counsel, all such conditions precedent to be performed by the Company or the applicable Guarantor (as the case may be), if any, provided for in this Indenture, any Collateral Document and the Notes relating to the proposed action have been complied with.

SECTION 11.05    Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or any Collateral Document, other than the Officers' Certificate required by Section 4.06, shall include:

(a)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)     a statement that, in the opinion of such Person, he has made such examination or investigation as is reasonably necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of any Person may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate or opinion of, or representation by, counsel or any Opinion of Counsel may be based, insofar as it relates to factual matters, upon certificates of public officials or upon a certificate or opinion of, or representations by, an officer or officers of the Company or any Guarantor (including an Officers' Certificate) stating that the information with respect to such factual matters is in the possession of the Company or such Guarantor unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 11.06     Rules by Trustee, Paying Agent, Registrar.

The Trustee may make reasonable rules in accordance with the Trustee's customary practices for action by or at a meeting of Holders.  The Paying Agent or Registrar may make reasonable rules for its functions.

SECTION 11.07     Legal Holidays.

A "Legal Holiday" used with respect to a particular place of payment is a Saturday, a Sunday or a day on which banking institutions in New York, New York, Chicago, Illinois or at

such place of payment are not required to be open.  If a payment date is a Legal Holiday at such place, payment may be made at such place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.

SECTION 11.08     Governing Law.

THIS INDENTURE, THE NOTES, THE COLLATERAL DOCUMENTS (OTHER THAN THE MORTGAGES) AND THE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401).  EACH OF THE PARTIES HERETO AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE GUARANTEES, THE COLLATERAL DOCUMENTS (OTHER THAN THE MORTGAGES) OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

SECTION 11.09     No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret another indenture, loan or debt agreement of the Company or any of its Subsidiaries.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

SECTION 11.10     No Recourse Against Others.

No Affiliate, director, manager, officer, employee, incorporator, member or holder of any Equity Interests in the Company, a Guarantor or the Trustee or any direct or indirect parent of the Company, a Guarantor or the Trustee, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, this Indenture, the Note Guarantees or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees.  The parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

SECTION 11.11     Successors.

All agreements of the Company and the Guarantors in this Indenture, the Notes and the Note Guarantees shall bind their respective successors.  All agreements of the Trustee and the Collateral Agent in this Indenture shall bind their respective successors.

SECTION 11.12     Duplicate Originals.

All parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together shall represent the same agreement.

SECTION 11.13    Severability.

In case any one or more of the provisions in this Indenture, the Notes or the other Indenture Documents shall be held invalid, illegal or unenforceable, in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions shall not in any way be affected or impaired thereby, it being intended that all of the provisions hereof shall be enforceable to the full extent permitted by law.

SECTION 11.14    Waiver of Jury Trial.

EACH OF THE COMPANY, THE GUARANTORS, THE TRUSTEE, THE COLLATERAL AGENT, AND BY ITS ACCEPTANCE THEREOF, EACH HOLDER OF A NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS INDENTURE, THE COLLATERAL DOCUMENTS, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED BY THIS INDENTURE.

SECTION 11.15    Table of Contents, Headings, etc.

The Table of Contents, Cross-Reference Table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

**ARTICLE TWELVE**

**SECURITY**

SECTION 12.01    Grant of Security Interest.

(a)    The due and punctual payment of the Note Obligations when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, purchase, repurchase, redemption or otherwise, and the performance of all other Note Obligations of the Company and the Guarantors to the Holders, the Collateral Agent or the Trustee under this Indenture, the Collateral Documents, the Note Guarantees and the Notes are secured as provided in the Collateral Documents which the Company and the Guarantors have entered into simultaneously with the execution of this Indenture and will be secured by Collateral Documents hereafter delivered as required or permitted by this Indenture.  Subject to the Intercreditor Agreement, the Collateral Documents shall provide for the grant by the Company and Guarantors party thereto to the Collateral Agent of security interests in the Note Collateral.

(b)    Each Holder, by its acceptance of any Notes and Note Guarantees, hereby (i) authorizes the Trustee and the Collateral Agent, as applicable, on behalf of and for the benefit of such Holder, to be the agent for and representative of such Holder with respect to the Note Guarantees, the Note Collateral and the Collateral Documents and (ii)

irrevocably appoints the Collateral Agent to act as such Holder's agent and Collateral Agent under the Intercreditor Agreement.

(c)     The Trustee and each Holder, by its acceptance of any Notes and Note Guarantees:  (i) consents and agrees to, and agrees to be bound by, the terms of each Collateral Document, as the same may be in effect or may be amended from time to time in accordance with their respective terms; (ii) authorizes and directs the Collateral Agent to enter into this Indenture and the Collateral Documents and authorizes and empowers the Collateral Agent to bind the Holders of the Notes and other holders of Note Obligations as set forth in the Collateral Documents and the Intercreditor Agreement to perform its obligations and exercise its rights thereunder in accordance therewith; and (iii) irrevocably authorizes the Collateral Agent to perform the duties and exercise the rights, powers and discretions that are specifically given to it hereunder or under the Collateral Documents or the Intercreditor Agreement, together with any other incidental rights, power and discretions.  The Company shall, and shall cause each of its Domestic Subsidiaries to, do or cause to be done, at its sole cost and expense, all such actions and things as may be required by the provisions of the Collateral Documents, or which the Collateral Agent from time to time may reasonably request, to assure and confirm to the Collateral Agent the security interests in the Note Collateral contemplated by the Collateral Documents so as to render the same available for the security and benefit of this Indenture and of the Note Obligations secured hereby, according to the intent and purpose herein and therein expressed and subject to the Intercreditor Agreement.  The Company shall, and shall cause each of its Domestic Subsidiaries to, take any and all commercially reasonable actions required or as may be reasonably requested by the Collateral Agent to (x) cause the Collateral Documents to create and maintain, as security for the Note Obligations, valid and enforceable, perfected security interests in and on all the Note Collateral, in favor of the Collateral Agent, for the benefit of itself and the Trustee and the Holders, superior to and prior to the rights of all third Persons and subject to no other Liens, in each case, except for Permitted Collateral Liens and (y) comply with the applicable provisions of the TIA.  If required for the purpose of meeting the legal requirements of any jurisdiction in which any of the Note Collateral may at the time be located, the Company, the Trustee and the Collateral Agent shall have the power to appoint, and shall take all reasonable action to appoint, one or more Persons approved by the Trustee and reasonably acceptable to the Company to act as co-Collateral Agent with respect to any such Note Collateral, with such rights and powers limited to those deemed necessary for the Company, the Trustee or the Collateral Agent to comply with any such legal requirements with respect to such Note Collateral, and which rights and powers shall not be inconsistent with the provisions of this Indenture or any Indenture Document. At any time and from time to time, the Company shall, and shall cause each of its Restricted Subsidiaries to, promptly execute, acknowledge and deliver such Collateral Documents, instruments, certificates, notices and other documents and take such other actions as shall be required by law or any Collateral Document, or which the Collateral Agent may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred as contemplated by this Indenture for the benefit of the holders of the Note Obligations.  The Company shall from time to time promptly pay all reasonable financing and continuation statement recording or filing fees, charges and

taxes relating to this Indenture, the Collateral Documents and any other instruments of further assurance required pursuant hereto or thereto.

(d)    Subject to and in accordance with the provisions of the Collateral Documents and this Indenture, so long as the Collateral Agent or (solely with respect to any Secondary Collateral) any Credit Facility Agent has not exercised their respective rights with respect to the Note Collateral upon the occurrence and during the continuance of an Event of Default, the Company and each Guarantor will have the right to remain in possession and retain exclusive control of the Note Collateral (other than any cash, securities, obligations and Cash Equivalents constituting part of the Note Collateral that may be deposited with the Collateral Agent or (solely with respect to any Secondary Collateral) any Credit Facility Agent in accordance with the provisions of the Collateral Documents and other than as set forth in the Collateral Documents), to operate the Note Collateral, to alter or repair the Note Collateral and to collect, invest and dispose of any income therefrom, subject, in the case of the Secondary Collateral, to the provisions of the Intercreditor Agreement and the Credit Facility Lien Security Documents.  Upon the occurrence and continuance of an Event of Default, the Collateral Agent or (solely with respect to any Secondary Collateral) any Credit Facility Agent will be entitled to foreclose upon and sell the Note Collateral or any part thereof as provided in the Collateral Documents or (solely with respect to any Secondary Collateral) the ABL Facility Lien Security Documents.

(e)    Anything contained in this Indenture or the Collateral Documents to the contrary notwithstanding, each Holder hereby agrees that no Holder shall have any right individually to realize upon any of the Note Collateral, it being understood and agreed that all powers, rights and remedies of the Trustee hereunder may be exercised solely by the Trustee in accordance with the terms hereof and all powers, rights and remedies in respect of the Note Collateral under the Collateral Documents may be exercised solely by the Collateral Agent.

(f)    Subject to the provisions of the Collateral Documents, the Trustee may, in its sole discretion and without the consent of the Holders, on behalf of the Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to (i) enforce any of its rights or any of the rights of the Holders under the Collateral Documents and (ii) collect and receive any and all amounts payable in respect of the Note Collateral in respect of the obligations of the Company and the Guarantors hereunder and thereunder. Subject to the provisions of the Collateral Documents, the Trustee shall have the power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Note Collateral by any acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interest and the interests of the Holders in the Note Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such

enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

(g)        Where any provision of this Indenture or any Collateral Document requires that additional property or assets be added to the Note Collateral, the Company shall, no later than the Note Collateral Required Date with respect to such property or assets (and subject to any provision hereof requiring any earlier action): (x) cause a valid and enforceable and (except solely as to Excluded Personal Property) perfected first priority Lien on or in such property or assets (subject only to Permitted Collateral Liens) to vest in the Collateral Agent, as security for the Note Obligations, and (y) deliver to the Trustee and the Collateral Agent the following:

(i)        unless such property or assets constitute Note Collateral Non-Specified Covered Property, a request from the Company that such Note Collateral be added;

(ii)        unless such property or assets constitute Note Collateral Non-Specified Covered Property, an Officers' Certificate to the effect that the Note Collateral being added is in the form, consists of the assets and is in the amount required by this Indenture;

(iii)        unless such property or assets constitute Note Collateral Covered Property or real property, Collateral Documents adding such property or assets as Note Collateral, which Collateral Documents shall be dated no later than such Note Collateral Required Date and, based on the type and location of the property subject thereto, substantially in the form and with substantially the terms of the applicable Collateral Documents entered into on the Issue Date (such Collateral Documents (or financing statements in respect thereof) having been duly received for recording in the appropriate filing, recording or registry office);

(iv)        to the extent such property or assets constitute real property, a Mortgage with respect to such property or assets, dated no later than such Note Collateral Required Date and substantially in the form attached as Exhibit H hereto (with such changes thereto as are customarily acceptable to holders of mortgages on real property in the jurisdiction where such real property is located (such Mortgage having been duly received for recording in the appropriate filing or recording office);

(v)        to the extent such property or assets constitute real property, title and extended coverage insurance covering such property or assets, in an amount equal to no less than the Fair Market Value of such property or assets;

(vi)        unless such property or assets constitute Note Collateral Covered Property, such financing statements or other filings or recording

instruments, if any, as the Company shall deem necessary to perfect the Collateral Agent's Lien in such Note Collateral;

(vii)    unless such property or assets constitute Note Collateral Non-Specified Covered Property, appropriate Opinions of Counsel (of scope and substance, and subject to customary exceptions, substantially the same as the Issue Date Opinions) with respect to, among other things, the creation, validity, perfection and (solely as to certificated securities and instruments) priority of the Collateral Agent's Lien on such property or assets and as to the due authorization, execution, delivery, validity and enforceability of such Mortgage (to the extent such property or assets constitute real property) or Collateral Documents (to the extent such property or assets do not constitute real property) pursuant to which the Collateral Agent's Lien has been or is being granted; and

(viii)    unless such property or assets constitute Note Collateral Non-Specified Covered Property, an Officers' Certificate and Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture to, and any other requirements provided for in this Indenture in respect of, the addition of such property or assets to the Note Collateral have been complied with (it being understood that in any event such Opinion of Counsel pursuant to this clause (viii) and any Opinion of Counsel pursuant to clause (vii) above or the following paragraph may expressly state that no opinion is expressed therein to priority of any Lien on any Note Collateral (except solely as to certificated securities and instruments)).

The Company shall, at the same time as the Company is required to furnish to the Trustee and the Collateral Agent the Opinion of Counsel required pursuant to Section 12.03(b), deliver to the  Trustee and the Collateral Agent an Officers' Certificate and Opinion of Counsel to the effect that, as to any property or assets required by any provision of this Indenture or any Collateral Document to be added to the Note Collateral on or after the Issue Date and prior to the date thereof and as to which an Officers' Certificate and Opinion of Counsel have not previously been delivered pursuant to clause (viii) of the preceding paragraph or pursuant to this paragraph of this Section 12.01(g), all conditions precedent provided for in this Indenture to the addition of such property or assets to, and any other requirements provided for in the Indenture in respect of, the addition of such property or assets to the Note Collateral have been complied with.

(h)    Each of the Collateral Agent and the Trustee is authorized and empowered to receive for the benefit of the Holders of the Notes any funds collected or distributed to the Collateral Agent or the Trustee under the Collateral Documents and, subject to the terms of the Collateral Documents, the Trustee is authorized and empowered to make further distributions of such funds to the Holders of the Notes according to the provisions of this Indenture.

(i)     Each Holder of the Notes, by its acceptance thereof, authorizes and directs the Trustee and the Collateral Agent to enter into one or more amendments to the Intercreditor Agreement or enter into any amendments or supplements to the Collateral Documents in accordance with the provisions of this Indenture, the Intercreditor Agreement and the Collateral Documents.

(j)     In the event that the Company shall issue Additional Notes pursuant to clause (c) of the fourth paragraph of Section 2.02, the net proceeds from any such issuance shall constitute "Collateral Monies" and shall be immediately deposited into the Collateral Account pending their use by the Company or any Guarantor to acquire Additional Assets that become Primary Collateral simultaneously with the acquisition thereof by the Company or such Guarantor, as applicable, or as otherwise specified in Section 12.11.

(k)     The Company shall, and shall cause each Domestic Subsidiary to, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or required by the Collateral Documents to maintain (at the sole cost and expense of the Company and its Domestic Subsidiaries) the security interest created by the Collateral Documents in the Note Collateral (other than with respect to any Note Collateral the security interest in which is not required to be perfected under the Collateral Documents) as a perfected [first] priority security interest subject only to Permitted Collateral Liens.

(l)     The Trustee and the Company hereby acknowledge and agree that the Trustee or the Collateral Agent, as the case may be, holds the Note Collateral in trust for the benefit of the Trustee and the Holders, in each case pursuant to the terms of the Collateral Documents and the Intercreditor Agreement.

(m)     If the Company or any Restricted Subsidiary fails to do so, the Collateral Agent shall, pursuant to the terms of the Collateral Documents, be irrevocably authorized and empowered, with full power of substitution, to execute, acknowledge and deliver such security agreements, instruments, certificates, notices and other documents and, subject to the terms of this Indenture and the Collateral Documents, take such other actions in the name, place and stead of the Company or such Restricted Subsidiary, but the Collateral Agent shall have no obligation to do so and no liability for any action taken or omitted by it in good faith in connection therewith.

(n)     If the Company or any Guarantor grants a Lien on any of its property or assets (including any Capital Stock) for the benefit of any holders of Credit Facility Obligations, the Company or such Guarantor, respectively, shall also simultaneously grant a Lien in such property or assets (including Capital Stock) in favor of the Collateral Agent for the benefit of the Trustee and the Holders so that such property or assets become Note Collateral.

SECTION 12.02    Intercreditor Agreement.

This Indenture and the Collateral Documents are subject to the terms, limitations and conditions set forth in the Intercreditor Agreement.  The Trustee and by its acceptance of its Note(s), each Holder, (a) consents to the subordination of Liens on the Second Lien Collateral as defined, and provided for, in the Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) authorizes and instructs the Collateral Agent to enter into the Intercreditor Agreement as agent for and representative of such Secured Party.  The foregoing provisions are intended as an inducement to the lenders under the Credit Facility to extend credit to the Company and such lenders are intended third party beneficiaries of such provisions.  If any conflict or inconsistency exists between this Indenture and the Intercreditor Agreement, the Intercreditor Agreement shall govern.  If any conflict or inconsistency exists between this Indenture and any Collateral Document (other than the Intercreditor Agreement), this Indenture shall govern.

SECTION 12.03    Recording and Opinions.

(a)    The Company shall furnish to the Trustee, at such time as required by TIA Section 314(b) an Opinion of Counsel either (1) stating that, in the opinion of such counsel, this Indenture and the Collateral Documents and any financing statements and other instruments have been properly recorded, registered and filed to the extent necessary to perfect the security interests created by the Collateral Documents (to the extent such security interests may be perfected by a recording, registering or filing) and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given or (2) stating that, in the opinion of such counsel, no such action is necessary to perfect any security interest created under any of the Collateral Documents.

(b)    The Company shall furnish to the Trustee and the Collateral Agent (if other than the Trustee), on or within one month of June 30 of each year, commencing June 30, 2011, an Opinion of Counsel either (1) stating that, in the opinion of such counsel, all action necessary to perfect or continue the perfection of the security interests created by the Collateral Documents (to the extent such security interests may be perfected by a recording, registering or filing) has been taken and reciting the details of such action or referring to prior Opinions of Counsel in which such details are given or (2) stating that, in the opinion of such counsel, no such action is necessary to perfect or continue the perfection of any security interest created under any of the Collateral Documents.

SECTION 12.04    Release of Note Collateral.

(a)    Subject to the Intercreditor Agreement, the Collateral Agent shall not at any time release Note Collateral from the security interests created by the Collateral Documents unless such release is in accordance with Section 12.04(b), 12.04(d), 12.05, 12.06, or 12.11.

(b)    So long as no Default or Event of Default under this Indenture shall have occurred and be continuing or would result therefrom and so long as such transaction

would not violate this Indenture, the Company and the Guarantors may, in the ordinary course of business and to the extent permitted by applicable law, without any release or consent by the Trustee, the Collateral Agent or any Holder, sell or otherwise dispose of inventory or collect accounts receivable or sell or otherwise dispose of equipment that has become worn out, defective or obsolete or not used or useful in the business of the Company and its Subsidiaries and which is, to the extent required by this Indenture or the Collateral Documents, replaced by property of substantially equivalent or greater value which becomes subject to the Note Lien of the Collateral Documents. The Company will deliver to the Trustee, within 30 calendar days following the end of each year, an Officers' Certificate to the effect that all releases during the preceding 12-month period in which no release or consent of the Trustee was obtained were in the ordinary course of business and were not prohibited by this Indenture or any Collateral Document.

(c)     The release of any Note Collateral from the terms of the Collateral Documents shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof if and to the extent the Note Collateral is released pursuant to Section 12.04(b), 12.04(d), 12.05, 12.06, or 12.11 or otherwise pursuant to this Indenture and the Collateral Documents or pursuant to the Intercreditor Agreement. To the extent applicable, the Company shall cause TIA Section 314(d) relating to the release of property from the security interests created by this Indenture and the Collateral Documents to be complied with. Any certificate or opinion required by TIA Section 314(d) may be made by an Officer of the Company, except in cases where TIA Section 314(d) requires that such certificate or opinion be made by an independent Person, which Person shall be an independent engineer, appraiser or other expert selected or approved by the Trustee in the exercise of reasonable care. A Person is "independent" if such Person (1) is in fact independent, (2) does not have any direct financial interest or any material indirect financial interest in the Company or in any Affiliate of the Company and (3) is not an officer, employee, promoter, underwriter, trustee, partner or director or person performing similar functions to any of the foregoing for the Company. The Trustee and the Collateral Agent shall be entitled to receive and rely upon a certificate provided by any such Person confirming that such Person is independent within the foregoing definition.

(d)     Notwithstanding any other provision of any Indenture Document, the consent and release of the Collateral Agent, the Trustee or any Holder will not be required for the sale or other disposition of Secondary Collateral in accordance with the terms of the ABL Facility or any other Credit Facility subject to compliance with the Intercreditor Agreement.

(e)     At any time when an Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Note Collateral pursuant to the provisions of this Indenture or the Collateral Documents will be effective as against the Holders, except (solely with respect to Secondary Collateral) as otherwise provided in the Intercreditor Agreement.

SECTION 12.05          Specified Releases of Note Collateral.

Subject to Section 12.04, any asset included in the Note Collateral may be released from the Note Liens at any time or from time to time in accordance with the provisions of the Collateral Documents, including the Intercreditor Agreement, upon the request of the Company pursuant to an Officers' Certificate certifying that all conditions precedent hereunder and under the Collateral Documents have been met and without the consent of the Collateral Agent, the Trustee or any Holder, under any one or more of the following circumstances:

(a)     upon delivery by the Company to the Collateral Agent of an Officers' Certificate certifying that the asset has been sold or otherwise disposed of by the Company or a Restricted Subsidiary to a Person other than the Company or a Guarantor in a transaction permitted by this Indenture, at the time of such sale or disposition; or

(b)     upon delivery by the Company to the Collateral Agent of an Officers' Certificate certifying that the asset is owned or has been acquired by a Guarantor that has been released from its Note Guarantee (including by virtue of (x) a Guarantor becoming an Unrestricted Subsidiary or (y) a sale by the Company or a Subsidiary thereof of all of the Capital Stock of a Guarantor); or

(c)     upon delivery by the Company to the Collateral Agent of an Officers' Certificate certifying that (x) such asset is comprised of Secondary Collateral, (y) Credit Facility Obligations remain outstanding under one or more Credit Facilities and (z) to the extent such consent is required, the Credit Facility Agent under any such Credit Facility has authorized the release of the same.

SECTION 12.06          Release of all Note Collateral.

The Liens on, and pledges of, all Note Collateral will be terminated and released, and upon the request of the Company pursuant to an Officers' Certificate certifying that all conditions precedent hereunder have been met, the Company and the Guarantors will be entitled to releases of all assets included in the Note Collateral from the Note Liens under all Collateral Documents, without the consent of the Collateral Agent, the Trustee or any Holder, upon any of:

(a)     payment in full of the principal of, premium, if any, and accrued and unpaid interest on the Notes and all other Obligations hereunder, the Note Guarantees and the Collateral Documents that are due and payable at or prior to the time such principal, premium, if any, and accrued and unpaid interest are paid;

(b)     a satisfaction and discharge of this Indenture in accordance with Section 8.02;

(c)     the occurrence of a Legal Defeasance or Covenant Defeasance in accordance with Section 8.01; or

(d)     the written consent of Holders of at least 75% in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).

SECTION 12.07     Matters as to Releases.

(a)     In the event (x) that the Company or any Guarantor has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any property or assets comprising Note Collateral that may be sold, exchanged or otherwise disposed of by the Company or such Guarantor pursuant to and in accordance with Section 12.04(b), 12.04(d), 12.05, 12.06, or 12.11 and the provisions of any applicable Collateral Document and (y) the Company or such Guarantor requests the Trustee or the Collateral Agent to execute and deliver a written instrument of disclaimer, release or quit-claim as to any interest in such property or assets under this Indenture and the Collateral Documents or, to the extent applicable to such property or assets, take all action that is necessary or reasonably requested by the Company (in each case at the expense of the Company) to release and reconvey to the Company or such Guarantor, without recourse, such property or asset or deliver such property or asset in its possession to the Company or such Guarantor, upon satisfaction of the conditions set forth herein or in the Collateral Documents for such execution and delivery or other action, the Collateral Agent or the Trustee, as applicable, shall execute, acknowledge and deliver to the Company or such Guarantor (in proper form) such an instrument or take such other action so requested.  As a condition precedent to such execution and delivery or such other action, the Trustee and the Collateral Agent shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel and an Officers' Certificate, each stating (i) that such execution is authorized or permitted by this Indenture and the Collateral Documents, (ii) that all conditions precedent thereto herein and in any Collateral Documents have been satisfied and (iii) under which of the circumstances set forth in Sections 12.04(b), 12.04(d), 12.05, 12.06, or 12.11 the Note Collateral is being released.  All purchasers and grantees of any property or rights purporting to be released herefrom shall be entitled to rely upon any such instrument executed by the Collateral Agent or the Trustee, as applicable, hereunder as sufficient for the purpose of this Indenture and as constituting a good and valid release of the property therein described from the Lien of this Indenture or of the Collateral Documents.

(b)     All instruments effectuating or confirming any release of any Note Liens shall have the effect solely of releasing such Note Liens as to the assets or property comprising Note Collateral described therein on customary terms and without any recourse, representation, warranty or liability whatsoever.

(c)     The Trustee and the Collateral Agent are not required to serve, file, register or record any instrument releasing Note Collateral.

(d)     The Company shall bear and pay all costs and expenses associated with any release of Note Liens pursuant to Sections 12.04, 12.05 or 12.06, including all

reasonable fees and disbursements of any attorneys or representatives acting for the Trustee or the Collateral Agent.

SECTION 12.08    Purchaser Protected.

No purchaser or grantee of any property or rights purporting to be released herefrom shall be bound to ascertain the authority of the Trustee or the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority; nor shall any purchaser or grantee of any property or rights permitted by this Indenture to be sold or otherwise disposed of by the Company be under any obligation to ascertain or inquire into the authority of the Company to make such sale or other disposition.

SECTION 12.09    Authorization of Actions to Be Taken by the Collateral Agent Under the Collateral Documents.

Wilmington Trust Company is hereby appointed to act in its capacity as the Collateral Agent. Subject to the provisions of the applicable Collateral Documents and the Intercreditor Agreement, (a) the Collateral Agent shall execute and deliver the Collateral Documents and the Intercreditor Agreement and act in accordance with the terms thereof, (b) the Collateral Agent may, in its sole discretion and without the consent of the Trustee or the Holders, take all actions it deems necessary or appropriate in order to (1) enforce any of the terms of the Collateral Documents and (2) collect and receive any and all amounts payable in respect of the Obligations of the Company and the Guarantors hereunder and under the Notes, the Note Guarantees, the Collateral Documents and the Intercreditor Agreement and (c) the Collateral Agent shall have power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Note Collateral by any act that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the Trustee and the Holders in the Note Collateral (including the power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the Note Liens or be prejudicial to the interests of the Holders, the Trustee or the Collateral Agent). Notwithstanding the foregoing, the Collateral Agent may, at the expense of the Company, request the direction of the Holders with respect to any such actions and upon receipt of the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Notes voting as a single class (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), shall take such actions; provided that all actions so taken shall, at all times, be in conformity with the requirements of the Intercreditor Agreement.

SECTION 12.10    Authorization of Receipt of Funds by the Collateral Agent Under the Collateral Documents.

The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Collateral Documents and the Intercreditor Agreement to the extent permitted under the Intercreditor Agreement, for turnover to the Trustee

to make further distributions of such funds to itself, the Collateral Agent and the Holders in accordance with the provisions of Section 6.10 and the other provisions of this Indenture.

SECTION 12.11    Collateral Monies.

(a)    All Collateral Monies, including the Net Proceeds received in connection with a Primary Collateral Asset Sale, the Net Loss Proceeds required to be deposited with the Collateral Agent in connection with an Event of Loss and the net proceeds of issuance of any Additional Notes, shall be held by the Collateral Agent as part of the Primary Collateral securing the Notes.  So long as no Default or Event of Default under this Indenture shall have occurred and be continuing, Collateral Monies may:

(i)    with respect to the Net Proceeds of Primary Collateral Asset Sales, be released as contemplated by Section 4.16, subject to the conditions set forth in this Indenture;

(ii)    with respect to Net Loss Proceeds, be released to repair or replace the relevant Primary Collateral as contemplated by Section 4.17, subject to the conditions set forth in this Indenture;

(iii)    at the Company's direction be applied by the Collateral Agent from time to time to the payment of the principal of, premium, if any, and interest on any Notes at maturity or upon redemption or retirement, or to the purchase of Notes upon tender or in the open market or otherwise, in each case, in compliance with this Indenture;

(iv)    continue to be held by the Collateral Agent as part of the Primary Collateral securing the Notes;

(v)    with respect to the net proceeds of the issuance of Additional Notes, be released to acquire Additional Assets constituting Specified Assets that simultaneously with the acquisition thereof become Specified Collateral and such Additional Assets are not acquired until and unless the provisions of Section 4.28 have been complied with respect to such Additional Assets, subject to the conditions set forth in this Indenture; or

(vi)    solely with respect to Collateral Monies received by the Collateral Agent pursuant to clause (6) of the definition of "Collateral Monies", be applied as provided in the relevant provisions of this Indenture or any Collateral Document applicable thereto.

(b)    Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall be entitled to apply any Collateral Monies to the payment of the principal of, premium if any, and interest on any Notes or otherwise to cure any Event of Default under this Indenture.  Collateral Monies deposited with the Collateral Agent shall be invested in cash or Cash Equivalents pursuant to the Company's direction and, so long as no Default or Event of Default shall have occurred and be continuing, the Company

shall be entitled to any interest or dividends accrued, earned or paid on such Cash Equivalents.

SECTION 12.12        Limitation on Certain Securities Collateral.

(a)        The Capital Stock and other securities of any Guarantor shall constitute Note Collateral only to the extent that such Capital Stock and other securities can secure the Notes or the Note Guarantees without Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act (or any other law, rule or regulation) requiring separate financial statements of such Person to be filed with the SEC (or any other governmental agency). In the event that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Guarantor due to the fact that such Person's Capital Stock and other securities secure the Notes or the Note Guarantees, then such portion (and only such portion) of the Capital Stock and other securities of such Guarantor as shall constitute the minimum amount necessary to avoid having such Person be subject to such requirement shall automatically be deemed not to be part of the Note Collateral. In such event, this Indenture or any Collateral Document may be amended or modified, without the consent of any holder of Notes or other Note Obligations, to the extent necessary to release the first-priority security interests on such portion of the shares of Capital Stock and other securities that are so deemed to no longer constitute part of the Note Collateral.

(b)        In the event that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulations adopted, which would permit) such Guarantor's Capital Stock and other securities to secure the Notes or the Note Guarantees in excess of the portion then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Guarantor, then such additional portion of the Capital Stock and other securities of such Person as shall constitute the maximum additional amount possible without having such Person be subject to such requirement shall automatically be deemed to be a part of the Note Collateral. In such event, this Indenture or any Collateral Document may be amended or modified, without the consent of any holder of Notes or other Note Obligations, to the extent necessary to subject such additional Capital Stock and other securities to the Liens under the Collateral Documents.

(c)        Solely for purposes of Section 4.16 and the definition of "Asset Sale", any Capital Stock and other securities that would be Note Collateral but for the provisions described in Section 12.12(a), shall nonetheless be treated as (and deemed to be) "Note Collateral."

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, all as of the date first written above.

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____

    Name:

    Title:

**WILMINGTON TRUST ~~COMPANY~~FSB**, as Trustee and Collateral Agent

By: _____

    Name:

    Title:

**GUARANTORS:**

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
       Name:
       Title:


**AVENTINE POWER, LLC**

By: _____
       Name:
       Title:


**AVENTINE RENEWABLE ENERGY-
AURORA WEST, LLC**

By: _____
       Name:
       Title:


**AVENTINE RENEWABLE ENERGY-MT.
VERNON, LLC**

By: _____
       Name:
       Title:


**NEBRASKA ENERGY, L.L.C.**

By: _____
       Name:
       Title:

Document comparison by Workshare Professional on Wednesday, February 24, 2010
11:12:21 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WSDMS/DB02/9283809/1 |
| Description | #9283809v1<DB02> - Aventine - Indenture [FILING VERSION Feb. 22] |
| Document 2 ID | interwovenSite://WSDMS/DB02/9299072/1 |
| Description | #9299072v1<DB02> - Aventine - Indenture [FILING VERSION 2/24/10] |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 246 |
| Deletions | 197 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 445 |

[FORM OF INITIAL NOTE]

THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ON THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND COMPARABLE YIELD FOR THE NOTES, PLEASE CONTACT AVENTINE RENEWABLE ENERGY HOLDINGS, INC., 120 NORTH PARKWAY DRIVE, PEKIN, ILLINOIS 61554, ATTENTION: CORPORATE CONTROLLER.

[Insert the following two paragraphs if this Note is a Global Note:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[Insert the following paragraph (i.e., the "Private Placement Legend") if this Note is a Restricted Security:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE

SECURITIES ACT), (B) IT IS A NON-U.S. PURCHASER AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE WHICH IS ONE YEAR (OR SUCH OTHER PERIOD THAT MAY BE HEREAFTER PROVIDED UNDER RULE 144 UNDER THE SECURITIES ACT PERMITTING RESALES OF RESTRICTED SECURITIES BY NON-AFFILIATES WITHOUT RESTRICTION) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE), ONLY (A) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S, OR TRANSFER AGENT'S, AS APPLICABLE, RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.]

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

**13% SENIOR SECURED NOTES DUE 2015**

CUSIP No.[      ]

No. [   ]                                                                              $[      ]

      Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company," which term includes any successor entity), for value received promises to pay to _____ or registered assigns the principal sum of _____ Dollars ~~on~~ [or such greater or lesser amount as may be indicated on Schedule A hereto][1] on [• ], 2015, and to pay interest thereon as hereinafter set forth.

      Interest Rate:  As specified in paragraph 1 of the reverse side hereof.

      Interest Payment Dates:  **[• ], [• ], [• ]** and **[• ]** of each year, beginning on **[• ]**, 2010.

      Record Dates:  **[• ], [• ], [• ]** and **[• ]**.

      Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

[Signature Follows Immediately on Next Page]

---

[1] Include only in the Global Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.

By: _____
Name:
Title:

Dated: _____

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the 13% Senior Secured Notes due 2015 referred to in the within-mentioned Indenture.

[▪ ]Wilmington Trust FSB, as Trustee

Dated: _____     By: _____
                                              Authorized Signatory

## 13% SENIOR SECURED NOTE DUE 2015

Capitalized terms used herein but not defined shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1. <u>Interest</u>. Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "<u>Company</u>," which term includes any successor entity), promises to pay interest on the principal amount of this Note at the rate per annum of 13% solely in cash; <u>provided</u>, <u>however</u>, that, if with respect to any Interest Payment Date that occurs prior to Maturity of any Notes, the Company has duly elected pursuant to Section 4.01(c) of the Indenture not to pay the entire installment of interest due on such Interest Payment Date in cash:

  (i) the interest on such Notes that is due on such Interest Payment Date shall be deemed to have accrued since the next preceding Interest Payment Date (or, if such Interest Payment Date is the first Interest Payment Date in respect of such Notes, the date of original issue thereof) at a rate of 15% per annum, whether or not the Company duly pays on such Interest Payment Date such installment of interest due on such Interest Payment Date; and

  (ii) if (but only if) the Company pays on such Interest Payment Date the entire installment of interest on such Notes due on such Interest Payment Date, the portion of such installment equal to the PIK Interest Amount with respect to such Interest Payment Date (*i.e.*, the portion equal to 7/15 of the aggregate amount thereof) shall be payable by issuance of PIK Notes in accordance with the fourth paragraph of Section 2.02 of the Indenture and the remainder of such installment shall be payable in cash.

Interest on this Note will accrue from the most recent date on which interest has been paid on this Note or, if no interest has been paid, from and including the Issue Date (or, if this Note was originally issued after the Issue Date as a PIK Note or as an Additional Note, from the date of original issue of this Note). The Company will pay interest quarterly in arrears on each Interest Payment Date, commencing [• ], 2010. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months. The Company will pay interest on overdue principal at 15% per annum and will pay interest on overdue installments of interest at the same rate to the extent lawful. Additional Interest may accrue on this Note in certain circumstances pursuant to the Registration Rights Agreement and all references to "interest" in this Note shall include any Additional Interest due on this Note pursuant to the terms of the Registration Rights Agreement.

2. <u>Method of Payment</u>. The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are the registered Holders at the close of business on the Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Record Date, and on or before such Interest Payment Date. Holders must surrender the Notes to a Paying Agent to collect principal payments. The Company shall pay principal and (except to the extent payable as PIK Interest) interest in U.S. Legal Tender. If a Holder has given wire transfer instructions to the Company, the Paying Agent will remit on behalf of the Company all principal, interest and premium, if any,

payable in cash on that Holder's Notes in accordance with those instructions.  All other payments on the Notes payable in cash will be made by check mailed to the Holders at their addresses set forth in the Register of Holders.  The Company shall pay all interest payable as PIK Interest in the manner specified in the Indenture.

3.     Paying Agent and Registrar.  Initially, [•]Wilmington Trust FSB (the "Trustee") will act as Paying Agent and Registrar.  The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

4.     Indenture.  The Notes and the Note Guarantees were issued under an Indenture, dated as of [• ], 2010 (the "Indenture"), among the Company, the Guarantors named therein, the Trustee and the Collateral Agent.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "TIA"), as in effect on the date of the Indenture until such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA.  Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of the Notes are referred to the Indenture and the TIA for a statement of such terms.  Any conflict between the Notes and the Indenture will be governed by the Indenture.  The Notes are senior secured obligations of the Company.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

5.     Redemption.

(a)     Optional Redemption.  (i)  The Company may, at its option, on any one or more occasions redeem all or a part of the Notes upon not less than 30 days' nor more than 60 days' prior notice to the Trustee, at the Redemption Prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date), if redeemed during the twelve-month period commencing on [• ] of the years set forth below:

| Year | Percentage |
|------|-----------|
| 2010 | 105% |
| 2011 | 104% |
| 2012 | 103% |
| 2013 | 102% |
| 2014 | 101% |

(ii)     Notwithstanding clause (a) above, if the Company delivers a Board Resolution to the Trustee setting forth the irrevocable determination of the Company not to complete construction of either the Aurora Facility or Mt. Vernon Facility, then during the 90-day period following the Issue Date, the Company may, at its option, redeem up to $25,000,000 in aggregate principal amount of the Notes originally issued under the Indenture (including the Exchange Notes) at a Redemption Price equal to 101% of the principal amount of the Notes redeemed plus accrued and unpaid interest on the Notes

redeemed to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date).

(b)     Mandatory Redemption.     The Company shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.  The Company may at any time and from time to time purchase Notes in the open market or otherwise.

6.     Notice of Redemption.     At least 30 days but not more than 60 days before the Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at such Holder's registered address with a copy to the Trustee and any Paying Agent.  If fewer than all of the Notes are to be redeemed pursuant to the provisions of the Indenture, the Trustee shall select the Notes to be redeemed (a) in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or (b) if the Notes are not then listed on a national securities exchange, on a pro rata basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate; provided, that if any such redemption is made pursuant to Section 5(a)(ii), the Trustee will select the Notes only on a pro rata basis or on as nearly a pro rata basis as is practicable (subject to DTC procedures), unless such method is otherwise prohibited.  Notes ~~of a principal amount in denominations of $2,000 or less may be redeemed only in whole.  The Trustee may select for redemption portions (equal to $2,000 or any integral multiple thereof) of the principal amount of Notes that have denominations larger than~~and portions of Notes selected shall be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date sufficient to pay such Redemption Price plus accrued and unpaid interest, if any, interest on the Notes to be redeemed shall cease to accrue on the Redemption Date, whether or not such Notes are presented for payment, and the only remaining right of the Holders of such Notes will be to receive payment of the Redemption Price upon surrender to the Paying Agent of the Notes redeemed.

7.     Offers to Purchase.  Sections 4.15 and 4.19 of the Indenture provide that upon the occurrence of a Change of Control or after certain Asset Sales, an Event of Loss and an Equity Offering, respectively, and subject to further limitations contained therein, the Company will make an offer to purchase certain amounts of the Notes in accordance with the procedures set forth in the Indenture.

8.     Registration Rights.  Pursuant to the Registration Rights Agreement, dated as of [•], 2010, among the Company, the Guarantors and the Initial Purchasers, the Company will, subject to the terms and conditions set forth therein, be obligated to consummate an Exchange Offer.  Upon the consummation of such Exchange Offer, the Holders of the Initial Notes shall have the right, subject to compliance with securities laws, to exchange such Notes for 13%

Senior Secured Notes due 2015, which have been registered under the Securities Act (the "Exchange Notes"), in like principal amount and having terms identical in all material respects to the Initial Notes. The Holders of the Initial Notes shall be entitled to receive certain Additional Interest payments in the event such Exchange Offer is not consummated and upon certain other conditions, all pursuant to and in accordance with the terms of the Registration Rights Agreement, dated as of **[• ]**, 2010, among the Company, the Guarantor and the Initial Purchasers.

9.     Denominations; Transfer; Exchange.   The Notes shall be issuable in fully registered form only, without coupons, in denominations of $2,000 and any integral multiple of $1,000 in excess of $2,000, subject to the payment of interest on any Notes on any Interest Payment Date by issuance of PIK Notes, in which case the aggregate principal amount of Global Notes previously authenticated under the Indenture may be increased by, or additional Notes constituting PIK Notes may be issued in, an aggregate principal amount equal to the PIK Interest Amount with respect to such Interest Payment Date for such Notes, rounded up the nearest $1.00. A Holder shall register the transfer of or exchange of Notes in accordance with the Indenture. The Registrar or co-Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note or portion thereof (a) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (b) selected for redemption in whole or in part pursuant to Article Three of the Indenture, except the unredeemed portion of any Note being redeemed in part.

10.     Persons Deemed Owners.   The registered Holder of a Note shall be treated as the owner of it for all purposes.

11.     Unclaimed Money.   If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Company. After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

12.     Discharge Prior to Redemption or Maturity.   If the Company at any time deposits with the Trustee U.S. Legal Tender or U.S. Government Obligations, or a combination thereof, sufficient to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated date for payment or redemption, as the case may be, and complies with the other provisions of the Indenture relating thereto, the Company and its Restricted Subsidiaries will be released and discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding the Company's obligation to pay the principal of and interest and Additional Interest, if any, on the Notes).

13.     Original Issue Discount.   The Notes are issued with "original issue discount" for U.S. federal income tax purposes. For information on the issue price, amount of original issue discount, issue date and comparable yield for the Notes, please contact Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, Attention: Corporate Controller.

14.     Amendment; Supplement; Waiver.  Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and the Collateral Documents may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class, and any existing Default or Event of Default or noncompliance with any provision of such agreements may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class.  Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or the Collateral Documents to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes in addition to or in place of certificated Notes, provide for the assumption of the obligations of the Company or any Guarantor in accordance with Section 5.01 or Section 10.04 of the Indenture, make any other change that would provide any additional rights or benefits to the Holders or that does not adversely affect in any material respect the legal rights of any Holder of a Note, to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA, to provide for any addition or release of Note Collateral permitted under the Indenture, the Intercreditor Agreement or the Collateral Documents and to release a Guarantor from its Note Guarantee and the Collateral Documents as permitted by the Indenture.

15.     Restrictive Covenants.  The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to, among other things, incur additional Indebtedness or Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, create dividend or other payment restrictions affecting Restricted Subsidiaries, merge or consolidate with any other Person or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of their assets.  Such limitations are subject to a number of important qualifications and exceptions.

16.     Successors.  When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Note Guarantees and the Indenture, the predecessor will be released from those obligations.

17.     Defaults and Remedies.  If an Event of Default occurs and is continuing (a) with respect to certain events of bankruptcy, the Notes will automatically become due and payable in the manner, at the time and with the effect provided in the Indenture.  If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then outstanding voting as a single class may declare all the Notes to be due and payable in the manner, at the time and with the effect provided in the Indenture.  Holders of Notes may not enforce the Indenture except as provided in the Indenture.  The Trustee is not obligated to enforce the Indenture or the Notes unless it has received reasonable indemnity satisfactory to it.  The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) if it determines that withholding notice is in their interest.

18.     Trustee Dealings with Company.  Subject to the terms of the TIA and the Indenture, the Trustee, in its individual or any other capacity, may become the owner or pledgee

of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

19.    <u>No Recourse Against Others</u>.  No Affiliate, director, manager, officer, employee, incorporator, member or holder of any Equity Interests in the Company, a Guarantor or the Trustee or any direct or indirect parent of the Company, a Guarantor or the Trustee, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, the Indenture, the Note Guarantees or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees.  The parties hereto acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

20.    <u>Guarantees</u>.  Payment of principal and interest (including interest on overdue principal and overdue interest, if lawful) on the Notes is unconditionally guaranteed, jointly and severally, by each of the Guarantors as provided in the Indenture.

21.    <u>Authentication</u>.  This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

22.    <u>Governing Law</u>. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401). EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.

23.    <u>Abbreviations and Defined Terms</u>.  Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

24.    <u>Security</u>.  Subject to the Intercreditor Agreement, the Company's and Guarantors' obligations under the Notes are secured by Liens on the Note Collateral pursuant to the terms of the Collateral Documents.  Subject to the terms of the Intercreditor Agreement, the actions of the Trustee and the Holders of the Notes in the enforcement of any remedies with respect to the Note Collateral and the application of the proceeds therefrom are limited pursuant to the terms of the Collateral Documents.

25.    <u>CUSIP Numbers</u>.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed thereon.

26.    _Acceptance_.  Each Holder, by its acceptance of its Note, agrees to be bound by the terms of the Intercreditor Agreement and the Registration Rights Agreement, and each of the Holders hereby authorizes the Trustee and the Collateral Agent to bind the Holders to the extent provided in the Indenture.

27.    _WAIVER OF JURY TRIAL_.  EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS NOTE, THE INDENTURE, THE NOTE GUARANTEES, THE COLLATERAL DOCUMENTS, THE INTERCREDITOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture.  Requests may be made to:  Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554.

# ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____
_____

(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____
agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Dated: _____     Signed: _____
                                           (Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

In connection with any transfer of this Note occurring prior to the date which is the earlier of (i) the date of the declaration by the SEC of the effectiveness of a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), covering resales of this Note (which effectiveness shall not have been suspended or terminated at the date of the transfer) and (ii) **[• ]**, 2011, the undersigned confirms that it has not utilized any general solicitation or general advertising in connection with the transfer and that this Note is being transferred:

[Check One]

(1)         _____         to the Company or a subsidiary thereof; or

(2)         _____         pursuant to and in compliance with Rule 144A under the Securities Act; or

(3)         _____         to an "accredited investor" (as defined in Rule 501(a) under the Securities Act) that has furnished to the Trustee a signed letter containing certain representations and agreements (the form of which letter can be obtained from the Trustee); or

(4)         _____         outside the Unites States to a person other than a "U.S. person" in compliance with Rule 904 of Regulation S under the Securities Act; or

(5)         _____         pursuant to the exemption from registration provided by Rule 144 under the Securities Act; or

(6)         _____         pursuant to an effective registration statement under the Securities Act; or

(7) _____ pursuant to another exemption from the registration requirements of the Securities Act (and based on an opinion of counsel acceptable to the Company).

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered Holder thereof; provided that if box (3), (4) or (5) is checked, the Company or the Trustee may require, prior to registering any such transfer of the Notes, in its sole discretion, such legal opinions, certifications, including an investment letter in the case of box (3) or (4), and other information as the Trustee or the Company has reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.15 of the Indenture shall have been satisfied.

Dated: _____  Signed: _____
(Sign exactly as your name appears on the other side of this Note)

Signature Guarantee: _____

## TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____  _____
NOTICE: To be executed by an executive officer

**[OPTION OF HOLDER TO ELECT PURCHASE]**

If you want to elect to have this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, check the appropriate box:

Section 4.15  [        ]

Section 4.19  [        ]

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____

NOTICE:   The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee: _____

[TO BE ATTACHED TO GLOBAL NOTE]

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee, as Custodian of the Depository |
|------|------|------|------|------|
|      |      |      |      |      |

[FORM OF EXCHANGE NOTE]

THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ON THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND COMPARABLE YIELD FOR THE NOTES, PLEASE CONTACT AVENTINE RENEWABLE ENERGY HOLDINGS, INC., 120 NORTH PARKWAY DRIVE, PEKIN, ILLINOIS 61554, ATTENTION: CORPORATE CONTROLLER.

[Insert the following two paragraphs if this Note is a Global Note:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

## AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

## 13% SENIOR SECURED NOTES DUE 2015

CUSIP No.[      ]

No. [  ]                                                                    $[      ]

Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company," which term includes any successor entity), for value received promises to pay to _____ or registered assigns the principal sum of _____ Dollars ~~on~~ [or such greater or lesser amount as may be indicated on Schedule A hereto][2] on [• ], 2015, and to pay interest thereon as hereinafter set forth.

Interest Rate:  As specified in paragraph 1 of the reverse side hereof.

Interest Payment Dates: [• ], [• ], [• ] and [• ] of each year, beginning on [• ], 2010.

Record Dates:  [• ], [• ], [• ] and [• ].

Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

[Signature Follows Immediately on Next Page]

---

[2] Include only on Global Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.


By: _____
Name:
Title:


Dated: _____

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This is one of the 13% Senior Secured Notes due 2015 referred to in the within-mentioned Indenture.

[• ], as Trustee

Dated: _____   By: _____
                                    Authorized Signatory

(REVERSE OF NOTE)

**13% SENIOR SECURED NOTE DUE 2015**

Capitalized terms used herein but not defined shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      Interest.  Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company," which term includes any successor entity), promises to pay interest on the principal amount of this Note at the rate per annum of 13% solely in cash; provided, however, that, if with respect to any Interest Payment Date that occurs prior to Maturity of any Notes, the Company has duly elected pursuant to Section 4.01(c) of the Indenture not to pay the entire installment of interest due on such Interest Payment Date in cash:

(i)      the interest on such Notes that is due on such Interest Payment Date shall be deemed to have accrued since the next preceding Interest Payment Date (or, if such Interest Payment Date is the first Interest Payment Date in respect of such Notes, the date of original issue thereof) at a rate of 15% per annum, whether or not the Company duly pays on such Interest Payment Date such installment of interest due on such Interest Payment Date; and

(ii)      if (but only if) the Company pays on such Interest Payment Date the entire installment of interest on such Notes due on such Interest Payment Date, the portion of such installment equal to the PIK Interest Amount with respect to such Interest Payment Date (i.e., the portion equal to 7/15 of the aggregate amount thereof) shall be payable by issuance of PIK Notes in accordance with the fourth paragraph of Section 2.02 of the Indenture and the remainder of such installment shall be payable in cash.

Interest on this Note will accrue from the most recent date on which interest has been paid on this Note or, if no interest has been paid, from and including the Issue Date (or, if this Note was originally issued after the Issue Date as a PIK Note or as an Additional Note, from the date of original issue of this Note).  The Company will pay interest quarterly in arrears on each Interest Payment Date, commencing [• ], 2010.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.  The Company will pay interest on overdue principal at 15% per annum and will pay interest on overdue installments of interest at the same rate to the extent lawful.

2.      Method of Payment.  The Company shall pay interest on the Notes (except defaulted interest) to the Persons who are the registered Holders at the close of business on the Record Date immediately preceding the Interest Payment Date even if the Notes are cancelled on registration of transfer or registration of exchange after such Record Date, and on or before such Interest Payment Date.  Holders must surrender the Notes to a Paying Agent to collect principal payments.  The Company shall pay principal and (except to the extent payable as PIK Interest) interest in U.S. Legal Tender.  If a Holder has given wire transfer instructions to the Company, the Paying Agent will remit on behalf of the Company all principal, interest and premium, if any, payable in cash on that Holder's Notes in accordance with those instructions.  All other payments on the Notes payable in cash will be made by check mailed to the Holders at their addresses set

forth in the Register of Holders. The Company shall pay all interest payable as PIK Interest in the manner specified in the Indenture.

3. <u>Paying Agent and Registrar</u>. Initially, [•]Wilmington Trust FSB (the "<u>Trustee</u>") will act as Paying Agent and Registrar. The Company may change any Paying Agent, Registrar or co-Registrar without notice to the Holders.

4. <u>Indenture</u>. The Notes and the Note Guarantees were issued under an Indenture, dated as of [•], 2010 (the "<u>Indenture</u>"), among the Company, the Guarantors named therein, the Trustee and the Collateral Agent. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) (the "<u>TIA</u>"), as in effect on the date of the Indenture until such time as the Indenture is qualified under the TIA, and thereafter as in effect on the date on which the Indenture is qualified under the TIA. Notwithstanding anything to the contrary herein, the Notes are subject to all such terms, and Holders of the Notes are referred to the Indenture and the TIA for a statement of such terms. Any conflict between the Notes and the Indenture will be governed by the Indenture. The Notes are senior secured obligations of the Company. Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as the same may be amended from time to time.

5. <u>Redemption</u>.

(a) <u>Optional Redemption</u>. (i) The Company may, at its option, on any one or more occasions redeem all or a part of the Notes upon not less than 30 days' nor more than 60 days' prior notice to the Trustee, at the Redemption Prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest to (but not including) the Redemption Date (subject to any installment of interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date), if redeemed during the twelve-month period commencing on [•] of the years set forth below:

| Year | Percentage |
|------|-----------|
| 2010 | 105% |
| 2011 | 104% |
| 2012 | 103% |
| 2013 | 102% |
| 2014 | 101% |

(ii) Notwithstanding clause (a) above, if the Company delivers a Board Resolution to the Trustee setting forth the irrevocable determination of the Company not to complete construction of either the Aurora Facility or Mt. Vernon Facility, then during the 90-day period following the Issue Date, the Company may, at its option, redeem up to $25,000,000 in aggregate principal amount of the Notes originally issued under the Indenture (including the Exchange Notes) at a Redemption Price equal to 101% of the principal amount of the Notes redeemed plus accrued and unpaid interest on the Notes redeemed to (but not including) the Redemption Date (subject to any installment of

interest thereon, the maturity of which is on or prior to the Redemption Date, being payable to Holders of record at the close of business on the relevant Record Date).

(b)　　<u>Mandatory Redemption</u>.　The Company shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.　The Company may at any time and from time to time purchase Notes in the open market or otherwise.

6.　　<u>Notice of Redemption</u>.　At least 30 days but not more than 60 days before the Redemption Date, the Company shall mail or cause to be mailed a notice of redemption by first class mail, postage prepaid, to each Holder whose Notes are to be redeemed at such Holder's registered address with a copy to the Trustee and any Paying Agent.　If fewer than all of the Notes are to be redeemed pursuant to the provisions of the Indenture, the Trustee shall select the Notes to be redeemed (a) in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed or (b) if the Notes are not then listed on a national securities exchange, on a <u>pro rata</u> basis, by lot or by such method as the Trustee may reasonably determine is fair and appropriate; <u>provided</u>, that if any such redemption is made pursuant to Section 5(a)(ii), the Trustee will select the Notes only on a <u>pro rata</u> basis or on as nearly a <u>pro rata</u> basis as is practicable (subject to DTC procedures), unless such method is otherwise prohibited.　Notes ~~of a principal amount in denominations of $2,000 or less may be redeemed only in whole.　The Trustee may select for redemption portions (equal to $2,000 or any integral multiple thereof) of the principal amount of Notes that have denominations larger than~~and portions of Notes selected shall be in amounts of $2,000 and integral multiples of $1,000 in excess thereof, except that (i) if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed, subject in the case of Global Notes, to the procedures of DTC; and (ii) in any event the unredeemed portion of Notes redeemed in part shall be at least $2,000.

Except as set forth in the Indenture, if monies for the redemption of the Notes called for redemption shall have been deposited with the Paying Agent for redemption on such Redemption Date sufficient to pay such Redemption Price plus accrued and unpaid interest, if any, interest on the Notes to be redeemed shall cease to accrue on the Redemption Date, whether or not such Notes are presented for payment, and the only remaining right of the Holders of such Notes will be to receive payment of the Redemption Price upon surrender to the Paying Agent of the Notes redeemed.

7.　　<u>Offers to Purchase</u>.　Sections 4.15 and 4.19 of the Indenture provide that upon the occurrence of a Change of Control or after certain Asset Sales, an Event of Loss and an Equity Offering, respectively, and subject to further limitations contained therein, the Company will make an offer to purchase certain amounts of the Notes in accordance with the procedures set forth in the Indenture.

8.　　<u>Denominations; Transfer; Exchange</u>.　The Notes shall be issuable in fully registered form only, without coupons, in denominations of $2,000 and any integral multiple of $1,000 in excess of $2,000, subject to the payment of interest on any Notes on any Interest Payment Date by issuance of PIK Notes, in which case the aggregate principal amount of Global Notes previously authenticated under the Indenture may be increased by, or additional Notes constituting PIK Notes may be issued in, an aggregate principal amount equal to the PIK Interest

Amount with respect to such Interest Payment Date for such Notes, rounded up the nearest $1.00. A Holder shall register the transfer or exchange of Notes in accordance with the Indenture. The Registrar or co-Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes, fees or similar governmental charges payable in connection therewith as permitted by the Indenture. The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note or portion thereof (a) during a period beginning at the opening of business fifteen (15) days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (b) selected for redemption in whole or in part pursuant to <u>Article Three</u> of the Indenture, except the unredeemed portion of any Note being redeemed in part.

9.      <u>Persons Deemed Owners</u>.  The registered Holder of a Note shall be treated as the owner of it for all purposes.

10.      <u>Unclaimed Money</u>.  If money for the payment of principal or interest remains unclaimed for two years, the Trustee and the Paying Agent may pay the money without interest thereon back to the Company.  After that, all liability of the Trustee and such Paying Agent with respect to such money shall cease.

11.      <u>Discharge Prior to Redemption or Maturity</u>.  If the Company at any time deposits with the Trustee U.S. Legal Tender or U.S. Government Obligations, or a combination thereof, sufficient to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated date for payment or redemption, as the case may be, and complies with the other provisions of the Indenture relating thereto, the Company and its Restricted Subsidiaries will be released and discharged from certain provisions of the Indenture and the Notes (including certain covenants, but excluding the Company's obligation to pay the principal of and interest on the Notes).

12.      <u>Original Issue Discount</u>.  The Notes are issued with "original issue discount" for U.S. federal income tax purposes.  For information on the issue price, amount of original issue discount, issue date and comparable yield for the Notes, please contact Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554, Attention:  Corporate Controller.

13.      <u>Amendment; Supplement; Waiver</u>.  Subject to certain exceptions, the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and the Collateral Documents may be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class, and any existing Default or Event of Default or noncompliance with any provision of such agreements may be waived with the written consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class.  Without consent of any Holder, the parties thereto may amend or supplement the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or the Collateral Documents to, among other things, cure any ambiguity, defect or inconsistency, provide for uncertificated Notes in addition to or in place of certificated Notes, provide for the assumption of the obligations of the Company or any Guarantor in accordance with Section 5.01 or Section 10.04 of the Indenture, make any other change that would provide any additional rights or benefits to the Holders or that does not adversely affect in

any material respect the legal rights of any Holder of a Note, to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA, to provide for any addition or release of Note Collateral permitted under the Indenture, the Intercreditor Agreement or the Collateral Documents and to release a Guarantor from its Note Guarantee and the Collateral Documents as permitted by the Indenture.

14.     <u>Restrictive Covenants</u>.  The Indenture imposes certain limitations on the ability of the Company and its Restricted Subsidiaries to, among other things, incur additional Indebtedness or Liens, make payments in respect of their Capital Stock or certain Indebtedness, enter into transactions with Affiliates, create dividend or other payment restrictions affecting Restricted Subsidiaries, merge or consolidate with any other Person or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of their assets.  Such limitations are subject to a number of important qualifications and exceptions.

15.     <u>Successors</u>.  When a successor assumes, in accordance with the Indenture, all the obligations of its predecessor under the Notes, the Note Guarantees and the Indenture, the predecessor will be released from those obligations.

16.     <u>Defaults and Remedies</u>.  If an Event of Default occurs and is continuing with respect to certain events of bankruptcy, the Notes will automatically become due and payable in the manner, at the time and with the effect provided in the Indenture.  If any other Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of Notes then outstanding voting as a single class may declare all the Notes to be, due and payable in the manner, at the time and with the effect provided in the Indenture. Holders of Notes may not enforce the Indenture except as provided in the Indenture.  The Trustee is not obligated to enforce the Indenture or the Notes unless it has received reasonable indemnity satisfactory to it.  The Indenture permits, subject to certain limitations therein provided, Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class to direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of Notes notice of any continuing Default or Event of Default (except a Default in payment of principal or interest) if it determines that withholding notice is in their interest.

17.     <u>Trustee Dealings with Company</u>.  Subject to the terms of the TIA and the Indenture, the Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company, its Subsidiaries or their respective Affiliates as if it were not the Trustee.

18.     <u>No Recourse Against Others</u>.  No Affiliate, director, manager, officer, employee, incorporator, member or holder of any Equity Interests in the Company, a Guarantor or the Trustee or any direct or indirect parent corporation of the Company, a Guarantor or the Trustee, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, the Indenture, the Note Guarantees or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of the Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes and the Note Guarantees.  The parties hereto

acknowledge that such waiver may not be effective to waive liabilities under the federal securities laws.

19.    Guarantees.    Payment of principal and interest (including interest on overdue principal and overdue interest, if lawful) on the Notes is unconditionally guaranteed, jointly and severally, by each of the Guarantors as provided in the Indenture.

20.    Authentication.    This Note shall not be valid until the Trustee or Authenticating Agent manually signs the certificate of authentication on this Note.

21.    Governing Law.    THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401). EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.

22.    Abbreviations and Defined Terms.    Customary abbreviations may be used in the name of a Holder of a Note or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

23.    Security.    Subject to the Intercreditor Agreement, the Company's and Guarantors' obligations under the Notes are secured by Liens on the Note Collateral pursuant to the terms of the Collateral Documents.  Subject to the Intercreditor Agreement, the actions of the Trustee and the Holders of the Notes in the enforcement of any remedies with respect to the Note Collateral and the application of the proceeds therefrom are limited pursuant to the terms of the Collateral Documents.

24.    CUSIP Numbers.    Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes as a convenience to the Holders of the Notes.  No representation is made as to the accuracy of such numbers as printed on the Notes and reliance may be placed only on the other identification numbers printed thereon.

25.    Acceptance.    Each Holder, by its acceptance of its Note, agrees to be bound by the terms of the Intercreditor Agreement, and each of the Holders hereby authorizes the Trustee and the Collateral Agent to bind the Holders to the extent provided in the Indenture.

26.    WAIVER OF JURY TRIAL.    EACH HOLDER, BY ITS ACCEPTANCE OF ITS NOTE, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS NOTE, THE INDENTURE, THE NOTE GUARANTEES, THE COLLATERAL DOCUMENTS, THE INTERCREDITOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture. Requests may be made to: Aventine Renewable Energy Holdings, Inc., 120 North Parkway Drive, Pekin, Illinois 61554.

## ASSIGNMENT FORM

If you the Holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to:

_____

_____
(Print or type name, address and zip code and
social security or tax ID number of assignee)

and irrevocably appoint _____
agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.

Dated: _____      Signed: _____
(Sign exactly as your name appears on the
other side of this Note)

Signature Guarantee: _____

**[OPTION OF HOLDER TO ELECT PURCHASE]**

If you want to elect to have this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, check the appropriate box:

Section 4.15  [        ]

Section 4.19  [        ]

If you want to elect to have only part of this Note purchased by the Company pursuant to Section 4.15 or Section 4.19 of the Indenture, state the amount you elect to have purchased:

$ _____

Dated: _____          _____

NOTICE:  The signature on this assignment must correspond with the name as it appears upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever and be guaranteed by the endorser's bank or broker.

Signature Guarantee: _____

[TO BE ATTACHED TO GLOBAL NOTE]

SCHEDULE A

**SCHEDULE OF INCREASES OR DECREASES IN GLOBAL NOTE**

The following increases or decreases in this Global Note have been made:

| Date | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee, as Custodian of the Depository |
|------|------|------|------|------|
|      |      |      |      |      |

EXHIBIT C

[FORM OF LEGEND FOR GLOBAL NOTES]

Any Global Note authenticated and delivered hereunder shall bear a legend (in addition to any other legends required in the case of a Restricted Security) in substantially the following form:

THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE OF A DEPOSITORY OR A SUCCESSOR DEPOSITORY. THIS NOTE IS NOT EXCHANGEABLE FOR NOTES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE DEPOSITORY OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE, AND NO TRANSFER OF THIS NOTE (OTHER THAN A TRANSFER OF THIS NOTE AS A WHOLE BY THE DEPOSITORY TO A NOMINEE OF THE DEPOSITORY OR BY A NOMINEE OF THE DEPOSITORY TO THE DEPOSITORY OR ANOTHER NOMINEE OF THE DEPOSITORY) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[FORM OF PRIVATE PLACEMENT LEGEND]

Each Note certificate representing a Restricted Security shall bear a legend in substantially the following form:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (B) IT IS A NON-U.S. PURCHASER AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT OR (C) IT IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER THIS NOTE, PRIOR TO THE DATE WHICH IS ONE YEAR (OR SUCH OTHER PERIOD THAT MAY BE HEREAFTER PROVIDED UNDER RULE 144 UNDER THE SECURITIES ACT PERMITTING RESALES OF RESTRICTED SECURITIES BY NON-AFFILIATES WITHOUT RESTRICTION) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF SUCH NOTE), ONLY (A) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S

AND THE TRUSTEE'S, OR TRANSFER AGENT'S, AS APPLICABLE, RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR TRANSFER AGENT.

[FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH
TRANSFERS TO NON-QIB ACCREDITED INVESTORS]

_____, _____

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554
Attn:  [  ]

Wilmington Trust FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Aventine Administrator

Re:  13% Senior Secured Notes due 2015 (the "Notes") of Aventine Renewable Energy Holdings, Inc. (the "Company")

Ladies and Gentlemen:

In connection with our proposed purchase of $_____ aggregate principal amount of the Notes, we confirm that:

We have been provided such information as we deem necessary in order to make our investment decision.

We understand that any subsequent transfer of the Notes is subject to certain restrictions and conditions set forth in the Indenture dated as of **[• ]**, 2010, relating to the Notes (the "Indenture") and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "Securities Act").

We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell or otherwise transfer any Notes prior to the date which is within one year after the original issuance of the Notes or the last date on which the Note is owned by the Company or any affiliate of the Company, we will do so only (i) to the Company or any of its subsidiaries, (ii) inside the United States in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (iii) inside the United States to an "accredited investor" (as defined below); provided that, prior to such transfer, the transferee furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you a signed letter containing certain representations and agreements relating to the

restrictions on transfer of the Notes, substantially in the form of this letter, (iv) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (v) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if available) or (vi) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any person purchasing any of the Notes from us a notice advising such purchaser that resales of the Notes are restricted as stated herein.

Either (i) we are not, and will not transfer the Notes to, an entity holding "plan assets," within the meaning of 29 C.F.R. 2510.3-101, of any "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Security Act of 1974, as amended ("ERISA"), or any "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or (2) our purchase and holding of the Notes will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code (or any substantially similar applicable law).

We understand that, on any proposed resale of any Notes, we will be required to furnish to you and the Company such certification, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions. We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

We are an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or their investment, as the case may be.

We are acquiring the Notes purchased by us for our own account or for one or more accounts (each of which is an "accredited investor") as to each of which we exercise sole investment discretion.

We are not acquiring Notes with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction; provided that the disposition of our property and the property of any accounts for which we are acting as fiduciary shall remain at all times within our and their control.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby, and we agree to notify you promptly if any of our representations or warranties herein cease to be accurate and complete.

This letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

Very truly yours,
[Name of Transferee]

By: _____
Authorized Signature

[FORM OF CERTIFICATE TO BE DELIVERED
IN CONNECTION WITH
TRANSFERS PURSUANT TO REGULATION S]

Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois 61554
Attn:  [    ]

Wilmington Trust FSB
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn: Aventine Administrator

Re:     13% Senior Secured Notes due 2015 (the "Notes") of Aventine Renewable
Energy Holdings, Inc. (the "Company")

Ladies and Gentlemen:

In connection with our proposed sale of $_____ aggregate principal amount of the Notes, we confirm that such sale has been effected pursuant to and in accordance with Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, we represent that:

1.     the offer of the Notes was not made to a person in the United States;

2.     either (a) at the time the buy offer was originated, the transferee was outside the United States or we and any person acting on our behalf reasonably believed that the transferee was outside the United States, or (b) the transaction was executed in, on or through the facilities of a designated off-shore securities market and neither we nor any person acting on our behalf knows that the transaction has been pre-arranged with a buyer in the United States;

3.     no directed selling efforts have been made in the United States in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S, as applicable;

4.     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.     we have advised the transferee of the transfer restrictions applicable to the Notes.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.  Terms used in this certificate have the meanings set forth in Regulation S.

Very truly yours,

[Name of Transferee]

By: _____

Authorized Signature

[FORM OF SUPPLEMENTAL INDENTURE]

AVENTINE RENEWABLE ENERGY HOLDINGS, INC.

and

the Guarantors named herein

_____

13% SENIOR SECURED NOTES DUE 2015

_____

_____

[Insert Ordinal Number] SUPPLEMENTAL INDENTURE

DATED AS OF _____, 20__

_____

[_____],

[WILMINGTON TRUST FSB],

As Trustee and Collateral Agent

_____

This SUPPLEMENTAL INDENTURE, dated as of _____ __, 20__ is among Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company"), each of the parties identified under the caption "Guarantors" on the signature page hereto (the "Guarantors") and [————Wilmington Trust FSB], as trustee (in such capacity, the "Trustee") and collateral agent (in such capacity, the "Collateral Agent").

## RECITALS

WHEREAS, the Company, the initial Guarantors and the Trustee entered into an Indenture, dated as of [_____], 2010 (as previously amended or supplemented, the "Indenture"), pursuant to which the Company has issued $___,000,000 in aggregate principal amount of 13% Senior Secured Notes due 2015 (the "Notes");

WHEREAS, Section 9.01(3) of the Indenture provides that the Company, the Guarantors and the Trustee may amend or supplement the Indenture in order to provide for the assumption of the obligations of any Guarantor to Holders in accordance with Section 10.04, without the consent of the Holders of the Notes;

WHEREAS, Section 9.01(7) of the Indenture provides that the Company, the Guarantors and the Trustee may amend or supplement the Indenture to allow any Subsidiary or any other Person to guarantee the Notes, without the consent of the Holders of the Notes; and

WHEREAS, all acts and things prescribed by the Indenture, by law and by the Certificate of Incorporation and the Bylaws (or comparable constituent documents) of the Company, of the Guarantors and of the Trustee necessary to make this Supplemental Indenture a valid instrument legally binding on the Company, the Guarantors and the Trustee, in accordance with its terms, have been duly done and performed;

NOW, THEREFORE, to comply with the provisions of the Indenture and in consideration of the above premises, the Company, the Guarantors and the Trustee covenant and agree for the equal and proportionate benefit of the respective Holders of the Notes as follows:

## ARTICLE 1

Section 1.01   This Supplemental Indenture is supplemental to the Indenture and does and shall be deemed to form a part of, and shall be construed in connection with and as part of, the Indenture for any and all purposes.

Section 1.02   This Supplemental Indenture shall become effective immediately upon its execution and delivery by each of the Company, the Guarantors and the Trustee.

## ARTICLE 2

Section 2.01   From this date, in accordance with Section 4.14 or Section 10.04 and by executing this Supplemental Indenture, each of the Guarantors whose signature appears below is and shall be subject to the provisions of the Indenture applicable to a "Guarantor" to the

extent provided for in Article Ten or Section 4.06, 4.09, 4.12, 4.23, 4.27, 4.28 or 4.29 thereunder or elsewhere in the Indenture or any Collateral Document.

Section 2.02    Except as specifically modified herein, the Indenture and the Notes are in all respects ratified and confirmed (mutatis mutandis) and shall remain in full force and effect in accordance with their terms with all capitalized terms used herein without definition having the same respective meanings ascribed to them as in the Indenture.

Section 2.03    Except as otherwise expressly provided herein, no duties, responsibilities or liabilities are assumed, or shall be construed to be assumed, by the Trustee by reason of this Supplemental Indenture.  This Supplemental Indenture is executed and accepted by the Trustee subject to all the terms and conditions set forth in the Indenture with the same force and effect as if those terms and conditions were repeated at length herein and made applicable to the Trustee with respect hereto.  The Trustee shall not be responsible for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the correctness of the recitals of fact contained herein, all of which recitals are made solely by the undersigned Guarantors.

Section 2.04    THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (OTHER THAN N.Y. GEN. OBL. LAW § 5-1401).  EACH OF THE PARTIES HERETO AGREES TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SUPPLEMENTAL INDENTURE OR THE TRANSACTIONS CONTEMPLATED BY THIS SUPPLEMENTAL INDENTURE.

Section 2.05    All parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together shall represent the same agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first written above.

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.

By   _____
     Name:_____
     Title:_____

**[NAMES OF GUARANTORS]**

By   _____
     Name:_____
     Title:_____

[———————WILMINGTON TRUST FSB],
as Trustee and Collateral Agent

By   _____
     Name:_____
     Title:_____

Document comparison by Workshare Professional on Wednesday, February 24, 2010 11:12:40 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WSDMS/DB02/9284076/1 |
| Description | #9284076v1<DB02> - Aventine - Indenture Exhibits [FILED VERSION 2/5/10] |
| Document 2 ID | interwovenSite://WSDMS/DB02/9299048/1 |
| Description | #9299048v1<DB02> - Aventine - Exhibits to Indenture [FILING VERSION 2/24/10] |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 50 |
| Deletions | 12 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 62 |

# **Exhibit B**

## **Form of Security Agreement Accompanying Indenture**

**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT, dated as of March [__], 2010, is made by **AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**, a Delaware corporation (the "Company"), **AVENTINE RENEWABLE ENERGY, INC.**, a Delaware corporation ("Aventine"), **AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**, a Delaware limited liability company ("Aurora West"), **NEBRASKA ENERGY, L.L.C.**, a Kansas limited liability company ("Nebraska Energy"), **AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**, a Delaware limited liability company ("Mt. Vernon"), and **AVENTINE POWER, LLC**, a Delaware limited liability company ("Aventine Power" and, together with the Company, Aventine, Aurora West, Nebraska Energy, Mt. Vernon and any other entity that may become a party hereto pursuant to Section 7.13 hereof, the "Grantors" and, each individually, a "Grantor"), in favor of Wilmington Trust FSB, as the Collateral Agent (in such capacity, the "Collateral Agent") for the ratable benefit of each of (i) the trustee (the "Trustee") under the Indenture, dated as of March [__], 2010 (as amended, supplemented or otherwise modified from time to time, the "Indenture"), among the Grantors, the Trustee and the Collateral Agent, (ii) the Collateral Agent and (iii) the holders of the senior secured notes issued under the Indenture (the "Holders"; together with the Trustee and the Collateral Agent, the "Secured Parties").

**W I T N E S S E T H:**

WHEREAS, the Company has issued $105 million aggregate principal amount of Senior Secured Notes due 2015 (the "Notes"), and may make further issuances of Notes, under the Indenture. In connection therewith, the Grantors have agreed to guarantee the payment and performance of the Company's obligations under the Indenture, the Notes and the Collateral Documents (collectively, the "Indenture Documents");

WHEREAS, pursuant to a Credit Agreement, dated as of March [___], 2010 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Company, the various financial institutions as are, or may from time to time become, parties thereto (the "Lenders"), and PNC Bank, National Association, as administrative agent (the "Original Administrative Agent"), the Lenders have extended commitments to make credit extensions to the Company;

WHEREAS, the Company, each of its Subsidiaries, [the Original Administrative Agent], as first lien collateral agent, and the Collateral Agent, as second lien collateral agent, have entered into that certain Intercreditor Agreement, dated as of March [___], 2010 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which agreement, among other things, sets forth, as between the Collateral Agent and the Administrative Agent, the relative priority of their respective Liens on the Secondary Collateral and their rights with respect thereto;

WHEREAS, as a condition to the effectiveness of the Indenture and to secure the obligations of the Grantors under and in connection with the Indenture Documents, the Grantors have executed and delivered this Agreement; and

1

WHEREAS, the Grantors will derive substantial direct and indirect benefit from the making of the extensions of credit under the Indenture.

NOW, THEREFORE, in consideration of the premises and to induce the Collateral Agent and the Trustee to enter into the Indenture and to induce the Holders to purchase the Notes, each Grantor hereby agrees as follows:

## ARTICLE I

### DEFINED TERMS

SECTION 1.1.        Definitions.

(a)        Unless otherwise defined herein, terms defined in the Indenture and used herein shall have the meanings given to them in the Indenture, and the following terms which are defined in the UCC are used herein as so defined: Accounts, Chattel Paper, Certificated Securities, Commercial Tort Claims, Commodity Accounts, Commodity Contracts, Commodity Intermediary, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Money, Payment Intangibles, Proceeds, Promissory Notes, Records, Security, Securities Accounts, Security Certificate, Security Entitlements, Securities Intermediary, Software, Supporting Obligations, Uncertificated Securities and Tangible Chattel Paper.

(b)        The following terms shall have the following meanings:

"Account Receivable" shall mean any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance.

"Administrative Agent" means the Original Administrative Agent or such other Person designated from time to time as "Administrative Agent" under the Credit Agreement.

"Agreement" shall mean this Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Blocked Account" shall mean Deposit Account No. [_____] established by the Company with the Controlling ABL Agent and any other Deposit Account hereafter established by the Company or any other Grantor with the Controlling ABL Agent which the Company or such Grantor and the Controlling ABL Agent jointly designate as the "Blocked Account," into which all cash receipts or other Proceeds of the Company or any other Grantor from any Secondary Collateral shall be deposited, to be held for the benefit of the Secured Obligations in accordance with the Intercreditor Agreement.

"Cash Collateral Accounts" shall mean, collectively, (i) any Collateral Account, and (ii) any other Deposit Account established by he Company or any other Grantor with

the Collateral Agent or another Deposit Account Bank, in which Proceeds of any Primary Collateral and other amounts to be held by the Collateral Agent shall be deposited, in each case in accordance with the Indenture.

"Closing Date" shall mean March **[___]**, 2010.

"Collateral" shall have the meaning provided in Article II hereof.

"Controlling Agent" shall mean (x) as to any Primary Collateral, the Collateral Agent or (y) as to any Secondary Collateral, the Controlling ABL Agent.

"Controlling ABL Agent" shall mean (i) the Administrative Agent, on behalf of the Joint Secured Parties in accordance with the Intercreditor Agreement, or (ii) if Discharge of the First Lien Obligations has occurred, the Collateral Agent.

"Copyright Licenses" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Copyright Security Agreement" means the Copyright Security Agreement executed and delivered by the Grantors to the Collateral Agent, substantially in the form of Annex III hereto, as such agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"Copyrights" shall mean (i) any and all other copyrights, in the United States or any other country, whether registered or unregistered, or published or unpublished, all registrations and recordings thereof and all applications in connection therewith, and (ii) the right to obtain all renewals of the foregoing.

"Deposit Account Bank" shall mean the Collateral Agent or initially, [_____], as depositary bank with respect to any Cash Collateral Account of any Grantor, and any other depositary institution located in the United States at which a Grantor establishes a Cash Collateral Account.

"Excluded Capital Stock" shall mean all Rule 3-16 Excluded Capital Stock and all Excluded Foreign Subsidiary Capital Stock.

"Excluded Foreign Subsidiary Capital Stock" shall have the meaning provided in Article II hereof.

"Excluded General Intangible" shall have the meaning provided in Article II hereof.

"Excluded Personal Property" shall mean with respect to any Grantor, (i) Non-UCC Property of such Grantor which when combined with the Non-UCC Property of all other Grantors, has a Fair Market Value not in excess of $250,000 in the aggregate for all Grantors and (ii) all Excluded Vehicles of such Grantor.

"Excluded Money" shall mean any Money that is not, and is not required by the terms of any Indenture Document to be, directly or indirectly, held by, or in or under the control of, the Controlling Agent.

"Excluded Trademark Applications" shall mean with respect to any Grantor, Specified Trademark Applications of such Grantor which when combined with the Specified Trademark Applications of all other Grantors, have a Fair Market Value not in excess of $250,000 in the aggregate for all Grantors.

"Excluded Vehicles" shall mean with respect to any Grantor, Vehicles owned by such Grantor as of the date hereof which when combined with the Vehicles owned by all other Grantors as of the date hereof, have a Fair Market Value not in excess of $1,000,000 in the aggregate for all Grantors.

"General Intangibles" shall mean all "general intangibles" as such term is defined in the UCC and, in any event, including with respect to any Grantor, all contracts, agreements, instruments and indentures in any form, and portions thereof, to which such Grantor is a party or under which such Grantor has any right, title or interest or to which such Grantor or any property of such Grantor is subject, as the same may from time to time be amended, supplemented or otherwise modified, including (i) all rights of such Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of such Grantor to damages arising thereunder, (iii) all equity that constitutes "general intangibles" and (iv) all rights of such Grantor to perform and to exercise all remedies thereunder.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Insurance" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent is the loss payee thereof) and (ii) any key man life insurance policies.

"Intellectual Property" shall mean all rights, priorities and privileges provided under United States, multinational and foreign law relating to intellectual property, including the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trade Secrets, the Trade Secret Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Issuer" shall mean, with reference to any Security, the issuer of such Security.

"Joint Secured Parties" shall mean (i) with respect to any Primary Collateral, the Secured Parties or (ii) with respect to any Secondary Collateral, the Secured Parties and the Lenders.

"Lock Box" shall mean [_____].

"Non-UCC Property" shall mean any personal property of the Grantors a security interest in which may not be perfected pursuant to the UCC and in which the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement has not been duly perfected under other applicable law.

"Patent License" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent to the extent that a grant of a security interest in such patent license is not prohibited by applicable law or the applicable patent agreement.

"Patent Security Agreement" means the Patent Security Agreement executed and delivered by the Grantors to the Collateral Agent, substantially in the form of Annex IV hereto, as such agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"Patents" shall mean (i) all letters patent of the United States or any other country and all reissues and extensions thereof, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Pledged Securities" shall mean the Securities of any Person that may be issued or granted to, or held by, any Grantor.

"Pledged Subsidiaries" shall have the meaning provided in Article II hereof.

"Receivable" means any Account (including any Account Receivable).

"Rule 3-16 Excluded Capital Stock" shall have the meaning provided in Article II hereof.

"SEC" shall mean the Securities and Exchange Commission.

"Secured Obligations" means the Note Obligations and the Credit Facility Obligations.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Secured Parties" has the meaning specified in the introductory paragraph hereof.

"Specified Trademark Applications" shall mean any intent-to-use United States trademark application of any Grantor not material to the operation of such Grantor's business for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office.

"Trade Secret Licenses" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right in or to Trade Secrets, to the extent that a grant of a security interest in such Trade Secret License is not prohibited by applicable law or the applicable Trade Secret License.

"Trade Secrets" shall mean all trade secrets and all other confidential or proprietary information and know-how whether or not such trade secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such trade secret, including but not limited to: (i) the right to sue for past, present and future misappropriation or other violation of any trade secret, and (ii) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Trademark License" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, to the extent that a grant of a security interest in such Trademark License is not prohibited by applicable law or the applicable Trademark License.

"Trademark Security Agreement" means the Trademark Security Agreement executed and delivered by the Grantors to the Collateral Agent, substantially in the form of Annex V hereto, as such agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"Trademarks" shall mean (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (ii) the right to obtain all renewals thereof.

"Vehicles" shall mean all cars, railcars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and, in any event, shall include all tires and other appurtenances to any of the foregoing.

SECTION 1.2.        Other Definitional Provisions.

(a)        The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Annex and Schedule references are to this Agreement unless otherwise specified.

(b)        The meanings given to terms defined herein or in the UCC or in the Indenture shall be equally applicable to both the singular and plural forms of such terms.

(c)     Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

(d)     The word "or" when used in this Agreement is not exclusive.

(e)     When the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation".

(f)     References to sections of or rules under the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time.

(g)     In accordance with the Intercreditor Agreement, Proceeds of the disposition of Capital Stock of a Subsidiary that results in the disposition of assets constituting Primary Collateral shall constitute Proceeds of Primary Collateral (and shall not contribute Proceeds of Secondary Collateral) to the extent of the portion of the Collateral disposed of that constitutes Primary Collateral.

## ARTICLE II

## GRANT OF SECURITY INTEREST

Each Grantor hereby assigns and transfers to the Collateral Agent, for the ratable benefit of the Secured Parties, and hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in, all of the following assets and property, tangible and intangible now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Note Obligations under the Indenture Documents:

(a)     all Accounts;

(b)     all books and Records pertaining to the Collateral or otherwise;

(c)     all Chattel Paper (including all Tangible Chattel Paper and Electronic Chattel Paper);

(d)     all Commercial Tort Claims described on Schedule 6;

(e)     all Commodity Accounts;

(f)     all Commodity Contracts;

(g)     all Deposit Accounts, including all Blocked Accounts and all Cash Collateral Accounts, together with all of the applicable Grantor's right, title and interest in and to all sums of property (including cash equivalents and other investments) now or

at any time hereafter on deposit therein, credited thereto or payable thereon, and all instruments, documents and other writings evidencing any such Blocked Accounts or Cash Collateral Accounts;

(h)     all Documents;

(i)     all Fixtures;

(j)     all General Intangibles;

(k)     all Goods (including all Equipment and Inventory);

(l)     all Instruments (including all promissory notes);

(m)     all Insurance;

(n)     all Intellectual Property;

(o)     all Intercompany Debt owed by the Company or any Subsidiary thereof (including any Grantor) to any Grantor;

(p)     all Investment Property, including, subject to the limitations set forth below in clauses (ii) and (iii) of the proviso in this Article II relating to Rule 3-16 Excluded Capital Stock and Excluded Foreign Subsidiary Capital Stock, respectively, all Capital Stock of each Subsidiary (collectively, the "Pledged Subsidiaries") of any Grantor;

(q)     all Letter-of-Credit Rights;

(r)     all Money;

(s)     all Pledged Securities;

(t)     all Receivables, to the extent not otherwise described above;

(u)     all Securities;

(v)     all Securities Accounts;

(w)     all Securities Entitlements;

(x)     all Supporting Obligations;

(y)     all Vehicles; and

(z)     to the extent not otherwise included, all Proceeds, products, accessions, rents and profits of or in respect of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided that, notwithstanding any other provisions set forth in this Article II to the contrary, this Agreement shall not, at any time, constitute a grant of a Lien on or security interest in, and "Collateral" shall not include:

(i)      any General Intangible or any lease, license, contract, property right or agreement to which any Grantor is a party or in which any Grantor has any right, title or interest if and to the extent the grant of a security interest hereunder would constitute or result in a breach, termination or default under such General Intangible or such lease, license, contract, property right or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC); provided that immediately upon the ineffectiveness, lapse or termination of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a lien on and security interest in, all its right, title and interest in and to such General Intangible, lease, license, contract, property right or agreement as if such provision had never been in effect (any such General Intangible, lease, license, contract, property right or agreement, solely to the extent and so long as not included in the "Collateral", an "Excluded General Intangible"); or

(ii)      in the event (and only in the event) that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Pledged Subsidiary due to the fact that such Pledged Subsidiary's Capital Stock and other securities secure the Notes, such portion (and only such portion) of the Capital Stock and other securities of such Pledged Subsidiary as shall constitute the minimum amount necessary to avoid having such Person be subject to such requirement (such portion of Capital Stock and other securities being collectively referred to as the "Rule 3-16 Excluded Capital Stock"); provided further that (A) notwithstanding anything to the contrary in this Agreement, if as of the Closing Date or any subsequent time any Capital Stock or other securities of any Pledged Subsidiary are not required to be pledged under this Agreement because Rule 3-16 would require the filing of separate financial statements of such Pledged Subsidiary if such Capital Stock or other securities were so pledged, in the event that Rule 3-16 is amended, modified or interpreted by the SEC or any other relevant Governmental Authority to no longer require (or is replaced with another rule or regulation that would not require) the filing of separate financial statements of such Pledged Subsidiary if such Capital Stock or other securities are pledged under this Agreement, then such Capital Stock or other securities of such Pledged Subsidiary shall automatically be deemed part of the Collateral and pledged under this Agreement; and (B) this Agreement may be amended or modified, without the consent of any holder of any Note Obligation, to the extent necessary to release the security interests securing the Note Obligations on such portion of the shares of Capital Stock and other securities that are so deemed to no longer constitute part of the Collateral or to grant security interests securing the Note Obligations on such portion of the shares of Capital Stock and other securities that are so deemed to constitute part of the Collateral; or

(iii)     any voting Capital Stock of any Foreign Subsidiary exceeding, and only to the extent that such Capital Stock exceeds, 65% of the issued and outstanding voting Capital Stock of such Foreign Subsidiary (such portion of Capital Stock, being collectively referred to as "Excluded Foreign Subsidiary Capital Stock"); or

(iv)     any Excluded Trademark Application.


# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce the Collateral Agent and the Trustee to enter into the Indenture and to induce the Holders to purchase the Notes, each Grantor hereby represents and warrants to the Collateral Agent, the Trustee and each Holder that:

SECTION 3.1.     Title; No Other Liens. Except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and the Permitted Liens, such Grantor owns each item of the Collateral owned by it free and clear of any and all Liens or claims of others. No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except (a) such as have been filed in favor of the Collateral Agent, for the ratable benefit of the Secured Parties pursuant to this Agreement and (b) such as are expressly permitted by the Indenture or this Agreement.

SECTION 3.2.     Perfected Priority Liens. The security interests granted pursuant to this Agreement, the Copyright Security Agreement, the Patent Security Agreement and the Trademark Security Agreement (a) upon completion of the filings and other actions specified on Schedule 1 hereto (which, in the case of all filings and other documents referred to on said Schedule, copies have been delivered to the Collateral Agent in completed and duly executed form) will constitute valid perfected security interests in the Collateral (to the extent that (i) except as to Excluded Vehicles and Excluded Money, a security interest therein may be perfected pursuant to the UCC and (ii) except for Excluded Personal Property, a security interest therein may be perfected pursuant to any laws other than the UCC) in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Note Obligations, enforceable in accordance with the terms hereof against all creditors of such Grantor subject to (1) bankruptcy, insolvency, moratorium and other similar laws now or hereafter in effect relating to or affecting creditors' rights generally, and (2) general principles of equity (regardless of whether considered in a proceeding at law or in equity), and (b) subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, are prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens. Any reference in this Agreement or the other Indenture Documents to Permitted Liens is not intended to and should not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created herein or by any of the other Indenture Documents to any Permitted Lien, except to the extent explicitly set forth in the Intercreditor Agreement.

SECTION 3.3.     Jurisdiction of Organization; Chief Executive Office.  Such Grantor's jurisdiction of incorporation, formation or organization (as applicable), location of

chief executive office or sole place of business (as applicable), organizational identification number and federal tax identification number are specified on <u>Schedule 2</u> hereto. Such Grantor has furnished to the Collateral Agent a certified charter, certificate of incorporation or other organizational document and a long-form good standing certificate as of a date which is recent to the date hereof.

SECTION 3.4.    <u>Inventory and Equipment</u>.

(a)    No part of the Equipment of such Grantor constitutes a Fixture or has otherwise become permanently attached to, affixed to or otherwise incorporated into any real property or improvements of any Person other than real property and improvements owned in fee by such Grantor (or subject to a leasehold in favor of such Grantor pursuant to a ground lease) and with respect to which such Grantor has delivered to the Collateral Agent a Mortgage granting to the Collateral Agent a first and prior mortgage Lien on such real property and improvements so owned in fee or subject to a leasehold (subject to Permitted Liens) to secure the Note Obligations.

(b)    No Equipment of such Grantor is or at any time will be evidenced by a negotiable Document.

(c)    No Inventory of such Grantor is or at any time will be evidenced by a negotiable Document that has not been delivered to the Controlling Agent (or held in trust therefor) upon request of the Controlling Agent after the occurrence and during the continuation of an Event of Default.

SECTION 3.5.    <u>Farm Products</u>.

(a)    None of the Collateral constitutes, or is the Proceeds of, Farm Products.

(b)    Such Grantor is not engaged in any farming operation within the meaning of UCC §9-102(a)(35).

SECTION 3.6.    <u>Securities and Securities Accounts</u>.

(a)    All Securities and all Securities Accounts in which such Grantor holds any beneficial or record interest are accurately listed and described on <u>Schedule 3</u> hereto.

(b)    Such Grantor is the sole entitlement holder of each such Securities Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than (solely in the case of Secondary Collateral) the Controlling ABL Agent) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Securities Account or securities or other property credited thereto.

(c)     Except as described on Schedule 3 hereto, the Pledged Securities constitute all of the issued and outstanding Securities of every class of the applicable Issuer owned by such Grantor on the Closing Date.

(d)     Schedule 3 sets forth an accurate list of all Excluded Capital Stock.

(e)     Such Grantor has delivered to the Collateral Agent an Acknowledgement and Consent to Pledge substantially in the form of Annex II hereto duly executed by each Issuer of Pledged Securities with respect to such Grantor.

(f)     All of the Pledged Securities have been duly and validly issued and are fully paid and nonassessable.

(g)     Such Grantor is the record and beneficial owner of, and has good and marketable title to, the Pledged Securities pledged by it hereunder, free of any and all Liens, restrictions on transfer, voting agreements, options or claims of, any other Person, other than Permitted Liens.

(h)     To the extent any of the Pledged Securities of such Grantor are Certificated Securities, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, such Grantor has delivered the Security Certificates evidencing such Securities, duly endorsed in blank, or accompanied by appropriate transfer powers executed in blank, to the Controlling Agent.

SECTION 3.7.     Receivables.

(a)     Except as listed on Schedule 7, no amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Controlling Agent to the extent required by Section 4.14.

(b)     The amounts represented by such Grantor to the Secured Parties from time to time as owing to such Grantor in respect of the Receivables will at such times be accurate in all material respects.

SECTION 3.8.     Commodity Accounts and Commodity Contracts.

(a)     All Commodity Accounts held by such Grantor are accurately listed and described on Schedule 8 hereto.

(b)     Such Grantor is the sole entitlement holder of each such Commodity Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the Controlling ABL Agent) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Commodity Account or securities or other property credited thereto.

SECTION 3.9.     Intellectual Property

(a)     All Intellectual Property owned or licensed by such Grantor or in which such Grantor holds an interest are accurately listed and described on <u>Schedule 4</u> hereto.

(b)     The Copyrights and Copyright applications listed on Schedule A to the Copyright Security Agreement executed and delivered in connection with this Agreement constitute all of the Copyrights and Copyright applications owned and currently in use by such Grantor. The Patents and Patent applications listed on Schedule A to the Patent Security Agreement executed and delivered in connection with this Agreement constitute all of the Patents and Patent applications owned and currently in use by such Grantor. The Trademarks and Trademark applications listed on Schedule A to the Trademark Security Agreement executed and delivered in connection with this Agreement constitute all of the Trademarks and Trademark applications owned and currently in use by such Grantor.

(c)     All Intellectual Property of such Grantor is valid, subsisting, unexpired, enforceable, has not been abandoned, and does not infringe the Intellectual Property rights of a third party.

(d)     Except as set forth on <u>Schedule 4</u> hereto, none of the Intellectual Property is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

(e)     No holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Intellectual Property.

(f)     No action or proceeding is pending or, to the knowledge of such Grantor, threatened on the date hereof seeking to limit, cancel or question the validity, or such Grantor's ownership, of any Intellectual Property.

(g)     Such Grantor neither owns nor holds any interest in any Specified Trademark Applications, except for any Excluded Trademark Applications with respect to such Grantor.

SECTION 3.10.     <u>Deposit Accounts</u>.

(a)     All Deposit Accounts held by such Grantor are accurately listed and described on <u>Schedule 9</u> hereto.

(b)     Such Grantor is the sole account holder of each such Deposit Account and such Grantor has not consented to, and is not otherwise aware of, any Person (other than (solely in the case of Secondary Collateral) the Controlling ABL Agent) having either sole dominion and control (within the meaning of common law) or "control" (within the meaning of Section 9-104 of the UCC) over, or any other interest in, any such Deposit Account or any money or other property deposited therein.

SECTION 3.11.     <u>Instruments and Chattel Paper</u>.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, such Grantor has taken all

actions reasonably requested by the Collateral Agent to establish control (as defined in the UCC) by the Controlling Agent of all Electronic Chattel Paper included in the Collateral and all "transferable records" as defined in Section 201 of the Federal Electronics Signatures in Global and National Commerce Act or in Section 16 of Uniform Electronic Transactions Act as in effect in all relevant jurisdictions. Without limiting the foregoing, such Grantor represents and warrants that all conditions necessary to establish the Controlling Agent's control over any Electronic Chattel Paper included in the Collateral under Section 9.105 of the UCC have been satisfied.

SECTION 3.12.    Aircraft.  Such Grantor neither owns nor holds any interest in aircraft.

SECTION 3.13.    Commercial Tort Claims.  All Commercial Tort Claims of each Grantor or in which any Grantor holds an interest are accurately listed and described on Schedule 6 hereto.

SECTION 3.14.    Non-UCC Property.  Such Grantor neither owns nor holds any interest in any Non-UCC Property, except for any Excluded Personal Property with respect to such Grantor.

SECTION 3.15.    Letter-of-Credit Rights.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, such Grantor has taken all actions necessary so that the Controlling Agent has control (under Section 9.107 of the UCC) of all Letter-of-Credit Rights included in the Collateral.

## ARTICLE IV

## COVENANTS

Each Grantor covenants and agrees that, from and after the date of this Agreement until the Notes shall have been paid in full and the Indenture shall have terminated, such Grantor shall:

SECTION 4.1.    Covenants in Indenture and other Indenture Documents. Take, or refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that each covenant and agreement applicable to such Grantor contained in the Indenture and the other Indenture Documents is performed and no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Grantor or any of its Subsidiaries.

SECTION 4.2.    Application of Cash Proceeds.  Cause each invoice issued by such Grantor in respect of Secondary Collateral to provide for payment of such invoice (a) if by check, by remitting the same to the Lock Box, and (b) by wire transfer, automated checking transaction or other electronic funds transfer by remitting the same directly to the Blocked Account, and otherwise take all action necessary to cause all cash Proceeds of the Secondary Collateral, including all cash Proceeds of Accounts Receivable, to be remitted to the Blocked Account.  Take all action necessary to cause all cash Proceeds of the Primary Collateral to be remitted to a Cash Collateral Account.  If, notwithstanding the foregoing, any Grantor shall receive any cash Proceeds of the Collateral, subject (solely in the case of Secondary Collateral)

14

to the Intercreditor Agreement, such Grantor shall hold such Proceeds in trust for the benefit of the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral), and not later than the second (2nd) Business Day following the date of receipt, deposit the same directly into the Blocked Account (if Proceeds of Secondary Collateral) or a Cash Collateral Account (if Proceeds of Primary Collateral) in the exact form received.

SECTION 4.3. Electronic Chattel Paper. Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, in the event that such Grantor shall at any time hold or acquire an interest in any Electronic Chattel Paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction) which is part of the Collateral, such Grantor shall promptly notify the Controlling Agent thereof in writing, and such Grantor shall take, or cause to be taken, such actions as the Collateral Agent may reasonably request to give the Controlling Agent control of such Electronic Chattel Paper under Section 9-314 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

SECTION 4.4. Maintenance of Perfected Security Interest; Further Documentation.

(a) Subject to the automatic release of Capital Stock to the extent it constitutes Rule 3-16 Excluded Capital Stock pursuant to Section 12.12 of the Indenture, maintain the security interest created by this Agreement as a perfected security interest to the extent and having at least the priority described in Section 3.2 hereof and, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, shall defend such security interest against the claims and demands of all Persons whomsoever; provided that the Collateral Agent shall release Liens and security interests in any Collateral which is sold or otherwise disposed of in accordance with the terms of the Indenture, the other Indenture Documents and the Intercreditor Agreement.

(b) Furnish to the Collateral Agent and the other Secured Parties from time to time, at such Grantor's sole cost and expense, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class may reasonably request by written notice delivered to the Company, all in such detail as such Holders may reasonably request.

(c) Take all actions necessary to maintain or perfect the Collateral Agent's security interest in (i) except for any Excluded Vehicles and Excluded Money, all the Collateral to the extent that a security interest therein may be perfected pursuant to the UCC, including filing all necessary UCC continuation statements and (ii) except for Excluded Personal Property, all the Collateral a security interest in which may be perfected pursuant to any laws other than the UCC.

(d)     Subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, at any time and from time to time and at the sole expense of such Grantor, such Grantor will promptly and duly execute (as required by applicable law), deliver or have recorded with appropriate agencies such further instruments and documents and take such further actions necessary or as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, reasonably desirable for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) the filing of any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby; (ii) in the case of any Cash Collateral Account and any other relevant Primary Collateral, taking any actions necessary to enable the Collateral Agent to obtain "control" (within the meaning of the UCC) with respect thereto; and (iii) in the case of any Blocked Account and any other relevant Secondary Collateral, taking any actions necessary to enable the Controlling ABL Agent to obtain "control" (within the meaning of the UCC) with respect thereto.

(e)     This Section 4.4 and the obligations imposed on each Grantor by this Section 4.4 shall be interpreted as broadly as possible in favor of the Controlling Agent and the Secured Parties in order to effectuate the purpose and intent of this Agreement.

SECTION 4.5.     Changes in Locations, Name, etc.  Not, except upon fifteen (15) Business Days' prior written notice to the Collateral Agent and delivery to the Collateral Agent of all additional financing statements and other documents necessary or, or as may be, in the written opinion of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class delivered to the Company within ten (10) Business Days of receipt of such notice, reasonably desirable to maintain the validity, perfection and priority of the security interests provided for herein:

(a)     change its jurisdiction of incorporation, formation, or organization, as applicable; or

(b)     change its name, identity or organizational structure.

Each notice delivered pursuant to this Section 4.5 shall specify in reasonable detail any change in the jurisdiction of incorporation, organization, formation, name, identity or corporate structure as applicable.

SECTION 4.6.     Notices.  Advise the Collateral Agent promptly, in reasonable detail, of (i) any Lien (other than Permitted Liens) on any of the Collateral, and (ii) the occurrence of any other event which, in such Grantor's reasonable opinion, would materially impair the Collateral or the security interests created hereby.

SECTION 4.7.     Pledged Securities; Securities Accounts.

(a)     Notify the Collateral Agent promptly in writing upon the acquisition by any Grantor of any Pledged Securities, which notice shall (i) set forth all information with respect to such Pledged Securities as is set forth on Schedule 3 hereto with respect to

the Pledged Securities owned by the Grantors on the date hereof, and (ii) except in the case of Excluded Capital Stock, be accompanied by an Acknowledgment and Consent to Pledge duly executed by the Issuer of such Securities (unless such Issuer is also a Grantor). Nothing contained in this <u>Section 4.7</u> shall permit any Grantor to invest in or hold any Security to the extent such investment is prohibited pursuant to the Indenture.

(b) If any Grantor shall become entitled to receive or shall receive any Security Certificate (including any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Securities of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any Pledged Securities (other than Excluded Capital Stock), or otherwise in respect thereof, accept the same as the agent of the Controlling Agent, hold the same in trust for the Controlling Agent and, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, deliver the same forthwith to the Controlling Agent in the exact form received, duly indorsed by such Grantor in blank or accompanied by an undated stock power covering such certificate duly executed in blank by such Grantor to the Controlling Agent, to be held by the Controlling Agent, subject to the terms hereof, as additional collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral). Unless such Grantor is permitted to retain such proceeds by the Indenture Documents, pay over any sums paid upon or in respect of the Investment Property included in the Collateral hereunder upon the liquidation or dissolution of any Pledged Subsidiary to the Controlling Agent to be held by it hereunder as additional collateral security for the Note Obligations, and in case any distribution of capital shall be made on or in respect of such Investment Property, or any property shall be distributed upon or with respect to such Investment Property pursuant to the recapitalization or reclassification of the capital of any Pledged Subsidiary or pursuant to the reorganization thereof, deliver the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Controlling Agent, to the Controlling Agent to be held by it hereunder as additional collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral). If any sums of money or property so paid or distributed in respect of the Investment Property included in the Collateral shall be received by such Grantor, until such money or property is paid or delivered to the Controlling Agent, hold such money or property in trust for the Controlling Agent, segregated from other funds of such Grantor, as additional collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral). Notwithstanding the foregoing, the Grantors shall not be required to pay over to the Controlling Agent or deliver to the Controlling Agent as Collateral any proceeds of any liquidation or dissolution of any Pledged Subsidiary, or any distribution of capital or property in respect of any Capital Stock, to the extent that the proceeds thereof are applied as required by the Intercreditor Agreement and the Indenture.

(c) Without the prior written consent of the Collateral Agent, not (i) vote to enable, or take any other action to permit, any Pledged Subsidiary to issue any stock or other equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Capital Stock or other equity securities

of any nature of any Pledged Subsidiary unless such securities (other than Excluded Capital Stock), duly indorsed by such Pledged Subsidiary in blank or accompanied by an undated stock power covering such securities duly executed by such Pledged Subsidiary, are delivered to the Controlling Agent, concurrently with the issuance thereof, to be held by the Controlling Agent as collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral), (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Pledged Securities or Proceeds thereof (except pursuant to a transaction expressly permitted by the Indenture), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Pledged Securities or Proceeds thereof, or any interest therein, except for Permitted Liens, or (iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or the Controlling Agent to dispose of any of the Pledged Securities or Proceeds thereof.

(d)     If such Grantor is a Pledged Subsidiary, (i) be bound by the terms of this Agreement relating to the Pledged Securities issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) notify the Collateral Agent promptly in writing of the occurrence of any of the events described in Section 4.7(b) hereof with respect to the Pledged Securities issued by it, and (iii) cause the terms of Section 5.3(c) and Section 5.7 hereof to apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to Section 5.3(c) and Section 5.7 hereof with respect to the Pledged Securities issued by it.

(e)     If such Grantor is a Pledged Subsidiary that is a partnership or a limited liability company, (i) confirms that none of the terms of any Capital Stock issued by it that is included in the Collateral provides that such Capital Stock is a "security" within the meaning of Sections 8-102 and 8-103 of the UCC, (ii) agrees that it will take no action to cause or permit any such Capital Stock to become such a "security", (iii) not issue any certificate representing any such Capital Stock and (iv) if, notwithstanding the foregoing, any such Capital Stock shall be or become such a "security", (and the Grantor that holds such Capital Stock hereby instructs such Pledged Subsidiary to) comply with instructions originated by the Controlling Agent without further consent by such Grantor.

SECTION 4.8.     Receivables.

(a)     Other than in the ordinary course of business, not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that could adversely affect in any material respect the value thereof.

(b)     Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if at any time the aggregate amount owing to such Grantor on all Accounts as to which a Governmental Authority is an obligor exceeds 5% of the aggregate amount owing to the Grantor on all Accounts, so notify the Collateral Agent and, if requested by the Controlling Agent, at such Grantor's sole cost and expense, from

and after the date on which such aggregate amount first exceeds such percentage, deliver to the Controlling Agent such assignments, notices of assignment and other documents or information as shall be necessary or otherwise requested by the Controlling Agent to permit the assignment hereunder of all Accounts as to which a Governmental Authority is an obligor pursuant to all applicable law (including the Assignment of Claims Act of 1940, as amended).

(c)     Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, upon the request of the Controlling Agent at any time after the occurrence and during the continuance of an Event of Default, notify obligors on the Receivables that the Receivables have been assigned to the Controlling Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Controlling Agent.

(d)     Anything herein to the contrary notwithstanding, remain liable under each of its Receivables to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Controlling Agent or any Joint Secured Party of any payment relating thereto, nor shall the Controlling Agent or any Joint Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(e)     Deliver to the Controlling Agent a copy of each material demand, notice or document received by it that questions or calls into doubt the validity or enforceability of more than 10% of the aggregate amount of the then outstanding Receivables that are included in the Collateral.

SECTION 4.9.     <u>Intellectual Property.</u>

(a)     Notify the Collateral Agent promptly, in writing, upon the acquisition by Grantor of any Intellectual Property (including upon any Specified Trademark Application ceasing to be an Excluded Trademark Application) which notice shall set forth (i) all information with respect to such Intellectual Property as is set forth on <u>Schedule 4</u> hereto with respect to Intellectual Property owned by the Grantors on the date hereof, and (ii) (except in the case of any Excluded Trademark Application) shall be accompanied by a Copyright Security Agreement, Patent Security Agreement or Trademark Security Agreement, as applicable, duly executed and completed by the applicable Grantor.

(b)     (Either itself or through licensees), with respect to each Trademark which is material to the operation of its business, (i) continue to use such Trademark on each and every trademark class of goods applicable to its current line as reflected in its then-current catalogs, brochures and price lists in order to maintain such Trademark in full force and effect, free from any claim of abandonment for non-use, (ii) maintain the quality of products and services offered under such Trademark, (iii) use such Trademark with all notices and legends required by applicable law or regulations, and (iv) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(c)     Not, and not permit any licensee to, do any act, whereby any Patent which is material to the operation of its business may become forfeited, abandoned or dedicated to the public.

(d)     Not, and not permit any licensee to, do any act or omit to do any act whereby any portion of any Copyright which is material to the operation of its business may become invalidated or otherwise impaired. Not (either itself or through licensees) do any act whereby any of the Copyrights may fall into the public domain.

(e)     Not, and not permit any licensee to, do any act that results in any Intellectual Property held by such Grantor infringing on the Intellectual Property rights of a third party.

(f)     Promptly notify the Collateral Agent immediately if it knows, or has reason to know, that any application or registration relating to any Patent, Copyright or Trademark may become abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding Grantor's ownership of, or the validity of, any Intellectual Property or such Grantor's right to register the same or to own and maintain the same.

(g)     To the extent any Grantor, either by itself or through an authorized agent, employee, licensee or designee, shall file an application for any Patent or Trademark with the United States Patent and Trademark Office or any Copyright in the U.S. Copyright Office or any similar office or agency in any other country or any political subdivision thereof, report such filing to the Collateral Agent within five (5) Business Days after the last day of the fiscal quarter in which such filing occurs. Upon request of the Collateral Agent, except for Excluded Personal Property, execute and deliver, and have recorded, a Copyright Security Agreement, a Patent Security Agreement, a Trademark Security Agreement (except in the case of any Excluded Trademark Application) and any and all other agreements, instruments, documents, and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest in any Copyright, Patent or Trademark and the goodwill and General Intangibles of such Grantor relating thereto or represented thereby.

(h)     Take all commercially reasonable and necessary steps, including in any proceeding before the United States Patent and Trademark Office, the U.S. Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain each registration of Patents, Trademarks and Copyrights held by, including filing of applications for renewal, affidavits of use and affidavits of incontestability, to the extent such Patents, Trademarks or Copyrights are material to the operation of its business.

(i)     In the event that any Intellectual Property of any Grantor which is material to the operation of its business is infringed, misappropriated or diluted by a third party, take such actions as such Grantor shall reasonably deem appropriate under the circumstances, or as otherwise reasonably necessary or as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, reasonably desirable to protect such Intellectual Property.

(j)     Take all steps reasonably necessary to protect the secrecy of all Trade Secrets, including entering into confidentiality agreements with employees with access to such Trade Secrets and labeling and restricting access to secret information and documents.

SECTION 4.10.     Commercial Tort Claims.  Notify the Collateral Agent promptly, in writing, in the event that any Grantor shall at any time after the date hereof hold any Commercial Tort Claims which notice shall set forth (i) all information with respect to such Commercial Tort Claims as is set forth on Schedule 6 hereto with respect to Commercial Tort Claims held by the Grantors on the date hereof, and (ii) shall include the express grant by such Grantor to the Collateral Agent of a security interest in such Commercial Tort Claim (and the proceeds thereof). In the event that such notice does not include such grant of a security interest, the sending thereof by such Grantor to the Collateral Agent shall be deemed to constitute such grant to the Collateral Agent. Upon the sending of such notice, any Commercial Tort Claim described therein shall constitute part of the Collateral and shall be deemed included therein.  Without limiting the authorization of the Collateral Agent provided in the Indenture or otherwise arising by such Grantor's execution of this Agreement or any of the other Indenture Documents, the Collateral Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming the Collateral Agent or its designee as secured party and such Grantor as debtor, or any amendments to any financing statements, covering any such Commercial Tort Claim as Collateral. In addition, promptly execute and deliver, or cause to be executed and delivered, to the Collateral Agent such other agreements, documents and instruments as reasonably required or as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, reasonably desirable in connection with such Commercial Tort Claim.

SECTION 4.11.     Negotiable Documents.  Not permit any property of such Grantor other than Inventory to be evidenced by a negotiable Document. If any Inventory is or becomes evidenced by a negotiable Document, upon request of the Controlling Agent after the occurrence and during the continuation of an Event of Default, cause such negotiable Document, subject to the terms of the Intercreditor Agreement, to be duly negotiated to the Controlling Agent.

SECTION 4.12.    Inventory and Equipment.

(a)    Take all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Controlling Agent's security interest in all Inventory and (except for any Excluded Personal Property) Equipment of such Grantor, or to enable the Controlling Agent to exercise and enforce its rights and remedies hereunder, subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, with respect to such Equipment and Inventory.

(b)    Keep materially correct and accurate records of the Inventory, itemizing and describing the kind, type and quantity of Inventory, such Grantor's cost therefor and (where applicable) the current list prices for the Inventory, in each case, in reasonable detail.

(c)    Not deliver any Document evidencing any Equipment and Inventory to any Person other than to the purchaser of such Inventory in the ordinary course of business or the issuer of such Document to claim the Goods evidenced therefor, or to the Controlling Agent.

(d)    Take commercially reasonable measures to maintain, keep and preserve the Inventory in good and merchantable condition, maintain and preserve each item of Equipment in good operating condition, ordinary wear and tear and immaterial impairments of value and damage by the elements excepted, and provide all maintenance, service and repairs necessary for such purpose.

(e)    Prevent any Equipment from becoming attached to real estate in such a manner that the same may become a Fixture or otherwise becomes permanently attached to, affixed to or otherwise incorporated into any real property or improvements of any Person other than real property and improvements owned in fee by such Grantor (or subject to a leasehold in favor of such Grantor pursuant to a ground lease) and with respect to which such Grantor has delivered to the Collateral Agent a Mortgage granting to the Collateral Agent a first and prior mortgage Lien on such real property and improvements so owned in fee or subject to a leasehold (subject to Permitted Liens) to secure the Note Obligations.

SECTION 4.13.    Amounts in Cash Collateral Account.

(a)    Cause all Collateral Monies, including all Net Proceeds received in connection with a Primary Collateral Asset Sale, as well as Net Loss Proceeds required to be deposited with the Collateral Agent, to be held by the Collateral Agent in the Cash Collateral Account as part of the Primary Collateral securing the Note Obligations. So long as no Default or Event of Default under the Indenture shall have occurred and be continuing, Collateral Monies may:

(1)    with respect to the Net Proceeds of Primary Collateral Asset Sales, be released as contemplated by Section 4.16 of the Indenture, subject to conditions set forth in the Indenture;

(2)     with respect to Net Loss Proceeds, be released to repair or replace the relevant Primary Collateral as contemplated by Section 4.17 of the Indenture, subject to conditions set forth in the Indenture;

(3)     at the Company's direction be applied by the Collateral Agent from time to time to (x) the payment of the principal of, premium, if any, and interest on the Notes at maturity or upon redemption or retirement, or (y) the purchase of the Notes upon tender or in the open market or otherwise, in each case, in compliance with the Indenture; or

(4)     continue to be held by the Collateral Agent in the Cash Collateral Account as part of the Primary Collateral securing the Notes.

(b)     The Collateral Agent shall be entitled to apply any Collateral Monies to cure any Event of Default under the Indenture. Collateral Monies deposited with the Collateral Agent shall be invested in cash or Cash Equivalents pursuant to the Company's direction and, so long as no Default or Event of Default shall have occurred and be continuing, the Company shall be entitled to any interest or dividends accrued, earned or paid on such Cash Equivalents.

SECTION 4.14.     Delivery of Instruments and Chattel Paper.  If any of the Collateral is or shall become evidenced by any Instrument, Certificated Security or Chattel Paper, deliver such Instrument, Certificated Security or Chattel Paper promptly to the Controlling Agent, duly indorsed in a manner reasonably satisfactory to the Controlling Agent, to be held as Collateral pursuant to this Agreement; provided, that the Grantors shall not be obligated to deliver to the Controlling Agent (i) any Instrument or Chattel Paper held by any Grantor at any time to the extent that the face amount of such Instrument or Chattel Paper does not exceed $100,000 or (ii) checks received in the ordinary course of business.

SECTION 4.15.     Payment of Obligations.  Pay and discharge or otherwise satisfy prior to delinquency, all material taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of income or profits therefrom, as well as all lawful claims for labor, materials and supplies or otherwise, except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Collateral Agent or the Secured Parties.

SECTION 4.16.     Non-UCC Property.  Neither own nor hold any interest in any Non-UCC Property, except for any Excluded Personal Property with respect to such Grantor.

SECTION 4.17.     Excluded Trademark Applications.  Neither own nor hold any interest in any Specified Trademark Application, except for any Excluded Trademark Applications with respect to such Grantor.

SECTION 4.18.     Letter-of-Credit Rights.  Not own or acquire any Letter-of-Credit Rights unless such Grantor has taken such actions as are necessary so that the Controlling Agent has control with respect to such Letter-of-Credit Rights under Section 9.107 of the UCC.

# ARTICLE V

## REMEDIAL PROVISIONS

SECTION 5.1.        Certain Matters Related to Receivables.

(a)        Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to make test verifications of the Receivables that are included in the Collateral using reasonable procedures that it reasonably considers advisable, and each Grantor shall furnish all such assistance and information as the Collateral Agent may reasonably require in connection with such test verifications.  Upon the occurrence and during the continuance of an Event of Default, upon the reasonable request of the Collateral Agent and at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others reasonably satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables of such Grantor that are included in the Collateral.

(b)        The Collateral Agent hereby authorizes each Grantor to collect such Grantor's Receivables that are included in the Collateral, subject to the Collateral Agent's direction and control after an Event of Default has occurred and is continuing, and the Collateral Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.  If required by the Controlling Agent at any time after an Event of Default has occurred and is continuing, any payments of Receivables that are included in the Collateral, when collected by any Grantor, (i) if required by the Indenture Documents or the Intercreditor Agreement, shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Controlling Agent in the Blocked Account (if Secondary Collateral) or a Cash Collateral Account (if Primary Collateral) in which the Controlling Agent has a first-priority perfected security interest maintained under the sole dominion and control of the Collateral Agent, subject to withdrawal by the Controlling Agent for the account of the Joint Secured Parties only as provided in Section 5.5, and (ii) until so turned over or if not required by the Indenture or the Intercreditor Agreement to be deposited into the Blocked Account (if Secondary Collateral) or a Cash Collateral Account (if Primary Collateral), shall be held by such Grantor in trust for the Controlling Agent and the Joint Secured Parties, segregated from other funds of such Grantor.  Each such deposit of Proceeds of Receivables that are included in the Collateral shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)        At any time after an Event of Default has occurred and is continuing, at the Collateral Agent's request, each Grantor shall deliver to the Controlling Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables included in the Collateral, including all original orders, invoices and shipping receipts

(d)　　The Company, the Collateral Agent, and the Deposit Account Bank have established in the name and for the benefit of the Collateral Agent, as agent for the Secured Parties, the Cash Collateral Accounts for purposes of this Agreement and the other Collateral Documents, which Cash Collateral Accounts are maintained with [_____] located in [_____].  With respect to any Deposit Account opened by any Grantor at any Deposit Account Bank after the Closing Date, the applicable Grantor, the Deposit Account Bank and the Collateral Agent shall enter into a control agreement in form reasonably satisfactory to the Collateral Agent simultaneously with the opening of such Deposit Account, which provides that such Deposit Account shall be under the control of the Collateral Agent, as agent for the Secured Parties, and the Collateral Agent shall have the right after the occurrence and continuance of an Event of Default to direct withdrawals from such Deposit Account and to exercise all rights with respect to all of the property from time to time on deposit therein pursuant to the terms of this Agreement and the control agreements, such form to be satisfactory to the Collateral Agent.

(e)　　The Company and the Controlling ABL Agent have established in the name and for the benefit of the Controlling ABL Agent, as agent for the Joint Secured Parties, the Blocked Account for purposes of this Agreement and the other Collateral Documents, which Blocked Account is maintained with [_____] located in [_____].  With respect to any Deposit Account opened by any Grantor at any bank after the Closing Date that is not a Cash Collateral Account, the applicable Grantor, the bank, and the Controlling ABL Agent shall enter into a customary control agreement simultaneously with the opening of such Deposit Account, which provides that such Deposit Account shall be under the control of the Controlling ABL Agent, as agent for the Joint Secured Parties, and the Controlling ABL Agent shall have the right after the occurrence and continuance of an Event of Default to direct withdrawals from such Blocked Account and to exercise all rights with respect to all of the property from time to time therein pursuant to the terms of this Agreement and the control agreements, such form to be satisfactory to the Controlling ABL Agent.

SECTION 5.2.　　　　Communications with Obligors; Grantors Remain Liable.

(a)　　The Collateral Agent in its own name or in the name of others may at any time after an Event of Default has occurred and is continuing communicate with obligors under the Receivables that are included in the Collateral to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Receivables.

(b)　　Upon the request of the Controlling Agent at any time after an Event of Default has occurred and is continuing, each Grantor shall notify obligors on the Receivables that are included in the Collateral that such Receivables have been assigned to the Controlling Agent for the ratable benefit of the Joint Secured Parties and that payments in respect thereof shall be made directly to the Controlling Agent.

(c)　　Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables that are included in the Collateral (or any agreement giving rise thereto) to observe and perform in its commercial judgment all the

conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. Neither the Controlling Agent nor any Joint Secured Party shall have any obligation or liability under any Receivable that is included in the Collateral (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Controlling Agent or any Joint Secured Party of any payment relating thereto, nor shall the Controlling Agent or any Joint Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable that is included in the Collateral (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

SECTION 5.3.        Pledged Securities.

        (a)        Unless an Event of Default shall have occurred and be continuing, each Grantor shall be permitted to exercise all voting and corporate rights with respect to the Pledged Securities; provided, however, that subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, no vote shall be cast or corporate right exercised or other action taken which, in the Collateral Agent's reasonable judgment, would materially impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Indenture, this Agreement or any other Indenture Document.

        (b)        Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing and upon the written request of the Collateral Agent, (i) any or all of the Pledged Securities (other than Excluded Capital Stock) shall be registered in the name of the Controlling Agent or its nominee, and the Controlling Agent or its nominee may thereafter exercise (x) all voting, corporate and other rights pertaining to such Pledged Securities at any meeting of shareholders or members of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including the right to exchange at its discretion any and all of the Pledged Securities (other than Excluded Capital Stock) upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by the applicable Grantor or the Controlling Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities (other than Excluded Capital Stock) with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Controlling Agent may determine), all without liability except to account for property actually received by it, but the Controlling Agent and the other Joint Secured Parties shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing, and (ii) the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral) shall

have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Securities (other than Excluded Capital Stock) and make application thereof to the Secured Obligations in accordance with the Intercreditor Agreement.

(c)     Each Grantor hereby authorizes and instructs each Issuer of Pledged Securities pledged by such Grantor hereunder to, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement (i) comply with any instruction received by such Issuer from the Controlling Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and such Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) pay any dividends or other payments with respect to the Pledged Securities directly to the Controlling Agent.

(d)     The Collateral Agent agrees that it shall not give any instruction described in Section 5.3(c) unless (1) an Event of Default under and as defined in the Indenture has occurred and is continuing and (2) such instructions are otherwise in accordance with the terms of the Indenture and this Agreement.

SECTION 5.4.     Proceeds to be Turned Over to Collateral Agent.  In addition to the rights of the Controlling Agent and the Joint Secured Parties specified in Section 5.1 with respect to payments of Receivables that are included in the Collateral, after an Event of Default has occurred and is continuing, all Proceeds received by any Grantor consisting of cash, checks and Instruments shall be held by such Grantor in trust for the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral), segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral) in the exact form received by such Grantor (duly indorsed by such Grantor to the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral), if required).  All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Cash Collateral Account maintained under its sole dominion and control.  All Proceeds while held by the Collateral Agent in a Cash Collateral Account shall continue to be held as collateral security for all the Note Obligations and shall not constitute payment thereof until applied as provided in the Intercreditor Agreement. All Proceeds while held by such Grantor in trust for the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral) shall continue to be held as collateral security for all the Joint Secured Obligations (if Proceeds of Secondary Collateral) or the Note Obligations (if Proceeds of Primary Collateral) and shall not constitute payment thereof until applied as provided in the Intercreditor Agreement.

SECTION 5.5.     Application of Proceeds.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, at any time after the occurrence and during the continuance of an Event of Default the Collateral Agent may apply all or any part of Proceeds, including any such Proceeds held in any Collateral Account in payment of the Note Obligations, in accordance with Section 6.10 of the Indenture. Any balance of such Proceeds

remaining after the Notes shall have been paid in full, and the Indenture shall have terminated shall be paid over to the Grantors or to whomsoever may be lawfully entitled to receive the same.

SECTION 5.6. UCC and Other Remedies. Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Notes, all rights and remedies of a secured party under the UCC or any other applicable law. Without limiting the generality of the foregoing and subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind, including notice of intent to accelerate or notice of acceleration, (except any notice required by law as referred to below) to or upon the Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Collateral Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released. Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere. Subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, the Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this Section 5.6, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Collateral Agent hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Notes and to any other Person legally entitled thereto in accordance with the terms of the Intercreditor Agreement and the Indenture. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Collateral Agent or any other Secured Party arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten days before such sale or other disposition.

SECTION 5.7. Registration Rights.

(a) Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if the Collateral Agent shall determine to exercise its right to sell any or all of the Pledged Securities (other than Excluded Capital Stock) pursuant to Section 5.6 hereof, and if in the written opinion delivered to the Company by Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single

class, it is necessary or advisable to have such Pledged Securities, or that portion thereof to be sold, registered under the provisions of the Securities Act, the relevant Grantor will cause any Issuer thereof to: (i) execute and deliver, and cause the directors, members, managers and officers of such Issuer to execute and deliver, all such instruments and documents, and do or cause to be done all such other acts as may be, in the opinion of the Collateral Agent, necessary or advisable to register such Pledged Securities, or that portion thereof to be sold, under the provisions of the Securities Act, (ii) cause the registration statement relating thereto to become effective and to remain effective for a period of one year from the date of the first public offering of such Pledged Securities, or that portion thereof to be sold, and (iii) make all amendments thereto or to the related prospectus which, in the written opinion delivered to the Company by Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the SEC applicable thereto. Each Grantor agrees to cause any Issuer to comply with the provisions of the securities or "Blue Sky" laws of any and all jurisdictions which the Collateral Agent shall designate and to make available to its security holders, as soon as practicable, an earnings statement (which need not be audited) which will satisfy the provisions of Section 11(a) of the Securities Act.

(b)     Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Securities (other than Excluded Capital Stock), by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Securities (other than Excluded Capital Stock) for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

(c)     Each Grantor agrees that, upon the occurrence and during the continuance of an Event of Default, if the Collateral Agent desires to sell any of the Pledged Securities (other than Excluded Capital Stock) at a public or private sale, it will, upon the written request of the Collateral Agent, use commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of such Pledged Securities pursuant to this Section 5.7 valid and binding and in compliance with any and all other applicable law. Each Grantor further agrees that a breach of any of the covenants contained in this Section 5.7 will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and as a consequence, that each and every covenant contained in this Section 5.7 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants

except for a defense that no Event of Default has occurred and is continuing under the Indenture.

SECTION 5.8.    Waiver; Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay the Note Obligations and the reasonable fees and disbursements of any attorneys employed by the Collateral Agent or any other Secured Party to collect such deficiency.

SECTION 5.9.    Actions of Collateral Agent. Except as may otherwise be specifically provided in the Indenture or any Collateral Document with respect to any act, or refraining from acting, that is discretionary with the Collateral Agent in accordance with the terms of any Indenture Document, the Collateral Agent will act or refrain from acting in accordance with the written instructions of the Holders of a majority in aggregate principal amount of the Notes then outstanding.


## ARTICLE VI

## THE COLLATERAL AGENT

SECTION 6.1.    The Collateral Agent's Appointment as Attorney-in-Fact etc.

(a)    Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, such Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following, subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement:

(1)    in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Receivable or with respect to any other Collateral whenever payable;

(2)    in the case of any Copyright, Patent or Trademark (other than Excluded Trademark Applications), execute, deliver and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest in such

Copyright, Patent or Trademark and the goodwill and General Intangibles of such Grantor relating thereto or represented thereby;

(3)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(4)     execute, in connection with any sale provided for in <u>Section 5.6</u> or <u>5.7</u> hereof, any endorsements, assignments or other instruments or documents of conveyance or transfer with respect to the Collateral; and

(5)     (A) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (B) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents (including any negotiable Documents) in connection with any of the Collateral; (D) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (E) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (F) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (G) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; and (H) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this <u>Section 6.1(a)</u> to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this <u>Section 6.1(a)</u> unless it shall have actual knowledge that an Event of Default shall have occurred and be continuing.

(b)     The Collateral Agent may (but without any obligation to do so) (i) perform or satisfy any of the Grantor's and any other obligated party's obligations under or

pursuant to this Agreement and the other Indenture Documents which remain unsatisfied (after providing any notice and opportunity to cure to which such Grantor or other obligated party is entitled under any other provision of any Indenture Document, if any), and (ii) take all other actions and pay such amounts and claims as Collateral Agent determines in its sole but reasonable discretion, is necessary or appropriate to protect the rights and interests of the Collateral Agent and the other Secured Parties under this Agreement and the other Indenture Documents and otherwise with respect to the Notes or to preserve and protect the Collateral or any part thereof from loss.

(c)     The reasonable out-of-pocket expenses of the Collateral Agent (including the reasonable fees and disbursements of counsel to the Collateral Agent and of any accounting, financial or other professional advisors) incurred in connection with actions undertaken as provided in this Section 6.1, together with interest thereon at a rate per annum equal to the rate per annum at which interest would then be payable under the Indenture on past due amounts, from the date of payment by the Collateral Agent to the date reimbursed by any Grantor, shall be payable by such Grantor to the Collateral Agent on demand.

(d)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done pursuant to the powers granted in this Section 6.1. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

SECTION 6.2.     Duty of the Collateral Agent. Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, the Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under the UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account. None of the Collateral Agent, any other Secured Party, nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's interests in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers. The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

SECTION 6.3.     Financing Statements.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement and pursuant to the UCC and any other applicable laws, each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent under this Agreement. A photographic or

other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

SECTION 6.4.    Authority of the Collateral Agent.  Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Collateral Agent and the other Secured Parties, be governed by the Indenture, and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and such Grantor, the Collateral Agent shall be conclusively presumed to be acting as Collateral Agent for the Secured Parties with full and valid authority so to act or refrain from acting, and such Grantor shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

## ARTICLE VII

### MISCELLANEOUS

SECTION 7.1.    Amendments in Writing. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Article IX of the Indenture and in accordance with the Intercreditor Agreement.

SECTION 7.2.    Notices.  All notices, requests and demands to or upon the Collateral Agent, any other Secured Party, or any Grantor hereunder shall be effected in the manner provided for in Section 11.02 of the Indenture.

SECTION 7.3.    No Waiver; Remedies Cumulative.  No failure or delay on the part of any Grantor or the Collateral Agent in exercising any right or remedy under this Agreement or any other Indenture Document and no course of dealing between such Grantor and the Collateral Agent or any Secured Party shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy under this Agreement or any other Indenture Document preclude any other or further exercise thereof or the exercise of any other right or remedy under this Agreement or any other Indenture Document. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which any Grantor, the Collateral Agent or any Secured Party would otherwise have. No notice to or demand on any Grantor not required under this Agreement or any other Indenture Document in any case shall entitle such Grantor or any other Grantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Collateral Agent or the Secured Parties to any other or further action in any circumstances without notice or demand.

SECTION 7.4.    Enforcement Expenses; Indemnification.

(a)    Each Grantor agrees to pay or reimburse the Collateral Agent for all of its reasonable, out-of-pocket costs and expenses (including the reasonable fees and disbursements of counsel to the Collateral Agent and any accounting, financial or other professional advisors) incurred (i) in enforcing or preserving any rights under this Agreement and the other Indenture Documents to which such Grantor is a party, or in

connection with any amendment, modification or waiver, under or in connection with this Agreement or the other Indenture Documents or (ii) in connection with any "Refinancing" under Section 7.02 of the Intercreditor Agreement.

(b)     Each Grantor agrees to pay, and to save the Collateral Agent and the Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)     Each Grantor agrees to pay, and to save the Collateral Agent and the Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, to the same extent each Grantor would be required to do so pursuant to the Intercreditor Agreement other than liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from the gross negligence or willful misconduct of the Collateral Agent and such Secured Parties.

(d)     The agreements in this Section 7.4 shall survive repayment of the Notes and all other amounts payable under the Indenture and the other Indenture Documents.

SECTION 7.5.     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Grantor may assign or otherwise transfer any of its rights or obligations hereunder except in accordance with the terms of the Indenture (and any attempted assignment or transfer by such Grantor without such consent shall be null and void).

SECTION 7.6.     Set-Off.  Each Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time after an Event of Default has occurred and is continuing, without notice to such Grantor or any other Grantor, any such notice being expressly waived by each Grantor, to set-off as appropriate and apply any and all deposits (general or special, time or demand, provisional or final, but excluding deposits held by such Grantor in a fiduciary capacity for others), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Collateral Agent to or for the credit or the account of such Grantor, or any part thereof in accordance with the Intercreditor Agreement, against and on account of the obligations and liabilities of such Grantor to the Collateral Agent hereunder and claims of every nature and description of the Collateral Agent against such Grantor, in any currency, whether arising hereunder, under the Indenture, under any other Collateral Document or otherwise, as the Collateral Agent may elect, whether or not the Collateral Agent has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured.  The rights of the Collateral Agent under this Section 7.6 are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Collateral Agent may have.

SECTION 7.7.    Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original but all of which shall together constitute one and the same instrument.

SECTION 7.8.    Severability.  In the event that any one or more of the provisions contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, (a) each Grantor agrees that such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and (b) each Grantor and the Collateral Agent (acting on behalf and at the direction of the Trustee and the Holders) will negotiate in good faith to amend such provision so as to be legal, valid, and enforceable.

SECTION 7.9.    ENTIRE AGREEMENT.  THIS AGREEMENT AND THE OTHER INDENTURE DOCUMENTS EMBODY THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE COLLATERAL AGENT, THE TRUSTEE, THE OTHER HOLDERS, THE GRANTORS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

SECTION 7.10.    Governing Law; Submission to Jurisdiction; etc.

(a)    Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT THE LAWS OF ANY OTHER STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERN THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY OF, OR THE EXERCISE OF ANY REMEDIES WITH RESPECT TO, ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE, IN WHICH CASE THE LAWS OF SUCH OTHER STATE SHALL GOVERN SUCH VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY AND SUCH EXERCISE OF REMEDIES.

(b)    SUBMISSION TO JURISDICTION.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE NOTES OR THE OTHER INDENTURE DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GRANTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH GRANTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, BUT NOT LIMITED TO, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON

CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c)     WAIVER OF JURY TRIAL & CONSEQUENTIAL DAMAGES.  TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, EACH OF THE GRANTORS, THE COLLATERAL AGENT, THE TRUSTEE, AND THE OTHER HOLDERS: (1) IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY INDENTURE DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (2) IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (3) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (IV) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE OTHER INDENTURE DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BASED UPON, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION.

(d)     Service of Process.  Each party hereto irrevocably consents to service of process by notice delivered in accordance with Section 7.2 hereof. Nothing herein or in any other Indenture Document shall affect the right of the Collateral Agent, the Trustee or any other Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any Grantor in any other jurisdiction.

SECTION 7.11.     Acknowledgments.  Each Grantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Indenture Documents;

(b)     neither the Collateral Agent nor the Trustee nor any other Holder has any fiduciary relationship with or duty to such Grantor arising out of or in connection with this Agreement or any of the other Indenture Documents, and the relationship between the Collateral Agent, the Trustee and the Holders, on one hand, and such Grantor, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Indenture Documents or otherwise exists by virtue of the transactions contemplated hereby among the Holders or among the Grantor and the Holders.

SECTION 7.12.    Section Headings.  The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 7.13.    Additional Grantors.  Each Subsidiary of the Company that is required to become a party to this Agreement pursuant to Section 4.14 of the Indenture shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of Annex I hereto.

SECTION 7.14.    Releases

(a)    At such time as the obligations of the Grantors shall have been defeased or discharged in accordance with the provisions of Article VIII of the Indenture, Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Grantor. At the request and joint and several expense of the Grantors following any such termination, the Collateral Agent shall promptly deliver to the appropriate Grantor any Collateral held by the Collateral Agent hereunder, and promptly execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

(b)    If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Indenture, then the Collateral Agent, at the request and sole expense of such Grantor, shall promptly execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.  At the request and sole expense of the Company, a Grantor shall be released from its obligations hereunder in the event that all the Capital Stock of such Grantor shall be sold, transferred or otherwise disposed of in a transaction permitted by the Indenture; provided that the Company shall have delivered to the Collateral Agent, at least ten (10) Business Days prior to the date of the proposed release, a written request for such release identifying the relevant Grantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Company stating that such transaction is in compliance with the Indenture.

(c)    Additional releases of Collateral shall be provided as set forth in the Intercreditor Agreement.

SECTION 7.15.    Reinstatement.  The provisions of this Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should such Grantor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any part of such Grantor's assets or should any other financial impairment occur, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Notes, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or

must otherwise be restored or returned to any obligee of the Notes, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored, or returned, the Notes shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

SECTION 7.16. <u>Conflict With Other Documents</u>. If any conflict or inconsistency exists between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern. If any conflict or inconsistency exists between this Agreement and the Indenture, the Indenture shall govern.

SECTION 7.17. <u>Additional Waiver</u>. Each Grantor waives all rights and defenses arising out of an election of remedies by the Collateral Agent.

[signature page to follow]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name: _____
Title: _____

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name: _____
Title: _____

**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**

**WILMINGTON TRUST FSB**, as
Collateral Agent

By: _____
Name: _____
Title: _____

# ANNEX I
## TO SECURITY AGREEMENT

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT, dated as of _____ , 20   , by _____ , a _____ (the "<u>Additional Grantor</u>"), in favor of [_____], as the Collateral Agent (in such capacity, the "<u>Collateral Agent</u>") for the Trustee and Holders party to the Indenture referred to below. All capitalized terms not defined herein shall have the meaning ascribed to them in such Indenture.

## WITNESSETH:

WHEREAS, the Grantors, the Trustee and the Collateral Agent, have entered into an Indenture, dated as of [_____], 2010 (as amended, supplemented or otherwise modified from time to time, the "<u>Indenture</u>");

WHEREAS, the Additional Grantor has executed a Supplemental Indenture to the Indenture pursuant to which it has become a Guarantor under the Indenture;

WHEREAS, in connection with the Indenture, the Company and the other Grantors (other than the Additional Grantor) have entered into the Security Agreement, dated as of [_____], 2010 (as amended, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>") in favor of the Collateral Agent for the ratable benefit of the Trustee, the Collateral Agent and the Holders;

WHEREAS, Sections 4.14 of the Indenture requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement.

NOW, THEREFORE, IT IS AGREED:

1.      <u>Security Agreement</u>.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 7.13 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder and hereby assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Collateral now owned or hereafter acquired by the Additional Grantor. The information set forth in Annex I-A hereto is hereby added to the information set forth on Schedules            * to the Security Agreement. The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Article III of the Security Agreement is true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date. The Additional Grantor has delivered to the Collateral Agent an Acknowledgement and Consent

to Pledge substantially in the form of Annex II to the Security Agreement duly executed by each Issuer of Pledged Securities of such Additional Grantor with respect to any of such Pledged Securities (other than any Excluded Capital Stock).

2. <u>GOVERNING LAW.</u> THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY OTHER STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERN THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY OF, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO, ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE, IN WHICH CASE THE LAWS OF SUCH OTHER STATE SHALL GOVERN SUCH VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY AND SUCH EXERCISE OF REMEDIES.

---

* Refer to each Schedule which needs to be supplemented.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

*[ADDITIONAL GRANTOR]*

By: _____

Name: _____

Title: _____


ACKNOWLEDGMENT BY *[INSERT NAME OF GRANTOR OWNING CAPITAL STOCK ISSUED BY ADDITIONAL GRANTOR (THE "RELEVANT GRANTOR")]*:

By execution of this Assumption Agreement in the space provided below, [*RELEVANT GRANTOR*] hereby acknowledges and agrees that the Securities described on Annex I-A hereto have been issued by the Additional Grantor identified herein and are held by [*RELEVANT GRANTOR*] and constitute "Pledged Securities" comprising part of the Pledged Securities of [*ADDITIONAL GRANTOR*] under the Security Agreement.


Dated:

[RELEVANT GRANTOR]


By: _____

Name: _____

Title: _____

**ACKNOWLEDGMENT AND CONSENT TO PLEDGE**

*[date]*

*[NAME OF ISSUER]*
*[ADDRESS OF ISSUER]*

Attention:

    Re:  Pledge of _____ *[describe the equity interest]* (the "Pledged Securities") in
    _____, a _____(the "Issuer"), held by *[Grantor's Name]*, a _____
    ("Grantor")

Ladies and Gentlemen:

       Reference is made herein to that certain Security Agreement dated as of [_____],
2010 (as amended, supplemented or otherwise modified from time to time, the "Security
Agreement"), by Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the
"Company"), Aventine Renewable Energy, Inc., a Delaware corporation ("Aventine"), Aventine
Renewable Energy – Aurora West, LLC, a Delaware limited liability company ("Aurora West"),
Nebraska Energy, L.L.C., a Delaware limited liability company ("Nebraska Energy"), Aventine
Renewable Energy – Mt. Vernon, LLC, a Delaware limited liability company ("Mt. Vernon"),
and Aventine Power, LLC, a Delaware limited liability company ("Aventine Power" and,
together with the Company, Aventine, Aurora West, Nebraska Energy, Mt. Vernon and any other
entity that may become a party hereto, the "Grantors" and, each individually, a "Grantor"), in
favor of [_____], as the Collateral Agent (in such capacity, the "Collateral Agent") for
the ratable benefit of each of (i) the trustee (the "Trustee") under the Indenture, dated as of
[_____], 2010 (as amended, supplemented or otherwise modified from time to time, the
"Indenture"), among the Grantors, the Trustee and the Collateral Agent, (ii) the Collateral Agent
and (iii) the holders of the senior secured notes issued under the Indenture (the "Holders").

       Pursuant to the terms of the Security Agreement or the terms of the Indenture, the Trustee
and the Holders have required that Grantor grant to the Collateral Agent, for the benefit of the
Collateral Agent, the Trustee and the Holders, a security interest in the Pledged Securities to
secure the Note Obligations.

       By executing this letter (this "Letter Agreement"), the Issuer and each
shareholder/member, as may be required under the applicable organization documents hereby (a)
acknowledges and confirms that the Pledged Securities represents all of Grantor's Securities (as
defined in the Security Agreement) in the Issuer, (b) agrees to enter a notation in the stock
transfer register or other appropriate records of the Issuer reflecting the pledge of the Pledged
Securities pursuant to the Security Agreement, (c) consents to the pledge by Grantor of the
Pledged Securities to secure the Note Obligations and subject (solely in the case of Secondary

Collateral) to the terms of the Intercreditor Agreement, consents to the transfer of the Pledged Securities pursuant to the exercise of the remedies provided for in the Security Agreement (or any transfer in lieu thereof), (d) waives any breach or violation of the terms or provisions of the Issuer's organizational documents caused by such pledge or transfer, (e) agrees that it will be bound by the terms of the Security Agreement relating to the Pledged Securities issued by it and will comply with such terms insofar as such terms are applicable to it, (f) agrees that it will notify the Collateral Agent promptly in writing upon the acquisition by Grantor of any Securities (as defined in the Uniform Commercial Code as from time to time in effect in the State of New York or, where applicable as to specific Collateral, any other relevant state) issued by the Issuer, which notice shall set forth in reasonable detail all information with respect to such Securities, (g) agrees, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, to comply with any instruction received from the Collateral Agent in writing that states that (1) an Event of Default under and as defined in the Indenture has occurred and is continuing and (2) such instructions are otherwise in accordance with the terms of the Indenture and Security Agreement, without any other or further instructions from Grantor, (h) agrees that any sums paid upon or in respect of the Pledged Securities, including any dividend or distribution or any amount paid upon the liquidation or dissolution of the Issuer shall be deposited directly into the Blocked Account (if Proceeds of Secondary Collateral) or a Cash Collateral Account (if Proceeds of Primary Collateral), (i) agrees to notify the Collateral Agent promptly in writing of the occurrence of any of the events described in Section 4.7(b) of the Security Agreement, and (j) agrees that the terms of Section 4.7, 5.3(c) and 5.7 of the Agreement shall apply to it, mutatis mutandis, with respect to all actions that may be required of it, or prohibited, pursuant to Section 4.7, Section 5.3(c) or 5.7 of the Agreement.

This Letter Agreement may be executed in counterparts, and all parties need not execute the same counterpart. This Letter Agreement shall be binding on and enforceable against the Grantor and the Issuer and inure to the benefit of the Collateral Agent and the Trustee and the Holders. Facsimiles shall be effective as originals.

Evidence your agreement to each of the terms and conditions set forth above by executing this Letter Agreement in the space indicated below.

Very truly yours,

*[NAME OF GRANTOR]*
By: _____
Name: _____
Title: _____

Acknowledged and Agreed
As of this _____ day of ____, 20___
*[NAME OF THE ISSUER]*
By: _____
Name: _____
Title: _____

**COPYRIGHT SECURITY AGREEMENT**

THIS COPYRIGHT SECURITY AGREEMENT (this "<u>Agreement</u>"), dated as of [_____], 2010 is entered into by AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "<u>Company</u>") and certain of its affiliates (collectively, the "<u>Grantors</u>") and [_____], as the Collateral Agent (the "<u>Collateral Agent</u>") for itself and the Trustee and the Holders. Capitalized terms not otherwise defined herein have the meanings set forth in the Security Agreement dated as of [_____], 2010 among the Grantors and the Collateral Agent (the "<u>Security Agreement</u>").

WHEREAS, pursuant to the Security Agreement, Grantors are granting a security interest to the Collateral Agent in certain Copyrights whether now owned or existing or hereafter acquired or arising and wherever located, including the Copyrights listed on <u>Schedule A</u> hereto ("<u>Secured Copyrights</u>").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Grantors and the Collateral Agent hereby agree as follows:

1. <u>Grant of Security Interest</u>.

(a) Each Grantor hereby grants to the Collateral Agent, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all the Secured Copyrights, subject to the terms and conditions of the Security Agreement and (solely in the case of Secondary Collateral) the Intercreditor Agreement.

(b) The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2. <u>Modification of Agreement</u>.

This Agreement or any provision hereof may not be changed, waived, or terminated except in accordance with the amendment provisions of the Security Agreement and the Intercreditor Agreement pursuant to which the Collateral Agent may modify this Agreement, after obtaining the applicable Grantor's approval of or signature to such modification, by amending <u>Schedule A</u> hereto to include reference to any right, title or interest in any existing Copyrights or any Copyrights acquired or developed by such Grantor after the execution hereof or to delete any reference to any right, title or interest in any Copyrights in which such Grantor no longer has or claims any right, title or interest.

3.     Governing Law.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERNS THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE.**

4.     Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and each Grantor and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder.

5.     Counterparts.

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. Facsimiles shall be effective as originals.

[signature page follows]

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name: _____
Title: _____

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name: _____
Title: _____

**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**          **WILMINGTON TRUST FSB**, as
                              Collateral Agent


By: _____
Name: _____
Title: _____

SCHEDULE A

COPYRIGHT SECURITY AGREEMENT

I.   REGISTERED COPYRIGHTS

| Copyright | Country | Reg. No.<br>(App. No.) | Reg. Date<br>(App. Date) | Record<br>Owner/Liens | Status/<br>Comment |
|-----------|---------|------------------------|--------------------------|-----------------------|--------------------|
|           |         |                        |                          |                       |                    |

II.   COPYRIGHT APPLICATIONS

STATE        OF)

                ) ss
COUNTY     OF)


On [ ], before me, the undersigned, a notary public in and for said state and county, personally appeared              , personally known to me (or proved to me on the basis of satisfactory evidence), to be the person who executed the within instrument as the              , on behalf of [GRANTOR], a [ ] corporation, the corporation therein named, and acknowledged to me that the corporation executed the within instrument pursuant to its bylaws or a resolution of its board of directors.


WITNESS MY HAND OR OFFICIAL SEAL.

(NOTARIAL STAMP OR SEAL)


_____
                 Notary Public

My Commission Expires:


_____

**PATENT SECURITY AGREEMENT**

THIS PATENT SECURITY AGREEMENT (this "Agreement"), dated as of [_____], 2010 is entered into by AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Company") and certain of its affiliates (collectively, the "Grantors") and [_____], as the Collateral Agent (the "Collateral Agent") for itself and the Trustee and the Holders. Capitalized terms not otherwise defined herein have the meanings set forth in the Security Agreement dated as of [_____], 2010 among the Grantors and the Collateral Agent (the "Security Agreement").

WHEREAS, pursuant to the Security Agreement, Grantors are granting a security interest to the Collateral Agent in certain Patents whether now owned or existing or hereafter acquired or arising and wherever located, including the Patents listed on Schedule A hereto ("Secured Patents").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantors and the Collateral Agent hereby agree as follows:

1.      Grant of Security Interest.

        (a)      Each Grantor hereby grants to the Collateral Agent, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the Secured Patents, subject to the terms and conditions of the Security Agreement and (solely in the case of Secondary Collateral) the Intercreditor Agreement.

        (b)      The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.      Modification of Agreement.

This Agreement or any provision hereof may not be changed, waived, or terminated except in accordance with the amendment provisions of the Security Agreement and the Intercreditor Agreement pursuant to which the Collateral Agent may modify this Agreement, after obtaining the applicable Grantor's approval of or signature to such modification, by amending Schedule A hereto to include reference to any right, title or interest in any existing Patents or any Patents acquired or developed by such Grantor after the execution hereof or to delete any reference to any right, title or interest in any Copyrights in which such Grantor no longer has or claims any right, title or interest.

3.     Governing Law.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERNS THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE.**

4.     Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and each Grantor and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder.

5.     Counterparts.

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

[signature page follows]

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name: _____
Title: _____

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name: _____
Title: _____

**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**               **WILMINGTON TRUST FSB**, as
                                    Collateral Agent


By: _____
Name: _____
Title: _____

SCHEDULE A

PATENT SECURITY AGREEMENT

I.    <u>REGISTERED PATENTS</u>

| Patent | Country | Reg. No. (App. No.) | Reg. Date (App. Date) | Record Owner/Liens | Status/ Comment |
|--------|---------|---------------------|------------------------|--------------------|-----------------|

II.    <u>PATENT APPLICATIONS</u>

STATE OF                    )
                            )    ss
COUNTY OF                   )


On [ ], before me, the undersigned, a notary public in and for said state and county, personally appeared                    , personally known to me (or proved to me on the basis of satisfactory evidence), to be the person who executed the within instrument as the                    , on behalf of [GRANTOR], a [ ] corporation, the corporation therein named, and acknowledged to me that the corporation executed the within instrument pursuant to its bylaws or a resolution of its board of directors.


WITNESS MY HAND OR OFFICIAL SEAL.

(NOTARIAL STAMP OR SEAL)


_____
                            Notary Public

My Commission Expires:


_____

**TRADEMARK SECURITY AGREEMENT**

THIS TRADEMARK SECURITY AGREEMENT (this "Agreement"), dated as of [_____], 2010 is entered into by AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Company") and certain of its affiliates (collectively, the "Grantors") and [_____], as the Collateral Agent (the "Collateral Agent") for itself and the Trustee and the Holders. Capitalized terms not otherwise defined herein have the meanings set forth in the Security Agreement dated as of [_____], 2010 among the Grantors and the Collateral Agent (the "Security Agreement").

WHEREAS, pursuant to the Security Agreement, Grantors are granting a security interest to the Collateral Agent in certain Trademarks whether now owned or existing or hereafter acquired or arising and wherever located, including the Trademarks listed on Schedule A ("Secured Trademarks").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantors and the Collateral Agent hereby agree as follows:

1.　　Grant of Security Interest.

Section 1.1 Each Grantor hereby grants to the Collateral Agent, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all the Secured Trademarks, subject to the terms and conditions of the Security Agreement and (solely in the case of Secondary Collateral) the Intercreditor Agreement.

Section 1.2 The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. The rights and remedies of the Trustee and the Holders with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.　　Modification of Agreement.

This Agreement or any provision hereof may not be changed, waived, or terminated except in accordance with the amendment provisions of the Security Agreement and the Intercreditor Agreement pursuant to which the Collateral Agent may modify this Agreement, after obtaining the applicable Grantor's approval of or signature to such modification, by amending Schedule A to include reference to any right, title or interest in any existing Trademarks or any Trademarks acquired or developed by such Grantor after the execution hereof or to delete any reference to any right, title or interest in any Trademarks in which such Grantor no longer has or claims any right, title or interest.

3.    Governing Law.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERNS THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE.**

4.    Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and each Grantor and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder.

5.    Counterparts.

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. Facsimiles shall be effective as originals.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name: _____
Title: _____

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name: _____
Title: _____

**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**	**WILMINGTON TRUST FSB**, as
Collateral Agent


By: _____
Name: _____
Title: _____

SCHEDULE A

TRADEMARKS SECURITY AGREEMENT

I.    <u>REGISTERED TRADEMARKS</u>

| Trademark | Country | Reg. No. (App. No.) | Reg. Date (App. Date) | Record Owner/Liens | Status/ Comment |
|-----------|---------|---------------------|-----------------------|--------------------|-----------------|
|           |         |                     |                       |                    |                 |

II.   <u>TRADEMARK APPLICATIONS</u>

STATE OF           )

                            )    ss

COUNTY OF       )

        On [ ], before me, the undersigned, a notary public in and for said state and county, personally appeared               , personally known to me (or proved to me on the basis of satisfactory evidence), to be the person who executed the within instrument as the              , on behalf of [GRANTOR], a [ ] corporation, the corporation therein named, and acknowledged to me that the corporation executed the within instrument pursuant to its bylaws or a resolution of its board of directors.

WITNESS MY HAND OR OFFICIAL SEAL.

(NOTARIAL STAMP OR SEAL)

                                    _____

                                         Notary Public

My Commission Expires:

_____

## SCHEDULE 1

## FILINGS AND OTHER ACTIONS
## REQUIRED TO PERFECT SECURITY INTERESTS

## [To be revised/completed by Grantors' Counsel]

<u>Uniform Commercial Code Filings</u>

**Grantor**                                    **Filing Office**

<u>Actions with respect to Pledged Securities</u>

[Delivery to Collateral Agent, as secured party, of the following: [_____], together with a stock power duly indorsed in blank]

<u>Other Actions</u>

[Execution and delivery of [Deposit Account Control Agreement]]

## SCHEDULE 2

## ORGANIZATIONAL INFORMATION

| Grantor | Jurisdiction of Incorporation, Formation or Organization | Location of Chief Executive Office or Sole Place of Business | Organizational Identification Number | Federal Tax Identification Number |
|---|---|---|---|---|

## SCHEDULE 3

## SECURITIES

| Grantor | Issuer | Ownership Interest |
| --- | --- | --- |

## EXCLUDED CAPITAL STOCK

| Grantor | Issuer | Ownership Interest |
| --- | --- | --- |

**SCHEDULE 4**

**INTELLECTUAL PROPERTY**

**<u>Copyrights</u>**


**<u>Patents</u>**


**<u>Trademarks</u>**

# SCHEDULE 5

# INSTRUMENTS AND CHATTEL PAPER

# SCHEDULE 6

# COMMERCIAL TORT CLAIMS

# SCHEDULE 7

# RECEIVABLES

# SCHEDULE 8

# COMMODITY ACCOUNTS

# SCHEDULE 9

# DEPOSIT ACCOUNTS

# Exhibit B-1

**Blackline of Form of Security Agreement Accompanying Indenture**

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT, dated as of March [__], 2010, is made by **AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**, a Delaware corporation (the "Company"), **AVENTINE RENEWABLE ENERGY, INC.**, a Delaware corporation ("Aventine"), **AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**, a Delaware limited liability company ("Aurora West"), **NEBRASKA ENERGY, L.L.C.**, a Kansas limited liability company ("Nebraska Energy"), **AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**, a Delaware limited liability company ("Mt. Vernon"), and **AVENTINE POWER, LLC**, a Delaware limited liability company ("Aventine Power" and, together with the Company, Aventine, Aurora West, Nebraska Energy, Mt. Vernon and any other entity that may become a party hereto pursuant to Section 7.13 hereof, the "Grantors" and, each individually, a "Grantor"), in favor of Wilmington Trust FSB, as the Collateral Agent (in such capacity, the "Collateral Agent") for the ratable benefit of each of (i) the trustee (the "Trustee") under the Indenture, dated as of March [__], 2010 (as amended, supplemented or otherwise modified from time to time, the "Indenture"), among the Grantors, the Trustee and the Collateral Agent, (ii) the Collateral Agent and (iii) the holders of the senior secured notes issued under the Indenture (the "Holders"; together with the Trustee and the Collateral Agent, the "Secured Parties").

# W I T N E S S E T H :

WHEREAS, the Company has issued $105 million aggregate principal amount of Senior Secured Notes due 2015 (the "Notes"), and may make further issuances of Notes, under the Indenture. In connection therewith, the Grantors have agreed to guarantee the payment and performance of the Company's obligations under the Indenture, the Notes and the Collateral Documents (collectively, the "Indenture Documents");

WHEREAS, pursuant to a Credit Agreement, dated as of March [___], 2010 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Company, the various financial institutions as are, or may from time to time become, parties thereto (the "Lenders") and PNC Bank, National Association, as administrative agent (the "Original Administrative Agent"), the Lenders have extended commitments to make credit extensions to the Company;

WHEREAS, the Company, each of its Subsidiaries, [the Original Administrative Agent], as first lien collateral agent, and the Collateral Agent, as second lien collateral agent, have entered into that certain Intercreditor Agreement, dated as of March [___], 2010 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which agreement, among other things, sets forth, as between the Collateral Agent and the Administrative Agent, the relative priority of their respective Liens on the Secondary Collateral and their rights with respect thereto;

WHEREAS, as a condition to the effectiveness of the Indenture and to secure the obligations of the Grantors under and in connection with the Indenture Documents, the Grantors have executed and delivered this Agreement; and

1

WHEREAS, the Grantors will derive substantial direct and indirect benefit from the making of the extensions of credit under the Indenture.

NOW, THEREFORE, in consideration of the premises and to induce the Collateral Agent and the Trustee to enter into the Indenture and to induce the Holders to purchase the Notes, each Grantor hereby agrees as follows:

# ARTICLE I

# DEFINED TERMS

SECTION 1.1.Definitions.

(a)     Unless otherwise defined herein, terms defined in the Indenture and used herein shall have the meanings given to them in the Indenture, and the following terms which are defined in the UCC are used herein as so defined: Accounts, Chattel Paper, Certificated Securities, Commercial Tort Claims, Commodity Accounts, Commodity Contracts, Commodity Intermediary, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Money, Payment Intangibles, Proceeds, Promissory Notes, Records, Security, Securities Accounts, Security Certificate, Security Entitlements, Securities Intermediary, Software, Supporting Obligations, Uncertificated Securities and Tangible Chattel Paper.

(b)     The following terms shall have the following meanings:

"Account Receivable" shall mean any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance.

"Administrative Agent" means the Original Administrative Agent or such other Person designated from time to time as "Administrative Agent" under the Credit Agreement.

"Agreement" shall mean this Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Blocked Account" shall mean Deposit Account No. [_____] established by the Company with the Controlling ABL Agent and any other Deposit Account hereafter established by the Company or any other Grantor with the Controlling ABL Agent which the Company or such Grantor and the Controlling ABL Agent jointly designate as the "Blocked Account," into which all cash receipts or other Proceeds of the Company or any other Grantor from any Secondary Collateral shall be deposited, to be held for the benefit of the Secured Obligations in accordance with the Intercreditor Agreement.

"Cash Collateral Accounts" shall mean, collectively, (i) any Collateral Account, and (ii) any other Deposit Account established by he Company or any other Grantor with

2

the Collateral Agent or another Deposit Account Bank, in which Proceeds of any Primary Collateral and other amounts to be held by the Collateral Agent shall be deposited, in each case in accordance with the Indenture.

"Closing Date" shall mean March [___], 2010.

"Collateral" shall have the meaning provided in Article II hereof.

"Controlling Agent" shall mean (x) as to any Primary Collateral, the Collateral Agent or (y) as to any Secondary Collateral, the Controlling ABL Agent.

"Controlling ABL Agent" shall mean (i) the Administrative Agent, on behalf of the Joint Secured Parties in accordance with the Intercreditor Agreement, or (ii) if Discharge of the First Lien Obligations has occurred, the Collateral Agent.

"Copyright Licenses" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Copyright Security Agreement" means the Copyright Security Agreement executed and delivered by the Grantors to the Collateral Agent, substantially in the form of Annex III hereto, as such agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"Copyrights" shall mean (i) any and all other copyrights, in the United States or any other country, whether registered or unregistered, or published or unpublished, all registrations and recordings thereof and all applications in connection therewith, and (ii) the right to obtain all renewals of the foregoing.

"Deposit Account Bank" shall mean the Collateral Agent or initially, [_____], as depositary bank with respect to any Cash Collateral Account of any Grantor, and any other depositary institution located in the United States at which a Grantor establishes a Cash Collateral Account.

"Excluded Capital Stock" shall mean all Rule 3-16 Excluded Capital Stock and all Excluded Foreign Subsidiary Capital Stock.

"Excluded Foreign Subsidiary Capital Stock" shall have the meaning provided in Article II hereof.

"Excluded General Intangible" shall have the meaning provided in Article II hereof.

"Excluded Personal Property" shall mean with respect to any Grantor, (i) Non-UCC Property of such Grantor which when combined with the Non-UCC Property of all

3

other Grantors, has a Fair Market Value not in excess of $250,000 in the aggregate for all Grantors and (ii) all Excluded Vehicles of such Grantor.

"Excluded Money" shall mean any Money that is not, and is not required by the terms of any Indenture Document to be, directly or indirectly, held by, or in or under the control of, the Controlling Agent.

"Excluded Trademark Applications" shall mean with respect to any Grantor, Specified Trademark Applications of such Grantor which when combined with the Specified Trademark Applications of all other Grantors, have a Fair Market Value not in excess of $250,000 in the aggregate for all Grantors.

"Excluded Vehicles" shall mean with respect to any Grantor, Vehicles owned by such Grantor as of the date hereof which when combined with the Vehicles owned by all other Grantors as of the date hereof, have a Fair Market Value not in excess of $1,000,000 in the aggregate for all Grantors.

"General Intangibles" shall mean all "general intangibles" as such term is defined in the UCC and, in any event, including with respect to any Grantor, all contracts, agreements, instruments and indentures in any form, and portions thereof, to which such Grantor is a party or under which such Grantor has any right, title or interest or to which such Grantor or any property of such Grantor is subject, as the same may from time to time be amended, supplemented or otherwise modified, including (i) all rights of such Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of such Grantor to damages arising thereunder, (iii) all equity that constitutes "general intangibles" and (iv) all rights of such Grantor to perform and to exercise all remedies thereunder.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Insurance" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent is the loss payee thereof) and (ii) any key man life insurance policies.

"Intellectual Property" shall mean all rights, priorities and privileges provided under United States, multinational and foreign law relating to intellectual property, including the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trade Secrets, the Trade Secret Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Issuer" shall mean, with reference to any Security, the issuer of such Security.

"Joint Secured Parties" shall mean (i) with respect to any Primary Collateral, the Secured Parties or (ii) with respect to any Secondary Collateral, the Secured Parties and the Lenders.

"Lock Box" shall mean [_____].

"Non-UCC Property" shall mean any personal property of the Grantors a security interest in which may not be perfected pursuant to the UCC and in which the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement has not been duly perfected under other applicable law.

"Patent License" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent to the extent that a grant of a security interest in such patent license is not prohibited by applicable law or the applicable patent agreement.

"Patent Security Agreement" means the Patent Security Agreement executed and delivered by the Grantors to the Collateral Agent, substantially in the form of Annex IV hereto, as such agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"Patents" shall mean (i) all letters patent of the United States or any other country and all reissues and extensions thereof, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Pledged Securities" shall mean the Securities of any Person that may be issued or granted to, or held by, any Grantor.

"Pledged Subsidiaries" shall have the meaning provided in Article II hereof.

"Receivable" means any Account (including any Account Receivable).

"Rule 3-16 Excluded Capital Stock" shall have the meaning provided in Article II hereof.

"SEC" shall mean the Securities and Exchange Commission.

"Secured Obligations" means the Note Obligations and the Credit Facility Obligations.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Secured Parties" has the meaning specified in the introductory paragraph hereof.

"Specified Trademark Applications" shall mean any intent-to-use United States trademark application of any Grantor not material to the operation of such Grantor's

business for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office.

"Trade Secret Licenses" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right in or to Trade Secrets, to the extent that a grant of a security interest in such Trade Secret License is not prohibited by applicable law or the applicable Trade Secret License.

"Trade Secrets" shall mean all trade secrets and all other confidential or proprietary information and know-how whether or not such trade secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such trade secret, including but not limited to: (i) the right to sue for past, present and future misappropriation or other violation of any trade secret, and (ii) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Trademark License" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, to the extent that a grant of a security interest in such Trademark License is not prohibited by applicable law or the applicable Trademark License.

"Trademark Security Agreement" means the Trademark Security Agreement executed and delivered by the Grantors to the Collateral Agent, substantially in the form of Annex V hereto, as such agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"Trademarks" shall mean (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (ii) the right to obtain all renewals thereof.

"Vehicles" shall mean all cars, railcars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and, in any event, shall include all tires and other appurtenances to any of the foregoing.

SECTION 1.2. Other Definitional Provisions.

(a)     The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Annex and Schedule references are to this Agreement unless otherwise specified.

(b)     The meanings given to terms defined herein or in the UCC or in the Indenture shall be equally applicable to both the singular and plural forms of such terms.

(c)     Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

(d)     The word "or" when used in this Agreement is not exclusive.

(e)     When the words "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation".

(f)     References to sections of or rules under the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time.

(g)     In accordance with the Intercreditor Agreement, Proceeds of the disposition of Capital Stock of a Subsidiary that results in the disposition of assets constituting Primary Collateral shall constitute Proceeds of Primary Collateral (and shall not contribute Proceeds of Secondary Collateral) to the extent of the portion of the Collateral disposed of that constitutes Primary Collateral.

## ARTICLE II

## GRANT OF SECURITY INTEREST

Each Grantor hereby assigns and transfers to the Collateral Agent, for the ratable benefit of the Secured Parties, and hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in, all of the following assets and property, tangible and intangible now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Note Obligations under the Indenture Documents:

(a)     all Accounts;

(b)     all books and Records pertaining to the Collateral or otherwise;

(c)     all Chattel Paper (including all Tangible Chattel Paper and Electronic Chattel Paper);

(d)     all Commercial Tort Claims described on Schedule 6;

(e)     all Commodity Accounts;

(f)     all Commodity Contracts;

(g)     all Deposit Accounts, including all Blocked Accounts and all Cash Collateral Accounts, together with all of the applicable Grantor's right, title and interest in and to all sums of property (including cash equivalents and other investments) now or at any time hereafter on deposit therein, credited thereto or payable thereon, and all instruments, documents and other writings evidencing any such Blocked Accounts or Cash Collateral Accounts;

(h)     all Documents;

(i)     all Fixtures;

(j)     all General Intangibles;

(k)     all Goods (including all Equipment and Inventory);

(l)     all Instruments (including all promissory notes);

(m)     all Insurance;

(n)     all Intellectual Property;

(o)     all Intercompany Debt owed by the Company or any Subsidiary thereof (including any Grantor) to any Grantor;

(p)     all Investment Property, including, subject to the limitations set forth below in clauses (ii) and (iii) of the proviso in this <u>Article II</u> relating to Rule 3-16 Excluded Capital Stock and Excluded Foreign Subsidiary Capital Stock, respectively, all Capital Stock of each Subsidiary (collectively, the "<u>Pledged Subsidiaries</u>") of any Grantor;

(q)     all Letter-of-Credit Rights;

(r)     all Money;

(s)     all Pledged Securities;

(t)     all Receivables, to the extent not otherwise described above;

(u)     all Securities;

(v)     all Securities Accounts;

(w)     all Securities Entitlements;

(x)     all Supporting Obligations;

(y)     all Vehicles; and

(z)     to the extent not otherwise included, all Proceeds, products, accessions, rents and profits of or in respect of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided that, notwithstanding any other provisions set forth in this Article II to the contrary, this Agreement shall not, at any time, constitute a grant of a Lien on or security interest in, and "Collateral" shall not include:

(i)     any General Intangible or any lease, license, contract, property right or agreement to which any Grantor is a party or in which any Grantor has any right, title or interest if and to the extent the grant of a security interest hereunder would constitute or result in a breach, termination or default under such General Intangible or such lease, license, contract, property right or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC); provided that immediately upon the ineffectiveness, lapse or termination of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a lien on and security interest in, all its right, title and interest in and to such General Intangible, lease, license, contract, property right or agreement as if such provision had never been in effect (any such General Intangible, lease, license, contract, property right or agreement, solely to the extent and so long as not included in the "Collateral", an "Excluded General Intangible"); or

(ii)     in the event (and only in the event) that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Pledged Subsidiary due to the fact that such Pledged Subsidiary's Capital Stock and other securities secure the Notes, such portion (and only such portion) of the Capital Stock and other securities of such Pledged Subsidiary as shall constitute the minimum amount necessary to avoid having such Person be subject to such requirement (such portion of Capital Stock and other securities being collectively referred to as the "Rule 3-16 Excluded Capital Stock"); provided further that (A) notwithstanding anything to the contrary in this Agreement, if as of the Closing Date or any subsequent time any Capital Stock or other securities of any Pledged Subsidiary are not required to be pledged under this Agreement because Rule 3-16 would require the filing of separate financial statements of such Pledged Subsidiary if such Capital Stock or other securities were so pledged, in the event that Rule 3-16 is amended, modified or interpreted by the SEC or any other relevant Governmental Authority to no longer require (or is replaced with another rule or regulation that would not require) the filing of separate financial statements of such Pledged Subsidiary if such Capital Stock or other securities are pledged under this Agreement, then such Capital Stock or other securities of such Pledged Subsidiary shall automatically be deemed part of the Collateral and pledged under this Agreement; and (B) this Agreement may be amended or modified, without the consent of any holder of any Note Obligation, to the extent necessary to release the security interests securing the Note Obligations on such portion of the shares of Capital Stock and other securities that are so deemed to no longer constitute part of the Collateral or to grant security interests securing the Note Obligations

on such portion of the shares of Capital Stock and other securities that are so deemed to constitute part of the Collateral; or

(iii)     any voting Capital Stock of any Foreign Subsidiary exceeding, and only to the extent that such Capital Stock exceeds, 65% of the issued and outstanding voting Capital Stock of such Foreign Subsidiary (such portion of Capital Stock, being collectively referred to as "Excluded Foreign Subsidiary Capital Stock"); or

(iv)     any Excluded Trademark Application.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce the Collateral Agent and the Trustee to enter into the Indenture and to induce the Holders to purchase the Notes, each Grantor hereby represents and warrants to the Collateral Agent, the Trustee and each Holder that:

SECTION 3.1.Title; No Other Liens. Except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and the Permitted Liens, such Grantor owns each item of the Collateral owned by it free and clear of any and all Liens or claims of others. No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except (a) such as have been filed in favor of the Collateral Agent, for the ratable benefit of the Secured Parties pursuant to this Agreement and (b) such as are expressly permitted by the Indenture or this Agreement.

SECTION 3.2.Perfected Priority Liens. The security interests granted pursuant to this Agreement, the Copyright Security Agreement, the Patent Security Agreement and the Trademark Security Agreement (a) upon completion of the filings and other actions specified on Schedule 1 hereto (which, in the case of all filings and other documents referred to on said Schedule, copies have been delivered to the Collateral Agent in completed and duly executed form) will constitute valid perfected security interests in the Collateral (to the extent that (i) except as to Excluded Vehicles and Excluded Money, a security interest therein may be perfected pursuant to the UCC and (ii) except for Excluded Personal Property, a security interest therein may be perfected pursuant to any laws other than the UCC) in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Note Obligations, enforceable in accordance with the terms hereof against all creditors of such Grantor subject to (1) bankruptcy, insolvency, moratorium and other similar laws now or hereafter in effect relating to or affecting creditors' rights generally, and (2) general principles of equity (regardless of whether considered in a proceeding at law or in equity), and (b) subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, are prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens. Any reference in this Agreement or the other Indenture Documents to Permitted Liens is not intended to and should not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created herein or by any of the other Indenture Documents to any Permitted Lien, except to the extent explicitly set forth in the Intercreditor Agreement.

SECTION 3.3. <u>Jurisdiction of Organization; Chief Executive Office</u>.  Such Grantor's jurisdiction of incorporation, formation or organization (as applicable), location of chief executive office or sole place of business (as applicable), organizational identification number and federal tax identification number are specified on <u>Schedule 2</u> hereto.  Such Grantor has furnished to the Collateral Agent a certified charter, certificate of incorporation or other organizational document and a long-form good standing certificate as of a date which is recent to the date hereof.

SECTION 3.4. <u>Inventory and Equipment</u>.

(a)     No part of the Equipment of such Grantor constitutes a Fixture or has otherwise become permanently attached to, affixed to or otherwise incorporated into any real property or improvements of any Person other than real property and improvements owned in fee by such Grantor (or subject to a leasehold in favor of such Grantor pursuant to a ground lease) and with respect to which such Grantor has delivered to the Collateral Agent a Mortgage granting to the Collateral Agent a first and prior mortgage Lien on such real property and improvements so owned in fee or subject to a leasehold (subject to Permitted Liens) to secure the Note Obligations.

(b)     No Equipment of such Grantor is or at any time will be evidenced by a negotiable Document.

(c)     No Inventory of such Grantor is or at any time will be evidenced by a negotiable Document that has not been delivered to the Controlling Agent (or held in trust therefor) upon request of the Controlling Agent after the occurrence and during the continuation of an Event of Default.

SECTION 3.5. <u>Farm Products</u>.

(a)     None of the Collateral constitutes, or is the Proceeds of, Farm Products.

(b)     Such Grantor is not engaged in any farming operation within the meaning of UCC §9-102(a)(35).

SECTION 3.6. <u>Securities and Securities Accounts</u>.

(a)     All Securities and all Securities Accounts in which such Grantor holds any beneficial or record interest are accurately listed and described on <u>Schedule 3</u> hereto.

(b)     Such Grantor is the sole entitlement holder of each such Securities Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than (solely in the case of Secondary Collateral) the ~~Administrative~~Controlling ABL Agent) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Securities Account or securities or other property credited thereto.

11

(c)     Except as described on Schedule 3 hereto, the Pledged Securities constitute all of the issued and outstanding Securities of every class of the applicable Issuer owned by such Grantor on the Closing Date.

(d)     Schedule 3 sets forth an accurate list of all Excluded Capital Stock.

(e)     Such Grantor has delivered to the Collateral Agent an Acknowledgement and Consent to Pledge substantially in the form of Annex II hereto duly executed by each Issuer of Pledged Securities with respect to such Grantor.

(f)     All of the Pledged Securities have been duly and validly issued and are fully paid and nonassessable.

(g)     Such Grantor is the record and beneficial owner of, and has good and marketable title to, the Pledged Securities pledged by it hereunder, free of any and all Liens, restrictions on transfer, voting agreements, options or claims of, any other Person, other than Permitted Liens.

(h)     To the extent any of the Pledged Securities of such Grantor are Certificated Securities, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, such Grantor has delivered the Security Certificates evidencing such Securities, duly endorsed in blank, or accompanied by appropriate transfer powers executed in blank, to the Controlling Agent.

SECTION 3.7.   Receivables.

(a)     Except as listed on Schedule 7, no amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the ~~Collateral~~Controlling Agent to the extent required by Section 4.14.

(b)     The amounts represented by such Grantor to the Secured Parties from time to time as owing to such Grantor in respect of the Receivables will at such times be accurate in all material respects.

SECTION 3.8.   Commodity Accounts and Commodity Contracts.

(a)     All Commodity Accounts held by such Grantor are accurately listed and described on Schedule 8 hereto.

(b)     Such Grantor is the sole entitlement holder of each such Commodity Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the ~~Administrative~~Controlling ABL Agent) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Commodity Account or securities or other property credited thereto.

SECTION 3.9.   Intellectual Property

(a)     All Intellectual Property owned or licensed by such Grantor or in which such Grantor holds an interest are accurately listed and described on Schedule 4 hereto.

(b)     The Copyrights and Copyright applications listed on Schedule A to the Copyright Security Agreement executed and delivered in connection with this Agreement constitute all of the Copyrights and Copyright applications owned and currently in use by such Grantor. The Patents and Patent applications listed on Schedule A to the Patent Security Agreement executed and delivered in connection with this Agreement constitute all of the Patents and Patent applications owned and currently in use by such Grantor. The Trademarks and Trademark applications listed on Schedule A to the Trademark Security Agreement executed and delivered in connection with this Agreement constitute all of the Trademarks and Trademark applications owned and currently in use by such Grantor.

(c)     All Intellectual Property of such Grantor is valid, subsisting, unexpired, enforceable, has not been abandoned, and does not infringe the Intellectual Property rights of a third party.

(d)     Except as set forth on Schedule 4 hereto, none of the Intellectual Property is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

(e)     No holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Intellectual Property.

(f)     No action or proceeding is pending or, to the knowledge of such Grantor, threatened on the date hereof seeking to limit, cancel or question the validity, or such Grantor's ownership, of any Intellectual Property.

(g)     Such Grantor neither owns nor holds any interest in any Specified Trademark Applications, except for any Excluded Trademark Applications with respect to such Grantor.

SECTION 3.10.     Deposit Accounts.

(a)     All Deposit Accounts held by such Grantor are accurately listed and described on Schedule 9 hereto.

(b)     Such Grantor is the sole account holder of each such Deposit Account and such Grantor has not consented to, and is not otherwise aware of, any Person (other than (solely in the case of Secondary Collateral) the ~~Administrative~~Controlling ABL Agent) having either sole dominion and control (within the meaning of common law) or "control" (within the meaning of Section 9-104 of the UCC) over, or any other interest in, any such Deposit Account or any money or other property deposited therein.

SECTION 3.11.     Instruments and Chattel Paper.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, such Grantor has taken all actions reasonably requested by the Collateral Agent to establish control (as defined in the UCC) by the

Controlling Agent of all Electronic Chattel Paper included in the Collateral and all "transferable records" as defined in Section 201 of the Federal Electronics Signatures in Global and National Commerce Act or in Section 16 of Uniform Electronic Transactions Act as in effect in all relevant jurisdictions. Without limiting the foregoing, such Grantor represents and warrants that all conditions necessary to establish the Controlling Agent's control over any Electronic Chattel Paper included in the Collateral under Section 9.105 of the UCC have been satisfied.

SECTION 3.12.    Aircraft.  Such Grantor neither owns nor holds any interest in aircraft.

SECTION 3.13.    Commercial Tort Claims.  All Commercial Tort Claims of each Grantor or in which any Grantor holds an interest are accurately listed and described on Schedule 6 hereto.

SECTION 3.14.    Non-UCC Property.  Such Grantor neither owns nor holds any interest in any Non-UCC Property, except for any Excluded Personal Property with respect to such Grantor.

SECTION 3.15.    Letter-of-Credit Rights.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, such Grantor has taken all actions necessary so that the Controlling Agent has control (under Section 9.107 of the UCC) of all Letter-of-Credit Rights included in the Collateral.

## ARTICLE IV

## COVENANTS

Each Grantor covenants and agrees that, from and after the date of this Agreement until the Notes shall have been paid in full and the Indenture shall have terminated, such Grantor shall:

SECTION 4.1. Covenants in Indenture and other Indenture Documents. Take, or refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that each covenant and agreement applicable to such Grantor contained in the Indenture and the other Indenture Documents is performed and no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Grantor or any of its Subsidiaries.

SECTION 4.2. Application of Cash Proceeds.  Cause each invoice issued by such Grantor in respect of Secondary Collateral to provide for payment of such invoice (a) if by check, by remitting the same to the Lock Box, and (b) by wire transfer, automated checking transaction or other electronic funds transfer by remitting the same directly to the Blocked Account, and otherwise take all action necessary to cause all cash Proceeds of the Secondary Collateral, including all cash Proceeds of Accounts Receivable, to be remitted to the Blocked Account. Take all action necessary to cause all cash Proceeds of the Primary Collateral to be remitted to a Cash Collateral Account.  If, notwithstanding the foregoing, any Grantor shall receive any cash Proceeds of the Collateral, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, such Grantor shall hold such Proceeds in trust for the benefit of the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral), and not later than the second (2nd) Business Day following the date of receipt,

deposit the same directly into the Blocked Account (if Proceeds of Secondary Collateral) or a Cash Collateral Account (if Proceeds of Primary Collateral) in the exact form received.

SECTION 4.3. <u>Electronic Chattel Paper</u>.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, in the event that such Grantor shall at any time hold or acquire an interest in any Electronic Chattel Paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction) which is part of the Collateral, such Grantor shall promptly notify the Controlling Agent thereof in writing, and such Grantor shall take, or cause to be taken, such actions as the Collateral Agent may reasonably request to give the Controlling Agent control of such Electronic Chattel Paper under Section 9-314 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

SECTION 4.4. <u>Maintenance of Perfected Security Interest; Further Documentation</u>.

(a)	Subject to the automatic release of Capital Stock to the extent it constitutes Rule 3-16 Excluded Capital Stock pursuant to Section 12.12 of the Indenture, maintain the security interest created by this Agreement as a perfected security interest to the extent and having at least the priority described in <u>Section 3.2</u> hereof and, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, shall defend such security interest against the claims and demands of all Persons whomsoever; <u>provided</u> that the Collateral Agent shall release Liens and security interests in any Collateral which is sold or otherwise disposed of in accordance with the terms of the Indenture, the other Indenture Documents and the Intercreditor Agreement.

(b)	Furnish to the Collateral Agent and the other Secured Parties from time to time, at such Grantor's sole cost and expense, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as ~~the Collateral Agent~~<u>Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class</u> may reasonably request <u>by written notice delivered to the Company</u>, all in such detail as ~~the Collateral Agent~~<u>such Holders</u> may reasonably request.

(c)	Take all actions necessary to maintain or perfect the Collateral Agent's security interest in (i) except for any Excluded Vehicles and Excluded Money, all the Collateral to the extent that a security interest therein may be perfected pursuant to the UCC, including filing all necessary UCC continuation statements and (ii) except for Excluded Personal Property, all the Collateral a security interest in which may be perfected pursuant to any laws other than the UCC.

(d)	Subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, at any time and from time to time~~, upon the written request of the Collateral Agent,~~ and at the sole expense of such Grantor, such Grantor will promptly and duly execute (as required by applicable law), deliver or have recorded with appropriate

15

agencies such further instruments and documents and take such further actions necessary or as the Collateral Agent may reasonably request may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, reasonably desirable for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) the filing of any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby; (ii) in the case of any Cash Collateral Account and any other relevant Primary Collateral, taking any actions necessary to enable the Collateral Agent to obtain "control" (within the meaning of the UCC) with respect thereto; and (iii) in the case of any Blocked Account and any other relevant Secondary Collateral, taking any actions necessary to enable the Controlling ABL Agent to obtain "control" (within the meaning of the UCC) with respect thereto.

(e) This Section 4.4 and the obligations imposed on each Grantor by this Section 4.4 shall be interpreted as broadly as possible in favor of the Controlling Agent and the Secured Parties in order to effectuate the purpose and intent of this Agreement.

SECTION 4.5. Changes in Locations, Name, etc. Not, except upon five fifteen (5 15) Business Days' prior written notice to the Collateral Agent and delivery to the Collateral Agent of all additional financing statements and other documents reasonably requested by the Collateral Agent, necessary necessary or, or as may be, in the written opinion of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class delivered to the Company within ten (10) Business Days of receipt of such notice, reasonably desirable to maintain the validity, perfection and priority of the security interests provided for herein:

(a) change its jurisdiction of incorporation, formation, or organization, as applicable; or

(b) change its name, identity or organizational structure.

Each notice delivered pursuant to this Section 4.5 shall specify in reasonable detail any change in the jurisdiction of incorporation, organization, formation, name, identity or corporate structure as applicable.

SECTION 4.6. Notices. Advise the Collateral Agent promptly, in reasonable detail, of (i) any Lien (other than Permitted Liens) on any of the Collateral, and (ii) the occurrence of any other event which, in such Grantor's reasonable opinion, would materially impair the Collateral or the security interests created hereby.

SECTION 4.7. Pledged Securities; Securities Accounts.

(a) Notify the Collateral Agent promptly in writing upon the acquisition by any Grantor of any Pledged Securities, which notice shall (i) set forth all information with respect to such Pledged Securities as is set forth on Schedule 3 hereto with respect to the Pledged Securities owned by the Grantors on the date hereof, and (ii) except in the case of Excluded Capital Stock, be accompanied by an Acknowledgment and Consent to Pledge duly executed by the Issuer of such Securities (unless such Issuer is also a Grantor).

16

Nothing contained in this Section 4.7 shall permit any Grantor to invest in or hold any Security to the extent such investment is prohibited pursuant to the Indenture.

(b)     If any Grantor shall become entitled to receive or shall receive any Security Certificate (including any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Securities of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any Pledged Securities (other than Excluded Capital Stock), or otherwise in respect thereof, accept the same as the agent of the Controlling Agent, hold the same in trust for the Controlling Agent and, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, deliver the same forthwith to the Controlling Agent in the exact form received, duly indorsed by such Grantor in blank or accompanied by an undated stock power covering such certificate duly executed in blank by such Grantor to the Controlling Agent, if required, together with an undated stock power covering such certificate duly executed in blank by such Grantor, to be held by the Controlling Agent, subject to the terms hereof, as additional collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral).  Unless such Grantor is permitted to retain such proceeds by the Indenture Documents, pay over any sums paid upon or in respect of the Investment Property included in the Collateral hereunder upon the liquidation or dissolution of any Pledged Subsidiary to the Controlling Agent to be held by it hereunder as additional collateral security for the Note Obligations, and in case any distribution of capital shall be made on or in respect of such Investment Property, or any property shall be distributed upon or with respect to such Investment Property pursuant to the recapitalization or reclassification of the capital of any Pledged Subsidiary or pursuant to the reorganization thereof, deliver the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Controlling Agent, to the Controlling Agent to be held by it hereunder as additional collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral).  If any sums of money or property so paid or distributed in respect of the Investment Property included in the Collateral shall be received by such Grantor, until such money or property is paid or delivered to the Controlling Agent, hold such money or property in trust for the Controlling Agent, segregated from other funds of such Grantor, as additional collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral). Notwithstanding the foregoing, the Grantors shall not be required to pay over to the Controlling Agent or deliver to the Controlling Agent as Collateral any proceeds of any liquidation or dissolution of any Pledged Subsidiary, or any distribution of capital or property in respect of any Capital Stock, to the extent that the proceeds thereof are applied as required by the Intercreditor Agreement and the Indenture.

(c)     Without the prior written consent of the Collateral Agent, not (i) vote to enable, or take any other action to permit, any Pledged Subsidiary to issue any stock or other equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Capital Stock or other equity securities of any nature of any Pledged Subsidiary unless such securities (other than Excluded Capital Stock), duly indorsed by such Pledged Subsidiary in blank or accompanied by an

17

undated stock power covering such securities duly executed by such Pledged Subsidiary, are delivered to the Controlling Agent, concurrently with the issuance thereof, to be held by the Controlling Agent as collateral security for the Note Obligations (if Primary Collateral) or the Secured Obligations (if Secondary Collateral), (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Pledged Securities or Proceeds thereof (except pursuant to a transaction expressly permitted by the Indenture), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Pledged Securities or Proceeds thereof, or any interest therein, except for Permitted Liens, or (iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or the Controlling Agent to dispose of any of the Pledged Securities or Proceeds thereof.

(d)      If such Grantor is a Pledged Subsidiary, (i) be bound by the terms of this Agreement relating to the Pledged Securities issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) notify the Collateral Agent promptly in writing of the occurrence of any of the events described in Section 4.7(b) hereof with respect to the Pledged Securities issued by it, and (iii) cause the terms of Section 5.3(c) and Section 5.7 hereof to apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to Section 5.3(c) and Section 5.7 hereof with respect to the Pledged Securities issued by it.

(e)      If such Grantor is a Pledged Subsidiary that is a partnership or a limited liability company, (i) confirms that none of the terms of any Capital Stock issued by it that is included in the Collateral provides that such Capital Stock is a "security" within the meaning of Sections 8-102 and 8-103 of the UCC, (ii) agrees that it will take no action to cause or permit any such Capital Stock to become such a "security", (iii) not issue any certificate representing any such Capital Stock and (iv) if, notwithstanding the foregoing, any such Capital Stock shall be or become such a "security", (and the Grantor that holds such Capital Stock hereby instructs such Pledged Subsidiary to) comply with instructions originated by the Controlling Agent without further consent by such Grantor.

SECTION 4.8. Receivables.

(a)      Other than in the ordinary course of business, not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that could adversely affect in any material respect the value thereof.

(b)      Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if at any time the aggregate amount owing to such Grantor on all Accounts as to which a Governmental Authority is an obligor exceeds 5% of the aggregate amount owing to the Grantor on all Accounts, so notify the Collateral Agent and, if requested by the Controlling Agent, at such Grantor's sole cost and expense, from and after the date on which such aggregate amount first exceeds such percentage, deliver to the Controlling Agent such assignments, notices of assignment and other documents or

information as shall be necessary or otherwise requested by the Controlling Agent to permit the assignment hereunder of all Accounts as to which a Governmental Authority is an obligor pursuant to all applicable law (including the Assignment of Claims Act of 1940, as amended).

(c)　　Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, upon the request of the Controlling Agent at any time after the occurrence and during the continuance of an Event of Default, notify obligors on the Receivables that the Receivables have been assigned to the Controlling Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Controlling Agent.

(d)　　Anything herein to the contrary notwithstanding, remain liable under each of its Receivables to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Controlling Agent or any Joint Secured Party of any payment relating thereto, nor shall the Controlling Agent or any Joint Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(e)　　Deliver to the Controlling Agent a copy of each material demand, notice or document received by it that questions or calls into doubt the validity or enforceability of more than 10% of the aggregate amount of the then outstanding Receivables that are included in the Collateral.

SECTION 4.9. Intellectual Property.

(a)　　Notify the Collateral Agent promptly, in writing, upon the acquisition by Grantor of any Intellectual Property (including upon any Specified Trademark Application ceasing to be an Excluded Trademark Application) which notice shall set forth (i) all information with respect to such Intellectual Property as is set forth on Schedule 4 hereto with respect to Intellectual Property owned by the Grantors on the date hereof, and (ii) (except in the case of any Excluded Trademark Application) shall be accompanied by a Copyright Security Agreement, Patent Security Agreement or Trademark Security Agreement, as applicable, duly executed and completed by the applicable Grantor.

(b)　　(Either itself or through licensees), with respect to each Trademark which is material to the operation of its business, (i) continue to use such Trademark on each and every trademark class of goods applicable to its current line as reflected in its then-

19

current catalogs, brochures and price lists in order to maintain such Trademark in full force and effect, free from any claim of abandonment for non-use, (ii) maintain the quality of products and services offered under such Trademark, (iii) use such Trademark with all notices and legends required by applicable law or regulations, and (iv) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(c)     Not, and not permit any licensee to, do any act, whereby any Patent which is material to the operation of its business may become forfeited, abandoned or dedicated to the public.

(d)     Not, and not permit any licensee to, do any act or omit to do any act whereby any portion of any Copyright which is material to the operation of its business may become invalidated or otherwise impaired. Not (either itself or through licensees) do any act whereby any of the Copyrights may fall into the public domain.

(e)     Not, and not permit any licensee to, do any act that results in any Intellectual Property held by such Grantor infringing on the Intellectual Property rights of a third party.

(f)     Promptly notify the Collateral Agent immediately if it knows, or has reason to know, that any application or registration relating to any Patent, Copyright or Trademark may become abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding Grantor's ownership of, or the validity of, any Intellectual Property or such Grantor's right to register the same or to own and maintain the same.

(g)     To the extent any Grantor, either by itself or through an authorized agent, employee, licensee or designee, shall file an application for any Patent or Trademark with the United States Patent and Trademark Office or any Copyright in the U.S. Copyright Office or any similar office or agency in any other country or any political subdivision thereof, report such filing to the Collateral Agent within five (5) Business Days after the last day of the fiscal quarter in which such filing occurs. Upon request of the Collateral Agent, except for Excluded Personal Property, execute and deliver, and have recorded, a Copyright Security Agreement, a Patent Security Agreement, a Trademark Security Agreement (except in the case of any Excluded Trademark Application) and any and all other agreements, instruments, documents, and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest in any Copyright, Patent or Trademark and the goodwill and General Intangibles of such Grantor relating thereto or represented thereby.

(h)     Take all commercially reasonable and necessary steps, including in any proceeding before the United States Patent and Trademark Office, the U.S. Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain each registration of Patents, Trademarks and Copyrights held by,

including filing of applications for renewal, affidavits of use and affidavits of incontestability, to the extent such Patents, Trademarks or Copyrights are material to the operation of its business.

(i)      In the event that any Intellectual Property of any Grantor which is material to the operation of its business is infringed, misappropriated or diluted by a third party, take such actions as such Grantor shall reasonably deem appropriate under the circumstances, or as otherwise reasonably ~~requested by the Collateral Agent,~~ necessary or as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, reasonably desirable to protect such Intellectual Property.

(j)      Take all steps reasonably necessary to protect the secrecy of all Trade Secrets, including entering into confidentiality agreements with employees with access to such Trade Secrets and labeling and restricting access to secret information and documents.

SECTION 4.10.      Commercial Tort Claims.  Notify the Collateral Agent promptly, in writing, in the event that any Grantor shall at any time after the date hereof hold any Commercial Tort Claims which notice shall set forth (i) all information with respect to such Commercial Tort Claims as is set forth on Schedule 6 hereto with respect to Commercial Tort Claims held by the Grantors on the date hereof, and (ii) shall include the express grant by such Grantor to the Collateral Agent of a security interest in such Commercial Tort Claim (and the proceeds thereof). In the event that such notice does not include such grant of a security interest, the sending thereof by such Grantor to the Collateral Agent shall be deemed to constitute such grant to the Collateral Agent. Upon the sending of such notice, any Commercial Tort Claim described therein shall constitute part of the Collateral and shall be deemed included therein.  Without limiting the authorization of the Collateral Agent provided in the Indenture or otherwise arising by such Grantor's execution of this Agreement or any of the other Indenture Documents, the Collateral Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming the Collateral Agent or its designee as secured party and such Grantor as debtor, or any amendments to any financing statements, covering any such Commercial Tort Claim as Collateral. In addition, promptly ~~upon the Collateral Agent's request,~~ execute and deliver, or cause to be executed and delivered, to the Collateral Agent such other agreements, documents and instruments as ~~the Collateral Agent may reasonably require~~ reasonably required or as may be, in the written opinion delivered to the Company of Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, reasonably desirable in connection with such Commercial Tort Claim.

SECTION 4.11.      Negotiable Documents.  Not permit any property of such Grantor other than Inventory to be evidenced by a negotiable Document. If any Inventory is or becomes evidenced by a negotiable Document, upon request of the Controlling Agent after the occurrence and during the continuation of an Event of Default, cause such negotiable Document, subject to the terms of the Intercreditor Agreement, to be duly negotiated to the Controlling Agent.

SECTION 4.12.      Inventory and Equipment.

21

(a)     Take all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Controlling Agent's security interest in all Inventory and (except for any Excluded Personal Property) Equipment of such Grantor, or to enable the Controlling Agent to exercise and enforce its rights and remedies hereunder, subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, with respect to such Equipment and Inventory.

(b)     Keep materially correct and accurate records of the Inventory, itemizing and describing the kind, type and quantity of Inventory, such Grantor's cost therefor and (where applicable) the current list prices for the Inventory, in each case, in reasonable detail.

(c)     Not deliver any Document evidencing any Equipment and Inventory to any Person other than to the purchaser of such Inventory in the ordinary course of business or the issuer of such Document to claim the Goods evidenced therefor, or to the Controlling Agent.

(d)     Take commercially reasonable measures to maintain, keep and preserve the Inventory in good and merchantable condition, maintain and preserve each item of Equipment in good operating condition, ordinary wear and tear and immaterial impairments of value and damage by the elements excepted, and provide all maintenance, service and repairs necessary for such purpose.

(e)     Prevent any Equipment from becoming attached to real estate in such a manner that the same may become a Fixture or otherwise becomes permanently attached to, affixed to or otherwise incorporated into any real property or improvements of any Person other than real property and improvements owned in fee by such Grantor (or subject to a leasehold in favor of such Grantor pursuant to a ground lease) and with respect to which such Grantor has delivered to the Collateral Agent a Mortgage granting to the Collateral Agent a first and prior mortgage Lien on such real property and improvements so owned in fee or subject to a leasehold (subject to Permitted Liens) to secure the Note Obligations.

SECTION 4.13.     Amounts in Cash Collateral Account.

(a)     Cause all Collateral Monies, including all Net Proceeds received in connection with a Primary Collateral Asset Sale, as well as Net Loss Proceeds required to be deposited with the Collateral Agent, to be held by the Collateral Agent in the Cash Collateral Account as part of the Primary Collateral securing the Note Obligations. So long as no Default or Event of Default under the Indenture shall have occurred and be continuing, Collateral Monies may:

(1)     with respect to the Net Proceeds of Primary Collateral Asset Sales, be released as contemplated by Section 4.16 of the Indenture, subject to conditions set forth in the Indenture;

(2)     with respect to Net Loss Proceeds, be released to repair or replace the relevant Primary Collateral as contemplated by Section 4.17 of the Indenture, subject to conditions set forth in the Indenture;

(3)     at the Company's direction be applied by the Collateral Agent from time to time to (x) the payment of the principal of, premium, if any, and interest on the Notes at maturity or upon redemption or retirement, or (y) the purchase of the Notes upon tender or in the open market or otherwise, in each case, in compliance with the Indenture; or

(4)     continue to be held by the Collateral Agent in the Cash Collateral Account as part of the Primary Collateral securing the Notes.

(b)     The Collateral Agent shall be entitled to apply any Collateral Monies to cure any Event of Default under the Indenture. Collateral Monies deposited with the Collateral Agent shall be invested in cash or Cash Equivalents pursuant to the Company's direction and, so long as no Default or Event of Default shall have occurred and be continuing, the Company shall be entitled to any interest or dividends accrued, earned or paid on such Cash Equivalents.

SECTION 4.14.     <u>Delivery of Instruments and Chattel Paper</u>.  If any of the Collateral is or shall become evidenced by any Instrument, Certificated Security or Chattel Paper, deliver such Instrument, Certificated Security or Chattel Paper promptly to the Controlling Agent, duly indorsed in a manner reasonably satisfactory to the Controlling Agent, to be held as Collateral pursuant to this Agreement; <u>provided</u>, that the Grantors shall not be obligated to deliver to the Controlling Agent (i) any Instrument or Chattel Paper held by any Grantor at any time to the extent that the face amount of such Instrument or Chattel Paper does not exceed $100,000 or (ii) checks received in the ordinary course of business.

SECTION 4.15.     <u>Payment of Obligations</u>.  Pay and discharge or otherwise satisfy prior to delinquency, all material taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of income or profits therefrom, as well as all lawful claims for labor, materials and supplies or otherwise, except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Collateral Agent or the Secured Parties.

SECTION 4.16.     <u>Non-UCC Property</u>.  Neither own nor hold any interest in any Non-UCC Property, except for any Excluded Personal Property with respect to such Grantor.

SECTION 4.17.     <u>Excluded Trademark Applications</u>.  Neither own nor hold any interest in any Specified Trademark Application, except for any Excluded Trademark Applications with respect to such Grantor.

SECTION 4.18.     <u>Letter-of-Credit Rights</u>.  Not own or acquire any Letter-of-Credit Rights unless such Grantor has taken such actions as are necessary so that the Controlling Agent has control with respect to such Letter-of-Credit Rights under Section 9.107 of the UCC.

## ARTICLE V

## REMEDIAL PROVISIONS

SECTION 5.1.<u>Certain Matters Related to Receivables.</u>

(a)    Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to make test verifications of the Receivables that are included in the Collateral using reasonable procedures that it reasonably considers advisable, and each Grantor shall furnish all such assistance and information as the Collateral Agent may reasonably require in connection with such test verifications.  Upon the occurrence and during the continuance of an Event of Default, upon the reasonable request of the Collateral Agent and at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others reasonably satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables of such Grantor that are included in the Collateral.

(b)    The Collateral Agent hereby authorizes each Grantor to collect such Grantor's Receivables that are included in the Collateral, subject to the Collateral Agent's direction and control after an Event of Default has occurred and is continuing, and the Collateral Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.  If required by the Controlling Agent at any time after an Event of Default has occurred and is continuing, any payments of Receivables that are included in the Collateral, when collected by any Grantor, (i) if required by the Indenture Documents or the Intercreditor Agreement, shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Controlling Agent in the Blocked Account (if Secondary Collateral) or a Cash Collateral Account (if Primary Collateral) in which the Controlling Agent has a first-priority perfected security interest maintained under the sole dominion and control of the Collateral Agent, subject to withdrawal by the Controlling Agent for the account of the Joint Secured Parties only as provided in <u>Section 5.5</u>, and (ii) until so turned over or if not required by the Indenture or the Intercreditor Agreement to be deposited into the Blocked Account (if Secondary Collateral) or a Cash Collateral Account (if Primary Collateral), shall be held by such Grantor in trust for the Controlling Agent and the Joint Secured Parties, segregated from other funds of such Grantor.  Each such deposit of Proceeds of Receivables that are included in the Collateral shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)    At any time after an Event of Default has occurred and is continuing, at the Collateral Agent's request, each Grantor shall deliver to the Controlling Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables included in the Collateral, including all original orders, invoices and shipping receipts

(d)     The Company, the Collateral Agent, and the Deposit Account Bank have established in the name and for the benefit of the Collateral Agent, as agent for the Secured Parties, the Cash Collateral Accounts for purposes of this Agreement and the other Collateral Documents, which Cash Collateral Accounts are maintained with [_____] located in [_____].  With respect to any Deposit Account opened by any Grantor at any Deposit Account Bank after the Closing Date, the applicable Grantor, the Deposit Account Bank and the Collateral Agent shall enter into a ~~customary~~ control agreement in form reasonably satisfactory to the Collateral Agent simultaneously with the opening of such Deposit Account, which provides that such Deposit Account shall be under the control of the Collateral Agent, as agent for the Secured Parties, and the Collateral Agent shall have the right after the occurrence and continuance of an Event of Default to direct withdrawals from such Deposit Account and to exercise all rights with respect to all of the property from time to time on deposit therein pursuant to the terms of this Agreement and the control agreements, such form to be satisfactory to the Collateral Agent.

(e)     The Company and the Controlling ABL Agent have established in the name and for the benefit of the Controlling ABL Agent, as agent for the Joint Secured Parties, the Blocked Account for purposes of this Agreement and the other Collateral Documents, which Blocked Account is maintained with [_____] located in [_____].  With respect to any Deposit Account opened by any Grantor at any bank after the Closing Date that is not a Cash Collateral Account, the applicable Grantor, the bank, and the Controlling ABL Agent shall enter into a customary control agreement simultaneously with the opening of such Deposit Account, which provides that such Deposit Account shall be under the control of the Controlling ABL Agent, as agent for the Joint Secured Parties, and the Controlling ABL Agent shall have the right after the occurrence and continuance of an Event of Default to direct withdrawals from such Blocked Account and to exercise all rights with respect to all of the property from time to time therein pursuant to the terms of this Agreement and the control agreements, such form to be satisfactory to the Controlling ABL Agent.

SECTION 5.2. Communications with Obligors; Grantors Remain Liable.

(a)     The Collateral Agent in its own name or in the name of others may at any time after an Event of Default has occurred and is continuing communicate with obligors under the Receivables that are included in the Collateral to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Receivables.

(b)     Upon the request of the Controlling Agent at any time after an Event of Default has occurred and is continuing, each Grantor shall notify obligors on the Receivables that are included in the Collateral that such Receivables have been assigned to the Controlling Agent for the ratable benefit of the Joint Secured Parties and that payments in respect thereof shall be made directly to the Controlling Agent.

(c)     Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables that are included in the Collateral (or any agreement giving rise thereto) to observe and perform in its commercial judgment all the

conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. Neither the Controlling Agent nor any Joint Secured Party shall have any obligation or liability under any Receivable that is included in the Collateral (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Controlling Agent or any Joint Secured Party of any payment relating thereto, nor shall the Controlling Agent or any Joint Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable that is included in the Collateral (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

SECTION 5.3. Pledged Securities.

(a) Unless an Event of Default shall have occurred and be continuing, each Grantor shall be permitted to exercise all voting and corporate rights with respect to the Pledged Securities; provided, however, that subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, no vote shall be cast or corporate right exercised or other action taken which, in the Collateral Agent's reasonable judgment, would materially impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Indenture, this Agreement or any other Indenture Document.

(b) Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing and upon the written request of the Collateral Agent, (i) any or all of the Pledged Securities (other than Excluded Capital Stock) shall be registered in the name of the Controlling Agent or its nominee, and the Controlling Agent or its nominee may thereafter exercise (x) all voting, corporate and other rights pertaining to such Pledged Securities at any meeting of shareholders or members of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including the right to exchange at its discretion any and all of the Pledged Securities (other than Excluded Capital Stock) upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by the applicable Grantor or the Controlling Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities (other than Excluded Capital Stock) with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Controlling Agent may determine), all without liability except to account for property actually received by it, but the Controlling Agent and the other Joint Secured Parties shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing, and (ii) the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral) shall have the right to receive any

and all cash dividends, payments or other Proceeds paid in respect of the Pledged Securities (other than Excluded Capital Stock) and make application thereof to the Secured Obligations in accordance with the Intercreditor Agreement.

(c)     Each Grantor hereby authorizes and instructs each Issuer of Pledged Securities pledged by such Grantor hereunder to, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement (i) comply with any instruction received by such Issuer from the Controlling Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and such Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) pay any dividends or other payments with respect to the Pledged Securities directly to the Controlling Agent.

(d)     The Collateral Agent agrees that it shall not give any instruction described in Section 5.3(c) unless (1) an Event of Default under and as defined in the Indenture has occurred and is continuing and (2) such instructions are otherwise in accordance with the terms of the Indenture and this Agreement.

SECTION 5.4. Proceeds to be Turned Over to Collateral Agent.  In addition to the rights of the Controlling Agent and the Joint Secured Parties specified in Section 5.1 with respect to payments of Receivables that are included in the Collateral, after an Event of Default has occurred and is continuing, all Proceeds received by any Grantor consisting of cash, checks and Instruments shall be held by such Grantor in trust for the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral), segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral) in the exact form received by such Grantor (duly indorsed by such Grantor to the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral), if required).  All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Cash Collateral Account maintained under its sole dominion and control.  All Proceeds while held by the Collateral Agent in a Cash Collateral Account shall continue to be held as collateral security for all the Note Obligations and shall not constitute payment thereof until applied as provided in the Intercreditor Agreement.  All Proceeds while held by such Grantor in trust for the Controlling Agent (if Proceeds of Secondary Collateral) or the Collateral Agent (if Proceeds of Primary Collateral) shall continue to be held as collateral security for all the Joint Secured Obligations (if Proceeds of Secondary Collateral) or the Note Obligations (if Proceeds of Primary Collateral) and shall not constitute payment thereof until applied as provided in the Intercreditor Agreement.

SECTION 5.5. Application of Proceeds.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, at any time after the occurrence and during the continuance of an Event of Default, at the Collateral Agent's election, the Collateral Agent may apply all or any part of Proceeds, including any such Proceeds held in any Collateral Account in payment of the Note Obligations, in accordance with Section 6.10 of the Indenture. Any balance of such Proceeds remaining after the Notes shall have been paid in full, and the Indenture shall

have terminated shall be paid over to the Grantors or to whomsoever may be lawfully entitled to receive the same.

SECTION 5.6. <u>UCC and Other Remedies</u>.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Notes, all rights and remedies of a secured party under the UCC or any other applicable law. Without limiting the generality of the foregoing and subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind, including notice of intent to accelerate or notice of acceleration, (except any notice required by law as referred to below) to or upon the Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Collateral Agent shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released. Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere. Subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, the Collateral Agent shall apply the net proceeds of any action taken by it pursuant to this <u>Section 5.6</u>, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Collateral Agent hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Notes and to any other Person legally entitled thereto in accordance with the terms of the Intercreditor Agreement and the Indenture. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Collateral Agent or any other Secured Party arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten days before such sale or other disposition.

SECTION 5.7. <u>Registration Rights</u>.

(a)  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, if the Collateral Agent shall determine to exercise its right to sell any or all of the Pledged Securities (other than Excluded Capital Stock) pursuant to <u>Section 5.6</u> hereof, and if in the <span style="color:blue"><u>written</u></span> opinion <span style="color:red"><s>of the Collateral Agent</s></span><span style="color:blue"><u>delivered to the Company by Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class,</u></span> it is necessary or advisable to have such Pledged

Securities, or that portion thereof to be sold, registered under the provisions of the Securities Act, the relevant Grantor will cause any Issuer thereof to: (i) execute and deliver, and cause the directors, members, managers and officers of such Issuer to execute and deliver, all such instruments and documents, and do or cause to be done all such other acts as may be, in the opinion of the Collateral Agent, necessary or advisable to register such Pledged Securities, or that portion thereof to be sold, under the provisions of the Securities Act, (ii) cause the registration statement relating thereto to become effective and to remain effective for a period of one year from the date of the first public offering of such Pledged Securities, or that portion thereof to be sold, and (iii) make all amendments thereto or to the related prospectus which, in the ~~opinion of the Collateral Agent~~written opinion delivered to the Company by Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the SEC applicable thereto. Each Grantor agrees to cause any Issuer to comply with the provisions of the securities or "Blue Sky" laws of any and all jurisdictions which the Collateral Agent shall designate and to make available to its security holders, as soon as practicable, an earnings statement (which need not be audited) which will satisfy the provisions of Section 11(a) of the Securities Act.

(b)     Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Securities (other than Excluded Capital Stock), by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Securities (other than Excluded Capital Stock) for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

(c)     Each Grantor agrees that, upon the occurrence and during the continuance of an Event of Default, if the Collateral Agent desires to sell any of the Pledged Securities (other than Excluded Capital Stock) at a public or private sale, it will, upon the written request of the Collateral Agent, use commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of such Pledged Securities pursuant to this Section 5.7 valid and binding and in compliance with any and all other applicable law. Each Grantor further agrees that a breach of any of the covenants contained in this Section 5.7 will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and as a consequence, that each and every covenant contained in this Section 5.7 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants

except for a defense that no Event of Default has occurred and is continuing under the Indenture.

SECTION 5.8. Waiver; Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay the Note Obligations and the reasonable fees and disbursements of any attorneys employed by the Collateral Agent or any other Secured Party to collect such deficiency.

SECTION 5.9. Actions of Collateral Agent. Except as may otherwise be specifically provided in the Indenture or any Collateral Document with respect to any act, or refraining from acting, that is discretionary with the Collateral Agent in accordance with the terms of any Indenture Document, the Collateral Agent will act or refrain from acting in accordance with the written instructions of the Holders of a majority in aggregate principal amount of the Notes then outstanding.

## ARTICLE VI

## THE COLLATERAL AGENT

SECTION 6.1. The Collateral Agent's Appointment as Attorney-in-Fact etc.

(a)     Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, such Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following, subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement:

(1)     in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Receivable or with respect to any other Collateral whenever payable;

(2)     in the case of any Copyright, Patent or Trademark (other than Excluded Trademark Applications), execute, deliver and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest in such

Copyright, Patent or Trademark and the goodwill and General Intangibles of such Grantor relating thereto or represented thereby;

(3)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(4)     execute, in connection with any sale provided for in Section 5.6 or 5.7 hereof, any endorsements, assignments or other instruments or documents of conveyance or transfer with respect to the Collateral; and

(5)     (A) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (B) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents (including any negotiable Documents) in connection with any of the Collateral; (D) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (E) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (F) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (G) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; and (H) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 6.1(a) to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 6.1(a) unless it shall have actual knowledge that an Event of Default shall have occurred and be continuing.

(b)     The Collateral Agent may (but without any obligation to do so) (i) perform or satisfy any of the Grantor's and any other obligated party's obligations under or

pursuant to this Agreement and the other Indenture Documents which remain unsatisfied (after providing any notice and opportunity to cure to which such Grantor or other obligated party is entitled under any other provision of any Indenture Document, if any), and (ii) take all other actions and pay such amounts and claims as Collateral Agent determines in its sole but reasonable discretion, is necessary or appropriate to protect the rights and interests of the Collateral Agent and the other Secured Parties under this Agreement and the other Indenture Documents and otherwise with respect to the Notes or to preserve and protect the Collateral or any part thereof from loss.

(c)     The reasonable out-of-pocket expenses of the Collateral Agent (including the reasonable fees and disbursements of counsel to the Collateral Agent and of any accounting, financial or other professional advisors) incurred in connection with actions undertaken as provided in this Section 6.1, together with interest thereon at a rate per annum equal to the rate per annum at which interest would then be payable under the Indenture on past due amounts, from the date of payment by the Collateral Agent to the date reimbursed by any Grantor, shall be payable by such Grantor to the Collateral Agent on demand.

(d)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done pursuant to the powers granted in this Section 6.1. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

SECTION 6.2. Duty of the Collateral Agent. Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, the Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under the UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account. None of the Collateral Agent, any other Secured Party, nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's interests in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers. The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

SECTION 6.3. Financing Statements.  Subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement and pursuant to the UCC and any other applicable laws, each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent under this Agreement. A photographic or other reproduction of

this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

SECTION 6.4. <u>Authority of the Collateral Agent</u>. Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Collateral Agent and the other Secured Parties, be governed by the Indenture, and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and such Grantor, the Collateral Agent shall be conclusively presumed to be acting as Collateral Agent for the Secured Parties with full and valid authority so to act or refrain from acting, and such Grantor shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

# ARTICLE VII

## MISCELLANEOUS

SECTION 7.1. <u>Amendments in Writing</u>. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Article IX of the Indenture and in accordance with the Intercreditor Agreement.

SECTION 7.2. <u>Notices</u>. All notices, requests and demands to or upon the Collateral Agent, any other Secured Party, or any Grantor hereunder shall be effected in the manner provided for in Section 11.02 of the Indenture.

SECTION 7.3. <u>No Waiver; Remedies Cumulative</u>. No failure or delay on the part of any Grantor or the Collateral Agent in exercising any right or remedy under this Agreement or any other Indenture Document and no course of dealing between such Grantor and the Collateral Agent or any Secured Party shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy under this Agreement or any other Indenture Document preclude any other or further exercise thereof or the exercise of any other right or remedy under this Agreement or any other Indenture Document. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which any Grantor, the Collateral Agent or any Secured Party would otherwise have. No notice to or demand on any Grantor not required under this Agreement or any other Indenture Document in any case shall entitle such Grantor or any other Grantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Collateral Agent or the Secured Parties to any other or further action in any circumstances without notice or demand.

SECTION 7.4. <u>Enforcement Expenses; Indemnification</u>.

(a) Each Grantor agrees to pay or reimburse the Collateral Agent for all of its reasonable, out-of-pocket costs and expenses ~~incurred~~ (including the reasonable fees and disbursements of counsel to the Collateral Agent and any accounting, financial or other professional advisors) incurred (i) in enforcing or preserving any rights under this Agreement and the other Indenture Documents to which such Grantor is a party,

33

~~including the reasonable fees and disbursements of counsel to the Collateral Agent~~or in connection with any amendment, modification or waiver, under or in connection with this Agreement or the other Indenture Documents or (ii) in connection with any "Refinancing" under Section 7.02 of the Intercreditor Agreement.

(b)     Each Grantor agrees to pay, and to save the Collateral Agent and the Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)     Each Grantor agrees to pay, and to save the Collateral Agent and the Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, to the same extent each Grantor would be required to do so pursuant to the Intercreditor Agreement other than liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from the gross negligence or willful misconduct of the Collateral Agent and such Secured Parties.

(d)     The agreements in this <u>Section 7.4</u> shall survive repayment of the Notes and all other amounts payable under the Indenture and the other Indenture Documents.

SECTION 7.5.<u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Grantor may assign or otherwise transfer any of its rights or obligations hereunder except in accordance with the terms of the Indenture (and any attempted assignment or transfer by such Grantor without such consent shall be null and void).

SECTION 7.6.<u>Set-Off</u>.  Each Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time after an Event of Default has occurred and is continuing, without notice to such Grantor or any other Grantor, any such notice being expressly waived by each Grantor, to set-off as appropriate and apply any and all deposits (general or special, time or demand, provisional or final, but excluding deposits held by such Grantor in a fiduciary capacity for others), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held by or owing by the Collateral Agent to or for the credit or the account of such Grantor, or any part thereof in accordance with the Intercreditor Agreement, against and on account of the obligations and liabilities of such Grantor to the Collateral Agent hereunder and claims of every nature and description of the Collateral Agent against such Grantor, in any currency, whether arising hereunder, under the Indenture, under any other Collateral Document or otherwise, as the Collateral Agent may elect, whether or not the Collateral Agent has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured. The rights of the Collateral Agent under this <u>Section 7.6</u> are in addition to other rights and

remedies (including, without limitation, other rights of set-off) which the Collateral Agent may have.

SECTION 7.7.Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original but all of which shall together constitute one and the same instrument.

SECTION 7.8.Severability.  In the event that any one or more of the provisions contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, (a) each Grantor agrees that such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and (b) each Grantor and the Collateral Agent (acting on behalf and at the direction of the Trustee and the Holders) will negotiate in good faith to amend such provision so as to be legal, valid, and enforceable.

SECTION 7.9.ENTIRE AGREEMENT.  THIS AGREEMENT AND THE OTHER INDENTURE DOCUMENTS EMBODY THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE COLLATERAL AGENT, THE TRUSTEE, THE OTHER HOLDERS, THE GRANTORS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

SECTION 7.10.        Governing Law; Submission to Jurisdiction; etc.

(a)        Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT THE LAWS OF ANY OTHER STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERN THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY OF, OR THE EXERCISE OF ANY REMEDIES WITH RESPECT TO, ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE, IN WHICH CASE THE LAWS OF SUCH OTHER STATE SHALL GOVERN SUCH VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY AND SUCH EXERCISE OF REMEDIES.

(b)        SUBMISSION TO JURISDICTION.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE NOTES OR THE OTHER INDENTURE DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GRANTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE

AFORESAID COURTS. EACH GRANTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, BUT NOT LIMITED TO, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c)     WAIVER OF JURY TRIAL & CONSEQUENTIAL DAMAGES.  TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, EACH OF THE GRANTORS, THE COLLATERAL AGENT, THE TRUSTEE, AND THE OTHER HOLDERS: (1) IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY INDENTURE DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (2) IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (3) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (IV) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE OTHER INDENTURE DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BASED UPON, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION.

(d)     Service of Process.  Each party hereto irrevocably consents to service of process by notice delivered in accordance with Section 7.2 hereof. Nothing herein or in any other Indenture Document shall affect the right of the Collateral Agent, the Trustee or any other Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any Grantor in any other jurisdiction.

SECTION 7.11.     Acknowledgments.  Each Grantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Indenture Documents;

(b)     neither the Collateral Agent nor the Trustee nor any other Holder has any fiduciary relationship with or duty to such Grantor arising out of or in connection with this Agreement or any of the other Indenture Documents, and the relationship between the Collateral Agent, the Trustee and the Holders, on one hand, and such Grantor, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Indenture Documents or otherwise exists by virtue of the transactions contemplated hereby among the Holders or among the Grantor and the Holders.

SECTION 7.12.     Section Headings.  The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

SECTION 7.13.     Additional Grantors.  Each Subsidiary of the Company that is required to become a party to this Agreement pursuant to Section 4.14 of the Indenture shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of Annex I hereto.

SECTION 7.14.     Releases

(a)     At such time as the obligations of the Grantors shall have been defeased or discharged in accordance with the provisions of Article VIII of the Indenture, Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Grantor. At the request and joint and several expense of the Grantors following any such termination, the Collateral Agent shall promptly deliver to the appropriate Grantor any Collateral held by the Collateral Agent hereunder, and promptly execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

(b)     If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Indenture, then the Collateral Agent, at the request and sole expense of such Grantor, shall promptly execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.  At the request and sole expense of the Company, a Grantor shall be released from its obligations hereunder in the event that all the Capital Stock of such Grantor shall be sold, transferred or otherwise disposed of in a transaction permitted by the Indenture; provided that the Company shall have delivered to the Collateral Agent, at least ten (10) Business Days prior to the date of the proposed release, a written request for such release identifying the relevant Grantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Company stating that such transaction is in compliance with the Indenture.

(c)     Additional releases of Collateral shall be provided as set forth in the Intercreditor Agreement.

SECTION 7.15.     Reinstatement.  The provisions of this Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should such Grantor become insolvent or make an

assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any part of such Grantor's assets or should any other financial impairment occur, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Notes, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned to any obligee of the Notes, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored, or returned, the Notes shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

SECTION 7.16.        Conflict With Other Documents.  If any conflict or inconsistency exists between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern.  If any conflict or inconsistency exists between this Agreement and the Indenture, the Indenture shall govern.

SECTION 7.17.        Additional Waiver.  Each Grantor waives all rights and defenses arising out of an election of remedies by the Collateral Agent.

[signature page to follow]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____


**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: _____
Title: _____


**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name: _____
Title: _____


**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____


**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name: _____
Title: _____


**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**

WILMINGTON TRUST FSB, as Collateral Agent

By: _____
Name: _____
Title: _____

**ANNEX I**
**TO SECURITY AGREEMENT**

**ASSUMPTION AGREEMENT**

THIS ASSUMPTION AGREEMENT, dated as of _____ , 20___ , by _____ , a _____ (the "Additional Grantor"), in favor of [_____], as the Collateral Agent (in such capacity, the "Collateral Agent") for the Trustee and Holders party to the Indenture referred to below. All capitalized terms not defined herein shall have the meaning ascribed to them in such Indenture.

**WITNESSETH:**

WHEREAS, the Grantors, the Trustee and the Collateral Agent, have entered into an Indenture, dated as of [_____], 2010 (as amended, supplemented or otherwise modified from time to time, the "Indenture");

WHEREAS, the Additional Grantor has executed a Supplemental Indenture to the Indenture pursuant to which it has become a Guarantor under the Indenture;

WHEREAS, in connection with the Indenture, the Company and the other Grantors (other than the Additional Grantor) have entered into the Security Agreement, dated as of [_____], 2010 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement") in favor of the Collateral Agent for the ratable benefit of the Trustee, the Collateral Agent and the Holders;

WHEREAS, Sections 4.14 of the Indenture requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement.

NOW, THEREFORE, IT IS AGREED:

1.      Security Agreement.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 7.13 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder and hereby assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a security interest in the Collateral now owned or hereafter acquired by the Additional Grantor. The information set forth in Annex I-A hereto is hereby added to the information set forth on Schedules            * to the Security Agreement. The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Article III of the Security Agreement is true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.  The Additional Grantor has delivered to the Collateral Agent an Acknowledgement and Consent to

Pledge substantially in the form of Annex II to the Security Agreement duly executed by each Issuer of Pledged Securities of such Additional Grantor with respect to any of such Pledged Securities (other than any Excluded Capital Stock).

2.       GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY OTHER STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERN THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY OF, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO, ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE, IN WHICH CASE THE LAWS OF SUCH OTHER STATE SHALL GOVERN SUCH VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY AND SUCH EXERCISE OF REMEDIES.

* Refer to each Schedule which needs to be supplemented.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

*[ADDITIONAL GRANTOR]*

By: _____
Name: _____
Title: _____

ACKNOWLEDGMENT BY *[INSERT NAME OF GRANTOR OWNING CAPITAL STOCK ISSUED BY ADDITIONAL GRANTOR (THE "RELEVANT GRANTOR")]*:

By execution of this Assumption Agreement in the space provided below, [*RELEVANT GRANTOR*] hereby acknowledges and agrees that the Securities described on Annex I-A hereto have been issued by the Additional Grantor identified herein and are held by [*RELEVANT GRANTOR*] and constitute "Pledged Securities" comprising part of the Pledged Securities of [*ADDITIONAL GRANTOR*] under the Security Agreement.

Dated:

[RELEVANT GRANTOR]

By: _____
Name: _____
Title: _____

# ANNEX II TO
# SECURITY AGREEMENT

## ACKNOWLEDGMENT AND CONSENT TO PLEDGE

*[date]*

*[NAME OF ISSUER]*
*[ADDRESS OF ISSUER]*

Attention:

  Re: Pledge of _____ *[describe the equity interest]* (the "Pledged Securities") in _____ , a _____(the "Issuer"), held by *[Grantor's Name]*, a _____("Grantor")

Ladies and Gentlemen:

   Reference is made herein to that certain Security Agreement dated as of [_____], 2010 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"), by Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "Company"), Aventine Renewable Energy, Inc., a Delaware corporation ("Aventine"), Aventine Renewable Energy – Aurora West, LLC, a Delaware limited liability company ("Aurora West"), Nebraska Energy, L.L.C., a Delaware limited liability company ("Nebraska Energy"), Aventine Renewable Energy – Mt. Vernon, LLC, a Delaware limited liability company ("Mt. Vernon"), and Aventine Power, LLC, a Delaware limited liability company ("Aventine Power" and, together with the Company, Aventine, Aurora West, Nebraska Energy, Mt. Vernon and any other entity that may become a party hereto, the "Grantors" and, each individually, a "Grantor"), in favor of [_____], as the Collateral Agent (in such capacity, the "Collateral Agent") for the ratable benefit of each of (i) the trustee (the "Trustee") under the Indenture, dated as of [_____], 2010 (as amended, supplemented or otherwise modified from time to time, the "Indenture"), among the Grantors, the Trustee and the Collateral Agent, (ii) the Collateral Agent and (iii) the holders of the senior secured notes issued under the Indenture (the "Holders").

   Pursuant to the terms of the Security Agreement or the terms of the Indenture, the Trustee and the Holders have required that Grantor grant to the Collateral Agent, for the benefit of the Collateral Agent, the Trustee and the Holders, a security interest in the Pledged Securities to secure the Note Obligations.

   By executing this letter (this "Letter Agreement"), the Issuer and each shareholder/member, as may be required under the applicable organization documents hereby (a) acknowledges and confirms that the Pledged Securities represents all of Grantor's Securities (as defined in the Security Agreement) in the Issuer, (b) agrees to enter a notation in the stock transfer register or other appropriate records of the Issuer reflecting the pledge of the Pledged Securities pursuant to the Security Agreement, (c) consents to the pledge by Grantor of the Pledged Securities to secure the Note Obligations and subject (solely in the case of Secondary Collateral) to the terms of the Intercreditor Agreement, consents to the transfer of the Pledged

Securities pursuant to the exercise of the remedies provided for in the Security Agreement (or any transfer in lieu thereof), (d) waives any breach or violation of the terms or provisions of the Issuer's organizational documents caused by such pledge or transfer, (e) agrees that it will be bound by the terms of the Security Agreement relating to the Pledged Securities issued by it and will comply with such terms insofar as such terms are applicable to it, (f) agrees that it will notify the Collateral Agent promptly in writing upon the acquisition by Grantor of any Securities (as defined in the Uniform Commercial Code as from time to time in effect in the State of New York or, where applicable as to specific Collateral, any other relevant state) issued by the Issuer, which notice shall set forth in reasonable detail all information with respect to such Securities, (g) agrees, subject (solely in the case of Secondary Collateral) to the Intercreditor Agreement, to comply with any instruction received from the Collateral Agent in writing that states that (1) an Event of Default under and as defined in the Indenture has occurred and is continuing and (2) such instructions are otherwise in accordance with the terms of the Indenture and Security Agreement, without any other or further instructions from Grantor, (h) agrees that any sums paid upon or in respect of the Pledged Securities, including any dividend or distribution or any amount paid upon the liquidation or dissolution of the Issuer shall be deposited directly into the Blocked Account (if Proceeds of Secondary Collateral) or a Cash Collateral Account (if Proceeds of Primary Collateral), (i) agrees to notify the Collateral Agent promptly in writing of the occurrence of any of the events described in Section 4.7(b) of the Security Agreement, and (j) agrees that the terms of Section 4.7, 5.3(c) and 5.7 of the Agreement shall apply to it, mutatis mutandis, with respect to all actions that may be required of it, or prohibited, pursuant to Section 4.7, Section 5.3(c) or 5.7 of the Agreement.

This Letter Agreement may be executed in counterparts, and all parties need not execute the same counterpart. This Letter Agreement shall be binding on and enforceable against the Grantor and the Issuer and inure to the benefit of the Collateral Agent and the Trustee and the Holders. Facsimiles shall be effective as originals.

Evidence your agreement to each of the terms and conditions set forth above by executing this Letter Agreement in the space indicated below.

Very truly yours,

*[NAME OF GRANTOR]*
By: _____
Name: _____
Title: _____

Acknowledged and Agreed
As of this _____ day of _____ , 20__
*[NAME OF THE ISSUER]*
By: _____
Name: _____
Title: _____

## COPYRIGHT SECURITY AGREEMENT

THIS COPYRIGHT SECURITY AGREEMENT (this "Agreement"), dated as of [_____], 2010 is entered into by AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Company") and certain of its affiliates (collectively, the "Grantors") and [_____], as the Collateral Agent (the "Collateral Agent") for itself and the Trustee and the Holders. Capitalized terms not otherwise defined herein have the meanings set forth in the Security Agreement dated as of [_____], 2010 among the Grantors and the Collateral Agent (the "Security Agreement").

WHEREAS, pursuant to the Security Agreement, Grantors are granting a security interest to the Collateral Agent in certain Copyrights whether now owned or existing or hereafter acquired or arising and wherever located, including the Copyrights listed on Schedule A hereto ("Secured Copyrights").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Grantors and the Collateral Agent hereby agree as follows:

1.    Grant of Security Interest.

(a)    Each Grantor hereby grants to the Collateral Agent, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all the Secured Copyrights, subject to the terms and conditions of the Security Agreement and (solely in the case of Secondary Collateral) the Intercreditor Agreement.

(b)    The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.    Modification of Agreement.

This Agreement or any provision hereof may not be changed, waived, or terminated except in accordance with the amendment provisions of the Security Agreement and the Intercreditor Agreement pursuant to which the Collateral Agent may modify this Agreement, after obtaining the applicable Grantor's approval of or signature to such modification, by amending Schedule A hereto to include reference to any right, title or interest in any existing Copyrights or any Copyrights acquired or developed by such Grantor after the execution hereof or to delete any reference to any right, title or interest in any Copyrights in which such Grantor no longer has or claims any right, title or interest.

3.      Governing Law.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERNS THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE.**

4.      Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and each Grantor and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder.

5.      Counterparts.

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. Facsimiles shall be effective as originals.

[signature page follows]

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____

Name: _____

Title: _____


**AVENTINE RENEWABLE ENERGY, INC.**

By: _____

Name: _____

Title: _____


**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____

Name: _____

Title: _____


**NEBRASKA ENERGY, L.L.C.**

By: _____

Name: _____

Title: _____


**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____

Name: _____

Title: _____


**AVENTINE POWER, LLC**

By: _____

Name: _____

Title: _____

**COLLATERAL AGENT:**                    **WILMINGTON TRUST FSB**, as Collateral Agent


By: _____

Name: _____

Title: _____

SCHEDULE A

COPYRIGHT SECURITY AGREEMENT

I.   REGISTERED COPYRIGHTS

| Copyright | Country | Reg. No. (App. No.) | Reg. Date (App. Date) | Record Owner/Liens | Status/ Comment |
| --- | --- | --- | --- | --- | --- |

II.   COPYRIGHT APPLICATIONS

STATE OF         )
                             )   ss
COUNTY OF      )

      On [ ], before me, the undersigned, a notary public in and for said state and county, personally appeared        , personally known to me (or proved to me on the basis of satisfactory evidence), to be the person who executed the within instrument as the           , on behalf of [GRANTOR], a [ ] corporation, the corporation therein named, and acknowledged to me that the corporation executed the within instrument pursuant to its bylaws or a resolution of its board of directors.

WITNESS MY HAND OR OFFICIAL SEAL.

(NOTARIAL STAMP OR SEAL)

                               _____
                                    Notary Public

My Commission Expires:

_____

**ANNEX IV TO
SECURITY AGREEMENT**

**PATENT SECURITY AGREEMENT**

THIS PATENT SECURITY AGREEMENT (this "Agreement"), dated as of [_____], 2010 is entered into by AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Company") and certain of its affiliates (collectively, the "Grantors") and [_____], as the Collateral Agent (the "Collateral Agent") for itself and the Trustee and the Holders. Capitalized terms not otherwise defined herein have the meanings set forth in the Security Agreement dated as of [_____], 2010 among the Grantors and the Collateral Agent (the "Security Agreement").

WHEREAS, pursuant to the Security Agreement, Grantors are granting a security interest to the Collateral Agent in certain Patents whether now owned or existing or hereafter acquired or arising and wherever located, including the Patents listed on Schedule A hereto ("Secured Patents").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantors and the Collateral Agent hereby agree as follows:

1.  Grant of Security Interest.

    (a)  Each Grantor hereby grants to the Collateral Agent, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the Secured Patents, subject to the terms and conditions of the Security Agreement and (solely in the case of Secondary Collateral) the Intercreditor Agreement.

    (b)  The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.  Modification of Agreement.

This Agreement or any provision hereof may not be changed, waived, or terminated except in accordance with the amendment provisions of the Security Agreement and the Intercreditor Agreement pursuant to which the Collateral Agent may modify this Agreement, after obtaining the applicable Grantor's approval of or signature to such modification, by amending Schedule A hereto to include reference to any right, title or interest in any existing Patents or any Patents acquired or developed by such Grantor after the execution hereof or to delete any reference to any right, title or interest in any Copyrights in which such Grantor no longer has or claims any right, title or interest.

3. <u>Governing Law</u>.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERNS THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE.**

4. <u>Successors and Assigns.</u>

This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and each Grantor and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder.

5. <u>Counterparts.</u>

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

[signature page follows]

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name: _____
Title: _____

**NEBRASKA ENERGY, L.L.C.**

By: _____
Name: _____
Title: _____

**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name: _____
Title: _____

**AVENTINE POWER, LLC**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**　　　　WILMINGTON TRUST FSB, as Collateral Agent

By: _____
Name: _____
Title: _____

SCHEDULE A

PATENT SECURITY AGREEMENT

I.    <u>REGISTERED PATENTS</u>

| Patent | Country | Reg. No. (App. No.) | Reg. Date (App. Date) | Record Owner/Liens | Status/ Comment |
|--------|---------|---------------------|------------------------|--------------------|-----------------|

II.    <u>PATENT APPLICATIONS</u>

STATE OF                          )
                                  )   ss
COUNTY OF                         )

      On [ ], before me, the undersigned, a notary public in and for said state and county, personally appeared                          , personally known to me (or proved to me on the basis of satisfactory evidence), to be the person who executed the within instrument as the , on behalf of [GRANTOR], a [ ] corporation, the corporation therein named, and acknowledged to me that the corporation executed the within instrument pursuant to its bylaws or a resolution of its board of directors.


WITNESS MY HAND OR OFFICIAL SEAL.

(NOTARIAL STAMP OR SEAL)

                              **_____**
                                     Notary Public

My Commission Expires:


**_____**

**TRADEMARK SECURITY AGREEMENT**

THIS TRADEMARK SECURITY AGREEMENT (this "Agreement"), dated as of [_____], 2010 is entered into by AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Company") and certain of its affiliates (collectively, the "Grantors") and [_____], as the Collateral Agent (the "Collateral Agent") for itself and the Trustee and the Holders. Capitalized terms not otherwise defined herein have the meanings set forth in the Security Agreement dated as of [_____], 2010 among the Grantors and the Collateral Agent (the "Security Agreement").

WHEREAS, pursuant to the Security Agreement, Grantors are granting a security interest to the Collateral Agent in certain Trademarks whether now owned or existing or hereafter acquired or arising and wherever located, including the Trademarks listed on Schedule A ("Secured Trademarks").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantors and the Collateral Agent hereby agree as follows:

1.     Grant of Security Interest.

Section 1.1 Each Grantor hereby grants to the Collateral Agent, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all the Secured Trademarks, subject to the terms and conditions of the Security Agreement and (solely in the case of Secondary Collateral) the Intercreditor Agreement.

Section 1.2 The security interest granted hereby is granted in conjunction with the security interest granted to the Collateral Agent under the Security Agreement. The rights and remedies of the Trustee and the Holders with respect to the security interest granted hereby are in addition to those set forth in the Security Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall control.

2.     Modification of Agreement.

This Agreement or any provision hereof may not be changed, waived, or terminated except in accordance with the amendment provisions of the Security Agreement and the Intercreditor Agreement pursuant to which the Collateral Agent may modify this Agreement, after obtaining the applicable Grantor's approval of or signature to such modification, by amending Schedule A to include reference to any right, title or interest in any existing Trademarks or any Trademarks acquired or developed by such Grantor after the execution hereof or to delete any reference to any right, title or interest in any Trademarks in which such Grantor no longer has or claims any right, title or interest.

3.        Governing Law.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT THE LAWS OF ANY STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED NECESSARILY GOVERNS THE VALIDITY, PERFECTION, PRIORITY AND ENFORCEABILITY, AND THE EXERCISE OF ANY REMEDIES WITH RESPECT TO ANY LIEN OR SECURITY INTEREST INTENDED TO BE CREATED OR GRANTED HEREBY ON COLLATERAL LOCATED IN SUCH STATE.**

4.        Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the Collateral Agent and each Grantor and their respective successors and assigns. No Grantor shall, without the prior written consent of the Collateral Agent given in accordance with the Indenture, assign any right, duty or obligation hereunder.

5.        Counterparts.

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. Facsimiles shall be effective as originals.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

**AVENTINE RENEWABLE ENERGY HOLDINGS, INC.**

By: _____
Name:_____
Title:_____


**AVENTINE RENEWABLE ENERGY, INC.**

By: _____
Name:_____
Title:_____


**AVENTINE RENEWABLE ENERGY – AURORA WEST, LLC**

By: _____
Name:_____
Title:_____


**NEBRASKA ENERGY, L.L.C.**

By: _____
Name:_____
Title:_____


**AVENTINE RENEWABLE ENERGY – MT. VERNON, LLC**

By: _____
Name:_____
Title:_____


**AVENTINE POWER, LLC**

By: _____
Name:_____
Title:_____

**COLLATERAL AGENT:**   WILMINGTON TRUST FSB, as Collateral Agent

By: _____
Name: _____
Title: _____

SCHEDULE A

TRADEMARKS SECURITY AGREEMENT

I.      <u>REGISTERED TRADEMARKS</u>

| Trademark | Country | Reg. No. (App. No.) | Reg. Date (App. Date) | Record Owner/Liens | Status/ Comment |
|-----------|---------|---------------------|-----------------------|--------------------|-----------------|

II.     <u>TRADEMARK APPLICATIONS</u>

STATE OF                  )

                               )   ss

COUNTY OF            )

On [ ], before me, the undersigned, a notary public in and for said state and county, personally appeared             , personally known to me (or proved to me on the basis of satisfactory evidence), to be the person who executed the within instrument as the , on behalf of [GRANTOR], a [ ] corporation, the corporation therein named, and acknowledged to me that the corporation executed the within instrument pursuant to its bylaws or a resolution of its board of directors.

WITNESS MY HAND OR OFFICIAL SEAL.

(NOTARIAL STAMP OR SEAL)

                                   _____

                                            Notary Public

My Commission Expires:

_____

**SCHEDULE 1**

**FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS**

**[To be revised/completed by Grantors' Counsel]**

<u>Uniform Commercial Code Filings</u>

**Grantor**                                   **Filing Office**

<u>Actions with respect to Pledged Securities</u>

[Delivery to Collateral Agent, as secured party, of the following:  [_____], together with a stock power duly indorsed in blank]

<u>Other Actions</u>

[Execution and delivery of [Deposit Account Control Agreement]]

## SCHEDULE 2

## ORGANIZATIONAL INFORMATION

| Grantor | Jurisdiction of Incorporation, Formation or Organization | Location of Chief Executive Office or Sole Place of Business | Organizational Identification Number | Federal Tax Identification Number |
|---------|----------------------------------------------------------|-------------------------------------------------------------|--------------------------------------|-----------------------------------|

## SCHEDULE 3

## SECURITIES

| Grantor | Issuer | Ownership Interest |
| --- | --- | --- |

## EXCLUDED CAPITAL STOCK

| Grantor | Issuer | Ownership Interest |
| --- | --- | --- |

# SCHEDULE 4

# INTELLECTUAL PROPERTY

## Copyrights


## Patents


## Trademarks

# SCHEDULE 5

# INSTRUMENTS AND CHATTEL PAPER

# SCHEDULE 6

# COMMERCIAL TORT CLAIMS

# SCHEDULE 7

# RECEIVABLES

# SCHEDULE 8

# COMMODITY ACCOUNTS

# SCHEDULE 9

# DEPOSIT ACCOUNTS

Document comparison by Workshare Professional on Wednesday, February 24, 2010 11:12:00 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WSDMS/DB02/9283845/1 |
| Description | #9283845v1<DB02> - Aventine - Security_Agreement [FILING VERSION Feb. 22] |
| Document 2 ID | interwovenSite://WSDMS/DB02/9299086/1 |
| Description | #9299086v1<DB02> - Aventine - Security_Agreement [FILING VERSION 2/24/10] |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 39 |
| Deletions | 25 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 68 |

**<u>Exhibit C</u>**

**Form of Intercreditor Agreement**

INTERCREDITOR AGREEMENT

dated as of

March [____], 2010

among

AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,
as Borrower,

and

Each of its Subsidiaries
Parties Hereto From Time to Time

PNC BANK, NATIONAL ASSOCIATION,
as First Lien Collateral Agent

and

WILMINGTON TRUST FSB,
as Second Lien Collateral Agent

THIS IS THE INTERCREDITOR AGREEMENT REFERRED TO IN THE COLLATERAL DOCUMENTS REFERRED TO IN THE CREDIT AGREEMENT AND INDENTURE REFERRED TO HEREIN.

**Table of Contents**

ARTICLE I Definitions ......................................................................................... 2

    SECTION 1.01    Certain Defined Terms ...................................................... 2
    SECTION 1.02    Other Defined Terms ......................................................... 2
    SECTION 1.03    Terms Generally ................................................................ 7

ARTICLE II Lien Priorities .................................................................................. 8

    SECTION 2.01    Relative Priorities .............................................................. 8
    SECTION 2.02    Prohibition on Contesting Liens ....................................... 8
    SECTION 2.03    Indenture Exclusive Collateral ......................................... 8
    SECTION 2.04    Limit on Liens .................................................................. 8

ARTICLE III Enforcement of Rights; Matters Relating to Collateral ......................... 9

    SECTION 3.01    Exercise of Rights and Remedies ..................................... 9
    SECTION 3.02    No Interference ............................................................... 11
    SECTION 3.03    Rights as Unsecured Creditors ........................................ 13
    SECTION 3.04    Automatic Release of Second-Priority Liens ................... 13
    SECTION 3.05    Insurance and Condemnation Awards ............................. 14
    SECTION 3.06    Blocked Account Agreements, Etc. .................................. 15
    SECTION 3.07    Access and License to Use Indenture Exclusive Collateral .............. 15

ARTICLE IV Payments ...................................................................................... 17

    SECTION 4.01    Application of Proceeds ................................................... 17
    SECTION 4.02    Payment Over .................................................................. 18
    SECTION 4.03    Certain Agreements with Respect to Unenforceable Collateral ......... 19

ARTICLE V Bailment and Sub-Agency for Perfection of Certain Security Interests ................. 20

ARTICLE VI Insolvency or Liquidation Proceedings .............................................. 21

    SECTION 6.01    Finance and Sale Matters ................................................ 21
    SECTION 6.02    Relief from the Automatic Stay ....................................... 22
    SECTION 6.03    Reorganization Securities ................................................ 22
    SECTION 6.04    Post-Petition Interest ....................................................... 22
    SECTION 6.05    Certain Waivers by the Second Lien Secured Parties ...... 23
    SECTION 6.06    Certain Voting Matters .................................................... 23

ARTICLE VII Other Agreements ........................................................................ 23

    SECTION 7.01    Matters Relating to Loan Documents .............................. 23
    SECTION 7.02    Effect of Refinancing of Indebtedness under First Lien Loan
                           Documents ....................................................................... 23
    SECTION 7.03    No Waiver by First Lien Secured Parties ......................... 24
    SECTION 7.04    Reinstatement .................................................................. 24
    SECTION 7.05    Further Assurances .......................................................... 24
    SECTION 7.06    Actions of Second Lien Collateral Agent ........................ 25

ARTICLE VIII Representations and Warranties ........................................................................ 25

    SECTION 8.01        Representations and Warranties of Each Party................................. 25
    SECTION 8.02        Representations and Warranties of Each Collateral Agent ............... 25

ARTICLE IX No Reliance; No Liability; Obligations Absolute................................................. 25

    SECTION 9.01        No Reliance; Information ................................................................. 25
    SECTION 9.02        No Warranties or Liability................................................................ 26
    SECTION 9.03        Obligations Absolute........................................................................ 27

ARTICLE X Miscellaneous........................................................................................................ 27

    SECTION 10.01      Notices.............................................................................................. 27
    SECTION 10.02      Conflicts ........................................................................................... 28
    SECTION 10.03      Effectiveness; Survival..................................................................... 28
    SECTION 10.04      Severability....................................................................................... 28
    SECTION 10.05      Amendments; Waivers ...................................................................... 28
    SECTION 10.06      Subrogation....................................................................................... 29
    SECTION 10.07      Applicable Law; Jurisdiction; Consent to Service of Process............ 29
    SECTION 10.08      Waiver of Jury Trial ......................................................................... 29
    SECTION 10.09      Parties in Interest.............................................................................. 30
    SECTION 10.10      Specific Performance ....................................................................... 30
    SECTION 10.11      Headings ........................................................................................... 30
    SECTION 10.12      Counterparts...................................................................................... 30
    SECTION 10.13      Provisions Solely to Define Relative Rights .................................... 30

INTERCREDITOR AGREEMENT dated as of **[•]**, 2010 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), among Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "**Company**"), and each of its Subsidiaries parties hereto from time to time (together with the Company, being hereafter collectively referred to as the "**Borrowers**"), PNC Bank, National Association, as agent for the First Lien Lenders (as defined below) (in such capacity, the "**First Lien Collateral Agent**"), and Wilmington Trust FSB ("**Wilmington Trust**"), as collateral agent for the Second Lien Lenders (as defined below) (in such capacity, the "**Second Lien Collateral Agent**").

## PRELIMINARY STATEMENT

Reference is made to (a) the Revolving Credit and Security Agreement dated as of **[•]**, 2010 (as amended, restated, supplemented, otherwise modified or Refinanced from time to time, the "**Credit Agreement**"), among the Borrowers, the lenders from time to time parties thereto (the "**First Lien Lenders**"), the First Lien Collateral Agent, as agent thereunder, (b) the First Lien Collateral Documents (such term and each other capitalized term used but not defined in this Preliminary Statement or the Recitals having the meaning given it in Article I), (c) the Indenture dated as of March **[__]**, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "**Indentur**e" and, together with the Credit Agreement, the "**Financing Agreements**"), among the Company, certain subsidiaries of the Company from time to time guarantors thereunder and Wilmington Trust, as indenture trustee (together with its successors and assigns in such capacity, the "**Indenture Trustee**") and collateral agent on behalf of the holders from time to time of the Notes described below (collectively with the Indenture Trustee and such holders, the "**Second Lien Lenders**") and (d) the Second Lien Collateral Documents.

## RECITALS

A.    The First Lien Lenders have made and have agreed to make loans and other extensions of credit to the Borrowers pursuant to the Credit Agreement, upon, among other terms and conditions, the condition that the First Lien Obligations shall be secured by first-priority Liens on, and security interests in, all of the assets of any Grantor that is described in Annex I hereto (the "**First Lien Collateral**").

B.    The Company has issued $105,000,000 aggregate principal amount of its **[•]**% Senior Secured Notes due 2015 (together with any **[•]**% Senior Secured Notes due 2015 issued in replacement or exchange therefor, collectively, the "**Notes**") upon, among other terms and conditions, the condition that the Indenture Obligations shall be secured by Liens on, and security interests in, the Second Lien Collateral.

C.    The Financing Agreements require, among other things, that the parties thereto set forth in this Agreement, among other things, their respective rights, obligations and remedies with respect to the Collateral.

Accordingly, the parties hereto agree as follows:

# ARTICLE I

## Definitions

**SECTION 1.01** **Certain Defined Terms**. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

**SECTION 1.02** **Other Defined Terms**. As used in this Agreement, the following terms shall have the meanings specified below:

"**Account**" shall have the meaning assigned to such term in the UCC.

"**Agreement**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereinafter in effect, or any successor statute.

"**Bankruptcy Law**" shall mean the Bankruptcy Code and any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law.

"**Borrowers**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**Collateral**" shall mean, collectively, the First Lien Collateral and the Second Lien Collateral.

"**Collateral Agents**" shall mean the First Lien Collateral Agent and the Second Lien Collateral Agent.

"**Collateral Documents**" shall mean the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**Company**" shall have the meaning assigned to such term in the Preamble of this Agreement.

"**Credit Agreement**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**DIP Financing**" shall have the meaning assigned to such term in Section 6.01(a)(ii).

"**DIP Financing Liens**" shall have the meaning assigned to such term in Section 6.01(a)(ii).

"**Discharge of First Lien Obligations**" shall mean, subject to Sections 7.02 and 7.04, (a) payment in full in cash of the principal of and interest (including interest accruing during the pendency of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such Insolvency or Liquidation Proceeding) and premium, if any, on all

Indebtedness outstanding under the First Lien Loan Documents to the extent constituting First Lien Obligations, (b) payment in full of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid, (c) cancellation of or the entry into arrangements satisfactory to the First Lien Collateral Agent with respect to all letters of credit issued and outstanding under the Credit Agreement (it being understood and agreed that the cash collateralization of all such letters of credit with cash in an amount equal to 103% of the aggregate stated amount thereof shall be deemed an arrangement that is satisfactory to the First Lien Collateral Agent) and (d) termination or expiration of all commitments to lend and all obligations to issue letters of credit under the Credit Agreement.

"**Disposition**" shall mean any sale, lease, exchange, transfer or other disposition. "Dispose" shall have a correlative meaning.

"**Equity Interests**" shall have the meaning assigned to such term in the Indenture.

"**Excess Claims**" shall have the meaning assigned to such term in the definition of the term "First Lien Obligations".

"**Excluded Contracts**" means, with respect to any Grantor, all contracts for the receipt by such Grantor of services or supplies but excluding any contracts that give rise to the payment of money to such Grantor.

"**Excluded Equipment**" means, to the extent any of the following items constitute fixtures and/or Equipment under applicable laws, all fixtures, fittings, appliances, apparatus, Equipment, machinery, building and construction materials and other articles of every kind and nature whatsoever (other than Inventory) and all replacements thereof and additions, enhancements or upgrades thereto, now or hereafter affixed, or attached to, placed upon or located on or in the Real Property or any buildings, structures and other improvements thereon.

"**Excluded Equity**" means the Equity Interests issued by each Unrestricted Subsidiary or any Foreign Subsidiary.

"**Excluded Intellectual Property**" means, collectively, (a) all patentable inventions, letters patent and applications for letters patent that are necessary or appropriate for the continued operation of the plants located at the Real Property, and (b) all trade secrets that are necessary or appropriate for the continued operation of the plants located at the Real Property.

"**Financing Agreements**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**First Lien Collateral**" shall have the meaning assigned to such term in Recital A.

"**First Lien Collateral Agent**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**First Lien Collateral Documents**" shall mean the Credit Agreement and the Other Documents (as defined in the Credit Agreement), and any other agreement, document or

instrument pursuant to which a Lien is granted to secure any First Lien Obligations or under which rights or remedies with respect to any such Lien are governed.

"**First Lien Lenders**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**First Lien Loan Documents**" shall mean the Credit Agreement and the Other Documents.

"**First Lien Obligations**" shall mean the Obligations (as defined in the Credit Agreement) secured by the First Lien Collateral pursuant to the First Lien Collateral Documents; provided, that the aggregate principal amount (including, without limitation, for the avoidance of doubt, the undrawn and unreimbursed amount of any letter of credit) of all such "Obligations" that exceed the Maximum Priority Debt Amount shall not constitute First Lien Obligations but shall be deemed to constitute "**Excess Claims**".

"**First Lien Required Lenders**" shall mean the "Required Lenders" as defined in the Credit Agreement.

"**First Lien Secured Parties**" shall mean, at any time, (a) the First Lien Lenders, (b) the First Lien Collateral Agent, (c) each other Person to whom any of the First Lien Obligations (including First Lien Obligations incurred in connection with any hedging agreement entered into with any First Lien Lender or any affiliate of such First Lien Lender and indemnification obligations) is owed and (d) the successors and assigns of each of the foregoing.

"**First-Priority Liens**" shall mean all Liens on the First Lien Collateral to secure the First Lien Obligations, whether created under the First Lien Collateral Documents or acquired by possession, statute, operation of law, subrogation or otherwise.

"**Foreign Subsidiary**" shall have the meaning assigned to such term in the Indenture.

"**Grantors**" shall mean the Company and each Subsidiary that shall have created or purported to create any First-Priority Lien or Second-Priority Lien on all or any part of its assets to secure any First Lien Obligations or any Indenture Obligations.

"**Guarantors**" shall mean, collectively, each Subsidiary that has guaranteed, or that may from time to time hereafter guarantee, the First Lien Obligations or the Indenture Obligations.

"**Indebtedness**" shall mean and includes all obligations that constitute Indebtedness as defined in the Credit Agreement or the Indenture, as applicable.

"**Indenture**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**Indenture Collateral Accounts**" means any "Collateral Account" (as defined in the Indenture).

"**Indenture Exclusive Collateral**" shall mean all of the assets of any Grantor with respect to which a Lien is granted as security for any Indenture Obligations; provided that "Indenture Exclusive Collateral" shall not include any assets constituting Second Lien Collateral or any First Lien Collateral.

"**Indenture Exclusive Collateral Liens**" shall mean all Liens on the Indenture Exclusive Collateral to secure the Indenture Obligations, whether created under the Second Lien Collateral Documents or acquired by possession, statute, operation of law, subrogation or otherwise.

"**Indenture Obligations**" shall mean the "Obligations" (as defined in the Indenture) under the Second Lien Loan Documents that are secured by the Second Lien Collateral and Indenture Exclusive Collateral pursuant to the Second Lien Collateral Documents.

"**Indenture Trustee**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**Initial Grantors**" means the Grantors named on the signature pages to this Agreement as originally executed and delivered on **[● ]**, 2010.

"**Insolvency or Liquidation Proceeding**" shall mean (a) any voluntary or involuntary proceeding under the Bankruptcy Code (as defined in the Indenture) or any other Bankruptcy Law with respect to any Grantor, (b) any voluntary or involuntary appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Grantor or for a substantial part of the property or assets of any Grantor, (c) any voluntary or involuntary winding-up or liquidation of any Grantor, or (d) a general assignment for the benefit of creditors by any Grantor.

"**Lien**" shall mean any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract. The term "Lien" shall also include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purpose of this Agreement, the Grantors shall be deemed to be the owners of any property which they have acquired or hold subject to a conditional sale agreement or other arrangements pursuant to which title to the property has been retained by or vested in some other Person for security purposes; provided, however, that the term "Lien" shall not include a trust or similar arrangement established for the purpose of defeasing any indebtedness pursuant to the terms evidencing or providing for the issuance of such indebtedness but only to the extent that such defeasance is permitted under this Agreement.

"**Loan Documents**" shall mean the First Lien Loan Documents and the Second Lien Loan Documents.

"**Maximum Priority Debt Amount**" means $23,000,000.

"**New First Lien Collateral Agent**" shall have the meaning assigned to such term in Section 7.02.

"**New First Lien Loan Document**s" shall have the meaning assigned to such term in Section 7.02.

"**New First Lien Obligation**s" shall have the meaning assigned to such term in Section 7.02.

"**Notes**" shall have the meaning assigned to such term in Recital B.

"**Pledged or Controlled Collateral**" shall have the meaning assigned to such term in Article V(a).

"**Proceeds**" shall have the meaning assigned to such term in the UCC.

"**Records**" shall have the meaning assigned to such term in the UCC.

"**Refinance**" shall mean, in respect of any Indebtedness, to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Refinancing Notice**" shall have the meaning assigned to such term in Section 7.02.

"**Release**" shall have the meaning assigned to such term in Section 3.04(a).

"**Restricted Subsidiary**" shall have the meaning assigned to such term in the Indenture.

"**Second Lien Collateral**" shall mean all of the assets of any Grantor that are described in Annex I hereto.

"**Second Lien Collateral Agent**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**Second Lien Collateral Documents**" shall mean the "Collateral Documents" as defined in the Indenture, and any agreement, pursuant to which a Lien is granted on Second Lien Collateral to secure any Indenture Obligations or under which rights or remedies with respect to any such Lien are governed.

"**Second Lien Lenders**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**Second Lien Loan Documents**" shall mean the Indenture and the Indenture Documents as defined therein.

"**Second Lien Permitted Actions**" shall have the meaning assigned to such term in Section 3.01(a).

"**Second Lien Required Lenders**" shall mean, subject to Section 2.09 of the Indenture, the holders of the Notes who hold a majority in aggregate principal amount thereof.

"**Second Lien Secured Partie**s" shall mean, at any time, (a) the Second Lien Lenders, (b) the Second Lien Collateral Agent, (c) each other Person to whom any of the Indenture Obligations is owed and (d) the successors and assigns of each of the foregoing.

"**Second Lien Security Agreement**" means the Security Agreement, dated as of March [___], 2010, made by the Borrowers in favor of the Second Lien Collateral Agent, as amended or supplemented from time to time in accordance with its terms and the terms of the Indenture.

"**Second-Priority Liens**" shall mean all Liens on the Second Lien Collateral to secure the Indenture Obligations, whether created under the Second Lien Collateral Documents or acquired by possession, statute, operation of law, subrogation or otherwise.

"**Secured Parties**" shall mean the First Lien Secured Parties and the Second Lien Secured Parties.

"**Standstill Period**" shall have the meaning assigned to such term in Section 3.02(a).

"**Termination Fees**" shall have the meaning assigned to such term in Section 3.01(d).

"**Uniform Commercial Code**" or "UCC" shall mean the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**Unrestricted Subsidiary**" shall have the meaning assigned to such term in the Indenture.

**SECTION 1.03**     **Terms Generally**.     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."   Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified, (b) any reference herein (i) to any Person shall be construed to include such Person's successors and assigns and (ii) to the Company or any other Grantor shall be construed to include the Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor, as the case may be, in any Insolvency or Liquidation Proceeding, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles or Sections shall be construed to refer to Articles or Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II

## Lien Priorities

SECTION 2.01  **Relative Priorities**.  Notwithstanding the date, manner or order of grant, attachment or perfection of any Second-Priority Lien or any First-Priority Lien, and notwithstanding any provision of the UCC or any other applicable law or the provisions of any Collateral Document or any other Loan Document or any other circumstance whatsoever, the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby agrees that, so long as the Discharge of First Lien Obligations has not occurred, (a) any First-Priority Lien now or hereafter held by or for the benefit of any First Lien Secured Party shall be senior in right, priority, operation, effect and all other respects to any and all Second-Priority Liens and (b) any Second-Priority Lien now or hereafter held by or for the benefit of any Second Lien Secured Party shall be junior and subordinate in right, priority, operation, effect and all other respects to any and all First-Priority Liens.  The First-Priority Liens shall be and remain senior in right, priority, operation, effect and all other respects to any Second-Priority Liens for all purposes, whether or not any First-Priority Liens are subordinated in any respect to any other Lien securing any other obligation of the Company, any other Grantor or any other Person.

SECTION 2.02  **Prohibition on Contesting Liens**.  Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, and the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that it will not, and hereby waives any right to, contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of any Second-Priority Lien (or Indenture Exclusive Collateral Lien) or any First-Priority Lien, as the case may be; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any other First Lien Secured Party, or the rights of the Second Lien Collateral Agent or any other Second Lien Secured Party, as applicable, to enforce this Agreement.

SECTION 2.03  **Indenture Exclusive Collateral**.  The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, agrees that neither it nor any of them shall request or accept the benefit of any Lien on any Indenture Exclusive Collateral to secure any Obligations under and as defined in the First Lien Loan Documents.

SECTION 2.04  **Limit on Liens**.  The parties hereto acknowledge and agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical.  In furtherance of the foregoing, (i) the First Lien Collateral Agent agrees to cooperate in good faith in order to determine, upon any reasonable request by the Second Lien Collateral Agent, the specific assets included in the First Lien Collateral, the steps taken to perfect the First-Priority Liens thereon and the identity of the respective parties obligated under the First Lien Loan Documents and (ii) the Second Lien Collateral Agent agrees to cooperate in good faith in order to determine, upon any reasonable request by the First Lien Collateral Agent, the specific assets included in the Second Lien Collateral, the steps taken to perfect the Second-Priority Liens thereon and the identity of the respective parties obligated under the Second Lien Loan Documents.

# ARTICLE III

## Enforcement of Rights; Matters Relating to Collateral

**SECTION 3.01** <u>**Exercise of Rights and Remedies**</u>. (a) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced, the First Lien Collateral Agent and the other First Lien Secured Parties shall have the exclusive right to enforce rights and exercise remedies (including any right of setoff) with respect to the First Lien Collateral (including making determinations regarding the release, Disposition or restrictions with respect to the First Lien Collateral), or to commence or seek to commence any action or proceeding with respect to such rights or remedies (including any foreclosure action or proceeding or any Insolvency or Liquidation Proceeding), in each case, without any consultation with or the consent of the Second Lien Collateral Agent or any other Second Lien Secured Party; <u>provided</u> that, notwithstanding the foregoing, (i) in any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent may file a proof of claim or statement of interest with respect to the Indenture Obligations, (ii) the Second Lien Collateral Agent may take any action to preserve or protect the validity and enforceability of the Second-Priority Liens (provided that no such action is, or could reasonably be expected to be, (A) adverse to the First-Priority Liens or the rights of the First Lien Collateral Agent or any other First Lien Secured Party to exercise remedies in respect thereof or (B) otherwise inconsistent with the terms of this Agreement, including the automatic release of Second-Priority Liens provided in Section 3.04), (iii) the Second Lien Collateral Agent may file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Secured Parties, including any claims secured by the Second Lien Collateral or otherwise make any agreements or file any motions pertaining to the Indenture Obligations, in each case, to the extent not inconsistent with the terms of this Agreement, (iv) the Second Lien Collateral Agent may exercise rights and remedies as an unsecured creditor, as provided in Section 3.03, and (v) subject to Section 3.02(a), the Second Lien Collateral Agent and the other Second Lien Secured Parties may enforce any of their rights and exercise any of their remedies with respect to the Second Lien Collateral after the termination of the Standstill Period (the actions described in this proviso being referred to herein as the "**Second Lien Permitted Actions**"). Except for the Second Lien Permitted Actions, unless and until the Discharge of First Lien Obligations has occurred, the sole right of the Second Lien Collateral Agent and the other Second Lien Secured Parties with respect to the Collateral shall be to receive a share of the proceeds of the Second Lien Collateral, if any, after the Discharge of First Lien Obligations has occurred and in accordance with the Second Lien Loan Documents and applicable law.

(b) In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the other First Lien Secured Parties may enforce the provisions of the First Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to Dispose of First Lien Collateral upon foreclosure, to incur expenses in connection with any such Disposition and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code, the Bankruptcy Code or any other Bankruptcy Law. The First Lien Collateral Agent agrees to provide at least ten

Business Days' prior written notice to the Second Lien Collateral Agent of its intention to foreclose upon or Dispose of any First Lien Collateral.

(c)     The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Second Lien Collateral Document or any other Second Lien Loan Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the other First Lien Secured Parties with respect to the First Lien Collateral as and to the extent set forth in this Agreement and the other First Lien Loan Documents, including the right of the First Lien Collateral Agent to permit any Grantor to Dispose of First Lien Collateral to a Person not affiliated with any Grantor.

(d)     Notwithstanding anything in this Agreement to the contrary, following the occurrence of an acceleration of any First Lien Obligations, the Second Lien Secured Parties may, at their sole expense and effort, upon irrevocable notice to the Company and the First Lien Collateral Agent, require the First Lien Secured Parties to transfer and assign to the Second Lien Secured Parties, without warranty or representation or recourse, all (but not less than all) of the First Lien Obligations; provided that (i) such assignment shall not conflict with any law, rule or regulation or order of any court or other governmental authority having jurisdiction, and (ii) the Second Lien Secured Parties shall have paid to the First Lien Collateral Agent, for the account of the First Lien Secured Parties, in immediately available funds, an amount equal to 100% of the principal amount of the First Lien Obligations that constitute loans or advances plus all accrued and unpaid interest thereon plus all accrued and unpaid fees (other than any fees that become due as a result of the prepayment of the loans and other advances under, or early termination of, the Credit Agreement (such fees are referred to hereinafter as "**Termination Fees**")) plus all the other First Lien Obligations then outstanding (which shall include, with respect to (A) the aggregate face amount of the letters of credit outstanding under the Credit Agreement, an amount in cash equal to 103% thereof, and (B) each interest rate hedging, cap, collar, swap or other similar agreements that evidence any First Lien Obligations, 100% of the aggregate amount of such First Lien Obligations, after giving effect to any netting arrangements, that the applicable Grantor would be required to pay if such interest rate hedging, cap, collar, swap or other similar agreements were terminated at such time).  In order to effectuate the foregoing, the First Lien Collateral Agent shall calculate, upon the written request of the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, the amount in cash that would be necessary so to purchase the First Lien Obligations.  If the right set forth in this Section 3.01(d) is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten Business Days of the request set forth in the first sentence of this Section 3.01(d).  If the Second Lien Secured Parties exercise the right set forth in this Section 3.01(d), it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Required Lenders.  Notwithstanding anything to the contrary herein, upon the consummation of such transfer and assignment, Termination Fees shall no longer constitute First Lien Obligations but shall instead be deemed to constitute Excess Claims and remain payable to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties.  It is understood and agreed that the Second Lien Collateral Agent shall have no substantive obligations under this paragraph (d) (including with respect to the negotiation of any documentation) and shall act solely in a ministerial capacity on behalf of the Second Lien Secured Parties.

**SECTION 3.02    No Interference**.  (a) The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that, whether or not any Insolvency or Liquidation Proceeding has been commenced, the Second Lien Secured Parties:

(i)    except for Second Lien Permitted Actions, will not, so long as the Discharge of First Lien Obligations has not occurred, (A) enforce or exercise, or seek to enforce or exercise, any rights or remedies (including any right of setoff) with respect to any Collateral (including the enforcement of any right under any account control agreement, landlord waiver or bailee's letter or any similar agreement or arrangement to which the Second Lien Collateral Agent or any other Second Lien Secured Party is a party) or (B) commence or join with any Person (other than the First Lien Collateral Agent) in commencing, or petition for or vote in favor of any resolution for, any action or proceeding with respect to such rights or remedies (including any foreclosure action); provided, however, that the Second Lien Collateral Agent may enforce or exercise any or all such rights and remedies, or commence, join with any Person in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding, after a period of 120 days has elapsed since the date on which the Second Lien Collateral Agent has delivered to the First Lien Collateral Agent written notice of the acceleration of all or any portion of the Notes (the "**Standstill Period**"); provided further, however (A) that notwithstanding the expiration of the Standstill Period or anything herein to the contrary, in no event shall the Second Lien Collateral Agent or any other Second Lien Secured Party enforce or exercise any rights or remedies with respect to any Collateral, or commence, join with any Person in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding, if the First Lien Collateral Agent or any other First Lien Secured Party shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to such Collateral or any such action or proceeding and (B) that after the expiration of the Standstill Period, so long as neither the First Lien Collateral Agent nor the First Lien Secured Parties have commenced any action to enforce the First-Priority Liens on any material portion of the Collateral, in the event that and for so long as the Second Lien Secured Parties (or the Second Lien Collateral Agent on their behalf) have commenced any actions to enforce the Second-Priority Liens with respect to any Collateral to the extent permitted hereunder and are diligently pursuing such actions, neither the First Lien Secured Parties nor the First Lien Collateral Agent shall take any action of a similar nature with respect to such Collateral; provided that all other provisions of this Intercreditor Agreement (including the turnover provisions of Article IV) are complied with;

(ii)    will not contest, protest or object to any foreclosure action or proceeding brought by the First Lien Collateral Agent or any other First Lien Secured Party, or any other enforcement or exercise by any First Lien Secured Party of any rights or remedies relating to the Collateral under the First Lien Loan Documents or otherwise, so long as Second-Priority Liens attach to the proceeds thereof subject to the relative priorities set forth in Section 2.01;

(iii)    subject to the rights of the Second Lien Secured Parties under clause (i) above, will not object to the forbearance by the First Lien Collateral Agent or any other First Lien Secured Party from commencing or pursuing any foreclosure action or

proceeding or any other enforcement or exercise of any rights or remedies with respect to the Collateral;

(iv)    will not, so long as the Discharge of First Lien Obligations has not occurred and except for Second Lien Permitted Actions, take or receive any Collateral, or any proceeds thereof or payment with respect thereto, in connection with the exercise of any right or enforcement of any remedy (including any right of setoff) with respect to any Collateral or in connection with any insurance policy award under a policy of insurance relating to any Collateral or any condemnation award (or deed in lieu of condemnation) relating to any Collateral;

(v)    will not, except for Second Lien Permitted Actions, take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the First Lien Loan Documents, including any Disposition of any Collateral, whether by foreclosure or otherwise;

(vi)    will not, except for Second Lien Permitted Actions, object to the manner in which the First Lien Collateral Agent or any other First Lien Secured Party may seek to enforce or collect the First Lien Obligations or the First-Priority Liens, regardless of whether any action or failure to act by or on behalf of the First Lien Collateral Agent or any other First Lien Secured Party is, or could be, adverse to the interests of the Second Lien Secured Parties, and will not assert, and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or other similar right that may be available under applicable law with respect to the Collateral or any similar rights a junior secured creditor may have under applicable law; and

(vii)    will not attempt, directly or indirectly, whether by judicial proceeding or otherwise, to challenge or question the validity or enforceability of any First Lien Obligation or any First Lien Collateral Document, including this Agreement, or the validity or enforceability of the priorities, rights or obligations established by this Agreement.

(b)    The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, agrees that, whether or not any Insolvency or Liquidation Proceeding has been commenced, the First Lien Secured Parties:

(i)    will not contest, protest or object to any foreclosure action or proceeding brought by the Second Lien Collateral Agent or any other Second Lien Secured Party, or any other enforcement or exercise by any Second Lien Secured Party of any rights or remedies relating to the Indenture Exclusive Collateral under the Second Lien Loan Documents or otherwise;

(ii)    will not object to the forbearance by the Second Lien Collateral Agent or any other Second Lien Secured Party from commencing or pursuing any foreclosure action or proceeding or any other enforcement or exercise of any rights or remedies with respect to the Indenture Exclusive Collateral;

(iii)    will not, so long as the Indenture Obligations have not been paid in full, take or receive any Indenture Exclusive Collateral, or any proceeds thereof or payment with respect thereto, in connection with the exercise of any right or enforcement of any remedy (including any right of setoff) with respect to any Indenture Exclusive Collateral or in connection with any insurance policy award under a policy of insurance relating to any Indenture Exclusive Collateral or any condemnation award (or deed in lieu of condemnation) relating to any Indenture Exclusive Collateral;

(iv)    will not, except in the course of taking any remedy or action against any First Lien Collateral (but, in any event, not against any Indenture Exclusive Collateral), take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the Second Lien Loan Documents, including any Disposition of any Indenture Exclusive Collateral, whether by foreclosure or otherwise;

(v)    will not object to the manner in which the Second Lien Collateral Agent or any other Second Lien Secured Party may seek to enforce or collect the Indenture Obligations or the Indenture Exclusive Collateral Liens, regardless of whether any action or failure to act by or on behalf of the Second Lien Collateral Agent or any other Second Lien Secured Party is, or could be, adverse to the interests of the First Lien Secured Parties, and will not assert, and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or other similar right that may be available under applicable law with respect to the Indenture Exclusive Collateral or any similar rights a creditor may have under applicable law; and

(vi)    will not attempt, directly or indirectly, whether by judicial proceeding or otherwise, to challenge or question the validity or enforceability of any Indenture Obligation or any Second Lien Collateral Document, including this Agreement, or the validity or enforceability of the priorities, rights or obligations established by this Agreement.

**SECTION 3.03**    **Rights as Unsecured Creditors**.    Except to the extent it would contravene the express provisions hereof, the Second Lien Collateral Agent and the other Second Lien Secured Parties may, in accordance with the terms of the Second Lien Loan Documents and applicable law, enforce rights and exercise remedies against the Company and any Guarantor as unsecured creditors.  Nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any other Second Lien Secured Party of the required payments of principal, premium, interest, fees and other amounts due under the Indenture so long as such receipt is not the direct or indirect result of the enforcement of, the exercise by the Second Lien Collateral Agent or any other Second Lien Secured Party of rights or remedies as a secured creditor (including any right of setoff) in respect of, or any enforcement in contravention of this Agreement of, any Second-Priority Lien.

**SECTION 3.04**    **Automatic Release of Second-Priority Liens**.    (a) If, in connection with (i) any Disposition of any Collateral permitted under the terms of the First Lien Loan Documents or (ii) the enforcement or exercise of any rights or remedies with respect to the Collateral, including any Disposition of Collateral, the First Lien Collateral Agent, for itself and

on behalf of the other First Lien Secured Parties, releases any of the First-Priority Liens, (in each case, a "**Release**"), other than any such Release granted in connection with the Discharge of First Lien Obligations then, subject to Sections 3.04(b) and (c), the Second-Priority Liens on such Collateral shall be automatically, unconditionally and simultaneously released, and the Second Lien Collateral Agent shall, for itself and on behalf of the other Second Lien Secured Parties, promptly execute and deliver to the First Lien Collateral Agent and the relevant Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or the relevant Grantor may reasonably request to effectively confirm such Release.

(b)     Notwithstanding the foregoing, in the event that a Release is of all or substantially all of the First Lien Collateral, then such Release (other than a Release in connection with the enforcement or exercise of any rights or remedies with respect to the Collateral permitted hereunder) shall require the consent of the Second Lien Required Lenders.

(c)     Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of each other Second Lien Secured Party, hereby appoints the First Lien Collateral Agent, and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as the attorney-in-fact of each Second Lien Secured Party for the limited purpose of carrying out the provisions of this Section 3.04 and taking any action and executing any instrument that the First Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 3.04 (including any endorsements or other instruments of transfer or release), which appointment is irrevocable and coupled with an interest.

**SECTION 3.05    Insurance and Condemnation Awards**.    (a) So long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent and the other First Lien Secured Parties shall have the exclusive right, subject to the rights of the Grantors under the First Lien Loan Documents, to settle and adjust claims in respect of First Lien Collateral under policies of insurance covering First Lien Collateral and to approve any award granted in any condemnation or similar proceeding, or any deed in lieu of condemnation, in respect of the First Lien Collateral.    All proceeds of any such policy and any such award, or any payments with respect to a deed in lieu of condemnation, in each case, in respect of First Lien Collateral, shall (a) first, prior to the Discharge of First Lien Obligations and subject to the rights of the Grantors under the First Lien Loan Documents, be paid to the First Lien Collateral Agent for the benefit of First Lien Secured Parties for application against the First Lien Obligations pursuant to the terms of the First Lien Loan Documents, (b) second, after the Discharge of First Lien Obligations and subject to the rights of the Grantors under the Second Lien Loan Documents, be paid to the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties for application against the Indenture Obligations pursuant to the terms of the Second Lien Loan Documents, (c) third, if all Indenture Obligations have been paid in full in cash, be paid to the First Lien Collateral Agent for the benefit of First Lien Secured Parties for application against any Excess Claims pursuant to the terms of the First Lien Loan Documents and (d) fourth, if no Indenture Obligations are outstanding, be paid to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.    Until the Discharge of First Lien Obligations has occurred, if the Second Lien Collateral Agent or any other Second Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award or payment, in each case, in respect of First Lien

Collateral, it shall transfer and pay over such proceeds to the First Lien Collateral Agent in accordance with Section 4.02(a).

(b) Subject to the terms of the Indenture, the Second Lien Collateral Agent and the other Second Lien Secured Parties shall have the exclusive right to settle and adjust claims in respect of Indenture Exclusive Collateral under policies of insurance covering Indenture Exclusive Collateral and to approve any award granted in any condemnation or similar proceeding, or any deed in lieu of condemnation, in respect of the Indenture Exclusive Collateral. Subject to the terms of the Indenture, all proceeds of any such policy and any such award, or any payments with respect to a deed in lieu of condemnation, in each case, in respect of Indenture Exclusive Collateral, shall (a) first, prior to the payment in full in cash of all Indenture Obligations and subject to the rights of the Grantors under the Second Lien Loan Documents, be paid to the Second Lien Collateral Agent for the benefit of Second Lien Secured Parties for application against the Indenture Obligations pursuant to the terms of the Second Lien Loan Documents, and (b) second, if all Indenture Obligations have been paid in full in cash, be paid to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If the First Lien Collateral Agent or any other First Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award or payment, in each case, in respect of Indenture Exclusive Collateral, it shall transfer and pay over such proceeds to the Second Lien Collateral Agent in accordance with Section 4.02(b).

**SECTION 3.06    Blocked Account Agreements, Etc.**. First Lien Collateral shall include at all times all cash collected by any Grantor on account of Receivables or Inventory constituting First Lien Collateral and shall be deposited into a collection or deposit account maintained with the Controlling ABL Agent (as such term is defined in the Second Lien Security Agreement) or at another financial institution subject to a deposit account control agreement in favor of, and in form acceptable to, the Controlling ABL Agent. Except in the case of proceeds in connection with any collection on such First Lien Collateral upon the enforcement or exercise of any right or remedy (which shall be applied as specified in Section 4.01), if there are no cash Obligations due and owing under the Credit Agreement and no default or event of default is then occurring under the Credit Agreement, each Grantor shall have the right to use such proceeds in any manner not prohibited by the Loan Documents, and any assets purchased by such Grantor shall constitute either First Lien Collateral or Indenture Exclusive Collateral as determined by the type of asset being purchased and the other terms of this Agreement.

**SECTION 3.07    Access and License to Use Indenture Exclusive Collateral**. (a) So long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent shall have the right (i) to enter onto, and remain on, the Real Property constituting Indenture Exclusive Collateral for no longer than 180 days from the date the First Lien Collateral Agent sends to the Second Lien Collateral Agent a written notice that the First Lien Collateral Agent or the other First Lien Secured Parties intend to enforce their rights in the First Lien Collateral and any and all of their remedies as secured creditors (whether under the Credit Agreement, under Article 9 of the Uniform Commercial Code as in effect in the State of New York, or otherwise at law or in equity) with respect thereto and (ii) to conduct sales, either public or private, of any or all of the First Lien Collateral on such Real Property and may take any reasonable steps to advertise such sales (including posting signs concerning such sales on such Real Property); provided, however, that nothing contained in this Agreement shall restrict the rights of the

Second Lien Collateral Agent from selling, assigning or otherwise transferring any Indenture Exclusive Collateral prior to the expiration of such 180 day period if the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.07; provided further that if the First Lien Collateral Agent conducts a sale of the First Lien Collateral on such Real Property, the First Lien Collateral Agent shall provide the Second Lien Collateral Agent with reasonable notice and use reasonable efforts to hold such sale in a manner which would not unduly disrupt the Second Lien Collateral Agent's use of, access to and preservation of the value of any Indenture Exclusive Collateral. The Second Lien Collateral Agent shall not unreasonably restrict the ability of the First Lien Collateral Agent to use any of the equipment (including accessing all files, ledgers, computer programs, software, licenses, tapes and disks contained within any equipment) located on such Real Property or constituting Indenture Exclusive Collateral for the purposes of (i) processing or preparing Borrowers' inventory, completing Borrowers' work-in-process inventory or preparing any of the other First Lien Collateral for sale, and (ii) verifying, processing and collecting account receivable reports, invoices and all other information relating to, or necessary for, the collection or sale of Borrowers' accounts receivable. In the event that Second Lien Collateral Agent, the Second Lien Secured Parties or any agent acting on behalf of any of them obtain title to, or exclusive possession of, the Indenture Exclusive Collateral, the Second Lien Collateral Agent and Second Lien Secured Parties hereby grant to First Lien Collateral Agent a license to use such Indenture Exclusive Collateral in accordance with the terms of this Section 3.07. Subject to paragraphs (b) and (c) of this Section 3.07, neither the First Lien Collateral Agent nor any of the other First Lien Secured Parties shall be obligated to make any payments to the Second Lien Collateral Agent for use of the Real Property or Indenture Exclusive Collateral. The license(s) granted to First Lien Collateral Agent and the other First Lien Secured Parties by the Second Lien Collateral Agent to enter onto and remain on the Real Property and use the Indenture Exclusive Collateral under the provisions of this Section 3.07 shall be irrevocable

(b)     If the First Lien Collateral Agent elects to enter upon and use the Indenture Exclusive Collateral as provided in paragraph (a) above, it shall take all reasonable efforts to avoid, to the extent reasonably practicable, interference with the operation of the Indenture Exclusive Collateral. Subject to the Second Lien Secured Parties having obtained possession and control of any of the Indenture Exclusive Collateral in connection with the enforcement of rights against the Indenture Exclusive Collateral, the Second Lien Collateral Agent may instruct the First Lien Collateral Agent in writing to remove all First Lien Collateral from such Indenture Exclusive Collateral by the end of the 180 day period referred to in paragraph (a) above, whereupon, at or prior to the end of such 180 day period, the First Lien Collateral Agent shall at its sole cost and expense, remove such First Lien Collateral from the Indenture Exclusive Collateral, provided that no stay or other order prohibiting such removal has been entered by a court of competent jurisdiction (it being understood and agreed that the running of such 180 day period shall be tolled during the pendency of any such stay or other order). If the First Lien Collateral Agent does not remove such First Lien Collateral by the end of such 180 day period (or such longer period as such a stay or other order is in effect), the Second Lien Collateral Agent may cause such First Lien Collateral to be removed, and, thereafter store such First Lien Collateral in such location or locations as the Second Lien Collateral Agent shall deem advisable pending repossession by the First Lien Collateral Agent. Any costs reasonably incurred by the Second Lien Collateral Agent or the other Second Lien Secured Parties by virtue of such removal and storage shall be paid by the First Lien Secured Parties. The Second Lien Collateral

Agent agrees to notify the First Lien Collateral Agent of the location or locations to which any of the Collateral shall have been removed by it pursuant to the foregoing provisions.

(c) During the period of actual occupation, use or control by the First Lien Secured Parties or their agents or representatives of any Indenture Exclusive Collateral (or any assets or property subject to a leasehold interest constituting Indenture Exclusive Collateral), the First Lien Secured Parties shall be obligated to (i) reimburse the Second Lien Secured Parties for all utilities, insurance and all other operating costs of such Indenture Exclusive Collateral or other assets or property during any such period of actual occupation, use or control (calculated on a per diem basis based upon a fraction, the numerator of which shall be the actual number of days of such occupation, use or control and the denominator of which shall be 365 days) to the extent the same are actually paid by such Second Lien Secured Parties, (ii) repair at their expense any physical damage to such Indenture Exclusive Collateral or other assets or property directly or indirectly resulting from such occupancy, use or control, and to leave such Indenture Exclusive Collateral or other assets or property in substantially the same condition as it was at the commencement of such occupancy, use or control and (iii) indemnify and hold harmless the Second Lien Secured Parties from and against any losses, claims, liabilities, costs or expenses directly or indirectly resulting from such occupancy, use or control or from any acts or omissions of the First Lien Secured Parties or their agents or representatives in connection therewith. Notwithstanding the foregoing, in no event shall the First Lien Secured Parties have any liability to the Second Lien Secured Parties pursuant to this Section 3.07 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Indenture Exclusive Collateral existing prior to the date of the exercise by the First Lien Secured Parties of their rights under this Section 3.07 (except to the extent of any injury to any Person on the Real Property constituting Indenture Exclusive Collateral or damage to any Indenture Exclusive Collateral as a result of such condition that would not have occurred but for the exercise by the First Lien Secured Parties of their right of use as set forth in this Section 3.07), and the First Lien Secured Parties shall have no duty or liability to maintain the Indenture Exclusive Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the First Lien Secured Parties, or for any diminution in the value of the Indenture Exclusive Collateral that results solely from ordinary wear and tear resulting from the use of the Indenture Exclusive Collateral by the First Lien Secured Parties in the manner and for the time periods specified under this Section 3.07. Without limiting the rights granted in this Section 3.07, the First Lien Secured Parties shall cooperate (at their own costs and expenses) with the Second Lien Collateral Agent in connection with any efforts made by the Second Lien Collateral Agent to sell the Indenture Exclusive Collateral.

## ARTICLE IV

### Payments

**SECTION 4.01  Application of Proceeds**.  Any Collateral or proceeds thereof received by any Secured Party or any Person that holds Excess Claims in connection with any Disposition of, or collection on, such Collateral upon the enforcement or exercise of any right or remedy (including any right of setoff) shall be applied as follows:

first, to the payment of costs and expenses of the First Lien Collateral Agent or (subject to Section 3.02) the Second Lien Collateral Agent, as the case may be, in connection with such enforcement or exercise,

second, after all such costs and expenses have been paid in full, to the payment of the First Lien Obligations,

third, after all such costs and expenses have been paid in full and the Discharge of First Lien Obligations has occurred, to the payment of the Indenture Obligations,

fourth, after all such costs and expenses have been paid in full, the Discharge of First Lien Obligations has occurred and all Indenture Obligations have been paid in full in cash, to the payment of any Excess Claims, and

fifth, after all such costs and expenses have been paid in full, the Discharge of First Lien Obligations has occurred, all Indenture Obligations have been paid in full in cash and all Excess Claims have been paid in full in cash, any surplus Collateral or proceeds then remaining shall be returned to the applicable Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**SECTION 4.02    Payment Over**.    (a)    So long as the Discharge of First Lien Obligations has not occurred, any Collateral or any proceeds thereof received by the Second Lien Collateral Agent or any other Second Lien Secured Party in connection with any Disposition of, or collection on, such Collateral upon the enforcement or the exercise of any right or remedy (including any right of setoff) with respect to the Collateral, or in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation), in each case, in respect of any Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith transferred or paid over to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties for application against the First Lien Obligations in the same form as received, together with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.    Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of each other Second Lien Secured Party, hereby appoints the First Lien Collateral Agent, and any officer or agent of the First Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each Second Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.02(a) and taking any action and executing any instrument that the First Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.02(a), which appointment is irrevocable and coupled with an interest.

(b)    Any Indenture Exclusive Collateral or any proceeds thereof (together with assets or proceeds subject to Liens referred to Section 2.03) received by the First Lien Collateral Agent or any other First Lien Secured Party in connection with any Disposition of, or collection on, such Indenture Exclusive Collateral upon the enforcement or the exercise of any right or remedy (including any right of setoff) with respect to the Indenture Exclusive Collateral, or in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation), in each case, in respect of any Indenture Exclusive Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith transferred or paid over to the Second Lien

Collateral Agent for the benefit of the Second Lien Secured Parties for application against the Indenture Obligations in the same form as received, together with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. Until the Indenture Obligations have been paid in full in cash, the First Lien Collateral Agent, for itself and on behalf of each other First Lien Secured Party, hereby appoints the Second Lien Collateral Agent, and any officer or agent of the Second Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each First Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.02(b) and taking any action and executing any instrument that the Second Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.02(b), which appointment is irrevocable and coupled with an interest.

**SECTION 4.03    Certain Agreements with Respect to Unenforceable Collateral**. (a) Notwithstanding anything to the contrary contained herein, if in any Insolvency or Liquidation Proceeding a determination is made that any First-Priority Lien of the First Lien Secured Parties encumbering any Collateral is not enforceable for any reason, then the Second Lien Collateral Agent and the Second Lien Secured Parties agree that, any distribution or recovery they may receive with respect to, or allocable to, the value of such First Lien Collateral or any proceeds thereof shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties in the same form as received without recourse, representation or warranty (other than a representation of the Second Lien Collateral Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Discharge of First Lien Obligations has occurred. Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of each other Second Lien Secured Party, hereby appoints the First Lien Collateral Agent, and any officer or agent of the First Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each Second Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.03(a) and taking any action and executing any instrument that the First Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.03(a), which appointment is irrevocable and coupled with an interest.

(b)    Notwithstanding anything to the contrary contained herein, if in any Insolvency or Liquidation Proceeding a determination is made that any Indenture Exclusive Collateral Lien of the Second Lien Secured Parties encumbering any Indenture Exclusive Collateral is not enforceable for any reason, then the First Lien Collateral Agent and the First Lien Secured Parties agree that, any distribution or recovery they may receive with respect to, or allocable to, the value of such Indenture Exclusive Collateral or any proceeds thereof shall be segregated and held in trust and forthwith paid over to the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties in the same form as received without recourse, representation or warranty (other than a representation of the First Lien Collateral Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Indenture Obligations have been paid in full in cash. Until the Indenture Obligations have been paid in full in cash, the First Lien Collateral Agent, for itself and on behalf of each other First Lien Secured Party, hereby appoints the Second Lien Collateral Agent, and any officer or agent of the Second Lien Collateral Agent, with full power of

substitution, the attorney-in-fact of each First Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.03(b) and taking any action and executing any instrument that the Second Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.03(b), which appointment is irrevocable and coupled with an interest.

## ARTICLE V

### Bailment and Sub-Agency for Perfection of Certain Security Interests

(a)     The First Lien Collateral Agent agrees that, if it shall at any time hold a First-Priority Lien on any Second Lien Collateral that can be perfected or the priority of which can be enhanced by the possession or control of such Second Lien Collateral or of any account in which such Second Lien Collateral is held, and if such Second Lien Collateral or any such account is in fact in the possession or under the control of the First Lien Collateral Agent, or of agents or bailees of the First Lien Collateral Agent (such Collateral being referred to herein as the "**Pledged or Controlled Collateral**"), the First Lien Collateral Agent shall, solely for the purpose of perfecting the Second-Priority Liens granted under the Second Lien Loan Documents and subject to the terms and conditions of this Article V, also hold or maintain control of such Pledged or Controlled Collateral as gratuitous bailee of and representative (as defined in Section 1-201(33) of the Uniform Commercial Code) for the Second Lien Collateral Agent, including for the benefit of the Second Lien Collateral Agent for purposes of Section 9-313 and 8-301 of the Uniform Commercial Code.

(b)     So long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent shall be entitled to deal with the Pledged or Controlled Collateral in accordance with the terms of this Agreement and the other First Lien Loan Documents as if the Second-Priority Liens did not exist.  The obligations and responsibilities of the First Lien Collateral Agent to the Second Lien Collateral Agent and the other Second Lien Secured Parties under this Article V shall be limited solely to holding or controlling the Pledged or Controlled Collateral as gratuitous bailee and representative (as defined in Section 1-201(33) of the Uniform Commercial Code) in accordance with this Article V.  Without limiting the foregoing, the First Lien Collateral Agent shall have no obligation or responsibility to ensure that any Pledged or Controlled Collateral is genuine or owned by any of the Grantors.  The First Lien Collateral Agent acting pursuant to this Article V shall not, by reason of this Agreement, any other Collateral Document or any other document, have a fiduciary relationship in respect of any other First Lien Secured Party, the Second Lien Collateral Agent or any other Second Lien Secured Party.

(c)     Upon the Discharge of First Lien Obligations, the First Lien Collateral Agent shall transfer the possession and control of the Pledged or Controlled Collateral, together with any necessary endorsements but without recourse or warranty, (i) if the Indenture Obligations are outstanding at such time, to the Second Lien Collateral Agent, and (ii) if no Indenture Obligations are outstanding at such time, to the applicable Grantor, in each case so as to allow such person to obtain possession and control of such Pledged or Controlled Collateral.  In connection with any transfer under clause (i) of the immediately preceding sentence, the First Lien Collateral Agent agrees to take all actions in its power as shall be reasonably requested by

the Grantor or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class to permit the Second Lien Collateral Agent to obtain, for the benefit of the Second Lien Secured Parties, a first-priority security interest in the Pledged or Controlled Collateral.

## ARTICLE VI

### Insolvency or Liquidation Proceedings

**SECTION 6.01    Finance and Sale Matters**.  (a) Until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that, in the event of any Insolvency or Liquidation Proceeding, the Second Lien Secured Parties:

(i)    except to the extent permitted by paragraph (b) of this Section 6.01, will not oppose or object to the use of any First Lien Collateral constituting cash collateral under Section 363 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, unless the First Lien Secured Parties, or a representative authorized by the First Lien Secured Parties, shall oppose or object to such use of cash collateral;

(ii)    will not oppose or object to any post-petition financing, whether provided by the First Lien Secured Parties or any other Person, under Section 364 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law (a "**DIP Financing**"), or the Liens on assets that constitute First Lien Collateral to secure any DIP Financing ("**DIP Financing Liens**"), unless the First Lien Secured Parties, or a representative authorized by the First Lien Secured Parties, shall then oppose or object to such DIP Financing or such DIP Financing Liens, and, to the extent that such DIP Financing Liens are senior to, or rank pari passu with, the First-Priority Liens, the Second Lien Collateral Agent will, for itself and on behalf of the other Second Lien Secured Parties, subordinate the Second-Priority Liens on assets constituting the Second Lien Collateral to the First-Priority Liens and the DIP Financing Liens thereon on the terms of this Agreement;

(iii)    except to the extent permitted by paragraph (b) of this Section 6.01, in connection with the use of cash collateral as described in clause (i) above or a DIP Financing, will not request adequate protection or any other relief in connection with such use of cash collateral, DIP Financing or DIP Financing Liens; and

(iv)    will not oppose or object to any Disposition of any First Lien Collateral free and clear of the Second-Priority Liens or other claims under Section 363 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, if the First Lien Secured Parties, or a representative authorized by the First Lien Secured Parties, shall consent to such Disposition.

(b)    The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that no Second Lien Secured Party shall contest, or support any other Person in contesting, (i) any request by the First Lien Collateral Agent or any other First

Lien Secured Party for adequate protection or (ii) any objection, based on a claim of a lack of adequate protection in respect of any First Lien Obligations, by the First Lien Collateral Agent or any other First Lien Secured Party to any motion, relief, action or proceeding. Notwithstanding the immediately preceding sentence, if, in connection with any DIP Financing or use of cash collateral, any First Lien Secured Party is granted adequate protection in the form of a Lien on additional collateral, the Second Lien Collateral Agent may, for itself and on behalf of the other Second Lien Secured Parties, seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the First-Priority Liens and DIP Financing Liens on the same basis as the other Second-Priority Liens are subordinated to the First-Priority Liens under this Agreement.

(c)     Notwithstanding the foregoing, the applicable provisions of Section 6.01(a) and (b) shall only be binding on the Second Lien Secured Parties with respect to any DIP Financing so long as (i) the principal amount of such DIP Financing, when taken together with the aggregate principal amount of the First Lien Obligations, does not exceed the Maximum Priority Debt Amount and (ii) such DIP Financing is not secured by any Indenture Exclusive Collateral.

**SECTION 6.02     Relief from the Automatic Stay**. The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that, so long as the Discharge of First Lien Obligations has not occurred, no Second Lien Secured Party shall, without the prior written consent of the First Lien Collateral Agent, seek or request relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of any part of the Collateral, any proceeds thereof or any Second-Priority Lien.

**SECTION 6.03     Reorganization Securities**. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of both the First Lien Obligations and the Indenture Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Indenture Obligations are secured by Liens upon some of the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**SECTION 6.04     Post-Petition Interest**. (a) The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that no Second Lien Secured Party shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any other First Lien Secured Party for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the First-Priority Liens (it being understood and agreed that such value shall be determined without regard to the existence of the Second-Priority Liens on the Collateral).

(b)     The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, agrees that the Second Lien  Collateral Agent or any other Second Lien Secured Party may make a claim for allowance in any Insolvency or Liquidation Proceeding of Indenture Obligations consisting of post-petition interest, fees or expenses to the extent of the value of (i) the Second-Priority Liens (provided, however, that that if the First Lien Secured Parties shall have made any such claim, such claim shall have been approved prior to, or will be approved

contemporaneous with, the approval of any such claim by any Second Lien Secured Party) and (ii) the Indenture Exclusive Collateral Liens.

SECTION 6.05  **Certain Waivers by the Second Lien Secured Parties**.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, waives any claim any Second Lien Secured Party may hereafter have against any First Lien Secured Party arising out of (a) the election by any First Lien Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, or (b) any cash collateral or financing arrangement, or any grant of a security interest in the Collateral, in any Insolvency or Liquidation Proceeding, in each case, with respect to the Collateral.

SECTION 6.06  **Certain Voting Matters**.  Each of the First Lien Collateral Agent, on behalf of the First Lien Secured Parties, and the Second Lien Collateral Agent, on behalf of the Second Lien Secured Parties, agrees that, without the consent of the other, it will not seek to vote with the other as a single class in connection with any plan of reorganization in any Insolvency or Liquidation Proceeding.

## ARTICLE VII

### Other Agreements

SECTION 7.01  **Matters Relating to Loan Documents**.  (a) The First Lien Loan Documents may be amended, restated, supplemented or otherwise modified in accordance with their terms, and the Indebtedness under the Credit Agreement may be Refinanced or replaced, in each case, without the consent of any Second Lien Secured Party; provided, however, that without the consent of the Second Lien Required Lenders, no such amendment, restatement, supplement, modification, Refinancing or replacement shall contravene any provision of this Agreement; provided further that the holders of the Indebtedness resulting from such Refinancing or replacement (or a duly authorized agent on their behalf) agree in writing to be bound by the terms of this Agreement (including Section 4.01).

(b)  Without the prior written consent of the First Lien Required Lenders, no Second Lien Loan Document may be amended, restated, supplemented or otherwise modified, or entered into, to the extent such amendment, restatement, supplement or modification, or the terms of such new Second Lien Loan Document, would contravene the provisions of this Agreement.  As an intercreditor agreement only and without prejudice to any rights of the First Lien Lenders under the Credit Agreement, Indebtedness under the Second Lien Loan Documents may be Refinanced if a duly authorized agent, on their behalf, agrees in writing to be bound by the terms of this Agreement.

(c)  Each of the Grantors and the Second Lien Collateral Agent agrees that the Indenture and each Second Lien Collateral Document shall contain the applicable provisions set forth on Annex II hereto, or similar provisions approved by the First Lien Collateral Agent.

SECTION 7.02  **Effect of Refinancing of Indebtedness under First Lien Loan Documents**.  If, within 30 days of the Discharge of First Lien Obligations, the Borrowers

Refinance Indebtedness outstanding under the First Lien Loan Documents and provided that (a) such Refinancing is permitted hereby and (b) the Company gives to the Second Lien Collateral Agent, at least ten Business Days prior to such Refinancing, written notice (the "**Refinancing Notice**") electing the application of the provisions of this Section 7.02 to such Refinancing Indebtedness, then (i) such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement, (ii) such Refinancing Indebtedness and all other obligations under the loan documents evidencing such Indebtedness (the "**New First Lien Obligations**") shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, (iii) the credit agreement and the other loan documents evidencing such Refinancing Indebtedness (the "**New First Lien Loan Documents**") shall automatically be treated as the Credit Agreement and the First Lien Loan Documents and, in the case of New First Lien Loan Documents that are security documents, as the First Lien Collateral Documents for all purposes of this Agreement, (iv) the collateral agent under the New First Lien Loan Documents (the "**New First Lien Collateral Agent**") shall be deemed to be the First Lien Collateral Agent for all purposes of this Agreement and (v) the lenders under the New First Lien Loan Documents shall be deemed to be the First Lien Lenders.  Upon receipt of a Refinancing Notice, which notice shall include the identity of the New First Lien Collateral Agent, the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New First Lien Collateral Agent may reasonably request in order to provide to the New First Lien Collateral Agent the rights and powers contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.  The Company shall cause the agreement, document or instrument pursuant to which the New First Lien Collateral Agent is appointed to provide that the New First Lien Collateral Agent agrees to be bound by the terms of this Agreement.

SECTION 7.03    **No Waiver by First Lien Secured Parties**.  Other than with respect to the Second Lien Permitted Actions, nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any other First Lien Secured Party from opposing, challenging or objecting to, in any Insolvency or Liquidation Proceeding or otherwise, any action taken, or any claim made, by the Second Lien Collateral Agent or any other Second Lien Secured Party, including any request by the Second Lien Collateral Agent or any other Second Lien Secured Party for adequate protection or any exercise by the Second Lien Collateral Agent or any other Second Lien Secured Party of any of its rights and remedies under the Second Lien Loan Documents or otherwise, in each case, in respect of any Second Lien Collateral.

SECTION 7.04    **Reinstatement**.  If, in any Insolvency or Liquidation Proceeding or otherwise, all or part of any payment with respect to the First Lien Obligations or Indenture Obligations previously made shall be rescinded for any reason whatsoever, then the First Lien Obligations or Indenture Obligations, as the case may be, shall be reinstated to the extent of the amount so rescinded and, if theretofore terminated, this Agreement shall be reinstated in full force and effect and such prior termination shall not diminish, release, discharge, impair or otherwise affect the Lien priorities and the relative rights and obligations of the First Lien Secured Parties and the Second Lien Secured Parties provided for herein.

SECTION 7.05    **Further Assurances**.  Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, and the Second Lien Collateral Agent,

for itself and on behalf of the other Second Lien Secured Parties, and each Grantor party hereto, for itself and on behalf of its subsidiaries, agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable law, or which the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

SECTION 7.06    **Actions of Second Lien Collateral Agent**.  Except as may otherwise be specifically provided in the Indenture or any Second Lien Collateral Document with respect to any act, or refraining from acting, that is discretionary with the Second Lien Collateral Agent in accordance with the terms of any Second Lien Loan Document, the Second Lien Collateral Agent will act or refrain from acting in accordance with the written instructions of the Second Lien Required Lenders.

## ARTICLE VIII

### Representations and Warranties

SECTION 8.01    **Representations and Warranties of Each Party**.  Each party hereto represents and warrants to the other parties hereto as follows:

(a)    Such party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to execute and deliver this Agreement and perform its obligations hereunder.

(b)    This Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party.

(c)    The execution, delivery and performance by such party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any governmental authority and (ii) will not violate any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of such party or any order of any governmental authority or any provision of any indenture, agreement or other instrument binding upon such party.

SECTION 8.02    **Representations and Warranties of Each Collateral Agent**.  Each Collateral Agent represents and warrants to the other parties hereto that it has been authorized by the Lenders under and as defined in the Credit Agreement and the holders of the Notes under the Indenture, as applicable, to enter into this Agreement.

## ARTICLE IX

### No Reliance; No Liability; Obligations Absolute

SECTION 9.01    **No Reliance; Information**.  Each Collateral Agent, for itself and on behalf of the respective other Secured Parties, acknowledges that (a) the respective Secured Parties have, independently and without reliance upon, in the case of the First Lien Secured Parties, any Second Lien Secured Party and, in the case of the Second Lien Secured Parties, any

First Lien Secured Party, and based on such documents and information as they have deemed appropriate, made their own credit analysis and decision to enter into the Loan Documents to which they are party and (b) the respective Secured Parties will, independently and without reliance upon, in the case of the First Lien Secured Parties, any Second Lien Secured Party and, in the case of the Second Lien Secured Parties, any First Lien Secured Party, and based on such documents and information as they shall from time to time deem appropriate, continue to make their own credit decision in taking or not taking any action under this Agreement or any other Loan Document to which they are party. The First Lien Secured Parties and the Second Lien Secured Parties shall have no duty to disclose to any Second Lien Secured Party or to any First Lien Secured Party, respectively, any information relating to the Company or any of the Subsidiaries, or any other circumstance bearing upon the risk of nonpayment of any of the Obligations, that is known or becomes known to any of them or any of their affiliates. In the event any First Lien Secured Party or any Second Lien Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to, respectively, any Second Lien Secured Party or any First Lien Secured Party, it shall be under no obligation (i) to make, and shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of the information so provided, (ii) to provide any additional information or to provide any such information on any subsequent occasion or (iii) to undertake any investigation. Notwithstanding anything to the contrary set forth in this Section 9.01, the parties hereto acknowledge that the Second Lien Collateral Agent has not conducted and will not conduct any credit analysis in respect of the Loan Documents or the transactions contemplated thereby.

**SECTION 9.02** **No Warranties or Liability**. (a) The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, acknowledges and agrees that, except for the representations and warranties set forth in Article VIII, neither the Second Lien Collateral Agent nor any other Second Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, acknowledges and agrees that, except for the representations and warranties set forth in Article VIII, neither the First Lien Collateral Agent nor any other First Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.

(b) The Second Lien Collateral Agent and the other Second Lien Secured Parties shall have no express or implied duty to the First Lien Collateral Agent or any other First Lien Secured Party, and the First Lien Collateral Agent and the other First Lien Secured Parties shall have no express or implied duty to the Second Lien Collateral Agent or any other Second Lien Secured Party, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of a default or an event of default under any First Lien Loan Document and any Second Lien Loan Document (other than, in each case, this Agreement), regardless of any knowledge thereof which they may have or be charged with.

(c)     The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that no First Lien Secured Party shall have any liability to the Second Lien Collateral Agent or any other Second Lien Secured Party, and hereby waives any claim against any First Lien Secured Party, arising out of any and all actions which the First Lien Collateral Agent or the other First Lien Secured Parties may take or permit or omit to take.

**SECTION 9.03     Obligations Absolute**.  The Lien priorities provided for herein and the respective rights, interests, agreements and obligations hereunder of the First Lien Collateral Agent and the other First Lien Secured Parties and the Second Lien Collateral Agent and the other Second Lien Secured Parties shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any Loan Document;

(b)     any change in the time, place or manner of payment of, or in any other term of (including, subject to the limitations set forth in Section 7.01(a), the Refinancing of), all or any portion of the First Lien Obligations, it being specifically acknowledged that a portion of the First Lien Obligations consists or may consist of Indebtedness that is revolving in nature, and the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed;

(c)     any change in the time, place or manner of payment of, or, subject to the limitations set forth in Section 7.01(b), in any other term of, all or any portion of the Indenture Obligations;

(d)     subject to the limitations set forth in Section 7.01(a), any amendment, waiver or other modification, whether by course of conduct or otherwise, of any Loan Document;

(e)     the securing of any First Lien Obligations or Indenture Obligations with any additional collateral or Guarantees, or any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral or any release of any Guarantee securing any First Lien Obligations or Indenture Obligations; or

(f)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Borrower, Grantor or any other loan party in respect of the First Lien Obligations or this Agreement, or any of the Second Lien Secured Parties in respect of the Indenture Obligations or this Agreement.

## ARTICLE X

### Miscellaneous

**SECTION 10.01     Notices**.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or by nationally recognized overnight courier service, mailed by certified or registered mail or sent by fax to each party hereto at its address set forth below its signature hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if

delivered by hand or by nationally recognized overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest un-revoked direction from such party given in accordance with this Section 10.01. As agreed to among the Company and any Collateral Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

SECTION 10.02   **Conflicts**.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions of this Agreement shall control.

SECTION 10.03   **Effectiveness; Survival**.  This Agreement shall become effective when executed and delivered by the parties hereto.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby waives any and all rights the Second Lien Secured Parties may now or hereafter have under applicable law to revoke this Agreement or any of the provisions of this Agreement.

SECTION 10.04   **Severability**.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.05   **Amendments; Waivers**.  (a) No failure or delay on the part of any party hereto in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)      Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the First Lien Collateral Agent and the Second Lien Collateral Agent; _provided_ that no such agreement shall amend, modify or otherwise affect the rights or obligations of any Grantor without such Grantor's prior written consent.

SECTION 10.06  **Subrogation**.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby waives any rights of subrogation it or they may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred; provided, however, that, as between the Company and the other Grantors, on the one hand, and the Second Lien Secured Parties, on the other hand, any such payment that is paid over to the First Lien Collateral Agent pursuant to this Agreement shall be deemed not to reduce any of the Indenture Obligations.  Following the Discharge of First Lien Obligations, each First Lien Party agrees to execute such documents, agreements, and instruments as any Second Lien Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the First Lien Obligations resulting from payments or distributions to such First Lien Secured Party by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by such First Lien Secured Party are paid by such Person upon request for payment thereof.

SECTION 10.07  **Applicable Law; Jurisdiction; Consent to Service of Process**. (a) THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

(b)  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan of the City of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)  Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court.  Each party hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 10.08  **Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS

AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**SECTION 10.09    Parties in Interest**.  This provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Lien Secured Parties and Second Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.  No other Person shall have or be entitled to assert rights or benefits hereunder.

**SECTION 10.10    Specific Performance**.  Each Collateral Agent may demand specific performance of this Agreement and, on behalf of itself and the respective other Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the respective Secured Parties.

**SECTION 10.11    Headings**.  Article and Section headings used herein and the Table of Contents hereto are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

**SECTION 10.12    Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

**SECTION 10.13    Provisions Solely to Define Relative Rights**.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties, on the one hand, and the Second Lien Secured Parties, on the other hand. None of the Company, any other Grantor, any Guarantor or any other creditor thereof shall have any rights or obligations, except as expressly provided in this Agreement, hereunder and none of the Company, any other Grantor or any Guarantor may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor or any Guarantor, which are absolute and unconditional, to pay the First Lien Obligations and the Indenture Obligations as and when the same shall become due and payable in accordance with their terms.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PNC BANK, NATIONAL ASSOCIATION**,
as First Lien Collateral Agent

By: _____
     Name:
     Title:

Address for notices:
200 South Wacker Drive, Suite 600
Chicago, Illinois 60606
Attention:  Portfolio Manager
Facsimile Number:  (312) 454-2919

**WILMINGTON TRUST FSB**,
as Second Lien Collateral Agent

By: _____
     Name:
     Title:

Address for notices:
Corporate Capital Markets
50 South Sixth Street, Suite 1290
Minneapolis, MN  55402
Attention: Aventine Administrator
Facsimile Number: (612) 217-5651

Acknowledged as of the date first above written:

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.


By: _____
        Name:
        Title:


**[• ]**


By: _____
        Name:
        Title:


**[• ]**


By: _____
        Name:
        Title:


Address for Notices:
c/o Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois  61554
Attention: **[• ]**
Facsimile Number: **[• ]**

## FIRST LIEN COLLATERAL AND SECOND LIEN COLLATERAL

All right, title and interest of AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Borrower"), and each other Grantor (such capitalized term and all other capitalized terms that are used and not defined in either this ANNEX I or the Intercreditor Agreement shall have the meanings ascribed to such terms in that certain Revolving Credit and Security Agreement dated as of (and as in effect on) the date hereof (as referred to in this ANNEX I, the "Security Agreement") made by the Borrower in favor of PNC BANK, NATIONAL ASSOCIATION), in and to the following, whether now owned or hereafter existing or acquired by such Grantor (all of the following are collectively referred to as the "First Lien Collateral" and as the "Second Lien Collateral" in this Annex I):

(a)     all Accounts and all books, other Records and Proceeds with respect thereto;

(b)     all Chattel Paper (including without limitation all Tangible Chattel Paper and Electronic Chattel Paper) and all books, other Records and Proceeds with respect thereto;

(c)     all Deposit Accounts, including without limitation each Controlled Deposit Account (including all deposits and investments therein and all earnings thereon) but excluding any Indenture Collateral Account, and all books, other Records and Proceeds with respect thereto;

(d)     all Documents and all books, other Records and Proceeds with respect thereto;

(e)     all Inventory and all books, other Records and Proceeds with respect thereto;

(f)     all Intellectual Property Collateral (other than Excluded Intellectual Property) and all books, other Records and Proceeds with respect thereto;

(g)     all Investment Property (other than Excluded Equity and Indenture Collateral Accounts) and all books, other Records and Proceeds with respect thereto;

(h)     all Letter-of-Credit Rights and all books, other Records and Proceeds with respect thereto;

(i)     all Receivables not otherwise described above and all books, other Records and Proceeds with respect thereto;

(j)     all Instruments related to or arising from Collateral and all books, other Records and Proceeds with respect thereto;

(k)     General Intangibles related to or arising from Receivables and Inventory and all books, other Records and Proceeds with respect thereto;

(l)     all Pledged Cash Collateral and all books, other records and proceeds with respect thereto; and

(m)     all Supporting Obligations and all books, other Records and Proceeds with respect thereto.

Notwithstanding the foregoing, each of the "First Lien Collateral" and the "Second Lien Collateral" shall not include:

(i)     any Proceeds (other than Equity Interests of a Restricted Subsidiary of the Borrower (other than a Foreign Subsidiary)) arising from a Disposition, casualty or condemnation of Indenture Exclusive Collateral;

(ii)     in the event of a Disposition of Equity Interests of a Restricted Subsidiary of the Borrower which results in a Disposition of assets constituting Indenture Exclusive Collateral, the portion of the Proceeds of such Disposition attributable to such assets;

(iii)     any (A) Commercial Tort Claims, (B) Excluded Contracts or other General Intangibles not related to or arising from Receivables or Inventory (other than Intellectual Property not constituting Excluded Intellectual Property), (C) Excluded Equipment or other Equipment or other Goods (other than Inventory), (D) Instruments not related to or arising from Collateral, or (E) Real Property;

(iv)     any General Intangibles or other rights arising under any contract, instrument, license or other document as to which the grant of a security interest would constitute a violation of a valid and enforceable restriction on such grant in favor of the Person(s) (other than such Grantor) obligated on such contract, instrument, license or other document, unless and until any required consents shall have been obtained; or

(v)     any Equity Interests issued by any Unrestricted Subsidiary or any Foreign Subsidiary.

Provision for the Indenture

**"The Trustee and by its acceptance of its Note(s), each Holder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) consents to the subordination of Liens on the Second Lien Collateral as defined, and provided for, in the Intercreditor Agreement, (c) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (d) authorizes and instructs the Collateral Agent to enter into the Intercreditor Agreement as agent for and representative of such Secured Party. The foregoing provisions are intended as an inducement to the lenders under the Credit Facility to extend credit to the Borrowers and such lenders are intended third party beneficiaries of such provisions."**

Provision for the Second Lien Collateral Documents

**"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent, for the ratable benefit of Secured Parties, pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent and the other Secured Parties hereunder with respect to the Second Lien Collateral, are subject to the provisions of the Intercreditor Agreement. In the event of any conflict or inconsistency between the provisions of the Intercreditor Agreement and this Agreement with respect to the Second Lien Collateral, the provisions of the Intercreditor Agreement shall control."**

## Exhibit C-1

## Blackline of Form of Intercreditor Agreement

INTERCREDITOR AGREEMENT

dated as of

[•March [____], 2010

among

AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,
as Borrower,

and

Each of its Subsidiaries
Parties Hereto From Time to Time

PNC BANK, NATIONAL ASSOCIATION,
as First Lien Collateral Agent

and

[•],
WILMINGTON TRUST FSB,
as Second Lien Collateral Agent

---

THIS IS THE INTERCREDITOR AGREEMENT REFERRED TO IN THE COLLATERAL DOCUMENTS REFERRED TO IN THE CREDIT AGREEMENT AND INDENTURE REFERRED TO HEREIN.

---

## Table of Contents

**Page**

ARTICLE I Definitions .................................................................................................. ~~2~~1

    SECTION 1.01      Certain Defined Terms ........................................................ ~~2~~1
    SECTION 1.02      Other Defined Terms ........................................................... ~~2~~1
    SECTION 1.03      Terms Generally .................................................................. ~~7~~1

ARTICLE II Lien Priorities ........................................................................................... ~~7~~1

    SECTION 2.01      Relative Priorities ............................................................... ~~7~~1
    SECTION 2.02      Prohibition on Contesting Liens .......................................... ~~8~~1
    SECTION 2.03      Indenture Exclusive Collateral ............................................ ~~8~~1
    SECTION 2.04      Limit on ~~Second~~ Liens .......................................................... ~~8~~1

ARTICLE III Enforcement of Rights; Matters Relating to Collateral .............................. ~~8~~1

    SECTION 3.01      Exercise of Rights and Remedies ........................................ ~~8~~1
    SECTION 3.02      No Interference ................................................................... ~~10~~1
    SECTION 3.03      Rights as Unsecured Creditors ............................................ ~~13~~1
    SECTION 3.04      Automatic Release of Second-Priority Liens ........................ ~~13~~1
    SECTION 3.05      Insurance and Condemnation Awards ................................... ~~14~~1
    SECTION 3.06      Blocked Account Agreements, Etc. ...................................... ~~15~~1
    SECTION 3.07      Access and License to Use Indenture Exclusive Collateral ... ~~15~~1

ARTICLE IV Payments ................................................................................................ ~~17~~1

    SECTION 4.01      Application of Proceeds ...................................................... ~~17~~1
    SECTION 4.02      Payment Over ..................................................................... ~~18~~1
    SECTION 4.03      Certain Agreements with Respect to Unenforceable Collateral ~~18~~1

ARTICLE V Bailment and Sub-Agency for Perfection of Certain Security Interests ......... ~~19~~1

ARTICLE VI Insolvency or Liquidation Proceedings ...................................................... ~~20~~1

    SECTION 6.01      Finance and Sale Matters .................................................... ~~20~~1
    SECTION 6.02      Relief from the Automatic Stay ........................................... ~~22~~1
    SECTION 6.03      Reorganization Securities .................................................... ~~22~~1
    SECTION 6.04      Post-Petition Interest .......................................................... ~~22~~1
    SECTION 6.05      Certain Waivers by the Second Lien Secured Parties ............ ~~22~~1
    SECTION 6.06      Certain Voting Matters ....................................................... ~~22~~1

ARTICLE VII Other Agreements ................................................................................... ~~23~~1

    SECTION 7.01      Matters Relating to Loan Documents .................................... ~~23~~1
    SECTION 7.02      Effect of Refinancing of Indebtedness under First Lien Loan
                                 Documents ......................................................................... ~~23~~1
    SECTION 7.03      No Waiver by First Lien Secured Parties .............................. ~~24~~1
    SECTION 7.04      Reinstatement .................................................................... ~~24~~1
    SECTION 7.05      Further Assurances ............................................................. ~~24~~1
    SECTION 7.06      Actions of Second Lien Collateral Agent ............................. 1

ARTICLE VIII Representations and Warranties......................................................24

SECTION 8.01      Representations and Warranties of Each Party......................24
SECTION 8.02      Representations and Warranties of Each Collateral Agent......25

ARTICLE IX No Reliance; No Liability; Obligations Absolute...........................25

SECTION 9.01      No Reliance; Information.....................................................25
SECTION 9.02      No Warranties or Liability....................................................26
SECTION 9.03      Obligations Absolute............................................................26

ARTICLE X Miscellaneous...............................................................................27

SECTION 10.01      Notices...............................................................................27
SECTION 10.02      Conflicts.............................................................................27
SECTION 10.03      Effectiveness; Survival.......................................................27
SECTION 10.04      Severability.........................................................................27
SECTION 10.05      Amendments; Waivers........................................................28
SECTION 10.06      Subrogation.........................................................................28
SECTION 10.07      Applicable Law; Jurisdiction; Consent to Service of Process......28
SECTION 10.08      Waiver of Jury Trial............................................................29
SECTION 10.09      Parties in Interest................................................................29
SECTION 10.10      Specific Performance...........................................................29
SECTION 10.11      Headings.............................................................................29
SECTION 10.12      Counterparts........................................................................30
SECTION 10.13      Provisions Solely to Define Relative Rights.........................30

INTERCREDITOR AGREEMENT dated as of [•], 2010 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**"), among Aventine Renewable Energy Holdings, Inc., a Delaware corporation (the "**Company**"), and each of its Subsidiaries parties hereto from time to time (together with the Company, being hereafter collectively referred to as the "**Borrowers**"), PNC Bank, National Association, as agent for the First Lien Lenders (as defined below) (in such capacity, the "**First Lien Collateral Agent**"), and [•] ("[•]Wilmington Trust FSB ("**Wilmington Trust**"), as collateral agent for the Second Lien Lenders (as defined below) (in such capacity, the "**Second Lien Collateral Agent**").

<u>PRELIMINARY STATEMENT</u>

Reference is made to (a) the Revolving Credit and Security Agreement dated as of [•], 2010 (as amended, restated, supplemented, otherwise modified or Refinanced from time to time, the "**Credit Agreement**"), among the Borrowers, the lenders from time to time parties thereto (the "**First Lien Lenders**"), the First Lien Collateral Agent, as agent thereunder, (b) the First Lien Collateral Documents (such term and each other capitalized term used but not defined in this Preliminary Statement or the Recitals having the meaning given it in Article I), (c) the Indenture dated as of March [•__], 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "**Indenture**" and, together with the Credit Agreement, the "**Financing Agreements**"), among the Company, certain subsidiaries of the Company from time to time guarantors thereunder and [•]Wilmington Trust, as indenture trustee (together with its successors and assigns in such capacity, the "**Indenture Trustee**") and collateral agent on behalf of the holders from time to time of the Notes described below (collectively with the Indenture Trustee and such holders, the "**Second Lien Lenders**") and (d) the Second Lien Collateral Documents.

<u>RECITALS</u>

A.      The First Lien Lenders have made and have agreed to make loans and other extensions of credit to the Borrowers pursuant to the Credit Agreement, upon, among other terms and conditions, the condition that the First Lien Obligations shall be secured by first-priority Liens on, and security interests in, all of the assets of any Grantor that is described in Annex I hereto (the "**First Lien Collateral**").

B.      The Company has issued $105,000,000 aggregate principal amount of its [•]% Senior Secured Notes due 2015 (together with any [•]% Senior Secured Notes due 2015 issued in replacement or exchange therefor, collectively, the "**Notes**") upon, among other terms and conditions, the condition that the Indenture Obligations shall be secured by Liens on, and security interests in, the Second Lien Collateral.

C.      The Financing Agreements require, among other things, that the parties thereto set forth in this Agreement, among other things, their respective rights, obligations and remedies with respect to the Collateral.

Accordingly, the parties hereto agree as follows:

# ARTICLE I

## Definitions

**SECTION 1.01** <u>Certain Defined Terms</u>. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

**SECTION 1.02** <u>Other Defined Terms</u>. As used in this Agreement, the following terms shall have the meanings specified below:

"**Account**" shall have the meaning assigned to such term in the UCC.

"**Agreement**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereinafter in effect, or any successor statute.

"**Bankruptcy Law**" shall mean the Bankruptcy Code and any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law.

"**Borrowers**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**Collateral**" shall mean, collectively, the First Lien Collateral and the Second Lien Collateral.

"**Collateral Agents**" shall mean the First Lien Collateral Agent and the Second Lien Collateral Agent.

"**Collateral Documents**" shall mean the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**Company**" shall have the meaning assigned to such term in the Preamble of this Agreement.

"**Credit Agreement**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**DIP Financing**" shall have the meaning assigned to such term in Section 6.01(a)(ii).

"**DIP Financing Liens**" shall have the meaning assigned to such term in Section 6.01(a)(ii).

"**Discharge of First Lien Obligations**" shall mean, subject to Sections 7.02 and 7.04, (a) payment in full in cash of the principal of and interest (including interest accruing during the pendency of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such Insolvency or Liquidation Proceeding) and premium, if any, on all

Indebtedness outstanding under the First Lien Loan Documents to the extent constituting First Lien Obligations, (b) payment in full of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid, (c) cancellation of or the entry into arrangements satisfactory to the First Lien Collateral Agent with respect to all letters of credit issued and outstanding under the Credit Agreement (it being understood and agreed that the cash collateralization of all such letters of credit with cash in an amount equal to 103% of the aggregate stated amount thereof shall be deemed an arrangement that is satisfactory to the First Lien Collateral Agent) and (d) termination or expiration of all commitments to lend and all obligations to issue letters of credit under the Credit Agreement.

"**Disposition**" shall mean any sale, lease, exchange, transfer or other disposition. "Dispose" shall have a correlative meaning.

"**Equity Interests**" shall have the meaning assigned to such term in the Indenture.

"**Excess Claims**" shall have the meaning assigned to such term in the definition of the term "First Lien Obligations".

"**Excluded Contracts**" means, with respect to any Grantor, all contracts for the receipt by such Grantor of services or supplies but excluding any contracts that give rise to the payment of money to such Grantor.

"**Excluded Equipment**" means, to the extent any of the following items constitute fixtures and/or Equipment under applicable laws, all fixtures, fittings, appliances, apparatus, Equipment, machinery, building and construction materials and other articles of every kind and nature whatsoever (other than Inventory) and all replacements thereof and additions, enhancements or upgrades thereto, now or hereafter affixed, or attached to, placed upon or located on or in the Real Property or any buildings, structures and other improvements thereon.

"**Excluded Equity**" means the Equity Interests issued by each Unrestricted Subsidiary or any Foreign Subsidiary.

"**Excluded Intellectual Property**" means, collectively, (a) all patentable inventions, letters patent and applications for letters patent that are necessary or appropriate for the continued operation of the plants located at the Real Property, and (b) all trade secrets that are necessary or appropriate for the continued operation of the plants located at the Real Property.

"**Financing Agreements**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**First Lien Collateral**" shall have the meaning assigned to such term in Recital A.

"**First Lien Collateral Agent**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**First Lien Collateral Documents**" shall mean the Credit Agreement and the Other Documents (as defined in the Credit Agreement), and any other agreement, document or

instrument pursuant to which a Lien is granted to secure any First Lien Obligations or under which rights or remedies with respect to any such Lien are governed.

"**First Lien Lenders**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**First Lien Loan Documents**" shall mean the Credit Agreement and the Other Documents.

"**First Lien Obligations**" shall mean the Obligations (as defined in the Credit Agreement) secured by the First Lien Collateral pursuant to the First Lien Collateral Documents; provided, that the aggregate principal amount (including, without limitation, for the avoidance of doubt, the undrawn and unreimbursed amount of any letter of credit) of all such "Obligations" that exceed the Maximum Priority Debt Amount shall not constitute First Lien Obligations but shall be deemed to constitute "**Excess Claims**".

"**First Lien Required Lenders**" shall mean the "Required Lenders" as defined in the Credit Agreement.

"**First Lien Secured Parties**" shall mean, at any time, (a) the First Lien Lenders, (b) the First Lien Collateral Agent, (c) each other Person to whom any of the First Lien Obligations (including First Lien Obligations incurred in connection with any hedging agreement entered into with any First Lien Lender or any affiliate of such First Lien Lender and indemnification obligations) is owed and (d) the successors and assigns of each of the foregoing.

"**First-Priority Liens**" shall mean all Liens on the First Lien Collateral to secure the First Lien Obligations, whether created under the First Lien Collateral Documents or acquired by possession, statute, operation of law, subrogation or otherwise.

"**Foreign Subsidiary**" shall have the meaning assigned to such term in the Indenture.

"**Grantors**" shall mean the Company and each Subsidiary that shall have created or purported to create any First-Priority Lien or Second-Priority Lien on all or any part of its assets to secure any First Lien Obligations or any Indenture Obligations.

"**Guarantors**" shall mean, collectively, each Subsidiary that has guaranteed, or that may from time to time hereafter guarantee, the First Lien Obligations or the Indenture Obligations.

"**Indebtedness**" shall mean and includes all obligations that constitute Indebtedness as defined in the Credit Agreement or the Indenture, as applicable.

"**Indenture**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**Indenture Collateral Accounts**" means any "Collateral Account" (as defined in the Indenture).

"**Indenture Exclusive Collateral**" shall mean all of the assets of any Grantor with respect to which a Lien is granted as security for any Indenture Obligations; provided that "Indenture Exclusive Collateral" shall not include any assets constituting Second Lien Collateral or any First Lien Collateral.

"**Indenture Exclusive Collateral Liens**" shall mean all Liens on the Indenture Exclusive Collateral to secure the Indenture Obligations, whether created under the Second Lien Collateral Documents or acquired by possession, statute, operation of law, subrogation or otherwise.

"**Indenture Obligations**" shall mean the "Obligations" (as defined in the Indenture) under the Second Lien Loan Documents that are secured by the Second Lien Collateral and Indenture Exclusive Collateral pursuant to the Second Lien Collateral Documents.

"**Indenture Trustee**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**Initial Grantors**" means the Grantors named on the signature pages to this Agreement as originally executed and delivered on **[• ]**, 2010.

"**Insolvency or Liquidation Proceeding**" shall mean (a) any voluntary or involuntary proceeding under the Bankruptcy Code (as defined in the Indenture) or any other Bankruptcy Law with respect to any Grantor, (b) any voluntary or involuntary appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Grantor or for a substantial part of the property or assets of any Grantor, (c) any voluntary or involuntary winding-up or liquidation of any Grantor, or (d) a general assignment for the benefit of creditors by any Grantor.

"**Lien**" shall mean any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract. The term "Lien" shall also include reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purpose of this Agreement, the Grantors shall be deemed to be the owners of any property which they have acquired or hold subject to a conditional sale agreement or other arrangements pursuant to which title to the property has been retained by or vested in some other Person for security purposes; provided, however, that the term "Lien" shall not include a trust or similar arrangement established for the purpose of defeasing any indebtedness pursuant to the terms evidencing or providing for the issuance of such indebtedness but only to the extent that such defeasance is permitted under this Agreement.

"**Loan Documents**" shall mean the First Lien Loan Documents and the Second Lien Loan Documents.

"**Maximum Priority Debt Amount**" means $23,000,000.

"**New First Lien Collateral Agent**" shall have the meaning assigned to such term in Section 7.02.

"**New First Lien Loan Document**s" shall have the meaning assigned to such term in Section 7.02.

"**New First Lien Obligation**s" shall have the meaning assigned to such term in Section 7.02.

"**Notes**" shall have the meaning assigned to such term in Recital B.

"**Pledged or Controlled Collateral**" shall have the meaning assigned to such term in Article V(a).

"**Proceeds**" shall have the meaning assigned to such term in the UCC.

"**Records**" shall have the meaning assigned to such term in the UCC.

"**Refinance**" shall mean, in respect of any Indebtedness, to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Refinancing Notice**" shall have the meaning assigned to such term in Section 7.02.

"**Release**" shall have the meaning assigned to such term in Section 3.04(a).

"**Restricted Subsidiary**" shall have the meaning assigned to such term in the Indenture.

"**Second Lien Collateral**" shall mean all of the assets of any Grantor that are described in Annex I hereto ~~with respect to which a Lien is granted as security for any Indenture Obligations~~.

"**Second Lien Collateral Agent**" shall have the meaning assigned to such term in the Preamble to this Agreement.

"**Second Lien Collateral Documents**" shall mean the "Collateral Documents" as defined in the Indenture, and any agreement, pursuant to which a Lien is granted on Second Lien Collateral to secure any Indenture Obligations or under which rights or remedies with respect to any such Lien are governed.

"**Second Lien Lenders**" shall have the meaning assigned to such term in the Preliminary Statement of this Agreement.

"**Second Lien Loan Documents**" shall mean the Indenture and the Indenture Documents as defined therein.

"**Second Lien Permitted Actions**" shall have the meaning assigned to such term in Section 3.01(a).

"**Second Lien Required Lenders**" shall mean, subject to Section 2.09 of the Indenture, the holders of the Notes who hold a majority in aggregate principal amount thereof.

"**Second Lien Secured Partie**s" shall mean, at any time, (a) the Second Lien Lenders, (b) the Second Lien Collateral Agent, (c) each other Person to whom any of the Indenture Obligations is owed and (d) the successors and assigns of each of the foregoing.

"**Second Lien Security Agreement**" means the Security Agreement, dated as of March [___], 2010, made by the Borrowers in favor of the Second Lien Collateral Agent, as amended or supplemented from time to time in accordance with its terms and the terms of the Indenture.

"**Second-Priority Liens**" shall mean all Liens on the Second Lien Collateral to secure the Indenture Obligations, whether created under the Second Lien Collateral Documents or acquired by possession, statute, operation of law, subrogation or otherwise.

"**Secured Parties**" shall mean the First Lien Secured Parties and the Second Lien Secured Parties.

"**Standstill Period**" shall have the meaning assigned to such term in Section 3.02(a).

"**Termination Fees**" shall have the meaning assigned to such term in Section 3.01(d).

"**Uniform Commercial Code**" or "UCC" shall mean the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**Unrestricted Subsidiary**" shall have the meaning assigned to such term in the Indenture.

**SECTION 1.03    Terms Generally**.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."   Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified, (b) any reference herein (i) to any Person shall be construed to include such Person's successors and assigns and (ii) to the Company or any other Grantor shall be construed to include the Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor, as the case may be, in any Insolvency or Liquidation Proceeding, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles or Sections shall be construed to refer to Articles or Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

# ARTICLE II

## Lien Priorities

**SECTION 2.01    Relative Priorities**.  Notwithstanding the date, manner or order of grant, attachment or perfection of any Second-Priority Lien or any First-Priority Lien, and notwithstanding any provision of the UCC or any other applicable law or the provisions of any Collateral Document or any other Loan Document or any other circumstance whatsoever, the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby agrees that, so long as the Discharge of First Lien Obligations has not occurred, (a) any First-Priority Lien now or hereafter held by or for the benefit of any First Lien Secured Party shall be senior in right, priority, operation, effect and all other respects to any and all Second-Priority Liens and (b) any Second-Priority Lien now or hereafter held by or for the benefit of any Second Lien Secured Party shall be junior and subordinate in right, priority, operation, effect and all other respects to any and all First-Priority Liens.  The First-Priority Liens shall be and remain senior in right, priority, operation, effect and all other respects to any Second-Priority Liens for all purposes, whether or not any First-Priority Liens are subordinated in any respect to any other Lien securing any other obligation of the Company, any other Grantor or any other Person.

**SECTION 2.02    Prohibition on Contesting Liens**.  Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, and the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that it will not, and hereby waives any right to, contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of any Second-Priority Lien (or Indenture Exclusive Collateral Lien) or any First-Priority Lien, as the case may be; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any other First Lien Secured Party, or the rights of the Second Lien Collateral Agent or any other Second Lien Secured Party, as applicable, to enforce this Agreement.

**SECTION 2.03    Indenture Exclusive Collateral**.  The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, agrees that neither it nor any of them shall request or accept the benefit of any Lien on any Indenture Exclusive Collateral to secure any Obligations under and as defined in the First Lien Loan Documents.

**SECTION 2.04    Limit on Second Liens**.  The parties hereto acknowledge and agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical. In furtherance of the foregoing, (i) the First Lien Collateral Agent agrees to cooperate in good faith in order to determine, upon any reasonable request by the Second Lien Collateral Agent, the specific assets included in the First Lien Collateral, the steps taken to perfect the First-Priority Liens thereon and the identity of the respective parties obligated under the First Lien Loan Documents and (ii) the Second Lien Collateral Agent agrees to cooperate in good faith in order to determine, upon any reasonable request by the First Lien Collateral Agent, the specific assets included in the Second Lien Collateral, the steps taken to perfect the Second-Priority Liens thereon and the identity of the respective parties obligated under the Second Lien Loan Documents.

# ARTICLE III

## Enforcement of Rights; Matters Relating to Collateral

**SECTION 3.01**     **Exercise of Rights and Remedies**.  (a) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced, the First Lien Collateral Agent and the other First Lien Secured Parties shall have the exclusive right to enforce rights and exercise remedies (including any right of setoff) with respect to the First Lien Collateral (including making determinations regarding the release, Disposition or restrictions with respect to the First Lien Collateral), or to commence or seek to commence any action or proceeding with respect to such rights or remedies (including any foreclosure action or proceeding or any Insolvency or Liquidation Proceeding), in each case, without any consultation with or the consent of the Second Lien Collateral Agent or any other Second Lien Secured Party; provided that, notwithstanding the foregoing, (i) in any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent may file a proof of claim or statement of interest with respect to the Indenture Obligations, (ii) the Second Lien Collateral Agent may take any action to preserve or protect the validity and enforceability of the Second-Priority Liens (provided that no such action is, or could reasonably be expected to be, (A) adverse to the First-Priority Liens or the rights of the First Lien Collateral Agent or any other First Lien Secured Party to exercise remedies in respect thereof or (B) otherwise inconsistent with the terms of this Agreement, including the automatic release of Second-Priority Liens provided in Section 3.04), (iii) the Second Lien Collateral Agent may file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Secured Parties, including any claims secured by the Second Lien Collateral or otherwise make any agreements or file any motions pertaining to the Indenture Obligations, in each case, to the extent not inconsistent with the terms of this Agreement, (iv) the Second Lien Collateral Agent may exercise rights and remedies as an unsecured creditor, as provided in Section 3.03, and (v) subject to Section 3.02(a), the Second Lien Collateral Agent and the other Second Lien Secured Parties may enforce any of their rights and exercise any of their remedies with respect to the Second Lien Collateral after the termination of the Standstill Period (the actions described in this proviso being referred to herein as the "**Second Lien Permitted Actions**").  Except for the Second Lien Permitted Actions, unless and until the Discharge of First Lien Obligations has occurred, the sole right of the Second Lien Collateral Agent and the other Second Lien Secured Parties with respect to the Collateral shall be to receive a share of the proceeds of the Second Lien Collateral, if any, after the Discharge of First Lien Obligations has occurred and in accordance with the Second Lien Loan Documents and applicable law.

(b)     In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the other First Lien Secured Parties may enforce the provisions of the First Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to Dispose of First Lien Collateral upon foreclosure, to incur expenses in connection with any such Disposition and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code, the Bankruptcy Code or any other Bankruptcy Law.  The First Lien Collateral Agent agrees to provide at least ten Business

Days' prior written notice to the Second Lien Collateral Agent of its intention to foreclose upon or Dispose of any First Lien Collateral.

(c)     The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Second Lien Collateral Document or any other Second Lien Loan Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the other First Lien Secured Parties with respect to the First Lien Collateral as and to the extent set forth in this Agreement and the other First Lien Loan Documents, including the right of the First Lien Collateral Agent to permit any Grantor to Dispose of First Lien Collateral to a Person not affiliated with any Grantor.

(d)     Notwithstanding anything in this Agreement to the contrary, following the occurrence of an acceleration of any First Lien Obligations, the Second Lien Secured Parties may, at their sole expense and effort, upon irrevocable notice to the Company and the First Lien Collateral Agent, require the First Lien Secured Parties to transfer and assign to the Second Lien Secured Parties, without warranty or representation or recourse, all (but not less than all) of the First Lien Obligations; provided that (i) such assignment shall not conflict with any law, rule or regulation or order of any court or other governmental authority having jurisdiction, and (ii) the Second Lien Secured Parties shall have paid to the First Lien Collateral Agent, for the account of the First Lien Secured Parties, in immediately available funds, an amount equal to 100% of the principal amount of the First Lien Obligations that constitute loans or advances plus all accrued and unpaid interest thereon plus all accrued and unpaid fees (other than any fees that become due as a result of the prepayment of the loans and other advances under, or early termination of, the Credit Agreement (such fees are referred to hereinafter as "**Termination Fees**")) plus all the other First Lien Obligations then outstanding (which shall include, with respect to (A) the aggregate face amount of the letters of credit outstanding under the Credit Agreement, an amount in cash equal to 103% thereof, and (B) each interest rate hedging, cap, collar, swap or other similar agreements that evidence any First Lien Obligations, 100% of the aggregate amount of such First Lien Obligations, after giving effect to any netting arrangements, that the applicable Grantor would be required to pay if such interest rate hedging, cap, collar, swap or other similar agreements were terminated at such time).  In order to effectuate the foregoing, the First Lien Collateral Agent shall calculate, upon the written request of the ~~Second Lien Collateral Agent from time to time~~Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class, the amount in cash that would be necessary so to purchase the First Lien Obligations.  If the right set forth in this Section 3.01(d) is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten Business Days of the request set forth in the first sentence of this Section 3.01(d).  If the Second Lien Secured Parties exercise the right set forth in this Section 3.01(d), it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien ~~Collateral Agent~~Required Lenders.  Notwithstanding anything to the contrary herein, upon the consummation of such transfer and assignment, Termination Fees shall no longer constitute First Lien Obligations but shall instead be deemed to constitute Excess Claims and remain payable to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties.  It is understood and agreed that the Second Lien Collateral Agent shall have no substantive obligations under this

paragraph (d) (including with respect to the negotiation of any documentation) and shall act solely in a ministerial capacity on behalf of the Second Lien Secured Parties.

**SECTION 3.02    No Interference**.  (a) The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that, whether or not any Insolvency or Liquidation Proceeding has been commenced, the Second Lien Secured Parties:

(i)    except for Second Lien Permitted Actions, will not, so long as the Discharge of First Lien Obligations has not occurred, (A) enforce or exercise, or seek to enforce or exercise, any rights or remedies (including any right of setoff) with respect to any Collateral (including the enforcement of any right under any account control agreement, landlord waiver or bailee's letter or any similar agreement or arrangement to which the Second Lien Collateral Agent or any other Second Lien Secured Party is a party) or (B) commence or join with any Person (other than the First Lien Collateral Agent) in commencing, or petition for or vote in favor of any resolution for, any action or proceeding with respect to such rights or remedies (including any foreclosure action); provided, however, that the Second Lien Collateral Agent may enforce or exercise any or all such rights and remedies, or commence, join with any Person in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding, after a period of 120 days has elapsed since the date on which the Second Lien Collateral Agent has delivered to the First Lien Collateral Agent written notice of the acceleration of all or any portion of the Notes (the "**Standstill Period**"); provided further, however (A) that notwithstanding the expiration of the Standstill Period or anything herein to the contrary, in no event shall the Second Lien Collateral Agent or any other Second Lien Secured Party enforce or exercise any rights or remedies with respect to any Collateral, or commence, join with any Person in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding, if the First Lien Collateral Agent or any other First Lien Secured Party shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to such Collateral or any such action or proceeding and (B) that after the expiration of the Standstill Period, so long as neither the First Lien Collateral Agent nor the First Lien Secured Parties have commenced any action to enforce the First-Priority Liens on any material portion of the Collateral, in the event that and for so long as the Second Lien Secured Parties (or the Second Lien Collateral Agent on their behalf) have commenced any actions to enforce the Second-Priority Liens with respect to any Collateral to the extent permitted hereunder and are diligently pursuing such actions, neither the First Lien Secured Parties nor the First Lien Collateral Agent shall take any action of a similar nature with respect to such Collateral; provided that all other provisions of this Intercreditor Agreement (including the turnover provisions of Article IV) are complied with;

(ii)    will not contest, protest or object to any foreclosure action or proceeding brought by the First Lien Collateral Agent or any other First Lien Secured Party, or any other enforcement or exercise by any First Lien Secured Party of any rights or remedies relating to the Collateral under the First Lien Loan Documents or otherwise, so long as Second-Priority Liens attach to the proceeds thereof subject to the relative priorities set forth in Section 2.01;

(iii)    subject to the rights of the Second Lien Secured Parties under clause (i) above, will not object to the forbearance by the First Lien Collateral Agent or any other First Lien Secured Party from commencing or pursuing any foreclosure action or proceeding or any other enforcement or exercise of any rights or remedies with respect to the Collateral;

(iv)    will not, so long as the Discharge of First Lien Obligations has not occurred and except for Second Lien Permitted Actions, take or receive any Collateral, or any proceeds thereof or payment with respect thereto, in connection with the exercise of any right or enforcement of any remedy (including any right of setoff) with respect to any Collateral or in connection with any insurance policy award under a policy of insurance relating to any Collateral or any condemnation award (or deed in lieu of condemnation) relating to any Collateral;

(v)    will not, except for Second Lien Permitted Actions, take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the First Lien Loan Documents, including any Disposition of any Collateral, whether by foreclosure or otherwise;

(vi)    will not, except for Second Lien Permitted Actions, object to the manner in which the First Lien Collateral Agent or any other First Lien Secured Party may seek to enforce or collect the First Lien Obligations or the First-Priority Liens, regardless of whether any action or failure to act by or on behalf of the First Lien Collateral Agent or any other First Lien Secured Party is, or could be, adverse to the interests of the Second Lien Secured Parties, and will not assert, and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or other similar right that may be available under applicable law with respect to the Collateral or any similar rights a junior secured creditor may have under applicable law; and

(vii)    will not attempt, directly or indirectly, whether by judicial proceeding or otherwise, to challenge or question the validity or enforceability of any First Lien Obligation or any First Lien Collateral Document, including this Agreement, or the validity or enforceability of the priorities, rights or obligations established by this Agreement.

(b)    The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, agrees that, whether or not any Insolvency or Liquidation Proceeding has been commenced, the First Lien Secured Parties:

(i)    will not contest, protest or object to any foreclosure action or proceeding brought by the Second Lien Collateral Agent or any other Second Lien Secured Party, or any other enforcement or exercise by any Second Lien Secured Party of any rights or remedies relating to the Indenture Exclusive Collateral under the Second Lien Loan Documents or otherwise;

(ii)     will not object to the forbearance by the Second Lien Collateral Agent or any other Second Lien Secured Party from commencing or pursuing any foreclosure action or proceeding or any other enforcement or exercise of any rights or remedies with respect to the Indenture Exclusive Collateral;

(iii)     will not, so long as the Indenture Obligations have not been paid in full, take or receive any Indenture Exclusive Collateral, or any proceeds thereof or payment with respect thereto, in connection with the exercise of any right or enforcement of any remedy (including any right of setoff) with respect to any Indenture Exclusive Collateral or in connection with any insurance policy award under a policy of insurance relating to any Indenture Exclusive Collateral or any condemnation award (or deed in lieu of condemnation) relating to any Indenture Exclusive Collateral;

(iv)     will not, except in the course of taking any remedy or action against any First Lien Collateral (but, in any event, not against any Indenture Exclusive Collateral), take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the Second Lien Loan Documents, including any Disposition of any Indenture Exclusive Collateral, whether by foreclosure or otherwise;

(v)     will not object to the manner in which the Second Lien Collateral Agent or any other Second Lien Secured Party may seek to enforce or collect the Indenture Obligations or the Indenture Exclusive Collateral Liens, regardless of whether any action or failure to act by or on behalf of the Second Lien Collateral Agent or any other Second Lien Secured Party is, or could be, adverse to the interests of the First Lien Secured Parties, and will not assert, and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or other similar right that may be available under applicable law with respect to the Indenture Exclusive Collateral or any similar rights a ~~junior secured~~ creditor may have under applicable law; and

(vi)     will not attempt, directly or indirectly, whether by judicial proceeding or otherwise, to challenge or question the validity or enforceability of any Indenture Obligation or any Second Lien Collateral Document, including this Agreement, or the validity or enforceability of the priorities, rights or obligations established by this Agreement.

**SECTION 3.03     Rights as Unsecured Creditors**.  Except to the extent it would contravene the express provisions hereof, the Second Lien Collateral Agent and the other Second Lien Secured Parties may, in accordance with the terms of the Second Lien Loan Documents and applicable law, enforce rights and exercise remedies against the Company and any Guarantor as unsecured creditors.  Nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any other Second Lien Secured Party of the required payments of principal, premium, interest, fees and other amounts due under the Indenture so long as such receipt is not the direct or indirect result of the enforcement of, the exercise by the Second Lien Collateral Agent or any other Second Lien Secured Party of rights or remedies as a secured creditor

(including any right of setoff) in respect of, or any enforcement in contravention of this Agreement of, any Second-Priority Lien.

**SECTION 3.04    Automatic Release of Second-Priority Liens**.  (a) If, in connection with (i) any Disposition of any Collateral permitted under the terms of the First Lien Loan Documents or (ii) the enforcement or exercise of any rights or remedies with respect to the Collateral, including any Disposition of Collateral, the First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, releases any of the First-Priority Liens, (in each case, a "**Release**"), other than any such Release granted in connection with the Discharge of First Lien Obligations then, subject to Sections 3.04(b) and (c), the Second-Priority Liens on such Collateral shall be automatically, unconditionally and simultaneously released, and the Second Lien Collateral Agent shall, for itself and on behalf of the other Second Lien Secured Parties, promptly execute and deliver to the First Lien Collateral Agent and the relevant Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or the relevant Grantor may reasonably request to effectively confirm such Release.

(b)    Notwithstanding the foregoing, in the event that a Release is of all or substantially all of the First Lien Collateral, then such Release (other than a Release in connection with the enforcement or exercise of any rights or remedies with respect to the Collateral permitted hereunder) shall require the consent of the Second Lien ~~Collateral Agent~~Required Lenders.

(c)    Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of each other Second Lien Secured Party, hereby appoints the First Lien Collateral Agent, and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as the attorney-in-fact of each Second Lien Secured Party for the limited purpose of carrying out the provisions of this Section 3.04 and taking any action and executing any instrument that the First Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 3.04 (including any endorsements or other instruments of transfer or release), which appointment is irrevocable and coupled with an interest.

**SECTION 3.05    Insurance and Condemnation Awards**.    (a) So long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent and the other First Lien Secured Parties shall have the exclusive right, subject to the rights of the Grantors under the First Lien Loan Documents, to settle and adjust claims in respect of First Lien Collateral under policies of insurance covering First Lien Collateral and to approve any award granted in any condemnation or similar proceeding, or any deed in lieu of condemnation, in respect of the First Lien Collateral.  All proceeds of any such policy and any such award, or any payments with respect to a deed in lieu of condemnation, in each case, in respect of First Lien Collateral, shall (a) first, prior to the Discharge of First Lien Obligations and subject to the rights of the Grantors under the First Lien Loan Documents, be paid to the First Lien Collateral Agent for the benefit of First Lien Secured Parties for application against the First Lien Obligations pursuant to the terms of the First Lien Loan Documents, (b) second, after the Discharge of First Lien Obligations and subject to the rights of the Grantors under the Second Lien Loan Documents, be paid to the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties for application against the Indenture Obligations pursuant to the terms of the Second Lien Loan Documents, (c) third, if all Indenture Obligations have been paid in full in cash, be paid to the First Lien Collateral Agent for the benefit of First Lien Secured Parties for

application against any Excess Claims pursuant to the terms of the First Lien Loan Documents and (d) fourth, if no Indenture Obligations are outstanding, be paid to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. Until the Discharge of First Lien Obligations has occurred, if the Second Lien Collateral Agent or any other Second Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award or payment, in each case, in respect of First Lien Collateral, it shall transfer and pay over such proceeds to the First Lien Collateral Agent in accordance with Section 4.02(a).

(b) Subject to the terms of the Indenture, the Second Lien Collateral Agent and the other Second Lien Secured Parties shall have the exclusive right to settle and adjust claims in respect of Indenture Exclusive Collateral under policies of insurance covering Indenture Exclusive Collateral and to approve any award granted in any condemnation or similar proceeding, or any deed in lieu of condemnation, in respect of the Indenture Exclusive Collateral. Subject to the terms of the Indenture, all proceeds of any such policy and any such award, or any payments with respect to a deed in lieu of condemnation, in each case, in respect of Indenture Exclusive Collateral, shall (a) first, prior to the payment in full in cash of all Indenture Obligations and subject to the rights of the Grantors under the Second Lien Loan Documents, be paid to the Second Lien Collateral Agent for the benefit of Second Lien Secured Parties for application against the Indenture Obligations pursuant to the terms of the Second Lien Loan Documents, and (b) second, if all Indenture Obligations have been paid in full in cash, be paid to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If the First Lien Collateral Agent or any other First Lien Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award or payment, in each case, in respect of Indenture Exclusive Collateral, it shall transfer and pay over such proceeds to the Second Lien Collateral Agent in accordance with Section 4.02(b).

### Blocked Account Agreements, Etc. ~~First Lien Collateral shall~~

. First Lien Collateral shall include at all times all cash collected by any Grantor on account of Receivables or Inventory constituting First Lien Collateral and shall be deposited into a collection or deposit account maintained with the ~~First Lien Collateral Agent~~Controlling ABL Agent (as such term is defined in the Second Lien Security Agreement) or at another financial institution subject to a deposit account control agreement in favor of, and in form acceptable to, ~~First Lien Collateral~~the Controlling ABL Agent. Except in the case of proceeds in connection with any collection on such First Lien Collateral upon the enforcement or exercise of any right or remedy (which shall be applied as specified in Section 4.01), if there are no cash Obligations due and owing under the Credit Agreement and no default or event of default is then occurring under the Credit Agreement, each Grantor shall have the right to use such proceeds in any manner not prohibited by the Loan Documents, and any assets purchased by such Grantor shall constitute either First Lien Collateral or Indenture Exclusive Collateral as determined by the type of asset being purchased and the other terms of this Agreement.

**SECTION 3.07    Access and License to Use Indenture Exclusive Collateral**. (a) So long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent shall have the right (i) to enter onto, and remain on, the Real Property constituting Indenture Exclusive Collateral for no longer than 180 days from the date the First Lien Collateral Agent

sends to the Second Lien Collateral Agent a written notice that the First Lien Collateral Agent or the other First Lien Secured Parties intend to enforce their rights in the First Lien Collateral and any and all of their remedies as secured creditors (whether under the Credit Agreement, under Article 9 of the Uniform Commercial Code as in effect in the State of New York, or otherwise at law or in equity) with respect thereto and (ii) to conduct sales, either public or private, of any or all of the First Lien Collateral on such Real Property and may take any reasonable steps to advertise such sales (including posting signs concerning such sales on such Real Property); provided, however, that nothing contained in this Agreement shall restrict the rights of the Second Lien Collateral Agent from selling, assigning or otherwise transferring any Indenture Exclusive Collateral prior to the expiration of such 180 day period if the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 3.07; provided further that if the First Lien Collateral Agent conducts a sale of the First Lien Collateral on such Real Property, the First Lien Collateral Agent shall provide the Second Lien Collateral Agent with reasonable notice and use reasonable efforts to hold such sale in a manner which would not unduly disrupt the Second Lien Collateral Agent's use of, access to and preservation of the value of any Indenture Exclusive Collateral. The Second Lien Collateral Agent shall not unreasonably restrict the ability of the First Lien Collateral Agent to use any of the equipment (including accessing all files, ledgers, computer programs, software, licenses, tapes and disks contained within any equipment) located on such Real Property or constituting Indenture Exclusive Collateral for the purposes of (i) processing or preparing Borrowers' inventory, completing Borrowers' work-in-process inventory or preparing any of the other First Lien Collateral for sale, and (ii) verifying, processing and collecting account receivable reports, invoices and all other information relating to, or necessary for, the collection or sale of Borrowers' ~~account receivables~~accounts receivable. In the event that Second Lien Collateral Agent, the Second Lien Secured Parties or any agent acting on behalf of any of them obtain title to, or exclusive possession of, the Indenture Exclusive Collateral, the Second Lien Collateral Agent and Second Lien Secured Parties hereby grant to First Lien Collateral Agent a license to use such Indenture Exclusive Collateral in accordance with the terms of this Section 3.07. Subject to paragraphs (b) and (c) of this Section 3.07, neither the First Lien Collateral Agent nor any of the other First Lien Secured Parties shall be obligated to make any payments to the Second Lien Collateral Agent for use of the Real Property or Indenture Exclusive Collateral. The license(s) granted to First Lien Collateral Agent and the other First Lien Secured Parties by the Second Lien Collateral Agent to enter onto and remain on the Real Property and use the Indenture Exclusive Collateral under the provisions of this Section 3.07 shall be irrevocable

(b)     If the First Lien Collateral Agent elects to enter upon and use the Indenture Exclusive Collateral as provided in paragraph (a) above, it shall take all reasonable efforts to avoid, to the extent reasonably practicable, interference with the operation of the Indenture Exclusive Collateral.  Subject to the Second Lien Secured Parties having obtained possession and control of any of the Indenture Exclusive Collateral in connection with the enforcement of rights against the Indenture Exclusive Collateral, the Second Lien Collateral Agent may instruct the First Lien Collateral Agent in writing to remove all First Lien Collateral from such Indenture Exclusive Collateral by the end of the 180 day period referred to in paragraph (a) above, whereupon, at or prior to the end of such 180 day period, the First Lien Collateral Agent shall at its sole cost and expense, remove such First Lien Collateral from the Indenture Exclusive Collateral, provided that no stay or other order prohibiting such removal has been entered by a court of competent jurisdiction (it being understood and agreed that the running of such 180 day

period shall be tolled during the pendency of any such stay or other order). If the First Lien Collateral Agent does not remove such First Lien Collateral by the end of such 180 day period (or such longer period as such a stay or other order is in effect), the Second Lien Collateral Agent may cause such First Lien Collateral to be removed, and, thereafter store such First Lien Collateral in such location or locations as the Second Lien Collateral Agent shall deem advisable pending repossession by the First Lien Collateral Agent. Any costs reasonably incurred by the Second Lien Collateral Agent or the other Second Lien Secured Parties by virtue of such removal and storage shall be paid by the First Lien Secured Parties. The Second Lien Collateral Agent agrees to notify the First Lien Collateral Agent of the location or locations to which any of the Collateral shall have been removed by it pursuant to the foregoing provisions.

(c)     During the period of actual occupation, use or control by the First Lien Secured Parties or their agents or representatives of any Indenture Exclusive Collateral (or any assets or property subject to a leasehold interest constituting Indenture Exclusive Collateral), the First Lien Secured Parties shall be obligated to (i) reimburse the Second Lien Secured Parties for all utilities, insurance and all other operating costs of such Indenture Exclusive Collateral or other assets or property during any such period of actual occupation, use or control (calculated on a per diem basis based upon a fraction, the numerator of which shall be the actual number of days of such occupation, use or control and the denominator of which shall be 365 days) to the extent the same are actually paid by such Second Lien Secured Parties, (ii) repair at their expense any physical damage to such Indenture Exclusive Collateral or other assets or property directly or indirectly resulting from such occupancy, use or control, and to leave such Indenture Exclusive Collateral or other assets or property in substantially the same condition as it was at the commencement of such occupancy, use or control and (iii) indemnify and hold harmless the Second Lien Secured Parties from and against any losses, claims, liabilities, costs or expenses directly or indirectly resulting from such occupancy, use or control or from any acts or omissions of the First Lien Secured Parties or their agents or representatives in connection therewith. Notwithstanding the foregoing, in no event shall the First Lien Secured Parties have any liability to the Second Lien Secured Parties pursuant to this Section 3.07 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Indenture Exclusive Collateral existing prior to the date of the exercise by the First Lien Secured Parties of their rights under this Section 3.07 (except to the extent of any injury to any Person on the Real Property constituting Indenture Exclusive Collateral or damage to any Indenture Exclusive Collateral as a result of such condition that would not have occurred but for the exercise by the First Lien Secured Parties of their right of use as set forth in this Section 3.07), and the First Lien Secured Parties shall have no duty or liability to maintain the Indenture Exclusive Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the First Lien Secured Parties, or for any diminution in the value of the Indenture Exclusive Collateral that results solely from ordinary wear and tear resulting from the use of the Indenture Exclusive Collateral by the First Lien Secured Parties in the manner and for the time periods specified under this Section 3.07. Without limiting the rights granted in this Section 3.07, the First Lien Secured Parties shall cooperate (at their own costs and expenses) with the Second Lien Collateral Agent in connection with any efforts made by the Second Lien Collateral Agent to sell the Indenture Exclusive Collateral.

**ARTICLE IV**

**Payments**

**SECTION 4.01** **Application of Proceeds**. Any Collateral or proceeds thereof received by any Secured Party or any Person that holds Excess Claims in connection with any Disposition of, or collection on, such Collateral upon the enforcement or exercise of any right or remedy (including any right of setoff) shall be applied as follows:

first, to the payment of costs and expenses of the First Lien Collateral Agent or (subject to Section 3.02) the Second Lien Collateral Agent, as the case may be, in connection with such enforcement or exercise,

second, after all such costs and expenses have been paid in full, to the payment of the First Lien Obligations,

third, after all such costs and expenses have been paid in full and the Discharge of First Lien Obligations has occurred, to the payment of the Indenture Obligations,

fourth, after all such costs and expenses have been paid in full, the Discharge of First Lien Obligations has occurred and all Indenture Obligations have been paid in full in cash, to the payment of any Excess Claims, and

fifth, after all such costs and expenses have been paid in full, the Discharge of First Lien Obligations has occurred, all Indenture Obligations have been paid in full in cash and all Excess Claims have been paid in full in cash, any surplus Collateral or proceeds then remaining shall be returned to the applicable Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**SECTION 4.02** **Payment Over**. (a) So long as the Discharge of First Lien Obligations has not occurred, any Collateral or any proceeds thereof received by the Second Lien Collateral Agent or any other Second Lien Secured Party in connection with any Disposition of, or collection on, such Collateral upon the enforcement or the exercise of any right or remedy (including any right of setoff) with respect to the Collateral, or in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation), in each case, in respect of any Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith transferred or paid over to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties for application against the First Lien Obligations in the same form as received, together with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of each other Second Lien Secured Party, hereby appoints the First Lien Collateral Agent, and any officer or agent of the First Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each Second Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.02(a) and taking any action and executing any instrument that the First Lien Collateral Agent may reasonably deem necessary

or advisable to accomplish the purposes of this Section 4.02(a), which appointment is irrevocable and coupled with an interest.

(b)     Any Indenture Exclusive Collateral or any proceeds thereof (together with assets or proceeds subject to Liens referred to Section 2.03) received by the First Lien Collateral Agent or any other First Lien Secured Party in connection with any Disposition of, or collection on, such Indenture Exclusive Collateral upon the enforcement or the exercise of any right or remedy (including any right of setoff) with respect to the Indenture Exclusive Collateral, or in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation), in each case, in respect of any Indenture Exclusive Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith transferred or paid over to the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties for application against the Indenture Obligations in the same form as received, together with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  Until the Indenture Obligations have been paid in full in cash, the First Lien Collateral Agent, for itself and on behalf of each other First Lien Secured Party, hereby appoints the Second Lien Collateral Agent, and any officer or agent of the Second Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each First Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.02(b) and taking any action and executing any instrument that the Second Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.02(b), which appointment is irrevocable and coupled with an interest.

**SECTION 4.03     Certain Agreements with Respect to Unenforceable Collateral**. (a) Notwithstanding anything to the contrary contained herein, if in any Insolvency or Liquidation Proceeding a determination is made that any First-Priority Lien of the First Lien Secured Parties encumbering any Collateral is not enforceable for any reason, then the Second Lien Collateral Agent and the Second Lien Secured Parties agree that, any distribution or recovery they may receive with respect to, or allocable to, the value of such First Lien Collateral or any proceeds thereof shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties in the same form as received without recourse, representation or warranty (other than a representation of the Second Lien Collateral Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Discharge of First Lien Obligations has occurred.  Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of each other Second Lien Secured Party, hereby appoints the First Lien Collateral Agent, and any officer or agent of the First Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each Second Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.03(a) and taking any action and executing any instrument that the First Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.03(a), which appointment is irrevocable and coupled with an interest.

(b)     Notwithstanding anything to the contrary contained herein, if in any Insolvency or Liquidation Proceeding a determination is made that any Indenture Exclusive Collateral Lien of the Second Lien Secured Parties encumbering any Indenture Exclusive Collateral is not enforceable for any reason, then the First Lien Collateral Agent and the First Lien Secured Parties

agree that, any distribution or recovery they may receive with respect to, or allocable to, the value of such Indenture Exclusive Collateral or any proceeds thereof shall be segregated and held in trust and forthwith paid over to the Second Lien Collateral Agent for the benefit of the Second Lien Secured Parties in the same form as received without recourse, representation or warranty (other than a representation of the First Lien Collateral Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Indenture Obligations have been paid in full in cash. Until the Indenture Obligations have been paid in full in cash, the First Lien Collateral Agent, for itself and on behalf of each other First Lien Secured Party, hereby appoints the Second Lien Collateral Agent, and any officer or agent of the Second Lien Collateral Agent, with full power of substitution, the attorney-in-fact of each First Lien Secured Party for the limited purpose of carrying out the provisions of this Section 4.03(b) and taking any action and executing any instrument that the Second Lien Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Section 4.03(b), which appointment is irrevocable and coupled with an interest.

## ARTICLE V

### Bailment and Sub-Agency for Perfection of Certain Security Interests

(a)     The First Lien Collateral Agent agrees that, if it shall at any time hold a First-Priority Lien on any Second Lien Collateral that can be perfected or the priority of which can be enhanced by the possession or control of such Second Lien Collateral or of any account in which such Second Lien Collateral is held, and if such Second Lien Collateral or any such account is in fact in the possession or under the control of the First Lien Collateral Agent, or of agents or bailees of the First Lien Collateral Agent (such Collateral being referred to herein as the "**Pledged or Controlled Collateral**"), the First Lien Collateral Agent shall, solely for the purpose of perfecting the Second-Priority Liens granted under the Second Lien Loan Documents and subject to the terms and conditions of this Article V, also hold or maintain control of such Pledged or Controlled Collateral as gratuitous bailee of and representative (as defined in Section 1-201(33) of the Uniform Commercial Code) for the Second Lien Collateral Agent, including for the benefit of the Second Lien Collateral Agent for purposes of Section 9-313 and 8-301 of the Uniform Commercial Code.

(b)     So long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent shall be entitled to deal with the Pledged or Controlled Collateral in accordance with the terms of this Agreement and the other First Lien Loan Documents as if the Second-Priority Liens did not exist. The obligations and responsibilities of the First Lien Collateral Agent to the Second Lien Collateral Agent and the other Second Lien Secured Parties under this Article V shall be limited solely to holding or controlling the Pledged or Controlled Collateral as gratuitous bailee and representative (as defined in Section 1-201(33) of the Uniform Commercial Code) in accordance with this Article V. Without limiting the foregoing, the First Lien Collateral Agent shall have no obligation or responsibility to ensure that any Pledged or Controlled Collateral is genuine or owned by any of the Grantors. The First Lien Collateral Agent acting pursuant to this Article V shall not, by reason of this Agreement, any other Collateral Document

or any other document, have a fiduciary relationship in respect of any other First Lien Secured Party, the Second Lien Collateral Agent or any other Second Lien Secured Party.

(c)     Upon the Discharge of First Lien Obligations, the First Lien Collateral Agent shall transfer the possession and control of the Pledged or Controlled Collateral, together with any necessary endorsements but without recourse or warranty, (i) if the Indenture Obligations are outstanding at such time, to the Second Lien Collateral Agent, and (ii) if no Indenture Obligations are outstanding at such time, to the applicable Grantor, in each case so as to allow such person to obtain possession and control of such Pledged or Controlled Collateral.   In connection with any transfer under clause (i) of the immediately preceding sentence, the First Lien Collateral Agent agrees to take all actions in its power as shall be reasonably requested by the ~~Second Lien Collateral Agent~~Grantor or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding voting as a single class to permit the Second Lien Collateral Agent to obtain, for the benefit of the Second Lien Secured Parties, a first-priority security interest in the Pledged or Controlled Collateral.

## ARTICLE VI

### Insolvency or Liquidation Proceedings

**SECTION 6.01     Finance and Sale Matters**.  (a) Until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that, in the event of any Insolvency or Liquidation Proceeding, the Second Lien Secured Parties:

(i)     except to the extent permitted by paragraph (b) of this Section 6.01, will not oppose or object to the use of any First Lien Collateral constituting cash collateral under Section 363 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, unless the First Lien Secured Parties, or a representative authorized by the First Lien Secured Parties, shall oppose or object to such use of cash collateral;

(ii)     will not oppose or object to any post-petition financing, whether provided by the First Lien Secured Parties or any other Person, under Section 364 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law (a "**DIP Financing**"), or the Liens on assets that constitute First Lien Collateral to secure any DIP Financing ("**DIP Financing Liens**"), unless the First Lien Secured Parties, or a representative authorized by the First Lien Secured Parties, shall then oppose or object to such DIP Financing or such DIP Financing Liens, and, to the extent that such DIP Financing Liens are senior to, or rank pari passu with, the First-Priority Liens, the Second Lien Collateral Agent will, for itself and on behalf of the other Second Lien Secured Parties, subordinate the Second-Priority Liens on assets constituting the Second Lien ~~Collataral~~Collateral to the First-Priority Liens and the DIP Financing Liens thereon on the terms of this Agreement;

(iii)     except to the extent permitted by paragraph (b) of this Section 6.01, in connection with the use of cash collateral as described in clause (i) above or a DIP

Financing, will not request adequate protection or any other relief in connection with such use of cash collateral, DIP Financing or DIP Financing Liens; and

(iv)     will not oppose or object to any Disposition of any First Lien Collateral free and clear of the Second-Priority Liens or other claims under Section 363 of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, if the First Lien Secured Parties, or a representative authorized by the First Lien Secured Parties, shall consent to such Disposition.

(b)     The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that no Second Lien Secured Party shall contest, or support any other Person in contesting, (i) any request by the First Lien Collateral Agent or any other First Lien Secured Party for adequate protection or (ii) any objection, based on a claim of a lack of adequate protection in respect of any First Lien Obligations, by the First Lien Collateral Agent or any other First Lien Secured Party to any motion, relief, action or proceeding. Notwithstanding the immediately preceding sentence, if, in connection with any DIP Financing or use of cash collateral, any First Lien Secured Party is granted adequate protection in the form of a Lien on additional collateral, the Second Lien Collateral Agent may, for itself and on behalf of the other Second Lien Secured Parties, seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the First-Priority Liens and DIP Financing Liens on the same basis as the other Second-Priority Liens are subordinated to the First-Priority Liens under this Agreement.

(c)     Notwithstanding the foregoing, the applicable provisions of Section 6.01(a) and (b) shall only be binding on the Second Lien Secured Parties with respect to any DIP Financing so long as (i) the principal amount of such DIP Financing, when taken together with the aggregate principal amount of the First Lien Obligations, does not exceed the Maximum Priority Debt Amount and (ii) such DIP Financing is not secured by any Indenture Exclusive Collateral.

**SECTION 6.02     Relief from the Automatic Stay**.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that, so long as the Discharge of First Lien Obligations has not occurred, no Second Lien Secured Party shall, without the prior written consent of the First Lien Collateral Agent, seek or request relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of any part of the Collateral, any proceeds thereof or any Second-Priority Lien.

**SECTION 6.03     Reorganization Securities**.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of both the First Lien Obligations and the Indenture Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Indenture Obligations are secured by Liens upon some of the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**SECTION 6.04     Post-Petition Interest**.  (a)  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that no Second Lien Secured

Party shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any other First Lien Secured Party for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the First-Priority Liens (it being understood and agreed that such value shall be determined without regard to the existence of the Second-Priority Liens on the Collateral).

(b)     The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, agrees that the Second Lien  Collateral Agent or any other Second Lien Secured Party may make a claim for allowance in any Insolvency or Liquidation Proceeding of Indenture Obligations consisting of post-petition interest, fees or expenses to the extent of the value of (i) the Second-Priority Liens (provided, however, that that if the First Lien Secured Parties shall have made any such claim, such claim shall have been approved prior to, or will be approved contemporaneous with, the approval of any such claim by any Second Lien Secured Party) and (ii) the Indenture Exclusive Collateral Liens.

**SECTION 6.05     Certain Waivers by the Second Lien Secured Parties**.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, waives any claim any Second Lien Secured Party may hereafter have against any First Lien Secured Party arising out of (a) the election by any First Lien Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code, or any comparable provision of any other Bankruptcy Law, or (b) any cash collateral or financing arrangement, or any grant of a security interest in the Collateral, in any Insolvency or Liquidation Proceeding, in each case, with respect to the Collateral.

**SECTION 6.06     Certain Voting Matters**.  Each of the First Lien Collateral Agent, on behalf of the First Lien Secured Parties, and the Second Lien Collateral Agent, on behalf of the Second Lien Secured Parties, agrees that, without the consent of the other, it will not seek to vote with the other as a single class in connection with any plan of reorganization in any Insolvency or Liquidation Proceeding.

## ARTICLE VII

## Other Agreements

**SECTION 7.01     Matters Relating to Loan Documents**.  (a) The First Lien Loan Documents may be amended, restated, supplemented or otherwise modified in accordance with their terms, and the Indebtedness under the Credit Agreement may be Refinanced or replaced, in each case, without the consent of any Second Lien Secured Party; provided, however, that without the consent of the Second Lien Required Lenders, no such amendment, restatement, supplement, modification, Refinancing or replacement shall contravene any provision of this Agreement; provided further that the holders of the Indebtedness resulting from such Refinancing or replacement (or a duly authorized agent on their behalf) agree in writing to be bound by the terms of this Agreement (including Section 4.01).

(b)     Without the prior written consent of the First Lien Required Lenders, no Second Lien Loan Document may be amended, restated, supplemented or otherwise modified, or entered into, to the extent such amendment, restatement, supplement or modification, or the terms of

such new Second Lien Loan Document, would contravene the provisions of this Agreement. As an intercreditor agreement only and without prejudice to any rights of the First Lien Lenders under the Credit Agreement, Indebtedness under the Second Lien Loan Documents may be Refinanced if a duly authorized agent, on their behalf, agrees in writing to be bound by the terms of this Agreement.

(c)     Each of ~~Company~~the Grantors and the Second Lien Collateral Agent agrees that the Indenture and each Second Lien Collateral Document shall contain the applicable provisions set forth on Annex II hereto, or similar provisions approved by the First Lien Collateral Agent.

**SECTION 7.02     Effect of Refinancing of Indebtedness under First Lien Loan Documents**.  If, within 30 days of the Discharge of First Lien Obligations, the Borrowers Refinance Indebtedness outstanding under the First Lien Loan Documents and provided that (a) such Refinancing is permitted hereby and (b) the Company gives to the Second Lien Collateral Agent, at least ten Business Days prior to such Refinancing, written notice (the "**Refinancing Notice**") electing the application of the provisions of this Section 7.02 to such Refinancing Indebtedness, then (i) such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement, (ii) such Refinancing Indebtedness and all other obligations under the loan documents evidencing such Indebtedness (the "**New First Lien Obligations**") shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, (iii) the credit agreement and the other loan documents evidencing such Refinancing Indebtedness (the "**New First Lien Loan Documents**") shall automatically be treated as the Credit Agreement and the First Lien Loan Documents and, in the case of New First Lien Loan Documents that are security documents, as the First Lien Collateral Documents for all purposes of this Agreement, (iv) the collateral agent under the New First Lien Loan Documents (the "**New First Lien Collateral Agent**") shall be deemed to be the First Lien Collateral Agent for all purposes of this Agreement and (v) the lenders under the New First Lien Loan Documents shall be deemed to be the First Lien Lenders.  Upon receipt of a Refinancing Notice, which notice shall include the identity of the New First Lien Collateral Agent, the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New First Lien Collateral Agent may reasonably request in order to provide to the New First Lien Collateral Agent the rights and powers contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.  The Company shall cause the agreement, document or instrument pursuant to which the New First Lien Collateral Agent is appointed to provide that the New First Lien Collateral Agent agrees to be bound by the terms of this Agreement.

**SECTION 7.03     No Waiver by First Lien Secured Parties**.  Other than with respect to the Second Lien Permitted Actions, nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any other First Lien Secured Party from opposing, challenging or objecting to, in any Insolvency or Liquidation Proceeding or otherwise, any action taken, or any claim made, by the Second Lien Collateral Agent or any other Second Lien Secured Party, including any request by the Second Lien Collateral Agent or any other Second Lien Secured Party for adequate protection or any exercise by the Second Lien Collateral Agent or any other

Second Lien Secured Party of any of its rights and remedies under the Second Lien Loan Documents or otherwise, in each case, in respect of any Second Lien Collateral.

**SECTION 7.04** **Reinstatement**. If, in any Insolvency or Liquidation Proceeding or otherwise, all or part of any payment with respect to the First Lien Obligations or Indenture Obligations previously made shall be rescinded for any reason whatsoever, then the First Lien Obligations or Indenture Obligations, as the case may be, shall be reinstated to the extent of the amount so rescinded and, if theretofore terminated, this Agreement shall be reinstated in full force and effect and such prior termination shall not diminish, release, discharge, impair or otherwise affect the Lien priorities and the relative rights and obligations of the First Lien Secured Parties and the Second Lien Secured Parties provided for herein.

**SECTION 7.05** **Further Assurances**. Each of the First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, and the Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, and each Grantor party hereto, for itself and on behalf of its subsidiaries, agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable law, or which the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

**SECTION 7.06** **Actions of Second Lien Collateral Agent**. Except as may otherwise be specifically provided in the Indenture or any Second Lien Collateral Document with respect to any act, or refraining from acting, that is discretionary with the Second Lien Collateral Agent in accordance with the terms of any Second Lien Loan Document, the Second Lien Collateral Agent will act or refrain from acting in accordance with the written instructions of the Second Lien Required Lenders.

## ARTICLE VIII

### Representations and Warranties

**SECTION 8.01** **Representations and Warranties of Each Party**. Each party hereto represents and warrants to the other parties hereto as follows:

(a) Such party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to execute and deliver this Agreement and perform its obligations hereunder.

(b) This Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party, enforceable in accordance with its terms, except that the enforcement hereof may be subject to (i) bankruptcy, insolvency, reorganization, receivership, moratorium, fraudulent conveyance or other similar laws now or hereafter in effect relating to creditors' rights generally and (ii) general principles of equity (whether applied by a court of law or equity) and the discretion of the court before which any proceeding therefor may be brought.

(c)     The execution, delivery and performance by such party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any governmental authority and (ii) will not violate any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of such party or any order of any governmental authority or any provision of any indenture, agreement or other instrument binding upon such party.

**SECTION 8.02    Representations and Warranties of Each Collateral Agent**.  Each Collateral Agent represents and warrants to the other parties hereto that it has been authorized by the Lenders under and as defined in the Credit Agreement and the holders of the Notes under the Indenture, as applicable, to enter into this Agreement.

## ARTICLE IX

### No Reliance; No Liability; Obligations Absolute

**SECTION 9.01    No Reliance; Information**.  Each Collateral Agent, for itself and on behalf of the respective other Secured Parties, acknowledges that (a) the respective Secured Parties have, independently and without reliance upon, in the case of the First Lien Secured Parties, any Second Lien Secured Party and, in the case of the Second Lien Secured Parties, any First Lien Secured Party, and based on such documents and information as they have deemed appropriate, made their own credit analysis and decision to enter into the Loan Documents to which they are party and (b) the respective Secured Parties will, independently and without reliance upon, in the case of the First Lien Secured Parties, any Second Lien Secured Party and, in the case of the Second Lien Secured Parties, any First Lien Secured Party, and based on such documents and information as they shall from time to time deem appropriate, continue to make their own credit decision in taking or not taking any action under this Agreement or any other Loan Document to which they are party.  The First Lien Secured Parties and the Second Lien Secured Parties shall have no duty to disclose to any Second Lien Secured Party or to any First Lien Secured Party, respectively, any information relating to the Company or any of the Subsidiaries, or any other circumstance bearing upon the risk of nonpayment of any of the Obligations, that is known or becomes known to any of them or any of their affiliates.  In the event any First Lien Secured Party or any Second Lien Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to, respectively, any Second Lien Secured Party or any First Lien Secured Party, it shall be under no obligation (i) to make, and shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of the information so provided, (ii) to provide any additional information or to provide any such information on any subsequent occasion or (iii) to undertake any investigation.  Notwithstanding anything to the contrary set forth in this Section 9.01, the parties hereto acknowledge that the Second Lien Collateral Agent has not conducted and will not conduct any credit analysis in respect of the Loan Documents or the transactions contemplated thereby.

**SECTION 9.02    No Warranties or Liability**.  (a) The First Lien Collateral Agent, for itself and on behalf of the other First Lien Secured Parties, acknowledges and agrees that, except for the representations and warranties set forth in Article VIII, neither the Second Lien Collateral Agent nor any other Second Lien Secured Party has made any express or implied representation

or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, acknowledges and agrees that, except for the representations and warranties set forth in Article VIII, neither the First Lien Collateral Agent nor any other First Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.

(b)     The Second Lien Collateral Agent and the other Second Lien Secured Parties shall have no express or implied duty to the First Lien Collateral Agent or any other First Lien Secured Party, and the First Lien Collateral Agent and the other First Lien Secured Parties shall have no express or implied duty to the Second Lien Collateral Agent or any other Second Lien Secured Party, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of a default or an event of default under any First Lien Loan Document and any Second Lien Loan Document (other than, in each case, this Agreement), regardless of any knowledge thereof which they may have or be charged with.

(c)     The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, agrees that no First Lien Secured Party shall have any liability to the Second Lien Collateral Agent or any other Second Lien Secured Party, and hereby waives any claim against any First Lien Secured Party, arising out of any and all actions which the First Lien Collateral Agent or the other First Lien Secured Parties may take or permit or omit to take.

**SECTION 9.03      Obligations Absolute**.  The Lien priorities provided for herein and the respective rights, interests, agreements and obligations hereunder of the First Lien Collateral Agent and the other First Lien Secured Parties and the Second Lien Collateral Agent and the other Second Lien Secured Parties shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any Loan Document;

(b)     any change in the time, place or manner of payment of, or in any other term of (including, subject to the limitations set forth in Section 7.01(a), the Refinancing of), all or any portion of the First Lien Obligations, it being specifically acknowledged that a portion of the First Lien Obligations consists or may consist of Indebtedness that is revolving in nature, and the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed;

(c)     any change in the time, place or manner of payment of, or, subject to the limitations set forth in Section 7.01(b), in any other term of, all or any portion of the Indenture Obligations;

(d)     subject to the limitations set forth in Section 7.01(a), any amendment, waiver or other modification, whether by course of conduct or otherwise, of any Loan Document;

(e)     the securing of any First Lien Obligations or Indenture Obligations with any additional collateral or Guarantees, or any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral or any release of any Guarantee securing any First Lien Obligations or Indenture Obligations; or

(f)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Borrower, Grantor or any other loan party in respect of the First Lien Obligations or this Agreement, or any of the Second Lien Secured Parties in respect of the Indenture Obligations or this Agreement.

## ARTICLE X

### Miscellaneous

**SECTION 10.01   Notices**.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or by nationally recognized overnight courier service, mailed by certified or registered mail or sent by fax to each party hereto at its address set forth below its signature hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or by nationally recognized overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest un-revoked direction from such party given in accordance with this Section 10.01.  As agreed to among the Company and any Collateral Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

**SECTION 10.02   Conflicts**.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions of this Agreement shall control.

**SECTION 10.03   Effectiveness; Survival**.  This Agreement shall become effective when executed and delivered by the parties hereto.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby waives any and all rights the Second Lien Secured Parties may now or hereafter have under applicable law to revoke this Agreement or any of the provisions of this Agreement.

**SECTION 10.04   Severability**.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular

provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.05   **Amendments; Waivers**.  (a) No failure or delay on the part of any party hereto in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)      Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the First Lien Collateral Agent and the Second Lien Collateral Agent; provided that no such agreement shall amend, modify or otherwise affect the rights or obligations of any Grantor without such Grantor's prior written consent.

SECTION 10.06   **Subrogation**.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby waives any rights of subrogation it or they may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred; provided, however, that, as between the Company and the other Grantors, on the one hand, and the Second Lien Secured Parties, on the other hand, any such payment that is paid over to the First Lien Collateral Agent pursuant to this Agreement shall be deemed not to reduce any of the Indenture Obligations.  Following the Discharge of First Lien Obligations, each First Lien Party agrees to execute such documents, agreements, and instruments as any Second Lien Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the First Lien Obligations resulting from payments or distributions to such First Lien Secured Party by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by such First Lien Secured Party are paid by such Person upon request for payment thereof.

SECTION 10.07   **Applicable Law; Jurisdiction; Consent to Service of Process**.  (a) THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

(b)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan of the City of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or

proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court. Each party hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**SECTION 10.08    Waiver of Jury Trial**. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**SECTION 10.09    Parties in Interest**. This provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Lien Secured Parties and Second Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement. No other Person shall have or be entitled to assert rights or benefits hereunder.

**SECTION 10.10    Specific Performance**. Each Collateral Agent may demand specific performance of this Agreement and, on behalf of itself and the respective other Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the respective Secured Parties.

**SECTION 10.11    Headings**. Article and Section headings used herein and the Table of Contents hereto are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

**SECTION 10.12** __Counterparts__.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

**SECTION 10.13** __Provisions Solely to Define Relative Rights__.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties, on the one hand, and the Second Lien Secured Parties, on the other hand. None of the Company, any other Grantor, any Guarantor or any other creditor thereof shall have any rights or obligations, except as expressly provided in this Agreement, hereunder and none of the Company, any other Grantor or any Guarantor may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor or any Guarantor, which are absolute and unconditional, to pay the First Lien Obligations and the Indenture Obligations as and when the same shall become due and payable in accordance with their terms.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PNC BANK, NATIONAL ASSOCIATION**,
as First Lien Collateral Agent

By: _____
    Name:
    Title:

Address for notices:
200 South Wacker Drive, Suite 600
Chicago, Illinois 60606
Attention:  Portfolio Manager
Facsimile Number:  (312) 454-2919

**WILMINGTON TRUST FSB**,
as Second Lien Collateral Agent

By: _____
    Name:
    Title:

Address for notices:
Corporate Capital Markets

50 South Sixth Street, Suite 1290
Minneapolis, MN  55402
Attention:  Aventine Administrator
Facsimile Number:  (612) 217-5651

Acknowledged as of the date first above written:

AVENTINE RENEWABLE ENERGY
HOLDINGS, INC.


By: _____
       Name:
       Title:


**[• ]**


By: _____
       Name:
       Title:


**[• ]**


By: _____
       Name:
       Title:


Address for Notices:
c/o Aventine Renewable Energy Holdings, Inc.
120 North Parkway Drive
Pekin, Illinois  61554
Attention: **[• ]**
Facsimile Number: **[• ]**

## FIRST LIEN COLLATERAL AND SECOND LIEN COLLATERAL

All right, title and interest of AVENTINE RENEWABLE ENERGY HOLDINGS, INC., a Delaware corporation (the "Borrower"), and each other Grantor (such capitalized term and all other capitalized terms that are used and not defined in either this ANNEX I or the Intercreditor Agreement shall have the meanings ascribed to such terms in that certain Revolving Credit and Security Agreement dated as of (and as in effect on) the date hereof (as referred to in this ANNEX I, the "Security Agreement") made by the Borrower in favor of PNC BANK, NATIONAL ASSOCIATION), in and to the following, whether now owned or hereafter existing or acquired by such Grantor (all of the following are collectively referred to as the "First Lien Collateral" and as the "Second Lien Collateral" in this Annex I):

(a)     all Accounts and all books, other Records and Proceeds with respect thereto;

(b)     all Chattel Paper (including without limitation all Tangible Chattel Paper and Electronic Chattel Paper) and all books, other Records and Proceeds with respect thereto;

(c)     all Deposit Accounts, including without limitation each Controlled Deposit Account (including all deposits and investments therein and all earnings thereon) but excluding any Indenture Collateral Account, and all books, other Records and Proceeds with respect thereto;

(d)     all Documents and all books, other Records and Proceeds with respect thereto;

(e)     all Inventory and all books, other Records and Proceeds with respect thereto;

(f)     all Intellectual Property Collateral (other than Excluded Intellectual Property) and all books, other Records and Proceeds with respect thereto;

(g)     all Investment Property (other than Excluded Equity and Indenture Collateral Accounts) and all books, other Records and Proceeds with respect thereto;

(h)     all Letter-of-Credit Rights and all books, other Records and Proceeds with respect thereto;

(i)     all Receivables not otherwise described above and all books, other Records and Proceeds with respect thereto;

(j)     all Instruments related to or arising from Collateral and all books, other Records and Proceeds with respect thereto;

(k)     General Intangibles related to or arising from Receivables and Inventory and all books, other Records and Proceeds with respect thereto;

(l)     all Pledged Cash Collateral and all books, other records and proceeds with respect thereto; and

(m)     all Supporting Obligations and all books, other Records and Proceeds with respect thereto.

Notwithstanding the foregoing, each of the "First Lien Collateral" and the "Second Lien Collateral" shall not include:

(i)     any Proceeds (other than Equity Interests of a Restricted Subsidiary of the Borrower (other than a Foreign Subsidiary)) arising from a Disposition, casualty or condemnation of Indenture Exclusive Collateral;

(ii)     in the event of a Disposition of Equity Interests of a Restricted Subsidiary of the Borrower which results in a Disposition of assets constituting Indenture Exclusive Collateral, the portion of the Proceeds of such Disposition attributable to such assets;

(iii)     any (A) Commercial Tort Claims, (B) Excluded Contracts or other General Intangibles not related to or arising from Receivables or Inventory (other than Intellectual Property not constituting Excluded Intellectual Property), (C) Excluded Equipment or other Equipment or other Goods (other than Inventory), (D) Instruments not related to or arising from Collateral, or (E) Real Property;

(iv)     any General Intangibles or other rights arising under any contract, instrument, license or other document as to which the grant of a security interest would constitute a violation of a valid and enforceable restriction on such grant in favor of the Person(s) (other than such Grantor) obligated on such contract, instrument, license or other document, unless and until any required consents shall have been obtained; or

(v)     any Equity Interests issued by any Unrestricted Subsidiary or any Foreign Subsidiary.

Provision for the Indenture

**"The Trustee and by its acceptance of its Note(s), each Holder (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) consents to the subordination of Liens on the Second Lien Collateral as defined, and provided for, in the Intercreditor Agreement, (c) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (d) authorizes and instructs the Collateral Agent to enter into the Intercreditor Agreement as agent for and representative of such Secured Party. The foregoing provisions are intended as an inducement to the lenders under the Credit Facility to extend credit to the Borrowers and such lenders are intended third party beneficiaries of such provisions."**

Provision for the Second Lien Collateral Documents

**"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent, for the ratable benefit of Secured Parties, pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent and the other Secured Parties hereunder with respect to the Second Lien Collateral, are subject to the provisions of the Intercreditor Agreement. In the event of any conflict or inconsistency between the provisions of the Intercreditor Agreement and this Agreement with respect to the Second Lien Collateral, the provisions of the Intercreditor Agreement shall control."**

Document comparison by Workshare Professional on Wednesday, February 24, 2010
11:11:44 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WSDMS/DB02/9284105/1 |
| Description | #9284105v1<DB02> - Aventine - Intercreditor Agreemetn [FILED VERSION 2/.5/10] |
| Document 2 ID | interwovenSite://WSDMS/DB02/9299077/1 |
| Description | #9299077v1<DB02> - Aventine - Intercreditor Agreement [FILED VERSION 2/24/10] |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 107 |
| Deletions | 82 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 195 |