# EXHIBIT B

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor *Aventine Renewable Energy, Inc.* | Case Number *09- 11216* |
|---|---|

NOTE *This form should not be used to make a claim for an administrative expense arising after the commencement of the case A request for payment of an administrative expense may be filed pursuant to 11 U S C § 503*

| Name of Creditor (the person or other entity to whom the debtor owes money or property) **First Union Rail Corporation, a/k/a First Union Rail** | ☐ Check this box to indicate that this claim amends a previously filed claim |
|---|---|
| Name and address where notices should be sent **First Union Rail Corporation, a/k/a First Union Rail** **One O'Hare Centre** **6250 River Road, Suite 5000** **Rosemont, IL 60018** | **Court Claim Number** _____ *(If known)* Filed on _____ |
| Name and address where payment should be sent (if different from above) FILED - 00371 US BANKRUPTCY CT-DIST OF DELAWARE AVENTINE RENEWABLE ENERGY HOLDINGS, INC , ET AL 09-11214 (KG) Telephone number | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim Attach copy of statement giving particulars ☐ Check this box if you are the debtor or trustee in this case |

| 1. Amount of Claim as of Date Case Filed. **$2,065,186.50 (See Attached)** | 5. Amount of Claim Entitled to Priority under 11 U S C §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount |
|---|---|

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges *(See Attached)*

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C §507(a)(1)(A) or (a)(1)(B)

| 2. Basis for Claim: Lease Payments *(See Attached)* (See instruction #2 on reverse side) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier — 11 U S C §507(a)(4) |
|---|---|
| 3. Last four digits of any number by which creditor identifies debtor: 3a Debtor may have scheduled account as: _____ (See instruction #3a on reverse side) | |
| 4. Secured Claim (See instruction #4 on reverse side ) Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information | ☐ Contributions to an employee benefit plan — 11 U S 0 §507(a)(5) |
| Nature of property or right of setoff   ☐ Real Estate ☐ Motor Vehicle ☐ Other Describe: Value of Property     Annual Interest Rate % | ☐ Up to $2,425* of deposits toward or services for personal, family, or household use — 11 U S C §507(a)(7) |
| Amount of arrearage and other charges as of time case filed Included in secured claim, if any.   Basis for perfection | ☐ Taxes or penalties owed to governmental units — 11 U S C §507(a)(8) |
| Amount of Secured Claim:     Amount Unsecured, $*(See Attached)* | ☒ Other — Specify applicable paragraph of 11 U S C §507(a)(_) *(See Attached)* |
| 6 Credits The amount of all payments on this claim has been credited for the purpose of making this proof of claim | Amount entitled to priority: *(See Attached)* |
| 7 Documents Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary *(See definition of "redacted" on reverse side)* *(See Attached)* DO NOT SEND ORIGINAL DOCUMENTS ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING If the documents are not available, please explain *(See Attached)* | *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment* |

| Date *9/4/09* | Signature The person filing this claim must sign it Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney, if any **First Union Rail Corporation, a/k/a First Union Rail** By Natalie H. Swiatek, AVP-Rail Accounting | FOR COURT USE ONLY SEP 8 2009 |
|---|---|---|

*Penalty for presenting fraudulent claim* Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U S C §§ 152 and 3571

B 10 (Official Form 10) (12/07)

| | |
|---|---|
| In re: | Chapter 11 |
| AVENTINE RENEWABLE ENERGY, INC., | Case No. 09-11216 (KG) |
| a/k/a | |
| WILLIAMS ETHANOL SERVICES, INC. | Rider to Proof of Claim |
| Debtor.[1] | |

**Creditor Information**

First Union Rail Corporation, a/k/a First Union Rail
One O'Hare Centre
6250 River Road, Suite 5000
Rosemont, IL 60018
Attn: Natalie Swiatek, AVP-Rail Accounting

**Claim Information**

1.  Basis of Claim:

    (a)     Prior to April 7, 2009 (the "Petition Date"), Aventine Renewable Energy,

Inc., a/k/a, Williams Ethanol Services, Inc., as lessee ("Lessee"), and Trinity Industries Leasing

Company, as the existing lessor ("Trinity"), were parties to a Railroad Car Lease Agreement

dated January 14, 2003 (the "Trinity Lease Agreement", as the same may be extended,

supplemented, amended or restated, from time to time, the "Lease", and together with all railroad

car lease transactions, riders thereto, and related agreements, entered into pursuant to the Lease,

---

[1] The above-captioned Debtor is one (1) of seven (7) Debtors, the chapter 11 cases of which are jointly administered under the case of Aventine Renewable Energy Holdings, Inc. All seven (7) Debtors' names, along with the last four digits of each Debtor's federal tax identification number, are: Aventine Renewable Energy Holdings, Inc. (9368), Aventine Renewable Energy, LLC (0195), Aventine Renewable Energy, Inc. (8352), Aventine Renewable Energy – Aurora West, LLC (9285), Aventine Renewable Energy – Mt Vernon, LLC (8144), Aventine Power, LLC (9343), and Nebraska Energy, L.L.C. (1872) (collectively, the "Debtors"). The corporate headquarters address for the Debtors is 120 North Parkway Drive, Pekin, Illinois 61554.

1357728.7

as the same may be extended, supplemented, amended or restated, from time to time, collectively, the "Lease Documents"). A copy of certain of the Lease Documents are annexed hereto, made a part hereof and marked as Exhibit A. Upon information and belief, all Lease Documents have been served upon Lessee, and any Lease Documents not annexed to this Proof of Claim are available upon request from First Union Rail Corporation, a/k/a First Union Rail ("First Union"), to the extent such Lease Documents are in the possession of First Union.

(b)     Thereafter, pursuant to a purchase agreement (the "Purchase Agreement"), dated July 31, 2007, between First Union, as purchaser, and the Existing Lessor, as seller, the Existing Lessor (1) sold to First Union all railcars, together with all present and future additions, attachments, replacements, parts, spare parts, substitutions, upgrades, repairs, accessions and accessories incorporated therein and/or affixed thereto (collectively, the "Equipment") subject to the Lease Documents, and (2) assigned to First Union all of the Existing Lessor's rights, title, interest and obligations in and to the Equipment, and in, to and under the Lease Documents to the extent such rights, title, interest, and obligations relate to the Equipment (First Union, in such capacity, is hereafter referred to as the "Lessor").

(c)     Pursuant to that certain Acknowledgment of Assignment (as supplemented, amended or restated from time to time, the "Assignment"), dated July 11, 2007, executed by Lessee and Existing Lessor, Lessee acknowledged and agreed to all terms of the Purchase Agreement, including, without limitation, the transfer of all Existing Lessor's foregoing rights and benefits to First Union, as the Lessor, including, without limitation, and all payments, indemnities, and covenants due and becoming due from Lessee under the Lease Documents. A

2

copy of the Assignment is annexed hereto, made a part hereof and marked as Exhibit B.

(d) As per the Petition Date, the Equipment, as same may be supplemented, replaced, and/or modified from time to time, includes forty-nine (49) of the railcars (each a "Car") more particularly described on exhibit A of the Assignment, each (i) built in the year 2006, (ii) described in the industry as "6,351 CF Hopper Cars", and (iii) bearing the reporting marks, "TILX 637853-637902".

