## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re                                              :   Chapter 11
:
AVENTINE RENEWABLE ENERGY            :   Bankruptcy No. 09-11214 (KG)
HOLDINGS, INC., *et al.*                      :   (Jointly Administered)
:
Debtors.                                 :   **Response to US Trustee Objection [Docket No. 1004]**
                                                      x  **Hearing Date:  July 15, 2010 at 10:00 a.m. (Eastern)**

---------------------------------------------------------------

### RESPONSE OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. TO THE UNITED STATES TRUSTEE'S OBJECTION TO FINAL APPLICATION OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES AS DEBTORS' FINANCIAL ADVISOR AND INVESTMENT BANKER

Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), Financial Advisor

and Investment Banker to the Debtors, hereby responds (the "Response") to The United States

Trustee's Objection[1] (the "Objection") [Docket No. 1004] to the Final Application of Houlihan

Lokey for Compensation and Reimbursement of Expenses as Debtors' Financial Advisor and

Investment Bankers (the "Fee Application") [Docket No. 859].  In support of this Response,

Houlihan Lokey respectfully states as follows:

### PRELIMINARY STATEMENT

As the Court recognized when it confirmed the Debtors' Plan of Reorganization,

Houlihan Lokey played an integral and invaluable role in advising the Debtors beginning prior to

their chapter 11 filings and through confirmation of the Plan.  Indeed, the Objection

conspicuously fails to raise any question regarding the quality or value of Houlihan Lokey's

---

[1]     Certain shareholders have sent letters to the Court purporting to join in or expand on the UST's Objection.
None of these parties, however, filed a timely objection to the Fee Application, and their letters add nothing
to the UST's Objection and likewise should be overruled.  Many of these shareholders also wrote similar
letters in advance of the confirmation hearing raising issues and objections that the Court ultimately
overruled.

efforts in these complex chapter 11 cases. Perhaps most critically, the United States Trustee ("UST") nowhere even contends, nor could she, that Houlihan Lokey was not disinterested under the applicable standards embodied under the Bankruptcy Code.

Nonetheless, for reasons that remain somewhat unclear, the UST asks this Court to reduce the fees earned by Houlihan Lokey by fifty percent – a reduction of almost $2.5 million – because of Houlihan Lokey's inadvertent failure to disclose certain connections, none of which impacted Houlihan Lokey's efforts or the economic recoveries in these cases whatsoever. Indeed, the evidence indisputably establishes that Houlihan Lokey's non-disclosure was inadvertent and that Houlihan Lokey promptly provided comprehensive supplemental disclosures of its connections with those parties when this omission was brought to light. Those disclosures clearly indicate that the "connections" are in each instance attenuated from the work performed by Houlihan Lokey in these cases and do not come close to creating a conflict of interest or impairing Houlihan Lokey's disinterestedness. There simply is no basis for sanctioning Houlihan Lokey at all, much less as severely as requested by the UST, for an innocent and harmless omission.

## BACKGROUND

### A.    Houlihan Lokey's Retention and Services

On April 17, 2009, the Debtors filed their application (the "Retention Application") to retain Houlihan Lokey as financial advisor and investment banker according to the terms set forth in the parties' engagement letter. The UST objected to the retention pursuant to section 328(a) of the Bankruptcy Code, and following a hearing, the Court approved the retention of Houlihan Lokey pursuant to section 328(a) *nunc pro tunc* to April 7, 2009 (the "Petition Date") [Dkt. No. 222].

Throughout the Debtors' bankruptcy cases (and even prior to the Petition Date), Houlihan Lokey has provided valuable services to the Debtors that culminated in the Court entering an order confirming the Debtors' First Amended Joint Plan of Reorganization (the "Plan") [Dkt. No. 814] on February 24, 2010. As set forth in the Fee Application, and as described below, Houlihan Lokey provided a wide range of services to the Debtors in these challenging cases, and performed these services with the utmost skill and professionalism.

**B.      Houlihan Lokey's Disclosures**

In support of the Retention Application, the Debtors attached the Declaration of William Hardie III of Houlihan Lokey (the "Disclosure Declaration"). Among other things, the Disclosure Declaration described Houlihan Lokey's efforts to perform a conflicts check. As set forth in the Disclosure Declaration, Houlihan Lokey's Compliance Group received from the Debtors on March 20, 2009 a list of parties-in-interest (the "Parties List"). (Disclosure Decl. at ¶ 18.) The Compliance Group then undertook "a comprehensive ongoing review of the Parties-In-Interest to determine possible conflicts . . . ." (*Id.*) Based, in part, on this review process, Mr. Hardie stated that "[t]o the best of my knowledge, Houlihan Lokey is a 'disinterested person' as that term is defined in section 101(14) and is required by section 327(a)." (*Id.* at ¶ 16.)

It is crucial to note that the Parties List provided by the Debtors to Houlihan Lokey and the other professionals that the Debtors sought to retain at the outset of these cases did not include the parties who became the DIP lenders, Brigade Leveraged Capital Structures Fund, Ltd., Nomura Corporate Research & Asset Management, Inc., Whitebox Hedged High Yield Partners, L.P. and Pandora Select Partners, L.P., and the party that would become the DIP agent, Whitebox Advisors (collectively, the "DIP Lenders").

As the Court may recall, the DIP Lenders stepped in literally on the eve of the Debtors' filing of their bankruptcy petitions to provide DIP financing on terms that, unlike the terms

demanded by the prepetition lenders, would not force a "fire sale" of the Debtors' assets. Thus, around the time that Houlihan Lokey completed the Retention Application and performed its conflicts search in connection with the Retention Application, in addition to all of the other tasks immediately preceding the bankruptcy filing, Houlihan Lokey was also focused on securing the DIP financing that ultimately allowed the Debtors to conduct an orderly reorganization process.

Subsequently, at the behest of certain disaffected shareholders, the UST contacted Debtors' counsel on February 3, 2010 to request that the Debtors obtain from Houlihan Lokey "a detailed explanation of any relationship [Houlihan Lokey] has or had with Whitebox Advisors or any affiliate thereof, at any time from January 1, 2008 to the present, whether in a bankruptcy or restructuring matter or otherwise" and to "include in that detailed explanation any matters in which [Houlihan Lokey] served as an advisor to any formal or informal committee on which Whitebox Advisors (or an affiliate thereof) was a member, whether officially or *ex officio*, specifically denoting Whitebox Advisors' capacity as a committee member."