(e) Upon information and belief, Lessee has not rejected the Lease and, upon information and belief, Lessee and/or other Debtors remain in possession of and continue to utilize the Equipment both prior to and following the Petition Date.

(f) Pursuant to and as more particularly set forth in the Lease Documents, each base monthly rental payment (collectively, the "Rent Payments") is due and payable in advance on or before the first day of each calendar month during the term of the Lease, which, pursuant to Rider Two (2) to the Lease is extending through and including December of 2013. The amount of each monthly Rent Payment that Lessee agreed to make was $763.00 per Car, with aggregate Monthly Rent Payments of $37,387.00.

2. Total Amount of Claim

(a) As of the Petition Date, Lessee was indebted to Lessor in an aggregate amount of not less than $38,150.00 in Rent Payments, together with all interest accrued and accruing thereon, and all fees, costs, expenses and other charges, including reasonable attorneys' fees and expenses, accruing or chargeable with respect thereto, pursuant to the Lease, applicable law, or otherwise.

3

(b)     As of the date hereof, the total indebtedness of Lessee, owing to Lessor under the Lease aggregates to not less than $2,065,186.50 in Rent Payments, which includes the foregoing indebtedness less any and all amounts received by Lessor from Lessee since the Petition Date, plus all interest accrued and accruing thereon, and all fees, costs, expenses and other charges, including reasonable attorneys' fees and expenses, accruing or chargeable with respect thereto, pursuant to the Lease Documents, applicable law, or otherwise. A schedule of aging Rent Payments, as well as all amounts received by Lessor from Lessee under the Lease since the Petition Date, is annexed hereto, made a part hereof and marked as Exhibit C.

(c)     Lessor does not waive its rights to any and all other interest accrued and accruing thereon, fees, costs, expenses, or other charges, including reasonable attorneys' fees and expenses, accruing or chargeable with respect thereto. This Proof of Claim may not include all amounts relating to fees, costs, expenses, and charges incurred before the Petition Date as to which the Lessee is liable, including costs and expenses incurred in enforcing and preserving rights with respect to the claim of Lessor.

3.     Classification of Claim.

The claim is a general unsecured claim, except to the extent that said claim is entitled to administrative priority or other priority under 11 U.S.C. §503, §507, or otherwise.[2]

4.     Credit and Setoffs.

The claim is not presently subject to any setoff or counterclaim.

---

[2] Lessor reserves its right to evaluate whether the Lease transactions constitute secured financing arrangements or otherwise.

4

5. Reservation of Rights

(a)    The execution and filing of this Proof of Claim is not: (i) a waiver or release of Lessor's rights against any other entity or person which may be liable for all or any part of the claims set forth herein; (ii) a consent by Lessor to the jurisdiction of this Court with respect to any proceeding commenced in these cases against or otherwise involving Lessor; (iii) a waiver of the right to withdraw the reference with respect thereto or any other proceeding commenced in these cases against or otherwise involving Lessor; or (iv) an election of remedies which waives or otherwise affects any other remedy.

(b)    Lessor reserves the right to amend or supplement this Proof of Claim.

(c)    The omission hereof of any document or agreement executed by Lessee or by any of the Debtors, or by Lessor or by Existing Lessor, shall not be deemed a waiver of any rights of Lessor under or with respect to such agreements or documents.

6. Notices

All notices concerning this Proof of Claim should be sent to (i) First Union Rail Corporation, a/k/a First Union Rail, One O'Hare Centre, 6250 River Road, Suite 5000, Rosemont, IL 60018, Attention: Natalie Swiatek, AVP-Rail Accounting; and (ii) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attention: Jonathan N. Helfat, Esq.

7. Certification

The undersigned, Natalie Swiatek, whose business and mailing address is First Union Rail Corporation, a/k/a First Union Rail, One O'Hare Centre, 6250 River Road, Suite

5

5000, Rosemont, IL 60018, and who is an officer of First Union, is authorized to execute this Proof of Claim.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

6

**FIRST UNION RAIL CORPORATION, A/K/A FIRST UNION RAIL**

By _Cathie H. Swratk, AVP Rail Acct_

Natalie H. Swiatek
AVP-Rail Accounting

Dated: September _4_, 2009

Penalty for presenting fraudulent claims: a fine of up to $500,000 or imprisonment for up to five (5) years, or both 18 U.S.C. §§ 152, 3571.

**EXHIBIT A**

AVREDO ISF

### TRINITY INDUSTRIES LEASING COMPANY
### RAILROAD CAR LEASE AGREEMENT

This Agreement, made this 14ᵗʰ day of January, 2003, between **Trinity Industries Leasing Company**, a Delaware corporation, with its principal office at 2525 Stemmons Freeway, Dallas, Texas 75207, (hereinafter called "Lessor") and **Williams Ethanol Services** a Delaware corporation, with its principal office at 1800 South Second Street, Pekin, Illinois 61554 (hereinafter called "Lessee").

In consideration of the mutual terms and conditions hereinafter set forth, the parties hereto hereby agree as follows:

### ARTICLE 1: LEASE AGREEMENT

Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the cars shown on each Rider hereto and such additional Riders as may be added from time to time (each such Rider and together with this Agreement shall be collectively referred to as the "Lease") by agreement of the parties and signed by their duly authorized representative (all such cars being hereinafter referred to as the "cars"). Each Rider shall set forth a brief description of the car or cars covered thereby, including such facts as the number of cars, the AAR or DOT specifications, rental charges, term throughout which the car or cars shall remain in Lessee's service and such other information as may be desired by both parties. Lessor and Lessee agree that each Rider hereto shall constitute a separate Lease which incorporates the terms of this Agreement. Each Rider shall be severable from any other cars or riders relating to this Agreement and shall become a separate lease which is separately transferable for all purposes. It is the intent of all parties to this Agreement to characterize this Agreement as a true lease.

### ARTICLE 2: DELIVERY

Lessor agrees to deliver each car to Lessee, freight charges collect, in the yard of the delivering line at the point specified by the Lessee, and Lessee agrees to accept such delivery. The obligations of the Lessor to deliver the cars shall be excused, and Lessor shall not be liable, for any causes beyond the reasonable control of Lessor (including, but not limited to, delays caused by fire, labor difficulties, delays of carriers and materials suppliers, governmental authority, late delivery by the manufacturer of the cars or late delivery by a prior lessee) and, in the event of a delay in such delivery, Lessor shall deliver the cars to Lessee as soon as reasonably possible thereafter.

### ARTICLE 3: CONDITION OF CARS - ACCEPTANCE

All cars delivered under this Lease shall be in satisfactory condition for movement in the normal interchange of rail traffic and shall otherwise comply with the description and specifications contained in the applicable Rider; but Lessee shall be solely responsible for determining that cars are in proper condition for loading and shipment, except for those responsibilities which, under applicable law, have been assumed by the railroads. Lessee shall inspect the cars promptly after they are delivered and shall notify Lessor in writing within five days after delivery of its rejection of any car, and the specific reasons for such rejection. Failure by the Lessee to inspect the cars within five days after delivery, and/or the successful loading of any car by Lessee, shall constitute acceptance of such car or cars, as the case may be, by Lessee and shall be conclusive evidence of the fit and suitable condition of such car or cars. At Lessor's request, Lessee shall deliver to Lessor an executed Certificate of Acceptance in the form of Exhibit A with respect to all cars.