Houlihan Lokey provided an informal response to the UST on February 9, 2010 based on the UST's request and then filed on February 15, 2010 the Supplemental Disclosure of William Hardie III on Behalf of Houlihan Lokey (the "Supplemental Disclosure," attached hereto as **Exhibit A**) [Dkt. No. 758]. As described in the Supplemental Disclosure, Houlihan Lokey conducted a supplemental conflicts check with respect to the Parties List and also a conflicts check of parties that were not included in the Parties List but were subsequently identified as having an interest in the Debtors. (Supp. Discl. at ¶ 3.) Besides reporting the results of those conflicts checks, Houlihan Lokey also provided a thorough description of its connections with Whitebox Advisors ("Whitebox"), as requested by the UST, and Brigade Capital Management ("Brigade").

Moreover, after the UST contacted Houlihan Lokey in February 2010, Houlihan Lokey almost immediately – and on its own initiative – modified its internal conflicts procedures for performing periodic conflicts checks during its bankruptcy engagements in order to avoid similar inadvertent non-disclosures from occurring in the future. Houlihan Lokey subsequently informed the UST of this formalized change in its internal procedures.

## C. Plan Confirmation

Several shareholders filed objections to the Plan. Certain of the shareholders' objections were based, at least in part, on Houlihan Lokey's valuation, and some shareholders questioned Houlihan Lokey's disinterestedness. (*See* Objections of Michael Welsh [Dkt. No. 738], Andrew Shirley [Dkt. No. 776], Fred Graetzer [Dkt. No. 787], and Alan Betensley [Dkt. No. 788]). The UST did not object to the Plan on any grounds, nor did the UST object to Mr. Hardie's testimony at the confirmation hearing (the "Confirmation Hearing").

At the Confirmation Hearing, certain shareholders appeared *pro se* and questioned Mr. Hardie on Houlihan Lokey's valuation. The only mention of any issues related to Houlihan Lokey's disinterestedness, however, was made by Debtors' counsel at the outset of the hearing. Debtors' counsel discussed the alleged conflicts raised by certain shareholders, briefly addressed the issues and offered Mr. Hardie to answer any questions that the Court may have. (Transcript of Confirmation Hearing, relevant portions of which are attached as **Exhibit B**, at 20:21-21:19.) The Court responded, "I do not have any questions. I don't know, when we get to the shareholders, to what extent they may have questions. But I'm satisfied." (*Id.* at 21:20-22.) The shareholders asked no questions regarding any alleged conflicts.

Following the Confirmation Hearing, the Court overruled the shareholders' objections and entered an order confirming the Plan. In doing so, the Court found that

I think that the evidence clearly establishes that . . . Houlihan
Lokey, since the first day hearing when I actually primed senior
loans on basically a leap of faith, but Houlihan Lokey has really
established itself as, and Mr. Hardie in particular is highly credible.
And having examined the valuation performed and introduced into
evidence, I am satisfied that all of the methodologies have been
clearly met and fully developed here but we have, I think, even
more important than those methodologies, the fact that there has
been an extensive market testing. And the evidence shows that
none of the potentially interested parties . . . came close to
proposing a dollar amount which would create value for the
stockholders in this case.

(*Id.* at 110:16-111:6.)

**D.    Houlihan Lokey's Fee Application**

Houlihan Lokey filed its Fee Application on March 15, 2010. Other than the UST, no

party filed a timely objection to the Fee Application.

In the Fee Application, Houlihan Lokey seeks final allowance of fees of $4,903,790.33

and reimbursement for out-of-pocket expenses of $147,921.43. The fees sought by Houlihan

Lokey include Monthly Fees and an In-Court Restructuring Transaction Fee and DIP Financing

Fee (each of those terms as defined in the Retention Application). In the Fee Application,

Houlihan Lokey describes the work that it performed on behalf of the Debtors. (Fee App. at 8-

13.) Among other things, Houlihan Lokey:

- Analyzed, evaluated and negotiated proposals on a broad range of matters, including DIP financing, proposed asset sales, treatment of creditor constituencies and exit financing.

- Conducted comprehensive due diligence of the Debtors and facilitated due diligence of the Debtors' actual financial results and key operating initiatives by other constituencies. Houlihan Lokey also reviewed the Debtors' weekly cash flows and long-term financial projections.

- Prepared and managed the Debtors' electronic due diligence dataroom, which was used by the various parties-in-interests to perform due diligence of the Debtors. Houlihan Lokey also managed an internal database which was utilized to track all correspondence between Houlihan Lokey and potential buyers or investors.

- Reviewed and analyzed the Debtor's financial performance and projections of future performance, including: (i) creating and updating the Debtors' 13-week DIP budget as necessary, (ii) assisting with the creation of a comprehensive financial model projecting sales and expenses at the plant level, and (iii) analyzing all letters of intent and exit financing proposals received in connection with Houlihan Lokey's marketing process.

- Prepared numerous analyses required for the Plan and Disclosure Statement, including: (i) a comprehensive valuation of the Debtors and their operations, (ii) the recoveries to all creditor classes, (ii) a liquidation analysis to ensure creditor recoveries under the Amended Plan of Reorganization equaled or exceeded recoveries in a chapter 7 liquidation, and (iv) a feasibility analysis.

- Conducted meetings and discussions with various parties, including potential DIP lenders, acquirers of some or all of the Debtors' assets, and exit financing investors contacted as a part of the reorganization process. Due to divergent views on collateral values held by the Prepetition Lender Group and the DIP Lenders and Unsecured Committee Group, Houlihan Lokey prepared marketing materials and ran a dual-track sale and plan solicitation and negotiation process in which more than 140 parties were contacted regarding the opportunity to either acquire the Debtors outright or invest debt or equity into a stand-alone plan of reorganization.

No party, including the UST, has questioned the reasonableness of the compensation sought by Houlihan Lokey.