If Lessee rejects any car, Lessor shall have the right to have the rejected car inspected by an inspector acceptable to both Lessor and Lessee. The cost of such inspection will be paid by Lessor if the cause for rejection is affirmed by the inspector, otherwise such cost will be borne by Lessee. The Lessee shall be deemed to have accepted any car for which the inspector determines that good cause for rejection did not exist. The decision of the inspector shall be final and binding upon the parties.

Lessee's acceptance, however affected, shall be deemed effective as of the delivery date and the monthly rentals as hereinafter set forth shall accrue from the delivery date. Such acceptance shall conclusively establish that such cars conform to the applicable standards set forth in the Rider(s) and the Interchange Rules.

### ARTICLE 4: RENTALS

Lessee agrees to pay to Lessor for the use of each car the monthly rental set forth in the Rider applicable to such car from the date such car is delivered to Lessee until such car is returned to Lessor, as hereinafter provided in Article 18. The rental shall be payable in U.S. Dollars and in advance on or before the first day of each calendar month (provided, however, that the rental for each car for the month in which it is delivered shall be prorated for the number of days, including the day of delivery, remaining in such month at a daily rate based upon a 365 day year and shall be payable on or before the first day of the next succeeding month) to Lessor at 21038 Network Place, Chicago, Illinois 60673-1210, or at such other address as Lessor may specify by notice to Lessee. Except as set forth in this Lease (including without limitation, the provisions of Article 11) rental shall be paid without deduction, set-off or counterclaim.

Except as set forth in Article 24, rent on a car shall cease immediately upon the effective date of cancellation or termination of this Agreement. Rent on a car shall further cease during the period(s) of time that such car is out of Lessee's service under this Agreement in accordance with Article 11 (Maintenance), Article 12 (Loss or Destruction), Article 18 (Return of Cars – Cleaning), and Article 19 (Modifications).

1

## ARTICLE 5: MILEAGE ALLOWANCE

Lessor shall collect all mileage earned by the cars during the lease term and shall credit to the rental of Lessee, such mileage earned by the cars while in the service of Lessee, as and when received from the railroads according to, and subject to, all rules of the tariffs of the railroads, but only to the extent of the aggregate rental charges payable for the duration of the lease term.

## ARTICLE 6: TERM

This Lease shall be effective as dated and will expire upon the completion of the leasing arrangement shown on the attached Riders of the Lease term, with respect to all cars covered by a particular Rider, shall commence on the average date of delivery of the cars covered by such Rider; and shall terminate as specified in such Rider, unless sooner terminated in accordance with provisions of this Lease.

## ARTICLE 7: USE AND POSSESSION

Throughout the continuance of this Lease so long as Lessee is not in default under this Lease, Lessee shall be entitled to possession of each car from the date the lease becomes effective as to such car; and shall use such car only in the manner for which it was designed and intended, and so as to subject it only to ordinary wear and tear, and on its own property or lines in the usual interchange of traffic; provided, however, that Lessee agrees that the cars shall at all times be used: (a) in conformity with all Interchange Rules; (b) in compliance with the terms and conditions of this Lease; (c) predominantly in the continental limits of the United States, provided however, in no event shall more than forty percent (40%) of the cars (as determined by mileage records and measured annually on a calendar year basis) be used outside of the contiguous United States and Canada at the same time.

In the event any car is used outside of the continental United States, for any reason whatsoever, Lessee shall assume full responsibility for all costs, taxes, duties or other charges incidental to such use including costs incurred in returning car to the continental United States.

## ARTICLE 8: EMPTY MILEAGE INDEMNIFICATION

Lessee agrees that it will use its best efforts to so use the cars that their total mileage under load will equal or exceed their mileage empty on each railroad over which the cars move. Should the empty mileage exceed the loaded mileage, Lessee shall pay to Lessor for such excess at the rate and at the time established by the tariff of the railroad on which such excess of empty miles has accrued, but only to the extent that a railroad charges Lessor. For the purpose of this paragraph, the railroad mileage reports received by Lessor shall be prima facie evidence of the facts reported therein.

## ARTICLE 9: ADDITIONAL CHARGES BY RAILROADS

Lessee agrees to use the cars, upon each railroad over which cars shall move, in accordance with the then prevailing tariffs to which each railroad shall be a party; and if the operation or movements of the cars during the term hereof shall result in any charges being made against Lessor by any such railroad, Lessee shall pay to Lessor the amount of such charges within the period prescribed by and at the rate and under the conditions of the then prevailing tariffs. Lessee agrees to indemnify Lessor against any such charges, and shall be liable for any switching, demurrage, track storage, detention or special handling charges imposed on any car during the term hereof.

## ARTICLE 10: LESSEE'S RIGHT TO TRANSFER OR SUBLEASE

Lessee shall not transfer, sublease or assign any car or its interests and obligations pursuant to the Lease, nor shall a transfer, sublease or assignment by operation of the law or otherwise of Lessee's interest in the cars or this Lease be effective against Lessor without Lessor's prior written consent; provided, that Lessee may assign this Agreement to it's parent or any affiliate or subsidiary at any time without Lessor's consent. No transfer, sublease or assignment of the Lease, or of any car, shall relieve Lessee from any of its obligations to Lessor under this Lease.

Notwithstanding the foregoing paragraph, Lessee shall have the right to sublease any of the cars for single trips to its customers or suppliers, and to cause each car so subleased to be boarded or placarded with the name of the sublessee in accordance with the provisions of the demurrage tariffs lawfully in effect, where the sole purpose of such subleasing is to obtain an exemption from demurrage for said cars so subleased; provided, however, that notwithstanding any such sublease, Lessee shall continue to remain liable to Lessor for the fulfillment of Lessee's obligations under this Lease.

## ARTICLE 11: MAINTENANCE RESPONSIBILITY

Lessor agrees to maintain the cars in good condition and repair at its expense according to the Interchange Rules of the Association of American Railroads (AAR). Lessee agrees to notify Lessor promptly when any car is damaged or in need of repair, and to forward such cars and any other cars subject to this Lease to shops as directed by Lessor for repairs and/or periodic maintenance and inspections. No repairs to any of the cars shall be made by Lessee without Lessor's prior written consent, except that Lessee shall, at its expense, replace any removable part (dome covers, hatch covers, outlet caps, etc.) if lost or broken. Replacement or repair by Lessee of any parts, equipment and/or accessories on any of the cars shall be with parts, equipment and/or accessories that are of like kind and of at least equal quality to those being replaced or repaired, unless otherwise agreed in writing by Lessor.

2

On tank cars, Lessee agrees that it will assume the responsibility for the maintenance and replacement of angle valves and check valves and, if such cars are so equipped, thermometer wells, gauging devices, regulator valves, safety heads and top unloading valves.

On hopper cars, Lessee will be responsible for inspection and cleaning of the operating mechanisms of the outlets, hatches and special fittings on such cars leased herein. Further, any damage to such outlets, hatches, special fittings or the operating mechanisms will be repaired for the account of the Lessee.