## ARGUMENT

### A.    The Failure to Initially Disclose Connections Was Inadvertent, Caused No Economic Harm and Does Not Create a Conflict of Interest

As described above, Houlihan Lokey's failure to disclose its connections to Whitebox and Brigade at the outset of these cases was inadvertent, not intentional. When Houlihan Lokey performed its initial conflicts check prior to the filing of the Retention Application, the list of parties it was provided unfortunately did not include Whitebox, Brigade or the other DIP Lenders. Moreover, at the time that Houlihan Lokey performed its initial conflicts check, it also was working tirelessly to secure the DIP financing that ultimately allowed the Debtors to successfully reorganize. Finally, when it was brought to Houlihan Lokey's attention that the DIP

Lenders were omitted from its conflicts check, it immediately disclosed all of its connections

with the DIP Lenders. While none of these facts excuse Houlihan Lokey's failure to perform a

subsequent conflicts check that would have resulted in the earlier disclosure of its connections

with Whitebox and Brigade, they certainly demonstrate that the failure was the result of

oversight, not deception.

In the face of this factual record, the UST nonetheless insinuates that Houlihan Lokey

acted willfully. (Obj. at ¶ 32) ("[I]t is difficult to understand HLHZ's failure to disclose its

multiple connections with Whitebox and Brigade as inadvertent rather than willful.") The UST's

only support for such an insinuation, however, is hardly convincing.

First, the UST alludes to the fact that Houlihan Lokey's professionals are experienced

bankruptcy practitioners. While it is certainly true that Houlihan Lokey has considerable

experience with retention and disclosure issues, it is equally clear that its oversight in these cases

was not a result of misapprehension; it simply was an inadvertent mistake that even experienced

professionals can make from time-to-time, especially when confronted with the real time

pressures of a complex and fluid chapter 11 proceeding.

Second, the UST questions how Houlihan Lokey could be "so concerned about its

connections arising from the *VeraSun* case that it erected an ethical barrier" while being

"unaware of its obligation to disclose those connections in these cases." (Obj. at ¶ 33.) The

UST, however, fundamentally misapprehends the *VeraSun/Aventine* ethical wall. Houlihan

Lokey created that safeguard not because it was concerned about the overlapping connections

with Whitebox, Brigade or any other specific party; rather, Houlihan Lokey established the

ethical wall at the outset of the *Aventine* engagement because of the inherent overlap created by

simultaneous engagements in similar highly-concentrated commodity industries. It is truly

unfortunate that the UST would attempt to infer improper motive from a measure undertaken out of an abundance of caution.

Perhaps the most compelling evidence of the inadvertent nature of the non-disclosures is the truly minor nature of the underlying connections – including those very connections highlighted by the UST – between Houlihan Lokey and Whitebox and Brigade:

- Houlihan Lokey was retained by the Official Committee of Unsecured Creditors in the case *In re VeraSun Energy Corp.* as its financial advisor and investment banker, and Whitebox and Brigade were *ex officio* members of the Committee. Of course, as *ex officio* members, Whitebox and Brigade had no authority to hire Houlihan Lokey or determine its compensation or any other terms of its retention.

- Houlihan Lokey was retained as the financial advisor to *ad hoc* groups in two bankruptcy cases, and Whitebox and Brigade each was a member of one of those *ad hoc* groups.

- The Official Committee of Unsecured Noteholders in *In re Energy Partners, Ltd.* sought to retain Houlihan Lokey as its financial advisor, and Whitebox was a member of that Committee. Houlihan Lokey was never retained in that case and did not receive any compensation.[2]

- Whitebox and Brigade retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Financial Advisors") to provide portfolio valuation services. Financial Advisors is a separate legal entity from Houlihan Lokey, the entity engaged in these cases, and thus it is not clear that Houlihan Lokey would even be required to disclose such a connection. Financial Advisors' work is wholly unrelated to the work performed by Houlihan Lokey in these cases, and, moreover, there is an "Information Wall" separating the group that performs the portfolio valuations from the employees of Houlihan Lokey.

---

[2]   The UST attempts to make more of the *Energy Partners* connection by taking out of context certain statements in a brief (the "Motion to Amend") that Houlihan Lokey filed in that case. Contrary to the UST's assertions, the Noteholders' Committee did not, in fact, ever retain Houlihan Lokey or backstop any of its fees. As described in the Motion to Amend, after the court denied the Noteholders' Committee's application to retain Houlihan Lokey pursuant to section 328, the Noteholders' Committee agreed to backstop any fees that would be disallowed by the court if Houlihan Lokey were retained pursuant to section 330. That agreement, however, "became moot when the parties reached a consensual agreement that resolved the valuation contest and led to confirmation of the Plan." (Motion to Amend at ¶ 18, n. 10.) In other words, after the consensual agreement, the Noteholders' Committee no longer needed to retain Houlihan Lokey, and it thus never paid any fees to Houlihan Lokey.

As the UST concedes, none of these connections even implicated Houlihan Lokey's

disinterestedness, let alone presented a conflict of interest. *See, e.g., In re eToys, Inc.*, 331 B.R.

176, 189 (Bankr. D. Del. 2005) ("Disinterestedness is defined to mean that [a professional] 'does

not have an interest materially adverse to the interest of the estate or of any class of creditors or

equity security holders, by reason of any direct or indirect relationship to, connection with, or

interest in, the debtor . . . or for any other reason.'" (quoting 11 U.S.C. § 101(14)(E))); *In re*

*Fleming Comp., Inc.*, 305 B.R. 389, 393 (Bankr. D. Del. 2004) ("A disinterested person is

someone who is 'not a creditor, an equity security holder, or an insider.'" (quoting 11 U.S.C. §

101(14)(a))).

**B.     Sanctions Are Not Warranted**

As the UST also readily acknowledges, "[n]ot every violation of the disclosure

requirements of the Code and Rules requires disgorgement . . . ." *See In re ACandS, Inc.*, 297

B.R. 395, 405 (Bankr. D. Del. 2003).   Indeed, while "serious omissions" may warrant a

reduction in compensation, "a court has broad discretion to determine whether the non-disclosure

at issue justifies remedial measures at all." 9 Lawrence P. King et al., *Collier on Bankruptcy* ¶

2014.05 (15th ed. 2009); *see also Miller Buckfire & Co., LLC v. Citation Corp. (In re Citation*

*Corp.)*, 493 F.3d 1313, 1321-22 (11th Cir. 2007) ("Neither Rule 2014 nor the Bankruptcy Code

mandates a sanction for the violation of Rule 2014.  In such situations, whether to impose a

penalty and the nature and extent of the penalty is generally a matter left to the bankruptcy

court's discretion."); *In re Roy Frischhertz Constr. Co.*, 2007 WL 2460998, at *5 (Bankr. E.D.