When a car is placed in a private shop for maintenance or repair, the rental charges shall cease on date of arrival in the shop, except in the case where a car arrives without advance notice of defects from Lessee, in which case rental charges will cease on communication of such notice of defects to Lessor from Lessee, and shall be reinstated on the date that the car is forwarded from the shop or on the date that the car is ready to leave, awaiting disposition instructions from Lessee. If any repairs are required as a result of the misuse by or negligence of Lessee or its consignee, agent or sublessee or while on a railroad that does not subscribe to, or fails to meet its responsibility under the Interchange Rules of the AAR, or while on any private siding or track or any private or industrial railroad, the rental charges shall continue during the repair period, and Lessee agrees to pay Lessor for the cost of such repairs.

## ARTICLE 12: LOSS OR DESTRUCTION

If any of the cars shall be completely destroyed, or if the physical condition of any car shall become such that the car cannot be operated in railroad service, as determined by the parties, then Lessor may, at its option, cancel this Lease as to such car as of the date on which such event occurred, or may substitute another car within a reasonable period of time. Lessee shall notify Lessor of the occurrence of any such event within two (2) days of such event. In the event of such substitution, the substituted car shall be held pursuant to all the terms and conditions of this Lease. Lessee agrees that if a car is lost or destroyed or is in such physical condition that it cannot be operated in railroad service by reason of misuse or negligence of Lessee or its consignee, agent or sublessee or while on a railroad that does not subscribe to the AAR Interchange Rules or while on any private siding or track or any private or industrial railroad, Lessee will pay Lessor the depreciated value of such car as determined by Rule #107 of the AAR Interchange Rules within ten (10) days following a request by Lessor for such payment. Lessor and Lessee shall cooperate with and assist each other in any reasonable manner requested, but without affecting their respective obligations under this Article or Article 22, to establish proper claims against parties responsible for the loss, destruction or damage to, the cars.

## ARTICLE 13: LOSS OF COMMODITY

Lessor shall not be liable for any loss of, or damage to, commodities, or any part thereof, loaded or shipped in the cars however such loss or damage shall be caused or shall result. Lessee agrees to assume responsibility for, to indemnify Lessor against, and to save it harmless from any such loss or damage or claim therefor.

## ARTICLE 14: DAMAGE TO CAR BY COMMODITY

Lessee shall be liable for damage to any car covered by this Lease, whether or not due to Lessee's negligence, if caused by or as a result of the commodity loaded therein. Lessee assumes responsibility for such damage to any use, including without limitation, as applicable, to the tank, fittings or appurtenances thereto, including the interior lining for tanks so equipped. Lessee will use said cars for the transportation and handling of commodities which will not injure the cars.

## ARTICLE 15: ALTERATION AND LETTERING

Lessee will preserve the cars in good condition and will not in any way alter the physical structure of the cars without the advance approval, in writing, of the Lessor. Lessee shall place no lettering or marking of any kind upon the cars without Lessor's prior written consent, provided however, that Lessee may cause said cars to be stenciled, boarded, or placarded with letters not to exceed two inches (2") in height to indicate to whom the cars are leased and with commodity stencils per AAR or DOT specifications.

## ARTICLE 16: LININGS AND COATINGS

The application, maintenance and removal of interior protective linings and coatings in cars so equipped is to be at the expense of the Lessee unless otherwise specified on the Rider. Commodity or mechanical damage to such linings or coatings shall be for the account of the Lessee.

## ARTICLE 17: INTERIOR PREPARATION FOR COMMODITIES

Any cleaning or special preparation of the interior of cars to make them suitable for the shipment of commodities by or for Lessee during the term of the lease shall be done at Lessee's expense unless otherwise agreed.

## ARTICLE 18: RETURN OF CARS - CLEANING

At the expiration of the lease term as provided in the Riders, Lessee shall, at its expense, return the cars to Lessor at the location and to the agent selected by the Lessor empty, clean and free from residue, and in the same good condition as the cars were in when delivered, except for normal wear and tear. At the expiration, should car cleaning be required, the Lessee shall bear the full cost of cleaning and the rental shall continue until the car is clean.

## ARTICLE 19: MODIFICATIONS

Lessor and Lessee agree that if, at any time after the effective date of any Rider, changes in car design or equipment are required by the AAR, DOT, FRA or any other governmental authority, Lessor may, at its option, perform all modifications so ordered and that the cost of those modifications shall be reflected in an increase in the monthly rental rate per car according to the rental escalation formula shown on the Rider for that car.

## ARTICLE 20: HIGH MILEAGE AND WEIGHT LIMITATION

Since the rentals and other terms of this Lease are based on normal usage of cars in non-unit train or other non-high mileage operations, Lessee agrees not to use cars in unit train or other designated high mileage usage without prior written consent of Lessor. Each car is limited to the number of total loaded and empty miles per calendar year shown on the Rider and is subject to a surcharge also shown on the Rider for all excess miles.

Lessee shall not exceed the weight limitations prescribed for operation of cars in unrestricted interchange service as set forth under Interchange Rule 91 without Lessor's prior written consent.

## ARTICLE 21: USE OF CARS ON CERTAIN ROADS UNDER AAR CIRCULAR OT-5

Upon the written request of Lessee (which request shall name the railroads involved) Lessor shall use reasonable efforts to obtain from each named railroad the authority to place the cars (other than tanks) in service under the provisions of AAR Circular OT-5 as promulgated by the Association of American Railroads and all supplements thereto and reissues thereof (such authority hereinafter called "consent(s)"). Lessee shall furnish to Lessor such information as is necessary to apply for and obtain such consents. Lessor, however, shall not be liable for failure to obtain such consents for any reason whatsoever and this Lease shall remain in full force and effect notwithstanding any failure of Lessor to obtain such consents.

## ARTICLE 22: INDEMNIFICATIONS

Lessee shall defend (if such defense is tendered to Lessee), indemnify and hold Lessor harmless from and against and does hereby release Lessor from all claims, suits, liabilities, losses, damages, costs and expenses, including attorney's fees, in any way arising out of, or resulting from, the condition, storage, use, loss of use, maintenance or operation of the cars, or any other cause whatsoever except to the extent the same results from Lessor's negligence or except to the extent a railroad has assumed full responsibility and satisfies such responsibility.

Except as otherwise provided under Article 13 herein, Lessor shall defend (if such defense is tendered to Lessor), indemnify and hold Lessee harmless from and against and does hereby release Lessee from all claims, suits, liabilities, losses, damages, costs and expenses, including attorney's fees, in any way arising out of, or resulting from, Lessor's negligence any negligent act or omission of Lessor.

## ARTICLE 23: TAXES AND LIENS

Lessor shall be liable for and pay all Federal, State or other governmental property taxes assessed or levied against the cars, except that (i) Lessee shall be liable for and pay such taxes when cars bear reporting marks and numbers other than Lessor's and (ii) Lessee shall be liable at all times for and shall pay or reimburse Lessor for the payment of any sales, use, leasing, operation, excise, gross receipts and other taxes (except income or property taxes) with respect to the care, together with any penalties, fines or interest thereon and all duties, imposts, taxes, investment tax credit reductions and similar charges arising out of the use of cars outside the continental United States.

Lessee acknowledges and agrees that by the execution of this Lease it does not obtain, and by payments and performance hereunder it does not, and will not, have or obtain any title to the cars or any property right or interest therein, legal or equitable, except solely as Lessee hereunder and subject to all of the terms hereof. Lessee shall keep the cars free from any liens or encumbrances created by or through Lessee.