La. Aug. 24, 2007) ("Where . . . the deficiency in reporting the facts to the court has not resulted

in any actual conflict and has proved largely to be harmless, courts have often used their

discretion to permit the representation and allow the requested fees.").

Indeed, where, as here, the non-disclosure was unintentional, did not harm or prejudice the Debtors and did not rise to the level of a disqualifying conflict, the Court should exercise its discretion and refrain from sanctioning Houlihan Lokey. *See, e.g.*, 3 *Collier on Bankruptcy* ¶ 328.05[3] ("Because the denial of compensation and reimbursement of expenses after services have been performed may be draconian and inherently unfair, this sanction should not be rigidly applied in the absence of actual injury or prejudice to the debtor's estate."); *Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994) (quoting same).

The UST nevertheless contends that a negligent disclosure violation that causes no harm should result in sanctions. (*See* Obj. at ¶ 25.) The Objection cites two cases, neither of which is persuasive, that it claims support such a draconian result. First, *In re BH&P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991) is inapposite because there the court found that an attorney who represented a debtor corporation and also represented its principals in their bankruptcy cases (and filed proofs of claim and nondischargeabilty complaints on behalf of one client against other clients) had an "actual conflict of interest" that rendered the attorney not disinterested and warranted disqualification. Second, in *In re Jore Corp.*, 298 B.R. 703, 725 (Bankr. D. Mont. 2003), the bankruptcy court found "illustrative" cases from other jurisdictions that applied a more lenient standard but ultimately recognized that it was bound by the especially strict precedent from the Court of Appeals for the Ninth Circuit,[3] which of course is not binding on this Court.

In fact, in none of the cases on which the UST relies did a court sanction a professional for an inadvertent non-disclosure that neither harmed the debtor's estate nor involved an actual conflict of interest. For instance, several of the UST's cases involved a professional that

---

[3] In *In re Park-Helena Corp.*, 63 F.3d 877 (9th Cir. 1995), the court held, among other things, that a professional must disclose all connections, no matter how *de minimis*.

willfully – not inadvertently – failed to disclose connections. *See In re ACandS, Inc.*, 297 B.R. at 404 (ordering disgorgement of fees where professional's "pattern of conduct suggest[ed] willful concealment, not mere negligence"); *In the Matter of Olsen Indus., Inc.*, 222 B.R. 49, 60 (Bankr. D. Del. 1997) (holding that debtor's law firm committed "an intentional and serious disclosure violation"). Likewise, in many of the UST's cases, the connections that were not disclosed gave rise to an actual conflict that rendered the professional not disinterested. *See Pearson v. First NH Mortgage Corp.*, 200 F.3d 30, 42 (1st Cir. 1999) (case remanded to bankruptcy court "given the evidence of serious conflicts of interest"); *eToys, Inc.*, 331 B.R. at 192 ("Because MNAT had an actual conflict of interest it was not qualified to represent the Debtors in asserting their claims . . . .");[4] *In re Jore Corp.*, 298 B.R. at 731 (noting presence of actual, unwaived conflict of interest); *In re BH&P, Inc.*, 949 F.2d at 1317-18 (affirming bankruptcy court's determination that actual conflict of interest was present); *In re Granite Partners, LP*, 219 B.R. 22, 43 (Bankr. S.D.N.Y. 1998) ("[T]he sanction of denial of all investigative fees is necessary to punish Willkie Farr and send yet another clear message to other professionals that bankruptcy courts will not tolerate the conflicts and nondisclosures that permeated the investigative aspects of these cases."); *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994) (ordering partial disgorgement of fees where counsel, tasked with conducting an investigation of accounting fraud by members of debtor's management team, "had undisclosed ties to three of the targets"); *In the Matter of CF Holding Corp.*, 164 B.R. 799, 806 (Bankr. D. Conn. 1994) (holding that debtors' special financial advisor "held or represented an interest adverse to the debtors' estates"); *In re McKinney Ranch Assocs.*, 62 B.R. 249, 256 (Bankr. C.D. Cal. 1986) (denying *nunc pro nunc*

---

[4]    In *eToys*, the court sanctioned the professional for failing to disclose a connection that resulted in an actual conflict of interest by disallowing only those fees that arose from the conflict. *See eToys, Inc.*, 331 B.R. at 193 ("Because it had an actual conflict for several months . . . the Court concludes that MNAT should disgorge all fees received in this case for work done by it on matters involving [such conflict].")

application of law firm as "[t]he representation of [the debtor's] general partners on matters relating to this case is a potential conflict with the estate within the scope of section 327").

Even the case principally discussed by the UST, *In re R&R Assocs. of Hampton*, 2003 WL 1233047 (Bankr. D. N.H. Jan. 31, 2003), bears no factual resemblance to this case. There, the attorney who represented the debtor partnership previously had represented one of the debtor's partners and numerous other entities controlled by that partner. *Id.* at *2. During the course of those prior representations, the attorney: (i) assisted the debtor's principal and his wife in the formation of three family limited partnerships and the subsequent transfer of assets, which otherwise might have been used to satisfy the debtor's obligations, into these partnerships and (ii) represented the debtor's principal and his wife in a variety of litigation matters. *Id.* The court concluded that "[t]he representation of the Debtor partnership and its general partner is, by itself, almost always a conflict of interest, and the representation of a material adverse interest" and that "the representations of the limited partnerships . . . just adds to the conflict." *Id.* at *4. The court consequently ordered the disgorgement of fees and expenses of just over $19,000. *Id.* at *5.