## ARTICLE 24: DEFAULT AND REMEDIES

If Lessee defaults in the payment of any sum of money to be paid under this Lease and such default continues for a period of ten (10) days after written notice to Lessee of such default or if Lessee fails to perform any covenant or condition required to be performed by Lessee, which failure shall not be remedied within ten (10) days after notice thereof by Lessor to Lessee or if Lessee shall dissolve, make or commit any act of bankruptcy or if any proceeding under any bankruptcy or insolvency statute or any laws relating to relief of debtors is commenced by Lessee or if any such proceeding is commenced against Lessee and same shall not have been removed within thirty (30) days of the date of the filing thereof or if a receiver, trustee or liquidator is appointed for Lessee or for all or a substantial part of Lessee's assets with Lessee's consent or, if without Lessee's consent, the same shall not have been removed within thirty (30) days of the date of the appointment thereof or if an order, judgment or decree is entered by a court of competent jurisdiction and continues unpaid and in effect for any period of thirty (30) consecutive days without a stay of execution or if a writ of attachment or execution is levied on any car and is not discharged within ten (10) days thereafter, Lessor may exercise one or more of the following remedies with respect to the cars:

4

1. Immediately terminate this Lease and Lessee's rights hereunder;

2. Require Lessee to return the cars to Lessor at Lessee's expense, and if Lessee fails to so comply, Lessor may take possession of such cars without demand or notice and without court order or legal process. Lessee hereby waives any damages occasioned by such taking of possession, whether or not Lessee was in default at the time possession was taken, so long as Lessor reasonably believes that Lessee was in default at such time. Lessee acknowledges that it may have a right to notice of possession and the taking of possession with a court order or other legal process. Lessee, however, knowingly waives any right to such notice of possession and the taking of such possession without court order or legal process;

3. Lease the cars to such persons, at such rental, and for such period of time as Lessor shall elect. Lessor shall apply the proceeds from such leasing, less all costs and expenses incurred in the recovery, repair, storage and renting of such cars, toward the payment of Lessee's obligations hereunder. Lessee shall remain liable for any deficiency, which, at Lessor's option, shall be paid monthly as suffered or immediately, or at the end of the Lease term as damages for Lessee's default;

4. Bring legal action to recover all rent or other amounts then accrued or thereafter accruing from Lessee to Lessor under any provision hereunder;

5. Pursue any other remedy which Lessor may have.

Each remedy is cumulative and may be enforced separately or concurrently. In the event of default, Lessee shall pay to Lessor upon demand all costs and expenses, including reasonable attorneys' fee expended by Lessor in the enforcement of its rights and remedies hereunder, and Lessee shall pay interest on any amount owing to Lessor from the time such amount becomes due hereunder at a rate per annum equal to three percentage points above the prime rate of Chase Manhattan Bank (or its successor), such rate to be reduced, however, to the extent it exceeds the maximum rate permitted by applicable law. In addition, Lessee shall, without expense to Lessor, assist Lessor in repossessing the cars and shall, for a reasonable time, if required, furnish suitable trackage space for the storage of the cars.

If Lessee fails to perform any of its obligations hereunder, Lessor, at Lessee's expense, and without waiving any rights it may have against Lessee for such nonperformance, may itself render such performance. Lessee shall reimburse Lessor on demand for all sums so paid by Lessor on Lessee's behalf, together with interest at a rate equal to three percentage points above the prime rate of Chase Manhattan Bank (or its successor), such rate to be reduced, however, to the extent it exceeds the maximum rate permitted by applicable law.

Nothing in this Article 24 shall serve to limit any remedies Lessee may have against Lessor for Lessor's breach of its obligations under this Agreement.

## ARTICLE 25: LESSOR'S RIGHT TO ASSIGN, SUBORDINATION

All rights of Lessor hereunder may be assigned, pledged, mortgaged, leased, transferred or otherwise disposed of, either in whole or in part, and/or Lessor may assign, pledge, mortgage, lease, transfer or otherwise dispose of title to the cars, with or without notice to Lessee. As a condition to any such assignment, pledge, mortgage, lease, transfer or other disposition, Lessor shall have entered into a management agreement with the assignee, pledgee, mortgagee, lessor, or other holder of legal title to or security interest in the cars for purposes of allowing such assignee, pledgee, mortgagee, lessor or other holder of legal title to or security interest in the cars to perform Lessor's obligations hereunder. In the event of any such assignment, pledge, mortgage, lease, transfer or other disposition, this Lease and all rights of Lessee hereunder or those of any person, firm or corporation who claims or who may hereafter claim any rights in this Lease under or through Lessee, are hereby made subject and subordinate to the terms, covenants and conditions of any assignment, pledge, mortgage, lease, or other agreements covering the cars heretofore or hereafter created and entered into by Lessor, its successors or assigns and to all of the rights of any such assignee, pledgee, mortgagee, lessor, transferee or other holder of legal title to or security interest in the cars ; provided, however, that so long as no event of default by Lessee has occurred and is continuing hereunder, Lessor shall continue to perform its obligations hereunder, and Lessee shall be entitled to use the cars in accordance with the terms and conditions hereof. During the term of this Lease no such assignee, pledgee, mortgagee, lessor, transferee or other holder of legal title to or security interest in the cars shall interfere with the quiet use, possession and enjoyment of the cars by Lessee provided that no event of default or termination event (however described) shall have occurred under such assignment, pledge, mortgage, lease or other agreement and provided that no event of default or termination event (however described) has occurred under this Lease and provided further that the exercise by assignee, pledgee, mortgagee, lessor, transferee or other holder of legal title to or security interest in the cars of their respective rights under or in connection with such assignment, pledge, mortgage, lease or other agreement or this Lease shall not constitute such an interference. Any sublease or assignment of the cars permitted by this Lease that is entered into by Lessee or its successors or assigns shall contain language which expressly makes such assignment or sublease subject to the subordination contained herein. At the request of Lessor or any assignee, pledgee, mortgagee, lessor, transferee or other holder of the legal title to or security interest in the cars, Lessee, at Lessor's expense, shall letter or mark the cars to identify the legal owner of the cars and, if applicable, place on each side of each car, in letters not less than one inch in height, the words "Ownership Subject to a Security Lease Filed with the Surface Transportation Board" or other appropriate words reasonably requested.

In the event that Lessor assigns its interest in this Lease, Lessee, at the request of Lessor, shall execute and deliver to Lessor an Acknowledgment of Assignment of Lease in form satisfactory to Lessor and upon such request and execution furnish to Lessor an opinion of counsel that such Acknowledgment has been duly authorized, executed and delivered by Lessee and constitutes a valid, legal and binding instrument, enforceable in accordance with its terms.

5

## ARTICLE 26: WARRANTIES

LESSOR MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO THE CONDITION, MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR ANY OTHER MATTER CONCERNING THE CARS. Lessee shall be solely responsible for determining that the specifications and design of any car are appropriate for the commodities loaded therein. During the period of any lease hereunder in which Lessee renders faithful performance of its obligations, Lessor hereby assigns to Lessee any factory or dealer warranty, whether express or implied, or other legal right Lessor may have against the manufacturer in connection with defects in the cars covered by this Lease.