Here, the connections disclosed by Houlihan Lokey are in no way similar to, as direct or as extensive as those of the attorney in *R&R Associates*. The only connections that involved an engagement by Whitebox or Brigade were their hiring of Financial Advisors, not Houlihan Lokey, in matters wholly unrelated to these cases, and which were separated by an "informational wall" that was fully disclosed by Houlihan Lokey. The other connections that are the focus of the Objection are engagements of Houlihan Lokey (or, in one case, a proposed engagement) by a committee or *ad hoc* group of which Whitebox or Brigade was a member (or, in one case, *ex officio* members). Clearly, such connections are attenuated at best, and in no way

resemble an attorney's joint representation of both a partnership and its general partner, as well as various limited partnerships into which assets were transferred.

In sum, there simply is no basis in law or in equity for imposing a sanction – much less a $2.5 million sanction – to punish a professional after the completion of their exemplary work because of an inadvertent failure to disclose minor connections that neither create a conflict of interest nor implicate the professional's disinterestedness.

## CONCLUSION

Through an inadvertent error, Houlihan Lokey failed to disclose certain connections with certain of the DIP Lenders. These connections are sufficiently remote that they do not create an actual conflict of interest or render Houlihan Lokey not disinterested. While the omissions were regrettable, they certainly do not justify any sanctions, let alone the draconian penalties requested by the United States Trustee. For all the foregoing reasons, Houlihan Lokey respectfully requests that the Court overrule the Objection of the United States Trustee and approve the Fee Application.

Dated: July 8, 2010            Respectfully submitted,


s/Richard A. Chesley
Richard A. Chesley (IL No. 6240877)
Gregory S. Otsuka (IL No. 6270388)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, IL 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100


ATTORNEYS FOR HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.

**EXHIBIT A**

**(Supplemental Disclosure of William Hardie III on Behalf of Houlihan Lokey)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AVENTINE RENEWABLE | : | |
| ENERGY HOLDINGS, INC., *et al.* | : | Bankruptcy No. 09-11214 (KG) |
| | : | Jointly Administered |
| Debtors. | | |

## SUPPLEMENTAL DECLARATION AND DISCLOSURE OF WILLIAM HARDIE III ON BEHALF OF HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.

I, William Hardie III, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. I am a Managing Director of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") and am duly authorized to make this Supplemental Declaration on behalf of Houlihan Lokey. Except as otherwise noted, the facts set forth in this Supplemental Declaration are personally known to me and, if called as a witness, I could and would testify thereto.

2. On April 7, 2009 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition under chapter 11 of title 11 of the United States Code, 11 USC §§ 101-1532 (as amended, the "Bankruptcy Code"). On April 17, 2009, the Debtors filed their Application for (i) Authority to Employ Houlihan Lokey as Financial Advisor and Investment Bankers for the Debtors *Nunc Pro Tunc* to the Petition Date and (ii) Waiver of Certain Information Requirements of Local Rule 2016-2 (the "Application") [Dkt No. 87]. In support of the Application, the Debtors submitted a declaration

(the "Declaration") that I executed on behalf of Houlihan Lokey. The Court entered an order approving the Application on June 19, 2009 [Dkt. No. 222].

3. Pursuant to Bankruptcy Rules 2014 and 2016 and following discussions with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), Houlihan Lokey conducted supplemental conflict checks with respect to interested or potentially interested parties. The supplemental conflict checks included conflict checks of those parties that were identified on Exhibit A to the Declaration and included in the prior conflict checks, as well as conflict checks of parties that were not included in the conflict checks that Houlihan Lokey completed as referenced in the Declaration.

4. Attached hereto as Exhibit A is a supplemental list of parties-in-interest for which Houlihan Lokey conducted conflict checks (in addition to those parties identified on Exhibit A to the Declaration). Exhibit B attached hereto identifies parties-in-interest for which Houlihan Lokey has provided in the recent past or is currently providing services in matters unrelated to the Debtors' cases. Exhibit A and Exhibit B hereto supplement the Declaration I submitted in connection with the Application. In each instance, Houlihan Lokey does not believe any of the relationships represent a conflict of interest in these cases.

5. At the U.S. Trustee's request, Houlihan Lokey also provides the following information regarding Houlihan Lokey's relationship with Whitebox Advisors ("Whitebox") in other matters unrelated to these cases:

- In April 2008, the Velocity Express Corporation ("Velocity") retained Houlihan Lokey as financial advisor on a prepetition basis (but not in Velocity's bankruptcy case). The engagement has concluded. Whitebox was a creditor in Velocity's bankruptcy cases.

2

- In December 2008, the Official Committee of Unsecured Creditors (the "<u>VeraSun Creditors Committee</u>") in the bankruptcy cases titled *In re VeraSun Energy Corp.* (Case No. 08-12606 (BLS)) (Bankr. D. Del.) retained Houlihan Lokey as financial advisor and investment banker. The engagement has concluded. Whitebox served as an *ex oficio* member of the VeraSun Creditors Committee. Since the beginning of Houlihan Lokey's engagement in the *Aventine* cases, out of an abundance of caution, Houlihan Lokey has maintained an ethical wall between the professionals who provided services in the *VeraSun* engagement and those professionals who are providing services in the *Aventine* engagement. (The respective teams are located in different Houlihan Lokey offices.)

- In January 2009, Houlihan Lokey was retained as the financial advisor to the Ad Hoc Senior Secured Group (the "<u>Spansion Ad Hoc Group</u>") in the bankruptcy cases titled *In re Spansion, Inc.* (Case No. 09-10690 (KJC)) (Bankr. D. Del.). The engagement is ongoing. Whitebox is a member of the Spansion Ad Hoc Group.

- In July 2009, the Official Committee of Unsecured Noteholders (the "<u>Energy Partners Noteholders Committee</u>") sought to retain Houlihan Lokey as its financial advisor in the bankruptcy cases titled *In re Energy Partners, Ltd.* (Case No. 09-32957-H4-11) (Bankr. S.D. Tex.). The *Energy Partners* bankruptcy court denied the Energy Partners Noteholders Committee's application, so Houlihan Lokey was not retained in those cases and did not receive any compensation. Whitebox was a member of the Energy Partners Noteholders Committee.