## ARTICLE 27: RIGHT OF INSPECTION AND NOTICES

Lessor, or its assignee, shall, at any reasonable time and without interfering with Lessee's operations, have the right to inspect the cars by its authorized representative wherever they may be located for the purpose of determining compliance by Lessee with its obligations hereunder. Lessee shall use its best effort to obtain permission, if necessary, for Lessor or its representative to enter upon any premises where the cars may be located.

Lessee shall notify Lessor, in writing, within three (3) days after any attachment, lien (including any tax and mechanics' liens) or other judicial process attaches to the cars.

## ARTICLE 28: MISCELLANEOUS

This Lease, together with any and all exhibits attached hereto, constitutes the entire agreement between Lessor and Lessee, and it shall not be amended, altered or changed except by written agreement signed by the parties hereto. No waiver of any provision of this Lease or consent to any departure by Lessee therefrom shall be effective unless the same shall be in writing, signed by both parties and then such waiver of consent shall be effective only in the specific instance and for the purpose for which it was given.

1. Governing Law

   This Lease shall be interpreted under and performance shall be governed by the laws of the State of Texas.

2. Conflict with Interchange Rules

   In the event the Interchange Rules conflict with any provision of this Lease, this Lease shall govern.

3. Exhibits

   All exhibits attached hereto are incorporated herein by this reference.

4. Payments

   All payments to be made under this Lease shall be made at the addresses set forth in Article 4.

5. Severability

   If any term or provision of this Lease or the application thereof shall, to any extent, be invalid or unenforceable, such invalidity or unenforceability shall not affect or render invalid or unenforceable any other provision of this Lease, and this Lease shall be valid and enforced to the fullest extent permitted by law.

6. Headings

   The headings that have been used to designate the various Sections and Articles hereof are solely for convenience in reading and ease of reference and shall not be construed in any event or manner as interpretative or limiting the interpretation of the same.

7. Governmental Laws

   Lessee shall comply with all governmental laws, rules, regulations, requirements and the Interchange Rules (herein collectively referred to as the "Rules") with respect to the use, operation and maintenance of any interior fading protective devices, special interior linings or removable parts. Lessee, at its expense, shall further comply with the Rules in the event such Rules require a change or replacement of any equipment or appliance on the cars or in case any additional or other equipment or appliance is required to be installed on the cars.

8. Survival

   All indemnities contained in this Lease shall survive the termination hereof. In addition, the obligation to pay any deficiency, as well as the obligation for any and all other payments by Lessee to Lessor hereunder shall survive the termination of this Lease or the lease contained herein.

## ARTICLE 29: ADDRESSING OF NOTICES

Any notice required or permitted hereunder shall be in writing and shall be delivered to the respective parties hereto by personal delivery thereof or by telegram, telex, telecopier or deposit in the United States mail as a certified or registered mailer, return receipt requested, postage prepaid, and addressed to the respective parties as follows, unless otherwise advised in writing.

Lessee to Lessor:

TO: Trinity Industries Leasing Company
2525 Stemmons Freeway
Dallas, TX 75207

ATTENTION: Vice President – Portfolio Management

Lessor to Lessee:

Williams Ethanol Services
1300 South Second St.
Pekin, IL 61554

ATTENTION: Supply & Transportation Specialist

## ARTICLE 30: ADMINISTRATION OF LEASE

Lessee agrees to make available to Lessor information concerning the movement of the cars reasonably required for the efficient administration of this Lease.

Lessee agrees to cooperate with Lessor for the purpose of complying with any reasonable requirements of any lender, the Surface Transportation Board or the provisions of Article 9 of the Uniform Commercial Code provided such cooperation does not materially affect the rights of liabilities or Lessee hereunder.

## ARTICLE 31: OPINION OF COUNSEL

Upon written request of Lessor, Lessee, on or before the execution of this Lease, shall furnish to Lessor an opinion of Lessee's counsel, satisfactory to counsel for Lessor and in form and substance satisfactory to such counsel, that as of the date of the Lease:

1. Lessee is a limited liability company duly incorporated, validly existing, and in good standing under the laws of the State of Delaware and is either duly qualified to do business and is in good standing in such other jurisdictions in which the business and activities of Lessee require such qualification or its failure to so qualify in such other jurisdiction will not have a material adverse impact on the Lease.

2. Lessee has full corporate power to enter into this Lease.

3. The Lease has been duly authorized, executed and delivered by Lessee and constitutes a valid, legal and binding agreement, enforceable in accordance with its terms.

4. No approval is required by Lessee from any governmental or public body or authority with respect to the entering into or performance of this Lease.

5. The entering into and performance of this Lease will not conflict with, or result in a breach of, the terms, conditions or provision of any law or any regulations, order, injunction, permit, franchise or decree of any court or governmental instrumentality.

6. The entering into and performance of this Lease will not conflict with, or result in a breach of, the terms, conditions or provisions of any indenture, agreement or other instrument to which Lessee is party or by which it or any of its property is bound.

7

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed and delivered as of the 13th day of February , 2003.

LESSOR: TRINITY INDUSTRIES LEASING COMPANY

By: _____
　　Thomas C. Jardine
　　Vice President

ATTEST:

By: _____
　　Secretary

LESSEE: WILLIAMS ETHANOL SERVICES

By: _____

Title: Director Morketing & Logistics

ATTEST:

By: _____

I hereby certify that the foregoing is a true and correct copy of the original thereof.

_____

Thomas C. Jardine
Vice President, Trinity Industries Leasing Company

D

THE STATE OF TEXAS

COUNTY OF DALLAS

§
§
§

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Thomas C. Jardine, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said Trinity Industries Leasing Company, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office this the 13th day of February, 2003.

Brandie Howard
Notary Public
My Commission Expires: 12-28-05



BRANDIE HOWARD
MY COMMISSION EXPIRES
December 28, 2005

THE STATE OF ILLINOIS

COUNTY OF TAZEWELL

§
§
§

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared James M Redden, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said Williams Ethanol Services, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office this the 11 day of February, 2003.

James M Redden
Notary Public
My Commission Expires: 12/10/03

*OFFICIAL SEAL*
Roxanne M. Helser
Notary Public, State of Illinois
Tazewell County
My Commission Expires 12/10/2003

9

## CERTIFICATE OF ACCEPTANCE OF RAILROAD CAR

This Certificate relates to the railroad cars listed below leased by Trinity Industries Leasing Company, to _____ under a Lease Agreement for __ railroad cars dated __. _____ __ into which this certificate is incorporated (by Article 3 thereof).

Railcar Numbers

Lessee hereby certifies that the railcars listed above were delivered to and received by Lessee, inspected, determined to be acceptable under the applicable standards (set forth in Article 3 of the Lease Agreement); and Lessee hereby certifies its acceptance of the railcars as of _____.

LESSEE: _____  _____

BY: _____ __  . _____  _____

TITLE: _____ .  _____ ..  _____

Effective this 17th day of October, 2005, this Rider shall become a part of the Railroad Car Lease Agreement between Trinity Industries Leasing Company, Lessor, and Avenline Renewable Energy, Inc., Lessee and successor in leasehold interest to Williams Ethanol Services and, dated January 14, 2003, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 50 | 6,351 cubic foot covered hopper cars as described in Trinity Rail specification no. LO-6351-D5C2258-PB4 dated 11/16/05, equipped with 42"x42" gates, marked and numbered TILX 637853 – 637902 | 6,351 | $763.00 |

**Delivery** – Notwithstanding Article 2, the cars shall be delivered to, and accepted by Lessee, at Eagle Pass, Texas. Rental charges shall commence upon such acceptance, provided however that Lessor shall prepay freight charges from Eagle Pass, Texas to the yard of the delivering line at Pekin, Illinois.