- In January 2009 and again in December 2009, Whitebox retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. to provide portfolio valuation services. Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases. Houlihan Lokey Howard & Zukin Financial Advisors' Hedge Fund and Derivatives Valuation Services Group provides valuation opinions on the securities and derivative holdings of various business development companies, private equity firms and hedge funds, such as Whitebox. This work is unrelated to the financial advisory services that Houlihan Lokey provides in these chapter 11 cases. Moreover, Houlihan Lokey, through the establishment of an "Information Wall" has separated its employees in the Hedge Fund and Derivatives Valuation Services Group from the rest of its employees, including those who have provided services in these cases. This "Information Wall" includes physical and technological barriers, compliance mechanisms and policies and procedures designed to prevent confidential, non-public information and work product from being shared improperly.

- Houlihan Lokey's capital markets group from time to time has approached Whitebox, among many other parties, as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey.

6. Houlihan Lokey also provides the following information regarding Houlihan Lokey's relationship with Brigade Capital Management ("Brigade") in other matters unrelated to these cases:

- As described above, the VeraSun Creditors Committee retained Houlihan Lokey as financial advisor and investment banker. The engagement has concluded. Brigade served as an *ex oficio* member of the VeraSun Creditors Committee.

- In October 2008, Brigade retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. to provide portfolio valuation services. As described above, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., and an "Information Wall" has separated its employees in the Hedge Fund and Derivatives Valuation Services Group from the rest of its employees, including those who have provided services in these cases.

- In December 2008, Houlihan Lokey was retained as the financial advisor to an ad hoc group of secured noteholders (the "Trump Ad Hoc Group") in the bankruptcy cases titled *In re TCI 2 Holdings, LLC* (Case No. 09-13654 (JHW)) (Bankr. D. N.J.). The engagement is ongoing. Brigade is a member of the Trump Ad Hoc Group.

- Houlihan Lokey's capital markets group from time to time has approached Brigade, among many other parties, as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey.

7. After reviewing the results of the supplemental conflict check completed by Houlihan Lokey, to the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, neither I nor Houlihan Lokey holds or represents an interest adverse to the Debtors or their respective estates, and Houlihan Lokey is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code, in that: (a) Houlihan has no connection with the Debtors, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in these chapter 11 cases or their respective attorneys or accountants, except as set forth in my Declaration and as set forth herein; (b) Houlihan Lokey is not a creditor, equity security holder or insider of the Debtors; (c) Houlihan Lokey is not and was not,

within two years of the Petition Date, a director, officer or employee of the Debtors; and (d) Houlihan Lokey neither holds nor represents an interest adverse to the Debtors, their respective estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in Debtors, or for any other reason. Accordingly, I believe that Houlihan Lokey is a "disinterested person," as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code.

Dated: February 15, 2010

_____
William Hardie III

## EXHIBIT A

## ADDITIONAL INTERESTED PARTIES SEARCHED [1]

**Equity and Option Holders:**

Mr. Andrew Shirley/Ivory Capital
Mr. Herschel Patton
Mr. James Szumera
Mr. Michael Welsh
Mr. William Toomey
Mrs. Sheila Toomey

**Outside Professionals:**

Akin Gump Strauss Hauer & Feld LLP
Cross & Simon LLC
Ernst & Young
Gibson, Dunn & Crutcher LLP
Greenberg Traurig, LLP
Jefferies & Company, Inc.
Jenner & Block LLP
Mr. Thomas Manuel
The Garden City Group, Inc.
Westervelt, Johnson, Nikoll & Keller, LLC

**Unsecured Creditors:**

Brigade Capital Management
Nomura Asset Management
Nomura Corporate Research & Asset Management, Inc.
SEACOR Capital Corporation
SEACOR Energy Inc.
SEACOR Holdings Inc.
Senator Investment Group LP
WhiteBox Advisors

---

[1] Parties on Exhibit A were not included in the initial list of interested parties received by Houlihan Lokey and were not previously reviewed for potential conflicts. This supplemental disclosure covers all parties identified to Houlihan Lokey as parties in interest as of February 12, 2010. Should additional parties in interest be indicated to Houlihan Lokey after February 12, 2010 Houlihan Lokey will provide an additional supplemental conflicts disclosure on a timely basis.

**Backstop Parties:**

Brigade Capital Management
Nomura Asset Management
Nomura Corporate Research & Asset Management, Inc.
SEACOR Capital Corporation
SEACOR Energy Inc.
SEACOR Holdings Inc.
Senator Investment Group LP
WhiteBox Advisors

**DIP Lenders:**

Brigade Capital Management
Nomura Asset Management
WhiteBox Advisors

**Potential Revolving Credit Facility Provider:**

PNC Bank
PNC Bank National Association

## EXHIBIT B

## ADDITIONAL INTERESTED PARTY RELATIONSHIPS (FORMER CLIENTS)

| HLHZ Relationship | Debtors' Relationship | Work Performed [2],[3] | Status |
|---|---|---|---|
| Bank of America, NA | Secured Creditor | Financial Advisory Services – Various (including Fair Market Value Opinion, ESOP Valuation Fairness Opinion and Portfolio Valuation Related Consulting Services); Financial Restructuring Services – Creditor Advisory Services; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Bank of America Business Capital | Affiliate of Secured Creditor Bank of America NA | Financial Advisory Services – Various (including Collateral Valuation and Fair Market Value Opinion); Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Bank of America Corporation | Affiliate of Secured Creditor Bank of America NA | Financial Advisory Services – Fair Market Value Opinion; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Bank of America Merrill Lynch | Affiliate of Secured Creditor Bank of America NA | Financial Restructuring Services – Advisor to Ad Hoc Group of Creditors; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| BP Plc | Top 30 Unsecured Creditor | General Financial Advisory Services & M&A Exclusive Sale Advisory | Former |
| Greenberg Traurig, LLP | Outside Professional (Advisor to Unsecured Creditors Committee) | Financial Advisory Services – Estate & Gift Tax and Transfer Pricing (Houlihan Lokey was engaged to provide services to Greenberg Traurig, LLP's clients, not to Greenberg Traurig, LLP) | Former |
| Jefferies & Company, Inc. | Outside Professional (Advisor to Unsecured Creditors Committee) | General Financial Advisory Services | Former |
| Jenner & Block LLP | Outside Professional (Special Legal Counsel to Debtors) | Financial Advisory Services – Various (including Estate & Gift Tax and Portfolio Valuation Related Consulting Services) (Houlihan Lokey was engaged to provide services to Jenner & Block LLP's clients, not to Jenner & Block LLP) | Former |

---

[2] As further detailed in the body of the declaration, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (Financial Advisory Services) is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases and there is an "Information Wall" separating the two entities including both physical and technological barriers.