**Weight Limitation** - Lessee shall not exceed the weight limitations prescribed for operation of cars in unrestricted interchange service as set forth under AAR Interchange Rule 70 without Lessor's prior written consent.

**Escalation of Monthly Rental Charge:**

1. Modifications - In accordance with Article 19 of Railroad Car Lease Agreement, any change in car design required by the AAR, DOT, FRA or other governmental authority during the term of this lease will cause the monthly car rental to increase for each car in the month following its modification as follows:

   A. For modification with a useful life equal to the car itself, car rental will increase by a monthly rate of $1.75 per car for each $100 of Lessor's cost incurred in the course of making modification.

   B. For modification with a useful life less than that of the car, monthly car rental increase will equal cost of modification, including the implicit cost of money at 10% per annum, divided by the number of months of estimated remaining life of the modification.

2. High Mileage - In accordance with Article 20, in the event that a car travels more than 30,000 miles (empty and loaded) in any calendar year, the Lessee shall pay the Lessor $0.03 per mile for each mile over 30,000 traveled by such car.

**Insurance**

Lessee shall maintain at all times on the cars, at its expense, commercial general liability insurance and umbrella/excess insurance (covering bodily injury, property damage and pollution exposures, including, but not limited to, contractual liability and products liability) against such risks, in such form as shall be satisfactory to Lessor and with such insurer(s) as shall be rated A-VII or better by A.M. Best. The requirement for pollution liability insurance may be satisfied by scheduling a self-insured retention in an umbrella/excess policy affording pollution liability insurance. The commercial general liability insurance policy or self-insured retention and umbrella or excess insurance policies shall have a combined limit of not less than $3 million per occurrence, and the policies shall be endorsed to name Lessor, Lessor's subsidiaries and Lessor's assignees as additional insureds as their interest may appear.

Prior to the delivery date and from time to time thereafter, Lessee shall furnish to Lessor an original certificate demonstrating that such insurance coverage is in effect, provided, however, that Lessor shall be under no duty to ascertain the existence or adequacy of such insurance. The insurance maintained by Lessee shall be primary without any right of contribution from insurance which may be maintained by Lessor. The obligations of Lessee under this provision shall be independent of all other terms under this Lease and shall in no event relieve Lessee from any indemnity obligation hereunder. The insurer shall give the Lessor at least thirty (30) days prior written notice (at the address for notice to Lessor set forth herein) of any alteration in or cancellation of the terms of such policies.

**TILC Capacity**

The parties hereto agree and acknowledge that, with respect to the Lease of the above-described cars being effected by this Rider, Trinity Industries Leasing Company (in its individual capacity, "TILC") may be executing this Rider not in its individual capacity as car owner, but in the capacity of manager for the benefit of the actual car owner, pursuant to contractual authority delegated by the car owner to TILC (as manager) to encumber and bind the subject cars and car owner under such Lease.

In connection therewith, TILC in its individual capacity represents and warrants to the Lessee, and agrees with the Lessee that (i) the party for whom TILC acts as manager is contractually bound and liable as Lessor to the same extent as if it signed the Lease directly, (ii) TILC is liable in its capacity as manager to perform the Lessor's obligations to the Lessee under such Lease, and (iii) if TILC (a) fails to perform the Lessor's obligations while serving as manager, or (b) is removed or terminated as manager and the car owner for whose benefit TILC has been acting as manager breaches or otherwise fails to perform (or cause to be performed) the Lessor's obligations to the Lessee in accordance with the

Lease, then in either such case TILC agrees that it is directly liable to the Lessee for any resulting damages and costs; to the same extent that TILC would have been had TILC been the actual car owner executing the Lease as Lessor.

The parties further agree that in the interest of convenience, the Railroad Car Lease Agreement, the terms of which are incorporated into this Rider to constitute the Lease of the above-described cars, shall be deemed for this purpose where TILC is acting as such manager, as if it had been entered into with TILC in the capacity of manager as aforesaid (and without affecting or altering the role of the Railroad Car Lease Agreement in other particular railcar lease transactions incorporating its terms, where TILC in fact entered into such other lease transactions in its individual capacity as car owner).

Severability of Rider

Lessor and Lessee agree that this Rider shall constitute a separate Lease which incorporates the terms of the above referenced Railroad Car Lease Agreement. This Rider shall be severable from any other cars or riders relating to the above referenced Railroad Car Lease Agreement and shall become a separate lease which is separately transferable for all purposes.

Minimum Rental Period

The minimum rental period for the cars leased hereunder shall be eighty-four (84) months, and the cars shall continue under lease thereafter for successive one (1) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least thirty (30) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.


Cancels Rider: _____ NA _____



TRINITY INDUSTRIES LEASING COMPANY       AVENTINE RENEWABLE ENERGY, INC.



By: _____            By: _____

Vice President, Portfolio Management    Title: _____

## EXHIBIT B

# ACKNOWLEDGMENT OF ASSIGNMENT

July 11, 2007

VIA FEDERAL EXPRESS

Mr. Darren Smith
Aventine Renewable Energy
1300 South 2nd Street ·
Pekin, IL 61554

> Re: Rider 2 dated October 17, 2006, incorporating the terms of the Railroad Car Lease
> Agreement (the "Master Agreement") dated January 14, 2003, between Trinity
> Industries Leasing Company, as lessor (the "Existing Lessor") and Aventine
> Renewable Energy, Inc. as lessee (the "Lessee")

Dear Darren:

1.     We refer to the railroad car lease transactions evidenced by the above-referenced Rider entered into pursuant to the above-referenced Master Agreement, as such documents may have been amended from time to time (any a "Lease" and collectively, the "Leases") between the above-referenced Existing Lessor and the Lessee.

2.     The Lessee is hereby advised that pursuant to a purchase agreement (the "Purchase Agreement") to be dated on or about July 31, 2007 (the "Effective Date") among the Existing Lessor as seller and First Union Rail as purchaser (the "Purchaser"), (a) the Existing Lessor intends to (i) sell the railcars subject to the Leases, which railcars are described in Exhibit A hereto (the "Equipment"), to the Purchaser and (ii) assign to the Purchaser all of the Existing Lessor's rights, title, interest and obligations in and to the Equipment and in, to and under the Leases to the extent such rights, title, interest and obligations relate to the Equipment, and (b) the · Purchaser intends to purchase the Equipment and assume the Existing Lessor's rights, title, interest and obligations in and to the Equipment and in, to and under the Lease. The Lessee will be notified of the Effective Date once it has occurred.

3.     The Lessee hereby acknowledges, consents to and agrees that, from and after the Effective Date, to the extent relating to periods on or after the Effective Date, all of its obligations under the Leases, including all payments and indemnities under the Leases, and all of its covenants with respect to insurance thereunder and under insurance certificates shall inure to the benefit of the Purchaser, and the Purchaser shall thereupon become the successor lessor under the Leases and be entitled to the rights of the lessor, and shall have assumed the obligations of the lessor, under the Leases.