[3] General Financial Advisory Services are performed by Houlihan Lokey's corporate finance practice. These assignments relate to various engagements including sell-side, buy-side and other strategic advisory services.

| HLHZ Relationship | Debtors' Relationship | Work Performed [2][3] | Status |
|---|---|---|---|
| JPMorgan Chase Bank | Secured Creditor | Financial Advisory Services – Various (including Fair Market Value Opinion, Tax and Fairness Opinion); Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| JPMorgan H&Q | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Restructuring Services – Distressed M&A Sellside; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| JPMorgan Investment Management | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Advisory Services – Valuation; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| JPMorgan Partners | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Advisory Services – Litigation; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| J.P. Morgan Plc | Affiliate of Secured Creditor JP Morgan Chase Bank | Financial Restructuring Services – Advisor to secured creditor group in which J.P. Morgan Plc was a member; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Nomura Holding America, Inc. | Affiliate of Unsecured Creditor / Backstop Party / DIP Lender Nomura Corporate Research and Asset Management, Inc. | Financial Advisory Services – Fair Market Value Opinion; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| Nomura International, PLC | Affiliate of Unsecured Creditor / Backstop Party / DIP Lender Nomura Corporate Research and Asset Management, Inc. | Financial Advisory Services – Portfolio Valuation Related Consulting Services; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |
| UBS Americas Inc. | Affiliate of Secured Creditor UBS Loan Finance, LLC | Financial Advisory Services – Fair Value Opinion; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Former |

---

[2] As further detailed in the body of the declaration, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (Financial Advisory Services) is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases and there is an "Information Wall" separating the two entities including both physical and technological barriers.

[3] General Financial Advisory Services are performed by Houlihan Lokey's corporate finance practice. These assignments relate to various engagements including sell-side, buy-side and other strategic advisory services.

## ADDITIONAL INTERESTED PARTY RELATIONSHIPS (CURRENT CLIENTS)

| HLHZ Relationship | Debtors' Relationship | Work Performed [2][3] | Status |
|---|---|---|---|
| Akin Gump Strauss Hauer & Feld LLP | Outside Professional (Advisor to DIP Lenders / Exit Financing Lenders) | Financial Advisory Services – Various (including Fairness Opinion, Estate & Gift Tax and Portfolio Valuation Related Consulting Services); Financial Restructuring Services – numerous creditor advisor engagements in which Akin Gump was counsel to various creditor groups and numerous debtor advisor engagements in which Akin Gump was counsel to the debtor and / or other parties in interest in cases in which Houlihan Lokey represented the same or different parties in connection with those matters (Houlihan Lokey is engaged to provide services to Akin Gump Strauss Hauer & Feld LLP's clients, not to Akin Gump Strauss Hauer & Feld LLP) | Various |
| Brigade Capital Management | Unsecured Creditor / Backstop Party / DIP Lender | See declaration | Various |
| Gibson, Dunn & Crutcher, LLP | Outside Professional (Legal Counsel to Shareholder) | General Financial Advisory Services and Financial Advisory Services – Various (including Litigation, Fair Market Value Opinion and Estate & Gift Tax) (Houlihan Lokey is engaged to provide services to Gibson, Dunn & Crutcher, LLP's clients, not to Gibson, Dunn & Crutcher, LLP) | Various |
| JPMorgan Chase & Company | Affiliate of Secured Creditor JP Morgan Chase Bank | General Financial Advisory Services - M&A Exclusive Sale; Houlihan Lokey's capital markets group routinely approaches this party as a potential financing source in connection with various transactional opportunities for other clients of Houlihan Lokey | Various |
| WhiteBox Advisors | Unsecured Creditor / Backstop Party / DIP Lender | See declaration | Various |

---

[2] As further detailed in the body of the declaration, Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (Financial Advisory Services) is a separate legal entity from Houlihan Lokey Howard & Zukin Capital, Inc., the entity retained by the Debtors in these cases and there is an "Information Wall" separating the two entities including both physical and technological barriers.

[3] General Financial Advisory Services are performed by Houlihan Lokey's corporate finance practice. These assignments relate to various engagements including sell-side, buy-side and other strategic advisory services.

**EXHIBIT B**

**(Partial Transcript of Confirmation Hearing)**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
AVENTINE RENEWABLE ENERGY           .    Case No. 09-11214(KG)
HOLDINGS, INC., a Delaware          .    (Jointly Administered)
Corporation, et al.,                .
                                    .    February 24, 2010
                                    .    1:00 p.m.
              Debtors.              .    (Wilmington)


                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BRENDAN L. SHANNON
             UNITED STATES BANKRUPTCY COURT JUDGE

<u>APPEARANCES:</u>

For the Debtors:            Joel A. Waite, Esq.
                            John T. Dorsey, Esq.
                            Matthew B. Lunn, Esq.
                            Young, Conaway, Stargatt
                            & Taylor, LLP


For the Committee:          Donald J. Detweiler, Esq.
                            Greenberg Traurig, LLP


For Wachovia Bank/
Wells Fargo:                Erik Weinick, Esq.
                            Otterbourg, Steindler, Houston
                            & Rosen, P.C.


For Southern Indiana
Gas & Electric Co.:         Thomas J. Francella, Jr., Esq.
                            Whiteford Taylor Preston, LLP


For Aurora:                 David Fournier, Esq.
                            Pepper Hamilton, LLP

                            Stephen H. Nelson, Esq.
                            Cline, Williams, Wright, Johnson
                            & Oldfather, LLP

For JPMorgan Chase Bank: William L. Wallander, Esq.
Clayton T. Hufft, Esq.
Vinson & Elkins, LLP

Tom Driscoll, Esq.
Bifferato

For Kiewit Energy Corp.
Zurich American Ins.
Company: Ronald S. Gellert, Esq.
Eckert, Seamans, Cherin
& Mellott, LLC

For the United
Steelworkers: Susan E. Kaufman, Esq.
Cooch and Taylor, P.A.