AVRE001

4.     The Lessee hereby represents and warrants for the benefit of the Purchaser that, on and as of the date this Acknowledgment of Assignment (this "Acknowledgement") is executed by the Lessee: (a) no Event of Default under any of the Leases has occurred and is continuing, (b) no rent or other amount payable under the Leases has been prepaid, (c) to the best of the Lessee's knowledge, the Lessee has no claims of any nature against the Existing Lessor under or in connection with any Lease, and (d) the Equipment is free and clear of all liens, claims and encumbrances arising by, through or under the Lessee (other than as permitted by the Lease).

5.     On or about the Effective Date, the Existing Lessor and/or the Purchaser shall provide additional notice to and instruct the Lessee (i) as to payment of all rentals and other amounts pursuant to the Leases due and payable after the Effective Date with respect to the Equipment and (ii) where to forward all notices to be given to the lessor under the Leases.

6.     The Lessee agrees to cooperate with (a) any reasonable request of the Purchaser to complete any filings to effectuate this transaction, and the Purchaser shall promptly reimburse the Lessee for any reasonable out-of-pocket expenses it may incur in connection with such filings, and (b) all actions by the Purchaser to effect the re-marking of the Equipment, which re-marking must be completed during the period within one (1) year following the Effective Date.

7.     The Lessee agrees that notwithstanding Section 25 of the Master Agreement, Purchaser shall not be required to enter into a management agreement with Manager to perform Lessor's obligations with respect to the Equipment subject to the Leases. Further, the Lessee agrees that with respect to any subsequent sale of the Equipment and assignment of the Leases, any such buyer and assignee shall not be required to enter into a management agreement with Manager for the Equipment subject to the Leases.

8.     This Acknowledgment may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

9.     The Lessee agrees that the Purchaser is entitled to the benefit of, and may rely on, this Acknowledgment of Assignment executed by the Lessee even though the Purchaser is not a direct signatory or party to it.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the undersigned has caused this Acknowledgement to be executed by its duly authorized officer as of the date first above written.

TRINITY INDUSTRIES LEASING COMPANY, as Existing Lessor

By: 
Name: Eric Marchetto
Title: Vice President

ACKNOWLEDGED AND AGREED TO:

AVENTINE RENEWABLE ENERGY, INC.

By: 
Name: Kenneth R. Gelchurff
Title: VP Commodities / Energy

## EXHIBIT A

| # Cars | Year Built | Description | Reporting Marks | Casualty Marks |
|--------|-----------|-------------|-----------------|----------------|
| 50 | 2006 | 6,351 CF Hopper Cars | TILX 637853-637902 | None |

**EXHIBIT C**

## The Trinity Lease

| Balance Outstanding as of the Petition Date | Aggregate Base Monthly Rent Payable | Due Date | Payments Received | Balance Due |
|---|---|---|---|---|
| $38,150 | | | | |
| | $37,387.00 | 5/1/2009 | | $75,537.00 |
| | $37,387.00 | 6/1/2009 | | $112,924.00 |
| | $37,387.00 | 7/1/2009 | $26,705.00 | $123,606.00 |
| | $37,387.00 | 8/1/2009 | $2,492.63 | $158,500.37 |
| | $37,387.00 | 9/1/2009 | $50.87 | $195,836.50 |
| | $37,387.00 | 10/1/2009 | . | $233,223.50 |
| | $37,387.00 | 11/1/2009 | | $270,610.50 |
| | $37,387.00 | 12/1/2009 | | $307,997.50 |
| | $37,387.00 | 1/1/2010 | | $345,384.50 |
| | $37,387.00 | 2/1/2010 | | $382,771.50 |
| | $37,387.00 | 3/1/2010 | | $420,158.50 |
| | $37,387.00 | 4/1/2010 | | $457,545.50 |
| | $37,387.00 | 5/1/2010 | | $494,932.50 |
| | $37,387.00 | 6/1/2010 | | $532,319.50 |
| | $37,387.00 | 7/1/2010 | | $569,706.50 |
| | $37,387.00 | 8/1/2010 | | $607,093.50 |
| | $37,387.00 | 9/1/2010 | | $644,480.50 |
| | $37,387.00 | 10/1/2010 | | $681,867.50 |
| | $37,387.00 | 11/1/2010 | | $719,254.50 |
| | $37,387.00 | 12/1/2010 | | $756,641.50 |
| | $37,387.00 | 1/1/2011 | | $794,028.50 |
| | $37,387.00 | 2/1/2011 | | $831,415.50 |
| | $37,387.00 | 3/1/2011 | | $868,802.50 |
| | $37,387.00 | 4/1/2011 | | $906,189.50 |
| | $37,387.00 | 5/1/2011 | | $943,576.50 |
| | $37,387.00 | 6/1/2011 | | $980,963.50 |
| | $37,387.00 | 7/1/2011 | | $1,018,350.50 |
| | $37,387.00 | 8/1/2011 | | $1,055,737.50 |
| | $37,387.00 | 9/1/2011 | | $1,093,124.50 |
| | $37,387.00 | 10/1/2011 | | $1,130,511.50 |
| | $37,387.00 | 11/1/2011 | | $1,167,898.50 |
| | $37,387.00 | 12/1/2011 | | $1,205,285.50 |
| | $37,387.00 | 1/1/2012 | | $1,242,672.50 |
| | $37,387.00 | 2/1/2012 | | $1,280,059.50 |
| | $37,387.00 | 3/1/2012 | | $1,317,446.50 |
| | $37,387.00 | 4/1/2012 | | $1,354,833.50 |
| | $37,387.00 | 5/1/2012 | | $1,392,220.50 |
| | $37,387.00 | 6/1/2012 | | $1,429,607.50 |
| | $37,387.00 | 7/1/2012 | | $1,466,994.50 |
| | $37,387.00 | 8/1/2012 | | $1,504,381.50 |

## The Trinity Lease   (Continued)

| Balance Outstanding as of the Petition Date | Aggregate Base Monthly Rent Payable | Due Date | Payments Received | Balance Due |
|---|---|---|---|---|
| | $37,387.00 | 9/1/2012 | | $1,504,381.50 |
| | $37,387.00 | 10/1/2012 | | $1,541,768.50 |
| | $37,387.00 | 11/1/2012 | | $1,579,155.50 |
| | $37,387.00 | 12/1/2012 | | $1,616,542.50 |
| | $37,387.00 | 1/1/2013 | | $1,653,929.50 |
| | $37,387.00 | 2/1/2013 | | $1,691,316.50 |
| | $37,387.00 | 3/1/2013 | | $1,728,703.50 |
| | $37,387.00 | 4/1/2013 | | $1,766,090.50 |
| | $37,387.00 | 5/1/2013 | | $1,803,477.50 |
| | $37,387.00 | 6/1/2013 | | $1,840,864.50 |
| | $37,387.00 | 7/1/2013 | | $1,878,251.50 |
| | $37,387.00 | 8/1/2013 | | $1,915,638.50 |
| | $37,387.00 | 9/1/2013 | | $1,953,025.50 |
| | $37,387.00 | 10/1/2013 | | $1,990,412.50 |
| | $37,387.00 | 11/1/2013 | | $2,027,799.50 |
| | $37,387.00 | 12/1/2013 | | $2,065,186.50 |