For the Backstop
Purchasers: Tori Grilfoyle, Esq.
Blank Rome, LLP

Shaya Rochester, Esq.
Michael S. Stamer, Esq.
Peter M. Friedman, Esq.
Ashley F. Waters, Esq.
Akin, Gump, Strauss, Hauer
& Feld, LLP

For the GAR Objectors: Robert W. Mallard, Esq.
Dorsey & Whitney, LLP

For the Indenture
Trustee: David P. Primack, Esq.
Kristin K. Going, Esq.
Drinker, Biddle & Reath, LLP

For the US. Trustee: Mark Kenney, Esq.
Office of the United States Trustee

VIA TELEPHONE:

Pro Se: Andrew E. Shirley
Michael J. Welsh

Audio Operator:        Jennifer Pasierb

Transcriptionist:       Jennifer Ryan Enslen
                             43 Bay Boulevard
                             Newark, De 19702
                             (302)836-1905

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          MR. WAITE: The primary thrust of each of the

2    shareholder objections, as I'm sure Your Honor is aware from

3    reading them, is their assertion that the plan does not treat

4    shareholders fairly based upon their belief that the Debtors

5    have substantially undervalued the Debtors, and they oppose

6    cram down of the plan on Class 9A under $1129(b) of the

7    Bankruptcy Code. As reflected in the disclosure statement

8    that we filed, the valuation prepared by Houlihan Lokey, the

9    Debtors' financial advisor, establishes a midpoint enterprise

10   value for the Debtors of approximately $240 million.  A

11   figure that the Committee and the Committee's financial

12   advisor, Jeffries & Company, has concurred with.  The

13   shareholders, on the other hand, assert that the Debtors

14   today should be valued at somewhere between 600 million and

15   in excess of a billion dollars.  The Debtors believe that the

16   shareholders' analysis is fundamentally flawed and in a short

17   while we'll present testimony of Mr. Hardie to address that

18   factual issue.  Which is the primary issue before the Court

19   today.

20          THE COURT: Yes.

21          MR. WAITE: Your Honor, the Welsh and Shirley

22   objections also assert that Houlihan Lokey is conflicted by

23   certain alleged connections with Whitebox and Brigade, two of

24   the note holders in this case, and DIP lenders.  As

25   referenced in our confirmation memorandum, Houlihan did file

1    a supplemental declaration that addresses those issues.  And

2    I think it's clear from the declaration itself that Houlihan

3    does not have an improper relationship with, and is not

4    conflicted by any confections with those bondholders.  We

5    believe that those allegations are without merit.  There's no

6    evidence or facts to back them up.  And it's not a legitimate

7    basis on which to deny confirmation.  The objection filed by

8    Mr. Betensley asserts that Houlihan is conflicted and the

9    plan should not be confirmed, because an executive at

10   Houlihan Lokey, who does not even work on this case, and an

11   executive at Whitebox in the year 2008 both made charitable

12   contributions to the same Minneapolis Jewish foundation.  And

13   that objection, from the Debtors' standpoint, is so absurd on

14   it's face that we'd ask that the Court summarily dismiss it.

15   I don't know if Your Honor has had a chance to review the

16   declaration.  Mr. Hardie will testify, and to the extent the

17   Court has questions about that issue that's been raised,

18   he'll be happy to answer them.  If the Court has questions

19   now, I can deal with them as well.

20        THE COURT: I do not have questions.  I don't know,

21   when we get to the shareholders, to what extent they may have

22   questions.  But I'm satisfied.

23        MR. WAITE: Okay.  Your Honor, with that, and given

24   that the objection really raises a factual issue, valuation

25   - -

1   objections, and confirm the plan, and allow us to move

2   forward with a reorganized company.

3          THE COURT: All right.  Thank you.

4          MR. WAITE: Thank you.

5          THE COURT: Thank you, Mr. Waite.  Well, I have

6   before me a plan to confirm which is fair and equitable, has

7   been proposed in good faith.  The evidence, and I do think

8   it's important to emphasize the word evidence as opposed to

9   argument, or speculation, or potential.  But the evidence

10  clearly establishes that it is appropriate to, first of all,

11  first of all that all of the requirements in §1129 have been

12  established, and Mr. Henning's proffer clearly established

13  that, as well as the Court's independent analysis of the

14  record in the case.  The only issue that really is before me

15  is comprised of the objections from equity, and I am going to

16  overrule those objections.  I think that the evidence clearly

17  establishes that Houlihan Lokey - - and I might say that

18  Houlihan Lokey, since the first day hearing when I actually

19  primed senior loans on basically a leap of faith, but

20  Houlihan Lokey has really established itself as, and Mr.

21  Hardie in particular is highly credible.  And having examined

22  the valuation performed and introduced into evidence, I am

23  satisfied that all of the methodologies have been clearly met

24  and fully developed here but we have, I think, even more

25  important than those methodologies, the fact that there has

1     been an extensive market testing.  And the evidence shows

2     that none of the potentially interested parties, and there

3     were very few of them despite extensive efforts by Houlihan

4     Lokey, but that none of the potential interested parties came

5     close to proposing a dollar amount which would create value

6     for the stockholders in this case.  And I do note that the

7     plan is comprehensive.  That I think the, it is highly

8     feasible, which is obviously of great significance to the

9     Court, and I also note that, again, we started the case when

10    ethanol was at a low.  We're here today when ethanol is at a

11    high, but it is a highly volatile industry, and I don't think

12    that it is appropriate for the Court to just simply take a

13    snapshot of any particular day in determining the

14    reasonableness and the fairness of the proposed plan.  In

15    fact, it is a market which will vary, and even at its peak

16    today, it's clear from the valuation that's been introduced

17    into evidence, and fully vetted on the witness stand, that

18    equity is simply far, far short of any recovery from this

19    Debtor.  And accordingly, I do overrule the objections, and I

20    will confirm the plan.  And I know that we have a

21    stipulation, too, for me to consider in conjunction with the

22    decision to confirm, and I'm pleased to do so.

23              MR. WAITE: Thank you, Your Honor.  With respect to

24    the stipulation, I think we walked through the terms of that

25    earlier.